

# N THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | |
| | § | Civil Action No. 4:24-cv-02001 |
| CONVERGEONE HOLDINGS, INC., et al., [1] | § | |
| | § | Bankruptcy Case No. 24-90194 |
| | § | |
| Debtors. | § | |
| | § | |
| Ad Hoc Group of Excluded Lenders, | § | |
| | § | |
| Appellant. | §§ | |
| | § | |

## APPELLANT AD HOC GROUP OF EXCLUDED LENDERS'
## EMERGENCY MOTION FOR A STAY PENDING APPEAL,
## AN INTERIM STAY, AND CERTIFICATION TO THE COURT OF APPEALS

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................... 5

    A.   The Debtors .................................................................................................................. 5

    B.   The Exclusive Investment Opportunities ................................................................... 5

    C.   Impact on Excluded Lenders ...................................................................................... 6

    D.   Plan Confirmation ....................................................................................................... 7

ARGUMENT ......................................................................................................................... 8

I.      THE COURT SHOULD STAY THE CONFIRMATION ORDER PENDING THE
       OUTCOME OF THE EXCLUDED LENDERS' APPEAL. .......................................... 8

    A.   Moving in the Bankruptcy Court Would Be Impractical. ......................................... 9

    B.   The Excluded Lenders Satisfy the Criteria for a Stay. .............................................. 9

       1.   The Excluded Lenders Are Likely to Succeed on this Appeal. ................................. 9

       2.   The Excluded Lenders Face the Possibility of Irreparable Harm Absent a Stay. ...... 16

       3.   The Balance of Harms and the Public Interest Favor a Stay. .................................... 17

II.    THE COURT SHOULD ENTER AN INTERIM STAY OF THE CONFIRMATION
       ORDER DURING THE PENDENCY OF THIS MOTION. ......................................... 18

III.   THIS APPEAL SHOULD BE CERTIFIED TO THE FIFTH CIRCUIT ........................ 19

CONCLUSION ..................................................................................................................... 20

4894-5194-5153

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 473 W. End Realty Corp.*,
   507 B.R. 496 (Bankr. S.D.N.Y. 2014) ...................................................................10

*In re Am.-CV Station Group, Inc.*,
   56 F.4th 1302 (11th Cir. 2023) ....................................................................12, 13

*Arnold v. Garlock, Inc.*,
   278 F.3d 426 (5th Cir. 2001) ..........................................................................8

*Bank of America National Trust & Savings Association v. 203 N. LaSalle St.*
   *Partnership*,
   526 U.S. 434 (1999)................................................................................... *passim*

*In re BGI, Inc.*,
   504 B.R. 754 (S.D.N.Y. 2014)........................................................................9

*In re Cajun Electric Power Co-op., Inc.*,
   150 F.3d 503 (5th Cir. 1998) ....................................................................15, 16

*In re Country Squire Assocs. of Carle Place, L.P.*,
   203 B.R. 182 (2d Cir. 1996) .........................................................................10

*Czyzewski v. Jevic Holding Corp.*,
   580 U.S. 451 (2017)...................................................................................18

*Detroit Free Press, Inc. v. Ashcroft*,
   No. 02-1437, 2002 WL 1332827 (6th Cir. Apr. 10, 2002) (per curiam) ................19

*In re Gen. Motors Corp.*,
   409 B.R. 24 (Bankr. S.D.N.Y. 2009).................................................................17

*In re Herrera*,
   No. 09-52974-C, 2010 WL 148182 (Bankr. W.D. Tex. Jan. 8, 2010) ....................17

*In re Javier Estrada, Inc.*,
   Civil Action No. L-10-13, 2010 WL 1416778 (S.D. Tex. Apr. 5, 2010) ................8

*In re Mem'l Prod. Partners LP*,
   Civil Action No. H-18-412, 2018 WL 10593659 (S.D. Tex. Oct. 16, 2018) ...........8

*Millennium Dental Techs., Inc. v. Fotana d.d.*,
   407 F. App'x 482 (Fed. Cir. 2011) (per curiam) ...............................................19

4894-5194-5153

*In re Ondova Ltd. Co.*,
620 F. App'x 290 (5th Cir. 2015) (per curiam) ...................................................19

*In re Pac. Lumber Co.*,
584 F.3d 229 (5th Cir. 2009) ...............................................................................17

*Rio Grande Cmty. Health Ctr., Inc. v. Armendariz*,
792 F.3d 229 (1st Cir. 2015) (per curiam) ..........................................................19

*In re S. Savings Assoc.*,
820 F.2d 700 (5th Cir. 1985) .................................................................................8

*Weber v. U.S. Trustee*,
484 F.3d 154 (2d Cir. 2007) ...........................................................................19, 20

**Statutes**

11 U.S.C. § 1123(a)(4) .................................................................................... *passim*

11 U.S.C. § 1123(a)(4) ...........................................................................................14

11 U.S.C. § 1126(g) .........................................................................................12, 13

11 U.S.C. § 1129 .................................................................................7, 11, 12, 14

11 U.S.C. § 1129(a)(1) ...........................................................................................14

11 U.S.C. § 1129(b)(2) .....................................................................................11, 12

11 U.S.C. § 1129(b)(2)(B)(ii) ...............................................................................3, 4

28 U.S.C. § 158(d) ...........................................................................................19, 20

28 U.S.C. § 158(d)(2)(A) .......................................................................................19

**Other Authorities**

10 Alan N. Resnick & Henry J. Sommer. *Collier on Bankruptcy* ...................................9

Fed. R. Bankr. P. 3019(a) .......................................................................................12

Fed. R. Bankr. P. 3020(e) .............................................................................2, 4, 7, 9

Fed. R. Bankr. P. 8007(a)(1) .....................................................................................9

Fed. R. Bankr. P. 8007(b)(2)(A) ...............................................................................9

Merriam-Webster.com Dictionary, https://www.merriam-
webster.com/dictionary/for (last visited May 25, 2024) .....................................12

4894-5194-5153

Appellant the Ad Hoc Group of Excluded Lenders (the "Excluded Lenders") respectfully submits this emergency motion for an interim stay and a stay pending its appeal of the bankruptcy court's findings of fact, conclusions of law, and order (the "Confirmation Order," Bk. Docket No. 396, App. 000001–65) confirming the chapter 11 plan of reorganization (the "Plan," Bk. Docket No. 27, App. 000066–136) of ConvergeOne Holdings, Inc. and its debtor affiliates (collectively, the "Debtors").[2] The Excluded Lenders also ask this Court to certify the appeal to the Fifth Circuit.[3]

## PRELIMINARY STATEMENT

The Debtors' Plan provides certain Class 3 members with enhanced recoveries at the expense of other class members. Specifically, the Debtors' Plan offered only certain first-lien lenders in Class 3 (the "Majority Lenders") and its private equity sponsor (the "Insider") the opportunity to purchase steeply discounted equity in the reorganized company resulting in those favored parties receiving millions in enhanced recovery under the Plan. The Excluded Lenders were deprived of the same investment opportunity to purchase discounted equity. As a result, the recovery of the Majority Lenders and Insider greatly exceeded the recovery of the Excluded Lenders—by more than 30%—even though they were all members of the same class under the Plan.

The Bankruptcy Code forbids debtors from discriminating among similarly situated creditors in this manner. *See* 11 U.S.C. § 1123(a)(4) ("[A] plan shall . . . provide the same treatment for each claim or interest of a particular class"). The Debtors effectively bought the

---

[2] References herein to "App." are to the accompanying *Appendix in Support of Ad Hoc Group of Excluded Lenders' Motion for Stay Pending Appeal, an Interim Appeal, and Certification to the Court of Appeals*, filed contemporaneously herewith.

[3] The Excluded Lenders are identified in the *Supplemental Verified Statement of the Ad Hoc Group of Excluded Lenders Pursuant to Bankruptcy Rule 2019* [Bk. Docket No. 233].

votes they needed for the Plan by siphoning value from the Excluded Lenders to the Majority Lenders and Insider. Under the Supreme Court's decision in *Bank of America National Trust & Savings Association v. 203 N. LaSalle St. Partnership*, 526 U.S. 434 (1999), an exclusive investment opportunity is a plan distribution of property on account of a claim unless the investment opportunity is exposed to market test.

The Excluded Lenders promptly appealed from the Confirmation Order and now move this Court to stay the Confirmation Order pending the outcome of that appeal. The Debtors will almost certainly consummate the Plan within a matter of days given that they moved for expedition below and then convinced the bankruptcy court to waive the automatic 14-day stay of confirmation orders. *See* Fed. R. Bankr. P. 3020(e). Although the Excluded Lenders do not believe that their appeal will be equitably moot following consummation because this Court can fashion tailored relief on appeal, they are moving for a stay out of an abundance of caution to preserve their appellate rights and avoid any possibility of equitable mootness. Given the impending consummation, the Excluded Lenders request that the Court issue a temporary interim stay until the Court has had an adequate opportunity to consider and rule on this motion.

A stay pending appeal is warranted because all the traditional four factors weigh in the Excluded Lenders' favor. *First*, they are exceedingly likely to succeed on appeal because the Plan provides preferential treatment to certain members of Class 3 at the expense of others. The following facts are undisputed:

(a)     the Majority Lenders, the Insider and the Excluded Lenders each hold first-lien Claims in Class 3;

(b)     the Plan provides only the Majority Lenders and Insider (and not the Excluded Lenders) with the exclusive investment opportunity to buy millions of dollars of steeply discounted equity of the reorganized company as part of a separate so-called backstop agreement;

2

(c) the opportunity to buy discounted equity was not market tested, but was instead reserved under the Plan exclusively for the Majority Lenders and Insider; and

(d) the investment opportunity under the Plan allows the Majority Lenders and Insider to recover roughly 31% more for their First Lien Claims relative to the recovery of the Excluded Lenders.

The central question in this case is causation: whether the Plan's grant of an exclusive investment opportunity to buy equity was "treatment for" the Majority Lenders' and Insider's claims within the meaning of 11 U.S.C. § 1123(a)(4), or consideration for a separate commitment. The Supreme Court answered that question in *LaSalle*. There, the Supreme Court (like the bankruptcy court here) had to determine whether a plan's grant of an exclusive investment opportunity to buy reorganized equity was treatment for a stakeholder's claim or interest, or separate consideration for the stakeholder's commitment to buy new equity. There (like here), the debtor argued that stakeholder was receiving new equity on account of a new cash infusion and not on account of its existing interest. The Supreme Court held that an investment opportunity to buy new equity is "property" (as distinct from the new equity itself) and that the investment opportunity is, as a matter of law, a distribution on account of the interest unless there is a market test.

Despite *LaSalle*, the bankruptcy court held that the investment opportunity exclusively offered to the Majority Lenders was *not* treatment for their claims but separate consideration for their commitment to buy discounted equity under the backstop agreement. In so ruling, the bankruptcy court noted that in *LaSalle*, the Supreme Court was interpreting § 1129(b)(2)(B)(ii), not § 1123(a)(4). While that is factually accurate, it is a distinction without a difference because the operative language of the two provisions is nearly identical and the issues evaluated under each statute are substantively the same. Section 1129(b)(2)(B)(ii) permits confirmation over a senior

3

creditors' objection so long as a junior creditor or shareholder does not receive "property" under a plan "on account of" their claim or interest. The causation questions in §§ 1129(B)(2)(B)(ii) and 1123(a)(4) are identical—namely, as applied here, is the Plan providing a stakeholder with property "*on account of*" (§1129(b)(2)(B)(ii)'s language) or "*for*" (§ 1123(a)(4)'s language) its claim or interest. The bankruptcy court's decision to distinguish *LaSalle* is flawed and is reversable error.

The Debtors had an option: Either give all Class 3 members the same opportunity to buy discounted reorganized stock or expose the investment opportunity to a market test. They did neither. Accordingly, the Plan violates § 1123(a)(4), and the bankruptcy court should have denied confirmation.

*Second*, the Excluded Lenders may be irreparably harmed absent a stay. The Debtors have made it clear that they seek to exit bankruptcy as quickly as possible and will move to consummate the Plan in a matter of days. That is particularly likely given that the Debtors sought, and the bankruptcy court granted (over the Excluded Lenders' objection), a waiver of Bankruptcy Rule 3020(e)'s 14-day stay of confirmation orders. If the Plan is consummated before the appeal is resolved (which is a near certainty), there is some risk that the appeal will be deemed equitably moot. While the Court can fashion appropriate appellate relief to avoid equitable mootness, the Excluded Lenders are moving for a stay out of an abundance of causation to preserve their appellate rights, which could be irreparably harmed without a stay.

*Third*, any harm to the Debtors from a stay would be minimal and would not justify denying the requested relief. In fact, any potential impact on the Debtors of delaying Plan consummation could easily be rectified to avoid alleged harm or damage to the Debtors by simply modifying the Plan to provide for equal treatment of all Class 3 claims.

4894-5194-5153

*Fourth*, it will serve the public interest to ensure that the important questions raised in this appeal are resolved by this Court without any risk of the appeal being dismissed on mootness grounds.

## BACKGROUND

### A.     The Debtors

The Debtors are a global information technology services company that provide connected human experiences by working with their channel partners, delivering IT services, and developing and commercializing their own technology products. The Debtors faced liquidity challenges due to a highly leveraged capital structure that became unsustainable.

Before filing their chapter 11 cases, the Debtors privately negotiated the terms of a proposed restructuring with a select group of creditors, including the Insider, who collectively hold approximately 81% of the Debtors' first-lien claims.[4] The Excluded Lenders sought to participate in such negotiations, but were denied.[5]

### B.     The Exclusive Investment Opportunities

The Plan provides that the Debtor will raise $245 million to fund Plan distributions and provide working capital of the reorganized business. Plan at 6 (art. I.A.51-52), 16 (art. I.A.167). Under the Plan, the Debtors will raise the $245 million by selling reorganized equity at a 35% discount to its assumed value under the Plan (the "Equity Rights Offering"). Plan at 12 (art. I.A.130). The Plan provides that the reorganized equity is worth roughly $434 million ("Plan Value"). The Equity Rights Offer has four parts:

---

[4] In the Plan, all Holders of First Lien Claims are classified together in Class 3. Plan at 26 (art. III.C.3).

[5] May 22, 2024 Hr'g Audio [Bk. Docket No. 388] at 27:30 to 31:40. The Excluded Lenders are obtaining a transcription of the confirmation hearings on an expedited basis.

4894-5194-5153

*Exclusive Equity Allocation*.  The Plan provides that Debtors will raise $86 million of the $245 million by selling discounted equity to a subset of the Majority Lenders and the Insider.  This is sometimes referred to as the "Direct Allocation" or "Stated Holdback."  *See* Plan at 6 (arts. I.A.51–52), App. 000075.  These shares are worth $132 million at Plan Value.

*Open Equity Allocation*.  The Plan further provides that Debtors will raise the remaining $159 million of the $245 million by offering to sell discounted equity to all holders of Class 3 claims on a *pro rata* basis.  This is the so-called "Open Allocation."  *See* Plan at 16–17 (arts. I.A.165–167, 171), 27 (art. III.C.3.(c)), App. 000085–86, 96.  In lieu of participating in the Open Equity Allocation, Class 3 members can elect to recover in the form of a take-back note (the "Take Back Note") worth 20% of their claims.  *See* Plan at 18 (art. I.A.189), 27 (art. III.C.3.(c)), App. 000087, 96.  The Excluded Lenders have no objection to the Open Equity Allocation because all Class 3 claimants are treated equally.

*Backstop Investment Opportunity*.  The Plan provides that a subset of the Majority Lenders and the Insider have the investment opportunity to purchase any discounted equity that is not sold in the open equity allocation to Class 3.  This is the so-called Backstop Commitment.  *See* Plan at 3 (art. I.A.16), App. 000072.  The maximum amount of equity that might go unsold in the Open Equity Allocation was 19% of the Class 3 claims (or $30 million of the $160 million sought to be raised) because the Majority Lenders and Insider who hold 81% of those claims had separately promised to purchase their portion of shares in the Open Equity Allocation.[6]

*Put Option Premium*.  Finally, the Plan provides that a subset of the Majority Lenders and the Insider will receive a backstop fee in the form of equity worth $37.7 million at Plan Value.  *See* Plan at 145.  This is the so-called "Put Option Premium." *See* Plan at 14 (art. I.A.145), App. 000083; Equity Rights Offering Term Sheet attached to Restructuring Term Sheet, App. 000252–257 (definition at App. 000255).

## C.     Impact on Excluded Lenders

It is undisputed that the Plan provides for Class 3 members to recover approximately 20% to 24% of their First Lien Claims.  The 4% difference depends on whether they opt to participate in the Open Equity Allocation or the Take-Back Note.  *See* Plan at 27 (art. III.C.3.(c)), App. 000096; Lall Decl. ¶ 10 [Bk. Docket No. 340], App. 000268.[7]

---

[6] *See* Restructuring Support Agreement ("RSA") § 4.02(a)(ii) (providing that each Consenting Stakeholder (which includes the each Holder of First Lien Claims party to the RSA) "elect the Rights Offering Rights and Takeback Loan Recovery Option (if applicable to such Party) . . . ."), App. 000154–55.

[7] The Lall Declaration was admitted into evidence without objection or cross examination.

4894-5194-5153

It is also undisputed that the Direct Allocation, Backstop Investment Opportunity, and the Put Option Premium (collectively, the "Exclusive Investment Opportunities") allows the Majority Lenders and the Insider to recover roughly **31% more** for their First Lien Claims relative to the recovery of the Excluded Lenders. *See* Lall Decl. ¶ 11, App. 000268. Accordingly, the Majority Lenders and Insider stand to receive a significantly higher enhancement over the recovery provided to the Excluded Lenders even though all such creditors are members of Class 3.

### D. Plan Confirmation

The Excluded Lenders objected to the Plan, arguing that the unequal treatment of Class 3 members violates § 1123(a)(4). The Excluded Lenders argued that because the Majority Lenders and the Insider (but not the Excluded Lenders) were given the Exclusive Investment Opportunities, the Majority Lenders and Insider received preferential treatment. In support, the Excluded Lenders cited *Bank of America National Trust & Savings Association v. 203 N. LaSalle St. Partnership*, 526 U.S. 434 (1999), where the Supreme Court held that, in the bankruptcy context, an investment opportunity that is not market tested is property offered to a stakeholder on account of its claim or interest. The Excluded Lenders also opposed the Debtors' request for a waiver of the 14-day stay of the Confirmation Order provided in Bankruptcy Rule 3020(e).

At a hybrid virtual hearing held on May 23, the bankruptcy court orally overruled the Excluded Lenders' objections to the Plan and waiver of the 14-day stay.[8] The court largely ducked the Excluded Lenders' *LaSalle* argument, holding that *LaSalle* applies only to questions under § 1129—not § 1123(a)(4)—even though the two provisions have nearly identical language.[9] The court also found that the Exclusive Investment Opportunities were given as consideration for the

---

[8] May 23, 2024 Hr'g Audio [Bk. Docket No. 394] at 10:35, 37:35.

[9] *Id.* 28:15-32:17.

4894-5194-5153

Majority Lenders' agreement to purchase any unsold shares in the Open Equity Allocation, not on account of their claims.

The Excluded Lenders attempted to move orally for a stay of the Confirmation Order pending appeal, but its counsel's audio at the hybrid virtual hearing was left muted by the bankruptcy court. Later that evening, the bankruptcy court entered the Confirmation Order. The following day, the Excluded Lenders filed their notice of appeal, as amended on May 25, 2024.

## ARGUMENT

### I. THE COURT SHOULD STAY THE CONFIRMATION ORDER PENDING THE OUTCOME OF THE EXCLUDED LENDERS' APPEAL.

This Court weighs four factors when determining whether to stay a bankruptcy order pending appeal: "(1) a likelihood of success on the merits, or, if a serious legal question is involved, a substantial case on the merits and equities weighing heavily in favor of granting the stay; (2) irreparable injury; (3) that the stay will not harm other parties; and (4) that the stay would serve the public interest." *In re Javier Estrada, Inc.*, Civil Action No. L-10-13, 2010 WL 1416778, at *1 (S.D. Tex. Apr. 5, 2010) (citing *Arnold v. Garlock, Inc.*, 278 F.3d 426, 438-42 (5th Cir. 2001)). "While each part must be met, the appellant need not always show a probability of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *In re Mem'l Prod. Partners LP*, Civil Action No. H-18-412, 2018 WL 10593659, at *1 (S.D. Tex. Oct. 16, 2018). When evaluating likelihood of success, this Court reviews a bankruptcy court's conclusions of law *de novo*. *In re S. Savings Assoc.*, 820 F.2d 700, 711 (5th Cir. 1985).

Here, all four factors militate strongly in favor of a stay.

8

## A. Moving in the Bankruptcy Court Would Be Impractical.

As a threshold matter, the Excluded Lenders are properly seeking a stay initially at this Court. Ordinarily, a party seeking to stay a bankruptcy court order moves first at the bankruptcy court. Fed. R. Bankr. P. 8007(a)(1). A party can move initially at the district court, however, if "moving first in the bankruptcy court would be impracticable." Fed. R. Bankr. P. 8007(b)(2)(A). Impracticability in this context requires "a showing that the bankruptcy judge is unavailable, or that, to be effective, relief must be immediate, and that based upon what occurred in the bankruptcy court, relief from it is improbable." *In re BGI, Inc.*, 504 B.R. 754, 761 (S.D.N.Y. 2014) (quoting 10 Alan N. Resnick & Henry J. Sommer. *Collier on Bankruptcy* ¶ 8005.111 (16th ed. 2013)).

Here, the Excluded Lenders tried to move for stay at the May 23 confirmation hearing, but their counsel's line was muted, and the bankruptcy court adjourned the hearing without un-muting the phone lines; thus, no oral motion was possible. And filing a written motion for stay was and is impractical. The Debtors' conduct, including their filing of a prepackaged Plan and seeking an expedited confirmation schedule, shows that they intend to consummate the Plan immediately. The bankruptcy court waived the 14-day stay provided by Bankruptcy Rule 3020(e), which means that the Plan can be consummated literally at any moment. *See* Confirmation Order ¶ 143. Under those circumstances, it would have been impractical for the Excluded Lenders to move first at the bankruptcy court because, by the time it decided the motion, the Plan will likely be consummated, rendering this motion moot. Given that the bankruptcy court waived the 14-day automatic stay, it is extremely improbable that it would have granted the Excluded Lenders a stay in any event.

## B. The Excluded Lenders Satisfy the Criteria for a Stay.

### 1. The Excluded Lenders Are Likely to Succeed on this Appeal.

This Court should grant a stay primarily because the Excluded Lenders are likely to succeed on their appeal. The Plan plainly violates § 1123(a)(4) by favoring claims held by some

9

members of Class 3. The bankruptcy court should not have confirmed the Plan under those circumstances.

"The 'substantial possibility of success' test is considered an intermediate level between 'possible' and 'probable' and is 'intended to eliminate frivolous appeals.'" *In re 473 W. End Realty Corp.*, 507 B.R. 496, 501 (Bankr. S.D.N.Y. 2014) (citing *In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182, 184 (2d Cir. 1996)). The Excluded Lenders' appeal is far from frivolous. To the contrary, it raises a serious legal question that is supported by Supreme Court precedent.

Section 1123(a)(4) of the Bankruptcy Code provides that "a plan shall provide the same treatment for each claim . . . of a particular class." 11 U.S.C. § 1123(a)(4). The Plan indisputably provides the Majority Lenders and Insider with a substantially higher recovery than the Excluded Lenders, who are members of the same class. On its face, the Plan violates § 1123(a)(4).

The Debtors tried to justify that discrimination by arguing that the Majority Lenders and Insider received preferential treatment not for their claims, but for agreeing to purchase any unsold shares in the Open Equity Allocation. But the Plan provides only the Majority Lenders (and not the Excluded Lenders) with the Exclusive Investment Opportunities, thus giving them the right to buy millions of dollars of steeply discounted equity of the reorganized Debtors. That opportunity to buy discounted equity was not market tested but instead was reserved under the Plan exclusively for the Majority Lenders. The Exclusive Investment Opportunities are part of the Plan's treatment for the Majority Lenders' claims and results in the Plan treating their claims much more favorably than the claims of the Excluded Lenders.

That is the teaching of *LaSalle*. There, the Supreme Court had to determine whether a chapter 11 plan's grant of an exclusive investment opportunity to buy reorganized equity was

either: (i) treatment for a stakeholders' claim or interest or (*ii*) separate consideration for the stakeholder's commitment to buy new equity. *LaSalle*, 526 U.S. at 451. It held that the investment opportunity to buy new equity is "property" (as distinct from the new equity itself) and that the investment opportunity is, as a matter of law, a distribution on account of the interest unless there is a market test. *Id.* at 455-57.

That same principle applies here. The Exclusive Investment Opportunities were not market tested. Instead, they were offered exclusively to the Majority Lenders and the Insider. Under *LaSalle*, the exclusive investment opportunity is property that was offered on account of the Majority Lenders' and Insider's claims.

The bankruptcy court held that *LaSalle* does not apply for five reasons, none of which withstands scrutiny. *First*, the court tried to distinguish *LaSalle* on the basis that it addressed § 1129, not § 1123(a)(4). But that is irrelevant. The central issue in *LaSalle* was whether an exclusive investment opportunity provided under a plan was "on account of" a claim or interest. *LaSalle*, 526 U.S. at 451. *LaSalle* thus concerned the causal link between an exclusive investment opportunity provided under a plan and a holder's claim or interest. *Id.* at 451 ("the better reading of subsection [1129](b)(2)(B)(ii) recognizes that a causal relationship between holding the prior claim or interest and receiving or retaining property is what activates [§1129(b)(2)]"). That is the same question presented here.

The bankruptcy court noted that § 1129 uses the phrase "on account of [a] claim or interest," whereas § 1123(a)(4) requires "the same treatment *for* each claim or interest of a particular class." 11 U.S.C. § 1123(a)(4) (emphasis added). But that is a distinction without a difference because "on account of" and "for" mean the same thing. The Supreme Court construed "on account of" to mean "because of." *LaSalle*, 526 U.S. at 450. Justice Thomas, in his

concurrence, adopted the same construction. *Id.* at 460 (Thomas, J., concurring) ("This phrase obviously denotes some type of causal relationship between the junior interest and the property received or retained—such an interpretation comports with common understandings of the phrase."). The term "for" has precisely that same meaning. *See For Definition*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/for (last visited May 25, 2024) (defining "for" to mean "because of").

Indeed, the Debtors recognized the interchangeability of the terms "on account of" (in § 1129) and "for" (in § 1123(a)(4)) in their brief in support of confirmation of the Plan: "[T]he law is clear that creditors can receive value ***on account of*** new-money commitments that is not provided to all creditors in a class. The only requirement is that this value be provided ***in exchange for*** the new-money commitment."[10] There was thus no basis for the bankruptcy court to treat the word "for" in § 1123(a)(4) differently from how the Supreme Court construed "on account of" in § 1129.

*Second*, the bankruptcy court was wrong that *LaSalle* is limited to "cramdown" cases under § 1129(b)(2). Nothing about the reasoning of *Lasalle* suggests such a limitation. Indeed, the Eleventh Circuit applied *LaSalle*'s reasoning in the context of determining whether a class of shareholders were deemed to reject a plan under § 1126(g). *See In re Am.-CV Station Group, Inc.*, 56 F.4th 1302 (11th Cir. 2023). In that case, the plan provided four shareholders with the exclusive right to buy new equity. *Id.* at 1306. The plan was modified to provide only one of the four shareholders the exclusive right to buy new equity. *Id.* at 1306–07. The excluded shareholders, who were stripped of their exclusive right to buy equity, objected to confirmation of the plan arguing that they were entitled to disclosure of the plan modification and a resolicitation of votes

---

[10] Bk. Docket No. 324, at ¶ 7 (emphasis added).

4894-5194-5153

on the modified plan under Bankruptcy Rule 3019(a) because the modification "materially and adversely affects" the treatment of a class of claim or interest holders. *In re Am.-CV Station Group*, 56 F.4th at 1305, 1307-08, 1311. The bankruptcy court determined that objecting shareholders were deemed to have voted to reject the plan and, therefore, were not entitled to additional disclosure or another opportunity to vote. *Id.* at 1307. Pursuant to § 1126(g), a class of claims or interests is deemed to reject a plan if such plan does not entitle holders of claims or interests in such class to receive or retain property under the plan on account of such claims or interests. The bankruptcy court found that no votes were cast by the class of shareholders and the class was not receiving any property under the plan because it extinguished their equity interests. *Id.*

The Eleventh Circuit disagreed, holding that the shareholders were receiving property on account of their interests pursuant to the plan before it was modified—namely, they were receiving an exclusive investment right to buy equity. *Id.* 1310–11. The Eleventh Circuit noted the central issue there was causation, and *LaSalle* provided the answer to the causation question:

> [I]f the unmodified plans did entitle the Class 3 interest holders to receive property on account of their pre-petition equity interests, then § 1126(g) does not apply—meaning the bankruptcy court could not deem the [excluded shareholders] to have rejected the plans. So the question is whether the [excluded shareholders] were entitled to receive or retain property under the unmodified plans on account of their interests.

> Answering that question, it turns out, is straightforward because of Supreme Court precedent. In *[LaSalle]*, the Court analyzed a similar Chapter 11 plan in which the former partners of the debtor received ownership in a reorganized partnership in exchange for capital contributions.

*Id.* at 1309–10 (citing *LaSalle*, 526 U.S. at 440). The Eleventh Circuit further stated on "substantive grounds, there were serious problems" with the modified plan under § 1123(a)(4). *Id.* at 1312. The modified plan could not be confirmed, according to the Eleventh Circuit, because it

violated 1123(a)(4). *Id.* By stripping the exclusive right to buy equity from three of the four shareholders in the class, "one member received property under the plan and the others received nothing. That was improper. All modifications, including this one, must comply with § 1123." *Id.* at 1312. "Had the bankruptcy court recognized that the Class 3 interest holders received property under the plans, it could not have granted the modification or confirmed the modified plans because the [favored shareholder group] was treated more favorably than the rest of Class 3. *See* 11 U.S.C. §§ 1129(a)(1), 1123(a)(4)." *Id.* The Eleventh Circuit's decision shows that *LaSalle* is not limited to cramdown cases under § 1129.

Third, the bankruptcy court confused the reorganized equity offered under the Plan with the exclusive opportunity to purchase that equity. The bankruptcy court stated, "[e]quity is not being offered . . . for nothing. Here, the participating parties are putting new money and backstopping a deal. We don't have a LaSalle problem here."[11] However, the issue in this case is that the Majority Lenders and Insider are being provided with an exclusive investment opportunity. Under LaSalle, that opportunity, in and of itself, is a separate property interest. 526 U.S. at 455 ("At the moment of the plan's approval the Debtor's partners necessarily enjoyed an exclusive opportunity . . . . This opportunity should, first of all, be treated as an item of property in its own right." (citations omitted) (emphasis added)). The bankruptcy court failed to recognize this Exclusive Investment Opportunities were being provided to the Majority Lenders on account of their Class 3 claims.

*Fourth*, the bankruptcy court incorrectly determined that an alternate financing proposal made by the Excluded Lenders shortly before the confirmation hearing, which was rejected by the Debtors, constituted a "market test" for purposes of *LaSalle*. There was no market test. The

---

[11] May 23, 2024 Hr'g Audio [Bk. Docket No. 394] at 29:40.

4894-5194-5153

alternate financing proposal was made after the cake was already baked: an RSA for a pre-packaged Plan had already been agreed to, the RSA had a pre-agreed speedy timeline for the conclusion of the chapter 11 case, votes for the pre-packaged Plan had already been solicited, and DIP financing was already in place.  A special committee of the Debtors' board (according to the testimony at trial) rejected the proposal not based on its economic terms, but rather because the alternate proposal lacked support from the Majority Lenders and the Insider.[12]  Accordingly, pursuant to the testimony, if the Debtors were to pivot to the Excluded Lenders' alternative financial proposal, the Plan could not be confirmed, the Debtors' stay in chapter 11 would be extended, and they would incur expenses for which they had not budgeted.[13]  All of that speaks only to whether the alternate financing proposal was feasible, not whether the economic terms were superior to what the Debtors exclusively offered to the Majority Lenders.  That "offer and rejection" is not a "market test" under *LaSalle*.

Instead, *LaSalle* demands a bona fide market test (or a lifting of the exclusive period contained in § 1121(b)) thereby exposing the investment opportunity to third-party competition to determine whether others would be willing to buy discounted equity on terms more favorable to the debtor than those offered to the exclusive group.  *LaSalle*, 526 U.S. at 457 ("Under a plan granting an exclusive right, making no provision for competing bids or competing plans, any determination that the price was top dollar would necessarily be made by a judge in bankruptcy court, whereas the best way to determine value is exposure to a market").  It is undisputed that did not happen here.

---

[12] May 22, 2024 Hr'g Audio [Bk. Docket No. 387] at 3:03-:20.

[13] *Id.* 3:20-:57.

15

*Fifth*, the bankruptcy court incorrectly determined that the Fifth Circuit had addressed the issue before it, citing *In re Cajun Electric Power Co-op., Inc*., 150 F.3d 503, 518–19 (5th Cir. 1998). But *Cajun Electric* (which did not involve an exclusive investment opportunity) did not address *LaSalle* because the 1998 *Cajun Electric* decision was decided *a year before* the 1999 *LaSalle* decision. *Cajun Electric* is also factually distinguishable. Cajun was an electric utility cooperative, with 12 members who were also power purchasers. The plan at issue was the product of a robust auction during the case that led to the submission of three competing chapter 11 plans. *Id.* at 507-08. Each plan provided for the reimbursement of legal expenses of a committee of certain members ("CCM"). *Id.* 507, 518-19. The district court concluded that the plan's payment of legal fees of CCM's members constituted discriminatory treatment relative to stakeholders in the same class in violation of § 1123(a)(4). *Id.* at 512. The Fifth Circuit disagreed and found no violation of § 1123(a)(4) because (a) the reimbursement of the CCM's members' legal fees was from a third party, <u>not</u> the debtor and (ii) "as the bankruptcy court found, the payments were not made in satisfaction of the CCM members' claims against Cajun, but rather as reimbursement for plan and litigation expenses incurred in the bankruptcy case." *Id.* at 518-19. *Cajun Electric* did not involve a plan's grant of an exclusive investment opportunity (unlike here), dealt with payments from a third party (unlike here), and did not consider *LaSalle*, which had not yet been decided. Thus, reliance on *Cajun Electric* is misplaced.

### 2. The Excluded Lenders Face the Possibility of Irreparable Harm Absent a Stay.

The Excluded Lenders seek a stay to preserve their appellate rights by eliminating any possibility that their appeal will be deemed equitably moot. To be clear, this appeal will not be equitably moot even if the Plan is consummated because the Court can fashion appellate relief that would not require unwinding the Plan. The Excluded Lenders nevertheless bring this Motion to

16

diligently preserve their appellate rights and to remove any doubt that the appeal will be deemed equitably moot. As discussed above, it is nearly certain that the Plan will be consummated before this appeal is resolved.

The possibility of equitable mootness can support a finding of irreparable harm where, as here, it is coupled with a showing of likelihood of success on the merits. *In re Herrera*, No. 09-52974-C, 2010 WL 148182, at *3 (Bankr. W.D. Tex. Jan. 8, 2010); *see also In re Gen. Motors Corp.*, 409 B.R. 24, 31 (Bankr. S.D.N.Y. 2009) ("[T]he threat of equitable mootness is enough to satisfy the requirement of showing *some* irreparable injury—enough to get on the scoreboard with respect to this issue."). Although it has not squarely addressed the issue, the Fifth Circuit has noted that the concept of equitable mootness may bear on stays pending appeal. *In re Pac. Lumber Co.*, 584 F.3d 229, 242 (5th Cir. 2009) ("Because the bankruptcy court denied a stay pending appeal, this court faced a *fait accompli*, a plan that was substantially consummated within weeks of confirmation. As we have noted, plan consummation may often be dispositive of the question of equitable mootness."). This Court should follow *Herrera*'s "cautious approach" and grant a stay to prevent any possibility that this appeal could be deemed equitably moot and to avoid irreparable harm to the Excluded Lenders' appellate rights. *Herrera*, 2010 WL 148182, at *3 ("Given the Fifth Circuit's recent observations regarding equitable mootness in the context of stays pending appeal, *see In re Pac. Lumber*, 584 F.3d at 242, this court is inclined to follow Judge Gerber's cautious approach.").

### 3. *The Balance of Harms and the Public Interest Favor a Stay.*

To ensure the Plan's swift confirmation, the Debtors argued below that delaying the Plan's effective date would result in a parade of horribles, including harm to their business. *See* Bk. Docket No. 324, ¶ 44. But hypothetical harms cannot justify implementation of a Plan that violates the Bankruptcy Code. In any event, any harm can readily be resolved by modifying the Plan to

17

allow for *pro rata* treatment of Class 3 creditors.  That would require a shift of only 11% of the reorganized Debtors' equity, equating to approximately $22 million, with no impact on the Debtors' overall restructuring.  The fix is purely a pro rata reallocation of equity to ensure equal treatment for Class 3.  The Debtors' contention that they need to immediately consummate the Plan is irrational because a simple tweak to the Plan to treat Class 3 creditors equally would not disrupt the broader restructuring and would cause no harm to the reorganized business, its employees, or its trading partners, while also bringing the Plan into compliance with the Bankruptcy Code.

A stay is also in the public interest.  If the Plan is permitted to become effective, it will signal to chapter 11 debtors that they need not treat similarly situated creditors similarly, at least not in this jurisdiction.  In any case, if the Debtors promises to the Majority Lenders and the Insider made in the RSA cannot be achieved without violating the equal treatment rule, it is the RSA and the Plan that must give way, not the rule.  As the Supreme Court has made clear, there are no "rare case" exceptions that allow plan distributions in violation of the Bankruptcy Code.  *See, e.g., Czyzewski v. Jevic Holding Corp*., 580 U.S. 451, 470 (2017) (courts lack authority to approve transactions that sanction a "departure from the protections Congress granted particular classes of creditors").  A stay will also ensure that this Court can resolve the important issues raised in this appeal without mootness providing any impediment.

## II.     THE COURT SHOULD ENTER AN INTERIM STAY OF THE CONFIRMATION ORDER DURING THE PENDENCY OF THIS MOTION.

Additionally, the Excluded Lenders request that the Court issue an interim stay on an expedited basis to stay the Confirmation Order until the Court has had an opportunity to resolve this Motion.  A temporary stay is necessary to preserve the status quo, protect the Excluded Lenders' rights, and avoid potentially mooting this motion before the Court has an opportunity to

4894-5194-5153

consider it. If the Confirmation Order is not immediately stayed, the Plan may be consummated before briefing on this motion is complete. Thus, to protect the Excluded Lenders' rights, the Court should grant an interim stay to maintain the status quo pending its consideration of the motion, as other courts have done in similar situations. *See, e.g.*, *In re Ondova Ltd. Co.*, 620 F. App'x 290, 291 (5th Cir. 2015) (per curiam) (temporarily staying sale order until further order of the court); *see also Rio Grande Cmty. Health Ctr., Inc. v. Armendariz*, 792 F.3d 229, 231 (1st Cir. 2015) (per curiam); *Millennium Dental Techs., Inc. v. Fotana d.d.*, 407 F. App'x 482, 483 (Fed. Cir. 2011) (per curiam); *Detroit Free Press, Inc. v. Ashcroft*, No. 02-1437, 2002 WL 1332827, at *1 (6th Cir. Apr. 10, 2002) (per curiam).

## III. THIS APPEAL SHOULD BE CERTIFIED TO THE FIFTH CIRCUIT.

Given the complex and novel legal question presented in this appeal, the Excluded Lenders further request that this Court certify their appeal of the Confirmation Order to the Fifth Circuit for immediate review. Under 28 U.S.C. § 158(d), this Court may certify a bankruptcy court decision for direct appeal if it determines that any of the following criteria are met:

> (i)   the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

> (ii)  the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

28 U.S.C. § 158(d)(2)(A). "Congress determined that certification directly to the court of appeals would permit [that court] to resolve controlling legal questions expeditiously that might foster the development of coherent bankruptcy-law precedent." *Weber v. U.S. Trustee*, 484 F.3d 154, 159 (2d Cir. 2007). Section 158(d) "expressly provides that the lower court may certify that decision is susceptible of direct appeal solely because there is no governing legal precedent." *Id.*

Here, the Court should certify the appeal of the Confirmation Order to the Fifth Circuit for two reasons. *First*, *LaSalle* represents controlling authority and should have been applied here to deny confirmation of the Plan. A plan's use of a backstop agreements to disguise unequal treatment for the majority to siphon value from the minority has become commonplace in restructurings in recent years, but no appellate court in this Circuit has yet had the opportunity to opine whether such arrangements are proscribed by § 1123(a)(4) and *LaSalle*. The lower courts would greatly benefit from a reasoned decision by the Fifth Circuit on this question.

*Second*, an immediate appeal would materially advance the progress of the case by definitively resolving the treatment of the Majority Lenders/Insider and the Excluded Lenders. Given the important and unresolved legal question raised in this case, the losing party is likely to appeal to the Fifth Circuit. Certifying to the appeal for the Fifth Circuit's immediate review will therefore expedite the final resolution of this case. *See Weber*, 484 F.3d at 158 (acknowledging that if adversely affected parties might "very well fold up their tents if convinced that the ruling has the approval of the court of appeals, but will not give up until that becomes clear[,]" immediate review is advisable). If the Debtors are correct about their need for a quick exit from bankruptcy, an immediate appeal to the Fifth Circuit would serve that interest.

## **CONCLUSION**

The Excluded Lenders request (1) entry an interim stay, in form attached hereto as **Exhibit A**, staying the Confirmation Order on pending a ruling on this motion, (2) enter an order, in the form attached as **Exhibit B,** staying the Confirmation Order pending the appeal thereof and certifying this appeal to the United States Court of Appeals to the Fifth Circuit for direct appeal, and (3) grant such other and further relief as may be just and proper.

4894-5194-5153

Respectfully submitted this 28th day of May, 2024.

**GRAY REED**

By: */s/ Jason S. Brookner*
    Jason S. Brookner
    Texas Bar No. 24033684
    William N. Drabble
    Texas Bar No. 24074154
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:      jbrookner@grayreed.com
             wdrabble@grayreed.com

- and -

**PROSKAUER ROSE LLP**
    David M. Hillman (*pro hac vice*)
    Michael T. Mervis (*pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
Email:      dhillman@proskauer.com
             mmervis@proskauer.com

- and -

**PROSKAUER ROSE LLP**
    John E. Roberts (*pro hac vice* pending)
One International Place
Boston, MA 02110-2600
Telephone:  (617) 526-9600
Facsimile:  (617) 526-9899
Email:      jroberts@proskauer.com

-and-

4894-5194-5153

**PROSKAUER ROSE LLP**
Steve Y. Ma (*pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
Telephone: (310) 284-4542
Facsimile: (310) 557-2193
Email: sma@proskauer.com

**COUNSEL TO THE AD HOC GROUP
OF EXCLUDED LENDERS**

<u>**Certificate of Conference Pursuant to LR 7.1D**</u>

The undersigned hereby certifies that he conferred with Jason Zakia and Charles Koster at White & Case, counsel to the Debtors, and counsel were unable to agree on the disposition of this motion.

*/s/ Jason S. Brookner*
Jason S. Brookner

4894-5194-5153

## Certificate of Service

The undersigned hereby certifies that on the 28th day of May, 2024, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system. In addition, a copy of the foregoing was served via electronic mail on the other parties to this appeal, as set forth below.

/s/ Jason S. Brookner
Jason S. Brookner

Charles R. Koster
**WHITE & CASE LLP**
609 Main Street, Suite 2900
Houston, TX 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

Bojan Guzina
Jason N. Zakia
Andrew F. O'Neill
Erin R. Rosenberg
Blair M. Warner
Adam T. Swingle
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
Email: bojan.guzina@whitecase.com
jzakia@whitecase.com
aoneill@whitecase.com
erin.rosenberg@whitecase.com
blair.warner@whitecase.com
adam.swingle@whitecase.com

**COUNSEL TO THE DEBTORS**

John F. Higgins
Eric M. English
James A. Keefe
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, TX 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
E-mail: jhiggins@porterhedges.com
eenglish@porterhedges.com
jkeefe@porterhedges.com

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg
Keith R. Martorana
C. Lee Wilson
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Email: sgreenberg@gibsondunn.com
kmartorana@gibsondunn.com
clwilson@gibsondunn.com

**GIBSON, DUNN & CRUTCHER LLP**
Michelle Choi
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: mchoi@gibsondunn.com

**COUNSEL TO THE**
**FIRST LIEN AD HOC GROUP**

4894-5194-5153