# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: § | |
| § | Civil Action No. 4:24-cv-02001 |
| CONVERGEONE HOLDINGS, INC., et al., [1] § | |
| § | Bankruptcy Case No. 24-90194 |
| Debtors. § | |
| § | |
| Ad Hoc Group of Excluded Lenders, § | |
| § | |
| Appellant. § | |
| § | |

## APPENDIX ACCOMPANYING
## BRIEF FOR APPELLANT THE AD HOC GROUP OF EXCLUDED LENDERS

| Tab | Bankruptcy Docket No. | Appendix Page No. | Document |
|---|---|---|---|
| 1. | - | App. 001-002 | Relevant Entries in the Bankruptcy Docket |
| 2. | 1 | App. 003-034 | Voluntary Petition |
| 3. | 4 | App. 035-204 | *Declaration of Salvatore Lombardi in Support of the Debtors' Chapter 11 Petitions and First Day Relief*<br>• *Restructuring Support Agreement* at App. 357-484 |
| 4. | 26 | App. 205-508 | *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its Debtor Affiliates* |
| 5. | 27 | App. 509-579 | *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its Debtor Affiliates* |
| 6. | 233 | App. 580-584 | *Supplemental Verified Statement of the Ad Hoc Group of Excluded Lenders Pursuant to Bankruptcy Rule 2019* |
| 7. | 328 | App. 585-730 | Amended *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its* |

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

| Tab | Bankruptcy Docket No. | Appendix Page No. | Document |
|-----|----|----|----|
| | | | *Debtor Affiliates (Technical Modifications)* |
| 8. | 333 | App. 731-738 | Exhibit 48 to the Debtors' *Witness and Exhibit List for May 17, 2024 Hearing* |
| 9. | 333 | App. 739-741 | Exhibit 49 to the Debtors' *Witness and Exhibit List for May 17, 2024 Hearing* |
| 10. | 333 | App. 742-749 | Exhibit 50 to the Debtors' *Witness and Exhibit List for May 17, 2024 Hearing* |
| 11. | 340 | App. 750-839 | Amended *Declaration of Keshav Lall in Connection with Ad Hoc Group of Excluded Lenders' Objection to Confirmation of Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its Debtor Affiliates* |
| 12. | 346 | App. 840-842 | Exhibit 60 to the Excluded Lenders' *Amended Witness and Exhibit List for May 17, 2024 Hearing* |
| 13. | 346 | App. 843-844 | Exhibit 65 to the Excluded Lenders' *Amended Witness and Exhibit List for May 17, 2024 Hearing* |
| 14. | 396 | App. 845-909 | *Findings of Fact, Conclusions of Law, and Order (I) Approving the Debtors' Disclosure Statement on a Final Basis and (II) Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its Debtor Affiliates* [entered on May 23, 2024] |
| 15. | 405 | App. 910-914 | *Notice of Appeal and Statement of Election* |
| 16. | 407 | App. 915-985 | Amended *Notice of Appeal and Statement of Election* |
| 17. | 416 | App. 986-1171 | Combined Disclosure Statement and Confirmation Hearing Transcript [taken on May 22, 2024] |
| 18. | 417 | App. 1172-1198 | Oral Ruling Confirmation of Plan Transcript [taken on May 23, 2024] |

Respectfully submitted this 2nd day of August, 2024.

**GRAY REED**

By: */s/ Jason S. Brookner*
    Jason S. Brookner
    Texas Bar No. 24033684
    William N. Drabble
    Texas Bar No. 24074154
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:      jbrookner@grayreed.com
           wdrabble@grayreed.com

- and -

**PROSKAUER ROSE LLP**
    David M. Hillman (*pro hac vice*)
    Michael T. Mervis (*pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
Email:      dhillman@proskauer.com
           mmervis@proskauer.com

- and -

**PROSKAUER ROSE LLP**
    John E. Roberts (*pro hac vice* pending)
One International Place
Boston, MA 02110-2600
Telephone:  (617) 526-9600
Facsimile:  (617) 526-9899
Email:      jroberts@proskauer.com

-and-

**PROSKAUER ROSE LLP**
    Steve Y. Ma (*pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
Telephone:  (310) 284-4542
Facsimile:  (310) 557-2193
Email:      sma@proskauer.com

**COUNSEL TO THE AD HOC GROUP
OF EXCLUDED LENDERS**

3

## <u>Certificate of Service</u>

The undersigned hereby certifies that on the 2nd day of August, 2024, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system.  In addition, a copy of the foregoing was served via electronic mail on the other parties to this appeal, as set forth below.

*/s/ Jason S. Brookner*
Jason S. Brookner

Charles R. Koster
**WHITE & CASE LLP**
609 Main Street, Suite 2900
Houston, TX 77002
Telephone:   (713) 496-9700
Facsimile:    (713) 496-9701
Email:        charles.koster@whitecase.com

Bojan Guzina
Jason N. Zakia
Andrew F. O'Neill
Erin R. Rosenberg
Blair M. Warner
Adam T. Swingle
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone:   (312) 881-5400
Email:        bojan.guzina@whitecase.com
              jzakia@whitecase.com
              aoneill@whitecase.com
              erin.rosenberg@whitecase.com
              blair.warner@whitecase.com
              adam.swingle@whitecase.com

**COUNSEL TO THE DEBTORS**

John F. Higgins
Eric M. English
James A. Keefe
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, TX 77002
Telephone:   (713) 226-6000
Facsimile:    (713) 226-6248
E-mail:       jhiggins@porterhedges.com
              eenglish@porterhedges.com
              jkeefe@porterhedges.com

Scott J. Greenberg
Keith R. Martorana
C. Lee Wilson
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Telephone:   (212) 351-4000
Facsimile:    (212) 351-4035
Email:        sgreenberg@gibsondunn.com
              kmartorana@gibsondunn.com
              clwilson@gibsondunn.com

Michelle Choi
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071
Telephone:   (213) 229-7000
Facsimile:    (213) 229-7520
Email:        mchoi@gibsondunn.com

**COUNSEL TO THE**
**FIRST LIEN AD HOC GROUP**

4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CONVERGEONE HOLDINGS, INC., *et al.* | Case No. 24-90194 (CML) |
| Debtors. | (Jointly Administered) |

## RELEVANT ENTRIES IN THE BANKRUPTCY DOCKET

| Date | Docket | Description |
|---|---|---|
| 04/04/2024 | 1 (32 pgs) | Chapter 11 Voluntary Petition Non-Individual Fee Amount $1738 Filed by ConvergeOne Holdings, Inc. (Koster, Charles) (Entered: 04/04/2024) |
| 04/04/2024 | 4 (170 pgs) | Declaration re: / *Declaration of Salvatore Lombardi in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (Filed By ConvergeOne Holdings, Inc. ).(Related document(s):1 Voluntary Petition (Chapter 11)) (Koster, Charles) (Entered: 04/04/2024) |
| 04/04/2024 | 26 (304 pgs) | Disclosure Statement Filed by ConvergeOne Holdings, Inc.. (Koster, Charles) (Entered: 04/04/2024) |
| 04/04/2024 | 27 (71 pgs) | Chapter 11 Plan of Reorganization Filed by ConvergeOne Holdings, Inc.. (Koster, Charles) (Entered: 04/04/2024) |
| 05/02/2024 | 233 (5 pgs) | Statement *Supplemental Verified Statement of The Ad Hoc Group of Excluded Lenders Pursuant to Bankruptcy Rule 2019* (Filed By The Ad Hoc Group of Excluded Lenders ). (Brookner, Jason) (Entered: 05/02/2024) |
| 05/14/2024 | 328 (146 pgs; 2 docs) | Amended Chapter 11 Plan Filed by ConvergeOne Holdings, Inc.. (Related document(s):27 Chapter 11 Plan) (Attachments: # 1 Redline) (Koster, Charles) (Entered: 05/14/2024) |
| 05/15/2024 | 333 (3077 pgs; 71 docs) | Exhibit List, Witness List (Filed By ConvergeOne Holdings, Inc. ).(Related document(s):26 Disclosure Statement, 27 Chapter 11 Plan) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53 # 54 Exhibit 54 # 55 Exhibit 55 # 56 Exhibit 56 # 57 Exhibit 57 # 58 Exhibit 58 # 59 Exhibit 59 # 60 Exhibit 60 # 61 Exhibit 61 # 62 Exhibit 62 # 63 Exhibit 63 # 64 Exhibit 64 # 65 Exhibit 65 # 66 Exhibit 66 # 67 Exhibit 67 # 68 Exhibit 68 # 69 Exhibit 69 # 70 Exhibit 70) (Koster, Charles) (Entered: 05/15/2024) |

| Date | Docket | Description |
|---|---|---|
| 05/15/2024 | 340<br>(90 pgs) | Sealed Document *Amended Declaration of Keshav Lall in Connection with Ad Hoc Group of Excluded Lenders' Objection to Confirmation of Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its Debtor Affiliates* (Filed By The Ad Hoc Group of Excluded Lenders ). (Brookner, Jason) (Entered: 05/15/2024) |
| 05/16/2024 | 346<br>(650 pgs; 72 docs) | Sealed Document *The Ad Hoc Group of Excluded Lenders' Amended Witness and Exhibit List for May 17, 2024 Hearing* (Filed By The Ad Hoc Group of Excluded Lenders ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53 # 54 Exhibit 54 # 55 Exhibit 55 # 56 Exhibit 56 # 57 Exhibit 57 # 58 Exhibit 58 # 59 Exhibit 59 # 60 Exhibit 60 # 61 Exhibit 61 # 62 Exhibit 62 # 63 Exhibit 63 # 64 Exhibit 64 # 65 Exhibit 65 # 66 Exhibit 66 # 67 Exhibit 67 # 68 Exhibit 68 # 69 Exhibit 69 # 70 Exhibit 70 # 71 Exhibit 71) (Brookner, Jason) (Entered: 05/16/2024) |
| 05/23/2024 | 396<br>(65 pgs) | Findings of Fact, Conclusions of Law, and Order (I) Approving the Debtors' Disclosure Statement on a Final Basis and (II) Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates (Related document: 328 Amended Chapter 11 Plan). Signed on 5/23/2024. (zac4) (Entered: 05/23/2024) |
| 05/24/2024 | 405<br>(5 pgs) | Notice of Appeal filed. (related document(s):396 Order Approving Disclosure Statement, Order Confirming Chapter 11 Plan). Fee Amount $298. Appellant Designation due by 06/7/2024. (Brookner, Jason) (Entered: 05/24/2024) |
| 05/25/2024 | 407<br>(71 pgs) | Amended Notice of Appeal filed. (related document(s):396 Order Approving Disclosure Statement, Order Confirming Chapter 11 Plan). Fee Amount $298. Appellant Designation due by 06/10/2024. (Brookner, Jason) (Entered: 05/25/2024) |
| 05/31/2024 | 416<br>(1 pg) | Transcript RE: Combined Disclosure Statement and Confirmation Hearing held on May 22, 2024 before Judge Christopher M. Lopez. Transcript is available for viewing in the Clerk's Office. Within 21 days, parties are advised to comply with privacy requirements of Fed. R. Bank. P. 9037, ensuring that certain protected information is redacted from transcripts prior to their availability on PACER. Filed by Transcript access will be restricted through 08/29/2024. (mhen) (Entered: 05/31/2024) |
| 05/31/2024 | 417<br>(1 pg) | Transcript RE: Oral Ruling Confirmation of Plan (Via Zoom) held on May 23, 2024 before Judge Christopher M. Lopez. Transcript is available for viewing in the Clerk's Office. Within 21 days, parties are advised to comply with privacy requirements of Fed. R. Bank. P. 9037, ensuring that certain protected information is redacted from transcripts prior to their availability on PACER. Filed by Transcript access will be restricted through 08/29/2024. (mhen) (Entered: 05/31/2024) |

4890-4351-3556

**App. 002**

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

Southern _____ District of Texas _____
(State)

Case number (*If known*): _____ Chapter 11 ____

☐ Check if this is an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | ConvergeOne Holdings, Inc. |
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 8 1 _ 4 6 1 9 4 2 7 |

4. **Debtor's address**

**Principal place of business**

10900 __ Nesbitt Avenue South ____
Number     Street

_____

Bloomington _____ MN __ 55437
City                State    ZIP Code

Hennepin County _____
County

**Mailing address, if different from principal place of business**

_____ _____
Number     Street

_____
P.O. Box

_____ _____ _____
City           State    ZIP Code

**Location of principal assets, if different from principal place of business**

_____ _____
Number     Street

_____

_____ _____ _____
City           State    ZIP Code

5. **Debtor's website** (URL)    www.onec1.com

000052   **App. 003**

| Debtor | ConvergeOne Holdings, Inc. | Case number (if known) _____ |
|---|---|---|
| | Name | |

**6. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding  LLP)

☐ Other. Specify: _____

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

5   1   9   1

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check all that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☑ A plan is being filed with this petition.

☑ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**App. 004**

Debtor    ConvergeOne Holdings, Inc.
          _____          Case number (if known) _____
          Name

| | | |
|---|---|---|
| **9.** | **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**<br><br>If more than 2 cases, attach a separate list. | ☑ No<br><br>☐ Yes.  District _____  When _____  Case number _____<br><br> MM / DD / YYYY<br><br> District _____  When _____  Case number _____<br><br> MM / DD / YYYY |

| | | |
|---|---|---|
| **10.** | **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**<br><br>List all cases. If more than 1, attach a separate list. | ☐ No<br><br>☑ Yes.  Debtor  See Rider 1 _____  Relationship  Affiliate<br><br> District  Southern District of Texas _____  When _____<br><br> MM  /  DD  /  YYYY<br><br> Case number, if known  _____ |

| | | |
|---|---|---|
| **11.** | **Why is the case filed in *this district*?** | *Check all that apply:*<br><br>☐ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.<br><br>☑ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district. |

| | | |
|---|---|---|
| **12.** | **Does the debtor own or have possession of any real property or personal property that needs immediate attention?** | ☑ No<br><br>☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.<br><br>**Why does the property need immediate attention?**  (*Check all that apply.*)<br><br>☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.<br><br> What is the hazard? _____<br><br>☐ It needs to be physically secured or protected from the weather.<br><br>☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).<br><br>☐ Other _____<br><br>**Where is the property?** _____<br><br> Number       Street<br><br> _____<br><br> City                          State ZIP Code<br><br>**Is the property insured?**<br><br>☐ No<br><br>☐ Yes. Insurance agency _____<br><br> Contact name _____<br><br> Phone _____ |

---

|  | **Statistical and administrative information** |
|---|---|

---

000934

**App. 005**

Debtor    ConvergeOne Holdings, Inc.                                      Case number (if known)_____
          Name

| | |
|---|---|
| **13. Debtor's estimation of available funds** | *Check one:*<br>☑ Funds will be available for distribution to unsecured creditors.<br>☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors. |

**14. Estimated number of creditors (on a consolidated basis)**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☑ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets (on a consolidated basis)**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☑ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

**16. Estimated liabilities (on a consolidated basis)**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☑ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

---

### Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   04/04/2024
              MM / DD / YYYY

✖ /s/ Salvatore Lombardi                              Salvatore Lombardi
Signature of authorized representative of debtor       Printed name

Title   Chief Financial Officer

---

Debtor   ConvergeOne Holdings, Inc.                                    Case number (if known)_____
         Name

18. **Signature of attorney**        ✖ /s/ Charles R. Koster                        Date   04/04/2024
                                     Signature of attorney for debtor                     MM   / DD / YYYY

                                     Charles R. Koster
                                     Printed name
                                     White & Case LLP
                                     Firm name
                                     609        Main Street, Suite 2900
                                     Number     Street
                                     Houston                                       TX        77002
                                     City                                          State     ZIP Code
                                     (713) 496-9700                                charles.koster@whitecase.com
                                     Contact phone                                 Email address

                                     24128278                                      TX
                                     Bar number                                    State

| Fill in this information to identify the case: |
|---|
| United States Bankruptcy Court for the:<br><br>       Southern District of Texas |
| Case number *(if known)*: _____    Chapter   11 |

☐ Check if this is an
amended filing

### Rider 1
### Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the Southern District of Texas for relief under chapter 11 of title 11 of the United States Code. The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of ConvergeOne Holdings, Inc.

- AAA Network Solutions, Inc.
- ConvergeOne Dedicated Services, LLC
- ConvergeOne Government Solutions, LLC
- ConvergeOne Holdings, Inc.
- ConvergeOne Managed Services, LLC
- ConvergeOne Systems Integration, Inc.
- ConvergeOne Technology Utilities, Inc.
- ConvergeOne Texas, LLC
- ConvergeOne Unified Technology Solutions, Inc.
- ConvergeOne, Inc.
- Integration Partners Corporation
- NetSource Communications Inc.
- NuAge Experts LLC
- Providea Conferencing, LLC
- PVKG Intermediate Holdings Inc.
- Silent IT, LLC
- WrightCore, Inc.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CONVERGEONE HOLDINGS, INC., | ) | Case No. 24-_____(___) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**LIST OF EQUITY SECURITY HOLDERS**[1]

| Equity Holder | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|
| PVKG Intermediate Holdings Inc. | 10900 Nesbitt Avenue South Bloomington, MN 55437 | 100% |

---

[1] This list serves as the disclosure required to be made by the debtor pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure.  All equity positions listed indicate the record holder of such equity as of the date of commencement of the chapter 11 case.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CONVERGEONE HOLDINGS, INC., | ) | Case No. 24-_____(____) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**CORPORATE OWNERSHIP STATEMENT**

Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a governmental unit, that directly or indirectly own 10% or more of any class of the debtor's equity interest:

| Shareholder | Approximate Percentage of Shares Held |
|---|---|
| PVKG Intermediate Holdings Inc. | 100% |

| Fill in this information to identify the case: | |
|---|---|
| Debtor Name:   ConvergeOne Holdings, Inc., *et al.* | |
| United States Bankruptcy Court for the:   Southern District of Texas | ☐ Check if this is an |
| Case Number (If known):   TBD | amended filing |

## Official Form 204

### Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders

12/15

A consolidated list of creditors holding the 30 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | INGRAM MICRO INC 1759 WEHRL DR WILLIAMSVILLE, NY  14221 | CONTACT: TIM HORNEF PHONE: 954-778-5244 TIM.HORNEF@INGRAMMICRO.COM | TRADE DEBT | | | | $39,783,078.85 |
| 2 | SCANSOURCE COMMUNICATIONS 6 LOGUE COURT GREENVILLE, SC  29615 | CONTACT: GARNER BASS PHONE: 913-499-4209 GARNER.BASS@SCANSOURCE.COM | TRADE DEBT | | | | $21,216,504.95 |
| 3 | GENESYS CLOUD SERVICES, INC. 2001 JUNIPERO SERRA BLVD DALY CITY, CA  94014 | CONTACT: BRANDON WARREN PHONE: 303-250-2133 BRANDON.WARREN@GENESYS.COM | TRADE DEBT | | | | $13,210,797.73 |
| 4 | CISCO SYSTEMS CAPITAL CORPORATION 170 W. TASMAN DRIVE SAN JOSE, CA  95134 | CONTACT: DAVE WOOSTER PHONE: 410-309-5521 DAWOOSTE@CISCO.COM; CSCC-AMERICAS-NOTICE@CISCO.COM | TRADE DEBT | | | | $5,154,088.59 |
| 5 | ARROW ENTERPRISE COMPUTING SOLUTIONS INC 9151 E PANORAMA CIRCLE CENTENNIAL, CO  80112 | CONTACT: EILEEN OBRIEN PHONE: 720-235-2430 EOBRIEN@ARROW.COM | TRADE DEBT | | | | $4,546,900.47 |
| 6 | CARAHSOFT TECHNOLOGY CORPORATION 11493 SUNSET HILLS ROAD SUITE 100 RESTON, VA  20190 | CONTACT: SHANNON LEVINSOHN PHONE: 703-2307548 SHANNON.LEVINSOHN@CARAHSOFT.COM | TRADE DEBT | | | | $3,964,945.81 |
| 7 | PURE STORAGE 2555 AUGUSTINE DR SANTA CLARA, CA  95054 | CONTACT: TRAVIS WORDEN PHONE: 913-220-3013 TWORDEN@PURESTORAGE.COM | TRADE DEBT | | | | $2,033,052.33 |

Official Form 204       Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 30 Largest Unsecured Claims       Page 1

000060

App. 011

Debtor:  ConvergeOne Holdings, Inc., *et al.*

Case Number  (if known):   TBD

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8  INCONTACT, INC. DBA NICE INCONTACT DBA NICE INCONTACT 75 WEST TOWNE RIDGE PKWY TOWER1 SANDY, UT  84070-5522 | CONTACT: TRISTAN ADMUNDSON TRISTAN.AMUNDSON@NICE.COM | TRADE DEBT | | | | $1,739,122.05 |
| 9  BLACKBERRY CORPORATION 3001 BISHOP DRIVE #400 SAN RAMON, CA  94583 | CONTACT: ROB PHILLIPS PHONE: 760-470-0494 ROPHILLIPS@BLACKBERRY.COM | TRADE DEBT | | | | $1,677,279.34 |
| 10  AVAYA 350 MT KEMBLE AVENUE MORRISTOWN, NJ  07960 | CONTACT: ANDREW SCHOBER PHONE: 972-745-5225 ASCHOBER@AVAYA.COM | TRADE DEBT | | | | $962,233.44 |
| 11  INTRADO LIFE & SAFETY SOLUTIONS CORP 1601 DRY CREEK DRIVE LONGMONT, CO  80503 | CONTACT: VANESSA HEARN PHONE: 514-831-0609 VHEARN@INTRADO.COM | TRADE DEBT | | | | $913,031.56 |
| 12  CALABRIO INC ATTN: ACCOUNTS RECEIVABLE 241 NORTH 5TH AVENUE, SUITE 120 MINNEAPOLIS, MN  55401 | CONTACT: JAYME KIESTER PHONE: 317-501-8758 JAYME.KIESTER@CALABRIO.COM | TRADE DEBT | | | | $907,292.11 |
| 13  VERKADA INC 406 E 3RD AVE SAN MATEO, CA  94401 | CONTACT: SHAUNA MONTGOMERT PHONE: 303-204-5710 SHAUNA.MONTGOMERY@VERKADA.COM | TRADE DEBT | | | | $755,889.80 |
| 14  FIVE9 INC 1801 W OLYMPIC BLVD FILE 2361 PASADENA, CA  91199-2361 | CONTACT: KEITH BUTLER PHONE: 678-451-3020 KEITH.BUTLER@FIVE9.COM | TRADE DEBT | | | | $713,970.96 |
| 15  NECTAR SERVICES CORP 366 N BROADWAY, SUITE 201 ATTN:  ANTHONY FERNANDEZ JERICO, NY  11753 | CONTACT: JAMIE RYAN PHONE: 516-250-3957 JRYAN@NECTARCORP.COM | TRADE DEBT | | | | $666,378.54 |
| 16  ORACLE AMERICA, INC. 500 ORACLE PARKWAY REDWOOD CITY, CA  94065 | CONTACT: PATRICK GRAVES PHONE: 636-497-0969 PATRICK.B.GRAVES@ORACLE.COM | TRADE DEBT | | | | $662,725.02 |
| 17  TACTICAL DIGITAL CORP 6200 ROLLING RD STE 2652 SPRINGFIELD, VA  22152 | CONTACT: DANIEL BRADLEY PHONE: 703-229-6236 DANIEL.BRADLEY@TACDIG.COM | TRADE DEBT | | | | $626,941.77 |
| 18  NUANCE INCORPORATED 8416 CAREFREE CIRCLE INDIANAPOLIS, IN  46236 | CONTACT: JULIE PRATT PHONE: 346-218-8081 JULIEPRATT@MICROSOFT.COM | TRADE DEBT | | | | $582,699.80 |
| 19  OPEN TEXT INC 2950 SOUTH DELAWARE STREET SAN MATEO, CA  94403 | CONTACT: KAROL WALDRON PHONE: 520-305-0211 KWALDRON@OPENTEXT.COM | TRADE DEBT | | | | $568,652.64 |

Official Form 204        Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 30 Largest Unsecured Claims        Page 2

000061

**App. 012**

Debtor:  ConvergeOne Holdings, Inc., *et al.*            Case Number  (if known):  TBD

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 20  INTELEPEER CLOUD COMMMUNICATIONS LLC 1855 GRIFFIN RD STE A200 DANIA BEACH, FL  33004 | CONTACT: JEREMY JONES PHONE: 585-283-6156 JJONES@INTELEPEER.COM | TRADE DEBT | | | | $559,324.01 |
| 21  HYPER 30 MEDICAL LLC UNITED CAPITAL FUNDING CORP PO BOX 31246 TAMPA, FL  33631-3246 | CONTACT: GERMAN PALACIOS PHONE: 727-489-3044 GPALACIOS@H30D.COM | TRADE DEBT | | | | $538,397.06 |
| 22  AKAMAI TECHNOLOGIES, INC. 145 BROADWAY CAMBRIDGE, MA  02142 | CONTACT: SEAN O'MAHONY PHONE: 469-964-4558 SEANO@AKAMAI.COM | TRADE DEBT | | | | $527,125.46 |
| 23  SWAMPFOX TECHNOLOGIES INC 1337 ASSEMBLY STREET COLUMBIA, SC  29201 | CONTACT: BOB COOPER PHONE: 803-451-4545 BOB.COOPER@SWAMPFOXINC.COM | TRADE DEBT | | | | $512,719.32 |
| 24  SUMMER SOLUTIONS INC 4 WINDSONG WAY HOPKINTON, MA  01748 | CONTACT: ROGER SKIDMORE PHONE: 713-893-9110 RSKIDMORE@ASASOLUTIONS.COM | TRADE DEBT | | | | $507,431.10 |
| 25  OMILIA NATURAL LANGUAGE SOLUTIONS LTD GLADSTONOS 55 ROUSSOS CENTER POINT 3RD FLOOR, OFFICE 3C-3D LIMASSOL  3040  CYPRUS | CONTACT: QUINN AGEN PHONE: 647-361-0741 QUINN.AGEN@OMILIA.COM | TRADE DEBT | | | | $494,422.50 |
| 26  MUTARE SOFTWARE 2325 HICKS RD ROLLING MEADOWS, IL  60008 | CONTACT: VICKI SIDOR PHONE: 859-979-1339 VSIDOR@MUTARE.COM | TRADE DEBT | | | | $469,905.84 |
| 27  WATERFIELD TECHNOLOGIES ONE WEST THIRD STREET SUITE 1115 TULSA, OK  74103 | CONTACT: CRYSTAL COUTURIER PHONE: 918-236-0214 CRYSTAL.COUTURIER@WATERFIELD.COM | TRADE DEBT | | | | $465,857.50 |
| 28  VERIGENT, LLC 10115 KINCEY AVE SUITE 250 HUNTERSVILLE, NC  28078 | CONTACT: TODD MERK PHONE: 704-658-3278 TMERK@VERIGENT.COM | TRADE DEBT | | | | $454,014.84 |
| 29  IT NETWORK CONSULTANTS, LLC #1130 2321 SIR BARTON WAY SUITE 140 LEXINGTON, KY  40509 | CONTACT: TINA MCCOLLUM PHONE: 859-963-1911 TMCCOLLUM@ITNC.BIZ | TRADE DEBT | | | | $443,623.76 |
| 30  SHI INTERNATIONAL CORP C/O OFFICE OF THE GENERAL COUNSEL 290 DAVIDSON AVENUE SOMERSET, NJ  08873 | CONTACT: CRYSTAL SCHULZ CRYSTAL_SCHULTZ@SHI.COM | TRADE DEBT | | | | $438,710.72 |

Official Form 204    Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 30 Largest Unsecured Claims    000062    Page 3

**App. 013**

**Fill in this information to identify the case and this filing:**

Debtor Name __ConvergeOne Holdings, Inc.__

United States Bankruptcy Court for the: __Southern__ District of __Texas__
(State)

Case number (*If known*): _____

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors   12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐ *Schedule H: Codebtors* (Official Form 206H)

☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* _____

☑ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☑ Other document that requires a declaration __List of Equity Holders and Corporate Ownership Statement__

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __04/04/2024__      ✖ __/s/ Salvatore Lombardi__
MM / DD / YYYY            Signature of individual signing on behalf of debtor

__Salvatore Lombardi__
Printed name

__Chief Financial Officer__
Position or relationship to debtor

**OMNIBUS RESOLUTIONS**
**OF THE BOARDS OF DIRECTORS, BOARDS OF MANAGERS, SOLE**
**SHAREHOLDERS, AND SOLE MEMBERS OF THE COMPANIES LISTED BELOW**

| | |
|---|---|
| AAA NETWORK SOLUTIONS, INC. | CONVERGEONE DEDICATED SERVICES, LLC |
| CONVERGEONE GOVERNMENT SOLUTIONS, LLC | CONVERGEONE HOLDINGS, INC. |
| CONVERGEONE MANAGED SERVICES, LLC | CONVERGEONE SYSTEMS INTEGRATION, INC. |
| CONVERGEONE TECHNOLOGY UTILITIES, INC. | CONVERGEONE UNIFIED TECHNOLOGY SOLUTIONS, INC. |
| CONVERGEONE TEXAS, LLC | CONVERGEONE, INC. |
| INTEGRATION PARTNERS CORPORATION | NETSOURCE COMMUNICATIONS INC. |
| NUAGE EXPERTS LLC | PROVIDEA CONFERENCING, LLC |
| PVKG INTERMEDIATE HOLDINGS INC. | SILENT IT, LLC |
| WRIGHTCORE, INC. | |

**April 2, 2024**

The undersigned, being (i) all of the directors, (ii) all of the managers, (iii) the sole shareholder, or (iv) the sole member, as the case may be (in each case, the "**Governing Body**") of each of the companies listed above (each, a "**Company**" and collectively, the "**Companies**"), acting pursuant to the certificate of incorporation and bylaws or similar governing documents of each Company, as applicable, and the applicable laws of the jurisdiction in which such Company is organized, do hereby consent to, adopt and approve, by written consent, the following resolutions (the "**Resolutions**"):

WHEREAS, each Governing Body has reviewed and considered the financial and operational condition of their respective Company and of the Companies as a whole, including (which word, for all purposes of these resolutions, shall be interpreted to be followed by the words, "without limitation") the historical performance of the Companies, the assets of the Companies, the current and long-term liabilities of the Companies, and relevant industry and credit market conditions, and have considered various alternatives in respect of such matters;

WHEREAS, each Governing Body has received, reviewed, and considered the recommendations of, and the materials presented by, the senior management of its applicable Company and such Company's legal, financial, and other outside professional advisors as to the financial condition of the Companies and the relative risks and benefits of pursuing a case under the provisions of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "**Bankruptcy Code**");

WHEREAS**,** the intention of each Governing Body is to use the Bankruptcy Code to implement a plan of reorganization and to emerge with an improved financial position and more sustainable capital structure;

WHEREAS**,** the Governing Bodies have reviewed and considered (i) the Companies' need to undertake the restructuring transactions set forth in that certain restructuring support agreement (as may be amended, modified, or supplemented from time to time, the "**Restructuring Support Agreement**"), (ii) that certain joint chapter 11 prepackaged plan of reorganization for each Company, reflecting the terms set forth in the Restructuring Support Agreement (as may be amended, modified, or supplemented from time to time, the "**Plan**") and that certain disclosure statement supporting the Plan (as may be amended, modified, or supplemented from time to time, the "**Disclosure Statement**") under the provisions of the Bankruptcy Code in accordance with the milestones set forth in the Restructuring Support Agreement, (iii) commencement of solicitation of the Plan pursuant to section 1125(g) of the Bankruptcy Code, (iv) entry into and performance under the DIP Documents, as defined herein, (v) entry into that certain equity backstop commitment agreement, dated on or about the date hereof (as may be amended, modified, or supplemented from time to time, the "**Backstop Commitment Agreement**"), which, among other things, authorizes each Company to issue new common stock pursuant to the terms set forth therein, and (vi) filing of a voluntary petition for relief for each Company under the Bankruptcy Code pursuant to applicable law and in accordance with the requirements of each Company's governing documents and applicable law (together with the transactions contemplated by the Restructuring Support Agreement and incorporated in the Plan and Disclosure Statement, the "**Restructuring Matters**"), and have determined that it is in the best interests of each Company, its equity holders, its creditors as a whole, and other parties in interest for the Companies to enter into the Restructuring Support Agreement;

WHEREAS, each Governing Body, having reviewed and considered (i) the presentations by the Companies' management and the legal and financial advisors of the Companies regarding the liabilities and liquidity of the Companies, the strategic alternatives available to them, and the impact of the foregoing on each Company's businesses; (ii) entry into the Restructuring Support Agreement; (iii) entry into and performance under the DIP Documents, as defined herein; and (iv) the filing of a voluntary petition for relief for each Company under the Bankruptcy Code pursuant to applicable law and in accordance with the requirements of each Company's governing documents and applicable law;

WHEREAS, each Governing Body has reviewed and considered the Companies' collective need for financing in connection with the chapter 11 cases under the Bankruptcy Code, and has determined that it is in the best interests of each Company, its equity holders, its creditors as a whole, and other parties in interest for the Companies to enter into the ABL DIP Credit Agreement and the Term DIP Credit Agreement (each as defined below) and one or more related agreements and amendments thereto with the financial institutions from time to time party thereto, pursuant to which the Companies will obtain post-petition debtor in possession financing to fund their chapter 11 cases and grant the liens required thereby;

WHEREAS, the Restructuring Support Agreement provides that it can be terminated if each Governing Body determines, upon advice of counsel, that proceeding with the transactions

000065

**App. 016**

contemplated thereby would be inconsistent with the exercise of its fiduciary duties or appliable law;

WHEREAS, each Governing Body has reviewed and considered the materials presented by the management of each Company and each Company's financial and legal advisors, and has had adequate opportunity to consult such persons regarding the materials presented, obtain additional information, and to fully consider each of the strategic alternatives available to each Company; and

NOW, THEREFORE, IT IS HEREBY RESOLVED, that, pursuant to the applicable governing documents of each Company, each Governing Body does hereby adopt the following the resolutions:

**Restructuring Support Agreement, Plan, Disclosure Statement, Solicitation, and Chapter 11 Filing**

RESOLVED, that in the business judgment of each Governing Body, it is desirable and in the best interest of each Company, its stakeholders, its creditors, and other parties in interest, that each Company finalize, execute, and deliver the Restructuring Support Agreement, subject to any necessary modifications and final negotiations consistent with these Resolutions and, in accordance with the requirements in each Company's governing documents and applicable law, hereby consents to, authorizes and approves, the entry into the Restructuring Support Agreement;

RESOLVED, that in the business judgment of each Governing Body, the form, terms, and provisions of the Restructuring Support Agreement, and the agreements and transactions contemplated by the Restructuring Support Agreement be, and hereby are, in all respects, authorized and approved;

RESOLVED, that in the business judgment of each Governing Body, it is desirable and in the best interest of each Company, its stakeholders, its creditors, and other parties in interest that each Company commence solicitation of the Plan, pursuant to section 1125(g) of the Bankruptcy Code and, in accordance with the requirements in each Company's governing documents and applicable law, hereby consents to, authorizes, and approves, the commencement of solicitation of the Plan;

RESOLVED, that in the business judgment of each Governing Body, it is desirable and in the best interest of each Company, its stakeholders, its creditors, and other parties in interest, that each Company files or causes to be filed voluntary petitions for relief (the "**Bankruptcy Petitions**") under the provisions of chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), and any other petition for relief or recognition or other order that may be desirable under applicable law in the United States, and, in accordance with the requirements in each Company's governing documents and applicable law, hereby consents to, authorizes, and approves, the filing of the Bankruptcy Petitions; and

RESOLVED, that any director or other duly appointed officer of each Company (collectively, the "**Authorized Persons**"), which shall include the Chief Executive Officer, Chief Financial Officer, Chief Revenue Officer, or General Counsel, shall be, and each of them

000066
**App. 017**

individually hereby is, authorized and directed for and on behalf of each Company to take all actions (including, without limitation, to negotiate and execute any documents, certificates, supplemental agreements, and instruments) to act as signatory on behalf of each Company in respect of the Restructuring Matters and/or any persons to whom such Authorized Persons delegate certain responsibilities, be, and hereby are, authorized to execute and file on behalf of each Company all petitions, schedules, lists, and other motions, papers, or documents, and to take any and all action that they deem necessary or proper to obtain relief in support of or related to the Restructuring Matters, including, but not limited to, any action necessary or proper to maintain the ordinary course operations of each Company's or any of its subsidiaries' businesses;

RESOLVED, that in the business judgment of each Governing Body, it is desirable and in the best interest of each Company, its creditors, and other parties in interest that the Authorized Persons file or cause to be filed the Plan, the Disclosure Statement, and all other papers or documents (including any amendments) related thereto, and to take any and all actions that the Governing Bodies deem necessary or appropriate to pursue confirmation and consummation of a plan of reorganization materially consistent with the Plan;

RESOLVED, that each Authorized Person be, and hereby is, authorized, empowered, and directed, together with the financial and legal advisors of the Companies, to file all other documents as each, in his or her discretion, may deem necessary or desirable to confirm a plan of reorganization materially consistent with the Plan, including, but not limited to, any amendments to, and modifications of, the Plan and the Disclosure Statement; and

RESOLVED, that each Authorized Person be, and hereby is, authorized, empowered, and directed to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver, and file any and all such instruments as each, in his or her discretion, may deem necessary or advisable in order to consummate the Plans if confirmed by the Bankruptcy Court.

## Retention of Professionals

RESOLVED, that each of the Authorized Persons be, and hereby are, authorized, empowered, and directed to employ on behalf of each Company: (i) the law firm of White & Case LLP as general bankruptcy counsel; (ii) Evercore Group LLC as investment banker; (iii) AlixPartners, LLP as restructuring advisor; (iv) Grant Thornton LLP as tax services provider; (v) Epiq Bankruptcy Solutions LLC, as notice, claims, and balloting agent; and (vi) any other legal counsel, accountants, financial advisors, restructuring advisors or other professionals the Authorized Persons deem necessary, appropriate or advisable; each to represent and assist each Company in carrying out its duties and responsibilities and exercising its rights under the Bankruptcy Code and any other applicable law (including, but not limited to, the law firms filing any pleadings or responses); and in connection therewith, the Authorized Persons be, and hereby are authorized, empowered, and directed, in accordance with the terms and conditions hereof, to execute appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate applications for authority to retain such professionals; and

RESOLVED, that each of the Authorized Persons be, and hereby are, authorized, empowered and directed to execute and file all petitions, schedules, motions, lists, applications,

4

**App. 018**

pleadings, and other papers, and to perform such further actions and execute such further documentation that the Authorized Persons in their absolute discretion deem necessary, appropriate or desirable in accordance with these Resolutions.

**Use of Cash Collateral, Debtor in Possession Financing, and Adequate Protection**

WHEREAS, reference is made to that certain Amended and Restated ABL Credit Agreement, dated January 4, 2019, by and among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings Inc., the additional subsidiary borrowers thereto, the lenders and issuing banks party thereto, and Wells Fargo Commercial Distribution Finance, LLC, in its capacity as administrative agent, collateral agent, floorplan funding agent, and swing line lender, as amended, amended and restated, supplemented, or otherwise modified from time to time (the "**ABL Credit Agreement**");

WHEREAS, reference is made to that certain First Lien Term Loan Credit Agreement, dated January 4, 2019, by and among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings Inc., the lender parties thereto, and Deutsche Bank AG New York Branch, in its capacity as administrative agent and collateral agent, as amended, amended and restated, supplemented, or otherwise modified from time to time (the "**First Lien Credit Agreement**");

WHEREAS, reference is made to that certain First Lien Senior Secured Note Purchase Agreement, dated July 10, 2020, by and among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings Inc., certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto, and Deutsche Bank Trust Company Americas, in its capacity as administrative agent and collateral agent, as amended, amended and restated, supplemented, or otherwise modified from time to time (the "**KL Note Purchase Agreement**");

WHEREAS, reference is made to that certain Amended Promissory Note and Purchase and Cashless Exchange Agreement, dated July 6, 2023, by and among ConvergeOne Holdings, Inc., and PVKG Investment Holdings, Inc., as holder and administrative agent, as amended, amended and restated, supplemented, or otherwise modified from time to time (the "**PVKG Note Purchase Agreement**");

WHEREAS, reference is made to that certain Second Lien Term Loan Credit Agreement, dated January 4, 2019, by and among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings Inc., the lender parties thereto, and UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent, as amended, amended and restated, supplemented, or otherwise modified from time to time (the "**Second Lien Credit Agreement**" and, together with the ABL Credit Agreement, the First Lien Credit Agreement, the First Lien Notes Purchase Agreement, and the First Lien Promissory Note, the "**Prepetition Financing Documents**");

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that in the business judgment of each Governing Body, it is desirable and in the best interest of each Company, its stakeholders, its creditors, and other parties in interest to obtain the benefits of (i) the use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"), which is security for the holders of certain Company obligations (such holders, the "**Prepetition Secured Parties**") under the Prepetition Financing

000068

**App. 019**

Documents; and (ii) the incurrence of debtor in possession financing obligations (the "**DIP Financing**") by entering into (a) that certain senior secured superpriority priming debtor-in-possession asset-based revolving credit facility (the "**ABL DIP Facility**"), subject to the terms of that certain commitment letter (the "**ABL DIP Commitment Letter**"), as reflected in that certain ABL DIP facility term sheet (the "**ABL DIP Facility Term Sheet**") and ABL DIP credit agreement (the "**ABL DIP Credit Agreement**") governing the ABL DIP Facility, and (b) that certain senior secured superpriority debtor-in-possession facility in the form of multiple draw term loans (the "**Term DIP Facility**" and, together with the ABL DIP Facility, the "**DIP Facilities**"), as reflected in the term loan DIP term sheet (the "**Term Loan DIP Term Sheet**") and term loan DIP credit agreement (the "**Term Loan DIP Credit Agreement**") governing the Term DIP Facility;

RESOLVED, that in order to use and obtain the benefits of DIP Financing and Cash Collateral, and in accordance with section 363 of the Bankruptcy Code, each Company will provide certain adequate protection to the Prepetition Secured Parties (the "**Adequate Protection Obligations**") as documented in a proposed interim order approving the DIP Financing and the use of Cash Collateral (the "**Financing Order**") to be submitted for approval of the Bankruptcy Court, and, to the extent that each Company is required to obtain consent from the Prepetition Secured Parties to enter into any of the DIP Documents, as defined herein, such consent has been (or will be) obtained;

RESOLVED, that in the business judgment of each Governing Body, the form, terms, and provisions of each of the instruments and documents governing the DIP Facilities listed below (collectively, the "**DIP Documents**"), and each Company's execution, delivery and performance of its obligations under the DIP Documents, including without limitation the grant of security interests under the DIP Documents, and any borrowings or guaranty therewith, be, and hereby are, in all respects, authorized and approved:

(a)     the ABL DIP Commitment Letter;

(b)     the ABL DIP Facility Term Sheet;

(c)     the ABL DIP Credit Agreement;

(d)     the Term DIP Loan Term Sheet;

(e)     the Term DIP Credit Agreement;

(f)     any promissory note executed by any Company in connection with the DIP Facilities;

(g)     any guarantee executed by any Company in connection with the DIP Facilities;

(h)     any security agreement or pledge agreement executed by any Company in connection with the DIP Facilities;

(i)     the Financing Order; and

6

(j)     all other certificates, instruments, and documents executed or delivered to or in favor of any of the Prepetition Secured Parties, Commitment Parties (as defined in the DIP Documents), agents, and/or any other parties under the DIP Facilities in connection with the loans made and transactions contemplated under the DIP Documents, as the same may be amended, supplemented or replaced from time to time;

RESOLVED, that to the extent applicable, each Company shall be, and is hereby, authorized to enter into the DIP Documents and incur the obligations thereunder (the "**DIP Obligations**"), and each of the Authorized Persons be, and hereby are, authorized, empowered, and directed in the name of, and on behalf of, each Company to execute deliver, and perform all of the obligations and the transactions contemplated under each of the DIP Documents in the name and on behalf of each Company, with such immaterial changes, additions, and modifications thereto as such Authorized Person shall approve, with such approval to be conclusively evidenced by such Authorized Person's execution and delivery thereof;

RESOLVED, that each of the Authorized Persons be, and hereby are, authorized, in the name and on behalf of each Company, to take all such further actions, or cause all such further actions to be taken and to execute and deliver all such further agreements, documents, instruments, certificates recordings, and filings, in the name and on behalf of each Company, as in the determination of such Authorized Person shall be necessary, proper, or advisable in order to fully carry out the intent and accomplish the purposes of the foregoing resolutions and to consummate the transactions contemplated thereby, such authority to be conclusively evidenced by the execution of any document or the taking of any such action by such Authorized Person;

RESOLVED, that each of the Authorized Persons be, and hereby are, authorized, in the name and on behalf of each Company, to enter into any guarantees as described or contemplated by the DIP Documents or any other documents, certificates, instruments, agreements, intercreditor agreements, any extension amendment, any incremental agreement, or any other amendment required to consummate the transactions contemplated by the DIP Documents and perform its obligations thereunder and to guarantee the payment and performance of the DIP Obligations of each Company and any other guarantor thereunder;

RESOLVED, that each of the Authorized Persons be, and hereby are, authorized, empowered, and directed in the name of, and on behalf of, each Company to seek authorization to incur the DIP Obligations and approval to use Cash Collateral pursuant to the Financing Order, and any Authorized Person be, and hereby is, authorized, empowered, and directed to negotiate, execute, and deliver any and all agreements, instruments, or documents, by or on behalf of each Company, necessary to implement the postpetition financing, including the Adequate Protection Obligations to the Prepetition Secured Parties in accordance with section 363 of the Bankruptcy Code, as well as any additional or further agreements for entry into the DIP Documents and the use of Cash Collateral in connection with the chapter 11 cases, which agreements may require each Company to grant liens and other adequate protection to the Prepetition Secured Parties and each other agreement, instrument, or document to be executed and delivered in connection therewith, by or on behalf of each Company pursuant thereto or in connection therewith, all with such changes therein and additions thereto as any Authorized Person approves, such approval to be conclusively evidenced by the taking of such action or by the execution and delivery thereof;

000070

**App. 021**

RESOLVED, that each of the Authorized Persons be, and hereby are, authorized, directed, and empowered, in the name of, and on behalf of, each Company to take such actions and negotiate or cause to be prepared and negotiated and to execute, deliver, perform, and cause the performance of, each of the transactions contemplated by the DIP Documents and such other agreements, certificates, instruments, receipts, petitions, motions, or other papers or required documents to which each Company is or will be party or any order entered into in connection with the chapter 11 cases, including a final order approving the DIP Financing and the use of Cash Collateral (together with the DIP Documents and the Financing Order, collectively, the "**Financing Documents**") and to incur and pay or cause to be paid all related fees and expenses, with such changes, additions and modifications thereto as an Authorized Person executing the same shall approve;

RESOLVED, that each Company, as debtor and debtor in possession under the Bankruptcy Code be, and hereby is, authorized, empowered, and directed to incur any and all obligations and to undertake any and all related transactions on substantially the same terms as contemplated under the Financing Documents, including granting liens on its assets to secure such obligations; and

RESOLVED, that each of the Authorized Persons be, and hereby are, authorized, empowered, and directed in the name of, and on behalf of, each Company, to execute and deliver any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions, and extensions of the postpetition financing or any of the Financing Documents or to do such other things which shall in his or her sole business judgment be necessary, desirable, proper, or advisable in order to perform the DIP Obligations and to give effect to the foregoing resolutions, which determination shall be conclusively evidenced by his or her or their execution thereof.

## Backstop Commitment Agreement

WHEREAS, the Company has negotiated the Backstop Commitment Agreement;

WHEREAS, the Company intends to effectuate a rights offering (the "**Rights Offering**"), pursuant to which the Company will distribute to each eligible offeree rights to subscribe for and acquire its pro rata share of shares of new common stock pursuant to the terms set forth in the Backstop Commitment Agreement and the related procedures set forth therein.

WHEREAS, the Company will obtain benefits from the Backstop Commitment Agreement and the Rights Offering, and it is advisable and in the best interests of the Company to enter to the Backstop Commitment Agreement, including the Rights Offering, and to perform its obligations thereunder.

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the form, terms, and provisions of the Backstop Commitment Agreement, and the transactions contemplated by the Backstop Commitment Agreement (including, without limitation, the issuance of stock thereunder and the Rights Offering), and all other exhibits, schedules, attachments, and ancillary documents or agreements related thereto, if any, in connection therewith, be, and hereby are, authorized, adopted, and approved.

000071
**App. 022**

RESOLVED, in the judgment of each Governing Body, it is desirable and in the best interests of the Company (including a consideration of its creditors and other parties in interest) to finalize, execute, and deliver the Backstop Commitment Agreement and all other exhibits, schedules, attachments, and ancillary documents or agreements, including the Rights Offering, subject to appropriate modifications and final negotiations, and the Company's performance of its obligations thereunder.

**General**

RESOLVED, that each Company is hereby authorized to authorize (and each Company hereby authorizes) any direct or indirect subsidiary of each Company or any entity of which such Company or any subsidiary of such Company is the sole member, general partner, managing member, or equivalent manager, as applicable, to take each of the actions described in these resolutions or any of the actions authorized in these resolutions, and none of the resolutions contained herein, or action taken in furtherance hereto, shall have or cause an adverse effect on any such subsidiary or such Company's interest therein (including without limitation, any automatic dissolution, divestiture, dissociation, or like event under applicable law);

RESOLVED, that in addition to the specific authorizations heretofore conferred upon the Authorized Persons, the Authorized Persons (and their designees and delegates), either individually or as otherwise required by each Company's governing documents and applicable law, be, and each of them hereby is, authorized to execute, acknowledge, deliver, and file any and all agreements, certificates, instruments, powers of attorney, letters, forms, transfer, deeds and other documents on behalf of each Company relating to the Restructuring Matters;

RESOLVED, that each of the Authorized Persons (and their designees and delegates) be, and hereby is, authorized and empowered, in the name of and on behalf of each Company, to take or cause to be taken any all such other and further action, and to execute, acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents and to pay all expenses, including but not limited to filing fees, in each case as in such Authorized Person's or Authorized Persons' absolute discretion, shall be necessary, appropriate, or desirable in order to fully carry out the intent and accomplish the purposes of the resolution adopted herein;

RESOLVED, that each Governing Body has received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the governing documents of each Company, or hereby waives any right to have received such notice;

RESOLVED, that all acts, agreements, transactions, and certificates relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of each Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved, confirmed and ratified as the true acts and deeds of each Company with the same force and effect as if each such act, transaction, agreement, or certificate had been specifically authorized in advance by resolution of each Governing Body; and

000072

**App. 023**

RESOLVED, that any Authorized Person (and their designees and delegates) be, and each of them hereby is, authorized to do all such other acts, deeds and other things as each Company itself may lawfully do, in accordance with its governing documents and applicable law, howsoever arising in connection with the matters above, or in furtherance of the intentions expressed in the foregoing resolutions, including, but not limited to, the negotiation, finalization, execution and delivery of any other agreements, certificates, instruments, powers of attorney, letters, forms, transfer, deeds and other documents whatsoever as the individual acting may in his/her absolute and unfettered discretion approve, deem or determine necessary, appropriate or advisable, such approval, deeming or determination to be conclusively evidenced by said individual taking such action or the execution thereof.

*       *       *       *       *

[*Signature Pages Follow*]

10

## SECRETARY'S CERTIFICATE

The undersigned, being duly elected as General Counsel and Secretary of PVKG Intermediate Holdings Inc. ("**PVKG**"), a Delaware Corporation, hereby certifies that (i) the attached resolutions are true and correct copies of the resolutions adopted by the members of the special committee of PVKG's Board of Directors on behalf of PVKG at a meeting of PVKG's Board of Directors held on April 2, 2024; and (ii) these resolutions have not been amended or modified or superseded in any way as of the date of this Certificate.

IN WITNESS WHEREOF, I have set my hand this 2nd day of April, 2024.

By: _____
      Rui Goncalves
      General Counsel and Secretary

[*Signature Page to Omnibus Resolutions*]

### <u>SECRETARY'S CERTIFICATE</u>

The undersigned, being duly elected as General Counsel and Secretary of ConvergeOne Holdings, Inc. ("**ConvergeOne**"), a Delaware Corporation, hereby certifies that (i) the attached resolutions are true and correct copies of the resolutions adopted by the members of the special committee of ConvergeOne's Board of Directors on behalf of ConvergeOne at a meeting of ConvergeOne's Board of Directors held on April 2, 2024; and (ii) these resolutions have not been amended or modified or superseded in any way as of the date of this Certificate.

IN WITNESS WHEREOF, I have set my hand this 2nd day of April, 2024.

By: _____
Rui Goncalves
General Counsel and Secretary

*[Signature Page to Omnibus Resolutions]*

000075

**App. 026**

IN WITNESS WHEREOF, the undersigned has duly executed this consent as of the date first set forth above.

**CONVERGEONE HOLDINGS, INC., THE SOLE SHAREHOLDER OF:**

**CONVERGEONE, INC.**

By: _____

Rui Gonçalves
General Counsel and Secretary

[*Signature Page to Omnibus Resolutions*]

IN WITNESS WHEREOF, the undersigned has duly executed this consent as of the date first set forth above.

**CONVERGEONE, INC., THE SOLE SHAREHOLDER OF:**

**AAA NETWORK SOLUTIONS, INC.**
**CONVERGEONE SYSTEMS INTEGRATION, INC.**
**CONVERGEONE UNIFIED TECHNOLOGY SOLUTIONS, INC.**
**INTEGRATION PARTNERS CORPORATION**
**NETSOURCE COMMUNICATIONS INC.**
**WRIGHTCORE, INC.**

By: _____
Rui Goncalves
General Counsel and Secretary

[*Signature Page to Omnibus Resolutions*]

IN WITNESS WHEREOF, the undersigned has duly executed this consent as of the date first set forth above.

**CONVERGEONE SYSTEMS INTEGRATION, INC., THE SOLE MEMBER OF:**

**CONVERGEONE MANAGED SERVICES, LLC**
**CONVERGEONE DEDICATED SERVICES, LLC**


By: _____
    Rui Goncalves
    General Counsel and Secretary

[*Signature Page to Omnibus Resolutions*]

IN WITNESS WHEREOF, the undersigned has duly executed this consent as of the date first set forth above.

**CONVERGEONE UNIFIED TECHNOLOGY SOLUTIONS, INC.,
THE SOLE SHAREHOLDER OF:**

**CONVERGEONE TECHNOLOGY UTILITIES, INC.**

By: _____

Rui Goncalves
General Counsel and Secretary

*[Signature Page to Omnibus Resolutions]*

000079

**App. 030**

IN WITNESS WHEREOF, the undersigned has duly executed this consent as of the date first set forth above.

**CONVERGEONE, INC., THE SOLE MEMBER OF:**

**CONVERGEONE TEXAS, LLC**
**NUAGE EXPERTS LLC**
**PROVIDEA CONFERENCING, LLC**
**SILENT IT, LLC**


By: _____
      Rui Goncalves
      General Counsel and Secretary

*[Signature Page to Omnibus Resolutions]*

IN WITNESS WHEREOF, the undersigned have duly executed this consent as of the date first set forth above.

**THE BOARD OF MANAGERS OF:**

**CONVERGEONE GOVERNMENT SOLUTIONS, LLC**

_____
Phillip Panzarello

_____
Mary Corrado

_____
Jason Friend

[_Signature Page to Omnibus Resolutions_]

IN WITNESS WHEREOF, the undersigned have duly executed this consent as of the date first set forth above.

**THE BOARD OF MANAGERS OF:**

**CONVERGEONE GOVERNMENT SOLUTIONS, LLC**

_____
Phillip Panzarella

_____
Mary Corrado

_____
Jason Friend

*[Signature Page to Omnibus Resolutions]*

IN WITNESS WHEREOF, the undersigned have duly executed this consent as of the date first set forth above.

**THE BOARD OF MANAGERS OF:**

**CONVERGEONE GOVERNMENT SOLUTIONS, LLC**

_____

Phillip Panzarella

_____

Mary Corrado

_____

Jason Friend

*[Signature Page to Omnibus Resolutions]*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90194 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF SALVATORE LOMBARDI IN SUPPORT OF
THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Salvatore Lombardi, pursuant to section 1746 of title 28 of the United States Code, hereby declare as follows:

1.      I am the Chief Financial Officer of ConvergeOne Holdings Inc., together with its affiliated debtors and debtors in possession (the "**Debtors**")[2] and non-Debtor subsidiaries ("**C1**" or the "**Company**").[3]  I have served as Chief Financial Officer since January 2023.  I have more than 20 years of experience in a variety of leadership roles at companies in the technology, financial services, pharmaceutical, and other industries, including in senior management as a senior vice president, executive vice president, managing director, deputy chief financial officer,

---

[1]   The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654).  The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

[2]   Terms used but not defined in this Declaration have the meanings ascribed in the Restructuring Support Agreement attached as **Exhibit B** and its exhibits, as applicable.

[3]   I am the Chief Financial Officer of each Debtor except for ConvergeOne Government Solutions, LLC.  I am also Chief Financial Officer of SPS Providea Limited (UK).

and chief financial officer.  In my capacity as Chief Financial Officer, I am generally familiar with C1's day-to-day operations, business and financial affairs, and books and records.

2.      Except as otherwise indicated, all statements set forth in this declaration (this "**Declaration**") are based upon (a) my personal knowledge and familiarity with the Debtors' operations, finances, and restructuring efforts, (b) my review of relevant documents and information provided to me by employees of or advisors to the Debtors, and (c) my opinion based upon my experience and knowledge concerning C1's operational, financial, and business affairs, including my general knowledge of the industry in which C1 operates.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.      Today (the "**Petition Date**"), the Debtors filed the above-captioned prepackaged cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").  The Debtors are requesting various forms of relief through several "first day" motions and applications (collectively, the "**First Day Motions**").  The Debtors are requesting, among other things, that the Court: (a) approve the Debtors' entry into debtor-in-possession financing facilities and consensual use of cash collateral, which will provide the liquidity necessary for the Debtors to continue operating their business during the Chapter 11 Cases and to successfully administer these Chapter 11 Cases; (b) conditionally approve the Debtors' Disclosure Statement, schedule a combined hearing for final approval of the Disclosure Statement and Plan, and grant related relief; (c) authorize the Debtors to pay in full certain prepetition claims, including employee wage, benefit, and expense reimbursement claims; (d) authorize the Debtors to continue their prepetition business practices, pay related claims in the ordinary course of business on a

000085
**App. 036**

postpetition basis, and grant other related relief; (e) authorize the Debtors to continue using their existing cash management system, including their existing bank accounts; (f) authorize the Debtors to continue operating under their shared services arrangements with their foreign, non-Debtor affiliates; and (g) provide other administrative relief to streamline these Chapter 11 Cases for the benefit of the Debtors' estates and creditors.

4.      I submit this Declaration to provide an overview of the Debtors and their business and to provide information in support of the Debtors' chapter 11 petitions and the First Day Motions.  Part I of this Declaration provides a general overview of the Debtors and these Chapter 11 Cases.  Part II further describes several features of C1's business.  Part III describes C1's prepetition corporate and capital structure.  Part IV further discusses the events and circumstances leading to the commencement of these Chapter 11 Cases, including an overview of the Debtors' prepetition restructuring efforts.  Part V discusses the relief requested in the First Day Motions.

## PART I

5.      C1 is a leading global information technology ("**IT**") services company.  C1 provides connected human experiences by working with its channel partners, delivering IT services, and developing and commercializing its own technology products.  C1 invites its customers to reimagine customer interactions, enables the future of work and collaboration, and builds cyber-resilient enterprises in an ever-evolving IT landscape.  The Company designs, implements, and supports thousands of state-of-the-art IT solutions across its core technology markets: pure and hybrid cloud solutions, business applications, customer experiences, contact center design and enablement, modern workplace infrastructure, cyber security, and enterprise networking.  C1 is supported by a dynamic global workforce of more than 3,000 employees and independent contractors.  C1 serves more than 6,000 private and public sector customers worldwide across a range of industries, including education, energy, financial services,

000086
**App. 037**

government, healthcare, manufacturing, media and communications, retail, and transportation. C1's customers include many of the companies listed on the Fortune 100, some of the largest school districts in the country, other large municipal entities, the federal government, the largest healthcare providers in the country, and a variety of leading global companies.

6.     C1's industry-leading ability to deliver sophisticated IT solutions and rapidly respond to its customers' needs in a complex, cloud-enabled, and artificial intelligence-supported environment is reflected in its unparalleled customer satisfaction metrics, long-term partnerships with industry leading suppliers, and strong business fundamentals.   Recently, however, the Company has faced liquidity challenges due to a highly leveraged capital structure that has become unsustainable in the current interest rate environment.   The significant interest expense on the Company's funded debt—which increased by approximately $55 million on an annual basis from 2022 to 2023—combined with increased working capital needs over the same time period, has depleted the Company's liquidity and impaired its ability to operate in the ordinary course.   In particular, the Company was unable to secure amendments to its first and second lien term loan agreements that would have transitioned the LIBOR benchmark rate to the Secured Overnight Financing Rate ("**SOFR**"), resulting in the conversion of the benchmark interest rates on these facilities from LIBOR to prime interest rates and a corresponding significant increase in the Company's interest expense.   C1 has also faced ongoing customer delays, resulting in shorter contract lengths and staggered and diversified purchasing of product and software, due to the financial challenges of one of the Company's largest technology partners and an overall industry-wide slow-down in capital spending due to recessionary concerns, which have further exacerbated the Company's liquidity challenges.   These issues, in turn, have fueled rating agency downgrades,

000087
**App. 038**

and led to supplier pressures including credit reductions and other restrictive trade terms that have resulted in a further drain on the Company's liquidity.

7.      C1's management team and professionals have worked diligently to develop a comprehensive strategy that will allow the Company to access necessary funding and restructure its funded debt, enabling the Company to de-lever its balance sheet and position itself for future growth.  The Debtors commenced these Chapter 11 Cases on a prepackaged basis with the support, pursuant to the terms of a Restructuring Support Agreement (the "**RSA**"), of creditors holding approximately 81% of the Debtors' first lien debt and 81% of the Debtors' second lien term loan debt (the "**Consenting Lenders**").  The RSA contemplates the equitization or cancellation of approximately $1.6 billion of the Debtors' funded debt.   The Debtors have also secured commitments for two debtor-in-possession financing facilities, and the consensual use of cash collateral, which will permit the Debtors to continue accessing their prepetition revolving credit facility with maximum availability of $250 million and draw on a $215 million new money multi-draw term loan facility during these Chapter 11 Cases.  The Debtors are also negotiating the terms of an exit revolving credit facility to fund the Debtors' post-chapter 11 operations and obligations, which exit facility will be provided either by the Debtors' existing asset-based revolving lender or a third-party financing provider.

8.      Other significant components of the RSA include:

- The Company will (i) conduct a $159.25 million fully-backstopped equity rights offering and (ii) receive a $85.75 million direct investment commitment from the backstop parties for the new equity interests in reorganized C1 (both subject to increase with the consent of the Debtors and the Required Consenting Lenders).  As part of these transactions, 95.625% of the new equity interests will be distributed to holders of first lien claims and the backstop parties.  As part of the equity rights offering, 65% of the 95.625% of new equity interests will be offered to all holders of first lien claims on a pro rata basis, subject to a 10% put option premium owed to the backstop parties and subject to dilution by the management incentive plan.  As part of the direct investment commitment, the backstop parties have committed to purchase 35% of the

5

95.625% of new equity interests, subject to a 10% put option premium owed to the backstop parties and subject to dilution by the management incentive plan. The proceeds of the equity rights offering and direct equity investment will be used to repay the debtor-in-possession term loan facility and provide reorganized C1 with working capital.

- Holders of certain first lien claims may elect to receive (a) takeback term loans issued under an exit term loan facility in a principal amount equal to such holders' first lien claims multiplied by 20%, or (b) takeback term loans in a principal amount equal to such holders' first lien claims multiplied by 15% and rights to purchase, through the rights offering, new equity interests in reorganized C1, subject to dilution, including on account of the management incentive plan and fees owed to the backstop parties. As set forth in the RSA, these elections will be adjusted on a pro rata basis, based on oversubscription, so that participation in each option is capped at 50% of the first lien claims eligible to participate.

- Holders of second lien claims will receive 4.375% of the new equity interests in reorganized C1, also subject to dilution by the management incentive plan.

- General unsecured creditors will receive either reinstatement of their general unsecured claims pursuant to section 1124 of the Bankruptcy Code, or payment in full in cash either on the Effective Date or the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to the unsecured claim.

- All prepetition equity interests in the Debtors will be cancelled and no distributions will be made on account of such interests.

- Pursuant to a global settlement of all disputes related to the allowance of claims arising from the Prepetition PVKG Note Purchase Agreement (as defined below), PVKG Lender (as defined below), the other Consenting Lenders, and the Debtors have agreed that PVKG Lender's claims on account of the Prepetition PVKG Notes will be allowed in the amount of $213 million.[4]

9.    The Debtors believe it is imperative that the Chapter 11 Cases proceed swiftly to confirmation of the Plan, allowing the Debtors to emerge from bankruptcy as soon as practicable while maintaining the stability of their business operations and preserving customer and vendor relationships and goodwill. Expeditious confirmation of a Plan and consummation of the restructuring transactions is in the best interests of the Debtors, their estates, and their stakeholders. To that end, the Debtors have agreed to several case milestones under the RSA requiring, among

---

[4]    PVKG Lender is a non-Debtor affiliate controlled by the Debtors' private equity sponsor.

000089
**App. 040**

other things, that the Plan be confirmed within 45 days of the Petition Date and that the Debtors emerge from these Chapter 11 Cases within 60 days of the Petition Date (subject to certain conditions discussed below). Critically, the Debtors expect to continue operating in the ordinary course throughout the Chapter 11 Cases and will remain focused on serving their customers with continued exceptional and dedicated service.

## PART II

### A.    C1's Business

10.    C1 designs and supports customer experience, infrastructure and networking, and security technology services and solutions for corporate enterprises and public sector entities spanning a wide variety of industries. C1 utilizes its own engineering and design expertise, proprietary intellectual property, and partnerships with leading suppliers and original equipment manufacturers ("**OEMs**") to produce and implement custom-built IT designs and solutions for its customers, including pure and hybrid cloud solutions, business applications, customer experiences, contact center design and enablement, modern workplace infrastructure, cyber security, and enterprise networking.

### B.    Corporate History

11.    C1 was founded in Minnesota in 1993, initially specializing in communications hardware and software design, integration, and refurbishing. C1 was among the first IT service providers to offer hosted voice and messaging services and high-speed Internet access in the mid-1990s. From there, through several acquisitions and mergers, C1 expanded to serve global clients ranging from sole proprietors to Fortune 100 companies and local, state, and federal governmental units and other public sector entities. C1 expanded its operations over the next two decades, building out its customer base and developing innovative technology solutions to meet the ever-evolving needs of its customers.

000090
**App. 041**

12.     In June 2014, affiliates of Clearlake Capital Group, L.P. ("**Clearlake**"), a private investment firm, acquired C1.   In December 2017, C1 and Clearlake entered into a merger agreement with Forum Merger Corporation, a special purpose acquisition company, that took ConvergeOne Holdings Inc. ("**C1 Holdings**") public in February 2018 (NASDAQ: CVONW). Following the closing of that transaction, Clearlake remained the largest shareholder of C1.

13.     In January 2019, affiliates of CVC Capital Partners ("**CVC**"), a global private equity and investment advisory firm with more than €118 billion in assets under management, completed an acquisition of C1 that took the Company private through an all-cash tender offer for all outstanding shares of C1 Holdings valued at approximately $1.8 billion.

14.     Following the CVC acquisition, C1 has completed several strategic acquisitions and investments to expand its technical capabilities and add customer and vendor relationships. The following chart illustrates C1's material acquisitions from 2019 to the present and the capabilities of each acquired company:

| Date | Target | Capabilities |
| --- | --- | --- |
| January 2019 | Venture Technologies | IT solutions provider to private and public organizations |
| August 2020 | Altivon | Premier contact center solutions |
| March 2021 | AAA Network Solutions, Inc. | Innovative education solutions provider to public sector customers |
| June 2021 | NuAge | Service provider to Salesforce |
| November 2021 | WrightCore, Inc. | Managed and professional services capabilities |
| December 2021 | Prime TSR | Cloud-focused software and data platforms capabilities |
| January 2022 | Integration Partners Corporation | Collaboration and digital infrastructure solutions in New England and the Midwest |

## C.     Business Operations

15.     C1's suite of innovative product and service solutions are supported by more than 1,000 engineers who collectively hold thousands of industry certifications and can rapidly deploy to provide support for C1's thousands of customers all over the globe.

000091
**App. 042**

16.     To design and implement IT solutions for its customers, C1 maintains partnerships with more than 140 global technology leaders, including software publishers, wholesale distributors, and OEMs such as Avaya, AWS, Cisco, Dell Technologies, Genesys, IBM, Juniper, Microsoft, Palo Alto, Extreme Networks and Google Cloud.  C1 purchases a variety of hardware and software for resale from these technology partners and utilizes their products in the IT designs and solutions it provides to its customers.  C1 is product agnostic and can act as a conduit between its customers and global partners, providing one point of contact to deliver optimal product and service solutions to its customers, optimizing IT investments and minimizing the cost, complexity, and time to implement solutions.

17.     The Company reported revenues of approximately $1.525 billion for the twelve months ended December 31, 2023, compared to approximately $1.456 billion in revenues for the twelve months ended December 31, 2022.

18.     C1's operations are divided into two distinct revenue segments: (a) the "**Services Segment**" and (b) the "**Product Segment**."  The Services Segment contains three offerings: "**Professional Services**," "**Managed Services**," and "**Resale Services**."  Each of these offerings can be sold separately or bundled together to form various holistic offerings based on each customer's specific needs and desired outcomes.  The Services Segment accounted for approximately 45% of the Company's total revenues in 2023.

- The Professional Services offering provides customers with consultation, design, integration and implementation, application development, program management, and maintenance services for customized collaboration, enterprise networking, data center, cloud, and security offerings.  Customers retain C1's engineers to create custom-designed, complex IT solutions which are then produced, sold, and implemented as standalone offerings or combined with OEM products and software and C1's own intellectual property to facilitate bespoke solutions for C1's customers.

- Through the Managed Services offering, C1 administers and maintains customers' mission critical IT infrastructure, typically over long-term contracts with high renewal rates.  Through C1's relationships with leading and next-generation technology

9

partners, and through the utilization of C1's own proprietary intellectual property, C1's engineers maintain and enhance customers' existing IT infrastructure.  The engineers monitor performance and troubleshoot and support rapid resolutions for their customers' IT data center portfolios.  Additionally, they provide IT helpdesk support, maintenance services, and technological infrastructure enhancements, including upgrades or modifications to software.

- The Resale Services offering consists of selling products and software subscriptions developed by C1's third-party OEM partners.  C1 actively markets products purchased from leading technology vendors in response to its customers' specifications.  C1's engineers utilize these products and software subscriptions to develop bespoke solutions to support the customers' IT infrastructure requirements and to augment their capabilities.

19.     The Product Segment procures hardware products and software services from C1's OEM and distribution partners and sells those products to C1's customers.  Sales through the Product Segment may consist of standalone products, including products improved by C1's proprietary intellectual property, or may be included in a more holistic technology solution that is combined with C1's Professional Services expertise.  The Product Segment accounted for approximately 55% of the Company's total revenues in 2023.

**D.      Intellectual Property**

20.     The Company's intellectual property portfolio enables unique services provided by C1's engineers to deliver superior outcomes for customers and to support its customers' applications, customer experience, cyber security, and collaboration capabilities, whether using in premise or cloud-based infrastructure.

21.     The Company deploys its proprietary intellectual property through software-as-a-service ("**SaaS**") offerings on its cloud platform, including:

- **C1 OnGuard**, which is an award-winning observability and telemetry service offering that provides continual monitoring and proactive incident detection and prevention of customer environments, inclusive of collaboration, contact center, cybersecurity, and infrastructure protection support to the Company's customers.

- **C1CX**, which is C1's flagship "Connected Experience (CX)" platform that provides customers with an enterprise-grade Contact Center as a Service and/or Unified Communications as a Service offering.  It includes core hybrid SaaS services powered

10

by industry-leading vendors as well as C1 proprietary offerings enhanced with value-added services to deliver a holistic experience.  C1CX is a platform that can be maintained at C1's data centers, customers' premises, or a third-party data center.

- **C1 Analytics**, which enables customers to leverage their enterprise-wide data through C1's methodologies on data collection and storage that enables advanced levels of analytics, AI, and machine learning.  Beyond reporting, C1 Analytics creates customer-specific data lakes, dashboards, and visualizations that leverage various data sources across the enterprise to uncover new insights and metrics for their customers.

- **C1CX Fabric**, the most unique Integration Platform as a Service of its kind, adds the needed functions to customer environments that create a data, integration, and orchestration fabric.  Fabric is delivered as a service, de-risks current investments as it becomes the common platform that integrates enterprise systems and data, and de-risks future investments by integrating SaaS to quickly trial new services.

- **C1 Elly** is a generative AI virtual assistant designed to work across any vendor.  It enables organizations to activate the potential of all enterprise data, including voice and digital information previously siloed across business systems, such as customer relationship management, enterprise risk management, IT service management systems, and other systems.  By leveraging C1's intellectual property, Elly enables authentic interactions, by integrating data across all touchpoints and endpoints to streamline conversations without making customers repeat themselves.  Elly is enhanced by the Human Experience Quality Index (HXQi), a proprietary scoring system used to measure the quality and accuracy of each interaction to mitigate hallucinations, toxicity, and irrelevance and ensure each conversation was completed successfully.

22.     In addition, the Company has a patent pending to protect its ongoing investments in research and development of systems and methods for managing and analyzing customer interactions and holds numerous U.S. and foreign trademarks and copyrights.  The Company also holds various licenses permitting the use and resale of its global partners' products and software.

**E.     Employees**

23.     As of the Petition Date, the Company's workforce of more than 3,000 individuals spans across 15 countries and consists of approximately 2,500 employees and 530 independent contractors.  The Company currently employs approximately 2,240 individuals in the United States (the "**U.S. Employees**"), approximately 230 employees in India (the "**India Employees**"), and approximately 30 employees in Canada (the "**Canada Employees**" and, together with the U.S. Employees and India Employees, the "**Employees**").  The U.S. Employees work across 49 states,

11

with main hubs in Minnesota, New Jersey, California, and Texas.  Most of the Company's workforce works remotely.  Additionally, most of the U.S. and Canada-based workforce is employed by or contracts with ConvergeOne, Inc. ("**C1 Inc.**") as the Company's main operating entity.

24.     While the majority of C1's employees are not represented by a labor union, Debtor AAA Network Solutions, Inc. ("**AAA**") and Debtor ConvergeOne Dedicated Services, LLC ("**C1DS**") are party to two collective bargaining agreements (each, a "**CBA**") with respect to approximately 85 unionized employees.  Of the represented employees, approximately 20 employees of C1DS are employed under a CBA with the Communication Workers of America, and the remainder of the represented employees at AAA and C1DS are employed under a CBA with various bargaining units of the International Brotherhood of Electrical Workers.[5]

25.     The Company utilizes its independent contractors based primarily in the United States and India for administrative, sales, technical, and research and development support roles.  Although a small number of these contractors based in the United States contract with C1 directly, most of the contractors in the United States and India are contracted through third-party vendors.  Contractors in India are contracted through an agreement between C1 Inc. and third-party managed service providers, including Seismic LLC (together with its affiliate, Inspiredge IT Solutions Provider Limited, "**Seismic**"), along with several other third-party vendors.  The relationship between C1 Inc. and non-Debtor affiliate ConvergeOne India Private Limited ("**C1 India**") is also governed by a Master Services Agreement, through which C1 India provides

---

[5]     C1 also signs project-specific subscription agreements with other local units of the International Brotherhood of Electrical Workers to the extent required by the applicable CBA or customer agreement.

000095

**App. 046**

technology and support services to C1 Inc. (the "**Shared Services Agreement**"), as discussed more below.

## PART III

**A.      Corporate Structure**

26.      As set forth on the organizational structure chart attached as **Exhibit A**, non-debtor ConvergeOne Investment LP, a Delaware limited partnership controlled by CVC, is C1's ultimate parent through its indirect 100% ownership of Debtor PVKG Intermediate Holdings Inc. ("**PVKG Intermediate**"), a Delaware corporation.

27.      PVKG Intermediate is the direct or indirect parent of each of the other Debtors, including C1 Holdings and C1 Inc.  ConvergeOne Texas, LLC, which is directly wholly-owned by C1 Inc., was formed under the laws of the State of Texas on January 12, 2024.

28.      In addition to various domestic subsidiaries, which are Debtors in these Chapter 11 Cases, C1 also has two international non-debtor subsidiaries discussed more below.[6]

**B.      Capital Structure**

**1.      The Debtors' Prepetition Indebtedness**

29.      As of the Petition Date, the Debtors have approximately $21.4 million in cash on hand, $155 million in accounts payable, and $1,821 billion in aggregate outstanding principal amount of funded debt obligations, detailed below.

---

[6]      Non-Debtor SPS – Providea Limited's parent, Debtor Providea Conferencing, LLC, has pledged 65% of SPS – Providea Limited's equity as collateral under the Debtors' prepetition funded debt obligations.  SPS – Providea Limited is not otherwise an obligor or guarantor under those facilities.  Non-Debtor C1 India's parent, Debtor C1 Inc., has pledged 65% of C1 India's equity as collateral under the Debtors' prepetition funded debt obligations.  C1 India is not otherwise an obligor or guarantor under those facilities.

000096

**App. 047**

| Funded Debt | Maturity | Principal Amount Outstanding ($ millions) |
|---|---|---|
| **Prepetition ABL Credit Agreement** | April 2025 | $190 |
| **Prepetition First Lien Term Loan Credit Agreement** | January 2026 | $1,061 |
| **Prepetition KL Note Purchase Agreement** | January 2026 | $75 |
| **Prepetition PVKG Note Purchase Agreement** | June 2028 | $220 |
| **Prepetition Second Lien Term Loan Credit Agreement** | January 2027 | $275 |
| **TOTAL** | | **$1,821** |

### i.    Prepetition ABL Credit Agreement

30.     Under its Amended and Restated ABL Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of July 10, 2022, Amendment No. 2 dated as of September 14, 2022, Amendment No. 3 dated as of January 23, 2023, and Amendment No. 4 dated as of August 29, 2023, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition ABL Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Wells Fargo Commercial Distribution Finance, LLC, as administrative agent, collateral agent, and floorplan funding agent (in such capacities, the "**Prepetition ABL Agent**"), and as swing line lender, and the lenders from time to time party thereto (together with the Prepetition ABL Agent and other secured parties under the Prepetition ABL Credit Agreement, the "**Prepetition ABL Secured Parties**"), the Prepetition ABL Secured Parties agreed to provide C1 Holdings with a secured revolving credit loan with aggregate availability of $250 million, subject to compliance with a borrowing base, various sublimits applicable to swingline loans, letters of credit, and floorplan advances otherwise authorized under the Prepetition ABL Credit Agreement, and various reserves that may be

000097

**App. 048**

established in accordance with the Prepetition ABL Credit Agreement (the "**Prepetition ABL Facility**").

31.    As of the Petition Date, an aggregate balance of approximately $190 million, including revolving loans, floorplan obligations, and accrued and unpaid interest, remains outstanding under the Prepetition ABL Facility.  The Company is unable to access the remaining availability under the Prepetition ABL Facility due to the Prepetition ABL Credit Agreement's borrowing base limitations, reserves and sublimits, and minimum availability requirements.  The obligations under the Prepetition ABL Facility are secured by a first priority security interest in substantially all of the Debtors' assets, subject to the intercreditor agreements described below. The Prepetition ABL Facility matures in April 2025.

### ii.    Prepetition First Lien Term Loan Credit Agreement

32.    Under the terms of a certain First Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of March 14, 2019 and Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition First Lien Term Loan Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Term Loan Agent**"), and certain lenders from time to time party thereto (together with the First Lien Term Loan Agent, the "**Prepetition First Lien Term Loan Secured Parties**"), the Prepetition First Lien Term Loan Secured Parties agreed to provide C1 Holdings with initial term loans in the principal amount of $960 million and incremental term loans in the principal amount of $150 million, resulting in aggregate borrowings under the Prepetition First Lien Term Loan Credit Agreement of $1.110 billion in principal (the "**Prepetition First Lien Term Loan Facility**").

15

**App. 049**

33.     As of the Petition Date, approximately $1.1 billion of obligations, including accrued and unpaid interest and OID, are outstanding under the Prepetition First Lien Term Loan Facility.   C1 Holdings' obligations under the Prepetition First Lien Term Loan Facility are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.   The Debtors' obligations under the Prepetition First Lien Term Loan Facility are secured by a first priority security interest in substantially all assets of the Debtors, subject to the intercreditor agreements described below. The Prepetition First Lien Term Loan Facility matures in January 2026.

### iii.     Prepetition KL Note Purchase Agreement

34.     Under the terms of a First Lien Secured Note Purchase Agreement dated as of July 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition KL Note Purchase Agreement**") by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, Deutsche Bank Trust Company, as administrative agent and collateral agent (the "**Prepetition KL Notes Agent**"), certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto ("**Kennedy Lewis**"), and any other holder from time to time party thereto (together with the Prepetition KL Notes Agent, the "**Prepetition KL Notes Secured Parties**"), C1 Holdings issued senior secured notes to Kennedy Lewis in the aggregate principal amount of $75 million (the "**Prepetition KL Notes**").

35.     As of the Petition Date, approximately $78.8 million of obligations, including accrued and unpaid interest and OID, are outstanding under the Prepetition KL Notes.   C1 Holdings' obligations under the Prepetition KL Notes are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.   The obligations under the Prepetition KL Notes are secured by a first priority security interest in substantially all of the Debtors' assets, subject to the intercreditor agreements described below.   The Prepetition KL Notes mature in January 2026.

000099

**App. 050**

#### iv.     Prepetition PVKG Note Purchase Agreement

36.     Under the terms of the Third Amendment and Restatement to Promissory Note and Purchase and Cashless Exchange Agreement dated as of July 6, 2023 (the "**Prepetition PVKG Note Purchase Agreement**")[7] by and among parties including C1 Holdings, as issuer, and PVKG Investment Holdings Inc. (an entity controlled by CVC), as holder (in such capacity, "**PVKG Lender**") and as administrative agent and collateral agent (in such capacities, the "**Prepetition PVKG Notes Agent,**" and in its capacities as holder, administrative agent, and collateral agent, the "**Prepetition PVKG Notes Secured Parties**"), C1 Holdings issued senior secured notes to PVKG Lender in the principal amount of approximately $160 million, and rolled up approximately $33 million of notes previously issued to PVKG Lender, resulting in a total principal balance of approximately $193 million (the "**Prepetition PVKG Notes**").   The Prepetition PVKG Notes Secured Parties, together with the Prepetition First Lien Term Loan Secured Parties and the Prepetition KL Note Secured Parties are referred to as the "**Prepetition First Lien Secured Parties**."

37.     As of the Petition Date, pursuant to a settlement of claims related to the Prepetition PVKG Notes, PVKG Lender, the other Consenting Lenders, and the Debtors have agreed that $213 million of obligations, including paid-in-kind interest added to principal and amortized OID, but excluding prepayment premiums and unamortized OID, remain outstanding under the Prepetition PVKG Notes.   C1 Holdings' obligations under the Prepetition PVKG Notes are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.   The obligations under the Prepetition PVKG Notes are secured by a first priority security interest in substantially all of the

---

[7]     The Prepetition PVKG Note Purchase Agreement is further discussed in Part IV below.

000100
**App. 051**

Debtors' assets, subject to the intercreditor agreements described below.  The Prepetition PVKG Notes mature in June 2028.

### v.       Prepetition Second Lien Term Loan Credit Agreement

38.       Under the terms of a Second Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of July 10, 2022, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition Second Lien Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition Second Lien Agent**"), and certain lenders from time to time party thereto (together with the Prepetition Second Lien Agent, the "**Prepetition Second Lien Secured Parties**"), the Prepetition Second Lien Secured Parties provided C1 Holdings with a single-draw secured term loan in the aggregate principal amount of $275 million (the "**Prepetition Second Lien Facility**").

39.       As of the Petition Date, approximately $287 million of obligations, including accrued and unpaid interest but excluding unamortized OID, are outstanding under the Prepetition Second Lien Facility.  C1 Holdings' obligations under the Prepetition Second Lien Facility are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.  The obligations under the Prepetition Second Lien Facility are secured by a second priority security interest in substantially all assets of the Debtors.  The Prepetition Second Lien Facility matures in January 2027.

### vi.       Prepetition Intercreditor Agreements

40.       A series of intercreditor agreements govern the relative lien and payment priorities of the Prepetition ABL Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition Second Lien Secured Parties (together, the "**Prepetition Secured Parties**").

18

41.     Under an ABL Intercreditor Agreement dated as of January 4, 2019 (as amended by that certain ABL Intercreditor Agreement Joinder dated as of May 15, 2023 and as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition ABL Intercreditor Agreement**") by and among the Prepetition ABL Agent, the Prepetition First Lien Term Loan Agent, Prepetition KL Notes Agent, and the Prepetition PVKG Notes Agent, the liens held by the Prepetition ABL Secured Parties on specified collateral, including the Debtors' cash, accounts receivable, and inventory, have priority over the liens held by the Prepetition First Lien Secured Parties on that collateral.  Conversely, the liens held by the Prepetition First Lien Secured Parties on certain collateral other than the Debtors' cash, accounts receivable, and inventory have priority over the liens on that collateral held by the Prepetition ABL Secured Parties.

42.     Under the terms of a First Lien Pari Passu Intercreditor Agreement dated as of January 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among the Prepetition First Lien Term Loan Agent, Prepetition KL Notes Agent, and the Prepetition PVKG Notes Agent, the parties agreed that they would be *pari passu* with respect to the priority of their liens on common collateral and that any payments in respect of their common collateral would be made pro rata, subject to the provisions of the Prepetition ABL Intercreditor Agreement.

43.     Finally, under the terms of a certain Intercreditor Agreement dated as of January 4, 2019 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date) governing the respective rights, interest, obligations, priority, and positions of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties, the liens securing the Prepetition ABL Credit Facility, Prepetition First Lien Term Loan Facility,

000102
**App. 053**

Prepetition KL Notes, and Prepetition PVKG Notes have priority over the liens securing the Prepetition Second Lien Facility.

### vii.    Prepetition Unsecured Trade Debt

44.    As of the Petition Date, the Debtors estimate that their unsecured trade debt totals approximately $155 million.  The Debtors have filed a motion seeking the authority to pay the undisputed prepetition claims of certain critical vendors, foreign vendors, lien claimants, and vendors holding claims entitled to priority under section 503(b)(9) of the Bankruptcy Code, in order to preserve the Debtors' partnerships with these vendors and the Debtors' ability to continue operating in the ordinary course during the pendency of these Chapter 11 Cases.  Because C1 Inc. is the Company's main operating entity, a substantial majority of the Debtors' total prepetition trade debt is owed by C1 Inc.

### C.    Intercompany Relationships and Obligations

45.    As is customary for a sophisticated company with global operations and enterprise-level management, the Debtors maintain business relationships with each other and their non-Debtor affiliates and routinely engage in ordinary course transactions through various intercompany service arrangements (the "**Intercompany Transactions**").  These Intercompany Transactions include the provision of various services to Debtors and non-Debtor affiliates pursuant to intercompany accounts receivables and payables, intercompany contracts, and intercompany loans.

### 1.    ConvergeOne Government Solutions, LLC

46.    Debtor ConvergeOne Government Solutions, LLC ("**C1GS**") is a wholly-owned subsidiary of C1 Inc. that operates largely independently of C1 Inc. and the other Debtors.  C1GS provides technology services to the federal government.  In order to maintain C1GS's eligibility to obtain classified contract work and to provide sensitive technology services for federal agencies

20

and to other government contractors, C1GS, C1 Inc., and other affiliates are party to a proxy agreement with the Department of Defense.  Among other things, the proxy agreement requires that the management of C1GS operate independently of C1 Inc. and that certain proxy holders agreed to by the Department of Defense serve as the directors of C1GS.  C1 Inc. provides certain shared services to C1GS pursuant to an affiliated operations plan, which authorizes C1 Inc. to provide human resources, legal, and marketing services, and payroll processing, among other services, to C1GS.  Finally, the proxy agreement requires C1 Inc. to adequately capitalize C1GS. To that end, C1 Inc. and C1GS are party to a funding agreement authorizing C1GS to submit written borrowing requests to C1 Inc. for liquidity necessary to fund C1GS's operations on a quarterly basis.

### 2.     Foreign Subsidiaries

47.     C1's foreign subsidiaries provide various services to C1, including providing shared administrative services and technical support to the Company and a majority of its customers and managing services and tax matters for certain foreign customers.

### i.     C1 India

48.     Under the terms of the Shared Services Agreement, dated July 7, 2023, between C1 India and C1 Inc., C1 India provides technological and support solutions as part of the Company's delivery of IT support and technology services and solutions to its customers across domains such as customer experience, cybersecurity, enterprise networking, and unified communications.  C1 India's operations are based in Hyderabad, India.  C1 India operates the C1 Global Innovation & Capability Center located in Hyderabad, India, which provides administrative, sales, technical, and research and development support to the Company.  C1 India's workforce consists of approximately 510 employees and independent contractors.  The Shared Services Agreement has

000104
**App. 055**

led to economies of scale for C1, providing for the efficient administration of necessary services across C1's entire corporate structure.

49.    C1 India operates as a service entity for C1 and does not generate any of its own revenue.  In consideration for the shared services, C1 Inc. makes monthly payments to C1 India for its operating costs derived at a cost-plus arm's length mark-up basis calculated pursuant to the Shared Services Agreement, based upon the funding requirements of C1 India, along with engaging in annual true-up or true-down adjustments.

50.    C1 India utilizes independent contractors in its workforce to help provide the shared services to C1 through agreements between C1 Inc. and third-party managed service providers, including Seismic.  The remaining contractors that provide services to C1 India are engaged by C1 Inc. through other third-party vendors.

## ii.    SPS-Providea Limited

51.    SPS-Providea Limited ("**SPS**") is a private limited company organized under the laws of England and Wales.  SPS operates as a procurement arm for C1 to perform under legacy contracts with global partners with foreign affiliates.  SPS sustains some of its own operations through customer receipts that it receives directly, but also receives periodic funding from C1 Inc. to make limited third-party vendor and other operational payments.  In 2023, SPS received approximately $5 million in total from C1 Inc.  C1 also uses SPS to facilitate purchases of technology hardware and maintain software solutions for customers based in the United Kingdom and Europe to comply with foreign privacy and other laws and regulations.

## PART IV

### A.    Prepetition Challenges Faced by the Company

52.    C1 has a long history of generating significant cash flows and working in conjunction with its channel partners to deliver IT services and bring its own technology products

000105
**App. 056**

to market.  C1's core business model, operating as an innovative, global IT services company, remains sound.  However, three recent challenges have created an immediate need for additional liquidity: (i) the Company's highly leveraged capital structure has resulted in significantly higher cash interest costs in the current interest rate environment, (ii) the Company faced customer delays resulting from the financial distress of one of its leading technology partners in the second half of 2022 and the first half of 2023, resulting in staggered and diversified customer contracts and product and software purchasing patterns, and (iii) downgrades of the Company's credit rating have resulted in supplier pressures, including credit reductions and other restrictive trade terms.  These challenges, along with other macroeconomic headwinds, have impacted C1's operations and its liquidity position.

53.     The Company has been forced to divert an increasing amount of cash for rising interest payments on its funded debt.  The Federal Reserve increased interest rates by approximately 5.00% between March 2022 and August 2023, resulting in the interest costs on C1's funded debt increasing by approximately $55 million on an annualized basis.

54.     Also beginning in 2022, concerns over the financial health of one of the Company's leading OEM partners began to grow and accelerated with the OEM's latest bankruptcy filing in February 2023.  This led to customers staggering their contract renewals and purchasing throughout C1's services and product operating segments.  The OEM's liquidity issues also slowed the development of its next generation of products and solutions, limiting what C1 could sell to its customers and requiring the Company to try to source other solutions from its partners.  As a result, this substantially depressed C1's 2022 and 2023 earnings, due to the OEM's position as one of C1's top global partners.  With the OEM's bankruptcy filing now twelve months behind, market confidence in its products and services is on the rise.

000106

**App. 057**

55.     Simultaneously, lower than forecasted revenues in 2023 required the Company to stretch payment terms with its vendors, driving up its accounts payable balance.  Although the Company ultimately returned its vendors to normal payment terms after raising additional capital in July 2023, a downgrade by the rating agencies caused some vendors to impose more onerous payment and credit terms, which further strained the Company's liquidity.

**B.      Prepetition Initiatives Pursued by the Company**

56.     C1 launched several operational and other strategic efforts over the last year to counteract these challenges and stabilize its business.

**1.      Operational Initiatives**

57.     C1 pursued various operational initiatives designed to improve operating efficiency and performance, reduce costs, increase liquidity, and improve the Company's overall balance sheet profile.

**i.      Cost-Cutting Initiatives**

58.     In the first quarter of 2023, the Company began implementing cost-cutting measures primarily impacting the Company's headcount, sales expenses, general and administrative expenses, and discretionary spending.  By the fourth quarter of 2023, these initiatives had already generated approximately $86 million in run-rate savings for the Company and are expected to total more than $100 million in savings when all initiatives are fully executed.

59.     These cost-saving measures included the following initiatives, among others: (a) reducing the Company's employee headcount and its use of domestic independent contractors by moving certain positions to C1 India and finding more cost-effective third-party alternatives for certain in-house departments; (b) automating various employee functions, including customer payment, contract renewal, and work order scheduling processes; (c) exiting unnecessary third-party IT, software maintenance, and support contracts; (d) delayering sales management teams;

000107
**App. 058**

(e) unifying its presales and sales engineering groups that were unnecessarily spread across the business; (f) simplifying the review and approval processes for new sales and customer contracts; (g) streamlining the sales function by consolidating seventeen separate sales regions into four sales segments; (h) exiting various real estate leases and decreasing discretionary maintenance spending; (i) reducing advertising and marketing spending by emphasizing the Company's own talent in-house and working directly with vendors on paid and sponsored media; and (j) minimizing redundant third-party spending, as well as travel and entertainment expenses.  The Company will continue to evaluate its cost-saving initiatives during the Chapter 11 Cases and may implement additional measures that are consistent with its go-forward business plan.

### ii.        New Management Team

60.     In January 2023, the Company appointed Jeffrey S. Russell to serve as its Chief Executive Officer.  Mr. Russell has over 35 years of technology services and business advisory experience, including most recently serving as the President and Chief Executive Officer of Accenture Canada.  During his tenure as Chief Executive Officer of Accenture Canada, Mr. Russell led the company through three years of strong cross-industry market share growth and significantly increased top-line revenue and profitability.

61.     In addition, the Company filled four other key executive leadership positions beginning around that time.  In December 2022, I began consulting with the Company, and in January 2023 I was appointed Chief Financial Officer.  I have over 20 years of experience in global finance and operations, including my most recent experience as Chief Financial Officer and Managing Director of cxLoyalty, a leading provider of loyalty and travel solutions that was recently acquired by JPMorgan Chase.  In June 2023, Amrit Chaudhuri was appointed Chief Growth Officer.  Mr. Chaudhuri has over 15 years of technology marketing experience and most recently served as Executive Vice President and Chief Marketing Officer at 8x8 and RingCentral.

000108

**App. 059**

In August 2023, Meghan Keough was appointed Chief Marketing Officer.  Ms. Keough has more than 20 years of experience in corporate and product marketing, product management, alliances, and business development, and most recently served as Senior Vice President at 8x8.  Finally, in September 2023, John DeLozier was appointed Chief Revenue Officer.  Mr. DeLozier has over 30 years of experience as an executive in the technology industry, including serving as President of Intelisys and Senior Vice President at 8x8 and CenturyLink.

## 2.   Strategic Initiatives

62.     In addition to the operational efforts detailed above, C1 undertook various strategic initiatives to address the challenges facing the Company.  These measures included: raising liquidity through the Prepetition PVKG Notes, appointing two independent and disinterested directors to the boards of PVKG Intermediate and C1 Holdings, creating a special committee of those boards (the "**Special Committee**") to consider strategic alternatives (including potential financing or recapitalization transactions), and engaging with key creditor constituencies regarding the terms of potential comprehensive restructuring transactions.  In connection with these measures, C1 engaged experienced advisors including White & Case LLP as counsel, AlixPartners, LLP as financial advisor, and Evercore Group L.L.C. as investment banker.

### i.    Prepetition PVKG Note Purchase Agreement and Out-of-Court Restructuring Efforts

63.     By March 2023, the Company's liquidity was becoming strained as its working capital declined and its accounts payable balance grew.  To help address these liquidity pressures, on March 24, 2023, PVKG Lender (an entity controlled by CVC) advanced approximately $30 million to C1 Inc. under an unsecured promissory note (the "**Original PVKG Lender Note**").  The Company used the loan proceeds to pay down its accounts payable balance.

000109
**App. 060**

64.     On May 14, 2023, the Original PVKG Lender Note was assigned to C1 Holdings from C1 Inc. under the terms of an Issuer Assignment and Assumption Agreement.  On May 15, 2023, PVKG Lender and C1 Holdings, along with various of its affiliates, agreed to amend and secure the Original PVKG Lender Note on a first lien basis in exchange for a reduction in the interest rate on the Original PVKG Lender Note.  As part of this amendment, PVKG Intermediate, C1 Holdings, and their domestic subsidiaries executed the First Lien Promissory Note Guarantee and Collateral Agreement.

65.     Meanwhile, despite the much-needed liquidity provided by the Original PVKG Lender Note, the Company's accounts payable balance had continued to climb in April and May 2023.  On June 1, 2023, PVKG Lender advanced an additional approximately $3.2 million to the Company through an increase to the Original PVKG Lender Note.  The Company again used the proceeds to address its growing accounts payable balance.

66.     Unfortunately, the Company's liquidity then continued to worsen through June 2023 and the Company projected an approximately $160 million liquidity need to address outstanding accounts payable and interest costs by July 2023.  To address this shortfall, the Company and its advisors considered various potential financing and other strategic alternatives that might be available to the Company.

67.     In April and May 2023, the Company, with the assistance of its advisors, explored several potential options.  Then, beginning in May 2023, the Company initiated discussions with an ad hoc group of lenders holding first lien term loan debt (the "**First Lien Ad Hoc Group**") and an ad hoc group of lenders holding second lien term loan debt (the "**Second Lien Ad Hoc Group**") regarding the terms of a potential financing transaction.  In June 2023, the Company engaged in discussions with CVC regarding a potential alternative financing transaction.  The Company

27

engaged in several rounds of negotiations with these parties on the terms of various proposals, and management and directors met regularly and extensively, including with the Company's advisors, to discuss the proposals and the Company's funding needs.

68.     Ultimately, after exploring various options and repeatedly pressing for the best available terms, the Company decided to move forward with a financing transaction with PVKG Lender, determining that it provided the most favorable terms for the Company, including greater access to liquidity, lowest execution risk, and the quickest timing to close.  By this time, the Company was on the brink of failure and immediate access to capital was crucial.  On July 6, 2023, after multiple rounds of negotiations with PVKG Lender, the disinterested directors of ConvergeOne Investment LP and C1 Holdings approved the terms of the transaction.

69.     Under the terms of the Prepetition PVKG Note Purchase Agreement, PVKG Lender rolled up the Original PVKG Lender Note and provided approximately $160 million in face value of new money financing to the Company in three payments of approximately: (a) $32 million on July 6, 2023, (b) $84 million on July 13, 2023, and (c) $44 million on August 30, 2023.  As a result, the total principal amount of the Prepetition PVKG Notes includes both the amounts under the Original PVKG Lender Note and the new money investment.  The PVKG Lender Amended Notes provide for an interest rate of 21.75% per annum payable in kind, were issued with a 7.0% OID on the new money portion, and include a "Prepayment Premium" provision, triggered by, among other events, a chapter 11 filing.

70.     Although the proceeds of the Prepetition PVKG Notes immediately eased the Company's liquidity needs, they did not ultimately solve fundamental issues facing the Company, including rising interest rates and the fact that some vendors, even after receiving payment from the Company, refused to extend credit terms to the Company going forward.  Among other

000111

**App. 062**

challenges, the Company was unable to secure consents to replace the LIBOR benchmark rate with the SOFR rate following the discontinuation of LIBOR.  The Company had approached the First Lien Ad Hoc Group and Second Lien Ad Hoc Group seeking to amend the Prepetition First Lien Term Loan Credit Agreement and the Prepetition Second Lien Term Loan Credit Agreement and proposed certain SOFR transition provisions, but ultimately the Company did not reach agreement with the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group.  By November 2023, the Company began re-engaging with its advisors to evaluate additional alternatives and assist with contingency planning efforts.

### ii.  Enhanced Corporate Governance Measures and Discussions of a Comprehensive In-Court Restructuring

71. In connection with its contingency planning efforts, Larry J. Nyhan and Sherman K. Edmiston III were appointed to the boards of directors for PVKG Intermediate and C1 Holdings as independent and disinterested directors.  Then, in January 2024, the Special Committee was formed to review, evaluate, and approve strategic and financial alternatives, including the possibility of seeking additional financing or undertaking a recapitalization transaction or other reorganization or restructuring.  The Special Committee is comprised of Mr. Russell, Mr. Nyhan, and Mr. Edmiston.  Mr. Nyhan has served on the boards of several distressed companies and has extensive experience in corporate restructuring having served as co-chairman of Sidley Austin LLP's corporate restructuring and bankruptcy group.  Mr. Edmiston currently serves on the boards of several companies and as a managing member of HI CapM Advisors, a consulting group that provides advisory services to corporations, hedge funds, and asset managers.

72. In January 2024, the Debtors engaged with the First Lien Ad Hoc Group, PVKG Lender (in its capacities as both a secured lender and equity holder), and the Prepetition ABL Secured Parties to discuss the terms of a potential in-court restructuring.  In February 2024, the

000112

**App. 063**

Debtors likewise engaged with the Second Lien Ad Hoc Group to discuss the terms of a comprehensive restructuring transaction. As a result of these negotiations, the Special Committee concluded that the restructuring transactions contemplated by the RSA would provide the Debtors with immediate access to much-needed liquidity and a path to deliver their capital structure in a meaningful way that would not be possible out of court.

### iii.     Entry Into the RSA

73.     Following extended arm's-length negotiations between the Debtors, the First Lien Ad Hoc Group, the Prepetition ABL Secured Parties, PVKG Lender, and the Second Lien Ad Hoc Group regarding the optimal path forward, on April 3, 2024, the Debtors entered into the RSA, a copy of which is attached to this Declaration as **Exhibit B**. The RSA provides that members of the First Lien Ad Hoc Group and PVKG Lender holding more than 81% of the first lien claims, as well as members of the Second Lien Ad Hoc Group holding 81% of the second lien term loan claims, will support and vote in favor of a Plan that will implement a significant deleveraging of the Debtors' balance sheet. In addition, pursuant to the RSA, the claims of PVKG Lender are deemed allowed under the Plan at $213 million, and the parties to the RSA (including the First Lien Ad Hoc Group whose claims are *pari passu* with PVKG Lender) have agreed to such allowance.

74.     Following careful consideration, including an investigation into surrounding circumstances, on April 2, 2024, the Special Committee approved the Debtors' entry into the RSA and the filing of the Chapter 11 Cases. The Debtors believe that the comprehensive restructuring contemplated by the RSA provides the Company with a value-maximizing path forward and will right-size the Company's capital structure in a manner that will ensure the viability of the Company's business as a going concern.

C.        **Proposed Timeline for These Chapter 11 Cases**

75.       The Debtors have agreed to several milestones in the RSA to ensure an orderly and

timely implementation of the restructuring transactions set forth in the RSA.  It is imperative that

the Debtors proceed swiftly to confirmation of the Plan and emergence from the Chapter 11 Cases

to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the

Debtors' business, and limit professional fees and administrative costs.  Expeditious confirmation

of a Plan and consummation of the restructuring transactions is in the best interests of the Debtors,

their estates, and their stakeholders.

76.       Under the RSA, the Plan must be confirmed within 45 days of the Petition Date.

Accordingly, the Debtors have agreed to the following case milestones:

| Milestone | Date |
|---|---|
| Plan and Disclosure Statement Filed | Petition Date (April 4, 2024) |
| Interim DIP Order Entered | Petition Date +3 Calendar Days (April 7, 2024) |
| Conditional Approval of Disclosure Statement | Petition Date +3 Calendar Days (April 7, 2024) |
| Final DIP Order Entered | Petition Date +35 Calendar Days (May 9, 2024) |
| Order Approving Adequacy of the Disclosure Statement | Petition Date +45 Calendar Days; (May 19, 2024) |
| Confirmation Order Entered | Petition Date +45 Calendar Days; (May 19, 2024) |
| Effective Date | Petition Date +60 Calendar Days. (June 3, 2024) |

D.        **Conditional Approval of the Debtors' Disclosure Statement and Related Relief**

77.       Consistent with the agreed milestones, the Debtors are seeking immediate

conditional approval of the Disclosure Statement, as further described in the *Debtors' Emergency*

000114
**App. 065**

*Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline, Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline, (IV) Waiving the Requirement to Hold the Creditors' Meeting and File SOFAS, Schedules, and 2015.3 Reports, and (V) Granting Related Relief* ("**Disclosure Statement Motion**").  I helped prepare and have personally reviewed the Disclosure Statement.   To the best of my knowledge, the information contained in the Disclosure Statement is accurate, and based on my review, I believe the Disclosure Statement provides sufficient information for a party eligible to vote on the Plan to make an informed decision.

78.     Through the Disclosure Statement Motion, the Debtors are also seeking to establish several dates and deadlines leading up to a hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "**Confirmation Timeline**").   The proposed Confirmation Timeline will allow the Debtors to meet the agreed milestones and promptly emerge from these Chapter 11 Cases.

### E.     Debtor-in-Possession Financing and Use of Cash Collateral

79.     During these Chapter 11 Cases, the Debtors will use the cash generated from their operations, in addition to current cash on hand of $21.4 million, to (a) satisfy payroll obligations, (b) honor postpetition obligations owed to customers and vendors, (c) maintain insurance coverage, (d) pay taxes, and (e) make any other payments essential to the continued management, operation, and preservation of the Debtors' business.  I have worked closely with the Debtors' advisors, including AlixPartners LLP, to review the Debtors' liquidity needs during these Chapter 11 Cases and prepare a 13-week cash flow forecast (the "**DIP Budget**") that projects the Debtors' weekly cash receipts, cash disbursements, and liquidity.  The Debtors and their advisors continued

000115
**App. 066**

to update the DIP Budget leading up to the Petition Date to account for changes in the Debtors' funding needs resulting from, among other things, the estimated timing of the commencement of these Chapter 11 Cases and ongoing discussions with the Debtors' largest vendors regarding their open accounts payable balances.

80.     Based upon the DIP Budget and discussions with the Debtors' advisors, I do not believe the Debtors would have sufficient liquidity to manage their estates solely by using cash generated from operations and cash on hand as of the Petition Date.  Accordingly, the Debtors seek access to further liquidity and financial accommodations provided by two debtor-in-possession financing facilities during the Chapter 11 Cases.

81.     *First*, the Debtors seek approval of the "**ABL DIP Facility**."  The ABL DIP Facility is a superpriority secured first lien asset-based debtor-in-possession lending facility in the aggregate principal amount of $250 million that allows continued access to the Debtors' prepetition revolving credit facility, subject to certain modifications set forth in the DIP Orders. The ABL DIP Facility preserves the Debtors' access to their prepetition revolving credit line that they use for daily working capital needs.  The ABL DIP Facility also contains a specific feature that is critical to the Debtors' continued ordinary course operations during these Chapter 11 Cases: a floorplan facility, which allows the Debtors to rapidly finance the purchase of products, software, and services from certain of the Debtors' leading global technology partners and vendors.  Under the floorplan facility, the Debtors are authorized to submit purchase orders to the Prepetition ABL Agent, who is then obligated to advance amounts due to the applicable vendor under those purchase orders promptly upon shipment.  As a result, the floorplan facility expedites payments to vendors and, in turn, expedites shipments of products, software, and services to the Debtors and their customers.   Any floorplan obligations then become revolving obligations under the

33

Prepetition ABL Facility, allowing the Debtors to immediately purchase products, software, and services from vendors and delay payment until the Debtors determine to pay down their outstanding obligations under the Prepetition ABL Facility.

82.    I understand that the Prepetition ABL Agent is requiring that all amounts outstanding under the floorplan facility be converted into postpetition obligations of the Debtors as a condition to entering into the ABL DIP Facility, which permits continued access to the floorplan postpetition.  Losing access to the floorplan facility would have an immediate, severe, and negative impact on the Debtors' continued operations by, among other things, causing the cancellation of all pending floorplan orders, delaying future shipments, and impairing the Debtors' ability to service their customers.  There are currently pending floorplan orders of $10 million waiting to be shipped that, if cancelled under the floorplan facility, would have to be immediately financed by the Debtors from available cash rather than through the floorplan.  Based on the DIP Budget, the Debtors do not have sufficient liquidity to make those payments directly, and the failure to immediately pay the amounts due on the corresponding purchase orders would interrupt the Debtors' delivery of goods and services to their customers.

83.    In addition, I understand that the floorplan facility cannot simply be replaced by a third-party revolving credit provider.  I understand that the Prepetition ABL Agent is able to offer the floorplan facility because of its existing relationships with the Debtors' top vendors who are authorized to receive floorplan financing under the Prepetition ABL Facility.  There is no assurance that any third-party financing provider has these same relationships, or that the Debtors' vendors would accept replacement financing from a third-party provider.  And, even if a third-party could replace the floorplan facility, all existing orders would need to be cancelled and then re-submitted to the new third-party financing provider's floorplan facility—which would still

000117
**App. 068**

cause material delay in the Debtors' ordinary course operations, obstruct the Debtors' delivery of goods and services to their customers, and impede the Debtors' seamless transition into these Chapter 11 Cases.

84.     I further understand that the Debtors presently lack availability under the Prepetition ABL Facility to incur new floorplan obligations.  In order for the Debtors to continue using the floorplan facility during the Chapter 11 Cases, the Debtors also must pay down existing amounts owed under the Prepetition ABL Facility in order to create new availability for postpetition floorplan orders and obligations in the ordinary course of business.

85.     As a result, to ensure continued access to the floorplan facility and preserve the ability to incur new floorplan obligations, the ABL DIP Facility contemplates the "**ABL Roll-Up**." The ABL Roll-Up provides for the following: (i) upon entry of the Interim DIP Order, all existing floorplan obligations owed under the floorplan facility will immediately convert on a cashless basis into obligations under the ABL DIP Facility; (ii) upon entry of the Interim DIP Order, the Debtors will be authorized to pay down amounts owing under the Prepetition ABL Facility with proceeds from the Debtors' term loan debtor-in-possession financing facility (discussed below), which will result in a corresponding increase in availability under the ABL DIP Facility for postpetition obligations, including floorplan obligations; and (iii) upon entry of the Final DIP Order, any remaining outstanding Prepetition ABL Facility obligations will convert on an automatic, cashless basis into obligations under the ABL DIP Facility.

86.     I understand that, without the ABL Roll-Up, among other terms in the ABL DIP Facility and proposed DIP Orders, the Prepetition ABL Agent would not be willing to enter into the ABL DIP Facility, including the floorplan facility, or consent to use of cash collateral.  The Debtors therefore have agreed to terms of the ABL DIP Facility, including the ABL Roll-Up, in

000118
**App. 069**

order to preserve access to their revolving credit line and floorplan facility, and to avoid material interruptions to their ordinary course options.

87.    **Second**, in addition to the ABL DIP Facility, the Debtors seek approval of the "**Term DIP Facility**."  The Term DIP Facility is a super-senior multi-draw term loan facility of $215 million, with an initial draw of $145 million and a second draw of $70 million.  Proceeds from the first draw will be used to pay down the Prepetition ABL Facility (increasing availability for postpetition floorplan obligations), to fund critical vendor payments and other relief requested in the Debtors' first day motions (if approved by the Court), and for general corporate purposes.  Both draws will be funded upon entry of the Interim DIP Order.  While the second draw will be immediately funded, it will be held in escrow pending entry of the Final DIP Order.  Under the restructuring transactions contemplated by the RSA, obligations under the Term DIP Facility will be repaid in full at emergence from the proceeds of an equity rights offering for the reorganized Debtors.  It is my understanding that the Term DIP Lenders would not allow borrowing under the Term DIP Facility or the use of cash collateral except on the terms set forth in the Term DIP Documents (as defined in the DIP Motion discussed below).

88.    As laid out more fully in the *Declaration of Evan Levine in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**DIP Declaration**" in support of the "**DIP Motion**"), the ABL DIP Facility and the Term Loan DIP Facility are the product of extensive, arm's-length prepetition negotiations

36

between the Debtors, the Prepetition ABL Agent, and the Consenting Lenders, and are the best proposals that the Debtors received for that financing.

89.    Having participated in and being familiar with the events leading to these negotiations, I believe that the terms of the ABL DIP Facility, the ABL DIP Facility Documents, the Term Loan DIP Facility, and the Term Loan DIP Facility Documents, including the DIP Budget, and the form and amount of adequate protection to be provided to the Prepetition Secured Parties, are fair and appropriate under the circumstances and in the best interests of the Debtors' estates.  The transactions set forth in the RSA and the Plan, which contemplate the Debtors' entry into the ABL DIP Facility and Term Loan DIP Facility, will ensure that the Debtors' customers and vendors have a financially strong business partner during these Chapter 11 Cases, provide a viable path forward to maximize value for creditors and other parties in interest, and will position the Debtors for long-term success.

## **PART V**

90.    The Debtors have filed the First Day Motions to minimize the adverse effects on their business caused by the filing of these Chapter 11 Cases.  The First Day Motions seek relief to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite the restructuring of the Debtors' balance sheet.  The First Day Motions include:

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to File Fee Letters Under Seal;*

- *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline,*

000120
**App. 071**

*Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline, (IV) Waiving the Requirement to Hold the Creditors' Meeting and File SOFAs, Schedules, and 2015.3 Reports, and (V) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue Their Prepetition Business Operations, Policies, and Practices and Pay Related Claims in the Ordinary Course of Business on a Postpetition Basis, (II) Granting Administrative Expense Priority to All Outstanding Orders and Authorizing the Debtors to Satisfy Such Obligations in the Ordinary Course, and (III) Granting Related Relief;*

- *Debtors' Emergency Ex Parte Application for Entry of an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (III) Approving the Form and Manner of the Notice of Commencement, and (IV) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System and (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, (C) Continue Utilizing Corporate Credit Cards, (II) Authorizing Continued Intercompany Transactions and Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, and (B) Continue Employee Benefits and Incentive Programs, and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Performing Under Customer Contracts, (B) Continue Customer Programs, and (C) Honor Prepetition Obligations Related Thereto and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Operating Under Shared Services Arrangements and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Related Obligations, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief;*

000121

**App. 072**

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance Coverage and Surety Bonds and Pay Related Prepetition Obligations, (B) Renew, Supplement, Modify, or Purchase Insurance Coverage and Surety Bonds, and (II) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedure for Resolving Objections by Utility Providers, and (IV) Granting Related Relief*; and

- *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases and (B) Abandonment of Certain Personal Property, Each Effective as of the Applicable Rejection Date and (II) Granting Related Relief.*[8]

91.     I am familiar with the content and substance of the First Day Motions and have reviewed each of them including their exhibits.  To the best of my knowledge and belief, the factual statements in each of the First Day Motions are true and accurate.  I incorporate by reference those factual statements as though set forth in this Declaration, with the exception of certain statements in the DIP Motion, which rely on the DIP Declaration.

92.     The relief requested in the First Day Motions is reasonable, necessary, and carefully tailored to allow the Debtors to operate with minimal disruption during the Chapter 11 Cases.  The relief requested is also critical to allowing the Debtors to successfully implement the Plan and promptly emerge from these Chapter 11 Cases.  Failure to obtain the relief requested in any of the First Day Motions could result in immediate and irreparable harm to the Debtors, their business, and their estates.  For all these reasons, I believe the relief requested in the First Day Motions is in the best interest of the Debtors' estates and that their approval will allow the Debtors to preserve and maximize the value of their estates for the benefit of their stakeholders.

*[Remainder of page intentionally left blank]*

---

[8]     The Debtors are not seeking emergency relief on this motion and parties will have 21 days from service to respond.

000122
**App. 073**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 4, 2024                                     /s/ Salvatore Lombardi
                                                         Salvatore Lombardi
                                                         Chief Financial Officer

**Exhibit A**

**Corporate Structure Chart**



**<u>Exhibit B</u>**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT (AS DEFINED BELOW).

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAWS, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS RESTRUCTURING SUPPORT AGREEMENT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY RESTRUCTURING TRANSACTIONS SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "***Agreement***")[1] is made and entered into as of April 3, 2024 (the "***Execution Date***"), by and among the following parties (each, a "***Party***" and together the "***Parties***"):

(i)     PVKG Intermediate Holdings Inc. ("***PVKG Intermediate***") and ConvergeOne Holdings, Inc. ("***C1 Holdings***"), on behalf of themselves and each of their direct

---

[1]     Capitalized terms used but not defined in the preamble or recitals to this Agreement shall have the meanings ascribed to such terms in Section 1.

and indirect subsidiaries listed on **Exhibit A** to this Agreement that have executed this Agreement (collectively, the "***Company Parties***");

(ii)    each Holder of a First Lien Claim that has executed and delivered counterpart signature pages to this Agreement on the date hereof, each solely in their capacities as such, or that executes and delivers a Joinder or Transfer Agreement to counsel to the Company Parties after the date hereof (such entities, the "***First Lien Consenting Lenders***"), including as of the date hereof:

    a.    each of the funds or accounts managed by (i) Kennedy Lewis Investment Management LLC, (ii) Monarch Alternative Capital LP, and (iii) Silver Point Capital (the "***Initial First Lien Ad Hoc Group Members***");

    b.    each of the funds or accounts managed by (i) MJX Asset Management LLC; (ii) PGIM, Inc., and (iii) Sound Point Capital Management, LP (the "***Subsequent First Lien Ad Hoc Group Members***");

    c.    Kennedy Lewis Investment Management LLC as the Holder of the KL Note Claims (the "***KL Lender***"); and

    d.    PVKG Investment Holdings, Inc. as the Holder of the PVKG Note Claims (the "***PVKG Lender***").

(iii)    each Holder of a Second Lien Claim that has executed and delivered counterpart signature pages to this Agreement on the date hereof, each solely in their capacities as such, or that executes and delivers a Joinder or Transfer Agreement to counsel to the Company Parties after the date hereof (such entities, the "***Second Lien Consenting Lenders***"), including, as of the date hereof, each of the funds or accounts managed by (i) Partners Group (USA) Inc., (ii) Siris Capital Group, LLC, (iii) AlbaCore Capital LLP, and (iv) Neuberger Berman Investment Advisers LLC and its affiliates; and

(iv)    PVKG Lender, ConvergeOne Investment, LP, and PVKG Investment US LP and each of their affiliates other than the Company Parties that have executed and delivered counterpart signature pages to this Agreement, in their capacities as direct or indirect Holders of Existing C1 Interests (collectively, the "***Consenting Sponsors***" and together with the First Lien Consenting Lenders, the "***Consenting Stakeholders***").

## *RECITALS*

**WHEREAS**, the Company Parties, the Consenting Stakeholders, and the Second Lien Consenting Lenders have in good faith and at arms' length negotiated certain restructuring transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "***Restructuring Term Sheet***" and, such transactions as described in this Agreement, the Restructuring Term Sheet, and the Definitive Documents, in each case, as may be amended, supplemented, or otherwise

000128

**App. 079**

modified from time to time in accordance with their applicable terms, and including any exhibits, annexes, and schedules thereto, collectively, the "***Restructuring Transactions***").

**WHEREAS**, the Restructuring Transactions shall be implemented through, among other things, voluntary bankruptcy cases to be commenced by the Company Parties under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended from time to time, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***" and such cases, the "***Chapter 11 Cases***").

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement, the Restructuring Term Sheet, and the Definitive Documents.

**NOW**, **THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation*.

1.01.   Definitions.  The following terms shall have the following definitions:

"***ABL DIP Agent***" means Wells Fargo Commercial Distribution Finance, LLC.

"***ABL DIP Commitment Letter***" means the commitment letter, as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, to be entered into between the Company Parties and the ABL DIP Secured Parties, pursuant to which the ABL DIP Secured Parties have committed to make available to the Debtors the ABL DIP Facility in accordance with the terms thereof and the ABL DIP Documents.

"***ABL DIP Documents***" has the meaning set forth in the ABL DIP Facility Term Sheet.

"***ABL DIP Facility***" means the debtor in possession financing facility for the priming asset based revolving credit facility to be provided to the Debtors on the terms and conditions set forth in the ABL DIP Facility Term Sheet.

"***ABL DIP Facility Term Sheet***" means the term sheet attached as **Exhibit 1** to the Restructuring Term Sheet describing the material terms of the ABL DIP Facility.

"***ABL DIP Secured Parties***" has the meaning set forth in the ABL DIP Facility Term Sheet.

"***Affiliate***" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

"***Agents/Trustees***" means, collectively, any administrative agent, collateral agent, indenture trustee, floorplan funding agent, or similar Entity under the Prepetition ABL Credit

000129
**App. 080**

Agreement, the Prepetition First Lien Term Loan Credit Agreement, the Prepetition KL Note Purchase Agreement, the Prepetition PVKG Note Purchase Agreement, the Prepetition Second Lien Term Loan Credit Agreement, the Prepetition Intercreditor Agreements, the ABL DIP Facility, or the Term DIP Facility, including any successors thereto and including, without limitation, the ABL DIP Agent and Term DIP Agent.

"*Agreement*" has the meaning set forth in the preamble to this Agreement and, for the avoidance of any doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02.

"*Agreement Effective Date*" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"*Agreement Effective Period*" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Consenting Stakeholder or Second Lien Consenting Lender that becomes a party hereto after the Agreement Effective Date, the date as of which such Consenting Stakeholder or Second Lien Consenting Lender becomes a party hereto) to the Termination Date applicable to that Party.

"*Alternative Restructuring Proposal*" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization, plan of liquidation, share exchange, business combination, joint venture, debt incurrence (including, without limitation, any debtor-in-possession financing or exit financing), or similar transaction involving any one or more Company Parties or the debt, equity, or other Interests of or in any one or more Company Parties, whether written or oral, that is an alternative to, or is inconsistent with, any material component of the Restructuring Transactions.

"*Backstop Agreement*" means that certain Backstop Agreement agreed to between the Backstop Parties and the Company Parties regarding the Backstop Parties' commitment to backstop the Rights Offering on the terms set forth in the Rights Offering Term Sheet.

"*Backstop Parties*" means the Investors.

"*Bankruptcy Code*" has the meaning set forth in the recitals to this Agreement.

"*Bankruptcy Court*" has the meaning set forth in the recitals to this Agreement.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

000130
**App. 081**

"**_Business Day_**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**_C1 Holdings_**" has the meaning set forth in the preamble to this Agreement.

"**_Causes of Action_**" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code, or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

"**_Chapter 11 Cases_**" has the meaning set forth in the recitals to this Agreement.

"**_Claim_**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"**_Company Claims or Interests_**" means any Claim against or Interest in a Debtor.

"**_Company Parties_**" has the meaning set forth in the preamble to this Agreement.

"**_Confidentiality Agreement_**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with any proposed Restructuring Transactions, and between any Company Party and any ad hoc groups, their advisors, or any Holder of any Company Claims or Interests.

"**_Confirmation Order_**" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**_Consenting Sponsors_**" has the meaning set forth in the preamble to this Agreement.

"**_Consenting Stakeholders_**" has the meaning set forth in the preamble to this Agreement.

"**_Debtors_**" means the Company Parties set forth in the preamble to this Agreement and listed on **Exhibit A** hereto that become debtors and debtors in possession in the Chapter 11 Cases.

"**_Definitive Documents_**" means, collectively, each of the documents listed in Section 3.01.

"**_DIP Orders_**" means, together, the Interim DIP Order and the Final DIP Order.

000131
**App. 082**

"***Disclosure Statement***" means that certain disclosure statement disclosing the terms and conditions of the Plan, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement and in accordance with, among other things, applicable securities Law, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Bankruptcy Rules, and other applicable Law.

"***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"***Execution Date***" has the meaning set forth in the preamble to this Agreement.

"***Existing C1 Interests***" has the meaning set forth in the Restructuring Term Sheet.

"***Exit ABL Facility***" has the meaning set forth in the Restructuring Term Sheet.

"***Exit ABL Facility Documents***" means any documents governing the Exit ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"***Exit Term Loan Facility***" has the meaning set forth in the Restructuring Term Sheet.

"***Exit Term Loan Facility Documents***" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"***Final DIP Order***" means any Final Order approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents, and authorizing the Debtors' use of cash collateral.

"***Final Order***" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken; or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing has been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, for the avoidance of any doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; *provided*, *further*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"*First Day Pleadings*" means the motions and related pleadings that the Debtors intend to file upon the commencement of the Chapter 11 Cases.

"*First Lien Ad Hoc Group*" means that certain ad hoc group of Holders of First Lien Claims, including the KL Lender, represented by the First Lien Ad Hoc Group Advisors.

"*First Lien Ad Hoc Group Advisors*" means Gibson, Dunn & Crutcher LLP, PJT Partners Inc., EY-Parthenon, any local counsel retained by the First Lien Ad Hoc Group, and such other professional advisors as are retained by the First Lien Ad Hoc Group with the prior written consent of the Debtors (not to be unreasonably withheld).

"*First Lien Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*First Lien Consenting Lenders*" has the meaning set forth in the preamble to this Agreement.

"*First Lien Term Loan Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*General Unsecured Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*Governance Documents*" means, as applicable, the organizational and governance documents for New C1 and its direct and indirect subsidiaries, giving effect to the Restructuring Transactions, including, without limitation, certificates of incorporation, certificates of formation, or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or similar governing documents), and the identities of proposed members of the board of directors of New C1, each consistent with the terms and conditions of the Governance Term Sheet and in form and substance acceptable to the Debtors and the Required Consenting Lenders.

"*Governance Term Sheet*" means the term sheet attached as **Exhibit 4** to the Restructuring Term Sheet describing organizational and governance matters for New C1.

"*Governmental Authority*" has the meaning as set forth in section 101(27) of the Bankruptcy Code.

"*Holder*" means any Person or Entity that is the record or beneficial owner of any Claim or Interest, including any investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold any Claim or Interest on behalf of any signatory to this Agreement.

"*Initial First Lien Ad Hoc Group Members*" has the meaning set forth in the preamble to this Agreement.

"*Initial Second Lien Ad Hoc Group Members*" means each of the funds or accounts that are managed by (i) Partners Group (USA) Inc. and (ii) Siris Capital Group, LLC

"*Interest*" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, units, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to

000133

**App. 084**

acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, units, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"***Interim DIP Order***" means any order entered on an interim basis approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents, and authorizing the Debtors' use of cash collateral.

"***Investors***" has the meaning set forth in the Rights Offering Term Sheet.

"***Joinder***" means a joinder to this Agreement, substantially in the form attached hereto as **Exhibit C**, providing, among other things, that such Person or Entity signatory thereto is bound by the terms of this Agreement.  For the avoidance of any doubt, any party that executes a Joinder shall be a "Party" under this Agreement as provided therein and herein.

"***Law***" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority or court of competent jurisdiction (including the Bankruptcy Court).

"***KL Lender***" has the meaning set forth in the preamble to this Agreement.

"***KL Lender Advisor***" means Akin Gump Strauss Hauer & Feld LLP.

"***KL Lender Advisor Cap***" means $250,000.

"***KL Note Claims***" has the meaning set forth in the Restructuring Term Sheet.

"***Milestones***" means the applicable milestones set forth in the Restructuring Term Sheet, as such milestones may be extended in accordance with the terms of this Agreement and the Restructuring Term Sheet.

"***Minority Protections***" has the meaning set forth in the Governance Term Sheet.

"***New C1***" means either PVKG Investment, as reorganized pursuant to the Plan, or, if applicable, any successor or assign thereto, by merger, consolidation, or otherwise on and after the Plan Effective Date, or a new entity, and each of its direct and indirect wholly-owned subsidiaries, which in any case shall be the ultimate parent of the other Company Parties on and after the Plan Effective Date as set forth in the Plan.  For the avoidance of doubt, the identity of New C1 shall be subject to the consent of the Debtors and the Required Consenting Lenders.

"***Parties***" has the meaning set forth in the preamble to this Agreement.

"***Permitted Transferee***" means each transferee of any Company Claims or Interests who meets the requirements of Section 8.01.

"***Person***" has the meaning set forth in section 101(41) of the Bankruptcy Code.

000134
**App. 085**

"**Petition Date**" means the first date that any of the Debtors commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization that will be filed by the Debtors under the Bankruptcy Code to implement the Restructuring Transactions in accordance with, and subject to the terms and conditions of, this Agreement, the Restructuring Term Sheet, the Definitive Documents, and related exhibits and appendices.

"**Plan Effective Date**" means the Effective Date of the Plan, as defined in the Restructuring Term Sheet.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that, subject to the terms and conditions provided in the Plan, will be filed by the Debtors with the Bankruptcy Court.

"**Prepetition ABL Credit Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**Prepetition First Lien Term Loan Credit Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**Prepetition First Lien and Second Lien Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of January 4, 2019 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), among Deutsche Bank AG New York Branch, as Initial Senior Lien Representative and Senior Lien Collateral Agent, UBS AG, Stamford Branch, as Initial Junior Lien Representative and Junior Lien Collateral Agent and the additional Representatives and Collateral Agents from time to time a party thereto, C1 Holdings, and certain subsidiaries and parent entities of C1 Holdings.

"**Prepetition Intercreditor Agreements**" means (a) that certain ABL Intercreditor Agreement, dated as of January 4, 2019 (as amended by that certain Joinder and Amendment to ABL Intercreditor Agreement dated as of July 10, 2020 and supplemented by that certain ABL Intercreditor Agreement Joinder dated as of May 15, 2023); (b) that certain First Lien Pari Passu Intercreditor Agreement, dated as of January 10, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time); and (c) the Prepetition First Lien and Second Lien Intercreditor Agreement.

"**Prepetition KL Note Purchase Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**Prepetition PVKG Note Purchase Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**Prepetition Second Lien Term Loan Credit Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**PVKG Intermediate**" has the meaning set forth in the preamble to this Agreement.

"**PVKG Investment**" means PVKG Investment Holdings, Inc.

000135

**App. 086**

"*PVKG Lender*" has the meaning set forth in the preamble to this Agreement.

"*PVKG Lender Advisors*" means Latham & Watkins LLP and any local counsel retained by the PVKG Lender to advise the PVKG Lender in its capacity as the Holder of the PVKG Note Claims.

"*PVKG Note Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*Qualified Marketmaker*" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims or Interests (or enter with customers into long and short positions in Company Claims or Interests), in its capacity as a dealer or market maker in Company Claims or Interests, and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"*Released Parties*" has the meaning set forth in the Restructuring Term Sheet.

"*Required ABL DIP Lenders*" has the meaning set forth in the ABL DIP Facility Term Sheet.

"*Required Consenting Lender Advisors*" means, collectively, the First Lien Ad Hoc Group Advisors and the PVKG Lender Advisors.

"*Required Consenting Lenders*" means, as of the relevant date, the Initial First Lien Ad Hoc Group Members and the PVKG Lender holding, collectively, in excess of 66 2/3% of the aggregate First Lien Claims collectively held by the Initial First Lien Ad Hoc Group Members and PVKG Lender.

"*Required Consenting Initial First Lien Ad Hoc Group Members*" means, as of the relevant date, the Initial First Lien Ad Hoc Group Members holding, collectively, in excess of 75% of the aggregate First Lien Claims collectively held by the Initial First Lien Ad Hoc Group Members.

"*Required Consenting Initial Second Lien Ad Hoc Group Members*" means, as of the relevant date, the Initial Second Lien Ad Hoc Group Members holding, collectively, in excess of 50.01% of the aggregate Second Lien Claims collectively held by the Initial Second Lien Ad Hoc Group Members.

"*Required Term DIP Lenders*" has the meaning set forth in the Term DIP Term Sheet.

"*Restructuring Expenses*" means the actual, reasonable, and documented fees and expenses of the First Lien Ad Hoc Group Advisors, the KL Lender Advisor (subject to the KL Lender Advisor Cap), the PVKG Lender Advisors, the Second Lien Ad Hoc Group Advisors, regardless of whether such fees and expenses are or were incurred before, on, or after the Agreement Effective Date, subject to the terms of any applicable fee reimbursement letter between any such Parties and any of the Company Parties, as the case may be; *provided*, *however*, that the invoices for such fees and expenses shall be in summary format (with such redactions as may be necessary to maintain attorney client privilege), and the First Lien Ad Hoc Group Advisors, PVKG

000136
**App. 087**

Lender Advisors, and the Second Lien Ad Hoc Group Advisors shall not be required to provide the Company Parties with attorney time entries or apply to the Bankruptcy Court for payment.

"***Restructuring Term Sheet***" has the meaning set forth in the recitals to this Agreement.

"***Restructuring Transactions***" has the meaning set forth in the recitals to this Agreement.

"***Rights Offering***" has the meaning set forth in the Restructuring Term Sheet.

"***Rights Offering Documents***" means, collectively, the Backstop Agreement, the Rights Offering Procedures, and any and all other agreements, documents, and instruments delivered or entered into in connection with the Rights Offering, not inconsistent with the terms of the Rights Offering Term Sheet.

"***Rights Offering Procedures***" means the procedures governing the Rights Offering.

"***Rights Offering Term Sheet***" means the term sheet attached as **Exhibit 3** to the Restructuring Term Sheet describing the material terms of the Rights Offering.

"***Second Lien Ad Hoc Group***" means that certain ad hoc group of Holders of Second Lien Claims represented by the Second Lien Ad Hoc Group Advisors.

"***Second Lien Ad Hoc Group Advisors***" means Davis Polk & Wardwell LLP, Guggenheim Securities, LLC, Haynes and Boone, LLP, and such other professional advisors as are retained by the Second Lien Ad Hoc Group with the prior written consent of the Required Consenting Lenders and the Debtors (not to be unreasonably withheld).

"***Second Lien Claims***" has the meaning set forth in the Restructuring Term Sheet.

"***Second Lien Consenting Lenders***" has the meaning set forth in the Preamble to this Agreement.

"***Solicitation Materials***" means all documents, forms, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"***Subsequent First Lien Ad Hoc Group Members***" has the meaning set forth in the preamble to this Agreement.

"*Term DIP Agent*" has the meaning set forth in the Term DIP Term Sheet.

"***Term DIP Facility***" means the debtor in possession financing facility for the priming super priority secured term loans that the Term DIP Lenders have committed to provide to the Debtors on the terms and conditions set forth in the Term DIP Term Sheet.

"***Term DIP Lenders***" has the meaning set forth in the Term DIP Term Sheet.

"***Term DIP Loan Documents***" has the meaning set forth in the Term DIP Term Sheet.

11

"**Term DIP Term Sheet**" means the term sheet attached as **Exhibit 2** to the Restructuring Term Sheet describing the material terms of the Term DIP Facility.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 12.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

1.02.    Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereunder," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

000138
**App. 089**

(j)     the use of "$", "Dollar" or "dollar" shall refer to denominations in U.S. Dollars.

**Section 2.**     *Effectiveness of this Agreement*.

2.01.     Agreement Effective Date. This Agreement shall become effective and binding upon each of the Parties on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b)     Holders of at least 66 2/3% of the principal amount of First Lien Claims, including each of the Required Consenting Lenders, and exclusive of the Holders of the PVKG Note Claims, shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(c)     Holders of 100% of the principal amount of the PVKG Note Claims shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(d)     Holders of at least 66 2/3% of the principal amount of Second Lien Claims shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(e)     the Consenting Sponsors shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(f)     the Company Parties shall have paid, or caused to be paid, all Restructuring Expenses for which an invoice has been received by the Company Parties (inclusive of any reasonable estimate of Restructuring Expenses through and including the Agreement Effective Date) in accordance with the terms of any applicable fee letter prior to the Agreement Effective Date; and

(g)     counsel to the Company Parties shall have given written notice (email sufficient) to counsel to each of the other Parties in the manner set forth in Section 14.10 that the conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.**     *Definitive Documents*.

3.01.     The Definitive Documents governing the Restructuring Transactions shall include the following documents, including all exhibits, annexes, schedules, and other attachments thereto:

(a)     the Plan;

(b)     the Disclosure Statement;

(c)     the Solicitation Materials;

000139
**App. 090**

(d)     the DIP Orders (and motion(s) seeking approval thereof);

(e)     the ABL DIP Commitment Letter;

(f)     the ABL DIP Documents;

(g)     the Term DIP Loan Documents;

(h)     the Exit ABL Facility Documents;

(i)     the Exit Term Loan Facility Documents;

(j)     the Backstop Agreement and motion(s) seeking approval thereof;

(k)     the Rights Offering Procedures;

(l)     the Rights Offering Documents;

(m)     the Governance Documents;

(n)     any order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials (and motion(s) seeking approval thereof), which may be the Confirmation Order;

(o)     the Confirmation Order;

(p)     the Plan Supplement;

(q)     all material pleadings and motions filed by the Company Parties in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings, any "second day" pleadings, and all orders sought pursuant thereto;

(r)     such other agreements, instruments, and documentation that are necessary, or as may be agreed in writing (email sufficient) between the Company Parties and the Required Consenting Lenders, to document and consummate the Restructuring Transactions; and

(s)     any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing.

Completion of Definitive Documents. The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and/or covenants consistent with the terms of this Agreement and the Restructuring Term Sheet, as they may be modified, amended, or supplemented in accordance with Section 13. Notwithstanding anything to the contrary herein, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise, when completed, (i) be in form and substance, including with respect to any

14

amendment, modification, or supplement thereto, acceptable to the Company Parties and the Required Consenting Lenders; (ii) provide for equal treatment of the KL Note Claims and First Lien Term Loan Claims, unless otherwise consented to by the Required Consenting Lenders and the KL Lender; (iii) provide for equal rights to the Holders of, and treatment of, the PVKG Note Claims and First Lien Term Loan Claims, unless otherwise consented to by the PVKG Lender and the Required Consenting Initial First Lien Ad Hoc Group Members; (iv) be in a form and substance, including with respect to any amendment, modification, or supplement thereto, reasonably acceptable to the Required Consenting Initial Second Lien Ad Hoc Group Members solely with respect to matters that directly or indirectly relate to the rights, distribution and treatment of the Consenting Second Lien Lenders provided for herein; and (v) the Governance Documents will be reasonably acceptable to the Subsequent First Lien Ad Hoc Group Members and Required Consenting Initial Second Lien Ad Hoc Group Members solely with respect to the Minority Protections and board observer rights provided therein.

**Section 4.** *Commitments of the Consenting Stakeholders and Second Lien Consenting Lenders*.

4.01.  <u>General Commitments</u>.

(a)  During the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender severally, and not jointly, agrees, in respect of all of its Company Claims or Interests, to:

(i)  agree by execution of this Agreement and the effectiveness of this Agreement to (A) consent, and to be deemed to have consented, to the incurrence of the ABL DIP Facility on the terms set forth in the ABL DIP Facility Term Sheet and the ABL DIP Documents and the Term DIP Facility on the terms set forth in the Term DIP Term Sheet and Term DIP Loan Documents; (B) consent, and direct the Agents/Trustees to consent, to the Company Parties' use of their cash collateral pursuant to the DIP Orders; and (C) if necessary, give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the foregoing;

(ii)  support the Restructuring Transactions on the terms and subject to the conditions of this Agreement and vote or consent and not object, to the extent applicable, all Company Claims or Interests owned by or held by such Consenting Stakeholder or Second Lien Consenting Lender and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions, subject to finalization of the Definitive Documents in accordance with the terms of this Agreement;

(iii)  give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the Restructuring Transactions; *provided* that no Consenting Stakeholder or Second Lien Consenting Lender shall be required hereunder to provide such Agents/Trustees with any indemnities or similar undertakings in connection with taking any such action or incur any fees or expenses in connection therewith;

15

(iv)     use commercially reasonable efforts to support the Company Parties' efforts to obtain any and all required regulatory or third-party approvals for the Restructuring Transactions;

(v)     use commercially reasonable efforts to cooperate in good faith with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other creditors and stakeholders;

(vi)     validly and timely deliver, and not withdraw, the consents, proxies, signature pages, tenders, ballots, or other means of voting or participation in the Restructuring Transactions (including directing its nominee or custodian, if applicable, on behalf of itself and the accounts, funds, or Affiliates for which it is acting as investment advisor, sub-advisor, or manager to validly and timely deliver and not withdraw) with respect to all Company Claims or Interests owned by or held by such Consenting Stakeholder or Second Lien Consenting Lender; and

(vii)     negotiate in good faith and use commercially reasonable efforts to execute, deliver, and implement the Definitive Documents and any other necessary filings, documents, pleadings, agreements, contracts and requests for regulatory approvals to which it is a party in a timely manner to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement.

(b)     During the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender severally, and not jointly, agrees, in respect of all of its Company Claims or Interests, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)     seek to modify the Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement and the Restructuring Term Sheet;

(iv)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of its Company Claims or Interests against the Company Parties other than in accordance with this Agreement and the Definitive Documents;

(v)     file any motion, objection, pleading, or other document with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement and the Restructuring Term Sheet (nor directly or indirectly cause or instruct any other person to make such a filing);

(vi)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement, the Definitive Documents, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this

16

Agreement (nor directly or indirectly cause or instruct any other person to initiate such litigation or proceeding);

(vii)   object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code (nor directly or indirectly cause or instruct any other person to take such action); or

(viii)   exercise any right or remedy for the enforcement, collection, or recovery of any of its Company Claims or Interests other than in accordance with this Agreement and the Definitive Documents (nor directly or indirectly cause or instruct any other person to take or exercise such right or remedy).

(c)   Solely upon the occurrence of the Plan Effective Date, each Consenting Stakeholder and Second Lien Consenting Lender agrees to release, waive, and discharge, without any further notice or action, any and all (i) Claims and Causes of Action it may have against the Released Parties, subject to the limits with respect to such release set forth in the Plan; and (ii) General Unsecured Claims against any of the Company Parties.

(d)   Solely with respect to the Consenting Stakeholders that are Term DIP Lenders, such Term DIP Lenders commit to provide the Term DIP Facility to the Debtors on the terms and conditions set forth in the Term DIP Term Sheet.

(e)   Solely with respect to the Consenting Stakeholders that are Backstop Parties, such Backstop Parties commit to provide the Backstop Commitment to the Debtors on the terms and conditions set forth in the Rights Offering Term Sheet.

4.02.   Chapter 11 Voting.

(a)   In addition to the obligations set forth in Section 4.01, during the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Party of the Disclosure Statement and the Solicitation Materials, whether before or after the commencement of the Chapter 11 Cases:

(i)   use commercially reasonable efforts to support confirmation of the Plan, including the solicitation, confirmation, and consummation of the Plan, as may be applicable and not direct or instruct any of the Agents/Trustees to take any actions inconsistent with this Agreement or the Restructuring Term Sheet;

(ii)   vote each of its Company Claims or Interests entitled to vote to accept the Plan, and elect the Rights Offering Rights and Takeback Term Loan Recovery Option (if applicable to such Party), by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its receipt of the Disclosure Statement and any other Solicitation Materials and the ballot; *provided*, *however*, that each Consenting Stakeholder that acquires First Lien Claims after the Execution Date in accordance with the terms hereof shall be entitled to elect by the applicable election deadline the Takeback Term Loan Recovery Option solely with respect to such after-acquired First Lien

17

Claims, and solely to the extent that such acquisition and election is identified to the Company Parties and the Required Consenting Lender Advisors;

(iii)     to the extent it is permitted to elect whether to opt out of (or opt in to) the releases set forth in the Plan, elect not to opt out of (or elect to opt in to) the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iv)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (ii) and (iii) above; *provided*, *however*, that such votes or elections shall be immediately revoked and deemed *void ab initio* upon the occurrence of a Termination Date.

(b)     During the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender, in respect of each of its Company Claims or Interests, severally, and not jointly, will not directly or indirectly object to, delay, impede, or take any other action inconsistent with this Agreement and the Restructuring Term Sheet. Notwithstanding the foregoing, nothing in this Agreement shall require any Consenting Stakeholder or Second Lien Consenting Lender to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations against such Party.

4.03.     Prepetition First Lien and Second Lien Intercreditor Agreement. For any and all purposes under the Prepetition First Lien and Second Lien Intercreditor Agreement, each Consenting Stakeholder hereby agrees (a) that each Holder of a Second Lien Claim may receive its *pro rata* share of the Second Lien Recovery in accordance with the terms of this Agreement, and such Consenting Stakeholder waives any of its rights in connection thereto, including, without limitation, any rights under Sections 4.02 or 6.10 of the Prepetition First Lien and Second Lien Intercreditor Agreement, and (b) that this Agreement shall serve as such Consenting Stakeholder's direction to the Senior Lien Collateral Agent and Senior Lien Representatives to do the same.

**Section 5.     *Additional Provisions Regarding the Consenting Stakeholders' and Second Lien Consenting Lenders' Commitments*.**

5.01.     Notwithstanding the Consenting Stakeholders' and Second Lien Consenting Lenders' agreements to support the Restructuring Transactions as set forth in Section 4, this Agreement shall not:

(a)     be construed to impair any Consenting Stakeholder's or Second Lien Consenting Lender's rights to appear as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as the positions advocated are consistent with this Agreement;

(b)     prevent any Consenting Stakeholder or Second Lien Consenting Lender from filing, or directing any agent or representative to file, any proof of claim in any Chapter 11 Cases;

(c)     limit the ability of a Consenting Stakeholder or Second Lien Consenting Lender to purchase, sell, or enter into any transactions regarding the Company Claims or Interests, subject

18

to the terms hereof and any applicable agreements or Law governing such Company Claims or Interests;

(d)     constitute a waiver or amendment of any term or provision of the Prepetition First Lien Term Loan Credit Agreement, the Prepetition KL Note Purchase Agreement, the Prepetition PVKG Note Purchase Agreement, or the Prepetition Second Lien Term Loan Credit Agreement;

(e)     affect the ability of any Consenting Stakeholder or Second Lien Consenting Lender to consult with any other Consenting Stakeholder, Second Lien Consenting Lender, Company Parties, or any other party in interest (including, if applicable, any official committee and the United States Trustee), so long as such consultation does not violate such Consenting Stakeholder's or Second Lien Consenting Lender's support obligations set forth herein, any applicable Confidentiality Agreement, or applicable Law, including the Bankruptcy Code;

(f)     impair or waive the rights of any Consenting Stakeholder or Second Lien Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(g)     prevent any Consenting Stakeholder or Second Lien Consenting Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(h)     obligate a Consenting Stakeholder or Second Lien Consenting Lender to deliver a vote to support the Plan (or any other Restructuring Transactions) or prohibit a Consenting Stakeholder or Second Lien Consenting Lender from withdrawing such vote, in each case, from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date or a material breach of this Agreement by such Consenting Stakeholder or Second Lien Consenting Lender, as applicable);

(i)     prevent any Consenting Stakeholder or Second Lien Consenting Lender from taking any action that is required by applicable Law upon the advice of counsel;

(j)     require any Consenting Stakeholder or Second Lien Consenting Lender to take any action that is prohibited by applicable Law upon the advice of counsel;

(k)     require any Consenting Stakeholder or Second Lien Consenting Lender to waive or forego the benefit of any applicable legal professional privilege;

(l)     unless expressly provided for under this Agreement, require any Consenting Stakeholder or Second Lien Consenting Lender to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations against such Party; or

(m)     prevent any Consenting Stakeholder or Second Lien Consenting Lender from making, seeking, or receiving any required regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, or licenses.

000145
**App. 096**

**Section 6.**          *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Subject in all cases to Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and take all steps reasonably necessary and desirable to implement and consummate the Restructuring Transactions in accordance with the terms and conditions set forth in this Agreement and the Restructuring Term Sheet (including the Milestones);

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment in consultation with the Required Consenting Lenders;

(c)     use commercially reasonable efforts to promptly obtain any and all regulatory and/or third-party approvals that are necessary or advisable to effectuate and consummate the Restructuring Transactions as determined by the Company Parties in consultation with the Required Consenting Lenders, including the expiration of any applicable waiting periods;

(d)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other stakeholders;

(f)     continue ordinary course practices to maintain good standing under the jurisdiction in which each Company Party is incorporated or organized;

(g)     except as otherwise contemplated by this Agreement or any order of the Bankruptcy Court, (i) conduct its businesses and operations only in the ordinary course in a manner that is consistent with past practices and in compliance with applicable Law, taking into account the Restructuring, (ii) maintain its physical assets, properties, and facilities, in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law (ordinary wear and tear and casualty and condemnation excepted), taking into account the Restructuring, (iii) maintain its books and records in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law, and (iv) maintain all insurance policies, or suitable replacements therefor, in full force and effect, in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law;

(h)     provide draft copies of all Definitive Documents to the Required Consenting Lender Advisors  and Second Lien Ad Hoc Group Advisors as soon as reasonably practicable, but in no event less than two (2) Business Days prior to the date when the Company Parties intend to file such documents, and, without limiting any approval rights set forth herein, consult in good faith with the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors regarding the form and substance of any such proposed filing; *provided*, *however*, that in the event that not less than two (2) Business Days' notice is impracticable or impossible under the circumstances, the Company Parties shall provide draft copies of any motions or other pleadings

20

to the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors as soon as otherwise practicable before the time when the Company Parties intend to file any such motion or other pleading;

(i)      pay and reimburse in full in cash in immediately available funds (i) prior to the Petition Date, all Restructuring Expenses accrued within five (5) Business Days of receipt of an invoice therefor (and in any event, before the Petition Date if invoiced before such date), (ii) after the Petition Date and prior to the Plan Effective Date, subject to any applicable orders of the Bankruptcy Court but without the need to file fee or retention applications, all Restructuring Expenses incurred prior to (to the extent not previously paid) on and after the Petition Date, but in any event within five (5) Business Days of delivery to the Company Parties of any applicable invoice or receipt, (iii) on the Plan Effective Date, all Restructuring Expenses incurred and outstanding in connection with the Restructuring Transactions (including any estimated fees and expenses estimated to be incurred through the Plan Effective Date) and after the Plan Effective Date, all accrued and unpaid Restructuring Expenses incurred in connection with the implementation and consummation of the Plan shall be paid by the Company Parties (or their successors in interest) on a regular and continuing basis promptly (but in any event within five (5) Business Days) following receipt of an invoice therefor;

(j)      timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order: (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (iii) dismissing any of the Chapter 11 Cases;

(k)      timely file a formal objection to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file or solicit acceptances of a plan of reorganization, as applicable;

(l)      to the extent requested in writing by the Required Consenting Lender Advisors or the Second Lien Ad Hoc Group Advisors, provide the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors, as applicable, with reasonable access to information (excluding any privileged information) regarding the operations of the Company Parties subject to any confidentiality agreements in effect; and

(m)      promptly inform the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors in writing (email being sufficient) after obtaining actual knowledge of (i) any event or circumstance that has occurred that would permit any Party to terminate this Agreement; or (ii) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt, or securement of security from or by any person in respect of any Company Party.

6.02.   Negative Commitments.  Subject in all cases to Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

000147
**App. 098**

(b)     take any action that is materially inconsistent with, or is intended to frustrate or impede, approval, implementation, and consummation of the Restructuring Transactions or any of the other transactions described in this Agreement or the Definitive Documents;

(c)     (i) execute, deliver, and/or file with the Bankruptcy Court or any other court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions that is not in form and substance acceptable in accordance with the terms set forth in Section 3 hereof, or if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing; or (ii) waive, amend, or modify any of the Definitive Documents, or, if applicable, file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, which waiver, amendment, modification, or filing contains any provision that is materially inconsistent with this Agreement (including the Restructuring Term Sheet) or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3 hereof;

(d)     seek to modify the Definitive Documents, in whole or in part, in a manner that is not consistent with Section 3 hereof;

(e)     without the prior written consent of the Required Consenting Lenders, with respect to any employee or director qualifying as an insider under the Bankruptcy Code, (i) enter into or amend, establish, adopt, restate, supplement, or otherwise modify or accelerate (A) any deferred compensation, incentive, success, retention, bonus, or other compensatory arrangements, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any such insider employee, or (B) any contracts, arrangements, or commitments that entitle any current or former insider director, officer, employee, manager, or agent to indemnification from the Company Parties, or (ii) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements) with respect to such insiders;

(f)     grant or agree to grant (including pursuant to a key employee retention plan, key employee incentive plan, or other similar arrangement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance, or other compensation or benefits of any employee or director qualifying as an insider under the Bankruptcy Code in each case, outside of the ordinary course of business and inconsistent with past practice, without the prior written consent of the Required Consenting Lenders;

(g)     (i) commence any proceeding or other action that challenges in a manner inconsistent with this Agreement or the Restructuring Term Sheet (A) the amount, validity, allowance, character, enforceability, or priority of any Company Claims or Interests of any of the Consenting Stakeholders or Second Lien Consenting Lenders, or (B) the validity, enforceability, or perfection of any lien or other encumbrance securing (or purporting to secure) any First Lien Claim or Second Lien Claim; (ii) otherwise seek to restrict any rights of any of the Consenting Stakeholders or Second Lien Consenting Lenders; or (iii) support any person in connection with any of the acts described in the foregoing clauses;

000148

**App. 099**

(h)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind against the other Parties in connection with the Restructuring, other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement or any Definitive Document;

(i)      without the prior written consent of the Required Consenting Lenders, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(j)      amend or change, or propose to amend or change, any of their respective existing organizational documents without the prior written consent of the Required Consenting Lenders;

(k)      (i) authorize, create, issue, sell, or grant any additional Interests, or (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Interests, in each case without the prior written consent of the Required Consenting Lenders.

(l)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(m)      file any motion, pleading, or Definitive Document with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement;

(n)      commence any process to sell, transfer, dispose, or otherwise monetize any assets of any of the Company Parties in a transaction or a series of transactions having a fair market value of $10,000,000 or greater without the prior written consent of the Required Consenting Lenders; or

(o)      assume, reject, terminate, settle, or renegotiate any material contract (including any material executory contracts and unexpired leases) without the prior written consent of the Required Consenting Lenders.

**Section 7.**      *Additional Provisions Regarding the Company Parties' Commitments*.

7.01.      <u>Non-Solicitation</u>.  The Company Parties shall not, directly or indirectly, solicit any Alternative Restructuring Proposal.

7.02.      <u>Company Parties' Fiduciary Duties</u>. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, to take any action or to refrain from taking any action to the extent such Company Party determines in good faith, after consultation with counsel, that taking or failing to take such action may violate applicable Law or be inconsistent with its fiduciary obligations under applicable Law.  The Company Parties shall promptly notify the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors in writing (email being sufficient) of any such determination within two (2) Business Days following such determination.  This Section 7.02 shall not impede any Consenting

000149
**App. 100**

Stakeholder's or Second Lien Consenting Lender's right to terminate this Agreement pursuant to Section 12 of this Agreement in accordance with the terms hereof.

7.03.    Alternative Restructuring Proposals. Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), if any Company Party receives a written or oral proposal or expression of interest from any Person or Entity regarding any Alternative Restructuring Proposal that its board of directors, board of managers, or similar governing body determines in good faith and following consultation with counsel represents a higher or otherwise better economic recovery to its stakeholders, as compared to the Restructuring, the Company Parties shall have the right to: (i) consider, respond to, facilitate, discuss, negotiate, support, or otherwise pursue such Alternative Restructuring Proposal; (ii) provide access to non-public information concerning the Company Parties to any Person or Entity and enter into any confidentiality agreement with such Person or Entity in connection therewith; and (iii) otherwise cooperate with, assist, or participate in any inquiries, proposals, discussions, or negotiations of such Alternative Restructuring Proposal. Within two (2) Business Days of a determination pursuant to this Section 7.03, the Company shall notify (with email being sufficient) the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors of such proposal or expression of interest, with, subject to Section 7.04, such notice to include a copy of such proposal, if it is in writing, or otherwise a summary of the material terms thereof.

7.04.    Notifications Regarding Alternative Restructuring Proposals. The Company Parties shall (a) provide to the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors on a professional eyes only basis, (1) a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for any Alternative Restructuring Proposal pursued under Section 7.03, if not barred under any applicable Confidentiality Agreement between any Company Party and the submitting party or such submitting party otherwise consents or (2) a summary of the material terms thereof, if any Company Party is bound by a Confidentiality Agreement with, or other known contractual or legal obligation of confidentiality to, the submitting party, in each case within two (2) Business Days of the Company Parties' or their advisors' receipt of such offer or proposal, and (b) provide such information to the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors regarding such discussions (including copies of any materials provided to such parties hereunder) as necessary to keep the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors reasonably contemporaneously informed as to the status and substance of such discussions.

7.05.    Non-Waiver of Company Parties' Rights. Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**    *Transfer of Interests and Securities*.

8.01.    Permitted Transfers. During the Agreement Effective Period, no Consenting Stakeholder or Second Lien Consenting Lender shall Transfer any ownership interest (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims or Interests to any affiliated or unaffiliated party, including any

24

party in which it may hold a direct or indirect beneficial interest, unless: either (i) the transferee executes and delivers to counsel to the Company Parties, Required Consenting Lender Advisors, and Second Lien Ad Hoc Group Advisors at or before the time of the proposed Transfer, a Transfer Agreement, or (ii) the transferee is a Consenting Stakeholder or Second Lien Consenting Lender, or an Affiliate of such Party, bound by the terms of this Agreement and the transferee provides notice of such Transfer (including the amount and type of Company Claim or Interest Transferred) to counsel to the Company Parties and to the Required Consenting Lender  Advisors by the close of business on the second Business Day following such Transfer.  Notwithstanding the foregoing, this Section 8 shall not apply to the grant of any lien or encumbrance on any right, title or interest in a Company Claim or Interest in favor of a bank or broker-dealer holding custody of any such right, title or interest in the Company Claim or Interest in the ordinary course of business that is released upon the Transfer of any such right, title or interest.

8.02.   <u>Effectiveness of Permitted Transfers</u>. Upon compliance with the requirements of Section 8.01, the Permitted Transferee shall be deemed a Consenting Stakeholder or Second Lien Consenting Lender, as applicable, and the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims or Interests. Any Transfer that does not comply with Section 8.01 or Section 8.03, as applicable, shall be void *ab initio*.

8.03.   <u>Additional Company Claims or Interests</u>. This Agreement shall in no way be construed to preclude the Consenting Stakeholders or Second Lien Consenting Lenders from acquiring additional Company Claims or Interests; *provided*, *however*, that (a) such additional Company Claims or Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder or Second Lien Consenting Lender, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties, the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors) and (b) such Consenting Stakeholder or Second Lien Consenting Lender must provide notice of such acquisition (including the amount and type of Company Claim or Interest acquired) to counsel to the Company Parties, the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors within five (5) Business Days of such acquisition.

8.04.   <u>No Cleansing</u>. This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing" materials or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder or Second Lien Consenting Lender to Transfer any of its Company Claims or Interests.  Notwithstanding the foregoing, if a Company Party and another Party have entered into a confidentiality agreement, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations of the Company Parties otherwise arising under such confidentiality agreements.

8.05.   <u>Qualified Marketmaker Matters</u>. Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims or Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims or Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims or Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims or Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a

25

transferee that is an Entity that is not an Affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is a permitted transfer under Section 8.01. To the extent that a Consenting Stakeholder or Second Lien Consenting Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Company Claims or Interests that the Qualified Marketmaker acquires from a Holder of the Company Claims or Interests who is not a Consenting Stakeholder or Second Lien Consenting Lender without the requirement that the transferee be a Permitted Transferee. For the avoidance of doubt, if a Qualified Marketmaker acquires any Company Claims or Interests from a Consenting Stakeholder or Second Lien Consenting Lender and is unable to transfer such Company Claims or Interests within the five (5) Business Day period referred to above, the Qualified Marketmaker shall execute and deliver a Transfer Agreement in respect of such Company Claims or Interests.

**Section 9.**     *Representations and Warranties of the Consenting Stakeholders and Second Lien Consenting Lenders*.

9.01.   Each Consenting Stakeholder and Second Lien Consenting Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder or Second Lien Consenting Lender executes and delivers this Agreement:

(a)     it is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims or Interests or is the nominee, investment manager, or advisor for beneficial Holders of the Company Claims or Interests reflected in such Consenting Stakeholder's or Second Lien Consenting Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)     it has the full power and authority to tender, act on behalf of, vote, and consent to matters concerning, such Company Claims or Interests, subject to applicable Law;

(c)     such Company Claims or Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Stakeholder's or Second Lien Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)     it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), (7), (8), (9), (12), and (13) under the Securities Act of 1933, as amended), and any securities acquired by the Consenting Stakeholder or Second Lien Consenting Lender in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

000152

**Section 10.**     *Representations and Warranties of the Company Parties.*

10.01. Each Company Party represents and warrants that as of the date such Company Party executes and delivers this Agreement:

(a)     to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented, or resolution of such Company Party passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, or other similar officer in respect of such Company Party; *provided* that this Section 10 does not apply to any proceeding commenced in connection with filing the Chapter 11 Cases;

(b)     except as expressly provided for in this Agreement, it has not entered into any arrangement (including with any individual creditor, irrespective of whether it is or is to become a Consenting Stakeholder or Second Lien Consenting Lender), other than in the ordinary course of its business, on terms that are materially inconsistent with this Agreement;

(c)     to the best of its knowledge, the execution and delivery by it of this Agreement does not result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases of any Company Parties undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contract to which it is a party; and

(d)     to the best of its knowledge, the diligence materials and other information concerning the Company Parties that such Company Party or its advisors provided to any Consenting Stakeholder or Second Lien Consenting Lender in connection with an actual or potential restructuring of the Company Parties did not, taken as a whole and as of the date such materials or information were so provided, contain any untrue statement of material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not materially misleading; *provided*, *however*, that, with respect to any projected financial information, forecasts, estimates, or forward-looking information, each Company Party represents only that such information was prepared in good faith based upon assumptions it believed to be reasonable at the time.

**Section 11.**     *Mutual Representations and Warranties*.

11.01. Each of the Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, a Joinder, or a Transfer Agreement, as applicable:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, as applicable (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring Transactions), no consent or approval is required by any other

27

person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other organizational or constitutional documents;

(d)     except as expressly provided in this Agreement and subject to any regulatory authority necessary to consummate the Restructuring Transactions, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements relating to the Company Parties with any Person or Entity that have not been disclosed to all Parties to this Agreement.

**Section 12.**     *Termination Events*.

12.01.   First Lien Consenting Lender and Second Lien Consenting Lender Termination Events.  This Agreement may be terminated with respect to (i) the First Lien Consenting Lenders by the Required Consenting Initial First Lien Ad Hoc Group Members, (ii) the PVKG Lender solely as to itself,[2] or (iii) the Second Lien Consenting Lenders solely as to themselves by the Required Consenting Initial Second Lien Ad Hoc Group Members (provided, however, that the termination events set forth in sections 12.01(a)-(g), (n), (q), (r), and (s) may only be exercisable by the Second Lien Consenting Lenders to the extent that such termination event reasonably, directly or indirectly, impacts the rights, distribution and treatment of the Consenting Second Lien Lenders provided for herein, or such other consent rights of the Required Initial Consenting Second Lien Lenders set forth herein), in each case, by delivering to the Company Parties a written notice in accordance with Section 14.10 upon the occurrence of any of the following events:

(a)     the breach in any material respect by any Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice in accordance with Section 14.10 detailing any such breach;

(b)     any of the Milestones set forth in the Restructuring Term Sheet is not achieved, except where such Milestone has been waived or extended by the Required Consenting Lenders; *provided*, *however*, that the right to terminate this Agreement under this Section 12.01(b) shall not be available if the failure of such Milestone to be achieved is caused by, or results from, the breach by the terminating Party of its covenants, agreements, or other obligations under this Agreement;

---

[2]     Any such termination by the PVKG Lender shall also apply in its capacity as a Consenting Sponsor.

28

(c)      this Agreement or any Definitive Document is amended, waived, or modified in any manner not consistent in any material respect with the terms of this Agreement and Restructuring Term Sheet;

(d)      any Company Party (i) files any motion or pleading that is inconsistent in any material respect with this Agreement or the Restructuring Term Sheet, (ii) files a pleading seeking approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is materially inconsistent with or not permitted by this Agreement without the prior written consent of the Required Consenting Lenders, the Required ABL DIP Lenders (solely with respect to the ABL DIP Documents), and the Required Term DIP Lenders (solely with respect to the Term DIP Loan Documents), (iii) revokes the Restructuring Transactions without the prior written consent of the Required Consenting Lenders, including execution of a written agreement with respect to an Alternative Restructuring Proposal or the withdrawal of the Plan, as applicable, or support therefor, (iv) exercises its rights set forth in Section 7.02, or (v) publicly announces its intention to take any such acts listed in the foregoing clauses (i), (ii), (iii) or (iv), or is otherwise inconsistent with the consent rights afforded such Parties under this Agreement;

(e)      a Company Party files a motion or pleading seeking an order (without the prior written consent of the Required Consenting Lenders, the Required ABL DIP Lenders, and the Required Term DIP Lenders) vacating or modifying the DIP Orders;

(f)      if (i) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the prior written consent of the Required Consenting Lenders, Required ABL DIP Lenders, and the Required Term DIP Lenders, or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company Parties fail to timely object to such motion;

(g)      the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the DIP Orders or otherwise consented to by the Required Consenting Lenders, the Required ABL DIP Lenders, and the Required Term DIP Lenders;

(h)      the occurrence of any "Event of Default" under (and as defined in) the DIP Orders, the ABL DIP Documents, or the Term DIP Loan Documents that has not been cured (if susceptible to cure) or waived by the Required ABL DIP Lenders or the Required Term DIP Lenders, as applicable;

(i)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with outside counsel and pursuant to Section 7.02 or Section 7.03, as applicable, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(j)      the Bankruptcy Court enters an order denying confirmation of the Plan or disallowing any material provision thereof and (i) such order remains in effect for fifteen (15) Business Days after entry of such order and (ii) the Company Parties have failed to timely appeal such order;

000155
**App. 106**

(k)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Lenders), (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iv) rejecting this Agreement;

(l)     upon the commencement of an involuntary case against any of the Company Parties or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief in respect of the Company Parties or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership, or similar law now or hereafter in effect; *provided*, *however*, that termination pursuant to this Section 12.01(l) shall only be effective if such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof, or if any court order grants the relief sought in such involuntary proceeding;

(m)     the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any Company Party's exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(n)     any Company Party files any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting Lenders;

(o)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after the Required Consenting Lenders transmit a written notice in accordance with Section 14.10 detailing any such issuance; *provided*, *however*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(p)     (i) the entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, recharacterizing, or limiting, in any respect, as applicable, the enforceability, priority, or validity of any of the First Lien Claims with respect to the Consenting Stakeholders or of the Second Lien Claims with respect to the Second Lien Consenting Lenders, other than an order approving the transactions as contemplated by this Agreement or the Restructuring Term Sheet, as applicable, or (ii) the filing of any motion, application, or adversary proceeding by the Company Parties (or the Company Parties support any other party filing any motion, application, or adversary proceeding) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, recharacterization, or subordination of any First Lien Claims or Second Lien Claims, as applicable, in a manner inconsistent with this Agreement or the Restructuring Term Sheet;

(q)     the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement or the Restructuring Term Sheet or (ii) frustrates the purposes of this Agreement, unless the order

30

granting such relief has been stayed, modified, or reversed within fourteen (14) days after such terminating party delivers a written notice in accordance with Section 14.10 hereof;

(r)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset(s) of the Company Parties and such order materially and adversely affect any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions;

(s)     the failure by the Company Parties to pay any of the Restructuring Expenses as and when required under this Agreement;

(t)     solely with respect to the Consenting Second Lien Lenders, the breach in any material respect by any Consenting Stakeholder of the agreements of the Consenting Stakeholder set forth in Section 4.03 of this Agreement that remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice in accordance with Section 14.10 detailing any such breach; or

(u)     the termination of this Agreement in accordance with its terms by the Company Parties.

12.02.  Company Parties' Termination Events. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by one or more First Lien Consenting Lenders of any representations, warranties, or covenants set forth in this Agreement that remains uncured (to the extent curable) for a period of five (5) Business Days after the receipt by the Required Consenting Lenders of notice of such breach; *provided*, *however*, that, so long as First Lien Consenting Lenders that have not breached this Agreement continue to hold or control at least 66 2/3% of the aggregate amount of the First Lien Claims, termination shall be effective only with respect to such breaching First Lien Consenting Lender;

(b)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with outside counsel and pursuant to Section 7.02 or Section 7.03, as applicable, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)     the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fifteen (15) Business Days after entry of such order;

(d)     the filing of any motion or pleading by any First Lien Consenting Lender with the Bankruptcy Court that (i) is inconsistent in any material respect with this Agreement or the Restructuring Term Sheet or (ii) seeks approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is materially inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded the Company Parties under this Agreement) without the prior written consent of the Company Parties, and such

31

motion or pleading has not been withdrawn within two (2) Business Days of the Company Parties notifying the Required Consenting Lenders and such filing party; *provided*, *however*, that, so long as First Lien Consenting Lenders that have not breached this Agreement continue to hold or control at least 66 2/3% of the aggregate amount of the First Lien Claims, termination shall be effective only with respect to such breaching First Lien Consenting Lender;

(e)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; *provided*, *however*, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

12.03.   <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement by the Company Parties and the Required Consenting Lenders.

12.04.   <u>Individual Termination Right</u>. Any Consenting Stakeholder or Second Lien Consenting Lender may terminate this Agreement as to itself only, upon five (5) Business Days' written notice to the Company Parties and the Required Consenting Lenders if this Agreement is modified, amended, supplemented, or waived in a manner that adversely affects the economic rights (including economic entitlements) or benefits of such Consenting Stakeholder or Second Lien Consenting Lender without its prior written consent.

12.05.   <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice immediately upon the occurrence of the Plan Effective Date.

12.06.   <u>Effect of Termination</u>.

(a)      <u>No Further Force and Effect</u>. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Company Claims or Interests or other Claims or Causes of Action.

(b)      <u>Termination and Voting</u>. Upon the occurrence of a Termination Date prior to the Plan Effective Date, any and all consents or ballots tendered by a Party subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided*, *however*, any Party withdrawing or changing its vote pursuant to this Section 12.08(b) shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such

000158
**App. 109**

withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.

(c)    Material Breaches. No purported termination of this Agreement shall be effective under this Section 12 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(b). Nothing in this Section 12 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

(d)    Miscellaneous. Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder or Second Lien Consenting Lender, and (b) any right of any Consenting Stakeholder or Second Lien Consenting Lender, or the ability of any Consenting Stakeholder or Second Lien Consenting Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party.

**Section 13.**    *Amendments and Waivers*.

13.01.   Amendments. This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13. Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*. This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by the Company Parties and the Required Consenting Lenders; *provided*, *however*, that (i) if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims or Interests held by a Consenting Stakeholder or Second Lien Consenting Lender as compared to similarly situated Parties, then the prior written consent of each such affected Party shall also be required to effectuate such modification, amendment, waiver, or supplement; (ii) if the proposed modification, amendment, waiver, or supplement does not provide for equal treatment of the KL Note Claims and First Lien Term Loan Claims, then the prior written consent of the KL Lender shall also be required; (iii) if the proposed modification, amendment, waiver, or supplement does not provide for equal rights to the Holders of, and the treatment of, the PVKG Note Claims and First Lien Term Loan Claims, then the prior written consent of the PVKG Lender shall also be required; (iv) if the proposed modification, amendment, waiver, or supplement reasonably relates to matters that, directly or indirectly, relate to the rights, distribution and treatment of the Consenting Second Lien Lenders provided for herein or the consent rights of the Required Consenting Second Lien Ad Hoc Group Members provided for herein, then the prior written consent of the Required Consenting Second Lien Ad Hoc Group Members shall also be required; (v) if the proposed modification, amendment, waiver, or supplement requires any Consenting Stakeholder to incur any expenses, liabilities, or other obligations, or to agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other

000159
**App. 110**

obligations against such Consenting Stakeholder, then the prior written consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver, or supplement; (vi) any modification, amendment, waiver, or supplement to Section 3.02 or this Section 13.01 shall require the prior written consent of all Parties; and (vii) any modifications, amendments, or supplements to the definitions of "Required Consenting Lenders," "Required Consenting Initial First Lien Ad Hoc Group Members," "Required Consenting Initial Second Lien Ad Hoc Group Members," or the rights set forth herein attributable thereto, shall require the prior written consent of all Consenting Stakeholders, Second Lien Consenting Lenders and Company Parties.

13.02.   Waiver.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other applicable remedies.

**Section 14.**   *Miscellaneous*.

14.01.   Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities, loans, or other instruments or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and other applicable Law.

14.02.   Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, schedules, annexes, and signature pages attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, schedules, annexes, and signature pages. In the event of any inconsistency between this Agreement (without reference to the exhibits, schedules, and annexes hereto) and the exhibits, schedules, and annexes hereto, this Agreement (without reference to the exhibits, schedules, and annexes thereto) shall govern.

14.03.   Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.   Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter

000160
**App. 111**

hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Upon the commencement of the Chapter 11 Cases, each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court and, with respect to such claims, (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06.  TRIAL BY JURY WAIVER.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07.  Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08.  Rules of Construction. This Agreement is the product of negotiations among the Company Parties, the Consenting Stakeholders, and the Second Lien Consenting Lenders. In the enforcement or interpretation of this Agreement, this Agreement shall be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the enforcement or interpretation hereof. The Company Parties, Consenting Stakeholders, and Second Lien Consenting Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  Successors and Assigns; Third Parties. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and, except as set forth in

000161
**App. 112**

Section 8, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

14.10.  <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

ConvergeOne Holdings, Inc.
10900 Nesbitt Ave. S.
Bloomington, MN 55437
Attention:  Rui Goncalves
E-mail:  rgoncalves@onec1.com

with copies to:

White & Case LLP
111 S. Wacker Dr.
Chicago, IL 60606
Attention:  Bojan Guzina, Andrew F. O'Neill, Erin R. Rosenberg, Blair M.
Warner, and Adam T. Swingle
E-mail:  bojan.guzina@whitecase.com
         aoneill@whitecase.com
         erin.rosenberg@whitecase.com
         blair.warner@whitecase.com
         adam.swingle@whitecase.com

(b)      if to the PVKG Lender or a Consenting Sponsor, to:

PVKG Investment Holdings, Inc.
712 Fifth Avenue, Suite 43
New York, NY 10019

and

Latham & Watkins LLP
1271 6th Ave
New York, NY 10020
Attention:  Keith A. Simon, Joshua Tinkelman, and David
Hammerman
E-mail:  Keith.Simon@lw.com
         Joshua.Tinkelman@lw.com
         David.Hammerman@lw.com

36

(c)    if to the KL Lender, to:

Kennedy Lewis Investment Management LLC
225 Liberty Street, Suite 4210
New York, NY 10281

and

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attention:  Daniel I. Fisher

E-mail:  dfisher@akingump.com

(d)    if to a member of the First Lien Ad Hoc Group or to the First Lien Ad Hoc Group
Advisors, to:

Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention:  Scott J. Greenberg, Keith R. Martorana, and Michelle
Choi
E-mail:  SGreenberg@gibsondunn.com
           KMartorana@gibsondunn.com
           MChoi@gibsondunn.com

(e)    if to a member of the Second Lien Ad Hoc Group or to the Second Lien Ad Hoc
Group Advisors, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:  Adam L. Shpeen and Abraham Bane
E-mail:  adam.shpeen@davispolk.com
           abraham.bane@davispolk.com

Any notice given by electronic mail, courier, registered or certified mail shall be effective when
received.

14.11.  <u>Independent Due Diligence and Decision Making</u>. Each Consenting Stakeholder
and Second Lien Consenting Lender hereby confirms that its decision to execute this Agreement
has been based upon its independent investigation of the operations, businesses, financial, and
other conditions and prospects of the Company Parties.

14.12.  <u>Enforceability of Agreement</u>. Each of the Parties to the extent enforceable waives
any right to assert that the exercise of any termination rights under this Agreement is subject to the

37

automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.   Settlement Discussions. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

14.14.   Specific Performance. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.   Several, Not Joint, Claims.   The agreements, representations, warranties, and obligations of the Company Parties under this Agreement are joint and several.   The agreements, representations, warranties, and obligations of the Consenting Stakeholders and Second Lien Consenting Lenders under this Agreement are, in all respects, several and neither joint nor joint and several.

14.16.   Severability and Construction. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect.

14.17.   Remedies Cumulative. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18.   Capacities of Consenting Stakeholders. Each Consenting Stakeholder and Second Lien Consenting Lender has entered into this agreement on account of all Company Claims or Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims or Interests.

14.19.   Relationship Among the Parties. None of the Consenting Stakeholders or Second Lien Consenting Lenders shall have any fiduciary duty, any duty or trust or confidence in any form, or other duties or responsibilities to each other, the Company Parties, or any of the Company Parties' other creditors or stakeholders, including without limitation any Holders of Company

000164

Claims or Interests, and, other than as expressly set forth herein, there are no commitments among or between the Consenting Stakeholders or Second Lien Consenting Lenders. It is understood and agreed that any Consenting Stakeholders or Second Lien Consenting Lenders may trade in any equity securities, debt, or debt securities of the Company Parties without the prior written consent of the Company Parties or any other Party, subject to applicable securities laws, any Confidentiality Agreement, and this Agreement. No prior history, pattern, or practice of sharing confidences among or between any of the Consenting Stakeholders, Second Lien Consenting Lenders, or the Company Parties shall in any way affect or negate this understanding and agreement. All rights under this Agreement are separately granted to each Consenting Stakeholder or Second Lien Consenting Lender, or by the Company Parties, and vice versa, and the use of a single document is for the convenience of the Company Parties. The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

14.20.  <u>Survival</u>. Notwithstanding (i) any Transfer of any Company Claims or Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 14.05, 14.06, 14.13, 14.14, and 14.22 and in the Confidentiality Agreements shall survive such Transfer or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

14.21.  <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement by any Party, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.22.  <u>Confidentiality and Publicity</u>. Other than to the extent required by applicable Law and regulation or by any governmental or regulatory authority, no Party shall disclose to any person (including for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial, and other advisors to the Company Parties (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and whose compliance with such obligations the Company Parties shall be responsible for), the principal amount or percentage of the Company Claims or Interests held by any First Lien Consenting Lender, any Second Lien Consenting Lender or any of their respective subsidiaries (including, for the avoidance of doubt, any Company Claims or Interests acquired pursuant to any Transfer) or the signature page of such First Lien Consenting Lender or Second Lien Consenting Lender; provided, however, that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Company Claims or Interests held by the First Lien Consenting Lenders and Second Lien Consenting Lenders, collectively. Notwithstanding the foregoing, the First Lien Consenting Lenders and Second Lien Consenting Lenders hereby consent to the disclosure of the execution, terms, and contents of this Agreement by the Company Parties in the Definitive Documents to the extent required by law or regulation; provided, however, that (i) if any of the Company Parties determines that it is required to attach a copy of this Agreement, a Joinder, or a Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, to the extent permissible under applicable Law, it will redact any reference to or concerning a specific First Lien Consenting

000165
**App. 116**

Lender's holdings of Company Claims or Interests (including before filing any pleading with the Bankruptcy Court) and such First Lien Consenting Lender's and Second Lien Consenting Lender's signature page and (ii) if disclosure of additional information of any First Lien Consenting Lender or Second Lien Consenting Lender is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each applicable First Lien Consenting Lender or Second Lien Consenting Lender (who shall have the right to seek a protective order prior to disclosure). Notwithstanding the foregoing, the Company Parties will submit to the Required Consenting Lender Advisors and the Second Lien Ad Hoc Group Advisors all press releases, public filings, public announcements, or other communications with any news media, or material mass communications, other than in the ordinary course of business and unrelated to this Agreement or the Restructuring Transactions, with any customers, vendors, or current or former employees, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least two (2) Business Days in advance of release (it being understood that such period may be shortened to the extent there are exigent circumstances) and will use commercially reasonable, good faith efforts to incorporate any comments provided by the Required Consenting Lender Advisors and the Second Lien Ad Hoc Group Advisors. Nothing contained herein shall be deemed to waive, amend, or modify the terms of any Confidentiality Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

*[Signature pages follow.]*

40

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**PVKG Intermediate Holdings Inc., and
ConvergeOne Holdings Inc., on behalf of themselves
and each of their direct and indirect subsidiaries listed on Exhibit [A] hereto**.

By: _____

Name: Rui Goncalves
Title:   General Counsel

*[Consenting Stakeholders' and Second Lien Consenting Lenders'*
*signature pages on file with the Company Parties]*

<u>**Exhibit A**</u>

**Company Parties**

**<u>Company Parties</u>**

AAA Network Solutions, Inc.
ConvergeOne Dedicated Services, LLC
ConvergeOne Government Solutions, LLC
ConvergeOne Holdings, Inc.
ConvergeOne Managed Services, LLC
ConvergeOne Systems Integration, Inc.
ConvergeOne Technology Utilities, Inc.
ConvergeOne Texas, LLC
ConvergeOne Unified Technology Solutions, Inc.
ConvergeOne, Inc.
Integration Partners Corporation
NetSource Communications Inc.
NuAge Experts LLC
Providea Conferencing, LLC
PVKG Intermediate Holdings Inc.
Silent IT, LLC
WrightCore, Inc.

**<u>Exhibit B</u>**

**Restructuring Term Sheet**

**ConvergeOne Holdings, Inc.,** *et al.*
**RESTRUCTURING TERM SHEET**[1]

THIS TERM SHEET (THE "RESTRUCTURING TERM SHEET") SETS FORTH THE PRINCIPAL TERMS OF THE RESTRUCTURING TRANSACTIONS AND CERTAIN RELATED TRANSACTIONS CONCERNING THE COMPANY PARTIES AGREED TO BY THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS. THIS RESTRUCTURING TERM SHEET DOES NOT CONTAIN A COMPLETE LIST OF ALL TERMS AND CONDITIONS OF THE POTENTIAL TRANSACTIONS DESCRIBED HEREIN. SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT TO WHICH THIS RESTRUCTURING TERM SHEET IS ATTACHED, THE RESTRUCTURING TRANSACTIONS SHALL BE CONSUMMATED THROUGH A PREPACKAGED PLAN OF REORGANIZATION IN THE CHAPTER 11 CASES.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THIS RESTRUCTURING TERM SHEET AND THE UNDERTAKINGS CONTEMPLATED HEREIN ARE SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION, AND DELIVERY OF DEFINITIVE DOCUMENTATION ACCEPTABLE TO THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS, AS APPLICABLE, AND SUBJECT TO ANY APPLICABLE CONSENT RIGHTS OF THE SECOND LIEN CONSENTING LENDERS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT. THIS RESTRUCTURING TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS RESTRUCTURING TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON OR ENTITY PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE RULE, STATUTE, OR DOCTRINE OF SIMILAR IMPORT PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS, WHETHER ARISING UNDER FEDERAL OR STATE LAW. UNTIL PUBLICLY DISCLOSED UPON THE PRIOR WRITTEN AGREEMENT OF THE COMPANY PARTIES AND CONSENTING STAKEHOLDERS, THIS RESTRUCTURING TERM SHEET SHALL REMAIN STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY OTHER PARTY OR PERSON WITHOUT THE CONSENT OF THE COMPANY PARTIES AND CONSENTING STAKEHOLDERS.

THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS AND EFFECTS RELATED TO THE RESTRUCTURING TRANSACTIONS OR ANY RELATED RESTRUCTURING OR SIMILAR TRANSACTION HAVE NOT BEEN FULLY EVALUATED AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY RESTRUCTURING TRANSACTIONS OR RELATED TRANSACTIONS.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW, INCLUDING THE BANKRUPTCY CODE.

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement.

| Restructuring Term Sheet | |
|---|---|
| **Restructuring Overview** | |
| **Debtors** | The Company Parties that are listed on **Exhibit A** to the Restructuring Support Agreement, which shall also be signatories to the Restructuring Support Agreement (each a "***Debtor***" and collectively, the "***Debtors***"). |
| **Restructuring Overview** | The Restructuring Transactions shall be implemented pursuant to the Definitive Documents through confirmation of a prepackaged chapter 11 plan (the "***Plan***") in cases to be commenced by the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, *et seq.* (as amended, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***" and such cases, the "***Chapter 11 Cases***"). |
| | The Restructuring Transactions shall be subject to the Definitive Documents, the terms of the Restructuring Support Agreement (including the exhibits thereto), and the consent rights set forth therein. |
| | The Restructuring Transactions provide for: |
| | (i) the incurrence of the ABL DIP Facility in accordance with the ABL DIP Documents, including the ABL DIP Term Sheet attached hereto as **Exhibit 1**, which, on the Effective Date, shall be (a) refinanced by the Exit ABL Facility by means of a cashless settlement or (b) indefeasibly paid in full in cash (or any combination thereof); |
| | (ii) the incurrence of the Term DIP Facility in accordance with the Term DIP Loan Documents, including the Term DIP Term Sheet attached hereto as **Exhibit 2**; |
| | (iii) the incurrence of the Exit ABL Facility on terms and conditions reasonably satisfactory to the Debtors and the Required Consenting Lenders, and the Exit Term Loan Facility in accordance with the Exit Term Loan Facility Documents, and in each case consistent with terms set forth below; |
| | (iv) a $245.0 million (subject to increase with the consent of the Debtors and the Required Consenting Lenders) equity rights offering (the "***Rights Offering***") which shall provide Rights Offering Rights, subject to the Holdback and the Put Option Premium (each as defined in the Rights Offering Term Sheet attached hereto as **Exhibit 3**) to the Holders of First Lien Claims eligible to participate in the Rights Offering on the terms and conditions set forth in the Rights Offering Term Sheet (as such terms may be modified subject to the consent rights set forth in the Restructuring Support Agreement) to be backstopped by the Investors (as defined in the Rights Offering Term Sheet) that commit to do so in accordance with the Backstop Agreement; |

2

| | |
|---|---|
| | (v)   in full and final satisfaction of each First Lien Claim, each Holder of a First Lien Claim shall have the right to elect to receive its applicable pro rata share of (which elections shall be (i) adjusted on a pro rata basis, based on oversubscription, as necessary, so that participation in each recovery option is capped at 50% of the First Lien Claims) and (ii) subject to the DIP Term Loan Rights (as defined in the Term DIP Term Sheet): <br><br>(a) the Takeback Term Loan Recovery Option; or <br><br>(b) the Rights Offering Rights and Takeback Term Loan Recovery Option. <br><br>(vi)   the PVKG Note Claims shall be Allowed in the aggregate amount of $213.0 million; <br><br>(vii)   in full and final satisfaction of each Second Lien Claim, each Holder of a Second Lien Claim shall receive its applicable pro rata share of the Second Lien Recovery; <br><br>(viii)   all General Unsecured Claims shall be reinstated, paid in full, or otherwise provided such treatment as to render them unimpaired; and <br><br>(ix)   all Existing C1 Interests shall be cancelled and no consideration shall be paid to Holders of such Existing C1 Interests in respect thereof. |
| **ABL DIP Facility** | Subject to the terms of the ABL DIP Commitment Letter and ABL DIP Documents, the Debtors shall obtain a senior secured superpriority priming debtor-in-possession asset-based revolving credit facility, in the aggregate principal amount of up to $250.0 million (subject to the Borrowing Base (as such term is defined in the ABL DIP Term Sheet), which shall be approved by the Bankruptcy Court, and which shall provide for a roll-up and conversion of all Prepetition ABL Secured Obligations, on a cashless, dollar-for-dollar basis, into new loans or commitments that repay or effectively replace all such Prepetition ABL Secured Obligations in full and become indebtedness and obligations under the ABL DIP Facility. <br><br>Upon the substantial consummation of the Plan, the remaining principal balance of the ABL DIP Loans (including any swingline loans, floorplan advances, and letters of credit issued thereunder) shall (a) if the ABL DIP Lenders (or a subset thereof) commit to provide the Exit ABL Facility (as defined below), automatically convert into asset-based revolving loans or letters of credit under an exit first lien asset based lending facility (the "***Exit ABL Facility***"), which shall be subject to (i) definitive documentation on terms to be agreed by the Debtors, the Required ABL DIP Lenders, and the Required Consenting Lenders, consistent with the consent rights set forth in the Restructuring Support Agreement, (ii) the Plan being in form and substance consistent in all material respects with the terms set forth in the Restructuring Support Agreement and such other terms to be agreed by the Debtors and the Required Consenting Lenders, consistent with the consent rights set forth in the Restructuring Support Agreement, and (iii) the |

3

| | |
|---|---|
| | consummation of such Plan, or (b) be indefeasibly paid in full in cash (or any combination thereof).<br><br>The Exit ABL Facility shall be subject to an intercreditor agreement on substantially the same terms as the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement) (the "**Exit Intercreditor Agreement**").<br><br>The obligations under the ABL DIP Facility are referred to herein as the "**ABL DIP Facility Claims**." |
| **Term DIP Facility** | The Term DIP Lenders (as defined in the Term DIP Term Sheet) shall provide multiple draw term loans in an aggregate principal amount of $215.0 million (the "**Term DIP Loans**") of which (i) $145.0 million shall be available in one draw upon entry of the Interim DIP Order, and (ii) $70.0 million shall be available for borrowing upon entry of the Final DIP Order and the satisfaction of certain other conditions precedent set forth in the Term DIP Term Sheet, each in accordance with the terms and conditions set forth in the Term DIP Loan Documents.<br><br>The obligations under the Term DIP Facility are referred to herein as the "**Term DIP Facility Claims**." |
| **Exit Term Loan Facility** | On the Effective Date, the Reorganized Debtors shall incur a secured term loan facility in the aggregate principal amount of not greater than $243 million (the "**Exit Term Loan Facility**") under an exit financing credit agreement (the "**Exit Term Loan Credit Agreement**").<br><br>The Exit Term Loan Facility shall consist of term loans issued to the Holders of First Lien Claims (the "**Takeback Term Loans**"), subject to the following material terms:<br><br>Interest Rate:  At the option of the Debtors, (i) SOFR (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate or (ii) Base Rate (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate, in each case payable in cash; *provided* that at any time an event of default exists under the Exit Term Loan Facility the Debtors shall not be able to elect SOFR.<br><br>Applicable Rate: 4.75% in the case of Base Rate loans and 5.75% in the case of SOFR loans.<br><br>Default Interest: During the continuance of an Event of Default, the Takeback Term Loans will bear interest at an additional 2.00% per annum and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum.  Default interest shall be payable in cash on demand.<br><br>Interest Payment Dates: Interest on (i) Base Rate loans shall be payable on the last business day of each fiscal quarter in arrears and (ii) SOFR loans shall be payable on the last day of each Interest Period in arrears (or, if earlier, the 3-month anniversary of the commencement of such Interest Period). |

000175

**App. 126**

Interest Period: At the option of the Debtors, one, three, or six months.

Amortization: None.

Tenor: 6 years, provided that if, in the reasonable determination of the Required Consenting Lenders in good faith consultation with the Debtors, the Restructuring Transactions cannot be effectuated in a manner that causes a taxable transaction to the lenders for U.S. federal and applicable state and local income tax purposes by causing a Reorganized Debtor, other than C1 Holdings, to be the issuer of the Takeback Term Loans, because such structure would reasonably be expected to result in material adverse tax consequences to the Reorganized Debtors as compared to the tax consequences to the Reorganized Debtors had C1 Holdings been the issuer of the Takeback Loans, subject to the consent of the Required Consenting Lenders, the tenor will be reduced to 4.75 years and in that case the Applicable Rate will be reduced to 4.25% in the case of Base Rate loans and 5.25% in the case of SOFR loans.

Fees: None, other than annual agency fee.

Security: A (x) first priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitute Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), and a first-priority lien on (A) that certain real property of the Reorganized Debtors located at 2368 Corporate Lane, Suite 112, Naperville, IL 60563 and (B) any other owned real property of the Reorganized Debtors and (y) a second priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitutes ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), which second priority liens shall be subordinated to the liens on such collateral securing the Exit ABL Facility, in the case of either clause (x) or (y) above, subject to customary exclusions consistent with the exclusions under the Prepetition First Lien Credit Agreement (including the exclusion of 35% of the equity interests of any first-tier foreign subsidiaries) and otherwise as may be agreed by the Reorganized Debtors and the Required Consenting Lenders.

Documentation Principles: The Exit Term Loan Credit Agreement with respect to the Exit Term Loan Facility shall (i) be based upon the Prepetition First Lien Term Loan Credit Agreement; (ii) include such modifications as are necessary to reflect the Restructuring Transactions, as implemented through the Chapter 11 Cases, and the fact that the Exit Term Loan Facility is an exit financing; (iii) include appropriate modifications to reflect changes in law or accounting standards since the date of such precedent; and (iv) shall incorporate the following:

- Affirmative Covenants: Consistent with the First Lien Term Loan Credit Agreement (but shall be modified in a manner acceptable to the Debtors and the Required Consenting Lenders to provide for modified reporting requirements and information rights that are customary for facilities of this type and relate to reporting and

5

| | |
|---|---|
| | information readily available to the Debtors in the ordinary course of business).<br><br>• <u>Negative Covenants</u>: Consistent with the First Lien Term Loan Credit Agreement, but shall be modified as may be required to effectuate the Restructuring Transactions, in each case, in a manner acceptable to the Debtors and the Required Consenting Lenders; *provided* that the Exit Term Loan Facility shall not include any financial covenants.<br><br>• <u>Miscellaneous</u>: Shall also include certain customary liability management protections in form and substance acceptable to the Debtors and the Required Consenting Lenders.<br><br><u>Intercreditor Agreements</u>: The Exit Term Loan Facility shall be subject to the Exit Intercreditor Agreement.<br><br><u>Ratings</u>: The Reorganized Debtors shall use commercially reasonable efforts to have the Takeback Term Loans rated by Moody's and S&P within 60 days of the Effective Date. |
| **Rights Offering** | The Plan shall provide for the Rights Offering on the terms and conditions set forth in the Rights Offering Term Sheet.<br><br>On the Effective Date, each Holder of a First Lien Claim that is an Eligible Offeree (as defined in the Rights Offering Term Sheet) or an Investor (as defined in the Rights Offering Term Sheet) or an entity designated by any of the foregoing shall receive, in accordance with the terms of the Rights Offering Term Sheet and relevant Definitive Documents, its applicable share of New Equity Interests (as defined in the Rights Offering Term Sheet). |

| Treatment of Claims and Interests |
|---|
| Each Holder of an allowed Claim or Interest, as applicable, shall receive the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's allowed Claim or Interest. |

| Type of Claim | Treatment | Impairment/ Voting |
|---|---|---|
| **ABL DIP Facility Claims** | On the Effective Date, in full and final satisfaction of the Allowed ABL DIP Facility Claims, (a) ABL DIP Facility Claims that are being converted to Exit ABL Facility Loans or other outstandings thereunder (such as letters of credit and floor plan advances, as provided below) shall be refinanced by the Exit ABL Facility in the amount of the remaining ABL DIP Facility Claims after such pay down by means of a cashless settlement, (b) ABL DIP Facility Claims that are not being converted to Exit ABL Facility Loans shall be indefeasibly paid in full in cash, and (c) accrued interest and fees under the ABL DIP Facility shall be paid in full | N/A |

|  | in cash immediately prior to the conversion of ABL DIP Loans to Exit ABL Facility Loans.  With respect to the amount of the ABL DIP Facility refinanced by means of a cashless settlement, (i) all principal amount of ABL DIP Loans (as defined in the ABL DIP Term Sheet) (including Swingline Loans and floorplan advances) shall be on a one-to-one basis automatically converted to and deemed to be Exit ABL Facility Loans, (ii) the Letters of Credit (as defined in the ABL DIP Term Sheet) issued and outstanding under the ABL DIP Credit Agreement shall automatically be converted to letters of credit deemed to be issued and outstanding under the Exit ABL Facility Documents, and (iii) all Collateral that secures the Obligations (each as defined in the ABL DIP Credit Agreement) under the ABL DIP Credit Agreement that shall also secure the Exit ABL Facility shall be reaffirmed, ratified and shall automatically secure all Obligations under the ABL Exit Facility Documents, subject to the priorities of liens set forth in the ABL Exit Facility Documents and the Exit Intercreditor Agreement.<br><br>For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses shall be paid in full in cash in accordance with the terms of the DIP Orders and the Plan, as applicable. |  |
|---|---|---|
| **Term DIP Facility Claims** | On the Effective Date, in full and final satisfaction of the Term DIP Facility Claims each Holder of a Term DIP Facility Claim shall receive its pro rata portion of cash on account of any principal, interest, fees, and expenses outstanding with respect to such Holder's Term DIP Facility Claim as of the Effective Date; *provided*, *however*, that any Holder of a Term DIP Facility Claim can, in lieu of such cash payment, exercise such Holder's Term DIP Loan Rights (as such term is defined in the Term DIP Term Sheet).<br><br>For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses shall be paid in full in cash in accordance with the terms of the DIP Orders and the Plan, as applicable. | N/A |
| **Administrative Claims** | Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | N/A |

| | | |
|---|---|---|
| **Priority Tax Claims** | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Other Secured Claims** | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, either: <br><br> (i) payment in full in cash of its Allowed Other Secured Claim; <br><br> (ii) the collateral securing its Allowed Other Secured Claim; <br><br> (iii) Reinstatement of its Allowed Other Secured Claim; or <br><br> (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **Other Priority Claims** | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Claim, each Holder of an Other Priority Claims shall receive cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **First Lien Claims** | Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, its elected pro rata share of (which elections shall be adjusted on a pro rata basis, based on oversubscription, as necessary, so that participation in each recovery option is capped at 50% of the First Lien Claims): <br><br> (i) Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 20% (the "***Takeback Term Loan Recovery Option***"); or <br><br> (ii) (a) Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 15%, plus (b) its pro rata share of the Rights Offering | Impaired / Entitled to Vote |

000179
**App. 130**

|  | Rights, subject to the Holdback and the Put Option Premium (the "***Rights Offering Rights and Takeback Term Loan Recovery Option***").<br><br>Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) that properly exercises its Rights Offering Rights to purchase New Equity Interests shall receive such New Equity Interests on the Effective Date.<br><br>In the event that a Holder of a First Lien Claim fails to timely elect its recovery, it shall receive the Rights Offering Rights and Takeback Term Loan Recovery Option. |  |
|---|---|---|
| **Second Lien Claims** | Each Holder of a Second Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive in full and final satisfaction, settlement, release, and discharge of such Claim, on or as soon as practicable after the Effective Date, its pro rata share of the Second Lien Recovery. | Impaired / Entitled to Vote |
| **General Unsecured Claims** | Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, either:<br><br>(i)  Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or<br><br>(ii) Payment in full in cash on (A) the Effective Date or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim. | Unimpaired / Deemed to Accept |
| **Intercompany Claims** | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), either Reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Section 510 Claims** | On the Effective Date, all Section 510 Claims (including all claims on account of the Employee Partnership Sale Units) shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims. | Impaired / Deemed to Reject |
| **Intercompany Interests** | Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), either Reinstated, converted, or otherwise set off, | Impaired / Deemed to Reject or |

9

| | settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan. | Unimpaired / Deemed to Accept |
|---|---|---|
| **Existing C1 Interests** | On the Effective Date, Existing C1 Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing C1 Interests shall not receive any distribution on account thereof. | Impaired / Deemed to Reject |

| **Additional Terms** | |
|---|---|
| **Definitive Documents** | This Restructuring Term Sheet does not include a description of all the terms, conditions, and other provisions that will be contained in the Definitive Documents, which shall be as set forth in the applicable term sheets referred to herein and otherwise and in form and substance acceptable to the Debtors and the Required Consenting Lenders, subject to the consent rights set forth in the Restructuring Support Agreement and herein. |
| **Executory Contracts and Unexpired Leases** | Prior to the Effective Date, the Debtors shall not assume or reject any material executory contract or material unexpired lease without the consent of the Required Consenting Lenders. <br><br> The Plan shall provide that the executory contracts and unexpired leases that are not assumed or rejected as of the Effective Date (either pursuant to the Plan or a separate motion and in consultation with the Required Consenting Lenders) shall be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| **Organizational Documents and Governance** | The Governance Documents and any other documentation evidencing the corporate governance for the Reorganized Debtors, including charters, bylaws, limited liability company agreements, shareholder agreements (including minority shareholder protections), and any other customary organizational documents shall be consistent with the Governance Term Sheet attached hereto as **Exhibit 4** and the consent rights set forth in the Restructuring Support Agreement. |
| **PVKG Note Claims** | The PVKG Note Claims shall be Allowed pursuant to the Plan in the aggregate amount of $213.0 million and, for the avoidance of doubt, such claims shall be classified and treated as First Lien Claims under the Plan. |
| **New C1 Board of Directors** | The Chief Executive Officer of New C1 shall serve on the board of directors of New C1 (the "***New Board***"); all other directors shall be agreed by the Debtors and the Required Consenting Lenders, consistent with the terms set forth in the Governance Term Sheet; *provided* that each Initial First Lien Ad Hoc Group Member and the PVKG Lender shall each be entitled to appoint one director to serve on the New Board, so long as such entity is contemplated to receive no less than 10% of the fully-diluted New Equity Interests (excluding New Equity Interests reserved for the post-Effective Date Management Incentive Plan). |

000181

**App. 132**

| | |
|---|---|
| **Management Incentive Plan** | The Reorganized Debtors shall reserve a pool of up to 10% of the fully diluted New Equity Interests that are issued and outstanding on the Effective Date for a post-Effective Date management incentive plan (the "***Management Incentive Plan Pool***"), the terms of which, including with respect to participants, form, allocation, structure and vesting shall be determined by the New Board. |
| **Employee Matters** | The Debtors shall assume any employment, confidentiality, and non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards), vacation, holiday pay, severance, retirement, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations of the Debtors that are in effect immediately prior to the Effective Date; *provided*, *however*, that the Debtors shall not enter into new agreements with insider employees absent the consent of the Required Consenting Lenders.<br><br>Notwithstanding the foregoing, the Debtors shall not assume any agreements or obligations relating to the Employee Partnership Sale Units, which shall be cancelled as of the Effective Date and shall receive no payment on account thereof from the Debtors or the Reorganized Debtors. |
| **Prepetition Indemnification Agreements** | The Plan shall provide that, to the extent consistent with applicable law, all indemnification provisions currently in place (whether in the bylaws, constitutions, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants and other professionals of the Debtors, as applicable, shall be reinstated and remain intact and irrevocable and shall survive effectiveness of the Restructuring Transactions. |
| **Releases, Injunctions, and Exculpations** | The Plan shall include customary releases, injunctions, and exculpations in each case to the fullest extent permitted by law and effective as of the Effective Date, as agreed by the Debtors and the Required Consenting Lenders. |
| **Tax Matters** | The Debtors, Required Consenting Lenders, and the Consenting Sponsors shall use reasonable best efforts to structure the Restructuring Transactions in a tax-efficient manner to the Reorganized Debtors and as a taxable transaction for U.S. federal and applicable state and local income tax purposes to the First Lien Consenting Lenders (other than PVKG Lender), ConvergeOne Investment LP, and PVKG Investment US L.P. as beneficial owner of ConvergeOne Investment, LP, and the tax structuring of the Restructuring Transactions shall be subject to the consent of the Required Consenting Lenders and the Consenting Sponsors, provided that, except for an adjustment to the tenor (and resultant change to the interest rate) as provided herein, neither such efforts nor such consent shall require a change to any other term provided herein. |

000182
**App. 133**

| | |
|---|---|
| **Professional Fees** | Upon entry of the Interim DIP Order, the Debtors shall open an escrow account to fund on an ongoing basis all unpaid Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services through the Effective Date. |
| **Restructuring Expenses** | The Debtors shall pay, as set forth in the Restructuring Support Agreement (and subject to any limitations set forth therein), the reasonable and documented fees and expenses of (i) the First Lien Ad Hoc Group Advisors; (ii) the KL Lender Advisor; (iii) the PVKG Lender Advisors; and (iv) the Second Lien Ad Hoc Group Advisors. |
| **Milestones** | The Restructuring Transactions shall be effectuated in accordance with the following deadlines (the "***Milestones***"):<br><br>(a) By 11:59 p.m. (prevailing Central Time) on April 3, 2024, the Petition Date shall have occurred.<br><br>(b) The Plan and Disclosure Statement shall have been filed no later than one (1) calendar day after the Petition Date.<br><br>(c) The Interim DIP Order shall have been entered no later than three (3) calendar days after the Petition Date.<br><br>(d) The order provisionally approving the adequacy of the Disclosure Statement shall have been entered no later than three (3) calendar days after the Petition Date.<br><br>(e) The Final DIP Order shall have been entered no later than thirty-five (35) calendar days after the Petition Date.<br><br>(f) The Disclosure Statement Order (which may be the Confirmation Order) shall have been entered no later than forty-five (45) calendar days after the Petition Date.<br><br>(g) The Confirmation Order shall have been entered no later than forty-five (45) calendar days after the Petition Date.<br><br>(h) The Effective Date shall have occurred no later than sixty (60) calendar days after the Petition Date. |
| **Conditions Precedent to the Effective Date** | It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived (in accordance with customary waiver provisions to be contained in the Plan):<br><br>(a) The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Lenders and shall be in full force and effect;<br><br>(b) The Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order, the latter of which shall be in full force and effect;<br><br>(c) The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with and subject to the consent rights set forth in the Restructuring Support Agreement; |

12

(d) The Backstop Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall be in full force and effect;

(e) The Rights Offering (including the Rights Offering Procedures) shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall have been consummated in accordance with its terms;

(f) The Debtors shall have received a commitment for the Exit ABL Facility, which shall refinance the ABL DIP Facility on the Effective Date and the terms and conditions of which shall be reasonably satisfactory to the Debtors and the Required Consenting Lenders;

(g) The Exit ABL Facility Documents and Exit Term Loan Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions;

(h) The New Equity Interests shall have been issued;

(i) All Restructuring Expenses shall have been paid in full in cash;

(j) The Definitive Documents shall (i) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent with the Restructuring Support Agreement and this Restructuring Term Sheet; and

(k) The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions.

000184

**App. 135**

| Certain Plan Definitions | |
|---|---|
| **Affiliate** | With respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code. |
| **Allowed** | With respect to any Claim or Interest, a Claim or an Interest expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors (with the consent of the Required Consenting Lenders, which shall not be unreasonably withheld, delayed, or conditioned), may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law; *provided, however* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. |
| **Confirmation** | The Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases. |
| **Confirmation Date** | The date upon which the Bankruptcy Court confirms the Plan pursuant to section 1129 of the Bankruptcy Code. |
| **Confirmation Hearing** | The hearing held by the Bankruptcy Court on the confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time. |
| **DIP Professional Fees** | As of the Effective Date, all accrued and unpaid professional fees and expenses payable under the DIP Orders to the professionals for the ABL DIP Agent, the Term DIP Agent, the ABL DIP Lenders, and the Term DIP Lenders (each as defined in the ABL DIP Term Sheet and the Term DIP Term Sheet, as applicable). |
| **Effective Date** | The date that is the first business day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in the Plan have been satisfied or waived in accordance with the terms of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter. |
| **Employee Partnership Sale Units** | Those certain partnership sale units issued to certain employees of the Debtors prior to the Petition Date in exchange for a waiver of the respective employee's then-existing equity interests in ConvergeOne Investment LP. |
| **Exculpated Parties** | Collectively, and in each case in their capacities as such: (a) the Debtors, (b) the directors, officers, managers, and employees of any Debtor, and (c) the Professionals. |

| Certain Plan Definitions | |
|---|---|
| **Existing C1 Interests** | The equity interests in PVKG Intermediate Holdings Inc. immediately prior to the Effective Date. |
| **First Lien Claims** | Collectively, the First Lien Term Loan Claims, the KL Note Claims, and the PVKG Note Claims. |
| **First Lien Term Loan Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition First Lien Term Loan Credit Agreement. |
| **General Unsecured Claims** | Any Claim that is not an: (a) ABL DIP Facility Claim; (b) Administrative Claim; (c) First Lien Claim; (d) Intercompany Claim; (e) Other Priority Claim; (f) Other Secured Claim; (g) Priority Tax Claim; (h) Professional Fee Claim; (i) Second Lien Claim; (j) Section 510 Claim; or (k) Term DIP Facility Claim. |
| **Governance Documents** | As applicable, the organizational and governance documents for the Reorganized Debtors, which shall give effect to the Restructuring Transactions, including, without limitation, any applicable certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or equivalent governing documents), and registration rights agreements, which documents shall be consistent with the Restructuring Support Agreement and the Governance Term Sheet. |
| **Holder** | A Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable. |
| **Impaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code |
| **Intercompany Claims** | Any Claim against a Debtor held by another Debtor. |
| **Intercompany Interests** | Any Interest in a Debtor held by another Debtor. |
| **KL Note Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition KL Note Purchase Agreement. |
| **Management Incentive Plan** | A post-Effective Date equity incentive plan providing for the issuance from time to time, of equity and equity-based awards with respect to New Equity Interests, as approved by the New Board following the Effective Date. |

2

| Certain Plan Definitions | |
|---|---|
| **New C1** | Either PVKG Investment Holdings, Inc., as reorganized pursuant to this Plan, or, if applicable, any successor or assign thereto, by merger, consolidation, or otherwise on and after the Effective Date, or a new entity, and each of its direct and indirect wholly-owned subsidiaries, which in any case shall be the ultimate parent of the other Company Parties on and after the Effective Date, and which entity shall be determined by agreement of the Debtors and the Required Consenting Lenders. |
| **New Equity Interests** | New common equity units in New C1, to be issued on the Effective Date. |
| **Other Priority Claims** | Any Claim, other than an Administrative Claim, Priority Tax Claim, ABL DIP Facility Claim, or Term DIP Facility Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claims** | Any Secured Claim against the Debtors other than the ABL DIP Facility Claims, Term DIP Facility Claims, First Lien Claims, and Second Lien Claims. |
| **Prepetition ABL Credit Agreement** | That certain Amended and Restated ABL Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of July 10, 2022, that certain Amendment No. 2 dated as of September 14, 2022, that certain Amendment No. 3 dated as of January 23, 2023, and that certain Amendment No. 4 dated as of August 29, 2023, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, certain subsidiary borrowers party thereto, Wells Fargo Commercial Distribution Finance, LLC, as administrative agent, collateral agent, floorplan funding agent, and swing line lender, and the lenders party thereto. |
| **Prepetition ABL Secured Obligations** | Any secured obligations arising under the Prepetition ABL Credit Agreement and related loan documents. |
| **Prepetition First Lien Term Loan Credit Agreement** | That certain First Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of March 14, 2019 and that certain Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto. |

3

| Certain Plan Definitions | |
|---|---|
| **Prepetition KL Note Purchase Agreement** | That certain First Lien Secured Note Purchase Agreement dated as of July 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date) by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, Deutsche Bank Trust Company, as administrative agent and collateral agent, certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto, and each other holder from time to time party thereto. |
| **Prepetition PVKG Note Purchase Agreement** | That certain Amended Promissory Note and Purchase and Cashless Exchange Agreement dated as of July 6, 2023 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, PVKG Lender (PVKG Investment Holdings, Inc.), as administrative agent and collateral agent, and PVKG Lender as holder. |
| **Prepetition Second Lien Term Loan Credit Agreement** | That certain Second Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of July 10, 2022, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto. |
| **Professional** | Any Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. |
| **Professional Fee Claim** | Any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. |
| **PVKG Note Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition PVKG Note Purchase Agreement. |

4

| Certain Plan Definitions | |
|---|---|
| **Related Party** | With respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, and nominees of the foregoing. |
| **Released Party** | Collectively, and in each case in their capacities as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Agents/Trustees; (h) all Releasing Parties; and (i) each Related Party of each Entity in clause (a) through (h); *provided*, *however*, that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party." |
| **Releasing Party** | Collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Agents/Trustees; (h) all Holders of Claims that vote to accept the Plan; (i) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (j) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (k) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (l) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (m) each Related Party of each Entity in clause (a) through (l); *provided*, *however*, that, for the avoidance of doubt, each Holder of Claims or Interests that is party to or has otherwise signed the Restructuring Support Agreement shall not opt out of the releases provided by the Plan. |
| **Reorganized Debtors** | A Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, unless otherwise dissolved pursuant to the Plan. |

5

| Certain Plan Definitions | |
|---|---|
| **Section 510 Claims** | Any Claim against any Debtor:  (a) arising from the rescission of a purchase or sale of an equity security as defined in section 101(17) of the Bankruptcy Code (including the Employee Partnership Sale Units) of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such an equity security made to the Debtors prior to the Petition Date; (c) for reimbursement or contribution allowed under section 502(e) of the Bankruptcy Code on account of such a Claim; and (d) any other claim determined to be subordinated under section 510 of the Bankruptcy Code. |
| **Second Lien Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition Second Lien Term Loan Credit Agreement. |
| **Second Lien Recovery** | 4.375% of the New Equity Interests (subject to dilution by the Management Incentive Plan Pool). |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code. |

000190
**App. 141**

**Exhibit 1**

**ABL DIP Term Sheet**

**ConvergeOne Holdings, Inc**
**ABL DIP Facility Term Sheet**

This term sheet (together with all annexes, exhibits and schedules attached hereto, this "**Term Sheet**") sets forth certain material terms of the proposed ABL DIP Facility (as defined below). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the commitment letter, dated as of April 3, 2024 (as amended, supplemented or modified in accordance with its terms, the "**Commitment Letter**"), to which this Term Sheet is attached.

This Term Sheet does not address all terms that would be required in connection with the ABL DIP Facility or that will be set forth in the ABL DIP Documents (as defined below), which are subject to negotiation and further subject to execution of definitive documents and the preparation of pleadings and proposed forms of orders that are consistent with this Term Sheet and the Documentation Principles and otherwise in form and substance acceptable to the ABL DIP Agent and the Borrowers.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

| | |
|---|---|
| **Borrowers** | ConvergeOne Holdings, Inc. (the "**Company**") and each subsidiary borrower thereof that is a debtor and debtor-in-possession (collectively, the "**Borrowers**") in the cases (the "**Borrowers' Cases**") to be filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for Southern District of Texas (the "**Bankruptcy Court**"), which shall be jointly administered with the Guarantors' Cases (as defined below). |
| **Guarantors** | PVKG Intermediate Holdings Inc, a Delaware corporation ("**Holdings**"), in its capacity as a debtor and debtor-in-possession, and each subsidiary guarantor thereof that is a debtor and debtor-in-possession (other than the Company and each other Borrower), each in their respective capacities as debtors and debtors-in-possession (the "**Guarantors**" and, collectively with the Company and the other Borrowers, the "**Loan Parties**" or the "**Debtors**") in the cases to be filed under the Bankruptcy Code with the Bankruptcy Court contemporaneously and jointly administered with the Borrowers' Cases (the "**Guarantors' Cases**" and, collectively with the Borrowers' Cases, the "**Chapter 11 Cases**").  The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**". |
| | SPS-Providea Limited and ConvergeOne India Private Limited shall not guarantee, and shall not provide security for, the ABL DIP Facility (as defined below) or the Term Loan DIP Facility (as defined below) and shall not be Loan Parties (consistent with the Prepetition ABL Credit Agreement in effect immediately prior to the Petition Date). |
| **Administrative Agent and** | Wells Fargo Commercial Distribution Finance, LLC shall act as administrative agent and the collateral agent for the ABL DIP Lenders (as defined below) with |

7834612.18

| | |
|---|---|
| **Collateral Agent** | respect to the ABL DIP Facility (in such capacities, the "**ABL DIP Agent**"). |
| **Floorplan Facility Funding Agent** | Wells Fargo Commercial Distribution Finance, LLC shall act as floorplan facility funding agent for the ABL DIP Facility. |
| **ABL DIP Lenders** | Wells Fargo Commercial Distribution Finance, LLC, Deutsche Bank AG New York Branch, UBS AG, Stamford Branch, and/or one or more of their respective designated affiliates and/or related funds or accounts (each an "**ABL DIP Lender**", and collectively, the "**ABL DIP Lenders**", and together with the ABL DIP Agent, the "**ABL DIP Secured Parties**"). |
| **Prepetition ABL Facility** | Senior secured asset-based revolving credit facility (the "**Prepetition ABL Facility**") made available to the Company and the other borrowers thereunder pursuant to that certain Amended and Restated ABL Credit Agreement, dated as of January 4, 2019  (as amended by Amendment No. 1 to Amended and Restated ABL Credit Agreement, dated as of July 10, 2022, Amendment No. 2 to Amended and Restated ABL Credit Agreement, dated as of September 14, 2022, Amendment No. 3 to Amended and Restated ABL Credit Agreement, dated as of January 23, 2023 and Amendment No. 4 to Amended and Restated ABL Credit Agreement, dated as of August 29, 2023) among the Borrowers, Holdings, Wells Fargo Commercial Distribution Finance, as administrative agent, collateral agent, floorplan funding agent and swing line lender (in such capacity, the "**Prepetition ABL Representative**") and the lenders party thereto (the "**Prepetition ABL Lenders**", and together with the Prepetition ABL Representative and the other secured parties under the Prepetition ABL Credit Agreement and related loan documents, the "**Prepetition ABL Secured Parties**") (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition ABL Credit Agreement**"; the obligations thereunder and under the related loan documents, the "**Prepetition ABL Obligations**"; and the liens and security interests granted in connection therewith, the "**Prepetition ABL Liens**"). |
| | ABL DIP Agent and ABL DIP Lenders acknowledge and agree that there shall not be deemed to be a termination of the commitments, an acceleration of the Prepetition ABL Obligations or any occurrence of any other event or condition that automatically occurs, in each case under the Prepetition ABL Credit Agreement solely as a result of the commencement of the Chapter 11 Cases; provided, that the Interim DIP Order shall have been entered no later than three (3) calendar days after the Petition Date, provided, further, that all other terms and conditions applicable to the commitments in the Prepetition ABL Credit Agreement (including the other conditions precedent set forth in Section 4.02 of the Prepetition ABL Credit Agreement) shall remain in full force and effect (this paragraph, the "**Prepetition ABL Credit Agreement Acknowledgment**"). |
| **Existing ABL Intercreditor Agreement** | That certain ABL Intercreditor Agreement, dated as of January 4, 2019 (as amended by that certain Joinder and Amendment to ABL Intercreditor Agreement dated as of July 10, 2020 and supplemented by that certain ABL |

2

| | |
|---|---|
| | Intercreditor Agreement Joinder dated as of May 15, 2023), among the Prepetition ABL Representative, the Prepetition First Lien Term Loan Agent (as defined below), UBS AG, Stamford Branch as the Initial Junior Lien Term Loan Agent, Deutsche Bank Trust Company Americas, as a New Term Loan Agent and PVKG Investment Holdings, Inc., as a New Term Loan Agent (the "**Existing ABL Intercreditor Agreement**"). |
| **Prepetition First Lien Term Facility** | Senior secured first lien term loan facility (the "**Prepetition First Lien Term Loan Facility**"; the loans thereunder, the "**Prepetition First Lien Term Loans**" and, the lenders thereunder, the "**Prepetition First Lien Term Loan Lenders**") made available to the Company pursuant to that certain First Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition First Lien Term Loan Credit Agreement**"; the liens and security interests granted in connection therewith, the "**Prepetition First Lien Term Loan Liens**"; and the obligations arising thereunder, the "**Prepetition First Lien Term Loan Secured Obligations**") among the Company, Holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Term Loan Agent**", and together with the First Lien Term Loan Lenders, the "**Prepetition First Lien Term Loan Secured Parties**"), and the other parties party thereto. |
| **Prepetition First Lien KL Notes** | Senior secured first lien notes (the "**First Lien KL Notes**" and, the holders of such notes, the "**First Lien KL Noteholders**") made available to the Company pursuant to that certain Note Purchase Agreement, dated as of July 10, 2020 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition First Lien KL Note Purchase Agreement**"; the liens and security interests granted in connection therewith, the "**Prepetition First Lien KL Notes Liens**"; the obligations arising thereunder, the "**Prepetition First Lien KL Notes Secured Obligations**") among the Company, Holdings, Deutsche Bank Trust Company Americas, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien KL Notes Agent**", and together with the Prepetition First Lien KL Noteholders, the "**Prepetition First Lien KL Notes Secured Parties**"), and the other parties party thereto. |
| **Prepetition First Lien CVC Notes** | Senior secured first lien notes (the "**Prepetition First Lien CVC Notes**" and, the holders of such notes, the "**Prepetition First Lien CVC Noteholders**") made available to the Company pursuant to that certain Note Purchase Agreement, dated as of July 6, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition First Lien CVC Note Purchase Agreement**"; the liens and security interests granted in connection therewith, the "**Prepetition First Lien CVC Notes Liens**", and together with the Prepetition First Lien Term Loan Liens and the Prepetition First Lien KL Notes Liens, the "**Prepetition First Lien Liens**"); and the obligations arising thereunder, the "**Prepetition First Lien CVC Notes Secured Obligations**", and, together with the Prepetition First Lien Term Loan Secured Obligations and the Prepetition First Lien KL Notes Secured |

3

|  | |
|---|---|
|  | Obligations, the "**Prepetition First Lien Secured Obligations**") among the Company, Holdings, PVKG Investment Holdings, Inc., as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien CVC Notes Agent**", and together with the Prepetition First Lien CVC Noteholders, the "**Prepetition First Lien CVC Notes Secured Parties**"; the Prepetition First Lien CVC Notes Secured Parties, together with the Prepetition First Lien Term Loan Secured Parties and the Prepetition First Lien KL Notes Secured Parties, the "**Prepetition First Lien Secured Parties**") and the other parties party thereto. |
| **Prepetition Second Lien Term Facility** | Senior secured second lien term loan facility (the "**Prepetition Second Lien Facility**"; and the lenders thereunder, the "**Prepetition Second Lien Lenders**") made available to the Company pursuant to that certain Second Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time); the liens and security interests granted in connection therewith, the "**Prepetition Second Lien Liens**" and, together with the Prepetition First Lien Liens, the "**Prepetition Liens**"; and the obligations arising thereunder, the "**Prepetition Second Lien Secured Obligations**") among the Company, Holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition Second Lien Agent**", and together with the Prepetition Second Lien Lenders, the "**Prepetition Second Lien Secured Parties**"; and together with the Prepetition First Lien Secured Parties, the "**Prepetition Secured Parties**")), and the other parties party thereto. |
| **ABL DIP Facility** | Upon the Closing Date, the Prepetition ABL Facility shall be ratified and amended pursuant to a customary Ratification and Amendment Agreement (the "**Ratification and Amendment Agreement**") consistent with this Term Sheet and the Documentation Principles (as defined below) and otherwise in form and substance satisfactory to ABL DIP Agent and the ABL DIP Lenders (the "**DIP ABL Credit Agreement**").  Pursuant to the DIP ABL Credit Agreement, the ABL DIP Agent and the ABL DIP Lenders will provide a senior secured superpriority priming debtor-in-possession asset-based revolving credit facility, in the aggregate principal amount of up to $250 million, subject to the Borrowing Base (the "**ABL DIP Facility**"; and the loans outstanding under the ABL DIP Facility from time to time, the "**ABL DIP Loans**" and the commitments outstanding under the ABL DIP Facility from time to time, the "**ABL DIP Commitments**") will be available to the Borrowers from and after the Closing Date, subject to the terms expressly set forth in the DIP ABL Credit Agreement, and such ABL DIP Facility shall provide for a gradual roll-up and conversion of all Prepetition ABL Obligations under the Interim DIP Order (as defined below), and upon entry of the Final DIP Order (as defined below), any remaining Prepetition ABL Obligations shall be fully rolled-up and converted into ABL DIP Obligations (as defined below) (the "**Roll-Up**"); provided that all Letters of Credit and Floorplan Approvals issued pursuant to the Prepetition ABL Credit Agreement shall automatically be deemed to have been issued pursuant to the DIP ABL Credit Agreement upon entry of the Interim DIP Order.  All indebtedness and obligations from time to time arising under the |

4

ABL DIP Facility, including the Roll-Up, are hereinafter referred to as the "**ABL DIP Obligations**".  The DIP ABL Credit Agreement and the other ABL DIP Documents shall be in form and substance, and upon terms and conditions, consistent with this Term Sheet and the Documentation Principles (as defined below).

The ABL DIP Loans may be incurred, subject to the satisfaction or waiver of all conditions thereto set forth in this Term Sheet (with such conditions in the Term Sheet to be set forth in the ABL DIP Documents), in accordance with the terms of the ABL DIP Documents, including as follows: (a) following the entry by the Bankruptcy Court of the Interim DIP Order (as defined below), in form and substance acceptable to the Required ABL DIP Lenders and the Required Consenting Lenders (as defined in the Restructuring Support Agreement, to be dated on or around April 3, 2024 (the "**RSA**")), authorizing the Roll-Up and (b) on and after the entry by the Bankruptcy Court of the Final DIP Order authorizing the ABL DIP Facility on a final basis, which shall be in form and substance acceptable to the Required ABL DIP Lenders and the Required Consenting Lenders (as defined in the RSA).

The definition of "Borrowing Base" (and any component definitions thereof) shall be consistent with the Prepetition ABL Credit Agreement in effect immediately prior to the Petition Date, except that (i) clause (2) of the definition of "Borrowing Base" shall be replaced by the following:  "(2) 50% of the Eligible Unbilled Accounts (net of Unbilled Accounts Reserves) owned by any Borrowing Base Party; provided that the amount calculated this clause (2) shall not exceed 15% of the Borrowing Base; plus" and (ii) an availability block of $25,000,000 shall be implemented. In addition, the definition of Eligible Accounts shall be modified to include as ineligible any Accounts (as defined in the Prepetition ABL Credit Agreement) owing by an account debtor which has any bonded projects.

The ability to impose additional Availability Reserves, Accounts Reserves, Dilution Reserves, Inventory Reserves, Landlord Lien Reserves, Secured Cash Management Reserves, Secured Hedging Reserves, Unbilled Account Reserves and other Reserves shall remain consistent with the Prepetition ABL Credit Agreement in effect on the Petition Date, except that (i) Availability Reserves may be implemented to account for the Carve Out (as defined below) as provided below, including with respect to the projected amount of professional fees and expenses for each rolling 2-week period and the amount of the Post-Carve Out Trigger Notice Cap (as defined below), as well as any other allowed administrative expense or priority claims arising in the Borrowers' Cases that, in the ABL DIP Agent's good faith determination, require payment prior to the full repayment of the ABL DIP Obligations, (ii)  any such reserves will take immediate effect to the extent the Borrowers request to borrow any ABL DIP Loans during the three (3) business day notice period normally required for the imposition of such reserves, (iii) reserves may be implemented in respect of claims or amounts payable or which may reasonably be expected to be incurred in connection with surety bonds and bonded projects in amounts determined by Agent in its Permitted Discretion, and (iv) any implementation of any new

5

|  | reserves (other than reserves implemented in respect of surety bonds and bonded projects), or increase in any existing reserves, after the Closing Date shall be based on any material facts or circumstances which arise after the Closing Date or which otherwise first become known to the ABL DIP Agent after the Closing Date.   In addition, references to "Closing Date" in the definition of Permitted Discretion (other than with respect to reserves or ineligibility criteria implemented in respect of surety bonds and bonded projects), clause (23) of the definition of Eligible Accounts and clause (15) of the definition of Eligible Inventory, in each case, under the Prepetition ABL Credit Agreement, shall be changed to a reference to the Closing Date as defined herein.

The ABL DIP Documents shall permit, subject to the DIP Intercreditor Arrangements (as defined below), the Loan Parties to incur a senior secured postpetition term loan facility on a superpriority basis in form and substance reasonably acceptable to the Required ABL DIP Lenders (as defined below), it being understood and agreed that (a) such term loan facility shall be secured by liens consistent with the priority set forth on Annex III, (b) such a term loan facility that is on terms substantially consistent with the terms set forth in the DIP Term Loan term sheet attached to the RSA (the "**Term Loan DIP Term Sheet**") shall be deemed to be acceptable to the Required ABL DIP Lenders (the "**Term Loan DIP Facility**," the loans outstanding thereunder, the "**Term DIP Loans**", the liens securing the Term Loan DIP Facility, the "**Term DIP Liens**", and the agent thereunder, the "**Term DIP Agent**").

The DIP Order shall provide for intercreditor arrangements that govern certain intercreditor arrangements between the ABL DIP Facility and the Term Loan DIP Facility (the "**DIP Intercreditor Arrangements**") with such arrangements to be on terms generally consistent with the Existing ABL Intercreditor Agreement and otherwise acceptable to the ABL DIP Agent, the Required ABL DIP Lenders (in their discretion), Required Consenting Lenders (in their discretion) and the Loan Parties. |
| **Floorplan Facility** | The ABL DIP Facility will be available for floorplan advances and floorplan approvals to approved vendors in respect of inventory to be acquired by the Company or any of its Restricted Subsidiaries (to be defined in a manner consistent with the Prepetition ABL Facility) from such vendors substantially on the same terms and conditions contained in the Floorplan Facility under, and as defined in, the Prepetition ABL Credit Agreement (the "**DIP Floorplan Facility**").  Any floorplan advances and other obligations under the Floorplan Facility arising under the Prepetition ABL Facility shall be deemed "rolled-up" and converted into ABL DIP Obligations upon the Closing Date. |
| **Letters of Credit** | A portion of the ABL DIP Facility not in excess of an amount to be agreed (but, in any event, not less than $85 million) will be available for the issuance of letters of credit ("**Letters of Credit**") by the ABL DIP Agent, sharing ratably in such Letters of Credit commitment (in such capacity, the "**Issuing Lender**"), to be on terms consistent with the Letter of Credit provisions under, and as |

6

| | |
|---|---|
| | defined in, the Prepetition ABL Credit Agreement. The face amount of any outstanding Letter of Credit (and, without duplication, any unpaid drawing in respect thereof) will reduce availability under the ABL DIP Facility on a dollar-for-dollar basis.<br><br>Letters of Credit may be issued on the Closing Date to backstop or replace surety bonds, letters of credit or similar instruments outstanding on the Closing Date (including by "grandfathering" such existing surety bonds, letters of credit or similar instruments into the ABL DIP Facility). |
| **Swingline Loans** | A portion of the ABL DIP Facility not in excess of the lesser of $10.0 million or 5% of the ABL DIP Commitments will be available for swingline loans (the "**Swingline Loans**") on same-day notice from the ABL DIP Agent (in such capacity, the "**Swingline Lender**") to be on terms consistent with the Swing Line Loan provisions under, and as defined in, the Prepetition ABL Credit Agreement. Any Swingline Loans will reduce availability under the ABL DIP Facility on a dollar-for-dollar basis (other than for purposes of calculating the Non-Use Fee). Each ABL DIP Lender under the ABL DIP Facility will be irrevocably and unconditionally required to purchase, under certain circumstances, a participation in each Swingline Loan on a pro rata basis. |
| **Permitted Liens** | (A)   Any valid liens ("**Permitted Prior Liens**") that are (1) in existence on the Petition Date, (2) are either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (3) senior in priority to the Prepetition First Lien Liens, (4) non-avoidable under the Bankruptcy Code or other applicable law, and (5) are permitted to be incurred under the First Lien Term Loan Credit Agreement, the Prepetition First Lien KL Note Purchase Agreement and the Prepetition First Lien CVC Note Purchase Agreement; and<br><br>(B)   liens permitted to have seniority over the ABL DIP Liens (as defined below) securing the ABL DIP Facility as specified in the DIP ABL Credit Agreement (the liens referenced in (A) and (B) above, collectively, the "**Permitted Liens**"). |
| **DIP Orders** | The order approving the Term Loan DIP Facility (as defined below) and the ABL DIP Facility on an interim basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties, the ABL DIP Agent, the Required ABL DIP Lenders (as defined below) and the Required Consenting Lenders (the "**Interim DIP Order**"), shall authorize and approve, among other matters, (i) the Loan Parties' entry into the Term DIP Documents (as defined below) and the ABL DIP Documents, as applicable, (ii) the making of the Term DIP Loans (as defined below) and the ABL DIP Loans (including Swingline Loans, floorplan advances, other obligations under the Floorplan Facility, and the issuance of Letters of Credit under the DIP ABL Credit Agreement) (including the Roll-Up and conversion of all amounts outstanding under the Prepetition ABL Facility into the ABL DIP Facility upon entry of the Interim DIP Order and Final DIP Order, as applicable), (iii) the |

7

granting of the super-priority claims and liens against the Loan Parties and their assets in accordance with the Term DIP Documents, the ABL DIP Documents (as applicable), the Existing ABL Intercreditor Agreement and the DIP Intercreditor Arrangements, respectively, with respect to the DIP Collateral (as defined below), (iv) the use of cash collateral solely in accordance with the terms of the ABL DIP Documents and the Term Loan DIP Documents, (v) the granting of adequate protection to the Prepetition First Lien Secured Parties and the Prepetition ABL Secured Parties, (vi) granting waivers of Debtors' rights to seek non-consensual use of cash collateral under Section 363 of the Bankruptcy Code, and (vii) granting other waivers (including, without limitation, surcharge waivers under Section 506(c) of the Bankruptcy Code, equities of the case waiver under Section 552 of the Bankruptcy Code, and marshaling requirements) with respect to the ABL DIP Obligations and the DIP Collateral.

The order approving the Term Loan DIP Facility and the ABL DIP Facility on a final basis, which shall be in form and substance acceptable to the Required ABL DIP Lenders and the Required Consenting Lenders, shall be the "**Final DIP Order**" and, together with the Interim DIP Order, shall be the "**DIP Orders**". The Final DIP Order shall grant (or reaffirm, as the case may be) waivers (including, without limitation, surcharge waivers under Section 506(c) of the Bankruptcy Code), equities of the case waiver under Section 552 of the Bankruptcy Code, rights to seek non-consensual use of cash collateral under Section 363 of the Bankruptcy Code, and marshaling requirements) with respect to the Prepetition ABL Obligations, the Prepetition First Lien Secured Obligations, the Prepetition Collateral, the DIP Collateral, the ABL DIP Obligations and the obligations under the Term Loan DIP Facility, and releases in favor of the Prepetition ABL Secured Parties and Prepetition First Lien Secured Parties.

| | |
|---|---|
| **Adequate Protection** | As adequate protection against the risk of any diminution in the value of the respective Prepetition Liens in all collateral securing the Prepetition ABL Obligations, the Prepetition First Lien Secured Obligations and the Prepetition Second Lien Secured Obligations (collectively, the "**Prepetition Collateral**") (as applicable), including as a result of the imposition of the automatic stay, the Loan Parties' use, sale, or lease of such collateral, including Cash Collateral (as defined below), during the Chapter 11 Cases, the granting of priming liens and claims on a dollar-for-dollar basis as set forth herein, and the imposition of the Carve Out, the Prepetition Secured Parties shall be granted the following adequate protection, subject in all cases to the Carve Out and the priority set forth on Annex III:<br><br>The Prepetition ABL Secured Parties shall be entitled to receive, subject in all cases to the Carve Out and Permitted Prior Liens, the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition ABL Liens in Prepetition Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Prepetition ABL Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex III** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition ABL Liens in Prepetition Collateral, a superpriority |

8

administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve Out) (the "**Prepetition ABL Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex III** attached hereto, as applicable; (C) the payment of the reasonable and documented fees and out-of-pocket expenses of the Prepetition ABL Representative, and the payment of the reasonable and documented fees of the Prepetition ABL Representative's legal counsel and any financial advisors or consultants retained by Prepetition ABL Representative (including without limitation, the prepetition and post-petition fees and expenses of (i) Otterbourg P.C., as counsel to the Prepetition ABL Representative, (ii) M3 Advisory Partners, LP, as financial advisor to the Prepetition ABL Representative, and (iii) local Texas counsel to the Prepetition ABL Representative); and (E) financial reporting consistent with the "Budget" section set forth below.

The Prepetition First Lien Secured Parties shall be entitled to receive, subject in all cases to the Carve Out and Permitted Prior Liens, the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition First Lien Liens in Prepetition Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**First Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex III** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition First Lien Liens in Prepetition Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve Out) (the "**First Lien Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex III** attached hereto, as applicable; (C) the payment of the reasonable and documented fees and out-of-pocket expenses of the Prepetition First Lien Term Loan Agent, the Prepetition First Lien KL Notes Agent and the Prepetition First Lien CVC Notes Agent, and the payment of the reasonable and documented fees of the First Lien Ad Hoc Group (as such term is defined in the RSA) (the "**First Lien Ad Hoc Group**") (including without limitation, the prepetition and post-petition fees and expenses of (i) Gibson Dunn & Crutcher LLP, as counsel to the First Lien Ad Hoc Group, (ii) PJT Partners, as financial advisor to the First Lien Ad Hoc Group, (iii) Latham & Watkins LLP, as counsel to the Prepetition First Lien CVC Notes Secured Parties and (iv) with the Borrower's consent (not to be unreasonably withheld), such other attorneys, financial

9

advisors or professionals retained by the First Lien Ad Hoc Group; and (D) financial reporting consistent with the "Budget" section set forth below.

The Prepetition Second Lien Secured Parties shall be entitled to receive, subject in all cases to the Carve Out and Permitted Prior Liens, the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition Second Lien Liens in Prepetition Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Second Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex III** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition Second Lien Liens in Prepetition Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve Out) (the "**Second Lien Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex III** attached hereto, as applicable; and (C) the payment of the reasonable and documented fees and out-of-pocket expenses of the Prepetition Second Lien Agent and, subject to the terms of the RSA, the payment of the reasonable and documented fees of the Second Lien Ad Hoc Group (as such term is defined in the RSA) (the "**Second Lien Ad Hoc Group**") (including without limitation, the prepetition and post-petition fees and expenses of (i) Davis Polk & Wardwell LLP, as counsel to the Second Lien Ad Hoc Group, (ii) Guggenheim Securities, LLC, as financial advisor to the Second Lien Ad Hoc Group, and (iii) with the Borrower's consent (not to be unreasonably withheld), such other attorneys, financial advisors or professionals retained by the Second Lien Ad Hoc Group.

| | |
|---|---|
| **Carve Out** | The liens on and security interests in the DIP Collateral (as defined below), the adequate protection liens, and all super-priority administrative expense claims granted under the DIP Orders, shall be subject and subordinate to the Carve Out.<br><br>For purposes hereof, "**Carve Out**" means, without duplication, an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "**Chapter 7 Trustee Carve-Out**"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtors' Professionals**") and to the extent set forth in the Budget as of the date of determination by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the |

10

Debtors' Professionals, "**Professional Persons**") at any time before or on the first business day following delivery by the ABL DIP Agent or Term DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice, less the amount of any retainers or other amounts held by any such Professional Person as of the Petition Date; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the ABL DIP Agent or Term DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the ABL DIP Agent or Term DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Creditors' Committee, and the ABL DIP Agent and Term DIP Agent, as applicable, which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Not later than 7:00 p.m. New York time on the Tuesday of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**") (collectively, "**Estimated Fees and Expenses**"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "**Weekly Statement**"); provided, that within one business day of the occurrence of the Termination Declaration Date, each Professional Person shall deliver one additional Weekly Statement (the "**Final Statement**") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the ABL DIP Agent and Term DIP Agent). If any Professional Person fails to timely deliver a Weekly Statement within one business day after such Weekly Statement is due, such Professional Person shall not be entitled to any funds in the Carve Out Reserves with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period. The ABL DIP Agent shall at all times maintain a Reserve (as defined in the ABL DIP Credit Agreement) in an amount equal to the Post-Carve Out Trigger Notice Cap, plus the aggregate amount of projected fees for all Professional Persons set forth in the Approved Budget for the week subsequent to the date of determination for such Reserve; provided that nothing set forth herein shall limit the ability of the ABL DIP Agent to increase such reserve if ABL DIP Agent

11

| | |
|---|---|
| | determines that the aggregate amount of Allowed Professional Fees are likely to exceed the amount set forth in the Approved Budget for such week. |
| **ABL DIP Facility Availability** | From and after the Closing Date (as defined below), subject to the entry of the Interim DIP Order and the satisfaction of the other conditions set forth in this Term Sheet, the ABL DIP Facility will be made available to the Borrower in the aggregate principal amount of up to $250,000,000 (subject to the Borrowing Base).  Amounts borrowed under the ABL DIP Facility may be reborrowed. |
| **Use of Proceeds of ABL DIP Facility and Term Loan DIP Facility** | The proceeds of the ABL DIP Loans under the ABL DIP Facility shall be used only for the following purposes: (i) the Roll-Up, (ii) payment of certain prepetition amounts of the type contemplated in the then current Approved Budget (including prepetition payments to critical vendors identified by the Loan Parties) and solely as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Loan Parties, which orders shall be in form and substance reasonably satisfactory to the Required ABL DIP Lenders, (iii) to the extent of the type contemplated in the then current Approved Budget and in accordance with the terms of the ABL DIP Facility and the Interim DIP Order/Final DIP Order, and (iv) payment of the costs and expenses of administering the Cases (including payments benefiting from the Carve Out) subject to the terms and conditions of the ABL DIP Facility, in each case of the forgoing, solely in accordance with and subject to the credit agreement governing the terms of the ABL DIP Facility, Interim DIP Order and Final DIP Order. |
| | Solely in accordance with and subject to the credit agreement governing the terms of the Term Loan DIP Facility (the "**Term DIP Credit Agreement**", and together with all security and collateral agreements related thereto, the "**Term DIP Documents**"), the proceeds of the Term Loan DIP Facility may be used only to (i) pay down certain Prepetition ABL Loans under the Prepetition ABL Facility (without a corresponding reduction in commitments thereunder), and (ii) for the other purposes described in the Term Loan DIP Term Sheet, in each case, in accordance with and subject to the Term DIP Documents, the DIP Orders and the Approved Budget (as defined below). |
| **ABL DIP Documents Control** | The provisions of the ABL DIP Documents shall, upon execution, supersede the provisions of this Term Sheet. |
| **Maturity** | The "**ABL DIP Termination Date**" with respect to the ABL DIP Facility shall be the earliest to occur of: |
| | (i)   the date that is six (6) months after the Petition Date (or if such day shall not be a business day, the next succeeding business day) (the "**Scheduled Termination Date**"); |
| | (ii)   11:59 p.m. New York City Time on the date that is thirty five (35) calendar days after the Petition Date, if the Final DIP Order has not been entered by the Bankruptcy Court prior to such date and time, |

12

7834612.18

|  | unless otherwise extended by the Required ABL DIP Lenders; |
|--|--|
|  | (iii) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court (the "**Plan**"); |
|  | (iv) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code; |
|  | (v) the acceleration of the ABL DIP Loans and the termination of the commitments under the ABL DIP Facility in accordance with the ABL DIP Documents; and |
|  | (vi) the consummation of a sale of all or substantially all assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code (other than to another Loan Party). |
|  | Subject to the provisions of the DIP Orders, as applicable, on the ABL DIP Termination Date (or such earlier date on which the ABL DIP Facility shall have been terminated), the Loan Parties shall repay all obligations arising under the ABL DIP Facility in full in cash and provide such amounts necessary to cash collateralize Letters of Credit and floorplan approvals under the Floorplan Facility (to the extent not backstopped), in each case subject to arrangements satisfactory to the ABL DIP Agent (provided that such payment may, in the case of any ABL DIP Lender who agrees to participate in any "exit financing", take the form of a cashless roll-up into such new "exit financing" and not cash; provided further that, to the extent any ABL DIP Lender does not participate or provide commitment to "exit financing", such payment shall be made in full in cash and such ABL DIP Lender's commitment shall be terminated). |
| **Amortization** | None. |
| **Payments and Interest Rates** | Consistent with the Prepetition ABL Facility except as set forth on **Annex II** attached hereto. |
| **Line Cap** | Consistent with the Prepetition ABL Facility, except that an availability block of $25,000,000 shall be implemented with respect to the Revolving Commitment component of the Line Cap calculation. |
| **Excess Availability** | At any time, (a) the Line Cap then in effect, plus (b) 100% of Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Facility, except reference to accounts subject to control agreements shall include accounts that are subject to control agreements on the Petition Date or other accounts held at the ABL DIP Agent or any of its affiliates, and any cash in such accounts that is used for cash collateralizing the pre-funded ACH Treasury Management services provided through Wells Fargo Commercial Distribution Finance, LLC shall be excluded as Qualified Cash) not to exceed for this purpose 25% of the Borrowing Base, minus (c) the sum, without duplication, of (i) the then |

13

|  | aggregate outstanding principal amount of ABL DIP Loans (including Swingline Loans and floorplan advances), (ii) unreimbursed drawings under letters of credit under the DIP ABL Credit Agreement and (iii) the undrawn face amount of outstanding letters of credit under the DIP ABL Credit Agreement ("**Excess Availability**") |
|---|---|
| **Cash Dominion** | Consistent with the Prepetition ABL Facility. |
| **Mandatory Prepayments** | Consistent with the Prepetition ABL Facility. |
| **Voluntary Prepayments** | Consistent with the Prepetition ABL Facility. |
| **Collateral and Priority** | Subject to the Carve Out, as security for the prompt payment and performance of all amounts due under the ABL DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses, indemnities or other amounts (collectively, the "**ABL DIP Obligations**"), effective as of the Petition Date, the ABL DIP Agent, for the benefit of itself and the ABL DIP Lenders, shall be granted automatically and properly perfected liens and security interests ("**ABL DIP Liens**") in all assets and properties of each of the Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of the Loan Parties, whether prior to or after the Petition Date, including all unencumbered assets of the Loan Parties (except for all claims and causes of action arising under Chapter 5 of the Bankruptcy Code ("**Avoidance Actions**"), but including, upon entry of the Final DIP Order, the proceeds of property recovered, whether by judgment, settlement or otherwise from Avoidance Actions ("**Avoidance Action Proceeds**")) (collectively, "**Unencumbered Property**") (collectively, the "**DIP Collateral**"); *provided,* that DIP Collateral shall exclude Excluded Assets but shall include any and all proceeds and products of Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets.

"**Excluded Assets**" has the meaning set forth in the Collateral Agreement (as defined in the Prepetition ABL Credit Agreement).

The ABL DIP Liens shall have the following priorities (subject in all cases to the Carve Out):

    i.   *First Liens on Unencumbered Property.* Pursuant to Section 364(c)(2) of the Bankruptcy Code, the ABL DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected and non-avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code), including Unencumbered Property, which ABL DIP Liens in Unencumbered Property shall be *pari passu* with any Term DIP Liens |

14

|  | in such Unencumbered Property, subject to the priorities set forth in **Annex III** attached hereto and the Carve Out. |
|  | ii. *Priming DIP Liens and Liens Junior to Certain Other Liens*. The ABL DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected in all DIP Collateral (other than as described in <u>clause (i)</u> above), which ABL DIP Liens (a) shall be, pursuant to Section 364(c)(3) of the Bankruptcy Code, subject and subordinate only to the (1) Carve Out, (2) Permitted Prior Liens, and (3) solely with respect to Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) and DIP Collateral of a type that would otherwise constitute Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), the Term DIP Liens, as applicable (to the extent the Term Loan DIP Facility asserts a first priority lien on such Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement)), (b) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in the ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) or any DIP Collateral that would otherwise constitute ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) (including, without limitation, any Term DIP Liens, as applicable, in ABL Priority Collateral), and (c) shall otherwise be subject to the priorities set forth in **Annex III** attached hereto. |
|  | iii. *Liens Senior to Other Liens*. Except to the extent expressly permitted hereunder, subject to the Carve Out, the ABL DIP Liens and the ABL DIP Superpriority Claims (as defined below) (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (B) any lien or security interest that is avoided or preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the Debtors or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
| **Guarantees** | Each Guarantor shall unconditionally guarantee, on a joint and several basis, all ABL DIP Obligations arising under or in connection with the ABL DIP Facility. |
| **ABL DIP Superpriority Claims** | Subject to the Carve Out, the ABL DIP Obligations shall be allowed super-priority administrative expense claims under Section 364(c) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claims shall have priority over all other claims against the Debtors, of any kind or nature whatsoever, including, without limitation, administrative expenses of the |

15

| | |
|---|---|
| | kind specified in or so ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise, with recourse against all DIP Collateral (the "**ABL DIP Superpriority Claims**"), which ABL DIP Superpriority Claims shall be subject to the priorities set forth in **Annex III** attached hereto. |
| **Term DIP Superpriority Claims** | Subject to the Carve Out, all amounts due under the Term Loan DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses indemnities or other amounts shall be allowed super-priority administrative expense claims under Section 364(c) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claims shall have priority over all other claims against the Debtors, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or so ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise, with recourse against all DIP Collateral (the "**Term DIP Superpriority Claims**"), which Term DIP Superpriority Claims shall be subject to the priorities set forth in **Annex III** attached hereto. |
| **Documentation Principles** | The ABL DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement and other guarantee, security, intercreditor, and other relevant documentation (the "**ABL DIP Documents**") based on the Prepetition ABL Credit Agreement and relevant guarantee, security and intercreditor documents, negotiated in good faith, in form and substance acceptable to the Loan Parties and the Required ABL DIP Lenders, which shall (i) reflect the terms set forth herein, (ii) reflect the terms of the Interim DIP Order or the Final DIP Order, as applicable, (iii) have usual and customary provisions for debtor-in-possession financings of this kind and provisions that are necessary to effectuate the financing contemplated hereby and (iv) otherwise be mutually agreed among the Borrower and the each ABL DIP Lender, (b) the Interim DIP Order and (c) the Final DIP Order (this paragraph, the "**Documentation Principles**"). |
| **Representations and Warranties** | The ABL DIP Documents will contain representations and warranties consistent with the Prepetition ABL Credit Agreement (modified as necessary to reflect the commencement of the Cases and to include those representations and warranties customarily found in loan documents for similar debtor-in-possession ABL Financings, and subject to the Documentation Principles). |
| **Budget** | The Loan Parties shall deliver: |
| | • a rolling 13-week cash flow forecast (the "**DIP Budget**") in form and substance satisfactory to the Required ABL DIP Lenders delivered on or prior to the Petition Date initially covering the period commencing on or about the Petition Date (the "**Initial DIP Budget**"), which reflects on a line-item basis, the Debtors' (a) weekly projected cash receipts ("**Budgeted Cash Receipts**"), (b) weekly projected disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses) under the Chapter 11 Cases ("**Budgeted** |

16

| | |
|---|---|
| | **Disbursement Amounts**") and (c) the weekly projected liquidity of the Debtors, and which shall be updated on the first Wednesday that is two full weeks after the Petition Date and every two weeks thereafter, which such proposed updated DIP Budget shall modify and supersede any prior agreed DIP Budget unless the ABL DIP Agent, acting at the direction of the Required ABL DIP Lenders, notifies (through counsel or otherwise) the Loan Parties in writing that such proposed DIP Budget is not in form and substance satisfactory to the Required ABL DIP Lenders within five Business Days after receipt thereof, in which case the existing Approved Budget shall remain in effect until superseded by an updated DIP Budget in form and substance satisfactory to the Required ABL DIP Lenders (as so updated, each an  "**Approved Budget**"); |
| | • on each Wednesday following each Variance Testing Period (beginning with the first Wednesday following the first Variance Testing Period), the delivery to the ABL DIP Lender Advisors of a variance report, which reflects for the applicable Variance Testing Period (defined below), (a) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts and the Budgeted Disbursement Amounts for such period as set forth in the Approved Budget as in effect for such period, (b) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (c) certifying compliance or non-compliance with the Permitted Variances (defined below), and (d) including explanations for all violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Debtors have taken or intend to take with respect thereto (each, a "**Variance Report**"); |
| | • together with each DIP Budget and each Variance Report, a reasonably detailed schedule listing all bank accounts of the Debtors with a balance in excess of $25,000 and their associated balances as of the applicable reporting date, including an identification of accounts covered by a deposit account control agreement; and |
| | • such other financial reporting readily available to the Debtors and reasonably requested by the ABL DIP Agent. |
| | "**Variance Testing Period**" shall mean (i) initially, the two-week period ending on the Friday of the second calendar week occurring after the Petition Date, and (ii) thereafter, each rolling two-week period ending on Friday of every second calendar week. |
| **Affirmative and Negative Covenants** | The ABL DIP Documents will contain the affirmative and negative covenants set forth in the Prepetition ABL Credit Agreement (modified as necessary to reflect the commencement of the Cases and to include those affirmative and negative covenants customarily found in loan documents for similar debtor-in-possession ABL financings, subject to the Documentation Principles) other than the Minimum Fixed Charge Coverage Ratio contained in Section 6.10(1) of the |

17

Prepetition ABL Credit Agreement; *provided, that*, without limitation, the ABL DIP Documents shall require:

(i)   update meetings and/or calls with the Debtors' senior management and advisors, the ABL DIP Lender Advisors and the ABL DIP Lenders every two weeks (or to the extent requested by ABL DIP Lender Advisors, every week), which update calls may cover the Debtors' financial performance and the other documentation provided pursuant to the reporting covenant described above;

(ii)   compliance with the DIP Orders;

(iii)   delivery of internal management prepared unaudited monthly financial statements, including an income statement for such month, balance sheet as of the end of such month and a cash flow statement for such month, within 30 days of month-end; and

(iv)   monthly (springing to weekly consistent with the Prepetition ABL Credit Agreement) delivery of Borrowing Base Certificates and related deliverables (including those deliverables that have been delivered with the Borrowing Base Certificates delivered under the Prepetition ABL Credit Agreement plus such additional deliverables as may be reasonably required by ABL DIP Agent, including, without limitation, supporting materials and information related to bonded contracts) through the DIP process;

(v)   Variances against the Approved Budget not to exceed the following permitted variances, with the covenant tested on a cumulative rolling two-week basis at the delivery of each Variance Report (collectively, the "**Permitted Variances**"):

- Aggregate receipts for the Variance Testing Period shall not be less than 85% of the Budgeted Cash Receipts for such Variance Testing Period;

- Aggregate disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses but excluding professional fees and expenses and any costs or cash collateralization associated with surety bonds) for the Variance Testing Period shall not be greater than 115% of the Budgeted Disbursement Amounts for such Variance Testing Period;

(vi)   the requirement to satisfy the following milestones:

- By 8:00 a.m. (prevailing Central Time) on April 8, 2024, the Petition Date shall have occurred.

- The Interim DIP Order shall have been entered no later than three (3) calendar days after the Petition Date.

7834612.18

| | |
|---|---|
| | • The Plan, Disclosure Statement (as defined in the RSA) and Backstop Motion (as defined in the RSA) shall have been filed no later than five (5) business days after the Petition Date. |
| | • The Final DIP Order shall have been entered no later than thirty-five (35) calendar days after the Petition Date. |
| | • The Disclosure Statement Order (as defined in the RSA) and Backstop Order (as defined in the RSA) shall have been entered no later than sixty (60) calendar days after the Petition Date. |
| | • The Confirmation Order (as defined in the RSA) shall be in form and substance satisfactory to ABL DIP Agent and Required ABL DIP Lenders, and shall have been entered no later than 105 calendar days after the Petition Date. |
| | • The Effective Date (as defined in the RSA) shall have occurred no later than 120 calendar days after the Petition Date. |
| | (vii)  Minimum Excess Revolving Availability covenant to be deleted and replaced with an availability block in the Borrowing Base as noted in the "ABL DIP Facility" section above. |
| | (viii)  Minimum Liquidity (which shall be defined as the sum of (i) all cash and cash equivalents of Loan Parties plus (ii) Excess Availability (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) and which shall not count Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) in the calculation of clause (i) above) of $20,000,000 and tested in a manner as provided for in the Term DIP Credit Agreement. |
| | (ix)  Within seven (7) Business Day after entry of the Final DIP Order, Borrowers shall have received not less than $70,000,000 (net of fees and expenses set forth in the Approved Budget) in proceeds of loans under the Term DIP Credit Agreement (which, for the avoidance of doubt, shall be in addition to the amount set forth in clause (vi) of Annex I), and not less than $35,000,000 of such net proceeds shall be paid to the ABL DIP Agent on such date to repay the loans under the ABL DIP Facility (without a corresponding reduction in commitments thereunder). |
| | *provided, further, that*, (x) the covenant baskets contained in Sections 6.01(2)(b), 6.01(3)(b), 6.03(3), 6.04(3), 6.04(4), 6.04(33), 6.04(38), 6.05(32), 6.06(15), 6.06(16), 6.09(2)(a) and 6.09(2)(b) of the Prepetition ABL Credit Agreement shall not be included in the DIP ABL Credit Agreement (it being understood and agreed that any use of such baskets prior to the Petition Date shall be separately grandfathered in under the DIP ABL Credit Agreement), (y) the covenant baskets contained in 6.01(33) and 6.02(33) shall be reduced to an aggregate amount not to exceed $1,000,000 (it being understood and agreed that any use of such baskets prior to the Petition Date shall be separately grandfathered in under the DIP ABL Credit Agreement), and (z) certain other covenant baskets shall be modified or deleted in a manner consistent with |

19

| | debtor-in-possession facilities of this type and in form and substance acceptable to the Company and the Required ABL DIP Lenders. |
|---|---|
| **Equity Cure** | The equity cure contained in Section 8.02 of the Prepetition ABL Credit Agreement shall not be included in the DIP ABL Credit Agreement. |
| **Conditions Precedent to Closing and the Initial Borrowing** | The closing of the ABL DIP Facility (the "**Closing Date**") shall occur as promptly as practical after the entry of the Interim DIP Order by the Bankruptcy Court, subject to the conditions precedent set forth on **Annex I** attached hereto. |
| **Conditions to Each Borrowing** | As set forth on **Annex II** attached hereto.<br><br>For the avoidance of doubt, such conditions precedent shall not apply to any ABL DIP Loan deemed made as a result of the Roll-Up. |
| **Events of Default** | The ABL DIP Documents will contain events of default consistent with those set forth in the Prepetition ABL Credit Agreement as well as additional events of default customarily found in loan documents for similar debtor-in-possession financing and other events of default reasonably agreed among the Loan Parties and the Required ABL DIP Lenders, subject to the Documentation Principles, including without limitation (a) any request made by the Loan Parties for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a DIP Order, as entered by the Bankruptcy Court which adversely effects the ABL DIP Lenders, without the prior written consent of the Required ABL DIP Lenders, (b) the occurrence and continuance of an "Event of Default" under the Term Loan DIP Facility, (c) the allowance of any superpriority claim arising under section 507(b) of the Bankruptcy Code which is pari passu with (other than the superpriority claims of the DIP Term Loan Facility) or senior to those of the DIP ABL Agent and the ABL DIP Lenders; (d) the dismissal of the Cases, or conversion of the Cases to cases under chapter 7 of the Bankruptcy Code; (e) the termination of the RSA; (f) if a surety declares a default or exercises any remedies in respect of a bonded contract, which default will or could reasonably be expected to result in claims against or payments by the Debtors in an aggregate amount of $7,500,000; and (g) the filing of any Plan that does not provide for the repayment in full in cash (provided that such payment may, in the case of any ABL DIP Lender who agrees to participate in any "exit financing", take the form of a cashless roll-up into such new "exit financing" and not cash; provided further that, to the extent any ABL DIP Lender does not participate or provide commitment to "exit financing", such payment shall be made in full in cash and such ABL DIP Lender's commitment shall be terminated). of the Prepetition ABL Obligations and ABL DIP Obligations on the Effective Date of such Plan.<br><br>Upon the occurrence and during the continuation of an Event of Default, subject to the DIP Intercreditor Arrangements or Existing ABL Intercreditor Agreement (as applicable), without further order from or application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the ABL DIP |

20

Agent, acting at the request of the Required ABL DIP Lenders, to (A) deliver to the Borrowers a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the ABL DIP Facility, (C) declare the ABL DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral, (E) terminate the ABL DIP Facility, (F) charge the default rate of interest under the ABL DIP Facility, (G) freeze all monies in any deposit accounts of the Debtors, (H) exercise any and all rights of setoff, (I) exercise any other right or remedy with respect to the DIP Collateral or the ABL DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the ABL DIP Documents, the DIP Orders or applicable law; *provided, however*, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (I) and (J) above, (i) the ABL DIP Agent, acting at the request of the Required ABL DIP Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee, the Term DIP Agent and the Office of the United States Trustee with five (5) Business Days' prior written notice (such period, the "**Remedies Notice Period**").  Immediately upon the expiration of the Remedies Notice Period, the Bankruptcy Court shall hold an emergency hearing when the Bankruptcy Court is available (the "**Enforcement Hearing**") at which the Debtors, any Official Committee, and/or any other party in interest shall be entitled to seek a determination from the Bankruptcy Court solely as to whether an Event of Default has occurred, and at the conclusion of the Enforcement Hearing, the Bankruptcy Court may fashion an appropriate remedy that is consistent with the terms of the DIP Orders; *provided*, that during the Remedies Notice Period, the Loan Parties shall be permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the Required ABL DIP Lenders and the Required Term DIP Lenders (as such term is defined in the Term Loan DIP Term Sheet) in their sole discretion. Except as otherwise set forth in the DIP Orders or ordered by the Bankruptcy Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Loan Parties shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the ABL DIP Secured Parties or the Term DIP Secured Parties (as such term is defined in the Term Loan DIP Term Sheet) under the DIP Orders.  No enforcement rights set forth in clauses (I) and (J) above shall be exercised prior to the Bankruptcy Court holding an Enforcement Hearing, subject to Bankruptcy Court availability, and the expiration of the Remedies Notice Period, and the Remedies Notice Period shall not expire until the conclusion of the Enforcement Hearing and the issuance of a ruling by the Bankruptcy Court if such Enforcement Hearing is conducted by the Bankruptcy Court.

Furthermore, upon the occurrence and during the continuation of an Event of Default, the ABL DIP Agent shall have the right, subject only to any separate applicable agreement between landlord and ABL DIP Agent, to enter upon any leased premises of the Debtors or any other party for the purpose of exercising

21

| | |
|---|---|
| | any remedy with respect to ABL DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder. |
| **Stipulations, Waivers, Releases and Protections** | 1. Upon entry of the Interim DIP Order, the Debtors shall waive any right to surcharge the DIP Collateral with respect to the ABL DIP Secured Parties.<br><br>2. Upon entry of the Interim DIP Order, the Debtors shall waive the equitable doctrine of "marshaling" against the DIP Collateral with respect to the ABL DIP Secured Parties.<br><br>3. The Debtors shall waive any right that they may have to seek further authority (a) to use Cash Collateral other than as provided in the DIP Order, (b) to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the indefeasible repayment in full of all Prepetition ABL Obligations and ABL DIP Obligations in cash at the time any such post-petition loans or financial accommodations are provided, extended or otherwise made available to Debtors, (c) to challenge the application of any payments authorized by the Interim DIP Order as pursuant to Section 506(b) of the Bankruptcy Code, or (d) to seek relief under the Bankruptcy Code, including without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of the ABL DIP Agent or any of the ABL DIP Secured Parties or the ABL DIP Agent's or any of the ABL DIP Secured Parties' exercise of such rights or remedies.<br><br>4. The Debtors shall waive, subject to "Challenge Rights", and forever release and discharge any and all claims and causes of action against each of the ABL DIP Secured Parties (and their respective related parties and representatives) as of the date of the applicable DIP Order.<br><br>5. No Cash Collateral, proceeds of the ABL DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the the Prepetition ABL Liens, the Prepetition ABL Obligations, ABL DIP Liens or ABL DIP Obligations, (b) investigate or initiate any claim or cause of action against any of the Prepetition ABL Secured Parties or the ABL DIP Secured Parties, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the ABL DIP Secured Parties, (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the ABL DIP Documents and the DIP Orders) that are senior to or *pari passu* with the ABL DIP Liens, ABL DIP Superpriority Claims, or the adequate protection liens or claims granted hereunder, or (e) propose, support or have a plan of reorganization or liquidation that does not provide for Payment in Full of |

22

|  | all Prepetition ABL Obligations and DIP ABL Obligations in cash (provided that such payment may, in the case of any ABL DIP Lender who agrees to participate in any "exit financing", take the form of a cashless roll-up into such new "exit financing" and not cash; provided further that, to the extent any ABL DIP Lender does not participate or provide commitment to "exit financing", such payment shall be made in full in cash and that ABL DIP Lender's commitment shall be terminated) on or before the Effective Date of such plan in accordance with the terms and conditions contained herein without the prior written consent of the ABL DIP Required Lenders.<br><br>6. The ABL DIP Secured Parties shall have the unqualified right to credit bid all DIP ABL Obligations, in each case, subject to the DIP Intercreditor Arrangements or the Existing ABL Intercreditor Agreement, as applicable.<br><br>7. The ABL DIP Secured Parties shall be entitled to good faith protection under Section 364(e) of the Bankruptcy Code. |
|---|---|
| **Expenses and Indemnification** | The DIP ABL Credit Agreement shall provide for the payment of all costs and expenses of the ABL DIP Agent and the ABL DIP Lenders, including, without limitation, the payment of all reasonable and documented fees and expenses of the ABL DIP Lender Advisors.<br><br>The DIP ABL Credit Agreement shall also provide for customary indemnification by each of the Loan Parties, on a joint and several basis, of each of the ABL DIP Secured Parties (together with their related parties and representatives). |
| **Assignments and Participations** | The DIP ABL Credit Agreement shall contain assignment and participation provisions that are usual and customary for financings of this type and as determined in accordance with the Documentation Principles.<br><br>Each assignment or participation of ABL DIP Loans shall be subject to a right of first refusal for the benefit of the initial ABL DIP Lenders providing ABL DIP Commitments. |
| **Required ABL DIP Lenders** | "**Required ABL DIP Lenders**" shall mean ABL DIP Lenders holding greater than 50% of the aggregate amount of ABL DIP Commitments and ABL DIP Loans; provided that if there are two or more ABL DIP Lenders that are not Affiliates of each other, an affirmative vote of the "Required ABL DIP Lenders" shall require the affirmative vote of no fewer than two ABL DIP Lenders that are not Affiliates of each other. |
| **Amendments** | Amendments shall require the consent of the Required ABL DIP Lenders consistent with the consent required by the Prepetition ABL Credit Agreement, except for amendments customarily requiring approval by affected ABL DIP Lenders under the ABL DIP Facility. |
| **Governing Law** | This Term Sheet and the ABL DIP Documents will be governed by the laws of |

23

000214

**App. 165**

| | |
|---|---|
| | the State of New York (except as otherwise set forth therein). The Bankruptcy Court shall maintain exclusive jurisdiction with respect to the interpretation and enforcement of the ABL DIP Documents and the exercise of the remedies by the ABL DIP Secured Parties and preservation of the value of the DIP Collateral. |
| **ABL DIP Lender Advisors** | Otterbourg P.C., as counsel to the ABL DIP Agent and the ABL DIP Lenders and M3 Advisory Partners, LP as financial advisor to the ABL DIP Agent and the ABL DIP Lenders  (the "**ABL DIP Lender Advisors**"). |

24

000215

**App. 166**

**Annex I**

<u>Conditions Precedent to Closing and the Initial Borrowing</u>

The Closing Date under the ABL DIP Facility, and the initial borrowing thereunder, shall be subject to the following conditions:

(i)      the Bankruptcy Court shall have entered the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required ABL DIP Lenders;

(ii)     the preparation, authorization and execution of the ABL DIP Documents with respect to the ABL DIP Facility, in form and substance consistent with this Term Sheet and otherwise acceptable to the Loan Parties, the ABL DIP Lenders and the ABL DIP Agent;

(iii)    the ABL DIP Lenders and the ABL DIP Agent shall have received and approved the Initial Budget;

(iv)     the delivery of customary legal opinions, which shall be satisfactory to the ABL DIP Agent and the ABL DIP Lenders;

(v)      the delivery of (i) a secretary's (or other officer's) certificate of the Borrowers and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments (including good standing certificates); and (ii) a customary closing officer's certificate of the Borrower;

(vi)     the preparation, authorization and execution of the Term DIP Documents with respect to the Term Loan DIP Facility, the Term Loan DIP Facility shall be in full force and effect and there shall not be a default or event of default thereunder, and Borrowers shall receive not less than $145,000,000 in gross proceeds of loans and a further $70,000,000 of gross proceeds of loans to be funded into escrow, in each case, under the Term DIP Documents, and not less than $75,000,000 of such net proceeds shall be paid to the ABL DIP Agent on the Closing Date to repay the revolving loans under the Prepetition ABL Facility (without a corresponding reduction in commitments thereunder);

(vii)    all premiums, payments, fees, costs and expenses (including, without limitation, the fees and expenses of the ABL DIP Lender Advisors and all other counsel, financial advisors and other professionals of the ABL DIP Lenders and ABL DIP Agent (whether incurred before or after the Petition Date) to the extent earned, due and owing, and including estimated fees and expenses through the Closing Date) shall have been paid;

(viii)   ABL DIP Agent shall have received at least five (5) Business Days prior to the Closing Date all documentation and information as is reasonably requested by ABL DIP Agent that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations in applicable jurisdictions, including, without limitation, the PATRIOT Act and Beneficial Ownership Regulation, in each case to the extent requested in writing at least seven (7) Business Days prior to the Closing Date, <u>provided</u>, that, the Loan Parties will use reasonable efforts to promptly provide any additional information requested thereafter;

(ix)     the ABL DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the ABL DIP Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order;

(x)      each Uniform Commercial Code financing statement and each intellectual property security

25

agreement required by the ABL DIP Documents to be filed in order to create in favor of the ABL DIP Agent a perfected lien on the DIP Collateral having the priorities set forth in the DIP Orders shall have been filed;

(xi)     all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to the Required ABL DIP Lenders;

(xii)    the Closing Date shall have occurred on or before the date that is five calendar days after the date of entry of the Interim DIP Order;

(xiii)   other than in respect of any projections, estimates or information of a general or industry specific nature, there shall be no material misstatements in (or omissions of material facts necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements are made) the materials (when taken as a whole and after giving effect to any updates or supplements thereto) previously furnished to the ABL DIP Agent and the ABL DIP Secured Parties by the Loan Parties in connection with the transactions contemplated herein. The ABL DIP Agent shall not have become aware of any material information or other matter after the date of the Commitment Letter and prior to the Closing Date that is inconsistent in a material and adverse manner with any previous due diligence, information or matter (including any financial information) in connection with the transactions contemplated herein;

(xiv)    after giving effect to the transactions occurring on the Closing Date, there shall be no default or event of default under the Prepetition ABL Credit Agreement as amended by the Ratification and Amendment Agreement;

(xv)     The amount of the opening Excess Availability (to be defined in a manner consistent with the Prepetition ABL Facility), but excluding any Qualified Cash in the determination of such Excess Availability, as calculated after giving effect to any credit extensions under the ABL DIP Facility, the repayment of any credit extensions under the ABL DIP Facility with the proceeds of the Term Loan DIP Facility and after provision for payment of all fees and expenses of the transactions paid or payable on or about the Closing Date, shall be not less than $35,000,000; and

(xvi)    ABL DIP Agent shall have received, in form and substance reasonably satisfactory to ABL DIP Agent, an updated Borrowing Base Certificate which calculates the Borrowing Base as of February 29, 2024.

7834612.18

<u>Conditions Precedent to Each Credit Extension</u>

In addition to the conditions precedent noted above, each borrowing or other credit extension under the ABL DIP Facility shall be subject to the following conditions:

(i)     the Bankruptcy Court shall have entered the Interim DIP Order or the Final DIP Order;

(ii)    the representations and warranties set forth in the ABL DIP Documents shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or material adverse effect, in all respects) as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties will be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or material adverse effect, in all respects) as of such earlier date);

(iii)   at the time of and immediately after any such borrowing, no default or event of default under the DIP ABL Credit Agreement shall have occurred and be continuing or would result therefrom;

(iv)    the ABL DIP Agent shall have received a signed borrowing request from the relevant Borrower; and

(v)      at the time of and immediately after such borrowing, Availability (to be defined in a manner consistent with the Prepetition ABL Facility) is not less than $0.

7834612.18

000218

**App. 169**

**Annex II**

Interest and Certain Payments

| | |
|---|---|
| Interest Rate: | At the option of the Borrowers, the ABL DIP Loans and Swingline Loans shall bear interest at a rate per annum equal to (i) the Adjusted SOFR Rate (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) (subject to a floor of 0.00%) plus the Applicable Rate or (ii) ABR (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) (subject to a floor of 0.00%) plus the Applicable Rate. |
| | "**Applicable Rate**" means 2.75% in the case of ABR Loans and 3.75% in the case of SOFR Loans. |
| Interest Payment Dates: | Interest on ABR Loans and SOFR Loans shall be payable on the last business day of each month in arrears; other interest payment dates shall be consistent with the Prepetition ABL Facility. |
| Non-Use Fee: | A payment equal to 0.50% per annum on the undrawn ABL DIP Commitments under the ABL DIP Facility, which shall be paid monthly. |
| Letter of Credit Fees: | Consistent with the Prepetition ABL Facility. |
| Default Rate: | Consistent with the Prepetition ABL Facility. |
| Rate Computation and Payment Basis: | Consistent with the Prepetition ABL Facility. |
| Arrangement Fees | Consistent with Fee Letter between Loan Parties and ABL DIP Agent. |
| Structuring Fees: | $2,500,000 Structuring Fee to be shared pro rata with all ABL DIP Lenders |
| Other Fees and Charges: | Consistent with the Prepetition ABL Facility. |

\*     \*     \*

7834612.18

000219
**App. 170**

**Annex III**

| Priority | DIP Collateral (other than Avoidance Action Proceeds) that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral (other than Avoidance Action Proceeds) that constitutes Term Loan Priority Collateral or that would otherwise constitute Term Loan Priority Collateral | DIP Collateral that constitutes Avoidance Action Proceeds |
|---|---|---|---|
| *First* | Carve Out and Permitted Liens described in clause (B) of the definition thereof | Carve Out and Permitted Liens | Carve Out |
| *Second* | ABL DIP Liens<br><br>ABL DIP Superiority Claims | Term DIP Liens<br><br>Term DIP Superpriority Claims | ABL DIP Liens and Term DIP Liens, on a *pari passu* basis<br><br>ABL DIP Superiority Claims and Term DIP Superpriority Claims, on a *pari passu* basis |
| *Third* | Prepetition ABL Adequate Protection Liens<br><br>Prepetition ABL Adequate Protection Claims | First Lien Adequate Protection Liens<br><br>First Lien Adequate Protection Claims | Prepetition ABL Adequate Protection Liens and First Lien Adequate Protection Liens, on a *pari passu* basis<br><br>Prepetition ABL Adequate Protection Claims and First Lien Adequate Protection Claims, on a *pari passu* basis |
| *Fourth* | Prepetition ABL Liens<br><br>Prepetition ABL Claims | Prepetition First Lien Liens<br><br>Prepetition First Lien Claims | N/A |
| *Fifth* | Term DIP Liens<br><br>Term DIP Superpriority Claims | Second Lien Adequate Protection Liens<br><br>Second Lien Adequate Protection Claims | N/A |

29

000220
**App. 171**

| *Sixth* | First Lien Adequate Protection Liens | Prepetition Second Lien Liens | N/A |
| | First Lien Adequate Protection Claims | Prepetition Second Lien Claims | |
| *Seventh* | Prepetition First Lien Liens | ABL DIP Liens | N/A |
| | Prepetition First Lien Claims | ABL DIP Superpriority Claims | |
| *Eighth* | Second Lien Adequate Protection Liens | Prepetition ABL Adequate Protection Liens | N/A |
| | Second Lien Adequate Protection Claims | Prepetition ABL Adequate Protection Claims | |
| *Ninth* | Prepetition Second Lien Liens | Prepetition ABL Liens | |
| | Prepetition Second Lien Claims | Prepetition ABL Claims | |

7834612.18

000221
**App. 172**

**Exhibit 2**

**Term DIP Term Sheet**

**CONVERGEONE HOLDINGS, INC., ET AL.**
**$215 MILLION SUPER-PRIORITY SENIOR SECURED**
**DEBTOR-IN-POSSESSION CREDIT FACILITY**

*The terms set forth in this Summary of Principal Terms and Conditions (the "Term DIP Term Sheet") are being provided on a confidential basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of the proposed Term DIP Facility (as defined below). Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Restructuring Support Agreement (the "RSA") or the Restructuring Term Sheet (the "RTS"), as applicable.*

### Summary of Proposed Terms and Conditions

| | |
|---|---|
| *Term DIP Facility:* | A super-priority senior secured debtor-in-possession term loan facility in an aggregate principal amount of $215 million (the "Term DIP Facility"; the Term DIP Lenders' commitments thereunder, the "Term DIP Commitments"; the loans thereunder, the "Term DIP Loans" and, together with the Term DIP Commitments, the "Term DIP Loan Exposure"; the Term DIP Lenders' claims thereunder, the "Term DIP Superpriority Claims"; and the proceeds received by the Borrower from the Term DIP Loans, the "Term DIP Proceeds"), subject to the terms and conditions set forth in this Term DIP Term Sheet and the Term DIP Loan Documents (as defined below). The Term DIP Loans will be available to be made in two draws, with the first draw being in an amount equal to $145 million and occurring substantially concurrently with the entry of the Interim DIP Order (the "Initial Draw") and the second draw being in an amount equal to $70 million and occurring at the same time as the Initial Draw with net proceeds funded into escrow as provided below with the release of such proceeds from escrow to occur upon entry of the Final DIP Order and satisfaction of the applicable conditions precedent set forth herein (the "Second Draw"); provided that the portion of the Term DIP Facility attributable to the Second Draw shall be funded into escrow substantially concurrently with the funding of the Initial Draw (such portion of the Term Facility, the "Escrowed Amount" and the agent in connection with the escrow arrangements, the "Escrow Agent") subject to escrow arrangements consistent with this Term Sheet and otherwise reasonably satisfactory to the Borrower and the Required Term DIP Lenders. The Escrowed Amount shall accrue interest and fees, commencing with the funding into escrow thereof. |
| *ABL DIP Facility:* | The Term DIP Loan Documents shall permit the Debtors to incur the ABL DIP Facility on terms and conditions acceptable to the Required Term DIP Lenders, it being understood and agreed that the terms and conditions set forth in the ABL DIP Facility Term Sheet attached to the fully executed RSA shall be deemed to be acceptable to the Required Term DIP Lenders. |
| *Relevant Prepetition Debt and Documents:* | That certain First Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "First Lien Credit Agreement"), by and among, PVKG Intermediate Holdings, Inc. as holdings, ConvergeOne Holdings, Inc., as borrower, Deutsch Bank AG New York Branch, as |

administrative agent, and the lenders party thereto from time to time (the "First Lien Term Loan Lenders");

That certain Note Purchase Agreement, dated as of July 10, 2020 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "First Lien KL Note Purchase Agreement"), by and among, PVKG Intermediate Holdings, Inc. as holdings, ConvergeOne Holdings, Inc., as issuer, Deutsch Bank Trust Company Americas, as administrative agent, and the holders party thereto from time to time (the "KL Noteholder");

That certain Note Purchase Agreement, dated as of July 6, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "First Lien CVC Note Purchase Agreement," and together with the First Lien Credit Agreement and the First Lien KL Note Purchase Agreement, the "First Lien Debt Agreements" the obligations thereunder, the "Prepetition First Lien Claims," and the liens related thereto, the "Prepetition First Lien Liens") among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings Inc., PVKG Investment Holdings, Inc., as administrative agent and collateral agent, and the holders party thereto from time to time (the "CVC Noteholder," together with the First Lien Term Loan Lenders and the KL Noteholder, the "First Lien Lenders");

That certain senior secured asset-based revolving credit facility made available to the Company and the other borrowers thereunder pursuant to that certain Amended and Restated ABL Credit Agreement (the "Prepetition ABL Credit Agreement"), dated as of January 4, 2019  (as amended by Amendment No. 1 to Amended and Restated ABL Credit Agreement, dated as of July 10, 2022, Amendment No. 2 to Amended and Restated ABL Credit Agreement, dated as of September 14, 2022, Amendment No. 3 to Amended and Restated ABL Credit Agreement, dated as of January 23, 2023 and Amendment No. 4 to Amended and Restated ABL Credit Agreement, dated as of August 29, 2023) among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings, Inc., Wells Fargo Commercial Distribution Finance, as administrative agent, collateral agent, floorplan funding agent and swing line lender, and the lenders party thereto (the "Prepetition ABL Lenders") (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition ABL Facility," the liens thereunder, the "Prepetition ABL Liens," and the claims thereunder, the "Prepetition ABL Claims");

That certain Second Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time the "Second Lien Credit Agreement" and the claims thereunder, the "Prepetition Second Lien Claims") by and among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings Inc., UBS AG, Stamford Branch, as administrative agent and collateral agent, and the lenders party thereto from time to time (the "Second Lien Term Loan Lenders");

2

That certain ABL Intercreditor Agreement dated as of January 4, 2019 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "ABL Intercreditor Agreement") among, *inter alios*, Wells Fargo Commercial Distribution Finance, LLC, as the ABL Agent, Deutsche Bank AG New York Branch, as the Initial Senior Lien Term Loan Agent, and UBS AG, Stamford Branch, as the Initial Junior Lien Term Loan Agent; and

That certain First Lien Pari Passu Intercreditor Agreement dated as of July 10, 2020 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time) among, *inter alios*, Deutsche Bank AG New York Branch, as Initial First Lien Representative and Initial First Lien Collateral Agent, and Deutsche Bank Trust Company Americas, as the Initial Other Representative and Initial Other Collateral Agent.

| | |
|---|---|
| *Borrower:* | ConvergeOne Holdings, Inc. (the "Borrower"), as a debtor and debtor-in-possession in a case under chapter 11 of the Bankruptcy Code to be filed in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") contemporaneously and jointly-administered with the other Chapter 11 Cases (the date of filing of the Chapter 11 Cases, the "Petition Date"). |
| *Guarantors:* | Each of the guarantors under the First Lien Debt Agreements, which are debtors and debtors-in-possession in the Chapter 11 Cases (collectively, the "Guarantors"). All obligations of the Borrower under the Term DIP Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors. |
| | The Borrower and the Guarantors are referred to herein as "Loan Parties" and each, a "Loan Party," or as "Debtors" and each, a "Debtor." |
| *Administrative Agent/Administrative Agent Fee:* | A financial institution acceptable to the Required Term DIP Lenders (as defined below) (in such capacity, the "Term DIP Agent"). |
| | The Term DIP Agent shall be paid an annual agency fee to be agreed by the Term DIP Agent, the Borrower and the Required Term DIP Lenders. |
| *Term DIP Lenders:* | Each of the entities set forth on Annex 1 hereto, which entities are either members of the First Lien Ad Hoc Group represented by Gibson, Dunn & Crutcher LLP ("Gibson") and PJT Partners ("PJT"), the CVC Noteholder or an entity that is related to or affiliated with any of the foregoing (collectively, the "Term DIP Lenders" and each, a "Term DIP Lender") that commits to provide the amount of the Term DIP Facility set forth opposite its name on Annex 1.  For the avoidance of doubt, CVC Noteholder's principal and accrued interest holdings under the First Lien Debt Agreements on the Petition Date shall be deemed to be $213 million in the aggregate. |
| | Each Term DIP Lender may participate in the Term DIP Facility on behalf of some or all accounts and funds managed by such Term DIP Lender and |

3

some or all accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such Term DIP Lender or any other affiliate of such Term DIP Lender (any such managed account or fund, or affiliate, a "Lender Affiliate"), and may allocate its Term DIP Commitments among Lender Affiliates in its sole discretion; provided that any such Lender Affiliate to which any such allocation is made shall immediately become a party to the RSA and commit its applicable portion of the Term DIP Facility; provided further that any Term DIP Lender may elect to participate in the Term DIP Facility, initially, through a fronting lender and any associated fees and expenses in connection with such fronting arrangement shall be paid out of the Term DIP Proceeds.

"Required Term DIP Lenders" means one or more Term DIP Lenders holding at least 50.1% of the aggregate Term DIP Loan Exposure.

|  |  |
|---|---|
| *Term DIP Premiums:* | The following premiums shall be applicable to all Term DIP Loans (the "Term DIP Premiums"): |

- "Term DIP Commitment Premium": a premium totaling 7.00% of the Term DIP Loans, payable in-kind in the form of additional Term DIP Loans to all Term DIP Lenders on a *Pro Rata* basis, earned and payable upon entry of the Interim DIP Order.

- "Term DIP Exit Premium": a premium totaling 3.00% of the Term DIP Loans (inclusive of the capitalized Term DIP Commitment Premium), payable in-kind in the form of additional Term DIP Loans to all Term DIP Lenders on a *Pro Rata* basis, earned upon entry of the Interim DIP Order and payable upon, but immediately prior to the occurrence of, the earlier of the Plan Effective Date or the Maturity Date (defined below).

|  |  |
|---|---|
| *Maturity:* | All obligations under the Term DIP Loan Documents (collectively, the "Term DIP Obligations") will be due and payable in full in cash (subject to the DIP Term Loan Rights (defined below)) on the earliest of: (i) the date that is six months after the Closing Date (as defined below); (ii) the date of acceleration of the Term DIP Loans pursuant to the terms of the Term DIP Credit Agreement and the other Term DIP Loan Documents; (iii) the date the Bankruptcy Court orders a conversion of any Chapter 11 Case to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Debtor; (iv) the substantial consummation of a plan of reorganization or liquidation of the Debtors, which has been confirmed by an order entered by the Bankruptcy Court (the "Plan"); (v) the appointment of a chapter 11 trustee or other Bankruptcy Court-mandated fiduciary with decision-making authority (including an examiner with expanded powers), (vi) the date of consummation of a sale of all or substantially all of the Debtors' assets, and (vii) the date of the Milestone relating to entry of the Final DIP Oder, to the extent the Final DIP Order is not entered into on or prior to such date (the earliest date to occur, the "Maturity Date"). |

4

On the Maturity Date, the Term DIP Loan Obligations shall be paid in full in cash; provided, however, that for convenience purposes in the event of a Maturity Date triggered pursuant to clause (iv) above as a result of the consummation of the Plan that is consistent with the RSA and acceptable to the Required Term DIP Lenders, then (such options (i) and (ii) below, collectively, the "DIP Term Loan Rights")

(i) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, (A) an Initial First Lien Ad Hoc Group Member, (B) CVC Noteholder, or (C) a Subsequent First Lien Ad Hoc Group Member (in each case, at its sole option) shall be entitled to exchange some or all of the Allocated Portion (defined below) of its Term DIP Obligations, on a dollar for dollar basis, for New Equity Interests pursuant to the terms of the Rights Offering, Backstop Commitment and Direct Investment (with the remainder of such Term DIP Obligations to be satisfied in cash), and

(ii) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, a Subsequent First Lien Ad Hoc Group Member (A) shall be entitled (at its sole option) to exchange the Allocated Portion (defined below) of its Term DIP Obligations, on a dollar for dollar basis, for Takeback Term Loans (with the remainder of such Term DIP Obligations to be satisfied in cash), and (B) any Subsequent First Lien Ad Hoc Group Member that is a Term DIP Lender or is a Lender Affiliate thereof of is related thereto, that elects  the option described in clause (A), shall utilize the Takeback Term Loan recovery portion of its First Lien Claims as currency, on a dollar for dollar basis, for New Equity Interests issuable under and pursuant to the terms of the Rights Offering, Backstop Commitment and Direct Investment (whether in their capacities as Investors or Eligible Offerees).

For purposes of the foregoing, the "Allocated Portion" shall mean Term DIP Obligations in an amount equal to the Rights, Direct Investment and Backstop Commitment (as each such term is defined in the Plan or the Rights Offering Term Sheet) that are allocated to an applicable Term DIP Lender under the Plan and the Backstop Agreement as either an Investor or Eligible Offeree; provided that, in the case of the Subsequent First Lien Ad Hoc Group Members, the amount of Term DIP Obligations exchanged for New Equity Interests and Takeback Term Loans pursuant to clauses (i) and (ii) above, respectively, on an aggregate basis, shall not exceed such Subsequent First Lien Ad Hoc Group Member's respective Allocated Portion.

*Use of Proceeds:*                Solely in accordance with and subject to the Approved Budget ((as defined below) subject to Permitted Variances), and the DIP Orders, the Term DIP Proceeds may be used only (i) to pay down Loans under the Prepetition ABL Facility (without a corresponding reduction in commitments thereunder), (ii) to pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with the Chapter 11 Cases (including payments benefiting from the Carve Out), (iii) for working capital and general corporate purposes of the Loan Parties, and (iv) for such other purposes as may be detailed in the Approved Budget

(subject to Permitted Variances).

| | |
|---|---|
| *Interest:* | Interest on the Term DIP Loans shall be payable in cash at the end of each month in arrears. At all times prior to the occurrence of an Event of Default (as defined below), interest on the outstanding principal amount of the Term DIP Loans shall accrue at a rate equal to SOFR + 8.00% *per annum* (subject to a SOFR floor of 4.00%). |
| | Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| *Default Interest:* | During the continuance of an Event of Default, the Term DIP Loans will bear interest at an additional 2.00% *per annum* and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% *per annum*.  Default interest shall be payable in cash on demand. |
| *Permitted Liens:* | (A)    Any valid liens ("Permitted Prior Liens") that are (1) in existence on the Petition Date, (2) are either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (3) senior in priority to the ABL Liens, (4) non-avoidable under the Bankruptcy Code or other applicable law, and (5) are permitted to be incurred under the Prepetition ABL Facility; and |
| | (B)    liens permitted to have seniority over the Term DIP Liens (as defined below) securing the Term DIP Facility as specified in the Term DIP Credit Agreement (the liens referenced in (A) and (B) above, collectively, the "Permitted Liens"). |
| *Collateral:* | The Term DIP Obligations shall constitute claims against each Loan Party entitled to the benefits of Bankruptcy Code section 364(c)(1), having super-priority over any and all administrative expenses and claims, of any kind or nature whatsoever, and subject to the priorities set forth in **Annex 2** attached hereto. |
| | The Term DIP Facility shall be secured by (collectively, the "DIP Collateral," and the liens thereon, the "Term DIP Liens") (i) a first priority lien on all unencumbered assets of the Loan Parties (except for all claims and causes of action arising under Chapter 5 of the Bankruptcy Code ("Avoidance Actions"), but including, upon entry of the Final DIP Order, the proceeds of property recovered, whether by judgment, settlement or otherwise from Avoidance Actions ("Avoidance Action Proceeds")) (collectively, "Unencumbered Property"), which Term DIP Liens in Unencumbered Property shall be pari passu with any ABL DIP Liens (as defined below) in Unencumbered Property but subject to the priorities set forth in Annex 2 attached hereto, (ii) a priming first priority lien on all assets currently securing the First Lien Debt Agreements that constitute Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement), subject only to Permitted Liens and (iii) a priming junior priority lien on all assets currently securing the First Lien Credit Agreement that constitute ABL Priority Collateral (as defined in the ABL Intercreditor |

6

Agreement), subject only to Permitted Liens, the Prepetition ABL Facility and any super priority debtor-in-possession asset-based loan credit facility provided by the Prepetition ABL Lenders that is consented to by the Required Term DIP Lenders (an "ABL DIP Facility," and the liens and claims thereunder, the "ABL DIP Liens" and "ABL DIP Superpriority Claims," respectively), all subject to the Carve-Out and the priorities set forth in **Annex 2** attached hereto; *provided,* that DIP Collateral shall exclude Excluded Assets but shall include any and all proceeds and products of Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets.

"Excluded Assets" shall be defined in a manner customary for facilities of this type and shall be based on such definition in the First Lien credit Agreement (it being understood and agreed that the definition of "Excluded Assets" shall include equity interests in excess of 65% of the issued and outstanding equity interests of non-U.S. subsidiaries but shall exclude all owned real property of the Loan Parties).

|  |  |
|---|---|
| *Covenants, Etc.:* | The Term DIP Loan Documents will contain representations, warranties, reporting requirements, mandatory prepayment requirements, voluntary prepayment requirements, affirmative covenants, negative covenants, and "sacred rights" based on the First Lien Credit Agreement (and consistent with the consent rights of the RSA) with the following modifications and such other modifications consistent with debtor-in-possession facilities of this type and in form and substance acceptable to the Company and the Required Term DIP Lenders: |

(i) update meetings and/or calls with the Debtors' senior management and advisors, the Term DIP Advisors and the Term DIP Lenders every two weeks (or to the extent requested by the Term DIP Advisors, every week), which update calls may cover the Debtors' financial performance and the other documentation provided pursuant to the reporting covenant described below,

(ii) delivery of internal management prepared unaudited monthly financial statements, including an income statement for such month, balance sheet as of the end of such month and a cash flow statement for such month, within 30 days of month-end (the "Monthly Reports"),

(iii) a rolling 13-week cash flow forecast (the "DIP Budget") in form and substance satisfactory to the Required Term DIP Lenders delivered on or prior to the Petition Date initially covering the period commencing on or about the Petition Date (the "Initial DIP Budget"), which reflects on a line-item basis, the Debtors' (a) weekly projected cash receipts ("Budgeted Cash Receipts"), (b) weekly projected disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses) under the Chapter 11 Cases ("Budgeted Disbursement Amounts") and (c) the weekly projected liquidity of the Debtors, and which shall be updated on the first Wednesday that is two full weeks after the Petition Date and every two weeks thereafter, which such proposed updated DIP Budget shall modify and supersede any prior agreed DIP Budget unless the Required

7

Term DIP Lenders, through counsel or otherwise, notify the Loan Parties in writing that such proposed DIP Budget is not in form and substance satisfactory to the Required Term DIP Lenders within five business days after receipt thereof, in which case the existing Approved Budget shall remain in effect until superseded by an updated DIP Budget in form and substance satisfactory to the Required Term DIP Lenders (as so updated, each an "Approved Budget"),

(iv) on each Wednesday following each Variance Testing Period (beginning with the first Wednesday following the first Variance Testing Period), the delivery to the Term DIP Advisors of a variance report, which reflects for the applicable Variance Testing Period (defined below), (a) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts and the Budgeted Disbursement Amounts for such period as set forth in the Approved Budget as in effect for such period, (b) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (c) certifying compliance or non-compliance with the Permitted Variances (defined below), and (d) including explanations for all violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Debtors have taken or intend to take with respect thereto (each, a "Variance Report"),

(v) the requirement to satisfy the Milestones set forth in the RTS;

(vi) compliance with the DIP Orders; and

(vii) such other financial reporting readily available to the Debtors and reasonably requested by the Term DIP Agent or any Term DIP Lender, including, if requested by any Term DIP Lender, deliver to each requesting Term DIP Lender monthly bookings and backlog reports.

"Variance Testing Period" shall mean (i) initially, the two-week period ending on the Friday of the second calendar week occurring after the Petition Date, and (ii) thereafter, each rolling two-week period ending on Friday of every second calendar week.

*Financial Covenants:*   Financial covenants and tests will be limited to:

(i) Variances against the Approved Budget not to exceed the following permitted variances, with the covenant tested on a cumulative rolling two-week basis at the delivery of each Variance Report (collectively, the "Permitted Variances"):

- Aggregate receipts for the Variance Testing Period shall not be less than 85% of the Budgeted Cash Receipts for such Variance Testing Period;

- Aggregate disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses but excluding professional fees and expenses and any costs or cash

8

collateralization associated with surety bonds) for the Variance Testing Period shall not be greater than 115% of the Budgeted Disbursement Amounts for such Variance Testing Period.

(ii) Minimum Liquidity (which shall be defined as the sum of (i) all cash and cash equivalents of Loan Parties plus (ii) Excess Availability (to be defined in a manner consistent with the Prepetition ABL Credit Agreement but excluding Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) from the calculation of Excess Availability) of $20,000,000.

|                    |                                                                                                                |
|--------------------|----------------------------------------------------------------------------------------------------------------|
| *Events of Default:* | The Term DIP Loan Documents will contain events of default based on those set forth in the First Lien Credit Agreement as well as additional events of default customarily found in loan documents for similar debtor-in-possession financing and other events of default agreed among the Debtors and the Required Term DIP Lenders, including without limitation (a) any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a DIP Order, as entered by the Bankruptcy Court which adversely affects the Term DIP Lenders, without the prior written consent of the Required Term DIP Lenders, (b) the occurrence and continuance of an "Event of Default" under the ABL DIP Facility, (c) the allowance of any superpriority claim arising under section 507(b) of the Bankruptcy Code which is pari passu with (other than the superpriority claims of the ABL DIP Facility) or senior to those of the Term DIP Agent and the Term DIP Lenders; (d) the dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (e) the termination of the RSA and (f) the filing of any Plan that is inconsistent with the RSA unless consented to by the Required Term DIP Lenders. |

Upon the occurrence and during the continuation of an Event of Default, subject to the Existing ABL Intercreditor Agreement, without further order from or application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Term DIP Agent, acting at the request of the Required Term DIP Lenders, to (A) deliver to the Borrower a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the Term DIP Facility, (C) declare the Term DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral, (E) terminate the Term DIP Facility, (F) charge the default rate of interest under the Term DIP Facility (which default rate shall be charged automatically in accordance with the terms of the Term DIP Facility), (G) freeze all monies in any deposit accounts of the Debtors, (H) exercise any and all rights of setoff, (I) exercise any other right or remedy with respect to the DIP Collateral or the Term DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the Term DIP Documents, the DIP Orders or applicable law; *provided, however*, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (I) and (J) above, (i) the Term DIP Agent, acting at the request of the Required

9

Term DIP Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee, the ABL DIP Agent and the Office of the United States Trustee with five (5) Business Days' prior written notice (such period, the "Remedies Notice Period").  Immediately upon the expiration of the Remedies Notice Period, the Bankruptcy Court shall hold an emergency hearing when the Bankruptcy Court is available (the "Enforcement Hearing") at which the Debtors, any Official Committee, and/or any other party in interest shall be entitled to seek a determination from the Bankruptcy Court solely as to whether an Event of Default has occurred, and at the conclusion of the Enforcement Hearing, the Bankruptcy Court may fashion an appropriate remedy that is consistent with the terms of the DIP Orders; *provided*, that during the Remedies Notice Period, the Loan Parties shall be permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the Required Term DIP Lenders and the Required ABL DIP Lenders (as such term is defined in the ABL DIP Facility Term Sheet) in their sole discretion. Except as otherwise set forth in the DIP Orders or ordered by the Bankruptcy Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Loan Parties shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Term DIP Agent or Term DIP Lenders (together the "Term DIP Secured Parties") or the ABL DIP Secured Parties under the DIP Orders. No enforcement rights set forth in clauses (I) and (J) above shall be exercised prior to the Bankruptcy Court holding an Enforcement Hearing, subject to Bankruptcy Court availability, and the expiration of the Remedies Notice Period, and the Remedies Notice Period shall not expire until the conclusion of the Enforcement Hearing and the issuance of a ruling by the Bankruptcy Court.

| | |
|---|---|
| *Rating:* | The Loan Parties shall use commercially reasonable efforts to obtain a rating for the Term DIP Facility by Moody's and S&P within 120 days of entry of the Final DIP Order. |
| *Term DIP Loan Documents*: | The Term DIP Facility will be documented by a Senior Secured Superpriority Debtor-in-Possession Term Loan Credit Agreement (the "Term DIP Credit Agreement") and other guarantee, security and loan documentation (together with the Term DIP Credit Agreement, the "Term DIP Loan Documents") in each case based on documentation related to the First Lien Credit Agreement (and the Loan Documents as defined thereunder) and shall reflect the terms and provisions set forth in this Term DIP Term Sheet and otherwise in form and substance satisfactory to the Required Term DIP Lenders. |
| *Interim and Final DIP Orders:* | The Interim DIP Order, which shall be satisfactory in form and substance to the Term DIP Agent and the Required Term DIP Lenders, shall authorize and approve, among other matters to be agreed, (i) the Debtors' entry into the Term DIP Loan Documents, (ii) the making of the Term DIP Loans, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets as required by this Term DIP Term Sheet in |

10

accordance with the Term DIP Loan Documents with respect to the DIP Collateral, (iv) the granting of adequate protection as set forth below, (v) the Term DIP Premiums, (vi) the waivers and marshalling provisions set forth below, (vii) stipulations as to the amount, validity, enforceability, perfection and priority of the prepetition indebtedness, (viii) waiver of any requirement of the Term DIP Lenders and prepetition secured lenders to file any proof of claim, (ix) the "Carve Out" referenced and defined below, and (x) customary indemnification and payment of all fees and expenses of Gibson, as counsel to the Term DIP Lenders, Latham & Watkins LLP, as counsel to the CVC Noteholder, PJT, as financial advisor to the Term DIP Lenders, applicable local counsel, and other necessary advisors (collectively, the "<u>Term DIP Advisors</u>"), as well as advisors to the Term DIP Agent. The Final DIP Order shall be in form and substance satisfactory to the Required Term DIP Lenders (the Final DIP Order and the Interim DIP Order, collectively, the "<u>DIP Orders</u>").

|  |  |
|---|---|
| *Adequate Protection:* | The DIP Orders shall approve customary adequate protection to be provided to the holders of Prepetition ABL Claims, Prepetition First Lien Claims and Prepetition Second Lien Claims (and the applicable Agents/Trustees on their behalf) to the extent of any diminution in value, including (i) replacement or new liens on the unencumbered and encumbered assets of the Loan Parties junior to the liens securing the Term DIP Facility and ABL DIP Facility (as applicable) (such liens, the "<u>Prepetition ABL Adequate Protection Liens</u>," the "<u>First Lien Adequate Protection Liens</u>" and the "<u>Second Lien Adequate Protection Liens</u>," as applicable), and (ii) super-priority claims against the Loan Parties as provided in section 507(b) of the Bankruptcy Code junior to the Term DIP Obligations and ABL DIP Obligations (as applicable) (such claims, the "<u>Prepetition ABL Adequate Protection Claims,</u>" the "<u>First Lien Adequate Protection Claims</u>," and the "<u>Second Lien Adequate Protection Claims</u>", as applicable), subject in all cases to the Carve Out and the priorities set forth in **Annex 2** attached hereto, and (iii) with respect to the Prepetition ABL Claims and Prepetition First Lien Claims, delivery of the Monthly Reports, Initial Budget, and any updated DIP Budget via posting to the lender website maintained for the holders of Prepetition First Lien Claims. |
| *Carve Out* | The liens on and security interests of the Term DIP Lenders in the DIP Collateral, the adequate protection liens, and all super-priority administrative expense claims granted under the DIP Orders, shall be subject and subordinate to the Carve Out. |
|  | For purposes hereof, "<u>Carve Out</u>" means, without duplication, an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "<u>Chapter 7 Trustee Carve-Out</u>"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to sections |

11

327, 328, or 363 of the Bankruptcy Code (the "Debtors' Professionals") and to the extent set forth in the Budget as of the date of determination by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtors' Professionals, "Professional Persons") at any time before or on the first business day following delivery by the ABL DIP Agent or Term DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice, less the amount of any retainers or other amounts held by any such Professional Person as of the Petition Date; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the ABL DIP Agent or Term DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the ABL DIP Agent or Term DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Creditors' Committee, and the ABL DIP Agent and Term DIP Agent, as applicable, which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Not later than 7:00 p.m. New York time on the Tuesday of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date") (collectively, "Estimated Fees and Expenses"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided, that within one business day of the occurrence of the Termination Declaration Date, each Professional Person shall deliver one additional Weekly Statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the ABL DIP Agent and Term DIP Agent). If any Professional Person fails to timely deliver a Weekly Statement within one business day after such Weekly Statement is due, such Professional Person shall not be entitled to any funds in the Carve Out Reserves with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period. The ABL DIP Agent shall at all times maintain a Reserve (as defined in the DIP ABL Credit Agreement (as such term is defined in the ABL DIP Facility Term Sheet)) in an amount equal to the Post-Carve Out

12

Trigger Notice Cap, plus the aggregate amount of projected fees for all Professional Persons set forth in the Approved Budget for the week subsequent to the date of determination for such Reserve; provided that nothing set forth herein shall limit the ability of the ABL DIP Agent to increase such reserve if ABL DIP Agent determines that the aggregate amount of Allowed Professional Fees are likely to exceed the amount set forth in the Approved Budget for such week.

*Waivers; Marshaling*

The Interim DIP Order shall provide for waivers of (i) section 506(c) and the "equities of the case" exception set forth in section 552 of the Bankruptcy Code and (ii) the doctrine of marshaling with respect to the Term DIP Loans and the DIP Collateral.  The Final DIP Order shall provide for waivers of (i) section 506(c) and the "equities of the case" exception set forth in section 552 of the Bankruptcy Code and (ii) the doctrine of marshaling with respect to the Prepetition ABL Claims, the Prepetition First Lien Claims and the collateral securing the Prepetition ABL Obligations, the Prepetition First Lien Claims and the Prepetition Second Lien Claims.

*Conditions Precedent to the Closing:*

The closing date (the "<u>Closing Date</u>") under the Term DIP Facility shall be subject solely to the following conditions:

(i) execution and delivery of the Term DIP Credit Agreement and any other Term DIP Loan Document being executed and delivered on the Closing Date, in form and substance consistent with this Term Sheet and otherwise acceptable to the Loan Parties, the Term DIP Lenders, the Term DIP Agent and the Escrow Agent;

(ii) delivery of the Initial DIP Budget, in form and substance satisfactory to the Required Term DIP Lenders;

(iii) entry of the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required Term DIP Lenders;

(iv) the payment of (x) all fees required to be paid on the Closing Date under the Term DIP Credit Agreement and the other Term DIP Loan Documents (including any applicable fee letters) and (y) all reasonable and documented fees and expenses of the Term DIP Advisors;

(v) delivery of a borrowing request;

(vi) the Chapter 11 Cases shall have been commenced by the Debtors and the same shall each be a debtor and a debtor in possession; the Chapter 11 Cases of the Debtors shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code; no trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases;

(vii) delivery of a secretary's (or other officer's) certificate of the Loan Parties, dated as of the Closing Date and in such form as is customary for

13

the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments (including good standing certificates);

(viii) Term DIP Agent shall have received at least five (5) Business Days prior to the Closing Date all documentation and information as is reasonably requested by Term DIP Agent or any Term DIP Lender that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations in applicable jurisdictions, including, without limitation, the PATRIOT Act, in each case to the extent requested in writing at least seven (7) Business Days prior to the Closing Date, provided, that, the Loan Parties will use reasonable efforts to promptly provide any additional information requested thereafter;

(ix) the representations and warranties set forth in the Term DIP Credit Agreement and any other Term Loan DIP Facility Documents entered into on the Closing Date shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties will be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) as of such earlier date);

(xi) on the Closing Date and immediately after giving effect to the Initial Draw, no default or Event of Default shall have occurred and be continuing or would result therefrom;

(xii) the RSA shall be in full force and effect and shall not have been modified in a fashion that is adverse to the Term DIP Lenders without the consent of the Required Term DIP Lenders;

(xiii) delivery of customary legal opinions;

(xiv) delivery of executed ABL DIP Facility Documents with respect to the ABL DIP Facility, which shall be consistent with the ABL DIP Facility Term Sheet and otherwise acceptable to the Term DIP Lenders; the ABL DIP Facility Documents shall be in full force and effect and there shall not be a default or event of default thereunder; provided that the amount of the opening Excess Availability (to be defined in a manner consistent with the Prepetition ABL Facility), but excluding any Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) in the determination of such Excess Availability under the DIP ABL Credit Agreement, as calculated after giving effect to any credit extensions under the ABL DIP Facility, the repayment of any credit extensions under the ABL DIP Facility with the proceeds of the Term DIP Facility and after provision for payment of all fees and expenses of the transactions paid or payable on or about the Closing Date, shall be not less than $35,000,000;

14

(xv) the Term DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the Term DIP Loan Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order;

(xvi) all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the Required Term DIP Lenders;

(xvii) the Closing Date shall have occurred on or before the date that is five calendar days after the date of entry of the Interim DIP Order;

(xviii) after giving effect to the transactions occurring on the Closing Date, there shall be no default or event of default under the Prepetition ABL Credit Agreement as amended by the Ratification and Amendment Agreement (as such term is defined in the ABL DIP Facility Term Sheet); and

(xix) delivery of an officer's certificate of the Borrower confirming compliance with the each of the conditions precedent (other than any matters which are to be delivered by, provided by, or subject to the satisfaction of, any party other than the Loan Parties).

| | |
|---|---|
| *Conditions Precedent to the Second Draw:* | The conditions to release from escrow of the proceeds of the Second Draw shall be subject solely to the following conditions: |

(i) the Loan Parties being in compliance with the Approved Budget (subject to Permitted Variances) in all respects and the proceeds of any such Term DIP Loan being made being used or intending to be used solely in accordance with the Approved Budget, subject to Permitted Variances;

(ii) the Final DIP Order shall have been entered by the Bankruptcy Court and shall not have been amended, modified, repealed or stayed in any respect without the Required Term DIP Lenders' consent;

(iii) the representations and warranties set forth in the Term DIP Credit Agreement and any other Term Loan DIP Facility Documents shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) on and as of the date of the release from escrow of the proceeds of the Second Draw with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties will be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) as of such earlier date);

(iv) on the date of release from escrow of the proceeds of the Second Draw and immediately after giving effect to such release, no default or Event of Default under the Term DIP Credit Agreement shall have occurred and be

15

continuing or would result therefrom;

(v) receipt of a withdrawal request; and

(vi) the RSA shall be in full force and effect and shall not have been modified in a fashion that is adverse to the Term DIP Lenders without the consent of the Required Term DIP Lenders.

16

**Annex 2**

| Priority | DIP Collateral (other than Avoidance Action Proceeds) that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral (other than Avoidance Action Proceeds) that constitutes Term Loan Priority Collateral or that would otherwise constitute Term Loan Priority Collateral | DIP Collateral that constitutes Avoidance Action Proceeds |
|---|---|---|---|
| *First* | Carve Out and Permitted Liens | Carve Out and Permitted Liens described in clause (B) of the definition thereof | Carve Out |
| *Second* | ABL DIP Liens<br><br>ABL DIP Superiority Claims | Term DIP Liens<br><br>Term DIP Superpriority Claims | ABL DIP Liens and Term DIP Liens, on a *pari passu* basis<br><br>ABL DIP Superiority Claims and Term DIP Superpriority Claims, on a *pari passu* basis |
| *Third* | Prepetition ABL Adequate Protection Liens<br><br>Prepetition ABL Adequate Protection Claims | First Lien Adequate Protection Liens<br><br>First Lien Adequate Protection Claims | Prepetition ABL Adequate Protection Liens and First Lien Adequate Protection Liens, on a *pari passu* basis<br><br>Prepetition ABL Adequate Protection Claims and First Lien Adequate Protection Claims, on a *pari passu* basis |
| *Fourth* | Prepetition ABL Liens<br><br>Prepetition ABL Claims | Prepetition First Lien Liens<br><br>Prepetition First Lien Claims | N/A |
| *Fifth* | Term DIP Liens<br><br>Term DIP Superpriority Claims | Second Lien Adequate Protection Liens<br><br>Second Lien Adequate Protection Claims | N/A |
| *Sixth* | First Lien Adequate Protection Liens<br><br>First Lien Adequate Protection Claims | Prepetition Second Lien Liens<br><br>Prepetition Second Lien Claims | N/A |
| *Seventh* | Prepetition First Lien Liens<br><br>Prepetition First Lien Claims | ABL DIP Liens<br><br>ABL DIP Superpriority Claims | N/A |
| *Eighth* | Second Lien Adequate | Prepetition ABL Adequate Protection | N/A |

18

|  | Protection Liens<br><br>Second Lien Adequate Protection Claims | Liens<br><br>Prepetition ABL Adequate Protection Claims |  |
|---|---|---|---|
| ***Ninth*** | Prepetition Second Lien Liens<br><br>Prepetition Second Lien Claims | Prepetition ABL Liens<br><br>Prepetition ABL Claims |  |

000240

**App. 191**

**Exhibit 3**

**Equity Rights Offering Term Sheet**

## CONVERGEONE HOLDINGS, INC.

### <u>Summary of Principal Terms of Proposed Equity Rights Offering</u>

*This Summary of Principal Terms (this "**Rights Offering Term Sheet**") provides an outline of a proposed equity rights offering of the Issuer identified below in connection with the emergence of the Issuer and certain of its affiliates (collectively, the "**Debtors**" and as reorganized pursuant to the Joint Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates (the "**Plan**"), "**ConvergeOne**" or the "**Company**")) from chapter 11 proceedings (the "**Chapter 11 Cases**") pursuant to the Plan.*

*This Rights Offering Term Sheet is referenced in, and appended to, that certain Restructuring Support Agreement dated as of April 3, 2024, by and among the Debtors and the Consenting Stakeholders (as amended, supplemented, or otherwise modified from time to time, the "**RSA**"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the RSA or the Restructuring Term Sheet attached thereto as **<u>Exhibit B</u>**, to which this Rights Offering Term Sheet is attached.*

*The statements contained in this Rights Offering Term Sheet and all discussions between and among the parties in connection therewith constitute privileged settlement communications entitled to protection under Rule 408 of the Federal Rules of Evidence and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.*

*THIS RIGHTS OFFERING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.*

| | |
|---|---|
| **Issuer** | PVKG Investment Holdings, Inc. ("**PVKG Investment**"). |
| **Security Description** | New shares of common stock (the "**New Equity Interests**") in PVKG Investment, which shall be issued to applicable holders of First Lien Claims and/or Term DIP Facility Claims, in each case on the Effective Date as set forth herein.[1] |
| **Offering** | In connection with the Plan, the Debtors shall commence an equity rights offering (the "**Rights Offering**") (subject to the terms below) of $245.0 million, which may be increased with the consent of the Debtors and the Required Consenting Lenders (the applicable amount, the "**Rights Offering Amount**"). 35% of the Rights Offering Amount shall be available solely for the Investors (the "**Holdback**"), while 65% of the Rights Offering Amount shall be available to all holders of First Lien Claims (the "**Non-Holdback Rights Offering Amount**"). <br><br> Each holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee, in accordance with the terms of the Backstop Agreement (as defined below) that elects the Rights Offering Rights and Takeback Term Loan |

---

[1]   The structure for effectuating the Rights Offering is subject to the Description of Transaction Steps (as defined in the Plan) to be included in the Plan Supplement.

000242

| | |
|---|---|
| | Recovery Option and is either (A) a "qualified institutional buyer" (a "**QIB**"), as such term is defined in Rule 144A under the Securities Act of 1933, as amended (the "**Securities Act**"), or (B) an institutional "accredited investor" (an "**IAI**") within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act or an entity in which all of the equity investors are IAIs (which, in the case of (A) and (B), for the avoidance of doubt, may not include any natural person) (collectively, the "**Eligible Offerees**") will be offered rights (the "**Rights**") to participate in the Rights Offering, in an amount not to exceed such holder's pro rata share of the Non-Holdback Rights Offering Amount based upon a fraction (expressed as a percentage) the numerator of which is the First Lien Claims held by such Eligible Offeree(s) and the denominator of which is all First Lien Claims held by all Eligible Offerees.  For the avoidance of doubt, such elections shall be adjusted on a pro rata basis, based on oversubscription, as necessary, so that participation in the Rights Offering Rights and Takeback Term Loan Recovery Option is capped at 50% of the First Lien Claims.

New Equity Interests issued pursuant to the Rights Offering, including the Holdback, the Non-Holdback Rights Offering Amount, and the Put Option Premium, shall be offered at a 35% discount to the stipulated equity value of the reorganized Debtors under the Plan (the "**Plan Discount**").

For the avoidance of doubt, each Eligible Offeree may exercise all or a portion of its Rights, but upon exercising its Rights, such Eligible Offeree shall be committed to participate for its full amount of exercised Rights in the Rights Offering, and will receive New Equity Interests as set forth in this Rights Offering Term Sheet.

The Rights may be exercised only in exchange for (x) cash or (y) to the extent that a holder of Rights is a Term DIP Lender under the Term DIP Facility, the exercise of such holders' DIP Term Loan Rights (as such term is defined in the Term DIP Term Sheet) on the terms set forth in the Term DIP Term Sheet appended as **Exhibit 2** to the Restructuring Term Sheet.

The RSA and subscription documents for the Rights Offering will provide that all Eligible Offerees that exercise their Rights must vote to accept the Plan and not object to the confirmation of the Plan. |
| **Use of Proceeds** | Proceeds of the Rights Offering shall be used for (i) refinancing of the Term DIP Facility, and (ii) for general corporate and working capital purposes. |
| **Transferability of Rights** | The Rights shall not be transferable, assignable, or detachable other than in connection with the transfer of the corresponding First Lien Claims. The holder shall not transfer or assign any First Lien Claims unless such holder transfers or assigns with such First Lien Claims the right to receive the corresponding Rights in the Rights Offering, subject to compliance with applicable securities laws relating to the transfer of restricted securities. After a Right has been exercised by submitting an election form, the underlying First Lien Claims will cease to be transferrable. |
| **Oversubscription Privilege** | The Rights shall not have an oversubscription privilege. |

000243

**App. 194**

| | |
|---|---|
| **Investors** | The entities that will backstop the Rights Offering and are party to the Backstop Agreement (or their designated Affiliate(s), managed fund(s) or account(s) or other designee(s) in accordance with the Backstop Agreement) (collectively, the "***Investors***").  The Investors will be the parties set forth on Schedule I hereto (or their designated Affiliate(s), managed fund(s) or account(s) or other designee(s) in accordance with the Backstop Agreement). |
| **Holdback** | The Investors shall have the sole right and obligation to purchase the Holdback, at the Investor Percentages (as defined below) set forth in Schedule I hereto. |
| **Backstop Commitment** | The Investors will, pursuant to a backstop agreement to be entered into among the Company and the Investors (the "***Backstop Agreement***"), backstop the Rights Offering by committing in the respective percentages (the "***Investor Percentages***") set forth on Schedule I hereto (the "***Backstop Commitment***") to purchase from the Company in the Rights Offering the New Equity Interests that are not purchased by the Eligible Offerees in the Rights Offering for an aggregate amount equal to the Rights Offering Amount, which purchase may be in cash or may utilize the currency of DIP Loan Obligations or Takeback Loans pursuant to the DIP Term Loan Rights.

The Backstop Agreement shall contain the terms and conditions set forth in this Rights Offering Term Sheet and other customary terms and conditions, including representations, warranties, conditions, covenants and indemnification for transactions of this type, and shall be acceptable to the Required Consenting Lenders and the Company Parties.

The Investors will also be obligated to fully exercise all Rights issued to the Investors and their Affiliates in the Rights Offering. |
| **Put Option Premium** | The "***Put Option Premium***" means, as consideration for the Investors providing the Backstop Commitment, a fully earned non-refundable aggregate premium, which shall in the event of a Closing (as defined in the Backstop Agreement), be payable on the Effective Date of the Plan to the Investors in additional units of New Equity Interests equal to 10% of the Rights Offering Amount (issued at the Plan Discount); it being understood that any Investor that breaches the Backstop Agreement as set forth in the Backstop Agreement shall not be entitled to its pro rata share of the Put Option Premium under any circumstances. The Put Option Premium shall be allocated pro rata among the Investors based on the Investor Percentages. |
| **Transferability of Backstop Commitments** | The Investors' respective Backstop Commitments under the Backstop Agreement shall be transferrable from (i) one Investor to another Investor, with the consent of the Required Consenting Lenders, (ii) from any Investor to any of its Affiliates, managed funds or accounts (so long as such Investor remains liable for such transferred Backstop Commitment), and (iii) to any other person approved in advance by the Company (acting reasonably) and the Required Consenting Lenders, in each case as long as such transferees are or become signatories to the Backstop Agreement. |

000244

**App. 195**

| | |
|---|---|
| **Several Obligations** | The Investors' respective Backstop Commitments and obligations under the Backstop Agreement shall be several obligations and neither joint nor joint and several obligations and, unless otherwise expressly agreed in writing by an Investor, no Investor shall have any liability for any obligation of another Investor. |
| **Funding Failures** | If an Investor fails to satisfy its Backstop Commitment (a "Backstop Shortfall"), the other non-defaulting Investors shall have the right, but not the obligation, severally and not jointly in their sole discretion, to assume their pro rata share of the Backstop Shortfall based on the Investor Percentages. |
| **Conditions Precedent** | The Backstop Agreement will contain conditions precedent to the obligations of the parties to consummate the transactions contemplated by the Backstop Agreement that are customary for transactions of the type contemplated by the Backstop Agreement, and otherwise acceptable to the Required Consenting Lenders and the Company Parties, including: Conditions Precedent for the Company: <br>• the Bankruptcy Court shall have approved the Backstop Agreement; <br>• the Bankruptcy Court shall have entered the order confirming the Plan; <br>• the concurrent occurrence of the Effective Date; <br>• receipt of required regulatory approvals and the absence of legal impediments to closing; and <br>• other customary conditions. <br>Conditions precedent for Investors: <br>• the Bankruptcy Court shall have approved the Backstop Agreement; <br>• the Bankruptcy Court shall have entered the order confirming the Plan; <br>• the concurrent occurrence of the Effective Date; <br>• receipt of required regulatory approvals and the absence of legal impediments to closing; and <br>• other customary conditions. |
| **No Shop; Termination Payment** | The Backstop Agreement will include a customary no-shop provision for competing proposals to restructure or acquire the Company with a customary fiduciary out for a superior proposal. <br><br>The Backstop Agreement will provide that if the Backstop Agreement is terminated as a result of a "fiduciary-out" by the Company, then the Company shall pay the Investors a termination payment of 5% of the Rights Offering Amount. The Backstop Agreement will provide that the termination payment shall be fully earned upon execution of the Backstop Agreement. |
| **Securities Law Matters** | The issuance of the New Equity Interests (except for any units of New Equity Interests issued in respect of the Backstop Commitments or Put Option Premium) shall be exempt from the registration requirements of the securities laws as a result |

|  | of section 1145 of the Bankruptcy Code to the maximum extent available by law or, if section 1145 is not available, then otherwise exempt from registration under the Securities Act of 1933, as amended (the "***Securities Act***") and any other applicable securities laws. |
|  | Any units of New Equity Interests issued in respect of the Backstop Commitments or Put Option Premium shall be exempt from registration requirements of the securities laws pursuant to Section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D, or such other exemption as may be available from any applicable registration requirements. |

5

**<u>Exhibit 4</u>**

**Governance Term Sheet**

ConvergeOne Holdings, Inc., *et al.*
GOVERNANCE TERM SHEET[1]

THIS TERM SHEET (THE "GOVERNANCE TERM SHEET") SETS FORTH THE PRINCIPAL TERMS OF THE PROPOSED GOVERNANCE STRUCTURE OF THE COMPANY AFTER ITS EMERGENCE FROM THE CHAPTER 11 PROCESS. THIS GOVERNANCE TERM SHEET IS REFERENCED IN, AND APPENDED TO, THAT CERTAIN RESTRUCTURING SUPPORT AGREEMENT DATED AS OF APRIL 3, 2024, BY AND AMONG THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS (AS AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "RSA").

THIS GOVERNANCE TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND OTHER APPLICABLE LAW.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS GOVERNANCE TERM SHEET IS INCONSISTENT WITH THE RSA, THE TERMS OF THIS GOVERNANCE TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| Governance Term Sheet | |
| --- | --- |
| **General** | PVKG Investment Holdings, Inc. (or an affiliate thereof or newly formed holding company) ("**New C1**") shall indirectly hold the equity of ConvergeOne Holdings, Inc. and New C1 shall be managed on a day-to-day basis by its Chief Executive Officer and executive officers with oversight from the New Board (as defined below). |
| **Corporate Form** | New C1 is expected to be managed by a Board of Directors (the "**New Board**") subject to a determination by the Debtors, the Company Parties, and Consenting Stakeholders. |
| **Board of Directors** | **Number of Directors**: New C1 will be governed by the New Board. The Chief Executive Officer of New C1 shall serve on the New Board; all other initial directors shall be appointed by the Required Consenting Lenders, with representation being proportionate to anticipated post-emergence equity ownership; for the avoidance of doubt, each Initial First Lien Ad Hoc Group Member and the PVKG Lender shall each be entitled to appoint one director to serve on the New Board, so long as such entity is contemplated to receive no less than 10% of the fully-diluted New Equity Interests (excluding New Equity Interests reserved for the post-Effective Date Management Incentive Plan). The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Any action, agreement, |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the RSA or the Restructuring Term Sheet, as applicable.

| | |
|---|---|
| | undertaking or authorization of New C1 or any of its subsidiaries outside of the ordinary course of business or that is material to C1 or any of its subsidiaries must be approved by the New Board.  In addition, and without limiting the foregoing, certain significant corporate actions (to be specified in the definitive documentation) will require the approval of the New Board.<br><br>Representation on each committee of the New Board shall also be proportionate to the Required Consenting Lenders' equity ownership.<br><br>If any subsidiary of New C1 has a board of directors (or similar governing body) which includes anyone other than employees of New C1 or its subsidiaries, then such board or governing body will be composed in the same manner as the New Board and be subject to the same governance terms. |
| **Board Observer** | The Subsequent First Lien Ad Hoc Group Members and the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative as a non-voting observer to the New Board; *provided* that such entitlement shall expire if such holders, at any time, cease to hold in excess of 12.5% of the New Equity Interests in the aggregate.<br><br>In addition, the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative to receive materials that were presented to the New Board at any board meeting; *provided*, *however*, that such representative shall sign a customary non-disclosure agreement (which shall provide that such representative may share such materials with Required Consenting Initial Second Lien Ad Hoc Group Members that are subject to confidentiality restrictions and whose individual holdings exceed 1% of the New Equity Interests), and New C1 shall be entitled to not include any privileged or competitively sensitive information, and such entitlement shall expire if such holders, at any time, cease to hold in excess of 1.0% of the New Equity Interests in the aggregate. |
| **Minority Protections** | The Governance Documents will include customary minority shareholder protections and rights for the benefit of each of the Subsequent First Lien Ad Hoc Group Members, the Initial Second Lien Ad Hoc Group Members and other minority shareholders, including, but not limited to, drag rights, tag- along rights, preemptive rights, information rights and prohibition on amendments with respect to the foregoing without the consent of majority of holders disproportionately affected by any such amendment (the "**Minority Protections**"). The Minority Protections will be in a form and substance reasonably acceptable to the Required Consenting First Lien Lenders, Subsequent First Lien Ad Hoc Group Members and Required Consenting Initial Second Lien Ad Hoc Group Members. |

000249

**App. 200**

**<u>Exhibit C</u>**

**Joinder**

## Joinder to Restructuring Support Agreement

The undersigned hereby acknowledges that it has reviewed and understands the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**RSA**") dated as of April 3, 2024, by and among the Company Parties, Consenting Stakeholders, and Second Lien Consenting Lenders.[1]

The undersigned hereby makes the applicable representations and warranties set forth in Section 9 and Section 11 of the RSA to each other Party, effective as of the date hereof and agrees to be bound by the terms and conditions of the RSA.

This joinder agreement shall be governed by the governing law set forth in the RSA.

Date: _____, 2024

**[JOINING PARTY]**

_____

Name:

Title:

Address:

E-mail address(es):

| Aggregate Principal Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Term Loan Claims | |
| KL Note Claims | |
| PVKG Note Claims | |
| Second Lien Term Loan Claims | |

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the RSA.

## **Exhibit D**

**Transfer Agreement**

## Transfer Agreement to Restructuring Support Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of April 3, 2024 (the "**RSA**"),[1] by and among the Company Parties, Consenting Stakeholders, and Second Lien Consenting Lenders, including the transferor of the Company Claims or Interests referenced herein ("**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound.

The Transferee specifically agrees to be bound by the terms and conditions of the RSA and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer set forth herein.

Date: _____, 2024

**[TRANSFEREE]**

_____

Name:

Title:

Address:

E-mail address:

| Aggregate Principal Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Term Loan Claims | |
| KL Note Claims | |
| PVKG Note Claims | |
| Second Lien Term Loan Claims | |

---

[1]    Capitalized terms used by not defined herein shall have the meanings ascribed to them in the RSA.

*Solicitation Version*

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90194 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

**WHITE & CASE LLP**
Bojan Guzina (*pro hac vice* pending)
Andrew F. O'Neill (*pro hac vice* pending)
Erin R. Rosenberg (*pro hac vice* pending)
Blair M. Warner (*pro hac vice* pending)
Adam T. Swingle (*pro hac vice* pending)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
Email:   bojan.guzina@whitecase.com
         aoneill@whitecase.com
         erin.rosenberg@whitecase.com
         blair.warner@whitecase.com
         adam.swingle@whitecase.com

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated: April 3, 2024
Houston, Texas

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

i

**DISCLOSURE STATEMENT, DATED APRIL 3, 2024**

**SOLICITATION OF VOTES ON THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION FOR CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM HOLDERS OF CLAIMS IN THE FOLLOWING CLASSES:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| **CLASS 3** | **FIRST LIEN CLAIMS** |
| **CLASS 4** | **SECOND LIEN CLAIMS** |

**IF YOU ARE IN CLASS 3 OR CLASS 4, YOU ARE RECEIVING THIS DISCLOSURE STATEMENT, THE PLAN, AND OTHER ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.**

THIS SOLICITATION (THE "**SOLICITATION**") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE JOINT PREPACKAGED CHAPTER 11 PLAN OF CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (COLLECTIVELY, THE "**DEBTORS**"), ATTACHED HERETO AS **EXHIBIT A** (THE "**PLAN**").

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS **4:00 P.M. (PREVAILING CENTRAL TIME) ON APRIL 17, 2024,** UNLESS EXTENDED BY THE DEBTORS IN WRITING.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS APRIL 1, 2024 (THE "**RECORD DATE**").

| BALLOTS SUBMISSION | | |
|---|---|---|
| **BALLOTS MUST BE SUBMITTED VIA ONE OF THE METHODS BELOW:** | | |
| **BY FIRST CLASS MAIL AT:** | **BY REGULAR MAIL, HAND DELIVERY OR OVERNIGHT AT:** | **ELECTRONICALLY VIA:** |
| ConvergeOne c/o Epiq Ballot Processing P.O. Box 4422 Beaverton, OR 97076-4422 | ConvergeOne c/o Epiq Ballot Processing 10300 SW Allen Boulevard Beaverton, OR 97005 | https://dm.epiq11.com/C1 USING THE UNIQUE E-BALLOT ID# ON YOUR BALLOT |

**BALLOTS SUBMITTED VIA ANY METHOD OTHER THAN THOSE SPECIFIED ABOVE, INCLUDING VIA FACSIMILE OR EMAIL, MAY NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT AT:**

**BY E-MAIL TO:** C1-INFO@EPIQGLOBAL.COM

**BY TELEPHONE:** (877) 295-6914 (US AND CANADA) OR +1 (971) 290-2761 (INTERNATIONAL)

AND REQUEST TO HAVE A MEMBER OF THE SOLICITATION TEAM CONTACT YOU.

---

### <u>RECOMMENDATION BY THE DEBTORS</u>

**EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH DEBTOR'S ESTATE, PROVIDE THE BEST RECOVERY AVAILABLE TO HOLDERS OF CLAIMS, AND REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.**

**EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT NO LATER THAN <u>APRIL 17, 2024, AT 4:00 P.M. (PREVAILING CENTRAL TIME</u>) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOT.**

**BALLOTS RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED.**

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

**THE DEBTORS ARE PROVIDING THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THEIR PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN.**

**THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.**

**PLEASE READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  A COPY OF THE PLAN IS ATTACHED HERETO AS <u>EXHIBIT A</u>.  THIS DISCLOSURE STATEMENT SUMMARIZES THE MATERIAL TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS AND PROVISIONS OF THE PLAN.  ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.**

**<u>SECURITIES LAW NOTICES</u>:  UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "<u>SECURITIES ACT</u>"), OR SIMILAR FEDERAL, STATE, OR LOCAL LAW, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.   THE SECURITIES ISSUED UNDER THE PLAN IN RELIANCE UPON SECTION 1145 OF THE BANKRUPTCY CODE ARE EXEMPT FROM, AMONG OTHER THINGS, THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT AND ANY OTHER APPLICABLE FEDERAL, STATE, OR LOCAL LAW REQUIRING REGISTRATION PRIOR TO THE OFFERING, ISSUANCE, DISTRIBUTION, OR SALE OF SECURITIES.**

**OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS FROM REGISTRATION UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.**

**THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE AND FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

READERS ARE FURTHER CAUTIONED THAT MANY OF THE ASSUMPTIONS, RISKS, AND UNCERTAINTIES RELATING TO THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN, INCLUDING THE IMPLEMENTATION OF THE PLAN, ARE BEYOND THE CONTROL OF THE DEBTORS.  IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "RISK FACTORS" IN ARTICLE X OF THIS DISCLOSURE STATEMENT AS WELL AS OTHER RISKS INHERENT TO THE DEBTORS. PARTIES ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS, AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.  THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND TO, AND UNDERTAKE NO OBLIGATION TO, UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.   THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

**TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY ............................................................................................. 1

II.     SUMMARY OF PLAN CLASSIFICATION AND TREATMENT ........................... 3

     A.      Classified Claims and Interests ........................................................................ 3

III.    SOLICITATION AND VOTING PROCEDURES ..................................................... 6

     A.      Voting Rights Summary ..................................................................................... 6
     B.      Votes Required for Acceptance by a Class of Claims ....................................... 7
     C.      Voting Record Date ............................................................................................ 7
     D.      Solicitation Procedures ...................................................................................... 7
     E.      Voting on the Plan .............................................................................................. 8
     F.      Ballots Not Counted........................................................................................... 8

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS ..................... 9

     A.      Overview of the Debtor's Business .................................................................... 9
     B.      Corporate History ............................................................................................... 9
     C.      Business Operations ......................................................................................... 10
     D.      The Debtors' Prepetition Corporate and Capital Structure .............................. 11

V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS....................................... 15

     A.      Prepetition Challenges Faced by the Company ............................................... 15
     B.      Prepetition Initiatives Pursued by the Company.............................................. 15
     C.      Debtor-in-Possession Financing and Use of Cash Collateral .......................... 19

VI.     ANTICIPATED EVENTS IN THE CHAPTER 11 CASES ................................. 21

     A.      Commencement of Chapter 11 Cases .............................................................. 21
     B.      First Day Motions ............................................................................................ 21
     C.      Procedural Motions .......................................................................................... 21
     D.      Timetable for These Chapter 11 Cases ............................................................ 22

VII.    OTHER KEY ASPECTS OF THE PLAN............................................................. 22

     A.      Unclassified Claims ......................................................................................... 22
     B.      Means for Implementation of the Plan............................................................. 24
     C.      The Reorganized Debtors ................................................................................. 25
     D.      Sources of Consideration for Plan Distributions.............................................. 25
     E.      Corporate Existence ......................................................................................... 27
     F.      Cancellation of Existing Agreements and Interests ......................................... 28
     G.      Corporate Action.............................................................................................. 28
     H.      Governance Documents.................................................................................... 29
     I.       Directors and Officers of the Reorganized Debtors......................................... 29
     J.       Employment Obligations.................................................................................. 30
     K.      Management Incentive Plan ............................................................................. 31
     L.      Preservation of Causes of Action..................................................................... 31
     M.      Provisions Regarding Treatment of Executory Contracts and Unexpired Leases ........... 32
     N.      Provisions Governing Distributions................................................................. 32
     O.      Provisions Governing Disputed Claims and Interests...................................... 32
     P.      Settlement, Release, Injunction, and Related Provisions.................................. 32
     Q.      Conditions Precedent to Confirmation and Consummation of the Plan ........... 37

VIII.   PROJECTED FINANCIAL INFORMATION ....................................................... 38

| IX. | CONFIRMATION OF THE PLAN | 39 |
|---|---|---|
| | A. The Confirmation Hearing | 39 |
| | B. Requirements for Confirmation of the Plan | 39 |
| | C. Feasibility | 39 |
| | D. Acceptance by Impaired Classes | 39 |
| | E. Confirmation Without Acceptance by All Impaired Classes | 40 |
| | F. Valuation Analysis | 41 |
| | G. Liquidation Analysis | 41 |
| **X.** | **RISK FACTORS** | **41** |
| | A. General | 41 |
| | B. Bankruptcy Law and Chapter 11 Case Considerations | 42 |
| | C. Risks Related to Recoveries Under the Plan | 46 |
| | D. Risks Related to the Company's and the Reorganized Debtors' Businesses | 48 |
| | E. Risks Related to the Offer and Issuance of Securities Under the Plan | 50 |
| **XI.** | **CERTAIN SECURITIES LAW MATTERS** | **52** |
| | A. New Equity Interests | 52 |
| | B. Issuance and Resale of New Equity Interests under the Plan | 53 |
| **XII.** | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **56** |
| | A. Introduction | 56 |
| | B. Restructuring Transactions | 57 |
| | C. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors | 58 |
| | D. Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims Entitled to Vote on the Plan | 60 |
| | E. Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims Entitled to Vote on the Plan | 68 |
| | F. Information Reporting and Back-Up Withholding | 71 |
| **XIII.** | **RECOMMENDATION** | **72** |

000707

**App. 211**

**EXHIBITS**

| | |
|---|---|
| **EXHIBIT A** | Joint Prepackaged Chapter 11 Plan of Reorganization |
| **EXHIBIT B** | Restructuring Support Agreement |
| **EXHIBIT C** | Financial Projections |
| **EXHIBIT D** | Valuation Analysis |
| **EXHIBIT E** | Liquidation Analysis |
| **EXHIBIT F** | Organizational Structure Chart |

ConvergeOne Holdings, Inc. ("**C1 Holdings**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors,**" and together with their non-Debtor affiliates, "**C1**" or the "**Company**"), submit this disclosure statement (this "**Disclosure Statement**"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* (the "**Plan**"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.

## I.      EXECUTIVE SUMMARY

C1 is a leading global information technology ("**IT**") services company. C1 provides connected human experiences by working with its channel partners, delivering IT services, and developing and commercializing its own technology products. C1 invites its customers to reimagine customer interactions, enables the future of work and collaboration, and builds cyber-resilient enterprises in an ever-evolving IT landscape. The Company designs, implements, and supports thousands of state-of-the-art IT solutions across its core technology markets: pure and hybrid cloud solutions, business applications, customer experiences, contact center design and enablement, modern workplace infrastructure, cyber security, and enterprise networking. C1 is supported by a dynamic global workforce of more than 3,000 employees and independent contractors. C1 serves more than 6,000 private and public sector customers worldwide across a range of industries, including education, energy, financial services, government, healthcare, manufacturing, media and communications, retail, and transportation. C1's customers include many of the companies listed on the Fortune 100, some of the largest school districts in the country, other large municipal entities, the federal government, the largest healthcare providers in the country, and a variety of leading global companies.

C1's industry-leading ability to deliver sophisticated IT solutions and rapidly respond to its customers' needs in a complex, cloud-enabled, and artificial intelligence-supported environment is reflected in its unparalleled customer satisfaction metrics, long-term partnerships with industry leading suppliers, and strong business fundamentals. Recently, however, the Company has faced liquidity challenges due to a highly leveraged capital structure that has become unsustainable in the current interest rate environment. The significant interest expense on the Company's funded debt—which increased by approximately $55 million on an annual basis from 2022 to 2023—combined with increased working capital needs over the same time period, has depleted the Company's liquidity and impaired its ability to operate in the ordinary course. In particular, the Company was unable to secure amendments to its first and second lien term loan agreements that would have transitioned the LIBOR benchmark rate to the Secured Overnight Financing Rate ("**SOFR**"), resulting in the conversion of the benchmark interest rates on these facilities from LIBOR to prime interest rates and a corresponding significant increase in the Company's interest expense. C1 has also faced ongoing customer delays, resulting in shorter contract lengths and staggered and diversified purchasing of product and software, due to the financial challenges of one of the Company's largest technology partners and an overall industry-wide slow-down in capital spending due to recessionary concerns, which have further exacerbated the Company's liquidity challenges. These issues, in turn, have fueled rating agency downgrades, and led to supplier pressures including credit reductions and other restrictive trade terms that have resulted in a further drain on the Company's liquidity.

The Company's management team and restructuring advisors, including White & Case LLP ("**White & Case**"), Evercore Inc. ("**Evercore**"), and AlixPartners, LLP ("**Alix**" and, collectively with White & Case and Evercore, the "**Advisors**") have worked diligently to develop a comprehensive strategy that will allow the Company to access necessary funding and restructure its funded debt, enabling the Company to de-lever its balance sheet and position itself for future growth.

The Debtors commenced these Chapter 11 Cases on a prepackaged basis with the support, pursuant to the terms of a Restructuring Support Agreement (the "**RSA**"), of creditors holding approximately 81% of the Debtors' first lien claims and 81% of the Debtors' second lien term loan debt (the "**Consenting**

**Lenders**").  The RSA contemplates the equitization or cancellation of approximately $1.6 billion of the Debtors' funded debt.  The Debtors have also secured commitments for two debtor-in-possession financing facilities, and the consensual use of cash collateral, which will permit the Debtors to continue accessing their prepetition revolving credit facility with maximum availability of $250 million and draw on a $215 million new money multi-draw term loan facility during these Chapter 11 Cases.  The Debtors are also negotiating the terms of an exit revolving credit facility to fund the Debtors' post-chapter 11 operations and obligations, which exit facility will be provided either by the Debtors' existing asset-based revolving lender or a third-party financing provider.

The terms of the transactions developed in connection with the RSA are contemplated under the Plan.  Key terms of the RSA, which are reflected in the Plan, include the following:

- The Company will (i) conduct a $159.25 million fully-backstopped equity rights offering and (ii) receive a $85.75 million direct investment commitment from the backstop parties for the new equity interests in reorganized C1 (both subject to increase with the consent of the Debtors and the Required Consenting Lenders).  As part of these transactions, 95.625% of the new equity interests will be distributed to holders of first lien claims and the backstop parties.  As part of the equity rights offering, 65% of the 95.625% of new equity interests will be offered to all holders of first lien claims on a pro rata basis, subject to a 10% put option premium owed to the backstop parties and subject to dilution by the management incentive plan.  As part of the direct investment commitment, the backstop parties have committed to purchase 35% of the 95.625% of new equity interests, subject to a 10% put option premium owed to the backstop parties and subject to dilution by the management incentive plan.  The proceeds of the equity rights offering and direct equity investment will be used to repay the debtor-in-possession term loan facility and provide reorganized C1 with working capital.

- Holders of certain first lien claims may elect to receive (a) takeback term loans issued under an exit term loan facility in a principal amount equal to such holders' first lien claims multiplied by 20%, or (b) takeback term loans in a principal amount equal to such holders' first lien claims multiplied by 15% and rights to purchase, through the rights offering, new equity interests in reorganized C1, subject to dilution, including on account of the management incentive plan and fees owed to the backstop parties.  As set forth in the RSA, these elections will be adjusted on a pro rata basis, based on oversubscription, so that participation in each option is capped at 50% of the first lien claims eligible to participate.

- Holders of second lien claims will receive 4.375% of the new equity interests in reorganized C1, also subject to dilution by a management incentive plan.

- General unsecured creditors will receive either reinstatement of their general unsecured claims pursuant to section 1124 of the Bankruptcy Code, or payment in full in cash either on the Effective Date or the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to the unsecured claim.

- All prepetition equity interests in the Debtors will be cancelled and no distributions will be made on account of such interests.

- Pursuant to a global settlement of all disputes related to the allowance of claims arising from the Prepetition PVKG Note Purchase Agreement (as defined below), PVKG Lender (as defined below), the other Consenting Lenders, and the Debtors have agreed that PVKG Lender's claims on account of the Prepetition PVKG Notes will be allowed in the amount of $213 million.[1]

---

[1]   PVKG Lender is a non-Debtor affiliate controlled by the Debtors' private equity sponsor.

000710

**App. 214**

It is imperative that C1 proceeds swiftly to confirmation of the Plan and emerges from the Chapter 11 Cases as soon as practicable in order to mitigate potential uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and minimize professional fees and the administrative costs of these cases. Expeditious confirmation of a Plan and consummation of the restructuring transactions is in the best interests of the Debtors, their estates, and their stakeholders. Critically, the Debtors expect to continue operating in the ordinary course throughout the Chapter 11 Cases and will remain focused on serving their customers with continued exceptional and dedicated service.

Under the RSA milestones, C1 must obtain confirmation of the Plan within forty-five (45) days of the Petition Date. Accordingly, the Company has proposed the following key case dates, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | April 1, 2024 |
| Rights Offering Record Date | April 1, 2024 |
| Solicitation Commencement Date | April 3, 2024 |
| Election/Subscription Commencement Date | April 3, 2024 |
| Mailing of (i) Combined Hearing Notice, (ii) Non-Voting Status Notice, and (iii) Opt-Out Form | April 8, 2024 |
| Publication Deadline | April 8, 2024 |
| Voting Deadline | April 17, 2024, at 4:00 p.m. prevailing Central Time |
| Election/Subscription Expiration Date | April 26, 2024, at 4:00 p.m. prevailing Central Time |
| Opt-Out Deadline (Non-Voting Classes) | April 30, 2024, at 4:00 p.m. prevailing Central Time |
| Plan and Disclosure Statement Objection Deadline | May 7, 2024, at 4:00 p.m., prevailing Central Time |
| Deadline to File Plan Supplement and proposed Confirmation Order | May 10, 2024 |
| Deadline for Filing Voting Report | May 14, 2024 |
| Confirmation Brief Deadline | May 14, 2024 |
| Combined Hearing | May 17, 2024, or such other date as the Court may direct |

## II.    SUMMARY OF PLAN CLASSIFICATION AND TREATMENT

### A.    Classified Claims and Interests

#### 1.    Classified Claims and Interest Summary

Article III of the Plan classifies Claims and Interests and sets forth the treatment for each Class. The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims and Allowed Interests under the Plan.

Your ability to receive distributions under the Plan depends upon the ability of the Debtors to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND, THEREFORE, ARE SUBJECT TO CHANGE.   REFERENCE**

000711
**App. 215**

SHOULD BE MADE TO THE ENTIRE PLAN FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.[2]

Except to the extent that the Debtors and a Holder of an Allowed Claim or Interest, as applicable, agree to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest.  Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course) or as soon as reasonably practicable thereafter, the timing of which shall be subject to the reasonable discretion of the Debtor.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

| Class | Claims and Interests | Treatment of Claims and Interests | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, in the discretion of the Reorganized Debtors: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the Collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $2.5 | 100.0% |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash of such Allowed Other Priority Claim on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date such Other Priority Claim becomes an Allowed Claim, (iii) the date on which such Allowed Other Priority Claim is due to be paid in the ordinary course of business of the Debtors or Reorganized Debtors, if applicable, and (iv) the date on which the Holder of such Allowed Other Priority Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing. | $21.7 | 100.0% |

---

[2]   The recoveries set forth in the chart are, in some cases, based on the estimated going concern value of the Reorganized Debtors, and may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business assets and general economic conditions.

000712

**App. 216**

| | | | | |
|---|---|---|---|---|
| 3 | First Lien Claims | Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed First Lien Claim, each Holder of an Allowed First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive on the Effective Date its elected Pro Rata share of (which elections shall be adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement)) as necessary, so that participation in each recovery option is equal to 50% of the First Lien Claims) (x) the Takeback Term Loan Recovery Option, or (y) the Rights Offering Rights and Takeback Term Loan Recovery Option. In the event that a Holder of a First Lien Claim fails to timely elect its recovery option, it shall be deemed to have elected the Rights Offering Rights and Takeback Term Loan Recovery Option. | $1,387 | 20.0-27.4%[3] |
| 4 | Second Lien Claims | Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Second Lien Claim, on the Effective Date each Holder of an Allowed Second Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive its Pro Rata share of the Second Lien Recovery. | $287 | 6.6% |
| 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim and in exchange for each Allowed General Unsecured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, either (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in Cash on (A) the Effective or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim. | $121[4] | 100.0% |
| 6 | Intercompany Claims | On the Effective Date, or as soon as reasonably practicable thereafter, Allowed Intercompany Claims shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), Reinstated, converted to | N/A | 0.0-100.0% |

---

[3]    Recoveries shown include value in respect of participation in the Takeback Term Loan Recovery Option and Rights Offering Rights and Takeback Term Loan Recovery Option.  The low end of the recovery range assumes the Holder of a First Lien Claim fully participating in the Takeback Term Loan Recovery Option, whereas the high end of the range of recovery assumes the Holder of a First Lien Claim fully participates in the Rights Offering Rights and Takeback Term Loan Recovery Option.

[4]    This class of claims also includes certain litigation claims.  None of these claims have been liquidated.

000713

**App. 217**

|   |   | equity, or otherwise set off, settled, distributed, contributed, canceled, or released to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors and the Required Consenting Lenders, as applicable. |   |   |
|---|---|---|---|---|
| 7 | Section 510 Claims | On the Effective Date, all Section 510 Claims (including all claims on account of the Employee Partnership Sale Units) shall be canceled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims. | $0.8 | 0.0% |
| 8 | Intercompany Interests | On the Effective Date, Intercompany Interests shall, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), be (i) Reinstated or (ii) set off, settled, addressed, distributed, contributed, merged, cancelled, or released. | N/A | 0.0-100.0% |
| 9 | Existing C1 Interests | On the Effective Date, Existing C1 Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing C1 Interests shall not receive any distribution on account thereof. | N/A | 0.0% |

## III.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots (the "**Ballot**" or "**Ballots**") to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.    Voting Rights Summary

The following chart provides a summary of the status and voting rights of Holders of Allowed Claims or Allowed Interests under the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 6 | Intercompany Claims | Impaired/Unimpaired | Deemed to Accept / Deemed to Reject; Not Entitled to Vote |
| 7 | Section 510 Claims | Impaired | Deemed to Reject; Not Entitled to Vote |
| 8 | Intercompany Interests | Impaired/Unimpaired | Deemed to Accept / Deemed to Reject; Not Entitled to Vote |
| 9 | Existing C1 Interests | Impaired | Deemed to Reject; Not Entitled to Vote |

As set forth above, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3 and 4 (the "**Voting Classes**").

If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions in the Ballot(s).  Please only use the Ballot(s) that accompany this

000714

**App. 218**

Disclosure Statement or the Ballot(s) that the Debtors, or Claims and Noticing Agent on behalf of the Debtors, otherwise provide to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Class.

The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 5, 6, 7, 8, and 9.[5]

### B.      Votes Required for Acceptance by a Class of Claims

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims is determined by calculating the amount and the number of claims voting to accept, as a percentage of the allowed claims that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.

### C.      Voting Record Date

**The Voting Record Date is April 1, 2024**.  The Voting Record Date is the date that determined when certain entities or persons were Holders of Claims for voting purposes under the Plan.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

### D.      Solicitation Procedures

#### 1.      Claims and Noticing Agent

The Debtors have retained Epiq Corporate Restructuring, LLC to act as, among other things, the Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

#### 2.      Solicitation Package

The following materials constitute the solicitation package distributed to Holders of Claims in the Voting Classes (collectively, the "**Solicitation Package**"):  (a) the Disclosure Statement (including all exhibits thereto); (b) the cover letter substantially in form attached to the Combined Disclosure Statement Motion as Exhibit 7; (c) the Combined Hearing Notice, substantially in the form attached to the Combined Disclosure Statement Motion as Exhibit 2; (d) the appropriate Ballot in the form attached to the Combined Disclosure Statement Motion as Exhibits 6A and 6B; and (e) for Holders of Claims in Class 3, the Election and Rights Offering Materials, substantially attached to the Combined Disclosure Statement Motion as Exhibit 8A, 8B, and 8C.

#### 3.      Distribution of the Solicitation Package and Plan Supplement

The Debtors caused the Claims and Noticing Agent to commence distribution of the Solicitation Package to Holders of Claims in the Voting Classes on April 3, 2024, which is fourteen (14) days before the Voting Deadline (*i.e.,* 4:00 p.m. (prevailing Central Time) on April 17, 2024).  The Claims and Noticing Agent commenced solicitation of votes by transmitting, via electronic mail, copies of the Solicitation Packages.   Hard copy mailings of the Solicitation Packages can be made by request.

The Solicitation Package (except the Ballot) may also be obtained from the Claims and Noticing Agent by:  (a) calling the Debtors' restructuring hotline at 877-295-6914 (US and Canada) or 1-971-290-2761 (international), (b) emailing C1-Info@epiqglobal.com, and/or (c) writing to the Claims and Noticing

---

[5]      As defined in the *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing; (II) Conditionally Approving the Disclosure Statement; (III) Approving the Confirmation Timeline, Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline; (IV) Waiving the Requirement to Hold the Creditors' Meeting and File SOFAs, Schedules, and 2015.3 Reports; and (V) Granting Related Relief* (the "**Combined Disclosure Statement Motion**").

000715

**App. 219**

Agent at ConvergeOne, c/o Epiq Ballot Processing, 10300 SW Boulevard, Beaverton, OR 97005.  You may also obtain copies of any pleadings Filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://dm.epiq11.com/C1 (free of charge), or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

### E.      Voting on the Plan

**The Voting Deadline is April 17, 2024, at 4:00 p.m., prevailing Central Time**.  Holders of Claims in the Voting Classes are able to return their Ballots in hard copy or submit it electronically on the Debtors' online balloting portal.  Ballots must be (1) properly completed, executed, and delivered timely via (a) the enclosed pre-paid, pre-addressed return envelope, (b) overnight courier, or hand delivery to the Claims and Noticing Agent at ConvergeOne, c/o Epiq Ballot Processing, 10300 SW Allen Boulevard, Beaverton, OR 97076-4422, or (c) first-class mail to the Claims and Noticing Agent at ConvergeOne, c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97005 or (2) submitted timely on the online balloting portal at https://dm.epiq11.com/C1.

Holders of Claims entitled to vote that cast a Ballot using the Claims and Noticing Agent's online portal should NOT also submit a paper Ballot.  The Claims and Noticing Agent's online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  **Ballots submitted via facsimile, email, or other means of electronic transmission will not be counted.**

The Debtors reserve the right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline.  The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in their discretion.  There can be no assurance that the Debtors will exercise its right to extend the Voting Deadline.

### F.      Ballots Not Counted

No ballot will be counted toward Confirmation if, among other things:  (1) it partially rejects and partially accepts the Plan, (2) it both accepts and rejects the Plan, (3) it is sent to the Debtors, the Debtors' agents (other than the Notice and Claims Agent), any indenture trustee, or the Advisors, (4) it is sent via facsimile or any electronic means other than via the online balloting portal, (5) it is illegible or contains insufficient information to permit the identification of the holder of the Claim, (6) it is cast by an Entity that does not hold a Claim in the Class indicated in Item 1 of the Ballot, (7) submitted by a holder not entitled to vote pursuant to the Plan, (8) it is unsigned, (9) it is non-original Ballot (excluding those Ballots submitted via the online balloting portal), and (10) not marked to accept or reject the Plan.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS, IN THEIR SOLE DISCRETION, DETERMINE OTHERWISE.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH

000716

**App. 220**

RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASS FOLLOWS THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT.  NO BALLOT VOTING TO ACCEPT THE PLAN MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

## IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS

### A.    Overview of the Debtor's Business

C1 designs and supports customer experience, infrastructure and networking, and security technology services and solutions for corporate enterprises and public sector entities spanning a wide variety of industries.  C1 utilizes its own engineering and design expertise, proprietary intellectual property, and partnerships with leading suppliers and original equipment manufacturers ("**OEMs**") to produce and implement custom-built IT designs and solutions for its customers, including pure and hybrid cloud solutions, business applications, customer experiences, contact center design and enablement, modern workplace infrastructure, cyber security, and enterprise networking.

### B.    Corporate History

C1 was founded in Minnesota in 1993, initially specializing in communications hardware and software design, integration, and refurbishing.  C1 was among the first IT service providers to offer hosted voice and messaging services and high-speed Internet access in the mid-1990s.  From there, through several acquisitions and mergers, C1 expanded to serve global clients ranging from sole proprietors to Fortune 100 companies and local, state, and federal governmental units and other public sector entities.  C1 expanded its operations over the next two decades, building out its customer base and developing innovative technology solutions to meet the ever-evolving needs of its customers.

In June 2014, affiliates of Clearlake Capital Group, L.P. ("**Clearlake**"), a private investment firm, acquired C1.  In December 2017, C1 and Clearlake entered into a merger agreement with Forum Merger Corporation, a special purpose acquisition company, that took ConvergeOne Holdings Inc. ("**C1 Holdings**") public in February 2018 (NASDAQ: CVONW).  Following the closing of that transaction, Clearlake remained the largest shareholder of C1.

In January 2019, affiliates of CVC Capital Partners ("**CVC**"), a global private equity and investment advisory firm with more than €118 billion in assets under management, completed an acquisition of C1 that took the Company private through an all-cash tender offer for all outstanding shares of C1 Holdings valued at approximately $1.8 billion.

Following the CVC acquisition, C1 has completed several strategic acquisitions and investments to expand its technical capabilities and add customer and vendor relationships.  The following chart illustrates C1's material acquisitions from 2019 to the present and the capabilities of each acquired company:

| Date | Target | Capabilities |
|---|---|---|
| January 2019 | Venture Technologies | IT solutions provider to private and public organizations |
| August 2020 | Altivon | Premier contact center solutions |
| March 2021 | AAA Network Solutions, Inc. | Innovative education solutions provider to public sector customers |

9

| June 2021 | NuAge | Service provider to Salesforce |
|-----------|-------|-------------------------------|
| November 2021 | WrightCore, Inc. | Managed and professional services capabilities |
| December 2021 | Prime TSR | Cloud-focused software and data platforms capabilities |
| January 2022 | Integration Partners Corporation | Collaboration and digital infrastructure solutions in New England and the Midwest |

### C.  Business Operations

C1's suite of innovative product and service solutions are supported by more than 1,000 engineers who collectively hold thousands of industry certifications and can rapidly deploy to provide support for C1's thousands of customers all over the globe.

To design and implement IT solutions for its customers, C1 maintains partnerships with more than 140 global technology leaders, including software publishers, wholesale distributors, and OEMs such as Avaya, AWS, Cisco, Dell Technologies, Genesys, IBM, Juniper, Microsoft, Palo Alto, Extreme Networks and Google Cloud.  C1 purchases a variety of hardware and software for resale from these technology partners and utilizes their products in the IT designs and solutions it provides to its customers.  C1 is product agnostic and can act as a conduit between its customers and global partners, providing one point of contact to deliver optimal product and service solutions to its customers, optimizing IT investments and minimizing the cost, complexity, and time to implement solutions.

The Company reported revenues of approximately $1.525 billion for the twelve months ended December 31, 2023, compared to approximately $1.456 billion in revenues for the twelve months ended December 31, 2022.

C1's operations are divided into two distinct revenue segments: (a) the "**Services Segment**" and (b) the "**Product Segment**." The Services Segment contains three offerings: "**Professional Services**," "**Managed Services**," and "**Resale Services**."  Each of these offerings can be sold separately or bundled together to form various holistic offerings based on each customer's specific needs and desired outcomes.  The Services Segment accounted for approximately 45% of the Company's total revenues in 2023.

### 1.  The Services Segment

#### (a)  Professional Services Segment

The Professional Services offering provides customers with consultation, design, integration and implementation, application development, program management, and maintenance services for customized collaboration, enterprise networking, data center, cloud, and security offerings.  Customers retain C1's engineers to create custom-designed, complex IT solutions which are then produced, sold, and implemented as standalone offerings or combined with OEM products and software and C1's own intellectual property to facilitate bespoke solutions for C1's customers.

#### (b)  Managed Services Segment

Through the Managed Services offering, C1 administers and maintains customers' mission critical IT infrastructure, typically over long-term contracts with high renewal rates.  Through C1's relationships with leading and next-generation technology partners, and through the utilization of C1's own proprietary intellectual property, C1's engineers maintain and enhance customers' existing IT infrastructure.  The engineers monitor performance and troubleshoot and support rapid resolutions for their customers' IT data center portfolios.  Additionally, they provide IT helpdesk support, maintenance services, and technological infrastructure enhancements, including upgrades or modifications to software.

000718

**App. 222**

### (c)   Resale Segment

The Resale Services offering consists of selling products and software subscriptions developed by C1's third-party OEM partners.  C1 actively markets products purchased from leading technology vendors in response to its customers' specifications.  C1's engineers utilize these products and software subscriptions to develop bespoke solutions to support the customers' IT infrastructure requirements and to augment their capabilities.

### 2.   The Product Segment

The Product Segment procures hardware products and software services from C1's OEM and distribution partners and sells those products to C1's customers.  Sales through the Product Segment may consist of standalone products, including products improved by C1's proprietary intellectual property, or may be included in a more holistic technology solution that is combined with C1's Professional Services expertise.  The Product Segment accounted for approximately 55% of the Company's total revenues in 2023.

### D.   The Debtors' Prepetition Corporate and Capital Structure

### 1.   Corporate Structure

As set forth on the organizational structure chart attached as **Exhibit F**, non-debtor ConvergeOne Investment LP, a Delaware limited partnership controlled by CVC, is C1's ultimate parent through its indirect 100% ownership of Debtor PVKG Intermediate Holdings Inc. ("**PVKG Intermediate**"), a Delaware corporation.

PVKG Intermediate is the direct or indirect parent of each of the other Debtors, including C1 Holdings and C1 Inc.  ConvergeOne Texas, LLC, which is directly wholly-owned by C1 Inc., was formed under the laws of the State of Texas on January 12, 2024.

In addition to various domestic subsidiaries, which are Debtors in these Chapter 11 Cases, C1 also has two international non-debtor subsidiaries.[6]

### 2.   Capital Structure

### (a)   The Debtors' Prepetition Indebtedness

As of the Petition Date, the Debtors have approximately $21.4 million in cash on hand, and $1,821 million in aggregate outstanding principal amount of funded debt obligations, detailed below.

---

[6]   Non-Debtor SPS – Providea Limited's parent, Debtor Providea Conferencing, LLC, has pledged 65% of SPS – Providea Limited's equity as collateral under the Debtors' prepetition funded debt obligations.  SPS – Providea Limited is not otherwise an obligor or guarantor under those facilities.  Non-Debtor C1 India's parent, Debtor C1 Inc., has pledged 65% of C1 India's equity as collateral under the Debtors' prepetition funded debt obligations.  C1 India is not otherwise an obligor or guarantor under those facilities.

000719

**App. 223**

| Funded Debt | Maturity | Principal Amount Outstanding ($ millions) |
|---|---|---|
| Prepetition ABL Credit Agreement | April 2025 | $190 |
| Prepetition First Lien Term Loan Credit Agreement | January 2026 | $1,061 |
| Prepetition KL Note Purchase Agreement | January 2026 | $75 |
| Prepetition PVKG Note Purchase Agreement | June 2028 | $220 |
| Prepetition Second Lien Term Loan Credit Agreement | January 2027 | $275 |
| TOTAL | | $1,821 |

### (i)       Prepetition ABL Facility

Under its Amended and Restated ABL Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of July 10, 2022, Amendment No. 2 dated as of September 14, 2022, Amendment No. 3 dated as of January 23, 2023, and Amendment No. 4 dated as of August 29, 2023, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition ABL Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Wells Fargo Commercial Distribution Finance, LLC, as administrative agent, collateral agent, and floorplan funding agent (in such capacities, the "**Prepetition ABL Agent**"), and as swing line lender, and the lenders from time to time party thereto (together with the Prepetition ABL Agent and other secured parties under the Prepetition ABL Credit Agreement, the "**Prepetition ABL Secured Parties**"), the Prepetition ABL Secured Parties agreed to provide C1 Holdings with a secured revolving credit loan with aggregate availability of $250 million, subject to compliance with a borrowing base, various sublimits applicable to swingline loans, letters of credit, and floorplan advances otherwise authorized under the Prepetition ABL Credit Agreement, and various reserves that may be established in accordance with the Prepetition ABL Credit Agreement (the "**Prepetition ABL Facility**").

As of the Petition Date, an aggregate balance of approximately $190 million, including revolving loans, floorplan obligations, and accrued and unpaid interest, remains outstanding under the Prepetition ABL Facility.  The Company is unable to access the remaining availability under the Prepetition ABL facility due to the Prepetition ABL Credit Agreement's borrowing base limitations, reserves and sublimits, and minimum availability requirements.  The obligations under the Prepetition ABL Facility are secured by a first priority security interest in substantially all of the Debtors' assets, subject to the intercreditor agreements described below.  The Prepetition ABL Facility matures in April 2025.

### (ii)      Prepetition First Lien Term Loan Credit Agreement

Under the terms of a certain First Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of March 14, 2019 and Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition First Lien Term Loan Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Term Loan**

12

**Agent**"), and certain lenders from time to time party thereto (together with the First Lien Term Loan Agent, the "**Prepetition First Lien Term Loan Secured Parties**"), the Prepetition First Lien Term Loan Secured Parties agreed to provide C1 Holdings with initial term loans in the principal amount of $960 million and incremental term loans in the principal amount of $150 million, resulting in aggregate borrowings under the Prepetition First Lien Term Loan Credit Agreement of $1.110 billion in principal (the "**Prepetition First Lien Term Loan Facility**").

As of the Petition Date, approximately $1.1 billion of obligations, including accrued and unpaid interest and OID, are outstanding under the Prepetition First Lien Term Loan Facility. C1 Holdings' obligations under the Prepetition First Lien Term Loan Facility are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate. The Debtors' obligations under the Prepetition First Lien Term Loan Facility are secured by a first priority security interest in substantially all assets of the Debtors, subject to the intercreditor agreements described below. The Prepetition First Lien Term Loan Facility matures in January 2026.

### (iii)     Prepetition KL Note Purchase Agreement

Under the terms of a First Lien Secured Note Purchase Agreement dated as of July 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition KL Note Purchase Agreement**") by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, Deutsche Bank Trust Company, as administrative agent and collateral agent (the "**Prepetition KL Notes Agent**"), certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto ("**Kennedy Lewis**"), and any other holder from time to time party thereto (together with the Prepetition KL Notes Agent, the "**Prepetition KL Notes Secured Parties**"), C1 Holdings issued senior secured notes to Kennedy Lewis in the aggregate principal amount of $75 million (the "**Prepetition KL Notes**").

As of the Petition Date, approximately $78.8 million of obligations, including accrued and unpaid interest and OID, are outstanding under the Prepetition KL Notes. C1 Holdings' obligations under the Prepetition KL Notes are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate. The obligations under the Prepetition KL Notes are secured by a first priority security interest in substantially all of the Debtors' assets, subject to the intercreditor agreements described below. The Prepetition KL Notes mature in January 2026.

### (iv)     Prepetition PVKG Note Purchase Agreement

Under the terms of the Third Amendment and Restatement to Promissory Note and Purchase and Cashless Exchange Agreement dated as of July 6, 2023 (the "**Prepetition PVKG Note Purchase Agreement**")[7] by and among parties including C1 Holdings, as issuer, and PVKG Investment Holdings Inc. (an entity controlled by CVC), as holder (in such capacity, "**PVKG Lender**") and as administrative agent and collateral agent (in such capacities, the "**Prepetition PVKG Notes Agent,**" and in its capacities as holder, administrative agent, and collateral agent, the "**Prepetition PVKG Notes Secured Parties**"), C1 Holdings issued senior secured notes to PVKG Lender in the principal amount of approximately $160 million, and rolled up approximately $33 million of notes previously issued to PVKG Lender, resulting in a total principal balance of approximately $193 million (the "**Prepetition PVKG Notes**"). The Prepetition PVKG Notes Secured Parties, together with the Prepetition First Lien Term Loan Secured Parties and the Prepetition KL Note Secured Parties are referred to as the "**Prepetition First Lien Secured Parties**."

As of the Petition Date, pursuant to a settlement of claims related to the Prepetition PVKG Notes, the parties thereto have agreed that $213 million of obligations, including paid-in-kind interest added to principal and amortized OID, but excluding prepayment premiums and unamortized OID, remain

---

[7]     The Prepetition PVKG Note Purchase Agreement is further discussed in Part V below.

outstanding under the Prepetition PVKG Notes.  C1 Holdings' obligations under the Prepetition PVKG Notes are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.  The obligations under the Prepetition PVKG Notes are secured by a first priority security interest in substantially all of the Debtors' assets, subject to the intercreditor agreements described below.  The Prepetition PVKG Notes mature in June 2028.

### (v)  Prepetition Second Lien Term Loan Credit Agreement

Under the terms of a Second Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of July 10, 2022, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition Second Lien Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition Second Lien Agent**"), and certain lenders from time to time party thereto (together with the Prepetition Second Lien Agent, the "**Prepetition Second Lien Secured Parties**"), the Prepetition Second Lien Secured Parties provided C1 Holdings with a single-draw secured term loan in the aggregate principal amount of $275 million (the "**Prepetition Second Lien Facility**").

As of the Petition Date, approximately $287 million of obligations, including accrued and unpaid interest but excluding unamortized OID, are outstanding under the Prepetition Second Lien Facility.  C1 Holdings' obligations under the Prepetition Second Lien Facility are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.  The obligations under the Prepetition Second Lien Facility are secured by a second priority security interest in substantially all assets of the Debtors.  The Prepetition Second Lien Facility matures in January 2027.

### (vi)  Prepetition Intercreditor Agreements

A series of intercreditor agreements govern the relative lien and payment priorities of the Prepetition ABL Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition Second Lien Secured Parties (together, the "**Prepetition Secured Parties**").

Under an ABL Intercreditor Agreement dated as of January 4, 2019 (as amended by that certain ABL Intercreditor Agreement Joinder dated as of May 15, 2023 and as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition ABL Intercreditor Agreement**") by and among the Prepetition ABL Agent, the Prepetition First Lien Term Loan Agent, Prepetition KL Notes Agent, and the Prepetition PVKG Notes Agent, the liens held by the Prepetition ABL Secured Parties on specified collateral, including the Debtors' cash, accounts receivable, and inventory, have priority over the liens held by the Prepetition First Lien Secured Parties on that collateral.  Conversely, the liens held by the Prepetition First Lien Secured Parties on certain collateral other than the Debtors' cash, accounts receivable, and inventory have priority over the liens on that collateral held by the Prepetition ABL Secured Parties.

Under the terms of a First Lien Pari Passu Intercreditor Agreement dated as of January 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among the Prepetition First Lien Term Loan Agent, Prepetition KL Notes Agent, and the Prepetition PVKG Notes Agent, the parties agreed that they would be *pari passu* with respect to the priority of their liens on common collateral and that any payments in respect of their common collateral would be made Pro Rata, subject to the provisions of the Prepetition ABL Intercreditor Agreement.

Finally, under the terms of a certain Intercreditor Agreement dated as of January 4, 2019 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date) governing the respective rights, interest, obligations, priority, and positions of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties, the liens securing the Prepetition ABL

14

Credit Facility, Prepetition First Lien Term Loan Facility, Prepetition KL Notes, and Prepetition PVKG Notes have priority over the liens securing the Prepetition Second Lien Facility.

### (vii)    Prepetition Unsecured Trade Debt

As of the Petition Date, the Debtors estimate that their unsecured trade debt totals approximately $155 million.  The Debtors have filed a motion seeking the authority to pay the undisputed prepetition claims of certain critical vendors, foreign vendors, lien claimants, and vendors holding claims entitled to priority under section 503(b)(9) of the Bankruptcy Code, in order to preserve the Debtors' partnerships with these vendors and the Debtors' ability to continue operating in the ordinary course during the pendency of these Chapter 11 Cases.  Because C1 Inc. is the Company's main operating entity, a substantial majority of the Debtors' total prepetition trade debt is owed by C1 Inc.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Prepetition Challenges Faced by the Company

C1 has a long history of generating significant cash flows and working in conjunction with its channel partners to deliver IT services and bring its own technology products to market.  C1's core business model, operating as an innovative, global IT services company, remains sound.  However, three recent challenges have created an immediate need for additional liquidity: (i) the Company's highly leveraged capital structure has resulted in significantly higher cash interest costs in the current interest rate environment, (ii) the Company faced customer delays resulting from the financial distress of one of its leading technology partners in the second half of 2022 and the first half of 2023, resulting in staggered and diversified customer contracts and product and software purchasing patterns, and (iii) downgrades of the Company's credit rating have resulted in supplier pressures, including credit reductions and other restrictive trade terms.  These challenges, along with other macroeconomic headwinds, have impacted C1's operations and its liquidity position.

The Company has been forced to divert an increasing amount of cash for rising interest payments on its funded debt.  The Federal Reserve increased interest rates by approximately 5.00% between March 2022 and August 2023, resulting in the interest costs on C1's funded debt increasing by approximately $55 million on an annualized basis.

Also beginning in 2022, concerns over the financial health of one of the Company's leading OEM partners began to grow and accelerated with the OEM's latest bankruptcy filing in February 2023.  This led to customers staggering their contract renewals and purchasing throughout C1's services and product operating segments.  The OEM's liquidity issues also slowed the development of its next generation of products and solutions, limiting what C1 could sell to its customers and requiring the Company to try to source other solutions from its partners.  As a result, this substantially depressed C1's 2022 and 2023 earnings, due to the OEM's position as one of C1's top global partners.  With the OEM's bankruptcy filing now twelve months behind, market confidence in its products and services is on the rise.

Simultaneously, lower than forecasted revenues in 2023 required the Company to stretch payment terms with its vendors, driving up its accounts payable balance.  Although the Company ultimately returned its vendors to normal payment terms after raising additional capital in July 2023, a downgrade by the rating agencies caused some vendors to impose more onerous payment and credit terms, which further strained the Company's liquidity.

### B.    Prepetition Initiatives Pursued by the Company

C1 launched several operational and other strategic efforts over the last year to counteract these challenges and stabilize its business.

000723

**App. 227**

1.      **Operational Initiatives**

C1 pursued various operational initiatives designed to improve operating efficiency and performance, reduce costs, increase liquidity, and improve the Company's overall balance sheet profile.

(a)      **Cost-Cutting Initiatives**

In the first quarter of 2023, the Company began implementing cost-cutting measures primarily impacting the Company's headcount, sales expenses, general and administrative expenses, and discretionary spending. By the fourth quarter of 2023, these initiatives had already generated approximately $86 million in run-rate savings for the Company and are expected to total more than $100 million in savings when all initiatives are fully executed.

These cost-saving measures included the following initiatives, among others: (a) reducing the Company's employee headcount and its use of domestic independent contractors by moving certain positions to C1 India and finding more cost-effective third-party alternatives for certain in-house departments; (b) automating various employee functions, including customer payment, contract renewal, and work order scheduling processes; (c) exiting unnecessary third-party IT, software maintenance, and support contracts; (d) delayering sales management teams; (e) unifying its presales and sales engineering groups that were unnecessarily spread across the business; (f) simplifying the review and approval processes for new sales and customer contracts; (g) streamlining the sales function by consolidating seventeen separate sales regions into four sales segments; (h) exiting various real estate leases and decreasing discretionary maintenance spending; (i) reducing advertising and marketing spending by emphasizing the Company's own talent in-house and working directly with vendors on paid and sponsored media; and (j) minimizing redundant third-party spending, as well as travel and entertainment expenses. The Company will continue to evaluate its cost-saving initiatives during the Chapter 11 Cases and may implement additional measures that are consistent with its go-forward business plan.

(b)      **New Management Team**

In January 2023, the Company appointed Jeffrey S. Russell to serve as its Chief Executive Officer. Mr. Russell has over 35 years of technology services and business advisory experience, including most recently serving as the President and Chief Executive Officer of Accenture Canada. During his tenure as Chief Executive Officer of Accenture Canada, Mr. Russell led the company through three years of strong cross-industry market share growth and significantly increased top-line revenue and profitability.

In addition, the Company filled four other key executive leadership positions beginning in late 2022. In January 2023, Mr. Salvatore Lombardi was appointed Chief Financial Officer. Mr. Lombardi has over 20 years of experience in global finance and operations, including his most recent experience as Chief Financial Officer and Managing Director of cxLoyalty, a leading provider of loyalty and travel solutions that was recently acquired by JPMorgan Chase. In June 2023, Amrit Chaudhuri was appointed Chief Growth Officer. Mr. Chaudhuri has over 15 years of technology marketing experience and most recently served as Executive Vice President and Chief Marketing Officer at 8x8 and RingCentral. In August 2023, Meghan Keough was appointed Chief Marketing Officer. Ms. Keough has more than 20 years of experience in corporate and product marketing, product management, alliances, and business development, and most recently served as Senior Vice President at 8x8. Finally, in September 2023, John DeLozier was appointed Chief Revenue Officer. Mr. DeLozier has over 30 years of experience as an executive in the technology industry, including serving as President of Intelisys and Senior Vice President at 8x8 and CenturyLink.

2.      **Strategic Initiatives**

In addition to the operational efforts detailed above, C1 undertook various strategic initiatives to address the challenges facing the Company. These measures included: raising liquidity through the Prepetition PVKG Notes, appointing two independent and disinterested directors to the boards of PVKG Intermediate and C1 Holdings, creating a special committee of those boards (the "**Special Committee**") to

16

consider strategic alternatives (including potential financing or recapitalization transactions), and engaging with key creditor constituencies regarding the terms of potential comprehensive restructuring transactions. In connection with these measures, C1 engaged the Advisors.

(a)   **Prepetition PVKG Note Purchase Agreement and Out-of-Court Restructuring Efforts**

By March 2023, the Company's liquidity was becoming strained as its working capital declined and its accounts payable balance grew.  To help address these liquidity pressures, on March 24, 2023, PVKG Lender (an entity controlled by CVC) advanced approximately $30 million to C1 Inc. under an unsecured promissory note (the "**Original PVKG Lender Note**").  The Company used the loan proceeds to pay down its accounts payable balance.

On May 14, 2023, the Original PVKG Lender Note was assigned to C1 Holdings from C1 Inc. under the terms of an Issuer Assignment and Assumption Agreement.  On May 15, 2023, PVKG Lender and C1 Holdings, along with various of its affiliates, agreed to amend and secure the Original PVKG Lender Note on a first lien basis in exchange for a reduction in the interest rate on the Original PVKG Lender Note. As part of this amendment, PVKG Intermediate, C1 Holdings, and their domestic subsidiaries executed the First Lien Promissory Note Guarantee and Collateral Agreement.

Meanwhile, despite the much-needed liquidity provided by the Original PVKG Lender Note, the Company's accounts payable balance had continued to climb in April and May 2023.  On June 1, 2023, PVKG Lender advanced an additional approximately $3.2 million to the Company through an increase to the Original PVKG Lender Note.  The Company again used the proceeds to address its growing accounts payable balance.

Unfortunately, the Company's liquidity then continued to worsen through June 2023 and the Company projected an approximately $160 million liquidity need to address outstanding accounts payable and interest costs by July 2023.  To address this shortfall, the Company and its advisors considered various potential financing and other strategic alternatives that might be available to the Company.

In April and May, the Company, with the assistance of its advisors, explored several potential options.  Then, beginning in May 2023, the Company initiated discussions with an ad hoc group of Holders of First Lien Claims (the "**First Lien Ad Hoc Group**") and an ad hoc group of Holders of Second Lien Claims (the "**Second Lien Ad Hoc Group**") regarding the terms of a potential financing transaction.  In June 2023, the Company engaged in discussions with CVC regarding a potential alternative financing transaction.  The Company engaged in several rounds of negotiations with these parties on the terms of various proposals, and management and directors met regularly and extensively, including with the Company's advisors, to discuss the proposals and the Company's funding needs.

Ultimately, after exploring various options and repeatedly pressing for the best available terms, the Company decided to move forward with a financing transaction with PVKG Lender, determining that it provided the most favorable terms for the Company, including greater access to liquidity, lowest execution risk, and the quickest timing to close.  By this time, the Company was on the brink of failure and immediate access to capital was crucial.  On July 6, 2023, after multiple rounds of negotiations with PVKG Lender, the disinterested directors of ConvergeOne Investment LP and C1 Holdings approved the terms of the transaction.

Under the terms of the Prepetition PVKG Note Purchase Agreement, PVKG Lender rolled up the Original PVKG Lender Note and provided approximately $160 million in face value of new money financing to the Company in three payments of approximately: (a) $32 million on July 6, 2023, (b) $84 million on July 13, 2023, and (c) $44 million on August 30, 2023.  As a result, the total principal amount of the Prepetition PVKG Notes includes both the amounts under the Original PVKG Lender Note and the new money investment.  The PVKG Lender Amended Notes provide for an interest rate of 21.75% per

17

annum payable in kind, were issued with a 7.0% OID on the new money portion, and include a "Prepayment Premium" provision, triggered by, among other events, a chapter 11 filing.

Although the proceeds of the Prepetition PVKG Notes immediately eased the Company's liquidity needs, they did not ultimately solve fundamental issues facing the Company, including rising interest rates and the fact that some vendors, even after receiving payment from the Company, refused to extend credit terms to the Company going forward.  Among other challenges, the Company was unable to secure consents to replace the LIBOR benchmark rate with the SOFR rate following the discontinuation of LIBOR.  The Company had approached the First Lien Ad Hoc Group and Second Lien Ad Hoc Group seeking to amend the Prepetition First Lien Term Loan Credit Agreement and the Prepetition Second Lien Term Loan Credit Agreement and proposed certain SOFR transition provisions, but ultimately the Company did not reach agreement with the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group.  By November 2023, the Company began re-engaging with its advisors to evaluate additional alternatives and assist with contingency planning efforts.

**(b)     Enhanced Corporate Governance Measures and Discussions of a Comprehensive In-Court Restructuring**

In connection with its contingency planning efforts, Larry J. Nyhan and Sherman K. Edmiston III were appointed to the boards of directors for PVKG Intermediate and C1 Holdings as independent and disinterested directors.  Then, in January 2024, the Special Committee was formed to review, evaluate, and approve strategic and financial alternatives, including the possibility of seeking additional financing or undertaking a recapitalization transaction or other reorganization or restructuring.  The Special Committee is comprised of Mr. Russell, Mr. Nyhan, and Mr. Edmiston.  Mr. Nyhan has served on the boards of several distressed companies and has extensive experience in corporate restructuring having served as co-chairman of Sidley Austin LLP's corporate restructuring and bankruptcy group.  Mr. Edmiston currently serves on the boards of several companies and as a managing member of HI CapM Advisors, a consulting group that provides advisory services to corporations, hedge funds, and asset managers.

In January 2024, the Debtors engaged with the First Lien Ad Hoc Group,  PVKG Lender (in its capacities as both a secured lender and equity holder), and the Prepetition ABL Secured Parties to discuss the terms of a potential in-court restructuring.  In February 2024, the Debtors likewise engaged with the Second Lien Ad Hoc Group to discuss the terms of a comprehensive restructuring transaction.  As a result of these negotiations, the Special Committee concluded that the restructuring transactions contemplated by the RSA would provide the Debtors with immediate access to much-needed liquidity and a path to delever their capital structure in a meaningful way that would not be possible out of court.

**(c)     Entry into RSA**

Following extended arm's-length negotiations between the Debtors, the First Lien Ad Hoc Group, the Prepetition ABL Secured Parties, PVKG Lender, and the Second Lien Ad Hoc Group regarding the optimal path forward, on April 3, 2024, the Debtors entered into the RSA, a copy of which is attached hereto as **Exhibit B**.  The RSA provides that members of the First Lien Ad Hoc Group and PVKG Lender holding more than 81% of the first lien claims, as well as members of the Second Lien Ad Hoc Group holding 81% of the second lien term loan claims, will support and vote in favor of a Plan that will implement a significant deleveraging of the Debtors' balance sheet.  In addition, pursuant to the RSA, the claims of PVKG Lender are deemed allowed under the Plan at $213 million, and the parties to the RSA (including the First Lien Ad Hoc Group whose claims are *pari passu* with PVKG Lender) have agreed to such allowance.

Following careful consideration, including an investigation into surrounding circumstances, on April 2, 2024, the Special Committee approved the Debtors' entry into the RSA and the filing of the Chapter 11 Cases.  The Debtors believe that the comprehensive restructuring contemplated by the RSA provides the

000726

**App. 230**

Company with a value-maximizing path forward and will right-size the Company's capital structure in a manner that will ensure the viability of the Company's business as a going concern.

### C.    Debtor-in-Possession Financing and Use of Cash Collateral

During these Chapter 11 Cases, the Debtors will use the cash generated from their operations, in addition to current cash on hand of $21.4 million, to (a) satisfy payroll obligations, (b) honor postpetition obligations owed to customers and vendors, (c) maintain insurance coverage, (d) pay taxes, and (e) make any other payments essential to the continued management, operation, and preservation of the Debtors' business.  The Debtors and their Advisors have reviewed the Debtors' liquidity needs during these Chapter 11 Cases and prepared a 13-week cash flow forecast (the "**DIP Budget**") that projects the Debtors' weekly cash receipts, cash disbursements, and liquidity.  The Debtors and their Advisors continued to update the DIP Budget leading up to the Petition Date to account for changes in the Debtors' funding needs resulting from, among other things, the estimated timing of the commencement of these Chapter 11 Cases and ongoing discussions with the Debtors' largest vendors regarding their open accounts payable balances.

Based upon the DIP Budget, the Debtors and their Advisors do not believe the Debtors will have sufficient liquidity to manage their estates solely by using cash generated from operations and cash on hand as of the Petition Date.  Accordingly, the Debtors will seek access to further liquidity and financial accommodations provided by two debtor-in-possession financing facilities during the Chapter 11 Cases.

*First*, the Debtors will seek approval of the "**ABL DIP Facility**."  The ABL DIP Facility is a superpriority secured first lien asset-based debtor-in-possession lending facility in the aggregate principal amount of $250 million that will allow continued access to the Debtors' prepetition revolving credit facility, subject to certain modifications set forth in the DIP Orders.  The ABL DIP Facility will preserve the Debtors' access to their prepetition revolving credit line that they will use for daily working capital needs. The ABL DIP Facility will also contain a specific feature that is critical to the Debtors' continued ordinary course operations during these Chapter 11 Cases: a floorplan facility, which will allow the Debtors to rapidly finance the purchase of products, software, and services from certain of the Debtors' leading global technology partners and vendors.  Under the floorplan facility, the Debtors will be authorized to submit purchase orders to the Prepetition ABL Agent, who is then obligated to advance amounts due to the applicable vendor under those purchase orders promptly upon shipment.  As a result, the floorplan facility will expedite payments to vendors and, in turn, expedite shipments of products, software, and services to the Debtors and their customers.  Any floorplan obligations then will become revolving obligations under the Prepetition ABL Facility, allowing the Debtors to immediately purchase products, software, and services from vendors and delay payment until the Debtors determine to pay down their outstanding obligations under the Prepetition ABL Facility.

The Prepetition ABL Agent is requiring all amounts outstanding under the floorplan facility be converted into postpetition obligations of the Debtors as a condition to entering into the ABL DIP Facility, which permits continued access to the floorplan postpetition.  Losing access to the floorplan facility will have an immediate, severe, and negative impact on the Debtors' continued operations by, among other things, causing the cancellation of all pending floorplan orders, delaying future shipments, and impairing the Debtors' ability to service their customers.  There are currently pending floorplan orders of $10 million waiting to be shipped that, if cancelled under the floorplan facility, would have to be immediately financed by the Debtors from available cash, rather than through the floorplan.  Based on the DIP Budget, the Debtors will not have sufficient liquidity to make those payments directly, and the failure to immediately pay the amounts due on the corresponding purchase orders will interrupt the Debtors' delivery of goods and services to their customers.

In addition, the floorplan facility cannot simply be replaced by a third-party revolving credit provider.  The Prepetition ABL Agent is able to offer the floorplan facility because of its existing relationships with the Debtors' top vendors who are authorized to receive floorplan financing under the Prepetition ABL Facility.  There is no assurance that any third-party financing provider has these same

19

relationships, or that the Debtors' vendors would accept replacement financing from a third-party provider. And, even if a third-party could replace the floorplan facility, all existing orders would need to be cancelled and then re-submitted to the new third-party financing provider's floorplan facility—which would still cause material delay in the Debtors' ordinary course operations, obstruct the Debtors' delivery of goods and services to their customers, and impede the Debtors' seamless transition into these Chapter 11 Cases.

The Debtors presently lack availability under the Prepetition ABL Facility to incur new floorplan obligations. In order for the Debtors to continue using the floorplan facility during the Chapter 11 Cases, the Debtors also must pay down existing amounts owed under the Prepetition ABL Facility in order to create new availability for postpetition floorplan orders and obligations in the ordinary course of business.

As a result, to ensure continued access to the floorplan facility and preserve the ability to incur new floorplan obligations, the ABL DIP Facility contemplates the "**ABL Roll-Up**." The ABL Roll-Up will provide for the following: (i) upon entry of the Interim DIP Order, all existing floorplan obligations owed under the floorplan facility will immediately convert on a cashless basis into obligations under the ABL DIP Facility; (ii) upon entry of the Interim DIP Order, the Debtors will be authorized to pay down amounts owing under the Prepetition ABL Facility with proceeds from the Debtors' term loan debtor-in-possession financing facility (discussed below), which will result in a corresponding increase in availability under the ABL DIP Facility for postpetition obligations, including floorplan obligations; and (iii) upon entry of the Final DIP Order, any remaining outstanding Prepetition ABL Facility obligations will convert on an automatic, cashless basis into obligations under the ABL DIP Facility.

Without the ABL Roll-Up, among other terms in the ABL DIP Facility and proposed DIP Orders, the Prepetition ABL Agent would not be willing to enter into the ABL DIP Facility, including the floorplan facility, or consent to the use of cash collateral. The Debtors therefore have agreed to terms of the ABL DIP Facility, including the ABL Roll-Up, in order to preserve access to their revolving credit line and floorplan facility, and to avoid material interruptions to their ordinary course options.

***Second***, in addition to the ABL DIP Facility, the Debtors will seek approval of the "**Term DIP Facility**." The Term DIP Facility is a super-senior multi-draw term loan facility of $215 million, with an initial draw of $145 million and a second draw of $70 million. Proceeds from the first draw will be used to pay down the Prepetition ABL Facility (increasing availability for postpetition floorplan obligations), to fund critical vendor payments and other relief requested in the Debtors' first day motions (if approved by the Court), and for general corporate purposes. Both draws will be funded upon entry of the Interim DIP Order. While the second draw will be immediately funded, it will be held in escrow pending entry of the Final DIP Order. Under the restructuring transactions contemplated by the RSA, obligations under the Term DIP Facility will be repaid in full at emergence from the proceeds of an equity rights offering for the reorganized Debtors. The Term DIP Lenders would not allow borrowing under the Term DIP Facility or the use of cash collateral except on the terms set forth in the Term DIP Documents (as defined in the DIP Motion discussed below).

As laid out more fully in the *Declaration of Evan Levine in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**DIP Declaration**" in support of the "**DIP Motion**"), the ABL DIP Facility and the Term Loan DIP Facility are the product of extensive, arm's-length prepetition negotiations between the Debtors, the Prepetition ABL Agent, and the Consenting Lenders, and are the best proposals that the Debtors received for that financing.

The terms of the ABL DIP Facility, the ABL DIP Facility Documents, the Term Loan DIP Facility, and the Term Loan DIP Facility Documents, including the DIP Budget, and the form and amount of adequate protection to be provided to the Prepetition Secured Parties, are fair and appropriate under the circumstances and in the best interests of the Debtors' estates. The transactions set forth in the RSA and

the Plan, which contemplate the Debtors' entry into the ABL DIP Facility and Term Loan DIP Facility, will ensure that the Debtors' customers and vendors have a financially strong business partner during these Chapter 11 Cases, provide a viable path forward to maximize value for creditors and other parties in interest, and will position the Debtors for long-term success.

## VI.     ANTICIPATED EVENTS IN THE CHAPTER 11 CASES

### A.     Commencement of Chapter 11 Cases

In accordance with the RSA, the Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on or about April 3, 2024.  The filing of the petitions will commence these Chapter 11 Cases at which time the Debtors will be afforded benefits under and become subject to the limitations of the Bankruptcy Code.

The Debtors intend to continue their operations in the ordinary course during the pendency of these Chapter 11 Cases.  To facilitate the efficient and expeditious implementation of the Plan through these Chapter 11 Cases, and to minimize disruptions to the Debtors' operations on the Petition Date, the Debtors intend to seek to have these Chapter 11 Cases assigned to the same bankruptcy judge and administered jointly and to file various motions seeking important and urgent relief from the Bankruptcy Court.  Such relief, if granted, will assist in the administration of these Chapter 11 Cases; however, there can be no assurance that the requested relief will be granted by the Bankruptcy Court.

### B.     First Day Motions

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Petitions**"), the Debtors intend to file several motions (the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  The Debtors intend to seek the following relief on the Petition Date to maintain their operations in the ordinary course, amongst other relief:

- continue paying employee wages and benefits;

- continue the use of the Debtors' cash management system, bank accounts, and business forms;

- continue insurance programs and surety bond program;

- pay certain prepetition taxes, fees, and assessments;

- pay all trade claims;

- establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service;

- continue shared service arrangements with non-debtor entities in the ordinary course of business; and

- use cash collateral and obtain approval for debtor-in-possession financing.

The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge at https://dm.epiq11.com/C1 once they are filed.

### C.     Procedural Motions

The Debtors intend to file various motions that common to chapter 11 proceedings of similar size and complexity as these Chapter 11 Cases, including applications to retain various processionals to assist the Debtors in these Chapter 11 Cases.

000729
**App. 233**

**D.    Timetable for These Chapter 11 Cases**

In accordance with the RSA, the Debtors have agreed to proceed with the implementation of the Plan through these Chapter 11 Cases.  Among the milestones contained in the RSA is the requirement that the Debtors shall have filed the Plan and Disclosure Statement with the Bankruptcy Court within one (1) calendar day after the Petition Date.  The RSA requires that the Bankruptcy Court enter an order provisionally approving the adequacy of the Disclosure Statement no later than three (3) calendar days after the Petition Date.  The RSA also requires that the Bankruptcy Court enter an order confirming the Plan within sixty (60) calendar days after the Petition Date.  The Debtors believe they can achieve the various milestones under the RSA, the occurrence of which is crucial to reorganizing the Debtors successfully.

**VII.    OTHER KEY ASPECTS OF THE PLAN**

This section of this Disclosure Statement summarizes some of the significant elements of the Plan. This summary is qualified in its entirety by reference to the Plan.  The Debtors encourage all Holders of Claims entitled to vote on the Plan to review the Plan closely.

**A.    Unclassified Claims**

**1.    Unclassified Claims Summary**

Administrative Claims, DIP Claims, Professional Fee Claims, Restructuring Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  The treatment of unclassified Claims is set forth in Article II of the Plan. The Claim treatment for such unclassified Claims is set forth below:

**(a)    Administrative Claims**

On the Effective Date, except to the extent that a Holder of an Allowed Administrative Claim agrees to different treatment, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in Cash.

**(b)    DIP Claims**

**(i)    ABL DIP Facility Claims**

On the Effective Date, in full and final satisfaction of the Allowed ABL DIP Facility Claims, (a) ABL DIP Facility Claims that are being converted to Exit ABL Facility Loans or other outstandings thereunder (such as letters of credit and floorplan advances, as provided below) shall be refinanced by the Exit ABL Facility in the amount of the remaining ABL DIP Facility Claims after such pay down by means of a cashless settlement, (b) ABL DIP Facility Claims that are not being converted to Exit ABL Facility Loans shall be indefeasibly paid in full in Cash, and (c) accrued interest and fees under the ABL DIP Facility shall be paid in full in Cash immediately prior to the conversion of ABL DIP Loans to Exit ABL Facility Loans.  With respect to the amount of the ABL DIP Facility refinanced by means of a cashless settlement, (i) all principal amount of ABL DIP Loans (as defined in the ABL DIP Credit Agreement) (including Swingline Loans and floorplan advances) shall be on a one-to-one basis automatically converted to and deemed to be Exit ABL Facility Loans, (ii) the Letters of Credit (as defined in the ABL DIP Credit Agreement) issued and outstanding under the ABL DIP Credit Agreement shall automatically be converted to letters of credit deemed to be issued and outstanding under the Exit ABL Facility Documents, and (iii) all Collateral that secures the Obligations (each as defined in the ABL DIP Credit Agreement) under the ABL DIP Credit Agreement that shall also secure the Exit ABL Facility shall be reaffirmed, ratified, and shall automatically secure all Obligations under the Exit ABL Facility Documents, subject to the priorities of Liens set forth in the Exit ABL Facility Documents and the Exit Intercreditor Agreement.

000730
**App. 234**

For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses related to the ABL DIP Facility shall be paid in full in Cash in accordance with the terms of the DIP Orders and the Plan, as applicable.

###### (ii)      Term DIP Facility Claims

On the Effective Date, in full and final satisfaction of the Allowed Term DIP Facility Claims, each Holder of a Term DIP Facility Claim shall receive its Pro Rata portion of Cash on account of any principal, interest, fees, and expenses outstanding with respect to such Holder's Term DIP Facility Claim as of the Effective Date; *provided*, *however*, that any Holder of a Term DIP Facility Claim can, in lieu of such Cash payment, exercise such Holder's Term DIP Loan Rights on the terms set forth in the Term DIP Term Sheet and pursuant to the terms of the Rights Offering Documents.

For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses related to the Term DIP Facility shall be paid in full in Cash accordance with the terms of the DIP Orders and the Plan, as applicable.

###### (c)      Professional Fee Claims

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, from the Professional Fee Escrow Account as soon as practicable after such Professional Fee Claims are Allowed.

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with an amount of Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  When all Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

###### (d)      Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date matters, after the Effective Date), shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the RSA, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided, however*, that such estimates shall not be considered an admission or limitation with respect to such

000731

**App. 235**

Restructuring Expenses. On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before, or after the Effective Date.

(e)     **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

B.     **Means for Implementation of the Plan**

1.     **General Settlement of Claims and Interests**

As discussed in detail in the Plan and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies (including the PVKG Note Claims Settlement) resolved pursuant to the Plan, including any challenge to the amount, validity, perfection, enforceability, priority, or extent of the First Lien Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

2.     **PVKG Note Claims Settlement**

The allowance and treatment of the PVKG Note Claims under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases of and by the PVKG Lender set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement of the PVKG Note Claims pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code. The PVKG Note Claims Settlement is incorporated into the Plan and includes the following material terms and conditions:

1.   The PVKG Note Claims shall be Allowed on the Effective Date against the Debtors in the amount of $213,000,000.00.

2.   The PVKG Note Claims shall receive the treatment as those in Class 3 First Lien Claims. For the avoidance of doubt, the PVKG Lender shall waive any Claims other than the PVKG Note Claims that it may have, including any General Unsecured Claims, if any; *provided* that the foregoing shall not limit the payment or reimbursement of the Restructuring Expenses by the Debtors or the Reorganized Debtors.

3.   PVKG Lender, as the Holder of the PVKG Note Claims, shall support Confirmation of the Plan and shall timely submit a ballot accepting the Plan, in each case in accordance with the terms and conditions of the RSA.

000732

**App. 236**

The Plan shall be deemed a motion to approve the good faith compromise and settlement of the PVKG Note Claims Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, within the range of reasonableness, and in the best interests of the Debtors and their Estates.

> 3.    **Restructuring Transactions**

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions (which, for the avoidance of doubt, shall be in form and substance acceptable to the Required Consenting Lenders and consistent with the RSA) and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including all actions set forth in Article IV.C of the Plan.  Specifically, the Debtors or Reorganized Debtors, as applicable, shall: (1) execute and deliver the Exit Facilities Documents and enter into the Exit Facilities; (2) implement the Rights Offering, the distribution of the Rights to the Eligible Offerees, issue the New Equity Interests in connection therewith, execute and implement the Backstop Agreement in connection therewith; (3) issue the Term DIP Loan Rights and the New Equity Interests in connection therewith; (4) issue and distribute the New Equity Interests as set forth in the Plan; and (5) reserve the Management Incentive Plan Pool.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

> C.    **The Reorganized Debtors**

On the Effective Date, the New Board shall be established in accordance with the terms of the Governance Term Sheet, and each Reorganized Debtor shall adopt its Governance Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

The New Board shall be the board of directors or similar Governing Body of New C1 and shall consist of members as designated in accordance with the Governance Term Sheet.

> D.    **Sources of Consideration for Plan Distributions**

Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Equity Interests will be exempt from SEC registration, as described more fully in Article IV.M of the Plan.

> 1.    **Exit Facilities**

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facilities Documents.  Confirmation of the Plan shall be deemed final approval of the Exit Facilities and the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Facilities Documents and such other documents as may be required to effectuate

the treatment afforded by the Exit Facilities.  Execution of the Exit Term Loan Credit Agreement by the Exit Term Loan Agent shall be deemed to bind all Holders of First Lien Claims and all Exit Term Loan Facility Lenders as if each such Holder or Exit Term Loan Facility Lender had executed the Exit Term Loan Credit Agreement with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

## 2.     Rights Offering

The Debtors shall distribute the Rights to the Eligible Offerees as set forth in the Plan and the Rights Offering Documents, including the Rights Offering Term Sheet, which is attached as Exhibit 4 to the Restructuring Term Sheet, which is attached as Exhibit B to the RSA.  Pursuant to the Rights Offering Documents, the Rights Offering shall be open to all Eligible Offerees, and Eligible Offerees shall be entitled to participate in the Rights Offering up to a maximum amount of each such Eligible Offeree's Pro Rata portion (calculated based on the aggregate principal amount of First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all First Lien Claims held by Eligible Offerees that exercised, or are deemed to have validly exercised, the Rights Offering Rights and Takeback Term Loan Recovery Option) of the Rights.  Each Eligible Offeree (other than Eligible Offerees that are also Investors, who must exercise all of their Rights) may exercise either all, a portion of, or none of its Rights in exchange for Cash (or, if such Eligible Offeree is also a DIP Lender, such Eligible Offeree's Term DIP Loan Rights). The Rights are not separately transferable or detachable from the First Lien Claims and may only be transferred together with the First Lien Claims.

New C1 shall be authorized to issue the New Equity Interests issuable pursuant to such exercise on the Effective Date pursuant to the terms of the Plan and the Rights Offering Documents.

The Rights Offering will be fully backstopped, severally and not jointly, by the Investors' Backstop Commitment pursuant to the Backstop Agreement.  In addition, the Investors will be allocated, and shall purchase and subscribe for, the Direct Investment pursuant to the terms of the Backstop Agreement and Backstop Order.  The Reorganized Debtors will issue the Put Option Premium to the Investors on the Effective Date in accordance with the terms and conditions set forth in the Backstop Agreement, the Backstop Order, and the Plan, in respect of their respective Backstop Commitments and Direct Investment Commitments.  Pursuant to the terms of the Rights Offering, each Investor may, at its sole option, exercise its Term DIP Loan Rights in satisfaction of its commitments under the Rights Offering and Backstop Agreement.

New Equity Interests issued pursuant to the Rights Offering and the Direct Investment shall be offered (and the Put Option Premium shall be issued) at the Plan Discount.

000734
**App. 238**

Entry of the Backstop Order and Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering, the Direct Investment, the Backstop Commitment, the Direct Investment Commitment, the Put Option Premium, and the Backstop Agreement (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by New C1 in connection therewith). On the Effective Date, the rights and obligations of the Debtors under the Backstop Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering may be used by the Reorganized Debtors to make distributions pursuant to the Plan and fund general corporate purposes.

When the issuance of New Equity Interests pursuant to the Plan and the Rights Offering Documents would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual issuance of shares of New Equity Interests shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Equity Interests shall be adjusted as necessary to account for the foregoing rounding.

### 3. New Equity Interests

New C1 shall be authorized to issue a certain number of shares of New Equity Interests pursuant to its Governance Documents. The issuance of the New Equity Interests shall be authorized without the need for any further corporate action. On the Effective Date, the New Equity Interests shall be issued and distributed as provided for in the Description of Transaction Steps to the Entities entitled to receive the New Equity Interests pursuant to, and in accordance with, the Plan.

All of the shares of New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of New Equity Interests shall be deemed as its agreement to the Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New Equity Interests will not be registered under the Securities Act or listed on any exchange as of the Effective Date and are not expected to meet the eligibility requirements of the DTC.

### 4. Use of Cash

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the Rights Offering to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan.

### E. Corporate Existence

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be and as contemplated by the Description of Transaction Steps (as defined in the Plan), with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

000735

**App. 239**

The Reorganized Debtors shall be authorized to dissolve the Debtors or the Reorganized Debtors in accordance with applicable law or otherwise, in each case as contemplated by the Description of Transaction Steps, including, for the avoidance of doubt, any conversion of any of the Debtors or the Reorganized Debtors pursuant to applicable law, and to the extent any such Entity is dissolved, such Entity shall be deemed dissolved pursuant to the Plan and shall require no further action or approval (other than any requisite filings required under applicable state or federal law).

### F.        Cancellation of Existing Agreements and Interests

On the Effective Date, except with respect to the Exit Facilities, or to the extent otherwise provided in the Plan, including in Article V.A of the Plan, the Confirmation Order, or any other Definitive Document, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect; *provided, however*, that notwithstanding anything to the contrary contained herein, any agreement that governs the rights of the DIP Agents shall continue in effect solely for purposes of allowing the DIP Agents to (i) enforce their rights against any Person other than any of the Released Parties, pursuant and subject to the terms of the DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (ii) receive distributions under the Plan and to distribute them to the Holders of the Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (iii) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, and (iv) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agents, or Holders of the ABL DIP Facility Claims and Term DIP Facility Claims under the Plan, as applicable. Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan.

Notwithstanding the preceding paragraph, any credit agreement or other instrument that governs the rights, claims, and remedies of the Holder of a Claim shall continue in full force and effect for the limited purposes of allowing Holders of Allowed Claims to receive distributions under the Plan and permitting the Reorganized Debtors and any other Distribution Agent, as applicable, to make distributions on account of the applicable Claims.

On the Effective Date, each holder of a certificate or instrument evidencing a Claim or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture or agreement that governs the rights of such holder of such Claim or Interest. Such surrendered certificate or instrument shall be deemed canceled as set forth in, and subject to the exceptions set forth in, Article IV.H of the Plan.

### G.        Corporate Action

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtors in accordance with the Governance Term Sheet; (3) the issuance and distribution of the New Equity Interests; (4) implementation of the Restructuring Transactions, including the Rights Offering; (5) entry into the Exit ABL Facility Documents; (6) entry into the Exit Term Loan Facility Documents; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the Governance Documents; (9) the assumption or assumption and assignment, as applicable, of Executory

28

Contracts and Unexpired Leases that are not rejected; (10) reservation of the Management Incentive Plan Pool; and (11) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Interests, the Governance Documents, the Exit ABL Facility, the Exit Term Loan Facility, the Exit ABL Facility Documents, and the Exit Term Loan Facility Documents, any other Definitive Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.I of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### H.    Governance Documents

On or immediately prior to the Effective Date, the Governance Documents shall be adopted or amended in a manner consistent with the terms and conditions set forth in the Governance Term Sheet (attached as Exhibit 5 to the Restructuring Term Sheet, which is attached as Exhibit B to the RSA), as may be necessary to effectuate the transactions contemplated by the Plan.  Each of the Reorganized Debtors will file its Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The Governance Documents shall prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the Governance Documents shall be included as exhibits to the Plan Supplement.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

On the Effective Date, New C1 shall enter into and deliver the New Equityholders' Agreement to each Holder of New Equity Interests, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.  On the Effective Date, Holders of New Equity Interests shall be deemed to have executed the New Equityholders' Agreement and be parties thereto, without the need to deliver signature pages thereto.

### I.    Directors and Officers of the Reorganized Debtors

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of C1 Holdings and PVKG Intermediate shall expire, and the members for the initial term of the New Board shall be appointed in accordance with the Governance Documents.  The New Board shall consist of members as designated in accordance with the Governance Term Sheet.  The Chief Executive Officer of New C1 shall serve on the board of directors of New C1; all other initial directors shall be appointed by the Required Consenting Lenders, with representation being proportionate to post-emergence equity ownership and subject to agreed-upon sunsets.  For the avoidance of doubt, each Initial First Lien Ad Hoc Group Member and the PVKG Lender shall each be entitled to appoint one director to serve on the New Board, so long as such entity is contemplated to receive no less than 10% of the fully diluted New Equity Interests (excluding New Equity Interests reserved for the post-Effective Date Management

29

Incentive Plan).  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the Governance Documents and other constituent documents of the Reorganized Debtors.

The Subsequent First Lien Ad Hoc Group Members and the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative as a non-voting observer to the New Board; *provided* that such entitlement shall expire if such holders, at any time, cease to hold in excess of 12.5% of the New Equity Interests in the aggregate.

In addition, the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative to receive materials that were presented to the New Board at any board meeting; *provided*, *however*, that such representative shall sign a customary non-disclosure agreement (which shall provide that such representative may share such materials with Required Consenting Initial Second Lien Ad Hoc Group Members that are subject to confidentiality restrictions and whose individual holdings exceed 1% of the New Equity Interests), and New C1 shall be entitled to not include any privileged or competitively sensitive information, and such entitlement shall expire if such holders, at any time, cease to hold in excess of 1.0% of the New Equity Interests in the aggregate.

### J.    Employment Obligations

Unless otherwise provided herein or the Confirmation Order, specifically rejected pursuant to a separate order of the Bankruptcy Court, specifically designated as a contract or lease to be rejected on the Rejected Executory Contract and Unexpired Lease List, or the subject of a separate rejection motion Filed by the Debtors, and subject to Article V of the Plan, all written employment, confidentiality, non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock units, and other equity awards), discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, vacation, holiday pay, severance, retirement, retention, supplemental retirement, executive retirement, pension, deferred compensation, indemnification, other similar employee-related agreements or arrangements, retirement income plans, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements that are in effect immediately prior to the Effective Date with the Debtors, (a) shall be assumed by the Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date, or (b) solely with the consent of the Required Consenting Lenders, the Reorganized Debtors shall enter into new agreements with such employees on terms and conditions acceptable to the Reorganized Debtors and such employee; *provided, however*, that the Debtors shall not enter into new agreements with insider employees absent the consent of the Required Consenting Lenders.

Notwithstanding the foregoing, and unless otherwise provided in the Plan Supplement, all plans or programs calling for stock grants, stock issuances, stock reserves, or stock options shall be deemed rejected with regard to such issuances, grants, reserves, and options.  The Debtors shall not assume any agreements or obligations relating to the Employee Partnership Sale Units, which shall be cancelled as of the Effective Date and shall receive no payment on account thereof from the Debtors or the Reorganized Debtors.  For the avoidance of doubt, no provision in any agreement, plan, or arrangement to be assumed pursuant to the foregoing paragraph relating to the award of equity or equity-like compensation shall be binding on, or honored by, the Reorganized Debtors.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of

000738
**App. 242**

the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### K.      Management Incentive Plan

On the Effective Date, the Management Incentive Plan Pool shall be reserved for management, key employees, and directors of the Reorganized Debtors.  Following the Effective Date, the New Board will adopt the Management Incentive Plan, the terms of which, including with respect to participants, form, allocation, structure, and vesting, shall be determined by the New Board.  Following the implementation of the Management Incentive Plan, the issuance of the New Equity Interests and any equity reserved for issuance under the Management Incentive Plan (to the extent applicable) shall be authorized without the need for any further corporate action and without any further action by the Debtor and the Reorganized Debtors or any of their equity holders, as applicable.

### L.      Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to the PVKG Note Claims Settlement and Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the PVKG Note Claims Settlement and the releases and exculpations contained in the Plan, including in Article VIII of the Plan.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including the PVKG Note Claims Settlement and Article VIII of the Plan**. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in the Plan, including the PVKG Note Claims Settlement and Article VIII of the Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

000739

**App. 243**

M. **Provisions Regarding Treatment of Executory Contracts and Unexpired Leases**

Article V of the Plan contains additional detailed provisions regarding the treatment of Executory Contracts and Unexpired Leases, including, among other things, (i) the procedures for assumption or rejection of Executory Contracts and Unexpired Leases, (ii) the cure of defaults for assumed Executory Contracts and Unexpired Leases, and (iii) the treatment of Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases.

N. **Provisions Governing Distributions**

Article VI of the Plan contains additional provisions governing Plan distributions, including provisions regarding, among other things, (i) compliance with tax requirements, (ii) undeliverable distributions and unclaimed property, and (iii) Claims paid or payable by third parties.

O. **Provisions Governing Disputed Claims and Interests**

Article VII of the Plan contains provisions regarding the procedures for resolving Disputed Claims.

P. **Settlement, Release, Injunction, and Related Provisions**

1. **Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

2. **Release of Liens**

**Except as otherwise provided in the Exit Facilities Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.C.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or**

32

**other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

        **3.**      **Releases by the Debtors**

      **As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors and the Estates, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the PVKG Notes Purchase Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, the Governance Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding the foregoing, nothing in <u>Article VIII.C</u> of the Plan shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors.**

      **Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising**

000741

**App. 245**

from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) essential to Confirmation of the Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

4.      Releases by Third Parties

Except as otherwise expressly set forth in the Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the PVKG Notes Purchase Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan Supplement, the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, the Exit Facilities Documents, the Governance Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

34

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

5.    Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivate related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan, the Plan Supplement, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.    Injunction

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any

35

**actions to interfere with the implementation or Consummation of the Plan in relation to any Claim or Interest that is extinguished, discharged, or released pursuant to the Plan.**

**Except as otherwise expressly provided in the Plan, the Definitive Documents, or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation pursuant to Article VIII of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties, and/or the Released Parties:**

      **(i)**    **commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;**

      **(ii)**    **enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;**

      **(iii)**    **creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;**

      **(iv)**    **except as otherwise provided under the Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and**

      **(v)**    **commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan or the Confirmation Order.**

**No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan, the Plan Supplement, the PVKG Notes Purchase Agreement, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the**

000744

**App. 248**

**Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.**

**The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.  The injunction in the Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

**Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan, the Confirmation Order, or under any other Definitive Document or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order from bringing an action to enforce the terms of the Plan, the Confirmation Order, the Definitive Documents, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan and the Confirmation Order.**

**Q.      Conditions Precedent to Confirmation and Consummation of the Plan**

**1.      Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

1.      The RSA shall not have been terminated as to the Required Consenting Lenders and shall be in full force and effect;

2.      The Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order, the latter of which shall be in full force and effect;

3.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with and subject to the consent rights set forth in the RSA, and the Confirmation Order shall be in full force and effect;

4.      The 9019 settlements embodied in the Plan shall have been approved by the Bankruptcy Court and incorporated in the Confirmation Order;

5.      The Backstop Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order), and shall be in full force and effect;

6.      The Debtors shall have received a commitment for the Exit ABL Facility, which shall refinance the ABL DIP Facility on the Effective Date and the terms and conditions of which shall be reasonably satisfactory to the Debtors and the Required Consenting Lenders;

37

7.      The Rights Offering and the Direct Investment (including the Rights Offering Documents) shall have been approved by the Bankruptcy Court and shall have been consummated in accordance with their terms;

8.      The Exit ABL Facility Documents and Exit Term Loan Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions;

9.      The New Equity Interests shall have been issued;

10.     All Restructuring Expenses shall have been paid in full in Cash;

11.     The Definitive Documents shall (a) be consistent with the RSA and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the RSA, (b) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (c) shall be adopted on terms consistent with the RSA and the Restructuring Term Sheet; and

12.     The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions.

### 2.      Waiver of Conditions

The conditions to the Effective Date set forth in Article IX of the Plan may be waived, in whole or in part, by the Debtors only with the prior written consent of the Required Consenting Lenders (email shall suffice) and, solely with respect to the condition set forth in Article IX.A of the Plan (1) (solely with respect to the Required Consenting Second Lien Lenders), (9), (10), (11), and (12), the Required Consenting Second Lien Lenders (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

### 3.      Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the RSA shall: (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

## VIII.   PROJECTED FINANCIAL INFORMATION

Attached hereto as **Exhibit C** is a projected consolidated income statement, which includes consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "**Financial Projections**") for the period beginning June 1, 2024 and continuing through 2028.  The Financial Projections are based on an assumed Effective Date of May 31, 2024.

Creditors, equity holders, and other interested parties should see the "Risk Factors" set forth in **Article X** below for a discussion of, among other things, certain factors that may affect the future financial performance of the Reorganized Debtors.

000746

**App. 250**

## IX.  CONFIRMATION OF THE PLAN

### A.  The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  The Confirmation Hearing may be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code and the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation of the Plan.  An objection to Confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.  The Objection Deadline is May 7, 2024, at 4:00 p.m. (prevailing Central Time).

### B.  Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### C.  Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their Advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their Financial Projections.  Creditors and other interested parties should review **Article X** of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.  Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is

000747
**App. 251**

not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[8]

Pursuant to Article III.F of the Plan, if a Class contains Claims is eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

### E.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank *(e.g.,* classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2.      Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe

---

[8]      A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the creditor or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.      Valuation Analysis

The Plan provides for the distribution of the New Equity Interests upon consummation of the rights offering and backstop commitment contemplated by the Plan.  Accordingly, Evercore performed an analysis of the estimated implied equity value of the Debtors as of an assumed Effective Date (the "**Valuation Analysis**") at the Debtors' request.  Based on the Valuation Analysis, which is attached hereto as **Exhibit D**, the Reorganized Debtors will have an implied equity value at emergence of approximately $434 million.

Creditors, equity holders, and other interested parties should see the "Risk Factors" set forth in **Article X** below for a discussion of, among other things, the Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken.  Evercore makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

### G.      Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "**Liquidation Analysis**") prepared by the Debtors with the assistance of the Advisors and reliance upon the valuation methodologies utilized by the Advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

## X.      RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.      General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, Holders of Claims entitled to vote on the Plan should read and carefully consider the factors set forth below,

000749

**App. 253**

as well as other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

**B.  Bankruptcy Law and Chapter 11 Case Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

**1.  The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors**

Subject to the terms of the RSA, if the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets and any other transaction that would maximize the value of the Debtors' estates.  The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it could adversely affect some or all of:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

**2.  Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  Here, it is possible that parties may object to confirmation of the Debtors' Plan on grounds related to how the Claims and Interests are classified in the Plan.  In that case, the cost of the Chapter 11 Cases and time needed to confirm could increase.  This is particularly the case if the Bankruptcy Court concludes that the classification of Claims and/or Interests under the Plan do not comply with the Bankruptcy Code's requirements.  Under such circumstances, the Plan might need to be modified.  Such modification could require the Debtors to re-solicit votes on the Plan before the Plan can be confirmed.

Nevertheless, the Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

000750

**App. 254**

### 3. The Bankruptcy Court May Not Approve the Debtors' Use of Cash Collateral, the ABL DIP Facility or the Term DIP Facility

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to enter into postpetition financing arrangements and use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the DIP Lenders in accordance with the terms of the ABL DIP Documents and Term Loan DIP Documents. Such access to postpetition financing and cash collateral will provide the Debtors with needed liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve the debtor-in-possession financing and/or such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral and postpetition financing. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing and/or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

### 4. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 5. The RSA and the Backstop Agreement May Be Terminated

As more fully set forth in the RSA and the Backstop Agreement, the RSA and Backstop Agreement may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the filing, confirmation, and consummation of the Plan, and breaches by the Debtors, the Consenting Stakeholders, and/or the Consenting Second Lien Lenders of their respective obligations under the documents. In addition, the termination of the RSA constitutes an event of default under the Debtors' Term DIP Credit Agreement. In the event that the RSA or Backstop Agreement is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

000751

**App. 255**

**6.      The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Plan will not take place.  In the event that the Effective Date does not occur, the Debtors may seek confirmation of a new plan.  If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, the Debtors may be forced to liquidate their assets.

**7.      The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that the Plan is not accepted by one or more voting classes, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the RSA.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

**8.      The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with section 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).  Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short under the circumstances.

In addition, Bankruptcy Rule 3018(v) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.  While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**9.      The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the

000752
**App. 256**

Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 10. The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  If the exclusive right expires or the Bankruptcy Court terminates that right, however, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan.

### 11. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

Although uncommon, if the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such cases, a chapter 7 trustee is appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  As set forth in the Liquidation Analysis attached as **Exhibit E**, the Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

000753

**App. 257**

### 12. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the RSA.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 13. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date should occur quickly after the Confirmation Date, and have agreed to a milestone in the RSA in furtherance such quick consummation, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 14. The United States Trustee or Other Parties May Object to the Plan on Account of the Third-Party Release Provisions

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved as currently drafted, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

### 15. The RSA Is Subject to Significant Conditions and Milestones

There are certain material conditions that must be satisfied under the RSA, including the timely satisfaction of milestones in the Chapter 11 Cases.  The ability to timely complete such milestones is subject to risks and uncertainties, certain of which are beyond the Debtors' control.

### C. Risks Related to Recoveries Under the Plan

### 1. Contingencies Could Affect Distributions to Holders of Allowed Claims

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders or Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### 2. The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results

The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance as of the date of this Disclosure Statement, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will

46

be realized and, therefore, the Debtors actual results may differ materially from the Financial Projections. If the Debtors do not achieve their projected financial results, the value of the New Equity Interests may be negatively affected, and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

**3.      The Debtors Will Likely Be Controlled by Significant Holders**

The Investors under the Backstop Agreement will receive the majority of New Equity Interests issued pursuant to the Plan (subject to dilution on account of the Management Incentive Plan and any other shares issued after the Effective Date not pursuant to the Plan).  If the holders of a significant portion of the New Equity Interests were to act as a group, such holders would be in a position to control the outcome of the Reorganized Debtors' actions requiring shareholder approval.

**4.      Estimated Valuations of the Debtors, the Exit Facilities, and the New Equity Interests, and Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent Potential Market Values**

The estimated recoveries to Holders of Allowed Claims pursuant to the Plan are not intended to represent the market value of the New Equity Interests or Exit Term Loans.  The estimated recoveries are based on numerous assumptions (the realization of many of which will beyond the control of the Debtors), including:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

**5.      The Terms of the Governance Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**

The terms of the Governance Documents are subject to change based on negotiations between the Debtors, the Consenting Stakeholders and Consenting Second Lien Lenders pursuant to the terms and conditions of the RSA and Governance Term Sheet attached thereto.  Holders of Claims that are not the Consenting Stakeholders or Consenting Second Lien Lenders will likely not participate in these negotiations and the results of such negotiations may affect the rights of equityholders in New C1 following the Effective Date.

**6.      The New Equity Interests are Subject to Dilution**

The ownership percentage represented by the New Equity Interests distributed on the Effective Date under the Plan will be subject to dilution from any New Equity Interests issued by the Reorganized Debtors after the consummation of the Plan, including pursuant to the Management Incentive Plan.

**7.      The Terms of the Exit Facilities Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**

The terms of the Exit Facilities Documents have not been finalized and are subject to change.  The results of such ongoing negotiations may affect the holders of the New Equity Interests following the Effective Date.  As a result, the final terms of the Exit Facilities Documents may be less favorable to Holders of Claims and Interests than as described herein and in the Plan.

8.      **Certain Tax Implications of the Plan May Increase the Tax Liability of the Reorganized Debtors**

Holders of Allowed Claims should carefully review **Article XII** of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

D.      **Risks Related to the Company's and the Reorganized Debtors' Businesses**

1.      **Operating in Bankruptcy for a Long Period of Time May Harm the Company's Businesses**

The Company's future results are dependent upon the successful confirmation and implementation of a plan of reorganization.  In addition, the Company is relying on an expedited case timeline to maintain its business through this restructuring.  A longer process could have a material adverse effect on the Company's businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Company's businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers could lose confidence in the Company's ability to reorganize their businesses successfully and seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  The chapter 11 proceedings also require the Debtors to seek debtor-in-possession financing to fund operations.  If the Debtors are unable to obtain final approval of such financing on favorable terms or at all, or if the Debtors are unable to fully draw on the availability under the ABL DIP Facility, the chances of successfully reorganizing the Company's businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

2.      **Financial Results May Be Volatile and May Not Reflect Historical Trends**

The Financial Projections attached hereto as **Exhibit C** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Company, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Company and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Company's operations.  There can be no assurance that the projected results will be realized or that actual results will not be subject to significant variations.  These variations may be material and may adversely affect the value of the New Equity Interests, the Company's financial position and the ability of the Company to make payments with respect to its indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Company also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Company's consolidated balance sheets.  The Company's financial results after the application of fresh start accounting also may be different from historical trends.

### 3.   C1's Business Is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

C1's operations are subject to various federal, state and local laws and regulations, including occupational health and safety laws.  The Company may be required to make large expenditures to comply with such regulations.  Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Company to administrative, civil and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

### 4.   The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors, many of which are beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on the Exit Facilities.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance such debt.  These alternative measures may not be available, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

### 5.   The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

It is possible that certain parties will commence litigation with respect to the treatment of their Claims, or other provisions under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  In general, litigation can be expensive and time consuming to bring or defend against and could divert management's attention.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability could thus be material.

000757

**App. 261**

E.      **Risks Related to the Offer and Issuance of Securities Under the Plan**

1.      **The Debtors Do Not Intend to Register the New Equity Interests under the Securities Act and Certain Holders of New Equity Interests May Be Restricted in Their Ability to Transfer or Sell Their Securities**

As summarized in **Article XI** of this Disclosure Statement, entitled "Certain Securities Laws Matters," certain of the New Equity Interests may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and applicable state securities laws.  The Debtors do not currently intend to register the New Equity Interests under the Securities Act.  As a result, certain of the New Equity Interests may be transferred only in transactions exempt from the registration requirements of the Securities Act and applicable state securities laws.

The Debtors believe that all shares of New Equity Interests (other than any New Equity Interests issued pursuant to the Management Incentive Plan, the Holdback and the unsubscribed New Equity Interests and the Put Option Premium issued to the Investors pursuant to the Backstop Agreement) issued after the Petition Date in exchange for the Claims described above will satisfy the requirements of section 1145(a) of the Bankruptcy Code.  Accordingly, the Debtors believe that such New Equity Interests (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be freely tradeable and transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within three months of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission or state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments, subject to any restrictions on the transferability of such New Equity Interests in the New Organizational Documents.

The New Equity Interests, including New Equity Interests issued pursuant to the Management Incentive Plan, the Holdback and the unsubscribed New Equity Interests and Put Option Premium issued to the Investors pursuant to the Backstop Agreement, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable state securities laws.  Holders of such restricted securities may not be entitled to have their restricted securities registered and are not permitted to resell them except in accordance with an available exemption from registration under the Securities Act.  Generally, Rule 144 of the Securities Act would permit the resale of securities received by a Person after a one-year holding period if current information regarding the issuer is publicly available and, under certain circumstances, volume limitations, manner of sale requirements and certain other conditions are met.  These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer.  A non-affiliate who has not been an affiliate of the issuer during the three months preceding a sale may resell restricted securities of an issuer that does not file reports with the United States Securities and Exchange Commission pursuant to Rule 144 after a one-year holding period.  An affiliate may resell restricted securities of an issuer that does not file reports with the United States Securities and Exchange Commission under Rule 144 after such one-year holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 will not be available for resales of such New Equity Interests by affiliates of the issuer.  Restricted securities (as well as other securities held by affiliates) may be resold without holding

50

periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

The Debtors make no representation regarding the right of any Holder of New Equity Interests to freely resell such securities.  *See* **Article XI** of this Disclosure Statement, entitled "Certain Securities Law Matters."

### 2. A Liquid Trading Market for the Shares of New Equity Interests May Not Develop

There is currently no market for the New Equity Interests and there can be no assurance as to the development or liquidity of any market for such securities.  The liquidity of any market for New Equity Interests will depend upon, among other things, the number of holders of shares of New Equity Interests, the Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Equity Interests will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New Equity Interests may be substantially limited.

In addition, the Reorganized Debtors do not expect to be subject to the reporting requirements of the Securities Exchange Act of 1934, together with the rules and regulations promulgated thereunder (the "**Exchange Act**"), and the Reorganized Debtors' equityholders will not be entitled to any information except as expressly required by the Governance Documents.  As a result, the information which the Debtors are required to provide in order to issue the New Equity Interests may be less than the Debtors would be required to provide if the New Equity Interests were registered.  Among other things, the Debtors may not be required to provide: (a) separate financial information for any subsidiary; (b) selected historical consolidated financial data of New C1; (c) selected quarterly financial data of New C1; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers.  This lack of information could impair your ability to evaluate your ownership and the marketability of the New Equity Interests.

### 3. Certain Securities will be Subject to Resale Restrictions

The New Equity Interests to be issued under the Plan will not be registered under the Securities Act, any state securities laws, or the laws of any other jurisdiction.  Such securities are being issued and sold pursuant to an exemption from registration under the applicable securities laws.  Accordingly, such securities will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act, and other applicable law.  In addition, holders of New Equity Interests issued pursuant to section 1145(a) of the Bankruptcy Code who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code will also be subject to resale restrictions.  *See* **Article XI** of this Disclosure Statement for a further discussion of the transfer restrictions applicable to the securities.

### 4. The Debtors Could Modify the Rights Offering and Election Procedures

Subject to the consent of the certain Holders, the Debtors may modify the Rights Offering and Election Procedures to, among other things, include additional procedures, as needed, to effectuate the Rights Offering.  Such modifications may adversely affect the rights of Eligible Offerees.

000759

**App. 263**

5.   **The Trading Price for the New Equity Interests May Be Depressed Following the Effective Date**

Following the Effective Date of the Plan, certain shares of the New Equity Interests may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements.  In addition, Holders of Claims that receive the New Equity Interests may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New Equity Interests available for trading could cause the trading price for the New Equity Interests to be depressed, particularly in the absence of an established trading market for the New Equity Interests.

## XI.   CERTAIN SECURITIES LAW MATTERS

### A.   New Equity Interests

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Equity Interests (i) pursuant to the terms of the Rights Offering and the Backstop Agreement and (ii) pursuant to the Management Incentive Plan Pool.

The Debtors believe that the New Equity Interests will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue-Sky Law.  The Debtors further believe that the offer and sale of the New Equity Interests pursuant to the Plan is, and subsequent transfers of the New Equity Interests by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act, which definition includes "**Controlling Persons**," and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.

The Debtors believe the New Equity Interests issued pursuant to section 1145 of the Bankruptcy Code (i) will not be a "restricted security" as defined in Rule 144(a)(3) under the Securities Act and (ii) will be freely transferable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the provisions of Rule 144 under the Securities Act with respect to a holder thereof that (x) is, or with three months of such transfer has been, an "affiliate" within the meaning of Rule 144(a)(1) or (y) has acquired the New Equity Interests from an "affiliate" in a transaction or chain of transactions not involving any public offering within one year of such transfer; and (c) any restrictions on the transferability of such New Equity Interests, as applicable.

Any New Equity Interests, including the New Equity Interests issued pursuant to the Management Incentive Plan, the Holdback and the unsubscribed New Equity Interests issued to the Investors pursuant to the Backstop Agreement, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

The following discussion of the issuance and transferability of the New Equity Interests relates solely to matters arising under federal and state securities laws.  The rights of holders of New Equity Interests, including the right to transfer such interests, will also be subject to any restrictions in the Governance Documents to the extent applicable.

000760
**App. 264**

**Recipients of the New Equity Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws.**

### B.    Issuance and Resale of New Equity Interests under the Plan

#### 1.    Issuance under Section 1145 of the Bankruptcy Code; Private Placement Exemptions

The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Equity Interests, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on (1) with respect to the New Equity Interests issued pursuant to the Rights Offering (other than the Holdback and the unsubscribed New Equity Interests issued to the Investors pursuant to the Backstop Agreement), section 1145(a) of the Bankruptcy Code, (2) with respect to the New Equity Interests issued pursuant to the Put Option Premium, section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and (3) with respect to the New Equity Interests issued pursuant to the Holdback and the unsubscribed New Equity Interests issued to the Investors pursuant to the Backstop Agreement, section (4)(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Section 1145 of the Bankruptcy Code provides, among other things, that section 5 of the Securities Act and any other applicable U.S. state or local law requirements for the issuance of a security do not apply to the offering, issuance, distribution or sale of stock, options, warrants or other securities by a debtor if (1) the offer or sale occurs under a plan of reorganization, (2) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (3) the securities are issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or are issued principally in such exchange or partly for cash and property.  The Debtors believe that all shares of New Equity Interests (other than any New Equity Interests underlying the Holdback, the unsubscribed New Equity Interests issued to the Investors pursuant to the Backstop Agreement and New Equity Interests and Put Option Premium, each issued pursuant to the Management Incentive Plan) issued after the Petition Date in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

The New Equity Interests underlying the Holdback, the unsubscribed New Equity Interests and Put Option Premium, each issued to the Investors pursuant to the Backstop Agreement and Management Incentive Plan Pool, in each case, may be offered, issued, and distributed pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of New Equity Interests.  **Recipients of the New Equity Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue-Sky Law**.  As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

#### 2.    Resales of New Equity Interests; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with

the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Equity Interests pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of such New Equity Interests who are deemed to be "underwriters" may be entitled to resell their New Equity Interests pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public resale of control securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available, and that volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Equity Interests would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Equity Interests and, in turn, whether any Person may freely trade such New Equity Interests.  However, the Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 will not be available for resales of such New Equity Interests by Persons deemed to be underwriters or otherwise.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN.  ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW EQUITY INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

The New Equity Interests, including the New Equity Interests issued pursuant to the Management Incentive Plan, the Holdback, and the unsubscribed New Equity Interests and Put Option Premium issued to the Investors pursuant to the Backstop Agreement, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

54

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." A non-affiliate who has not been an affiliate of the issuer during the three months preceding a sale may resell restricted securities of an issuer that does not file reports with the United States Securities and Exchange Commission pursuant to Rule 144 after a one-year holding period.  An affiliate may resell restricted securities of an issuer that does not file reports with the United States Securities and Exchange Commission under Rule 144 after such one-year holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Equity Interests by affiliates of the Debtors. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any New Equity Interests offered, issued and distributed pursuant to Regulation S under the Securities Act:  (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions:  (a) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (b) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

The New Equity Interests, including the New Equity Interests issued pursuant to the Management Incentive Plan and the Holdback, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will bear a restrictive legend.

The Debtors will reserve the right to require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of such New Equity Interests.  The Debtors will also reserve the right to stop the transfer of any such New Equity Interests if such transfer is not registered in compliance with Rule 144, or in compliance with another applicable exemption from registration.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the New Equity Interests are exempt from the registration requirements of section 5 of the Securities Act.

In addition to the foregoing restrictions, the New Equity Interests will also be subject to any applicable transfer restrictions contained in the Governance Documents.

**PERSONS WHO RECEIVE "RESTRICTED SECURITIES" UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND**

000763
**App. 267**

THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF NEW EQUITY INTERESTS MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under U.S. federal income tax laws (including, for example, banks, brokers dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. Holders who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only

56

Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. In particular, this summary does not discuss the tax consequences of the entitlements and obligations under the Backstop Agreement to which certain Holders are party. This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "**U.S. Holder**" is a Holder of a Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "**Non-U.S. Holder**" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

      **B.**      **Restructuring Transactions**

The Debtors expect that New C1, the issuer of the Rights and New Equity Interests, will be PVKG Investment Holdings, Inc., and that PVKG Intermediate Holdings, Inc. will be the issuer of the Takeback Term Loans, even though the debt instruments underlying the First Lien Claims were issued by its subsidiary, ConvergeOne Holdings, Inc. In addition, because New C1 is also the PVKG Lender, the Debtors expect that, as the first step of the Restructuring Transactions, PVKG Lender will distribute the PVKG Note Claims to ConvergeOne Investment LP, the sole owner of PVKG Lender (and sole indirect owner of the Existing C1 Interests), in redemption of 100% of the equity of PVKG Lender (the "**Redemption**"). The Debtors further expect that PVKG Investment Holdings Inc. will contribute the Rights and New Equity Interests to PVKG Intermediate Holdings, Inc., and on the Effective Date, PVKG Intermediate Holdings, Inc. will transfer (i) the Rights, together with the Takeback Term Loans, to the

57

Holders of First Lien Claims in exchange for the First Lien Claims (the "**First Lien Exchange**"), and (ii) the New Equity Interests to the Holders of Second Lien Claims in exchange for the Second Lien Claims (the "**Second Lien Exchange**," and together with the First Lien Exchange, the "**Exchange**"), in each case pursuant to the Plan.

For U.S. federal income tax purposes, if the Restructuring Transactions are structured as described above and no other relevant elections are made or transactions undertaken, the Debtors intend to take the position that each of the Redemption and the Exchange is treated as a taxable transaction. There can be no assurance, however, that the IRS may not assert, or that a court may not sustain, a different position. The tax consequences to the Debtors, Reorganized Debtors and Holders of Claims described herein could be materially different in the event the U.S. federal tax characterization of the Redemption and the Exchange is not respected, or in the event that the Debtors consummate Restructuring Transactions that differ from the transactions described above. The remainder of this disclosure assumes that the Restructuring Transactions will be structured as described above and that each of the Redemption and Exchange will be treated as taxable transactions for U.S. federal income tax purposes.

The steps to be utilized to consummate the Plan, along with the go forward tax structure of New C1 and its subsidiaries, will be addressed in greater detail in the Description of Transaction Steps (as described in the Plan), and supplemental tax disclosure may be provided in connection therewith.

    **C.**    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors**

        **1.**    **General**

Each of the Debtors is organized in the United States and is either a member of an affiliated group of corporations that files consolidated federal income tax returns with PVKG Investment Holdings, Inc. as the common parent (such consolidated group, the "**C1 Group**") or is an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the C1 Group. The Debtors estimate that, as of December 31, 2023, the C1 Group had a consolidated net operating loss ("**NOL**") of approximately $24.3 million, among other tax attributes, including tax basis in assets, and approximately $512.9 million of business interest expense deductions deferred under section 163(j) of the IRC ("**Section 163(j) Carryforwards**"). The amount of C1 Group NOLs, Section 163(j) Carryforwards and other tax attributes, as well as the application of any limitations thereon, remains subject to review and adjustment, including by the IRS. As discussed below, certain of the Debtors' tax attributes are expected to be significantly reduced or eliminated entirely upon implementation of the Plan as a result of the recognition of "cancellation of indebtedness income" ("**COD Income**"). The Debtors may also incur other income in connection with the implementation of the Plan, as discussed below. Furthermore, the Reorganized Debtors' use of remaining tax attributes following emergence (as described below) is expected to be subject to limitation under sections 382 and 383 of the IRC.

        **2.**    **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income to the Debtors, in general, will be the excess of (a) the adjusted issue price of the First Lien Claims, Second Lien Claims and General Unsecured Claims, in each case constituting indebtedness, that is satisfied, over (b) the sum of (i) the issue price of the Takeback Term Loans, and (ii) the fair market value of the Rights and New Equity Interests and any other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the IRC, a taxpayer will not, however, be required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy

Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors remain subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers.  Section 163(j) Carryforwards are not subject to reduction under these rules.  Except as discussed in "—*Other Income*" below, any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations.  Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction.  To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member.  If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income.  The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of the Takeback Term Loans and the fair market value of the Rights and New Equity Interests, and any other consideration, none of which can be determined until after the Plan is consummated.  However, the Debtors expect that the amount of such COD Income will eliminate their NOLs and certain other carryforwards allocable to periods prior to the Effective Date, and may significantly reduce the Debtors' tax basis in their assets.

### 3.    Other Income

The Debtors may incur other income for U.S. federal income tax purposes in connection with the Restructuring Transactions that, unlike COD Income, generally will not be excluded from the Debtors' U.S. federal taxable income.  For example, if it is determined that an entity in the C1 Group recognizing CODI Income has a so-called "excess loss account"[9] with respect to its stock and recognizes COD Income that is excluded from gross income pursuant to section 108 of the IRC (as discussed above), the C1 Group will recognize taxable income to the extent its tax attributes are not otherwise reduced by such excluded COD Income.  Although as part of the Restructuring Transactions the Debtors expect to eliminate any excess loss accounts existing prior to the Exchange, no assurance can be given that the IRS will respect the ordering of the steps pursuant to which such elimination takes place.  In addition, the U.S. federal income tax considerations relating to the Plan are complex and subject to uncertainties.  No assurance can be given that the IRS will agree with the Debtors' interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to effect the Plan.  If the IRS were to successfully challenge any such interpretation or position, the Debtors may recognize additional taxable income for U.S. federal

---

[9]    Within a consolidated group, a corporation's basis in the stock of a subsidiary corporation generally is (i) increased by the income of such subsidiary and any contributions to such subsidiary and (ii) decreased by any losses of such subsidiary which are used by the group and by any distributions from such subsidiary.  If total net reductions exceed the parent's initial basis in the subsidiary stock, the excess is called an "excess loss account" or "ELA" and is treated as negative basis.  The consolidated group must include the ELA in income upon the occurrence of certain events, including to the extent the subsidiary has COD Income in excess of reduced tax attributes.  In general, the subsidiary's tax attributes cannot be used to offset such income.

000767
**App. 271**

income tax purposes, and the Debtors may not have sufficient deductions, losses or other attributes for U.S. federal income tax purposes to fully offset such income.

### 4.    Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

Under sections 382 and 383 of the IRC, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, Section 163(j) Carryforwards, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "**Pre-Change Losses**") that may be utilized to offset future taxable income generally are subject to an annual limitation.  For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of the Rights (and subsequent subscription for New Equity Interests) and New Equity Interests pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

As a result of the attribute reductions described above, the Reorganized Debtors are not expected to have any meaningful tax attributes that would be subject to limitations under sections 382 or 383 of the IRC, except for Section 163(j) Carryforwards.  However, due to the general limit on the usability of Section 163(j) Carryforwards (*i.e.*, 30% of EBIT), and the fact that interest deductions will be generated on the Takeback Term Loans following the Effective Date that will also subject to such limitation, any limitations under section 382 of the IRC are not expected to restrict the Reorganized Debtors ability to deduct the maximum allowable interest under the general limitation.  In addition, the Reorganized Debtors do not expect to have a net unrealized built-in loss at the time of the ownership change.  Accordingly, the rules regarding determining the limitations under section 382, including special rules that apply when a corporation undergoes an "ownership change" as a result of a bankruptcy proceeding, are not discussed further herein.

### D.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Claims Entitled to Vote on the Plan

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan, including the steps described above.  U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

### 1.    Redemption of Equity of PVKG Lender

As noted above, prior to the exchange of consideration under the Plan for First Lien Claims, PVKG Investment Holdings Inc., as the Holder of the PVKG Note Claims, expects to distribute the PVKG Note Claims to ConvergeOne Investment LP, the sole owner of PVKG Lender (and the sole indirect owner of the Existing C1 Interests), in redemption of 100% of the equity of PVKG Lender.  Other than the U.S.

60

federal income tax consequences of such transfer discussed below, the discussion herein does not discuss the U.S. federal income tax consequences of other transfer of any Claims (including subsequent transfers of the PVKG Note Claims).

The treatment of this transaction for U.S. federal income tax purposes generally will depend on whether the Redemption qualifies as a sale of the equity of PVKG Lender under section 302 of the IRC that is taxable as described below, or rather as a distribution that is taxable as described below under the heading "— *Dividends on New Equity Interests.*" Generally, whether a redemption qualifies for sale or distribution treatment will depend largely on the total number of shares held or treated as held by a holder immediately after the redemption relative to the total number of shares held or treated as held by the holder immediately before such redemption.

The Redemption generally will be treated as a sale of the equity of PVKG Lender (rather than as a distribution) if the Redemption (i) is "substantially disproportionate" with respect to ConvergeOne Investment LP, (ii) results in a "complete termination" of ConvergeOne Investment LP's interest in PVKG Investment Holdings, Inc. or (iii) is "not essentially equivalent to a dividend" with respect to ConvergeOne Investment LP.

The IRS has indicated in published rulings that in situations where a redemption is accompanied by an issuance of stock, and both steps are clearly part of an integrated plan to reduce a shareholder's interest in a redeeming corporation, effect will be given only to the overall result for purposes of determining whether any of the foregoing tests are satisfied. In addition, in determining whether any of the foregoing tests are satisfied, a shareholder generally takes into account not only stock actually owned by it, but also shares that are constructively owned by it. Accordingly, whether the Redemption will be treated as a sale of equity of PVKG Lender will depend on the ownership of PVKG Investment Holdings, Inc. following all of the Restructuring Steps and the consummation of the Plan. In particular, in measuring the total number of shares of PVKG Investment Holdings, Inc. held or treated as held by a ConvergeOne Investment LP immediately after the Redemption relative to the total number of shares in PVKG Investment Holdings, Inc. held or treated as held by ConvergeOne Investment LP immediately before such redemption, the issuance of New Equity Interests pursuant to the Holdback and the Second Lien Exchange, exercise of the Rights, and payment of the Put Option Premium (including to issuances to affiliates of ConvergeOne Investment LP under the constructive ownership rules) should be taken into account.

In order to meet the substantially disproportionate test, the percentage of outstanding voting stock of PVKG Investment Holdings, Inc. actually and constructively owned by ConvergeOne Investment LP immediately following the Redemption must, among other requirements, be less than 80% of such voting stock actually and constructively owned by ConvergeOne Investment LP immediately before the Redemption. The Redemption will not be essentially equivalent to a dividend if such Redemption results in a "meaningful reduction" of ConvergeOne Investment LP's interest in PVKG Investment Holdings, Inc. Whether this test will be satisfied will depend on the particular facts and circumstances. In particular, the IRS has indicated in a published ruling that the factors to be considered in this analysis include a reduction in a shareholder's right to (i) vote and exercise control, (ii) participate in current earnings and accumulated surplus, and (iii) share in net assets on liquidation. The reduction in the right to vote is of particular significance when a redemption causes a redeemed shareholder to lose the potential for controlling the redeeming corporation.

ConvergeOne Investment LP's interest in PVKG Investment Holdings, Inc. is not expected to result in a complete termination of its interest because ConvergeOne Investment LP and/or its Affiliates are expected to receive New Equity Interests pursuant to the Rights Offering and the Holdback. However, given that ConvergeOne Investment LP's ownership in PVKG Investment Holdings, Inc. (including through constructive ownership) following the Restructuring Transactions is expected to be less than 50%, it is expected that the Redemption will result in a "meaningful reduction," and, depending on the exact percentage of such ownership, will meet the substantially disproportionate test. If none of the foregoing

000769
**App. 273**

tests are satisfied, then the Redemption might be treated as a distribution and the tax effects will be as described below under "—*Dividends on New Equity Interests*."

Assuming the Redemption qualifies as a sale of the equity of PVKG Lender under section 302 of the IRC, ConvergeOne Investment, LP generally will recognize gain or loss in an amount equal to the (a) the fair market value of the PVKG Note Claims <u>minus</u> (b) ConvergeOne Investment LP's adjusted tax basis in its PVKG Lender equity.  Any such capital gain or loss generally will be long-term capital gain or loss if ConvergeOne Investment, LP's holding period for the C1 Existing Interests exceeds one year.  If ConvergeOne Investment, LP acquired equity of PVKG Lender on different dates or at different prices, it should consult with its tax advisor to determine how the above rules apply to it.  Long-term capital gains recognized by non-corporate beneficial owners will be eligible to be taxed at reduced rates.  The deductibility of capital losses is subject to limitations.  ConvergeOne Investment, LP's initial basis in the PVKG Note Claims will equal its fair market value, and ConvergeOne Investment, LP's holding period with respect to the PVKG Note Claims would begin the day after the Redemption.

No assurance can be given that the IRS will agree with the Debtors' interpretations of the tax rules applicable to, or tax positions taken with respect to, the Redemption.  In particular, it is possible that the Redemption, viewed together with the subsequent receipt of the Rights and Takeback Term Loan in respect of the PVKG Note Claims could be viewed as a partially tax-free recapitalization, in which case the U.S. federal income tax consequences could be materially different than as described above.  The Holders of PVKG Note Claims are urged to consult their tax advisors regarding the U.S. federal income tax consequences of the Redemption.  The remainder of this discussion assumes that the Redemption will be respected as a sale of equity of PVKG Lender under section 302 of the IRC.

### 2.    Treatment of Holders of First Lien Claims

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed First Lien Claim will receive its Pro Rata share of (as adjusted pursuant to the Plan and Backstop Agreement) (a) the Takeback Term Loan Recovery Option, or (b) the Rights Offering Rights and Takeback Term Loan Recovery Option.

As described above, the Debtors and Reorganized Debtors currently intend to treat the distributions under the Plan to Holders of First Lien Claims as a fully taxable exchange of such Claims pursuant to section 1001 of the IRC.  A U.S. Holder of a First Lien Claim who is subject to this treatment should recognize gain or loss equal to: (a) the sum of (i) the fair market value of the Rights received, if applicable, and (ii) the issue price of the Takeback Term Loans received (determined as discussed below), minus (b) the U.S. Holder's adjusted tax basis in its First Lien Claim.  Such U.S. Holder should obtain a tax basis equal to the consideration's fair market value (or issue price, in the case of debt instruments) as of the date such consideration is distributed to the U.S. Holder.  The holding period for any such property should begin on the day following the receipt of such consideration.

The character of gain or loss arising from such exchange as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  To the extent that a portion of the consideration received by a U.S. Holder in exchange for its Claim is allocable to accrued but untaxed interest or OID, or market discount, a U.S. Holder may recognize ordinary income.  See the discussions of "Accrued Interest," "Market Discount" and "Limitations on Use of Capital Losses" below.

No assurance can be given that the IRS will agree with the Debtors' interpretations of the tax rules applicable to, or tax positions taken with respect to, the First Lien Exchange.  In particular, it is possible

000770

**App. 274**

that the First Lien Claims could be treated as having been exchanged pursuant to a non-taxable transaction (including, for instance, in a transaction to which section 368 of the IRC applies) in which case the U.S. Holders would recognize gain only to the extent of the Rights received by them, and would not be entitled to claim any losses. U.S. Holders are urged to consult their own tax advisors regarding the tax treatment of the First Lien Exchange.

**(a)**      **Treatment of Holders of First Lien Claims of the Rights**

The Reorganized Debtors intend to take the position that a U.S. Holder of a First Lien Claim that elects to exercise Rights received as part of its Plan distribution should be treated as purchasing, in exchange for its Rights and the amount of cash paid by the U.S. Holder to exercise such Rights, New Equity Interests. Such a purchase should generally be treated as the exercise of an option under general U.S. federal income tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises the Rights.

A U.S. Holder's aggregate tax basis in the New Equity Interests purchased through the Rights Offering should equal the sum of (a) the amount of cash paid by the U.S. Holder to exercise the Rights, plus (b) such U.S. Holder's tax basis in the Rights immediately before exercise. A U.S. Holder's holding period for the Takeback Term Loans and the New Equity Interests received pursuant to such exercise should begin on the day following the Effective Date. Except as otherwise specifically provided here the remainder of this discussion assumes that the Rights will be so exercised by the Holders.

A U.S. Holder that elects not to exercise the Rights may be entitled to claim a (likely short-term capital) loss equal to the amount of tax basis allocated to such Rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses. U.S. Holders electing not to exercise their Rights should consult with their own tax advisors as to the tax consequences of such decision.

**(b)**      **Accrued Interest**

To the extent that any amount received by a U.S. Holder of a Claim under the Plan is attributable to accrued but untaxed interest (or original issue discount ("**OID**")) on the debt instruments constituting the exchanged Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest (or OID) on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on its Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Claims will be allocated first to the principal amount of the applicable Claim, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**(c)**      **Market Discount**

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments

63

constituting the Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a *de minimis* amount (equal to 1/4th of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

**(d)      Limitations on Use of Capital Losses**

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**3.      Treatment of Holders of Second Lien Claims**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each U.S. Holder of an Allowed Class 4 Second Lien Claim will, to the extent the Holders of Allowed Second Lien Claims vote as a class to accept the Plan, receive its Pro Rata share of the Second Lien Recovery.

As described above, the Debtors and Reorganized Debtors currently intent to treat the distributions under the Plan to Holders of Second Lien Claims as a fully taxable exchange of such Claims pursuant to section 1001 of the IRC.  A U.S. Holder of a Second Lien Claim who is subject to this treatment should recognize gain or loss equal to: (a) the fair market value of the New Equity Interests received, minus (b) the U.S. Holder's adjusted tax basis in its Second Lien Claim. Such U.S. Holder should obtain a tax basis equal to the  fair market value of the New Equity Interests as of the date such consideration is distributed to the U.S. Holder.  The holding period for the New Equity Interests should begin on the day following the receipt of such consideration.

The character of gain or loss arising from such exchange will be determined pursuant to the same factors as discussed above with respect to Treatment of Holders of First Lien Claims.  To the extent that a portion of the consideration received by a U.S. Holder in exchange for its Claim is allocable to accrued but untaxed interest or OID, or market discount, a U.S. Holder may recognize ordinary income.  See the discussions of "Accrued Interest," "Market Discount" and "Limitations on Use of Capital Losses" above.

No assurance can be given that the IRS will agree with the Debtors' interpretations of the tax rules applicable to, or tax positions taken with respect to, the Second Lien Exchange.  In particular, it is possible that the Second Lien Claims could be treated as having been exchanged pursuant to a non-taxable transaction (including, for instance, in a transaction to which section 351 of the IRC applies) in which case

the U.S. Holders would generally not recognize any gain or loss in connection with the transaction.  U.S. Holders are urged to consult their own tax advisors regarding the tax treatment of the Second Lien Exchange.

4. **U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Takeback Term Loans**

(a) **Payments of Qualified Stated Interest**

Payments or accruals of "qualified stated interest" (as defined below) on the Takeback Term Loans will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes.  The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the Takeback Term Loans, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

(b) **Original Issue Discount**

Where, as here, U.S. Holders of First Lien Claims receiving debt instruments are also receiving other property in exchange for their Claims (*i.e.,* the Rights), the "investment unit" rules may apply to the determination of the "issue price" for any debt instrument received in exchange for their First Lien Claims. In such case, the issue price of the Takeback Term Loans will depend, in part, on the issue price of the "investment unit" (*i.e.,* the Takeback Term Loans and the Rights), and the respective fair market values of the elements of consideration that comprise the investment unit.  The issue price of an investment unit is generally determined in the same manner as the issue price of a debt instrument.  As a result, the issue price of the investment unit will depend on whether the investment unit is considered, for U.S. federal income tax purposes and applying rules similar to those applied to debt instruments, to be traded on an established market.  In general, consideration can be treated as being traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes available with respect to the items discussed below.  Additionally, when determining fair market value under these rules, actual trades and firm quotes will generally be dispositive, while it may be possible to refute the application of mere "indicative" quotes if such indicative quotes "materially misrepresent the fair market value of the property" being valued.

If neither the investment unit nor the components thereof nor the surrendered First Lien Claims are publicly traded on an established market, then the issue price of the Takeback Term Loans would generally be determined under section 1273(b)(4) or 1274 of the IRC, as applicable.  If neither the investment unit nor the components thereof are publicly traded on an established market, but the First Lien Claims are so traded, then the issue price of the investment unit will be determined by the fair market value of the First Lien Claims.

If the investment unit received in exchange for First Lien Claims is considered to be publicly traded on an established market, the issue price of the investment unit would be the fair market value of the investment unit.  The law is somewhat unclear on whether an investment unit is treated as publicly traded if some, but not all, elements of such investment unit are publicly traded.  In the event that the Takeback Term Loans are publicly traded on an established market but the Rights are not treated as publicly traded on an established market, the determination of the issue price of the loans under the Takeback Term Loans is unclear.  Such issue price could be based on (i) in the case where the First Lien Claims are also publicly traded on an established market, on the trading value of such First Lien Claims, allocated as described below, (ii) based on the demonstrated trading price of the Takeback Term Loans, or (iii) the stated redemption price at maturity of the Takeback Term Loans.

65

If an issue price is determined for the investment unit received in exchange for surrendered First Lien Claims under the above rules, then the issue price of an investment unit is allocated among the elements of consideration making up the investment unit based on their relative fair market values, with such allocation determining the issue price of the Takeback Term Loans.

As a general matter, debt instruments in a single "issue" will be treated as having the same adjusted issue price, even if they were acquired for differing amounts or kinds of consideration and even if the rules discussed above would, applied separately, result in different adjusted issue prices.  The Debtors intend to take the position that the Takeback Term Loans issued in exchange for the PVKG Note Claims and the other First Lien Claims are part of a single "issue" for U.S. federal income tax purposes, and that, if the issue price of the Takeback Term Loans, or the investment unit of which the Takeback Term Loans are a component, is based on the trading value of the First Lien Claims, other than the PVKG Note Claims, such trading value would also be determinative of the issue price of the Takeback Term Loans issued in partial exchange of the PVKG Note Claims.

An issuer's allocation of the issue price of an investment unit is binding on all U.S. Holders of the investment unit unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit.

As discussed above, a debt instrument, such as the Takeback Term Loans, is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a *de minimis* amount.  A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in cash at least annually.  The interest on the Takeback Term Loans is expected to be unconditionally payable in cash at least annually.  However, the Takeback Term Loans may be considered to be issued with OID to the extent the allocation rules described above result in the Takeback Term Loans having an issue price that is less than their stated redemption price at maturity.

For purposes of determining whether there is OID, the *de minimis* amount is generally equal to 1/4th of 1 percent of the principal amount of the Takeback Term Loans multiplied by the remaining number of complete years to maturity from their original issue date, or if the Takeback Term Loans provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations).  If the Takeback Term Loans are issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the Takeback Term Loans, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any cash payment on the Takeback Term Loans that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on the Takeback Term Loans is *de minimis,* rather than being characterized as interest, any payment attributable to the *de minimis* OID will be treated as gain from the sale of the Takeback Term Loans, and a Pro Rata amount of such *de minimis* OID must be included in income as principal payments are received on the Takeback Term Loans].

**(c)     Sale, Taxable Exchange, or other Taxable Disposition**

Upon the disposition of the Takeback Term Loans by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest or OID, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the Takeback Term Loans, as applicable (as discussed above). A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income.  A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if at the time of the taxable disposition, the U.S. Holder has held

66

the Takeback Term Loans for more than one year.  Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.

The treatment of the exchange to the extent a portion of the consideration received is allocable to market discount, which differs from the treatment described above, is discussed above.

### 5. U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Equity Interests Received in the Second Lien Exchange and Following Subscription of Rights

#### (a) Dividends on New Equity Interests

Holders of First Lien Claims will have the option of selecting the Rights Offering Rights and Takeback Term Loan Recovery Option, under which the Holder will receive Rights to purchase New Equity Interests.  Each Holder of a First Lien Claim that properly exercises its Rights to purchase New Equity Interests shall receive such New Equity Interests on the Effective Date.  Any distributions made on account of such New Equity Interests and New Equity Interests received pursuant to the Second Lien Exchange will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of New C1 as determined under U.S. federal income tax principles.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Equity Interests.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

#### (b) Sale, Redemption, or Repurchase of New Equity Interests

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Equity Interests.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Equity Interests for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below.  Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Equity Interests as ordinary income if such U.S. Holder took a bad debt deduction with respect to its First Lien Claims or recognized an ordinary loss on the exchange of its First Lien Claims for the Rights.

### 6. Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

000775

**App. 279**

E.      **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims Entitled to Vote on the Plan**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the receipt, ownership and disposition of the Takeback Term Loans, Rights and/or New Equity Interests, as applicable.

1.      **Gain Recognition**

Any gain realized by a Non-U.S. Holder on the exchange of its Claims generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply).  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and of Owning and Disposing of Takeback Term Loans**

(a)      **Payments of Interest (Including Interest Attributable to Accrued but Untaxed Interest)**

Subject to the discussion of backup withholding and FATCA below, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest, including in each case any such amounts paid to a Non-U.S. Holder under the Plan) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder may qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

•      the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in the issuer of the applicable debt within the meaning of section 871(h)(3) of the IRC and Treasury Regulations thereunder;

•      the Non-U.S. Holder is not a controlled foreign corporation related to the issuer of the applicable debt, actually or constructively through the ownership rules under section 864(d)(4) of the IRC;

68

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives the applicable paying agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest on the Takeback Term Loans paid to a Non-U.S. Holder or interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest on the Takeback Term Loans or interest paid to a Non-U.S. Holder pursuant to the Plan is effectively connected with a trade or business in the United States ("**ECI**") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, provided the appropriate statement is provided to the applicable paying agent) unless an applicable income tax treaty provides otherwise. To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

**(b)     Sale, Taxable Exchange, or Other Disposition of the Takeback Term Loans**

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of the Takeback Term Loans (other than any amount representing accrued but unpaid interest on the loan) unless:

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of the Takeback Term Loans under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above in "Payments of Interest (Including Interest Attributable to Accrued, Untaxed Interest)." To claim an exemption from withholding, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower applicable income tax treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.

3.   **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Equity Interests Received in the Second Lien Exchange and Following Subscription of Rights**

(a)   **Dividends on New Equity Interests**

Any distributions made with respect to New Equity Interests, received on account of properly subscribed Rights or in the Second Lien Exchange (other than certain distributions of stock of New C1) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of New C1, as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain). Except as described below, dividends paid with respect to New Equity Interests held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Equity Interests held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If New C1 is considered a "U.S. real property holding corporation" (a "**USRPHC**"), distributions to a Non-U.S. Holder will generally be subject to withholding by New C1 at a rate of 15 percent to the extent they are not treated as dividends. In the event the New Equity Interests are regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of equity interests that includes New Equity Interests during a specified testing period. Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations. The Debtors do not believe they are, and do not believe that New C1 will be,

000778

USRPHCs, in light of the nature of their assets and business operations, but no formal study has been or will be conducted in this regard.

**(b)      Sale, Redemption, or Repurchase of New Equity Interests**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Equity Interests of New C1 unless:

(i)      such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

(ii)     such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(iii)    the issuer of such New Equity Interests is or has been during a specified testing period a "USRPHC" (as discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Equity Interests.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  As discussed above, the Debtors do not believe they are, and do not believe New C1 will be, USRPHCs, in light of the nature of their assets and business operations.

**4.      FATCA**

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("**FATCA**"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**F.      Information Reporting and Back-Up Withholding**

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns

000779

**App. 283**

reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  April 3, 2024                                  ConvergeOne Holdings, Inc.
                                                       on behalf of itself and all other Debtors


                                            By:   */s/ Jeffrey Russell*
                                                  ConvergeOne Holdings, Inc.

000780
**App. 284**

**<u>Exhibit A</u>**

**Prepackaged Plan of Reorganization**

000781

*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90194 (CML) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES

THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

**WHITE & CASE LLP**
Bojan Guzina (*pro hac vice* pending)
Andrew F. O'Neill (*pro hac vice* pending)
Erin R. Rosenberg (*pro hac vice* pending)
Blair M. Warner (*pro hac vice* pending)
Adam T. Swingle (*pro hac vice* pending)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
Email:  bojan.guzina@whitecase.com
        aoneill@whitecase.com
        erin.rosenberg@whitecase.com
        blair.warner@whitecase.com
        adam.swingle@whitecase.com

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated: April 3, 2024

---

[1]   The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
     AND GOVERNING LAW ........................................................................................ 1
   A.   Defined Terms. ................................................................................................ 1
   B.   Rules of Interpretation. ................................................................................. 20
   C.   Computation of Time. .................................................................................. 20
   D.   Governing Law. ............................................................................................ 20
   E.   Reference to Monetary Figures. ................................................................... 21
   F.   Controlling Document. ................................................................................. 21
   G.   Consent Rights. ............................................................................................ 21

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ............................................ 21
   A.   Administrative Claims. ................................................................................. 22
   B.   DIP Claims. .................................................................................................. 22
   C.   Professional Fee Claims. .............................................................................. 23
   D.   Priority Tax Claims. ..................................................................................... 24
   E.   Restructuring Expenses. ............................................................................... 24

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............ 24
   A.   Classification of Claims and Interests. ........................................................ 24
   B.   Formation of Debtor Groups for Convenience Only. ................................... 25
   C.   Treatment of Claims and Interests. .............................................................. 25
   D.   Special Provision Governing Unimpaired Claims. ...................................... 29
   E.   Elimination of Vacant Classes. .................................................................... 29
   F.   Acceptance by Impaired Classes. ................................................................ 29
   G.   Voting Classes, Presumed Acceptance by Non-Voting Classes. ................. 29
   H.   Intercompany Interests. ................................................................................ 30
   I.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .... 30
   J.   No Substantive Consolidation. .................................................................... 30
   K.   Controversy Concerning Impairment. ......................................................... 30
   L.   Subordinated Claims. ................................................................................... 30

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ...................................... 31
   A.   General Settlement of Claims and Interests. ................................................ 31
   B.   PVKG Note Claims Settlement. .................................................................. 31
   C.   Restructuring Transactions. .......................................................................... 32
   D.   The Reorganized Debtors. ............................................................................ 32
   E.   Sources of Consideration for Plan Distributions. ......................................... 32
   F.   Corporate Existence. .................................................................................... 35
   G.   Vesting of Assets in the Reorganized Debtors. ........................................... 35
   H.   Cancellation of Existing Agreements and Interests. .................................... 35
   I.   Corporate Action. ........................................................................................ 36
   J.   Governance Documents. ............................................................................... 36
   K.   Directors and Officers of the Reorganized Debtors. .................................... 37
   L.   Effectuating Documents; Further Transactions. .......................................... 38
   M.   Certain Securities Law Matters. ................................................................... 38
   N.   Section 1146 Exemption. ............................................................................. 38
   O.   Employment Obligations. ............................................................................ 39
   P.   Management Incentive Plan. ......................................................................... 40
   Q.   Preservation of Causes of Action. ............................................................... 40
   R.   Dissolution of Certain Debtors. ................................................................... 41
   S.   Closing the Chapter 11 Cases. ..................................................................... 41

000783
**App. 287**

T.      Post-Effective Date Payment of Restructuring Expenses. ................................. 41

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 41

A.      Assumption of Executory Contracts and Unexpired Leases. ........................... 41
B.      Indemnification Obligations. .......................................................................... 42
C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. ..................... 43
D.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .................. 43
E.      Insurance Policies. .......................................................................................... 44
F.      Workers' Compensation Program ................................................................... 44
G.      Reservation of Rights. .................................................................................... 45
H.      Nonoccurrence of Effective Date .................................................................. 45
I.      Contracts and Leases Entered Into After the Petition Date. ........................... 45

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................ 45

A.      Distributions on Account of Claims Allowed as of the Effective Date. .......... 45
B.      Distribution Agent. ......................................................................................... 46
C.      Rights and Powers of the Distribution Agent. ................................................ 46
D.      Special Rules for Distributions to Holders of Disputed Claims. .................... 46
E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...... 46
F.      Manner of Payment. ....................................................................................... 47
G.      Compliance with Tax Requirements. .............................................................. 47
H.      Allocations. ..................................................................................................... 48
I.      No Postpetition Interest on Claims. ............................................................... 48
J.      Foreign Currency Exchange Rate. .................................................................. 48
K.      Setoffs and Recoupment. ............................................................................... 48
L.      Claims Paid or Payable by Third Parties. ....................................................... 48

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ....................................................................................... 49

A.      Disputed Claims Process. ............................................................................... 49
B.      Allowance of Claims. ..................................................................................... 50
C.      Claims Administration Responsibilities. ........................................................ 50
D.      Adjustment to Claims or Interests Without Objection. ................................... 50
E.      Distributions After Allowance. ...................................................................... 51

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............ 51

A.      Discharge of Claims and Termination of Interests. ........................................ 51
B.      Release of Liens. ............................................................................................ 51
C.      Releases by the Debtors. ................................................................................ 52
D.      Releases by Third Parties. .............................................................................. 53
E.      Exculpation. ................................................................................................... 54
F.      Injunction. ...................................................................................................... 55
G.      Waiver of Statutory Limitations on Releases. ................................................ 56
H.      Protections Against Discriminatory Treatment. ............................................. 56
I.      Document Retention. ...................................................................................... 57
J.      Reimbursement or Contribution. .................................................................... 57

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN ...................... 57

A.      Conditions Precedent to the Effective Date. .................................................. 57
B.      Waiver of Conditions. .................................................................................... 58
C.      Substantial Consummation. ............................................................................ 58
D.      Effect of Failure of Conditions. ..................................................................... 58

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN .................... 58

|     | A. | Modification and Amendments | 58 |
|     | B. | Effect of Confirmation on Modifications. | 59 |
|     | C. | Revocation or Withdrawal of Plan | 59 |

ARTICLE XI. RETENTION OF JURISDICTION ................................................. 59

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................. 62

|     | A. | Immediate Binding Effect. | 62 |
|     | B. | Waiver of Stay. | 62 |
|     | C. | Additional Documents. | 63 |
|     | D. | Payment of Statutory Fees. | 63 |
|     | E. | Statutory Committee and Cessation of Fee and Expense Payment | 63 |
|     | F. | Reservation of Rights. | 63 |
|     | G. | Successors and Assigns. | 63 |
|     | H. | Notices. | 63 |
|     | I. | Term of Injunctions or Stays | 65 |
|     | J. | Entire Agreement. | 65 |
|     | K. | Exhibits. | 65 |
|     | L. | Deemed Acts. | 65 |
|     | M. | Nonseverability of Plan Provisions. | 65 |
|     | N. | Votes Solicited in Good Faith. | 66 |
|     | O. | Request for Expedited Determination of Taxes. | 66 |
|     | P. | Closing of Chapter 11 Cases. | 66 |
|     | Q. | Waiver or Estoppel. | 66 |

000785

**App. 289**

**INTRODUCTION**

ConvergeOne Holdings, Inc. and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in **Article I.A** of this Plan. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    Defined Terms.

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "ABL DIP Agent" means Wells Fargo Commercial Distribution Finance, LLC.

2.    "ABL DIP Commitment Letter" means the commitment letter, as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, entered into between the Debtors, the ABL DIP Agent, and the ABL DIP Lenders, pursuant to which the ABL DIP Lenders committed to make available to the Debtors the ABL DIP Facility in accordance with the terms thereof and the ABL DIP Documents.

3.    "ABL DIP Credit Agreement" means that certain Ratification and Amendment Agreement consistent with the ABL DIP Term Sheet and the Documentation Principles (as defined therein) and otherwise in form and substance satisfactory to the ABL DIP Agent, the ABL DIP Lenders, and the Required Consenting Lenders, ratifying and amending the Prepetition ABL Facility.

4.    "ABL DIP Facility" means that certain postpetition senior secured superpriority priming debtor-in-possession asset-based revolving credit facility, in the aggregate principal amount of up to $250.0 million (subject to the Borrowing Base, as such term is defined in the ABL DIP Term Sheet), entered into on the terms and conditions set forth in the ABL DIP Documents and the DIP Orders.

5.    "ABL DIP Facility Claim" means any Claim arising from, under, or in connection with the ABL DIP Credit Agreement or any other ABL DIP Documents, including Claims for the aggregate outstanding principal amount of, plus unpaid interests on, the ABL DIP Loans, and all fees, and other expenses related thereto and arising and payable under the ABL DIP Facility.

6.    "ABL DIP Documents" means any documents governing the ABL DIP Facility that are entered into in accordance with the ABL DIP Term Sheet and the DIP Orders and any amendments,

1

modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the ABL DIP Term Sheet and the ABL DIP Credit Agreement.

7.    "ABL DIP Lenders" means the lenders party to the ABL DIP Credit Agreement from time to time.

8.    "ABL DIP Loans" means the loans contemplated under and documented by the ABL DIP Documents.

9.    "ABL DIP Term Sheet" means the term sheet attached as **Exhibit 1** to the Restructuring Term Sheet describing the terms of the ABL DIP Facility.

10.    "Administrative Claim" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; (d) Adequate Protection Claims (as defined in the DIP Orders); and (e) Restructuring Expenses.

11.    "Affiliate" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

12.    "Agents/Trustees" means, collectively, any administrative agent, collateral agent, indenture trustee, floorplan funding agent, or similar Entity under the Prepetition ABL Credit Agreement, the First Lien Term Loan Credit Agreement, the KL Note Purchase Agreement, the PVKG Note Purchase Agreement, the Second Lien Credit Agreement, the Prepetition Intercreditor Agreements, the ABL DIP Facility, the Term DIP Facility, or the Exit Facilities, including any successors thereto and, without limitation, the Prepetition ABL Agent, the First Lien Term Loan Agent, the DIP Agents, and the Exit Facilities Agents.

13.    "Allocated Portion" means Term DIP Facility Claims in an amount equal to the Rights, Direct Investment, and Backstop Commitment that are allocated to an applicable Term DIP Lender under this Plan and the Backstop Agreement as either an Investor or Eligible Offeree.

14.    "Allowed" means, with respect to any Claim or Interest, a Claim or an Interest expressly allowed under this Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors (with the consent of the Required Consenting Lenders, which shall not be unreasonably withheld, delayed, or conditioned) may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law; *provided, however* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

15.    "Backstop Agreement" means that certain Equity Backstop Commitment Agreement by and among PVKG Investment, C1 Holdings, PVKG Intermediate, and the Investors, as may be amended, supplemented, or modified from time to time in accordance with the terms thereof, setting forth the terms and conditions for, among other things, the Rights Offering, the Investors' backstop of the Rights Offering

2

Amount, the purchase of the Direct Investment, and the issuance of the Put Option Premium all at the Plan Discount, which agreement shall be set forth in the Plan Supplement.

16.    "Backstop Commitment" means the Investors' commitments to purchase up to $159,250,000 of the New Equity Interests at the Plan Discount, pursuant to the terms of the Rights Offering and in accordance with the Backstop Agreement; *provided* that the Investors may fulfill their Backstop Commitment by exercising their Term DIP Loan Rights pursuant to the terms of and in accordance with the Rights Offering Documents.

17.    "Backstop Order" means the Final Order authorizing, among other things, the Debtors' entry into and performance under the Backstop Agreement and approving any other documents related thereto and approving the payment of fees and expenses related thereto, which Final Order may be the Confirmation Order.

18.    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

19.    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas.

20.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

21.    "Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

22.    "C1 Holdings" means ConvergeOne Holdings, Inc.

23.    "Cash" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

24.    "Cash Collateral" has the meaning set forth in section 363(a) of the Bankruptcy Code.

25.    "Cause of Action" means, without limitation, any Claim, Interest, claim, damage, remedy, cause of action, controversy, demand, right, right of setoff, action, cross claim, counterclaim, recoupment, claim for breach of duty imposed by Law or in equity, action, Lien, indemnity, contribution, reimbursement, guaranty, debt, suit, class action, third-party claim, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, direct or indirect, choate or inchoate, liquidated or unliquidated, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable or existing directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, under the Bankruptcy Code or applicable non-bankruptcy law, or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state law; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

26.    "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when

3

used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.    "Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

28.    "Claims and Noticing Agent" means Epiq Corporate Restructuring, LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

29.    "Claims Register" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

30.    "Class" means a class of Claims or Interests as set forth in **Article III** hereof pursuant to section 1122(a) of the Bankruptcy Code.

31.    "CM/ECF" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

32.    "Company Parties" means PVKG Intermediate, C1 Holdings, and each of their direct and indirect subsidiaries that are or become parties to the Restructuring Support Agreement, solely in their capacity as such.

33.    "Confirmation" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

34.    "Confirmation Date" means the date upon which the Bankruptcy Court confirms this Plan pursuant to section 1129 of the Bankruptcy Code.

35.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court on the confirmation of this Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

36.    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors and the Required Consenting Lenders and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders.

37.    "Consenting Sponsors" means PVKG Lender, ConvergeOne Investment, LP, and PVKG Investment US LP and each of their affiliates other than the Debtors that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, in their respective capacities as direct or indirect Holders of Existing C1 Interests.

38.    "Consenting Stakeholders" means, collectively, the First Lien Consenting Lenders and the Consenting Sponsors.

39.    "Consummation" means the occurrence of the Effective Date.

40.    "Cure Claim" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

4

41.     "<u>D&O Liability Insurance Policies</u>" means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related thereto) issued at any time to, or providing coverage to, any of the Debtors or any of the Debtors' current or former directors, members, managers, or officers for directors', managers', and officers' liability.

42.     "<u>Debtor Release</u>" means the release set forth in **<u>Article VIII.C</u>** of this Plan.

43.     "<u>Definitive Documents</u>" means, collectively, (a) this Plan; (b) the Disclosure Statement; (c) the Solicitation Materials; (d) the DIP Orders (and motion(s) seeking approval thereof); (e) the ABL DIP Commitment Letter; (f) the ABL DIP Documents; (g) the Term DIP Loan Documents; (h) the Exit ABL Facility Documents; (i) the Exit Term Loan Facility Documents; (j) the Backstop Agreement and any motion(s) seeking approval thereof; (k) the Rights Offering and Election Procedures; (l) the Rights Offering Documents; (m) the Governance Documents; (n) any order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials (and motion(s) seeking approval thereof); (o) the Confirmation Order; (p) the Plan Supplement; (q) all material pleadings and motions Filed by the Company Parties in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings, any "second day" pleadings, and all orders sought pursuant thereto; (r) such other agreements, instruments, and documentation that are necessary, or as may be agreed in writing (email sufficient) between the Company Parties, the Required Consenting Lenders,  and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders, to document and consummate the Restructuring Transactions; and (s) any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing, which in each case shall be in form and substance acceptable to the Debtors, the Required Consenting Lenders, and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders.

44.     "<u>Description of Transaction Steps</u>" means the description of steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement.

45.     "<u>DIP Agents</u>" means, collectively, the ABL DIP Agent and the Term DIP Agent.

46.     "<u>DIP Claims</u>" means all Claims held by the DIP Lenders or the DIP Agents on account of, arising under, or related to the ABL DIP Credit Facility and/or the Term DIP Facility, or the DIP Orders, including, without limitation, Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Orders.

47.     "<u>DIP Lenders</u>" means, collectively, the ABL DIP Lenders and the Term DIP Lenders.

48.     "<u>DIP Orders</u>" means, collectively, the Interim DIP Order and the Final DIP Order and any other Bankruptcy Court order approving entry into the ABL DIP Documents and/or the Term DIP Loan Documents.

49.     "<u>DIP Professional Fees</u>" means, as of the Effective Date, all accrued and unpaid professional fees and expenses payable under the DIP Orders to the professionals for the DIP Agents and the DIP Lenders.

50.     "<u>Direct Investment</u>" means a number of New Equity Interests, issued at the Plan Discount in exchange for an aggregate amount equal to the Direct Investment Amount, which will be available solely

000790

**App. 294**

for Investors and which Investors shall have the sole right and obligation to purchase in accordance with the Investor Percentages set forth in the Backstop Agreement.

51.     "Direct Investment Amount" means an amount equal to 35% of $245,000,000 (subject to increase with the consent of the Debtors and the Required Consenting Lenders).

52.     "Direct Investment Commitment" means the Investors' commitments to purchase from New C1, based on the Investor Percentages, $85,750,000 of New Equity Interests at the Plan Discount, pursuant to the terms of the Rights Offering and in accordance with the Backstop Agreement.

53.     "Disallowed" means any Claim, or any portion thereof, that has been disallowed by Final Order or pursuant to a settlement among the Debtors and the holder thereof.  "Disallow" and "Disallowance" shall have correlative meanings.

54.     "Disclosure Statement" means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order and as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

55.     "Disclosure Statement Order" means one or more orders entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Debtors, the Required Consenting Lenders (subject to the parties' rights and obligations under the Restructuring Support Agreement), and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders: (i) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (ii) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

56.     "Disputed" means, as to a Claim or an Interest, a Claim or an Interest: (a) that is not Allowed; (b) that is not Disallowed under this Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

57.     "Distribution Agent" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Lenders, to make or facilitate distributions pursuant to this Plan.

58.     "Distribution Record Date" means the record date for purposes of making distributions under this Plan on account of Allowed Claims, which date shall be the Effective Date or such other date agreed to by the Debtors and the Required Consenting Lenders.

59.     "DTC" means The Depository Trust Company.

60.     "Effective Date" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in **Article IX.A** of this Plan have been satisfied or waived in accordance with **Article IX.B** of this Plan, as determined by the Debtors, the Required Consenting Lenders, and solely with respect to the condition set forth in **Article IX.A** (1) (solely with respect to the Required Consenting Second Lien Lenders), (9), (10), (11), and (12), the Required Consenting Second Lien Lenders.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

000791

**App. 295**

61.     "Eligible Offerees" means, collectively, each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee, in accordance with the terms of the Backstop Agreement) that elects the Rights and Takeback Term Loan Recovery Option and is either (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act of 1933, as amended, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), or (3) or (7) under the Securities Act of 1933, as amended, or an entity in which all of the equity investors are institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person).  For the avoidance of doubt, each Investor shall be an Eligible Offeree.

62.     "Employee Partnership Sale Units" means those certain partnership sale units issued to certain employees of the Debtors prior to the Petition Date in exchange for a waiver of the respective employee's then-existing equity interests in ConvergeOne Investment LP.

63.     "Employment Obligations" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with **Article IV.O** of this Plan.

64.     "Entity" means any entity, as defined in section 101(15) of the Bankruptcy Code.

65.     "Equity Security" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

66.     "Estate" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

67.     "Exculpated Parties" means, collectively, and in each case in their capacities as such: (a) the Debtors, (b) the directors, officers, managers, and employees of any Debtor, and (c) the Professionals.

68.     "Executory Contract" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69.     "Existing C1 Interests" means the equity interests in PVKG Intermediate immediately prior to the Effective Date.

70.     "Exit ABL Agent" means the administrative agent, collateral agent, or similar Entity under the Exit ABL Credit Agreement.

71.     "Exit ABL Credit Agreement" means the credit agreement with respect to the Exit ABL Facility, as may be amended, supplemented, or otherwise modified from to time, the terms of which, for the avoidance of doubt, shall be on terms and conditions reasonably satisfactory to the Debtors and the Required Consenting Lenders.

72.     "Exit ABL Facility" means the first lien asset based lending facility, to be incurred on the Effective Date by the Reorganized Debtors pursuant to the Exit ABL Credit Agreement, which shall be on terms and conditions reasonably satisfactory to the Debtors and the Required Consenting Lenders.

73.     "Exit ABL Facility Documents" means any documents governing the Exit ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the Exit ABL Credit Agreement and the Exit Intercreditor Agreement.

7

74.    "Exit Facilities" means, collectively, the Exit ABL Facility and Exit Term Loan Facility.

75.    "Exit Facilities Agents" means, collectively, the Exit ABL Agent and the Exit Term Loan Agent.

76.    "Exit Facilities Documents" means, collectively, the Exit ABL Facility Documents and the Exit Term Loan Facility Documents.

77.    "Exit Intercreditor Agreement" means the new intercreditor agreement to be entered into on substantially the same terms as the Prepetition Intercreditor Agreements or such other terms as are acceptable to the Debtors and the Required Consenting Lenders, governing the relevant rights and priorities under the Exit Facilities Documents.

78.    "Exit Term Loans" means the term loans provided under the Exit Term Loan Facility on the terms and conditions set forth in the Exit Term Loan Credit Agreement, which shall include the Takeback Term Loans.

79.    "Exit Term Loan Agent" means the administrative agent, collateral agent, or similar Entity under the Exit Term Loan Credit Agreement.

80.    "Exit Term Loan Credit Agreement" means the credit agreement with respect to the Exit Term Loan Facility, as may be amended, supplemented, or otherwise modified from to time.

81.    "Exit Term Loan Facility" means the secured term loan facility in an aggregate principal amount not greater than $243 million pursuant to the Exit Term Loan Credit Agreement.

82.    "Exit Term Loan Facility Documents" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the Exit Term Loan Credit Agreement and the Exit Intercreditor Agreement.

83.    "Exit Term Loan Lenders" means those lenders party to the Exit Term Loan Credit Agreement.

84.    "Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date.

85.    "File" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

86.    "Final DIP Order" means one or more Final Orders entered approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents, and authorizing the Debtors' use of Cash Collateral.

87.    "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken; or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the

8

new trial, reargument, or rehearing has been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided that*, for the avoidance of any doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; *provided, further,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

88.     "First Day Pleadings" means the motions and related pleadings that the Debtors shall have filed upon the commencement of the Chapter 11 Cases.

89.     "First Lien Ad Hoc Group" means that certain ad hoc group of Holders of First Lien Claims, including the KL Lender, represented or otherwise advised by the First Lien Ad Hoc Group Advisors.

90.     "First Lien Ad Hoc Group Advisors" means Gibson, Dunn & Crutcher LLP, PJT Partners Inc., EY-Parthenon, any local counsel retained by the First Lien Ad Hoc Group, and such other professional advisors as are retained by the First Lien Ad Hoc Group with the prior written consent of the Debtors (not to be unreasonably withheld).

91.     "First Lien Claims" means collectively, the First Lien Term Loan Claims, the KL Note Claims, and the PVKG Note Claims.

92.     "First Lien Consenting Lenders" means the Initial First Lien Ad Hoc Group Members, KL Lender, PVKG Lender, each Holder of a First Lien Claim that has signed the Restructuring Support Agreement, each solely in their capacities as such, and any other Holder of a First Lien Claim that executes and delivers a joinder or transfer agreement to counsel to the Company Parties after the effective date of the Restructuring Support Agreement.

93.     "First Lien Term Loan Agent" means Deutsche Bank AG New York Branch in its capacity as administrative agent and collateral agent under the First Lien Term Loan Credit Agreement.

94.     "First Lien Term Loan Claims" means any Claim against any Debtor derived from, based upon, or arising under the First Lien Term Loan Credit Agreement and the other Loan Documents (as defined therein) (including, for the avoidance of doubt, all Obligations (as defined in the First Lien Term Loan Credit Agreement) owing under or in connection with the Loan Documents) and orders of the Bankruptcy Court (including, without limitation, the DIP Orders).

95.     "First Lien Term Loan Credit Agreement" means that certain prepetition First Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of March 14, 2019 and that certain Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto.

96.     "General Unsecured Claim" means any Unsecured Claim against the Debtors that is not an: (a) Administrative Claim; (b) Priority Tax Claim; (c) Professional Fee Claim; (d) Other Priority Claim; (e) Intercompany Claim; or (f) Section 510 Claim.  For the avoidance of doubt, General Unsecured Claims include (x) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (y) Claims resulting from litigation against one or more of the Debtors.

97.    "Governance Documents" means, as applicable, the organizational and governance documents for New C1 and/or the Reorganized Debtors, which will give effect to the Restructuring Transactions, including, without limitation, the New Equityholders' Agreement, any applicable certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or equivalent governing documents), and registration rights agreements, which shall be consistent with the Restructuring Support Agreement and the Governance Term Sheet and in form and substance acceptable to the Debtors and the Required Consenting Lenders, and solely with respect to the Minority Protections (as defined in the Governance Term Sheet) and board observer rights provided for therein, the Subsequent First Lien Ad Hoc Group Members and the Required Consenting Second Lien Lenders (in accordance with the consent rights set forth in the Restructuring Support Agreement).

98.    "Governance Term Sheet" means the term sheet attached as **Exhibit 4** to the Restructuring Term Sheet describing organizational and governance matters for New C1.

99.    "Governing Body" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

100.    "Governmental Unit" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

101.    "Holder" means a Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable, including any Person or Entity that is the record or beneficial owner, nominee, investment advisor, sub-advisor, or manager of discretionary accounts that hold any Claim against or Interest in any Debtor.

102.    "Impaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

103.    "Initial First Lien Ad Hoc Group Members" means each of the funds or accounts managed by (a) Kennedy Lewis Investment Management LLC, (b) Monarch Alternative Capital LP, and (c) Silver Point Capital.

104.    "Initial Second Lien Ad Hoc Group Members" means each of the funds or accounts managed by (i) Partners Group (USA) Inc. and (ii) Siris Capital Group, LLC.

105.    "Intercompany Claim" means any Claim against a Debtor held by another Debtor.

106.    "Intercompany Interest" means any Interest in a Debtor held by another Debtor.

107.    "Interest" means, collectively, (a) any Equity Security in any Debtor and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor that existed immediately before the Effective Date.

108.    "Interim DIP Order" means one or more orders entered on an interim basis approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents and authorizing the Debtors' use of Cash Collateral.

000795

**App. 299**

109.   "<u>Investor Percentages</u>" means the respective percentages set forth in the Backstop Agreement governing each Investor's respective Backstop Commitment or Direct Investment Commitment.

110.   "<u>Investors</u>" means the Holders of First Lien Claims that are party to the Backstop Agreement (or their designated Affiliate(s), managed fund(s) or account(s) or other designee(s) in accordance with the Backstop Agreement).   For the avoidance of doubt, each Investor must be (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act of 1933, as amended, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), or (3) or (7) under the Securities Act of 1933, as amended, or an entity in which all of the equity investors are institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person).

111.   "<u>Judicial Code</u>" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

112.   "<u>KL Lender</u>" means Kennedy Lewis Investment Management LLC as the Holder of the KL Note Claims.

113.   "<u>KL Lender Advisor</u>" means Akin Gump Strauss Hauer & Feld LLP.

114.   "<u>KL Lender Advisor Cap</u>" means $250,000.

115.   "<u>KL Note Claims</u>" means any Claim against any Debtor derived from, based upon, or arising under the KL Note Purchase Agreement.

116.   "<u>KL Note Purchase Agreement</u>" means that certain prepetition First Lien Secured Note Purchase Agreement dated as of July 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date) by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, Deutsche Bank Trust Company Americas, as administrative agent and collateral agent, certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto, and each other holder from time to time party thereto.

117.   "<u>Lender Affiliate</u>" means any accounts and funds managed by a Term DIP Lender, accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such Term DIP Lender, or any other affiliate of such Term DIP Lender.

118.   "<u>Lien</u>" means a lien as defined in section 101(37) of the Bankruptcy Code.

119.   "<u>Management Incentive Plan</u>" means the post-emergence equity incentive plan providing for the issuance from time to time, of equity and equity-based awards with respect to New Equity Interests, as approved by the New Board following the Effective Date, the timing and certain terms of which are set forth in **Article IV.P**.

120.   "<u>Management Incentive Plan Pool</u>" means a pool of up to 10% of the fully diluted New Equity Interests that are issued and outstanding on the Effective Date that shall be reserved for issuance under the Management Incentive Plan.

121.   "<u>New Board</u>" means the board of directors or similar Governing Body of New C1.

122.   "<u>New C1</u>" means either PVKG Investment, as reorganized pursuant to this Plan, or, if applicable, any successor or assign thereto, by merger, consolidation, or otherwise on and after the Effective

11

Date, or a new entity, and each of its direct and indirect wholly-owned subsidiaries, which in any case shall be the ultimate parent of the other Company Parties on and after the Effective Date, and which entity shall be determined by agreement of the Debtors and the Required Consenting Lenders and shall be reasonably acceptable to the Required Consenting Second Lien Lenders.

123.    "New Equity Interests" means new shares of common stock in New C1 to be issued on the Effective Date.

124.    "New Equityholders' Agreement" means that certain equityholders' agreement that will govern certain matters related to the governance of the Reorganized Debtors and which shall be consistent with the Governance Term Sheet.

125.    "Other Priority Claim" means any Claim, other than an Administrative Claim, Priority Tax Claim, ABL DIP Facility Claim, or Term DIP Facility Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

126.    "Other Secured Claim" means any Secured Claim against the Debtors other than the ABL DIP Facility Claims, Term DIP Facility Claims, Prepetition ABL Claims, First Lien Claims, and Second Lien Claims.

127.    "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

128.    "Petition Date" means the date on which the Debtors commence the Chapter 11 Cases.

129.    "Plan" means this joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with **Article X.A** hereof and the Restructuring Support Agreement, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated by reference herein and made part of the Plan as if set forth herein.

130.    "Plan Discount" means the 35% discount to the Stipulated Equity Value at which the New Equity Interests issued through the Rights Offering and the Direct Investment will be purchased, and at which the New Equity Interests issued pursuant to the Put Option Premium shall be issued.

131.    "Plan Distribution" means a payment or distribution to Holders of Allowed Claims or other eligible Entities under and in accordance with this Plan.

132.    "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement), the initial drafts of certain of such documents to be Filed by the Debtors no later than seven (7) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) the Governance Documents; (b) the New Equityholders' Agreement; (c) the Backstop Agreement; (d) the identity and members of the New Board to the extent known at the time of filing; (e) the Schedule of Retained Causes of Action; (f) the Exit Facilities Documents; (g) the Description of Transaction Steps (which shall, for the avoidance of doubt, remain subject to modification until the Effective Date and may provide for certain actions to occur prior to the Effective Date, subject to the consent of the Required Consenting Lenders and consultation with the Required Consenting Second Lien Lenders);

000797

(h) the Rejected Executory Contract and Unexpired Lease List; and (i) any other necessary documentation related to the Restructuring Transactions.

133.    "Prepetition ABL Agent" means Wells Fargo Commercial Distribution Finance, LLC, in its capacity as the administrative agent, collateral agent, floorplan funding agent and swing line lender under the Prepetition ABL Credit Agreement.

134.    "Prepetition ABL Claims" means any Claim against any Debtor derived from, based upon, or arising under the Prepetition ABL Credit Agreement.

135.    "Prepetition ABL Credit Agreement" means that certain Amended and Restated ABL Credit Agreement, dated as of January 4, 2019  (as amended by that certain Amendment No. 1, dated as of July 10, 2022, that certain Amendment No. 2, dated as of September 14, 2022, that certain Amendment No. 3, dated as of January 23, 2023, and that certain Amendment No. 4, dated as of August 29, 2023, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate as holdings, certain subsidiary borrowers party thereto, Wells Fargo Commercial Distribution Finance, LLC, as administrative agent, collateral agent, floorplan funding agent and swing line lender, and the lenders party thereto.

136.    "Prepetition ABL Facility" means the secured revolving credit loan in the aggregate principal amount of up to $250.0 million, subject to compliance with a borrowing base and various sublimits applicable to various Swingline Loans, Letters of Credit, and floorplan advances otherwise authorized under the Prepetition ABL Credit Agreement.

137.    "Prepetition Intercreditor Agreements" means (a) that certain ABL Intercreditor Agreement, dated as of January 4, 2019 (as amended by that certain Joinder and Amendment to ABL Intercreditor Agreement dated as of July 10, 2020 and supplemented by that certain ABL Intercreditor Agreement Joinder dated as of May 15, 2023); (b) that certain First Lien Pari Passu Intercreditor Agreement, dated as of January 10, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time); and (c) that certain first lien and second lien Intercreditor Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented, or otherwise modified from time to time).

138.    "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

139.    "Pro Rata" means, unless otherwise specified, with respect to any Claim, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

140.    "Professional" means any Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

141.    "Professional Fee Amount" means the aggregate amount of unpaid Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur through the Effective Date in rendering services to the Debtors as set forth in **Article II.C** of this Plan.

142.    "Professional Fee Claim" means any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through

000798

**App. 302**

and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

143.    "Professional Fee Escrow Account" means an interest-bearing account funded upon entry of the Interim DIP Order and maintained by the Debtors with Cash for the benefit of the Professionals in accordance with the DIP Orders and the terms set forth in this Plan.

144.    "Proof of Claim" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

145.    "Put Option Premium" means a fully earned nonrefundable aggregate premium equal to the sum of (i) 10% of the Rights Offering Amount and (ii) 10% of the Direct Investment Amount, collectively which shall be payable on the Effective Date to the Investors in shares of New Equity Interests, and shall be allocated pro rata among the Investors based on the Investor Percentages in accordance with the Backstop Agreement.

146.    "PVKG Intermediate" means PVKG Intermediate Holdings Inc.

147.    "PVKG Investment" means PVKG Investment Holdings, Inc.

148.    "PVKG Lender" means PVKG Investment as the Holder of the PVKG Note Claims.

149.    "PVKG Lender Advisors" means Latham & Watkins LLP and any local counsel retained by the PVKG Lender to advise the PVKG Lender in its capacity as the Holder of the PVKG Note Claims.

150.    "PVKG Note Claims" means any Claim against any Debtor derived from, based upon, or arising under the PVKG Note Purchase Agreement, which shall be Allowed in the aggregate amount of $213.0 million pursuant to the PVKG Note Claims Settlement and the terms of this Plan and the Confirmation Order.

151.    "PVKG Note Claims Settlement" means the settlement of all Claims, Causes of Action, and controversies among the Debtors, the Consenting Sponsors, the First Lien Consenting Lenders, the Second Lien Consenting Lenders, and any other Consenting Stakeholder regarding or related to the PVKG Note Purchase Agreement and/or the transactions consummated in connection therewith, as set forth in and contemplated by this Plan and effective as of the Effective Date.

152.    "PVKG Note Purchase Agreement" means that certain Amended Promissory Note and Purchase and Cashless Exchange Agreement dated as of July 6, 2023 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, and PVKG Lender, as administrative agent, collateral agent, and holder.

153.    "Reinstate" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.  "Reinstated" and "Reinstatement" shall have correlative meanings.

154.    "Rejected Executory Contract and Unexpired Lease List" means the list, as determined by the Debtors in consultation with the Required Consenting Lenders, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to this Plan, which list, as may be amended from time to time, with the consent of the Debtors and the Required Consenting Lenders, shall be included in the Plan Supplement.

14

155.     "Related Party" means with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' respective directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, and nominees of the foregoing.

156.     "Released Party" means, collectively, the following Entities, in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Investors; (h) the Agents/Trustees; (i) all Releasing Parties; and (j) each Related Party of each Entity in clause (a) through (i); *provided*, *however*, that, in each case, an Entity shall not be a Released Party if it (i) elects to opt out of the releases contained in this Plan if permitted to opt out; or (ii) files with the Bankruptcy Court an objection to the Plan, including the releases, that is not consensually resolved before Confirmation or supports any such objection or objector.

157.     "Releasing Party" means, collectively, and in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Investors; (h) the Agents/Trustees; (i) all Holders of Claims that vote to accept the Plan; (j) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (k) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (l) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (m) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; and (n) each Related Party of each Entity in clause (a) through (m).

158.     "Reorganized Debtor" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, unless otherwise dissolved pursuant to this Plan.

159.     "Required Consenting Lenders" means, as of the relevant date of determination, the Initial First Lien Ad Hoc Group Members and the PVKG Lender holding, collectively, in excess of 66 2/3% of the aggregate First Lien Claims collectively held by the Initial First Lien Ad Hoc Group Members and the PVKG Lender.

000800

**App. 304**

160.    "Required Consenting Second Lien Lenders" means, as of the relevant date of determination, the Initial Second Lien Ad Hoc Group Members holding, collectively, in excess of 50.01% of the aggregate Second Lien Claims collectively held by the Initial Second Lien Ad Hoc Group Members.

161.    "Restructuring Expenses" means the actual, reasonable, and documented fees and expenses of the First Lien Ad Hoc Group Advisors, the KL Lender Advisor (subject to the KL Lender Advisor Cap), the PVKG Lender Advisors, and the Second Lien Ad Hoc Group Advisors, regardless of whether such fees and expenses are or were incurred before, on, or after the date on which the conditions set forth in Section 2 of the Restructuring Support Agreement were satisfied or waived by the appropriate Party or Parties in accordance with the terms of the Restructuring Support Agreement, subject to the terms of any applicable fee reimbursement letter between any such Parties and any of the Company Parties, as the case may be; *provided*, *however*, that the invoices for such fees and expenses shall be in summary format (with such redactions as may be necessary to maintain attorney client privilege), and the First Lien Ad Hoc Group Advisors, PVKG Lender Advisors, and the Second Lien Ad Hoc Group Advisors shall not be required to provide the Company Parties with attorney time entries or apply to the Bankruptcy Court for payment.

162.    "Restructuring Support Agreement" means that certain Restructuring Support Agreement, entered into as of April 3, 2024, by and among the Debtors and the other parties thereto, including all exhibits thereto (including the Restructuring Term Sheet), as may be amended, modified, or supplemented from time to time, in accordance with its terms, attached to the First Day Declaration as **Exhibit B**.

163.    "Restructuring Term Sheet" means the term sheet attached to the Restructuring Support Agreement as **Exhibit B** thereto.

164.    "Restructuring Transactions" means the transactions described in **Article IV.C** of this Plan.

165.    "Rights" means the rights offered to Eligible Offerees to participate in the Rights Offering, in an amount not to exceed such Eligible Offeree's Pro Rata portion (calculated based on the aggregate principal amount of First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all First Lien Claims held by Eligible Offerees that exercised, or are deemed to have validly exercised the Rights Offering Rights and Takeback Term Loan Recovery Option) of the Rights Offering Amount.

166.    "Rights Offering" means the equity rights offering to be consummated by New C1 on the Effective Date in accordance with the Rights Offering Documents, pursuant to which New C1 shall issue the Rights for an aggregate purchase price equal to the Rights Offering Amount at the Plan Discount.

167.    "Rights Offering Amount" means an amount equal to 65% of $245,000,000 (subject to increase with the consent of the Debtors and the Required Consenting Lenders).

168.    "Rights Offering Documents" means, collectively, the Rights Offering Term Sheet, the Backstop Agreement, the Backstop Order (which may be the Confirmation Order), the Rights Offering and Election Procedures, and any other agreements or documents memorializing the Rights Offering, as may be amended, restated, supplemented, or otherwise modified from time to time according to their respective terms.

169.    "Rights Offering Participants" means, collectively, the Eligible Offerees that exercise, or are deemed to have validly exercised, their respective Rights for New Equity Interests in connection with the Rights Offering.

16

170.    "Rights Offering and Election Procedures" means the procedures regarding the Class 3 recovery option election and governing the Rights Offering attached as an exhibit to the Disclosure Statement.

171.    "Rights Offering Rights and Takeback Term Loan Recovery Option" means, for a Holder of a First Lien Claim that elects or is deemed to elect such option, (a) Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 15%, plus (b) such Holder's Pro Rata share of the Rights.  For the avoidance of doubt, such election shall be adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in the Rights Offering Rights and Takeback Term Loan Recovery Option does not exceed 50% of the First Lien Claims.

172.    "Rights Offering Term Sheet" means the term sheet attached as **Exhibit 3** to the Restructuring Term Sheet describing the material terms of the Rights Offering, the Direct Investment, the Backstop Commitment, and the Direct Investment Commitment.

173.    "Schedule of Retained Causes of Action" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

174.    "Second Lien Ad Hoc Group" means that certain group of Holders of Second Lien Claims represented or otherwise advised by the Second Lien Ad Hoc Group Advisors.

175.    "Second Lien Ad Hoc Group Advisors" means Davis Polk & Wardwell LLP, Guggenheim Securities, LLC, Haynes and Boone, LLP, and such other professional advisors as are retained by the Second Lien Ad Hoc Group with the prior written consent of the Required Consenting Lenders and the Debtors (not to be unreasonably withheld).

176.    "Second Lien Agent" means UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent under the Second Lien Credit Agreement.

177.    "Second Lien Consenting Lenders" means each Holder of a Second Lien Claim that has signed the Restructuring Support Agreement, each solely in their capacities as such, and each Holder of a Second Lien Claim that executes and delivers a joinder or transfer agreement to counsel to the Company Parties after the effective date of the Restructuring Support Agreement, including, for the avoidance of doubt, each of the funds or accounts managed by (i) Partners Group (USA) Inc., (ii) Siris Capital Group, LLC, (iii) AlbaCore Capital LLP, and (iv) Neuberger Berman Investment Advisers LLC and its affiliates.

178.    "Second Lien Credit Agreement" means that certain prepetition Second Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of July 10, 2022), and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto.

179.    "Second Lien Recovery" means 4.375% of the New Equity Interests issued on the Effective Date (subject to dilution only by the Management Incentive Plan Pool).

180.    "Second Lien Claims" means any Claim against any Debtor derived from, based upon, or arising under the Second Lien Credit Agreement.

000802

181.    "Section 510 Claim" means any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of an Equity Security (including the Employee Partnership Sale Units) of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such an Equity Security made to the Debtors prior to the Petition Date; (c) for reimbursement or contribution allowed under section 502(e) of the Bankruptcy Code on account of such a Claim; and (d) any other claim determined to be subordinated under section 510 of the Bankruptcy Code.

182.    "Secured Claim" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

183.    "Securities Act" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, and the rules and regulations promulgated thereunder.

184.    "Security" means any security, as defined in section 2(a)(1) of the Securities Act.

185.    "SIR" means any self-insured retention under the Debtors' insurance policies.

186.    "Solicitation Materials" means, collectively, all materials used in connection the solicitation of votes on the Plan, including the Disclosure Statement, the Disclosure Statement Order, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan.

187.    "Stipulated Equity Value" means approximately $434 million.

188.    "Subsequent First Lien Ad Hoc Group Members" means each of the funds or accounts managed by (a) MJX Asset Management, LLC; (b) PGIM, Inc., and (c) Sound Point Capital Management, LP.

189.    "Takeback Term Loan Recovery Option" means, for a Holder of a First Lien Claim that elects such option, Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 20%. For the avoidance of doubt, such election shall be adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in the Takeback Term Loan Recovery Option does not exceed 50% of the First Lien Claims.

190.    "Takeback Term Loans" means the Exit Term Loans issued to Holders of First Lien Claims.

191.    "Term DIP Agent" means Wilmington Savings Fund Society, FSB, in its capacity as the administrative agent and collateral agent under the DIP Term Loan Credit Agreement.

192.    "Term DIP Credit Agreement" means the credit agreement with respect to the Term DIP Facility, as may be amended, supplemented, or otherwise modified from to time.

193.    "Term DIP Facility" means the senior secured debtor in possession financing facility for the Term DIP Loans, in an aggregate amount of $215.0 million, entered into on the terms and conditions set forth in the Term DIP Loan Documents and the DIP Orders.

194.    "Term DIP Facility Claims" means any Claim arising from, under, or in connection with the Term DIP Credit Agreement or any other Term DIP Loan Documents, including Claims for the

000803
**App. 307**

aggregate outstanding principal amount of, plus unpaid interests on, the Term DIP Loan, and all fees, premiums, and other expenses related thereto and arising and payable under the Term DIP Facility.

195.    "Term DIP Lenders" means the "Lenders" under, and as defined in, the Term DIP Credit Agreement.

196.    "Term DIP Loan Documents" means any documents governing the Term DIP Facility that are entered into in accordance with the Term DIP Credit Agreement, Term DIP Term Sheet and the DIP Orders, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, in each case consistent with the Term DIP Term Sheet and otherwise in form and substance satisfactory to the Required Term DIP Lenders (as defined in the Term DIP Credit Agreement).

197.    "Term DIP Loan Rights" means the following rights: (i) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, (A) an Initial First Lien Ad Hoc Group Member, (B) PVKG Lender, or (C) a Subsequent First Lien Ad Hoc Group Member (in each case, at its sole option) shall be entitled to exchange some or all of the Allocated Portion of its Term DIP Facility Claims, on a dollar-for-dollar basis, for New Equity Interests pursuant to the terms of the Rights Offering, Backstop Commitment, and Direct Investment, and in accordance with the Rights Offering Documents (with the remainder of such Term DIP Facility Claims to be satisfied in Cash); and (ii) (A) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, a Subsequent First Lien Ad Hoc Group Member shall be entitled (at its sole option) to exchange the Allocated Portion of its Term DIP Facility Claims, on a dollar-for-dollar basis, for Takeback Term Loans (with the remainder of such Term DIP Facility Claims to be satisfied in Cash), and (B) any Subsequent First Lien Ad Hoc Group Member that is a Term DIP Lender or is a Lender Affiliate thereof or is related thereto, that elects the option described in the foregoing clause (A) shall utilize the Takeback Term Loan recovery portion of its First Lien Claims under this Plan as currency, on a dollar-for-dollar basis, for New Equity Interests issuable under and pursuant to the terms of the Rights Offering, Backstop Commitment, and Direct Investment and in accordance with the Rights Offering Documents (whether in their capacities as Investors under the Rights Offering or Eligible Offerees).

198.    "Term DIP Loans" means the multiple draw term loans provided under the Term DIP Facility.

199.    "Term DIP Term Sheet" means the term sheet attached as **Exhibit 2** to the Restructuring Term Sheet describing the material terms of the Term DIP Facility.

200.    "Third-Party Release" means the release set forth in **Article VIII.D** of this Plan.

201.    "Unexpired Lease" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

202.    "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is Unimpaired within the meaning of section 1124 of the Bankruptcy Code.

203.    "Unsecured Claim" means any Claim that is not a Secured Claim.

204.    "Workers' Compensation Program" means the Debtors' (a) written contracts, agreements, agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance issued to or entered into at any time by any of the Debtors.

000804

**App. 308**

B.    <u>Rules of Interpretation</u>.

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto (both as that term is defined herein and as it is defined in the Restructuring Support Agreement); (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (16) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.    <u>Computation of Time</u>.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If any payment, distribution, act, or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

D.    <u>Governing Law</u>.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York

000805

**App. 309**

General Obligations Law), shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan or the Confirmation Order (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however*, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Reorganized Debtor.

E.      Reference to Monetary Figures.

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided herein.

F.      Controlling Document.

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects. In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

G.      Consent Rights.

Notwithstanding anything herein to the contrary, any and all consent, approval, and consultation rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement, the DIP Orders, the Backstop Order, or any Definitive Document, including with respect to the form and substance of the Plan, the Plan Supplement, and all other Definitive Documents (including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents), shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

Agreement with respect to the form and substance of this Plan, any Definitive Document, all exhibits to this Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in **Article I.A** hereof) and be fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement or the Backstop Agreement, as applicable, is terminated in accordance with its terms. Failure to reference in this Plan the rights referred to in the immediately preceding sentence as such rights relate to any document referenced in the Restructuring Support Agreement or the Backstop Agreement, as applicable, shall not impair such rights and obligations. In case of a conflict between the consent rights of the parties to the Restructuring Support Agreement that are set forth in the Restructuring Support Agreement or of the parties to the Backstop Agreement that are set forth in the Backstop Agreement, as applicable, with those parties' consent rights that are set forth in this Plan or the Plan Supplement, the consent rights in the Restructuring Support Agreement or the Backstop Agreement, as applicable, shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, Restructuring Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in **Article III** hereof.

000806
**App. 310**

A.      <u>Administrative Claims</u>.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and Restructuring Expenses) shall be paid in full an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in full and final satisfaction, compromise, settlement, release, and discharge of such Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed on or prior to the Effective Date, the first Business Day after the date that is thirty (30) days after the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.  Subject to the terms of the Restructuring Support Agreement and the DIP Orders, nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Administrative Claim.

B.      <u>DIP Claims</u>.

1.      <u>ABL DIP Facility Claims</u>.

On the Effective Date, in full and final satisfaction of the Allowed ABL DIP Facility Claims, (a) ABL DIP Facility Claims that are being converted to Exit ABL Facility Loans or other outstandings thereunder (such as letters of credit and floorplan advances, as provided below) shall be refinanced by the Exit ABL Facility in the amount of the remaining ABL DIP Facility Claims after such pay down by means of a cashless settlement, (b) ABL DIP Facility Claims that are not being converted to Exit ABL Facility Loans shall be indefeasibly paid in full in Cash, and (c) accrued interest and fees under the ABL DIP Facility shall be paid in full in Cash immediately prior to the conversion of ABL DIP Loans to Exit ABL Facility Loans.  With respect to the amount of the ABL DIP Facility refinanced by means of a cashless settlement, (i) all principal amount of ABL DIP Loans (as defined in the ABL DIP Credit Agreement) (including Swingline Loans and floorplan advances) shall be on a one-to-one basis automatically converted to and deemed to be Exit ABL Facility Loans, (ii) the Letters of Credit (as defined in the ABL DIP Credit Agreement) issued and outstanding under the ABL DIP Credit Agreement shall automatically be converted to letters of credit deemed to be issued and outstanding under the Exit ABL Facility Documents, and (iii) all Collateral that secures the Obligations (each as defined in the ABL DIP Credit Agreement) under the ABL DIP Credit Agreement that shall also secure the Exit ABL Facility shall be reaffirmed, ratified, and shall automatically secure all Obligations under the Exit ABL Facility Documents, subject to the priorities of Liens set forth in the Exit ABL Facility Documents and the Exit Intercreditor Agreement.

For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses related to the ABL DIP Facility shall be paid in full in Cash in accordance with the terms of the DIP Orders and this Plan, as applicable.

000807

**App. 311**

    2.    <u>Term DIP Facility Claims</u>.

On the Effective Date, in full and final satisfaction of the Allowed Term DIP Facility Claims, each Holder of a Term DIP Facility Claim shall receive its Pro Rata portion of Cash on account of any principal, interest, fees, and expenses outstanding with respect to such Holder's Term DIP Facility Claim as of the Effective Date; *provided*, *however*, that any Holder of a Term DIP Facility Claim can, in lieu of such Cash payment, exercise such Holder's Term DIP Loan Rights on the terms set forth in the Term DIP Term Sheet and pursuant to the terms of the Rights Offering Documents.

For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses related to the Term DIP Facility shall be paid in full in Cash accordance with the terms of the DIP Orders and this Plan, as applicable.

C.    <u>Professional Fee Claims</u>.

    1.    <u>Final Fee Applications and Payment of Professional Fee Claims</u>.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, from the Professional Fee Escrow Account as soon as practicable after such Professional Fee Claims are Allowed.

    2.    <u>Professional Fee Escrow Account</u>.

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with an amount of Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. When all Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

    3.    <u>Professional Fee Amount</u>.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors or the Debtors' Estates before and as of the Effective Date, and shall deliver such estimate to the Debtors and the First Lien Ad Hoc Group Advisors no later than three (3) Business Days before the Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional.

    4.    <u>Post-Confirmation Fees and Expenses</u>.

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors. Upon

000808

**App. 312**

the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      Restructuring Expenses.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date matters, after the Effective Date), shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the Restructuring Support Agreement, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.   All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided, however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.   On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before, or after the Effective Date.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      Classification of Claims and Interests.

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in **Article II** of this Plan (or as otherwise set forth herein), all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Claims, Priority Tax Claims, Professional Fee Claims, or Restructuring Expenses, as described in **Article II**.

A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

000809
**App. 313**

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 6 | Intercompany Claims | Impaired/Unimpaired | Deemed to Accept / Deemed to Reject; Not Entitled to Vote |
| 7 | Section 510 Claims | Impaired | Deemed to Reject; Not Entitled to Vote |
| 8 | Intercompany Interests | Impaired/Unimpaired | Deemed to Accept / Deemed to Reject; Not Entitled to Vote |
| 9 | Existing C1 Interests | Impaired | Deemed to Reject; Not Entitled to Vote |

B.    Formation of Debtor Groups for Convenience Only.

This Plan is a separate plan of reorganization for each Debtor.  This Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, Confirmation of this Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.  The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

C.    Treatment of Claims and Interests.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.    Class 1 – Other Secured Claims.

(a)    Classification: Class 1 consists of all Other Secured Claims.

(b)    Treatment:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each

000810
**App. 314**

Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, in the discretion of the Reorganized Debtors:

(i)      payment in full in Cash of its Allowed Other Secured Claim;

(ii)     the collateral securing its Allowed Other Secured Claim;

(iii)    Reinstatement of its Allowed Other Secured Claim; or

(iv)    such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    <u>Voting</u>:  Allowed Other Secured Claims in Class 1 are Unimpaired.  Each Holder of an Allowed Other Secured Claim is conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

2.    <u>Class 2 – Other Priority Claims</u>.

(a)    <u>Classification</u>: Class 2 consists of all Other Priority Claims.

(b)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash of such Allowed Other Priority Claim on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date such Other Priority Claim becomes an Allowed Claim, (iii) the date on which such Allowed Other Priority Claim is due to be paid in the ordinary course of business of the Debtors or Reorganized Debtors, if applicable, and (iv) the date on which the Holder of such Allowed Other Priority Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

(c)    <u>Voting</u>:  Allowed Other Priority Claims in Class 2 are Unimpaired.  Each Holder of an Allowed Other Priority Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

3.    <u>Class 3 – First Lien Claims</u>.

(a)    <u>Classification</u>: Class 3 consists of all First Lien Claims.

(b)    <u>Allowance</u>:  On the Effective Date, all First Lien Claims shall be deemed Allowed, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount as follows, and, with respect to the PVKG Note Claims, shall be pursuant to the PVKG Note Claims Settlement:

(i)      First Lien Term Loan Claims:  $1,095,726,307.33

(ii)     KL Note Claims: $78,812,500.00

000811

**App. 315**

        (iii)      PVKG Note Claims:  $213,000,000.00

(c)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed First Lien Claim, each Holder of an Allowed First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive on the Effective Date its elected Pro Rata share of (which elections shall be (i) adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in each recovery option is equal to 50% of the First Lien Claims) (x) the Takeback Term Loan Recovery Option, or (y) the Rights Offering Rights and Takeback Term Loan Recovery Option.  In the event that a Holder of a First Lien Claim fails to timely elect its recovery option, it shall be deemed to have elected the Rights Offering Rights and Takeback Term Loan Recovery Option.

(d)    <u>Voting</u>:  Allowed First Lien Claims in Class 3 are Impaired.  Each Holder of an Allowed First Lien Claim shall be entitled to vote to accept or reject this Plan.

4.    <u>Class 4 – Second Lien Claims</u>.

(a)    <u>Classification</u>:  Class 4 consists of all Second Lien Claims.

(b)    <u>Allowance</u>:  On the Effective Date, all Second Lien Claims shall be deemed Allowed, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of $286,541,971.71.

(c)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Second Lien Claim, on the Effective Date each Holder of an Allowed Second Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive its Pro Rata share of the Second Lien Recovery.

(d)    <u>Voting</u>:  Allowed Second Lien Claims are Impaired.  Each Holder of an Allowed Second Lien Claim shall be entitled to vote to accept or reject this Plan.

5.    <u>Class 5 – General Unsecured Claims</u>.

(a)    <u>Classification</u>:  Class 5 consists of all General Unsecured Claims.

(b)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim and in exchange for each Allowed General Unsecured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, either (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in Cash on (A) the Effective or (B) the date due in the ordinary course of

business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(c) <u>Voting</u>:  Allowed General Unsecured Claims in Class 5 are Unimpaired.  Each Holder of an Allowed General Unsecured Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

6.  <u>Class 6 – Intercompany Claims</u>.

(a) <u>Classification</u>:  Class 6 consists of all Intercompany Claims.

(b) <u>Treatment</u>:  On the Effective Date, or as soon as reasonably practicable thereafter, Allowed Intercompany Claims shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), Reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, canceled, or released to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors and the Required Consenting Lenders, as applicable.

(c) <u>Voting</u>:  Allowed Intercompany Claims in Class 6 are either (i) Unimpaired and are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Intercompany Claims are not entitled to vote to accept or reject this Plan.

7.  <u>Class 7 – Section 510 Claims</u>.

(a) <u>Classification</u>:  Class 7 consists of all Section 510 Claims.

(b) <u>Treatment</u>:  On the Effective Date, all Section 510 Claims (including all claims on account of the Employee Partnership Sale Units) shall be canceled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims.

(c) <u>Voting</u>:  Allowed Section 510 Claims in Class 7 are Impaired.  Each Holder of an Allowed Section 510 Claim is conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Section 510 Claims are not entitled to vote to accept or reject this Plan.

8.  <u>Class 8 – Intercompany Interests</u>.

(a) <u>Classification</u>:  Class 8 consists of all Intercompany Interests.

(b) <u>Treatment</u>:  On the Effective Date, Intercompany Interests shall, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), be (i) Reinstated or (ii) set off, settled, addressed, distributed, contributed, merged, cancelled, or released.

000813
**App. 317**

(c)  <u>Voting</u>:  Allowed Intercompany Interests are Unimpaired if such Interests are Reinstated, or are Impaired if such Interests are cancelled.  Holders of Intercompany Interests are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject this Plan.

9.  <u>Class 9 – Existing C1 Interests</u>.

(a)  <u>Classification</u>:  Class 9 consists of all Existing C1 Interests.

(b)  <u>Treatment</u>:  On the Effective Date, Existing C1 Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing C1 Interests shall not receive any distribution on account thereof.

(c)  <u>Voting</u>:  Allowed Existing C1 Interests are Impaired under this Plan.  Each Holder of an Allowed Existing C1 Interest is conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Existing C1 Interests are not entitled to vote to accept or reject this Plan.

D.  <u>Special Provision Governing Unimpaired Claims</u>.

Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

E.  <u>Elimination of Vacant Classes</u>.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.  <u>Acceptance by Impaired Classes</u>.

An Impaired Class of Claims shall have accepted this Plan, if not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan, and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept this Plan.

G.  <u>Voting Classes, Presumed Acceptance by Non-Voting Classes</u>.

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject this Plan, the Holders of such Claims in such Class shall be deemed to have accepted this Plan.

000814
**App. 318**

H.    Intercompany Interests.

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Equity Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims.

I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to **Article III.C** of this Plan. The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with **Article X** of this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

J.    No Substantive Consolidation.

Although this Plan is presented as a joint plan of reorganization for administrative purposes, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Except as expressly provided herein, nothing in this Plan, the Confirmation Order, or the Disclosure Statement shall constitute or be deemed to constitute a representation that any one or all of the Debtors is subject to or liable for any Claims or Interests against or in any other Debtor.  A Claim or Interest against or in multiple Debtors will be treated as a separate Claim or Interest against or in each applicable Debtor's Estate for all purposes, including voting and distribution; *provided*, *however*, that no Claim will receive value in excess of one hundred percent (100.0%) of the Allowed amount of such Claim (inclusive of post-petition interest, if applicable) under the Plan for all such Debtors.

K.    Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired or is properly classified under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

L.    Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to this Plan.

000815
**App. 319**

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.    General Settlement of Claims and Interests.

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies (including the PVKG Note Claims Settlement) resolved pursuant to this Plan, including any challenge to the amount, validity, perfection, enforceability, priority, or extent of the First Lien Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise.  This Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to **Article VI** hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

B.    PVKG Note Claims Settlement.

The allowance and treatment of the PVKG Note Claims under this Plan, together with the other terms and conditions set forth in this Plan and the Confirmation Order (including the releases of and by the PVKG Lender set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement of the PVKG Note Claims pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code.  The PVKG Note Claims Settlement is incorporated into this Plan and includes the following material terms and conditions:

1.    The PVKG Note Claims shall be Allowed on the Effective Date against the Debtors in the amount of $213,000,000.00.

2.    The PVKG Note Claims shall receive the treatment set forth in **Article III.C.3** hereof.  For the avoidance of doubt, the PVKG Lender shall waive any Claims other than the PVKG Note Claims that it may have, including any General Unsecured Claims, if any; *provided* that the foregoing shall not limit the payment or reimbursement of the Restructuring Expenses by the Debtors or the Reorganized Debtors.

3.    PVKG Lender, as the Holder of the PVKG Note Claims, shall support Confirmation of this Plan and shall timely submit a ballot accepting the Plan, in each case in accordance with the terms and conditions of the Restructuring Support Agreement.

This Plan shall be deemed a motion to approve the good faith compromise and settlement of the PVKG Note Claims Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, within the range of reasonableness, and in the best interests of the Debtors and their Estates.

000816

C.      Restructuring Transactions.

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions (which, for the avoidance of doubt, shall be in form and substance acceptable to the Required Consenting Lenders, and, subject to the consent rights set forth in the Restructuring Support Agreement, reasonably acceptable to the Required Consenting Second Lien Lenders, and otherwise consistent with the Restructuring Support Agreement) and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan that are consistent with and pursuant to the terms and conditions of this Plan, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, and the Restructuring Support Agreement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, the Confirmation Order, and the Restructuring Support Agreement and having other terms to which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable Governance Documents; (4) the execution and delivery of the Exit Facilities Documents and entry into the Exit Facilities; (5) pursuant to the Rights Offering Documents, the implementation of the Rights Offering, the distribution of the Rights to the Eligible Offerees, the issuance of the New Equity Interests in connection therewith, the execution and implementation of the Backstop Agreement in connection therewith; (6) the issuance of the Term DIP Loan Rights and the New Equity Interests in connection therewith; (7) the issuance and distribution of the New Equity Interests as set forth in this Plan; (8) the reservation of the Management Incentive Plan Pool; (9) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Description of Transaction Steps; and (10) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

D.      The Reorganized Debtors.

On the Effective Date, the New Board shall be established in accordance with the terms of the Governance Term Sheet, and each Reorganized Debtor shall adopt its Governance Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan.

E.      Sources of Consideration for Plan Distributions.

Each distribution and issuance referred to in **Article VI** of this Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with this Plan, including the New Equity Interests will be exempt from SEC registration, as described more fully in **Article IV.M** below.

000817
**App. 321**

1. <u>Exit Facilities.</u>

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facilities Documents.  Confirmation of this Plan shall be deemed final approval of the Exit Facilities and the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities.  Execution of the Exit Term Loan Credit Agreement by the Exit Term Loan Agent shall be deemed to bind all Holders of First Lien Claims and all Exit Term Loan Facility Lenders as if each such Holder or Exit Term Loan Facility Lender had executed the Exit Term Loan Credit Agreement with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

2. <u>Rights Offering.</u>

The Debtors shall distribute the Rights to the Eligible Offerees as set forth in this Plan and the Rights Offering Documents.  Pursuant to the Rights Offering Documents, the Rights Offering shall be open to all Eligible Offerees, and Eligible Offerees shall be entitled to participate in the Rights Offering up to a maximum amount of each such Eligible Offeree's Pro Rata portion (calculated based on the aggregate principal amount of First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all First Lien Claims held by Eligible Offerees that exercised, or are deemed to have validly exercised, the Rights Offering Rights and Takeback Term Loan Recovery Option) of the Rights.  Each Eligible Offeree (other than Eligible Offerees that are also Investors, who must exercise all of their Rights) may exercise either all, a portion of, or none of its Rights in exchange for Cash (or, if such Eligible Offeree is also a DIP Lender, such Eligible Offeree's Term DIP Loan Rights).  The Rights are not separately transferrable or detachable from the First Lien Claims and may only be transferred together with the First Lien Claims.

New C1 shall be authorized to issue the New Equity Interests issuable pursuant to such exercise on the Effective Date pursuant to the terms of this Plan and the Rights Offering Documents.

The Rights Offering will be fully backstopped, severally and not jointly, by the Investors' Backstop Commitment pursuant to the Backstop Agreement.  In addition, the Investors will be allocated, and shall purchase and subscribe for, the Direct Investment pursuant to the terms of the Backstop Agreement and Backstop Order.  The Reorganized Debtors will issue the Put Option Premium to the Investors on the

000818

**App. 322**

Effective Date in accordance with the terms and conditions set forth in the Backstop Agreement, the Backstop Order, and this Plan, in respect of their respective Backstop Commitments and Direct Investment Commitments.  Pursuant to the terms of the Rights Offering, each Investor may, at its sole option, exercise its Term DIP Loan Rights in satisfaction of its commitments under the Rights Offering and Backstop Agreement.

New Equity Interests issued pursuant to the Rights Offering and the Direct Investment shall be offered (and the Put Option Premium shall be issued) at the Plan Discount.

Entry of the Backstop Order and Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering, the Direct Investment, the Backstop Commitment, the Direct Investment Commitment, the Put Option Premium, and the Backstop Agreement (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by New C1 in connection therewith).  On the Effective Date, the rights and obligations of the Debtors under the Backstop Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering may be used by the Reorganized Debtors to make distributions pursuant to this Plan and fund general corporate purposes.

When the issuance of New Equity Interests pursuant to this Plan and the Rights Offering Documents would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual issuance of shares of New Equity Interests shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Equity Interests shall be adjusted as necessary to account for the foregoing rounding.

3.    New Equity Interests.

New C1 shall be authorized to issue a certain number of shares of New Equity Interests pursuant to its Governance Documents.  The issuance of the New Equity Interests shall be authorized without the need for any further corporate action.  On the Effective Date, the New Equity Interests shall be issued and distributed as provided for in the Description of Transaction Steps to the Entities entitled to receive the New Equity Interests pursuant to, and in accordance with, this Plan.

All of the shares of New Equity Interests issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in **Article VI** hereof shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Equity Interests shall be deemed as its agreement to the Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.  The New Equity Interests will not be registered under the Securities Act or listed on any exchange as of the Effective Date and are not expected to meet the eligibility requirements of the DTC.

4.    Use of Cash.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the Rights Offering to fund distributions to certain Holders of Allowed Claims, consistent with the terms of this Plan.

F.      Corporate Existence.

Except as otherwise provided in this Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be and as contemplated by the Description of Transaction Steps, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under this Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

The Reorganized Debtors shall be authorized to dissolve the Debtors or the Reorganized Debtors in accordance with applicable law or otherwise, in each case as contemplated by the Description of Transaction Steps, including, for the avoidance of doubt, any conversion of any of the Debtors or the Reorganized Debtors pursuant to applicable law, and to the extent any such Entity is dissolved, such Entity shall be deemed dissolved pursuant to the Plan and shall require no further action or approval (other than any requisite filings required under applicable state or federal law).

G.      Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, except as otherwise provided in this Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      Cancellation of Existing Agreements and Interests.

On the Effective Date, except with respect to the Exit Facilities, or to the extent otherwise provided in this Plan, including in **Article V.A** hereof, the Confirmation Order, or any other Definitive Document, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect; *provided, however*, that notwithstanding anything to the contrary contained herein, any agreement that governs the rights of the DIP Agents shall continue in effect solely for purposes of allowing the DIP Agents to (i) enforce their rights against any Person other than any of the Released Parties, pursuant and subject to the terms of the DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (ii) receive distributions under this Plan and to distribute them to the Holders of the Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (iii) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, and (iv) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agents, or Holders of the ABL DIP Facility Claims and Term DIP Facility Claims under this Plan, as applicable.  Holders of or parties to such cancelled

000820

**App. 324**

instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to this Plan.

Notwithstanding the preceding paragraph, any credit agreement or other instrument that governs the rights, claims, and remedies of the Holder of a Claim shall continue in full force and effect for the limited purposes of allowing Holders of Allowed Claims to receive distributions under this Plan and permitting the Reorganized Debtors and any other Distribution Agent, as applicable, to make distributions on account of the applicable Claims.

On the Effective Date, each holder of a certificate or instrument evidencing a Claim or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture or agreement that governs the rights of such holder of such Claim or Interest. Such surrendered certificate or instrument shall be deemed canceled as set forth in, and subject to the exceptions set forth in, this **Article IV.H**.

I.     Corporate Action.

Upon the Effective Date, all actions contemplated under this Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtors in accordance with the Governance Term Sheet; (3) the issuance and distribution of the New Equity Interests; (4) implementation of the Restructuring Transactions, including the Rights Offering; (5) entry into the Exit ABL Facility Documents; (6) entry into the Exit Term Loan Facility Documents; (7) all other actions contemplated under this Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the Governance Documents; (9) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases that are not rejected; (10) reservation of the Management Incentive Plan Pool; and (11) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date). All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Interests, the Governance Documents, the Exit ABL Facility, the Exit Term Loan Facility, the Exit ABL Facility Documents, and the Exit Term Loan Facility Documents, any other Definitive Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this **Article IV.I** shall be effective notwithstanding any requirements under non-bankruptcy law.

J.     Governance Documents.

On or immediately prior to the Effective Date, the Governance Documents shall be adopted or amended in a manner consistent with the terms and conditions set forth in the Governance Term Sheet, as may be necessary to effectuate the transactions contemplated by this Plan. Each of the Reorganized Debtors will file its Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate

000821

**App. 325**

laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document. The Governance Documents shall prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the Governance Documents shall be included as exhibits to the Plan Supplement. After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

On the Effective Date, New C1 shall enter into and deliver the New Equityholders' Agreement to each Holder of New Equity Interests, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity. On the Effective Date, Holders of New Equity Interests shall be deemed to have executed the New Equityholders' Agreement and be parties thereto, without the need to deliver signature pages thereto.

K.      Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of C1 Holdings and PVKG Intermediate shall expire, and the members for the initial term of the New Board shall be appointed in accordance with the Governance Documents. The New Board shall consist of members as designated in accordance with the Governance Term Sheet. The Chief Executive Officer of New C1 shall serve on the board of directors of New C1; all other initial directors shall be appointed by the Required Consenting Lenders, with representation being proportionate to post-emergence equity ownership and subject to agreed-upon sunsets. For the avoidance of doubt, each Initial First Lien Ad Hoc Group Member and the PVKG Lender shall each be entitled to appoint one director to serve on the New Board, so long as such entity is contemplated to receive no less than 10% of the fully diluted New Equity Interests (excluding New Equity Interests reserved for the post-Effective Date Management Incentive Plan). The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the Governance Documents and other constituent documents of the Reorganized Debtors.

The Subsequent First Lien Ad Hoc Group Members and the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative as a non-voting observer to the New Board; *provided* that such entitlement shall expire if such holders, at any time, cease to hold in excess of 12.5% of the New Equity Interests in the aggregate.

In addition, the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative to receive materials that were presented to the New Board at any board meeting; *provided*, *however*, that such representative shall sign a customary non-disclosure agreement (which shall provide that such representative may share such materials with Required Consenting Initial Second Lien Ad Hoc Group Members that are subject to confidentiality restrictions and whose individual holdings exceed 1% of the New Equity Interests), and New C1 shall be entitled to not include any privileged or competitively sensitive information, and such entitlement shall expire if such holders, at any time, cease to hold in excess of 1.0% of the New Equity Interests in the aggregate.

000822

L.    Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of this Plan and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

M.    Certain Securities Law Matters.

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of Securities under the Plan.

The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Equity Interests, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on (1) with respect to the New Equity Interests issued pursuant to the Rights Offering (other than with respect to the Backstop Commitment and the Direct Investment Commitment), section 1145 of the Bankruptcy Code, (2) with respect to the New Equity Interests issuable pursuant to the Plan as the Second Lien Recovery, section 1145 of the Bankruptcy Code, and (3) with respect to the New Equity Interests issued pursuant to the Direct Investment, the Put Option Premium, and the unsubscribed New Equity Interests issued to the Investors pursuant to the Backstop Agreement, section 4(a)(2) of the Securities Act or Regulation D or Regulation S promulgated thereunder.

The New Equity Interests issued pursuant to section 1145 of the Bankruptcy Code (i) will not be a "restricted security" as defined in Rule 144(a)(3) under the Securities Act and (ii) will be freely transferable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the provisions of Rule 144 under the Securities Act with respect to a holder thereof that (x) is, or within 90 days of such transfer has been, an "affiliate" within the meaning of Rule 144(a)(1) or (y) has acquired the New Equity Interests from an "affiliate" in a transaction or chain of transactions not involving any public offering within one year of such transfer; and (c) any restrictions on the transferability of such New Equity Interests in the New Organizational Documents.

The New Equity Interests, including the Direct Investment and the New Equity Interests reserved for issuance under the Management Incentive Plan Pool, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S thereunder, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

N.    Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to: (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or

000823

**App. 327**

other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.    <u>Employment Obligations</u>.

Unless otherwise provided herein or the Confirmation Order, specifically rejected pursuant to a separate order of the Bankruptcy Court, specifically designated as a contract or lease to be rejected on the Rejected Executory Contract and Unexpired Lease List, or the subject of a separate rejection motion Filed by the Debtors, and subject to **Article V** of this Plan, all written employment, confidentiality, non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock units, and other equity awards), discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, vacation, holiday pay, severance, retirement, retention, supplemental retirement, executive retirement, pension, deferred compensation, indemnification, other similar employee-related agreements or arrangements, retirement income plans, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements that are in effect immediately prior to the Effective Date with the Debtors, (a) shall be assumed by the Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date, or (b) solely with the consent of the Required Consenting Lenders, the Reorganized Debtors shall enter into new agreements with such employees on terms and conditions acceptable to the Reorganized Debtors and such employee; *provided, however*, that the Debtors shall not enter into new agreements with insider employees absent the consent of the Required Consenting Lenders.

Notwithstanding the foregoing, and unless otherwise provided in the Plan Supplement, all plans or programs calling for stock grants, stock issuances, stock reserves, or stock options shall be deemed rejected with regard to such issuances, grants, reserves, and options.  The Debtors shall not assume any agreements or obligations relating to the Employee Partnership Sale Units, which shall be cancelled as of the Effective Date and shall receive no payment on account thereof from the Debtors or the Reorganized Debtors.  For the avoidance of doubt, no provision in any agreement, plan, or arrangement to be assumed pursuant to the foregoing paragraph relating to the award of equity or equity-like compensation shall be binding on, or honored by, the Reorganized Debtors.  Nothing in this Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

39

P.      Management Incentive Plan.

On the Effective Date, the Management Incentive Plan Pool shall be reserved for management, key employees, and directors of the Reorganized Debtors.  Following the Effective Date, the New Board will adopt the Management Incentive Plan, the terms of which, including with respect to participants, form, allocation, structure, and vesting, shall be determined by the New Board.  Following the implementation of the Management Incentive Plan, the issuance of the New Equity Interests and any equity reserved for issuance under the Management Incentive Plan (to the extent applicable) shall be authorized without the need for any further corporate action and without any further action by the Debtor and the Reorganized Debtors or any of their equity holders, as applicable.

Q.      Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to the PVKG Note Claims Settlement and **Article VIII** hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the PVKG Note Claims Settlement and the releases and exculpations contained in this Plan, including in **Article VIII**.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan, including the PVKG Note Claims Settlement and Article VIII of this Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in this Plan, including the PVKG Note Claims Settlement and **Article VIII** of this Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

000825
**App. 329**

R.        Dissolution of Certain Debtors.

On or after the Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, Order, or rule, including any action by the stockholders, members, the board of directors, or similar Governing Body of the Debtors or the Reorganized Debtors; *provided* that, subject in all respects to the terms of this Plan, the Reorganized Debtors shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable and in accordance with the Description of Transaction Steps: (1) file a certificate of dissolution for such Debtors, together with all other necessary corporate and company documents, to effect such Debtors' dissolution under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any such Debtors or their Estates, as determined under applicable tax laws; and (3) represent the interests of the Debtors or their Estates before any taxing authority in all tax matters, including any action, proceeding or audit.

S.        Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

T.        Post-Effective Date Payment of Restructuring Expenses.

Following the Effective Date, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, the Restructuring Expenses related to this Plan and implementation, consummation, and/or defense of the Restructuring Transactions, whether incurred before, on, or after the Effective Date, in accordance with any applicable engagement letter, any order of the Bankruptcy Court (including, without limitation, the DIP Orders), and the Restructuring Support Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.        Assumption of Executory Contracts and Unexpired Leases.

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion or notice to reject pending as of the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall

not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumption of the Restructuring Support Agreement pursuant to sections 365 and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date. The Restructuring Support Agreement shall be binding and enforceable against the parties to the Restructuring Support Agreement in accordance with its terms. For the avoidance of doubt, the assumption of the Restructuring Support Agreement herein shall not otherwise modify, alter, amend, or supersede any of the terms or conditions of the Restructuring Support Agreement including, without limitation, any termination events or provisions thereunder.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions of the Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease or the execution of any other Restructuring Transaction (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. For the avoidance of doubt, consummation of the Restructuring Transactions shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary in the Plan (except for the consent rights set forth in **Article I.G**), the Debtors or Reorganized Debtors, as applicable, reserve the right to amend or supplement the Rejected Executory Contract and Unexpired Lease List in their discretion (but with the consent of the Required Consenting Lenders) prior to the Confirmation Date (or such later date as may be permitted by **Article V.C** or **Article V.E** below), provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have no less than seven (7) days to object thereto on any grounds.

B.    Indemnification Obligations.

All indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for (each in their capacities as such) the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants, and other professionals of, or acting on behalf of, the Company Parties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties than the indemnification provisions in place prior to the Effective Date; *provided* that nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date. For the avoidance of doubt, following the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail

000827

policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in this Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection.  **Any Proofs of Claim arising from the rejection of an Executory Contract or Unexpired Lease not timely Filed with the Claims and Noticing Agent shall be automatically Disallowed without further order of the Bankruptcy Court, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in __Article VIII.F__ of this Plan, notwithstanding anything in a Proof of Claim to the contrary.**  All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim, as applicable, pursuant to __Article III.C__ of this Plan and may be objected to in accordance with the provisions of __Article VII__ of this Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  Notwithstanding anything to the contrary in this Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List (with the consent of the Required Consenting Lenders) at any time through and including thirty days after the Effective Date.

D.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Claim; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim.  The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or

Reorganized Debtors, for which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim pursuant to this **Article V.D** shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Claim has been fully paid pursuant to this Article V.D, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

E.      Insurance Policies.

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan.  Unless otherwise provided in this Plan or listed on the Rejected Executory Contract and Unexpired Lease List, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court.  Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.  The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary.  For the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.

F.      Workers' Compensation Program.

As of the Effective Date, the Debtors and Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Program.  All Proofs of Claims on account of workers' compensation, including the Workers' Compensation Program, shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that nothing in the Plan

44

shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; *provided further*, *however*, that nothing herein shall be deemed to impose any obligations on the Debtors or their insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

G.      Reservation of Rights.

Nothing contained in this Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to **Article XI** of this Plan.

H.      Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      Distributions on Account of Claims Allowed as of the Effective Date.

Unless otherwise provided in the Plan, on or as soon as practicable after the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in **Article VII** hereof. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

45

B.      Distribution Agent.

All distributions under this Plan shall be made by the Distribution Agent.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      Rights and Powers of the Distribution Agent.

1.      Powers of the Distribution Agent.

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

D.      Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.      Delivery of Distributions in General.

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim Filed by that Holder or the address in any written notice of address change delivered to the Debtors or the Distribution Agent; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

Notwithstanding the foregoing, (a) all distributions on account of DIP Claims will be made to the applicable DIP Agent, and the DIP Agent will be, and will act as, the Distribution Agent with respect to the DIP Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; (b) all distributions on account of First Lien Term Loan Claims will be made to the First Lien Term Loan Agent, and the First Lien Term Loan Agent will be, and will act as, the Distribution Agent with respect to the First Lien Term Loan Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; and (c) all distributions on account of Second Lien Claims will be made to the Second Lien Agent, and the Second Lien Agent will be, and will act as, the Distribution Agent with respect to the Second Lien Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

       3.       <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interests; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property shall be discharged and forever barred. The Reorganized Debtors and the Distribution Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

F.       <u>Manner of Payment</u>.

At the option of the Distribution Agent, any Cash distribution to be made hereunder may be made by check, wire transfer, automated clearing house, or credit card, or as otherwise required or provided in applicable agreements. All distributions of Cash to the Holders of the applicable Allowed Claims under this Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or Reorganized Debtor.

G.       <u>Compliance with Tax Requirements</u>.

In connection with this Plan, to the extent applicable, the Debtors, Reorganized Debtors, Distribution Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

000832
**App. 336**

H.      Allocations.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      No Postpetition Interest on Claims.

Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.      Foreign Currency Exchange Rate.

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.      Setoffs and Recoupment.

Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or assigned on or before the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); *provided*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

L.      Claims Paid or Payable by Third Parties.

1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the second to last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal

48

Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

If an applicable insurance policy has a SIR or a deductible, the Holder of an Allowed Claim that is payable pursuant to such insurance policy shall have an Allowed General Unsecured Claim against the applicable Debtor's estate up to the amount of the SIR or deductible amount that may be established upon the liquidation of the Claim and such Holder's recovery from the Debtors or Reorganized Debtors shall be solely in the form of its distribution on account of such Allowed General Unsecured Claim under this Plan.  Any recovery on account of the Claim in excess of the SIR or deductible established upon the liquidation of the Claim shall be recovered solely from insurance coverage (if any) and only to the extent of available insurance coverage and any proceeds thereof, if any.  Nothing in this Plan shall be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy.

3.      Applicability of Insurance Policies.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      Disputed Claims Process.

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan and as otherwise required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.  All Proofs of Claim Filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure Claim pursuant to section 365 of the

Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under the Plan, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired Lease in accordance with **Article V.C**.  Notwithstanding the foregoing, Entities must File cure objections as set forth in **Article V.D** of the Plan to the extent such Entity disputes the amount of the Cure Claim paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      Allowance of Claims.

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      Claims Administration Responsibilities.

Subject to any applicable restrictions in the Restructuring Support Agreement, the Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority, without further notice to or action, order, or approval of the Bankruptcy Court, to (i) File, prosecute, litigate to judgment, or withdraw any objections to Claims, (ii) settle, compromise, or resolve any such objections to Claims, and (iii) administer and adjust the Claims Register to reflect such settlements or compromises.  Except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such debtor had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including the Causes of Action retained pursuant to this Plan.

**Any objections to Claims other than General Unsecured Claims must be served and Filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims other than General Unsecured Claims not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.**

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.      Adjustment to Claims or Interests Without Objection.

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the

Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.  Distributions After Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.  Discharge of Claims and Termination of Interests.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.  Release of Liens.

**Except as otherwise provided in the Exit Facilities Documents, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.C.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or**

000836

other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

C.      Releases by the Debtors.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors and the Estates, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the PVKG Notes Purchase Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the Exit Facilities Documents, the Governance Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding the foregoing, nothing in this Article VIII.C shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising

000837
**App. 341**

from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) essential to Confirmation of this Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing this Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.     Releases by Third Parties.

Except as otherwise expressly set forth in this Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the PVKG Notes Purchase Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the Exit Facilities Documents, the Governance Documents, and all other Definitive Documents,

in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) consensual; (2) essential to the confirmation of this Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

E.      Exculpation.

Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivate related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, this Plan, the Plan Supplement, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of this Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

000839

**App. 343**

F.    Injunction.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan in relation to any Claim or Interest that is extinguished, discharged, or released pursuant to this Plan.

Except as otherwise expressly provided in this Plan, the Definitive Documents, or the Confirmation Order, or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation pursuant to Article VIII, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties, and/or the Released Parties:

(a)    commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(b)    enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(c)    creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(d)    except as otherwise provided under this Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

(e)    commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to this Plan or the Confirmation Order.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, this Plan, the Plan Supplement, the PVKG Notes Purchase Agreement, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other

55

avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.  The injunction in this Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under this Plan, the Confirmation Order, or under any other Definitive Document or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order from bringing an action to enforce the terms of this Plan, the Confirmation Order, the Definitive Documents, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order.

G.      Waiver of Statutory Limitations on Releases.

Each Releasing Party in each of the releases contained in this Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party.  The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

H.      Protections Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      Document Retention.

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policies, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

J.      Reimbursement or Contribution.

If the Bankruptcy Court Disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of Allowance or Disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

A.      Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of **Article IX.B** hereof:

1.      The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Lenders or the Required Consenting Second Lien Lenders and shall be in full force and effect;

2.      The Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order, the latter of which shall be in full force and effect;

3.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with and subject to the consent rights set forth in the Restructuring Support Agreement, and the Confirmation Order shall be in full force and effect;

4.      The 9019 settlements embodied in this Plan shall have been approved by the Bankruptcy Court and incorporated in the Confirmation Order;

5.      The Backstop Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order), and shall be in full force and effect;

6.      The Debtors shall have received a commitment for the Exit ABL Facility, which shall refinance the ABL DIP Facility on the Effective Date and the terms and conditions of which shall be reasonably satisfactory to the Debtors and the Required Consenting Lenders;

7.      The Rights Offering and the Direct Investment (including the Rights Offering Documents) shall have been approved by the Bankruptcy Court and shall have been consummated in accordance with their terms;

8.      The Exit ABL Facility Documents and Exit Term Loan Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related

000842
**App. 346**

thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions;

9.      The New Equity Interests shall have been issued;

10.    All Restructuring Expenses shall have been paid in full in Cash;

11.    The Definitive Documents shall (a) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (b) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (c) shall be adopted on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet; and

12.    The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions.

B.      <u>Waiver of Conditions</u>.

The conditions to the Effective Date set forth in this **<u>Article IX</u>** may be waived, in whole or in part, by the Debtors only with the prior written consent of the Required Consenting Lenders (email shall suffice) and, solely with respect to the condition set forth in **<u>Article IX.A</u>** (1) (solely with respect to the Required Consenting Second Lien Lenders), (9), (10), (11), and (12), the Required Consenting Second Lien Lenders (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

C.      <u>Substantial Consummation</u>.

Consummation of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.      <u>Effect of Failure of Conditions</u>.

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

### ARTICLE X.
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.      <u>Modification and Amendments</u>.

Except as otherwise specifically provided in this Plan and to the extent permitted by the Restructuring Support Agreement, subject to certain restrictions and requirements set forth in section 1127

000843
**App. 347**

of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors reserve the right to modify this Plan without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  After the Confirmation Date and before substantial consummation of the Plan, the Debtors may initiate proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and intent of the Plan.

After the Confirmation Date, but before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court; provided that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests.

Notwithstanding anything to the contrary herein, the Debtors shall not amend or modify this Plan in a manner inconsistent with the Restructuring Support Agreement or the Backstop Agreement.

B.      Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      Revocation or Withdrawal of Plan.

Subject to the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then:  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or relating to, the Chapter 11 Cases, the Confirmation Order, and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan;

3.      resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including Cure Claims; (ii) any dispute regarding whether a contract or lease is or was executory, expired, or terminated; (iii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iv) any other issue related to any Executory Contracts and Unexpired Leases; or (v) any dispute regarding whether the Plan or any Restructuring Transactions trigger any cross-default or change of control provision in any contract or agreement;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes arising from or relating to distributions under this Plan or the Confirmation Order;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action that may arise from or in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan or the Confirmation Order and the administration of the Estates;

11.      hear and determine disputes arising in connection with the interpretation, implementation, effect, or enforcement of this Plan or the Plan Supplement, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

12.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan or the Confirmation Order;

13.      adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in **Article VIII** hereof

000845
**App. 349**

and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

14.     adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to **Article VI** hereof;

15.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     determine any other matters that may arise in connection with or relate to this Plan, the Definitive Documents, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement, including the Restructuring Support Agreement; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court or arbitration forum;

17.     enter an order concluding or closing the Chapter 11 Cases;

18.     consider any modifications of this Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     adjudicate, decide, or resolve disputes as to the ownership of any Claim or Interest;

21.     adjudicate, decide, or resolve all matters related to any subordinated Claim;

22.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

23.     adjudicate, decide, or resolve matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

24.     grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

25.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under **Article VIII** hereof;

26.     hear and determine all disputes involving the obligations or terms of the Rights Offering, the Direct Investment, and the Backstop Agreement;

27.     enforce all orders previously entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

28.     hear any other matter not inconsistent with the Bankruptcy Code; and

000846
**App. 350**

29.    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Person or Entity's rights arising from or obligations incurred in connection with the Plan.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this **Article XI**, the provisions of this **Article XI** shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior Order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

As of the Effective Date, notwithstanding anything in this **Article XI** to the contrary, the Exit Facilities Documents shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

A.    <u>Immediate Binding Effect</u>.

Subject to **Article IX.A** hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted or rejected this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan or the Confirmation Order, each Entity acquiring property under this Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan and the Confirmation Order, regardless of whether any such Holder of a Claim or Interest has voted on this Plan.

B.    <u>Waiver of Stay</u>.

The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order shall be waived by the Confirmation Order. The Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

C.    Additional Documents.

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan or the Confirmation Order.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan and the Confirmation Order.

D.    Payment of Statutory Fees.

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by each of the Debtors or the Reorganized Debtors (or the Distribution Agent on behalf of each of the Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

E.    Statutory Committee and Cessation of Fee and Expense Payment.

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except with respect to final fee applications of the Professionals.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

F.    Reservation of Rights.

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any Entity unless and until the Effective Date occurs.

G.    Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.    Notices.

To be effective, all notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.    if to the Debtors or the Reorganized Debtors, to:
ConvergeOne Holdings, Inc.
10900 Nesbitt Avenue South
Bloomington, MN 55437

000848

**App. 352**

Attention:  Rui Goncalves
E-mail:  rgoncalves@onec1.com

with copies (which shall not constitute notice) to:

White & Case LLP
111 South Wacker Drive
Chicago, IL 60606
Attention:  Bojan Guzina, Andrew F. O'Neill, Erin R. Rosenberg, Blair M. Warner, and
Adam T. Swingle
E-mail:  bojan.guzina@whitecase.com
            aoneill@whitecase.com
            erin.rosenberg@whitecase.com
            blair.warner@whitecase.com
            adam.swingle@whitecase.com

2.   if to the PVKG Lender or a Consenting Sponsor, to:
PVKG Investment Holdings, Inc.
Attention:  Lars Haegg and PJ Heyer
E-mail:  lhaegg@cvc.com
            pheyer@cvc.com

with copies to:

Latham & Watkins LLP
1271 6th Avenue
New York, NY 10020
Attention:  Keith A. Simon, Joshua Tinkelman, and David Hammerman
E-mail: keith.simon@lw.com
            joshua.tinkelman@lw.com
            david.hammerman@lw.com

3.   if to a member of the First Lien Ad Hoc Group, to:
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention:  Scott J. Greenberg, Keith R. Martorana, and Michelle Choi
E-mail:   SGreenberg@gibsondunn.com
            KMartorana@gibsondunn.com
            MChoi@gibsondunn.com

4.   if to a member of the Second Lien Ad Hoc Group, to:
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:  Adam L. Shpeen and Abraham Bane
E-mail address:  adam.shpeen@davispolk.com
                    abraham.bane@davispolk.com

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to
receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive

000849
**App. 353**

documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.      Term of Injunctions or Stays.

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      Entire Agreement.

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, this Plan (including, for the avoidance of doubt, the Plan Supplement), the Confirmation Order, and the applicable Definitive Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan, the Confirmation Order, the Definitive Documents, the Plan Supplement, and the documents related thereto.

K.      Exhibits.

All exhibits and documents included in this Plan, the Confirmation Order, and the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/C1 or the Bankruptcy Court's website at http://www.txs.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

L.      Deemed Acts.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party by virtue of this Plan and the Confirmation Order.

M.      Nonseverability of Plan Provisions.

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, subject to the terms of the Restructuring Support Agreement, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it

000850

**App. 354**

may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable, *provided* that any such deletion or modification must be consistent with the Restructuring Support Agreement and the Backstop Agreement and the consent rights contained in each of them; and (3) non-severable and mutually dependent.

N.     Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, each of the Released Parties and Exculpated Parties will be deemed to have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and in a manner consistent with the Disclosure Statement, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the negotiation, execution, delivery, and performance of the Restructuring Support Agreement and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan.  Without limiting the generality of the foregoing, upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code and other applicable law, and, pursuant to section 1125(e) of the Bankruptcy Code, any person will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan or the Rights Offering or the Direct Investment, and, therefore, none of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and the Rights Offering or the Direct Investment.

O.     Request for Expedited Determination of Taxes.

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

P.     Closing of Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to (1) close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case and (2) change the name of the remaining Debtor and case caption of the remaining open Chapter 11 Case as desired, in the Reorganized Debtors' sole discretion.

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Q.     Waiver or Estoppel.

Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

000851
**App. 355**

Dated:  April 3, 2024

CONVERGEONE HOLDINGS, INC.
(for itself and on behalf of each of the other
Debtors and Debtors in Possession)

By:  */s/ Jeffrey Russell*
Name: Jeffrey Russell
Title: Chief Executive Officer

000852
**App. 356**

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT (AS DEFINED BELOW).

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAWS, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS RESTRUCTURING SUPPORT AGREEMENT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY RESTRUCTURING TRANSACTIONS SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "***Agreement***")[1] is made and entered into as of April 3, 2024 (the "***Execution Date***"), by and among the following parties (each, a "***Party***" and together the "***Parties***"):

> (i)    PVKG Intermediate Holdings Inc. ("***PVKG Intermediate***") and ConvergeOne Holdings, Inc. ("***C1 Holdings***"), on behalf of themselves and each of their direct

---

[1]    Capitalized terms used but not defined in the preamble or recitals to this Agreement shall have the meanings ascribed to such terms in Section 1.

and indirect subsidiaries listed on **Exhibit A** to this Agreement that have executed this Agreement (collectively, the "***Company Parties***");

(ii)    each Holder of a First Lien Claim that has executed and delivered counterpart signature pages to this Agreement on the date hereof, each solely in their capacities as such, or that executes and delivers a Joinder or Transfer Agreement to counsel to the Company Parties after the date hereof (such entities, the "***First Lien Consenting Lenders***"), including as of the date hereof:

    a.    each of the funds or accounts managed by (i) Kennedy Lewis Investment Management LLC, (ii) Monarch Alternative Capital LP, and (iii) Silver Point Capital (the "***Initial First Lien Ad Hoc Group Members***");

    b.    each of the funds or accounts managed by (i) MJX Asset Management LLC; (ii) PGIM, Inc., and (iii) Sound Point Capital Management, LP (the "***Subsequent First Lien Ad Hoc Group Members***");

    c.    Kennedy Lewis Investment Management LLC as the Holder of the KL Note Claims (the "***KL Lender***"); and

    d.    PVKG Investment Holdings, Inc. as the Holder of the PVKG Note Claims (the "***PVKG Lender***").

(iii)    each Holder of a Second Lien Claim that has executed and delivered counterpart signature pages to this Agreement on the date hereof, each solely in their capacities as such, or that executes and delivers a Joinder or Transfer Agreement to counsel to the Company Parties after the date hereof (such entities, the "***Second Lien Consenting Lenders***"), including, as of the date hereof, each of the funds or accounts managed by (i) Partners Group (USA) Inc., (ii) Siris Capital Group, LLC, (iii) AlbaCore Capital LLP, and (iv) Neuberger Berman Investment Advisers LLC and its affiliates; and

(iv)    PVKG Lender, ConvergeOne Investment, LP, and PVKG Investment US LP and each of their affiliates other than the Company Parties that have executed and delivered counterpart signature pages to this Agreement, in their capacities as direct or indirect Holders of Existing C1 Interests (collectively, the "***Consenting Sponsors***" and together with the First Lien Consenting Lenders, the "***Consenting Stakeholders***").

### RECITALS

**WHEREAS**, the Company Parties, the Consenting Stakeholders, and the Second Lien Consenting Lenders have in good faith and at arms' length negotiated certain restructuring transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "***Restructuring Term Sheet***" and, such transactions as described in this Agreement, the Restructuring Term Sheet, and the Definitive Documents, in each case, as may be amended, supplemented, or otherwise

2

modified from time to time in accordance with their applicable terms, and including any exhibits, annexes, and schedules thereto, collectively, the "***Restructuring Transactions***").

**WHEREAS**, the Restructuring Transactions shall be implemented through, among other things, voluntary bankruptcy cases to be commenced by the Company Parties under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended from time to time, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***" and such cases, the "***Chapter 11 Cases***").

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement, the Restructuring Term Sheet, and the Definitive Documents.

**NOW**, **THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     ***Definitions and Interpretation***.

    1.01.   Definitions.  The following terms shall have the following definitions:

"***ABL DIP Agent***" means Wells Fargo Commercial Distribution Finance, LLC.

"***ABL DIP Commitment Letter***" means the commitment letter, as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, to be entered into between the Company Parties and the ABL DIP Secured Parties, pursuant to which the ABL DIP Secured Parties have committed to make available to the Debtors the ABL DIP Facility in accordance with the terms thereof and the ABL DIP Documents.

"***ABL DIP Documents***" has the meaning set forth in the ABL DIP Facility Term Sheet.

"***ABL DIP Facility***" means the debtor in possession financing facility for the priming asset based revolving credit facility to be provided to the Debtors on the terms and conditions set forth in the ABL DIP Facility Term Sheet.

"***ABL DIP Facility Term Sheet***" means the term sheet attached as **Exhibit 1** to the Restructuring Term Sheet describing the material terms of the ABL DIP Facility.

"***ABL DIP Secured Parties***" has the meaning set forth in the ABL DIP Facility Term Sheet.

"***Affiliate***" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

"***Agents/Trustees***" means, collectively, any administrative agent, collateral agent, indenture trustee, floorplan funding agent, or similar Entity under the Prepetition ABL Credit

3

Agreement, the Prepetition First Lien Term Loan Credit Agreement, the Prepetition KL Note Purchase Agreement, the Prepetition PVKG Note Purchase Agreement, the Prepetition Second Lien Term Loan Credit Agreement, the Prepetition Intercreditor Agreements, the ABL DIP Facility, or the Term DIP Facility, including any successors thereto and including, without limitation, the ABL DIP Agent and Term DIP Agent.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of any doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Consenting Stakeholder or Second Lien Consenting Lender that becomes a party hereto after the Agreement Effective Date, the date as of which such Consenting Stakeholder or Second Lien Consenting Lender becomes a party hereto) to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization, plan of liquidation, share exchange, business combination, joint venture, debt incurrence (including, without limitation, any debtor-in-possession financing or exit financing), or similar transaction involving any one or more Company Parties or the debt, equity, or other Interests of or in any one or more Company Parties, whether written or oral, that is an alternative to, or is inconsistent with, any material component of the Restructuring Transactions.

"**Backstop Agreement**" means that certain Backstop Agreement agreed to between the Backstop Parties and the Company Parties regarding the Backstop Parties' commitment to backstop the Rights Offering on the terms set forth in the Rights Offering Term Sheet.

"**Backstop Parties**" means the Investors.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

"***Business Day***" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"***C1 Holdings***" has the meaning set forth in the preamble to this Agreement.

"***Causes of Action***" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code, or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

"***Chapter 11 Cases***" has the meaning set forth in the recitals to this Agreement.

"***Claim***" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"***Company Claims or Interests***" means any Claim against or Interest in a Debtor.

"***Company Parties***" has the meaning set forth in the preamble to this Agreement.

"***Confidentiality Agreement***" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with any proposed Restructuring Transactions, and between any Company Party and any ad hoc groups, their advisors, or any Holder of any Company Claims or Interests.

"***Confirmation Order***" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"***Consenting Sponsors***" has the meaning set forth in the preamble to this Agreement.

"***Consenting Stakeholders***" has the meaning set forth in the preamble to this Agreement.

"***Debtors***" means the Company Parties set forth in the preamble to this Agreement and listed on **Exhibit A** hereto that become debtors and debtors in possession in the Chapter 11 Cases.

"***Definitive Documents***" means, collectively, each of the documents listed in Section 3.01.

"***DIP Orders***" means, together, the Interim DIP Order and the Final DIP Order.

"*Disclosure Statement*" means that certain disclosure statement disclosing the terms and conditions of the Plan, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement and in accordance with, among other things, applicable securities Law, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Bankruptcy Rules, and other applicable Law.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Execution Date*" has the meaning set forth in the preamble to this Agreement.

"*Existing C1 Interests*" has the meaning set forth in the Restructuring Term Sheet.

"*Exit ABL Facility*" has the meaning set forth in the Restructuring Term Sheet.

"*Exit ABL Facility Documents*" means any documents governing the Exit ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"*Exit Term Loan Facility*" has the meaning set forth in the Restructuring Term Sheet.

"*Exit Term Loan Facility Documents*" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"*Final DIP Order*" means any Final Order approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents, and authorizing the Debtors' use of cash collateral.

"*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken; or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing has been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, for the avoidance of any doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; *provided*, *further*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

6

"*First Day Pleadings*" means the motions and related pleadings that the Debtors intend to file upon the commencement of the Chapter 11 Cases.

"*First Lien Ad Hoc Group*" means that certain ad hoc group of Holders of First Lien Claims, including the KL Lender, represented by the First Lien Ad Hoc Group Advisors.

"*First Lien Ad Hoc Group Advisors*" means Gibson, Dunn & Crutcher LLP, PJT Partners Inc., EY-Parthenon, any local counsel retained by the First Lien Ad Hoc Group, and such other professional advisors as are retained by the First Lien Ad Hoc Group with the prior written consent of the Debtors (not to be unreasonably withheld).

"*First Lien Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*First Lien Consenting Lenders*" has the meaning set forth in the preamble to this Agreement.

"*First Lien Term Loan Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*General Unsecured Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*Governance Documents*" means, as applicable, the organizational and governance documents for New C1 and its direct and indirect subsidiaries, giving effect to the Restructuring Transactions, including, without limitation, certificates of incorporation, certificates of formation, or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or similar governing documents), and the identities of proposed members of the board of directors of New C1, each consistent with the terms and conditions of the Governance Term Sheet and in form and substance acceptable to the Debtors and the Required Consenting Lenders.

"*Governance Term Sheet*" means the term sheet attached as **Exhibit 4** to the Restructuring Term Sheet describing organizational and governance matters for New C1.

"*Governmental Authority*" has the meaning as set forth in section 101(27) of the Bankruptcy Code.

"*Holder*" means any Person or Entity that is the record or beneficial owner of any Claim or Interest, including any investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold any Claim or Interest on behalf of any signatory to this Agreement.

"*Initial First Lien Ad Hoc Group Members*" has the meaning set forth in the preamble to this Agreement.

"*Initial Second Lien Ad Hoc Group Members*" means each of the funds or accounts that are managed by (i) Partners Group (USA) Inc. and (ii) Siris Capital Group, LLC

"*Interest*" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, units, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to

7

acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, units, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"*Interim DIP Order*" means any order entered on an interim basis approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents, and authorizing the Debtors' use of cash collateral.

"*Investors*" has the meaning set forth in the Rights Offering Term Sheet.

"*Joinder*" means a joinder to this Agreement, substantially in the form attached hereto as **Exhibit C**, providing, among other things, that such Person or Entity signatory thereto is bound by the terms of this Agreement.  For the avoidance of any doubt, any party that executes a Joinder shall be a "Party" under this Agreement as provided therein and herein.

"*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority or court of competent jurisdiction (including the Bankruptcy Court).

"*KL Lender*" has the meaning set forth in the preamble to this Agreement.

"*KL Lender Advisor*" means Akin Gump Strauss Hauer & Feld LLP.

"*KL Lender Advisor Cap*" means $250,000.

"*KL Note Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*Milestones*" means the applicable milestones set forth in the Restructuring Term Sheet, as such milestones may be extended in accordance with the terms of this Agreement and the Restructuring Term Sheet.

"*Minority Protections*" has the meaning set forth in the Governance Term Sheet.

"*New C1*" means either PVKG Investment, as reorganized pursuant to the Plan, or, if applicable, any successor or assign thereto, by merger, consolidation, or otherwise on and after the Plan Effective Date, or a new entity, and each of its direct and indirect wholly-owned subsidiaries, which in any case shall be the ultimate parent of the other Company Parties on and after the Plan Effective Date as set forth in the Plan.  For the avoidance of doubt, the identity of New C1 shall be subject to the consent of the Debtors and the Required Consenting Lenders.

"*Parties*" has the meaning set forth in the preamble to this Agreement.

"*Permitted Transferee*" means each transferee of any Company Claims or Interests who meets the requirements of Section 8.01.

"*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

8

"**Petition Date**" means the first date that any of the Debtors commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization that will be filed by the Debtors under the Bankruptcy Code to implement the Restructuring Transactions in accordance with, and subject to the terms and conditions of, this Agreement, the Restructuring Term Sheet, the Definitive Documents, and related exhibits and appendices.

"**Plan Effective Date**" means the Effective Date of the Plan, as defined in the Restructuring Term Sheet.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that, subject to the terms and conditions provided in the Plan, will be filed by the Debtors with the Bankruptcy Court.

"**Prepetition ABL Credit Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**Prepetition First Lien Term Loan Credit Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**Prepetition First Lien and Second Lien Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of January 4, 2019 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), among Deutsche Bank AG New York Branch, as Initial Senior Lien Representative and Senior Lien Collateral Agent, UBS AG, Stamford Branch, as Initial Junior Lien Representative and Junior Lien Collateral Agent and the additional Representatives and Collateral Agents from time to time a party thereto, C1 Holdings, and certain subsidiaries and parent entities of C1 Holdings.

"**Prepetition Intercreditor Agreements**" means (a) that certain ABL Intercreditor Agreement, dated as of January 4, 2019 (as amended by that certain Joinder and Amendment to ABL Intercreditor Agreement dated as of July 10, 2020 and supplemented by that certain ABL Intercreditor Agreement Joinder dated as of May 15, 2023); (b) that certain First Lien Pari Passu Intercreditor Agreement, dated as of January 10, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time); and (c) the Prepetition First Lien and Second Lien Intercreditor Agreement.

"**Prepetition KL Note Purchase Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**Prepetition PVKG Note Purchase Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**Prepetition Second Lien Term Loan Credit Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**PVKG Intermediate**" has the meaning set forth in the preamble to this Agreement.

"**PVKG Investment**" means PVKG Investment Holdings, Inc.

"**PVKG Lender**" has the meaning set forth in the preamble to this Agreement.

"**PVKG Lender Advisors**" means Latham & Watkins LLP and any local counsel retained by the PVKG Lender to advise the PVKG Lender in its capacity as the Holder of the PVKG Note Claims.

"**PVKG Note Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims or Interests (or enter with customers into long and short positions in Company Claims or Interests), in its capacity as a dealer or market maker in Company Claims or Interests, and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Released Parties**" has the meaning set forth in the Restructuring Term Sheet.

"**Required ABL DIP Lenders**" has the meaning set forth in the ABL DIP Facility Term Sheet.

"**Required Consenting Lender Advisors**" means, collectively, the First Lien Ad Hoc Group Advisors and the PVKG Lender Advisors.

"**Required Consenting Lenders**" means, as of the relevant date, the Initial First Lien Ad Hoc Group Members and the PVKG Lender holding, collectively, in excess of 66 2/3% of the aggregate First Lien Claims collectively held by the Initial First Lien Ad Hoc Group Members and PVKG Lender.

"**Required Consenting Initial First Lien Ad Hoc Group Members**" means, as of the relevant date, the Initial First Lien Ad Hoc Group Members holding, collectively, in excess of 75% of the aggregate First Lien Claims collectively held by the Initial First Lien Ad Hoc Group Members.

"**Required Consenting Initial Second Lien Ad Hoc Group Members**" means, as of the relevant date, the Initial Second Lien Ad Hoc Group Members holding, collectively, in excess of 50.01% of the aggregate Second Lien Claims collectively held by the Initial Second Lien Ad Hoc Group Members.

"**Required Term DIP Lenders**" has the meaning set forth in the Term DIP Term Sheet.

"**Restructuring Expenses**" means the actual, reasonable, and documented fees and expenses of the First Lien Ad Hoc Group Advisors, the KL Lender Advisor (subject to the KL Lender Advisor Cap), the PVKG Lender Advisors, the Second Lien Ad Hoc Group Advisors, regardless of whether such fees and expenses are or were incurred before, on, or after the Agreement Effective Date, subject to the terms of any applicable fee reimbursement letter between any such Parties and any of the Company Parties, as the case may be; *provided*, *however*, that the invoices for such fees and expenses shall be in summary format (with such redactions as may be necessary to maintain attorney client privilege), and the First Lien Ad Hoc Group Advisors, PVKG

10

Lender Advisors, and the Second Lien Ad Hoc Group Advisors shall not be required to provide the Company Parties with attorney time entries or apply to the Bankruptcy Court for payment.

"***Restructuring Term Sheet***" has the meaning set forth in the recitals to this Agreement.

"***Restructuring Transactions***" has the meaning set forth in the recitals to this Agreement.

"***Rights Offering***" has the meaning set forth in the Restructuring Term Sheet.

"***Rights Offering Documents***" means, collectively, the Backstop Agreement, the Rights Offering Procedures, and any and all other agreements, documents, and instruments delivered or entered into in connection with the Rights Offering, not inconsistent with the terms of the Rights Offering Term Sheet.

"***Rights Offering Procedures***" means the procedures governing the Rights Offering.

"***Rights Offering Term Sheet***" means the term sheet attached as **Exhibit 3** to the Restructuring Term Sheet describing the material terms of the Rights Offering.

"***Second Lien Ad Hoc Group***" means that certain ad hoc group of Holders of Second Lien Claims represented by the Second Lien Ad Hoc Group Advisors.

"***Second Lien Ad Hoc Group Advisors***" means Davis Polk & Wardwell LLP, Guggenheim Securities, LLC, Haynes and Boone, LLP, and such other professional advisors as are retained by the Second Lien Ad Hoc Group with the prior written consent of the Required Consenting Lenders and the Debtors (not to be unreasonably withheld).

"***Second Lien Claims***" has the meaning set forth in the Restructuring Term Sheet.

"***Second Lien Consenting Lenders***" has the meaning set forth in the Preamble to this Agreement.

"***Solicitation Materials***" means all documents, forms, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"***Subsequent First Lien Ad Hoc Group Members***" has the meaning set forth in the preamble to this Agreement.

"****Term DIP Agent***"* has the meaning set forth in the Term DIP Term Sheet.

"***Term DIP Facility***" means the debtor in possession financing facility for the priming super priority secured term loans that the Term DIP Lenders have committed to provide to the Debtors on the terms and conditions set forth in the Term DIP Term Sheet.

"***Term DIP Lenders***" has the meaning set forth in the Term DIP Term Sheet.

"***Term DIP Loan Documents***" has the meaning set forth in the Term DIP Term Sheet.

11

"***Term DIP Term Sheet***" means the term sheet attached as **Exhibit 2** to the Restructuring Term Sheet describing the material terms of the Term DIP Facility.

"***Termination Date***" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 12.

"***Transfer***" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"***Transfer Agreement***" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

1.02.   <u>Interpretation</u>.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereunder," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

(j)      the use of "$", "Dollar" or "dollar" shall refer to denominations in U.S. Dollars.

**Section 2.**      *Effectiveness of this Agreement*.

2.01.   <u>Agreement Effective Date</u>. This Agreement shall become effective and binding upon each of the Parties on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b)      Holders of at least 66 2/3% of the principal amount of First Lien Claims, including each of the Required Consenting Lenders, and exclusive of the Holders of the PVKG Note Claims, shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(c)      Holders of 100% of the principal amount of the PVKG Note Claims shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(d)      Holders of at least 66 2/3% of the principal amount of Second Lien Claims shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(e)      the Consenting Sponsors shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(f)      the Company Parties shall have paid, or caused to be paid, all Restructuring Expenses for which an invoice has been received by the Company Parties (inclusive of any reasonable estimate of Restructuring Expenses through and including the Agreement Effective Date) in accordance with the terms of any applicable fee letter prior to the Agreement Effective Date; and

(g)      counsel to the Company Parties shall have given written notice (email sufficient) to counsel to each of the other Parties in the manner set forth in Section 14.10 that the conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.**      *Definitive Documents*.

3.01.   The Definitive Documents governing the Restructuring Transactions shall include the following documents, including all exhibits, annexes, schedules, and other attachments thereto:

(a)      the Plan;

(b)      the Disclosure Statement;

(c)      the Solicitation Materials;

000866

(d)     the DIP Orders (and motion(s) seeking approval thereof);

(e)     the ABL DIP Commitment Letter;

(f)     the ABL DIP Documents;

(g)     the Term DIP Loan Documents;

(h)     the Exit ABL Facility Documents;

(i)     the Exit Term Loan Facility Documents;

(j)     the Backstop Agreement and motion(s) seeking approval thereof;

(k)     the Rights Offering Procedures;

(l)     the Rights Offering Documents;

(m)     the Governance Documents;

(n)     any order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials (and motion(s) seeking approval thereof), which may be the Confirmation Order;

(o)     the Confirmation Order;

(p)     the Plan Supplement;

(q)     all material pleadings and motions filed by the Company Parties in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings, any "second day" pleadings, and all orders sought pursuant thereto;

(r)     such other agreements, instruments, and documentation that are necessary, or as may be agreed in writing (email sufficient) between the Company Parties and the Required Consenting Lenders, to document and consummate the Restructuring Transactions; and

(s)     any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing.

Completion of Definitive Documents. The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and/or covenants consistent with the terms of this Agreement and the Restructuring Term Sheet, as they may be modified, amended, or supplemented in accordance with Section 13. Notwithstanding anything to the contrary herein, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise, when completed, (i) be in form and substance, including with respect to any

14

amendment, modification, or supplement thereto, acceptable to the Company Parties and the Required Consenting Lenders; (ii) provide for equal treatment of the KL Note Claims and First Lien Term Loan Claims, unless otherwise consented to by the Required Consenting Lenders and the KL Lender; (iii) provide for equal rights to the Holders of, and treatment of, the PVKG Note Claims and First Lien Term Loan Claims, unless otherwise consented to by the PVKG Lender and the Required Consenting Initial First Lien Ad Hoc Group Members; (iv) be in a form and substance, including with respect to any amendment, modification, or supplement thereto, reasonably acceptable to the Required Consenting Initial Second Lien Ad Hoc Group Members solely with respect to matters that directly or indirectly relate to the rights, distribution and treatment of the Consenting Second Lien Lenders provided for herein; and (v) the Governance Documents will be reasonably acceptable to the Subsequent First Lien Ad Hoc Group Members and Required Consenting Initial Second Lien Ad Hoc Group Members solely with respect to the Minority Protections and board observer rights provided therein.

**Section 4.**     *Commitments of the Consenting Stakeholders and Second Lien Consenting Lenders*.

     4.01.   <u>General Commitments</u>.

     (a)     During the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender severally, and not jointly, agrees, in respect of all of its Company Claims or Interests, to:

          (i)     agree by execution of this Agreement and the effectiveness of this Agreement to (A) consent, and to be deemed to have consented, to the incurrence of the ABL DIP Facility on the terms set forth in the ABL DIP Facility Term Sheet and the ABL DIP Documents and the Term DIP Facility on the terms set forth in the Term DIP Term Sheet and Term DIP Loan Documents; (B) consent, and direct the Agents/Trustees to consent, to the Company Parties' use of their cash collateral pursuant to the DIP Orders; and (C) if necessary, give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the foregoing;

          (ii)     support the Restructuring Transactions on the terms and subject to the conditions of this Agreement and vote or consent and not object, to the extent applicable, all Company Claims or Interests owned by or held by such Consenting Stakeholder or Second Lien Consenting Lender and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions, subject to finalization of the Definitive Documents in accordance with the terms of this Agreement;

          (iii)     give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the Restructuring Transactions; *provided* that no Consenting Stakeholder or Second Lien Consenting Lender shall be required hereunder to provide such Agents/Trustees with any indemnities or similar undertakings in connection with taking any such action or incur any fees or expenses in connection therewith;

000868
**App. 372**

(iv)     use commercially reasonable efforts to support the Company Parties' efforts to obtain any and all required regulatory or third-party approvals for the Restructuring Transactions;

(v)     use commercially reasonable efforts to cooperate in good faith with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other creditors and stakeholders;

(vi)     validly and timely deliver, and not withdraw, the consents, proxies, signature pages, tenders, ballots, or other means of voting or participation in the Restructuring Transactions (including directing its nominee or custodian, if applicable, on behalf of itself and the accounts, funds, or Affiliates for which it is acting as investment advisor, sub-advisor, or manager to validly and timely deliver and not withdraw) with respect to all Company Claims or Interests owned by or held by such Consenting Stakeholder or Second Lien Consenting Lender; and

(vii)     negotiate in good faith and use commercially reasonable efforts to execute, deliver, and implement the Definitive Documents and any other necessary filings, documents, pleadings, agreements, contracts and requests for regulatory approvals to which it is a party in a timely manner to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement.

(b)     During the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender severally, and not jointly, agrees, in respect of all of its Company Claims or Interests, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)     seek to modify the Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement and the Restructuring Term Sheet;

(iv)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of its Company Claims or Interests against the Company Parties other than in accordance with this Agreement and the Definitive Documents;

(v)     file any motion, objection, pleading, or other document with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement and the Restructuring Term Sheet (nor directly or indirectly cause or instruct any other person to make such a filing);

(vi)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement, the Definitive Documents, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this

16

Agreement (nor directly or indirectly cause or instruct any other person to initiate such litigation or proceeding);

(vii)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code (nor directly or indirectly cause or instruct any other person to take such action); or

(viii)    exercise any right or remedy for the enforcement, collection, or recovery of any of its Company Claims or Interests other than in accordance with this Agreement and the Definitive Documents (nor directly or indirectly cause or instruct any other person to take or exercise such right or remedy).

(c)    Solely upon the occurrence of the Plan Effective Date, each Consenting Stakeholder and Second Lien Consenting Lender agrees to release, waive, and discharge, without any further notice or action, any and all (i) Claims and Causes of Action it may have against the Released Parties, subject to the limits with respect to such release set forth in the Plan; and (ii) General Unsecured Claims against any of the Company Parties.

(d)    Solely with respect to the Consenting Stakeholders that are Term DIP Lenders, such Term DIP Lenders commit to provide the Term DIP Facility to the Debtors on the terms and conditions set forth in the Term DIP Term Sheet.

(e)    Solely with respect to the Consenting Stakeholders that are Backstop Parties, such Backstop Parties commit to provide the Backstop Commitment to the Debtors on the terms and conditions set forth in the Rights Offering Term Sheet.

4.02.    <u>Chapter 11 Voting</u>.

(a)    In addition to the obligations set forth in Section 4.01, during the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Party of the Disclosure Statement and the Solicitation Materials, whether before or after the commencement of the Chapter 11 Cases:

(i)    use commercially reasonable efforts to support confirmation of the Plan, including the solicitation, confirmation, and consummation of the Plan, as may be applicable and not direct or instruct any of the Agents/Trustees to take any actions inconsistent with this Agreement or the Restructuring Term Sheet;

(ii)    vote each of its Company Claims or Interests entitled to vote to accept the Plan, and elect the Rights Offering Rights and Takeback Term Loan Recovery Option (if applicable to such Party), by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its receipt of the Disclosure Statement and any other Solicitation Materials and the ballot; *provided*, *however*, that each Consenting Stakeholder that acquires First Lien Claims after the Execution Date in accordance with the terms hereof shall be entitled to elect by the applicable election deadline the Takeback Term Loan Recovery Option solely with respect to such after-acquired First Lien

17

Claims, and solely to the extent that such acquisition and election is identified to the Company Parties and the Required Consenting Lender Advisors;

(iii)    to the extent it is permitted to elect whether to opt out of (or opt in to) the releases set forth in the Plan, elect not to opt out of (or elect to opt in to) the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iv)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (ii) and (iii) above; *provided*, *however*, that such votes or elections shall be immediately revoked and deemed *void ab initio* upon the occurrence of a Termination Date.

(b)    During the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender, in respect of each of its Company Claims or Interests, severally, and not jointly, will not directly or indirectly object to, delay, impede, or take any other action inconsistent with this Agreement and the Restructuring Term Sheet. Notwithstanding the foregoing, nothing in this Agreement shall require any Consenting Stakeholder or Second Lien Consenting Lender to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations against such Party.

4.03.    Prepetition First Lien and Second Lien Intercreditor Agreement. For any and all purposes under the Prepetition First Lien and Second Lien Intercreditor Agreement, each Consenting Stakeholder hereby agrees (a) that each Holder of a Second Lien Claim may receive its *pro rata* share of the Second Lien Recovery in accordance with the terms of this Agreement, and such Consenting Stakeholder waives any of its rights in connection thereto, including, without limitation, any rights under Sections 4.02 or 6.10 of the Prepetition First Lien and Second Lien Intercreditor Agreement, and (b) that this Agreement shall serve as such Consenting Stakeholder's direction to the Senior Lien Collateral Agent and Senior Lien Representatives to do the same.

**Section 5.    *Additional Provisions Regarding the Consenting Stakeholders' and Second Lien Consenting Lenders' Commitments*.**

5.01.    Notwithstanding the Consenting Stakeholders' and Second Lien Consenting Lenders' agreements to support the Restructuring Transactions as set forth in Section 4, this Agreement shall not:

(a)    be construed to impair any Consenting Stakeholder's or Second Lien Consenting Lender's rights to appear as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as the positions advocated are consistent with this Agreement;

(b)    prevent any Consenting Stakeholder or Second Lien Consenting Lender from filing, or directing any agent or representative to file, any proof of claim in any Chapter 11 Cases;

(c)    limit the ability of a Consenting Stakeholder or Second Lien Consenting Lender to purchase, sell, or enter into any transactions regarding the Company Claims or Interests, subject

to the terms hereof and any applicable agreements or Law governing such Company Claims or Interests;

(d)     constitute a waiver or amendment of any term or provision of the Prepetition First Lien Term Loan Credit Agreement, the Prepetition KL Note Purchase Agreement, the Prepetition PVKG Note Purchase Agreement, or the Prepetition Second Lien Term Loan Credit Agreement;

(e)     affect the ability of any Consenting Stakeholder or Second Lien Consenting Lender to consult with any other Consenting Stakeholder, Second Lien Consenting Lender, Company Parties, or any other party in interest (including, if applicable, any official committee and the United States Trustee), so long as such consultation does not violate such Consenting Stakeholder's or Second Lien Consenting Lender's support obligations set forth herein, any applicable Confidentiality Agreement, or applicable Law, including the Bankruptcy Code;

(f)     impair or waive the rights of any Consenting Stakeholder or Second Lien Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(g)     prevent any Consenting Stakeholder or Second Lien Consenting Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(h)     obligate a Consenting Stakeholder or Second Lien Consenting Lender to deliver a vote to support the Plan (or any other Restructuring Transactions) or prohibit a Consenting Stakeholder or Second Lien Consenting Lender from withdrawing such vote, in each case, from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date or a material breach of this Agreement by such Consenting Stakeholder or Second Lien Consenting Lender, as applicable);

(i)     prevent any Consenting Stakeholder or Second Lien Consenting Lender from taking any action that is required by applicable Law upon the advice of counsel;

(j)     require any Consenting Stakeholder or Second Lien Consenting Lender to take any action that is prohibited by applicable Law upon the advice of counsel;

(k)     require any Consenting Stakeholder or Second Lien Consenting Lender to waive or forego the benefit of any applicable legal professional privilege;

(l)     unless expressly provided for under this Agreement, require any Consenting Stakeholder or Second Lien Consenting Lender to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations against such Party; or

(m)     prevent any Consenting Stakeholder or Second Lien Consenting Lender from making, seeking, or receiving any required regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, or licenses.

000872

**Section 6.**      *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Subject in all cases to Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary and desirable to implement and consummate the Restructuring Transactions in accordance with the terms and conditions set forth in this Agreement and the Restructuring Term Sheet (including the Milestones);

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment in consultation with the Required Consenting Lenders;

(c)      use commercially reasonable efforts to promptly obtain any and all regulatory and/or third-party approvals that are necessary or advisable to effectuate and consummate the Restructuring Transactions as determined by the Company Parties in consultation with the Required Consenting Lenders, including the expiration of any applicable waiting periods;

(d)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other stakeholders;

(f)      continue ordinary course practices to maintain good standing under the jurisdiction in which each Company Party is incorporated or organized;

(g)      except as otherwise contemplated by this Agreement or any order of the Bankruptcy Court, (i) conduct its businesses and operations only in the ordinary course in a manner that is consistent with past practices and in compliance with applicable Law, taking into account the Restructuring, (ii) maintain its physical assets, properties, and facilities, in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law (ordinary wear and tear and casualty and condemnation excepted), taking into account the Restructuring, (iii) maintain its books and records in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law, and (iv) maintain all insurance policies, or suitable replacements therefor, in full force and effect, in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law;

(h)      provide draft copies of all Definitive Documents to the Required Consenting Lender Advisors  and Second Lien Ad Hoc Group Advisors as soon as reasonably practicable, but in no event less than two (2) Business Days prior to the date when the Company Parties intend to file such documents, and, without limiting any approval rights set forth herein, consult in good faith with the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors regarding the form and substance of any such proposed filing; *provided*, *however*, that in the event that not less than two (2) Business Days' notice is impracticable or impossible under the circumstances, the Company Parties shall provide draft copies of any motions or other pleadings

000873
**App. 377**

to the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors as soon as otherwise practicable before the time when the Company Parties intend to file any such motion or other pleading;

(i)     pay and reimburse in full in cash in immediately available funds (i) prior to the Petition Date, all Restructuring Expenses accrued within five (5) Business Days of receipt of an invoice therefor (and in any event, before the Petition Date if invoiced before such date), (ii) after the Petition Date and prior to the Plan Effective Date, subject to any applicable orders of the Bankruptcy Court but without the need to file fee or retention applications, all Restructuring Expenses incurred prior to (to the extent not previously paid) on and after the Petition Date, but in any event within five (5) Business Days of delivery to the Company Parties of any applicable invoice or receipt, (iii) on the Plan Effective Date, all Restructuring Expenses incurred and outstanding in connection with the Restructuring Transactions (including any estimated fees and expenses estimated to be incurred through the Plan Effective Date) and after the Plan Effective Date, all accrued and unpaid Restructuring Expenses incurred in connection with the implementation and consummation of the Plan shall be paid by the Company Parties (or their successors in interest) on a regular and continuing basis promptly (but in any event within five (5) Business Days) following receipt of an invoice therefor;

(j)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order: (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (iii) dismissing any of the Chapter 11 Cases;

(k)     timely file a formal objection to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file or solicit acceptances of a plan of reorganization, as applicable;

(l)     to the extent requested in writing by the Required Consenting Lender Advisors or the Second Lien Ad Hoc Group Advisors, provide the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors, as applicable, with reasonable access to information (excluding any privileged information) regarding the operations of the Company Parties subject to any confidentiality agreements in effect; and

(m)     promptly inform the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors in writing (email being sufficient) after obtaining actual knowledge of (i) any event or circumstance that has occurred that would permit any Party to terminate this Agreement; or (ii) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt, or securement of security from or by any person in respect of any Company Party.

6.02.   Negative Commitments.  Subject in all cases to Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is materially inconsistent with, or is intended to frustrate or impede, approval, implementation, and consummation of the Restructuring Transactions or any of the other transactions described in this Agreement or the Definitive Documents;

(c)      (i) execute, deliver, and/or file with the Bankruptcy Court or any other court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions that is not in form and substance acceptable in accordance with the terms set forth in Section 3 hereof, or if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing; or (ii) waive, amend, or modify any of the Definitive Documents, or, if applicable, file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, which waiver, amendment, modification, or filing contains any provision that is materially inconsistent with this Agreement (including the Restructuring Term Sheet) or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3 hereof;

(d)      seek to modify the Definitive Documents, in whole or in part, in a manner that is not consistent with Section 3 hereof;

(e)      without the prior written consent of the Required Consenting Lenders, with respect to any employee or director qualifying as an insider under the Bankruptcy Code, (i) enter into or amend, establish, adopt, restate, supplement, or otherwise modify or accelerate (A) any deferred compensation, incentive, success, retention, bonus, or other compensatory arrangements, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any such insider employee, or (B) any contracts, arrangements, or commitments that entitle any current or former insider director, officer, employee, manager, or agent to indemnification from the Company Parties, or (ii) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements) with respect to such insiders;

(f)      grant or agree to grant (including pursuant to a key employee retention plan, key employee incentive plan, or other similar arrangement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance, or other compensation or benefits of any employee or director qualifying as an insider under the Bankruptcy Code in each case, outside of the ordinary course of business and inconsistent with past practice, without the prior written consent of the Required Consenting Lenders;

(g)      (i) commence any proceeding or other action that challenges in a manner inconsistent with this Agreement or the Restructuring Term Sheet (A) the amount, validity, allowance, character, enforceability, or priority of any Company Claims or Interests of any of the Consenting Stakeholders or Second Lien Consenting Lenders, or (B) the validity, enforceability, or perfection of any lien or other encumbrance securing (or purporting to secure) any First Lien Claim or Second Lien Claim; (ii) otherwise seek to restrict any rights of any of the Consenting Stakeholders or Second Lien Consenting Lenders; or (iii) support any person in connection with any of the acts described in the foregoing clauses;

000875
**App. 379**

(h)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind against the other Parties in connection with the Restructuring, other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement or any Definitive Document;

(i)    without the prior written consent of the Required Consenting Lenders, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(j)    amend or change, or propose to amend or change, any of their respective existing organizational documents without the prior written consent of the Required Consenting Lenders;

(k)    (i) authorize, create, issue, sell, or grant any additional Interests, or (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Interests, in each case without the prior written consent of the Required Consenting Lenders.

(l)    modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(m)    file any motion, pleading, or Definitive Document with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement;

(n)    commence any process to sell, transfer, dispose, or otherwise monetize any assets of any of the Company Parties in a transaction or a series of transactions having a fair market value of $10,000,000 or greater without the prior written consent of the Required Consenting Lenders; or

(o)    assume, reject, terminate, settle, or renegotiate any material contract (including any material executory contracts and unexpired leases) without the prior written consent of the Required Consenting Lenders.

**Section 7.**    *Additional Provisions Regarding the Company Parties' Commitments.*

7.01.    <u>Non-Solicitation</u>.  The Company Parties shall not, directly or indirectly, solicit any Alternative Restructuring Proposal.

7.02.    <u>Company Parties' Fiduciary Duties</u>. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, to take any action or to refrain from taking any action to the extent such Company Party determines in good faith, after consultation with counsel, that taking or failing to take such action may violate applicable Law or be inconsistent with its fiduciary obligations under applicable Law.  The Company Parties shall promptly notify the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors in writing (email being sufficient) of any such determination within two (2) Business Days following such determination.  This Section 7.02 shall not impede any Consenting

000876
**App. 380**

Stakeholder's or Second Lien Consenting Lender's right to terminate this Agreement pursuant to Section 12 of this Agreement in accordance with the terms hereof.

7.03.    Alternative Restructuring Proposals. Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), if any Company Party receives a written or oral proposal or expression of interest from any Person or Entity regarding any Alternative Restructuring Proposal that its board of directors, board of managers, or similar governing body determines in good faith and following consultation with counsel represents a higher or otherwise better economic recovery to its stakeholders, as compared to the Restructuring, the Company Parties shall have the right to: (i) consider, respond to, facilitate, discuss, negotiate, support, or otherwise pursue such Alternative Restructuring Proposal; (ii) provide access to non-public information concerning the Company Parties to any Person or Entity and enter into any confidentiality agreement with such Person or Entity in connection therewith; and (iii) otherwise cooperate with, assist, or participate in any inquiries, proposals, discussions, or negotiations of such Alternative Restructuring Proposal. Within two (2) Business Days of a determination pursuant to this Section 7.03, the Company shall notify (with email being sufficient) the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors of such proposal or expression of interest, with, subject to Section 7.04, such notice to include a copy of such proposal, if it is in writing, or otherwise a summary of the material terms thereof.

7.04.    Notifications Regarding Alternative Restructuring Proposals. The Company Parties shall (a) provide to the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors on a professional eyes only basis, (1) a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for any Alternative Restructuring Proposal pursued under Section 7.03, if not barred under any applicable Confidentiality Agreement between any Company Party and the submitting party or such submitting party otherwise consents or (2) a summary of the material terms thereof, if any Company Party is bound by a Confidentiality Agreement with, or other known contractual or legal obligation of confidentiality to, the submitting party, in each case within two (2) Business Days of the Company Parties' or their advisors' receipt of such offer or proposal, and (b) provide such information to the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors regarding such discussions (including copies of any materials provided to such parties hereunder) as necessary to keep the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors reasonably contemporaneously informed as to the status and substance of such discussions.

7.05.    Non-Waiver of Company Parties' Rights. Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**    *Transfer of Interests and Securities*.

8.01.    Permitted Transfers. During the Agreement Effective Period, no Consenting Stakeholder or Second Lien Consenting Lender shall Transfer any ownership interest (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims or Interests to any affiliated or unaffiliated party, including any

24

party in which it may hold a direct or indirect beneficial interest, unless: either (i) the transferee executes and delivers to counsel to the Company Parties, Required Consenting Lender Advisors, and Second Lien Ad Hoc Group Advisors at or before the time of the proposed Transfer, a Transfer Agreement, or (ii) the transferee is a Consenting Stakeholder or Second Lien Consenting Lender, or an Affiliate of such Party, bound by the terms of this Agreement and the transferee provides notice of such Transfer (including the amount and type of Company Claim or Interest Transferred) to counsel to the Company Parties and to the Required Consenting Lender  Advisors by the close of business on the second Business Day following such Transfer.  Notwithstanding the foregoing, this Section 8 shall not apply to the grant of any lien or encumbrance on any right, title or interest in a Company Claim or Interest in favor of a bank or broker-dealer holding custody of any such right, title or interest in the Company Claim or Interest in the ordinary course of business that is released upon the Transfer of any such right, title or interest.

8.02.   <u>Effectiveness of Permitted Transfers</u>. Upon compliance with the requirements of Section 8.01, the Permitted Transferee shall be deemed a Consenting Stakeholder or Second Lien Consenting Lender, as applicable, and the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims or Interests. Any Transfer that does not comply with Section 8.01 or Section 8.03, as applicable, shall be void *ab initio*.

8.03.   <u>Additional Company Claims or Interests</u>. This Agreement shall in no way be construed to preclude the Consenting Stakeholders or Second Lien Consenting Lenders from acquiring additional Company Claims or Interests; *provided*, *however*, that (a) such additional Company Claims or Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder or Second Lien Consenting Lender, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties, the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors) and (b) such Consenting Stakeholder or Second Lien Consenting Lender must provide notice of such acquisition (including the amount and type of Company Claim or Interest acquired) to counsel to the Company Parties, the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors within five (5) Business Days of such acquisition.

8.04.   <u>No Cleansing</u>. This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing" materials or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder or Second Lien Consenting Lender to Transfer any of its Company Claims or Interests.  Notwithstanding the foregoing, if a Company Party and another Party have entered into a confidentiality agreement, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations of the Company Parties otherwise arising under such confidentiality agreements.

8.05.   <u>Qualified Marketmaker Matters</u>. Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims or Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims or Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims or Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims or Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a

25

transferee that is an Entity that is not an Affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is a permitted transfer under Section 8.01. To the extent that a Consenting Stakeholder or Second Lien Consenting Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Company Claims or Interests that the Qualified Marketmaker acquires from a Holder of the Company Claims or Interests who is not a Consenting Stakeholder or Second Lien Consenting Lender without the requirement that the transferee be a Permitted Transferee. For the avoidance of doubt, if a Qualified Marketmaker acquires any Company Claims or Interests from a Consenting Stakeholder or Second Lien Consenting Lender and is unable to transfer such Company Claims or Interests within the five (5) Business Day period referred to above, the Qualified Marketmaker shall execute and deliver a Transfer Agreement in respect of such Company Claims or Interests.

**Section 9.**    *Representations and Warranties of the Consenting Stakeholders and Second Lien Consenting Lenders*.

9.01.    Each Consenting Stakeholder and Second Lien Consenting Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder or Second Lien Consenting Lender executes and delivers this Agreement:

(a)    it is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims or Interests or is the nominee, investment manager, or advisor for beneficial Holders of the Company Claims or Interests reflected in such Consenting Stakeholder's or Second Lien Consenting Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)    it has the full power and authority to tender, act on behalf of, vote, and consent to matters concerning, such Company Claims or Interests, subject to applicable Law;

(c)    such Company Claims or Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Stakeholder's or Second Lien Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)    it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), (7), (8), (9), (12), and (13) under the Securities Act of 1933, as amended), and any securities acquired by the Consenting Stakeholder or Second Lien Consenting Lender in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

26

**Section 10.**    *Representations and Warranties of the Company Parties.*

10.01. Each Company Party represents and warrants that as of the date such Company Party executes and delivers this Agreement:

(a)    to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented, or resolution of such Company Party passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, or other similar officer in respect of such Company Party; *provided* that this Section 10 does not apply to any proceeding commenced in connection with filing the Chapter 11 Cases;

(b)    except as expressly provided for in this Agreement, it has not entered into any arrangement (including with any individual creditor, irrespective of whether it is or is to become a Consenting Stakeholder or Second Lien Consenting Lender), other than in the ordinary course of its business, on terms that are materially inconsistent with this Agreement;

(c)    to the best of its knowledge, the execution and delivery by it of this Agreement does not result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases of any Company Parties undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contract to which it is a party; and

(d)    to the best of its knowledge, the diligence materials and other information concerning the Company Parties that such Company Party or its advisors provided to any Consenting Stakeholder or Second Lien Consenting Lender in connection with an actual or potential restructuring of the Company Parties did not, taken as a whole and as of the date such materials or information were so provided, contain any untrue statement of material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not materially misleading; *provided*, *however*, that, with respect to any projected financial information, forecasts, estimates, or forward-looking information, each Company Party represents only that such information was prepared in good faith based upon assumptions it believed to be reasonable at the time.

**Section 11.**    *Mutual Representations and Warranties.*

11.01. Each of the Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, a Joinder, or a Transfer Agreement, as applicable:

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, as applicable (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring Transactions), no consent or approval is required by any other

000880
**App. 384**

person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other organizational or constitutional documents;

(d)      except as expressly provided in this Agreement and subject to any regulatory authority necessary to consummate the Restructuring Transactions, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements relating to the Company Parties with any Person or Entity that have not been disclosed to all Parties to this Agreement.

**Section 12.**      *Termination Events*.

12.01.   First Lien Consenting Lender and Second Lien Consenting Lender Termination Events.  This Agreement may be terminated with respect to (i) the First Lien Consenting Lenders by the Required Consenting Initial First Lien Ad Hoc Group Members, (ii) the PVKG Lender solely as to itself,[2] or (iii) the Second Lien Consenting Lenders solely as to themselves by the Required Consenting Initial Second Lien Ad Hoc Group Members (provided, however, that the termination events set forth in sections 12.01(a)-(g), (n), (q), (r), and (s) may only be exercisable by the Second Lien Consenting Lenders to the extent that such termination event reasonably, directly or indirectly, impacts the rights, distribution and treatment of the Consenting Second Lien Lenders provided for herein, or such other consent rights of the Required Initial Consenting Second Lien Lenders set forth herein), in each case, by delivering to the Company Parties a written notice in accordance with Section 14.10 upon the occurrence of any of the following events:

(a)      the breach in any material respect by any Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice in accordance with Section 14.10 detailing any such breach;

(b)      any of the Milestones set forth in the Restructuring Term Sheet is not achieved, except where such Milestone has been waived or extended by the Required Consenting Lenders; *provided*, *however*, that the right to terminate this Agreement under this Section 12.01(b) shall not be available if the failure of such Milestone to be achieved is caused by, or results from, the breach by the terminating Party of its covenants, agreements, or other obligations under this Agreement;

---

[2]     Any such termination by the PVKG Lender shall also apply in its capacity as a Consenting Sponsor.

28

(c)      this Agreement or any Definitive Document is amended, waived, or modified in any manner not consistent in any material respect with the terms of this Agreement and Restructuring Term Sheet;

(d)      any Company Party (i) files any motion or pleading that is inconsistent in any material respect with this Agreement or the Restructuring Term Sheet, (ii) files a pleading seeking approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is materially inconsistent with or not permitted by this Agreement without the prior written consent of the Required Consenting Lenders, the Required ABL DIP Lenders (solely with respect to the ABL DIP Documents), and the Required Term DIP Lenders (solely with respect to the Term DIP Loan Documents), (iii) revokes the Restructuring Transactions without the prior written consent of the Required Consenting Lenders, including execution of a written agreement with respect to an Alternative Restructuring Proposal or the withdrawal of the Plan, as applicable, or support therefor, (iv) exercises its rights set forth in Section 7.02, or (v) publicly announces its intention to take any such acts listed in the foregoing clauses (i), (ii), (iii) or (iv), or is otherwise inconsistent with the consent rights afforded such Parties under this Agreement;

(e)      a Company Party files a motion or pleading seeking an order (without the prior written consent of the Required Consenting Lenders, the Required ABL DIP Lenders, and the Required Term DIP Lenders) vacating or modifying the DIP Orders;

(f)      if (i) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the prior written consent of the Required Consenting Lenders, Required ABL DIP Lenders, and the Required Term DIP Lenders, or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company Parties fail to timely object to such motion;

(g)      the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the DIP Orders or otherwise consented to by the Required Consenting Lenders, the Required ABL DIP Lenders, and the Required Term DIP Lenders;

(h)      the occurrence of any "Event of Default" under (and as defined in) the DIP Orders, the ABL DIP Documents, or the Term DIP Loan Documents that has not been cured (if susceptible to cure) or waived by the Required ABL DIP Lenders or the Required Term DIP Lenders, as applicable;

(i)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with outside counsel and pursuant to Section 7.02 or Section 7.03, as applicable, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(j)      the Bankruptcy Court enters an order denying confirmation of the Plan or disallowing any material provision thereof and (i) such order remains in effect for fifteen (15) Business Days after entry of such order and (ii) the Company Parties have failed to timely appeal such order;

29

(k)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Lenders), (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iv) rejecting this Agreement;

(l)      upon the commencement of an involuntary case against any of the Company Parties or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief in respect of the Company Parties or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership, or similar law now or hereafter in effect; *provided*, *however*, that termination pursuant to this Section 12.01(l) shall only be effective if such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof, or if any court order grants the relief sought in such involuntary proceeding;

(m)      the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any Company Party's exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(n)      any Company Party files any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting Lenders;

(o)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after the Required Consenting Lenders transmit a written notice in accordance with Section 14.10 detailing any such issuance; *provided*, *however*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(p)      (i) the entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, recharacterizing, or limiting, in any respect, as applicable, the enforceability, priority, or validity of any of the First Lien Claims with respect to the Consenting Stakeholders or of the Second Lien Claims with respect to the Second Lien Consenting Lenders, other than an order approving the transactions as contemplated by this Agreement or the Restructuring Term Sheet, as applicable, or (ii) the filing of any motion, application, or adversary proceeding by the Company Parties (or the Company Parties support any other party filing any motion, application, or adversary proceeding) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, recharacterization, or subordination of any First Lien Claims or Second Lien Claims, as applicable, in a manner inconsistent with this Agreement or the Restructuring Term Sheet;

(q)      the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement or the Restructuring Term Sheet or (ii) frustrates the purposes of this Agreement, unless the order

30

granting such relief has been stayed, modified, or reversed within fourteen (14) days after such terminating party delivers a written notice in accordance with Section 14.10 hereof;

(r)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset(s) of the Company Parties and such order materially and adversely affect any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions;

(s)     the failure by the Company Parties to pay any of the Restructuring Expenses as and when required under this Agreement;

(t)     solely with respect to the Consenting Second Lien Lenders, the breach in any material respect by any Consenting Stakeholder of the agreements of the Consenting Stakeholder set forth in Section 4.03 of this Agreement that remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice in accordance with Section 14.10 detailing any such breach; or

(u)     the termination of this Agreement in accordance with its terms by the Company Parties.

12.02.  <u>Company Parties' Termination Events</u>. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by one or more First Lien Consenting Lenders of any representations, warranties, or covenants set forth in this Agreement that remains uncured (to the extent curable) for a period of five (5) Business Days after the receipt by the Required Consenting Lenders of notice of such breach; *provided*, *however*, that, so long as First Lien Consenting Lenders that have not breached this Agreement continue to hold or control at least 66 2/3% of the aggregate amount of the First Lien Claims, termination shall be effective only with respect to such breaching First Lien Consenting Lender;

(b)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with outside counsel and pursuant to Section 7.02 or Section 7.03, as applicable, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)     the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fifteen (15) Business Days after entry of such order;

(d)     the filing of any motion or pleading by any First Lien Consenting Lender with the Bankruptcy Court that (i) is inconsistent in any material respect with this Agreement or the Restructuring Term Sheet or (ii) seeks approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is materially inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded the Company Parties under this Agreement) without the prior written consent of the Company Parties, and such

31

motion or pleading has not been withdrawn within two (2) Business Days of the Company Parties notifying the Required Consenting Lenders and such filing party; *provided*, *however*, that, so long as First Lien Consenting Lenders that have not breached this Agreement continue to hold or control at least 66 2/3% of the aggregate amount of the First Lien Claims, termination shall be effective only with respect to such breaching First Lien Consenting Lender;

(e)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; *provided*, *however*, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

12.03.   Mutual Termination. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement by the Company Parties and the Required Consenting Lenders.

12.04.   Individual Termination Right. Any Consenting Stakeholder or Second Lien Consenting Lender may terminate this Agreement as to itself only, upon five (5) Business Days' written notice to the Company Parties and the Required Consenting Lenders if this Agreement is modified, amended, supplemented, or waived in a manner that adversely affects the economic rights (including economic entitlements) or benefits of such Consenting Stakeholder or Second Lien Consenting Lender without its prior written consent.

12.05.   Automatic Termination. This Agreement shall terminate automatically without any further required action or notice immediately upon the occurrence of the Plan Effective Date.

12.06.   Effect of Termination.

(a)      No Further Force and Effect. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Company Claims or Interests or other Claims or Causes of Action.

(b)      Termination and Voting. Upon the occurrence of a Termination Date prior to the Plan Effective Date, any and all consents or ballots tendered by a Party subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided*, *however*, any Party withdrawing or changing its vote pursuant to this Section 12.08(b) shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such

000885
**App. 389**

withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.

(c)  Material Breaches. No purported termination of this Agreement shall be effective under this Section 12 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(b). Nothing in this Section 12 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

(d)  Miscellaneous. Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder or Second Lien Consenting Lender, and (b) any right of any Consenting Stakeholder or Second Lien Consenting Lender, or the ability of any Consenting Stakeholder or Second Lien Consenting Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party.

**Section 13.**    *Amendments and Waivers.*

13.01.  Amendments. This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13. Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*. This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by the Company Parties and the Required Consenting Lenders; *provided*, *however*, that (i) if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims or Interests held by a Consenting Stakeholder or Second Lien Consenting Lender as compared to similarly situated Parties, then the prior written consent of each such affected Party shall also be required to effectuate such modification, amendment, waiver, or supplement; (ii) if the proposed modification, amendment, waiver, or supplement does not provide for equal treatment of the KL Note Claims and First Lien Term Loan Claims, then the prior written consent of the KL Lender shall also be required; (iii) if the proposed modification, amendment, waiver, or supplement does not provide for equal rights to the Holders of, and the treatment of, the PVKG Note Claims and First Lien Term Loan Claims, then the prior written consent of the PVKG Lender shall also be required; (iv) if the proposed modification, amendment, waiver, or supplement reasonably relates to matters that, directly or indirectly, relate to the rights, distribution and treatment of the Consenting Second Lien Lenders provided for herein or the consent rights of the Required Consenting Second Lien Ad Hoc Group Members provided for herein, then the prior written consent of the Required Consenting Second Lien Ad Hoc Group Members shall also be required; (v) if the proposed modification, amendment, waiver, or supplement requires any Consenting Stakeholder to incur any expenses, liabilities, or other obligations, or to agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other

33

obligations against such Consenting Stakeholder, then the prior written consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver, or supplement; (vi) any modification, amendment, waiver, or supplement to Section 3.02 or this Section 13.01 shall require the prior written consent of all Parties; and (vii) any modifications, amendments, or supplements to the definitions of "Required Consenting Lenders," "Required Consenting Initial First Lien Ad Hoc Group Members," "Required Consenting Initial Second Lien Ad Hoc Group Members," or the rights set forth herein attributable thereto, shall require the prior written consent of all Consenting Stakeholders, Second Lien Consenting Lenders and Company Parties.

13.02.  Waiver.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other applicable remedies.

**Section 14.**   *Miscellaneous.*

14.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities, loans, or other instruments or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and other applicable Law.

14.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, schedules, annexes, and signature pages attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, schedules, annexes, and signature pages. In the event of any inconsistency between this Agreement (without reference to the exhibits, schedules, and annexes hereto) and the exhibits, schedules, and annexes hereto, this Agreement (without reference to the exhibits, schedules, and annexes thereto) shall govern.

14.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter

000887

hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05. GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Upon the commencement of the Chapter 11 Cases, each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court and, with respect to such claims, (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06. TRIAL BY JURY WAIVER. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07. Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08. Rules of Construction. This Agreement is the product of negotiations among the Company Parties, the Consenting Stakeholders, and the Second Lien Consenting Lenders. In the enforcement or interpretation of this Agreement, this Agreement shall be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the enforcement or interpretation hereof. The Company Parties, Consenting Stakeholders, and Second Lien Consenting Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09. Successors and Assigns; Third Parties. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and, except as set forth in

000888
**App. 392**

Section 8, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

14.10.  <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

ConvergeOne Holdings, Inc.
10900 Nesbitt Ave. S.
Bloomington, MN 55437
Attention:  Rui Goncalves
E-mail:  rgoncalves@onec1.com

with copies to:

White & Case LLP
111 S. Wacker Dr.
Chicago, IL 60606
Attention:  Bojan Guzina, Andrew F. O'Neill, Erin R. Rosenberg, Blair M. Warner, and Adam T. Swingle
E-mail:  bojan.guzina@whitecase.com
        aoneill@whitecase.com
        erin.rosenberg@whitecase.com
        blair.warner@whitecase.com
        adam.swingle@whitecase.com

(b)     if to the PVKG Lender or a Consenting Sponsor, to:

PVKG Investment Holdings, Inc.
712 Fifth Avenue, Suite 43
New York, NY 10019

and

Latham & Watkins LLP
1271 6th Ave
New York, NY 10020
Attention:  Keith A. Simon, Joshua Tinkelman, and David Hammerman
E-mail:  Keith.Simon@lw.com
        Joshua.Tinkelman@lw.com
        David.Hammerman@lw.com

000889
**App. 393**

(c)   if to the KL Lender, to:

Kennedy Lewis Investment Management LLC
225 Liberty Street, Suite 4210
New York, NY 10281

and

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attention:  Daniel I. Fisher

E-mail:  dfisher@akingump.com

(d)   if to a member of the First Lien Ad Hoc Group or to the First Lien Ad Hoc Group Advisors, to:

Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention:  Scott J. Greenberg, Keith R. Martorana, and Michelle Choi
E-mail:  SGreenberg@gibsondunn.com
         KMartorana@gibsondunn.com
         MChoi@gibsondunn.com

(e)   if to a member of the Second Lien Ad Hoc Group or to the Second Lien Ad Hoc Group Advisors, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:  Adam L. Shpeen and Abraham Bane
E-mail:  adam.shpeen@davispolk.com
         abraham.bane@davispolk.com

Any notice given by electronic mail, courier, registered or certified mail shall be effective when received.

14.11.   Independent Due Diligence and Decision Making. Each Consenting Stakeholder and Second Lien Consenting Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial, and other conditions and prospects of the Company Parties.

14.12.   Enforceability of Agreement. Each of the Parties to the extent enforceable waives any right to assert that the exercise of any termination rights under this Agreement is subject to the

37

automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.   <u>Settlement Discussions</u>. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

14.14.   <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.   <u>Several, Not Joint, Claims</u>.   The agreements, representations, warranties, and obligations of the Company Parties under this Agreement are joint and several.  The agreements, representations, warranties, and obligations of the Consenting Stakeholders and Second Lien Consenting Lenders under this Agreement are, in all respects, several and neither joint nor joint and several.

14.16.   <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect.

14.17.   <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18.   <u>Capacities of Consenting Stakeholders</u>. Each Consenting Stakeholder and Second Lien Consenting Lender has entered into this agreement on account of all Company Claims or Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims or Interests.

14.19.   <u>Relationship Among the Parties</u>. None of the Consenting Stakeholders or Second Lien Consenting Lenders shall have any fiduciary duty, any duty or trust or confidence in any form, or other duties or responsibilities to each other, the Company Parties, or any of the Company Parties' other creditors or stakeholders, including without limitation any Holders of Company

000891
**App. 395**

Claims or Interests, and, other than as expressly set forth herein, there are no commitments among or between the Consenting Stakeholders or Second Lien Consenting Lenders. It is understood and agreed that any Consenting Stakeholders or Second Lien Consenting Lenders may trade in any equity securities, debt, or debt securities of the Company Parties without the prior written consent of the Company Parties or any other Party, subject to applicable securities laws, any Confidentiality Agreement, and this Agreement. No prior history, pattern, or practice of sharing confidences among or between any of the Consenting Stakeholders, Second Lien Consenting Lenders, or the Company Parties shall in any way affect or negate this understanding and agreement. All rights under this Agreement are separately granted to each Consenting Stakeholder or Second Lien Consenting Lender, or by the Company Parties, and vice versa, and the use of a single document is for the convenience of the Company Parties. The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

14.20.   <u>Survival</u>. Notwithstanding (i) any Transfer of any Company Claims or Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 14.05, 14.06, 14.13, 14.14, and 14.22 and in the Confidentiality Agreements shall survive such Transfer or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

14.21.   <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement by any Party, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.22.   <u>Confidentiality and Publicity</u>. Other than to the extent required by applicable Law and regulation or by any governmental or regulatory authority, no Party shall disclose to any person (including for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial, and other advisors to the Company Parties (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and whose compliance with such obligations the Company Parties shall be responsible for), the principal amount or percentage of the Company Claims or Interests held by any First Lien Consenting Lender, any Second Lien Consenting Lender or any of their respective subsidiaries (including, for the avoidance of doubt, any Company Claims or Interests acquired pursuant to any Transfer) or the signature page of such First Lien Consenting Lender or Second Lien Consenting Lender; provided, however, that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Company Claims or Interests held by the First Lien Consenting Lenders and Second Lien Consenting Lenders, collectively. Notwithstanding the foregoing, the First Lien Consenting Lenders and Second Lien Consenting Lenders hereby consent to the disclosure of the execution, terms, and contents of this Agreement by the Company Parties in the Definitive Documents to the extent required by law or regulation; provided, however, that (i) if any of the Company Parties determines that it is required to attach a copy of this Agreement, a Joinder, or a Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, to the extent permissible under applicable Law, it will redact any reference to or concerning a specific First Lien Consenting

000892
**App. 396**

Lender's holdings of Company Claims or Interests (including before filing any pleading with the Bankruptcy Court) and such First Lien Consenting Lender's and Second Lien Consenting Lender's signature page and (ii) if disclosure of additional information of any First Lien Consenting Lender or Second Lien Consenting Lender is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each applicable First Lien Consenting Lender or Second Lien Consenting Lender (who shall have the right to seek a protective order prior to disclosure). Notwithstanding the foregoing, the Company Parties will submit to the Required Consenting Lender Advisors and the Second Lien Ad Hoc Group Advisors all press releases, public filings, public announcements, or other communications with any news media, or material mass communications, other than in the ordinary course of business and unrelated to this Agreement or the Restructuring Transactions, with any customers, vendors, or current or former employees, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least two (2) Business Days in advance of release (it being understood that such period may be shortened to the extent there are exigent circumstances) and will use commercially reasonable, good faith efforts to incorporate any comments provided by the Required Consenting Lender Advisors and the Second Lien Ad Hoc Group Advisors. Nothing contained herein shall be deemed to waive, amend, or modify the terms of any Confidentiality Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signature pages follow.*]

40

000893

**App. 397**

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**PVKG Intermediate Holdings Inc., and
ConvergeOne Holdings Inc., on behalf of themselves
and each of their direct and indirect subsidiaries listed on Exhibit [A] hereto**.

By: _____

Name: Rui Goncalves

Title:   General Counsel

*[Consenting Stakeholders' and Second Lien Consenting Lenders'*
*signature pages on file with the Company Parties]*

## Exhibit A

**Company Parties**

**Company Parties**

AAA Network Solutions, Inc.
ConvergeOne Dedicated Services, LLC
ConvergeOne Government Solutions, LLC
ConvergeOne Holdings, Inc.
ConvergeOne Managed Services, LLC
ConvergeOne Systems Integration, Inc.
ConvergeOne Technology Utilities, Inc.
ConvergeOne Texas, LLC
ConvergeOne Unified Technology Solutions, Inc.
ConvergeOne, Inc.
Integration Partners Corporation
NetSource Communications Inc.
NuAge Experts LLC
Providea Conferencing, LLC
PVKG Intermediate Holdings Inc.
Silent IT, LLC
WrightCore, Inc.

**<u>Exhibit B</u>**

**Restructuring Term Sheet**

**ConvergeOne Holdings, Inc.,** *et al.*
**RESTRUCTURING TERM SHEET**[1]

THIS TERM SHEET (THE "RESTRUCTURING TERM SHEET") SETS FORTH THE PRINCIPAL TERMS OF THE RESTRUCTURING TRANSACTIONS AND CERTAIN RELATED TRANSACTIONS CONCERNING THE COMPANY PARTIES AGREED TO BY THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS. THIS RESTRUCTURING TERM SHEET DOES NOT CONTAIN A COMPLETE LIST OF ALL TERMS AND CONDITIONS OF THE POTENTIAL TRANSACTIONS DESCRIBED HEREIN. SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT TO WHICH THIS RESTRUCTURING TERM SHEET IS ATTACHED, THE RESTRUCTURING TRANSACTIONS SHALL BE CONSUMMATED THROUGH A PREPACKAGED PLAN OF REORGANIZATION IN THE CHAPTER 11 CASES.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THIS RESTRUCTURING TERM SHEET AND THE UNDERTAKINGS CONTEMPLATED HEREIN ARE SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION, AND DELIVERY OF DEFINITIVE DOCUMENTATION ACCEPTABLE TO THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS, AS APPLICABLE, AND SUBJECT TO ANY APPLICABLE CONSENT RIGHTS OF THE SECOND LIEN CONSENTING LENDERS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT. THIS RESTRUCTURING TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS RESTRUCTURING TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON OR ENTITY PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE RULE, STATUTE, OR DOCTRINE OF SIMILAR IMPORT PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS, WHETHER ARISING UNDER FEDERAL OR STATE LAW. UNTIL PUBLICLY DISCLOSED UPON THE PRIOR WRITTEN AGREEMENT OF THE COMPANY PARTIES AND CONSENTING STAKEHOLDERS, THIS RESTRUCTURING TERM SHEET SHALL REMAIN STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY OTHER PARTY OR PERSON WITHOUT THE CONSENT OF THE COMPANY PARTIES AND CONSENTING STAKEHOLDERS.

THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS AND EFFECTS RELATED TO THE RESTRUCTURING TRANSACTIONS OR ANY RELATED RESTRUCTURING OR SIMILAR TRANSACTION HAVE NOT BEEN FULLY EVALUATED AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY RESTRUCTURING TRANSACTIONS OR RELATED TRANSACTIONS.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW, INCLUDING THE BANKRUPTCY CODE.

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement.

| **Restructuring Term Sheet** | |
| --- | --- |
| **Restructuring Overview** | |
| **Debtors** | The Company Parties that are listed on **Exhibit A** to the Restructuring Support Agreement, which shall also be signatories to the Restructuring Support Agreement (each a "***Debtor***" and collectively, the "***Debtors***"). |
| **Restructuring Overview** | The Restructuring Transactions shall be implemented pursuant to the Definitive Documents through confirmation of a prepackaged chapter 11 plan (the "***Plan***") in cases to be commenced by the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, *et seq.* (as amended, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***" and such cases, the "***Chapter 11 Cases***").<br><br>The Restructuring Transactions shall be subject to the Definitive Documents, the terms of the Restructuring Support Agreement (including the exhibits thereto), and the consent rights set forth therein.<br><br>The Restructuring Transactions provide for:<br><br>(i)  the incurrence of the ABL DIP Facility in accordance with the ABL DIP Documents, including the ABL DIP Term Sheet attached hereto as **Exhibit 1**, which, on the Effective Date, shall be (a) refinanced by the Exit ABL Facility by means of a cashless settlement or (b) indefeasibly paid in full in cash (or any combination thereof);<br><br>(ii)  the incurrence of the Term DIP Facility in accordance with the Term DIP Loan Documents, including the Term DIP Term Sheet attached hereto as **Exhibit 2**;<br><br>(iii)  the incurrence of the Exit ABL Facility on terms and conditions reasonably satisfactory to the Debtors and the Required Consenting Lenders, and the Exit Term Loan Facility in accordance with the Exit Term Loan Facility Documents, and in each case consistent with terms set forth below;<br><br>(iv)  a $245.0 million (subject to increase with the consent of the Debtors and the Required Consenting Lenders) equity rights offering (the "***Rights Offering***") which shall provide Rights Offering Rights, subject to the Holdback and the Put Option Premium (each as defined in the Rights Offering Term Sheet attached hereto as **Exhibit 3**) to the Holders of First Lien Claims eligible to participate in the Rights Offering on the terms and conditions set forth in the Rights Offering Term Sheet (as such terms may be modified subject to the consent rights set forth in the Restructuring Support Agreement) to be backstopped by the Investors (as defined in the Rights Offering Term Sheet) that commit to do so in accordance with the Backstop Agreement; |

2

|  | |
|---|---|
|  | (v)     in full and final satisfaction of each First Lien Claim, each Holder of a First Lien Claim shall have the right to elect to receive its applicable pro rata share of (which elections shall be (i) adjusted on a pro rata basis, based on oversubscription, as necessary, so that participation in each recovery option is capped at 50% of the First Lien Claims) and (ii) subject to the DIP Term Loan Rights (as defined in the Term DIP Term Sheet): <br><br>(a)   the Takeback Term Loan Recovery Option; or <br><br>(b)   the Rights Offering Rights and Takeback Term Loan Recovery Option. <br><br>(vi)   the PVKG Note Claims shall be Allowed in the aggregate amount of $213.0 million; <br><br>(vii)   in full and final satisfaction of each Second Lien Claim, each Holder of a Second Lien Claim shall receive its applicable pro rata share of the Second Lien Recovery; <br><br>(viii)   all General Unsecured Claims shall be reinstated, paid in full, or otherwise provided such treatment as to render them unimpaired; and <br><br>(ix)   all Existing C1 Interests shall be cancelled and no consideration shall be paid to Holders of such Existing C1 Interests in respect thereof. |
| **ABL DIP Facility** | Subject to the terms of the ABL DIP Commitment Letter and ABL DIP Documents, the Debtors shall obtain a senior secured superpriority priming debtor-in-possession asset-based revolving credit facility, in the aggregate principal amount of up to $250.0 million (subject to the Borrowing Base (as such term is defined in the ABL DIP Term Sheet), which shall be approved by the Bankruptcy Court, and which shall provide for a roll-up and conversion of all Prepetition ABL Secured Obligations, on a cashless, dollar-for-dollar basis, into new loans or commitments that repay or effectively replace all such Prepetition ABL Secured Obligations in full and become indebtedness and obligations under the ABL DIP Facility. <br><br>Upon the substantial consummation of the Plan, the remaining principal balance of the ABL DIP Loans (including any swingline loans, floorplan advances, and letters of credit issued thereunder) shall (a) if the ABL DIP Lenders (or a subset thereof) commit to provide the Exit ABL Facility (as defined below), automatically convert into asset-based revolving loans or letters of credit under an exit first lien asset based lending facility (the "***Exit ABL Facility***"), which shall be subject to (i) definitive documentation on terms to be agreed by the Debtors, the Required ABL DIP Lenders, and the Required Consenting Lenders, consistent with the consent rights set forth in the Restructuring Support Agreement, (ii) the Plan being in form and substance consistent in all material respects with the terms set forth in the Restructuring Support Agreement and such other terms to be agreed by the Debtors and the Required Consenting Lenders, consistent with the consent rights set forth in the Restructuring Support Agreement, and (iii) the |

3

| | |
|---|---|
| | consummation of such Plan, or (b) be indefeasibly paid in full in cash (or any combination thereof). |
| | The Exit ABL Facility shall be subject to an intercreditor agreement on substantially the same terms as the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement) (the "***Exit Intercreditor Agreement***"). |
| | The obligations under the ABL DIP Facility are referred to herein as the "***ABL DIP Facility Claims***." |
| **Term DIP Facility** | The Term DIP Lenders (as defined in the Term DIP Term Sheet) shall provide multiple draw term loans in an aggregate principal amount of $215.0 million (the "***Term DIP Loans***") of which (i) $145.0 million shall be available in one draw upon entry of the Interim DIP Order, and (ii) $70.0 million shall be available for borrowing upon entry of the Final DIP Order and the satisfaction of certain other conditions precedent set forth in the Term DIP Term Sheet, each in accordance with the terms and conditions set forth in the Term DIP Loan Documents. |
| | The obligations under the Term DIP Facility are referred to herein as the "***Term DIP Facility Claims***." |
| **Exit Term Loan Facility** | On the Effective Date, the Reorganized Debtors shall incur a secured term loan facility in the aggregate principal amount of not greater than $243 million (the "***Exit Term Loan Facility***") under an exit financing credit agreement (the "***Exit Term Loan Credit Agreement***"). |
| | The Exit Term Loan Facility shall consist of term loans issued to the Holders of First Lien Claims (the "***Takeback Term Loans***"), subject to the following material terms: |
| | <u>Interest Rate</u>:  At the option of the Debtors, (i) SOFR (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate or (ii) Base Rate (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate, in each case payable in cash; *provided* that at any time an event of default exists under the Exit Term Loan Facility the Debtors shall not be able to elect SOFR. |
| | <u>Applicable Rate</u>: 4.75% in the case of Base Rate loans and 5.75% in the case of SOFR loans. |
| | <u>Default Interest</u>: During the continuance of an Event of Default, the Takeback Term Loans will bear interest at an additional 2.00% per annum and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum.  Default interest shall be payable in cash on demand. |
| | <u>Interest Payment Dates</u>: Interest on (i) Base Rate loans shall be payable on the last business day of each fiscal quarter in arrears and (ii) SOFR loans shall be payable on the last day of each Interest Period in arrears (or, if earlier, the 3-month anniversary of the commencement of such Interest Period). |

000902

**App. 406**

Interest Period: At the option of the Debtors, one, three, or six months.

Amortization: None.

Tenor: 6 years, provided that if, in the reasonable determination of the Required Consenting Lenders in good faith consultation with the Debtors, the Restructuring Transactions cannot be effectuated in a manner that causes a taxable transaction to the lenders for U.S. federal and applicable state and local income tax purposes by causing a Reorganized Debtor, other than C1 Holdings, to be the issuer of the Takeback Term Loans, because such structure would reasonably be expected to result in material adverse tax consequences to the Reorganized Debtors as compared to the tax consequences to the Reorganized Debtors had C1 Holdings been the issuer of the Takeback Loans, subject to the consent of the Required Consenting Lenders, the tenor will be reduced to 4.75 years and in that case the Applicable Rate will be reduced to 4.25% in the case of Base Rate loans and 5.25% in the case of SOFR loans.

Fees: None, other than annual agency fee.

Security: A (x) first priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitute Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), and a first-priority lien on (A) that certain real property of the Reorganized Debtors located at 2368 Corporate Lane, Suite 112, Naperville, IL 60563 and (B) any other owned real property of the Reorganized Debtors and (y) a second priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitutes ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), which second priority liens shall be subordinated to the liens on such collateral securing the Exit ABL Facility, in the case of either clause (x) or (y) above, subject to customary exclusions consistent with the exclusions under the Prepetition First Lien Credit Agreement (including the exclusion of 35% of the equity interests of any first-tier foreign subsidiaries) and otherwise as may be agreed by the Reorganized Debtors and the Required Consenting Lenders.

Documentation Principles: The Exit Term Loan Credit Agreement with respect to the Exit Term Loan Facility shall (i) be based upon the Prepetition First Lien Term Loan Credit Agreement; (ii) include such modifications as are necessary to reflect the Restructuring Transactions, as implemented through the Chapter 11 Cases, and the fact that the Exit Term Loan Facility is an exit financing; (iii) include appropriate modifications to reflect changes in law or accounting standards since the date of such precedent; and (iv) shall incorporate the following:

- Affirmative Covenants: Consistent with the First Lien Term Loan Credit Agreement (but shall be modified in a manner acceptable to the Debtors and the Required Consenting Lenders to provide for modified reporting requirements and information rights that are customary for facilities of this type and relate to reporting and

5

| | |
|---|---|
| | information readily available to the Debtors in the ordinary course of business). |
| | • <u>Negative Covenants</u>: Consistent with the First Lien Term Loan Credit Agreement, but shall be modified as may be required to effectuate the Restructuring Transactions, in each case, in a manner acceptable to the Debtors and the Required Consenting Lenders; *provided* that the Exit Term Loan Facility shall not include any financial covenants. |
| | • <u>Miscellaneous</u>: Shall also include certain customary liability management protections in form and substance acceptable to the Debtors and the Required Consenting Lenders. |
| | <u>Intercreditor Agreements</u>: The Exit Term Loan Facility shall be subject to the Exit Intercreditor Agreement. |
| | <u>Ratings</u>: The Reorganized Debtors shall use commercially reasonable efforts to have the Takeback Term Loans rated by Moody's and S&P within 60 days of the Effective Date. |
| **Rights Offering** | The Plan shall provide for the Rights Offering on the terms and conditions set forth in the Rights Offering Term Sheet. |
| | On the Effective Date, each Holder of a First Lien Claim that is an Eligible Offeree (as defined in the Rights Offering Term Sheet) or an Investor (as defined in the Rights Offering Term Sheet) or an entity designated by any of the foregoing shall receive, in accordance with the terms of the Rights Offering Term Sheet and relevant Definitive Documents, its applicable share of New Equity Interests (as defined in the Rights Offering Term Sheet). |

| Treatment of Claims and Interests | | |
|---|---|---|
| Each Holder of an allowed Claim or Interest, as applicable, shall receive the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's allowed Claim or Interest. | | |
| **Type of Claim** | **Treatment** | **Impairment/ Voting** |
| **ABL DIP Facility Claims** | On the Effective Date, in full and final satisfaction of the Allowed ABL DIP Facility Claims, (a) ABL DIP Facility Claims that are being converted to Exit ABL Facility Loans or other outstandings thereunder (such as letters of credit and floor plan advances, as provided below) shall be refinanced by the Exit ABL Facility in the amount of the remaining ABL DIP Facility Claims after such pay down by means of a cashless settlement, (b) ABL DIP Facility Claims that are not being converted to Exit ABL Facility Loans shall be indefeasibly paid in full in cash, and (c) accrued interest and fees under the ABL DIP Facility shall be paid in full | N/A |

000904

**App. 408**

| | | |
|---|---|---|
| | in cash immediately prior to the conversion of ABL DIP Loans to Exit ABL Facility Loans.  With respect to the amount of the ABL DIP Facility refinanced by means of a cashless settlement, (i) all principal amount of ABL DIP Loans (as defined in the ABL DIP Term Sheet) (including Swingline Loans and floorplan advances) shall be on a one-to-one basis automatically converted to and deemed to be Exit ABL Facility Loans, (ii) the Letters of Credit (as defined in the ABL DIP Term Sheet) issued and outstanding under the ABL DIP Credit Agreement shall automatically be converted to letters of credit deemed to be issued and outstanding under the Exit ABL Facility Documents, and (iii) all Collateral that secures the Obligations (each as defined in the ABL DIP Credit Agreement) under the ABL DIP Credit Agreement that shall also secure the Exit ABL Facility shall be reaffirmed, ratified and shall automatically secure all Obligations under the ABL Exit Facility Documents, subject to the priorities of liens set forth in the ABL Exit Facility Documents and the Exit Intercreditor Agreement. | |
| | For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses shall be paid in full in cash in accordance with the terms of the DIP Orders and the Plan, as applicable. | |
| **Term DIP Facility Claims** | On the Effective Date, in full and final satisfaction of the Term DIP Facility Claims each Holder of a Term DIP Facility Claim shall receive its pro rata portion of cash on account of any principal, interest, fees, and expenses outstanding with respect to such Holder's Term DIP Facility Claim as of the Effective Date; *provided*, *however*, that any Holder of a Term DIP Facility Claim can, in lieu of such cash payment, exercise such Holder's Term DIP Loan Rights (as such term is defined in the Term DIP Term Sheet). | N/A |
| | For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses shall be paid in full in cash in accordance with the terms of the DIP Orders and the Plan, as applicable. | |
| **Administrative Claims** | Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | N/A |

000905

**App. 409**

| Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
|---|---|---|
| Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, either:<br><br>(i) payment in full in cash of its Allowed Other Secured Claim;<br><br>(ii) the collateral securing its Allowed Other Secured Claim;<br><br>(iii) Reinstatement of its Allowed Other Secured Claim; or<br><br>(iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Claim, each Holder of an Other Priority Claims shall receive cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| First Lien Claims | Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, its elected pro rata share of (which elections shall be adjusted on a pro rata basis, based on oversubscription, as necessary, so that participation in each recovery option is capped at 50% of the First Lien Claims):<br><br>(i) Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 20% (the "***Takeback Term Loan Recovery Option***"); or<br><br>(ii) (a) Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 15%, plus (b) its pro rata share of the Rights Offering | Impaired / Entitled to Vote |

8

| | Rights, subject to the Holdback and the Put Option Premium (the "***Rights Offering Rights and Takeback Term Loan Recovery Option***"). Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) that properly exercises its Rights Offering Rights to purchase New Equity Interests shall receive such New Equity Interests on the Effective Date. In the event that a Holder of a First Lien Claim fails to timely elect its recovery, it shall receive the Rights Offering Rights and Takeback Term Loan Recovery Option. | |
|---|---|---|
| **Second Lien Claims** | Each Holder of a Second Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive in full and final satisfaction, settlement, release, and discharge of such Claim, on or as soon as practicable after the Effective Date, its pro rata share of the Second Lien Recovery. | Impaired / Entitled to Vote |
| **General Unsecured Claims** | Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, either: (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) Payment in full in cash on (A) the Effective Date or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim. | Unimpaired / Deemed to Accept |
| **Intercompany Claims** | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), either Reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Section 510 Claims** | On the Effective Date, all Section 510 Claims (including all claims on account of the Employee Partnership Sale Units) shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims. | Impaired / Deemed to Reject |
| **Intercompany Interests** | Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), either Reinstated, converted, or otherwise set off, | Impaired / Deemed to Reject or |

000907

**App. 411**

| | settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan. | Unimpaired / Deemed to Accept |
|---|---|---|
| **Existing C1 Interests** | On the Effective Date, Existing C1 Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing C1 Interests shall not receive any distribution on account thereof. | Impaired / Deemed to Reject |

| **Additional Terms** | |
|---|---|
| **Definitive Documents** | This Restructuring Term Sheet does not include a description of all the terms, conditions, and other provisions that will be contained in the Definitive Documents, which shall be as set forth in the applicable term sheets referred to herein and otherwise and in form and substance acceptable to the Debtors and the Required Consenting Lenders, subject to the consent rights set forth in the Restructuring Support Agreement and herein. |
| **Executory Contracts and Unexpired Leases** | Prior to the Effective Date, the Debtors shall not assume or reject any material executory contract or material unexpired lease without the consent of the Required Consenting Lenders. |
| | The Plan shall provide that the executory contracts and unexpired leases that are not assumed or rejected as of the Effective Date (either pursuant to the Plan or a separate motion and in consultation with the Required Consenting Lenders) shall be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| **Organizational Documents and Governance** | The Governance Documents and any other documentation evidencing the corporate governance for the Reorganized Debtors, including charters, bylaws, limited liability company agreements, shareholder agreements (including minority shareholder protections), and any other customary organizational documents shall be consistent with the Governance Term Sheet attached hereto as **Exhibit 4** and the consent rights set forth in the Restructuring Support Agreement. |
| **PVKG Note Claims** | The PVKG Note Claims shall be Allowed pursuant to the Plan in the aggregate amount of $213.0 million and, for the avoidance of doubt, such claims shall be classified and treated as First Lien Claims under the Plan. |
| **New C1 Board of Directors** | The Chief Executive Officer of New C1 shall serve on the board of directors of New C1 (the "***New Board***"); all other directors shall be agreed by the Debtors and the Required Consenting Lenders, consistent with the terms set forth in the Governance Term Sheet; *provided* that each Initial First Lien Ad Hoc Group Member and the PVKG Lender shall each be entitled to appoint one director to serve on the New Board, so long as such entity is contemplated to receive no less than 10% of the fully-diluted New Equity Interests (excluding New Equity Interests reserved for the post-Effective Date Management Incentive Plan). |

000908

**App. 412**

| | |
|---|---|
| **Management Incentive Plan** | The Reorganized Debtors shall reserve a pool of up to 10% of the fully diluted New Equity Interests that are issued and outstanding on the Effective Date for a post-Effective Date management incentive plan (the "***Management Incentive Plan Pool***"), the terms of which, including with respect to participants, form, allocation, structure and vesting shall be determined by the New Board. |
| **Employee Matters** | The Debtors shall assume any employment, confidentiality, and non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards), vacation, holiday pay, severance, retirement, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations of the Debtors that are in effect immediately prior to the Effective Date; *provided*, *however*, that the Debtors shall not enter into new agreements with insider employees absent the consent of the Required Consenting Lenders.

Notwithstanding the foregoing, the Debtors shall not assume any agreements or obligations relating to the Employee Partnership Sale Units, which shall be cancelled as of the Effective Date and shall receive no payment on account thereof from the Debtors or the Reorganized Debtors. |
| **Prepetition Indemnification Agreements** | The Plan shall provide that, to the extent consistent with applicable law, all indemnification provisions currently in place (whether in the bylaws, constitutions, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants and other professionals of the Debtors, as applicable, shall be reinstated and remain intact and irrevocable and shall survive effectiveness of the Restructuring Transactions. |
| **Releases, Injunctions, and Exculpations** | The Plan shall include customary releases, injunctions, and exculpations in each case to the fullest extent permitted by law and effective as of the Effective Date, as agreed by the Debtors and the Required Consenting Lenders. |
| **Tax Matters** | The Debtors, Required Consenting Lenders, and the Consenting Sponsors shall use reasonable best efforts to structure the Restructuring Transactions in a tax-efficient manner to the Reorganized Debtors and as a taxable transaction for U.S. federal and applicable state and local income tax purposes to the First Lien Consenting Lenders (other than PVKG Lender), ConvergeOne Investment LP, and PVKG Investment US L.P. as beneficial owner of ConvergeOne Investment, LP, and the tax structuring of the Restructuring Transactions shall be subject to the consent of the Required Consenting Lenders and the Consenting Sponsors, provided that, except for an adjustment to the tenor (and resultant change to the interest rate) as provided herein, neither such efforts nor such consent shall require a change to any other term provided herein. |

11

| | |
|---|---|
| **Professional Fees** | Upon entry of the Interim DIP Order, the Debtors shall open an escrow account to fund on an ongoing basis all unpaid Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services through the Effective Date. |
| **Restructuring Expenses** | The Debtors shall pay, as set forth in the Restructuring Support Agreement (and subject to any limitations set forth therein), the reasonable and documented fees and expenses of (i) the First Lien Ad Hoc Group Advisors; (ii) the KL Lender Advisor; (iii) the PVKG Lender Advisors; and (iv) the Second Lien Ad Hoc Group Advisors. |
| **Milestones** | The Restructuring Transactions shall be effectuated in accordance with the following deadlines (the "*Milestones*"):<br><br>(a) By 11:59 p.m. (prevailing Central Time) on April 3, 2024, the Petition Date shall have occurred.<br><br>(b) The Plan and Disclosure Statement shall have been filed no later than one (1) calendar day after the Petition Date.<br><br>(c) The Interim DIP Order shall have been entered no later than three (3) calendar days after the Petition Date.<br><br>(d) The order provisionally approving the adequacy of the Disclosure Statement shall have been entered no later than three (3) calendar days after the Petition Date.<br><br>(e) The Final DIP Order shall have been entered no later than thirty-five (35) calendar days after the Petition Date.<br><br>(f) The Disclosure Statement Order (which may be the Confirmation Order) shall have been entered no later than forty-five (45) calendar days after the Petition Date.<br><br>(g) The Confirmation Order shall have been entered no later than forty-five (45) calendar days after the Petition Date.<br><br>(h) The Effective Date shall have occurred no later than sixty (60) calendar days after the Petition Date. |
| **Conditions Precedent to the Effective Date** | It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived (in accordance with customary waiver provisions to be contained in the Plan):<br><br>(a) The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Lenders and shall be in full force and effect;<br><br>(b) The Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order, the latter of which shall be in full force and effect;<br><br>(c) The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with and subject to the consent rights set forth in the Restructuring Support Agreement; |

000910
**App. 414**

(d) The Backstop Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall be in full force and effect;

(e) The Rights Offering (including the Rights Offering Procedures) shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall have been consummated in accordance with its terms;

(f) The Debtors shall have received a commitment for the Exit ABL Facility, which shall refinance the ABL DIP Facility on the Effective Date and the terms and conditions of which shall be reasonably satisfactory to the Debtors and the Required Consenting Lenders;

(g) The Exit ABL Facility Documents and Exit Term Loan Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions;

(h) The New Equity Interests shall have been issued;

(i) All Restructuring Expenses shall have been paid in full in cash;

(j) The Definitive Documents shall (i) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent with the Restructuring Support Agreement and this Restructuring Term Sheet; and

(k) The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions.

000911

**App. 415**

| Certain Plan Definitions | |
|---|---|
| **Affiliate** | With respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code. |
| **Allowed** | With respect to any Claim or Interest, a Claim or an Interest expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors (with the consent of the Required Consenting Lenders, which shall not be unreasonably withheld, delayed, or conditioned), may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law; *provided, however* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. |
| **Confirmation** | The Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases. |
| **Confirmation Date** | The date upon which the Bankruptcy Court confirms the Plan pursuant to section 1129 of the Bankruptcy Code. |
| **Confirmation Hearing** | The hearing held by the Bankruptcy Court on the confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time. |
| **DIP Professional Fees** | As of the Effective Date, all accrued and unpaid professional fees and expenses payable under the DIP Orders to the professionals for the ABL DIP Agent, the Term DIP Agent, the ABL DIP Lenders, and the Term DIP Lenders (each as defined in the ABL DIP Term Sheet and the Term DIP Term Sheet, as applicable). |
| **Effective Date** | The date that is the first business day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in the Plan have been satisfied or waived in accordance with the terms of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter. |
| **Employee Partnership Sale Units** | Those certain partnership sale units issued to certain employees of the Debtors prior to the Petition Date in exchange for a waiver of the respective employee's then-existing equity interests in ConvergeOne Investment LP. |
| **Exculpated Parties** | Collectively, and in each case in their capacities as such: (a) the Debtors, (b) the directors, officers, managers, and employees of any Debtor, and (c) the Professionals. |

| Certain Plan Definitions | |
|---|---|
| **Existing C1 Interests** | The equity interests in PVKG Intermediate Holdings Inc. immediately prior to the Effective Date. |
| **First Lien Claims** | Collectively, the First Lien Term Loan Claims, the KL Note Claims, and the PVKG Note Claims. |
| **First Lien Term Loan Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition First Lien Term Loan Credit Agreement. |
| **General Unsecured Claims** | Any Claim that is not an: (a) ABL DIP Facility Claim; (b) Administrative Claim; (c) First Lien Claim; (d) Intercompany Claim; (e) Other Priority Claim; (f) Other Secured Claim; (g) Priority Tax Claim; (h) Professional Fee Claim; (i) Second Lien Claim; (j) Section 510 Claim; or (k) Term DIP Facility Claim. |
| **Governance Documents** | As applicable, the organizational and governance documents for the Reorganized Debtors, which shall give effect to the Restructuring Transactions, including, without limitation, any applicable certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or equivalent governing documents), and registration rights agreements, which documents shall be consistent with the Restructuring Support Agreement and the Governance Term Sheet. |
| **Holder** | A Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable. |
| **Impaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code |
| **Intercompany Claims** | Any Claim against a Debtor held by another Debtor. |
| **Intercompany Interests** | Any Interest in a Debtor held by another Debtor. |
| **KL Note Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition KL Note Purchase Agreement. |
| **Management Incentive Plan** | A post-Effective Date equity incentive plan providing for the issuance from time to time, of equity and equity-based awards with respect to New Equity Interests, as approved by the New Board following the Effective Date. |

| Certain Plan Definitions | |
|---|---|
| **New C1** | Either PVKG Investment Holdings, Inc., as reorganized pursuant to this Plan, or, if applicable, any successor or assign thereto, by merger, consolidation, or otherwise on and after the Effective Date, or a new entity, and each of its direct and indirect wholly-owned subsidiaries, which in any case shall be the ultimate parent of the other Company Parties on and after the Effective Date, and which entity shall be determined by agreement of the Debtors and the Required Consenting Lenders. |
| **New Equity Interests** | New common equity units in New C1, to be issued on the Effective Date. |
| **Other Priority Claims** | Any Claim, other than an Administrative Claim, Priority Tax Claim, ABL DIP Facility Claim, or Term DIP Facility Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claims** | Any Secured Claim against the Debtors other than the ABL DIP Facility Claims, Term DIP Facility Claims, First Lien Claims, and Second Lien Claims. |
| **Prepetition ABL Credit Agreement** | That certain Amended and Restated ABL Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of July 10, 2022, that certain Amendment No. 2 dated as of September 14, 2022, that certain Amendment No. 3 dated as of January 23, 2023, and that certain Amendment No. 4 dated as of August 29, 2023, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, certain subsidiary borrowers party thereto, Wells Fargo Commercial Distribution Finance, LLC, as administrative agent, collateral agent, floorplan funding agent, and swing line lender, and the lenders party thereto. |
| **Prepetition ABL Secured Obligations** | Any secured obligations arising under the Prepetition ABL Credit Agreement and related loan documents. |
| **Prepetition First Lien Term Loan Credit Agreement** | That certain First Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of March 14, 2019 and that certain Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto. |

000914
**App. 418**

| Certain Plan Definitions | |
|---|---|
| **Prepetition KL Note Purchase Agreement** | That certain First Lien Secured Note Purchase Agreement dated as of July 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date) by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, Deutsche Bank Trust Company, as administrative agent and collateral agent, certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto, and each other holder from time to time party thereto. |
| **Prepetition PVKG Note Purchase Agreement** | That certain Amended Promissory Note and Purchase and Cashless Exchange Agreement dated as of July 6, 2023 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, PVKG Lender (PVKG Investment Holdings, Inc.), as administrative agent and collateral agent, and PVKG Lender as holder. |
| **Prepetition Second Lien Term Loan Credit Agreement** | That certain Second Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of July 10, 2022, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto. |
| **Professional** | Any Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. |
| **Professional Fee Claim** | Any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. |
| **PVKG Note Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition PVKG Note Purchase Agreement. |

4

| Certain Plan Definitions | |
|---|---|
| **Related Party** | With respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, and nominees of the foregoing. |
| **Released Party** | Collectively, and in each case in their capacities as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Agents/Trustees; (h) all Releasing Parties; and (i) each Related Party of each Entity in clause (a) through (h); *provided*, *however*, that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party." |
| **Releasing Party** | Collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Agents/Trustees; (h) all Holders of Claims that vote to accept the Plan; (i) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (j) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (k) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (l) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (m) each Related Party of each Entity in clause (a) through (l); *provided*, *however*, that, for the avoidance of doubt, each Holder of Claims or Interests that is party to or has otherwise signed the Restructuring Support Agreement shall not opt out of the releases provided by the Plan. |
| **Reorganized Debtors** | A Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, unless otherwise dissolved pursuant to the Plan. |

000916

**App. 420**

| Certain Plan Definitions | |
|---|---|
| **Section 510 Claims** | Any Claim against any Debtor:  (a) arising from the rescission of a purchase or sale of an equity security as defined in section 101(17) of the Bankruptcy Code (including the Employee Partnership Sale Units) of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such an equity security made to the Debtors prior to the Petition Date; (c) for reimbursement or contribution allowed under section 502(e) of the Bankruptcy Code on account of such a Claim; and (d) any other claim determined to be subordinated under section 510 of the Bankruptcy Code. |
| **Second Lien Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition Second Lien Term Loan Credit Agreement. |
| **Second Lien Recovery** | 4.375% of the New Equity Interests (subject to dilution by the Management Incentive Plan Pool). |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code. |

000917

**App. 421**

**Exhibit 1**

**ABL DIP Term Sheet**

**ConvergeOne Holdings, Inc**
**ABL DIP Facility Term Sheet**

This term sheet (together with all annexes, exhibits and schedules attached hereto, this "**Term Sheet**") sets forth certain material terms of the proposed ABL DIP Facility (as defined below). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the commitment letter, dated as of April 3, 2024 (as amended, supplemented or modified in accordance with its terms, the "**Commitment Letter**"), to which this Term Sheet is attached.

This Term Sheet does not address all terms that would be required in connection with the ABL DIP Facility or that will be set forth in the ABL DIP Documents (as defined below), which are subject to negotiation and further subject to execution of definitive documents and the preparation of pleadings and proposed forms of orders that are consistent with this Term Sheet and the Documentation Principles and otherwise in form and substance acceptable to the ABL DIP Agent and the Borrowers.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

| | |
|---|---|
| **Borrowers** | ConvergeOne Holdings, Inc. (the "**Company**") and each subsidiary borrower thereof that is a debtor and debtor-in-possession (collectively, the "**Borrowers**") in the cases (the "**Borrowers' Cases**") to be filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for Southern District of Texas (the "**Bankruptcy Court**"), which shall be jointly administered with the Guarantors' Cases (as defined below). |
| **Guarantors** | PVKG Intermediate Holdings Inc, a Delaware corporation ("**Holdings**"), in its capacity as a debtor and debtor-in-possession, and each subsidiary guarantor thereof that is a debtor and debtor-in-possession (other than the Company and each other Borrower), each in their respective capacities as debtors and debtors-in-possession (the "**Guarantors**" and, collectively with the Company and the other Borrowers, the "**Loan Parties**" or the "**Debtors**") in the cases to be filed under the Bankruptcy Code with the Bankruptcy Court contemporaneously and jointly administered with the Borrowers' Cases (the "**Guarantors' Cases**" and, collectively with the Borrowers' Cases, the "**Chapter 11 Cases**"). The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**". |
| | SPS-Providea Limited and ConvergeOne India Private Limited shall not guarantee, and shall not provide security for, the ABL DIP Facility (as defined below) or the Term Loan DIP Facility (as defined below) and shall not be Loan Parties (consistent with the Prepetition ABL Credit Agreement in effect immediately prior to the Petition Date). |
| **Administrative Agent and** | Wells Fargo Commercial Distribution Finance, LLC shall act as administrative agent and the collateral agent for the ABL DIP Lenders (as defined below) with |

7834612.18

| | |
|---|---|
| **Collateral Agent** | respect to the ABL DIP Facility (in such capacities, the "**ABL DIP Agent**"). |
| **Floorplan Facility Funding Agent** | Wells Fargo Commercial Distribution Finance, LLC shall act as floorplan facility funding agent for the ABL DIP Facility. |
| **ABL DIP Lenders** | Wells Fargo Commercial Distribution Finance, LLC, Deutsche Bank AG New York Branch, UBS AG, Stamford Branch, and/or one or more of their respective designated affiliates and/or related funds or accounts (each an "**ABL DIP Lender**", and collectively, the "**ABL DIP Lenders**", and together with the ABL DIP Agent, the "**ABL DIP Secured Parties**"). |
| **Prepetition ABL Facility** | Senior secured asset-based revolving credit facility (the "**Prepetition ABL Facility**") made available to the Company and the other borrowers thereunder pursuant to that certain Amended and Restated ABL Credit Agreement, dated as of January 4, 2019  (as amended by Amendment No. 1 to Amended and Restated ABL Credit Agreement, dated as of July 10, 2022, Amendment No. 2 to Amended and Restated ABL Credit Agreement, dated as of September 14, 2022, Amendment No. 3 to Amended and Restated ABL Credit Agreement, dated as of January 23, 2023 and Amendment No. 4 to Amended and Restated ABL Credit Agreement, dated as of August 29, 2023) among the Borrowers, Holdings, Wells Fargo Commercial Distribution Finance, as administrative agent, collateral agent, floorplan funding agent and swing line lender (in such capacity, the "**Prepetition ABL Representative**") and the lenders party thereto (the "**Prepetition ABL Lenders**", and together with the Prepetition ABL Representative and the other secured parties under the Prepetition ABL Credit Agreement and related loan documents, the "**Prepetition ABL Secured Parties**") (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition ABL Credit Agreement**"; the obligations thereunder and under the related loan documents, the "**Prepetition ABL Obligations**"; and the liens and security interests granted in connection therewith, the "**Prepetition ABL Liens**"). |
| | ABL DIP Agent and ABL DIP Lenders acknowledge and agree that there shall not be deemed to be a termination of the commitments, an acceleration of the Prepetition ABL Obligations or any occurrence of any other event or condition that automatically occurs, in each case under the Prepetition ABL Credit Agreement solely as a result of the commencement of the Chapter 11 Cases; provided, that the Interim DIP Order shall have been entered no later than three (3) calendar days after the Petition Date, provided, further, that all other terms and conditions applicable to the commitments in the Prepetition ABL Credit Agreement (including the other conditions precedent set forth in Section 4.02 of the Prepetition ABL Credit Agreement) shall remain in full force and effect (this paragraph, the "**Prepetition ABL Credit Agreement Acknowledgment**"). |
| **Existing ABL Intercreditor Agreement** | That certain ABL Intercreditor Agreement, dated as of January 4, 2019 (as amended by that certain Joinder and Amendment to ABL Intercreditor Agreement dated as of July 10, 2020 and supplemented by that certain ABL |

7834612.18

| | |
|---|---|
| | Intercreditor Agreement Joinder dated as of May 15, 2023), among the Prepetition ABL Representative, the Prepetition First Lien Term Loan Agent (as defined below), UBS AG, Stamford Branch as the Initial Junior Lien Term Loan Agent, Deutsche Bank Trust Company Americas, as a New Term Loan Agent and PVKG Investment Holdings, Inc., as a New Term Loan Agent (the "**Existing ABL Intercreditor Agreement**"). |
| **Prepetition First Lien Term Facility** | Senior secured first lien term loan facility (the "**Prepetition First Lien Term Loan Facility**"; the loans thereunder, the "**Prepetition First Lien Term Loans**" and, the lenders thereunder, the "**Prepetition First Lien Term Loan Lenders**") made available to the Company pursuant to that certain First Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition First Lien Term Loan Credit Agreement**"; the liens and security interests granted in connection therewith, the "**Prepetition First Lien Term Loan Liens**"; and the obligations arising thereunder, the "**Prepetition First Lien Term Loan Secured Obligations**") among the Company, Holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Term Loan Agent**", and together with the First Lien Term Loan Lenders, the "**Prepetition First Lien Term Loan Secured Parties**"), and the other parties party thereto. |
| **Prepetition First Lien KL Notes** | Senior secured first lien notes (the "**First Lien KL Notes**" and, the holders of such notes, the "**First Lien KL Noteholders**") made available to the Company pursuant to that certain Note Purchase Agreement, dated as of July 10, 2020 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition First Lien KL Note Purchase Agreement**"; the liens and security interests granted in connection therewith, the "**Prepetition First Lien KL Notes Liens**"; the obligations arising thereunder, the "**Prepetition First Lien KL Notes Secured Obligations**") among the Company, Holdings, Deutsche Bank Trust Company Americas, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien KL Notes Agent**", and together with the Prepetition First Lien KL Noteholders, the "**Prepetition First Lien KL Notes Secured Parties**"), and the other parties party thereto. |
| **Prepetition First Lien CVC Notes** | Senior secured first lien notes (the "**Prepetition First Lien CVC Notes**" and, the holders of such notes, the "**Prepetition First Lien CVC Noteholders**") made available to the Company pursuant to that certain Note Purchase Agreement, dated as of July 6, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition First Lien CVC Note Purchase Agreement**"; the liens and security interests granted in connection therewith, the "**Prepetition First Lien CVC Notes Liens**", and together with the Prepetition First Lien Term Loan Liens and the Prepetition First Lien KL Notes Liens, the "**Prepetition First Lien Liens**"); and the obligations arising thereunder, the "**Prepetition First Lien CVC Notes Secured Obligations**", and, together with the Prepetition First Lien Term Loan Secured Obligations and the Prepetition First Lien KL Notes Secured |

3

000921
**App. 425**

| | |
|---|---|
| | Obligations, the "**Prepetition First Lien Secured Obligations**") among the Company, Holdings, PVKG Investment Holdings, Inc., as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien CVC Notes Agent**", and together with the Prepetition First Lien CVC Noteholders, the "**Prepetition First Lien CVC Notes Secured Parties**"; the Prepetition First Lien CVC Notes Secured Parties, together with the Prepetition First Lien Term Loan Secured Parties and the Prepetition First Lien KL Notes Secured Parties, the "**Prepetition First Lien Secured Parties**") and the other parties party thereto. |
| **Prepetition Second Lien Term Facility** | Senior secured second lien term loan facility (the "**Prepetition Second Lien Facility**"; and the lenders thereunder, the "**Prepetition Second Lien Lenders**") made available to the Company pursuant to that certain Second Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time); the liens and security interests granted in connection therewith, the "**Prepetition Second Lien Liens**" and, together with the Prepetition First Lien Liens, the "**Prepetition Liens**"; and the obligations arising thereunder, the "**Prepetition Second Lien Secured Obligations**") among the Company, Holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition Second Lien Agent**", and together with the Prepetition Second Lien Lenders, the "**Prepetition Second Lien Secured Parties**"; and together with the Prepetition First Lien Secured Parties, the "**Prepetition Secured Parties**")), and the other parties party thereto. |
| **ABL DIP Facility** | Upon the Closing Date, the Prepetition ABL Facility shall be ratified and amended pursuant to a customary Ratification and Amendment Agreement (the "**Ratification and Amendment Agreement**") consistent with this Term Sheet and the Documentation Principles (as defined below) and otherwise in form and substance satisfactory to ABL DIP Agent and the ABL DIP Lenders (the "**DIP ABL Credit Agreement**").  Pursuant to the DIP ABL Credit Agreement, the ABL DIP Agent and the ABL DIP Lenders will provide a senior secured superpriority priming debtor-in-possession asset-based revolving credit facility, in the aggregate principal amount of up to $250 million, subject to the Borrowing Base (the "**ABL DIP Facility**"; and the loans outstanding under the ABL DIP Facility from time to time, the "**ABL DIP Loans**" and the commitments outstanding under the ABL DIP Facility from time to time, the "**ABL DIP Commitments**") will be available to the Borrowers from and after the Closing Date, subject to the terms expressly set forth in the DIP ABL Credit Agreement, and such ABL DIP Facility shall provide for a gradual roll-up and conversion of all Prepetition ABL Obligations under the Interim DIP Order (as defined below), and upon entry of the Final DIP Order (as defined below), any remaining Prepetition ABL Obligations shall be fully rolled-up and converted into ABL DIP Obligations (as defined below) (the "**Roll-Up**"); provided that all Letters of Credit and Floorplan Approvals issued pursuant to the Prepetition ABL Credit Agreement shall automatically be deemed to have been issued pursuant to the DIP ABL Credit Agreement upon entry of the Interim DIP Order.  All indebtedness and obligations from time to time arising under the |

4

ABL DIP Facility, including the Roll-Up, are hereinafter referred to as the "**ABL DIP Obligations**". The DIP ABL Credit Agreement and the other ABL DIP Documents shall be in form and substance, and upon terms and conditions, consistent with this Term Sheet and the Documentation Principles (as defined below).

The ABL DIP Loans may be incurred, subject to the satisfaction or waiver of all conditions thereto set forth in this Term Sheet (with such conditions in the Term Sheet to be set forth in the ABL DIP Documents), in accordance with the terms of the ABL DIP Documents, including as follows: (a) following the entry by the Bankruptcy Court of the Interim DIP Order (as defined below), in form and substance acceptable to the Required ABL DIP Lenders and the Required Consenting Lenders (as defined in the Restructuring Support Agreement, to be dated on or around April 3, 2024 (the "**RSA**")), authorizing the Roll-Up and (b) on and after the entry by the Bankruptcy Court of the Final DIP Order authorizing the ABL DIP Facility on a final basis, which shall be in form and substance acceptable to the Required ABL DIP Lenders and the Required Consenting Lenders (as defined in the RSA).

The definition of "Borrowing Base" (and any component definitions thereof) shall be consistent with the Prepetition ABL Credit Agreement in effect immediately prior to the Petition Date, except that (i) clause (2) of the definition of "Borrowing Base" shall be replaced by the following: "(2) 50% of the Eligible Unbilled Accounts (net of Unbilled Accounts Reserves) owned by any Borrowing Base Party; provided that the amount calculated this clause (2) shall not exceed 15% of the Borrowing Base; plus" and (ii) an availability block of $25,000,000 shall be implemented. In addition, the definition of Eligible Accounts shall be modified to include as ineligible any Accounts (as defined in the Prepetition ABL Credit Agreement) owing by an account debtor which has any bonded projects.

The ability to impose additional Availability Reserves, Accounts Reserves, Dilution Reserves, Inventory Reserves, Landlord Lien Reserves, Secured Cash Management Reserves, Secured Hedging Reserves, Unbilled Account Reserves and other Reserves shall remain consistent with the Prepetition ABL Credit Agreement in effect on the Petition Date, except that (i) Availability Reserves may be implemented to account for the Carve Out (as defined below) as provided below, including with respect to the projected amount of professional fees and expenses for each rolling 2-week period and the amount of the Post-Carve Out Trigger Notice Cap (as defined below), as well as any other allowed administrative expense or priority claims arising in the Borrowers' Cases that, in the ABL DIP Agent's good faith determination, require payment prior to the full repayment of the ABL DIP Obligations, (ii) any such reserves will take immediate effect to the extent the Borrowers request to borrow any ABL DIP Loans during the three (3) business day notice period normally required for the imposition of such reserves, (iii) reserves may be implemented in respect of claims or amounts payable or which may reasonably be expected to be incurred in connection with surety bonds and bonded projects in amounts determined by Agent in its Permitted Discretion, and (iv) any implementation of any new

5

|  | reserves (other than reserves implemented in respect of surety bonds and bonded projects), or increase in any existing reserves, after the Closing Date shall be based on any material facts or circumstances which arise after the Closing Date or which otherwise first become known to the ABL DIP Agent after the Closing Date.  In addition, references to "Closing Date" in the definition of Permitted Discretion (other than with respect to reserves or ineligibility criteria implemented in respect of surety bonds and bonded projects), clause (23) of the definition of Eligible Accounts and clause (15) of the definition of Eligible Inventory, in each case, under the Prepetition ABL Credit Agreement, shall be changed to a reference to the Closing Date as defined herein.

The ABL DIP Documents shall permit, subject to the DIP Intercreditor Arrangements (as defined below), the Loan Parties to incur a senior secured postpetition term loan facility on a superpriority basis in form and substance reasonably acceptable to the Required ABL DIP Lenders (as defined below), it being understood and agreed that (a) such term loan facility shall be secured by liens consistent with the priority set forth on Annex III, (b) such a term loan facility that is on terms substantially consistent with the terms set forth in the DIP Term Loan term sheet attached to the RSA (the "**Term Loan DIP Term Sheet**") shall be deemed to be acceptable to the Required ABL DIP Lenders (the "**Term Loan DIP Facility**," the loans outstanding thereunder, the "**Term DIP Loans**", the liens securing the Term Loan DIP Facility, the "**Term DIP Liens**", and the agent thereunder, the "**Term DIP Agent**").

The DIP Order shall provide for intercreditor arrangements that govern certain intercreditor arrangements between the ABL DIP Facility and the Term Loan DIP Facility (the "**DIP Intercreditor Arrangements**") with such arrangements to be on terms generally consistent with the Existing ABL Intercreditor Agreement and otherwise acceptable to the ABL DIP Agent, the Required ABL DIP Lenders (in their discretion), Required Consenting Lenders (in their discretion) and the Loan Parties. |
| **Floorplan Facility** | The ABL DIP Facility will be available for floorplan advances and floorplan approvals to approved vendors in respect of inventory to be acquired by the Company or any of its Restricted Subsidiaries (to be defined in a manner consistent with the Prepetition ABL Facility) from such vendors substantially on the same terms and conditions contained in the Floorplan Facility under, and as defined in, the Prepetition ABL Credit Agreement (the "**DIP Floorplan Facility**").  Any floorplan advances and other obligations under the Floorplan Facility arising under the Prepetition ABL Facility shall be deemed "rolled-up" and converted into ABL DIP Obligations upon the Closing Date. |
| **Letters of Credit** | A portion of the ABL DIP Facility not in excess of an amount to be agreed (but, in any event, not less than $85 million) will be available for the issuance of letters of credit ("**Letters of Credit**") by the ABL DIP Agent, sharing ratably in such Letters of Credit commitment (in such capacity, the "**Issuing Lender**"), to be on terms consistent with the Letter of Credit provisions under, and as |

6

7834612.18

| | |
|---|---|
| | defined in, the Prepetition ABL Credit Agreement. The face amount of any outstanding Letter of Credit (and, without duplication, any unpaid drawing in respect thereof) will reduce availability under the ABL DIP Facility on a dollar-for-dollar basis. |
| | Letters of Credit may be issued on the Closing Date to backstop or replace surety bonds, letters of credit or similar instruments outstanding on the Closing Date (including by "grandfathering" such existing surety bonds, letters of credit or similar instruments into the ABL DIP Facility). |
| **Swingline Loans** | A portion of the ABL DIP Facility not in excess of the lesser of $10.0 million or 5% of the ABL DIP Commitments will be available for swingline loans (the "**Swingline Loans**") on same-day notice from the ABL DIP Agent (in such capacity, the "**Swingline Lender**") to be on terms consistent with the Swing Line Loan provisions under, and as defined in, the Prepetition ABL Credit Agreement. Any Swingline Loans will reduce availability under the ABL DIP Facility on a dollar-for-dollar basis (other than for purposes of calculating the Non-Use Fee). Each ABL DIP Lender under the ABL DIP Facility will be irrevocably and unconditionally required to purchase, under certain circumstances, a participation in each Swingline Loan on a pro rata basis. |
| **Permitted Liens** | (A)  Any valid liens ("**Permitted Prior Liens**") that are (1) in existence on the Petition Date, (2) are either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (3) senior in priority to the Prepetition First Lien Liens, (4) non-avoidable under the Bankruptcy Code or other applicable law, and (5) are permitted to be incurred under the First Lien Term Loan Credit Agreement, the Prepetition First Lien KL Note Purchase Agreement and the Prepetition First Lien CVC Note Purchase Agreement; and |
| | (B)  liens permitted to have seniority over the ABL DIP Liens (as defined below) securing the ABL DIP Facility as specified in the DIP ABL Credit Agreement (the liens referenced in (A) and (B) above, collectively, the "**Permitted Liens**"). |
| **DIP Orders** | The order approving the Term Loan DIP Facility (as defined below) and the ABL DIP Facility on an interim basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties, the ABL DIP Agent, the Required ABL DIP Lenders (as defined below) and the Required Consenting Lenders (the "**Interim DIP Order**"), shall authorize and approve, among other matters, (i) the Loan Parties' entry into the Term DIP Documents (as defined below) and the ABL DIP Documents, as applicable, (ii) the making of the Term DIP Loans (as defined below) and the ABL DIP Loans (including Swingline Loans, floorplan advances, other obligations under the Floorplan Facility, and the issuance of Letters of Credit under the DIP ABL Credit Agreement) (including the Roll-Up and conversion of all amounts outstanding under the Prepetition ABL Facility into the ABL DIP Facility upon entry of the Interim DIP Order and Final DIP Order, as applicable), (iii) the |

7

7834612.18

|  | granting of the super-priority claims and liens against the Loan Parties and their assets in accordance with the Term DIP Documents, the ABL DIP Documents (as applicable), the Existing ABL Intercreditor Agreement and the DIP Intercreditor Arrangements, respectively, with respect to the DIP Collateral (as defined below), (iv) the use of cash collateral solely in accordance with the terms of the ABL DIP Documents and the Term Loan DIP Documents, (v) the granting of adequate protection to the Prepetition First Lien Secured Parties and the Prepetition ABL Secured Parties, (vi) granting waivers of Debtors' rights to seek non-consensual use of cash collateral under Section 363 of the Bankruptcy Code, and (vii) granting other waivers (including, without limitation, surcharge waivers under Section 506(c) of the Bankruptcy Code, equities of the case waiver under Section 552 of the Bankruptcy Code, and marshaling requirements) with respect to the ABL DIP Obligations and the DIP Collateral.<br><br>The order approving the Term Loan DIP Facility and the ABL DIP Facility on a final basis, which shall be in form and substance acceptable to the Required ABL DIP Lenders and the Required Consenting Lenders, shall be the "**Final DIP Order**" and, together with the Interim DIP Order, shall be the "**DIP Orders**". The Final DIP Order shall grant (or reaffirm, as the case may be) waivers (including, without limitation, surcharge waivers under Section 506(c) of the Bankruptcy Code), equities of the case waiver under Section 552 of the Bankruptcy Code, rights to seek non-consensual use of cash collateral under Section 363 of the Bankruptcy Code, and marshaling requirements) with respect to the Prepetition ABL Obligations, the Prepetition First Lien Secured Obligations, the Prepetition Collateral, the DIP Collateral, the ABL DIP Obligations and the obligations under the Term Loan DIP Facility, and releases in favor of the Prepetition ABL Secured Parties and Prepetition First Lien Secured Parties. |
| **Adequate Protection** | As adequate protection against the risk of any diminution in the value of the respective Prepetition Liens in all collateral securing the Prepetition ABL Obligations, the Prepetition First Lien Secured Obligations and the Prepetition Second Lien Secured Obligations (collectively, the "**Prepetition Collateral**") (as applicable), including as a result of the imposition of the automatic stay, the Loan Parties' use, sale, or lease of such collateral, including Cash Collateral (as defined below), during the Chapter 11 Cases, the granting of priming liens and claims on a dollar-for-dollar basis as set forth herein, and the imposition of the Carve Out, the Prepetition Secured Parties shall be granted the following adequate protection, subject in all cases to the Carve Out and the priority set forth on Annex III:<br><br>The Prepetition ABL Secured Parties shall be entitled to receive, subject in all cases to the Carve Out and Permitted Prior Liens, the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition ABL Liens in Prepetition Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Prepetition ABL Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex III** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition ABL Liens in Prepetition Collateral, a superpriority |

administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve Out) (the "**Prepetition ABL Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex III** attached hereto, as applicable; (C) the payment of the reasonable and documented fees and out-of-pocket expenses of the Prepetition ABL Representative, and the payment of the reasonable and documented fees of the Prepetition ABL Representative's legal counsel and any financial advisors or consultants retained by Prepetition ABL Representative (including without limitation, the prepetition and post-petition fees and expenses of (i) Otterbourg P.C., as counsel to the Prepetition ABL Representative, (ii) M3 Advisory Partners, LP, as financial advisor to the Prepetition ABL Representative, and (iii) local Texas counsel to the Prepetition ABL Representative); and (E) financial reporting consistent with the "Budget" section set forth below.

The Prepetition First Lien Secured Parties shall be entitled to receive, subject in all cases to the Carve Out and Permitted Prior Liens, the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition First Lien Liens in Prepetition Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**First Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex III** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition First Lien Liens in Prepetition Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve Out) (the "**First Lien Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex III** attached hereto, as applicable; (C) the payment of the reasonable and documented fees and out-of-pocket expenses of the Prepetition First Lien Term Loan Agent, the Prepetition First Lien KL Notes Agent and the Prepetition First Lien CVC Notes Agent, and the payment of the reasonable and documented fees of the First Lien Ad Hoc Group (as such term is defined in the RSA) (the "**First Lien Ad Hoc Group**") (including without limitation, the prepetition and post-petition fees and expenses of (i) Gibson Dunn & Crutcher LLP, as counsel to the First Lien Ad Hoc Group, (ii) PJT Partners, as financial advisor to the First Lien Ad Hoc Group, (iii) Latham & Watkins LLP, as counsel to the Prepetition First Lien CVC Notes Secured Parties and (iv) with the Borrower's consent (not to be unreasonably withheld), such other attorneys, financial

9

| | advisors or professionals retained by the First Lien Ad Hoc Group; and (D) financial reporting consistent with the "Budget" section set forth below. |
|---|---|
| | The Prepetition Second Lien Secured Parties shall be entitled to receive, subject in all cases to the Carve Out and Permitted Prior Liens, the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition Second Lien Liens in Prepetition Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Second Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex III** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition Second Lien Liens in Prepetition Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve Out) (the "**Second Lien Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex III** attached hereto, as applicable; and (C) the payment of the reasonable and documented fees and out-of-pocket expenses of the Prepetition Second Lien Agent and, subject to the terms of the RSA, the payment of the reasonable and documented fees of the Second Lien Ad Hoc Group (as such term is defined in the RSA) (the "**Second Lien Ad Hoc Group**") (including without limitation, the prepetition and post-petition fees and expenses of (i) Davis Polk & Wardwell LLP, as counsel to the Second Lien Ad Hoc Group, (ii) Guggenheim Securities, LLC, as financial advisor to the Second Lien Ad Hoc Group, and (iii) with the Borrower's consent (not to be unreasonably withheld), such other attorneys, financial advisors or professionals retained by the Second Lien Ad Hoc Group. |
| **Carve Out** | The liens on and security interests in the DIP Collateral (as defined below), the adequate protection liens, and all super-priority administrative expense claims granted under the DIP Orders, shall be subject and subordinate to the Carve Out. |
| | For purposes hereof, "**Carve Out**" means, without duplication, an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "**Chapter 7 Trustee Carve-Out**"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtors' Professionals**") and to the extent set forth in the Budget as of the date of determination by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the |

10

Debtors' Professionals, "**Professional Persons**") at any time before or on the first business day following delivery by the ABL DIP Agent or Term DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice, less the amount of any retainers or other amounts held by any such Professional Person as of the Petition Date; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the ABL DIP Agent or Term DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the ABL DIP Agent or Term DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Creditors' Committee, and the ABL DIP Agent and Term DIP Agent, as applicable, which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Not later than 7:00 p.m. New York time on the Tuesday of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**") (collectively, "**Estimated Fees and Expenses**"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "**Weekly Statement**"); provided, that within one business day of the occurrence of the Termination Declaration Date, each Professional Person shall deliver one additional Weekly Statement (the "**Final Statement**") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the ABL DIP Agent and Term DIP Agent). If any Professional Person fails to timely deliver a Weekly Statement within one business day after such Weekly Statement is due, such Professional Person shall not be entitled to any funds in the Carve Out Reserves with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period.  The ABL DIP Agent shall at all times maintain a Reserve (as defined in the ABL DIP Credit Agreement) in an amount equal to the Post-Carve Out Trigger Notice Cap, plus the aggregate amount of projected fees for all Professional Persons set forth in the Approved Budget for the week subsequent to the date of determination for such Reserve; provided that nothing set forth herein shall limit the ability of the ABL DIP Agent to increase such reserve if ABL DIP Agent

11

000929
**App. 433**

| | |
|---|---|
| | determines that the aggregate amount of Allowed Professional Fees are likely to exceed the amount set forth in the Approved Budget for such week. |
| **ABL DIP Facility Availability** | From and after the Closing Date (as defined below), subject to the entry of the Interim DIP Order and the satisfaction of the other conditions set forth in this Term Sheet, the ABL DIP Facility will be made available to the Borrower in the aggregate principal amount of up to $250,000,000 (subject to the Borrowing Base). Amounts borrowed under the ABL DIP Facility may be reborrowed. |
| **Use of Proceeds of ABL DIP Facility and Term Loan DIP Facility** | The proceeds of the ABL DIP Loans under the ABL DIP Facility shall be used only for the following purposes: (i) the Roll-Up, (ii) payment of certain prepetition amounts of the type contemplated in the then current Approved Budget (including prepetition payments to critical vendors identified by the Loan Parties) and solely as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Loan Parties, which orders shall be in form and substance reasonably satisfactory to the Required ABL DIP Lenders, (iii) to the extent of the type contemplated in the then current Approved Budget and in accordance with the terms of the ABL DIP Facility and the Interim DIP Order/Final DIP Order, and (iv) payment of the costs and expenses of administering the Cases (including payments benefiting from the Carve Out) subject to the terms and conditions of the ABL DIP Facility, in each case of the forgoing, solely in accordance with and subject to the credit agreement governing the terms of the ABL DIP Facility, Interim DIP Order and Final DIP Order.

Solely in accordance with and subject to the credit agreement governing the terms of the Term Loan DIP Facility (the "**Term DIP Credit Agreement**", and together with all security and collateral agreements related thereto, the "**Term DIP Documents**"), the proceeds of the Term Loan DIP Facility may be used only to (i) pay down certain Prepetition ABL Loans under the Prepetition ABL Facility (without a corresponding reduction in commitments thereunder), and (ii) for the other purposes described in the Term Loan DIP Term Sheet, in each case, in accordance with and subject to the Term DIP Documents, the DIP Orders and the Approved Budget (as defined below). |
| **ABL DIP Documents Control** | The provisions of the ABL DIP Documents shall, upon execution, supersede the provisions of this Term Sheet. |
| **Maturity** | The "**ABL DIP Termination Date**" with respect to the ABL DIP Facility shall be the earliest to occur of:

(i)    the date that is six (6) months after the Petition Date (or if such day shall not be a business day, the next succeeding business day) (the "**Scheduled Termination Date**");

(ii)   11:59 p.m. New York City Time on the date that is thirty five (35) calendar days after the Petition Date, if the Final DIP Order has not been entered by the Bankruptcy Court prior to such date and time, |

12

000930

**App. 434**

| | |
|---|---|
| | unless otherwise extended by the Required ABL DIP Lenders; |
| | (iii) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court (the "**Plan**"); |
| | (iv) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code; |
| | (v) the acceleration of the ABL DIP Loans and the termination of the commitments under the ABL DIP Facility in accordance with the ABL DIP Documents; and |
| | (vi) the consummation of a sale of all or substantially all assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code (other than to another Loan Party). |
| | Subject to the provisions of the DIP Orders, as applicable, on the ABL DIP Termination Date (or such earlier date on which the ABL DIP Facility shall have been terminated), the Loan Parties shall repay all obligations arising under the ABL DIP Facility in full in cash and provide such amounts necessary to cash collateralize Letters of Credit and floorplan approvals under the Floorplan Facility (to the extent not backstopped), in each case subject to arrangements satisfactory to the ABL DIP Agent (provided that such payment may, in the case of any ABL DIP Lender who agrees to participate in any "exit financing", take the form of a cashless roll-up into such new "exit financing" and not cash; provided further that, to the extent any ABL DIP Lender does not participate or provide commitment to "exit financing", such payment shall be made in full in cash and such ABL DIP Lender's commitment shall be terminated). |
| **Amortization** | None. |
| **Payments and Interest Rates** | Consistent with the Prepetition ABL Facility except as set forth on **Annex II** attached hereto. |
| **Line Cap** | Consistent with the Prepetition ABL Facility, except that an availability block of $25,000,000 shall be implemented with respect to the Revolving Commitment component of the Line Cap calculation. |
| **Excess Availability** | At any time, (a) the Line Cap then in effect, plus (b) 100% of Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Facility, except reference to accounts subject to control agreements shall include accounts that are subject to control agreements on the Petition Date or other accounts held at the ABL DIP Agent or any of its affiliates, and any cash in such accounts that is used for cash collateralizing the pre-funded ACH Treasury Management services provided through Wells Fargo Commercial Distribution Finance, LLC shall be excluded as Qualified Cash) not to exceed for this purpose 25% of the Borrowing Base, minus (c) the sum, without duplication, of (i) the then |

13

| | |
|---|---|
| | aggregate outstanding principal amount of ABL DIP Loans (including Swingline Loans and floorplan advances), (ii) unreimbursed drawings under letters of credit under the DIP ABL Credit Agreement and (iii) the undrawn face amount of outstanding letters of credit under the DIP ABL Credit Agreement ("**Excess Availability**") |
| **Cash Dominion** | Consistent with the Prepetition ABL Facility. |
| **Mandatory Prepayments** | Consistent with the Prepetition ABL Facility. |
| **Voluntary Prepayments** | Consistent with the Prepetition ABL Facility. |
| **Collateral and Priority** | Subject to the Carve Out, as security for the prompt payment and performance of all amounts due under the ABL DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses, indemnities or other amounts (collectively, the "**ABL DIP Obligations**"), effective as of the Petition Date, the ABL DIP Agent, for the benefit of itself and the ABL DIP Lenders, shall be granted automatically and properly perfected liens and security interests ("**ABL DIP Liens**") in all assets and properties of each of the Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of the Loan Parties, whether prior to or after the Petition Date, including all unencumbered assets of the Loan Parties (except for all claims and causes of action arising under Chapter 5 of the Bankruptcy Code ("**Avoidance Actions**"), but including, upon entry of the Final DIP Order, the proceeds of property recovered, whether by judgment, settlement or otherwise from Avoidance Actions ("**Avoidance Action Proceeds**")) (collectively, "**Unencumbered Property**") (collectively, the "**DIP Collateral**"); *provided,* that DIP Collateral shall exclude Excluded Assets but shall include any and all proceeds and products of Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets. |
| | "**Excluded Assets**" has the meaning set forth in the Collateral Agreement (as defined in the Prepetition ABL Credit Agreement). |
| | The ABL DIP Liens shall have the following priorities (subject in all cases to the Carve Out): |
| | i. *First Liens on Unencumbered Property.* Pursuant to Section 364(c)(2) of the Bankruptcy Code, the ABL DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected and non-avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code), including Unencumbered Property, which ABL DIP Liens in Unencumbered Property shall be *pari passu* with any Term DIP Liens |

14

| | |
|---|---|
| | in such Unencumbered Property, subject to the priorities set forth in **Annex III** attached hereto and the Carve Out. |
| | ii. *Priming DIP Liens and Liens Junior to Certain Other Liens*. The ABL DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected in all DIP Collateral (other than as described in underline(i) above), which ABL DIP Liens (a) shall be, pursuant to Section 364(c)(3) of the Bankruptcy Code, subject and subordinate only to the (1) Carve Out, (2) Permitted Prior Liens, and (3) solely with respect to Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) and DIP Collateral of a type that would otherwise constitute Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), the Term DIP Liens, as applicable (to the extent the Term Loan DIP Facility asserts a first priority lien on such Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement)), (b) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in the ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) or any DIP Collateral that would otherwise constitute ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) (including, without limitation, any Term DIP Liens, as applicable, in ABL Priority Collateral), and (c) shall otherwise be subject to the priorities set forth in **Annex III** attached hereto. |
| | iii. *Liens Senior to Other Liens*. Except to the extent expressly permitted hereunder, subject to the Carve Out, the ABL DIP Liens and the ABL DIP Superpriority Claims (as defined below) (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (B) any lien or security interest that is avoided or preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the Debtors or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
| **Guarantees** | Each Guarantor shall unconditionally guarantee, on a joint and several basis, all ABL DIP Obligations arising under or in connection with the ABL DIP Facility. |
| **ABL DIP Superpriority Claims** | Subject to the Carve Out, the ABL DIP Obligations shall be allowed super-priority administrative expense claims under Section 364(c) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claims shall have priority over all other claims against the Debtors, of any kind or nature whatsoever, including, without limitation, administrative expenses of the |

7834612.18

| | |
|---|---|
| | kind specified in or so ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise, with recourse against all DIP Collateral (the "**ABL DIP Superpriority Claims**"), which ABL DIP Superpriority Claims shall be subject to the priorities set forth in **Annex III** attached hereto. |
| **Term DIP Superpriority Claims** | Subject to the Carve Out, all amounts due under the Term Loan DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses indemnities or other amounts shall be allowed super-priority administrative expense claims under Section 364(c) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claims shall have priority over all other claims against the Debtors, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or so ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise, with recourse against all DIP Collateral (the "**Term DIP Superpriority Claims**"), which Term DIP Superpriority Claims shall be subject to the priorities set forth in **Annex III** attached hereto. |
| **Documentation Principles** | The ABL DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement and other guarantee, security, intercreditor, and other relevant documentation (the "**ABL DIP Documents**") based on the Prepetition ABL Credit Agreement and relevant guarantee, security and intercreditor documents, negotiated in good faith, in form and substance acceptable to the Loan Parties and the Required ABL DIP Lenders, which shall (i) reflect the terms set forth herein, (ii) reflect the terms of the Interim DIP Order or the Final DIP Order, as applicable, (iii) have usual and customary provisions for debtor-in-possession financings of this kind and provisions that are necessary to effectuate the financing contemplated hereby and (iv) otherwise be mutually agreed among the Borrower and the each ABL DIP Lender, (b) the Interim DIP Order and (c) the Final DIP Order (this paragraph, the "**Documentation Principles**"). |
| **Representations and Warranties** | The ABL DIP Documents will contain representations and warranties consistent with the Prepetition ABL Credit Agreement (modified as necessary to reflect the commencement of the Cases and to include those representations and warranties customarily found in loan documents for similar debtor-in-possession ABL Financings, and subject to the Documentation Principles). |
| **Budget** | The Loan Parties shall deliver: |
| | • a rolling 13-week cash flow forecast (the "**DIP Budget**") in form and substance satisfactory to the Required ABL DIP Lenders delivered on or prior to the Petition Date initially covering the period commencing on or about the Petition Date (the "**Initial DIP Budget**"), which reflects on a line-item basis, the Debtors' (a) weekly projected cash receipts ("**Budgeted Cash Receipts**"), (b) weekly projected disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses) under the Chapter 11 Cases ("**Budgeted** |

16

000934

**App. 438**

| | |
|---|---|
| | **Disbursement Amounts**") and (c) the weekly projected liquidity of the Debtors, and which shall be updated on the first Wednesday that is two full weeks after the Petition Date and every two weeks thereafter, which such proposed updated DIP Budget shall modify and supersede any prior agreed DIP Budget unless the ABL DIP Agent, acting at the direction of the Required ABL DIP Lenders, notifies (through counsel or otherwise) the Loan Parties in writing that such proposed DIP Budget is not in form and substance satisfactory to the Required ABL DIP Lenders within five Business Days after receipt thereof, in which case the existing Approved Budget shall remain in effect until superseded by an updated DIP Budget in form and substance satisfactory to the Required ABL DIP Lenders (as so updated, each an   "**Approved Budget**"); |
| | • on each Wednesday following each Variance Testing Period (beginning with the first Wednesday following the first Variance Testing Period), the delivery to the ABL DIP Lender Advisors of a variance report, which reflects for the applicable Variance Testing Period (defined below), (a) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts and the Budgeted Disbursement Amounts for such period as set forth in the Approved Budget as in effect for such period, (b) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (c) certifying compliance or non-compliance with the Permitted Variances (defined below), and (d) including explanations for all violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Debtors have taken or intend to take with respect thereto (each, a "**Variance Report**"); |
| | • together with each DIP Budget and each Variance Report, a reasonably detailed schedule listing all bank accounts of the Debtors with a balance in excess of $25,000 and their associated balances as of the applicable reporting date, including an identification of accounts covered by a deposit account control agreement; and |
| | • such other financial reporting readily available to the Debtors and reasonably requested by the ABL DIP Agent. |
| | "**Variance Testing Period**" shall mean (i) initially, the two-week period ending on the Friday of the second calendar week occurring after the Petition Date, and (ii) thereafter, each rolling two-week period ending on Friday of every second calendar week. |
| **Affirmative and Negative Covenants** | The ABL DIP Documents will contain the affirmative and negative covenants set forth in the Prepetition ABL Credit Agreement (modified as necessary to reflect the commencement of the Cases and to include those affirmative and negative covenants customarily found in loan documents for similar debtor-in-possession ABL financings, subject to the Documentation Principles) other than the Minimum Fixed Charge Coverage Ratio contained in Section 6.10(1) of the |

17

000935

**App. 439**

Prepetition ABL Credit Agreement; *provided, that*, without limitation, the ABL DIP Documents shall require:

(i)   update meetings and/or calls with the Debtors' senior management and advisors, the ABL DIP Lender Advisors and the ABL DIP Lenders every two weeks (or to the extent requested by ABL DIP Lender Advisors, every week), which update calls may cover the Debtors' financial performance and the other documentation provided pursuant to the reporting covenant described above;

(ii)  compliance with the DIP Orders;

(iii) delivery of internal management prepared unaudited monthly financial statements, including an income statement for such month, balance sheet as of the end of such month and a cash flow statement for such month, within 30 days of month-end; and

(iv)  monthly (springing to weekly consistent with the Prepetition ABL Credit Agreement) delivery of Borrowing Base Certificates and related deliverables (including those deliverables that have been delivered with the Borrowing Base Certificates delivered under the Prepetition ABL Credit Agreement plus such additional deliverables as may be reasonably required by ABL DIP Agent, including, without limitation, supporting materials and information related to bonded contracts) through the DIP process;

(v)   Variances against the Approved Budget not to exceed the following permitted variances, with the covenant tested on a cumulative rolling two-week basis at the delivery of each Variance Report (collectively, the "**Permitted Variances**"):

- Aggregate receipts for the Variance Testing Period shall not be less than 85% of the Budgeted Cash Receipts for such Variance Testing Period;

- Aggregate disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses but excluding professional fees and expenses and any costs or cash collateralization associated with surety bonds) for the Variance Testing Period shall not be greater than 115% of the Budgeted Disbursement Amounts for such Variance Testing Period;

(vi)  the requirement to satisfy the following milestones:

- By 8:00 a.m. (prevailing Central Time) on April 8, 2024, the Petition Date shall have occurred.

- The Interim DIP Order shall have been entered no later than three (3) calendar days after the Petition Date.

7834612.18

|  | • The Plan, Disclosure Statement (as defined in the RSA) and Backstop Motion (as defined in the RSA) shall have been filed no later than five (5) business days after the Petition Date.<br><br>• The Final DIP Order shall have been entered no later than thirty-five (35) calendar days after the Petition Date.<br><br>• The Disclosure Statement Order (as defined in the RSA) and Backstop Order (as defined in the RSA) shall have been entered no later than sixty (60) calendar days after the Petition Date.<br><br>• The Confirmation Order (as defined in the RSA) shall be in form and substance satisfactory to ABL DIP Agent and Required ABL DIP Lenders, and shall have been entered no later than 105 calendar days after the Petition Date.<br><br>• The Effective Date (as defined in the RSA) shall have occurred no later than 120 calendar days after the Petition Date. |
|--|--|
|  | (vii) Minimum Excess Revolving Availability covenant to be deleted and replaced with an availability block in the Borrowing Base as noted in the "ABL DIP Facility" section above. |
|  | (viii) Minimum Liquidity (which shall be defined as the sum of (i) all cash and cash equivalents of Loan Parties plus (ii) Excess Availability (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) and which shall not count Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) in the calculation of clause (i) above) of $20,000,000 and tested in a manner as provided for in the Term DIP Credit Agreement. |
|  | (ix) Within seven (7) Business Day after entry of the Final DIP Order, Borrowers shall have received not less than $70,000,000 (net of fees and expenses set forth in the Approved Budget) in proceeds of loans under the Term DIP Credit Agreement (which, for the avoidance of doubt, shall be in addition to the amount set forth in clause (vi) of Annex I), and not less than $35,000,000 of such net proceeds shall be paid to the ABL DIP Agent on such date to repay the loans under the ABL DIP Facility (without a corresponding reduction in commitments thereunder). |
|  | *provided, further, that*, (x) the covenant baskets contained in Sections 6.01(2)(b), 6.01(3)(b), 6.03(3), 6.04(3), 6.04(4), 6.04(33), 6.04(38), 6.05(32), 6.06(15), 6.06(16), 6.09(2)(a) and 6.09(2)(b) of the Prepetition ABL Credit Agreement shall not be included in the DIP ABL Credit Agreement (it being understood and agreed that any use of such baskets prior to the Petition Date shall be separately grandfathered in under the DIP ABL Credit Agreement), (y) the covenant baskets contained in 6.01(33) and 6.02(33) shall be reduced to an aggregate amount not to exceed $1,000,000 (it being understood and agreed that any use of such baskets prior to the Petition Date shall be grandfathered in under the DIP ABL Credit Agreement), and (z) certain other covenant baskets shall be modified or deleted in a manner consistent with |

7834612.18

| | |
|---|---|
| | debtor-in-possession facilities of this type and in form and substance acceptable to the Company and the Required ABL DIP Lenders. |
| **Equity Cure** | The equity cure contained in Section 8.02 of the Prepetition ABL Credit Agreement shall not be included in the DIP ABL Credit Agreement. |
| **Conditions Precedent to Closing and the Initial Borrowing** | The closing of the ABL DIP Facility (the "**Closing Date**") shall occur as promptly as practical after the entry of the Interim DIP Order by the Bankruptcy Court, subject to the conditions precedent set forth on **Annex I** attached hereto. |
| **Conditions to Each Borrowing** | As set forth on **Annex II** attached hereto. <br><br> For the avoidance of doubt, such conditions precedent shall not apply to any ABL DIP Loan deemed made as a result of the Roll-Up. |
| **Events of Default** | The ABL DIP Documents will contain events of default consistent with those set forth in the Prepetition ABL Credit Agreement as well as additional events of default customarily found in loan documents for similar debtor-in-possession financing and other events of default reasonably agreed among the Loan Parties and the Required ABL DIP Lenders, subject to the Documentation Principles, including without limitation (a) any request made by the Loan Parties for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a DIP Order, as entered by the Bankruptcy Court which adversely effects the ABL DIP Lenders, without the prior written consent of the Required ABL DIP Lenders, (b) the occurrence and continuance of an "Event of Default" under the Term Loan DIP Facility, (c) the allowance of any superpriority claim arising under section 507(b) of the Bankruptcy Code which is pari passu with (other than the superpriority claims of the DIP Term Loan Facility) or senior to those of the DIP ABL Agent and the ABL DIP Lenders; (d) the dismissal of the Cases, or conversion of the Cases to cases under chapter 7 of the Bankruptcy Code; (e) the termination of the RSA; (f) if a surety declares a default or exercises any remedies in respect of a bonded contract, which default will or could reasonably be expected to result in claims against or payments by the Debtors in an aggregate amount of $7,500,000; and (g) the filing of any Plan that does not provide for the repayment in full in cash (provided that such payment may, in the case of any ABL DIP Lender who agrees to participate in any "exit financing", take the form of a cashless roll-up into such new "exit financing" and not cash; provided further that, to the extent any ABL DIP Lender does not participate or provide commitment to "exit financing", such payment shall be made in full in cash and such ABL DIP Lender's commitment shall be terminated). of the Prepetition ABL Obligations and ABL DIP Obligations on the Effective Date of such Plan. <br><br> Upon the occurrence and during the continuation of an Event of Default, subject to the DIP Intercreditor Arrangements or Existing ABL Intercreditor Agreement (as applicable), without further order from or application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the ABL DIP |

20

Agent, acting at the request of the Required ABL DIP Lenders, to (A) deliver to the Borrowers a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the ABL DIP Facility, (C) declare the ABL DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral, (E) terminate the ABL DIP Facility, (F) charge the default rate of interest under the ABL DIP Facility, (G) freeze all monies in any deposit accounts of the Debtors, (H) exercise any and all rights of setoff, (I) exercise any other right or remedy with respect to the DIP Collateral or the ABL DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the ABL DIP Documents, the DIP Orders or applicable law; *provided, however*, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (I) and (J) above, (i) the ABL DIP Agent, acting at the request of the Required ABL DIP Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee, the Term DIP Agent and the Office of the United States Trustee with five (5) Business Days' prior written notice (such period, the "**Remedies Notice Period**"). Immediately upon the expiration of the Remedies Notice Period, the Bankruptcy Court shall hold an emergency hearing when the emergency Court is available (the "**Enforcement Hearing**") at which the Debtors, any Official Committee, and/or any other party in interest shall be entitled to seek a determination from the Bankruptcy Court solely as to whether an Event of Default has occurred, and at the conclusion of the Enforcement Hearing, the Bankruptcy Court may fashion an appropriate remedy that is consistent with the terms of the DIP Orders; *provided*, that during the Remedies Notice Period, the Loan Parties shall be permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the Required ABL DIP Lenders and the Required Term DIP Lenders (as such term is defined in the Term Loan DIP Term Sheet) in their sole discretion. Except as otherwise set forth in the DIP Orders or ordered by the Bankruptcy Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Loan Parties shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the ABL DIP Secured Parties or the Term DIP Secured Parties (as such term is defined in the Term Loan DIP Term Sheet) under the DIP Orders. No enforcement rights set forth in clauses (I) and (J) above shall be exercised prior to the Bankruptcy Court holding an Enforcement Hearing, subject to Bankruptcy Court availability, and the expiration of the Remedies Notice Period, and the Remedies Notice Period shall not expire until the conclusion of the Enforcement Hearing and the issuance of a ruling by the Bankruptcy Court if such Enforcement Hearing is conducted by the Bankruptcy Court.

Furthermore, upon the occurrence and during the continuation of an Event of Default, the ABL DIP Agent shall have the right, subject only to any separate applicable agreement between landlord and ABL DIP Agent, to enter upon any leased premises of the Debtors or any other party for the purpose of exercising

21

000939
**App. 443**

| | |
|---|---|
| | any remedy with respect to ABL DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder. |
| **Stipulations, Waivers, Releases and Protections** | 1. Upon entry of the Interim DIP Order, the Debtors shall waive any right to surcharge the DIP Collateral with respect to the ABL DIP Secured Parties. |
| | 2. Upon entry of the Interim DIP Order, the Debtors shall waive the equitable doctrine of "marshaling" against the DIP Collateral with respect to the ABL DIP Secured Parties. |
| | 3. The Debtors shall waive any right that they may have to seek further authority (a) to use Cash Collateral other than as provided in the DIP Order, (b) to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the indefeasible repayment in full of all Prepetition ABL Obligations and ABL DIP Obligations in cash at the time any such post-petition loans or financial accommodations are provided, extended or otherwise made available to Debtors, (c) to challenge the application of any payments authorized by the Interim DIP Order as pursuant to Section 506(b) of the Bankruptcy Code, or (d) to seek relief under the Bankruptcy Code, including without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of the ABL DIP Agent or any of the ABL DIP Secured Parties or the ABL DIP Agent's or any of the ABL DIP Secured Parties' exercise of such rights or remedies. |
| | 4. The Debtors shall waive, subject to "Challenge Rights", and forever release and discharge any and all claims and causes of action against each of the ABL DIP Secured Parties (and their respective related parties and representatives) as of the date of the applicable DIP Order. |
| | 5. No Cash Collateral, proceeds of the ABL DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the the Prepetition ABL Liens, the Prepetition ABL Obligations, ABL DIP Liens or ABL DIP Obligations, (b) investigate or initiate any claim or cause of action against any of the Prepetition ABL Secured Parties or the ABL DIP Secured Parties, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the ABL DIP Secured Parties, (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the ABL DIP Documents and the DIP Orders) that are senior to or *pari passu* with the ABL DIP Liens, ABL DIP Superpriority Claims, or the adequate protection liens or claims granted hereunder, or (e) propose, support or have a plan of reorganization or liquidation that does not provide for Payment in Full of |

22

000940

**App. 444**

|  | all Prepetition ABL Obligations and DIP ABL Obligations in cash (provided that such payment may, in the case of any ABL DIP Lender who agrees to participate in any "exit financing", take the form of a cashless roll-up into such new "exit financing" and not cash; provided further that, to the extent any ABL DIP Lender does not participate or provide commitment to "exit financing", such payment shall be made in full in cash and that ABL DIP Lender's commitment shall be terminated) on or before the Effective Date of such plan in accordance with the terms and conditions contained herein without the prior written consent of the ABL DIP Required Lenders. |
|  | 6.   The ABL DIP Secured Parties shall have the unqualified right to credit bid all ABL DIP Obligations, in each case, subject to the DIP Intercreditor Arrangements or the Existing ABL Intercreditor Agreement, as applicable. |
|  | 7.   The ABL DIP Secured Parties shall be entitled to good faith protection under Section 364(e) of the Bankruptcy Code. |
| **Expenses and Indemnification** | The DIP ABL Credit Agreement shall provide for the payment of all costs and expenses of the ABL DIP Agent and the ABL DIP Lenders, including, without limitation, the payment of all reasonable and documented fees and expenses of the ABL DIP Lender Advisors.

The DIP ABL Credit Agreement shall also provide for customary indemnification by each of the Loan Parties, on a joint and several basis, of each of the ABL DIP Secured Parties (together with their related parties and representatives). |
| **Assignments and Participations** | The DIP ABL Credit Agreement shall contain assignment and participation provisions that are usual and customary for financings of this type and as determined in accordance with the Documentation Principles.

Each assignment or participation of ABL DIP Loans shall be subject to a right of first refusal for the benefit of the initial ABL DIP Lenders providing ABL DIP Commitments. |
| **Required ABL DIP Lenders** | "**Required ABL DIP Lenders**" shall mean ABL DIP Lenders holding greater than 50% of the aggregate amount of ABL DIP Commitments and ABL DIP Loans; provided that if  there are two or more ABL DIP Lenders that are not Affiliates of each other, an affirmative vote of the "Required ABL DIP Lenders" shall require the affirmative vote of no  fewer than two ABL DIP Lenders that are not Affiliates of each other. |
| **Amendments** | Amendments shall require the consent of the Required ABL DIP Lenders consistent with the consent required by the Prepetition ABL Credit Agreement, except for amendments customarily requiring approval by affected ABL DIP Lenders under the ABL DIP Facility. |
| **Governing Law** | This Term Sheet and the ABL DIP Documents will be governed by the laws of |

7834612.18

| | |
|---|---|
| | the State of New York (except as otherwise set forth therein). The Bankruptcy Court shall maintain exclusive jurisdiction with respect to the interpretation and enforcement of the ABL DIP Documents and the exercise of the remedies by the ABL DIP Secured Parties and preservation of the value of the DIP Collateral. |
| **ABL DIP Lender Advisors** | Otterbourg P.C., as counsel to the ABL DIP Agent and the ABL DIP Lenders and M3 Advisory Partners, LP as financial advisor to the ABL DIP Agent and the ABL DIP Lenders  (the "**ABL DIP Lender Advisors**"). |

24

**Annex I**

Conditions Precedent to Closing and the Initial Borrowing

The Closing Date under the ABL DIP Facility, and the initial borrowing thereunder, shall be subject to the following conditions:

(i)     the Bankruptcy Court shall have entered the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required ABL DIP Lenders;

(ii)    the preparation, authorization and execution of the ABL DIP Documents with respect to the ABL DIP Facility, in form and substance consistent with this Term Sheet and otherwise acceptable to the Loan Parties, the ABL DIP Lenders and the ABL DIP Agent;

(iii)   the ABL DIP Lenders and the ABL DIP Agent shall have received and approved the Initial Budget;

(iv)    the delivery of customary legal opinions, which shall be satisfactory to the ABL DIP Agent and the ABL DIP Lenders;

(v)     the delivery of (i) a secretary's (or other officer's) certificate of the Borrowers and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments (including good standing certificates); and (ii) a customary closing officer's certificate of the Borrower;

(vi)    the preparation, authorization and execution of the Term DIP Documents with respect to the Term Loan DIP Facility, the Term Loan DIP Facility shall be in full force and effect and there shall not be a default or event of default thereunder, and Borrowers shall receive not less than $145,000,000 in gross proceeds of loans and a further $70,000,000 of gross proceeds of loans to be funded into escrow, in each case, under the Term DIP Documents, and not less than $75,000,000 of such net proceeds shall be paid to the ABL DIP Agent on the Closing Date to repay the revolving loans under the Prepetition ABL Facility (without a corresponding reduction in commitments thereunder);

(vii)   all premiums, payments, fees, costs and expenses (including, without limitation, the fees and expenses of the ABL DIP Lender Advisors and all other counsel, financial advisors and other professionals of the ABL DIP Lenders and ABL DIP Agent (whether incurred before or after the Petition Date) to the extent earned, due and owing, and including estimated fees and expenses through the Closing Date) shall have been paid;

(viii)  ABL DIP Agent shall have received at least five (5) Business Days prior to the Closing Date all documentation and information as is reasonably requested by ABL DIP Agent that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations in applicable jurisdictions, including, without limitation, the PATRIOT Act and Beneficial Ownership Regulation, in each case to the extent requested in writing at least seven (7) Business Days prior to the Closing Date, provided, that, the Loan Parties will use reasonable efforts to promptly provide any additional information requested thereafter;

(ix)    the ABL DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the ABL DIP Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order;

(x)     each Uniform Commercial Code financing statement and each intellectual property security

25

000943
**App. 447**

agreement required by the ABL DIP Documents to be filed in order to create in favor of the ABL DIP Agent a perfected lien on the DIP Collateral having the priorities set forth in the DIP Orders shall have been filed;

(xi)    all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to the Required ABL DIP Lenders;

(xii)    the Closing Date shall have occurred on or before the date that is five calendar days after the date of entry of the Interim DIP Order;

(xiii)    other than in respect of any projections, estimates or information of a general or industry specific nature, there shall be no material misstatements in (or omissions of material facts necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements are made) the materials (when taken as a whole and after giving effect to any updates or supplements thereto) previously furnished to the ABL DIP Agent and the ABL DIP Secured Parties by the Loan Parties in connection with the transactions contemplated herein. The ABL DIP Agent shall not have become aware of any material information or other matter after the date of the Commitment Letter and prior to the Closing Date that is inconsistent in a material and adverse manner with any previous due diligence, information or matter (including any financial information) in connection with the transactions contemplated herein;

(xiv)    after giving effect to the transactions occurring on the Closing Date, there shall be no default or event of default under the Prepetition ABL Credit Agreement as amended by the Ratification and Amendment Agreement;

(xv)    The amount of the opening Excess Availability (to be defined in a manner consistent with the Prepetition ABL Facility), but excluding any Qualified Cash in the determination of such Excess Availability, as calculated after giving effect to any credit extensions under the ABL DIP Facility, the repayment of any credit extensions under the ABL DIP Facility with the proceeds of the Term Loan DIP Facility and after provision for payment of all fees and expenses of the transactions paid or payable on or about the Closing Date, shall be not less than $35,000,000; and

(xvi)    ABL DIP Agent shall have received, in form and substance reasonably satisfactory to ABL DIP Agent, an updated Borrowing Base Certificate which calculates the Borrowing Base as of February 29, 2024.

26

7834612.18

<u>Conditions Precedent to Each Credit Extension</u>

In addition to the conditions precedent noted above, each borrowing or other credit extension under the ABL DIP Facility shall be subject to the following conditions:

(i)     the Bankruptcy Court shall have entered the Interim DIP Order or the Final DIP Order;

(ii)    the representations and warranties set forth in the ABL DIP Documents shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or material adverse effect, in all respects) as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties will be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or material adverse effect, in all respects) as of such earlier date);

(iii)   at the time of and immediately after any such borrowing, no default or event of default under the DIP ABL Credit Agreement shall have occurred and be continuing or would result therefrom;

(iv)    the ABL DIP Agent shall have received a signed borrowing request from the relevant Borrower; and

(v)      at the time of and immediately after such borrowing, Availability (to be defined in a manner consistent with the Prepetition ABL Facility) is not less than $0.

27

7834612.18

**Annex II**

Interest and Certain Payments

| | |
|---|---|
| Interest Rate: | At the option of the Borrowers, the ABL DIP Loans and Swingline Loans shall bear interest at a rate per annum equal to (i) the Adjusted SOFR Rate (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) (subject to a floor of 0.00%) plus the Applicable Rate or (ii) ABR (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) (subject to a floor of 0.00%) plus the Applicable Rate. |
| | "**Applicable Rate**" means 2.75% in the case of ABR Loans and 3.75% in the case of SOFR Loans. |
| Interest Payment Dates: | Interest on ABR Loans and SOFR Loans shall be payable on the last business day of each month in arrears; other interest payment dates shall be consistent with the Prepetition ABL Facility. |
| Non-Use Fee: | A payment equal to 0.50% per annum on the undrawn ABL DIP Commitments under the ABL DIP Facility, which shall be paid monthly. |
| Letter of Credit Fees: | Consistent with the Prepetition ABL Facility. |
| Default Rate: | Consistent with the Prepetition ABL Facility. |
| Rate Computation and Payment Basis: | Consistent with the Prepetition ABL Facility. |
| Arrangement Fees | Consistent with Fee Letter between Loan Parties and ABL DIP Agent. |
| Structuring Fees: | $2,500,000 Structuring Fee to be shared pro rata with all ABL DIP Lenders |
| Other Fees and Charges: | Consistent with the Prepetition ABL Facility. |

\*       \*       \*

28

7834612.18

**Annex III**

| Priority | DIP Collateral (other than Avoidance Action Proceeds) that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral (other than Avoidance Action Proceeds) that constitutes Term Loan Priority Collateral or that would otherwise constitute Term Loan Priority Collateral | DIP Collateral that constitutes Avoidance Action Proceeds |
|---|---|---|---|
| *First* | Carve Out and Permitted Liens described in clause (B) of the definition thereof | Carve Out and Permitted Liens | Carve Out |
| *Second* | ABL DIP Liens<br><br>ABL DIP Superiority Claims | Term DIP Liens<br><br>Term DIP Superpriority Claims | ABL DIP Liens and Term DIP Liens, on a *pari passu* basis<br><br>ABL DIP Superiority Claims and Term DIP Superpriority Claims, on a *pari passu* basis |
| *Third* | Prepetition ABL Adequate Protection Liens<br><br>Prepetition ABL Adequate Protection Claims | First Lien Adequate Protection Liens<br><br>First Lien Adequate Protection Claims | Prepetition ABL Adequate Protection Liens and First Lien Adequate Protection Liens, on a *pari passu* basis<br><br>Prepetition ABL Adequate Protection Claims and First Lien Adequate Protection Claims, on a *pari passu* basis |
| *Fourth* | Prepetition ABL Liens<br><br>Prepetition ABL Claims | Prepetition First Lien Liens<br><br>Prepetition First Lien Claims | N/A |
| *Fifth* | Term DIP Liens<br><br>Term DIP Superpriority Claims | Second Lien Adequate Protection Liens<br><br>Second Lien Adequate Protection Claims | N/A |

29

7834612.18

| *__Sixth__* | First Lien Adequate Protection Liens | Prepetition Second Lien Liens | N/A |
|---|---|---|---|
| | First Lien Adequate Protection Claims | Prepetition Second Lien Claims | |
| *__Seventh__* | Prepetition First Lien Liens | ABL DIP Liens | N/A |
| | Prepetition First Lien Claims | ABL DIP Superpriority Claims | |
| *__Eighth__* | Second Lien Adequate Protection Liens | Prepetition ABL Adequate Protection Liens | N/A |
| | Second Lien Adequate Protection Claims | Prepetition ABL Adequate Protection Claims | |
| *__Ninth__* | Prepetition Second Lien Liens | Prepetition ABL Liens | |
| | Prepetition Second Lien Claims | Prepetition ABL Claims | |

7834612.18

**Exhibit 2**

**Term DIP Term Sheet**

**CONVERGEONE HOLDINGS, INC., ET AL.**
**$215 MILLION SUPER-PRIORITY SENIOR SECURED**
**DEBTOR-IN-POSSESSION CREDIT FACILITY**

*The terms set forth in this Summary of Principal Terms and Conditions (the "Term DIP Term Sheet") are being provided on a confidential basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of the proposed Term DIP Facility (as defined below). Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Restructuring Support Agreement (the "RSA") or the Restructuring Term Sheet (the "RTS"), as applicable.*

**Summary of Proposed Terms and Conditions**

| | |
|---|---|
| *Term DIP Facility:* | A super-priority senior secured debtor-in-possession term loan facility in an aggregate principal amount of $215 million (the "Term DIP Facility"; the Term DIP Lenders' commitments thereunder, the "Term DIP Commitments"; the loans thereunder, the "Term DIP Loans" and, together with the Term DIP Commitments, the "Term DIP Loan Exposure"; the Term DIP Lenders' claims thereunder, the "Term DIP Superpriority Claims"; and the proceeds received by the Borrower from the Term DIP Loans, the "Term DIP Proceeds"), subject to the terms and conditions set forth in this Term DIP Term Sheet and the Term DIP Loan Documents (as defined below). The Term DIP Loans will be available to be made in two draws, with the first draw being in an amount equal to $145 million and occurring substantially concurrently with the entry of the Interim DIP Order (the "Initial Draw") and the second draw being in an amount equal to $70 million and occurring at the same time as the Initial Draw with net proceeds funded into escrow as provided below with the release of such proceeds from escrow to occur upon entry of the Final DIP Order and satisfaction of the applicable conditions precedent set forth herein (the "Second Draw"); provided that the portion of the Term DIP Facility attributable to the Second Draw shall be funded into escrow substantially concurrently with the funding of the Initial Draw (such portion of the Term Facility, the "Escrowed Amount" and the agent in connection with the escrow arrangements, the "Escrow Agent") subject to escrow arrangements consistent with this Term Sheet and otherwise reasonably satisfactory to the Borrower and the Required Term DIP Lenders. The Escrowed Amount shall accrue interest and fees, commencing with the funding into escrow thereof. |
| *ABL DIP Facility:* | The Term DIP Loan Documents shall permit the Debtors to incur the ABL DIP Facility on terms and conditions acceptable to the Required Term DIP Lenders, it being understood and agreed that the terms and conditions set forth in the ABL DIP Facility Term Sheet attached to the fully executed RSA shall be deemed to be acceptable to the Required Term DIP Lenders. |
| *Relevant Prepetition Debt and Documents:* | That certain First Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "First Lien Credit Agreement"), by and among, PVKG Intermediate Holdings, Inc. as holdings, ConvergeOne Holdings, Inc., as borrower, Deutsch Bank AG New York Branch, as |

administrative agent, and the lenders party thereto from time to time (the "First Lien Term Loan Lenders");

That certain Note Purchase Agreement, dated as of July 10, 2020 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "First Lien KL Note Purchase Agreement"), by and among, PVKG Intermediate Holdings, Inc. as holdings, ConvergeOne Holdings, Inc., as issuer, Deutsch Bank Trust Company Americas, as administrative agent, and the holders party thereto from time to time (the "KL Noteholder");

That certain Note Purchase Agreement, dated as of July 6, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "First Lien CVC Note Purchase Agreement," and together with the First Lien Credit Agreement and the First Lien KL Note Purchase Agreement, the "First Lien Debt Agreements" the obligations thereunder, the "Prepetition First Lien Claims," and the liens related thereto, the "Prepetition First Lien Liens") among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings Inc., PVKG Investment Holdings, Inc., as administrative agent and collateral agent, and the holders party thereto from time to time (the "CVC Noteholder," and together with the First Lien Term Loan Lenders and the KL Noteholder, the "First Lien Lenders");

That certain senior secured asset-based revolving credit facility made available to the Company and the other borrowers thereunder pursuant to that certain Amended and Restated ABL Credit Agreement (the "Prepetition ABL Credit Agreement"), dated as of January 4, 2019  (as amended by Amendment No. 1 to Amended and Restated ABL Credit Agreement, dated as of July 10, 2022, Amendment No. 2 to Amended and Restated ABL Credit Agreement, dated as of September 14, 2022, Amendment No. 3 to Amended and Restated ABL Credit Agreement, dated as of January 23, 2023 and Amendment No. 4 to Amended and Restated ABL Credit Agreement, dated as of August 29, 2023) among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings, Inc., Wells Fargo Commercial Distribution Finance, as administrative agent, collateral agent, floorplan funding agent and swing line lender, and the lenders party thereto (the "Prepetition ABL Lenders") (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition ABL Facility," the liens thereunder, the "Prepetition ABL Liens," and the claims thereunder, the "Prepetition ABL Claims");

That certain Second Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time the "Second Lien Credit Agreement" and the claims thereunder, the "Prepetition Second Lien Claims") by and among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings Inc., UBS AG, Stamford Branch, as administrative agent and collateral agent, and the lenders party thereto from time to time (the "Second Lien Term Loan Lenders");

000951

That certain ABL Intercreditor Agreement dated as of January 4, 2019 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "ABL Intercreditor Agreement") among, *inter alios*, Wells Fargo Commercial Distribution Finance, LLC, as the ABL Agent, Deutsche Bank AG New York Branch, as the Initial Senior Lien Term Loan Agent, and UBS AG, Stamford Branch, as the Initial Junior Lien Term Loan Agent; and

That certain First Lien Pari Passu Intercreditor Agreement dated as of July 10, 2020 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time) among, *inter alios*, Deutsche Bank AG New York Branch, as Initial First Lien Representative and Initial First Lien Collateral Agent, and Deutsche Bank Trust Company Americas, as the Initial Other Representative and Initial Other Collateral Agent.

| | |
|---|---|
| *Borrower:* | ConvergeOne Holdings, Inc. (the "Borrower"), as a debtor and debtor-in-possession in a case under chapter 11 of the Bankruptcy Code to be filed in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") contemporaneously and jointly-administered with the other Chapter 11 Cases (the date of filing of the Chapter 11 Cases, the "Petition Date"). |
| *Guarantors:* | Each of the guarantors under the First Lien Debt Agreements, which are debtors and debtors-in-possession in the Chapter 11 Cases (collectively, the "Guarantors"). All obligations of the Borrower under the Term DIP Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors.<br><br>The Borrower and the Guarantors are referred to herein as "Loan Parties" and each, a "Loan Party," or as "Debtors" and each, a "Debtor." |
| *Administrative Agent/Administrative Agent Fee:* | A financial institution acceptable to the Required Term DIP Lenders (as defined below) (in such capacity, the "Term DIP Agent").<br><br>The Term DIP Agent shall be paid an annual agency fee to be agreed by the Term DIP Agent, the Borrower and the Required Term DIP Lenders. |
| *Term DIP Lenders:* | Each of the entities set forth on Annex 1 hereto, which entities are either members of the First Lien Ad Hoc Group represented by Gibson, Dunn & Crutcher LLP ("Gibson") and PJT Partners ("PJT"), the CVC Noteholder or an entity that is related to or affiliated with any of the foregoing (collectively, the "Term DIP Lenders" and each, a "Term DIP Lender") that commits to provide the amount of the Term DIP Facility set forth opposite its name on Annex 1. For the avoidance of doubt, CVC Noteholder's principal and accrued interest holdings under the First Lien Debt Agreements on the Petition Date shall be deemed to be $213 million in the aggregate.<br><br>Each Term DIP Lender may participate in the Term DIP Facility on behalf of some or all accounts and funds managed by such Term DIP Lender and |

3

some or all accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such Term DIP Lender or any other affiliate of such Term DIP Lender (any such managed account or fund, or affiliate, a "Lender Affiliate"), and may allocate its Term DIP Commitments among Lender Affiliates in its sole discretion; provided that any such Lender Affiliate to which any such allocation is made shall immediately become a party to the RSA and commit to provide its applicable portion of the Term DIP Facility; provided further that any Term DIP Lender may elect to participate in the Term DIP Facility, initially, through a fronting lender and any associated fees and expenses in connection with such fronting arrangement shall be paid out of the Term DIP Proceeds.

"Required Term DIP Lenders" means one or more Term DIP Lenders holding at least 50.1% of the aggregate Term DIP Loan Exposure.

*Term DIP Premiums:*    The following premiums shall be applicable to all Term DIP Loans (the "Term DIP Premiums"):

- "Term DIP Commitment Premium": a premium totaling 7.00% of the Term DIP Loans, payable in-kind in the form of additional Term DIP Loans to all Term DIP Lenders on a *Pro Rata* basis, earned and payable upon entry of the Interim DIP Order.

- "Term DIP Exit Premium": a premium totaling 3.00% of the Term DIP Loans (inclusive of the capitalized Term DIP Commitment Premium), payable in-kind in the form of additional Term DIP Loans to all Term DIP Lenders on a *Pro Rata* basis, earned upon entry of the Interim DIP Order and payable upon, but immediately prior to the occurrence of, the earlier of the Plan Effective Date or the Maturity Date (defined below).

*Maturity:*    All obligations under the Term DIP Loan Documents (collectively, the "Term DIP Obligations") will be due and payable in full in cash (subject to the DIP Term Loan Rights (defined below)) on the earliest of: (i) the date that is six months after the Closing Date (as defined below); (ii) the date of acceleration of the Term DIP Loans pursuant to the terms of the Term DIP Credit Agreement and the other Term DIP Loan Documents; (iii) the date the Bankruptcy Court orders a conversion of any Chapter 11 Case to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Debtor; (iv) the substantial consummation of a plan of reorganization or liquidation of the Debtors, which has been confirmed by an order entered by the Bankruptcy Court (the "Plan"); (v) the appointment of a chapter 11 trustee or other Bankruptcy Court-mandated fiduciary with decision-making authority (including an examiner with expanded powers), (vi) the date of consummation of a sale of all or substantially all of the Debtors' assets, and (vii) the date of the Milestone relating to entry of the Final DIP Oder, to the extent the Final DIP Order is not entered into on or prior to such date (the earliest date to occur, the "Maturity Date").

4

On the Maturity Date, the Term DIP Loan Obligations shall be paid in full in cash; provided, however, that for convenience purposes in the event of a Maturity Date triggered pursuant to clause (iv) above as a result of the consummation of the Plan that is consistent with the RSA and acceptable to the Required Term DIP Lenders, then (such options (i) and (ii) below, collectively, the "DIP Term Loan Rights")

(i) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, (A) an Initial First Lien Ad Hoc Group Member, (B) CVC Noteholder, or (C) a Subsequent First Lien Ad Hoc Group Member (in each case, at its sole option) shall be entitled to exchange some or all of the Allocated Portion (defined below) of its Term DIP Obligations, on a dollar for dollar basis, for New Equity Interests pursuant to the terms of the Rights Offering, Backstop Commitment and Direct Investment (with the remainder of such Term DIP Obligations to be satisfied in cash), and

(ii) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, a Subsequent First Lien Ad Hoc Group Member (A) shall be entitled (at its sole option) to exchange the Allocated Portion (defined below) of its Term DIP Obligations, on a dollar for dollar basis, for Takeback Term Loans (with the remainder of such Term DIP Obligations to be satisfied in cash), and (B) any Subsequent First Lien Ad Hoc Group Member that is a Term DIP Lender or is a Lender Affiliate thereof of is related thereto, that elects  the option described in clause (A), shall utilize the Takeback Term Loan recovery portion of its First Lien Claims as currency, on a dollar for dollar basis, for New Equity Interests issuable under and pursuant to the terms of the Rights Offering, Backstop Commitment and Direct Investment (whether in their capacities as Investors or Eligible Offerees).

For purposes of the foregoing, the "Allocated Portion" shall mean Term DIP Obligations in an amount equal to the Rights, Direct Investment and Backstop Commitment (as each such term is defined in the Plan or the Rights Offering Term Sheet) that are allocated to an applicable Term DIP Lender under the Plan and the Backstop Agreement as either an Investor or Eligible Offeree; provided that, in the case of the Subsequent First Lien Ad Hoc Group Members, the amount of Term DIP Obligations exchanged for New Equity Interests and Takeback Term Loans pursuant to clauses (i) and (ii) above, respectively, on an aggregate basis, shall not exceed such Subsequent First Lien Ad Hoc Group Member's respective Allocated Portion.

*Use of Proceeds:*     Solely in accordance with and subject to the Approved Budget ((as defined below) subject to Permitted Variances), and the DIP Orders, the Term DIP Proceeds may be used only (i) to pay down Loans under the Prepetition ABL Facility (without a corresponding reduction in commitments thereunder), (ii) to pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with the Chapter 11 Cases (including payments benefiting from the Carve Out), (iii) for working capital and general corporate purposes of the Loan Parties, and (iv) for such other purposes as may be detailed in the Approved Budget

5

(subject to Permitted Variances).

| | |
|---|---|
| *Interest:* | Interest on the Term DIP Loans shall be payable in cash at the end of each month in arrears. At all times prior to the occurrence of an Event of Default (as defined below), interest on the outstanding principal amount of the Term DIP Loans shall accrue at a rate equal to SOFR + 8.00% *per annum* (subject to a SOFR floor of 4.00%).

Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| *Default Interest:* | During the continuance of an Event of Default, the Term DIP Loans will bear interest at an additional 2.00% *per annum* and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% *per annum*.  Default interest shall be payable in cash on demand. |
| *Permitted Liens:* | (A)  Any valid liens ("Permitted Prior Liens") that are (1) in existence on the Petition Date, (2) are either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (3) senior in priority to the ABL Liens, (4) non-avoidable under the Bankruptcy Code or other applicable law, and (5) are permitted to be incurred under the Prepetition ABL Facility; and

(B)  liens permitted to have seniority over the Term DIP Liens (as defined below) securing the Term DIP Facility as specified in the Term DIP Credit Agreement (the liens referenced in (A) and (B) above, collectively, the "Permitted Liens"). |
| *Collateral:* | The Term DIP Obligations shall constitute claims against each Loan Party entitled to the benefits of Bankruptcy Code section 364(c)(1), having super-priority over any and all administrative expenses and claims, of any kind or nature whatsoever, and subject to the priorities set forth in **Annex 2** attached hereto.

The Term DIP Facility shall be secured by (collectively, the "DIP Collateral," and the liens thereon, the "Term DIP Liens") (i) a first priority lien on all unencumbered assets of the Loan Parties (except for all claims and causes of action arising under Chapter 5 of the Bankruptcy Code ("Avoidance Actions"), but including, upon entry of the Final DIP Order, the proceeds of property recovered, whether by judgment, settlement or otherwise from Avoidance Actions ("Avoidance Action Proceeds")) (collectively, "Unencumbered Property"), which Term DIP Liens in Unencumbered Property shall be pari passu with any ABL DIP Liens (as defined below) in Unencumbered Property but subject to the priorities set forth in Annex 2 attached hereto, (ii) a priming first priority lien on all assets currently securing the First Lien Debt Agreements that constitute Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement), subject only to Permitted Liens and (iii) a priming junior priority lien on all assets currently securing the First Lien Credit Agreement that constitute ABL Priority Collateral (as defined in the ABL Intercreditor |

6

Agreement), subject only to Permitted Liens, the Prepetition ABL Facility and any super priority debtor-in-possession asset-based loan credit facility provided by the Prepetition ABL Lenders that is consented to by the Required Term DIP Lenders (an "ABL DIP Facility," and the liens and claims thereunder, the "ABL DIP Liens" and "ABL DIP Superpriority Claims," respectively), all subject to the Carve-Out and the priorities set forth in **Annex 2** attached hereto; *provided,* that DIP Collateral shall exclude Excluded Assets but shall include any and all proceeds and products of Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets.

"Excluded Assets" shall be defined in a manner customary for facilities of this type and shall be based on such definition in the First Lien credit Agreement (it being understood and agreed that the definition of "Excluded Assets" shall include equity interests in excess of 65% of the issued and outstanding equity interests of non-U.S. subsidiaries but shall exclude all owned real property of the Loan Parties).

|   |   |
|---|---|
| *Covenants, Etc.:* | The Term DIP Loan Documents will contain representations, warranties, reporting requirements, mandatory prepayment requirements, voluntary prepayment requirements, affirmative covenants, negative covenants, and "sacred rights" based on the First Lien Credit Agreement (and consistent with the consent rights of the RSA) with the following modifications and such other modifications consistent with debtor-in-possession facilities of this type and in form and substance acceptable to the Company and the Required Term DIP Lenders: |

(i) update meetings and/or calls with the Debtors' senior management and advisors, the Term DIP Advisors and the Term DIP Lenders every two weeks (or to the extent requested by the Term DIP Advisors, every week), which update calls may cover the Debtors' financial performance and the other documentation provided pursuant to the reporting covenant described below,

(ii) delivery of internal management prepared unaudited monthly financial statements, including an income statement for such month, balance sheet as of the end of such month and a cash flow statement for such month, within 30 days of month-end (the "Monthly Reports"),

(iii) a rolling 13-week cash flow forecast (the "DIP Budget") in form and substance satisfactory to the Required Term DIP Lenders delivered on or prior to the Petition Date initially covering the period commencing on or about the Petition Date (the "Initial DIP Budget"), which reflects on a line-item basis, the Debtors' (a) weekly projected cash receipts ("Budgeted Cash Receipts"), (b) weekly projected disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses) under the Chapter 11 Cases ("Budgeted Disbursement Amounts") and (c) the weekly projected liquidity of the Debtors, and which shall be updated on the first Wednesday that is two full weeks after the Petition Date and every two weeks thereafter, which such proposed updated DIP Budget shall modify and supersede any prior agreed DIP Budget unless the Required

7

Term DIP Lenders, through counsel or otherwise, notify the Loan Parties in writing that such proposed DIP Budget is not in form and substance satisfactory to the Required Term DIP Lenders within five business days after receipt thereof, in which case the existing Approved Budget shall remain in effect until superseded by an updated DIP Budget in form and substance satisfactory to the Required Term DIP Lenders (as so updated, each an "<u>Approved Budget</u>"),

(iv) on each Wednesday following each Variance Testing Period (beginning with the first Wednesday following the first Variance Testing Period), the delivery to the Term DIP Advisors of a variance report, which reflects for the applicable Variance Testing Period (defined below), (a) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts and the Budgeted Disbursement Amounts for such period as set forth in the Approved Budget as in effect for such period, (b) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (c) certifying compliance or non-compliance with the Permitted Variances (defined below), and (d) including explanations for all violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Debtors have taken or intend to take with respect thereto (each, a "<u>Variance Report</u>"),

(v) the requirement to satisfy the Milestones set forth in the RTS;

(vi) compliance with the DIP Orders; and

(vii) such other financial reporting readily available to the Debtors and reasonably requested by the Term DIP Agent or any Term DIP Lender, including, if requested by any Term DIP Lender, deliver to each requesting Term DIP Lender monthly bookings and backlog reports.

"<u>Variance Testing Period</u>" shall mean (i) initially, the two-week period ending on the Friday of the second calendar week occurring after the Petition Date, and (ii) thereafter, each rolling two-week period ending on Friday of every second calendar week.

*Financial Covenants:*                       Financial covenants and tests will be limited to:

(i) Variances against the Approved Budget not to exceed the following permitted variances, with the covenant tested on a cumulative rolling two-week basis at the delivery of each Variance Report (collectively, the "<u>Permitted Variances</u>"):

- Aggregate receipts for the Variance Testing Period shall not be less than 85% of the Budgeted Cash Receipts for such Variance Testing Period;

- Aggregate disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses but excluding professional fees and expenses and any costs or cash

8

collateralization associated with surety bonds) for the Variance Testing Period shall not be greater than 115% of the Budgeted Disbursement Amounts for such Variance Testing Period.

(ii) Minimum Liquidity (which shall be defined as the sum of (i) all cash and cash equivalents of Loan Parties plus (ii) Excess Availability (to be defined in a manner consistent with the Prepetition ABL Credit Agreement but excluding Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) from the calculation of Excess Availability) of $20,000,000.

|                     |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
|---------------------|---|
| *Events of Default:* | The Term DIP Loan Documents will contain events of default based on those set forth in the First Lien Credit Agreement as well as additional events of default customarily found in loan documents for similar debtor-in-possession financing and other events of default agreed among the Debtors and the Required Term DIP Lenders, including without limitation (a) any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a DIP Order, as entered by the Bankruptcy Court which adversely affects the Term DIP Lenders, without the prior written consent of the Required Term DIP Lenders, (b) the occurrence and continuance of an "Event of Default" under the ABL DIP Facility, (c) the allowance of any superpriority claim arising under section 507(b) of the Bankruptcy Code which is pari passu with (other than the superpriority claims of the ABL DIP Facility) or senior to those of the Term DIP Agent and the Term DIP Lenders; (d) the dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (e) the termination of the RSA and (f) the filing of any Plan that is inconsistent with the RSA unless consented to by the Required Term DIP Lenders. |

Upon the occurrence and during the continuation of an Event of Default, subject to the Existing ABL Intercreditor Agreement, without further order from or application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Term DIP Agent, acting at the request of the Required Term DIP Lenders, to (A) deliver to the Borrower a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the Term DIP Facility, (C) declare the Term DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral, (E) terminate the Term DIP Facility, (F) charge the default rate of interest under the Term DIP Facility (which default rate shall be charged automatically in accordance with the terms of the Term DIP Facility), (G) freeze all monies in any deposit accounts of the Debtors, (H) exercise any and all rights of setoff, (I) exercise any other right or remedy with respect to the DIP Collateral or the Term DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the Term DIP Documents, the DIP Orders or applicable law; *provided, however*, that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (I) and (J) above, (i) the Term DIP Agent, acting at the request of the Required

9

Term DIP Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee, the ABL DIP Agent and the Office of the United States Trustee with five (5) Business Days' prior written notice (such period, the "Remedies Notice Period").  Immediately upon the expiration of the Remedies Notice Period, the Bankruptcy Court shall hold an emergency hearing when the Bankruptcy Court is available (the "Enforcement Hearing") at which the Debtors, any Official Committee, and/or any other party in interest shall be entitled to seek a determination from the Bankruptcy Court solely as to whether an Event of Default has occurred, and at the conclusion of the Enforcement Hearing, the Bankruptcy Court may fashion an appropriate remedy that is consistent with the terms of the DIP Orders; *provided*, that during the Remedies Notice Period, the Loan Parties shall be permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the Required Term DIP Lenders and the Required ABL DIP Lenders (as such term is defined in the ABL DIP Facility Term Sheet) in their sole discretion. Except as otherwise set forth in the DIP Orders or ordered by the Bankruptcy Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Loan Parties shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Term DIP Agent or Term DIP Lenders (together the "Term DIP Secured Parties") or the ABL DIP Secured Parties under the DIP Orders. No enforcement rights set forth in clauses (I) and (J) above shall be exercised prior to the Bankruptcy Court holding an Enforcement Hearing, subject to Bankruptcy Court availability, and the expiration of the Remedies Notice Period, and the Remedies Notice Period shall not expire until the conclusion of the Enforcement Hearing and the issuance of a ruling by the Bankruptcy Court.

| | |
|---|---|
| *Rating:* | The Loan Parties shall use commercially reasonable efforts to obtain a rating for the Term DIP Facility by Moody's and S&P within 120 days of entry of the Final DIP Order. |
| *Term DIP Loan Documents*: | The Term DIP Facility will be documented by a Senior Secured Superpriority Debtor-in-Possession Term Loan Credit Agreement (the "Term DIP Credit Agreement") and other guarantee, security and loan documentation (together with the Term DIP Credit Agreement, the "Term DIP Loan Documents") in each case based on documentation related to the First Lien Credit Agreement (and the Loan Documents as defined thereunder) and shall reflect the terms and provisions set forth in this Term DIP Term Sheet and otherwise in form and substance satisfactory to the Required Term DIP Lenders. |
| *Interim and Final DIP Orders:* | The Interim DIP Order, which shall be satisfactory in form and substance to the Term DIP Agent and the Required Term DIP Lenders, shall authorize and approve, among other matters to be agreed, (i) the Debtors' entry into the Term DIP Loan Documents, (ii) the making of the Term DIP Loans, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets as required by this Term DIP Term Sheet in |

10

accordance with the Term DIP Loan Documents with respect to the DIP Collateral, (iv) the granting of adequate protection as set forth below, (v) the Term DIP Premiums, (vi) the waivers and marshalling provisions set forth below, (vii) stipulations as to the amount, validity, enforceability, perfection and priority of the prepetition indebtedness, (viii) waiver of any requirement of the Term DIP Lenders and prepetition secured lenders to file any proof of claim, (ix) the "Carve Out" referenced and defined below, and (x) customary indemnification and payment of all fees and expenses of Gibson, as counsel to the Term DIP Lenders, Latham & Watkins LLP, as counsel to the CVC Noteholder, PJT, as financial advisor to the Term DIP Lenders, applicable local counsel, and other necessary advisors (collectively, the "Term DIP Advisors"), as well as advisors to the Term DIP Agent. The Final DIP Order shall be in form and substance satisfactory to the Required Term DIP Lenders (the Final DIP Order and the Interim DIP Order, collectively, the "DIP Orders").

| | |
|---|---|
| *Adequate Protection:* | The DIP Orders shall approve customary adequate protection to be provided to the holders of Prepetition ABL Claims, Prepetition First Lien Claims and Prepetition Second Lien Claims (and the applicable Agents/Trustees on their behalf) to the extent of any diminution in value, including (i) replacement or new liens on the unencumbered and encumbered assets of the Loan Parties junior to the liens securing the Term DIP Facility and ABL DIP Facility (as applicable) (such liens, the "Prepetition ABL Adequate Protection Liens," the "First Lien Adequate Protection Liens" and the "Second Lien Adequate Protection Liens," as applicable), and (ii) super-priority claims against the Loan Parties as provided in section 507(b) of the Bankruptcy Code junior to the Term DIP Obligations and ABL DIP Obligations (as applicable) (such claims, the "Prepetition ABL Adequate Protection Claims," the "First Lien Adequate Protection Claims," and the "Second Lien Adequate Protection Claims", as applicable), subject in all cases to the Carve Out and the priorities set forth in **Annex 2** attached hereto, and (iii) with respect to the Prepetition ABL Claims and Prepetition First Lien Claims, delivery of the Monthly Reports, Initial Budget, and any updated DIP Budget via posting to the lender website maintained for the holders of Prepetition First Lien Claims. |
| *Carve Out* | The liens on and security interests of the Term DIP Lenders in the DIP Collateral, the adequate protection liens, and all super-priority administrative expense claims granted under the DIP Orders, shall be subject and subordinate to the Carve Out.<br><br>For purposes hereof, "Carve Out" means, without duplication, an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve-Out"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections |

11

327, 328, or 363 of the Bankruptcy Code (the "Debtors' Professionals") and to the extent set forth in the Budget as of the date of determination by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtors' Professionals, "Professional Persons") at any time before or on the first business day following delivery by the ABL DIP Agent or Term DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice, less the amount of any retainers or other amounts held by any such Professional Person as of the Petition Date; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the ABL DIP Agent or Term DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the ABL DIP Agent or Term DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Creditors' Committee, and the ABL DIP Agent and Term DIP Agent, as applicable, which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Not later than 7:00 p.m. New York time on the Tuesday of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date") (collectively, "Estimated Fees and Expenses"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided, that within one business day of the occurrence of the Termination Declaration Date, each Professional Person shall deliver one additional Weekly Statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the ABL DIP Agent and Term DIP Agent). If any Professional Person fails to timely deliver a Weekly Statement within one business day after such Weekly Statement is due, such Professional Person shall not be entitled to any funds in the Carve Out Reserves with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period. The ABL DIP Agent shall at all times maintain a Reserve (as defined in the DIP ABL Credit Agreement (as such term is defined in the ABL DIP Facility Term Sheet)) in an amount equal to the Post-Carve Out

12

Trigger Notice Cap, plus the aggregate amount of projected fees for all Professional Persons set forth in the Approved Budget for the week subsequent to the date of determination for such Reserve; *provided* that nothing set forth herein shall limit the ability of the ABL DIP Agent to increase such reserve if ABL DIP Agent determines that the aggregate amount of Allowed Professional Fees are likely to exceed the amount set forth in the Approved Budget for such week.

| | |
|---|---|
| *Waivers; Marshaling* | The Interim DIP Order shall provide for waivers of (i) section 506(c) and the "equities of the case" exception set forth in section 552 of the Bankruptcy Code and (ii) the doctrine of marshaling with respect to the Term DIP Loans and the DIP Collateral.  The Final DIP Order shall provide for waivers of (i) section 506(c) and the "equities of the case" exception set forth in section 552 of the Bankruptcy Code and (ii) the doctrine of marshaling with respect to the Prepetition ABL Claims, the Prepetition First Lien Claims and the collateral securing the Prepetition ABL Obligations, the Prepetition First Lien Claims and the Prepetition Second Lien Claims. |
| *Conditions Precedent to the Closing:* | The closing date (the "<u>Closing Date</u>") under the Term DIP Facility shall be subject solely to the following conditions: |

(i) execution and delivery of the Term DIP Credit Agreement and any other Term DIP Loan Document being executed and delivered on the Closing Date, in form and substance consistent with this Term Sheet and otherwise acceptable to the Loan Parties, the Term DIP Lenders, the Term DIP Agent and the Escrow Agent;

(ii) delivery of the Initial DIP Budget, in form and substance satisfactory to the Required Term DIP Lenders;

(iii) entry of the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required Term DIP Lenders;

(iv) the payment of (x) all fees required to be paid on the Closing Date under the Term DIP Credit Agreement and the other Term DIP Loan Documents (including any applicable fee letters) and (y) all reasonable and documented fees and expenses of the Term DIP Advisors;

(v) delivery of a borrowing request;

(vi) the Chapter 11 Cases shall have been commenced by the Debtors and the same shall each be a debtor and a debtor in possession; the Chapter 11 Cases of the Debtors shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code; no trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases;

(vii) delivery of a secretary's (or other officer's) certificate of the Loan Parties, dated as of the Closing Date and in such form as is customary for

13

the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments (including good standing certificates);

(viii) Term DIP Agent shall have received at least five (5) Business Days prior to the Closing Date all documentation and information as is reasonably requested by Term DIP Agent or any Term DIP Lender that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations in applicable jurisdictions, including, without limitation, the PATRIOT Act, in each case to the extent requested in writing at least seven (7) Business Days prior to the Closing Date, provided, that, the Loan Parties will use reasonable efforts to promptly provide any additional information requested thereafter;

(ix) the representations and warranties set forth in the Term DIP Credit Agreement and any other Term Loan DIP Facility Documents entered into on the Closing Date shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties will be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) as of such earlier date);

(xi) on the Closing Date and immediately after giving effect to the Initial Draw, no default or Event of Default shall have occurred and be continuing or would result therefrom;

(xii) the RSA shall be in full force and effect and shall not have been modified in a fashion that is adverse to the Term DIP Lenders without the consent of the Required Term DIP Lenders;

(xiii) delivery of customary legal opinions;

(xiv) delivery of executed ABL DIP Facility Documents with respect to the ABL DIP Facility, which shall be consistent with the ABL DIP Facility Term Sheet and otherwise acceptable to the Term DIP Lenders; the ABL DIP Facility Documents shall be in full force and effect and there shall not be a default or event of default thereunder; provided that the amount of the opening Excess Availability (to be defined in a manner consistent with the Prepetition ABL Facility), but excluding any Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) in the determination of such Excess Availability under the DIP ABL Credit Agreement, as calculated after giving effect to any credit extensions under the ABL DIP Facility, the repayment of any credit extensions under the ABL DIP Facility with the proceeds of the Term DIP Facility and after provision for payment of all fees and expenses of the transactions paid or payable on or about the Closing Date, shall be not less than $35,000,000;

14

(xv) the Term DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the Term DIP Loan Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order;

(xvi) all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the Required Term DIP Lenders;

(xvii) the Closing Date shall have occurred on or before the date that is five calendar days after the date of entry of the Interim DIP Order;

(xviii) after giving effect to the transactions occurring on the Closing Date, there shall be no default or event of default under the Prepetition ABL Credit Agreement as amended by the Ratification and Amendment Agreement (as such term is defined in the ABL DIP Facility Term Sheet); and

(xix) delivery of an officer's certificate of the Borrower confirming compliance with the each of the conditions precedent (other than any matters which are to be delivered by, provided by, or subject to the satisfaction of, any party other than the Loan Parties).

| | |
|---|---|
| *Conditions Precedent to the Second Draw:* | The conditions to release from escrow of the proceeds of the Second Draw shall be subject solely to the following conditions: |

(i) the Loan Parties being in compliance with the Approved Budget (subject to Permitted Variances) in all respects and the proceeds of any such Term DIP Loan being made being used or intending to be used solely in accordance with the Approved Budget, subject to Permitted Variances;

(ii) the Final DIP Order shall have been entered by the Bankruptcy Court and shall not have been amended, modified, repealed or stayed in any respect without the Required Term DIP Lenders' consent;

(iii) the representations and warranties set forth in the Term DIP Credit Agreement and any other Term Loan DIP Facility Documents shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) on and as of the date of the release from escrow of the proceeds of the Second Draw with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties will be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) as of such earlier date);

(iv) on the date of release from escrow of the proceeds of the Second Draw and immediately after giving effect to such release, no default or Event of Default under the Term DIP Credit Agreement shall have occurred and be

15

continuing or would result therefrom;

(v) receipt of a withdrawal request; and

(vi) the RSA shall be in full force and effect and shall not have been modified in a fashion that is adverse to the Term DIP Lenders without the consent of the Required Term DIP Lenders.

16

000965

**App. 469**

**Annex 2**

| Priority | DIP Collateral (other than Avoidance Action Proceeds) that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral (other than Avoidance Action Proceeds) that constitutes Term Loan Priority Collateral or that would otherwise constitute Term Loan Priority Collateral | DIP Collateral that constitutes Avoidance Action Proceeds |
|---|---|---|---|
| *First* | Carve Out and Permitted Liens | Carve Out and Permitted Liens described in clause (B) of the definition thereof | Carve Out |
| *Second* | ABL DIP Liens<br><br>ABL DIP Superiority Claims | Term DIP Liens<br><br>Term DIP Superpriority Claims | ABL DIP Liens and Term DIP Liens, on a *pari passu* basis<br><br>ABL DIP Superiority Claims and Term DIP Superpriority Claims, on a *pari passu* basis |
| *Third* | Prepetition ABL Adequate Protection Liens<br><br>Prepetition ABL Adequate Protection Claims | First Lien Adequate Protection Liens<br><br>First Lien Adequate Protection Claims | Prepetition ABL Adequate Protection Liens and First Lien Adequate Protection Liens, on a *pari passu* basis<br><br>Prepetition ABL Adequate Protection Claims and First Lien Adequate Protection Claims, on a *pari passu* basis |
| *Fourth* | Prepetition ABL Liens<br><br>Prepetition ABL Claims | Prepetition First Lien Liens<br><br>Prepetition First Lien Claims | N/A |
| *Fifth* | Term DIP Liens<br><br>Term DIP Superpriority Claims | Second Lien Adequate Protection Liens<br><br>Second Lien Adequate Protection Claims | N/A |
| *Sixth* | First Lien Adequate Protection Liens<br><br>First Lien Adequate Protection Claims | Prepetition Second Lien Liens<br><br>Prepetition Second Lien Claims | N/A |
| *Seventh* | Prepetition First Lien Liens<br><br>Prepetition First Lien Claims | ABL DIP Liens<br><br>ABL DIP Superpriority Claims | N/A |
| *Eighth* | Second Lien Adequate | Prepetition ABL Adequate Protection | N/A |

18

|  |  |  |  |
|---|---|---|---|
|  | Protection Liens<br><br>Second Lien Adequate Protection Claims | Liens<br><br>Prepetition ABL Adequate Protection Claims |  |
| *__Ninth__* | Prepetition Second Lien Liens<br><br>Prepetition Second Lien Claims | Prepetition ABL Liens<br><br>Prepetition ABL Claims |  |

000967
**App. 471**

**Exhibit 3**

**Equity Rights Offering Term Sheet**

**CONVERGEONE HOLDINGS, INC.**

**Summary of Principal Terms of Proposed Equity Rights Offering**

This Summary of Principal Terms (this "***Rights Offering Term Sheet***") provides an outline of a proposed equity rights offering of the Issuer identified below in connection with the emergence of the Issuer and certain of its affiliates (collectively, the "***Debtors***" and as reorganized pursuant to the Joint Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates (the "***Plan***"), "***ConvergeOne***" or the "***Company***")) from chapter 11 proceedings (the "***Chapter 11 Cases***") pursuant to the Plan.

This Rights Offering Term Sheet is referenced in, and appended to, that certain Restructuring Support Agreement dated as of April 3, 2024, by and among the Debtors and the Consenting Stakeholders (as amended, supplemented, or otherwise modified from time to time, the "***RSA***"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the RSA or the Restructuring Term Sheet attached thereto as **Exhibit B**, to which this Rights Offering Term Sheet is attached.

The statements contained in this Rights Offering Term Sheet and all discussions between and among the parties in connection therewith constitute privileged settlement communications entitled to protection under Rule 408 of the Federal Rules of Evidence and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

THIS RIGHTS OFFERING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.

| | |
|---|---|
| **Issuer** | PVKG Investment Holdings, Inc. ("***PVKG Investment***"). |
| **Security Description** | New shares of common stock (the "***New Equity Interests***") in PVKG Investment, which shall be issued to applicable holders of First Lien Claims and/or Term DIP Facility Claims, in each case on the Effective Date as set forth herein.[1] |
| **Offering** | In connection with the Plan, the Debtors shall commence an equity rights offering (the "***Rights Offering***") (subject to the terms below) of $245.0 million, which may be increased with the consent of the Debtors and the Required Consenting Lenders (the applicable amount, the "***Rights Offering Amount***"). 35% of the Rights Offering Amount shall be available solely for the Investors (the "***Holdback***"), while 65% of the Rights Offering Amount shall be available to all holders of First Lien Claims (the "***Non-Holdback Rights Offering Amount***"). |
| | Each holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee, in accordance with the terms of the Backstop Agreement (as defined below) that elects the Rights Offering Rights and Takeback Term Loan |

---

[1]  The structure for effectuating the Rights Offering is subject to the Description of Transaction Steps (as defined in the Plan) to be included in the Plan Supplement.

|  | Recovery Option and is either (A) a "qualified institutional buyer" (a "***QIB***"), as such term is defined in Rule 144A under the Securities Act of 1933, as amended (the "***Securities Act***"), or (B) an institutional "accredited investor" (an "***IAI***") within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act or an entity in which all of the equity investors are IAIs (which, in the case of (A) and (B), for the avoidance of doubt, may not include any natural person) (collectively, the "***Eligible Offerees***") will be offered rights (the "***Rights***") to participate in the Rights Offering, in an amount not to exceed such holder's pro rata share of the Non-Holdback Rights Offering Amount based upon a fraction (expressed as a percentage) the numerator of which is the First Lien Claims held by such Eligible Offeree(s) and the denominator of which is all First Lien Claims held by all Eligible Offerees.  For the avoidance of doubt, such elections shall be adjusted on a pro rata basis, based on oversubscription, as necessary, so that participation in the Rights Offering Rights and Takeback Term Loan Recovery Option is capped at 50% of the First Lien Claims. |
|  | New Equity Interests issued pursuant to the Rights Offering, including the Holdback, the Non-Holdback Rights Offering Amount, and the Put Option Premium, shall be offered at a 35% discount to the stipulated equity value of the reorganized Debtors under the Plan (the "***Plan Discount***"). |
|  | For the avoidance of doubt, each Eligible Offeree may exercise all or a portion of its Rights, but upon exercising its Rights, such Eligible Offeree shall be committed to participate for its full amount of exercised Rights in the Rights Offering, and will receive New Equity Interests as set forth in this Rights Offering Term Sheet. |
|  | The Rights may be exercised only in exchange for (x) cash or (y) to the extent that a holder of Rights is a Term DIP Lender under the Term DIP Facility, the exercise of such holders' DIP Term Loan Rights (as such term is defined in the Term DIP Term Sheet) on the terms set forth in the Term DIP Term Sheet appended as **Exhibit 2** to the Restructuring Term Sheet. |
|  | The RSA and subscription documents for the Rights Offering will provide that all Eligible Offerees that exercise their Rights must vote to accept the Plan and not object to the confirmation of the Plan. |
| **Use of Proceeds** | Proceeds of the Rights Offering shall be used for (i) refinancing of the Term DIP Facility, and (ii) for general corporate and working capital purposes. |
| **Transferability of Rights** | The Rights shall not be transferable, assignable, or detachable other than in connection with the transfer of the corresponding First Lien Claims. The holder shall not transfer or assign any First Lien Claims unless such holder transfers or assigns with such First Lien Claims the right to receive the corresponding Rights in the Rights Offering, subject to compliance with applicable securities laws relating to the transfer of restricted securities. After a Right has been exercised by submitting an election form, the underlying First Lien Claims will cease to be transferrable. |
| **Oversubscription Privilege** | The Rights shall not have an oversubscription privilege. |

2

| | |
|---|---|
| **Investors** | The entities that will backstop the Rights Offering and are party to the Backstop Agreement (or their designated Affiliate(s), managed fund(s) or account(s) or other designee(s) in accordance with the Backstop Agreement) (collectively, the "***Investors***"). The Investors will be the parties set forth on Schedule I hereto (or their designated Affiliate(s), managed fund(s) or account(s) or other designee(s) in accordance with the Backstop Agreement). |
| **Holdback** | The Investors shall have the sole right and obligation to purchase the Holdback, at the Investor Percentages (as defined below) set forth in Schedule I hereto. |
| **Backstop Commitment** | The Investors will, pursuant to a backstop agreement to be entered into among the Company and the Investors (the "***Backstop Agreement***"), backstop the Rights Offering by committing in the respective percentages (the "***Investor Percentages***") set forth on Schedule I hereto (the "***Backstop Commitment***") to purchase from the Company in the Rights Offering the New Equity Interests that are not purchased by the Eligible Offerees in the Rights Offering for an aggregate amount equal to the Rights Offering Amount, which purchase may be in cash or may utilize the currency of DIP Loan Obligations or Takeback Loans pursuant to the DIP Term Loan Rights. |
| | The Backstop Agreement shall contain the terms and conditions set forth in this Rights Offering Term Sheet and other customary terms and conditions, including representations, warranties, conditions, covenants and indemnification for transactions of this type, and shall be acceptable to the Required Consenting Lenders and the Company Parties. |
| | The Investors will also be obligated to fully exercise all Rights issued to the Investors and their Affiliates in the Rights Offering. |
| **Put Option Premium** | The "***Put Option Premium***" means, as consideration for the Investors providing the Backstop Commitment, a fully earned non-refundable aggregate premium, which shall in the event of a Closing (as defined in the Backstop Agreement), be payable on the Effective Date of the Plan to the Investors in additional units of New Equity Interests equal to 10% of the Rights Offering Amount (issued at the Plan Discount); it being understood that any Investor that breaches the Backstop Agreement as set forth in the Backstop Agreement shall not be entitled to its pro rata share of the Put Option Premium under any circumstances. The Put Option Premium shall be allocated pro rata among the Investors based on the Investor Percentages. |
| **Transferability of Backstop Commitments** | The Investors' respective Backstop Commitments under the Backstop Agreement shall be transferrable from (i) one Investor to another Investor, with the consent of the Required Consenting Lenders, (ii) from any Investor to any of its Affiliates, managed funds or accounts (so long as such Investor remains liable for such transferred Backstop Commitment), and (iii) to any other person approved in advance by the Company (acting reasonably) and the Required Consenting Lenders, in each case as long as such transferees are or become signatories to the Backstop Agreement. |

3

| | |
|---|---|
| **Several Obligations** | The Investors' respective Backstop Commitments and obligations under the Backstop Agreement shall be several obligations and neither joint nor joint and several obligations and, unless otherwise expressly agreed in writing by an Investor, no Investor shall have any liability for any obligation of another Investor. |
| **Funding Failures** | If an Investor fails to satisfy its Backstop Commitment (a "Backstop Shortfall"), the other non-defaulting Investors shall have the right, but not the obligation, severally and not jointly in their sole discretion, to assume their pro rata share of the Backstop Shortfall based on the Investor Percentages. |
| **Conditions Precedent** | The Backstop Agreement will contain conditions precedent to the obligations of the parties to consummate the transactions contemplated by the Backstop Agreement that are customary for transactions of the type contemplated by the Backstop Agreement, and otherwise acceptable to the Required Consenting Lenders and the Company Parties, including: <br><br> Conditions Precedent for the Company: <br><br> • the Bankruptcy Court shall have approved the Backstop Agreement; <br><br> • the Bankruptcy Court shall have entered the order confirming the Plan; <br><br> • the concurrent occurrence of the Effective Date; <br><br> • receipt of required regulatory approvals and the absence of legal impediments to closing; and <br><br> • other customary conditions. <br><br> Conditions precedent for Investors: <br><br> • the Bankruptcy Court shall have approved the Backstop Agreement; <br><br> • the Bankruptcy Court shall have entered the order confirming the Plan; <br><br> • the concurrent occurrence of the Effective Date; <br><br> • receipt of required regulatory approvals and the absence of legal impediments to closing; and <br><br> • other customary conditions. |
| **No Shop; Termination Payment** | The Backstop Agreement will include a customary no-shop provision for competing proposals to restructure or acquire the Company with a customary fiduciary out for a superior proposal. <br><br> The Backstop Agreement will provide that if the Backstop Agreement is terminated as a result of a "fiduciary-out" by the Company, then the Company shall pay the Investors a termination payment of 5% of the Rights Offering Amount. The Backstop Agreement will provide that the termination payment shall be fully earned upon execution of the Backstop Agreement. |
| **Securities Law Matters** | The issuance of the New Equity Interests (except for any units of New Equity Interests issued in respect of the Backstop Commitments or Put Option Premium) shall be exempt from the registration requirements of the securities laws as a result |

|  | of section 1145 of the Bankruptcy Code to the maximum extent available by law or, if section 1145 is not available, then otherwise exempt from registration under the Securities Act of 1933, as amended (the "***Securities Act***") and any other applicable securities laws. |
|  | Any units of New Equity Interests issued in respect of the Backstop Commitments or Put Option Premium shall be exempt from registration requirements of the securities laws pursuant to Section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D, or such other exemption as may be available from any applicable registration requirements. |

5

**Exhibit 4**

**Governance Term Sheet**

ConvergeOne Holdings, Inc., *et al.*
GOVERNANCE TERM SHEET[1]

THIS TERM SHEET (THE "GOVERNANCE TERM SHEET") SETS FORTH THE PRINCIPAL
TERMS OF THE PROPOSED GOVERNANCE STRUCTURE OF THE COMPANY AFTER ITS
EMERGENCE FROM THE CHAPTER 11 PROCESS.  THIS GOVERNANCE TERM SHEET IS
REFERENCED IN, AND APPENDED TO, THAT CERTAIN RESTRUCTURING SUPPORT
AGREEMENT DATED AS OF APRIL 3, 2024, BY AND AMONG THE COMPANY PARTIES
AND THE CONSENTING STAKEHOLDERS (AS AMENDED, SUPPLEMENTED, OR
OTHERWISE MODIFIED FROM TIME TO TIME, THE "RSA").

THIS GOVERNANCE TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE
CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION
OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF
REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY,
ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF
SECURITIES, BANKRUPTCY AND OTHER APPLICABLE LAW.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF
THIS GOVERNANCE TERM SHEET IS INCONSISTENT WITH THE RSA, THE TERMS OF
THIS GOVERNANCE TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL
CONTROL.

| Governance Term Sheet | |
| --- | --- |
| **General** | PVKG Investment Holdings, Inc. (or an affiliate thereof or newly formed holding company) ("**New C1**") shall indirectly hold the equity of ConvergeOne Holdings, Inc. and New C1 shall be managed on a day-to-day basis by its Chief Executive Officer and executive officers with oversight from the New Board (as defined below). |
| **Corporate Form** | New C1 is expected to be managed by a Board of Directors (the "**New Board**") subject to a determination by the Debtors, the Company Parties, and Consenting Stakeholders. |
| **Board of Directors** | <u>**Number of Directors**</u>: New C1 will be governed by the New Board.  The Chief Executive Officer of New C1 shall serve on the New Board; all other initial directors shall be appointed by the Required Consenting Lenders, with representation being proportionate to anticipated post-emergence equity ownership; for the avoidance of doubt, each Initial First Lien Ad Hoc Group Member and the PVKG Lender shall each be entitled to appoint one director to serve on the New Board, so long as such entity is contemplated to receive no less than 10% of the fully-diluted New Equity Interests (excluding New Equity Interests reserved for the post-Effective Date Management Incentive Plan).  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Any action, agreement, |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the RSA or the
Restructuring Term Sheet, as applicable.

|  | undertaking or authorization of New C1 or any of its subsidiaries outside of the ordinary course of business or that is material to C1 or any of its subsidiaries must be approved by the New Board.  In addition, and without limiting the foregoing, certain significant corporate actions (to be specified in the definitive documentation) will require the approval of the New Board.

Representation on each committee of the New Board shall also be proportionate to the Required Consenting Lenders' equity ownership.

If any subsidiary of New C1 has a board of directors (or similar governing body) which includes anyone other than employees of New C1 or its subsidiaries, then such board or governing body will be composed in the same manner as the New Board and be subject to the same governance terms. |
|---|---|
| **Board Observer** | The Subsequent First Lien Ad Hoc Group Members and the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative as a non-voting observer to the New Board; *provided* that such entitlement shall expire if such holders, at any time, cease to hold in excess of 12.5% of the New Equity Interests in the aggregate.

In addition, the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative to receive materials that were presented to the New Board at any board meeting; *provided*, *however*, that such representative shall sign a customary non-disclosure agreement (which shall provide that such representative may share such materials with Required Consenting Initial Second Lien Ad Hoc Group Members that are subject to confidentiality restrictions and whose individual holdings exceed 1% of the New Equity Interests), and New C1 shall be entitled to not include any privileged or competitively sensitive information, and such entitlement shall expire if such holders, at any time, cease to hold in excess of 1.0% of the New Equity Interests in the aggregate. |
| **Minority Protections** | The Governance Documents will include customary minority shareholder protections and rights for the benefit of each of the Subsequent First Lien Ad Hoc Group Members, the Initial Second Lien Ad Hoc Group Members and other minority shareholders, including, but not limited to, drag rights, tag- along rights, preemptive rights, information rights and prohibition on amendments with respect to the foregoing without the consent of majority of holders disproportionately affected by any such amendment (the "**Minority Protections**"). The Minority Protections will be in a form and substance reasonably acceptable to the Required Consenting First Lien Lenders, Subsequent First Lien Ad Hoc Group Members and Required Consenting Initial Second Lien Ad Hoc Group Members. |

2

**<u>Exhibit C</u>**

**Joinder**

## Joinder to Restructuring Support Agreement

The undersigned hereby acknowledges that it has reviewed and understands the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**RSA**") dated as of April 3, 2024, by and among the Company Parties, Consenting Stakeholders, and Second Lien Consenting Lenders.[1]

The undersigned hereby makes the applicable representations and warranties set forth in Section 9 and Section 11 of the RSA to each other Party, effective as of the date hereof and agrees to be bound by the terms and conditions of the RSA.

This joinder agreement shall be governed by the governing law set forth in the RSA.

Date: _____, 2024

**[JOINING PARTY]**

_____

Name:

Title:

Address:

E-mail address(es):

| Aggregate Principal Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Term Loan Claims | |
| KL Note Claims | |
| PVKG Note Claims | |
| Second Lien Term Loan Claims | |

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the RSA.

**<u>Exhibit D</u>**

**Transfer Agreement**

## Transfer Agreement to Restructuring Support Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of April 3, 2024 (the "**RSA**"),[1] by and among the Company Parties, Consenting Stakeholders, and Second Lien Consenting Lenders, including the transferor of the Company Claims or Interests referenced herein ("**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound.

The Transferee specifically agrees to be bound by the terms and conditions of the RSA and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer set forth herein.

Date: _____, 2024

**[TRANSFEREE]**

_____

Name:

Title:

Address:

E-mail address:

| Aggregate Principal Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Term Loan Claims | |
| KL Note Claims | |
| PVKG Note Claims | |
| Second Lien Term Loan Claims | |

---

[1]   Capitalized terms used by not defined herein shall have the meanings ascribed to them in the RSA.

**Exhibit C**

**Financial Projections**

## FINANCIAL PROJECTIONS

**Introduction**[1]

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan.  In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their post-Effective Date financial obligations while maintaining sufficient liquidity and capital resources.

In connection with the Disclosure Statement, the Debtors' management team ("**Management**") prepared the following financial projections for the for the post-emergence portion of 2024 and years 2025 through 2028 (the "**Financial Projections**").  The Financial Projections were prepared by Management, with the assistance of the Debtors' Advisors, and are based on several assumptions made by Management with respect to the potential future performance of the Reorganized Debtors' operations, assuming the consummation of the Plan.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or the Financial Projections to Holders of Claims or Interests or other parties in interest going forward, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.

Management prepared the Financial Projections based on information available to them, including information derived from public sources that have not been independently verified.  No representations or warranties, expressed or implied, are provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

### Accounting Policies and Disclaimer

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.  THE FINANCIAL PROJECTIONS DO NOT REFLECT THE FORMAL IMPLEMENTATION OF REORGANIZATION ACCOUNTING PURSUANT TO FINANCIAL ACCOUNTING STANDARDS BOARD ACCOUNTING STANDARDS CODIFICATION TOPIC 852, REORGANIZATIONS ("**ASC 852**") OR THE IMPACT SUCH IMPLEMENTATION MAY HAVE ON DIRECT OR PASS-THROUGH TAX LIABILITIES.  MANAGEMENT CONTINUES TO EVALUATE THE COMBINED COMPANY CARRYFORWARD TAX BASIS UPON EMERGENCE.  OVERALL, THE IMPLEMENTATION OF ASC 852 IS NOT ANTICIPATED TO HAVE A MATERIAL IMPACT ON THE UNDERLYING ECONOMICS OF THE PLAN.  THE FINANCIAL PROJECTIONS HAVE BEEN PREPARED USING METHODOLOGIES THAT ARE MATERIALLY CONSISTENT WITH THOSE APPLIED IN THE DEBTORS' HISTORICAL FINANCIAL STATEMENTS.  THE

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to them in the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its Debtor Affiliates* (the "**Disclosure Statement**"), to which this exhibit is attached, or in the *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "**Plan**"), as applicable.

000982

**App. 486**

FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT ACCOUNTING FIRM.   ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS OR THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED.   ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE DISCLOSURE STATEMENT, THE RISK FACTORS SET FORTH THEREIN, AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

**Principal Assumptions for the Financial Projections**

The Financial Projections (the "**Long Range Plan**" or the "**LRP**") are based upon, and assume the successful implementation of, the Debtors' Plan.   Both the LRP and the Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors or their advisors.   In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany a restructuring pursuant to the Bankruptcy Code.

Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will likely vary from the projected results.   These variations may be material.   Accordingly, no definitive representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Debtors to achieve the projected results of operations.

In deciding whether to vote to accept or reject the Plan, Holders of Claims entitled to vote to accept or reject the Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections.

Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

**Safe Harbor Under the Private Securities Litigation Reform Act of 1995**

The Financial Projections contain certain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Exchange Act.   Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and Management with respect to the timing of, completion of, and scope of the current restructuring, Plan, LRP, bank financing, and debt and equity market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that their intentions, beliefs, and expectations reflected in the forward-looking statements are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance.   Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by the forward-looking statements.

000983
**App. 487**

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control.  Although Management believes these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to:

   a) the willingness of customers to invest in technology and the manner in which customers procure such technology and services;
   b) the impact of general macroeconomic conditions and adoption of new technology;
   c) the continuation of existing relationships with OEM partners and distributors;
   d) the Debtors' ability to execute on its product and technology redevelopment roadmap;
   e) the ability to implement operational improvements and organization structures contemplated in the forecast;
   f) the Debtors' ability to retain key staff and attract key employees; and
   g) the potential impact, if any, of the Chapter 11 Cases (if filed) on customers' purchasing behavior.

Additional details regarding these uncertainties are described in the Disclosure Statement.  Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections.  Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections.  The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of the Reorganized Debtors' future performance.

The Financial Projections were prepared using an approach that incorporated multiple detailed information sources.  Key personnel from the Debtors' operating areas and across various functions provided input in the development of the Financial Projections.  In preparation of the Financial Projections, the Debtors considered the current competitive environment, historical operating/production performance and operating costs.  The Financial Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth herein.

The Financial Projections may not be comparable to historical financials found in the Debtor's public disclosures and may contain financial metrics which do not conform to GAAP.  The Financial Projections do not reflect all of the adjustments necessary to implement Fresh Start accounting pursuant to Accounting Standards Certification 852-10, as issued by the Financial Accounting Standards Board.

The Financial Projections assume an Effective Date of May 31, 2024.

**Business Overview**

ConvergeOne Holdings, Inc. and its Debtor and Non-Debtor Affiliates (collectively "**C1**") is a leading global information technology ("**IT**") services company.  C1 provides connected human experiences by working with its channel partners, delivering IT services, and developing and commercializing its own technology products.  C1 invites its customers to reimagine customer interactions, enables the future of work and collaboration, and builds cyber-resilient enterprises in an ever-evolving IT landscape.  The

Company designs, implements, and supports thousands of state-of-the-art IT solutions across its core technology markets: pure and hybrid cloud solutions, business applications, customer experiences, contact center design and enablement, modern workplace infrastructure, cyber security, and enterprise networking. C1 is supported by a dynamic global workforce of more than 3,000 employees and independent contractors. C1 serves more than 6,000 private and public sector customers worldwide across a range of industries, including education, energy, financial services, government, healthcare, manufacturing, media and communications, retail, and transportation.  C1's customers include many of the companies listed on the Fortune 100, some of the largest school districts in the country, other large municipal entities, the federal government, the largest healthcare providers in the country, and a variety of leading global companies.

C1's operations are divided into two distinct revenue segments: (a) the "**Services Segment**" and (b) the "**Product Segment**."  The Services Segment contains three offerings: "**Professional Services**," "**Managed Services**," and "**Resale Services**."

**Services Segment**

- **Professional Services:**  Provides customers with consultation, design, integration and implementation, application development, program management, and maintenance services for customized collaboration, enterprise networking, data center, cloud, and security offerings.  Customers retain C1's engineers to create custom-designed, complex IT solutions which are then produced, sold, and implemented as standalone offerings or combined with OEM products and software and C1's own intellectual property to facilitate bespoke solutions for C1's customers.

- **Managed Services:**  C1 administers and maintains customers' mission critical IT infrastructure, typically over long-term contracts with high renewal rates.  Through C1's relationships with leading and next-generation technology partners, and through the utilization of C1's own proprietary intellectual property, C1's engineers maintain and enhance customers' existing IT infrastructure.  The engineers monitor performance and troubleshoot and support rapid resolutions for their customers' IT data center portfolios.  Additionally, they provide IT helpdesk support, maintenance services, and technological infrastructure enhancements, including upgrades or modifications to software.

- **Resale Services:** Consists of selling products and software subscriptions developed by C1's third-party OEM partners.  C1 actively markets products purchased from leading technology vendors in response to its customers' specifications.  C1's engineers utilize these products and software subscriptions to develop bespoke solutions to support the customers' IT infrastructure requirements and to augment their capabilities.

**Product Segment**

- **Product:**  Procures hardware products and software services from C1's OEM and distribution partners and sells those products to C1's customers.  Sales through the Product Segment may consist of standalone products, including products improved by C1's proprietary intellectual property, or may be included in a more holistic technology solution that is combined with C1's Professional Services expertise.

4

**NON-GAAP FINANCIAL PROJECTIONS**

The following table provides a summary of Financial Projections for the Debtors and their Affiliates, which should be reviewed in conjunction with the associated notes:

**Financial Projections:**

**Non-GAAP Income Statement:**

| | 6/1 - 12/31 | FY | FY | FY | FY |
|---|---|---|---|---|---|
| **1. Non-GAAP Income Statement ($, M)** | **2024** | **2025** | **2026** | **2027** | **2028** |
| Net Revenue | | | | | |
| Services | 377 | 667 | 713 | 761 | 813 |
| Product | 487 | 865 | 915 | 994 | 1,079 |
| **Total Net Revenue** | **864** | **1,531** | **1,629** | **1,755** | **1,892** |
| | | | | | |
| Cost of Good Sold | | | | | |
| Services | (185) | (345) | (368) | (392) | (417) |
| Product | (383) | (681) | (721) | (783) | (850) |
| **Total Cost of Good Sold** | **(568)** | **(1,026)** | **(1,089)** | **(1,174)** | **(1,267)** |
| | | | | | |
| Gross Profit | | | | | |
| Services | 192 | 322 | 345 | 370 | 396 |
| Product | 103 | 184 | 194 | 211 | 229 |
| **Total Gross Profit (Loss)** | **296** | **506** | **540** | **581** | **625** |
| | | | | | |
| SG&A | (213) | (360) | (364) | (369) | (377) |
| Depreciation and Amortization | (71) | (123) | (118) | (121) | (56) |
| | | | | | |
| **Operating Profit (Loss)** | **11** | **23** | **57** | **91** | **192** |
| | | | | | |
| Interest and Fees | (19) | (32) | (32) | (32) | (32) |
| | | | | | |
| **Net Profit Before Tax (Loss)** | **(8)** | **(9)** | **25** | **59** | **160** |
| | | | | | |
| Tax | (7) | (30) | (32) | (34) | (41) |
| | | | | | |
| **Net Profit After Tax (Loss)** | **(14)** | **(39)** | **(6)** | **25** | **119** |
| | | | | | |
| Add-Backs for EBITDA | | | | | |
| Depreciation and Amortization | 71 | 123 | 118 | 121 | 56 |
| Interest and Fees | 19 | 32 | 32 | 32 | 32 |
| Tax | 7 | 30 | 32 | 34 | 41 |
| **EBITDA** | **82** | **146** | **175** | **212** | **249** |

- **Revenue:** The Debtors' revenues are generated across its two revenue segments: 1) Products and 2) Services. The Debtors' revenue recognition methodologies vary depending on the specific product or service being sold. In certain multi-year agreements in which the Company is acting as an agent between the vendor and the customer the Debtor recognizes the net revenue for all years associated with the contract at inception, rather than over each annual period of the multi-year

5

agreement.  Although, the Debtor is acting as an agent in the transaction and reports revenue net, it still services the contract payments from customer to vendor.  As such, the Debtor recognizes both a receivable (from the customer) and payable (to the vendor) for the entirety of the contract, at inception, which results in certain current and noncurrent receivables and payables.

- **Cost of Goods Sold:**  Consists of standard costs, and salaries related to overhead costs of personnel engaged in the delivery of the Debtors' service and product offerings and associated facility fees.

- **Selling, General and Administrative Expenses (SG&A):**  Includes salaries and benefits, commissions, bonus, advertising and marketing, meetings and travel, professional fees, facility cost, and other operating expense.

- **Interest and Fees:**  The post-emergence period consists of cash interest expense on the term loan and ABL.

- **Tax:**  Forecasted cash taxes are estimated based on assumed tax rates against projected income.  No formal tax analysis has been prepared for foreign tax estimates, and all tax estimates are subject to change pending further review.

- **EBITDA:**  Excludes depreciation and amortization of intangibles, interest expense, and provision for income taxes, as well as one-time costs associated with acquisitions and restructuring, refinancing fees, and stock-based compensation and GAAP adjustments to lease costs.

6

**Non-GAAP Balance Sheet:**

| 2. Non-GAAP Balance Sheet ($, M) | FY 2024 | FY 2025 | FY 2026 | FY 2027 | FY 2028 |
|---|---|---|---|---|---|
| Current Assets | | | | | |
| Cash | 47 | 96 | 209 | 317 | 452 |
| Accounts Receivable | 660 | 656 | 636 | 684 | 736 |
| Inventories | 77 | 77 | 86 | 93 | 101 |
| Deferred Customer Support Cost | 44 | 45 | 45 | 46 | 48 |
| Other Current Assets | 20 | 21 | 21 | 21 | 21 |
| **Total Current Assets** | **849** | **895** | **996** | **1,161** | **1,358** |
| | | | | | |
| Goodwill | 107 | 107 | 107 | 107 | 107 |
| Accounts Receivable, noncurrent | 363 | 255 | 148 | 41 | 0 |
| Property Plant & Equipment, Net | 32 | 36 | 37 | 35 | 32 |
| Other Non-Current Assets | 297 | 263 | 261 | 275 | 292 |
| **Total Assets** | **1,648** | **1,557** | **1,549** | **1,620** | **1,788** |
| | | | | | |
| Current Liabilities | | | | | |
| Accounts Payable | 420 | 395 | 397 | 427 | 458 |
| Deferred Revenue | 57 | 61 | 58 | 63 | 69 |
| Other Current Liabilities | 187 | 181 | 181 | 181 | 181 |
| **Total Current Liabilities** | **664** | **637** | **637** | **671** | **708** |
| | | | | | |
| Long-Term Debt, Net | 301 | 301 | 301 | 301 | 301 |
| Accounts payable, noncurrent | 177 | 150 | 149 | 160 | 171 |
| Other Long Term Liabilities | 86 | 87 | 86 | 87 | 88 |
| **Total Liabilities** | **1,228** | **1,175** | **1,173** | **1,219** | **1,268** |
| | | | | | |
| **Total Stockholders Equity** | **420** | **381** | **375** | **401** | **521** |
| | | | | | |
| **Total Liabilities & Stockholders Equity** | **1,648** | **1,557** | **1,549** | **1,620** | **1,788** |

- **Accounts Receivable (AR):** Accounts receivable is based on the Debtors' sales forecast and billing practices for its different types of services and products. Invoiced amounts are assumed to be collected on average at 60 days. Accounts receivable also includes unbilled revenue, for which the Debtors have completed its performance obligation(s), but per the terms of the customer contract, the Debtor does not yet have the right to bill the customer. A portion of the current Accounts Receivable and most of the Accounts Receivable, noncurrent balance pertains to resale of vendor multi-year arrangements where the Debtor is acting as an agent in the transaction for accounting purposes.

    **Property, Plant and Equipment (PPE):** PPE consists of software, computers, building, equipment, furniture and fixtures, and leasehold improvements. Capital expenditures are based on currently anticipated needs and are subject to changes based on requirements. PPE is depreciated over the approximate useful life of the asset of 50 months. No adjustment to PPE values has been made to reflect fresh-start accounting.

000988

**App. 492**

- **Deferred Customer Support Contract Costs:** Capitalized internal and external costs incurred specifically to assist the Debtors in rendering services to its customers.  These include external costs associated with professional and managed services and internal professional services' labor costs directly related to getting the customers solution fully functional and ready for the customer to use.

- **Other Non-Current Assets:** Includes prepaid commissions, prepaid expenses, operating lease assets, and intangible assets.

- **Accounts Payable:** Consists of accruals and recorded invoices related goods and services provided to the company by its vendors.  C1's average payment terms with its vendors is approximately 50-60 days.  A portion of the current Accounts Payable and most of the Accounts Payable, noncurrent balance pertains to resale of vendor multi-year arrangements where the Debtor is acting as an agent in the transaction for accounting purposes.

- **Deferred Revenue:**  Deferred revenue represents amounts invoiced to customers or payments received from customers in advance of satisfying the obligations associated with the customer contract.

- **Other Current Liabilities:**  Includes accrued compensation and customer deposits.

- **Long-Term Debt:**  The Debtors' post-emergence capital structure is assumed to consist of a $243 million term loan and $200 million ABL ($58 million drawn at emergence).  Key terms include:

  - Term loan: (a) 6-year tenor from emergence; and (b) SOFR + 5.75% cash interest rate (SOFR is assumed to be 5.31% in projections)

  - ABL: (a) SOFR + 2.50% cash interest rate (SOFR is assumed to be 5.31% in projections)

- **Other Long-Term Liabilities:**  Noncurrent deferred revenue, other noncurrent liabilities, and noncurrent operating lease payable.

000989
**App. 493**

**Non-GAAP Statement of Cash Flows:**

| | 6/1 - 12/31 | FY | FY | FY | FY |
|---|---|---|---|---|---|
| **3. Non-GAAP Statement of Cash Flows ($, M)** | **2024** | **2025** | **2026** | **2027** | **2028** |
| EBITDA | 82 | 146 | 175 | 212 | 249 |
| Working Capital | (64) | (48) | (20) | (58) | (61) |
| Cash Taxes | (10) | (30) | (32) | (34) | (41) |
| Other | 0 | 0 | 0 | 0 | 0 |
| **Cash Flow from Operations** | **9** | **69** | **124** | **120** | **147** |
| Capital Expenditures | (13) | (20) | (12) | (12) | (12) |
| Debt Issued (Repaid) | 0 | 0 | 0 | 0 | 0 |
| **Total Net Cash Flow** | **(4)** | **49** | **112** | **108** | **135** |
| *Cash and cash equivalents - beginning of the period* | *51* | *47* | *96* | *209* | *317* |
| *Increase (decrease) in cash from activities* | *(4)* | *49* | *112* | *108* | *135* |
| *Cash and cash equivalents - end of the period* | *47* | *96* | *209* | *317* | *452* |

- **Change in Working Capital:** Driven by ordinary course changes in accounts receivable, accounts payable, inventory, deferred revenue, contract assets/costs, other current assets, and other current liabilities.

- **Cash Taxes:** Cash taxes based upon estimated federal income taxes equivalent to the estimated expense during 2024. Does not reflect final restructuring implementation of CODI impact on future NOLs.

9

## Exhibit D

**Valuation Analysis**

## VALUATION ANALYSIS

THE IMPUTED VALUATION INFORMATION CONTAINED HEREIN DOES NOT PURPORT TO BE OR CONSTITUTE (I) A RECOMMENDATION TO ANY HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AS TO HOW TO VOTE ON, OR OTHERWISE ACT WITH RESPECT TO, THE PLAN, (II) AN OPINION AS TO THE FAIRNESS FROM A FINANCIAL POINT OF VIEW OF THE CONSIDERATION TO BE RECEIVED UNDER THE PLAN OR OF THE TERMS AND PROVISIONS OF THE PLAN OR OF ANY TRANSACTION OFFERED PURSUANT TO THE PLAN OR OTHERWISE DESCRIBED THEREIN, INCLUDING WITHOUT LIMITATION, THE RIGHTS OFFERING DESCRIBED BELOW, OR (III) AN APPRAISAL OF THE ASSETS OF THE REORGANIZED DEBTORS.   FURTHERMORE, THE INFORMATION HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS OR THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR PURSUANT TO ANY OTHER SECURITIES OFFERING CONTEMPLATED HEREIN OR OF THE PRICES AT WHICH ANY SUCH SECURITIES MAY TRADE AFTER GIVING EFFECT TO THE TRANSACTIONS CONTEMPLATED BY THE PLAN.  THE ACTUAL VALUE OF AN OPERATING BUSINESS SUCH AS THE REORGANIZED DEBTORS' IS SUBJECT TO UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN VARIOUS FACTORS AFFECTING THE FINANCIAL CONDITIONS AND PROSPECTS OF SUCH A BUSINESS.

THIS INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER BANKRUPTCY CODE SECTION 1125 TO ENABLE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS (AND, IF APPLICABLE, OTHER STAKEHOLDERS) ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN, AND, OTHER THAN WITH RESPECT TO THE FOREGOING, WAS NOT PREPARED FOR THE PURPOSE OF PROVIDING THE BASIS FOR AN INVESTMENT DECISION BY ANY HOLDER OR ANY OTHER PERSON OR ENTITY WITH RESPECT TO ANY TRANSACTION OFFERED PURSUANT TO THE PLAN OR OTHERWISE DESCRIBED THEREIN (INCLUDING WITHOUT LIMITATION THE RIGHTS OFFERING DESCRIBED BELOW), AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING WITHOUT LIMITATION THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS.  THE IMPUTED VALUATION INFORMATION CONTAINED HEREIN SHOULD ALSO BE CONSIDERED IN CONJUNCTION WITH THE RISK FACTORS DESCRIBED IN **ARTICLE X** OF THE DISCLOSURE STATEMENT AND THE FINANCIAL PROJECTIONS ATTACHED THERETO AS **EXHIBIT D**.

The Backstop Agreement executed by the Investors, sophisticated financial institutions that are familiar with the Debtors' operations and the technology and communications industries, is the culmination of good faith, arm's length, extensive negotiations among the Debtors and the Investors and their respective financial and legal advisers based on in-depth due diligence in the months leading up to the Petition Date.

The Plan contemplates, among other things, the Debtors or the Reorganized Debtors raising $245 million of capital through the Rights Offering at a 35% discount to an implied $434 million equity value. Such capital raise would be difficult to consummate without the material deleveraging and equitization contemplated by the Plan.

On the Effective Date, the Reorganized Debtors project having approximately $368 million of funded net debt (excluding minimum cash of $50 million and including all floorplan-related obligations under the ABL).

000992

Accordingly, this further implies an imputed total enterprise value of the Reorganized Debtors upon emergence of approximately $802 million.

000993
**App. 497**

**Exhibit E**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS

**Introduction**[1]

Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7.

To demonstrate that the Plan satisfies this test, the Debtors and non-debtor affiliates and subsidiaries (collectively, "**C1**"), with the assistance of their restructuring advisor, AlixPartners, LLP, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**"), which is based upon certain assumptions discussed in the Disclosure Statement and accompanying notes to the Liquidation Analysis.

The Liquidation Analysis sets forth an estimated range of recovery values for each Class upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation.  As illustrated by this Liquidation Analysis, Holders of Claims or Interests in certain Impaired Classes would receive a lower recovery in a hypothetical chapter 7 liquidation than they would under the Plan.  Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such holder would receive in a chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the test set forth in section 1129(a)(7) of the Bankruptcy Code.

**Statement of Limitations**

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties, and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.

THE LIQUIDATION ANALYSIS WAS PREPARED FOR THE SOLE PURPOSE OF GENERATING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE GENERATED IF THE DEBTORS' ASSETS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE.  THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.   THE UNDERLYING FINANCIAL INFORMATION IN THE LIQUIDATION ANALYSIS AND VALUES STATED HEREIN HAVE NOT BEEN SUBJECT TO ANY REVIEW, COMPILATION, OR AUDIT BY ANY INDEPENDENT ACCOUNTING FIRM.   IN ADDITION, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE.   AS A RESULT, THE ACTUAL VALUE OF CLAIMS THAT ULTIMATELY WOULD BE ALLOWED AGAINST THE DEBTORS' ESTATES COULD VARY SIGNIFICANTLY FROM THE ESTIMATES STATED HEREIN, DEPENDING ON THE NATURE AND AMOUNT OF CLAIMS ASSERTED DURING THE PENDENCY OF THE CHAPTER 7 CASE.  SIMILARLY, THE VALUE OF THE DEBTORS' ASSETS

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to them in the disclosure statement to which this exhibit is attached (the "**Disclosure Statement**") or in the *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "**Plan**"), as applicable.

IN A LIQUIDATION SCENARIO IS UNCERTAIN AND COULD VARY SIGNIFICANTLY FROM THE VALUES SET FORTH IN THE LIQUIDATION ANALYSIS.

The Liquidation Analysis does not include estimates for: (i) the tax consequences, either foreign or domestic, that may be triggered upon the liquidation and sale of assets; (ii) recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions; (iii) environmental claims resulting from the shut down or sale of the C1's facilities; (iv) damages as a result of breach or rejection of obligations incurred and leases and executory contracts assumed or entered into; and (v) Claims that may be entitled to priority under the Bankruptcy Code, including administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code.  More specific assumptions are detailed in the notes below.

ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN.  THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review the Debtors' financial statements to account for other known liabilities, as necessary.  In addition, the Liquidation Analysis includes estimates for Claims not currently asserted against the Debtors, chapter 7 administrative claims such as wind down costs and trustee fees (together, the "**Wind-Down Expenses**"), which could be asserted and allowed in a chapter 7 liquidation.  The Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis.  Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS.

**Basis of Presentation**

The Liquidation Analysis has been prepared assuming that the Debtors convert their Chapter 11 Cases to chapter 7 cases of the Bankruptcy Code on or about September 30, 2024 (the "**Liquidation Date**").  Except as otherwise noted herein, the Liquidation Analysis is based upon the unaudited financial statements of the Debtors as of February 29, 2024 and those values, in total and subject to certain adjustments, are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date, with the exception of Cash, Accounts Receivable, Inventories, and certain liabilities, which were projected as of the Liquidation Date based on the Debtors' financial projections.  The Debtors' management team believes that the February 29, 2024 book value and projections of assets and certain liabilities are the best available estimate for such book values as of the Liquidation Date.  It is assumed that on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "**Trustee**") to oversee the liquidation of the Debtors' Estates, during which time all of the assets of the Debtors would be sold, abandoned, surrendered, or otherwise liquidated, in piecemeal or in whole, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law:  (i) *first*, for payment of liquidation, wind-down expenses, severance costs, trustee fees and other chapter 7 administrative claims attributable to the Wind-Down Expenses; (ii) *second,* to pay the secured portions of all Allowed Secured Claims from the

2

respective collateral; and (iii) *third*, to pay amounts on the Allowed Administrative and Other Priority Claims.  Any remaining net cash would be distributed to creditors holding Unsecured Claims, including deficiency claims that arise to the extent of the unsecured portion of the Allowed Secured Claims.

The cessation of business in a chapter 7 liquidation is likely to cause additional Claims to be asserted against the Debtors' Estates that otherwise would not exist absent such a liquidation.  Examples of these kinds of Claims include limited claims related to executory customer and other contracts and certain employee-related Claims, such as WARN Act or similar Claims, and others.  These additional Claims could be significant and, in certain circumstances, may be entitled to priority under the Bankruptcy Code.  No adjustment has been made for these potential Claims in this Liquidation Analysis.

This Liquidation Analysis assumes operations of the C1 will cease on the Liquidation Date, and the related individual assets will be sold during a three-to-six-month process (the "**Liquidation Timeline**") under the direction of the Trustee, utilizing certain Debtors employees, resources, and third-party advisors, to allow for the orderly wind down of the Debtors' estates.  There can be no assurance that the liquidation would be completed in this limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of parties-in-interest.

The Liquidation Analysis is also based on the assumptions that:  (i) the Debtors have continued access to cash during the Liquidation Timeline to fund Wind-Down Expenses and (ii) operations, accounting, treasury, IT, and other management services needed to wind down the estates continue.  The Liquidation Analysis was prepared on a by-entity basis for C1 and is displayed below on a consolidated basis for convenience.  Asset recoveries accrue first to satisfy creditor claims, including Intercompany Claims, at the legal entity level.  To the extent any remaining value exists at the individual entity, it flows to each individual entity's parent organization or appropriate shareholder.

3

## LIQUIDATION ANALYSIS

The Liquidation Analysis was prepared on a by-entity basis for each C1 entity.  The following table provides a summary of Liquidation Analysis on a consolidated basis.  The Liquidation Analysis should be read in conjunction with, and is qualified in its entirety by, the associated notes.

| (USD in millions) Assets | Notes | Pro Forma Book Value of Assets | | | Debtor Entities | | | | All Liquidating Entities | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Proceeds (%) | | Proceeds | | Proceeds (%) | | Proceeds | |
| | | Debtors | Non-Debtors | Total | Low | High | Low | High | Low | High | Low | High |
| *Gross Liquidation Value* | | | | | | | | | | | | |
| Cash | A | 46.7 | 1.3 | 47.9 | 100% | 100% | 46.7 | 46.7 | 100% | 100% | 47.9 | 47.9 |
| Accounts Receivable - Trade | B | 385.6 | 1.6 | 387.2 | 25% | 50% | 96.4 | 192.8 | 25% | 50% | 96.8 | 193.6 |
| Accounts Receivable - Multi-Year and Noncurrent | C | 372.4 | - | 372.4 | 0% | 0% | - | - | 0% | 0% | - | - |
| Inventory | D | 74.1 | - | 74.1 | 20% | 30% | 14.8 | 22.2 | 20% | 30% | 14.8 | 22.2 |
| PP&E | E | 25.3 | 0.4 | 25.7 | 17% | 25% | 4.2 | 6.5 | 17% | 26% | 4.3 | 6.6 |
| Intangible Assets | F | 452.0 | - | 452.0 | 0% | 0% | - | - | 0% | 0% | - | - |
| Intellectual Property | F | - | - | - | n/a | n/a | 106.3 | 162.6 | n/a | n/a | 106.3 | 162.6 |
| Other Assets | G | 873.6 | 0.6 | 874.2 | 0% | 0% | - | - | 0% | 0% | - | - |
| **Gross liquidation proceeds** | | **2,229.7** | **3.8** | **2,233.5** | **12%** | **19%** | **268.4** | **430.7** | **12%** | **19%** | **270.2** | **433.0** |
| *Less: Liquidation Costs* | | | | | | | | | | | | |
| Wind-down Operating Expense | H | | | | | | (6.0) | (3.0) | | | (6.3) | (3.2) |
| Severance / Notice | I | | | | | | (45.7) | (45.7) | | | (46.2) | (45.9) |
| Trustee Fees | J | | | | | | (6.7) | (11.5) | | | (6.7) | (11.6) |
| Professional Fees | K | | | | | | (11.2) | (11.6) | | | (11.2) | (11.7) |
| **Total Liquidation Costs** | | | | | | | **(69.6)** | **(71.9)** | | | **(70.4)** | **(72.3)** |
| *Plus: Intercompany Proceeds from Waterfall* | | | | | | | | | | | | |
| Net Intercompany Receivables | L | | | | | | 0.0 | 0.2 | | | | |
| Net Residual Value | M | | | | | | - | - | | | | |
| **Net Liquidation Proceeds Available to Creditors** | | | | | **9%** | **16%** | **198.8** | **359.0** | **9%** | **16%** | **199.8** | **360.6** |

| *Proceeds to External Creditors* | | Estimated Claims | | | Recovery (%) | | Recovery ($) | | Recovery (%) | | Recovery ($) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Low | High | Low | High | Low | High | Low | High |
| DIP TL Claims | N | 215.0 | - | 215.0 | 37% | 80% | 80.3 | 172.5 | 37% | 80% | 80.3 | 172.5 |
| DIP ABL Claims | O | 186.4 | - | 186.4 | 64% | 100% | 118.5 | 186.4 | 64% | 100% | 118.5 | 186.4 |
| First Lien Claims | P | 1,395.0 | - | 1,395.0 | 0% | 0% | - | - | 0% | 0% | - | - |
| Second Lien Claims | Q | 286.5 | - | 286.5 | 0% | 0% | - | - | 0% | 0% | - | - |
| **Total Secured Claims** | | **2,083.0** | **-** | **2,083.0** | **10%** | **17%** | **198.8** | **359.0** | **10%** | **17%** | **198.8** | **359.0** |
| Administrative Claims | R | 236.3 | - | 236.3 | 0% | 0% | - | - | 0% | 0% | - | - |
| Priority Claims | S | 26.3 | - | 26.3 | 0% | 0% | - | - | 0% | 0% | - | - |
| General Unsecured claims | T | 31.4 | 2.2 | 33.6 | 0% | 0% | - | - | 3% | 5% | 1.0 | 1.7 |
| **Total Unsecured Claims** | | **294.0** | **2.2** | **296.2** | **0%** | **0%** | **-** | **-** | **0%** | **1%** | **1.0** | **1.7** |
| **Total Claims** | | **2,377.0** | **2.2** | **2,379.2** | **8%** | **15%** | **198.8** | **359.0** | **8%** | **15%** | **199.8** | **360.6** |

### <u>Notes to the Liquidation Analysis</u>

*Gross Liquidation Proceeds:*  As described above, each C1 entity will seek to recover the value of its assets consistent with the process described above.  The total amount collected at each C1 entity is based on the following assumptions:

**A.**   <u>Cash</u>:  The gross liquidation proceeds of Cash and Cash equivalents for all entities holding Cash are estimated to be 100% of the projected balance as of the Liquidation Date per the Debtors' projections.  Cash is allocated among entities based on C1's books and records as of February 29, 2024, adjusted for forecasted cash flows up to the Liquidation Date.

This analysis assumes a consolidated balance of approximately $1.3 million in accounts maintained by non-Debtor entities as of the Liquidation Date.

Additionally, the Liquidation Analysis assumes that the Debtors' outstanding surety bonds are collateralized with cash during the chapter 11 cases in the amount of $77 million ("**Surety Collateral**").

This Liquidation Analysis further assumes, without conceding, that the Surety Collateral would not be available to the Estates in a liquidation scenario because such Surety Collateral likely would be the subject of negotiation and possibly protracted litigation among customer beneficiaries and providers of surety bonds

4

in a liquidation scenario.  Nothing herein shall be interpreted as a waiver of the Debtors' ability to contest the extent, perfection, priority, validity, or amounts of such parties' claims related to the Surety Collateral.  The Debtors reserve all their rights.

**B.**  Accounts Receivable - Trade:  For purposes of this Liquidation Analysis, the liquidation proceeds of trade receivables were estimated to range from 25-50% of net book value, which is based on, among other things, the anticipated challenges associated with collecting receivables from customers asserting claims for uncompleted contracts and unperformed services.  Additionally, customers may have right of setoff against existing receivables for prepayments against other goods or services to be provided by the company.

**C.**  Accounts Receivable – Multi-Year and Noncurrent ("**MY and N/C A/R**"):  MY and N/C A/R consist predominantly of unbilled receivables for long-term contract assets where contracted services have not yet been performed.  These assets were assumed to generate no proceeds.

**D.**  Inventory:  Inventory consists of IT hardware held for sale to end customers based on their requirements. The Liquidation Analysis assumes that 20-30% of the net book value of inventory could be recovered in a liquidation scenario due to the specialized nature of the C1's customer-specific and internal use hardware and the C1's inability to provide ongoing support to customers in connection with the equipment.

**E.**  Property, Plant and Equipment ("**PP&E**"):  PP&E includes computer systems, internal-use software, telecommunications equipment, leasehold improvements, furniture and fixtures, and other equipment of C1.

This Liquidation Analysis assumes a recovery of 30-50% on the net book value for all material categories of PP&E aside from internal-use software, real property, leasehold improvements, and assets under construction which are assumed not to generate recovery.  This Liquidation Analysis assumes that the Debtors' real property can be sold for 85-115% of the average price per square foot of similar office properties based on recent real estate transactions for such properties in the same municipality.

Given competitive market dynamics, this Liquidation Analysis assumes that competitors maintain their own internal use software and therefore any C1-owned internal-use software will have no recoverable value. Recoverable value for internally developed proprietary software used in providing customer services is discussed in Note F below.

This Liquidation Analysis assumes no value is recoverable from the C1's leased real property, leasehold improvements or assets under construction in a chapter 7 liquidation.

**F.**  Intangible Assets:  The Debtors' Intangible Assets consist of the book values of Trademarks, Customer Relationships, and Non-Compete agreements.  This analysis attributes no liquidation value for these assets.

This analysis attributes all material value of Intangible Assets to the Debtors' other intellectual property, which primarily consists of internally developed proprietary software and other technology for use in delivering services to customers.  Given the competitive market dynamics, this Liquidation Analysis assumes that competitors have developed and maintain their own customer software and technology.  Liquidation value attributable to the Debtors' intellectual property is based on an analysis of the discounted cash flow of the net operating cash flow from the Debtors' proprietary solutions in management's long term business plan projections.

**G.**  Other Assets:  Other Assets of C1 include Goodwill, Deferred Customer Support, Prepaid Expense, Prepaid Commissions, Operating Lease Assets, Income Tax Receivables, Other Receivables, and Other Current Assets.

This Liquidation Analysis ascribes no value to the C1's Other Assets.

*Liquidation Costs*: Each Debtor and non-Debtor entity is expected to pay liquidation, wind down expenses, statutory severance costs, trustee fees and other chapter 7 administrative claims prior to satisfaction of any debts to external or internal creditors. The total amount of estimated liquidation costs at each entity is the lesser of the Gross Liquidation Proceeds and the estimated costs as set forth in Notes H, I, J, and K below.

**H.**    Wind-Down Operating Expense:    This Liquidation Analysis assumes the cessation of the Debtors' ordinary course operations as of the Liquidation Date. The Debtors anticipate material costs to wind-down the business in an orderly manner, including continuation of certain leases and service arrangements following the Liquidation Date in order to secure books and records and allow for access to physical assets during the liquidation period.

The Debtors expect orderly liquidation of their facilities and subsidiaries to last three to six months. During that period, C1 is assumed to incur monthly estimated personnel costs for 40-45 Debtor employees and 10-15 Non-Debtor employees in the Finance, IT, HR, Facilities Management, and Legal functions, and non-personnel costs equal to 50% of the monthly cash operating expenses, excluding sales and marketing-related costs, plus the rent on the headquarters office, which is assumed to be the base of liquidation activities. These individuals will primarily be responsible for overseeing and maintaining certain of the Debtors' operations, providing historical knowledge and insight to the Trustee regarding the Debtors' businesses, and concluding the administrative liquidation of the businesses after the sale of substantially all of the Debtors' assets. These costs are assumed based on expenses of C1 projected for the fiscal year ended December 31, 2024, with such costs assumed to be incurred at ConvergeOne, Inc. for Debtor entities, and at Non-Debtor Entities where there are material physical assets to be liquidated.

Each C1 entity is assumed to wind-down independently without financial support from any other entity beyond recoveries on its Intercompany Claims and/or residual interests.

**I.**    Severance / Notice:    This Liquidation Analysis assumes that all employees of Debtors (other than those assisting with the liquidation and wind-down) will be terminated as of the Liquidation Date receive severance, notice and/or retention payments of, on average, eight weeks estimated fully-loaded costs based on the Debtors' severance policies, and that terminated employees of Non-Debtors receive severance, notice and/or retention payments of, on average, fifteen days' estimated fully-loaded costs based on relevant jurisdictional requirements. The severance periods and corresponding costs could, however, differ materially from the assumptions set forth by this Liquidation Analysis, which would reduce recoveries available to Holders of Claims and Interests. For purposes of this Liquidation Analysis, severance costs are assumed to be incurred at each Debtor and Non-Debtor employer entity.

**J.**    Trustee Fees:    Pursuant to section 326 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1.0 million, upon all moneys disbursed or turned over in the case by the trustee to parties in interest. For purposes of this Liquidation Analysis, these fees are simplified to 3% of liquidation proceeds realized, excluding Cash, at each Debtor entity.

Non-Debtor entities are expected to pay equivalent trustee fees or similar costs in their respective jurisdictions.

**K.**    Professional Fees:    Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses affiliated with selling the Debtors' assets and winding down operations, will be entitled to payment in full prior to any distribution to Administrative Claims and Other Priority Claims. This Liquidation Analysis estimates professional fees to be approximately 3-5% of the total liquidation proceeds realized at each Debtor and non-Debtor entity, excluding Cash (or $25,000 per entity, whichever is greater), which is based on expected fees and expenses of legal, financial, and other professionals as well as the complexity of the Debtors' liquidation and wind-down.

001000
**App. 504**

***Intercompany Proceeds from Waterfall****:*  After the payment of the Liquidation Costs, the Debtors and non-Debtors proceed to distribute any remaining proceeds to external and internal creditors in accordance with their relative payment priorities, which results in certain intercompany balances in favor of the Debtors:

**L.**   Intercompany Receivables:  The collection from intercompany balances depends on, among other things, the available proceeds from Debtor and non-Debtor liquidations and the characterization or recharacterization of such balances under applicable law.  In addition, the non-Debtor affiliates are domiciled in foreign countries, which may make it challenging to distribute proceeds to domestic Debtor entities or other foreign non-Debtor Affiliates.

For the purpose of this Liquidation Analysis, intercompany liabilities are treated *pari passu* with Debtor and non-Debtor unsecured Claims.  Intercompany assets at the Debtors are subject to liens in favor of the DIP Term Loan Claims, DIP ABL Claims, and First Lien Claims.

**M.**   Net Residual Value:  Intercompany equity interests are valued based on net liquidation proceeds on an entity-by-entity basis.  The Debtors' collection from equity interests depends on, among other things, the available proceeds from Debtor and non-Debtor liquidations and the characterization or recharacterization of such balances under applicable law.  In addition, the non-Debtor affiliates are domiciled in foreign countries which may make it challenging to distribute proceeds to domestic Debtor entities or other foreign non-Debtor affiliates.

***Proceeds to External Creditors****:*  After the payment of the Liquidation Costs, the Debtors and non-Debtors proceed to distribute any remaining proceeds to external and internal creditors in accordance with their relative payment priorities.

**N.**   DIP Term Loan Claims:  DIP Term Loan Claims are composed of $215 million of principal outstanding interest as of the Liquidation Date.

**O.**   DIP ABL Claims:  DIP ABL Claims are composed of $118 million of principal and $68 million of outstanding floorplan obligations as of the Liquidation Date.

**P.**   First Lien Claims:  First Lien Claims are composed of $1,356 million of principal and $39 million of outstanding interest as of the Petition Date.  This analysis assumes no interest accrues between the Petition Date and the Liquidation Date.

**Q.**   Second Lien Claims:  Second Lien Claims are composed of $275 million of principal and $12 million of accrued interest as of the Petition Date.  This analysis assumes no interest accrues between the Petition Date and the Liquidation Date.

The DIP ABL Claims benefit from first priority liens and asset pledges on the C1 borrowers' and guarantors' Accounts Receivable, Inventories, and Cash (the "**DIP ABL Priority Collateral**").  The DIP Term Loan Claims benefit from first priority liens and asset pledges at C1 and each of the entities that guarantee the DIP Term Loan Claims, covering substantially all the assets of each entity (other than DIP ABL Priority Collateral) and second priority liens on the ABL Priority Collateral held by C1 and each of the entities that guarantee the DIP Term Loan Claims.

Estimated recoveries on the DIP ABL Claims are estimated to range from 64-100% in a chapter 7 liquidation.  Estimated recoveries on the DIP Term Loan Claims are estimated to range from 37-80% in a chapter 7 liquidation.

The First Lien Claims benefit from first priority liens (junior to the DIP Term Loan Claims) and asset pledges at C1 and each of the entities that guarantee the First Lien Claims, covering substantially all the assets of each

7

entity (other than ABL Priority Collateral) and second priority liens (junior to the DIP Term Loan Claims) on the ABL Priority Collateral held by C1 and each of the entities that guarantee the First Lien Claims.

First Lien Claims are estimated to receive no recovery in a chapter 7 liquidation.  Second Lien Claims are estimated to receive no recovery in a liquidation.

**R.**   Administrative Claims:  Administrative Claims arising in a hypothetical chapter 7 liquidation may include, among other things: (1) Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code; (2) post-petition trade payables; and (3) accrued post-petition employee obligations; other Administrative Claims are likely to be asserted, but this Liquidation Analysis makes no assumptions regarding such other Claims.

This Liquidation Analysis assumes there will be approximately $236 million of Administrative Claims outstanding at C1 on the Liquidation Date.

The amount of Administrative Claims provided above is an estimate based on information known to the Debtors as of the date hereof.  As a result, the total amount of Administrative Claims allowed in the Chapter 11 Cases could differ materially from the assumptions set forth by this Liquidation Analysis, thereby reducing recoveries available to Holders of Claims and Interests in a chapter 7 liquidation.

Administrative Claims against the Debtors are expected to receive no recovery in a chapter 7 liquidation.

**S.**   Priority Claims: This Liquidation Analysis assumes that estimated accrued liabilities for accrued payroll liabilities and taxes payable by the Debtors and their affiliates are treated as Priority Claims.  However, the pool of Priority Claims could differ materially from the assumptions set forth in this Liquidation Analysis, thereby reducing recoveries available to Holders of Claims and Interests in a chapter 7 liquidation.  This Liquidation Analysis assumes that there will be $26 million of priority claims as of the liquidation date.

Priority Claims against the Debtors are expected to receive no recovery in a liquidation.

**T.**   General Unsecured Claims:  General Unsecured Claims arising in a hypothetical chapter 7 may include, among other things: (a) prepetition trade Claims not satisfied under First Day Orders; (b) Claims for damages arising from the termination or rejection of the Debtors' various supply agreements, contracts, and unexpired leases; (c) claims related to litigation against C1; and (d) numerous other types of prepetition liabilities, including, at each entity.  General Unsecured Claims do not include any Administrative Claims, Professional Fee Claims, Secured Tax Claims, Other Secured Claims, Priority Tax Claims, Other Priority Claims or other Claims separately shown herein.

This Liquidation Analysis assumes that there will be $31 million of General Unsecured Claims at the Debtors as of the Liquidation Date.

The amount of General Unsecured Claims is an estimate based on information known to the Debtors as of the date hereof.  As a result, the amount of General Unsecured Claims allowed could differ materially from the assumptions set forth by this Liquidation Analysis.

General Unsecured Claims against the Debtors are expected to receive no recovery in a liquidation.

**Exhibit F**

**Organizational Structure Chart**



*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90194 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES

---

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

---

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

**WHITE & CASE LLP**
Bojan Guzina (*pro hac vice* pending)
Andrew F. O'Neill (*pro hac vice* pending)
Erin R. Rosenberg (*pro hac vice* pending)
Blair M. Warner (*pro hac vice* pending)
Adam T. Swingle (*pro hac vice* pending)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
Email:  bojan.guzina@whitecase.com
        aoneill@whitecase.com
        erin.rosenberg@whitecase.com
        blair.warner@whitecase.com
        adam.swingle@whitecase.com

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated: April 3, 2024

---

[1]  The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
         AND GOVERNING LAW ...................................................................................... 1
    A.    Defined Terms. ........................................................................................... 1
    B.    Rules of Interpretation. ............................................................................ 20
    C.    Computation of Time. .............................................................................. 20
    D.    Governing Law. ....................................................................................... 20
    E.    Reference to Monetary Figures. ............................................................... 21
    F.    Controlling Document. ............................................................................. 21
    G.    Consent Rights. ........................................................................................ 21

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ...................................... 21
    A.    Administrative Claims. ............................................................................ 22
    B.    DIP Claims. .............................................................................................. 22
    C.    Professional Fee Claims. ......................................................................... 23
    D.    Priority Tax Claims. ................................................................................. 24
    E.    Restructuring Expenses. ........................................................................... 24

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................... 24
    A.    Classification of Claims and Interests. .................................................... 24
    B.    Formation of Debtor Groups for Convenience Only. .............................. 25
    C.    Treatment of Claims and Interests. .......................................................... 25
    D.    Special Provision Governing Unimpaired Claims. .................................. 29
    E.    Elimination of Vacant Classes. ................................................................ 29
    F.    Acceptance by Impaired Classes. ............................................................ 29
    G.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ............. 29
    H.    Intercompany Interests. ............................................................................ 30
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ... 30
    J.    No Substantive Consolidation. ................................................................ 30
    K.    Controversy Concerning Impairment. ..................................................... 30
    L.    Subordinated Claims. ............................................................................... 30

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ............................. 31
    A.    General Settlement of Claims and Interests. ........................................... 31
    B.    PVKG Note Claims Settlement. .............................................................. 31
    C.    Restructuring Transactions. ..................................................................... 32
    D.    The Reorganized Debtors. ....................................................................... 32
    E.    Sources of Consideration for Plan Distributions. .................................... 32
    F.    Corporate Existence. ................................................................................ 35
    G.    Vesting of Assets in the Reorganized Debtors. ....................................... 35
    H.    Cancellation of Existing Agreements and Interests. ................................ 35
    I.    Corporate Action. ..................................................................................... 36
    J.    Governance Documents. ........................................................................... 36
    K.    Directors and Officers of the Reorganized Debtors. ............................... 37
    L.    Effectuating Documents; Further Transactions. ...................................... 38
    M.    Certain Securities Law Matters. .............................................................. 38
    N.    Section 1146 Exemption. ......................................................................... 38
    O.    Employment Obligations. ......................................................................... 39
    P.    Management Incentive Plan. .................................................................... 40
    Q.    Preservation of Causes of Action. ........................................................... 40
    R.    Dissolution of Certain Debtors. ............................................................... 41
    S.    Closing the Chapter 11 Cases. ................................................................. 41

T.     Post-Effective Date Payment of Restructuring Expenses. ....................................... 41

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 41
    A.     Assumption of Executory Contracts and Unexpired Leases. ............................................ 41
    B.     Indemnification Obligations. .......................................................................................... 42
    C.     Claims Based on Rejection of Executory Contracts or Unexpired Leases. ..................... 43
    D.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ................... 43
    E.     Insurance Policies. ......................................................................................................... 44
    F.     Workers' Compensation Program. .................................................................................. 44
    G.     Reservation of Rights. .................................................................................................... 45
    H.     Nonoccurrence of Effective Date ................................................................................... 45
    I.     Contracts and Leases Entered Into After the Petition Date. ............................................ 45

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................... 45
    A.     Distributions on Account of Claims Allowed as of the Effective Date. ......................... 45
    B.     Distribution Agent. ......................................................................................................... 46
    C.     Rights and Powers of the Distribution Agent. ................................................................ 46
    D.     Special Rules for Distributions to Holders of Disputed Claims. .................................... 46
    E.     Delivery of Distributions and Undeliverable or Unclaimed Distributions. .................... 46
    F.     Manner of Payment. ....................................................................................................... 47
    G.     Compliance with Tax Requirements. .............................................................................. 47
    H.     Allocations. .................................................................................................................... 48
    I.     No Postpetition Interest on Claims. ................................................................................ 48
    J.     Foreign Currency Exchange Rate. .................................................................................. 48
    K.     Setoffs and Recoupment. ................................................................................................ 48
    L.     Claims Paid or Payable by Third Parties. ...................................................................... 48

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
              DISPUTED CLAIMS ......................................................................................... 49
    A.     Disputed Claims Process. ............................................................................................... 49
    B.     Allowance of Claims. ..................................................................................................... 50
    C.     Claims Administration Responsibilities. ........................................................................ 50
    D.     Adjustment to Claims or Interests Without Objection. ................................................... 50
    E.     Distributions After Allowance. ...................................................................................... 51

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............ 51
    A.     Discharge of Claims and Termination of Interests. ........................................................ 51
    B.     Release of Liens. ............................................................................................................ 51
    C.     Releases by the Debtors. ................................................................................................ 52
    D.     Releases by Third Parties. .............................................................................................. 53
    E.     Exculpation. ................................................................................................................... 54
    F.     Injunction. ...................................................................................................................... 55
    G.     Waiver of Statutory Limitations on Releases. ................................................................ 56
    H.     Protections Against Discriminatory Treatment. .............................................................. 56
    I.     Document Retention. ...................................................................................................... 57
    J.     Reimbursement or Contribution. .................................................................................... 57

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN ..................... 57
    A.     Conditions Precedent to the Effective Date. ................................................................... 57
    B.     Waiver of Conditions. .................................................................................................... 58
    C.     Substantial Consummation. ............................................................................................ 58
    D.     Effect of Failure of Conditions. ..................................................................................... 58

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN ................... 58

|   | A. | Modification and Amendments | 58 |
|---|---|---|---|
|   | B. | Effect of Confirmation on Modifications. | 59 |
|   | C. | Revocation or Withdrawal of Plan | 59 |

| ARTICLE XI. RETENTION OF JURISDICTION | 59 |
|---|---|

| ARTICLE XII. MISCELLANEOUS PROVISIONS | 62 |
|---|---|

|   | A. | Immediate Binding Effect. | 62 |
|---|---|---|---|
|   | B. | Waiver of Stay. | 62 |
|   | C. | Additional Documents. | 63 |
|   | D. | Payment of Statutory Fees. | 63 |
|   | E. | Statutory Committee and Cessation of Fee and Expense Payment | 63 |
|   | F. | Reservation of Rights. | 63 |
|   | G. | Successors and Assigns. | 63 |
|   | H. | Notices. | 63 |
|   | I. | Term of Injunctions or Stays | 65 |
|   | J. | Entire Agreement. | 65 |
|   | K. | Exhibits. | 65 |
|   | L. | Deemed Acts. | 65 |
|   | M. | Nonseverability of Plan Provisions. | 65 |
|   | N. | Votes Solicited in Good Faith. | 66 |
|   | O. | Request for Expedited Determination of Taxes. | 66 |
|   | P. | Closing of Chapter 11 Cases. | 66 |
|   | Q. | Waiver or Estoppel. | 66 |

001008

**App. 512**

## INTRODUCTION

ConvergeOne Holdings, Inc. and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in **Article I.A** of this Plan. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

### ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.    Defined Terms.

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "ABL DIP Agent" means Wells Fargo Commercial Distribution Finance, LLC.

2.    "ABL DIP Commitment Letter" means the commitment letter, as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, entered into between the Debtors, the ABL DIP Agent, and the ABL DIP Lenders, pursuant to which the ABL DIP Lenders committed to make available to the Debtors the ABL DIP Facility in accordance with the terms thereof and the ABL DIP Documents.

3.    "ABL DIP Credit Agreement" means that certain Ratification and Amendment Agreement consistent with the ABL DIP Term Sheet and the Documentation Principles (as defined therein) and otherwise in form and substance satisfactory to the ABL DIP Agent, the ABL DIP Lenders, and the Required Consenting Lenders, ratifying and amending the Prepetition ABL Facility.

4.    "ABL DIP Facility" means that certain postpetition senior secured superpriority priming debtor-in-possession asset-based revolving credit facility, in the aggregate principal amount of up to $250.0 million (subject to the Borrowing Base, as such term is defined in the ABL DIP Term Sheet), entered into on the terms and conditions set forth in the ABL DIP Documents and the DIP Orders.

5.    "ABL DIP Facility Claim" means any Claim arising from, under, or in connection with the ABL DIP Credit Agreement or any other ABL DIP Documents, including Claims for the aggregate outstanding principal amount of, plus unpaid interests on, the ABL DIP Loans, and all fees, and other expenses related thereto and arising and payable under the ABL DIP Facility.

6.    "ABL DIP Documents" means any documents governing the ABL DIP Facility that are entered into in accordance with the ABL DIP Term Sheet and the DIP Orders and any amendments,

1

modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the ABL DIP Term Sheet and the ABL DIP Credit Agreement.

7.      "ABL DIP Lenders" means the lenders party to the ABL DIP Credit Agreement from time to time.

8.      "ABL DIP Loans" means the loans contemplated under and documented by the ABL DIP Documents.

9.      "ABL DIP Term Sheet" means the term sheet attached as **Exhibit 1** to the Restructuring Term Sheet describing the terms of the ABL DIP Facility.

10.     "Administrative Claim" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; (d) Adequate Protection Claims (as defined in the DIP Orders); and (e) Restructuring Expenses.

11.     "Affiliate" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

12.     "Agents/Trustees" means, collectively, any administrative agent, collateral agent, indenture trustee, floorplan funding agent, or similar Entity under the Prepetition ABL Credit Agreement, the First Lien Term Loan Credit Agreement, the KL Note Purchase Agreement, the PVKG Note Purchase Agreement, the Second Lien Credit Agreement, the Prepetition Intercreditor Agreements, the ABL DIP Facility, the Term DIP Facility, or the Exit Facilities, including any successors thereto and, without limitation, the Prepetition ABL Agent, the First Lien Term Loan Agent, the DIP Agents, and the Exit Facilities Agents.

13.     "Allocated Portion" means Term DIP Facility Claims in an amount equal to the Rights, Direct Investment, and Backstop Commitment that are allocated to an applicable Term DIP Lender under this Plan and the Backstop Agreement as either an Investor or Eligible Offeree.

14.     "Allowed" means, with respect to any Claim or Interest, a Claim or an Interest expressly allowed under this Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors (with the consent of the Required Consenting Lenders, which shall not be unreasonably withheld, delayed, or conditioned) may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law; *provided, however* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

15.     "Backstop Agreement" means that certain Equity Backstop Commitment Agreement by and among PVKG Investment, C1 Holdings, PVKG Intermediate, and the Investors, as may be amended, supplemented, or modified from time to time in accordance with the terms thereof, setting forth the terms and conditions for, among other things, the Rights Offering, the Investors' backstop of the Rights Offering

2

Amount, the purchase of the Direct Investment, and the issuance of the Put Option Premium all at the Plan Discount, which agreement shall be set forth in the Plan Supplement.

16.    "<u>Backstop Commitment</u>" means the Investors' commitments to purchase up to $159,250,000 of the New Equity Interests at the Plan Discount, pursuant to the terms of the Rights Offering and in accordance with the Backstop Agreement; *provided* that the Investors may fulfill their Backstop Commitment by exercising their Term DIP Loan Rights pursuant to the terms of and in accordance with the Rights Offering Documents.

17.    "<u>Backstop Order</u>" means the Final Order authorizing, among other things, the Debtors' entry into and performance under the Backstop Agreement and approving any other documents related thereto and approving the payment of fees and expenses related thereto, which Final Order may be the Confirmation Order.

18.    "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

19.    "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Texas.

20.    "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

21.    "<u>Business Day</u>" means any day, other than a Saturday, Sunday, or "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

22.    "<u>C1 Holdings</u>" means ConvergeOne Holdings, Inc.

23.    "<u>Cash</u>" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

24.    "<u>Cash Collateral</u>" has the meaning set forth in section 363(a) of the Bankruptcy Code.

25.    "<u>Cause of Action</u>" means, without limitation, any Claim, Interest, claim, damage, remedy, cause of action, controversy, demand, right, right of setoff, action, cross claim, counterclaim, recoupment, claim for breach of duty imposed by Law or in equity, action, Lien, indemnity, contribution, reimbursement, guaranty, debt, suit, class action, third-party claim, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, direct or indirect, choate or inchoate, liquidated or unliquidated, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable or existing directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, under the Bankruptcy Code or applicable non-bankruptcy law, or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state law; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

26.    "<u>Chapter 11 Cases</u>" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when

001011
**App. 515**

used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.     "Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

28.     "Claims and Noticing Agent" means Epiq Corporate Restructuring, LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

29.     "Claims Register" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

30.     "Class" means a class of Claims or Interests as set forth in **Article III** hereof pursuant to section 1122(a) of the Bankruptcy Code.

31.     "CM/ECF" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

32.     "Company Parties" means PVKG Intermediate, C1 Holdings, and each of their direct and indirect subsidiaries that are or become parties to the Restructuring Support Agreement, solely in their capacity as such.

33.     "Confirmation" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

34.     "Confirmation Date" means the date upon which the Bankruptcy Court confirms this Plan pursuant to section 1129 of the Bankruptcy Code.

35.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on the confirmation of this Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

36.     "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors and the Required Consenting Lenders and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders.

37.     "Consenting Sponsors" means PVKG Lender, ConvergeOne Investment, LP, and PVKG Investment US LP and each of their affiliates other than the Debtors that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, in their respective capacities as direct or indirect Holders of Existing C1 Interests.

38.     "Consenting Stakeholders" means, collectively, the First Lien Consenting Lenders and the Consenting Sponsors.

39.     "Consummation" means the occurrence of the Effective Date.

40.     "Cure Claim" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

001012
**App. 516**

41.     "<u>D&O Liability Insurance Policies</u>" means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related thereto) issued at any time to, or providing coverage to, any of the Debtors or any of the Debtors' current or former directors, members, managers, or officers for directors', managers', and officers' liability.

42.     "<u>Debtor Release</u>" means the release set forth in **Article VIII.C** of this Plan.

43.     "<u>Definitive Documents</u>" means, collectively, (a) this Plan; (b) the Disclosure Statement; (c) the Solicitation Materials; (d) the DIP Orders (and motion(s) seeking approval thereof); (e) the ABL DIP Commitment Letter; (f) the ABL DIP Documents; (g) the Term DIP Loan Documents; (h) the Exit ABL Facility Documents; (i) the Exit Term Loan Facility Documents; (j) the Backstop Agreement and any motion(s) seeking approval thereof; (k) the Rights Offering and Election Procedures; (l) the Rights Offering Documents; (m) the Governance Documents; (n) any order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials (and motion(s) seeking approval thereof); (o) the Confirmation Order; (p) the Plan Supplement; (q) all material pleadings and motions Filed by the Company Parties in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings, any "second day" pleadings, and all orders sought pursuant thereto; (r) such other agreements, instruments, and documentation that are necessary, or as may be agreed in writing (email sufficient) between the Company Parties, the Required Consenting Lenders,  and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders, to document and consummate the Restructuring Transactions; and (s) any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing, which in each case shall be in form and substance acceptable to the Debtors, the Required Consenting Lenders, and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders.

44.     "<u>Description of Transaction Steps</u>" means the description of steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement.

45.     "<u>DIP Agents</u>" means, collectively, the ABL DIP Agent and the Term DIP Agent.

46.     "<u>DIP Claims</u>" means all Claims held by the DIP Lenders or the DIP Agents on account of, arising under, or related to the ABL DIP Credit Facility and/or the Term DIP Facility, or the DIP Orders, including, without limitation, Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Orders.

47.     "<u>DIP Lenders</u>" means, collectively, the ABL DIP Lenders and the Term DIP Lenders.

48.     "<u>DIP Orders</u>" means, collectively, the Interim DIP Order and the Final DIP Order and any other Bankruptcy Court order approving entry into the ABL DIP Documents and/or the Term DIP Loan Documents.

49.     "<u>DIP Professional Fees</u>" means, as of the Effective Date, all accrued and unpaid professional fees and expenses payable under the DIP Orders to the professionals for the DIP Agents and the DIP Lenders.

50.     "<u>Direct Investment</u>" means a number of New Equity Interests, issued at the Plan Discount in exchange for an aggregate amount equal to the Direct Investment Amount, which will be available solely

001013

**App. 517**

for Investors and which Investors shall have the sole right and obligation to purchase in accordance with the Investor Percentages set forth in the Backstop Agreement.

51.    "Direct Investment Amount" means an amount equal to 35% of $245,000,000 (subject to increase with the consent of the Debtors and the Required Consenting Lenders).

52.    "Direct Investment Commitment" means the Investors' commitments to purchase from New C1, based on the Investor Percentages, $85,750,000 of New Equity Interests at the Plan Discount, pursuant to the terms of the Rights Offering and in accordance with the Backstop Agreement.

53.    "Disallowed" means any Claim, or any portion thereof, that has been disallowed by Final Order or pursuant to a settlement among the Debtors and the holder thereof.    "Disallow" and "Disallowance" shall have correlative meanings.

54.    "Disclosure Statement" means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order and as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

55.    "Disclosure Statement Order" means one or more orders entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Debtors, the Required Consenting Lenders (subject to the parties' rights and obligations under the Restructuring Support Agreement), and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders: (i) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (ii) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

56.    "Disputed" means, as to a Claim or an Interest, a Claim or an Interest: (a) that is not Allowed; (b) that is not Disallowed under this Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

57.    "Distribution Agent" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Lenders, to make or facilitate distributions pursuant to this Plan.

58.    "Distribution Record Date" means the record date for purposes of making distributions under this Plan on account of Allowed Claims, which date shall be the Effective Date or such other date agreed to by the Debtors and the Required Consenting Lenders.

59.    "DTC" means The Depository Trust Company.

60.    "Effective Date" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in **Article IX.A** of this Plan have been satisfied or waived in accordance with **Article IX.B** of this Plan, as determined by the Debtors, the Required Consenting Lenders, and solely with respect to the condition set forth in **Article IX.A** (1) (solely with respect to the Required Consenting Second Lien Lenders), (9), (10), (11), and (12), the Required Consenting Second Lien Lenders.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

001014

**App. 518**

61.     "Eligible Offerees" means, collectively, each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee, in accordance with the terms of the Backstop Agreement) that elects the Rights and Takeback Term Loan Recovery Option and is either (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act of 1933, as amended, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), or (3) or (7) under the Securities Act of 1933, as amended, or an entity in which all of the equity investors are institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person).  For the avoidance of doubt, each Investor shall be an Eligible Offeree.

62.     "Employee Partnership Sale Units" means those certain partnership sale units issued to certain employees of the Debtors prior to the Petition Date in exchange for a waiver of the respective employee's then-existing equity interests in ConvergeOne Investment LP.

63.     "Employment Obligations" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with **Article IV.O** of this Plan.

64.     "Entity" means any entity, as defined in section 101(15) of the Bankruptcy Code.

65.     "Equity Security" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

66.     "Estate" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

67.     "Exculpated Parties" means, collectively, and in each case in their capacities as such: (a) the Debtors, (b) the directors, officers, managers, and employees of any Debtor, and (c) the Professionals.

68.     "Executory Contract" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69.     "Existing C1 Interests" means the equity interests in PVKG Intermediate immediately prior to the Effective Date.

70.     "Exit ABL Agent" means the administrative agent, collateral agent, or similar Entity under the Exit ABL Credit Agreement.

71.     "Exit ABL Credit Agreement" means the credit agreement with respect to the Exit ABL Facility, as may be amended, supplemented, or otherwise modified from to time, the terms of which, for the avoidance of doubt, shall be on terms and conditions reasonably satisfactory to the Debtors and the Required Consenting Lenders.

72.     "Exit ABL Facility" means the first lien asset based lending facility, to be incurred on the Effective Date by the Reorganized Debtors pursuant to the Exit ABL Credit Agreement, which shall be on terms and conditions reasonably satisfactory to the Debtors and the Required Consenting Lenders.

73.     "Exit ABL Facility Documents" means any documents governing the Exit ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the Exit ABL Credit Agreement and the Exit Intercreditor Agreement.

001015
**App. 519**

74.     "Exit Facilities" means, collectively, the Exit ABL Facility and Exit Term Loan Facility.

75.     "Exit Facilities Agents" means, collectively, the Exit ABL Agent and the Exit Term Loan Agent.

76.     "Exit Facilities Documents" means, collectively, the Exit ABL Facility Documents and the Exit Term Loan Facility Documents.

77.     "Exit Intercreditor Agreement" means the new intercreditor agreement to be entered into on substantially the same terms as the Prepetition Intercreditor Agreements or such other terms as are acceptable to the Debtors and the Required Consenting Lenders, governing the relevant rights and priorities under the Exit Facilities Documents.

78.     "Exit Term Loans" means the term loans provided under the Exit Term Loan Facility on the terms and conditions set forth in the Exit Term Loan Credit Agreement, which shall include the Takeback Term Loans.

79.     "Exit Term Loan Agent" means the administrative agent, collateral agent, or similar Entity under the Exit Term Loan Credit Agreement.

80.     "Exit Term Loan Credit Agreement" means the credit agreement with respect to the Exit Term Loan Facility, as may be amended, supplemented, or otherwise modified from to time.

81.     "Exit Term Loan Facility" means the secured term loan facility in an aggregate principal amount not greater than $243 million pursuant to the Exit Term Loan Credit Agreement.

82.     "Exit Term Loan Facility Documents" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the Exit Term Loan Credit Agreement and the Exit Intercreditor Agreement.

83.     "Exit Term Loan Lenders" means those lenders party to the Exit Term Loan Credit Agreement.

84.     "Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date.

85.     "File" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

86.     "Final DIP Order" means one or more Final Orders entered approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents, and authorizing the Debtors' use of Cash Collateral.

87.     "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken; or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the

8

new trial, reargument, or rehearing has been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided that*, for the avoidance of any doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; *provided, further,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

88.    "First Day Pleadings" means the motions and related pleadings that the Debtors shall have filed upon the commencement of the Chapter 11 Cases.

89.    "First Lien Ad Hoc Group" means that certain ad hoc group of Holders of First Lien Claims, including the KL Lender, represented or otherwise advised by the First Lien Ad Hoc Group Advisors.

90.    "First Lien Ad Hoc Group Advisors" means Gibson, Dunn & Crutcher LLP, PJT Partners Inc., EY-Parthenon, any local counsel retained by the First Lien Ad Hoc Group, and such other professional advisors as are retained by the First Lien Ad Hoc Group with the prior written consent of the Debtors (not to be unreasonably withheld).

91.    "First Lien Claims" means collectively, the First Lien Term Loan Claims, the KL Note Claims, and the PVKG Note Claims.

92.    "First Lien Consenting Lenders" means the Initial First Lien Ad Hoc Group Members, KL Lender, PVKG Lender, each Holder of a First Lien Claim that has signed the Restructuring Support Agreement, each solely in their capacities as such, and any other Holder of a First Lien Claim that executes and delivers a joinder or transfer agreement to counsel to the Company Parties after the effective date of the Restructuring Support Agreement.

93.    "First Lien Term Loan Agent" means Deutsche Bank AG New York Branch in its capacity as administrative agent and collateral agent under the First Lien Term Loan Credit Agreement.

94.    "First Lien Term Loan Claims" means any Claim against any Debtor derived from, based upon, or arising under the First Lien Term Loan Credit Agreement and the other Loan Documents (as defined therein) (including, for the avoidance of doubt, all Obligations (as defined in the First Lien Term Loan Credit Agreement) owing under or in connection with the Loan Documents) and orders of the Bankruptcy Court (including, without limitation, the DIP Orders).

95.    "First Lien Term Loan Credit Agreement" means that certain prepetition First Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of March 14, 2019 and that certain Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto.

96.    "General Unsecured Claim" means any Unsecured Claim against the Debtors that is not an: (a) Administrative Claim; (b) Priority Tax Claim; (c) Professional Fee Claim; (d) Other Priority Claim; (e) Intercompany Claim; or (f) Section 510 Claim.  For the avoidance of doubt, General Unsecured Claims include (x) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (y) Claims resulting from litigation against one or more of the Debtors.

97.     "<u>Governance Documents</u>" means, as applicable, the organizational and governance documents for New C1 and/or the Reorganized Debtors, which will give effect to the Restructuring Transactions, including, without limitation, the New Equityholders' Agreement, any applicable certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or equivalent governing documents), and registration rights agreements, which shall be consistent with the Restructuring Support Agreement and the Governance Term Sheet and in form and substance acceptable to the Debtors and the Required Consenting Lenders, and solely with respect to the Minority Protections (as defined in the Governance Term Sheet) and board observer rights provided for therein, the Subsequent First Lien Ad Hoc Group Members and the Required Consenting Second Lien Lenders (in accordance with the consent rights set forth in the Restructuring Support Agreement).

98.     "<u>Governance Term Sheet</u>" means the term sheet attached as **<u>Exhibit 4</u>** to the Restructuring Term Sheet describing organizational and governance matters for New C1.

99.     "<u>Governing Body</u>" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

100.    "<u>Governmental Unit</u>" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

101.    "<u>Holder</u>" means a Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable, including any Person or Entity that is the record or beneficial owner, nominee, investment advisor, sub-advisor, or manager of discretionary accounts that hold any Claim against or Interest in any Debtor.

102.    "<u>Impaired</u>" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

103.    "<u>Initial First Lien Ad Hoc Group Members</u>" means each of the funds or accounts managed by (a) Kennedy Lewis Investment Management LLC, (b) Monarch Alternative Capital LP, and (c) Silver Point Capital.

104.    "<u>Initial Second Lien Ad Hoc Group Members</u>" means each of the funds or accounts managed by (i) Partners Group (USA) Inc. and (ii) Siris Capital Group, LLC.

105.    "<u>Intercompany Claim</u>" means any Claim against a Debtor held by another Debtor.

106.    "<u>Intercompany Interest</u>" means any Interest in a Debtor held by another Debtor.

107.    "<u>Interest</u>" means, collectively, (a) any Equity Security in any Debtor and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor that existed immediately before the Effective Date.

108.    "<u>Interim DIP Order</u>" means one or more orders entered on an interim basis approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents and authorizing the Debtors' use of Cash Collateral.

001018

**App. 522**

109.   "Investor Percentages" means the respective percentages set forth in the Backstop Agreement governing each Investor's respective Backstop Commitment or Direct Investment Commitment.

110.   "Investors" means the Holders of First Lien Claims that are party to the Backstop Agreement (or their designated Affiliate(s), managed fund(s) or account(s) or other designee(s) in accordance with the Backstop Agreement).   For the avoidance of doubt, each Investor must be (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act of 1933, as amended, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), or (3) or (7) under the Securities Act of 1933, as amended, or an entity in which all of the equity investors are institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person).

111.   "Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

112.   "KL Lender" means Kennedy Lewis Investment Management LLC as the Holder of the KL Note Claims.

113.   "KL Lender Advisor" means Akin Gump Strauss Hauer & Feld LLP.

114.   "KL Lender Advisor Cap" means $250,000.

115.   "KL Note Claims" means any Claim against any Debtor derived from, based upon, or arising under the KL Note Purchase Agreement.

116.   "KL Note Purchase Agreement" means that certain prepetition First Lien Secured Note Purchase Agreement dated as of July 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date) by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, Deutsche Bank Trust Company Americas, as administrative agent and collateral agent, certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto, and each other holder from time to time party thereto.

117.   "Lender Affiliate" means any accounts and funds managed by a Term DIP Lender, accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such Term DIP Lender, or any other affiliate of such Term DIP Lender.

118.   "Lien" means a lien as defined in section 101(37) of the Bankruptcy Code.

119.   "Management Incentive Plan" means the post-emergence equity incentive plan providing for the issuance from time to time, of equity and equity-based awards with respect to New Equity Interests, as approved by the New Board following the Effective Date, the timing and certain terms of which are set forth in **Article IV.P**.

120.   "Management Incentive Plan Pool" means a pool of up to 10% of the fully diluted New Equity Interests that are issued and outstanding on the Effective Date that shall be reserved for issuance under the Management Incentive Plan.

121.   "New Board" means the board of directors or similar Governing Body of New C1.

122.   "New C1" means either PVKG Investment, as reorganized pursuant to this Plan, or, if applicable, any successor or assign thereto, by merger, consolidation, or otherwise on and after the Effective

Date, or a new entity, and each of its direct and indirect wholly-owned subsidiaries, which in any case shall be the ultimate parent of the other Company Parties on and after the Effective Date, and which entity shall be determined by agreement of the Debtors and the Required Consenting Lenders and shall be reasonably acceptable to the Required Consenting Second Lien Lenders.

123.    "New Equity Interests" means new shares of common stock in New C1 to be issued on the Effective Date.

124.    "New Equityholders' Agreement" means that certain equityholders' agreement that will govern certain matters related to the governance of the Reorganized Debtors and which shall be consistent with the Governance Term Sheet.

125.    "Other Priority Claim" means any Claim, other than an Administrative Claim, Priority Tax Claim, ABL DIP Facility Claim, or Term DIP Facility Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

126.    "Other Secured Claim" means any Secured Claim against the Debtors other than the ABL DIP Facility Claims, Term DIP Facility Claims, Prepetition ABL Claims, First Lien Claims, and Second Lien Claims.

127.    "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

128.    "Petition Date" means the date on which the Debtors commence the Chapter 11 Cases.

129.    "Plan" means this joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with **Article X.A** hereof and the Restructuring Support Agreement, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated by reference herein and made part of the Plan as if set forth herein.

130.    "Plan Discount" means the 35% discount to the Stipulated Equity Value at which the New Equity Interests issued through the Rights Offering and the Direct Investment will be purchased, and at which the New Equity Interests issued pursuant to the Put Option Premium shall be issued.

131.    "Plan Distribution" means a payment or distribution to Holders of Allowed Claims or other eligible Entities under and in accordance with this Plan.

132.    "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement), the initial drafts of certain of such documents to be Filed by the Debtors no later than seven (7) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) the Governance Documents; (b) the New Equityholders' Agreement; (c) the Backstop Agreement; (d) the identity and members of the New Board to the extent known at the time of filing; (e) the Schedule of Retained Causes of Action; (f) the Exit Facilities Documents; (g) the Description of Transaction Steps (which shall, for the avoidance of doubt, remain subject to modification until the Effective Date and may provide for certain actions to occur prior to the Effective Date, subject to the consent of the Required Consenting Lenders and consultation with the Required Consenting Second Lien Lenders);

001020

**App. 524**

(h) the Rejected Executory Contract and Unexpired Lease List; and (i) any other necessary documentation related to the Restructuring Transactions.

133.    "Prepetition ABL Agent" means Wells Fargo Commercial Distribution Finance, LLC, in its capacity as the administrative agent, collateral agent, floorplan funding agent and swing line lender under the Prepetition ABL Credit Agreement.

134.    "Prepetition ABL Claims" means any Claim against any Debtor derived from, based upon, or arising under the Prepetition ABL Credit Agreement.

135.    "Prepetition ABL Credit Agreement" means that certain Amended and Restated ABL Credit Agreement, dated as of January 4, 2019  (as amended by that certain Amendment No. 1, dated as of July 10, 2022, that certain Amendment No. 2, dated as of September 14, 2022, that certain Amendment No. 3, dated as of January 23, 2023, and that certain Amendment No. 4, dated as of August 29, 2023, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate as holdings, certain subsidiary borrowers party thereto, Wells Fargo Commercial Distribution Finance, LLC, as administrative agent, collateral agent, floorplan funding agent and swing line lender, and the lenders party thereto.

136.    "Prepetition ABL Facility" means the secured revolving credit loan in the aggregate principal amount of up to $250.0 million, subject to compliance with a borrowing base and various sublimits applicable to various Swingline Loans, Letters of Credit, and floorplan advances otherwise authorized under the Prepetition ABL Credit Agreement.

137.    "Prepetition Intercreditor Agreements" means (a) that certain ABL Intercreditor Agreement, dated as of January 4, 2019 (as amended by that certain Joinder and Amendment to ABL Intercreditor Agreement dated as of July 10, 2020 and supplemented by that certain ABL Intercreditor Agreement Joinder dated as of May 15, 2023); (b) that certain First Lien Pari Passu Intercreditor Agreement, dated as of January 10, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time); and (c) that certain first lien and second lien Intercreditor Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented, or otherwise modified from time to time).

138.    "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

139.    "Pro Rata" means, unless otherwise specified, with respect to any Claim, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

140.    "Professional" means any Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

141.    "Professional Fee Amount" means the aggregate amount of unpaid Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur through the Effective Date in rendering services to the Debtors as set forth in **Article II.C** of this Plan.

142.    "Professional Fee Claim" means any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through

13

and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

143.    "Professional Fee Escrow Account" means an interest-bearing account funded upon entry of the Interim DIP Order and maintained by the Debtors with Cash for the benefit of the Professionals in accordance with the DIP Orders and the terms set forth in this Plan.

144.    "Proof of Claim" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

145.    "Put Option Premium" means a fully earned nonrefundable aggregate premium equal to the sum of (i) 10% of the Rights Offering Amount and (ii) 10% of the Direct Investment Amount, collectively which shall be payable on the Effective Date to the Investors in shares of New Equity Interests, and shall be allocated pro rata among the Investors based on the Investor Percentages in accordance with the Backstop Agreement.

146.    "PVKG Intermediate" means PVKG Intermediate Holdings Inc.

147.    "PVKG Investment" means PVKG Investment Holdings, Inc.

148.    "PVKG Lender" means PVKG Investment as the Holder of the PVKG Note Claims.

149.    "PVKG Lender Advisors" means Latham & Watkins LLP and any local counsel retained by the PVKG Lender to advise the PVKG Lender in its capacity as the Holder of the PVKG Note Claims.

150.    "PVKG Note Claims" means any Claim against any Debtor derived from, based upon, or arising under the PVKG Note Purchase Agreement, which shall be Allowed in the aggregate amount of $213.0 million pursuant to the PVKG Note Claims Settlement and the terms of this Plan and the Confirmation Order.

151.    "PVKG Note Claims Settlement" means the settlement of all Claims, Causes of Action, and controversies among the Debtors, the Consenting Sponsors, the First Lien Consenting Lenders, the Second Lien Consenting Lenders, and any other Consenting Stakeholder regarding or related to the PVKG Note Purchase Agreement and/or the transactions consummated in connection therewith, as set forth in and contemplated by this Plan and effective as of the Effective Date.

152.    "PVKG Note Purchase Agreement" means that certain Amended Promissory Note and Purchase and Cashless Exchange Agreement dated as of July 6, 2023 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, and PVKG Lender, as administrative agent, collateral agent, and holder.

153.    "Reinstate" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.  "Reinstated" and "Reinstatement" shall have correlative meanings.

154.    "Rejected Executory Contract and Unexpired Lease List" means the list, as determined by the Debtors in consultation with the Required Consenting Lenders, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to this Plan, which list, as may be amended from time to time, with the consent of the Debtors and the Required Consenting Lenders, shall be included in the Plan Supplement.

001022

**App. 526**

155.   "Related Party" means with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' respective directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, and nominees of the foregoing.

156.   "Released Party" means, collectively, the following Entities, in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Investors; (h) the Agents/Trustees; (i) all Releasing Parties; and (j) each Related Party of each Entity in clause (a) through (i); *provided, however*, that, in each case, an Entity shall not be a Released Party if it (i) elects to opt out of the releases contained in this Plan if permitted to opt out; or (ii) files with the Bankruptcy Court an objection to the Plan, including the releases, that is not consensually resolved before Confirmation or supports any such objection or objector.

157.   "Releasing Party" means, collectively, and in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Investors; (h) the Agents/Trustees; (i) all Holders of Claims that vote to accept the Plan; (j) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (k) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (l) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (m) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; and (n) each Related Party of each Entity in clause (a) through (m).

158.   "Reorganized Debtor" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, unless otherwise dissolved pursuant to this Plan.

159.   "Required Consenting Lenders" means, as of the relevant date of determination, the Initial First Lien Ad Hoc Group Members and the PVKG Lender holding, collectively, in excess of 66 2/3%of the aggregate First Lien Claims collectively held by the Initial First Lien Ad Hoc Group Members and the PVKG Lender.

160.    "Required Consenting Second Lien Lenders" means, as of the relevant date of determination, the Initial Second Lien Ad Hoc Group Members holding, collectively, in excess of 50.01% of the aggregate Second Lien Claims collectively held by the Initial Second Lien Ad Hoc Group Members.

161.    "Restructuring Expenses" means the actual, reasonable, and documented fees and expenses of the First Lien Ad Hoc Group Advisors, the KL Lender Advisor (subject to the KL Lender Advisor Cap), the PVKG Lender Advisors, and the Second Lien Ad Hoc Group Advisors, regardless of whether such fees and expenses are or were incurred before, on, or after the date on which the conditions set forth in Section 2 of the Restructuring Support Agreement were satisfied or waived by the appropriate Party or Parties in accordance with the terms of the Restructuring Support Agreement, subject to the terms of any applicable fee reimbursement letter between any such Parties and any of the Company Parties, as the case may be; *provided*, *however*, that the invoices for such fees and expenses shall be in summary format (with such redactions as may be necessary to maintain attorney client privilege), and the First Lien Ad Hoc Group Advisors, PVKG Lender Advisors, and the Second Lien Ad Hoc Group Advisors shall not be required to provide the Company Parties with attorney time entries or apply to the Bankruptcy Court for payment.

162.    "Restructuring Support Agreement" means that certain Restructuring Support Agreement, entered into as of April 3, 2024, by and among the Debtors and the other parties thereto, including all exhibits thereto (including the Restructuring Term Sheet), as may be amended, modified, or supplemented from time to time, in accordance with its terms, attached to the First Day Declaration as **Exhibit B**.

163.    "Restructuring Term Sheet" means the term sheet attached to the Restructuring Support Agreement as **Exhibit B** thereto.

164.    "Restructuring Transactions" means the transactions described in **Article IV.C** of this Plan.

165.    "Rights" means the rights offered to Eligible Offerees to participate in the Rights Offering, in an amount not to exceed such Eligible Offeree's Pro Rata portion (calculated based on the aggregate principal amount of First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all First Lien Claims held by Eligible Offerees that exercised, or are deemed to have validly exercised the Rights Offering Rights and Takeback Term Loan Recovery Option) of the Rights Offering Amount.

166.    "Rights Offering" means the equity rights offering to be consummated by New C1 on the Effective Date in accordance with the Rights Offering Documents, pursuant to which New C1 shall issue the Rights for an aggregate purchase price equal to the Rights Offering Amount at the Plan Discount.

167.    "Rights Offering Amount" means an amount equal to 65% of $245,000,000 (subject to increase with the consent of the Debtors and the Required Consenting Lenders).

168.    "Rights Offering Documents" means, collectively, the Rights Offering Term Sheet, the Backstop Agreement, the Backstop Order (which may be the Confirmation Order), the Rights Offering and Election Procedures, and any other agreements or documents memorializing the Rights Offering, as may be amended, restated, supplemented, or otherwise modified from time to time according to their respective terms.

169.    "Rights Offering Participants" means, collectively, the Eligible Offerees that exercise, or are deemed to have validly exercised, their respective Rights for New Equity Interests in connection with the Rights Offering.

001024
**App. 528**

170.    "Rights Offering and Election Procedures" means the procedures regarding the Class 3 recovery option election and governing the Rights Offering attached as an exhibit to the Disclosure Statement.

171.    "Rights Offering Rights and Takeback Term Loan Recovery Option" means, for a Holder of a First Lien Claim that elects or is deemed to elect such option, (a) Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 15%, plus (b) such Holder's Pro Rata share of the Rights.  For the avoidance of doubt, such election shall be adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in the Rights Offering Rights and Takeback Term Loan Recovery Option does not exceed 50% of the First Lien Claims.

172.    "Rights Offering Term Sheet" means the term sheet attached as **Exhibit 3** to the Restructuring Term Sheet describing the material terms of the Rights Offering, the Direct Investment, the Backstop Commitment, and the Direct Investment Commitment.

173.    "Schedule of Retained Causes of Action" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

174.    "Second Lien Ad Hoc Group" means that certain group of Holders of Second Lien Claims represented or otherwise advised by the Second Lien Ad Hoc Group Advisors.

175.    "Second Lien Ad Hoc Group Advisors" means Davis Polk & Wardwell LLP, Guggenheim Securities, LLC, Haynes and Boone, LLP, and such other professional advisors as are retained by the Second Lien Ad Hoc Group with the prior written consent of the Required Consenting Lenders and the Debtors (not to be unreasonably withheld).

176.    "Second Lien Agent" means UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent under the Second Lien Credit Agreement.

177.    "Second Lien Consenting Lenders" means each Holder of a Second Lien Claim that has signed the Restructuring Support Agreement, each solely in their capacities as such, and each Holder of a Second Lien Claim that executes and delivers a joinder or transfer agreement to counsel to the Company Parties after the effective date of the Restructuring Support Agreement, including, for the avoidance of doubt, each of the funds or accounts managed by (i) Partners Group (USA) Inc., (ii) Siris Capital Group, LLC, (iii) AlbaCore Capital LLP, and (iv) Neuberger Berman Investment Advisers LLC and its affiliates.

178.    "Second Lien Credit Agreement" means that certain prepetition Second Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of July 10, 2022), and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto.

179.    "Second Lien Recovery" means 4.375% of the New Equity Interests issued on the Effective Date (subject to dilution only by the Management Incentive Plan Pool).

180.    "Second Lien Claims" means any Claim against any Debtor derived from, based upon, or arising under the Second Lien Credit Agreement.

001025

**App. 529**

181.    "Section 510 Claim" means any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of an Equity Security (including the Employee Partnership Sale Units) of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such an Equity Security made to the Debtors prior to the Petition Date; (c) for reimbursement or contribution allowed under section 502(e) of the Bankruptcy Code on account of such a Claim; and (d) any other claim determined to be subordinated under section 510 of the Bankruptcy Code.

182.    "Secured Claim" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

183.    "Securities Act" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, and the rules and regulations promulgated thereunder.

184.    "Security" means any security, as defined in section 2(a)(1) of the Securities Act.

185.    "SIR" means any self-insured retention under the Debtors' insurance policies.

186.    "Solicitation Materials" means, collectively, all materials used in connection the solicitation of votes on the Plan, including the Disclosure Statement, the Disclosure Statement Order, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan.

187.    "Stipulated Equity Value" means approximately $434 million.

188.    "Subsequent First Lien Ad Hoc Group Members" means each of the funds or accounts managed by (a) MJX Asset Management, LLC; (b) PGIM, Inc., and (c) Sound Point Capital Management, LP.

189.    "Takeback Term Loan Recovery Option" means, for a Holder of a First Lien Claim that elects such option, Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 20%.  For the avoidance of doubt, such election shall be adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in the Takeback Term Loan Recovery Option does not exceed 50% of the First Lien Claims.

190.    "Takeback Term Loans" means the Exit Term Loans issued to Holders of First Lien Claims.

191.    "Term DIP Agent" means Wilmington Savings Fund Society, FSB, in its capacity as the administrative agent and collateral agent under the DIP Term Loan Credit Agreement.

192.    "Term DIP Credit Agreement" means the credit agreement with respect to the Term DIP Facility, as may be amended, supplemented, or otherwise modified from to time.

193.    "Term DIP Facility" means the senior secured debtor in possession financing facility for the Term DIP Loans, in an aggregate amount of $215.0 million, entered into on the terms and conditions set forth in the Term DIP Loan Documents and the DIP Orders.

194.    "Term DIP Facility Claims" means any Claim arising from, under, or in connection with the Term DIP Credit Agreement or any other Term DIP Loan Documents, including Claims for the

18

aggregate outstanding principal amount of, plus unpaid interests on, the Term DIP Loan, and all fees, premiums, and other expenses related thereto and arising and payable under the Term DIP Facility.

195.     "Term DIP Lenders" means the "Lenders" under, and as defined in, the Term DIP Credit Agreement.

196.     "Term DIP Loan Documents" means any documents governing the Term DIP Facility that are entered into in accordance with the Term DIP Credit Agreement, Term DIP Term Sheet and the DIP Orders, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, in each case consistent with the Term DIP Term Sheet and otherwise in form and substance satisfactory to the Required Term DIP Lenders (as defined in the Term DIP Credit Agreement).

197.     "Term DIP Loan Rights" means the following rights: (i) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, (A) an Initial First Lien Ad Hoc Group Member, (B) PVKG Lender, or (C) a Subsequent First Lien Ad Hoc Group Member (in each case, at its sole option) shall be entitled to exchange some or all of the Allocated Portion of its Term DIP Facility Claims, on a dollar-for-dollar basis, for New Equity Interests pursuant to the terms of the Rights Offering, Backstop Commitment, and Direct Investment, and in accordance with the Rights Offering Documents (with the remainder of such Term DIP Facility Claims to be satisfied in Cash); and (ii) (A) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, a Subsequent First Lien Ad Hoc Group Member shall be entitled (at its sole option) to exchange the Allocated Portion of its Term DIP Facility Claims, on a dollar-for-dollar basis, for Takeback Term Loans (with the remainder of such Term DIP Facility Claims to be satisfied in Cash), and (B) any Subsequent First Lien Ad Hoc Group Member that is a Term DIP Lender or is a Lender Affiliate thereof or is related thereto, that elects the option described in the foregoing clause (A) shall utilize the Takeback Term Loan recovery portion of its First Lien Claims under this Plan as currency, on a dollar-for-dollar basis, for New Equity Interests issuable under and pursuant to the terms of the Rights Offering, Backstop Commitment, and Direct Investment and in accordance with the Rights Offering Documents (whether in their capacities as Investors under the Rights Offering or Eligible Offerees).

198.     "Term DIP Loans" means the multiple draw term loans provided under the Term DIP Facility.

199.     "Term DIP Term Sheet" means the term sheet attached as **Exhibit 2** to the Restructuring Term Sheet describing the material terms of the Term DIP Facility.

200.     "Third-Party Release" means the release set forth in **Article VIII.D** of this Plan.

201.     "Unexpired Lease" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

202.     "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is Unimpaired within the meaning of section 1124 of the Bankruptcy Code.

203.     "Unsecured Claim" means any Claim that is not a Secured Claim.

204.     "Workers' Compensation Program" means the Debtors' (a) written contracts, agreements, agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance issued to or entered into at any time by any of the Debtors.

B.     Rules of Interpretation.

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto (both as that term is defined herein and as it is defined in the Restructuring Support Agreement); (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (16) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.     Computation of Time.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If any payment, distribution, act, or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

D.     Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York

20

General Obligations Law), shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan or the Confirmation Order (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however*, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Reorganized Debtor.

E.      Reference to Monetary Figures.

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided herein.

F.      Controlling Document.

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects. In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

G.      Consent Rights.

Notwithstanding anything herein to the contrary, any and all consent, approval, and consultation rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement, the DIP Orders, the Backstop Order, or any Definitive Document, including with respect to the form and substance of the Plan, the Plan Supplement, and all other Definitive Documents (including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents), shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

Agreement with respect to the form and substance of this Plan, any Definitive Document, all exhibits to this Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in **Article I.A** hereof) and be fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement or the Backstop Agreement, as applicable, is terminated in accordance with its terms. Failure to reference in this Plan the rights referred to in the immediately preceding sentence as such rights relate to any document referenced in the Restructuring Support Agreement or the Backstop Agreement, as applicable, shall not impair such rights and obligations. In case of a conflict between the consent rights of the parties to the Restructuring Support Agreement that are set forth in the Restructuring Support Agreement or of the parties to the Backstop Agreement that are set forth in the Backstop Agreement, as applicable, with those parties' consent rights that are set forth in this Plan or the Plan Supplement, the consent rights in the Restructuring Support Agreement or the Backstop Agreement, as applicable, shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, Restructuring Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in **Article III** hereof.

001029
**App. 533**

A.      Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and Restructuring Expenses) shall be paid in full an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in full and final satisfaction, compromise, settlement, release, and discharge of such Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed on or prior to the Effective Date, the first Business Day after the date that is thirty (30) days after the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.  Subject to the terms of the Restructuring Support Agreement and the DIP Orders, nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Administrative Claim.

B.      DIP Claims.

1.      ABL DIP Facility Claims.

On the Effective Date, in full and final satisfaction of the Allowed ABL DIP Facility Claims, (a) ABL DIP Facility Claims that are being converted to Exit ABL Facility Loans or other outstandings thereunder (such as letters of credit and floorplan advances, as provided below) shall be refinanced by the Exit ABL Facility in the amount of the remaining ABL DIP Facility Claims after such pay down by means of a cashless settlement, (b) ABL DIP Facility Claims that are not being converted to Exit ABL Facility Loans shall be indefeasibly paid in full in Cash, and (c) accrued interest and fees under the ABL DIP Facility shall be paid in full in Cash immediately prior to the conversion of ABL DIP Loans to Exit ABL Facility Loans.  With respect to the amount of the ABL DIP Facility refinanced by means of a cashless settlement, (i) all principal amount of ABL DIP Loans (as defined in the ABL DIP Credit Agreement) (including Swingline Loans and floorplan advances) shall be on a one-to-one basis automatically converted to and deemed to be Exit ABL Facility Loans, (ii) the Letters of Credit (as defined in the ABL DIP Credit Agreement) issued and outstanding under the ABL DIP Credit Agreement shall automatically be converted to letters of credit deemed to be issued and outstanding under the Exit ABL Facility Documents, and (iii) all Collateral that secures the Obligations (each as defined in the ABL DIP Credit Agreement) under the ABL DIP Credit Agreement that shall also secure the Exit ABL Facility shall be reaffirmed, ratified, and shall automatically secure all Obligations under the Exit ABL Facility Documents, subject to the priorities of Liens set forth in the Exit ABL Facility Documents and the Exit Intercreditor Agreement.

For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses related to the ABL DIP Facility shall be paid in full in Cash in accordance with the terms of the DIP Orders and this Plan, as applicable.

001030

**App. 534**

2.      Term DIP Facility Claims.

On the Effective Date, in full and final satisfaction of the Allowed Term DIP Facility Claims, each Holder of a Term DIP Facility Claim shall receive its Pro Rata portion of Cash on account of any principal, interest, fees, and expenses outstanding with respect to such Holder's Term DIP Facility Claim as of the Effective Date; *provided*, *however*, that any Holder of a Term DIP Facility Claim can, in lieu of such Cash payment, exercise such Holder's Term DIP Loan Rights on the terms set forth in the Term DIP Term Sheet and pursuant to the terms of the Rights Offering Documents.

For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses related to the Term DIP Facility shall be paid in full in Cash accordance with the terms of the DIP Orders and this Plan, as applicable.

C.      Professional Fee Claims.

1.      Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, from the Professional Fee Escrow Account as soon as practicable after such Professional Fee Claims are Allowed.

2.      Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with an amount of Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  When all Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.      Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors or the Debtors' Estates before and as of the Effective Date, and shall deliver such estimate to the Debtors and the First Lien Ad Hoc Group Advisors no later than three (3) Business Days before the Effective Date; *provided, however,* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional.

4.      Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors.  Upon

23

the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      Restructuring Expenses.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date matters, after the Effective Date), shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the Restructuring Support Agreement, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.   All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided, however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.   On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before, or after the Effective Date.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      Classification of Claims and Interests.

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in **Article II** of this Plan (or as otherwise set forth herein), all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Claims, Priority Tax Claims, Professional Fee Claims, or Restructuring Expenses, as described in **Article II**.

A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

001032
**App. 536**

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 6 | Intercompany Claims | Impaired/Unimpaired | Deemed to Accept / Deemed to Reject; Not Entitled to Vote |
| 7 | Section 510 Claims | Impaired | Deemed to Reject; Not Entitled to Vote |
| 8 | Intercompany Interests | Impaired/Unimpaired | Deemed to Accept / Deemed to Reject; Not Entitled to Vote |
| 9 | Existing C1 Interests | Impaired | Deemed to Reject; Not Entitled to Vote |

B.      Formation of Debtor Groups for Convenience Only.

This Plan is a separate plan of reorganization for each Debtor.  This Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, Confirmation of this Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.  The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

C.      Treatment of Claims and Interests.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Secured Claims.

(a)      Classification: Class 1 consists of all Other Secured Claims.

(b)      Treatment:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each

Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, in the discretion of the Reorganized Debtors:

    (i)      payment in full in Cash of its Allowed Other Secured Claim;

    (ii)     the collateral securing its Allowed Other Secured Claim;

    (iii)    Reinstatement of its Allowed Other Secured Claim; or

    (iv)    such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    <u>Voting</u>:  Allowed Other Secured Claims in Class 1 are Unimpaired.  Each Holder of an Allowed Other Secured Claim is conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

2.    <u>Class 2 – Other Priority Claims</u>.

(a)    <u>Classification</u>:  Class 2 consists of all Other Priority Claims.

(b)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash of such Allowed Other Priority Claim on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date such Other Priority Claim becomes an Allowed Claim, (iii) the date on which such Allowed Other Priority Claim is due to be paid in the ordinary course of business of the Debtors or Reorganized Debtors, if applicable, and (iv) the date on which the Holder of such Allowed Other Priority Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

(c)    <u>Voting</u>:  Allowed Other Priority Claims in Class 2 are Unimpaired.  Each Holder of an Allowed Other Priority Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

3.    <u>Class 3 – First Lien Claims</u>.

(a)    <u>Classification</u>:  Class 3 consists of all First Lien Claims.

(b)    <u>Allowance</u>:  On the Effective Date, all First Lien Claims shall be deemed Allowed, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount as follows, and, with respect to the PVKG Note Claims, shall be pursuant to the PVKG Note Claims Settlement:

    (i)      First Lien Term Loan Claims:  $1,095,726,307.33

    (ii)     KL Note Claims:  $78,812,500.00

001034

**App. 538**

        (iii)       PVKG Note Claims:  $213,000,000.00

(c)     <u>Treatment</u>:  Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed First Lien Claim, each Holder of an Allowed First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive on the Effective Date its elected Pro Rata share of (which elections shall be (i) adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in each recovery option is equal to 50% of the First Lien Claims) (x) the Takeback Term Loan Recovery Option, or (y) the Rights Offering Rights and Takeback Term Loan Recovery Option.  In the event that a Holder of a First Lien Claim fails to timely elect its recovery option, it shall be deemed to have elected the Rights Offering Rights and Takeback Term Loan Recovery Option.

(d)     <u>Voting</u>:  Allowed First Lien Claims in Class 3 are Impaired.  Each Holder of an Allowed First Lien Claim shall be entitled to vote to accept or reject this Plan.

4.     <u>Class 4 – Second Lien Claims</u>.

(a)     <u>Classification</u>:  Class 4 consists of all Second Lien Claims.

(b)     <u>Allowance</u>:  On the Effective Date, all Second Lien Claims shall be deemed Allowed, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of $286,541,971.71.

(c)     <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Second Lien Claim, on the Effective Date each Holder of an Allowed Second Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive its Pro Rata share of the Second Lien Recovery.

(d)     <u>Voting</u>:  Allowed Second Lien Claims are Impaired.  Each Holder of an Allowed Second Lien Claim shall be entitled to vote to accept or reject this Plan.

5.     <u>Class 5 – General Unsecured Claims</u>.

(a)     <u>Classification</u>:  Class 5 consists of all General Unsecured Claims.

(b)     <u>Treatment</u>:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim and in exchange for each Allowed General Unsecured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, either (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in Cash on (A) the Effective or (B) the date due in the ordinary course of

001035

**App. 539**

business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(c)     <u>Voting</u>:  Allowed General Unsecured Claims in Class 5 are Unimpaired.  Each Holder of an Allowed General Unsecured Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

6.     <u>Class 6 – Intercompany Claims</u>.

(a)     <u>Classification</u>: Class 6 consists of all Intercompany Claims.

(b)     <u>Treatment</u>:  On the Effective Date, or as soon as reasonably practicable thereafter, Allowed Intercompany Claims shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), Reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, canceled, or released to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors and the Required Consenting Lenders, as applicable.

(c)     <u>Voting</u>:  Allowed Intercompany Claims in Class 6 are either (i) Unimpaired and are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Intercompany Claims are not entitled to vote to accept or reject this Plan.

7.     <u>Class 7 – Section 510 Claims</u>.

(a)     <u>Classification</u>: Class 7 consists of all Section 510 Claims.

(b)     <u>Treatment</u>:  On the Effective Date, all Section 510 Claims (including all claims on account of the Employee Partnership Sale Units) shall be canceled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims.

(c)     <u>Voting</u>:  Allowed Section 510 Claims in Class 7 are Impaired.  Each Holder of an Allowed Section 510 Claim is conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Section 510 Claims are not entitled to vote to accept or reject this Plan.

8.     <u>Class 8 – Intercompany Interests</u>.

(a)     <u>Classification</u>: Class 8 consists of all Intercompany Interests.

(b)     <u>Treatment</u>:  On the Effective Date, Intercompany Interests shall, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), be (i) Reinstated or (ii) set off, settled, addressed, distributed, contributed, merged, cancelled, or released.

001036

**App. 540**

(c)     <u>Voting</u>:  Allowed Intercompany Interests are Unimpaired if such Interests are Reinstated, or are Impaired if such Interests are cancelled.  Holders of Intercompany Interests are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject this Plan.

9.     <u>Class 9 – Existing C1 Interests</u>.

(a)     <u>Classification</u>:  Class 9 consists of all Existing C1 Interests.

(b)     <u>Treatment</u>:   On the Effective Date, Existing C1 Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing C1 Interests shall not receive any distribution on account thereof.

(c)     <u>Voting</u>:  Allowed Existing C1 Interests are Impaired under this Plan.  Each Holder of an Allowed Existing C1 Interest is conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Existing C1 Interests are not entitled to vote to accept or reject this Plan.

D.     <u>Special Provision Governing Unimpaired Claims</u>.

Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

E.     <u>Elimination of Vacant Classes</u>.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.     <u>Acceptance by Impaired Classes</u>.

An Impaired Class of Claims shall have accepted this Plan, if not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan, and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept this Plan.

G.     <u>Voting Classes, Presumed Acceptance by Non-Voting Classes</u>.

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject this Plan, the Holders of such Claims in such Class shall be deemed to have accepted this Plan.

001037
**App. 541**

H.      Intercompany Interests.

     To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Equity Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims.

I.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

     Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to **Article III.C** of this Plan. The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with **Article X** of this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

J.      No Substantive Consolidation.

     Although this Plan is presented as a joint plan of reorganization for administrative purposes, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Except as expressly provided herein, nothing in this Plan, the Confirmation Order, or the Disclosure Statement shall constitute or be deemed to constitute a representation that any one or all of the Debtors is subject to or liable for any Claims or Interests against or in any other Debtor.  A Claim or Interest against or in multiple Debtors will be treated as a separate Claim or Interest against or in each applicable Debtor's Estate for all purposes, including voting and distribution; *provided*, *however*, that no Claim will receive value in excess of one hundred percent (100.0%) of the Allowed amount of such Claim (inclusive of post-petition interest, if applicable) under the Plan for all such Debtors.

K.      Controversy Concerning Impairment.

     If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired or is properly classified under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

L.      Subordinated Claims.

     The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to this Plan.

001038

**App. 542**

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.    General Settlement of Claims and Interests.

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies (including the PVKG Note Claims Settlement) resolved pursuant to this Plan, including any challenge to the amount, validity, perfection, enforceability, priority, or extent of the First Lien Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise.  This Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to **Article VI** hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

B.    PVKG Note Claims Settlement.

The allowance and treatment of the PVKG Note Claims under this Plan, together with the other terms and conditions set forth in this Plan and the Confirmation Order (including the releases of and by the PVKG Lender set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement of the PVKG Note Claims pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code.  The PVKG Note Claims Settlement is incorporated into this Plan and includes the following material terms and conditions:

1.    The PVKG Note Claims shall be Allowed on the Effective Date against the Debtors in the amount of $213,000,000.00.

2.    The PVKG Note Claims shall receive the treatment set forth in **Article III.C.3** hereof.  For the avoidance of doubt, the PVKG Lender shall waive any Claims other than the PVKG Note Claims that it may have, including any General Unsecured Claims, if any; *provided* that the foregoing shall not limit the payment or reimbursement of the Restructuring Expenses by the Debtors or the Reorganized Debtors.

3.    PVKG Lender, as the Holder of the PVKG Note Claims, shall support Confirmation of this Plan and shall timely submit a ballot accepting the Plan, in each case in accordance with the terms and conditions of the Restructuring Support Agreement.

This Plan shall be deemed a motion to approve the good faith compromise and settlement of the PVKG Note Claims Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, within the range of reasonableness, and in the best interests of the Debtors and their Estates.

001039
**App. 543**

C.      Restructuring Transactions.

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions (which, for the avoidance of doubt, shall be in form and substance acceptable to the Required Consenting Lenders, and, subject to the consent rights set forth in the Restructuring Support Agreement, reasonably acceptable to the Required Consenting Second Lien Lenders, and otherwise consistent with the Restructuring Support Agreement) and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan that are consistent with and pursuant to the terms and conditions of this Plan, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, and the Restructuring Support Agreement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, the Confirmation Order, and the Restructuring Support Agreement and having other terms to which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable Governance Documents; (4) the execution and delivery of the Exit Facilities Documents and entry into the Exit Facilities; (5) pursuant to the Rights Offering Documents, the implementation of the Rights Offering, the distribution of the Rights to the Eligible Offerees, the issuance of the New Equity Interests in connection therewith, the execution and implementation of the Backstop Agreement in connection therewith; (6) the issuance of the Term DIP Loan Rights and the New Equity Interests in connection therewith; (7) the issuance and distribution of the New Equity Interests as set forth in this Plan; (8) the reservation of the Management Incentive Plan Pool; (9) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Description of Transaction Steps; and (10) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

D.      The Reorganized Debtors.

On the Effective Date, the New Board shall be established in accordance with the terms of the Governance Term Sheet, and each Reorganized Debtor shall adopt its Governance Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan.

E.      Sources of Consideration for Plan Distributions.

Each distribution and issuance referred to in **Article VI** of this Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with this Plan, including the New Equity Interests will be exempt from SEC registration, as described more fully in **Article IV.M** below.

001040

**App. 544**

1.   <u>Exit Facilities</u>.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facilities Documents.  Confirmation of this Plan shall be deemed final approval of the Exit Facilities and the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities.  Execution of the Exit Term Loan Credit Agreement by the Exit Term Loan Agent shall be deemed to bind all Holders of First Lien Claims and all Exit Term Loan Facility Lenders as if each such Holder or Exit Term Loan Facility Lender had executed the Exit Term Loan Credit Agreement with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

2.   <u>Rights Offering</u>.

The Debtors shall distribute the Rights to the Eligible Offerees as set forth in this Plan and the Rights Offering Documents.  Pursuant to the Rights Offering Documents, the Rights Offering shall be open to all Eligible Offerees, and Eligible Offerees shall be entitled to participate in the Rights Offering up to a maximum amount of each such Eligible Offeree's Pro Rata portion (calculated based on the aggregate principal amount of First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all First Lien Claims held by Eligible Offerees that exercised, or are deemed to have validly exercised, the Rights Offering Rights and Takeback Term Loan Recovery Option) of the Rights.  Each Eligible Offeree (other than Eligible Offerees that are also Investors, who must exercise all of their Rights) may exercise either all, a portion of, or none of its Rights in exchange for Cash (or, if such Eligible Offeree is also a DIP Lender, such Eligible Offeree's Term DIP Loan Rights).  The Rights are not separately transferrable or detachable from the First Lien Claims and may only be transferred together with the First Lien Claims.

New C1 shall be authorized to issue the New Equity Interests issuable pursuant to such exercise on the Effective Date pursuant to the terms of this Plan and the Rights Offering Documents.

The Rights Offering will be fully backstopped, severally and not jointly, by the Investors' Backstop Commitment pursuant to the Backstop Agreement.  In addition, the Investors will be allocated, and shall purchase and subscribe for, the Direct Investment pursuant to the terms of the Backstop Agreement and Backstop Order.  The Reorganized Debtors will issue the Put Option Premium to the Investors on the

001041

**App. 545**

Effective Date in accordance with the terms and conditions set forth in the Backstop Agreement, the Backstop Order, and this Plan, in respect of their respective Backstop Commitments and Direct Investment Commitments.  Pursuant to the terms of the Rights Offering, each Investor may, at its sole option, exercise its Term DIP Loan Rights in satisfaction of its commitments under the Rights Offering and Backstop Agreement.

New Equity Interests issued pursuant to the Rights Offering and the Direct Investment shall be offered (and the Put Option Premium shall be issued) at the Plan Discount.

Entry of the Backstop Order and Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering, the Direct Investment, the Backstop Commitment, the Direct Investment Commitment, the Put Option Premium, and the Backstop Agreement (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by New C1 in connection therewith).  On the Effective Date, the rights and obligations of the Debtors under the Backstop Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering may be used by the Reorganized Debtors to make distributions pursuant to this Plan and fund general corporate purposes.

When the issuance of New Equity Interests pursuant to this Plan and the Rights Offering Documents would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual issuance of shares of New Equity Interests shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Equity Interests shall be adjusted as necessary to account for the foregoing rounding.

     3.    <u>New Equity Interests</u>.

New C1 shall be authorized to issue a certain number of shares of New Equity Interests pursuant to its Governance Documents.  The issuance of the New Equity Interests shall be authorized without the need for any further corporate action.  On the Effective Date, the New Equity Interests shall be issued and distributed as provided for in the Description of Transaction Steps to the Entities entitled to receive the New Equity Interests pursuant to, and in accordance with, this Plan.

All of the shares of New Equity Interests issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in **Article VI** hereof shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Equity Interests shall be deemed as its agreement to the Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.  The New Equity Interests will not be registered under the Securities Act or listed on any exchange as of the Effective Date and are not expected to meet the eligibility requirements of the DTC.

     4.    <u>Use of Cash</u>.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the Rights Offering to fund distributions to certain Holders of Allowed Claims, consistent with the terms of this Plan.

001042
**App. 546**

F.      Corporate Existence.

Except as otherwise provided in this Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be and as contemplated by the Description of Transaction Steps, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under this Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

The Reorganized Debtors shall be authorized to dissolve the Debtors or the Reorganized Debtors in accordance with applicable law or otherwise, in each case as contemplated by the Description of Transaction Steps, including, for the avoidance of doubt, any conversion of any of the Debtors or the Reorganized Debtors pursuant to applicable law, and to the extent any such Entity is dissolved, such Entity shall be deemed dissolved pursuant to the Plan and shall require no further action or approval (other than any requisite filings required under applicable state or federal law).

G.      Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in this Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      Cancellation of Existing Agreements and Interests.

On the Effective Date, except with respect to the Exit Facilities, or to the extent otherwise provided in this Plan, including in **Article V.A** hereof, the Confirmation Order, or any other Definitive Document, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect; *provided, however*, that notwithstanding anything to the contrary contained herein, any agreement that governs the rights of the DIP Agents shall continue in effect solely for purposes of allowing the DIP Agents to (i) enforce their rights against any Person other than any of the Released Parties, pursuant and subject to the terms of the DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (ii) receive distributions under this Plan and to distribute them to the Holders of the Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (iii) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, and (iv) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agents, or Holders of the ABL DIP Facility Claims and Term DIP Facility Claims under this Plan, as applicable. Holders of or parties to such cancelled

instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to this Plan.

Notwithstanding the preceding paragraph, any credit agreement or other instrument that governs the rights, claims, and remedies of the Holder of a Claim shall continue in full force and effect for the limited purposes of allowing Holders of Allowed Claims to receive distributions under this Plan and permitting the Reorganized Debtors and any other Distribution Agent, as applicable, to make distributions on account of the applicable Claims.

On the Effective Date, each holder of a certificate or instrument evidencing a Claim or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture or agreement that governs the rights of such holder of such Claim or Interest. Such surrendered certificate or instrument shall be deemed canceled as set forth in, and subject to the exceptions set forth in, this **Article IV.H**.

I.      Corporate Action.

Upon the Effective Date, all actions contemplated under this Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtors in accordance with the Governance Term Sheet; (3) the issuance and distribution of the New Equity Interests; (4) implementation of the Restructuring Transactions, including the Rights Offering; (5) entry into the Exit ABL Facility Documents; (6) entry into the Exit Term Loan Facility Documents; (7) all other actions contemplated under this Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the Governance Documents; (9) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases that are not rejected; (10) reservation of the Management Incentive Plan Pool; and (11) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date). All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Interests, the Governance Documents, the Exit ABL Facility, the Exit Term Loan Facility, the Exit ABL Facility Documents, and the Exit Term Loan Facility Documents, any other Definitive Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this **Article IV.I** shall be effective notwithstanding any requirements under non-bankruptcy law.

J.      Governance Documents.

On or immediately prior to the Effective Date, the Governance Documents shall be adopted or amended in a manner consistent with the terms and conditions set forth in the Governance Term Sheet, as may be necessary to effectuate the transactions contemplated by this Plan. Each of the Reorganized Debtors will file its Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate

laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document. The Governance Documents shall prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the Governance Documents shall be included as exhibits to the Plan Supplement. After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

On the Effective Date, New C1 shall enter into and deliver the New Equityholders' Agreement to each Holder of New Equity Interests, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity. On the Effective Date, Holders of New Equity Interests shall be deemed to have executed the New Equityholders' Agreement and be parties thereto, without the need to deliver signature pages thereto.

K.      Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of C1 Holdings and PVKG Intermediate shall expire, and the members for the initial term of the New Board shall be appointed in accordance with the Governance Documents. The New Board shall consist of members as designated in accordance with the Governance Term Sheet. The Chief Executive Officer of New C1 shall serve on the board of directors of New C1; all other initial directors shall be appointed by the Required Consenting Lenders, with representation being proportionate to post-emergence equity ownership and subject to agreed-upon sunsets. For the avoidance of doubt, each Initial First Lien Ad Hoc Group Member and the PVKG Lender shall each be entitled to appoint one director to serve on the New Board, so long as such entity is contemplated to receive no less than 10% of the fully diluted New Equity Interests (excluding New Equity Interests reserved for the post-Effective Date Management Incentive Plan). The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the Governance Documents and other constituent documents of the Reorganized Debtors.

The Subsequent First Lien Ad Hoc Group Members and the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative as a non-voting observer to the New Board; *provided* that such entitlement shall expire if such holders, at any time, cease to hold in excess of 12.5% of the New Equity Interests in the aggregate.

In addition, the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative to receive materials that were presented to the New Board at any board meeting; *provided*, *however*, that such representative shall sign a customary non-disclosure agreement (which shall provide that such representative may share such materials with Required Consenting Initial Second Lien Ad Hoc Group Members that are subject to confidentiality restrictions and whose individual holdings exceed 1% of the New Equity Interests), and New C1 shall be entitled to not include any privileged or competitively sensitive information, and such entitlement shall expire if such holders, at any time, cease to hold in excess of 1.0% of the New Equity Interests in the aggregate.

001045

L.      Effectuating Documents; Further Transactions.

        On and after the Effective Date, the Reorganized Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of this Plan and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

M.      Certain Securities Law Matters.

        No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of Securities under the Plan.

        The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Equity Interests, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on (1) with respect to the New Equity Interests issued pursuant to the Rights Offering (other than with respect to the Backstop Commitment and the Direct Investment Commitment), section 1145 of the Bankruptcy Code, (2) with respect to the New Equity Interests issuable pursuant to the Plan as the Second Lien Recovery, section 1145 of the Bankruptcy Code, and (3) with respect to the New Equity Interests issued pursuant to the Direct Investment, the Put Option Premium, and the unsubscribed New Equity Interests issued to the Investors pursuant to the Backstop Agreement, section 4(a)(2) of the Securities Act or Regulation D or Regulation S promulgated thereunder.

        The New Equity Interests issued pursuant to section 1145 of the Bankruptcy Code (i) will not be a "restricted security" as defined in Rule 144(a)(3) under the Securities Act and (ii) will be freely transferable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the provisions of Rule 144 under the Securities Act with respect to a holder thereof that (x) is, or within 90 days of such transfer has been, an "affiliate" within the meaning of Rule 144(a)(1) or (y) has acquired the New Equity Interests from an "affiliate" in a transaction or chain of transactions not involving any public offering within one year of such transfer; and (c) any restrictions on the transferability of such New Equity Interests in the New Organizational Documents.

        The New Equity Interests, including the Direct Investment and the New Equity Interests reserved for issuance under the Management Incentive Plan Pool, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S thereunder, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

N.      Section 1146 Exemption.

        To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to: (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or

other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.     Employment Obligations.

Unless otherwise provided herein or the Confirmation Order, specifically rejected pursuant to a separate order of the Bankruptcy Court, specifically designated as a contract or lease to be rejected on the Rejected Executory Contract and Unexpired Lease List, or the subject of a separate rejection motion Filed by the Debtors, and subject to **Article V** of this Plan, all written employment, confidentiality, non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock units, and other equity awards), discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, vacation, holiday pay, severance, retirement, retention, supplemental retirement, executive retirement, pension, deferred compensation, indemnification, other similar employee-related agreements or arrangements, retirement income plans, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements that are in effect immediately prior to the Effective Date with the Debtors, (a) shall be assumed by the Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date, or (b) solely with the consent of the Required Consenting Lenders, the Reorganized Debtors shall enter into new agreements with such employees on terms and conditions acceptable to the Reorganized Debtors and such employee; *provided, however*, that the Debtors shall not enter into new agreements with insider employees absent the consent of the Required Consenting Lenders.

Notwithstanding the foregoing, and unless otherwise provided in the Plan Supplement, all plans or programs calling for stock grants, stock issuances, stock reserves, or stock options shall be deemed rejected with regard to such issuances, grants, reserves, and options. The Debtors shall not assume any agreements or obligations relating to the Employee Partnership Sale Units, which shall be cancelled as of the Effective Date and shall receive no payment on account thereof from the Debtors or the Reorganized Debtors. For the avoidance of doubt, no provision in any agreement, plan, or arrangement to be assumed pursuant to the foregoing paragraph relating to the award of equity or equity-like compensation shall be binding on, or honored by, the Reorganized Debtors. Nothing in this Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

P.      Management Incentive Plan.

On the Effective Date, the Management Incentive Plan Pool shall be reserved for management, key employees, and directors of the Reorganized Debtors.  Following the Effective Date, the New Board will adopt the Management Incentive Plan, the terms of which, including with respect to participants, form, allocation, structure, and vesting, shall be determined by the New Board.  Following the implementation of the Management Incentive Plan, the issuance of the New Equity Interests and any equity reserved for issuance under the Management Incentive Plan (to the extent applicable) shall be authorized without the need for any further corporate action and without any further action by the Debtor and the Reorganized Debtors or any of their equity holders, as applicable.

Q.      Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to the PVKG Note Claims Settlement and **Article VIII** hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the PVKG Note Claims Settlement and the releases and exculpations contained in this Plan, including in **Article VIII**.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan, including the PVKG Note Claims Settlement and Article VIII of this Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in this Plan, including the PVKG Note Claims Settlement and **Article VIII** of this Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

001048
**App. 552**

R.  Dissolution of Certain Debtors.

On or after the Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, Order, or rule, including any action by the stockholders, members, the board of directors, or similar Governing Body of the Debtors or the Reorganized Debtors; *provided* that, subject in all respects to the terms of this Plan, the Reorganized Debtors shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable and in accordance with the Description of Transaction Steps: (1) file a certificate of dissolution for such Debtors, together with all other necessary corporate and company documents, to effect such Debtors' dissolution under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any such Debtors or their Estates, as determined under applicable tax laws; and (3) represent the interests of the Debtors or their Estates before any taxing authority in all tax matters, including any action, proceeding or audit.

S.  Closing the Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

T.  Post-Effective Date Payment of Restructuring Expenses.

Following the Effective Date, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, the Restructuring Expenses related to this Plan and implementation, consummation, and/or defense of the Restructuring Transactions, whether incurred before, on, or after the Effective Date, in accordance with any applicable engagement letter, any order of the Bankruptcy Court (including, without limitation, the DIP Orders), and the Restructuring Support Agreement.

### ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.  Assumption of Executory Contracts and Unexpired Leases.

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion or notice to reject pending as of the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall

41

not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumption of the Restructuring Support Agreement pursuant to sections 365 and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date. The Restructuring Support Agreement shall be binding and enforceable against the parties to the Restructuring Support Agreement in accordance with its terms. For the avoidance of doubt, the assumption of the Restructuring Support Agreement herein shall not otherwise modify, alter, amend, or supersede any of the terms or conditions of the Restructuring Support Agreement including, without limitation, any termination events or provisions thereunder.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions of the Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease or the execution of any other Restructuring Transaction (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. For the avoidance of doubt, consummation of the Restructuring Transactions shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary in the Plan (except for the consent rights set forth in **Article I.G**), the Debtors or Reorganized Debtors, as applicable, reserve the right to amend or supplement the Rejected Executory Contract and Unexpired Lease List in their discretion (but with the consent of the Required Consenting Lenders) prior to the Confirmation Date (or such later date as may be permitted by **Article V.C** or **Article V.E** below), provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have no less than seven (7) days to object thereto on any grounds.

B.      Indemnification Obligations.

All indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for (each in their capacities as such) the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants, and other professionals of, or acting on behalf of, the Company Parties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties than the indemnification provisions in place prior to the Effective Date; *provided* that nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date. For the avoidance of doubt, following the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail

policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

C.      <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases.</u>

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in this Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection. **Any Proofs of Claim arising from the rejection of an Executory Contract or Unexpired Lease not timely Filed with the Claims and Noticing Agent shall be automatically Disallowed without further order of the Bankruptcy Court, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in <u>Article VIII.F</u> of this Plan, notwithstanding anything in a Proof of Claim to the contrary.** All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim, as applicable, pursuant to <u>Article III.C</u> of this Plan and may be objected to in accordance with the provisions of <u>Article VII</u> of this Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. Notwithstanding anything to the contrary in this Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List (with the consent of the Required Consenting Lenders) at any time through and including thirty days after the Effective Date.

D.      <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.</u>

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Claim; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or

Reorganized Debtors, for which such objection is timely Filed.  Any counterpart to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterpart to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim pursuant to this **Article V.D** shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Claim has been fully paid pursuant to this Article V.D, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

E.      Insurance Policies.

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan.  Unless otherwise provided in this Plan or listed on the Rejected Executory Contract and Unexpired Lease List, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court.  Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.  The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary.  For the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.

F.      Workers' Compensation Program.

As of the Effective Date, the Debtors and Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Program.  All Proofs of Claims on account of workers' compensation, including the Workers' Compensation Program, shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that nothing in the Plan

shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; *provided further*, *however*, that nothing herein shall be deemed to impose any obligations on the Debtors or their insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

G.      Reservation of Rights.

Nothing contained in this Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to **Article XI** of this Plan.

H.      Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      Distributions on Account of Claims Allowed as of the Effective Date.

Unless otherwise provided in the Plan, on or as soon as practicable after the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in **Article VII** hereof.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      Distribution Agent.

All distributions under this Plan shall be made by the Distribution Agent.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      Rights and Powers of the Distribution Agent.

1.      Powers of the Distribution Agent.

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

D.      Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.      Delivery of Distributions in General.

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim Filed by that Holder or the address in any written notice of address change delivered to the Debtors or the Distribution Agent; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

46

Notwithstanding the foregoing, (a) all distributions on account of DIP Claims will be made to the applicable DIP Agent, and the DIP Agent will be, and will act as, the Distribution Agent with respect to the DIP Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; (b) all distributions on account of First Lien Term Loan Claims will be made to the First Lien Term Loan Agent, and the First Lien Term Loan Agent will be, and will act as, the Distribution Agent with respect to the First Lien Term Loan Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; and (c) all distributions on account of Second Lien Claims will be made to the Second Lien Agent, and the Second Lien Agent will be, and will act as, the Distribution Agent with respect to the Second Lien Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

       3.      <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interests; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property shall be discharged and forever barred.  The Reorganized Debtors and the Distribution Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

F.      <u>Manner of Payment</u>.

At the option of the Distribution Agent, any Cash distribution to be made hereunder may be made by check, wire transfer, automated clearing house, or credit card, or as otherwise required or provided in applicable agreements.  All distributions of Cash to the Holders of the applicable Allowed Claims under this Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or Reorganized Debtor.

G.      <u>Compliance with Tax Requirements</u>.

In connection with this Plan, to the extent applicable, the Debtors, Reorganized Debtors, Distribution Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

001055
**App. 559**

H.      Allocations.

        Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      No Postpetition Interest on Claims.

        Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.      Foreign Currency Exchange Rate.

         Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.      Setoffs and Recoupment.

        Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or assigned on or before the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); *provided*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

L.      Claims Paid or Payable by Third Parties.

        1.      Claims Paid by Third Parties.

        The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the second to last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal

48

Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

        2.      <u>Claims Payable by Third Parties</u>.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

If an applicable insurance policy has a SIR or a deductible, the Holder of an Allowed Claim that is payable pursuant to such insurance policy shall have an Allowed General Unsecured Claim against the applicable Debtor's estate up to the amount of the SIR or deductible amount that may be established upon the liquidation of the Claim and such Holder's recovery from the Debtors or Reorganized Debtors shall be solely in the form of its distribution on account of such Allowed General Unsecured Claim under this Plan. Any recovery on account of the Claim in excess of the SIR or deductible established upon the liquidation of the Claim shall be recovered solely from insurance coverage (if any) and only to the extent of available insurance coverage and any proceeds thereof, if any. Nothing in this Plan shall be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy.

        3.      <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      <u>Disputed Claims Process.</u>

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan and as otherwise required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim Filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure Claim pursuant to section 365 of the

49

Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under the Plan, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired Lease in accordance with **Article V.C**.  Notwithstanding the foregoing, Entities must File cure objections as set forth in **Article V.D** of the Plan to the extent such Entity disputes the amount of the Cure Claim paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      Allowance of Claims.

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      Claims Administration Responsibilities.

Subject to any applicable restrictions in the Restructuring Support Agreement, the Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority, without further notice to or action, order, or approval of the Bankruptcy Court, to (i) File, prosecute, litigate to judgment, or withdraw any objections to Claims, (ii) settle, compromise, or resolve any such objections to Claims, and (iii) administer and adjust the Claims Register to reflect such settlements or compromises.  Except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such debtor had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including the Causes of Action retained pursuant to this Plan.

**Any objections to Claims other than General Unsecured Claims must be served and Filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims other than General Unsecured Claims not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.**

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.      Adjustment to Claims or Interests Without Objection.

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the

Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.       Distributions After Allowance.

        To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.       Discharge of Claims and Termination of Interests.

        Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.       Release of Liens.

        **Except as otherwise provided in the Exit Facilities Documents, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.C.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or**

51

**other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

C.    <u>Releases by the Debtors</u>.

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors and the Estates, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the PVKG Notes Purchase Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the Exit Facilities Documents, the Governance Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding the foregoing, nothing in this <u>Article VIII.C</u> shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising**

from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) essential to Confirmation of this Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing this Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.      Releases by Third Parties.

Except as otherwise expressly set forth in this Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the PVKG Notes Purchase Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the Exit Facilities Documents, the Governance Documents, and all other Definitive Documents,

001061

**App. 565**

in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) consensual; (2) essential to the confirmation of this Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

E.     Exculpation.

Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivate related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, this Plan, the Plan Supplement, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of this Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

001062

**App. 566**

F.      Injunction.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan in relation to any Claim or Interest that is extinguished, discharged, or released pursuant to this Plan.

Except as otherwise expressly provided in this Plan, the Definitive Documents, or the Confirmation Order, or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation pursuant to Article VIII, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties, and/or the Released Parties:

(a)     commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(b)     enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(c)     creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(d)     except as otherwise provided under this Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

(e)     commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to this Plan or the Confirmation Order.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, this Plan, the Plan Supplement, the PVKG Notes Purchase Agreement, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other

55

avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.  The injunction in this Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under this Plan, the Confirmation Order, or under any other Definitive Document or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order from bringing an action to enforce the terms of this Plan, the Confirmation Order, the Definitive Documents, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order.

G.     Waiver of Statutory Limitations on Releases.

Each Releasing Party in each of the releases contained in this Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party.  The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

H.     Protections Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

001064
**App. 568**

I.      Document Retention.

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policies, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

J.      Reimbursement or Contribution.

If the Bankruptcy Court Disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of Allowance or Disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

A.      Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of **Article IX.B** hereof:

    1.      The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Lenders or the Required Consenting Second Lien Lenders and shall be in full force and effect;

    2.      The Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order, the latter of which shall be in full force and effect;

    3.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with and subject to the consent rights set forth in the Restructuring Support Agreement, and the Confirmation Order shall be in full force and effect;

    4.      The 9019 settlements embodied in this Plan shall have been approved by the Bankruptcy Court and incorporated in the Confirmation Order;

    5.      The Backstop Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order), and shall be in full force and effect;

    6.      The Debtors shall have received a commitment for the Exit ABL Facility, which shall refinance the ABL DIP Facility on the Effective Date and the terms and conditions of which shall be reasonably satisfactory to the Debtors and the Required Consenting Lenders;

    7.      The Rights Offering and the Direct Investment (including the Rights Offering Documents) shall have been approved by the Bankruptcy Court and shall have been consummated in accordance with their terms;

    8.      The Exit ABL Facility Documents and Exit Term Loan Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related

001065
**App. 569**

thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions;

     9.     The New Equity Interests shall have been issued;

     10.     All Restructuring Expenses shall have been paid in full in Cash;

     11.     The Definitive Documents shall (a) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (b) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (c) shall be adopted on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet; and

     12.     The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions.

B.     <u>Waiver of Conditions</u>.

The conditions to the Effective Date set forth in this **<u>Article IX</u>** may be waived, in whole or in part, by the Debtors only with the prior written consent of the Required Consenting Lenders (email shall suffice) and, solely with respect to the condition set forth in **<u>Article IX.A</u>** (1) (solely with respect to the Required Consenting Second Lien Lenders), (9), (10), (11), and (12), the Required Consenting Second Lien Lenders (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

C.     <u>Substantial Consummation</u>.

Consummation of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.     <u>Effect of Failure of Conditions</u>.

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.     <u>Modification and Amendments</u>.

Except as otherwise specifically provided in this Plan and to the extent permitted by the Restructuring Support Agreement, subject to certain restrictions and requirements set forth in section 1127

001066

**App. 570**

of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors reserve the right to modify this Plan without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  After the Confirmation Date and before substantial consummation of the Plan, the Debtors may initiate proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and intent of the Plan.

After the Confirmation Date, but before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court; provided that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests.

Notwithstanding anything to the contrary herein, the Debtors shall not amend or modify this Plan in a manner inconsistent with the Restructuring Support Agreement or the Backstop Agreement.

B.      Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      Revocation or Withdrawal of Plan.

Subject to the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then:  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or relating to, the Chapter 11 Cases, the Confirmation Order, and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan;

3.      resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including Cure Claims; (ii) any dispute regarding whether a contract or lease is or was executory, expired, or terminated; (iii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iv) any other issue related to any Executory Contracts and Unexpired Leases; or (v) any dispute regarding whether the Plan or any Restructuring Transactions trigger any cross-default or change of control provision in any contract or agreement;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes arising from or relating to distributions under this Plan or the Confirmation Order;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action that may arise from or in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan or the Confirmation Order and the administration of the Estates;

11.     hear and determine disputes arising in connection with the interpretation, implementation, effect, or enforcement of this Plan or the Plan Supplement, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

12.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan or the Confirmation Order;

13.     adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in **Article VIII** hereof

60

and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

14.     adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to **Article VI** hereof;

15.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     determine any other matters that may arise in connection with or relate to this Plan, the Definitive Documents, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement, including the Restructuring Support Agreement; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court or arbitration forum;

17.     enter an order concluding or closing the Chapter 11 Cases;

18.     consider any modifications of this Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     adjudicate, decide, or resolve disputes as to the ownership of any Claim or Interest;

21.     adjudicate, decide, or resolve all matters related to any subordinated Claim;

22.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

23.     adjudicate, decide, or resolve matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

24.     grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

25.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under **Article VIII** hereof;

26.     hear and determine all disputes involving the obligations or terms of the Rights Offering, the Direct Investment, and the Backstop Agreement;

27.     enforce all orders previously entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

28.     hear any other matter not inconsistent with the Bankruptcy Code; and

29.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Person or Entity's rights arising from or obligations incurred in connection with the Plan.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this **Article XI**, the provisions of this **Article XI** shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior Order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

As of the Effective Date, notwithstanding anything in this **Article XI** to the contrary, the Exit Facilities Documents shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     Immediate Binding Effect.

Subject to **Article IX.A** hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted or rejected this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan or the Confirmation Order, each Entity acquiring property under this Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan and the Confirmation Order, regardless of whether any such Holder of a Claim or Interest has voted on this Plan.

B.     Waiver of Stay.

The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order shall be waived by the Confirmation Order.  The Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

001070
**App. 574**

C.     Additional Documents.

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan or the Confirmation Order.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan and the Confirmation Order.

D.     Payment of Statutory Fees.

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by each of the Debtors or the Reorganized Debtors (or the Distribution Agent on behalf of each of the Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

E.     Statutory Committee and Cessation of Fee and Expense Payment.

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except with respect to final fee applications of the Professionals.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

F.     Reservation of Rights.

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any Entity unless and until the Effective Date occurs.

G.     Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.     Notices.

To be effective, all notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.     if to the Debtors or the Reorganized Debtors, to:
ConvergeOne Holdings, Inc.
10900 Nesbitt Avenue South
Bloomington, MN 55437

001071

**App. 575**

Attention:  Rui Goncalves
E-mail:  rgoncalves@onec1.com

with copies (which shall not constitute notice) to:

White & Case LLP
111 South Wacker Drive
Chicago, IL 60606
Attention:  Bojan Guzina, Andrew F. O'Neill, Erin R. Rosenberg, Blair M. Warner, and
Adam T. Swingle
E-mail:  bojan.guzina@whitecase.com
         aoneill@whitecase.com
         erin.rosenberg@whitecase.com
         blair.warner@whitecase.com
         adam.swingle@whitecase.com


2.   <u>if to the PVKG Lender or a Consenting Sponsor, to</u>:
     PVKG Investment Holdings, Inc.
     Attention:  Lars Haegg and PJ Heyer
     E-mail:  lhaegg@cvc.com
              pheyer@cvc.com

     with copies to:

     Latham & Watkins LLP
     1271 6th Avenue
     New York, NY 10020
     Attention:  Keith A. Simon, Joshua Tinkelman, and David Hammerman
     E-mail: keith.simon@lw.com
             joshua.tinkelman@lw.com
             david.hammerman@lw.com


3.   <u>if to a member of the First Lien Ad Hoc Group, to</u>:
     Gibson Dunn & Crutcher LLP
     200 Park Avenue
     New York, NY 10166
     Attention:  Scott J. Greenberg, Keith R. Martorana, and Michelle Choi
     E-mail:  SGreenberg@gibsondunn.com
              KMartorana@gibsondunn.com
              MChoi@gibsondunn.com


4.   <u>if to a member of the Second Lien Ad Hoc Group, to</u>:
     Davis Polk & Wardwell LLP
     450 Lexington Avenue
     New York, NY 10017
     Attention:  Adam L. Shpeen and Abraham Bane
     E-mail address:  adam.shpeen@davispolk.com
                      abraham.bane@davispolk.com


After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to
receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive

documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.      Term of Injunctions or Stays.

        Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      Entire Agreement.

        Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, this Plan (including, for the avoidance of doubt, the Plan Supplement), the Confirmation Order, and the applicable Definitive Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan, the Confirmation Order, the Definitive Documents, the Plan Supplement, and the documents related thereto.

K.      Exhibits.

        All exhibits and documents included in this Plan, the Confirmation Order, and the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/C1 or the Bankruptcy Court's website at http://www.txs.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

L.      Deemed Acts.

        Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party by virtue of this Plan and the Confirmation Order.

M.      Nonseverability of Plan Provisions.

        If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, subject to the terms of the Restructuring Support Agreement, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it

001073

**App. 577**

may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable, *provided* that any such deletion or modification must be consistent with the Restructuring Support Agreement and the Backstop Agreement and the consent rights contained in each of them; and (3) non-severable and mutually dependent.

N.      Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, each of the Released Parties and Exculpated Parties will be deemed to have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and in a manner consistent with the Disclosure Statement, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the negotiation, execution, delivery, and performance of the Restructuring Support Agreement and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan. Without limiting the generality of the foregoing, upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code and other applicable law, and, pursuant to section 1125(e) of the Bankruptcy Code, any person will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan or the Rights Offering or the Direct Investment, and, therefore, none of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and the Rights Offering or the Direct Investment.

O.      Request for Expedited Determination of Taxes.

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

P.      Closing of Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to (1) close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case and (2) change the name of the remaining Debtor and case caption of the remaining open Chapter 11 Case as desired, in the Reorganized Debtors' sole discretion.

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Q.      Waiver or Estoppel.

Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

001074

**App. 578**

Dated:  April 3, 2024                        CONVERGEONE HOLDINGS, INC.
                                             (for itself and on behalf of each of the other
                                             Debtors and Debtors in Possession)

                                        By:  */s/ Jeffrey Russell*
                                             Name: Jeffrey Russell
                                             Title: Chief Executive Officer

001075
**App. 579**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CONVERGEONE HOLDINGS, INC., *et al.*[1] | ) Case No. 24-90194 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**SUPPLEMENTAL VERIFIED STATEMENT OF THE AD HOC GROUP OF
EXCLUDED LENDERS PURSUANT TO BANKRUPTCY RULE 2019**

In connection with the chapter 11 cases (the "Chapter 11 Cases") commenced by ConvergeOne Holdings, Inc. and its affiliated debtors (collectively, the "Debtors") on April 4, 2024 (the "Petition Date"), pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule 2019"), Proskauer Rose LLP ("Proskauer") and Gray Reed & McGraw LLP ("Gray Reed" and, together with Proskauer, "Counsel") hereby submit this supplemental verified statement (the "Verified Statement") with respect to Counsel's representation of an *ad hoc* group of lenders (the "Ad Hoc Group of Excluded Lenders") formed by certain unaffiliated holders (each, a "Member" and collectively, "Excluded Lenders") of the Debtors' first lien term loan under that certain First Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of March 14, 2019 and Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated, the "Credit Agreement"),

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

by and among ConvergeOne Holdings Inc., as borrower, PVKG Intermediate Holdings Inc., as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto, and in support hereof respectfully state as follows:

1.     In April 2024, the Excluded Lenders retained Proskauer to represent them in connection the Debtors' chapter 11 cases.  At the same time, the Excluded Lenders retained Gray Reed to serve as their Texas counsel with respect to the chapter 11 cases and all related matters.

2.     On April 16, 2024, Counsel filed the *Initial Verified Statement of the Ad Hoc Group of Excluded Lenders Pursuant to Bankruptcy Rule 2019* [Docket No. 167].

3.     In accordance with Bankruptcy Rule 2019, attached hereto as **Exhibit A** is an updated list of the names, addresses, and disclosable economic interests as of May 2, 2024 of all the Members of the Ad Hoc Group of Excluded Lenders.  The information set forth herein (including **Exhibit A**) is based upon information provided to Counsel by the Members of the Ad Hoc Group of Excluded Lenders and is intended only to comply with Bankruptcy Rule 2019.

4.     As of the date of this Verified Statement, Counsel represent only the Members of the Ad Hoc Group of Excluded Lenders.  Counsel do not represent any other entities in connection with the Debtors' chapter 11 cases. Counsel do not represent the Excluded Lenders as a "committee" (as such term is used in the Bankruptcy Code and Bankruptcy Rules) and do not undertake to represent the interests of, and are not fiduciaries for, any creditor, party in interest, or other entity that has not signed a retention agreement with Counsel. Counsel do not represent the interests of, and are not fiduciaries for, any creditor, party in interest, or other entity that has terminated its prior retention of Counsel.  In addition, the Excluded Lenders do not represent or purport to represent any other entities in connection with the Debtors' chapter 11 cases. Each of

001590
**App. 581**

the Excluded Lenders does not represent the interests of, nor act as a fiduciary for, any person or entity other than itself in connection with the Debtors' chapter 11 cases.

5.      Upon information and belief formed after due inquiry, none of Counsel hold any disclosable economic interests (as that term is defined in Bankruptcy Rule 2019(a)(1)) in relation to the Debtors.

6.      Nothing contained in this Verified Statement (including **Exhibit A**) is intended to or should be construed as (a) a limitation upon, or waiver of any right to assert, file and/or amend the claims of any Member of the Ad Hoc Group of Excluded Lenders in accordance with applicable law and any orders entered in the chapter 11 cases or (b) an admission with respect to any fact or legal theory.

7.      The Excluded Lenders, through Counsel, reserve the right to amend or supplement this Verified Statement as necessary for any reason in accordance with the requirements of Bankruptcy Rule 2019.

8.      The undersigned verify that the foregoing is true and correct to the best of their knowledge and that the information contained in **Exhibit A** has been provided by the named entities.

*[Remainder of Page Left Intentionally Blank]*

001591
**App. 582**

Respectfully submitted this 2nd day of May, 2024.

**GRAY REED**

By: */s/ Jason S. Brookner*
    Jason S. Brookner
    Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:   (713) 986-7000
Facsimile:    (713) 986-7100
Email:        jbrookner@grayreed.com

- and -

**PROSKAUER ROSE LLP**
    David M. Hillman (admitted *pro hac vice*)
    Michael T. Mervis (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone:   (212) 969-3000
Facsimile:    (212) 969-2900
Email:        dhillman@proskauer.com
                mmervis@proskauer.com

- and -

**PROSKAUER ROSE LLP**
    Peter J. Young (admitted *pro hac vice*)
    Steve Y. Ma (admitted *pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
Telephone:   (310) 284-4542
Facsimile:    (310) 557-2193
Email:        pyoung@proskauer.com
                sma@proskauer.com

**COUNSEL TO THE AD HOC GROUP
OF EXCLUDED LENDERS**

## Certificate of Service

The undersigned hereby certifies that on the 2nd day of May, 2024, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system.

    */s/ Jason S. Brookner*
    Jason S. Brookner

4

## Exhibit A

### *Excluded Lenders*

| Name[1] and Address | First Lien Term Loans | Other Disclosable Economic Interests |
|---|---|---|
| **Blue Owl Liquid Credit Advisors LLC**<br><br>1 Greenwich Plaza, Suite C, 2nd Floor<br>Greenwich, CT 06830 | $44,520,726.39 | N/A |
| **Cerberus Capital Management, L.P.**<br><br>11812 San Vicente Blvd, Suite 300<br>Los Angeles, CA 90049 | $26,747,828.00 | N/A |
| **Ellington CLO Management LLC**<br><br>711 Third Avenue<br>New York, NY 10017 | $6,027,633.23 | N/A |
| **Livello Capital Management**<br><br>104 West 40th Street 19th Fl<br>New York, NY 10018 | $5,921,287.60 | N/A |
| **Palmer Square Capital Management**<br><br>1900 Shawnee Mission Pkwy, #315<br>Mission Woods, KS 66205 | $55,551,285.79 | N/A |
| **Steele Creek Investment Management**<br><br>201 S. College St, Suite 1690<br>Charlotte, NC 28244 | $25,753,024.50 | N/A |

---

[1] Certain entities are listed in this **Exhibit A** on behalf of certain funds and/or accounts for which they serve as investment manager or adviser.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | Case No. 24-90194 (CML) |
| Debtors. | (Jointly Administered) |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF
## REORGANIZATION OF CONVERGEONE HOLDINGS, INC.
## AND ITS DEBTOR AFFILIATES (TECHNICAL MODIFICATIONS)

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

**WHITE & CASE LLP**
Bojan Guzina (admitted *pro hac vice*)
Andrew F. O'Neill (admitted *pro hac vice*)
Erin R. Rosenberg (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
Adam T. Swingle (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
Email:   bojan.guzina@whitecase.com
         aoneill@whitecase.com
         erin.rosenberg@whitecase.com
         blair.warner@whitecase.com
         adam.swingle@whitecase.com

*Counsel to the Debtors and Debtors in Possession*

Dated: May 14, 2024

---

[1]   The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
        AND GOVERNING LAW ..................................................................................... 1
    A.    Defined Terms. ........................................................................................................ 1
    B.    Rules of Interpretation. ........................................................................................ 20
    C.    Computation of Time. .......................................................................................... 20
    D.    Governing Law. .................................................................................................... 21
    E.    Reference to Monetary Figures. .......................................................................... 21
    F.    Controlling Document. ........................................................................................ 21
    G.    Consent Rights. ................................................................................................... 21

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ......................................... 22
    A.    Administrative Claims. ........................................................................................ 22
    B.    DIP Claims. .......................................................................................................... 22
    C.    Professional Fee Claims. ..................................................................................... 23
    D.    Priority Tax Claims. ............................................................................................. 24
    E.    Restructuring Expenses. ...................................................................................... 24

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................... 24
    A.    Classification of Claims and Interests. ............................................................... 24
    B.    Formation of Debtor Groups for Convenience Only. ......................................... 25
    C.    Treatment of Claims and Interests. ..................................................................... 25
    D.    Special Provision Governing Unimpaired Claims. ............................................. 29
    E.    Elimination of Vacant Classes. ........................................................................... 29
    F.    Acceptance by Impaired Classes. ....................................................................... 29
    G.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ....................... 29
    H.    Intercompany Interests. ....................................................................................... 30
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ... 30
    J.    No Substantive Consolidation. ............................................................................ 30
    K.    Controversy Concerning Impairment. ................................................................. 30
    L.    Subordinated Claims. .......................................................................................... 30

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ................................. 31
    A.    General Settlement of Claims and Interests. ....................................................... 31
    B.    PVKG Note Claims Settlement. .......................................................................... 31
    C.    Restructuring Transactions. ................................................................................. 32
    D.    The Reorganized Debtors. ................................................................................... 32
    E.    Sources of Consideration for Plan Distributions. ............................................... 32
    F.    Corporate Existence. ........................................................................................... 35
    G.    Vesting of Assets in the Reorganized Debtors. .................................................. 35
    H.    Cancellation of Existing Agreements and Interests. ........................................... 35
    I.    Corporate Action. ................................................................................................ 36
    J.    Governance Documents. ...................................................................................... 36
    K.    Directors and Officers of the Reorganized Debtors. .......................................... 37
    L.    Effectuating Documents; Further Transactions. ................................................. 38
    M.    Certain Securities Law Matters. .......................................................................... 38
    N.    Section 1146 Exemption. .................................................................................... 38
    O.    Employment Obligations. .................................................................................... 39
    P.    Management Incentive Plan. ................................................................................ 40
    Q.    Preservation of Causes of Action. ...................................................................... 40
    R.    Dissolution of Certain Debtors. .......................................................................... 41
    S.    Closing the Chapter 11 Cases. ............................................................................ 41

002317
**App. 586**

T.     Post-Effective Date Payment of Restructuring Expenses. .................................... 41

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 41
    A.     Assumption of Executory Contracts and Unexpired Leases. ............................. 41
    B.     Indemnification Obligations. .......................................................................... 42
    C.     Claims Based on Rejection of Executory Contracts or Unexpired Leases. ..................... 43
    D.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .................. 43
    E.     Insurance Policies. ......................................................................................... 44
    F.     Workers' Compensation Program .................................................................. 44
    G.     Reservation of Rights. .................................................................................... 45
    H.     Nonoccurrence of Effective Date .................................................................. 45
    I.     Contracts and Leases Entered Into After the Petition Date. ............................ 45

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .................................................. 45
    A.     Distributions on Account of Claims Allowed as of the Effective Date. ............. 45
    B.     Distribution Agent. ........................................................................................ 46
    C.     Rights and Powers of the Distribution Agent. ................................................ 46
    D.     Special Rules for Distributions to Holders of Disputed Claims. ...................... 46
    E.     Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...................... 46
    F.     Manner of Payment. ...................................................................................... 47
    G.     Compliance with Tax Requirements. .............................................................. 47
    H.     Allocations. .................................................................................................. 48
    I.     No Postpetition Interest on Claims. ............................................................... 48
    J.     Foreign Currency Exchange Rate. .................................................................. 48
    K.     Setoffs and Recoupment. ............................................................................... 48
    L.     Claims Paid or Payable by Third Parties. ...................................................... 48

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
            DISPUTED CLAIMS ...................................................................................... 49
    A.     Disputed Claims Process. .............................................................................. 49
    B.     Allowance of Claims. .................................................................................... 50
    C.     Claims Administration Responsibilities. ........................................................ 50
    D.     Adjustment to Claims or Interests Without Objection. .................................... 50
    E.     Distributions After Allowance. ...................................................................... 51

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............ 51
    A.     Discharge of Claims and Termination of Interests. ........................................ 51
    B.     Release of Liens. ........................................................................................... 51
    C.     Releases by the Debtors. ................................................................................ 52
    D.     Releases by Third Parties. .............................................................................. 53
    E.     Exculpation. ................................................................................................. 54
    F.     Injunction. .................................................................................................... 55
    G.     Waiver of Statutory Limitations on Releases. ................................................ 56
    H.     Protections Against Discriminatory Treatment. .............................................. 57
    I.     Document Retention. ..................................................................................... 57
    J.     Reimbursement or Contribution. ................................................................... 57

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN ..................... 57
    A.     Conditions Precedent to the Effective Date. ................................................... 57
    B.     Waiver of Conditions. .................................................................................... 58
    C.     Substantial Consummation. ........................................................................... 58
    D.     Effect of Failure of Conditions. ..................................................................... 59

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN ................... 59

|   |   |   |   |
|---|---|---|---|
| A. | Modification and Amendments | ................................................................ | 59 |
| B. | Effect of Confirmation on Modifications. | ........................................... | 59 |
| C. | Revocation or Withdrawal of Plan | ....................................................... | 59 |

ARTICLE XI. RETENTION OF JURISDICTION .......................................................... 60

ARTICLE XII. MISCELLANEOUS PROVISIONS ........................................................ 62

|   |   |   |   |
|---|---|---|---|
| A. | Immediate Binding Effect | ..................................................................... | 62 |
| B. | Waiver of Stay. | ..................................................................................... | 63 |
| C. | Additional Documents. | .......................................................................... | 63 |
| D. | Payment of Statutory Fees. | ................................................................... | 63 |
| E. | Statutory Committee and Cessation of Fee and Expense Payment | .......... | 63 |
| F. | Reservation of Rights. | ........................................................................... | 63 |
| G. | Successors and Assigns. | ....................................................................... | 64 |
| H. | Notices. | ................................................................................................ | 64 |
| I. | Term of Injunctions or Stays | ................................................................ | 65 |
| J. | Entire Agreement. | ................................................................................. | 65 |
| K. | Exhibits. | .............................................................................................. | 65 |
| L. | Deemed Acts. | ....................................................................................... | 66 |
| M. | Nonseverability of Plan Provisions. | ..................................................... | 66 |
| N. | Votes Solicited in Good Faith. | .............................................................. | 66 |
| O. | Request for Expedited Determination of Taxes. | .................................... | 67 |
| P. | Closing of Chapter 11 Cases. | ............................................................... | 67 |
| Q. | Waiver or Estoppel. | .............................................................................. | 67 |

002319

**App. 588**

## INTRODUCTION

ConvergeOne Holdings, Inc. and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in **Article I.A** of this Plan.  Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

### ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.      Defined Terms.

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "ABL DIP Agent" means Wells Fargo Commercial Distribution Finance, LLC.

2.      "ABL DIP Commitment Letter" means the commitment letter, as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, entered into between the Debtors, the ABL DIP Agent, and the ABL DIP Lenders, pursuant to which the ABL DIP Lenders committed to make available to the Debtors the ABL DIP Facility in accordance with the terms thereof and the ABL DIP Documents.

3.      "ABL DIP Credit Agreement" means that certain Ratification and Amendment Agreement consistent with the ABL DIP Term Sheet and the Documentation Principles (as defined therein) and otherwise in form and substance satisfactory to the ABL DIP Agent, the ABL DIP Lenders, and the Required Consenting Lenders, ratifying and amending the Prepetition ABL Facility.

4.      "ABL DIP Facility" means that certain postpetition senior secured superpriority priming debtor-in-possession asset-based revolving credit facility, in the aggregate principal amount of up to $250.0 million (subject to the Borrowing Base, as such term is defined in the ABL DIP Term Sheet), entered into on the terms and conditions set forth in the ABL DIP Documents and the DIP Orders.

5.      "ABL DIP Facility Claim" means any Claim arising from, under, or in connection with the ABL DIP Credit Agreement or any other ABL DIP Documents, including Claims for the aggregate outstanding principal amount of, plus unpaid interests on, the ABL DIP Loans, and all fees, and other expenses related thereto and arising and payable under the ABL DIP Facility.

6.      "ABL DIP Documents" means any documents governing the ABL DIP Facility that are entered into in accordance with the ABL DIP Term Sheet and the DIP Orders and any amendments,

1

modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the ABL DIP Term Sheet and the ABL DIP Credit Agreement.

7.      "ABL DIP Lenders" means the lenders party to the ABL DIP Credit Agreement from time to time.

8.      "ABL DIP Loans" means the loans contemplated under and documented by the ABL DIP Documents.

9.      "ABL DIP Term Sheet" means the term sheet attached as **Exhibit 1** to the Restructuring Term Sheet describing the terms of the ABL DIP Facility.

10.      "Administrative Claim" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; (d) Adequate Protection Claims (as defined in the DIP Orders); and (e) Restructuring Expenses.

11.      "Affiliate" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

12.      "Agents/Trustees" means, collectively, any administrative agent, collateral agent, indenture trustee, floorplan funding agent, or similar Entity under the Prepetition ABL Credit Agreement, the First Lien Term Loan Credit Agreement, the KL Note Purchase Agreement, the PVKG Note Purchase Agreement, the Second Lien Credit Agreement, the Prepetition Intercreditor Agreements, the ABL DIP Facility, the Term DIP Facility, or the Exit Facilities, including any successors thereto and, without limitation, the Prepetition ABL Agent, the First Lien Term Loan Agent, the DIP Agents, and the Exit Facilities Agents.

13.      "Allocated Portion" means Term DIP Facility Claims in an amount equal to the Rights, Direct Investment, and Backstop Commitment that are allocated to an applicable Term DIP Lender under this Plan and the Backstop Agreement as either an Investor or Eligible Offeree.

14.      "Allowed" means, with respect to any Claim or Interest, a Claim or an Interest expressly allowed under this Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors (with the consent of the Required Consenting Lenders, which shall not be unreasonably withheld, delayed, or conditioned) may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law; *provided, however* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

15.      "Backstop Agreement" means that certain Equity Backstop Commitment Agreement by and among PVKG Investment, C1 Holdings, PVKG Intermediate, and the Investors, as may be amended, supplemented, or modified from time to time in accordance with the terms thereof, setting forth the terms and conditions for, among other things, the Rights Offering, the Investors' backstop of the Rights Offering

2

Amount, the purchase of the Direct Investment, and the issuance of the Put Option Premium all at the Plan Discount, which agreement shall be set forth in the Plan Supplement.

16.     "Backstop Commitment" means the Investors' commitments to purchase up to $159,250,000 of the New Equity Interests at the Plan Discount, pursuant to the terms of the Rights Offering and in accordance with the Backstop Agreement; *provided* that the Investors may fulfill their Backstop Commitment by exercising their Term DIP Loan Rights pursuant to the terms of and in accordance with the Rights Offering Documents.

17.     "Backstop Order" means the Final Order authorizing, among other things, the Debtors' entry into and performance under the Backstop Agreement and approving any other documents related thereto and approving the payment of fees and expenses related thereto, which Final Order may be the Confirmation Order.

18.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

19.     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas.

20.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

21.     "Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

22.     "C1 Holdings" means ConvergeOne Holdings, Inc.

23.     "Cash" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

24.     "Cash Collateral" has the meaning set forth in section 363(a) of the Bankruptcy Code.

25.     "Cause of Action" means, without limitation, any Claim, Interest, claim, damage, remedy, cause of action, controversy, demand, right, right of setoff, action, cross claim, counterclaim, recoupment, claim for breach of duty imposed by Law or in equity, action, Lien, indemnity, contribution, reimbursement, guaranty, debt, suit, class action, third-party claim, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, direct or indirect, choate or inchoate, liquidated or unliquidated, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable or existing directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, under the Bankruptcy Code or applicable non-bankruptcy law, or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state law; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

26.     "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when

3

used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.     "Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

28.     "Claims and Noticing Agent" means Epiq Corporate Restructuring, LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

29.     "Claims Register" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

30.     "Class" means a class of Claims or Interests as set forth in **Article III** hereof pursuant to section 1122(a) of the Bankruptcy Code.

31.     "CM/ECF" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

32.     "Company Parties" means PVKG Intermediate, C1 Holdings, and each of their direct and indirect subsidiaries that are or become parties to the Restructuring Support Agreement, solely in their capacity as such.

33.     "Confirmation" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

34.     "Confirmation Date" means the date upon which the Bankruptcy Court confirms this Plan pursuant to section 1129 of the Bankruptcy Code.

35.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on the confirmation of this Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

36.     "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors and the Required Consenting Lenders and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders.

37.     "Consenting Sponsors" means PVKG Lender, ConvergeOne Investment, LP, and PVKG Investment US LP and each of their affiliates other than the Debtors that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, in their respective capacities as direct or indirect Holders of Existing C1 Interests.

38.     "Consenting Stakeholders" means, collectively, the First Lien Consenting Lenders and the Consenting Sponsors.

39.     "Consummation" means the occurrence of the Effective Date.

40.     "Cure Claim" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

4

41.     "<u>D&O Liability Insurance Policies</u>" means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related thereto) issued at any time to, or providing coverage to, any of the Debtors or any of the Debtors' current or former directors, members, managers, or officers for directors', managers', and officers' liability.

42.     "<u>Debtor Release</u>" means the release set forth in **Article VIII.C** of this Plan.

43.     "<u>Definitive Documents</u>" means, collectively, (a) this Plan; (b) the Disclosure Statement; (c) the Solicitation Materials; (d) the DIP Orders (and motion(s) seeking approval thereof); (e) the ABL DIP Commitment Letter; (f) the ABL DIP Documents; (g) the Term DIP Loan Documents; (h) the Exit ABL Facility Documents; (i) the Exit Term Loan Facility Documents; (j) the Backstop Agreement and any motion(s) seeking approval thereof; (k) the Rights Offering and Election Procedures; (l) the Rights Offering Documents; (m) the Governance Documents; (n) any order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials (and motion(s) seeking approval thereof); (o) the Confirmation Order; (p) the Plan Supplement; (q) all material pleadings and motions Filed by the Company Parties in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings, any "second day" pleadings, and all orders sought pursuant thereto; (r) such other agreements, instruments, and documentation that are necessary, or as may be agreed in writing (email sufficient) between the Company Parties, the Required Consenting Lenders,  and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders, to document and consummate the Restructuring Transactions; and (s) any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing, which in each case shall be in form and substance acceptable to the Debtors, the Required Consenting Lenders, and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders.

44.     "<u>Description of Transaction Steps</u>" means the description of steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement.

45.     "<u>DIP Agents</u>" means, collectively, the ABL DIP Agent and the Term DIP Agent.

46.     "<u>DIP Claims</u>" means all Claims held by the DIP Lenders or the DIP Agents on account of, arising under, or related to the ABL DIP Credit Facility and/or the Term DIP Facility, or the DIP Orders, including, without limitation, Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Orders.

47.     "<u>DIP Lenders</u>" means, collectively, the ABL DIP Lenders and the Term DIP Lenders.

48.     "<u>DIP Orders</u>" means, collectively, the Interim DIP Order and the Final DIP Order and any other Bankruptcy Court order approving entry into the ABL DIP Documents and/or the Term DIP Loan Documents.

49.     "<u>DIP Professional Fees</u>" means, as of the Effective Date, all accrued and unpaid professional fees and expenses payable under the DIP Orders to the professionals for the DIP Agents and the DIP Lenders.

50.     "<u>Direct Investment</u>" means a number of New Equity Interests, issued at the Plan Discount in exchange for an aggregate amount equal to the Direct Investment Amount, which will be available solely

for Investors and which Investors shall have the sole right and obligation to purchase in accordance with the Investor Percentages set forth in the Backstop Agreement.

51.    "Direct Investment Amount" means an amount equal to 35% of $245,000,000 (subject to increase with the consent of the Debtors and the Required Consenting Lenders).

52.    "Direct Investment Commitment" means the Investors' commitments to purchase from New C1, based on the Investor Percentages, $85,750,000 of New Equity Interests at the Plan Discount, pursuant to the terms of the Rights Offering and in accordance with the Backstop Agreement.

53.    "Disallowed" means any Claim, or any portion thereof, that has been disallowed by Final Order or pursuant to a settlement among the Debtors and the holder thereof.  "Disallow" and "Disallowance" shall have correlative meanings.

54.    "Disclosure Statement" means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order and as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

55.    "Disclosure Statement Order" means one or more orders entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Debtors, the Required Consenting Lenders (subject to the parties' rights and obligations under the Restructuring Support Agreement), and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders: (i) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (ii) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

56.    "Disputed" means, as to a Claim or an Interest, a Claim or an Interest: (a) that is not Allowed; (b) that is not Disallowed under this Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

57.    "Distribution Agent" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Lenders, to make or facilitate distributions pursuant to this Plan.

58.    "Distribution Record Date" means the record date for purposes of making distributions under this Plan on account of Allowed Claims, which date shall be the Effective Date or such other date agreed to by the Debtors and the Required Consenting Lenders.

59.    "DTC" means The Depository Trust Company.

60.    "Effective Date" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in **Article IX.A** of this Plan have been satisfied or waived in accordance with **Article IX.B** of this Plan, as determined by the Debtors, the Required Consenting Lenders, and solely with respect to the condition set forth in **Article IX.A** (1) (solely with respect to the Required Consenting Second Lien Lenders), (9), (10), (11), and (12), the Required Consenting Second Lien Lenders.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

6

61. "<u>Eligible Offerees</u>" means, collectively, each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee, in accordance with the terms of the Backstop Agreement) that elects the Rights and Takeback Term Loan Recovery Option and is either (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act of 1933, as amended, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), or (3) or (7) under the Securities Act of 1933, as amended, or an entity in which all of the equity investors are institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person). For the avoidance of doubt, each Investor shall be an Eligible Offeree.

62. "<u>Employee Partnership Sale Units</u>" means those certain partnership sale units issued to certain employees of the Debtors prior to the Petition Date in exchange for a waiver of the respective employee's then-existing equity interests in ConvergeOne Investment LP.

63. "<u>Employment Obligations</u>" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with **<u>Article IV.O</u>** of this Plan.

64. "<u>Entity</u>" means any entity, as defined in section 101(15) of the Bankruptcy Code.

65. "<u>Equity Security</u>" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

66. "<u>Estate</u>" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

67. "<u>Exculpated Parties</u>" means, collectively, and in each case in its capacity as such, the Debtors.

68. "<u>Executory Contract</u>" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69. "<u>Existing C1 Interests</u>" means the equity interests in PVKG Intermediate immediately prior to the Effective Date.

70. "<u>Exit ABL Agent</u>" means the administrative agent, collateral agent, or similar Entity under the Exit ABL Credit Agreement.

71. "<u>Exit ABL Credit Agreement</u>" means the credit agreement with respect to the Exit ABL Facility, as may be amended, supplemented, or otherwise modified from to time, the terms of which, for the avoidance of doubt, shall be on terms and conditions reasonably satisfactory to the Debtors and the Required Consenting Lenders.

72. "<u>Exit ABL Facility</u>" means the first lien asset based lending facility, to be incurred on the Effective Date by the Reorganized Debtors pursuant to the Exit ABL Credit Agreement, which shall be on terms and conditions reasonably satisfactory to the Debtors and the Required Consenting Lenders.

73. "<u>Exit ABL Facility Documents</u>" means any documents governing the Exit ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the Exit ABL Credit Agreement and the Exit Intercreditor Agreement.

002326
**App. 595**

74.   "Exit Facilities" means, collectively, the Exit ABL Facility and Exit Term Loan Facility.

75.   "Exit Facilities Agents" means, collectively, the Exit ABL Agent and the Exit Term Loan Agent.

76.   "Exit Facilities Documents" means, collectively, the Exit ABL Facility Documents and the Exit Term Loan Facility Documents.

77.   "Exit Intercreditor Agreement" means the new intercreditor agreement to be entered into on substantially the same terms as the Prepetition Intercreditor Agreements or such other terms as are acceptable to the Debtors and the Required Consenting Lenders, governing the relevant rights and priorities under the Exit Facilities Documents.

78.   "Exit Term Loans" means the term loans provided under the Exit Term Loan Facility on the terms and conditions set forth in the Exit Term Loan Credit Agreement, which shall include the Takeback Term Loans.

79.   "Exit Term Loan Agent" means the administrative agent, collateral agent, or similar Entity under the Exit Term Loan Credit Agreement.

80.   "Exit Term Loan Credit Agreement" means the credit agreement with respect to the Exit Term Loan Facility, as may be amended, supplemented, or otherwise modified from to time.

81.   "Exit Term Loan Facility" means the secured term loan facility in an aggregate principal amount not greater than $243 million pursuant to the Exit Term Loan Credit Agreement.

82.   "Exit Term Loan Facility Documents" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the Exit Term Loan Credit Agreement and the Exit Intercreditor Agreement.

83.   "Exit Term Loan Lenders" means those lenders party to the Exit Term Loan Credit Agreement.

84.   "Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date.

85.   "File" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

86.   "Final DIP Order" means one or more Final Orders entered approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents, and authorizing the Debtors' use of Cash Collateral.

87.   "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken; or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the

8

new trial, reargument, or rehearing has been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided that*, for the avoidance of any doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; *provided, further,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

88.     "First Day Pleadings" means the motions and related pleadings that the Debtors shall have filed upon the commencement of the Chapter 11 Cases.

89.     "First Lien Ad Hoc Group" means that certain ad hoc group of Holders of First Lien Claims, including the KL Lender, represented or otherwise advised by the First Lien Ad Hoc Group Advisors.

90.     "First Lien Ad Hoc Group Advisors" means Gibson, Dunn & Crutcher LLP, PJT Partners Inc., EY-Parthenon, any local counsel retained by the First Lien Ad Hoc Group, and such other professional advisors as are retained by the First Lien Ad Hoc Group with the prior written consent of the Debtors (not to be unreasonably withheld).

91.     "First Lien Claims" means collectively, the First Lien Term Loan Claims, the KL Note Claims, and the PVKG Note Claims.

92.     "First Lien Consenting Lenders" means the Initial First Lien Ad Hoc Group Members, KL Lender, PVKG Lender, each Holder of a First Lien Claim that has signed the Restructuring Support Agreement, each solely in their capacities as such, and any other Holder of a First Lien Claim that executes and delivers a joinder or transfer agreement to counsel to the Company Parties after the effective date of the Restructuring Support Agreement.

93.     "First Lien Term Loan Agent" means Deutsche Bank AG New York Branch in its capacity as administrative agent and collateral agent under the First Lien Term Loan Credit Agreement.

94.     "First Lien Term Loan Claims" means any Claim against any Debtor derived from, based upon, or arising under the First Lien Term Loan Credit Agreement and the other Loan Documents (as defined therein) (including, for the avoidance of doubt, all Obligations (as defined in the First Lien Term Loan Credit Agreement) owing under or in connection with the Loan Documents) and orders of the Bankruptcy Court (including, without limitation, the DIP Orders).

95.     "First Lien Term Loan Credit Agreement" means that certain prepetition First Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of March 14, 2019 and that certain Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto.

96.     "General Unsecured Claim" means any Unsecured Claim against the Debtors that is not an: (a) Administrative Claim; (b) Priority Tax Claim; (c) Professional Fee Claim; (d) Other Priority Claim; (e) Intercompany Claim; or (f) Section 510 Claim.  For the avoidance of doubt, General Unsecured Claims include (x) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (y) Claims resulting from litigation against one or more of the Debtors.

002328

**App. 597**

97.    "<u>Governance Documents</u>" means, as applicable, the organizational and governance documents for New C1 and/or the Reorganized Debtors, which will give effect to the Restructuring Transactions, including, without limitation, the New Equityholders' Agreement, any applicable certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or equivalent governing documents), and registration rights agreements, which shall be consistent with the Restructuring Support Agreement and the Governance Term Sheet and in form and substance acceptable to the Debtors and the Required Consenting Lenders, and solely with respect to the Minority Protections (as defined in the Governance Term Sheet) and board observer rights provided for therein, the Subsequent First Lien Ad Hoc Group Members and the Required Consenting Second Lien Lenders (in accordance with the consent rights set forth in the Restructuring Support Agreement).

98.    "<u>Governance Term Sheet</u>" means the term sheet attached as **<u>Exhibit 4</u>** to the Restructuring Term Sheet describing organizational and governance matters for New C1.

99.    "<u>Governing Body</u>" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

100.    "<u>Governmental Unit</u>" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

101.    "<u>Holder</u>" means a Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable, including any Person or Entity that is the record or beneficial owner, nominee, investment advisor, sub-advisor, or manager of discretionary accounts that hold any Claim against or Interest in any Debtor.

102.    "<u>Impaired</u>" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

103.    "<u>Initial First Lien Ad Hoc Group Members</u>" means each of the funds or accounts managed by (a) Kennedy Lewis Investment Management LLC, (b) Monarch Alternative Capital LP, and (c) Silver Point Capital.

104.    "<u>Initial Second Lien Ad Hoc Group Members</u>" means each of the funds or accounts managed by (i) Partners Group (USA) Inc. and (ii) Siris Capital Group, LLC.

105.    "<u>Intercompany Claim</u>" means any Claim against a Debtor held by another Debtor.

106.    "<u>Intercompany Interest</u>" means any Interest in a Debtor held by another Debtor.

107.    "<u>Interest</u>" means, collectively, (a) any Equity Security in any Debtor and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor that existed immediately before the Effective Date.

108.    "<u>Interim DIP Order</u>" means one or more orders entered on an interim basis approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents and authorizing the Debtors' use of Cash Collateral.

109. "Investor Percentages" means the respective percentages set forth in the Backstop Agreement governing each Investor's respective Backstop Commitment or Direct Investment Commitment.

110. "Investors" means the Holders of First Lien Claims that are party to the Backstop Agreement (or their designated Affiliate(s), managed fund(s) or account(s) or other designee(s) in accordance with the Backstop Agreement). For the avoidance of doubt, each Investor must be (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act of 1933, as amended, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), or (3) or (7) under the Securities Act of 1933, as amended, or an entity in which all of the equity investors are institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person).

111. "Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

112. "KL Lender" means Kennedy Lewis Investment Management LLC as the Holder of the KL Note Claims.

113. "KL Lender Advisor" means Akin Gump Strauss Hauer & Feld LLP.

114. "KL Lender Advisor Cap" means $250,000.

115. "KL Note Claims" means any Claim against any Debtor derived from, based upon, or arising under the KL Note Purchase Agreement.

116. "KL Note Purchase Agreement" means that certain prepetition First Lien Secured Note Purchase Agreement dated as of July 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date) by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, Deutsche Bank Trust Company Americas, as administrative agent and collateral agent, certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto, and each other holder from time to time party thereto.

117. "Lender Affiliate" means any accounts and funds managed by a Term DIP Lender, accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such Term DIP Lender, or any other affiliate of such Term DIP Lender.

118. "Lien" means a lien as defined in section 101(37) of the Bankruptcy Code.

119. "Management Incentive Plan" means the post-emergence equity incentive plan providing for the issuance from time to time, of equity and equity-based awards with respect to New Equity Interests, as approved by the New Board following the Effective Date, the timing and certain terms of which are set forth in **Article IV.P**.

120. "Management Incentive Plan Pool" means a pool of up to 10% of the fully diluted New Equity Interests that are issued and outstanding on the Effective Date that shall be reserved for issuance under the Management Incentive Plan.

121. "New Board" means the board of directors or similar Governing Body of New C1.

122. "New C1" means either PVKG Investment, as reorganized pursuant to this Plan, or, if applicable, any successor or assign thereto, by merger, consolidation, or otherwise on and after the Effective

11

Date, or a new entity, and each of its direct and indirect wholly-owned subsidiaries, which in any case shall be the ultimate parent of the other Company Parties on and after the Effective Date, and which entity shall be determined by agreement of the Debtors and the Required Consenting Lenders and shall be reasonably acceptable to the Required Consenting Second Lien Lenders.

123.    "New Equity Interests" means new shares of common stock in New C1 to be issued on the Effective Date.

124.    "New Equityholders' Agreement" means that certain equityholders' agreement that will govern certain matters related to the governance of the Reorganized Debtors and which shall be consistent with the Governance Term Sheet.

125.    "Other Priority Claim" means any Claim, other than an Administrative Claim, Priority Tax Claim, ABL DIP Facility Claim, or Term DIP Facility Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

126.    "Other Secured Claim" means any Secured Claim against the Debtors other than the ABL DIP Facility Claims, Term DIP Facility Claims, Prepetition ABL Claims, First Lien Claims, and Second Lien Claims.

127.    "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

128.    "Petition Date" means the date on which the Debtors commence the Chapter 11 Cases.

129.    "Plan" means this joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with **Article X.A** hereof and the Restructuring Support Agreement, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated by reference herein and made part of the Plan as if set forth herein.

130.    "Plan Discount" means the 35% discount to the Stipulated Equity Value at which the New Equity Interests issued through the Rights Offering and the Direct Investment will be purchased, and at which the New Equity Interests issued pursuant to the Put Option Premium shall be issued.

131.    "Plan Distribution" means a payment or distribution to Holders of Allowed Claims or other eligible Entities under and in accordance with this Plan.

132.    "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement), the initial drafts of certain of such documents to be Filed by the Debtors no later than seven (7) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) the Governance Documents; (b) the New Equityholders' Agreement; (c) the Backstop Agreement; (d) the identity and members of the New Board to the extent known at the time of filing; (e) the Schedule of Retained Causes of Action; (f) the Exit Facilities Documents; (g) the Description of Transaction Steps (which shall, for the avoidance of doubt, remain subject to modification until the Effective Date and may provide for certain actions to occur prior to the Effective Date, subject to the consent of the Required Consenting Lenders and consultation with the Required Consenting Second Lien Lenders);

002331

**App. 600**

(h) the Rejected Executory Contract and Unexpired Lease List; and (i) any other necessary documentation related to the Restructuring Transactions.

133.     "Prepetition ABL Agent" means Wells Fargo Commercial Distribution Finance, LLC, in its capacity as the administrative agent, collateral agent, floorplan funding agent and swing line lender under the Prepetition ABL Credit Agreement.

134.     "Prepetition ABL Claims" means any Claim against any Debtor derived from, based upon, or arising under the Prepetition ABL Credit Agreement.

135.     "Prepetition ABL Credit Agreement" means that certain Amended and Restated ABL Credit Agreement, dated as of January 4, 2019  (as amended by that certain Amendment No. 1, dated as of July 10, 2022, that certain Amendment No. 2, dated as of September 14, 2022, that certain Amendment No. 3, dated as of January 23, 2023, and that certain Amendment No. 4, dated as of August 29, 2023, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate as holdings, certain subsidiary borrowers party thereto, Wells Fargo Commercial Distribution Finance, LLC, as administrative agent, collateral agent, floorplan funding agent and swing line lender, and the lenders party thereto.

136.     "Prepetition ABL Facility" means the secured revolving credit loan in the aggregate principal amount of up to $250.0 million, subject to compliance with a borrowing base and various sublimits applicable to various Swingline Loans, Letters of Credit, and floorplan advances otherwise authorized under the Prepetition ABL Credit Agreement.

137.     "Prepetition Intercreditor Agreements" means (a) that certain ABL Intercreditor Agreement, dated as of January 4, 2019 (as amended by that certain Joinder and Amendment to ABL Intercreditor Agreement dated as of July 10, 2020 and supplemented by that certain ABL Intercreditor Agreement Joinder dated as of May 15, 2023); (b) that certain First Lien Pari Passu Intercreditor Agreement, dated as of January 10, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time); and (c) that certain first lien and second lien Intercreditor Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented, or otherwise modified from time to time).

138.     "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

139.     "Pro Rata" means, unless otherwise specified, with respect to any Claim, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

140.     "Professional" means any Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

141.     "Professional Fee Amount" means the aggregate amount of unpaid Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur through the Effective Date in rendering services to the Debtors as set forth in **Article II.C** of this Plan.

142.     "Professional Fee Claim" means any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through

002332
**App. 601**

and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

143.    "Professional Fee Escrow Account" means an interest-bearing account funded upon entry of the Interim DIP Order and maintained by the Debtors with Cash for the benefit of the Professionals in accordance with the DIP Orders and the terms set forth in this Plan.

144.    "Proof of Claim" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

145.    "Put Option Premium" means a fully earned nonrefundable aggregate premium equal to the sum of (i) 10% of the Rights Offering Amount and (ii) 10% of the Direct Investment Amount, collectively which shall be payable on the Effective Date to the Investors in shares of New Equity Interests, and shall be allocated pro rata among the Investors based on the Investor Percentages in accordance with the Backstop Agreement.

146.    "PVKG Intermediate" means PVKG Intermediate Holdings Inc.

147.    "PVKG Investment" means PVKG Investment Holdings, Inc.

148.    "PVKG Lender" means PVKG Investment as the Holder of the PVKG Note Claims.

149.    "PVKG Lender Advisors" means Latham & Watkins LLP and any local counsel retained by the PVKG Lender to advise the PVKG Lender in its capacity as the Holder of the PVKG Note Claims.

150.    "PVKG Note Claims" means any Claim against any Debtor derived from, based upon, or arising under the PVKG Note Purchase Agreement, which shall be Allowed in the aggregate amount of $213.0 million pursuant to the PVKG Note Claims Settlement and the terms of this Plan and the Confirmation Order.

151.    "PVKG Note Claims Settlement" means the settlement of all Claims, Causes of Action, and controversies among the Debtors, the Consenting Sponsors, the First Lien Consenting Lenders, the Second Lien Consenting Lenders, and any other Consenting Stakeholder regarding or related to the PVKG Note Purchase Agreement and/or the transactions consummated in connection therewith, as set forth in and contemplated by this Plan and effective as of the Effective Date.

152.    "PVKG Note Purchase Agreement" means that certain Amended Promissory Note and Purchase and Cashless Exchange Agreement dated as of July 6, 2023 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, and PVKG Lender, as administrative agent, collateral agent, and holder.

153.    "Reinstate" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.  "Reinstated" and "Reinstatement" shall have correlative meanings.

154.    "Rejected Executory Contract and Unexpired Lease List" means the list, as determined by the Debtors in consultation with the Required Consenting Lenders, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to this Plan, which list, as may be amended from time to time, with the consent of the Debtors and the Required Consenting Lenders, shall be included in the Plan Supplement.

155.   "Related Party" means with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' respective directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, and nominees of the foregoing.[2]

156.   "Released Party" means, collectively, the following Entities, in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Investors; (h) the Agents/Trustees; (i) all Releasing Parties; and (j) each Related Party of each Entity in clause (a) through (i); *provided*, *however*, that, in each case, an Entity shall not be a Released Party if it (i) elects to opt out of the releases contained in this Plan if permitted to opt out; or (ii) files with the Bankruptcy Court an objection to the Plan, including the releases, that is not consensually resolved before Confirmation or supports any such objection or objector.

157.   "Releasing Party" means, collectively, and in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Investors; (h) the Agents/Trustees; (i) all Holders of Claims that vote to accept the Plan; (j) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (k) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (l) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (m) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; and (n) each Related Party of each Entity in clause (a) through (m).

158.   "Reorganized Debtor" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, unless otherwise dissolved pursuant to this Plan.

---

[2]   With respect to the releases set forth in Article VIII of the Plan, the term "Related Party," solely with respect to the Related Parties of Deutsche Bank Trust Company Americas as agent under the KL Note Purchase Agreement ("**DBTCA**"), shall mean its current and former directors, managers, officers, employees, agents, attorneys, accountants, other professionals, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director, officer, or manager in his or her capacity as director or manager of DBTCA), and the respective heirs, executors, estates, and nominees of the foregoing.

15

159.    "Required Consenting Lenders" means, as of the relevant date of determination, the Initial First Lien Ad Hoc Group Members and the PVKG Lender holding, collectively, in excess of 66 2/3% of the aggregate First Lien Claims collectively held by the Initial First Lien Ad Hoc Group Members and the PVKG Lender.

160.    "Required Consenting Second Lien Lenders" means, as of the relevant date of determination, the Initial Second Lien Ad Hoc Group Members holding, collectively, in excess of 50.01% of the aggregate Second Lien Claims collectively held by the Initial Second Lien Ad Hoc Group Members.

161.    "Restructuring Expenses" means the actual, reasonable, and documented fees and expenses of the First Lien Ad Hoc Group Advisors, the KL Lender Advisor (subject to the KL Lender Advisor Cap), the PVKG Lender Advisors, and the Second Lien Ad Hoc Group Advisors, regardless of whether such fees and expenses are or were incurred before, on, or after the date on which the conditions set forth in Section 2 of the Restructuring Support Agreement were satisfied or waived by the appropriate Party or Parties in accordance with the terms of the Restructuring Support Agreement, subject to the terms of any applicable fee reimbursement letter between any such Parties and any of the Company Parties, as the case may be; *provided*, *however*, that the invoices for such fees and expenses shall be in summary format (with such redactions as may be necessary to maintain attorney client privilege), and the First Lien Ad Hoc Group Advisors, PVKG Lender Advisors, and the Second Lien Ad Hoc Group Advisors shall not be required to provide the Company Parties with attorney time entries or apply to the Bankruptcy Court for payment.

162.    "Restructuring Support Agreement" means that certain Restructuring Support Agreement, entered into as of April 3, 2024, by and among the Debtors and the other parties thereto, including all exhibits thereto (including the Restructuring Term Sheet), as may be amended, modified, or supplemented from time to time, in accordance with its terms, attached to the First Day Declaration as **Exhibit B**.

163.    "Restructuring Term Sheet" means the term sheet attached to the Restructuring Support Agreement as **Exhibit B** thereto.

164.    "Restructuring Transactions" means the transactions described in **Article IV.C** of this Plan.

165.    "Rights" means the rights offered to Eligible Offerees to participate in the Rights Offering, in an amount not to exceed such Eligible Offeree's Pro Rata portion (calculated based on the aggregate principal amount of First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all First Lien Claims held by Eligible Offerees that exercised, or are deemed to have validly exercised the Rights Offering Rights and Takeback Term Loan Recovery Option) of the Rights Offering Amount.

166.    "Rights Offering" means the equity rights offering to be consummated by New C1 on the Effective Date in accordance with the Rights Offering Documents, pursuant to which New C1 shall issue the Rights for an aggregate purchase price equal to the Rights Offering Amount at the Plan Discount.

167.    "Rights Offering Amount" means an amount equal to 65% of $245,000,000 (subject to increase with the consent of the Debtors and the Required Consenting Lenders).

168.    "Rights Offering Documents" means, collectively, the Rights Offering Term Sheet, the Backstop Agreement, the Backstop Order (which may be the Confirmation Order), the Rights Offering and Election Procedures, and any other agreements or documents memorializing the Rights Offering, as may be amended, restated, supplemented, or otherwise modified from time to time according to their respective terms.

16

169.    "Rights Offering Participants" means, collectively, the Eligible Offerees that exercise, or are deemed to have validly exercised, their respective Rights for New Equity Interests in connection with the Rights Offering.

170.    "Rights Offering and Election Procedures" means the procedures regarding the Class 3 recovery option election and governing the Rights Offering attached as an exhibit to the Disclosure Statement.

171.    "Rights Offering Rights and Takeback Term Loan Recovery Option" means, for a Holder of a First Lien Claim that elects or is deemed to elect such option, (a) Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 15%, plus (b) such Holder's Pro Rata share of the Rights.  For the avoidance of doubt, such election shall be adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in the Rights Offering Rights and Takeback Term Loan Recovery Option does not exceed 50% of the First Lien Claims.

172.    "Rights Offering Term Sheet" means the term sheet attached as **Exhibit 3** to the Restructuring Term Sheet describing the material terms of the Rights Offering, the Direct Investment, the Backstop Commitment, and the Direct Investment Commitment.

173.    "Schedule of Retained Causes of Action" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

174.    "Second Lien Ad Hoc Group" means that certain group of Holders of Second Lien Claims represented or otherwise advised by the Second Lien Ad Hoc Group Advisors.

175.    "Second Lien Ad Hoc Group Advisors" means Davis Polk & Wardwell LLP, Guggenheim Securities, LLC, Haynes and Boone, LLP, and such other professional advisors as are retained by the Second Lien Ad Hoc Group with the prior written consent of the Required Consenting Lenders and the Debtors (not to be unreasonably withheld).

176.    "Second Lien Agent" means UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent under the Second Lien Credit Agreement.

177.    "Second Lien Consenting Lenders" means each Holder of a Second Lien Claim that has signed the Restructuring Support Agreement, each solely in their capacities as such, and each Holder of a Second Lien Claim that executes and delivers a joinder or transfer agreement to counsel to the Company Parties after the effective date of the Restructuring Support Agreement, including, for the avoidance of doubt, each of the funds or accounts managed by (i) Partners Group (USA) Inc., (ii) Siris Capital Group, LLC, (iii) AlbaCore Capital LLP, and (iv) Neuberger Berman Investment Advisers LLC and its affiliates.

178.    "Second Lien Credit Agreement" means that certain prepetition Second Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of July 10, 2022), and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto.

179.    "Second Lien Recovery" means 4.375% of the New Equity Interests issued on the Effective Date (subject to dilution only by the Management Incentive Plan Pool).

002336

180. "Second Lien Claims" means any Claim against any Debtor derived from, based upon, or arising under the Second Lien Credit Agreement.

181. "Section 510 Claim" means any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of an Equity Security (including the Employee Partnership Sale Units) of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such an Equity Security made to the Debtors prior to the Petition Date; (c) for reimbursement or contribution allowed under section 502(e) of the Bankruptcy Code on account of such a Claim; and (d) any other claim determined to be subordinated under section 510 of the Bankruptcy Code.

182. "Secured Claim" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

183. "Securities Act" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, and the rules and regulations promulgated thereunder.

184. "Security" means any security, as defined in section 2(a)(1) of the Securities Act.

185. "SIR" means any self-insured retention under the Debtors' insurance policies.

186. "Solicitation Materials" means, collectively, all materials used in connection the solicitation of votes on the Plan, including the Disclosure Statement, the Disclosure Statement Order, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan.

187. "Stipulated Equity Value" means approximately $434 million.

188. "Subsequent First Lien Ad Hoc Group Members" means each of the funds or accounts managed by (a) MJX Asset Management, LLC; (b) PGIM, Inc., and (c) Sound Point Capital Management, LP.

189. "Takeback Term Loan Recovery Option" means, for a Holder of a First Lien Claim that elects such option, Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 20%. For the avoidance of doubt, such election shall be adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in the Takeback Term Loan Recovery Option does not exceed 50% of the First Lien Claims.

190. "Takeback Term Loans" means the Exit Term Loans issued to Holders of First Lien Claims.

191. "Term DIP Agent" means Wilmington Savings Fund Society, FSB, in its capacity as the administrative agent and collateral agent under the DIP Term Loan Credit Agreement.

192. "Term DIP Credit Agreement" means the credit agreement with respect to the Term DIP Facility, as may be amended, supplemented, or otherwise modified from to time.

193. "Term DIP Facility" means the senior secured debtor in possession financing facility for the Term DIP Loans, in an aggregate amount of $215.0 million, entered into on the terms and conditions set forth in the Term DIP Loan Documents and the DIP Orders.

18

194.    "Term DIP Facility Claims" means any Claim arising from, under, or in connection with the Term DIP Credit Agreement or any other Term DIP Loan Documents, including Claims for the aggregate outstanding principal amount of, plus unpaid interests on, the Term DIP Loan, and all fees, premiums, and other expenses related thereto and arising and payable under the Term DIP Facility.

195.    "Term DIP Lenders" means the "Lenders" under, and as defined in, the Term DIP Credit Agreement.

196.    "Term DIP Loan Documents" means any documents governing the Term DIP Facility that are entered into in accordance with the Term DIP Credit Agreement, Term DIP Term Sheet and the DIP Orders, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, in each case consistent with the Term DIP Term Sheet and otherwise in form and substance satisfactory to the Required Term DIP Lenders (as defined in the Term DIP Credit Agreement).

197.    "Term DIP Loan Rights" means the following rights: (i) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, (A) an Initial First Lien Ad Hoc Group Member, (B) PVKG Lender, or (C) a Subsequent First Lien Ad Hoc Group Member (in each case, at its sole option) shall be entitled to exchange some or all of the Allocated Portion of its Term DIP Facility Claims, on a dollar-for-dollar basis, for New Equity Interests pursuant to the terms of the Rights Offering, Backstop Commitment, and Direct Investment, and in accordance with the Rights Offering Documents (with the remainder of such Term DIP Facility Claims to be satisfied in Cash); and (ii) (A) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, a Subsequent First Lien Ad Hoc Group Member shall be entitled (at its sole option) to exchange the Allocated Portion of its Term DIP Facility Claims, on a dollar-for-dollar basis, for Takeback Term Loans (with the remainder of such Term DIP Facility Claims to be satisfied in Cash), and (B) any Subsequent First Lien Ad Hoc Group Member that is a Term DIP Lender or is a Lender Affiliate thereof or is related thereto, that elects the option described in the foregoing clause (A) shall utilize the Takeback Term Loan recovery portion of its First Lien Claims under this Plan as currency, on a dollar-for-dollar basis, for New Equity Interests issuable under and pursuant to the terms of the Rights Offering, Backstop Commitment, and Direct Investment and in accordance with the Rights Offering Documents (whether in their capacities as Investors under the Rights Offering or Eligible Offerees).

198.    "Term DIP Loans" means the multiple draw term loans provided under the Term DIP Facility.

199.    "Term DIP Term Sheet" means the term sheet attached as **Exhibit 2** to the Restructuring Term Sheet describing the material terms of the Term DIP Facility.

200.    "Third-Party Release" means the release set forth in **Article VIII.D** of this Plan.

201.    "Unexpired Lease" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

202.    "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is Unimpaired within the meaning of section 1124 of the Bankruptcy Code.

203.    "Unsecured Claim" means any Claim that is not a Secured Claim.

204.    "Workers' Compensation Program" means the Debtors' (a) written contracts, agreements, agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers'

compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance issued to or entered into at any time by any of the Debtors.

B.    Rules of Interpretation.

        For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or amendments thereto (both as that term is defined herein and as it is defined in the Restructuring Support Agreement); (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (16) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.    Computation of Time.

        Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If any payment, distribution, act, or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

002339

**App. 608**

D.      Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan or the Confirmation Order (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Reorganized Debtor.

E.      Reference to Monetary Figures.

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided herein.

F.      Controlling Document.

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.   In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).   In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

G.      Consent Rights.

Notwithstanding anything herein to the contrary, any and all consent, approval, and consultation rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement, the DIP Orders, the Backstop Order, or any Definitive Document, including with respect to the form and substance of the Plan, the Plan Supplement, and all other Definitive Documents (including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents), shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

Agreement with respect to the form and substance of this Plan, any Definitive Document, all exhibits to this Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in **Article I.A** hereof) and be fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement or the Backstop Agreement, as applicable, is terminated in accordance with its terms.   Failure to reference in this Plan the rights referred to in the immediately preceding sentence as such rights relate to any document referenced in the Restructuring Support Agreement or the Backstop Agreement, as applicable, shall not impair such rights and obligations.   In case of a conflict between the consent rights of the parties to the Restructuring Support Agreement that are set forth in the Restructuring Support Agreement or of the parties to the Backstop Agreement that are set forth in the Backstop Agreement, as applicable, with those parties' consent rights that are set forth in this Plan or the Plan Supplement, the consent rights in the Restructuring Support Agreement or the Backstop Agreement, as applicable, shall control.

002340

**App. 609**

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, Restructuring Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in **Article III** hereof.

A.     Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and Restructuring Expenses) shall be paid in full an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in full and final satisfaction, compromise, settlement, release, and discharge of such Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed on or prior to the Effective Date, the first Business Day after the date that is thirty (30) days after the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.  Subject to the terms of the Restructuring Support Agreement and the DIP Orders, nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Administrative Claim.

B.     DIP Claims.

1.     ABL DIP Facility Claims.

On the Effective Date, in full and final satisfaction of the Allowed ABL DIP Facility Claims, (a) ABL DIP Facility Claims that are being converted to Exit ABL Facility Loans or other outstandings thereunder (such as letters of credit and floorplan advances, as provided below) shall be refinanced by the Exit ABL Facility in the amount of the remaining ABL DIP Facility Claims after such pay down by means of a cashless settlement, (b) ABL DIP Facility Claims that are not being converted to Exit ABL Facility Loans shall be indefeasibly paid in full in Cash, and (c) accrued interest and fees under the ABL DIP Facility shall be paid in full in Cash immediately prior to the conversion of ABL DIP Loans to Exit ABL Facility Loans.  With respect to the amount of the ABL DIP Facility refinanced by means of a cashless settlement, (i) all principal amount of ABL DIP Loans (as defined in the ABL DIP Credit Agreement) (including Swingline Loans and floorplan advances) shall be on a one-to-one basis automatically converted to and deemed to be Exit ABL Facility Loans, (ii) the Letters of Credit (as defined in the ABL DIP Credit Agreement) issued and outstanding under the ABL DIP Credit Agreement shall automatically be converted to letters of credit deemed to be issued and outstanding under the Exit ABL Facility Documents, and (iii) all Collateral that secures the Obligations (each as defined in the ABL DIP Credit Agreement) under the ABL DIP Credit Agreement that shall also secure the Exit ABL Facility shall be reaffirmed, ratified, and shall automatically secure all Obligations under the Exit ABL Facility Documents, subject to the priorities of Liens set forth in the Exit ABL Facility Documents and the Exit Intercreditor Agreement.

002341

**App. 610**

For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses related to the ABL DIP Facility shall be paid in full in Cash in accordance with the terms of the DIP Orders and this Plan, as applicable.

2.      Term DIP Facility Claims.

On the Effective Date, in full and final satisfaction of the Allowed Term DIP Facility Claims, each Holder of a Term DIP Facility Claim shall receive its Pro Rata portion of Cash on account of any principal, interest, fees, and expenses outstanding with respect to such Holder's Term DIP Facility Claim as of the Effective Date; *provided*, *however*, that any Holder of a Term DIP Facility Claim can, in lieu of such Cash payment, exercise such Holder's Term DIP Loan Rights on the terms set forth in the Term DIP Term Sheet and pursuant to the terms of the Rights Offering Documents.

For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses related to the Term DIP Facility shall be paid in full in Cash accordance with the terms of the DIP Orders and this Plan, as applicable.

C.      Professional Fee Claims.

1.      Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, from the Professional Fee Escrow Account as soon as practicable after such Professional Fee Claims are Allowed.

2.      Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with an amount of Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  When all Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.      Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors or the Debtors' Estates before and as of the Effective Date, and shall deliver such estimate to the Debtors and the First Lien Ad Hoc Group Advisors no later than three (3) Business Days before the Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional.

002342
**App. 611**

4.      Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      Restructuring Expenses.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date matters, after the Effective Date), shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the Restructuring Support Agreement, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided, however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.   On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before, or after the Effective Date.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      Classification of Claims and Interests.

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in **Article II** of this Plan (or as otherwise set forth herein), all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Claims, Priority Tax Claims, Professional Fee Claims, or Restructuring Expenses, as described in **Article II**.

A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such

24

other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 6 | Intercompany Claims | Impaired/Unimpaired | Deemed to Accept / Deemed to Reject; Not Entitled to Vote |
| 7 | Section 510 Claims | Impaired | Deemed to Reject; Not Entitled to Vote |
| 8 | Intercompany Interests | Impaired/Unimpaired | Deemed to Accept / Deemed to Reject; Not Entitled to Vote |
| 9 | Existing C1 Interests | Impaired | Deemed to Reject; Not Entitled to Vote |

B.    <u>Formation of Debtor Groups for Convenience Only</u>.

This Plan is a separate plan of reorganization for each Debtor. This Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, Confirmation of this Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under this Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

C.    <u>Treatment of Claims and Interests</u>.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.    <u>Class 1 – Other Secured Claims</u>.

(a)    <u>Classification</u>: Class 1 consists of all Other Secured Claims.

(b)    <u>Treatment</u>: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction,

002344
**App. 613**

settlement, release, and discharge of (including any Liens related thereto) each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, in the discretion of the Reorganized Debtors:

(i)     payment in full in Cash of its Allowed Other Secured Claim;

(ii)    the collateral securing its Allowed Other Secured Claim;

(iii)   Reinstatement of its Allowed Other Secured Claim; or

(iv)    such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     <u>Voting</u>:  Allowed Other Secured Claims in Class 1 are Unimpaired.  Each Holder of an Allowed Other Secured Claim is conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

2.     <u>Class 2 – Other Priority Claims</u>.

(a)     <u>Classification</u>:  Class 2 consists of all Other Priority Claims.

(b)     <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash of such Allowed Other Priority Claim on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date such Other Priority Claim becomes an Allowed Claim, (iii) the date on which such Allowed Other Priority Claim is due to be paid in the ordinary course of business of the Debtors or Reorganized Debtors, if applicable, and (iv) the date on which the Holder of such Allowed Other Priority Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

(c)     <u>Voting</u>:  Allowed Other Priority Claims in Class 2 are Unimpaired.  Each Holder of an Allowed Other Priority Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

3.     <u>Class 3 – First Lien Claims</u>.

(a)     <u>Classification</u>:  Class 3 consists of all First Lien Claims.

(b)     <u>Allowance</u>:  On the Effective Date, all First Lien Claims shall be deemed Allowed, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount as follows, and, with respect to the PVKG Note Claims, shall be pursuant to the PVKG Note Claims Settlement:

(i)     First Lien Term Loan Claims:  $1,095,726,307.33

(ii)    KL Note Claims:  $78,812,500.00

26

  (iii) PVKG Note Claims:  $213,000,000.00

 (c) <u>Treatment</u>:  Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed First Lien Claim, each Holder of an Allowed First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive on the Effective Date its elected Pro Rata share of (which elections shall be (i) adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in each recovery option is equal to 50% of the First Lien Claims) (x) the Takeback Term Loan Recovery Option, or (y) the Rights Offering Rights and Takeback Term Loan Recovery Option.  In the event that a Holder of a First Lien Claim fails to timely elect its recovery option, it shall be deemed to have elected the Rights Offering Rights and Takeback Term Loan Recovery Option.

 (d) <u>Voting</u>:  Allowed First Lien Claims in Class 3 are Impaired.  Each Holder of an Allowed First Lien Claim shall be entitled to vote to accept or reject this Plan.

4. <u>Class 4 – Second Lien Claims</u>.

 (a) <u>Classification</u>:  Class 4 consists of all Second Lien Claims.

 (b) <u>Allowance</u>:  On the Effective Date, all Second Lien Claims shall be deemed Allowed, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of $286,541,971.71.

 (c) <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Second Lien Claim, on the Effective Date each Holder of an Allowed Second Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive its Pro Rata share of the Second Lien Recovery.

 (d) <u>Voting</u>:  Allowed Second Lien Claims are Impaired.  Each Holder of an Allowed Second Lien Claim shall be entitled to vote to accept or reject this Plan.

5. <u>Class 5 – General Unsecured Claims</u>.

 (a) <u>Classification</u>:  Class 5 consists of all General Unsecured Claims.

 (b) <u>Treatment</u>:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim and in exchange for each Allowed General Unsecured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, either (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in Cash on (A) the Effective or (B) the date due in the ordinary course of

27

business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(c)    <u>Voting</u>:  Allowed General Unsecured Claims in Class 5 are Unimpaired.  Each Holder of an Allowed General Unsecured Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

6.    <u>Class 6 – Intercompany Claims</u>.

(a)    <u>Classification</u>: Class 6 consists of all Intercompany Claims.

(b)    <u>Treatment</u>:  On the Effective Date, or as soon as reasonably practicable thereafter, Allowed Intercompany Claims shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), Reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, canceled, or released to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors and the Required Consenting Lenders, as applicable.

(c)    <u>Voting</u>:  Allowed Intercompany Claims in Class 6 are either (i) Unimpaired and are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Intercompany Claims are not entitled to vote to accept or reject this Plan.

7.    <u>Class 7 – Section 510 Claims</u>.

(a)    <u>Classification</u>: Class 7 consists of all Section 510 Claims.

(b)    <u>Treatment</u>:  On the Effective Date, all Section 510 Claims (including all claims on account of the Employee Partnership Sale Units) shall be canceled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims.

(c)    <u>Voting</u>:  Allowed Section 510 Claims in Class 7 are Impaired.  Each Holder of an Allowed Section 510 Claim is conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Section 510 Claims are not entitled to vote to accept or reject this Plan.

8.    <u>Class 8 – Intercompany Interests</u>.

(a)    <u>Classification</u>: Class 8 consists of all Intercompany Interests.

(b)    <u>Treatment</u>:  On the Effective Date, Intercompany Interests shall, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), be (i) Reinstated or (ii) set off, settled, addressed, distributed, contributed, merged, cancelled, or released.

002347

**App. 616**

(c)      <u>Voting</u>:  Allowed Intercompany Interests are Unimpaired if such Interests are Reinstated, or are Impaired if such Interests are cancelled.  Holders of Intercompany Interests are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject this Plan.

9.      <u>Class 9 – Existing C1 Interests</u>.

(a)      <u>Classification</u>:  Class 9 consists of all Existing C1 Interests.

(b)      <u>Treatment</u>:   On the Effective Date, Existing C1 Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing C1 Interests shall not receive any distribution on account thereof.

(c)      <u>Voting</u>:  Allowed Existing C1 Interests are Impaired under this Plan.  Each Holder of an Allowed Existing C1 Interest is conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Existing C1 Interests are not entitled to vote to accept or reject this Plan.

D.      <u>Special Provision Governing Unimpaired Claims</u>.

Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

E.      <u>Elimination of Vacant Classes</u>.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      <u>Acceptance by Impaired Classes</u>.

An Impaired Class of Claims shall have accepted this Plan, if not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan, and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept this Plan.

G.      <u>Voting Classes, Presumed Acceptance by Non-Voting Classes</u>.

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject this Plan, the Holders of such Claims in such Class shall be deemed to have accepted this Plan.

002348
**App. 617**

H.     Intercompany Interests.

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Equity Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims.

I.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to **Article III.C** of this Plan. The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with **Article X** of this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

J.     No Substantive Consolidation.

Although this Plan is presented as a joint plan of reorganization for administrative purposes, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Except as expressly provided herein, nothing in this Plan, the Confirmation Order, or the Disclosure Statement shall constitute or be deemed to constitute a representation that any one or all of the Debtors is subject to or liable for any Claims or Interests against or in any other Debtor.  A Claim or Interest against or in multiple Debtors will be treated as a separate Claim or Interest against or in each applicable Debtor's Estate for all purposes, including voting and distribution; *provided*, *however*, that no Claim will receive value in excess of one hundred percent (100.0%) of the Allowed amount of such Claim (inclusive of post-petition interest, if applicable) under the Plan for all such Debtors.

K.     Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired or is properly classified under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

L.     Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to this Plan.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.   <u>General Settlement of Claims and Interests</u>.

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies (including the PVKG Note Claims Settlement) resolved pursuant to this Plan, including any challenge to the amount, validity, perfection, enforceability, priority, or extent of the First Lien Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise.  This Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to **Article VI** hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

B.   <u>PVKG Note Claims Settlement</u>.

The allowance and treatment of the PVKG Note Claims under this Plan, together with the other terms and conditions set forth in this Plan and the Confirmation Order (including the releases of and by the PVKG Lender set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement of the PVKG Note Claims pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code.  The PVKG Note Claims Settlement is incorporated into this Plan and includes the following material terms and conditions:

1.   The PVKG Note Claims shall be Allowed on the Effective Date against the Debtors in the amount of $213,000,000.00.

2.   The PVKG Note Claims shall receive the treatment set forth in **Article III.C.3** hereof.  For the avoidance of doubt, the PVKG Lender shall waive any Claims other than the PVKG Note Claims that it may have, including any General Unsecured Claims, if any; *provided* that the foregoing shall not limit the payment or reimbursement of the Restructuring Expenses by the Debtors or the Reorganized Debtors.

3.   PVKG Lender, as the Holder of the PVKG Note Claims, shall support Confirmation of this Plan and shall timely submit a ballot accepting the Plan, in each case in accordance with the terms and conditions of the Restructuring Support Agreement.

This Plan shall be deemed a motion to approve the good faith compromise and settlement of the PVKG Note Claims Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, within the range of reasonableness, and in the best interests of the Debtors and their Estates.

002350
**App. 619**

C.      Restructuring Transactions.

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions (which, for the avoidance of doubt, shall be in form and substance acceptable to the Required Consenting Lenders, and, subject to the consent rights set forth in the Restructuring Support Agreement, reasonably acceptable to the Required Consenting Second Lien Lenders, and otherwise consistent with the Restructuring Support Agreement) and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan that are consistent with and pursuant to the terms and conditions of this Plan, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, and the Restructuring Support Agreement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, the Confirmation Order, and the Restructuring Support Agreement and having other terms to which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable Governance Documents; (4) the execution and delivery of the Exit Facilities Documents and entry into the Exit Facilities; (5) pursuant to the Rights Offering Documents, the implementation of the Rights Offering, the distribution of the Rights to the Eligible Offerees, the issuance of the New Equity Interests in connection therewith, the execution and implementation of the Backstop Agreement in connection therewith; (6) the issuance of the Term DIP Loan Rights and the New Equity Interests in connection therewith; (7) the issuance and distribution of the New Equity Interests as set forth in this Plan; (8) the reservation of the Management Incentive Plan Pool; (9) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Description of Transaction Steps; and (10) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

D.      The Reorganized Debtors.

On the Effective Date, the New Board shall be established in accordance with the terms of the Governance Term Sheet, and each Reorganized Debtor shall adopt its Governance Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan.

E.      Sources of Consideration for Plan Distributions.

Each distribution and issuance referred to in **Article VI** of this Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain Securities in connection with this Plan, including the New Equity Interests will be exempt from SEC registration, as described more fully in **Article IV.M** below.

002351

**App. 620**

1.     Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facilities Documents.  Confirmation of this Plan shall be deemed final approval of the Exit Facilities and the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities.  Execution of the Exit Term Loan Credit Agreement by the Exit Term Loan Agent shall be deemed to bind all Holders of First Lien Claims and all Exit Term Loan Facility Lenders as if each such Holder or Exit Term Loan Facility Lender had executed the Exit Term Loan Credit Agreement with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

2.     Rights Offering.

The Debtors shall distribute the Rights to the Eligible Offerees as set forth in this Plan and the Rights Offering Documents.  Pursuant to the Rights Offering Documents, the Rights Offering shall be open to all Eligible Offerees, and Eligible Offerees shall be entitled to participate in the Rights Offering up to a maximum amount of each such Eligible Offeree's Pro Rata portion (calculated based on the aggregate principal amount of First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all First Lien Claims held by Eligible Offerees that exercised, or are deemed to have validly exercised, the Rights Offering Rights and Takeback Term Loan Recovery Option) of the Rights.  Each Eligible Offeree (other than Eligible Offerees that are also Investors, who must exercise all of their Rights) may exercise either all, a portion of, or none of its Rights in exchange for Cash (or, if such Eligible Offeree is also a DIP Lender, such Eligible Offeree's Term DIP Loan Rights).  The Rights are not separately transferrable or detachable from the First Lien Claims and may only be transferred together with the First Lien Claims.

New C1 shall be authorized to issue the New Equity Interests issuable pursuant to such exercise on the Effective Date pursuant to the terms of this Plan and the Rights Offering Documents.

The Rights Offering will be fully backstopped, severally and not jointly, by the Investors' Backstop Commitment pursuant to the Backstop Agreement.  In addition, the Investors will be allocated, and shall purchase and subscribe for, the Direct Investment pursuant to the terms of the Backstop Agreement and Backstop Order.  The Reorganized Debtors will issue the Put Option Premium to the Investors on the

002352
**App. 621**

Effective Date in accordance with the terms and conditions set forth in the Backstop Agreement, the Backstop Order, and this Plan, in respect of their respective Backstop Commitments and Direct Investment Commitments.  Pursuant to the terms of the Rights Offering, each Investor may, at its sole option, exercise its Term DIP Loan Rights in satisfaction of its commitments under the Rights Offering and Backstop Agreement.

New Equity Interests issued pursuant to the Rights Offering and the Direct Investment shall be offered (and the Put Option Premium shall be issued) at the Plan Discount.

Entry of the Backstop Order and Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering, the Direct Investment, the Backstop Commitment, the Direct Investment Commitment, the Put Option Premium, and the Backstop Agreement (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by New C1 in connection therewith).  On the Effective Date, the rights and obligations of the Debtors under the Backstop Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering may be used by the Reorganized Debtors to make distributions pursuant to this Plan and fund general corporate purposes.

When the issuance of New Equity Interests pursuant to this Plan and the Rights Offering Documents would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual issuance of shares of New Equity Interests shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Equity Interests shall be adjusted as necessary to account for the foregoing rounding.

       3.     <u>New Equity Interests</u>.

New C1 shall be authorized to issue a certain number of shares of New Equity Interests pursuant to its Governance Documents.  The issuance of the New Equity Interests shall be authorized without the need for any further corporate action.  On the Effective Date, the New Equity Interests shall be issued and distributed as provided for in the Description of Transaction Steps to the Entities entitled to receive the New Equity Interests pursuant to, and in accordance with, this Plan.

All of the shares of New Equity Interests issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in **Article VI** hereof shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Equity Interests shall be deemed as its agreement to the Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.  The New Equity Interests will not be registered under the Securities Act or listed on any exchange as of the Effective Date and are not expected to meet the eligibility requirements of the DTC.

       4.     <u>Use of Cash</u>.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the Rights Offering to fund distributions to certain Holders of Allowed Claims, consistent with the terms of this Plan.

F.     Corporate Existence.

Except as otherwise provided in this Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be and as contemplated by the Description of Transaction Steps, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under this Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

The Reorganized Debtors shall be authorized to dissolve the Debtors or the Reorganized Debtors in accordance with applicable law or otherwise, in each case as contemplated by the Description of Transaction Steps, including, for the avoidance of doubt, any conversion of any of the Debtors or the Reorganized Debtors pursuant to applicable law, and to the extent any such Entity is dissolved, such Entity shall be deemed dissolved pursuant to the Plan and shall require no further action or approval (other than any requisite filings required under applicable state or federal law).

G.     Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, except as otherwise provided in this Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.     Cancellation of Existing Agreements and Interests.

On the Effective Date, except with respect to the Exit Facilities, or to the extent otherwise provided in this Plan, including in **Article V.A** hereof, the Confirmation Order, or any other Definitive Document, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect; *provided, however*, that notwithstanding anything to the contrary contained herein, any agreement that governs the rights of the DIP Agents shall continue in effect solely for purposes of allowing the DIP Agents to (i) enforce their rights against any Person other than any of the Released Parties, pursuant and subject to the terms of the DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (ii) receive distributions under this Plan and to distribute them to the Holders of the Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (iii) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, and (iv) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agents, or Holders of the ABL DIP Facility Claims and Term DIP Facility Claims under this Plan, as applicable.  Holders of or parties to such cancelled

002354

**App. 623**

instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to this Plan.

Notwithstanding the preceding paragraph, any credit agreement or other instrument that governs the rights, claims, and remedies of the Holder of a Claim shall continue in full force and effect for the limited purposes of allowing Holders of Allowed Claims to receive distributions under this Plan and permitting the Reorganized Debtors and any other Distribution Agent, as applicable, to make distributions on account of the applicable Claims.

On the Effective Date, each holder of a certificate or instrument evidencing a Claim or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture or agreement that governs the rights of such holder of such Claim or Interest. Such surrendered certificate or instrument shall be deemed canceled as set forth in, and subject to the exceptions set forth in, this **Article IV.H**.

I.     Corporate Action.

Upon the Effective Date, all actions contemplated under this Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtors in accordance with the Governance Term Sheet; (3) the issuance and distribution of the New Equity Interests; (4) implementation of the Restructuring Transactions, including the Rights Offering; (5) entry into the Exit ABL Facility Documents; (6) entry into the Exit Term Loan Facility Documents; (7) all other actions contemplated under this Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the Governance Documents; (9) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases that are not rejected; (10) reservation of the Management Incentive Plan Pool; and (11) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date). All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Interests, the Governance Documents, the Exit ABL Facility, the Exit Term Loan Facility, the Exit ABL Facility Documents, and the Exit Term Loan Facility Documents, any other Definitive Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this **Article IV.I** shall be effective notwithstanding any requirements under non-bankruptcy law.

J.     Governance Documents.

On or immediately prior to the Effective Date, the Governance Documents shall be adopted or amended in a manner consistent with the terms and conditions set forth in the Governance Term Sheet, as may be necessary to effectuate the transactions contemplated by this Plan. Each of the Reorganized Debtors will file its Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate

002355

**App. 624**

laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document. The Governance Documents shall prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the Governance Documents shall be included as exhibits to the Plan Supplement. After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

On the Effective Date, New C1 shall enter into and deliver the New Equityholders' Agreement to each Holder of New Equity Interests, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity. On the Effective Date, Holders of New Equity Interests shall be deemed to have executed the New Equityholders' Agreement and be parties thereto, without the need to deliver signature pages thereto.

K.     Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of C1 Holdings and PVKG Intermediate shall expire, and the members for the initial term of the New Board shall be appointed in accordance with the Governance Documents. The New Board shall consist of members as designated in accordance with the Governance Term Sheet. The Chief Executive Officer of New C1 shall serve on the board of directors of New C1; all other initial directors shall be appointed by the Required Consenting Lenders, with representation being proportionate to post-emergence equity ownership and subject to agreed-upon sunsets. For the avoidance of doubt, each Initial First Lien Ad Hoc Group Member and the PVKG Lender shall each be entitled to appoint one director to serve on the New Board, so long as such entity is contemplated to receive no less than 10% of the fully diluted New Equity Interests (excluding New Equity Interests reserved for the post-Effective Date Management Incentive Plan). The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the Governance Documents and other constituent documents of the Reorganized Debtors.

The Subsequent First Lien Ad Hoc Group Members and the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative as a non-voting observer to the New Board; *provided* that such entitlement shall expire if such holders, at any time, cease to hold in excess of 12.5% of the New Equity Interests in the aggregate.

In addition, the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative to receive materials that were presented to the New Board at any board meeting; *provided*, *however*, that such representative shall sign a customary non-disclosure agreement (which shall provide that such representative may share such materials with Required Consenting Initial Second Lien Ad Hoc Group Members that are subject to confidentiality restrictions and whose individual holdings exceed 1% of the New Equity Interests), and New C1 shall be entitled to not include any privileged or competitively sensitive information, and such entitlement shall expire if such holders, at any time, cease to hold in excess of 1.0% of the New Equity Interests in the aggregate.

002356
**App. 625**

L.    Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of this Plan and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

M.    Certain Securities Law Matters.

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of Securities under the Plan.

The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Equity Interests, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on (1) with respect to the New Equity Interests issued pursuant to the Rights Offering (other than with respect to the Backstop Commitment and the Direct Investment Commitment), section 1145 of the Bankruptcy Code, (2) with respect to the New Equity Interests issuable pursuant to the Plan as the Second Lien Recovery, section 1145 of the Bankruptcy Code, and (3) with respect to the New Equity Interests issued pursuant to the Direct Investment, the Put Option Premium, and the unsubscribed New Equity Interests issued to the Investors pursuant to the Backstop Agreement, section 4(a)(2) of the Securities Act or Regulation D or Regulation S promulgated thereunder.

The New Equity Interests issued pursuant to section 1145 of the Bankruptcy Code (i) will not be a "restricted security" as defined in Rule 144(a)(3) under the Securities Act and (ii) will be freely transferable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the provisions of Rule 144 under the Securities Act with respect to a holder thereof that (x) is, or within 90 days of such transfer has been, an "affiliate" within the meaning of Rule 144(a)(1) or (y) has acquired the New Equity Interests from an "affiliate" in a transaction or chain of transactions not involving any public offering within one year of such transfer; and (c) any restrictions on the transferability of such New Equity Interests in the New Organizational Documents.

The New Equity Interests, including the Direct Investment and the New Equity Interests reserved for issuance under the Management Incentive Plan Pool, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S thereunder, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

N.    Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to: (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or

002357

**App. 626**

other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.    <u>Employment Obligations</u>.

Unless otherwise provided herein or the Confirmation Order, specifically rejected pursuant to a separate order of the Bankruptcy Court, specifically designated as a contract or lease to be rejected on the Rejected Executory Contract and Unexpired Lease List, or the subject of a separate rejection motion Filed by the Debtors, and subject to **Article V** of this Plan, all written employment, confidentiality, non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock units, and other equity awards), discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, vacation, holiday pay, severance, retirement, retention, supplemental retirement, executive retirement, pension, deferred compensation, indemnification, other similar employee-related agreements or arrangements, retirement income plans, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements that are in effect immediately prior to the Effective Date with the Debtors, (a) shall be assumed by the Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date, or (b) solely with the consent of the Required Consenting Lenders, the Reorganized Debtors shall enter into new agreements with such employees on terms and conditions acceptable to the Reorganized Debtors and such employee; *provided, however*, that the Debtors shall not enter into new agreements with insider employees absent the consent of the Required Consenting Lenders.

Notwithstanding the foregoing, and unless otherwise provided in the Plan Supplement, all plans or programs calling for stock grants, stock issuances, stock reserves, or stock options shall be deemed rejected with regard to such issuances, grants, reserves, and options.  The Debtors shall not assume any agreements or obligations relating to the Employee Partnership Sale Units, which shall be cancelled as of the Effective Date and shall receive no payment on account thereof from the Debtors or the Reorganized Debtors.  For the avoidance of doubt, no provision in any agreement, plan, or arrangement to be assumed pursuant to the foregoing paragraph relating to the award of equity or equity-like compensation shall be binding on, or honored by, the Reorganized Debtors.  Nothing in this Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

002358

**App. 627**

P.      Management Incentive Plan.

On the Effective Date, the Management Incentive Plan Pool shall be reserved for management, key employees, and directors of the Reorganized Debtors.  Following the Effective Date, the New Board will adopt the Management Incentive Plan, the terms of which, including with respect to participants, form, allocation, structure, and vesting, shall be determined by the New Board.  Following the implementation of the Management Incentive Plan, the issuance of the New Equity Interests and any equity reserved for issuance under the Management Incentive Plan (to the extent applicable) shall be authorized without the need for any further corporate action and without any further action by the Debtor and the Reorganized Debtors or any of their equity holders, as applicable.

Q.      Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to the PVKG Note Claims Settlement and **Article VIII** hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the PVKG Note Claims Settlement and the releases and exculpations contained in this Plan, including in **Article VIII**.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan, including the PVKG Note Claims Settlement and _Article VIII_ of this Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in this Plan, including the PVKG Note Claims Settlement and **Article VIII** of this Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

R.      Dissolution of Certain Debtors.

        On or after the Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, Order, or rule, including any action by the stockholders, members, the board of directors, or similar Governing Body of the Debtors or the Reorganized Debtors; *provided* that, subject in all respects to the terms of this Plan, the Reorganized Debtors shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable and in accordance with the Description of Transaction Steps: (1) file a certificate of dissolution for such Debtors, together with all other necessary corporate and company documents, to effect such Debtors' dissolution under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any such Debtors or their Estates, as determined under applicable tax laws; and (3) represent the interests of the Debtors or their Estates before any taxing authority in all tax matters, including any action, proceeding or audit.

S.      Closing the Chapter 11 Cases.

        Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

T.      Post-Effective Date Payment of Restructuring Expenses.

        Following the Effective Date, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, the Restructuring Expenses related to this Plan and implementation, consummation, and/or defense of the Restructuring Transactions, whether incurred before, on, or after the Effective Date, in accordance with any applicable engagement letter, any order of the Bankruptcy Court (including, without limitation, the DIP Orders), and the Restructuring Support Agreement.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      Assumption of Executory Contracts and Unexpired Leases.

        Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion or notice to reject pending as of the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.

        Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall

002360
**App. 629**

not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumption of the Restructuring Support Agreement pursuant to sections 365 and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.  The Restructuring Support Agreement shall be binding and enforceable against the parties to the Restructuring Support Agreement in accordance with its terms.  For the avoidance of doubt, the assumption of the Restructuring Support Agreement herein shall not otherwise modify, alter, amend, or supersede any of the terms or conditions of the Restructuring Support Agreement including, without limitation, any termination events or provisions thereunder.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions of the Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease or the execution of any other Restructuring Transaction (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  For the avoidance of doubt, consummation of the Restructuring Transactions shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary in the Plan (except for the consent rights set forth in **Article I.G**), the Debtors or Reorganized Debtors, as applicable, reserve the right to amend or supplement the Rejected Executory Contract and Unexpired Lease List in their discretion (but with the consent of the Required Consenting Lenders) prior to the Confirmation Date (or such later date as may be permitted by **Article V.C** or **Article V.E** below), provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have no less than seven (7) days to object thereto on any grounds.

B.    <u>Indemnification Obligations</u>.

All indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for (each in their capacities as such) the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants, and other professionals of, or acting on behalf of, the Company Parties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties than the indemnification provisions in place prior to the Effective Date; *provided* that nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date. For the avoidance of doubt, following the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail

42

policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in this Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection.  **Any Proofs of Claim arising from the rejection of an Executory Contract or Unexpired Lease not timely Filed with the Claims and Noticing Agent shall be automatically Disallowed without further order of the Bankruptcy Court, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in <u>Article VIII.F</u> of this Plan, notwithstanding anything in a Proof of Claim to the contrary.**  All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim, as applicable, pursuant to <u>**Article III.C**</u> of this Plan and may be objected to in accordance with the provisions of <u>**Article VII**</u> of this Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  Notwithstanding anything to the contrary in this Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List (with the consent of the Required Consenting Lenders) at any time through and including thirty days after the Effective Date.

D.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Claim; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim.  The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or

002362
**App. 631**

Reorganized Debtors, for which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim pursuant to this **Article V.D** shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Claim has been fully paid pursuant to this Article V.D, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

E.      Insurance Policies.

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan.  Unless otherwise provided in this Plan or listed on the Rejected Executory Contract and Unexpired Lease List, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court.  Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.  The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary.  For the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.

F.      Workers' Compensation Program.

As of the Effective Date, the Debtors and Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Program.  All Proofs of Claims on account of workers' compensation, including the Workers' Compensation Program, shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that nothing in the Plan

shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; *provided further*, *however*, that nothing herein shall be deemed to impose any obligations on the Debtors or their insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

G.      Reservation of Rights.

Nothing contained in this Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to **Article XI** of this Plan.

H.      Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      Distributions on Account of Claims Allowed as of the Effective Date.

Unless otherwise provided in the Plan, on or as soon as practicable after the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in **Article VII** hereof.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      Distribution Agent.

All distributions under this Plan shall be made by the Distribution Agent.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      Rights and Powers of the Distribution Agent.

1.      Powers of the Distribution Agent.

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

D.      Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.      Delivery of Distributions in General.

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim Filed by that Holder or the address in any written notice of address change delivered to the Debtors or the Distribution Agent; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

Notwithstanding the foregoing, (a) all distributions on account of DIP Claims will be made to the applicable DIP Agent, and the DIP Agent will be, and will act as, the Distribution Agent with respect to the DIP Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; (b) all distributions on account of First Lien Term Loan Claims will be made to the First Lien Term Loan Agent, and the First Lien Term Loan Agent will be, and will act as, the Distribution Agent with respect to the First Lien Term Loan Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; and (c) all distributions on account of Second Lien Claims will be made to the Second Lien Agent, and the Second Lien Agent will be, and will act as, the Distribution Agent with respect to the Second Lien Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

3.      Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interests; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property shall be discharged and forever barred.  The Reorganized Debtors and the Distribution Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

F.      Manner of Payment.

At the option of the Distribution Agent, any Cash distribution to be made hereunder may be made by check, wire transfer, automated clearing house, or credit card, or as otherwise required or provided in applicable agreements.  All distributions of Cash to the Holders of the applicable Allowed Claims under this Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or Reorganized Debtor.

G.      Compliance with Tax Requirements.

In connection with this Plan, to the extent applicable, the Debtors, Reorganized Debtors, Distribution Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

002366
**App. 635**

H.      <u>Allocations</u>.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      <u>No Postpetition Interest on Claims</u>.

Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.      <u>Foreign Currency Exchange Rate</u>.

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.      <u>Setoffs and Recoupment</u>.

Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or assigned on or before the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); *provided*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

L.      <u>Claims Paid or Payable by Third Parties</u>.

      1.      <u>Claims Paid by Third Parties</u>.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the second to last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal

002367

**App. 636**

Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

        2.        <u>Claims Payable by Third Parties</u>.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

If an applicable insurance policy has a SIR or a deductible, the Holder of an Allowed Claim that is payable pursuant to such insurance policy shall have an Allowed General Unsecured Claim against the applicable Debtor's estate up to the amount of the SIR or deductible amount that may be established upon the liquidation of the Claim and such Holder's recovery from the Debtors or Reorganized Debtors shall be solely in the form of its distribution on account of such Allowed General Unsecured Claim under this Plan.  Any recovery on account of the Claim in excess of the SIR or deductible established upon the liquidation of the Claim shall be recovered solely from insurance coverage (if any) and only to the extent of available insurance coverage and any proceeds thereof, if any.  Nothing in this Plan shall be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy.

        3.        <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      <u>Disputed Claims Process</u>.

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan and as otherwise required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.  All Proofs of Claim Filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure Claim pursuant to section 365 of the

49

Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under the Plan, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired Lease in accordance with **Article V.C**. Notwithstanding the foregoing, Entities must File cure objections as set forth in **Article V.D** of the Plan to the extent such Entity disputes the amount of the Cure Claim paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.     Allowance of Claims.

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.     Claims Administration Responsibilities.

Subject to any applicable restrictions in the Restructuring Support Agreement, the Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority, without further notice to or action, order, or approval of the Bankruptcy Court, to (i) File, prosecute, litigate to judgment, or withdraw any objections to Claims, (ii) settle, compromise, or resolve any such objections to Claims, and (iii) administer and adjust the Claims Register to reflect such settlements or compromises. Except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such debtor had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including the Causes of Action retained pursuant to this Plan.

**Any objections to Claims other than General Unsecured Claims must be served and Filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims other than General Unsecured Claims not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.**

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.     Adjustment to Claims or Interests Without Objection.

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the

Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.     <u>Distributions After Allowance.</u>

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.     <u>Discharge of Claims and Termination of Interests.</u>

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.     <u>Release of Liens.</u>

**Except as otherwise provided in the Exit Facilities Documents, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with <u>Article III.C.1</u> hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or**

002370
**App. 639**

other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The foregoing direction to release liens shall be considered a direction in accordance with, as applicable, the First Lien Term Loan Credit Agreement and the Second Lien Credit Agreement, as if such direction included the signatures of the necessary lenders thereunder to direct the applicable agent to take the actions contemplated thereby. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

C.      Releases by the Debtors.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors and the Estates, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the PVKG Notes Purchase Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the Exit Facilities Documents, the Governance Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding the foregoing, nothing in this Article VIII.C shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have

52

against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) essential to Confirmation of this Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing this Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.     Releases by Third Parties.

Except as otherwise expressly set forth in this Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the PVKG Notes Purchase Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance

53

Documents, the Backstop Agreement, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the Exit Facilities Documents, the Governance Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of this Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

E.    Exculpation.

Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivate related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, this Plan, the Plan Supplement, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of this Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing

54

the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

F.    <u>Injunction</u>.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan in relation to any Claim or Interest that is extinguished, discharged, or released pursuant to this Plan.

Except as otherwise expressly provided in this Plan, the Definitive Documents, or the Confirmation Order, or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation pursuant to <u>Article VIII</u>, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties, and/or the Released Parties:

(a)    commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(b)    enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(c)    creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(d)    except as otherwise provided under this Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

(e)    commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to this Plan or the Confirmation Order.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, this Plan, the Plan Supplement, the PVKG Notes Purchase

002374

**App. 643**

Agreement, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.  The injunction in this Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under this Plan, the Confirmation Order, or under any other Definitive Document or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order from bringing an action to enforce the terms of this Plan, the Confirmation Order, the Definitive Documents, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order.

Nothing in the Plan, the Confirmation Order, or other related Plan documents (the "<u>Plan Documents</u>") shall (i) discharge or release the Debtors, the Reorganized Debtors, any Released Party, any non-debtor, or any other person from any right, claim, liability, or cause of action of or to the United States of America, inclusive of its agencies and sub-agencies (the "<u>United States</u>"), (ii) impair the ability of the United States from pursuing any claim, liability, right, defense, or cause of action against the Debtors, Reorganized Debtors, any Released Party, any non-debtor, or any other person, (iii) cause the United States to be a Releasing Party under the Plan Documents, (iv) be construed as a compromise or settlement of any claim, interest, or cause of action of the United States, (v) affect or impair the exercise of the United States' police and regulatory powers, (vi) constitute an approval or consent by the United States without compliance with all applicable legal requirements and approvals under non-bankruptcy law, or (vii) exculpate any party or person from any liability to the United States whatsoever.  Notwithstanding anything to the contrary in the foregoing and for the avoidance of doubt, the United States shall remain subject to the terms of Article VII of the Plan.

G.      <u>Waiver of Statutory Limitations on Releases</u>.

Each Releasing Party in each of the releases contained in this Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not

002375

**App. 644**

**extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party. The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.**

H.      Protections Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      Document Retention.

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policies, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

J.      Reimbursement or Contribution.

If the Bankruptcy Court Disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of Allowance or Disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

A.      Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of **Article IX.B** hereof:

1.      The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Lenders or the Required Consenting Second Lien Lenders and shall be in full force and effect;

2.      The Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order, the latter of which shall be in full force and effect;

3.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with and subject to the consent rights set forth in the Restructuring Support Agreement, and the Confirmation Order shall be in full force and effect;

002376
**App. 645**

4.      The 9019 settlements embodied in this Plan shall have been approved by the Bankruptcy Court and incorporated in the Confirmation Order;

5.      The Backstop Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order), and shall be in full force and effect;

6.      The Debtors shall have received a commitment for the Exit ABL Facility, which shall refinance the ABL DIP Facility on the Effective Date and the terms and conditions of which shall be reasonably satisfactory to the Debtors and the Required Consenting Lenders;

7.      The Rights Offering and the Direct Investment (including the Rights Offering Documents) shall have been approved by the Bankruptcy Court and shall have been consummated in accordance with their terms;

8.      The Exit ABL Facility Documents and Exit Term Loan Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions;

9.      The New Equity Interests shall have been issued;

10.     All Restructuring Expenses shall have been paid in full in Cash;

11.     The Definitive Documents shall (a) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (b) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (c) shall be adopted on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet; and

12.     The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions.

B.     <u>Waiver of Conditions</u>.

The conditions to the Effective Date set forth in this **Article IX** may be waived, in whole or in part, by the Debtors only with the prior written consent of the Required Consenting Lenders (email shall suffice), and, solely with respect to the condition set forth in **Article IX.A** (1) (solely with respect to the Required Consenting Second Lien Lenders), (9), (10), (11), and (12), the Required Consenting Second Lien Lenders (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

C.     <u>Substantial Consummation</u>.

Consummation of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

002377
**App. 646**

D.      Effect of Failure of Conditions.

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.      Modification and Amendments.

Except as otherwise specifically provided in this Plan and to the extent permitted by the Restructuring Support Agreement, subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors reserve the right to modify this Plan without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  After the Confirmation Date and before substantial consummation of the Plan, the Debtors may initiate proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and intent of the Plan.

After the Confirmation Date, but before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court; provided that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests.

Notwithstanding anything to the contrary herein, the Debtors shall not amend or modify this Plan in a manner inconsistent with the Restructuring Support Agreement or the Backstop Agreement.

B.      Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      Revocation or Withdrawal of Plan.

Subject to the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then:  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims or Interests;

(b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or relating to, the Chapter 11 Cases, the Confirmation Order, and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan;

3.      resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including Cure Claims; (ii) any dispute regarding whether a contract or lease is or was executory, expired, or terminated; (iii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iv) any other issue related to any Executory Contracts and Unexpired Leases; or (v) any dispute regarding whether the Plan or any Restructuring Transactions trigger any cross-default or change of control provision in any contract or agreement;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes arising from or relating to distributions under this Plan or the Confirmation Order;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action that may arise from or in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan or the Confirmation Order and the administration of the Estates;

11.     hear and determine disputes arising in connection with the interpretation, implementation, effect, or enforcement of this Plan or the Plan Supplement, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

12.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan or the Confirmation Order;

13.     adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in **Article VIII** hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

14.     adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to **Article VI** hereof;

15.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     determine any other matters that may arise in connection with or relate to this Plan, the Definitive Documents, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement, including the Restructuring Support Agreement; _provided_ that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court or arbitration forum;

17.     enter an order concluding or closing the Chapter 11 Cases;

18.     consider any modifications of this Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     adjudicate, decide, or resolve disputes as to the ownership of any Claim or Interest;

21.     adjudicate, decide, or resolve all matters related to any subordinated Claim;

22.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

23.     adjudicate, decide, or resolve matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

24.     grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

25.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under **Article VIII** hereof;

26.     hear and determine all disputes involving the obligations or terms of the Rights Offering, the Direct Investment, and the Backstop Agreement;

27.     enforce all orders previously entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

28.     hear any other matter not inconsistent with the Bankruptcy Code; and

29.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Person or Entity's rights arising from or obligations incurred in connection with the Plan.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this **Article XI**, the provisions of this **Article XI** shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior Order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

As of the Effective Date, notwithstanding anything in this **Article XI** to the contrary, the Exit Facilities Documents shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     Immediate Binding Effect.

Subject to **Article IX.A** hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted or rejected this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in

002381
**App. 650**

this Plan or the Confirmation Order, each Entity acquiring property under this Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan and the Confirmation Order, regardless of whether any such Holder of a Claim or Interest has voted on this Plan.

B.       Waiver of Stay.

The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order shall be waived by the Confirmation Order. The Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

C.       Additional Documents.

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan or the Confirmation Order. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan and the Confirmation Order.

D.       Payment of Statutory Fees.

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by each of the Debtors or the Reorganized Debtors (or the Distribution Agent on behalf of each of the Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Reorganized Debtors (or the Distribution Agent on behalf of each of the Reorganized Debtors) shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made during the applicable period, attested to by the Reorganized Debtors. The obligation to file quarterly reports shall continue until the earliest of the Debtors' cases being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code

E.       Statutory Committee and Cessation of Fee and Expense Payment.

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except with respect to final fee applications of the Professionals. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

F.       Reservation of Rights.

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of this Plan, any statement or provision contained

002382
**App. 651**

in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any Entity unless and until the Effective Date occurs.

G.      Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.      Notices.

To be effective, all notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.      if to the Debtors or the Reorganized Debtors, to:
ConvergeOne Holdings, Inc.
10900 Nesbitt Avenue South
Bloomington, MN 55437
Attention:  Rui Goncalves
E-mail:  rgoncalves@onec1.com

with copies (which shall not constitute notice) to:

White & Case LLP
111 South Wacker Drive
Chicago, IL 60606
Attention:  Bojan Guzina, Andrew F. O'Neill, Erin R. Rosenberg, Blair M. Warner, and Adam T. Swingle
E-mail:  bojan.guzina@whitecase.com
           aoneill@whitecase.com
           erin.rosenberg@whitecase.com
           blair.warner@whitecase.com
           adam.swingle@whitecase.com

2.      if to the PVKG Lender or a Consenting Sponsor, to:
PVKG Investment Holdings, Inc.
Attention:  Lars Haegg and PJ Heyer
E-mail:  lhaegg@cvc.com
           pheyer@cvc.com

with copies to:

Latham & Watkins LLP
1271 6th Avenue
New York, NY 10020
Attention:  Keith A. Simon, Joshua Tinkelman, and David Hammerman
E-mail: keith.simon@lw.com
           joshua.tinkelman@lw.com

002383

**App. 652**

david.hammerman@lw.com

3.   if to a member of the First Lien Ad Hoc Group, to:
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention:  Scott J. Greenberg, Keith R. Martorana, and Michelle Choi
E-mail:   SGreenberg@gibsondunn.com
KMartorana@gibsondunn.com
MChoi@gibsondunn.com

4.   if to a member of the Second Lien Ad Hoc Group, to:
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:  Adam L. Shpeen and Abraham Bane
E-mail address:  adam.shpeen@davispolk.com
abraham.bane@davispolk.com

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.   Term of Injunctions or Stays.

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.   Entire Agreement.

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, this Plan (including, for the avoidance of doubt, the Plan Supplement), the Confirmation Order, and the applicable Definitive Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan, the Confirmation Order, the Definitive Documents, the Plan Supplement, and the documents related thereto.

K.   Exhibits.

All exhibits and documents included in this Plan, the Confirmation Order, and the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at  https://dm.epiq11.com/C1  or the Bankruptcy Court's website at http://www.txs.uscourts.gov/.  To the extent any exhibit or document is inconsistent with the terms of this

002384
**App. 653**

Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

L.      Deemed Acts.

        Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party by virtue of this Plan and the Confirmation Order.

M.      Nonseverability of Plan Provisions.

        If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, subject to the terms of the Restructuring Support Agreement, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable, _provided_ that any such deletion or modification must be consistent with the Restructuring Support Agreement and the Backstop Agreement and the consent rights contained in each of them; and (3) non-severable and mutually dependent.

N.      Votes Solicited in Good Faith.

        Upon entry of the Confirmation Order, each of the Released Parties and Exculpated Parties will be deemed to have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and in a manner consistent with the Disclosure Statement, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the negotiation, execution, delivery, and performance of the Restructuring Support Agreement and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan.  Without limiting the generality of the foregoing, upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code and other applicable law, and, pursuant to section 1125(e) of the Bankruptcy Code, any person will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan or the Rights Offering or the Direct Investment, and, therefore, none of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and the Rights Offering or the Direct Investment.

002385

**App. 654**

O.      Request for Expedited Determination of Taxes.

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

P.      Closing of Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to (1) close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case and (2) change the name of the remaining Debtor and case caption of the remaining open Chapter 11 Case as desired, in the Reorganized Debtors' sole discretion.

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Q.      Waiver or Estoppel.

Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

002386

**App. 655**

Dated:  May 14, 2024                    CONVERGEONE HOLDINGS, INC.
                                        (for itself and on behalf of each of the other
                                        Debtors and Debtors in Possession)

                                By:     */s/ Jeffrey Russell*
                                        Name: Jeffrey Russell
                                        Title: Chief Executive Officer

68

*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90194 (CML) |
|  | ) |  |
| Debtors. | ) | (~~Joint Administration Requested~~Jointly Administered) |
|  | ) |  |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES (TECHNICAL MODIFICATIONS)

~~THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.~~

**WHITE & CASE LLP**
Charles R. Koster (Texas Bar No. 24128278)
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

**WHITE & CASE LLP**
Bojan Guzina (admitted *pro hac vice* ~~pending~~)
Andrew F. O'Neill (admitted *pro hac vice* ~~pending~~)
Erin R. Rosenberg (admitted *pro hac vice* ~~pending~~)
Blair M. Warner (admitted *pro hac vice* ~~pending~~)
Adam T. Swingle (admitted *pro hac vice* ~~pending~~)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
Email:   bojan.guzina@whitecase.com
         aoneill@whitecase.com
         erin.rosenberg@whitecase.com
         blair.warner@whitecase.com
         adam.swingle@whitecase.com

*~~Proposed~~ Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

Dated: ~~April 3~~May 14, 2024

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW .................................................................................................1
    A.    Defined Terms. ...............................................................................................1
    B.    Rules of Interpretation. ................................................................................20
    C.    Computation of Time. ..................................................................................20
    D.    Governing Law. ........................................................................................2021
    E.    Reference to Monetary Figures. ..................................................................21
    F.    Controlling Document. ................................................................................21
    G.    Consent Rights. ...........................................................................................21

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS .......................................2122
    A.    Administrative Claims. ................................................................................22
    B.    DIP Claims. .................................................................................................22
    C.    Professional Fee Claims. .............................................................................23
    D.    Priority Tax Claims. ....................................................................................24
    E.    Restructuring Expenses. ..............................................................................24

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ......24
    A.    Classification of Claims and Interests. .......................................................24
    B.    Formation of Debtor Groups for Convenience Only. ..................................25
    C.    Treatment of Claims and Interests. .............................................................25
    D.    Special Provision Governing Unimpaired Claims. ......................................29
    E.    Elimination of Vacant Classes. ...................................................................29
    F.    Acceptance by Impaired Classes. ...............................................................29
    G.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ................29
    H.    Intercompany Interests. ...............................................................................30
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ..30
    J.    No Substantive Consolidation. ...................................................................30
    K.    Controversy Concerning Impairment. .........................................................30
    L.    Subordinated Claims. ..................................................................................30

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN .....................................31
    A.    General Settlement of Claims and Interests. ...............................................31
    B.    PVKG Note Claims Settlement. .................................................................31
    C.    Restructuring Transactions. .........................................................................32
    D.    The Reorganized Debtors. ...........................................................................32
    E.    Sources of Consideration for Plan Distributions. .......................................32
    F.    Corporate Existence. ...................................................................................35
    G.    Vesting of Assets in the Reorganized Debtors. ..........................................35
    H.    Cancellation of Existing Agreements and Interests. ...................................35
    I.    Corporate Action. ........................................................................................36
    J.    Governance Documents. ..............................................................................36
    K.    Directors and Officers of the Reorganized Debtors. ...................................37
    L.    Effectuating Documents; Further Transactions. ..........................................38
    M.    Certain Securities Law Matters. ..................................................................38
    N.    Section 1146 Exemption. .............................................................................38
    O.    Employment Obligations. ............................................................................39
    P.    Management Incentive Plan. ........................................................................40
    Q.    Preservation of Causes of Action. ...............................................................40
    R.    Dissolution of Certain Debtors. ..................................................................41
    S.    Closing the Chapter 11 Cases. ....................................................................41

T.      Post-Effective Date Payment of Restructuring Expenses. ........................................ 41
ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...... 41
    A.      Assumption of Executory Contracts and Unexpired Leases. ............................... 41
    B.      Indemnification Obligations. ................................................................................ 42
    C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. .......... 43
    D.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ....... 43
    E.      Insurance Policies. ............................................................................................... 44
    F.      Workers' Compensation Program. ....................................................................... 44
    G.      Reservation of Rights. ......................................................................................... 45
    H.      Nonoccurrence of Effective Date. ....................................................................... 45
    I.      Contracts and Leases Entered Into After the Petition Date. ................................ 45
ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................... 45
    A.      Distributions on Account of Claims Allowed as of the Effective Date. ............... 45
    B.      Distribution Agent. .............................................................................................. 46
    C.      Rights and Powers of the Distribution Agent. ..................................................... 46
    D.      Special Rules for Distributions to Holders of Disputed Claims. ......................... 46
    E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ......... 46
    F.      Manner of Payment. ............................................................................................. 47
    G.      Compliance with Tax Requirements. .................................................................... 47
    H.      Allocations. ......................................................................................................... 48
    I.      No Postpetition Interest on Claims. ..................................................................... 48
    J.      Foreign Currency Exchange Rate. ....................................................................... 48
    K.      Setoffs and Recoupment. ..................................................................................... 48
    L.      Claims Paid or Payable by Third Parties. ............................................................ 48
ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
               DISPUTED CLAIMS ........................................................................................... 49
    A.      Disputed Claims Process. .................................................................................... 49
    B.      Allowance of Claims. ........................................................................................... 50
    C.      Claims Administration Responsibilities. .............................................................. 50
    D.      Adjustment to Claims or Interests Without Objection. ........................................ 50
    E.      Distributions After Allowance. ............................................................................ 51
ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...... 51
    A.      Discharge of Claims and Termination of Interests. ............................................. 51
    B.      Release of Liens. ................................................................................................. 51
    C.      Releases by the Debtors. ...................................................................................... 52
    D.      Releases by Third Parties. .................................................................................... 53
    E.      Exculpation. ......................................................................................................... 54
    F.      Injunction. ............................................................................................................ 55
    G.      Waiver of Statutory Limitations on Releases. ...................................................... 56
    H.      Protections Against Discriminatory Treatment. ................................................... 5657
    I.      Document Retention. ............................................................................................ 57
    J.      Reimbursement or Contribution. ......................................................................... 57
ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN ............. 57
    A.      Conditions Precedent to the Effective Date. ........................................................ 57
    B.      Waiver of Conditions. .......................................................................................... 58
    C.      Substantial Consummation. .................................................................................. 58
    D.      Effect of Failure of Conditions. ........................................................................... 5859
ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN ........... 5859

A.      Modification and Amendments. ................................................................ 58 59
B.      Effect of Confirmation on Modifications. .............................................. 59
C.      Revocation or Withdrawal of Plan. ........................................................ 59

ARTICLE XI. RETENTION OF JURISDICTION ....................................................... 59 60

ARTICLE XII. MISCELLANEOUS PROVISIONS ....................................................... 62
A.      Immediate Binding Effect. ..................................................................... 62
B.      Waiver of Stay. ...................................................................................... 62 63
C.      Additional Documents. ........................................................................... 63
D.      Payment of Statutory Fees. .................................................................... 63
E.      Statutory Committee and Cessation of Fee and Expense Payment. ....... 63
F.      Reservation of Rights. ............................................................................ 63
G.      Successors and Assigns. ......................................................................... 63 64
H.      Notices. .................................................................................................. 63 64
I.      Term of Injunctions or Stays. ................................................................. 65
J.      Entire Agreement. .................................................................................. 65
K.      Exhibits. ................................................................................................ 65
L.      Deemed Acts. ......................................................................................... 65 66
M.      Nonseverability of Plan Provisions. ...................................................... 65 66
N.      Votes Solicited in Good Faith. ............................................................... 66
O.      Request for Expedited Determination of Taxes. .................................... 66 67
P.      Closing of Chapter 11 Cases. ................................................................. 66 67
Q.      Waiver or Estoppel. ............................................................................... 66 67

iii

**INTRODUCTION**

ConvergeOne Holdings, Inc. and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in **Article I.A** of this Plan.  Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      Defined Terms.

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "ABL DIP Agent" means Wells Fargo Commercial Distribution Finance, LLC.

2.      "ABL DIP Commitment Letter" means the commitment letter, as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, entered into between the Debtors, the ABL DIP Agent, and the ABL DIP Lenders, pursuant to which the ABL DIP Lenders committed to make available to the Debtors the ABL DIP Facility in accordance with the terms thereof and the ABL DIP Documents.

3.      "ABL DIP Credit Agreement" means that certain Ratification and Amendment Agreement consistent with the ABL DIP Term Sheet and the Documentation Principles (as defined therein) and otherwise in form and substance satisfactory to the ABL DIP Agent, the ABL DIP Lenders, and the Required Consenting Lenders, ratifying and amending the Prepetition ABL Facility.

4.      "ABL DIP Facility" means that certain postpetition senior secured superpriority priming debtor-in-possession asset-based revolving credit facility, in the aggregate principal amount of up to $250.0 million (subject to the Borrowing Base, as such term is defined in the ABL DIP Term Sheet), entered into on the terms and conditions set forth in the ABL DIP Documents and the DIP Orders.

5.      "ABL DIP Facility Claim" means any Claim arising from, under, or in connection with the ABL DIP Credit Agreement or any other ABL DIP Documents, including Claims for the aggregate outstanding principal amount of, plus unpaid interests on, the ABL DIP Loans, and all fees, and other expenses related thereto and arising and payable under the ABL DIP Facility.

6.      "ABL DIP Documents" means any documents governing the ABL DIP Facility that are entered into in accordance with the ABL DIP Term Sheet and the DIP Orders and any amendments,

1

modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the ABL DIP Term Sheet and the ABL DIP Credit Agreement.

7.    "ABL DIP Lenders" means the lenders party to the ABL DIP Credit Agreement from time to time.

8.    "ABL DIP Loans" means the loans contemplated under and documented by the ABL DIP Documents.

9.    "ABL DIP Term Sheet" means the term sheet attached as **Exhibit 1** to the Restructuring Term Sheet describing the terms of the ABL DIP Facility.

10.    "Administrative Claim" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; (d) Adequate Protection Claims (as defined in the DIP Orders); and (e) Restructuring Expenses.

11.    "Affiliate" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

12.    "Agents/Trustees" means, collectively, any administrative agent, collateral agent, indenture trustee, floorplan funding agent, or similar Entity under the Prepetition ABL Credit Agreement, the First Lien Term Loan Credit Agreement, the KL Note Purchase Agreement, the PVKG Note Purchase Agreement, the Second Lien Credit Agreement, the Prepetition Intercreditor Agreements, the ABL DIP Facility, the Term DIP Facility, or the Exit Facilities, including any successors thereto and, without limitation, the Prepetition ABL Agent, the First Lien Term Loan Agent, the DIP Agents, and the Exit Facilities Agents.

13.    "Allocated Portion" means Term DIP Facility Claims in an amount equal to the Rights, Direct Investment, and Backstop Commitment that are allocated to an applicable Term DIP Lender under this Plan and the Backstop Agreement as either an Investor or Eligible Offeree.

14.    "Allowed" means, with respect to any Claim or Interest, a Claim or an Interest expressly allowed under this Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors (with the consent of the Required Consenting Lenders, which shall not be unreasonably withheld, delayed, or conditioned) may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law; *provided, however* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

15.    "Backstop Agreement" means that certain Equity Backstop Commitment Agreement by and among PVKG Investment, C1 Holdings, PVKG Intermediate, and the Investors, as may be amended, supplemented, or modified from time to time in accordance with the terms thereof, setting forth the terms

2

and conditions for, among other things, the Rights Offering, the Investors' backstop of the Rights Offering Amount, the purchase of the Direct Investment, and the issuance of the Put Option Premium all at the Plan Discount, which agreement shall be set forth in the Plan Supplement.

16. "Backstop Commitment" means the Investors' commitments to purchase up to $159,250,000 of the New Equity Interests at the Plan Discount, pursuant to the terms of the Rights Offering and in accordance with the Backstop Agreement; *provided* that the Investors may fulfill their Backstop Commitment by exercising their Term DIP Loan Rights pursuant to the terms of and in accordance with the Rights Offering Documents.

17. "Backstop Order" means the Final Order authorizing, among other things, the Debtors' entry into and performance under the Backstop Agreement and approving any other documents related thereto and approving the payment of fees and expenses related thereto, which Final Order may be the Confirmation Order.

18. "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

19. "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas.

20. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

21. "Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

22. "C1 Holdings" means ConvergeOne Holdings, Inc.

23. "Cash" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

24. "Cash Collateral" has the meaning set forth in section 363(a) of the Bankruptcy Code.

25. "Cause of Action" means, without limitation, any Claim, Interest, claim, damage, remedy, cause of action, controversy, demand, right, right of setoff, action, cross claim, counterclaim, recoupment, claim for breach of duty imposed by Law or in equity, action, Lien, indemnity, contribution, reimbursement, guaranty, debt, suit, class action, third-party claim, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, direct or indirect, choate or inchoate, liquidated or unliquidated, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable or existing directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, under the Bankruptcy Code or applicable non-bankruptcy law, or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state law; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

002395

**App. 664**

26.     "<u>Chapter 11 Cases</u>" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.     "<u>Claim</u>" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

28.     "<u>Claims and Noticing Agent</u>" means Epiq Corporate Restructuring, LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

29.     "<u>Claims Register</u>" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

30.     "<u>Class</u>" means a class of Claims or Interests as set forth in **Article III** hereof pursuant to section 1122(a) of the Bankruptcy Code.

31.     "<u>CM/ECF</u>" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

32.     "<u>Company Parties</u>" means PVKG Intermediate, C1 Holdings, and each of their direct and indirect subsidiaries that are or become parties to the Restructuring Support Agreement, solely in their capacity as such.

33.     "<u>Confirmation</u>" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

34.     "<u>Confirmation Date</u>" means the date upon which the Bankruptcy Court confirms this Plan pursuant to section 1129 of the Bankruptcy Code.

35.     "<u>Confirmation Hearing</u>" means the hearing held by the Bankruptcy Court on the confirmation of this Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

36.     "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Debtors and the Required Consenting Lenders and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders.

37.     "<u>Consenting Sponsors</u>" means PVKG Lender, ConvergeOne Investment, LP, and PVKG Investment US LP and each of their affiliates other than the Debtors that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, in their respective capacities as direct or indirect Holders of Existing C1 Interests.

38.     "<u>Consenting Stakeholders</u>" means, collectively, the First Lien Consenting Lenders and the Consenting Sponsors.

39.     "<u>Consummation</u>" means the occurrence of the Effective Date.

002396

**App. 665**

40.     "Cure Claim" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

41.     "D&O Liability Insurance Policies" means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related thereto) issued at any time to, or providing coverage to, any of the Debtors or any of the Debtors' current or former directors, members, managers, or officers for directors', managers', and officers' liability.

42.     "Debtor Release" means the release set forth in **Article VIII.C** of this Plan.

43.     "Definitive Documents" means, collectively, (a) this Plan; (b) the Disclosure Statement; (c) the Solicitation Materials; (d) the DIP Orders (and motion(s) seeking approval thereof); (e) the ABL DIP Commitment Letter; (f) the ABL DIP Documents; (g) the Term DIP Loan Documents; (h) the Exit ABL Facility Documents; (i) the Exit Term Loan Facility Documents; (j) the Backstop Agreement and any motion(s) seeking approval thereof; (k) the Rights Offering and Election Procedures; (l) the Rights Offering Documents; (m) the Governance Documents; (n) any order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials (and motion(s) seeking approval thereof); (o) the Confirmation Order; (p) the Plan Supplement; (q) all material pleadings and motions Filed by the Company Parties in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings, any "second day" pleadings, and all orders sought pursuant thereto; (r) such other agreements, instruments, and documentation that are necessary, or as may be agreed in writing (email sufficient) between the Company Parties, the Required Consenting Lenders,  and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders, to document and consummate the Restructuring Transactions; and (s) any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing, which in each case shall be in form and substance acceptable to the Debtors, the Required Consenting Lenders, and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders.

44.     "Description of Transaction Steps" means the description of steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan and as set forth in the Plan Supplement.

45.     "DIP Agents" means, collectively, the ABL DIP Agent and the Term DIP Agent.

46.     "DIP Claims" means all Claims held by the DIP Lenders or the DIP Agents on account of, arising under, or related to the ABL DIP Credit Facility and/or the Term DIP Facility, or the DIP Orders, including, without limitation, Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Orders.

47.     "DIP Lenders" means, collectively, the ABL DIP Lenders and the Term DIP Lenders.

48.     "DIP Orders" means, collectively, the Interim DIP Order and the Final DIP Order and any other Bankruptcy Court order approving entry into the ABL DIP Documents and/or the Term DIP Loan Documents.

002397
**App. 666**

49.     "DIP Professional Fees" means, as of the Effective Date, all accrued and unpaid professional fees and expenses payable under the DIP Orders to the professionals for the DIP Agents and the DIP Lenders.

50.     "Direct Investment" means a number of New Equity Interests, issued at the Plan Discount in exchange for an aggregate amount equal to the Direct Investment Amount, which will be available solely for Investors and which Investors shall have the sole right and obligation to purchase in accordance with the Investor Percentages set forth in the Backstop Agreement.

51.     "Direct Investment Amount" means an amount equal to 35% of $245,000,000 (subject to increase with the consent of the Debtors and the Required Consenting Lenders).

52.     "Direct Investment Commitment" means the Investors' commitments to purchase from New C1, based on the Investor Percentages, $85,750,000 of New Equity Interests at the Plan Discount, pursuant to the terms of the Rights Offering and in accordance with the Backstop Agreement.

53.     "Disallowed" means any Claim, or any portion thereof, that has been disallowed by Final Order or pursuant to a settlement among the Debtors and the holder thereof.  "Disallow" and "Disallowance" shall have correlative meanings.

54.     "Disclosure Statement" means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order and as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

55.     "Disclosure Statement Order" means one or more orders entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Debtors, the Required Consenting Lenders (subject to the parties' rights and obligations under the Restructuring Support Agreement), and, subject to the consent rights set forth in the Restructuring Support Agreement, the Required Consenting Second Lien Lenders: (i) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (ii) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

56.     "Disputed" means, as to a Claim or an Interest, a Claim or an Interest: (a) that is not Allowed; (b) that is not Disallowed under this Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

57.     "Distribution Agent" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Lenders, to make or facilitate distributions pursuant to this Plan.

58.     "Distribution Record Date" means the record date for purposes of making distributions under this Plan on account of Allowed Claims, which date shall be the Effective Date or such other date agreed to by the Debtors and the Required Consenting Lenders.

59.     "DTC" means The Depository Trust Company.

60.     "Effective Date" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the

occurrence of the Effective Date set forth in **Article IX.A** of this Plan have been satisfied or waived in accordance with **Article IX.B** of this Plan, as determined by the Debtors, the Required Consenting Lenders, and solely with respect to the condition set forth in **Article IX.A** (1) (solely with respect to the Required Consenting Second Lien Lenders), (9), (10), (11), and (12), the Required Consenting Second Lien Lenders.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

61.   "Eligible Offerees" means, collectively, each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee, in accordance with the terms of the Backstop Agreement) that elects the Rights and Takeback Term Loan Recovery Option and is either (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act of 1933, as amended, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), or (3) or (7) under the Securities Act of 1933, as amended, or an entity in which all of the equity investors are institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person).  For the avoidance of doubt, each Investor shall be an Eligible Offeree.

62.   "Employee Partnership Sale Units" means those certain partnership sale units issued to certain employees of the Debtors prior to the Petition Date in exchange for a waiver of the respective employee's then-existing equity interests in ConvergeOne Investment LP.

63.   "Employment Obligations" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with **Article IV.O** of this Plan.

64.   "Entity" means any entity, as defined in section 101(15) of the Bankruptcy Code.

65.   "Equity Security" means any equity security, as defined in section 101(16) of the Bankruptcy Code, in a Debtor.

66.   "Estate" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

67.   "Exculpated Parties" means, collectively, and in each case in ~~their capacities~~ its capacity as such: ~~(a)~~ the Debtors~~, (b) the directors, officers, managers, and employees of any Debtor, and (c) the Professionals~~.

68.   "Executory Contract" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69.   "Existing C1 Interests" means the equity interests in PVKG Intermediate immediately prior to the Effective Date.

70.   "Exit ABL Agent" means the administrative agent, collateral agent, or similar Entity under the Exit ABL Credit Agreement.

71.   "Exit ABL Credit Agreement" means the credit agreement with respect to the Exit ABL Facility, as may be amended, supplemented, or otherwise modified from to time, the terms of which, for the avoidance of doubt, shall be on terms and conditions reasonably satisfactory to the Debtors and the Required Consenting Lenders.

72.   "Exit ABL Facility" means the first lien asset based lending facility, to be incurred on the Effective Date by the Reorganized Debtors pursuant to the Exit ABL Credit Agreement, which shall be on terms and conditions reasonably satisfactory to the Debtors and the Required Consenting Lenders.

73.     "Exit ABL Facility Documents" means any documents governing the Exit ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the Exit ABL Credit Agreement and the Exit Intercreditor Agreement.

74.     "Exit Facilities" means, collectively, the Exit ABL Facility and Exit Term Loan Facility.

75.     "Exit Facilities Agents" means, collectively, the Exit ABL Agent and the Exit Term Loan Agent.

76.     "Exit Facilities Documents" means, collectively, the Exit ABL Facility Documents and the Exit Term Loan Facility Documents.

77.     "Exit Intercreditor Agreement" means the new intercreditor agreement to be entered into on substantially the same terms as the Prepetition Intercreditor Agreements or such other terms as are acceptable to the Debtors and the Required Consenting Lenders, governing the relevant rights and priorities under the Exit Facilities Documents.

78.     "Exit Term Loans" means the term loans provided under the Exit Term Loan Facility on the terms and conditions set forth in the Exit Term Loan Credit Agreement, which shall include the Takeback Term Loans.

79.     "Exit Term Loan Agent" means the administrative agent, collateral agent, or similar Entity under the Exit Term Loan Credit Agreement.

80.     "Exit Term Loan Credit Agreement" means the credit agreement with respect to the Exit Term Loan Facility, as may be amended, supplemented, or otherwise modified from to time.

81.     "Exit Term Loan Facility" means the secured term loan facility in an aggregate principal amount not greater than $243 million pursuant to the Exit Term Loan Credit Agreement.

82.     "Exit Term Loan Facility Documents" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, including the Exit Term Loan Credit Agreement and the Exit Intercreditor Agreement.

83.     "Exit Term Loan Lenders" means those lenders party to the Exit Term Loan Credit Agreement.

84.     "Federal Judgment Rate" means the federal judgment rate in effect as of the Petition Date.

85.     "File" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

86.     "Final DIP Order" means one or more Final Orders entered approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents, and authorizing the Debtors' use of Cash Collateral.

8

87.     "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken; or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing has been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided that,* for the avoidance of any doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; *provided, further,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

88.     "First Day Pleadings" means the motions and related pleadings that the Debtors shall have filed upon the commencement of the Chapter 11 Cases.

89.     "First Lien Ad Hoc Group" means that certain ad hoc group of Holders of First Lien Claims, including the KL Lender, represented or otherwise advised by the First Lien Ad Hoc Group Advisors.

90.     "First Lien Ad Hoc Group Advisors" means Gibson, Dunn & Crutcher LLP, PJT Partners Inc., EY-Parthenon, any local counsel retained by the First Lien Ad Hoc Group, and such other professional advisors as are retained by the First Lien Ad Hoc Group with the prior written consent of the Debtors (not to be unreasonably withheld).

91.     "First Lien Claims" means collectively, the First Lien Term Loan Claims, the KL Note Claims, and the PVKG Note Claims.

92.     "First Lien Consenting Lenders" means the Initial First Lien Ad Hoc Group Members, KL Lender, PVKG Lender, each Holder of a First Lien Claim that has signed the Restructuring Support Agreement, each solely in their capacities as such, and any other Holder of a First Lien Claim that executes and delivers a joinder or transfer agreement to counsel to the Company Parties after the effective date of the Restructuring Support Agreement.

93.     "First Lien Term Loan Agent" means Deutsche Bank AG New York Branch in its capacity as administrative agent and collateral agent under the First Lien Term Loan Credit Agreement.

94.     "First Lien Term Loan Claims" means any Claim against any Debtor derived from, based upon, or arising under the First Lien Term Loan Credit Agreement and the other Loan Documents (as defined therein) (including, for the avoidance of doubt, all Obligations (as defined in the First Lien Term Loan Credit Agreement) owing under or in connection with the Loan Documents) and orders of the Bankruptcy Court (including, without limitation, the DIP Orders).

95.     "First Lien Term Loan Credit Agreement" means that certain prepetition First Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of March 14, 2019 and that certain Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Deutsche Bank AG New

002401
**App. 670**

York Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto.

96.     "General Unsecured Claim" means any Unsecured Claim against the Debtors that is not an: (a) Administrative Claim; (b) Priority Tax Claim; (c) Professional Fee Claim; (d) Other Priority Claim; (e) Intercompany Claim; or (f) Section 510 Claim.   For the avoidance of doubt, General Unsecured Claims include (x) Claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (y) Claims resulting from litigation against one or more of the Debtors.

97.     "Governance Documents" means, as applicable, the organizational and governance documents for New C1 and/or the Reorganized Debtors, which will give effect to the Restructuring Transactions, including, without limitation, the New Equityholders' Agreement, any applicable certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or equivalent governing documents), and registration rights agreements, which shall be consistent with the Restructuring Support Agreement and the Governance Term Sheet and in form and substance acceptable to the Debtors and the Required Consenting Lenders, and solely with respect to the Minority Protections (as defined in the Governance Term Sheet) and board observer rights provided for therein, the Subsequent First Lien Ad Hoc Group Members and the Required Consenting Second Lien Lenders (in accordance with the consent rights set forth in the Restructuring Support Agreement).

98.     "Governance Term Sheet" means the term sheet attached as **Exhibit 4** to the Restructuring Term Sheet describing organizational and governance matters for New C1.

99.     "Governing Body" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

100.     "Governmental Unit" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

101.     "Holder" means a Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable, including any Person or Entity that is the record or beneficial owner, nominee, investment advisor, sub-advisor, or manager of discretionary accounts that hold any Claim against or Interest in any Debtor.

102.     "Impaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

103.     "Initial First Lien Ad Hoc Group Members" means each of the funds or accounts managed by (a) Kennedy Lewis Investment Management LLC, (b) Monarch Alternative Capital LP, and (c) Silver Point Capital.

104.     "Initial Second Lien Ad Hoc Group Members" means each of the funds or accounts managed by (i) Partners Group (USA) Inc. and (ii) Siris Capital Group, LLC.

105.     "Intercompany Claim" means any Claim against a Debtor held by another Debtor.

106.     "Intercompany Interest" means any Interest in a Debtor held by another Debtor.

107.    "Interest" means, collectively, (a) any Equity Security in any Debtor and (b) any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor that existed immediately before the Effective Date.

108.    "Interim DIP Order" means one or more orders entered on an interim basis approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents and authorizing the Debtors' use of Cash Collateral.

109.    "Investor Percentages" means the respective percentages set forth in the Backstop Agreement governing each Investor's respective Backstop Commitment or Direct Investment Commitment.

110.    "Investors" means the Holders of First Lien Claims that are party to the Backstop Agreement (or their designated Affiliate(s), managed fund(s) or account(s) or other designee(s) in accordance with the Backstop Agreement).  For the avoidance of doubt, each Investor must be (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act of 1933, as amended, or (b) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), or (3) or (7) under the Securities Act of 1933, as amended, or an entity in which all of the equity investors are institutional "accredited investors" (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person).

111.    "Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

112.    "KL Lender" means Kennedy Lewis Investment Management LLC as the Holder of the KL Note Claims.

113.    "KL Lender Advisor" means Akin Gump Strauss Hauer & Feld LLP.

114.    "KL Lender Advisor Cap" means $250,000.

115.    "KL Note Claims" means any Claim against any Debtor derived from, based upon, or arising under the KL Note Purchase Agreement.

116.    "KL Note Purchase Agreement" means that certain prepetition First Lien Secured Note Purchase Agreement dated as of July 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date) by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, Deutsche Bank Trust Company Americas, as administrative agent and collateral agent, certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto, and each other holder from time to time party thereto.

117.    "Lender Affiliate" means any accounts and funds managed by a Term DIP Lender, accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such Term DIP Lender, or any other affiliate of such Term DIP Lender.

118.    "Lien" means a lien as defined in section 101(37) of the Bankruptcy Code.

119.    "Management Incentive Plan" means the post-emergence equity incentive plan providing for the issuance from time to time, of equity and equity-based awards with respect to New Equity

Interests, as approved by the New Board following the Effective Date, the timing and certain terms of which are set forth in **Article IV.P**.

120.     "Management Incentive Plan Pool" means a pool of up to 10% of the fully diluted New Equity Interests that are issued and outstanding on the Effective Date that shall be reserved for issuance under the Management Incentive Plan.

121.     "New Board" means the board of directors or similar Governing Body of New C1.

122.     "New C1" means either PVKG Investment, as reorganized pursuant to this Plan, or, if applicable, any successor or assign thereto, by merger, consolidation, or otherwise on and after the Effective Date, or a new entity, and each of its direct and indirect wholly-owned subsidiaries, which in any case shall be the ultimate parent of the other Company Parties on and after the Effective Date, and which entity shall be determined by agreement of the Debtors and the Required Consenting Lenders and shall be reasonably acceptable to the Required Consenting Second Lien Lenders.

123.     "New Equity Interests" means new shares of common stock in New C1 to be issued on the Effective Date.

124.     "New Equityholders' Agreement" means that certain equityholders' agreement that will govern certain matters related to the governance of the Reorganized Debtors and which shall be consistent with the Governance Term Sheet.

125.     "Other Priority Claim" means any Claim, other than an Administrative Claim, Priority Tax Claim, ABL DIP Facility Claim, or Term DIP Facility Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

126.     "Other Secured Claim" means any Secured Claim against the Debtors other than the ABL DIP Facility Claims, Term DIP Facility Claims, Prepetition ABL Claims, First Lien Claims, and Second Lien Claims.

127.     "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

128.     "Petition Date" means the date on which the Debtors commence the Chapter 11 Cases.

129.     "Plan" means this joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with **Article X.A** hereof and the Restructuring Support Agreement, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated by reference herein and made part of the Plan as if set forth herein.

130.     "Plan Discount" means the 35% discount to the Stipulated Equity Value at which the New Equity Interests issued through the Rights Offering and the Direct Investment will be purchased, and at which the New Equity Interests issued pursuant to the Put Option Premium shall be issued.

131.     "Plan Distribution" means a payment or distribution to Holders of Allowed Claims or other eligible Entities under and in accordance with this Plan.

132.     "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or

002404

**App. 673**

supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement), the initial drafts of certain of such documents to be Filed by the Debtors no later than seven (7) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) the Governance Documents; (b) the New Equityholders' Agreement; (c) the Backstop Agreement; (d) the identity and members of the New Board to the extent known at the time of filing; (e) the Schedule of Retained Causes of Action; (f) the Exit Facilities Documents; (g) the Description of Transaction Steps (which shall, for the avoidance of doubt, remain subject to modification until the Effective Date and may provide for certain actions to occur prior to the Effective Date, subject to the consent of the Required Consenting Lenders and consultation with the Required Consenting Second Lien Lenders); (h) the Rejected Executory Contract and Unexpired Lease List; and (i) any other necessary documentation related to the Restructuring Transactions.

133.    "Prepetition ABL Agent" means Wells Fargo Commercial Distribution Finance, LLC, in its capacity as the administrative agent, collateral agent, floorplan funding agent and swing line lender under the Prepetition ABL Credit Agreement.

134.    "Prepetition ABL Claims" means any Claim against any Debtor derived from, based upon, or arising under the Prepetition ABL Credit Agreement.

135.    "Prepetition ABL Credit Agreement" means that certain Amended and Restated ABL Credit Agreement, dated as of January 4, 2019  (as amended by that certain Amendment No. 1, dated as of July 10, 2022, that certain Amendment No. 2, dated as of September 14, 2022, that certain Amendment No. 3, dated as of January 23, 2023, and that certain Amendment No. 4, dated as of August 29, 2023, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate as holdings, certain subsidiary borrowers party thereto, Wells Fargo Commercial Distribution Finance, LLC, as administrative agent, collateral agent, floorplan funding agent and swing line lender, and the lenders party thereto.

136.    "Prepetition ABL Facility" means the secured revolving credit loan in the aggregate principal amount of up to $250.0 million, subject to compliance with a borrowing base and various sublimits applicable to various Swingline Loans, Letters of Credit, and floorplan advances otherwise authorized under the Prepetition ABL Credit Agreement.

137.    "Prepetition Intercreditor Agreements" means (a) that certain ABL Intercreditor Agreement, dated as of January 4, 2019 (as amended by that certain Joinder and Amendment to ABL Intercreditor Agreement dated as of July 10, 2020 and supplemented by that certain ABL Intercreditor Agreement Joinder dated as of May 15, 2023); (b) that certain First Lien Pari Passu Intercreditor Agreement, dated as of January 10, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time); and (c) that certain first lien and second lien Intercreditor Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented, or otherwise modified from time to time).

138.    "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

139.    "Pro Rata" means, unless otherwise specified, with respect to any Claim, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

002405

**App. 674**

140.    "<u>Professional</u>" means any Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

141.    "<u>Professional Fee Amount</u>" means the aggregate amount of unpaid Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur through the Effective Date in rendering services to the Debtors as set forth in **Article II.C** of this Plan.

142.    "<u>Professional Fee Claim</u>" means any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

143.    "<u>Professional Fee Escrow Account</u>" means an interest-bearing account funded upon entry of the Interim DIP Order and maintained by the Debtors with Cash for the benefit of the Professionals in accordance with the DIP Orders and the terms set forth in this Plan.

144.    "<u>Proof of Claim</u>" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

145.    "<u>Put Option Premium</u>" means a fully earned nonrefundable aggregate premium equal to the sum of (i) 10% of the Rights Offering Amount and (ii) 10% of the Direct Investment Amount, collectively which shall be payable on the Effective Date to the Investors in shares of New Equity Interests, and shall be allocated pro rata among the Investors based on the Investor Percentages in accordance with the Backstop Agreement.

146.    "<u>PVKG Intermediate</u>" means PVKG Intermediate Holdings Inc.

147.    "<u>PVKG Investment</u>" means PVKG Investment Holdings, Inc.

148.    "<u>PVKG Lender</u>" means PVKG Investment as the Holder of the PVKG Note Claims.

149.    "<u>PVKG Lender Advisors</u>" means Latham & Watkins LLP and any local counsel retained by the PVKG Lender to advise the PVKG Lender in its capacity as the Holder of the PVKG Note Claims.

150.    "<u>PVKG Note Claims</u>" means any Claim against any Debtor derived from, based upon, or arising under the PVKG Note Purchase Agreement, which shall be Allowed in the aggregate amount of $213.0 million pursuant to the PVKG Note Claims Settlement and the terms of this Plan and the Confirmation Order.

151.    "<u>PVKG Note Claims Settlement</u>" means the settlement of all Claims, Causes of Action, and controversies among the Debtors, the Consenting Sponsors, the First Lien Consenting Lenders, the Second Lien Consenting Lenders, and any other Consenting Stakeholder regarding or related to the PVKG Note Purchase Agreement and/or the transactions consummated in connection therewith, as set forth in and contemplated by this Plan and effective as of the Effective Date.

002406

**App. 675**

152.     "PVKG Note Purchase Agreement" means that certain Amended Promissory Note and Purchase and Cashless Exchange Agreement dated as of July 6, 2023 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, and PVKG Lender, as administrative agent, collateral agent, and holder.

153.     "Reinstate" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.  "Reinstated" and "Reinstatement" shall have correlative meanings.

154.     "Rejected Executory Contract and Unexpired Lease List" means the list, as determined by the Debtors in consultation with the Required Consenting Lenders, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to this Plan, which list, as may be amended from time to time, with the consent of the Debtors and the Required Consenting Lenders, shall be included in the Plan Supplement.

155.     "Related Party" means with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' respective directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, and nominees of the foregoing.[2]

156.     "Released Party" means, collectively, the following Entities, in each case in their capacities as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Investors; (h) the Agents/Trustees; (i) all Releasing Parties; and (j) each Related Party of each Entity in clause (a) through (i); *provided*, *however*, that, in each case, an Entity shall not be a Released Party if (i) it elects to opt out of the releases contained in this Plan if permitted to opt out; or (ii) files with the Bankruptcy Court an objection to the Plan, including the releases, that is not consensually resolved before Confirmation or supports any such objection or objector.

157.     "Releasing Party" means, collectively, and in each case in their capacities as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Investors; (h) the Agents/Trustees; (i) all Holders of Claims that vote to accept the Plan; (j) all Holders of Claims or

---

[2]     With respect to the releases set forth in Article VIII of the Plan, the term "Related Party," solely with respect to the Related Parties of Deutsche Bank Trust Company Americas as agent under the KL Note Purchase Agreement ("**DBTCA**"), shall mean its current and former directors, managers, officers, employees, agents, attorneys, accountants, other professionals, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director, officer, or manager in his or her capacity as director or manager of DBTCA), and the respective heirs, executors, estates, and nominees of the foregoing.

002407

**App. 676**

Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (k) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable notice of non-voting status indicating that they opt not to grant the releases provided in the Plan; (l) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (m) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; and (n) each Related Party of each Entity in clause (a) through (m).

158. "Reorganized Debtor" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, unless otherwise dissolved pursuant to this Plan.

159. "Required Consenting Lenders" means, as of the relevant date of determination, the Initial First Lien Ad Hoc Group Members and the PVKG Lender holding, collectively, in excess of 66 2/3%of the aggregate First Lien Claims collectively held by the Initial First Lien Ad Hoc Group Members and the PVKG Lender.

160. "Required Consenting Second Lien Lenders" means, as of the relevant date of determination, the Initial Second Lien Ad Hoc Group Members holding, collectively, in excess of 50.01% of the aggregate Second Lien Claims collectively held by the Initial Second Lien Ad Hoc Group Members.

161. "Restructuring Expenses" means the actual, reasonable, and documented fees and expenses of the First Lien Ad Hoc Group Advisors, the KL Lender Advisor (subject to the KL Lender Advisor Cap), the PVKG Lender Advisors, and the Second Lien Ad Hoc Group Advisors, regardless of whether such fees and expenses are or were incurred before, on, or after the date on which the conditions set forth in Section 2 of the Restructuring Support Agreement were satisfied or waived by the appropriate Party or Parties in accordance with the terms of the Restructuring Support Agreement, subject to the terms of any applicable fee reimbursement letter between any such Parties and any of the Company Parties, as the case may be; *provided*, *however*, that the invoices for such fees and expenses shall be in summary format (with such redactions as may be necessary to maintain attorney client privilege), and the First Lien Ad Hoc Group Advisors, PVKG Lender Advisors, and the Second Lien Ad Hoc Group Advisors shall not be required to provide the Company Parties with attorney time entries or apply to the Bankruptcy Court for payment.

162. "Restructuring Support Agreement" means that certain Restructuring Support Agreement, entered into as of April 3, 2024, by and among the Debtors and the other parties thereto, including all exhibits thereto (including the Restructuring Term Sheet), as may be amended, modified, or supplemented from time to time, in accordance with its terms, attached to the First Day Declaration as **Exhibit B**.

163. "Restructuring Term Sheet" means the term sheet attached to the Restructuring Support Agreement as **Exhibit B** thereto.

164. "Restructuring Transactions" means the transactions described in **Article IV.C** of this Plan.

16

165.    "<u>Rights</u>" means the rights offered to Eligible Offerees to participate in the Rights Offering, in an amount not to exceed such Eligible Offeree's Pro Rata portion (calculated based on the aggregate principal amount of First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all First Lien Claims held by Eligible Offerees that exercised, or are deemed to have validly exercised the Rights Offering Rights and Takeback Term Loan Recovery Option) of the Rights Offering Amount.

166.    "<u>Rights Offering</u>" means the equity rights offering to be consummated by New C1 on the Effective Date in accordance with the Rights Offering Documents, pursuant to which New C1 shall issue the Rights for an aggregate purchase price equal to the Rights Offering Amount at the Plan Discount.

167.    "<u>Rights Offering Amount</u>" means an amount equal to 65% of $245,000,000 (subject to increase with the consent of the Debtors and the Required Consenting Lenders).

168.    "<u>Rights Offering Documents</u>" means, collectively, the Rights Offering Term Sheet, the Backstop Agreement, the Backstop Order (which may be the Confirmation Order), the Rights Offering and Election Procedures, and any other agreements or documents memorializing the Rights Offering, as may be amended, restated, supplemented, or otherwise modified from time to time according to their respective terms.

169.    "<u>Rights Offering Participants</u>" means, collectively, the Eligible Offerees that exercise, or are deemed to have validly exercised, their respective Rights for New Equity Interests in connection with the Rights Offering.

170.    "<u>Rights Offering and Election Procedures</u>" means the procedures regarding the Class 3 recovery option election and governing the Rights Offering attached as an exhibit to the Disclosure Statement.

171.    "<u>Rights Offering Rights and Takeback Term Loan Recovery Option</u>" means, for a Holder of a First Lien Claim that elects or is deemed to elect such option, (a) Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 15%, plus (b) such Holder's Pro Rata share of the Rights. For the avoidance of doubt, such election shall be adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in the Rights Offering Rights and Takeback Term Loan Recovery Option does not exceed 50% of the First Lien Claims.

172.    "<u>Rights Offering Term Sheet</u>" means the term sheet attached as **<u>Exhibit 3</u>** to the Restructuring Term Sheet describing the material terms of the Rights Offering, the Direct Investment, the Backstop Commitment, and the Direct Investment Commitment.

173.    "<u>Schedule of Retained Causes of Action</u>" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

174.    "<u>Second Lien Ad Hoc Group</u>" means that certain group of Holders of Second Lien Claims represented or otherwise advised by the Second Lien Ad Hoc Group Advisors.

175.    "<u>Second Lien Ad Hoc Group Advisors</u>" means Davis Polk & Wardwell LLP, Guggenheim Securities, LLC, Haynes and Boone, LLP, and such other professional advisors as are

002409
**App. 678**

retained by the Second Lien Ad Hoc Group with the prior written consent of the Required Consenting Lenders and the Debtors (not to be unreasonably withheld).

176.     "Second Lien Agent" means UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent under the Second Lien Credit Agreement.

177.     "Second Lien Consenting Lenders" means each Holder of a Second Lien Claim that has signed the Restructuring Support Agreement, each solely in their capacities as such, and each Holder of a Second Lien Claim that executes and delivers a joinder or transfer agreement to counsel to the Company Parties after the effective date of the Restructuring Support Agreement, including, for the avoidance of doubt, each of the funds or accounts managed by (i) Partners Group (USA) Inc., (ii) Siris Capital Group, LLC, (iii) AlbaCore Capital LLP, and (iv) Neuberger Berman Investment Advisers LLC and its affiliates.

178.     "Second Lien Credit Agreement" means that certain prepetition Second Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of July 10, 2022), and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto.

179.     "Second Lien Recovery" means 4.375% of the New Equity Interests issued on the Effective Date (subject to dilution only by the Management Incentive Plan Pool).

180.     "Second Lien Claims" means any Claim against any Debtor derived from, based upon, or arising under the Second Lien Credit Agreement.

181.     "Section 510 Claim" means any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of an Equity Security (including the Employee Partnership Sale Units) of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such an Equity Security made to the Debtors prior to the Petition Date; (c) for reimbursement or contribution allowed under section 502(e) of the Bankruptcy Code on account of such a Claim; and (d) any other claim determined to be subordinated under section 510 of the Bankruptcy Code.

182.     "Secured Claim" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

183.     "Securities Act" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, and the rules and regulations promulgated thereunder.

184.     "Security" means any security, as defined in section 2(a)(1) of the Securities Act.

185.     "SIR" means any self-insured retention under the Debtors' insurance policies.

186.     "Solicitation Materials" means, collectively, all materials used in connection the solicitation of votes on the Plan, including the Disclosure Statement, the Disclosure Statement Order, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan.

187.     "Stipulated Equity Value" means approximately $434 million.

002410
**App. 679**

188.    "Subsequent First Lien Ad Hoc Group Members" means each of the funds or accounts managed by (a) MJX Asset Management, LLC; (b) PGIM, Inc., and (c) Sound Point Capital Management, LP.

189.    "Takeback Term Loan Recovery Option" means, for a Holder of a First Lien Claim that elects such option, Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 20%.  For the avoidance of doubt, such election shall be adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in the Takeback Term Loan Recovery Option does not exceed 50% of the First Lien Claims.

190.    "Takeback Term Loans" means the Exit Term Loans issued to Holders of First Lien Claims.

191.    "Term DIP Agent" means Wilmington Savings Fund Society, FSB, in its capacity as the administrative agent and collateral agent under the DIP Term Loan Credit Agreement.

192.    "Term DIP Credit Agreement" means the credit agreement with respect to the Term DIP Facility, as may be amended, supplemented, or otherwise modified from to time.

193.    "Term DIP Facility" means the senior secured debtor in possession financing facility for the Term DIP Loans, in an aggregate amount of $215.0 million, entered into on the terms and conditions set forth in the Term DIP Loan Documents and the DIP Orders.

194.    "Term DIP Facility Claims" means any Claim arising from, under, or in connection with the Term DIP Credit Agreement or any other Term DIP Loan Documents, including Claims for the aggregate outstanding principal amount of, plus unpaid interests on, the Term DIP Loan, and all fees, premiums, and other expenses related thereto and arising and payable under the Term DIP Facility.

195.    "Term DIP Lenders" means the "Lenders" under, and as defined in, the Term DIP Credit Agreement.

196.    "Term DIP Loan Documents" means any documents governing the Term DIP Facility that are entered into in accordance with the Term DIP Credit Agreement, Term DIP Term Sheet and the DIP Orders, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, in each case consistent with the Term DIP Term Sheet and otherwise in form and substance satisfactory to the Required Term DIP Lenders (as defined in the Term DIP Credit Agreement).

197.    "Term DIP Loan Rights" means the following rights: (i) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, (A) an Initial First Lien Ad Hoc Group Member, (B) PVKG Lender, or (C) a Subsequent First Lien Ad Hoc Group Member (in each case, at its sole option) shall be entitled to exchange some or all of the Allocated Portion of its Term DIP Facility Claims, on a dollar-for-dollar basis, for New Equity Interests pursuant to the terms of the Rights Offering, Backstop Commitment, and Direct Investment, and in accordance with the Rights Offering Documents (with the remainder of such Term DIP Facility Claims to be satisfied in Cash); and (ii) (A) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, a Subsequent First Lien Ad Hoc Group Member shall be entitled (at its sole option) to exchange the Allocated Portion of its Term DIP Facility Claims, on a

19

dollar-for-dollar basis, for Takeback Term Loans (with the remainder of such Term DIP Facility Claims to be satisfied in Cash), and (B) any Subsequent First Lien Ad Hoc Group Member that is a Term DIP Lender or is a Lender Affiliate thereof or is related thereto, that elects the option described in the foregoing clause (A) shall utilize the Takeback Term Loan recovery portion of its First Lien Claims under this Plan as currency, on a dollar-for-dollar basis, for New Equity Interests issuable under and pursuant to the terms of the Rights Offering, Backstop Commitment, and Direct Investment and in accordance with the Rights Offering Documents (whether in their capacities as Investors under the Rights Offering or Eligible Offerees).

198.    "Term DIP Loans" means the multiple draw term loans provided under the Term DIP Facility.

199.    "Term DIP Term Sheet" means the term sheet attached as **Exhibit 2** to the Restructuring Term Sheet describing the material terms of the Term DIP Facility.

200.    "Third-Party Release" means the release set forth in **Article VIII.D** of this Plan.

201.    "Unexpired Lease" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

202.    "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is Unimpaired within the meaning of section 1124 of the Bankruptcy Code.

203.    "Unsecured Claim" means any Claim that is not a Secured Claim.

204.    "Workers' Compensation Program" means the Debtors' (a) written contracts, agreements, agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance issued to or entered into at any time by any of the Debtors.

B.    Rules of Interpretation.

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto (both as that term is defined herein and as it is defined in the Restructuring Support Agreement); (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by,

20

and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (16) unless otherwise specified, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.      Computation of Time.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If any payment, distribution, act, or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

D.      Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan or the Confirmation Order (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or the Reorganized Debtor.

E.      Reference to Monetary Figures.

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided herein.

F.      Controlling Document.

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated

002413

**App. 682**

otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

G.    Consent Rights.

Notwithstanding anything herein to the contrary, any and all consent, approval, and consultation rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement, the DIP Orders, the Backstop Order, or any Definitive Document, including with respect to the form and substance of the Plan, the Plan Supplement, and all other Definitive Documents (including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents), shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

Agreement with respect to the form and substance of this Plan, any Definitive Document, all exhibits to this Plan, and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in **Article I.A** hereof) and be fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement or the Backstop Agreement, as applicable, is terminated in accordance with its terms. Failure to reference in this Plan the rights referred to in the immediately preceding sentence as such rights relate to any document referenced in the Restructuring Support Agreement or the Backstop Agreement, as applicable, shall not impair such rights and obligations. In case of a conflict between the consent rights of the parties to the Restructuring Support Agreement that are set forth in the Restructuring Support Agreement or of the parties to the Backstop Agreement that are set forth in the Backstop Agreement, as applicable, with those parties' consent rights that are set forth in this Plan or the Plan Supplement, the consent rights in the Restructuring Support Agreement or the Backstop Agreement, as applicable, shall control.

**ARTICLE II.**
**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, Restructuring Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in **Article III** hereof.

A.    Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, or otherwise provided for under the Plan, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and Restructuring Expenses) shall be paid in full an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in full and final satisfaction, compromise, settlement, release, and discharge of such Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed on or prior to the Effective Date, the first Business Day after the date that is thirty (30) days after the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business, in accordance with the terms and conditions of the particular transaction or course of business

002414
**App. 683**

giving rise to such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. Subject to the terms of the Restructuring Support Agreement and the DIP Orders, nothing in the foregoing or otherwise in this Plan shall prejudice the Debtors' or the Reorganized Debtors' rights and defenses regarding any asserted Administrative Claim.

B.      DIP Claims.

    1.      ABL DIP Facility Claims.

On the Effective Date, in full and final satisfaction of the Allowed ABL DIP Facility Claims, (a) ABL DIP Facility Claims that are being converted to Exit ABL Facility Loans or other outstandings thereunder (such as letters of credit and floorplan advances, as provided below) shall be refinanced by the Exit ABL Facility in the amount of the remaining ABL DIP Facility Claims after such pay down by means of a cashless settlement, (b) ABL DIP Facility Claims that are not being converted to Exit ABL Facility Loans shall be indefeasibly paid in full in Cash, and (c) accrued interest and fees under the ABL DIP Facility shall be paid in full in Cash immediately prior to the conversion of ABL DIP Loans to Exit ABL Facility Loans. With respect to the amount of the ABL DIP Facility refinanced by means of a cashless settlement, (i) all principal amount of ABL DIP Loans (as defined in the ABL DIP Credit Agreement) (including Swingline Loans and floorplan advances) shall be on a one-to-one basis automatically converted to and deemed to be Exit ABL Facility Loans, (ii) the Letters of Credit (as defined in the ABL DIP Credit Agreement) issued and outstanding under the ABL DIP Credit Agreement shall automatically be converted to letters of credit deemed to be issued and outstanding under the Exit ABL Facility Documents, and (iii) all Collateral that secures the Obligations (each as defined in the ABL DIP Credit Agreement) under the ABL DIP Credit Agreement that shall also secure the Exit ABL Facility shall be reaffirmed, ratified, and shall automatically secure all Obligations under the Exit ABL Facility Documents, subject to the priorities of Liens set forth in the Exit ABL Facility Documents and the Exit Intercreditor Agreement.

For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses related to the ABL DIP Facility shall be paid in full in Cash in accordance with the terms of the DIP Orders and this Plan, as applicable.

    2.      Term DIP Facility Claims.

On the Effective Date, in full and final satisfaction of the Allowed Term DIP Facility Claims, each Holder of a Term DIP Facility Claim shall receive its Pro Rata portion of Cash on account of any principal, interest, fees, and expenses outstanding with respect to such Holder's Term DIP Facility Claim as of the Effective Date; *provided*, *however*, that any Holder of a Term DIP Facility Claim can, in lieu of such Cash payment, exercise such Holder's Term DIP Loan Rights on the terms set forth in the Term DIP Term Sheet and pursuant to the terms of the Rights Offering Documents.

For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses related to the Term DIP Facility shall be paid in full in Cash accordance with the terms of the DIP Orders and this Plan, as applicable.

002415

**App. 684**

C.      Professional Fee Claims.

     1.      Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, from the Professional Fee Escrow Account as soon as practicable after such Professional Fee Claims are Allowed.

     2.      Professional Fee Escrow Account.

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with an amount of Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  When all Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

     3.      Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors or the Debtors' Estates before and as of the Effective Date, and shall deliver such estimate to the Debtors and the First Lien Ad Hoc Group Advisors no later than three (3) Business Days before the Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional.

     4.      Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to

002416
**App. 685**

the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      Restructuring Expenses.

        The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date matters, after the Effective Date), shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the Restructuring Support Agreement, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided, however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before, or after the Effective Date.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      Classification of Claims and Interests.

        This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in **Article II** of this Plan (or as otherwise set forth herein), all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Claims, Priority Tax Claims, Professional Fee Claims, or Restructuring Expenses, as described in **Article II**.

        A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

        The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |

002417
**App. 686**

| 6 | Intercompany Claims | Impaired/Unimpaired | Deemed to Accept / Deemed to Reject; Not Entitled to Vote |
| 7 | Section 510 Claims | Impaired | Deemed to Reject; Not Entitled to Vote |
| 8 | Intercompany Interests | Impaired/Unimpaired | Deemed to Accept / Deemed to Reject; Not Entitled to Vote |
| 9 | Existing C1 Interests | Impaired | Deemed to Reject; Not Entitled to Vote |

B.      Formation of Debtor Groups for Convenience Only.

This Plan is a separate plan of reorganization for each Debtor.  This Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, Confirmation of this Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.  Except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.  The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

C.      Treatment of Claims and Interests.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Secured Claims.

(a)      Classification:  Class 1 consists of all Other Secured Claims.

(b)      Treatment:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, in the discretion of the Reorganized Debtors:

(i)      payment in full in Cash of its Allowed Other Secured Claim;

(ii)      the collateral securing its Allowed Other Secured Claim;

(iii)      Reinstatement of its Allowed Other Secured Claim; or

(iv)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      Voting:  Allowed Other Secured Claims in Class 1 are Unimpaired.  Each Holder of an Allowed Other Secured Claim is conclusively deemed to have accepted

26

this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

2.  <u>Class 2 – Other Priority Claims</u>.

    (a)    <u>Classification</u>:  Class 2 consists of all Other Priority Claims.

    (b)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash of such Allowed Other Priority Claim on or as soon as reasonably practicable after the last to occur of (i) the Effective Date, (ii) the date such Other Priority Claim becomes an Allowed Claim, (iii) the date on which such Allowed Other Priority Claim is due to be paid in the ordinary course of business of the Debtors or Reorganized Debtors, if applicable, and (iv) the date on which the Holder of such Allowed Other Priority Claim and the Debtors or Reorganized Debtors shall otherwise agree in writing.

    (c)    <u>Voting</u>:  Allowed Other Priority Claims in Class 2 are Unimpaired.  Each Holder of an Allowed Other Priority Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

3.  <u>Class 3 – First Lien Claims</u>.

    (a)    <u>Classification</u>:  Class 3 consists of all First Lien Claims.

    (b)    <u>Allowance</u>:  On the Effective Date, all First Lien Claims shall be deemed Allowed, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount as follows, and, with respect to the PVKG Note Claims, shall be pursuant to the PVKG Note Claims Settlement:

        (i)    First Lien Term Loan Claims:  $1,095,726,307.33

        (ii)    KL Note Claims:  $78,812,500.00

        (iii)    PVKG Note Claims:  $213,000,000.00

    (c)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed First Lien Claim, each Holder of an Allowed First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive on the Effective Date its elected Pro Rata share of (which elections shall be (i) adjusted on a Pro Rata basis (in accordance with the Adjustment (as defined in the Backstop Agreement) as calculated pursuant to the Backstop Agreement), as necessary, so that participation in each recovery option is equal to 50% of the First Lien Claims) (x) the Takeback Term Loan Recovery Option, or (y) the Rights Offering Rights and Takeback Term Loan Recovery Option.  In the event that a Holder of a First Lien Claim fails to timely elect its recovery option, it

27

shall be deemed to have elected the Rights Offering Rights and Takeback Term Loan Recovery Option.

(d) <u>Voting</u>:  Allowed First Lien Claims in Class 3 are Impaired.  Each Holder of an Allowed First Lien Claim shall be entitled to vote to accept or reject this Plan.

4. <u>Class 4 – Second Lien Claims</u>.

(a) <u>Classification</u>:  Class 4 consists of all Second Lien Claims.

(b) <u>Allowance</u>: On the Effective Date, all Second Lien Claims shall be deemed Allowed, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of $286,541,971.71.

(c) <u>Treatment</u>: Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of (including any Liens related thereto) each Allowed Second Lien Claim, on the Effective Date each Holder of an Allowed Second Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive its Pro Rata share of the Second Lien Recovery.

(d) <u>Voting</u>:  Allowed Second Lien Claims are Impaired.  Each Holder of an Allowed Second Lien Claim shall be entitled to vote to accept or reject this Plan.

5. <u>Class 5 – General Unsecured Claims</u>.

(a) <u>Classification</u>:  Class 5 consists of all General Unsecured Claims.

(b) <u>Treatment</u>:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim and in exchange for each Allowed General Unsecured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, either (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or (ii) payment in full in Cash on (A) the Effective or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

(c) <u>Voting</u>:  Allowed General Unsecured Claims in Class 5 are Unimpaired.  Each Holder of an Allowed General Unsecured Claim shall be conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore shall not be entitled to vote to accept or reject this Plan.

6. <u>Class 6 – Intercompany Claims</u>.

(a) <u>Classification</u>:  Class 6 consists of all Intercompany Claims.

(b) <u>Treatment</u>:  On the Effective Date, or as soon as reasonably practicable thereafter, Allowed Intercompany Claims shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), Reinstated,

28

converted to equity, or otherwise set off, settled, distributed, contributed, canceled, or released to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors and the Required Consenting Lenders, as applicable.

(c)     Voting:  Allowed Intercompany Claims in Class 6 are either (i) Unimpaired and are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders of Intercompany Claims are not entitled to vote to accept or reject this Plan.

7.     Class 7 – Section 510 Claims.

(a)     Classification:  Class 7 consists of all Section 510 Claims.

(b)     Treatment:  On the Effective Date, all Section 510 Claims (including all claims on account of the Employee Partnership Sale Units) shall be canceled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims.

(c)     Voting:  Allowed Section 510 Claims in Class 7 are Impaired.  Each Holder of an Allowed Section 510 Claim is conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Section 510 Claims are not entitled to vote to accept or reject this Plan.

8.     Class 8 – Intercompany Interests.

(a)     Classification:  Class 8 consists of all Intercompany Interests.

(b)     Treatment:  On the Effective Date, Intercompany Interests shall, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), be (i) Reinstated or (ii) set off, settled, addressed, distributed, contributed, merged, cancelled, or released.

(c)     Voting:  Allowed Intercompany Interests are Unimpaired if such Interests are Reinstated, or are Impaired if such Interests are cancelled.  Holders of Intercompany Interests are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject this Plan.

9.     Class 9 – Existing C1 Interests.

(a)     Classification:  Class 9 consists of all Existing C1 Interests.

(b)     Treatment:  On the Effective Date, Existing C1 Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing C1 Interests shall not receive any distribution on account thereof.

002421
**App. 690**

       (c)    <u>Voting</u>:  Allowed Existing C1 Interests are Impaired under this Plan.  Each Holder of an Allowed Existing C1 Interest is conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Existing C1 Interests are not entitled to vote to accept or reject this Plan.

D.      <u>Special Provision Governing Unimpaired Claims</u>.

Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

E.      <u>Elimination of Vacant Classes</u>.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      <u>Acceptance by Impaired Classes</u>.

An Impaired Class of Claims shall have accepted this Plan, if not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan, and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept this Plan.

G.      <u>Voting Classes, Presumed Acceptance by Non-Voting Classes</u>.

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject this Plan, the Holders of such Claims in such Class shall be deemed to have accepted this Plan.

H.      <u>Intercompany Interests</u>.

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Equity Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims.

I.      <u>Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code</u>.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to **Article III.C** of this Plan.  The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with **Article X** of this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment

002422

applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

J.      No Substantive Consolidation.

Although this Plan is presented as a joint plan of reorganization for administrative purposes, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Except as expressly provided herein, nothing in this Plan, the Confirmation Order, or the Disclosure Statement shall constitute or be deemed to constitute a representation that any one or all of the Debtors is subject to or liable for any Claims or Interests against or in any other Debtor.  A Claim or Interest against or in multiple Debtors will be treated as a separate Claim or Interest against or in each applicable Debtor's Estate for all purposes, including voting and distribution; *provided*, *however*, that no Claim will receive value in excess of one hundred percent (100.0%) of the Allowed amount of such Claim (inclusive of post-petition interest, if applicable) under the Plan for all such Debtors.

K.      Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired or is properly classified under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

L.      Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to this Plan.


**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

A.      General Settlement of Claims and Interests.

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies (including the PVKG Note Claims Settlement) resolved pursuant to this Plan, including any challenge to the amount, validity, perfection, enforceability, priority, or extent of the First Lien Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise.  This Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to **Article VI** hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

002423

B.     PVKG Note Claims Settlement.

The allowance and treatment of the PVKG Note Claims under this Plan, together with the other terms and conditions set forth in this Plan and the Confirmation Order (including the releases of and by the PVKG Lender set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement of the PVKG Note Claims pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code.  The PVKG Note Claims Settlement is incorporated into this Plan and includes the following material terms and conditions:

1.     The PVKG Note Claims shall be Allowed on the Effective Date against the Debtors in the amount of $213,000,000.00.

2.     The PVKG Note Claims shall receive the treatment set forth in **Article III.C.3** hereof. For the avoidance of doubt, the PVKG Lender shall waive any Claims other than the PVKG Note Claims that it may have, including any General Unsecured Claims, if any; *provided* that the foregoing shall not limit the payment or reimbursement of the Restructuring Expenses by the Debtors or the Reorganized Debtors.

3.     PVKG Lender, as the Holder of the PVKG Note Claims, shall support Confirmation of this Plan and shall timely submit a ballot accepting the Plan, in each case in accordance with the terms and conditions of the Restructuring Support Agreement.

This Plan shall be deemed a motion to approve the good faith compromise and settlement of the PVKG Note Claims Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, within the range of reasonableness, and in the best interests of the Debtors and their Estates.

C.     Restructuring Transactions.

Before, on, and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions (which, for the avoidance of doubt, shall be in form and substance acceptable to the Required Consenting Lenders, and, subject to the consent rights set forth in the Restructuring Support Agreement, reasonably acceptable to the Required Consenting Second Lien Lenders, and otherwise consistent with the Restructuring Support Agreement) and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan that are consistent with and pursuant to the terms and conditions of this Plan, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, and the Restructuring Support Agreement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, the Confirmation Order, and the Restructuring Support Agreement and having other terms to which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable Governance Documents; (4) the execution and delivery of the Exit Facilities Documents and entry into the Exit Facilities; (5) pursuant to the Rights Offering Documents, the implementation of the Rights Offering, the distribution of the Rights to the Eligible Offerees, the issuance of the New Equity Interests in connection therewith, the execution and

32

implementation of the Backstop Agreement in connection therewith; (6) the issuance of the Term DIP Loan Rights and the New Equity Interests in connection therewith; (7) the issuance and distribution of the New Equity Interests as set forth in this Plan; (8) the reservation of the Management Incentive Plan Pool; (9) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Description of Transaction Steps; and (10) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

D.     The Reorganized Debtors.

On the Effective Date, the New Board shall be established in accordance with the terms of the Governance Term Sheet, and each Reorganized Debtor shall adopt its Governance Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan.

E.     Sources of Consideration for Plan Distributions.

Each distribution and issuance referred to in **Article VI** of this Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with this Plan, including the New Equity Interests will be exempt from SEC registration, as described more fully in **Article IV.M** below.

1.     Exit Facilities.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facilities Documents. Confirmation of this Plan shall be deemed final approval of the Exit Facilities and the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Facilities Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities. Execution of the Exit Term Loan Credit Agreement by the Exit Term Loan Agent shall be deemed to bind all Holders of First Lien Claims and all Exit Term Loan Facility Lenders as if each such Holder or Exit Term Loan Facility Lender had executed the Exit Term Loan Credit Agreement with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Persons and Entities granted such

33

Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

2.   Rights Offering.

The Debtors shall distribute the Rights to the Eligible Offerees as set forth in this Plan and the Rights Offering Documents.  Pursuant to the Rights Offering Documents, the Rights Offering shall be open to all Eligible Offerees, and Eligible Offerees shall be entitled to participate in the Rights Offering up to a maximum amount of each such Eligible Offeree's Pro Rata portion (calculated based on the aggregate principal amount of First Lien Claims held by such Eligible Offeree relative to the aggregate principal amount of all First Lien Claims held by Eligible Offerees that exercised, or are deemed to have validly exercised, the Rights Offering Rights and Takeback Term Loan Recovery Option) of the Rights. Each Eligible Offeree (other than Eligible Offerees that are also Investors, who must exercise all of their Rights) may exercise either all, a portion of, or none of its Rights in exchange for Cash (or, if such Eligible Offeree is also a DIP Lender, such Eligible Offeree's Term DIP Loan Rights).  The Rights are not separately transferrable or detachable from the First Lien Claims and may only be transferred together with the First Lien Claims.

New C1 shall be authorized to issue the New Equity Interests issuable pursuant to such exercise on the Effective Date pursuant to the terms of this Plan and the Rights Offering Documents.

The Rights Offering will be fully backstopped, severally and not jointly, by the Investors' Backstop Commitment pursuant to the Backstop Agreement.  In addition, the Investors will be allocated, and shall purchase and subscribe for, the Direct Investment pursuant to the terms of the Backstop Agreement and Backstop Order.  The Reorganized Debtors will issue the Put Option Premium to the Investors on the Effective Date in accordance with the terms and conditions set forth in the Backstop Agreement, the Backstop Order, and this Plan, in respect of their respective Backstop Commitments and Direct Investment Commitments.  Pursuant to the terms of the Rights Offering, each Investor may, at its sole option, exercise its Term DIP Loan Rights in satisfaction of its commitments under the Rights Offering and Backstop Agreement.

New Equity Interests issued pursuant to the Rights Offering and the Direct Investment shall be offered (and the Put Option Premium shall be issued) at the Plan Discount.

Entry of the Backstop Order and Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering, the Direct Investment, the Backstop Commitment, the Direct Investment Commitment, the Put Option Premium, and the Backstop Agreement (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by New C1 in connection therewith).  On the Effective Date, the rights and obligations of the Debtors under the Backstop Agreement shall vest in the Reorganized Debtors, as applicable.

The proceeds of the Rights Offering may be used by the Reorganized Debtors to make distributions pursuant to this Plan and fund general corporate purposes.

34

When the issuance of New Equity Interests pursuant to this Plan and the Rights Offering Documents would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual issuance of shares of New Equity Interests shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Equity Interests shall be adjusted as necessary to account for the foregoing rounding.

      3.    <u>New Equity Interests</u>.

New C1 shall be authorized to issue a certain number of shares of New Equity Interests pursuant to its Governance Documents.  The issuance of the New Equity Interests shall be authorized without the need for any further corporate action.  On the Effective Date, the New Equity Interests shall be issued and distributed as provided for in the Description of Transaction Steps to the Entities entitled to receive the New Equity Interests pursuant to, and in accordance with, this Plan.

All of the shares of New Equity Interests issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in **Article VI** hereof shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Equity Interests shall be deemed as its agreement to the Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.  The New Equity Interests will not be registered under the Securities Act or listed on any exchange as of the Effective Date and are not expected to meet the eligibility requirements of the DTC.

      4.    <u>Use of Cash</u>.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the Rights Offering to fund distributions to certain Holders of Allowed Claims, consistent with the terms of this Plan.

F.    <u>Corporate Existence</u>.

Except as otherwise provided in this Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be and as contemplated by the Description of Transaction Steps, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under this Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

The Reorganized Debtors shall be authorized to dissolve the Debtors or the Reorganized Debtors in accordance with applicable law or otherwise, in each case as contemplated by the Description of Transaction Steps, including, for the avoidance of doubt, any conversion of any of the Debtors or the Reorganized Debtors pursuant to applicable law, and to the extent any such Entity is dissolved, such Entity shall be deemed dissolved pursuant to the Plan and shall require no further action or approval (other than any requisite filings required under applicable state or federal law).

002427
**App. 696**

G.      <u>Vesting of Assets in the Reorganized Debtors</u>.

Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, except as otherwise provided in this Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      <u>Cancellation of Existing Agreements and Interests</u>.

On the Effective Date, except with respect to the Exit Facilities, or to the extent otherwise provided in this Plan, including in **Article V.A** hereof, the Confirmation Order, or any other Definitive Document, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect; *provided, however*, that notwithstanding anything to the contrary contained herein, any agreement that governs the rights of the DIP Agents shall continue in effect solely for purposes of allowing the DIP Agents to (i) enforce their rights against any Person other than any of the Released Parties, pursuant and subject to the terms of the DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (ii) receive distributions under this Plan and to distribute them to the Holders of the Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (iii) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, and (iv) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agents, or Holders of the ABL DIP Facility Claims and Term DIP Facility Claims under this Plan, as applicable.  Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to this Plan.

Notwithstanding the preceding paragraph, any credit agreement or other instrument that governs the rights, claims, and remedies of the Holder of a Claim shall continue in full force and effect for the limited purposes of allowing Holders of Allowed Claims to receive distributions under this Plan and permitting the Reorganized Debtors and any other Distribution Agent, as applicable, to make distributions on account of the applicable Claims.

On the Effective Date, each holder of a certificate or instrument evidencing a Claim or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture or agreement that governs the rights of such holder of such Claim or Interest.  Such surrendered certificate or instrument shall be deemed canceled as set forth in, and subject to the exceptions set forth in, this **Article IV.H**.

002428
**App. 697**

I.        Corporate Action.

Upon the Effective Date, all actions contemplated under this Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtors in accordance with the Governance Term Sheet; (3) the issuance and distribution of the New Equity Interests; (4) implementation of the Restructuring Transactions, including the Rights Offering; (5) entry into the Exit ABL Facility Documents; (6) entry into the Exit Term Loan Facility Documents; (7) all other actions contemplated under this Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the Governance Documents; (9) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases that are not rejected; (10) reservation of the Management Incentive Plan Pool; and (11) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Interests, the Governance Documents, the Exit ABL Facility, the Exit Term Loan Facility, the Exit ABL Facility Documents, and the Exit Term Loan Facility Documents, any other Definitive Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this **Article IV.I** shall be effective notwithstanding any requirements under non-bankruptcy law.

J.        Governance Documents.

On or immediately prior to the Effective Date, the Governance Documents shall be adopted or amended in a manner consistent with the terms and conditions set forth in the Governance Term Sheet, as may be necessary to effectuate the transactions contemplated by this Plan.  Each of the Reorganized Debtors will file its Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The Governance Documents shall prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the Governance Documents shall be included as exhibits to the Plan Supplement.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

On the Effective Date, New C1 shall enter into and deliver the New Equityholders' Agreement to each Holder of New Equity Interests, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.  On the Effective Date, Holders of New Equity Interests shall be deemed to have executed the New Equityholders' Agreement and be parties thereto, without the need to deliver signature pages thereto.

002429
**App. 698**

K.      Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors or other Governing Body of C1 Holdings and PVKG Intermediate shall expire, and the members for the initial term of the New Board shall be appointed in accordance with the Governance Documents.  The New Board shall consist of members as designated in accordance with the Governance Term Sheet.  The Chief Executive Officer of New C1 shall serve on the board of directors of New C1; all other initial directors shall be appointed by the Required Consenting Lenders, with representation being proportionate to post-emergence equity ownership and subject to agreed-upon sunsets.  For the avoidance of doubt, each Initial First Lien Ad Hoc Group Member and the PVKG Lender shall each be entitled to appoint one director to serve on the New Board, so long as such entity is contemplated to receive no less than 10% of the fully diluted New Equity Interests (excluding New Equity Interests reserved for the post-Effective Date Management Incentive Plan).  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the Governance Documents and other constituent documents of the Reorganized Debtors.

The Subsequent First Lien Ad Hoc Group Members and the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative as a non-voting observer to the New Board; *provided* that such entitlement shall expire if such holders, at any time, cease to hold in excess of 12.5% of the New Equity Interests in the aggregate.

In addition, the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative to receive materials that were presented to the New Board at any board meeting; *provided*, *however*, that such representative shall sign a customary non-disclosure agreement (which shall provide that such representative may share such materials with Required Consenting Initial Second Lien Ad Hoc Group Members that are subject to confidentiality restrictions and whose individual holdings exceed 1% of the New Equity Interests), and New C1 shall be entitled to not include any privileged or competitively sensitive information, and such entitlement shall expire if such holders, at any time, cease to hold in excess of 1.0% of the New Equity Interests in the aggregate.

L.      Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of this Plan and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

M.      Certain Securities Law Matters.

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of Securities under the Plan.

The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Equity Interests, will be exempt from the registration requirements of section 5 of the Securities Act or

38

any similar federal, state, or local law in reliance on (1) with respect to the New Equity Interests issued pursuant to the Rights Offering (other than with respect to the Backstop Commitment and the Direct Investment Commitment), section 1145 of the Bankruptcy Code, (2) with respect to the New Equity Interests issuable pursuant to the Plan as the Second Lien Recovery, section 1145 of the Bankruptcy Code, and (3) with respect to the New Equity Interests issued pursuant to the Direct Investment, the Put Option Premium, and the unsubscribed New Equity Interests issued to the Investors pursuant to the Backstop Agreement, section 4(a)(2) of the Securities Act or Regulation D or Regulation S promulgated thereunder.

The New Equity Interests issued pursuant to section 1145 of the Bankruptcy Code (i) will not be a "restricted security" as defined in Rule 144(a)(3) under the Securities Act and (ii) will be freely transferable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the provisions of Rule 144 under the Securities Act with respect to a holder thereof that (x) is, or within 90 days of such transfer has been, an "affiliate" within the meaning of Rule 144(a)(1) or (y) has acquired the New Equity Interests from an "affiliate" in a transaction or chain of transactions not involving any public offering within one year of such transfer; and (c) any restrictions on the transferability of such New Equity Interests in the New Organizational Documents.

The New Equity Interests, including the Direct Investment and the New Equity Interests reserved for issuance under the Management Incentive Plan Pool, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S thereunder, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

N.    Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to:  (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code,

002431

**App. 700**

shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.     Employment Obligations.

Unless otherwise provided herein or the Confirmation Order, specifically rejected pursuant to a separate order of the Bankruptcy Court, specifically designated as a contract or lease to be rejected on the Rejected Executory Contract and Unexpired Lease List, or the subject of a separate rejection motion Filed by the Debtors, and subject to **Article V** of this Plan, all written employment, confidentiality, non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock units, and other equity awards), discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, vacation, holiday pay, severance, retirement, retention, supplemental retirement, executive retirement, pension, deferred compensation, indemnification, other similar employee-related agreements or arrangements, retirement income plans, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements that are in effect immediately prior to the Effective Date with the Debtors, (a) shall be assumed by the Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Effective Date, or (b) solely with the consent of the Required Consenting Lenders, the Reorganized Debtors shall enter into new agreements with such employees on terms and conditions acceptable to the Reorganized Debtors and such employee; *provided, however*, that the Debtors shall not enter into new agreements with insider employees absent the consent of the Required Consenting Lenders.

Notwithstanding the foregoing, and unless otherwise provided in the Plan Supplement, all plans or programs calling for stock grants, stock issuances, stock reserves, or stock options shall be deemed rejected with regard to such issuances, grants, reserves, and options. The Debtors shall not assume any agreements or obligations relating to the Employee Partnership Sale Units, which shall be cancelled as of the Effective Date and shall receive no payment on account thereof from the Debtors or the Reorganized Debtors. For the avoidance of doubt, no provision in any agreement, plan, or arrangement to be assumed pursuant to the foregoing paragraph relating to the award of equity or equity-like compensation shall be binding on, or honored by, the Reorganized Debtors. Nothing in this Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

P.     Management Incentive Plan.

On the Effective Date, the Management Incentive Plan Pool shall be reserved for management, key employees, and directors of the Reorganized Debtors. Following the Effective Date, the New Board will adopt the Management Incentive Plan, the terms of which, including with respect to participants, form, allocation, structure, and vesting, shall be determined by the New Board. Following the implementation of the Management Incentive Plan, the issuance of the New Equity Interests and any equity reserved for issuance under the Management Incentive Plan (to the extent applicable) shall be authorized without the need for any further corporate action and without any further action by the Debtor and the Reorganized Debtors or any of their equity holders, as applicable.

002432
**App. 701**

Q.      Preservation of Causes of Action.

        In accordance with section 1123(b) of the Bankruptcy Code, but subject to the PVKG Note Claims Settlement and **Article VIII** hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the PVKG Note Claims Settlement and the releases and exculpations contained in this Plan, including in **Article VIII**.

        The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan, including the PVKG Note Claims Settlement and Article VIII of this Plan**. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

        The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in this Plan, including the PVKG Note Claims Settlement and **Article VIII** of this Plan. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

R.      Dissolution of Certain Debtors.

        On or after the Effective Date, certain of the Debtors may be dissolved without further action under applicable law, regulation, Order, or rule, including any action by the stockholders, members, the board of directors, or similar Governing Body of the Debtors or the Reorganized Debtors; *provided* that, subject in all respects to the terms of this Plan, the Reorganized Debtors shall have the power and authority to take any action necessary to wind down and dissolve the foregoing Debtors, and may, to the extent applicable and in accordance with the Description of Transaction Steps: (1) file a certificate of dissolution for such Debtors, together with all other necessary corporate and company documents, to effect such Debtors' dissolution under the applicable laws of their states of formation; (2) complete and file all final or otherwise required federal, state, and local tax returns and pay taxes required to be paid for such Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any such Debtors or their Estates, as determined under

002433

**App. 702**

applicable tax laws; and (3) represent the interests of the Debtors or their Estates before any taxing authority in all tax matters, including any action, proceeding or audit.

S.      <u>Closing the Chapter 11 Cases</u>.

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

T.      <u>Post-Effective Date Payment of Restructuring Expenses</u>.

Following the Effective Date, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course, the Restructuring Expenses related to this Plan and implementation, consummation, and/or defense of the Restructuring Transactions, whether incurred before, on, or after the Effective Date, in accordance with any applicable engagement letter, any order of the Bankruptcy Court (including, without limitation, the DIP Orders), and the Restructuring Support Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      <u>Assumption of Executory Contracts and Unexpired Leases</u>.

Each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion or notice to reject pending as of the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumption of the Restructuring Support Agreement pursuant to sections 365 and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.  The Restructuring Support Agreement shall be binding and enforceable against the parties to the Restructuring Support Agreement in accordance with its terms.  For the avoidance of doubt, the assumption of the Restructuring Support Agreement herein shall not otherwise modify, alter, amend, or supersede any of the terms or conditions of the Restructuring Support Agreement including, without limitation, any termination events or provisions thereunder.

002434

**App. 703**

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions of the Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease or the execution of any other Restructuring Transaction (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  For the avoidance of doubt, consummation of the Restructuring Transactions shall not be deemed an assignment of any Executory Contract or Unexpired Lease of the Debtors, notwithstanding any change in name, organizational form, or jurisdiction of organization of any Debtor in connection with the occurrence of the Effective Date.

Notwithstanding anything to the contrary in the Plan (except for the consent rights set forth in **Article I.G**), the Debtors or Reorganized Debtors, as applicable, reserve the right to amend or supplement the Rejected Executory Contract and Unexpired Lease List in their discretion (but with the consent of the Required Consenting Lenders) prior to the Confirmation Date (or such later date as may be permitted by **Article V.C** or **Article V.E** below), provided that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have no less than seven (7) days to object thereto on any grounds.

B.    Indemnification Obligations.

All indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for (each in their capacities as such) the current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants, and other professionals of, or acting on behalf of, the Company Parties, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Company Parties than the indemnification provisions in place prior to the Effective Date; *provided* that nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.  For the avoidance of doubt, following the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company Parties who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date.

002435
**App. 704**

C.      <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in this Plan or the Rejected Executory Contract and Unexpired Lease List, as applicable.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent at the address specified in any notice of entry of the Confirmation Order and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection.  **Any Proofs of Claim arising from the rejection of an Executory Contract or Unexpired Lease not timely Filed with the Claims and Noticing Agent shall be automatically Disallowed without further order of the Bankruptcy Court, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in <u>Article VIII.F</u> of this Plan, notwithstanding anything in a Proof of Claim to the contrary.**  All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim, as applicable, pursuant to **<u>Article III.C</u>** of this Plan and may be objected to in accordance with the provisions of **<u>Article VII</u>** of this Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  Notwithstanding anything to the contrary in this Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List (with the consent of the Required Consenting Lenders) at any time through and including thirty days after the Effective Date.

D.      <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>.

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Claim; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim.  The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or Reorganized Debtors, for which such objection is timely Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

002436
**App. 705**

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim pursuant to this **Article V.D** shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Claim has been fully paid pursuant to this Article V.D, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

E.    Insurance Policies.

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan. Unless otherwise provided in this Plan or listed on the Rejected Executory Contract and Unexpired Lease List, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court. Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed. The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary. For the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.

F.    Workers' Compensation Program.

As of the Effective Date, the Debtors and Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Program. All Proofs of Claims on account of workers' compensation, including the Workers' Compensation Program, shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of

45

Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; *provided further*, *however*, that nothing herein shall be deemed to impose any obligations on the Debtors or their insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

G.      Reservation of Rights.

Nothing contained in this Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to **Article XI** of this Plan.

H.      Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      Contracts and Leases Entered Into After the Petition Date.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**ARTICLE VI.
PROVISIONS GOVERNING DISTRIBUTIONS**

A.      Distributions on Account of Claims Allowed as of the Effective Date.

Unless otherwise provided in the Plan, on or as soon as practicable after the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in **Article VII** hereof.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      Distribution Agent.

All distributions under this Plan shall be made by the Distribution Agent.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      Rights and Powers of the Distribution Agent.

1.      Powers of the Distribution Agent.

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

D.      Special Rules for Distributions to Holders of Disputed Claims.

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.      Delivery of Distributions in General.

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim Filed by that Holder or the address in any written notice of address change delivered to the Debtors or the Distribution Agent; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

002439

**App. 708**

Notwithstanding the foregoing, (a) all distributions on account of DIP Claims will be made to the applicable DIP Agent, and the DIP Agent will be, and will act as, the Distribution Agent with respect to the DIP Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; (b) all distributions on account of First Lien Term Loan Claims will be made to the First Lien Term Loan Agent, and the First Lien Term Loan Agent will be, and will act as, the Distribution Agent with respect to the First Lien Term Loan Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; and (c) all distributions on account of Second Lien Claims will be made to the Second Lien Agent, and the Second Lien Agent will be, and will act as, the Distribution Agent with respect to the Second Lien Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

    3.    Undeliverable Distributions and Unclaimed Property.

    In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interests; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property shall be discharged and forever barred.  The Reorganized Debtors and the Distribution Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

F.    Manner of Payment.

    At the option of the Distribution Agent, any Cash distribution to be made hereunder may be made by check, wire transfer, automated clearing house, or credit card, or as otherwise required or provided in applicable agreements.  All distributions of Cash to the Holders of the applicable Allowed Claims under this Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or Reorganized Debtor.

G.    Compliance with Tax Requirements.

    In connection with this Plan, to the extent applicable, the Debtors, Reorganized Debtors, Distribution Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

002440
**App. 709**

H.     <u>Allocations</u>.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.     <u>No Postpetition Interest on Claims</u>.

Unless otherwise specifically provided for in this Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.     <u>Foreign Currency Exchange Rate</u>.

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.     <u>Setoffs and Recoupment</u>.

Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or assigned on or before the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); *provided*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

L.     <u>Claims Paid or Payable by Third Parties</u>.

1.     <u>Claims Paid by Third Parties</u>.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the second to last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not an Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the

49

amount of such Claim as of the date of any such distribution under this Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

If an applicable insurance policy has a SIR or a deductible, the Holder of an Allowed Claim that is payable pursuant to such insurance policy shall have an Allowed General Unsecured Claim against the applicable Debtor's estate up to the amount of the SIR or deductible amount that may be established upon the liquidation of the Claim and such Holder's recovery from the Debtors or Reorganized Debtors shall be solely in the form of its distribution on account of such Allowed General Unsecured Claim under this Plan. Any recovery on account of the Claim in excess of the SIR or deductible established upon the liquidation of the Claim shall be recovered solely from insurance coverage (if any) and only to the extent of available insurance coverage and any proceeds thereof, if any. Nothing in this Plan shall be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy.

3.      Applicability of Insurance Policies.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      Disputed Claims Process.

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan and as otherwise required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim Filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of

50

Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure Claim pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under the Plan, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired Lease in accordance with **Article V.C**.  Notwithstanding the foregoing, Entities must File cure objections as set forth in **Article V.D** of the Plan to the extent such Entity disputes the amount of the Cure Claim paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.       Allowance of Claims.

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.       Claims Administration Responsibilities.

Subject to any applicable restrictions in the Restructuring Support Agreement, the Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority, without further notice to or action, order, or approval of the Bankruptcy Court, to (i) File, prosecute, litigate to judgment, or withdraw any objections to Claims, (ii) settle, compromise, or resolve any such objections to Claims, and (iii) administer and adjust the Claims Register to reflect such settlements or compromises.  Except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such debtor had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including the Causes of Action retained pursuant to this Plan.

**Any objections to Claims other than General Unsecured Claims must be served and Filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims other than General Unsecured Claims not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.**

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law.  If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

002443

**App. 712**

D.      Adjustment to Claims or Interests Without Objection.

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      Distributions After Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

**ARTICLE VIII.
SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      Discharge of Claims and Termination of Interests.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.      Release of Liens.

**Except as otherwise provided in the Exit Facilities Documents, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors**

elect to Reinstate in accordance with <u>Article III.C.1</u> hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The <u>foregoing direction to release liens shall be considered a direction in accordance with, as applicable, the First Lien Term Loan Credit Agreement and the Second Lien Credit Agreement, as if such direction included the signatures of the necessary lenders thereunder to direct the applicable agent to take the actions contemplated thereby.  The</u> presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

C.      <u>Releases by the Debtors</u>.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, and except as expressly provided in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of the Debtors and the Estates, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the PVKG Notes Purchase Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this

002445

**Plan, the Exit Facilities Documents, the Governance Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding the foregoing, nothing in this** Article VIII.C **shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person or Entity that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to Confirmation of this Plan; (2) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing this Plan; (3) a good faith settlement and compromise of the Claims released by the Debtor Release; (4) in the best interests of the Debtors and all Holders of Claims and Interests; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

D.      Releases by Third Parties.

**Except as otherwise expressly set forth in this Plan or the Confirmation Order, and except for the rights that remain in effect from and after the Effective Date to enforce this Plan, the Definitive Documents, and the obligations contemplated by the Restructuring Transactions or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Estates, the Chapter 11 Cases, the Restructuring Transactions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving**

002446

**App. 715**

rise to, any Claim or Interest that is treated under this Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the PVKG Notes Purchase Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, the Plan Supplement, this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, the Exit Facilities Documents, the Governance Documents, and all other Definitive Documents, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in the preceding paragraph shall not release any Released Party (other than a Released Party that is a Reorganized Debtor, Debtor, or a director, officer, or employee of any Debtor as of the Petition Date), from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) consensual; (2) essential to the confirmation of this Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

E.       Exculpation.

Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action or Claim whether direct or derivate related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, this Plan, the Plan Supplement, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the solicitation of votes for the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, except for Claims related to any act or omission that is determined in a Final Order to have

55

constituted willful misconduct, gross negligence, or actual fraud, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan and the Confirmation Order.

The Exculpated Parties set forth above have, and upon Confirmation of this Plan shall be deemed to have, participated in good faith and in compliance with applicable law with respect to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

F.      Injunction.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and Affiliates, and each of their successors and assigns, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan in relation to any Claim or Interest that is extinguished, discharged, or released pursuant to this Plan.

Except as otherwise expressly provided in this Plan, the Definitive Documents, or the Confirmation Order, or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation pursuant to Article VIII, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties, and/or the Released Parties:

(a)     commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(b)     enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or Order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(c)     creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;

(d)     except as otherwise provided under this Plan, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

(e)     commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to this Plan or the Confirmation Order.

002448

**App. 717**

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action related to the Chapter 11 Cases prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Restructuring Transactions, the Governance Documents, the Backstop Agreement, the Rights Offering, the Rights Offering Documents, the ABL DIP Facility, the Term DIP Facility, the DIP Orders, the Disclosure Statement, this Plan, the Plan Supplement, the PVKG Notes Purchase Agreement, or any transaction related to the Restructuring, any contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Transactions, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing, without regard to whether such Person or Entity is a Releasing Party, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action. The injunction in this Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under this Plan, the Confirmation Order, or under any other Definitive Document or other document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order from bringing an action to enforce the terms of this Plan, the Confirmation Order, the Definitive Documents, or such document, instrument, or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement this Plan and the Confirmation Order.

Nothing in the Plan, the Confirmation Order, or other related Plan documents (the "Plan Documents") shall (i) discharge or release the Debtors, the Reorganized Debtors, any Released Party, any non-debtor, or any other person from any right, claim, liability, or cause of action of or to the United States of America, inclusive of its agencies and sub-agencies (the "United States"), (ii) impair the ability of the United States from pursuing any claim, liability, right, defense, or cause of action against the Debtors, Reorganized Debtors, any Released Party, any non-debtor, or any other person, (iii) cause the United States to be a Releasing Party under the Plan Documents, (iv) be construed as a compromise or settlement of any claim, interest, or cause of action of the United States, (v) affect or impair the exercise of the United States' police and regulatory powers, (vi) constitute an approval or consent by the United States without compliance with all applicable legal requirements and approvals under non-bankruptcy law, or (vii) exculpate any party or person from any liability to the United States whatsoever.  Notwithstanding anything to the

57

**contrary in the foregoing and for the avoidance of doubt, the United States shall remain subject to the terms of Article VII of the Plan.**

G.      Waiver of Statutory Limitations on Releases.

**Each Releasing Party in each of the releases contained in this Plan expressly acknowledges that although ordinarily a general release may not extend to Claims that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law that provides that a release does not extend to Claims that the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party. The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.**

H.      Protections Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      Document Retention.

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policies, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

J.      Reimbursement or Contribution.

If the Bankruptcy Court Disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of Allowance or Disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

002450
**App. 719**

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN**

A.    Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of **Article IX.B** hereof:

1.    The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Lenders or the Required Consenting Second Lien Lenders and shall be in full force and effect;

2.    The Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order, the latter of which shall be in full force and effect;

3.    The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with and subject to the consent rights set forth in the Restructuring Support Agreement, and the Confirmation Order shall be in full force and effect;

4.    The 9019 settlements embodied in this Plan shall have been approved by the Bankruptcy Court and incorporated in the Confirmation Order;

5.    The Backstop Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order), and shall be in full force and effect;

6.    The Debtors shall have received a commitment for the Exit ABL Facility, which shall refinance the ABL DIP Facility on the Effective Date and the terms and conditions of which shall be reasonably satisfactory to the Debtors and the Required Consenting Lenders;

7.    The Rights Offering and the Direct Investment (including the Rights Offering Documents) shall have been approved by the Bankruptcy Court and shall have been consummated in accordance with their terms;

8.    The Exit ABL Facility Documents and Exit Term Loan Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions;

9.    The New Equity Interests shall have been issued;

10.    All Restructuring Expenses shall have been paid in full in Cash;

11.    The Definitive Documents shall (a) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (b) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (c) shall be adopted on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet; and

59

12.     The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions.

B.      Waiver of Conditions.

The conditions to the Effective Date set forth in this **Article IX** may be waived, in whole or in part, by the Debtors only with the prior written consent of the Required Consenting Lenders (email shall suffice), and, solely with respect to the condition set forth in **Article IX.A** (1) (solely with respect to the Required Consenting Second Lien Lenders), (9), (10), (11), and (12), the Required Consenting Second Lien Lenders (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

C.      Substantial Consummation.

Consummation of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.      Effect of Failure of Conditions.

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.      Modification and Amendments.

Except as otherwise specifically provided in this Plan and to the extent permitted by the Restructuring Support Agreement, subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors reserve the right to modify this Plan without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. After the Confirmation Date and before substantial consummation of the Plan, the Debtors may initiate proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and intent of the Plan.

After the Confirmation Date, but before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court; provided that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests.

60

Notwithstanding anything to the contrary herein, the Debtors shall not amend or modify this Plan in a manner inconsistent with the Restructuring Support Agreement or the Backstop Agreement.

B.     Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     Revocation or Withdrawal of Plan.

Subject to the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then:  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or relating to, the Chapter 11 Cases, the Confirmation Order, and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.     Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or Allowance of Claims or Interests;

2.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan;

3.     resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including Cure Claims; (ii) any dispute regarding whether a contract or lease is or was executory, expired, or terminated; (iii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iv) any other issue related to any Executory Contracts and Unexpired Leases; or (v) any dispute regarding whether the Plan or any Restructuring Transactions trigger any cross-default or change of control provision in any contract or agreement;

61

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes arising from or relating to distributions under this Plan or the Confirmation Order;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action that may arise from or in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan or the Confirmation Order and the administration of the Estates;

11.      hear and determine disputes arising in connection with the interpretation, implementation, effect, or enforcement of this Plan or the Plan Supplement, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

12.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan or the Confirmation Order;

13.      adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in **Article VIII** hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

14.      adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to **Article VI** hereof;

15.      enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.      determine any other matters that may arise in connection with or relate to this Plan, the Definitive Documents, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any contract, instrument, release, indenture, or other agreement or document created in connection with this

002454
**App. 723**

Plan, the Plan Supplement, or the Disclosure Statement, including the Restructuring Support Agreement; _provided_ that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court or arbitration forum;

17.    enter an order concluding or closing the Chapter 11 Cases;

18.    consider any modifications of this Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.    adjudicate, decide, or resolve disputes as to the ownership of any Claim or Interest;

21.    adjudicate, decide, or resolve all matters related to any subordinated Claim;

22.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

23.    adjudicate, decide, or resolve matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

24.    grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

25.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under **Article VIII** hereof;

26.    hear and determine all disputes involving the obligations or terms of the Rights Offering, the Direct Investment, and the Backstop Agreement;

27.    enforce all orders previously entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

28.    hear any other matter not inconsistent with the Bankruptcy Code; and

29.    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Person or Entity's rights arising from or obligations incurred in connection with the Plan.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11

002455
**App. 724**

Cases, including the matters set forth in this **Article XI**, the provisions of this **Article XI** shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior Order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

As of the Effective Date, notwithstanding anything in this **Article XI** to the contrary, the Exit Facilities Documents shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      Immediate Binding Effect.

Subject to **Article IX.A** hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted or rejected this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan or the Confirmation Order, each Entity acquiring property under this Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan and the Confirmation Order, regardless of whether any such Holder of a Claim or Interest has voted on this Plan.

B.      Waiver of Stay.

The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order shall be waived by the Confirmation Order.  The Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

C.      Additional Documents.

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan or the Confirmation Order.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan and the Confirmation Order.

D.      Payment of Statutory Fees.

All fees payable pursuant to section 1930(a) of the Judicial Code shall be paid by each of the Debtors or the Reorganized Debtors (or the Distribution Agent on behalf of each of the Reorganized

002456

**App. 725**

Debtors), as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the Reorganized Debtors (or the Distribution Agent on behalf of each of the Reorganized Debtors) shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made during the applicable period, attested to by the Reorganized Debtors.  The obligation to file quarterly reports shall continue until the earliest of the Debtors' cases being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

E.      Statutory Committee and Cessation of Fee and Expense Payment.

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except with respect to final fee applications of the Professionals.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

F.      Reservation of Rights.

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any Entity unless and until the Effective Date occurs.

G.      Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.      Notices.

To be effective, all notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.      if to the Debtors or the Reorganized Debtors, to:
ConvergeOne Holdings, Inc.
10900 Nesbitt Avenue South
Bloomington, MN 55437
Attention:  Rui Goncalves
E-mail:  rgoncalves@onec1.com

with copies (which shall not constitute notice) to:

002457
**App. 726**

White & Case LLP
111 South Wacker Drive
Chicago, IL 60606
Attention:  Bojan Guzina, Andrew F. O'Neill, Erin R. Rosenberg, Blair M. Warner, and Adam T. Swingle
E-mail:  bojan.guzina@whitecase.com
            aoneill@whitecase.com
            erin.rosenberg@whitecase.com
            blair.warner@whitecase.com
            adam.swingle@whitecase.com

2.    if to the PVKG Lender or a Consenting Sponsor, to:
       PVKG Investment Holdings, Inc.
       Attention:  Lars Haegg and PJ Heyer
       E-mail:  lhaegg@cvc.com
                  pheyer@cvc.com

       with copies to:

       Latham & Watkins LLP
       1271 6th Avenue
       New York, NY 10020
       Attention:  Keith A. Simon, Joshua Tinkelman, and David Hammerman
       E-mail: keith.simon@lw.com
                 joshua.tinkelman@lw.com
                 david.hammerman@lw.com

3.    if to a member of the First Lien Ad Hoc Group, to:
       Gibson Dunn & Crutcher LLP
       200 Park Avenue
       New York, NY 10166
       Attention:  Scott J. Greenberg, Keith R. Martorana, and Michelle Choi
       E-mail:   SGreenberg@gibsondunn.com
                   KMartorana@gibsondunn.com
                   MChoi@gibsondunn.com

4.    if to a member of the Second Lien Ad Hoc Group, to:
       Davis Polk & Wardwell LLP
       450 Lexington Avenue
       New York, NY 10017
       Attention:  Adam L. Shpeen and Abraham Bane
       E-mail address:  adam.shpeen@davispolk.com
                           abraham.bane@davispolk.com

       After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

002458
**App. 727**

I.	Term of Injunctions or Stays.

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.	Entire Agreement.

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, this Plan (including, for the avoidance of doubt, the Plan Supplement), the Confirmation Order, and the applicable Definitive Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan, the Confirmation Order, the Definitive Documents, the Plan Supplement, and the documents related thereto.

K.	Exhibits.

All exhibits and documents included in this Plan, the Confirmation Order, and the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/C1 or the Bankruptcy Court's website at http://www.txs.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

L.	Deemed Acts.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party by virtue of this Plan and the Confirmation Order.

M.	Nonseverability of Plan Provisions.

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, subject to the terms of the Restructuring Support Agreement, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable, *provided* that any such deletion or

67

modification must be consistent with the Restructuring Support Agreement and the Backstop Agreement and the consent rights contained in each of them; and (3) non-severable and mutually dependent.

N.      Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, each of the Released Parties and Exculpated Parties will be deemed to have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and in a manner consistent with the Disclosure Statement, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the negotiation, execution, delivery, and performance of the Restructuring Support Agreement and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan.  Without limiting the generality of the foregoing, upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code and other applicable law, and, pursuant to section 1125(e) of the Bankruptcy Code, any person will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan or the Rights Offering or the Direct Investment, and, therefore, none of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and the Rights Offering or the Direct Investment.

O.      Request for Expedited Determination of Taxes.

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

P.      Closing of Chapter 11 Cases.

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to (1) close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case and (2) change the name of the remaining Debtor and case caption of the remaining open Chapter 11 Case as desired, in the Reorganized Debtors' sole discretion.

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Q.      Waiver or Estoppel.

Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

002460
**App. 729**

Dated:  ~~April 3~~<u>May 14</u>, 2024

CONVERGEONE HOLDINGS, INC.
(for itself and on behalf of each of the other
Debtors and Debtors in Possession)

By:  _/s/ Jeffrey Russell_
Name: Jeffrey Russell
Title: Chief Executive Officer

002461
**App. 730**

# **Exhibit H**

**From:** Matthew Hoffman <mhoffman@cerberus.com>
**Sent:** Tuesday, March 19, 2024 11:00 AM
**To:** Sheaffer, Paul
**Cc:** de Gosztonyi, Daniel; Mundi, Sharan; Harianawala, Arif; Marc Millman; Jordan Wolfe
**Subject:** Converge One

Paul,

Hope all is well.  The loan is now trading on a bigboy and I know guys inside the small group are buying.  We would like to be included as I have noted to Silverpoint, Monarch, and Kennedy Lewis very directly.  I don't see why we would be on the outside here and as noted we have a very close relationships with the company's board.  I would ask you and Scott G to request we be brought into the fold here.  If there is some level of entry on size, let me know.  We are involved in many names with these folks, do not poke us in the eye pls.  I'm around to chat today if helpful, thanks.


Matt Hoffman
CERBERUS CAPITAL MANAGEMENT, L.P.
875 Third Avenue | NEW YORK, NY 10022
(O) 646-885-3854 | (M) 908-463-1301 (No text)
(F) 646-885-3855
mhoffman@cerberus.com


---

**From:** Sheaffer, Paul <Sheaffer@pjtpartners.com>
**Sent:** Thursday, February 15, 2024 9:34 AM
**To:** Matthew Hoffman <mhoffman@cerberus.com>
**Cc:** de Gosztonyi, Daniel <daniel.degosztonyi@pjtpartners.com>; Mundi, Sharan <Sharan.Mundi@pjtpartners.com>; Harianawala, Arif <Arif.Harianawala@pjtpartners.com>
**Subject:** [EXTERNAL] RE: RE: RE: Re: RE: Converge One


**\*\*\* EXTERNAL EMAIL \*\*\***

Yes, we'll cleanse the forecast we send you.


---

**From:** Matthew Hoffman <mhoffman@cerberus.com>
**Sent:** Thursday, February 15, 2024 9:31 AM
**To:** Sheaffer, Paul <Sheaffer@pjtpartners.com>
**Cc:** de Gosztonyi, Daniel <daniel.degosztonyi@pjtpartners.com>; Mundi, Sharan <Sharan.Mundi@pjtpartners.com>; Harianawala, Arif <Arif.Harianawala@pjtpartners.com>
**Subject:** RE: [EXTERNAL] RE: RE: Re: RE: Converge One

**CAUTION:** Email originated outside of PJT Partners. Use care when clicking on links or opening attachments.

1

Would be helpful if they will be cleansed.  If not then ok to not receive.  Thx.

Matt Hoffman
CERBERUS CAPITAL MANAGEMENT, L.P.
875 Third Avenue | NEW YORK, NY 10022
(O) 646-885-3854 | (M) 908-463-1301
(F) 646-885-3855
mhoffman@cerberus.com

---

**From:** Sheaffer, Paul <Sheaffer@pjtpartners.com>
**Sent:** Thursday, February 15, 2024 9:28 AM
**To:** Matthew Hoffman <mhoffman@cerberus.com>
**Cc:** de Gosztonyi, Daniel <daniel.degosztonyi@pjtpartners.com>; Mundi, Sharan <Sharan.Mundi@pjtpartners.com>; Harianawala, Arif <Arif.Harianawala@pjtpartners.com>
**Subject:** [EXTERNAL] RE: RE: Re: RE: Converge One

**\*\*\* EXTERNAL EMAIL \*\*\***

We can share projections post transaction if helpful.

Arif – can you attach the projections?

---

**From:** Matthew Hoffman <mhoffman@cerberus.com>
**Sent:** Thursday, February 15, 2024 9:26 AM
**To:** Sheaffer, Paul <Sheaffer@pjtpartners.com>
**Subject:** RE: [EXTERNAL] RE: Re: RE: Converge One

**CAUTION:** Email originated outside of PJT Partners. Use care when clicking on links or opening attachments.

Do you have a deck from the company on projections you have shared w Ad-Hoc or others?

Matt Hoffman
CERBERUS CAPITAL MANAGEMENT, L.P.
875 Third Avenue | NEW YORK, NY 10022
(O) 646-885-3854 | (M) 908-463-1301
(F) 646-885-3855
mhoffman@cerberus.com

---

**From:** Sheaffer, Paul <Sheaffer@pjtpartners.com>
**Sent:** Thursday, February 15, 2024 9:02 AM
**To:** Matthew Hoffman <mhoffman@cerberus.com>
**Subject:** [EXTERNAL] RE: Re: RE: Converge One

**\*\*\* EXTERNAL EMAIL \*\*\***

Thanks – need feedback.  I'm around

2

Highly Confidential

AHG000007

**App. 733**

**From:** Matthew Hoffman <mhoffman@cerberus.com>
**Sent:** Wednesday, February 14, 2024 8:09 PM
**To:** Sheaffer, Paul <Sheaffer@pjtpartners.com>
**Subject:** Re: [EXTERNAL] Re: RE: Converge One

**CAUTION:** Email originated outside of PJT Partners. Use care when clicking on links or opening attachments.

Paul - Got pulled into another larger complex deal today and still going.  Will connect in am, have a good evening.

Matt Hoffman
CERBERUS CAPITAL MANAGEMENT, L.P.
875 Third Avenue | NEW YORK, NY 10022
(O) +1 646-885-3854 | (M) +1 908-463-1301 (No text)
(F) +1 646-885-3855
mhoffman@cerberus.com

---

**From:** Sheaffer, Paul <Sheaffer@pjtpartners.com>
**Sent:** Friday, February 9, 2024 5:33:48 PM
**To:** Matthew Hoffman <mhoffman@cerberus.com>
**Cc:** Marc Millman <mmillman@cerberus.com>; Jordan Wolfe <jwolfe@cerberus.com>
**Subject:** [EXTERNAL] Re: RE: Converge One

### *** EXTERNAL EMAIL ***

Hi Matt - have been traveling today.

Want to talk Monday morning?
Sent from my iPhone

> On Feb 9, 2024, at 11:50 AM, Matthew Hoffman <mhoffman@cerberus.com> wrote:

**CAUTION:** Email originated outside of PJT Partners. Use care when clicking on links or opening attachments.

Paul,

Hope you are well.  It appears we have been put on the outside of something that is going on in this name.  I have gathered this from conversations with a few holders though I have no specific information of any sort.  We were included in this group from close to the onset and we will not be on the outside of a deal that may hurt minority creditors.  Please give me a ring to discuss assuming you are still engaged.

Matt Hoffman
CERBERUS CAPITAL MANAGEMENT, L.P.
875 Third Avenue | NEW YORK, NY 10022
(O) 646-885-3854 | (M) 908-463-1301
(F) 646-885-3855
mhoffman@cerberus.com

Highly Confidential

AHG000008
**App. 734**

**From:** Sheaffer, Paul <Sheaffer@pjtpartners.com>
**Sent:** Wednesday, May 31, 2023 3:20 PM
**To:** Matthew Hoffman <mhoffman@cerberus.com>
**Subject:** [EXTERNAL] RE: Converge One

Matt – sorry been tied up.  You free around 4?

---

**From:** Matthew Hoffman <mhoffman@cerberus.com>
**Sent:** Wednesday, May 31, 2023 12:11 PM
**To:** Sheaffer, Paul <Sheaffer@pjtpartners.com>
**Subject:** RE: [EXTERNAL] Converge One

CAUTION: Email originated outside of PJT Partners. Use care when clicking on links or opening attachments.

Call me on this.


Matt Hoffman
CERBERUS CAPITAL MANAGEMENT, L.P.
875 Third Avenue | NEW YORK, NY 10022
(O) 646-885-3854 | (M) 908-463-1301
(F) 646-885-3855
mhoffman@cerberus.com


---

**From:** Sheaffer, Paul <Sheaffer@pjtpartners.com>
**Sent:** Friday, May 19, 2023 9:29 AM
**To:** Jacob Zand <jzand@cerberus.com>; Matthew Hoffman <mhoffman@cerberus.com>; Rickardo Francis <RFrancis@cerberus.com>
**Cc:** Baird, Jamie <Baird@pjtpartners.com>; Evarts, William <Evarts@pjtpartners.com>
**Subject:** [EXTERNAL] Converge One

Hey guys –

Hope all is well.

Is one of you close to Converge One?  We're trying to get to lenders on it today.

---

**From:** Jacob Zand <jzand@cerberus.com>
**Sent:** Tuesday, February 14, 2023 2:21 PM
**To:** Marc Millman <mmillman@cerberus.com>; Jordan Wolfe <jwolfe@cerberus.com>
**Cc:** Sheaffer, Paul <Sheaffer@pjtpartners.com>; Matthew Hoffman <mhoffman@cerberus.com>; Rickardo Francis <RFrancis@cerberus.com>
**Subject:** RE: [EXTERNAL] Veritas

CAUTION: Email originated outside of PJT Partners. Use care when clicking on links or opening attachments.

Paul –

4

AHG000009

**App. 735**

Hope all is well.  Marc Millman / Jordan Wolfe cover on our side and know well.  They are on this email.  Hopefully you guys can catch up.

Jacob Zand
jzand@cerberus.com
T: 646-885-3034
C: 917-969-6019

---

**From:** Sheaffer, Paul <Sheaffer@pjtpartners.com>
**Sent:** Tuesday, February 14, 2023 2:18 PM
**To:** Matthew Hoffman <mhoffman@cerberus.com>; Rickardo Francis <RFrancis@cerberus.com>; Jacob Zand <jzand@cerberus.com>
**Subject:** [EXTERNAL] Veritas

Hey guys –

Is someone at your team looking into this one?  have been tracking on and off for last few years.

Would be great to compare notes if you are covering.


**Paul Sheaffer**
Partner
PJT Partners
280 Park Avenue | New York, NY 10017
office / text. +1.212.364.2435 | mobile. +1.646.402.4943

This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. If you are not an intended recipient of an electronic communication, please notify the sender immediately, delete the message and do not act upon, print, disclose, copy, retain or redistribute any portion or contents to any other person. Please refer to www.pjtpartners.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient.

**\*\*\* EXTERNAL EMAIL \*\*\***


CERBERUS EMPLOYEES SOLELY COMMUNICATE ELECTRONICALLY VIA THEIR CERBERUS E-MAIL ADDRESS OR THROUGH MICROSOFT TEAMS.  PLEASE DO NOT USE TEXT MESSAGING, ANY SOCIAL MEDIA OR MESSAGING APP, OR ANY OTHER MEANS OF COMMUNICATION.

This e-mail (including any attachments) contains confidential information and may be read, copied and used only by the intended recipient. It may also contain information that may be legally privileged and/or deemed to be material non-public information. If you have received this email by mistake, please notify the sender immediately by e-mail and delete this e-mail from your system. Any unauthorized copying, storage, disclosure, distribution or other use of the material in this e-mail and any attachment is strictly forbidden. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this e-mail and any attachment which arise as a result of e-mail transmission. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. For more information about how we collect and process any personal information about you, please refer to: https://www.cerberus.com/privacy-policy/.

Highly Confidential                                                                AHG000010
                                                                                                                  **App. 736**

**Paul Sheaffer**
Partner
PJT Partners
280 Park Avenue | New York, NY 10017
office / text. +1.212.364.2435 | mobile. +1.646.402.4943

**\*\*\* EXTERNAL EMAIL \*\*\***

CERBERUS EMPLOYEES SOLELY COMMUNICATE ELECTRONICALLY VIA THEIR CERBERUS E-MAIL ADDRESS OR THROUGH MICROSOFT TEAMS.  PLEASE DO NOT USE TEXT MESSAGING, ANY SOCIAL MEDIA OR MESSAGING APP, OR ANY OTHER MEANS OF COMMUNICATION.

This e-mail (including any attachments) contains confidential information and may be read, copied and used only by the intended recipient. It may also contain information that may be legally privileged and/or deemed to be material non-public information. If you have received this email by mistake, please notify the sender immediately by e-mail and delete this e-mail from your system. Any unauthorized copying, storage, disclosure, distribution or other use of the material in this e-mail and any attachment is strictly forbidden. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this e-mail and any attachment which arise as a result of e-mail transmission. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. For more information about how we collect and process any personal information about you, please refer to: https://www.cerberus.com/privacy-policy/.

**\*\*\* EXTERNAL EMAIL \*\*\***

CERBERUS EMPLOYEES SOLELY COMMUNICATE ELECTRONICALLY VIA THEIR CERBERUS E-MAIL ADDRESS OR THROUGH MICROSOFT TEAMS.  PLEASE DO NOT USE TEXT MESSAGING, ANY SOCIAL MEDIA OR MESSAGING APP, OR ANY OTHER MEANS OF COMMUNICATION.

This e-mail (including any attachments) contains confidential information and may be read, copied and used only by the intended recipient. It may also contain information that may be legally privileged and/or deemed to be material non-public information. If you have received this email by mistake, please notify the sender immediately by e-mail and delete this e-mail from your system. Any unauthorized copying, storage, disclosure, distribution or other use of the material in this e-mail and any attachment is strictly forbidden. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this e-mail and any attachment which arise as a result of e-mail transmission. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. For more information about how we collect and process any personal information about you, please refer to: https://www.cerberus.com/privacy-policy/.

CERBERUS EMPLOYEES SOLELY COMMUNICATE ELECTRONICALLY VIA THEIR CERBERUS E-MAIL ADDRESS OR THROUGH MICROSOFT TEAMS.  PLEASE DO NOT USE TEXT MESSAGING, ANY SOCIAL MEDIA OR MESSAGING APP, OR ANY OTHER MEANS OF COMMUNICATION.

This e-mail (including any attachments) contains confidential information and may be read, copied and used only by the intended recipient. It may also contain information that may be legally privileged and/or deemed to be material non-public information. If you have received this email by mistake, please notify the sender immediately by e-mail and delete this e-mail from your system. Any unauthorized copying, storage, disclosure, distribution or other use of the material in this e-mail and any attachment is strictly forbidden. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this e-mail and any attachment which arise as a result of e-mail transmission. This message is provided for informational

Highly Confidential                                                                                    AHG000011

**App. 737**

purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. For more information about how we collect and process any personal information about you, please refer to: https://www.cerberus.com/privacy-policy/.

CERBERUS EMPLOYEES SOLELY COMMUNICATE ELECTRONICALLY VIA THEIR CERBERUS E-MAIL ADDRESS OR THROUGH MICROSOFT TEAMS.  PLEASE DO NOT USE TEXT MESSAGING, ANY SOCIAL MEDIA OR MESSAGING APP, OR ANY OTHER MEANS OF COMMUNICATION.

This e-mail (including any attachments) contains confidential information and may be read, copied and used only by the intended recipient. It may also contain information that may be legally privileged and/or deemed to be material non-public information. If you have received this email by mistake, please notify the sender immediately by e-mail and delete this e-mail from your system. Any unauthorized copying, storage, disclosure, distribution or other use of the material in this e-mail and any attachment is strictly forbidden. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this e-mail and any attachment which arise as a result of e-mail transmission. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. For more information about how we collect and process any personal information about you, please refer to: https://www.cerberus.com/privacy-policy/.

CERBERUS EMPLOYEES SOLELY COMMUNICATE ELECTRONICALLY VIA THEIR CERBERUS E-MAIL ADDRESS OR THROUGH MICROSOFT TEAMS.  PLEASE DO NOT USE TEXT MESSAGING, ANY SOCIAL MEDIA OR MESSAGING APP, OR ANY OTHER MEANS OF COMMUNICATION.

This e-mail (including any attachments) contains confidential information and may be read, copied and used only by the intended recipient. It may also contain information that may be legally privileged and/or deemed to be material non-public information. If you have received this email by mistake, please notify the sender immediately by e-mail and delete this e-mail from your system. Any unauthorized copying, storage, disclosure, distribution or other use of the material in this e-mail and any attachment is strictly forbidden. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this e-mail and any attachment which arise as a result of e-mail transmission. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. For more information about how we collect and process any personal information about you, please refer to: https://www.cerberus.com/privacy-policy/.

Highly Confidential

AHG000012

**App. 738**

# Exhibit I



AHG000023

exclude or worse. I have asked a few times to be part of the solution here and been rebuffed, to me this seems like you're putting us in bucket (3).

This is very surprising and not how I thought of the relationship between Cerberus and SP. Our recent convo where I made outgoing calls to you initially and to the guys in CFIELD group afterwards (some who were very against you coming in and now are not) should have made you guys know I view us as (1) or at worst (2).

We'd really rather not go to war here but if we aren't included in your group, we won't have an option other than joining the opposing group to propose an alternative DIP and equity infusion

to the company. In situations like this where we are materially excluded from the economics associated with an LME, our policy is to pursue any and all remedies as aggressively as possible.

Our preference is to work with your group and get this in and out of court as quickly as possible to preserve the company's reputation and allow it to win new business. We believe we have useful operational assets that can support that process as well.

Let me know your thoughts. Show less

JOHN ABATE
12:50:13 As you know, we are restricted. We will catch up once all has calmed down and discuss.

2

Highly Confidential

AHG000024

**App. 741**

# Exhibit J

| | |
|---|---|
| **From:** | Matthew Hoffman <mhoffman@cerberus.com> |
| **Sent:** | Thursday, April 4, 2024 9:25 PM |
| **To:** | Martorana, Keith R. |
| **Subject:** | Re: [EXTERNAL] Re: Converge One |

Thanks for ring back.  We are going to chat in am w Paul to have him walk us though this.  Seems like there is some tiering even of guys in the 81%.  It is extremely greedy by these guys to intentionally carve 18% out of this.  Reads like TPCG which was vigorously challenged.  People keep saying "but you guys are small" and I keep saying, size doesn't matter you misunderstand the board.

Matt Hoffman
CERBERUS CAPITAL MANAGEMENT, L.P.
875 Third Avenue | NEW YORK, NY 10022
(O) +1 646-885-3854 | (M) +1 908-463-1301 (No text)
(F) +1 646-885-3855
mhoffman@cerberus.com

---

**From:** Matthew Hoffman
**Sent:** Thursday, April 4, 2024 2:40:16 PM
**To:** Martorana, Keith R. <KMartorana@gibsondunn.com>
**Cc:** Silverman, Stephen D. <SSilverman@gibsondunn.com>; Jordan Wolfe <jwolfe@cerberus.com>; Marc Millman <mmillman@cerberus.com>
**Subject:** RE: [EXTERNAL] Re: Converge One

Keith can you call me?

Matt Hoffman
CERBERUS CAPITAL MANAGEMENT, L.P.
875 Third Avenue | NEW YORK, NY 10022
(O) 646-885-3854 | (M) 908-463-1301
(F) 646-885-3855
mhoffman@cerberus.com

---

**From:** Martorana, Keith R. <KMartorana@gibsondunn.com>
**Sent:** Wednesday, March 27, 2024 8:22 AM
**To:** Matthew Hoffman <mhoffman@cerberus.com>
**Cc:** Silverman, Stephen D. <SSilverman@gibsondunn.com>; Jordan Wolfe <jwolfe@cerberus.com>; Marc Millman <mmillman@cerberus.com>
**Subject:** Re: [EXTERNAL] Re: Converge One

**\*\*\* EXTERNAL EMAIL \*\*\***

Hi Matt - good to connect with you again. I can speak today - how about 11:00?

   **Keith Martorana**

1

AHG000037

**App. 743**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193
Tel +1 212.351.3991 • Fax +1 212.351.6391
KMartorana@gibsondunn.com • www.gibsondunn.com

On Mar 26, 2024, at 9:55 PM, Matthew Hoffman <mhoffman@cerberus.com> wrote:

[WARNING: External Email]

Understood and appreciated.  Moved to bcc, save you.

Keith - Good to connect again.  I understand there are some larger players here.  It would be good to speak live if you can tomorrow am.

Matt Hoffman
CERBERUS CAPITAL MANAGEMENT, L.P.
875 Third Avenue | NEW YORK, NY 10022
(O) +1 646-885-3854 | (M) +1 908-463-1301 (No text)
(F) +1 646-885-3855
mhoffman@cerberus.com

---

**From:** Greenberg, Scott J. <SGreenberg@gibsondunn.com>
**Sent:** Tuesday, March 26, 2024 9:50:46 PM
**To:** Matthew Hoffman <mhoffman@cerberus.com>
**Cc:** Silverman, Stephen D. <SSilverman@cerberus.com>; Jordan Wolfe <jwolfe@cerberus.com>; Marc Millman <mmillman@cerberus.com>; Martorana, Keith R. <KMartorana@gibsondunn.com>
**Subject:** [EXTERNAL] Re: Converge One

## *** EXTERNAL EMAIL ***

Matt   Copying Keith.   Been underwater and Keiths handling.  There have been larger guys restricted for a bit including the folks you named below.

Scott

Sent from my iPad

On Mar 26, 2024, at 9:43 PM, Matthew Hoffman <mhoffman@cerberus.com> wrote:

[WARNING: External Email]

Guys,

Hope all is well.  I know you have been busy.  I spoke to W&C earlier.  It seems like we are close to some form of process kicking off here.  I have asked in the past that we be included in a group, as had been the case in early/mid 2023, and we have offered a few times to get restricted.  We own ~20m 1L and as noted in the past have some quite useful operational resources we think we can bring to bear here.  We

2

would like to be part of the solution here and have expressed the same to Silverpoint, Monarch and Kennedy Lewis.  I think wrt the go forward business we can be helpful.  Please let me know your thoughts.

Matt Hoffman
CERBERUS CAPITAL MANAGEMENT, L.P.
875 Third Avenue | NEW YORK, NY 10022
(O) 646-885-3854 | (M) 908-463-1301
(F) 646-885-3855
mhoffman@cerberus.com

---

**From:** Matthew Hoffman <mhoffman@cerberus.com>
**Sent:** Wednesday, June 21, 2023 7:40 PM
**To:** Greenberg, Scott J. <SGreenberg@gibsondunn.com>; Marc Millman <mmillman@cerberus.com>
**Cc:** Jordan Wolfe <jwolfe@cerberus.com>; Silverman, Stephen D. <SSilverman@gibsondunn.com>
**Subject:** Re: [EXTERNAL] Re: CV1

Thanks Scott, we get it, smooth travels and chat soon.

Matt Hoffman
CERBERUS CAPITAL MANAGEMENT, L.P.
875 Third Avenue | NEW YORK, NY 10022
(O) 646-885-3854 | (M) 908-463-1301
(F) 646-885-3855
mhoffman@cerberus.com

---

**From:** Greenberg, Scott J. <SGreenberg@gibsondunn.com>
**Sent:** Wednesday, June 21, 2023 3:44 PM
**To:** Marc Millman <mmillman@cerberus.com>
**Cc:** Jordan Wolfe <jwolfe@cerberus.com>; Matthew Hoffman <mhoffman@cerberus.com>; Silverman, Stephen D. <SSilverman@gibsondunn.com>
**Subject:** [EXTERNAL] Re: CV1


Traveling back from vacation today so on flights most of day. Top 5 guys in terms of size are restricting to start the dialogue.   Company wasn't willing to restrict a huge number of lenders so asked for top holders for now.
Sent from my iPhone


On Jun 21, 2023, at 8:38 AM, Marc Millman <mmillman@cerberus.com> wrote:


**[WARNING: External Email]**
Scott –

We heard through the grapevine that lenders are on the cusp of getting restricted on ConvergeOne?  Is this the case?  Do you have time for a quick conversation today?

Highly Confidential                                                    AHG000039
                                                                      **App. 745**

Marc

**Marc Millman**
**CERBERUS CAPITAL MANAGEMENT, L.P.**
11812 San Vicente Blvd, Suite 300 | LOS ANGELES, CA 90049
(O) 310-903-5015 | (M) 646-388-1306
mmillman@cerberus.com

CERBERUS EMPLOYEES SOLELY COMMUNICATE ELECTRONICALLY VIA THEIR CERBERUS
E-MAIL ADDRESS OR THROUGH MICROSOFT TEAMS.  PLEASE DO NOT USE TEXT
MESSAGING, ANY SOCIAL MEDIA OR MESSAGING APP, OR ANY OTHER MEANS OF
COMMUNICATION.

This e-mail (including any attachments) contains confidential information and may be read, copied and used only by the intended recipient. It may also contain information that may be legally privileged and/or deemed to be material non-public information. If you have received this email by mistake, please notify the sender immediately by e-mail and delete this e-mail from your system. Any unauthorized copying, storage, disclosure, distribution or other use of the material in this e-mail and any attachment is strictly forbidden. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this e-mail and any attachment which arise as a result of e-mail transmission. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. For more information about how we collect and process any personal information about you, please refer to: https://www.cerberus.com/privacy-policy/.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

*** EXTERNAL EMAIL ***

CERBERUS EMPLOYEES SOLELY COMMUNICATE ELECTRONICALLY VIA THEIR CERBERUS E-MAIL ADDRESS
OR THROUGH MICROSOFT TEAMS.  PLEASE DO NOT USE TEXT MESSAGING, ANY SOCIAL MEDIA OR
MESSAGING APP, OR ANY OTHER MEANS OF COMMUNICATION.

This e-mail (including any attachments) contains confidential information and may be read, copied and used only by the intended recipient. It may also contain information that may be legally privileged and/or deemed to be material non-public information. If you have received this email by mistake, please notify the sender immediately by e-mail and delete this e-mail from your system. Any unauthorized copying, storage, disclosure, distribution or other use of the material in this e-mail and any attachment is strictly forbidden. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this e-mail and any attachment which arise as a result of e-mail transmission. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. For more information about how we collect and process any personal information about you, please refer to: https://www.cerberus.com/privacy-policy/.

Highly Confidential

AHG000040

**App. 746**

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

CERBERUS EMPLOYEES SOLELY COMMUNICATE ELECTRONICALLY VIA THEIR CERBERUS E-MAIL ADDRESS OR THROUGH MICROSOFT TEAMS.  PLEASE DO NOT USE TEXT MESSAGING, ANY SOCIAL MEDIA OR MESSAGING APP, OR ANY OTHER MEANS OF COMMUNICATION.

This e-mail (including any attachments) contains confidential information and may be read, copied and used only by the intended recipient. It may also contain information that may be legally privileged and/or deemed to be material non-public information. If you have received this email by mistake, please notify the sender immediately by e-mail and delete this e-mail from your system. Any unauthorized copying, storage, disclosure, distribution or other use of the material in this e-mail and any attachment is strictly forbidden. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this e-mail and any attachment which arise as a result of e-mail transmission. This message is provided for informational purposes and should not be construed as a solicitation or offer to buy or sell any securities or related financial instruments. For more information about how we collect and process any personal information about you, please refer to: https://www.cerberus.com/privacy-policy/.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

Highly Confidential

AHG000041

**App. 747**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CONVERGEONE HOLDINGS, INC., *et al.*[1] | ) | Case No. 24-90194 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### ORDER GRANTING THE AD HOC GROUP OF EXCLUDED LENDERS' EMERGENCY MOTION TO QUASH THE DEBTORS' RULE 30(B)(6) NOTICE OF DEPOSITION OF THE AD HOC GROUP OF EXCLUDED LENDERS UNDER SEAL

Upon the *Emergency Motion to Quash the Debtors' Rule 30(b)(6) Notice of Deposition of the Ad Hoc Group of Excluded Lenders* (the "Motion")[2] of the Ad Hoc Group of Excluded Lenders (the "Excluded Lenders")[3] for entry of an order (this "Order") quashing the Debtors' 30(b)(6) Notice; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found good cause

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654).  The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

[3] The Excluded Lenders are identified in the *Verified Statement of the Ad Hoc Group of Excluded Lenders Pursuant to Bankruptcy Rule 2019* [Docket No. 233].

for the relief requested in the Motion; and after due deliberation and sufficient cause appearing

therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted;

2.      The 30(b)(6) Notice is hereby quashed; and it is further

3.      The Debtors are precluded from deposing or otherwise eliciting testimony from the

Excluded Lenders in connection with these chapter 11 cases.


 Signed: _____, 2024

_____
        Christopher M. López
        United States Bankruptcy Judge

2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CONVERGEONE HOLDINGS, INC., *et al.*[1] | Case No. 24-90194 (CML) |
| Debtors. | (Jointly Administered) |

**AMENDED DECLARATION OF KESHAV LALL IN CONNECTION WITH AD HOC GROUP OF EXCLUDED LENDERS' OBJECTION TO CONFIRMATION OF JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

I, Keshav Lall, hereby declare as follows:

1.     I am a co-founder and Managing Partner of Uzzi & Lall ("U&L").  U&L is financial advisory services firm, and is financial advisor to an *ad hoc* group of holders of the Debtors' first lien term loan debt (the "Excluded Lenders") in the above-captioned matter.

2.     At U&L, I advise clients in connection with corporate restructurings, financings and mergers and acquisitions.  I have approximately 20 years of experience working as an advisor, corporate leader and investor in a wide range of strategic matters.  Prior to the formation of U&L in 2024, I was a Senior Managing Director at M-III Partners LP.  Prior thereto, I was Chief Executive Officer of Essar Capital Americas.  I have also held principal investing positions at Balyasny Asset Management, Citadel Investment Group and Deutsche Bank.  I started my career

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

in the M&A Investment Banking Department at Deutsche Bank.  In such capacities, I have been involved in, among other things, complex bankruptcies relating to chapter 11 plan negotiations, rights offerings, backstops, DIP financings, cash collateral usage and/or new money recapitalizations.  I graduated from Cornell University cum laude with a B.S. in Applied Economics and Business Management.

3.      I submit this Declaration in connection with the *Ad Hoc Group of Excluded Lenders' Objection to Confirmation of Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* (the "Objection") [Docket No. 263].[2]

4.      Unless otherwise stated herein, the statements in this Declaration are based on my knowledge or opinion, on information that I have received from counsel for the Excluded Lenders, the Debtors' *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 26] (the "Disclosure Statement"), or employees of U&L working directly with me or under my supervision, direction, or control.

**A.      The Equity Rights Offering, Including The Exclusive Investment Opportunity**

5.      I understand that the Debtors' Proposed Plan seeks to raise $245 million of new capital through the issuance of new equity at a 35% discount, representing an 86.8 percent ownership stake in the Reorganized Debtors, pursuant to an equity rights offering and a direct investment opportunity.  The undiscounted value of new common stock available in connection with this new capital raise is $376.9 million, or 86.8 percent of the Debtors' Stipulated Equity

---

[2]   Capitalized terms used but not defined herein shall have the meanings given to them in the Objection or the *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 27] (the "Proposed Plan"), as applicable.

Value of $434 million.  The discount to Stipulated Equity Value applied in connection with the capital raise is 35 percent (the "Plan Discount").

6.      Of the $245 million of new capital to be raised, $159.25 million will be raised pursuant to a rights offering available to all Holders in Class 3 on a *pro rata* basis (the "Open Equity Allocation").   The common stock available for purchase through the Open Equity Allocation represents an approximate 56.5 percent ownership stake in the Reorganized Debtors.

7.      The remaining $85.75 million of new capital will be raised through a direct investment opportunity (the "Exclusive Equity Allocation") reserved exclusively for purchase by certain parties to the RSA (the "Majority Lenders").  RSA, Exhibit 3 (Equity Rights Offering Term Sheet) to Exhibit B (Restructuring Term Sheet) at 1.  The common stock available for purchase through the Exclusive Equity Allocation represents an approximate 30.4 percent ownership stake in the Reorganized Debtors and has a value of approximately $131.9 million at Stipulated Equity Value.  The difference between the value of the equity available in the Exclusive Equity Allocation at Stipulated Equity Value and the amount paid for such equity is equal to $46.2 million.

8.      The Proposed Plan provides, by default, that Holders of First Lien Claims participate in the Open Equity Allocation and receive Takeback Term Loans in a principal amount equal to 15 percent of their First Lien Claims.  Proposed Plan § III.C.3.(c).  Holders of First Lien Claims may elect to receive the Takeback Term Loan Recovery Option instead of participating in the Open Equity Allocation.  *Id.*  The Takeback Term Loan Recovery Option provides a Holder that makes such election with a recovery solely in the form of Takeback Term Loans in a principal amount equal to 20 percent of such Holder's First Lien Claim.  *Id.*  The Proposed Plan provides an adjustment mechanism pursuant to which participation in each recovery option is limited to 50 percent of the total.  *Id.*

9.      The RSA also grants certain parties thereto with a backstop fee defined as a "Put Option Premium."  This Put Option Premium is equal to 10 percent of the total capital raise of $245 million, payable in equity at the Plan Discount.  When such discount is applied, the value of the Put Option Premium is equal to $37.7 million at the Stipulated Equity Value and represents an approximate 8.7 percent ownership stake in the Reorganized Debtors.  RSA, Exhibit 3 (Equity Rights Offering Term Sheet) to Exhibit B (Restructuring Term Sheet) at 3.  The Put Premium Option is a direct grant of equity that does not require the investment of additional funds.  *Id*.

**B.      Impact on Excluded Lenders**

10.      The Debtors project a recovery to the Excluded Lenders in Class 3 to be between 20 percent and 27.4 percent in the Disclosure Statement;[3] provided, however, the recoveries for Excluded Lenders, when considering the actual results of the recovery option elections, are (a) 20.0 percent for Holders electing the Takeback Term Loan Recovery Option and (b) 24.0 percent for Holders electing to participate in the Open Equity Allocation.  *See* **Exhibit 1** hereto**.**

11.      When considering the actual results of the recovery option elections, the recoveries for the Majority Lenders as a group are 31.5 percent if the value received by them in the Exclusive Investment Opportunities is considered to be a part of their recovery on their First Lien Claims.  This recovery reflects an enhancement of more than 31.2 percent over the recovery provided to the Excluded Lenders electing to participate in the Open Equity Allocation.  *See* **Exhibit 1** hereto.

**C.      The Put Option Premium**

12.      The Disclosure Statement provides that creditors holding 81 percent of the First Lien Claims support the Debtors' proposed restructuring pursuant to the terms of the RSA.  Disclosure Statement at 1.  Assuming 81 percent of the First Lien Claims were committed to

---

[3]    *See* Disclosure Statement at 5.

exercise the full share of rights available to them in the Open Equity Allocation, 19 percent of the equity available in the Open Equity Allocation was at risk of not being purchased by the Excluded Lenders.  The funding commitment to backstop the equity available to Excluded Lenders was $30.7 (the "Excluded Lender Backstop").  The Put Option Premium of $37.7 million reflects a fee of 122.7 percent against the Excluded Lender Backstop.

**D.      The Alternative Proposals**

13.      On April 26, 2024, the Excluded Lenders delivered to the Debtors an alternative proposal (the "Alternative Proposal"), a copy of which is attached hereto as **Exhibit 2**.

14.      The Alternative Proposal provides all Holders in Class 3 with recoveries between 28.0 percent and 29.8 percent (depending on whether a Holder participates in the Exit Term Loan Facility) as compared to 24.0 percent under the Proposed Plan excluding the Exclusive Investment Opportunity.  *See* **Exhibit 1** hereto for a comparison of the Alternative Proposal versus the Proposed Plan.  The Alternative Proposal maintains substantially identical leverage and debt terms as contemplated under the Proposed Plan.

15.      On April 29, 2024, the Debtors rejected the Alternative Proposal, mainly asserting that (i) the Alternative Proposal is not backed by committed capital, (ii) if the Debtors pivoted to the Alternative Proposal, they would risk losing their existing DIP financing, and (iii) pursing the Alternative Proposal would require extending the current case timeline.  *See* **Exhibit 3** hereto.

16.      On May 8, 2024, the Excluded Lenders delivered to the Debtors a revised Alternative Proposal (the "Modified Alternative Proposal"), a copy of which, together with a revised commitment letter with clarifying revisions delivered to the Debtors on May 9, 2024, is attached hereto as **Exhibit 4**.  The Modified Alternative Proposal (i) includes a fully committed $245 million debtor-in-possession term loan credit facility for the Debtors in full replacement of its existing DIP financing.   The Modified Alternative Proposal further provides that any

5

outstanding principal under such facility will convert to exit financing on substantially the same terms as the Exit Term Loan Facility described in the Proposed Plan.

17.     On May 10, 2024, the Debtors rejected the Modified Alternative Proposal.  *See* **Exhibit 5** hereto.

I declare under the penalty of perjury that the foregoing is true and correct.  Executed this 15th day of May, 2024 in New York, New York.


 /s/ *Keshav Lall*
Keshav Lall

6

**EXHIBIT 1**

**Debtors Proposed Plan**

Uzzi & Lall

**1  Current Capital Structure**

| Debt | Amount ($ Mn) |
|------|---------------|
| ABL | 190.0 |
| **Total ABL** | **190.0** |
| 1L | 1,095.7 |
| KL Management | 78.8 |
| PVKG Note | 213.0 |
| **1L Group** | **1,387.5** |
| **Total First Lien Debt** | **1,577.5** |
| 2L | 286.5 |
| **Total Secured Debt** | **1,864.1** |

**Exit Capital Structure**

| Debt | Amount ($ Mn) |
|------|---------------|
| Exit ABL | 125.0 |
| Exit Term Loan (1L Takeback) | 243.0 |
| **Total Debt** | **368.0** |

**1a.  1L Claims**

| | Amount ($ Mn) | % |
|--|---------------|---|
| Majority Lenders | 1,119.9 | 80.7% |
| Excluded Group | 267.6 | 19.3% |
| **Total** | **1,387.5** | **100%** |

**2  Plan Details**

| Plan Value | Amount ($ Mn) |
|------------|---------------|
| Stipulated Equity Value | 434.0 |
| Rights offering discount | 35.0% |
| **Discounted Equity Value** | **282.1** |

| New Equity Split | % | Amount ($ Mn) |
|------------------|---|---------------|
| 1L | 95.625% | 415.0 |
| 2L | 4.375% | 19.0 |
| **Total** | **100%** | **434.0** |

Uzzi & Lall

| 2a. Rights Offering | Rights Offer Split (%) | Purchase Price ($ Mn) (A) | % Equity | Share of Stipulated Equity Value ($ Mn) (B) | Distributable Value ($ Mn) (B - A) |
|---|---|---|---|---|---|
| Open Equity Allocation Amount | 65.0% | 159.25 | 56.5% | 245.0 | 85.8 |
| Exclusive Equity Allocation Amount | 35.0% | 85.75 | 30.4% | 131.9 | 46.2 |
| **Total Open Equity Allocation and Exclusive Equity Allocation** | | **245.0** | **86.8%** | **376.9** | **131.9** |

| 2b. Put Option Premium | Fee | New Capital Raise (Rights Issue) | Fee Amount (A) | Fee distributed as equity at 35% discount of Plan Disc (B) | Distributable Value ($ Mn) (A / B) |
|---|---|---|---|---|---|
| | 10% | 245.0 | 24.5 | 24.5 / (1-0.35) | 37.7 |

**Put Option Premium as % Equity in Reorganized Company**

| | |
|---|---|
| Put Option Premium (Backstop Fee) (A) | 37.7 |
| Stipulated Equity Value (B) | 434.0 |
| **% of Equity in the Reorganized Company (A/ B)** | **8.7%** |

| | |
|---|---|
| Backstop of Excluded Lenders ($ Mn) | 30.7 |
| Put Option Premium ($ Mn) | 37.7 |
| % Fee of Put Option Premium against excluded Lender Backstop | 122.7% |

## 3 Recovery

| $ Mn | Majority Lenders | Excluded Group (Open Equity Allocation Option) | Excluded Group (Term Loan Only Option) |
|---|---|---|---|
| Take Back Debt | 193.6 | 26.4 | 22.9 |
| Open Equity Allocation Amount | 75.4 | 10.3 | |
| Exclusive Equity Allocation Amount | 46.2 | - | |
| Put Option Premium Fee | 37.7 | - | |
| **Total Recovery** | **352.9** | **36.7** | **22.9** |
| | | | |
| 1L Claims | 1,119.9 | 152.9 | 114.7 |
| **1L Recovery (%)** | **31.5%** | **24.0%** | **20.0%** |

| Difference in Recovery | Enhancement in Recovery (%) |
|---|---|
| 7.5% | 31.2% |

2   **App. 758**

**Excluded Lender Alternative Plan**                                                                    Uzzi & Lall

**1  Current Capital Structure**

| Debt | Amount ($ Mn) |
|---|---|
| ABL | 190.0 |
| 1L | 1,095.7 |
| KL Management | 78.8 |
| PVKG Note | 213.0 |
| **1L Group** | **1,387.5** |
| **Total First Lien Debt** | **1,577.5** |
| 2L | 286.5 |
| **Total Secured Debt** | **1,864.1** |

**Exit Capital Structure**

| Debt | Amount ($ Mn) |
|---|---|
| Exit ABL | 125.0 |
| Exit Term Loan (1L Takeback) | 245.0 |
| **Total Debt** | **370.0** |

**2  Plan Details**

**2a.  Plan Value**

| | Amount ($ Mn) |
|---|---|
| Stipulated Equity Value | 434.0 |
| Difference in Exit Facility | -2.0 |
| **Distributable Equity Value** | **432** |

**2b.  1L Fees**
**(10% Exit Facility )**

| | Exit Facility | Fee | Amount ($ Mn) (A) | Distributable Equity Value (B) | % Equity at Distributable Value (A / B) |
|---|---|---|---|---|---|
| Exit Facility Fee | 245.0 | 10% | 24.5 | 432 | 5.7% |

**2c.  Equity Split**

| | Split (%) | Distributable Equity Value | Amount ($ Mn) |
|---|---|---|---|
| 1L | 90.0% | 432.0 | 388.6 |
| 1L Fee | 5.7% | 432.0 | 24.5 |
| 2L | 4.4% | 432.0 | 18.9 |
| **Total** | **100.0%** | | **432.0** |

**3  Recovery**

Uzzi & Lall

| $ Mn | Total 1L | Majority Lenders | Excluded Group | |
|---|---|---|---|---|
| Equity (1L) | 388.6 | 313.7 | 74.9 | |
| Exit Facility Fee* | 24.5 | 19.8 | 4.7 | * Assumes 100% participation |
| **Total Recovery** | **413.1** | **333.4** | **79.7** | |
| | | | | |
| 1L Claims | 1,387.5 | 1,119.9 | 267.6 | |
| **1L Recovery Without Exit Fee (%)** | **28.0%** | **28.0%** | **28.0%** | |
| **1L Recovery with Exit Fee (%)** | **29.8%** | **29.8%** | **29.8%** | |

**EXHIBIT 2**



Proskauer Rose LLP    Eleven Times Square    New York, NY 10036-8299

April 26, 2024

David M. Hillman
Member of the Firm
d +1.212.969.3470
f 212.969.2900
DHillman@proskauer.com
www.proskauer.com

**By Email**

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Attn: Bojan Guzina (bojan.guzina@whitecase.com)

      Re:    <u>ConvergeOne Holdings, Inc., *et. al.* (Case No. 24-90194-CML)</u>

Dear Bojan:

We represent a group of excluded lenders (the "<u>Excluded Lenders</u>") that hold, manage, or represent approximately $164 million (roughly 15%) of non-insider, first-lien term loan debt arising under that certain *First Lien Term Loan Credit Agreement*, dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of March 14, 2019 and Amendment No. 2 dated as of December 17, 2021), by and among ConvergeOne Holdings Inc. (together with its direct and indirect subsidiaries, the "<u>Company</u>") as borrower, PVKG Intermediate Holdings Inc. ("<u>PVKG Intermediate</u>"), as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto.

We ask that you share this letter with Larry J. Nyhan and Sherman K. Edmiston III as the independent directors on the boards of the Company and PVKG Intermediate (the "<u>Independent Directors</u>") and Jeffrey S. Russell as Chief Executive Officer of the Company.

We write with respect to the restructuring transaction (the "<u>Proposed Transaction</u>") proposed by the Company and its affiliated debtors (collectively, the "<u>Debtors</u>") in their joint chapter 11 plan, dated April 3, 2024 (the "<u>Proposed Plan</u>"),[1] and that certain Restructuring Support Agreement, dated April 3, 2024 (the "<u>RSA</u>"). As you know, the Excluded Lenders oppose the Proposed Transaction and are deeply troubled by the Special Committee's willingness to approve a transaction that is plainly designed to benefit a select group of lenders (the "<u>Majority Lenders</u>"), which includes the Company's equity sponsor, CVC Capital Partners and its affiliates, to the detriment of other similarly-situated creditors without first exploring market-based alternatives, and doing so on a self-imposed, hyper-aggressive timeline. Simply put, fiduciaries do not act this way.

The Proposed Transaction is not executable because, among other deficiencies, it violates the equal treatment requirement of section 1123(a)(4) of the Bankruptcy Code. The Proposed Plan is predicated on the Rights Offering under which (a) a direct investment opportunity to purchase $131.9 million of new equity at a substantial discount to Stipulate Equity Value is reserved

---

[1]    Capitalized terms used herein that are not otherwise defined shall have the meanings given to them in the Proposed Plan.

Beijing | Boca Raton | Boston | Chicago | Hong Kong | London | Los Angeles | New Orleans | New York | Paris | São Paulo | Washington, DC    **App. 762**

**Proskauer»**

April 26, 2024
Page 2

exclusively for the Majority Lenders, and (b) a Put Option Premium in the form of a direct grant of $37.7 million of new equity at Stipulated Equity Value is also reserved exclusively for the Majority Lenders (together, the "Exclusive Investment Opportunity"). The Exclusive Investment Opportunity positions the Majority Lenders to receive unfairly reorganized equity with an aggregate value of approximately $169.7 million at Stipulated Equity Value in exchange for only $85.75 million of new money. The Excluded Lenders were denied any participation in the Exclusive Investment Opportunity.

The Supreme Court held that chapter 11 plans of reorganizations providing exclusive investment opportunities to existing stakeholders are, in absence of a legitimate market test, unconfirmable as a matter of law. *Bank of America Nat. Trust and Savings Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).[2] Here, there was no effort whatsoever to market test the exclusive arrangement and, indeed, no need for an exclusive arrangement as the Excluded Lenders were and remain ready, willing and able to participate in the Exclusive Investment Opportunity. Even if *LaSalle* were not applied, the transaction will nonetheless be subject to the exacting entire fairness standard of review given its participation by insiders. This transaction is on its face patently unfair. It seems obvious that the transaction was structured in this manner to garner improperly the votes of a majority at the expense of the minority in violation of the basic principles of chapter 11.

As our fiduciaries, you are duty-bound to pivot. To that end, the Excluded Lenders have developed a viable and superior alternative plan which is fair to all and set forth in the term sheet attached hereto as **Exhibit A** (the "Alternative Proposal"). The Alternative Proposal provides that Class 3 Holders will receive identical treatment in the form of their *pro rata* share of $388.6 million of New Equity Interests at the Stipulated Equity Value. Instead of raising capital through a highly dilutive and legally flawed Rights Offering, exit capital will be raised pursuant to an exit term loan facility (the "Exit Term Loan Facility") in the aggregate principal amount of $245 million on substantially the same terms as the proposed Takeback Loans.[3] All Class 3 Holders will have the opportunity to participate in the Exit Term Loan Facility (both on a *pro rata* basis and to backstop the facility). The cornerstone of the Alternative Proposal is equality of treatment for all Class 3 Holders.

The Alternative Proposal is superior to the Proposed Plan for at least four reasons:

1. The Alternative Proposal (unlike the Proposed Plan) respects the equal treatment requirement for all Class 3 Holders and is therefore confirmable.

2. The Alternative Proposal provides Class 3 Holders as a class with a significantly enhanced recovery relative to the Proposed Plan. The Alternative Proposal

---

[2]     The deficiencies preventing confirmation of the Proposed Plan are further highlighted in the Excluded Lenders' emergency motion filed on April 15, 2024 (Docket No. 152).

[3]     The Excluded Lenders are interested in providing a backstop for some or all of the Exit Term Loan Facility and are in active dialogue with third parties who have expressed interest in providing the backstop.

**App. 763**

Proskauer»

April 26, 2024
Page 3

provides a recovery of between **28.0% and 29.8%** to all Holders of First Lien Claims as compared to the Proposed Plan, which provides a recovery of only between 20% and 23.7% on account of claims, excluding the Exclusive Investment Opportunity available only to the Majority Lenders.  Including the Exclusive Investment Opportunity, Majority Lenders will receive not less than a 31.2% recovery, and maybe more depending upon the participation in the Takeback Term Loan Recovery Option, a staggering over 50% enhancement over the recovery provided to the Excluded Lenders.[4]

3.  The Alternative Proposal maintains the Reorganized Debtors' leverage at $245 million.

We ask the that the Independent Directors cease pursuit of the unconfirmable Proposed Plan, engage with us on the Alternative Proposal and allow for good faith negotiations on the terms of an actionable alternative to the unconfirmable Proposed Plan.  We believe engagement is a far better path for the Debtors as compared with value-destructive litigation leading up to, and in connection with, a contested confirmation hearing.  Let us know how you would like to proceed by no later than **April 30, 2024**.

We are available to discuss your questions or comments on our Alternative Proposal.

Very truly yours,

David M. Hillman

Enclosure

---

[4]     A comparison of the recoveries between the Proposed Plan and the Alternative Proposal is attached hereto as **Exhibit B**.

**App. 764**

**Exhibit A**

ConvergeOne Holdings, Inc.
Excluded Lenders' Alternative Proposal

| | |
|---|---|
| **Exit Term Loan Facility** | In lieu of the Rights Offering and Direct Investment, on the Effective Date, the Reorganized Debtors shall be capitalized through a secured term loan facility in the aggregate principal amount of not greater than $245 million under an exit financing credit agreement on substantially the same terms as the Exit Term Loan Facility described in the Proposed Plan and RSA, and as set forth below.<br><br>Interest Rate:  At the option of the Debtors, (i) SOFR (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate or (ii) Base Rate (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate, in each case payable in cash; *provided* that at any time an event of default exists under the Exit Term Loan Facility, the Debtors shall not be able to elect SOFR.<br><br>Applicable Rate:  4.75% in the case of Base Rate loans and 5.75% in the case of SOFR loans.<br><br>Default Interest:  During the continuance of an Event of Default, the Takeback Term Loans will bear interest at an additional 2.00% per annum and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum. Default interest shall be payable in cash on demand.<br><br>Interest Payment Dates:  Interest on (i) Base Rate loans shall be payable on the last business day of each fiscal quarter in arrears and (ii) SOFR loans shall be payable on the last day of each Interest Period in arrears (or, if earlier, the three-month anniversary of the commencement of such Interest Period).<br><br>Interest Period:  At the option of the Debtors, one, three, or six months.<br><br>Amortization:  None.<br><br>Tenor:  Six years, provided that if, in the reasonable determination of the Required Excluded Lenders[5] in good faith consultation with the |

---

[5]     "Required Excluded Lenders" shall mean, as of the relevant date, the Excluded Lenders, collectively, in excess of 66 2/3% of the aggregate First Lien Claims collectively held by the Excluded Lenders.

Debtors, the Restructuring Transaction (as modified by the Alternative Proposal) cannot be effectuated in a manner that causes a taxable transaction to the lenders for U.S. federal and applicable state and local income tax purposes by causing a Reorganized Debtor, other than C1 Holdings, to be the issuer of the Exit Term Loans, because such structure would reasonably be expected to result in material adverse tax consequences to the Reorganized Debtors as compared to the tax consequences to the Reorganized Debtors had C1 Holdings been the issuer of the Exit Term Loans, subject to the consent of the Required Excluded Lenders, the tenor will be reduced to 4.75 years and in that case the Applicable Rate will be reduced to 4.25% in the case of Base Rate loans and 5.25% in the case of SOFR loans.

Fees: 10% of aggregate principal amount (consisting of a 5% exit fee available to all Holders of First Lien Claims who participate in their *pro rata* share of the Exit Term Loan Facility, and a 5% backstop fee available to all Holders of First Lien Claims who elect to backstop the Exit Term Loan Facility) (collectively, the "Facility Fees"), plus annual agency fee. The Facility Fees are payable in New Equity Interests at the Stipulated Equity Value.

Security: A (x) first-priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitute Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), and a first-priority lien on (A) that certain real property of the Reorganized Debtors located at 2368 Corporate Lane, Suite 112, Naperville, IL 60563 and (B) any other owned real property of the Reorganized Debtors and (y) a second-priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitutes ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), which second-priority liens shall be subordinated to the liens on such collateral securing the Exit ABL Facility, in the case of either clause (x) or (y) above, subject to customary exclusions consistent with the exclusions under the Prepetition First Lien Credit Agreement (including the exclusion of 35% of the equity interests of any first-tier foreign subsidiaries) and otherwise as may be agreed by the Reorganized Debtors and the Required Consenting Lenders.

Documentation Principles: The Exit Term Loan Credit Agreement with respect to the Exit Term Loan Facility shall (i) be based upon the Prepetition First Lien Term Loan Credit Agreement; (ii) include such modifications as are necessary to reflect the Restructuring Transaction

2

**App. 766**

(as modified by the Alternative Proposal), as implemented through the Chapter 11 Cases, and the fact that the Exit Term Loan Facility is an exit financing; (iii) include appropriate modifications to reflect changes in law or accounting standards since the date of such precedent; and (iv) shall incorporate the following:

- Affirmative Covenants: Consistent with the First Lien Term Loan Credit Agreement (but modified in a manner acceptable to the Debtors and the Required Excluded Lenders to provide for modified reporting requirements and information rights that are customary for facilities of this type and relate to reporting and information readily available to the Debtors in the ordinary course of business).

- Negative Covenants: Consistent with the First Lien Term Loan Credit Agreement, but modified as may be required to effectuate the Restructuring Transaction (as modified by the Alternative Proposal), in each case, in a manner acceptable to the Debtors and the Required Excluded Lenders; *provided* that the Exit Term Loan Facility shall not include any financial covenants.

- Miscellaneous: Shall also include certain customary liability management protections in form and substance acceptable to the Debtors and the Required Excluded Lenders.

Intercreditor Agreements: The Exit Term Loan Facility shall be subject to the Exit Intercreditor Agreement.

Ratings: The Reorganized Debtors shall use commercially reasonable efforts to have the Takeback Term Loans rated by Moody's and S&P within sixty days of the Effective Date.

Backstop:  Each Holder of a First Lien Claim shall have the opportunity to participate in the backstop of the Exit Term Loan Facility and receive their *pro rata* portion of the Backstop Fee.

The Excluded Lenders are interested in providing a backstop for some or all of the Exit Term Loan Facility and are in active dialogue with third parties who have expressed interest in providing the backstop.

First Lien Claim Participation: Each Holder of a First Lien Claim shall have the participate in their *pro rata* portion of the Exit Term Loan Facility.

3

**App. 767**

| | |
|---|---|
| **Treatment of First Lien Claims** | Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, its *pro rata* share of $388.6 million of New Equity Interests at the Stipulated Equity Value (the "<u>First Lien Claim Recovery</u>"). |

**Exhibit B**

Recovery Analysis

| A | C1 Restructuring Plan - Ad hoc Group |
|---|---|

**Uzzi & Lall**

**1 Current Capital Structure**

| Debt | Amount ($ Mn) |
|---|---|
| ABL | 190.0 |
| **Total ABL** | **190.0** |
| 1L | 1,095.7 |
| KL Management | 78.8 |
| PVKG Note Purchase | 213.0 |
| **1L Group** | **1,387.5** |
| **Total First Lien Debt** | **1,577.5** |
| 2L | 286.5 |
| **Total Secured Debt** | **1,864.1** |

**Exit Capital Structure**

| Debt | Amount ($ Mn) |
|---|---|
| Exit ABL | 125.0 |
| Exit Term Loan (1L Takeback) | 243.0 |
| **Total Debt** | **368.0** |

**1a. 1L Claims**

| 1L Claims | Amount ($ Mn) | % |
|---|---|---|
| Ad hoc Group | 1,117.5 | 80.5% |
| Excluded Group | 270.0 | 19.5% |
| **Total** | **1,387.5** | **100%** |

**2 Plan Details**

| Plan Value | Amount ($ Mn) |
|---|---|
| Stipulated Equity Value | 434.0 |
| Rights offering discount | 35.0% |
| **Discounted Equity Value** | **282.1** |

| New Equity Split | % | Amount ($ Mn) |
|---|---|---|
| 1L | 95.625% | 415.0 |
| 2L | 4.375% | 19.0 |
| **Total** | **100%** | **434.0** |



**2a. Rights Offering**

| | Rights Offer Split (%) | Purchase Price ($ Mn) (A) | % Equity | Stipulated Equity Value ($ Mn) (B) | Distributable Value ($ Mn) (B - A) |
|---|---|---|---|---|---|
| Rights Offer Amount | 65.0% | 159.25 | 56.5% | 245.0 | 85.8 |
| Direct Investment Amount | 35.0% | 85.75 | 30.4% | 131.92 | 46.2 |
| **Total Rights Offer and Direct Investment** | | **245** | **86.8%** | **376.9** | **131.9** |

**2b. Backstop Fees**

| | Fee | % Stipulated Equity Value | Fee Amount ($ Mn) |
|---|---|---|---|
| Put Option Premium | 10% | 5.6% | 24.5 |
| Plan Discount Value | 10% | 3.0% | 13.2 |
| **Total Fees** | | **8.7%** | **37.7** |

**3 Recovery**

| *$ Mn* | Ad hoc Group | Excluded Group | |
|---|---|---|---|
| Take Back Debt | 195.7 | 47.3 | |
| Rights Offer Amount | 69.1 | 16.7 | Assuming 100% subscription to Rights Offer |
| Direct Investment Amount | 46.2 | - | |
| Put Option Premium Fee | 37.7 | - | |
| **Total Recovery** | **348.6** | **64.0** | |
| | | | |
| 1L Claims | 1,118 | 270 | |
| **1L Recovery (%)** | **31.2%** | **23.7%** | Assuming equal pro rata participation in Takeback Term Loan Recovery Option and Rights Offering and Takeback Term Loan Recovery Option |
| | | | |
| 2L Recovery at Plan Value | 19.0 | | |
| 2L Claims | 286.5 | | |
| **2L Recovery (%)** | **6.6%** | | |

## B   C1 Restructuring Plan - Alternative



### 1   Current Capital Structure

| Debt | Amount ($ Mn) |
|---|---|
| ABL | 190.0 |
| 1L | 1,095.7 |
| KL Management | 78.8 |
| PVKG Note Purchase | 213.0 |
| **1L Group** | **1,387.5** |
| **Total First Lien Debt** | **1,577.5** |
| 2L | 286.5 |
| **Total Secured Debt** | **1,864.1** |

### Exit Capital Structure

| Debt | Amount ($ Mn) |
|---|---|
| Exit ABL | 125 |
| Exit Term Loan | 245 |
| **Total Debt** | **370** |

### 2   Plan Details

**2a.**
| Plan Value | Amount ($ Mn) |
|---|---|
| Stipulated Equity Value | 434.0 |
| Difference in Exit Facility | -   2.0 |
| **Distributable Equity Value** | **432** |

**2b.**
| 1L Fees (10% Exit Facility ) | Fee | Amount ($ Mn) | % Equity |
|---|---|---|---|
| Exit Facility Fee | 10% | 24.5 | 5.67% |
| **Total Fees** | | **24.5** | **5.67%** |

**2c.**
| Equity Split | Split (%) | Amount ($ Mn) |
|---|---|---|
| 1L | 89.95% | 388.6 |
| 1L Fee | 5.7% | 24.5 |
| 2L | 4.375% | 18.9 |
| **Total Rights Offer** | | **432.0** |

**3** **Recovery**

Uzzi & Lall

| *$ Mn* | Total 1L | Ad hoc Group | Excluded Group | |
|---|---|---|---|---|
| Equity (1L) | 388.6 | 313.0 | 75.6 | |
| Exit Facility Fee | 24.5 | 19.7 | 4.8 | Assumes 100% participation |
| **Total Recovery** | **413.1** | **332.7** | **80.4** | |
| | | | | |
| 1L Claims | 1,388 | 1,118 | 270 | |
| **1L Recovery Without Exit Fee (%)** | **28.0%** | **28.0%** | **28.0%** | |
| **1L Recovery with Exit Fee (%)** | **29.8%** | **29.8%** | **29.8%** | |
| | | | | |
| 2L Recovery | 18.9 | | | |
| 2L Claims | 286.5 | | | |
| **2L Recovery (%)** | **6.6%** | | | |

4   **App. 773**

**EXHIBIT 3**

**WHITE & CASE**

April 29, 2024

VIA E-MAIL

**Confidential – Subject to FRE 408**

White & Case LLP
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606-4302
**T** +1 312 881 5400

**whitecase.com**

Proskauer Rose LLP
Eleven Times Square
New York, NY
10036-8299
Attn: David M. Hillman (DHillman@proskauer.com)

RE:      *April 26, 2024 Letter – ConvergeOne Holdings, Inc., et. al.* (Case No. 24-90194-CML)

Dear David:

      I am responding to your letter dated April 26, 2024 regarding ConvergeOne Holdings, Inc. and its affiliated debtors ("ConvergeOne" or the "Debtors").[1]  The Debtors appreciate the interest of the ad hoc group of minority first lien lenders (the "Minority Ad Hoc Group") in providing exit financing for the Debtors as part of the Alternative Proposal. The Independent Directors have considered the Alternative Proposal.  The Independent Directors have determined that the Alternative Proposal would not result in higher or otherwise better recoveries for the Debtors' stakeholders than the restructuring transaction that is embodied in the RSA and the Plan.

      The Alternative Proposal suffers from three principal deficiencies that render it unworkable:

- **Lack of Financing Commitments**.  The Alternative Proposal is not backed by committed capital.  Your letter states that the Minority Ad Hoc Group is "interested in providing a backstop for some or all of the Exit Term Loan Facility and [is] in active dialogue with third parties who have expressed interest in providing the backstop."  This "interest" is not sufficient to make the Alternative Proposal a viable option.  Committed capital is essential.  While we appreciate that your clients may be in "active dialogue" with potential third party lenders, this is far short of committed capital.  New lenders will likely require significant due diligence before they commit capital and we do not know the terms of any potential commitment.  We also ask that you disclose the identities of all third parties that the Minority Ad Hoc Group has approached regarding a potential financing commitment.

- **Potential Loss of DIP Loan Commitments**.  If the Debtors were to abandon the RSA and pivot to the Alternative Proposal, the Debtors would risk losing the DIP term loan (which cross-defaults to the RSA) and would be forced to find alternative DIP financing.  The Debtors would

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in your letter or the Plan, as applicable.

WHITE & CASE

April 29, 2024

also face a cross-default on the ABL DIP facility. The Alternative Proposal does nothing to address any of these consequences. Your clients have not offered to replace the current DIP facilities, nor does your letter explain how the chapter 11 cases or the Debtors' business would be funded while the Debtors pursue the Alternative Proposal, which would require a longer timeline to confirmation than the current Plan.

- **Extension of Current Timeline**. The confirmation hearing for the current Plan is in less than three weeks. If the Debtors were to abandon the Plan and pivot to the Alternative Proposal, the current case timeline would be extended by several weeks if not months. Pivoting to the Alternative Proposal would require a new plan and disclosure statement, and a new solicitation and voting period. Your letter completely ignores the negative impacts that this would have on the Debtors' business, and does not account for the additional administrative costs that the Debtors would incur. There are significant business harms resulting from additional time in chapter 11, in addition to significant professional fees that accrue with each additional day in bankruptcy.

The Alternative Proposal also lacks any meaningful stakeholder support. Your group appears to speak for less than 10% in amount of the Class 3 claims. In contrast, the Proposed Transaction is not only fully funded and backstopped, but is supported by approximately 89% in amount of Class 3 claims and 100% in amount of the Class 4 claims that voted on the Plan.

Stakeholder support for the Proposed Transaction under the RSA is based in part on the opportunity for Class 3 to receive takeback debt. The takeback debt structure included in the Proposed Transaction is important to certain Class 3 Holders that cannot, or do not wish to, receive equity as part of their Plan treatment. Approximately 8% of the Class 3 Holders of First Lien Claims elected to receive takeback debt and no equity as their Plan treatment. They would not have that option under the Alternative Proposal.

Your suggestion that the Debtors' current path is the result of an abdication of the Independent Directors' fiduciary duties is outrageous and wrong. Your supposedly superior proposal is premised on a nearly identical equity value and pro forma capital structure as the Proposed Transaction. It does nothing to increase the value of the business post-emergence relative to the Proposed Transaction, but would add significant cost, delay, and risk to the process. The Independent Directors could not possibly discharge their fiduciary duties by abandoning the fully-committed and backstopped Plan in favor of this uncommitted Alternative Proposal.

There is no basis to question the integrity of the Independent Directors or the process that resulted in the RSA and the Plan. The Independent Directors are highly experienced restructuring professionals. They have served the Debtors with professionalism, care, and integrity. For more than three months, the Independent Directors and Mr. Russell have diligently explored all potential restructuring alternatives for the Debtors. The Proposed Transaction was the best, and indeed the only, viable option available to the Debtors. It is the result of hard-fought negotiations that resulted in significantly improved terms for the Debtors. Members of the Minority Ad Hoc Group were well aware of the ongoing restructuring discussions that were taking place during this time, but they did not present an alternative proposal to the Debtors until more than three weeks after the Petition Date and less than three weeks before the Confirmation Hearing. The Independent Directors and Mr. Russell made a reasonable and justified decision to embrace the Proposed Transaction as the best alternative available to the Debtors. The overwhelming creditor support for the Plan is clear indication that the Debtors' stakeholders agree with that decision.

2

**App. 776**

**WHITE & CASE**

April 29, 2024

      If you want the Debtors to re-consider the Alternative Proposal, please fix the infirmities identified above and submit an actionable proposal that would allow the Debtors to emerge from bankruptcy on a substantially similar timeline as the current Plan.  We will continue to engage with you in good faith, consistent with our fiduciary duties.  Time is of the essence.  All rights are reserved.

Best regards,

*/s/ Bojan Guzina*

**Bojan Guzina**

**T** +1 312 881 5365
**E** bojan.guzina@whitecase.com

3

**App. 777**

**EXHIBIT 4**

1



Proskauer Rose LLP   Eleven Times Square   New York, NY 10036-8299

May 8, 2024

David M. Hillman
Member of the Firm

d +1.212.969.3470
f 212.969.2900
DHillman@proskauer.com
www.proskauer.com

**By Email**

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Attn: Bojan Guzina (bojan.guzina@whitecase.com)

      Re:    <u>April 29, 2024 Letter – ConvergeOne Holdings, Inc., *et. al.* (Case No. 24-90194-CML</u>

Dear Bojan:

We are in receipt of your letter, dated April 29, 2024, in which you informed the Excluded Lenders that the Debtors were declining to engage with the Excluded Lenders on the Alternative Proposal[1] because, among other things, it lacked committed capital and failed to address the potential loss of the Existing DIP Term Loan Facility. We dispute the contentions set forth in your letter and maintain that the Alternative Proposal is a viable and superior alternative to the Proposed Plan, which is unconfirmable for the reasons set forth in our letter, dated April 26, 2024, and our objection to confirmation of the Proposed Plan, filed on May 7, 2024 [ECF No. 263]. Nonetheless, we write to supplement the Alternative Proposal (the "<u>Modified Alternative Proposal</u>") with the commitment letter (the "<u>Commitment Letter</u>") attached hereto as **Exhibit A**, which substantially resolves the Alternative Proposal's alleged deficiencies set forth in your letter.

We ask that you share this letter with Larry J. Nyhan and Sherman K. Edmiston III as the independent directors on the boards of the Company and PVKG Intermediate (the "<u>Independent Directors</u>").

The Modified Alternative Proposal includes a committed $245 million super-priority senior secured debtor-in-possession term loan credit facility for the Company in full replacement of the Existing DIP Term Loan Facility. The Modified Alternative Proposal further provides that any outstanding principal under such facility will convert to exit financing on substantially the same terms as the Exit Term Loan Facility described in the Proposed Plan, and as set forth therein.[2]

---

[1]      Capitalized terms used herein that are not otherwise defined shall have the meanings given to them in the letter dated April 26, 2024, the joint chapter 11 plan, dated April 3, 2024 (the "<u>Proposed Plan</u>"), or the Commitment Letter (as defined herein), as applicable.

[2]      To meet the Debtors' need for an upfront commitment and replacement of the Existing DIP Term Loan Facility, it was necessary to modify the original Alternative Proposal and provide initial commitment parties under the Commitment Letter a reasonable fee for their commitment. Such modification has only a modest impact on the original recovery analysis, and the Modified Alternative Proposal remains superior to the Proposed Plan.

Proskauer»

May 8, 2024
Page 2

     Accordingly, we again ask the that the Independent Directors cease pursuit of the unconfirmable Proposed Plan, engage with us on the Modified Alternative Proposal and allow for good faith negotiations on the terms of an actionable alternative to the unconfirmable Proposed Plan.  Let us know how you would like to proceed by no later than **May 10, 2024**.

     We are available to discuss your questions or comments on our Modified Alternative Proposal.

Very truly yours,

David M. Hillman

Enclosure

**App. 780**

**Exhibit A**

Commitment Letter

May 8, 2024

<u>PERSONAL AND CONFIDENTIAL</u>

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Attn: Bojan Guzina (<u>bojan.guzina@whitecase.com</u>)

<u>$245 Million Replacement Super-Priority Senior Secured
Debtor-In-Possession Term Loan Credit Facility Commitment Letter</u>

ConvergeOne Holdings, Inc. (the "<u>Company</u>", "<u>you</u>" or "<u>your</u>"), certain of your subsidiaries (the "<u>Subsidiary Debtors</u>") and the direct parent of the Company ("<u>Holdings</u>" and, collectively with the Company and the Subsidiary Debtors, the "<u>Debtors</u>"), are debtors in voluntarily commenced Chapter 11 Cases, jointly administered under Chapter 11 Case No. 24-90194 (collectively, the "<u>Chapter 11 Cases</u>" and each individually a "<u>Chapter 11 Case</u>") in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"), the Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, and you are the borrower under that certain Super-Priority Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of April 5, 2024, among PVKG Intermediate Holdings Inc., as Holdings ("<u>Holdings</u>"), the Company, as the Borrower (as defined therein), the lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent (the "<u>Existing DIP Term Loan Credit Agreement</u>", and the term loan credit facility thereunder, the "<u>Existing DIP Term Loan Facility</u>").  The parties listed on <u>Annex I</u> hereto that are identified as Commitment Parties (each, a "<u>Commitment Party</u>", and collectively (severally, and not jointly or jointly and severally) the "<u>Commitment Parties</u>", "<u>we</u>", "<u>us</u>" or "<u>our</u>"), agree to commit to provide a $245 million super-priority senior secured debtor-in-possession term loan credit facility for the Company under Sections 364(c) and 364(d) of the Bankruptcy Code in full replacement of the Existing DIP Term Loan Facility on the terms and subject to the conditions set forth herein (the "<u>Replacement DIP Term Loan Facility</u>").  Unless otherwise specified in this Commitment Letter, all references to "$" shall refer to U.S. dollars.  Capitalized terms used in this Commitment Letter without definition shall have the meanings assigned to them in the DIP Term Sheet.

1. <u>Commitment</u>.

To provide assurance that the Replacement DIP Term Loan Facility shall be available on the terms and conditions set forth in this Commitment Letter and in the DIP Term Sheet, each Commitment Party is pleased to advise the Company of its several, but not joint, commitment (the "<u>Commitment</u>") to provide the amount of the Replacement DIP Term Loan Facility set forth on <u>Annex I</u> hereto, on the terms set forth in the DIP Term Sheet attached as <u>Exhibit A</u> (the "<u>DIP Term Sheet</u>" and, together with this letter, this "<u>Commitment Letter</u>"), subject solely to the conditions set forth in the "*Conditions Precedent to the Closing*" section of the DIP Term Sheet referenced below (collectively, the "<u>Conditions Precedent</u>").

2. <u>Information</u>.

You represent, warrant and covenant that (a) all written information concerning you and your subsidiaries and your and their respective business, including all disclosure statements filed with the Bankruptcy Court in connection with the Chapter 11 Cases (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "<u>Projections</u>") and information of a general economic or industry specific nature) (the "<u>Information</u>") that has been or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished,

1

to the Company's knowledge, complete and correct in all material respects and not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the first sentence  the immediately succeeding paragraph) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates.  We acknowledge that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control and (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results. Consequently, we acknowledge and agree that the Company makes no guarantee with respect to the Projections.

You agree that if, at any time prior to the entry of the Final DIP Order approving the Replacement DIP Term Loan Facility, you become aware that any of the representations, warranties and covenants in the preceding paragraph would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be, to the Company's knowledge, correct in all material respects. Notwithstanding the foregoing, for the avoidance of doubt, there will be no requirement to update previously delivered Projections to reflect new assumptions so long as the assumptions were reasonable at the time made and made available to us or any of our affiliates.  Without limiting the representations, warranties and covenants to be contained in the definitive documentation for the Replacement DIP Term Loan Facility or the Conditions Precedent that are applicable to the relevant borrowing, the accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Commitment Parties under this Commitment Letter or the availability of the Replacement DIP Term Loan Facility.

3.  <u>Fees</u>.

As consideration for the Commitments and agreements of the Commitment Parties under this Commitment Letter, the Company agrees to pay (or cause to be paid) the fees set forth in the DIP Term Sheet. The parties to this Commitment Letter (the "<u>parties</u>") acknowledge and agree that the obligation of the Company to pay such fees shall constitute an "Obligation" under and as defined in the definitive documentation for the Replacement DIP Term Loan Facility.

4.  <u>Conditions</u>.

The Commitment Parties' Commitments and agreements under this Commitment Letter in respect of the Replacement DIP Term Loan Facility are subject solely to the satisfaction (or waiver by the Commitment Parties) of the Conditions Precedent.  The Commitment Parties' commitments to fund the Replacement DIP Term Loan Facility on the date of the relevant borrowing are subject solely to the satisfaction (or waiver by the Commitment Parties) of the Conditions Precedent that are applicable to the relevant borrowing.  There are no conditions (implied or otherwise) to the Commitments under this Commitment Letter in respect of the Replacement DIP Term Loan Facility, and there will be no conditions (implied or otherwise) to the availability of the Replacement DIP Term Loan Facility on the date of the relevant borrowing, including compliance with the terms of this Commitment Letter or the DIP Term Sheet, other than the Conditions Precedent that are applicable to the relevant borrowing.

5.  <u>Indemnification and Expenses</u>.

You agree to (a) indemnify and hold harmless each Commitment Party and the Term DIP Agent (as defined in the DIP Term Sheet), their respective affiliates and their and their affiliates' respective officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers, financial advisors and advisers), consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses") to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Replacement DIP Term Loan Facility, the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, and (b) reimburse each Commitment Party promptly (but in any event within ten business days) upon receipt of a reasonably detailed invoice in respect of the same for any reasonable and documented out-of-pocket (i) fees and expenses of Proskauer Rose LLP and any reasonably necessary local legal counsel and (ii) fees and expenses of Uzzi & Lall , in each case, incurred in connection with the Replacement DIP Term Loan Facility, the enforcement of this Commitment Letter, the definitive documentation for the Replacement DIP Term Loan Facility, and any ancillary documents and security arrangements in connection with the same, but no other third-party financial advisors without your prior written consent, not to be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith, actual fraud or willful misconduct or (ii) material breach of its obligations under this Commitment Letter or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Debtors or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the Term DIP Agent, in its capacity or in fulfilling its role as such).

None of you, Holdings, the other Debtors, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to any another such person for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the Replacement DIP Term Loan Facility, the enforcement of this Commitment Letter, the definitive documentation for the Replacement DIP Term Loan Facility, or any ancillary documents and security arrangements in connection with the Replacement DIP Term Loan Facility.

6.  Assignments, Amendments.

This Commitment Letter shall not be assignable by you or us without the prior written consent of the other parties to this Commitment Letter (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties to this Commitment Letter, the Indemnified Persons and with respect to Section 5 and this Section 6, the Term DIP Agent, and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties to this Commitment Letter, the Indemnified Persons, and with respect to Section 5 and this Section 6, the Term DIP Agent. Notwithstanding the foregoing, for the avoidance of doubt, any Term DIP Lender may assign its rights, commitments and obligations under this Commitment Letter to any Term DIP Lender or any Lender Affiliate (as defined in the DIP Term Sheet) as set forth in the DIP Term Sheet.  This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by (a) each Commitment Party and (b) you.

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof.  Section headings used in this Commitment Letter are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in

interpreting, this Commitment Letter. The words "execution," "signed," "signature," "delivery," and words of like import in this Commitment Letter shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. You acknowledge that information and documents relating to the Replacement DIP Term Loan Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Commitment Party nor the Term DIP Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the Replacement DIP Term Loan Facility.

7.   Governing Law, Etc.; Jurisdiction.

This Commitment Letter and any claim, controversy or dispute arising under or related to this Commitment Letter (including, without limitation, any claims sounding in contract law or tort law arising out of the subject matter hereof) shall be governed by, and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the laws of any jurisdiction other than the State of New York.

Any and all suits, legal actions or proceedings arising out of or relating to this Commitment Letter or the Replacement DIP Term Loan Facility shall, (x) prior to a Filing, be brought solely in the New York State court or Federal Court located in the Borough of Manhattan in New York City, and any appellate court from any thereof, and, (y) following a Filing, be brought solely in the Bankruptcy Court (the foregoing courts collectively, the "Chosen Courts"). Each party submits to and accepts the jurisdiction of the Chosen Courts for the purpose of such suits, legal actions or proceedings, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, or, to the extent applicable, the Bankruptcy Court; provided that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter or the Replacement DIP Term Loan Facility in any New York State court, in any such Federal court or in Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

You hereby agree that you shall not bring any suit, action, proceeding, claim or counterclaim under this Commitment Letter or with respect to the transactions contemplated hereby in any court other than such New York State court or Federal Court of the United States of America sitting in the Borough of Manhattan in New York City or the Bankruptcy Court. Service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

8.    Waiver of Jury Trial. EACH OF THE PARTIES TO THIS COMMITMENT LETTER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT

TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

9.   Confidentiality.

        This Commitment Letter is delivered to the Company on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you, Holdings and its subsidiaries and your and their respective officers, directors, employees, legal counsel, accountants, financial advisors on a confidential and "need to know" basis and, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you, Holdings or any of its subsidiaries, as applicable, of the confidential nature of this Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any ad-hoc or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (d) to the Bankruptcy Court, (e) as and to the extent required in any financial statements or for other customary accounting purposes, (f) in connection with the exercise of remedies hereunder or any suit, action or proceeding relating to this Commitment Letter or the enforcement hereof, (g) to the extent such information becomes publicly available other than by reason of improper disclosure by you or your officers, directors, employees, legal counsel, accountants or financial advisors in violation of any confidentiality obligations hereunder, (h) to the Lenders (as defined in the Existing DIP Term Loan Credit Agreement) and their respective affiliates, officers, directors, employees, members, partners, equityholders, attorneys, accountants, agents and advisors on a "need to know" basis, in each case, in connection with the Chapter 11 Cases, if subject to the same or similar confidentiality restrictions, and (i) you may disclose the aggregate amount of the premiums and fees under this Commitment Letter as part of projections, pro forma information and a generic disclosure of aggregate sources and uses.

        Each Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated by this Commitment Letter or obtained from or on behalf of you, Holdings or your and its respective affiliates in the course of the transactions contemplated by this Commitment Letter, except that the Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants and advisors involved in the transactions contemplated by this Commitment Letter on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Commitment Party responsible for such persons' compliance with this paragraph), (b) on a confidential basis to any bona fide prospective Term DIP Lender, prospective participant or swap counterparty (in accordance with the terms of the DIP Term Sheet) that agrees to keep such information confidential in accordance with the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Commitment Parties promptly in advance thereof), (d) to the extent such information:  (i) becomes publicly available other than as a result of a breach of this Commitment Letter or other confidentiality obligation owed by such Commitment Party to you or your affiliates or (ii) becomes available to the Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Commitment Party's knowledge, is not in violation of any confidentiality obligation

5

**App. 786**

owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Commitment Parties' rights with respect to this Commitment Letter and/or the Replacement DIP Term Loan Facility, (g) to the extent independently developed by such Commitment Party or its affiliates without reliance on confidential information, (h) with respect to the existence and contents of the DIP Term Sheet and definitive documentation for the Replacement DIP Term Loan Facility, in consultation with you, to the rating agencies or (i) with respect to the existence and contents of this Commitment Letter and the Replacement DIP Term Loan Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the Replacement DIP Term Loan Facility and to industry trade organizations where such information with respect to the Replacement DIP Term Loan Facility is customarily included in league table measurements.  The Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provisions in the definitive documentation for the Replacement DIP Term Loan Facility upon the effectiveness thereof and, in any event, will terminate one year from the date of this Commitment Letter.

10. Miscellaneous.

You acknowledge and agree that nothing in this Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Commitment Party, the Term DIP Agent or any of their respective affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Commitment Party, the Term DIP Agent or any of their respective affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Commitment Letter or the transactions contemplated hereby, and agree that no Commitment Party, Term DIP Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated by this Commitment Letter (including the exercise of rights and remedies under this Commitment Letter) are arm's-length commercial transactions and that we and the Term DIP Agent are acting as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated by this Commitment Letter are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the Term DIP Agent may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning the Company and other companies that may be the subject of the transactions contemplated by this Commitment Letter and such affiliates will be entitled to the benefits afforded to us and the Term DIP Agent under this Commitment Letter, so long as any such affiliates receiving information concerning the Company and other companies in accordance with this paragraph shall be subject to the same confidentiality obligations provided for in this Commitment Letter (with each Commitment Party responsible for its affiliates' compliance with this paragraph).

The Commitment Parties notify the Company that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act") and the requirements of 31 C.F.R. § 1010.230 (the "Beneficial Ownership Regulation"), it and its affiliates are required to obtain, verify and record information that identifies each Credit Party, which information includes names, addresses, tax identification numbers and other information that will allow Commitment Parties and its affiliates to identify each Credit Party in accordance with the PATRIOT Act and the Beneficial Ownership Regulation.  This notice is given in accordance with the requirements of the

6

PATRIOT Act and the Beneficial Ownership Regulation and is effective for Commitment Parties and its affiliates.

Each of the parties agrees that this Commitment Letter is a binding and enforceable agreement (subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law)) with respect to its subject matter, including an agreement to negotiate in good faith the definitive documentation for the Replacement DIP Term Loan Facility by the parties in a manner consistent with this Commitment Letter.  It being acknowledged and agreed that the availability of the Replacement DIP Term Loan Facility is subject solely to the Conditions Precedent that are applicable to the relevant borrowing.

If the foregoing correctly sets forth our agreement, please indicate the Company's acceptance of the terms of this Commitment Letter by returning to the Commitment Parties executed counterparts of this Commitment Letter not later than 11:59 p.m., New York City time, on May 17, 2024. This offer will automatically expire at such time if the Commitment Parties have not received such executed counterparts in accordance with the preceding sentence.   This Commitment Letter and the Commitments and agreements under this Commitment Letter shall automatically terminate on the earlier of (i) the date of the effectiveness of the definitive documentation for the Replacement DIP Term Loan Facility and (ii) unless the Commitment Parties shall, in their sole discretion, agree in writing to an extension, 11:59 p.m., New York City time, on August 15, 2024.  Notwithstanding the immediately preceding sentence, Section 3 above, as well as the indemnification and expenses, confidentiality, information, jurisdiction, governing law and waiver of jury trial provisions contained in this Commitment Letter shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Commitment Letter or the Commitment Parties' Commitments under this Commitment Letter.  Notwithstanding the foregoing, your obligations under this Commitment Letter, other than those pursuant to Section 3 and with respect to confidentiality, shall automatically terminate and be superseded by the applicable provisions in the definitive documentation for the Replacement DIP Term Loan Facility, in each case, to the extent covered by the same, on the date of the effectiveness of the definitive documentation for the Replacement DIP Term Loan Facility, and you shall be released from all liability in connection therewith at such time.

*[Signature Pages Follow]*

**App. 788**

Very truly yours,

David M. Hillman
Title: Member of the Firm
        Proskauer Rose LLP

[*Signature Page to Commitment Letter*]

**App. 789**

DocuSign Envelope ID: 7538BEC9-5F91-455D-8C83-82E6A963BA45

Very truly yours,

BLUE TORCH FINANCE LLC

By:  Blue Torch Capital LP, its managing member

By: _Kevin Genda_ _____

Name: Kevin Genda

Title:  Authorized Signatory

[*Signature Page to Commitment Letter*]

CERBERUS CAPITAL MANAGEMENT,
L.P., on behalf of its affiliated funds and
accounts


Alex Benjamin (May 8, 2024 13:41 EDT)

Name:  Alex Benjamin

Title:  Chief Legal Officer

*[Signature Page to Commitment Letter]*

ELLINGTON MANAGEMENT GROUP, L.L.C.,
on behalf of certain funds and accounts it or its
affiliates, manage or advises

_____

Name: Daniel Margolis

Title: General Counsel

[*Signature Page to Commitment Letter*]

LIVELLO CAPITAL MANAGEMENT LP,
on behalf of itself and its affiliated funds and
managed funds

Name: Joseph Salegna

Title:  Chief Financial Officer

*[Signature Page to Commitment Letter]*

PALMER SQUARE CAPITAL
MANAGEMENT, on behalf of itself and its
affiliated funds and managed funds

_____

Name: Scott A Betz

Title: Chief Operating Officer

[*Signature Page to Commitment Letter*]

STEELE CREEK INVESTMENT
MANAGEMENT, on behalf of itself and its
affiliated funds and managed funds

*Andre Monitto*

Name: Andre Monitto

Title: Research Analyst

[*Signature Page to Commitment Letter*]

Accepted and agreed to as of _____, 2024:

CONGERGEONE HOLDINGS, INC.


By: _____
    Name:
    Title:

[*Signature Page to Commitment Letter*]

**Annex I**

**Commitment Parties and Commitments**

| Commitment Party[1] | Commitment Amount |
|---|---|
| CERBERUS CAPITAL MANAGEMENT, L.P. | $32,500,000 |
| ELLINGTON CLO MANAGEMENT LLC | $2,500,000 |
| LIVELLO CAPITAL MANAGEMENT | $10,000,000 |
| PALMER SQUARE CAPITAL MANAGEMENT | $25,000,000 |
| STEELE CREEK INVESTMENT MANAGEMENT | $5,000,000 |
| BLUE TORCH FINANCE LLC | $170,000,000 |

---

[1] Certain entities are listed in this Annex I on behalf of certain funds and/or accounts for which they serve as investment manager or adviser.

**Exhibit A**

**CONVERGEONE HOLDINGS, INC., ET AL.**

**$245 MILLION SUPER-PRIORITY SENIOR SECURED
DEBTOR-IN-POSSESSION TERM LOAN CREDIT FACILITY**

     The terms set forth in this Summary of Principal Terms and Conditions (the "DIP Term Sheet") are being provided on a confidential basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of the proposed Term DIP Facility (as defined below). Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Commitment Letter.

**Summary of Proposed Terms and Conditions**

| | |
|---|---|
| **Term DIP Facility:** | A super-priority senior secured debtor-in-possession term loan facility in an aggregate principal amount of $245 million (the "Term DIP Facility"; the Term DIP Lenders' commitments thereunder, the "Term DIP Commitments"; the loans thereunder, the "Term DIP Loans" and, together with the Term DIP Commitments, the "Term DIP Loan Exposure"; the Term DIP Lenders' claims thereunder, the "Term DIP Superpriority Claims"; and the proceeds received by the Borrower from the Term DIP Loans, the "Term DIP Proceeds"), subject to the terms and conditions set forth in this DIP Term Sheet and the Term DIP Loan Documents (as defined below). |
| | The Term DIP Loans will be available to be made in a single draw in an amount equal to $245 million. |
| **ABL DIP Facility:** | The Term DIP Loan Documents shall permit the Debtors to incur the ABL DIP Facility on terms and conditions consistent with the Existing DIP Term Loan Credit Agreement (as in effect on the date hereof). |
| **Borrower:** | ConvergeOne Holdings, Inc. (the "Borrower"), as a debtor and debtor-in-possession in the Chapter 11 Cases. |
| **Guarantors:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Administrative Agent and Administrative Agent Fee:** | A financial institution acceptable to the Required Term DIP Lenders (as defined below) (in such capacity, the "Term DIP Agent"). |
| | The Term DIP Agent shall be paid an annual agency fee to be agreed by the Term DIP Agent, the Borrower and the Required Term DIP Lenders. |
| **Term DIP Lenders:** | Each of the entities set forth on Annex 1 hereto (each, an "Initial Term DIP Lender" and collectively the "Initial Term DIP Lenders") that commits to provide the amount of the Term DIP Facility set forth opposite its name on Annex 1, subject to the Term DIP Pro Rata Participation Right (as defined below) (all lenders in respect of the Term DIP Facility, including the Initial Term DIP Lenders and any lenders that elect to become lenders in respect of |

| | |
|---|---|
| | the Term DIP Facility through the Term DIP Pro Rata Participation Right, collectively, the "Term DIP Lenders" and each, a "Term DIP Lender"). |
| | Each Term DIP Lender may participate in the Term DIP Facility on behalf of some or all accounts and funds managed by such Term DIP Lender and some or all accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such Term DIP Lender or any other affiliate of such Term DIP Lender (any such managed account or fund, or affiliate, a "Lender Affiliate"), and may allocate its Term DIP Commitments among Lender Affiliates in its sole discretion; provided that any such Lender Affiliate to which any such allocation is made shall immediately become a party to the Commitment Letter and commit to provide its applicable portion of the Term DIP Facility; provided further that any Term DIP Lender may elect to participate in the Term DIP Facility, initially, through a fronting lender and any associated fees and expenses in connection with such fronting arrangement shall be paid out of the Term DIP Proceeds. |
| | "Required Term DIP Lenders" means two or more unaffiliated Term DIP Lenders holding at least 50.1% of the aggregate Term DIP Loan Exposure. |
| **Term DIP Premium:** | The following premiums shall be applicable to all Term DIP Loans (the "Term DIP Premiums"): |
| | • "Term DIP Commitment Premium": a premium totaling 5.00% of the Term DIP Loans, payable to the Initial Term DIP Lenders on a *pro rata* basis based on their commitments set forth on Annex I as of the date hereof, earned upon entry of the Final DIP Order and payable upon, but immediately prior to the occurrence of, the earlier of the Plan Effective Date or the Maturity Date (defined below). |
| | • "Term DIP Exit Premium": a premium totaling 5.00% of the Term DIP Loans, payable to all Term DIP Lenders on a *Pro Rata* basis, earned upon entry of the Final DIP Order and payable upon, but immediately prior to the occurrence of, the earlier of the Plan Effective Date or the Maturity Date (defined below). |
| | The Term DIP Commitment Premium and the Term DIP Exit Premium are payable in cash; provided, that, in the event that an Acceptable Amended Plan (as defined below) is consummated and made effective, the Term DIP Commitment Premium and the Term DIP Exit Premium may instead be paid in New Equity Interests (as defined in the Joint Plan) at the Stipulated Equity Value (as defined in the Joint Plan) on the effective date of such Acceptable Amended Plan; provided, further, that in the event that the Term DIP Commitment Premium and the Term DIP Exit Premium are paid in New Equity Interests (as defined in the Joint Plan) at the Stipulated Equity Value (as defined in the Joint Plan) on the effective date of such Acceptable Amended Plan, the New Equity Interests paid to Blue Torch Capital and its affiliates (if any), in their capacities as Initial Term DIP Lenders or Term DIP Lenders, as applicable, shall include a customary put right exercisable by the holders of such New Equity Interests on or after the third anniversary of the effective date of such Acceptable Amended Plan. |

| | |
|---|---|
| **Maturity:** | All obligations under the Term DIP Loan Documents (collectively, the "Term DIP Obligations") will be due and payable in full in cash (subject to the DIP Term Loan Rights (defined below)) on the earliest of: (i) the date that is six months after the Closing Date (as defined below); (ii) the date of acceleration of the Term DIP Loans pursuant to the terms of the Term DIP Credit Agreement and the other Term DIP Loan Documents; (iii) the date the Bankruptcy Court orders a conversion of any Chapter 11 Case to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Debtor; (iv) the substantial consummation of a plan of reorganization or liquidation of the Debtors, which has been confirmed by an order entered by the Bankruptcy Court (the "Plan"), (v) the appointment of a chapter 11 trustee or other Bankruptcy Court-mandated fiduciary with decision-making authority (including an examiner with expanded powers), (vi) the date of consummation of a sale of all or substantially all of the Debtors' assets, and (vii) the date of the Milestone relating to entry of the Final DIP Order, to the extent the Final DIP Order is not entered into on or prior to such date (the earliest date to occur, the "Maturity Date").<br><br>On the Maturity Date, the Term DIP Loan Obligations shall be paid in full in cash; provided, however, that in the event of a Maturity Date triggered pursuant to clause (iv) above as a result of the consummation and effectiveness of an amended plan of reorganization of the Debtors that is consistent with the Alternative Transaction described (and as defined in) the April 26, 2024 letter from Proskauer Rose to White & Case describing the Alternative Proposal (as defined in the letter) (the "Board Letter"), consistent with this DIP Term Sheet, and in form and substance acceptable to the Loan Parties, the Term DIP Lenders, the Term DIP Agent (an "Acceptable Amended Plan"), then each Term DIP Lender shall exchange all of its Term DIP Obligations, on a dollar for dollar basis, for Exit Term Loans (as defined below). |
| **Use of Proceeds:** | Solely in accordance with and subject to the Approved Budget (in each case where used herein, to be defined in the Term DIP Credit Agreement (as defined below) in the same way as in the Existing DIP Term Loan Facility (as in effect on the date hereof) subject to Permitted Variances (in each case where used, to be defined in the Term DIP Credit Agreement (as defined below) in the same way as in the Existing DIP Term Loan Facility (as in effect on the date hereof)), and the Final DIP Order (as defined below), the Term DIP Proceeds may be used only (i) to pay in full in cash all outstanding obligations under the Existing DIP Term Loan Facility, which shall be required upon the initial funding of the Term DIP Loans, (ii) to pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with the Chapter 11 Cases (including payments benefiting from the Carve Out), (iii) for working capital and general corporate purposes of the Loan Parties, and (iv) for such other purposes as may be detailed in the Approved Budget (subject to Permitted Variances). |
| **Interest:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |

6

| | |
|---|---|
| **Default Interest:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Permitted Liens:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Collateral:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Covenants, Etc.:** | Representations, warranties, reporting requirements, mandatory prepayment requirements, voluntary prepayment requirements, affirmative covenants, negative covenants, and "sacred rights" will be substantially the same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Financial Covenants:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Events of Default:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Ratings Requirement:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Term DIP Loan Documents:** | The Term DIP Facility will be documented by a Senior Secured Super-priority Debtor-in-Possession Term Loan Credit Agreement (the "<u>Term DIP Credit Agreement</u>") and other guarantee, security and loan documentation (together with the Term DIP Credit Agreement, the "<u>Term DIP Loan Documents</u>") in each case substantially the same as those that document the Existing DIP Term Loan Facility (as in effect on the date hereof), as modified to the extent necessary to reflect the terms and provisions set forth in this DIP Term Sheet and otherwise in form and substance satisfactory to the Required Term DIP Lenders. |
| **Final DIP Order:** | The final DIP order, which shall be satisfactory in form and substance to the Term DIP Agent and the Required Term DIP Lenders, shall authorize and approve, among other matters to be agreed, (i) the Debtors' entry into the Term DIP Loan Documents, (ii) the making of the Term DIP Loans, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets as required by this DIP Term Sheet in accordance with the Term DIP Loan Documents with respect to the DIP Collateral, (iv) the granting of adequate protection as set forth below, (v) the Term DIP Premiums, (vi) the waivers and marshalling provisions set forth below, (vii) stipulations as to the amount, validity, enforceability, perfection and priority of the prepetition indebtedness, (viii) waiver of any requirement of the Term DIP Lenders and prepetition secured lenders to file any proof of claim, (ix) the "Carve Out" referenced and defined below, and (x) customary indemnification and payment of all fees and expenses of Proskauer Rose LLP, as counsel to the Term DIP Lenders, Uzzi & Lall, as financial advisor to the Term DIP Lenders, applicable local counsel, and other necessary advisors (collectively, |

7

**App. 801**

| | |
|---|---|
| | the "Term DIP Advisors"), as well as advisors to the Term DIP Agent (such a final DIP order that satisfies the foregoing criteria, the "Final DIP Order"). |
| **Adequate Protection:** | The Final DIP Order shall approve adequate protection that is substantially the same under the existing DIP orders that have been entered in the Chapter 11 Cases prior to the date hereof. |
| **Carve Out:** | The liens on and security interests of the Term DIP Lenders in the DIP Collateral, the adequate protection liens, and all super-priority administrative expense claims granted under the Final DIP Order, shall be subject and subordinate to the Carve Out.<br><br>For purposes hereof, "Carve Out" shall have substantially the same meaning as under the existing DIP orders that have been entered in the Chapter 11 Cases prior to the date hereof. |
| **Waivers; Marshaling:** | The Final DIP Order shall provide for waivers of (i) section 506(c) and the "equities of the case" exception set forth in section 552 of the Bankruptcy Code and (ii) the doctrine of marshaling with respect to the Prepetition ABL Claims, the Prepetition First Lien Claims and the collateral securing the Prepetition ABL Obligations, the Prepetition First Lien Claims and the Prepetition Second Lien Claims. |
| **Conditions Precedent to the Closing:** | The closing date (the "Closing Date") under the Term DIP Facility shall be subject solely to the following conditions:<br><br>(i)    execution and delivery of the Term DIP Credit Agreement and any other Term DIP Loan Document being executed and delivered on the Closing Date, in form and substance consistent with this Term Sheet and otherwise acceptable to the Loan Parties, the Term DIP Lenders, and the Term DIP Agent;<br><br>(ii)    delivery of the Initial DIP Budget, in form and substance satisfactory to the Required Term DIP Lenders;<br><br>(iii)    entry of the Final DIP Order, and the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required Term DIP Lenders;<br><br>(iv)    the payment of (x) all fees required to be paid on the Closing Date under the Term DIP Credit Agreement and the other Term DIP Loan Documents (including any applicable fee letters) and (y) all reasonable and documented fees and expenses of the Term DIP Advisors;<br><br>(v)    delivery of a borrowing request;<br><br>(vi)    the Chapter 11 Cases of the Debtors shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code; no trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases; |

| | |
|---|---|
| | (vii)    delivery of a secretary's (or other officer's) certificate of the Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments (including good standing certificates); |
| | (viii)    the Term DIP Agent shall have received at least five (5) Business Days prior to the Closing Date all documentation and information as is reasonably requested by Term DIP Agent or any Term DIP Lender that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations in applicable jurisdictions, including, without limitation, the PATRIOT Act, in each case to the extent requested in writing at least seven (7) Business Days prior to the Closing Date, provided, that, the Loan Parties will use reasonable efforts to promptly provide any additional information requested thereafter; |
| | (ix)    the representations and warranties set forth in the Term DIP Credit Agreement and any other Term Loan DIP Facility Documents entered into on the Closing Date shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties will be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) as of such earlier date); |
| | (x)    on the Closing Date and immediately after giving effect to the funding of the Term DIP Loans, no default or Event of Default shall have occurred and be continuing or would result therefrom; |
| | (xi)    delivery of customary legal opinions; |
| | (xii)    no material modifications shall have been made to the ABL DIP Loan Documents (in each case where used herein, as defined in the Existing DIP Term Loan Credit Agreement as in effect on the date hereof) since the date hereof that are adverse to the interests of the Term DIP Lenders, and no default or event of default shall exist arise under the ABL DIP Loan Documents or be caused as a result of the occurrence of the Closing Date, the funding of the Term DIP Loans and the other transactions contemplated hereby to occur on the Closing Date; |
| | (xiii)    the Term DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the Term DIP Loan Documents and the Final DIP Order, having the priorities set forth in the Final DIP Order; |

9

| | | |
|---|---|---|
| | (xiv) | the Closing Date shall have occurred on or before the date that is five calendar days after the date of entry of the Final DIP Order; |
| | (xv) | after giving effect to the transactions occurring on the Closing Date, there shall be no default or event of default under the Pre-Petition ABL Credit Agreement (as defined in the Existing DIP Term Loan Credit Agreement as in effect on the date hereof); |
| | (xvi) | (a) the RSA shall have been terminated, (b) the Joint Plan shall have been withdrawn, and (c) a restructuring support agreement in support of an Acceptable Amended Plan shall have been executed by the Debtors; |
| | (xvii) | delivery of an officer's certificate of the Borrower confirming compliance with the each of the conditions precedent (other than any matters which are to be delivered by, provided by, or subject to the satisfaction of, any party other than the Loan Parties). |
| **Term DIP Pro Rata Participation Right:** | Each Holder (as defined in the Joint Plan as in effect on the date hereof) of a First Lien Claim (as defined in the Joint Plan as in effect on the date hereof) (or its designated affiliate, managed fund or account or other designee) shall be offered the opportunity to participate on a *Pro Rata* basis in the Term DIP Facility until the date that is ten business days prior to the hearing date for the proposed Final DIP Order (the "Term DIP Limited Pro Rata Participation Right"). The Term DIP Loan commitments of the Initial Term DIP Lenders set forth on Annex I shall be reduced on a *Pro Rata* basis by any amounts committed in respect of the Term DIP Facility by Holders exercising the Term DIP Pro Rata Participation Right. | |
| **Exit Term Loan Facility and Exit Term Loans:**[2] | In lieu of the Rights Offering and Direct Investment (in each case, as defined in the Joint Plan (as defined in the Existing DIP Term Loan Credit Agreement as in effect on the date hereof (the "Joint Plan"))), on the effective date of an Acceptable Amended Plan, the reorganized Debtors shall be capitalized through a secured term loan facility in the aggregate principal amount of $245 million consisting entirely of the cashless roll of outstanding principal under the Term DIP Facility (the "Exit Term Loan Facility") under an exit financing credit agreement on substantially the same terms as the Exit Term Loan Facility described in the Joint Plan, and as set forth below.<br><br>Interest Rate:  At the option of the Debtors, (i) SOFR (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate or (ii) Base Rate (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate, in each case payable in cash; provided that at any time an event of default exists under the Exit Term Loan Facility, the Debtors shall not be able to elect SOFR. | |

---

[2] All capitalized terms used in this section that are not defined in the Commitment Letter shall have the meanings given to them in the Joint Plan as in effect on the date hereof, or, if not defined therein, in the Board Letter.

<u>Applicable Rate</u>:  4.65% in the case of Base Rate loans and 5.65% in the case of SOFR loans.

<u>Default Interest</u>:  During the continuance of an Event of Default, the Exit Term Loans will bear interest at an additional 2.00% per annum and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum. Default interest shall be payable in cash on demand.

<u>Interest Payment Dates</u>:  Interest on (i) Base Rate loans shall be payable on the last business day of each fiscal quarter in arrears and (ii) SOFR loans shall be payable on the last day of each Interest Period in arrears (or, if earlier, the three-month anniversary of the commencement of such Interest Period).

<u>Interest Period</u>:  At the option of the Debtors, one, three, or six months.

<u>Amortization</u>:  None.

<u>Tenor</u>:  Six years; <u>provided</u> that if, in the reasonable determination of two or more unaffiliated lenders holding at least 50.1% of the aggregate Exit Term Loan Facility exposure (the "<u>Required Exit Lenders</u>") in good faith consultation with the Debtors, the Restructuring Transaction (as modified by the Alternative Proposal) cannot be effectuated in a manner that causes a taxable transaction to the lenders for U.S. federal and applicable state and local income tax purposes by causing a Reorganized Debtor, other than the Borrower to be the issuer of the Exit Term Loans, because such structure would reasonably be expected to result in material adverse tax consequences to the Reorganized Debtors as compared to the tax consequences to the Reorganized Debtors had the Borrower been the issuer of the Exit Term Loans, subject to the consent of the Required Exit Lenders, the tenor will be reduced to 4.75 years and in that case the Applicable Rate will be reduced to 4.25% in the case of Base Rate loans and 5.25% in the case of SOFR loans.

<u>Premiums</u>: None, other than the Term DIP Commitment Premium and the Term DIP Exit Premium (as defined and described above), which shall, on the closing date of the Exit Term Loan Facility, be paid in New Equity Interests (as defined in the Joint Plan as in effect on the date hereof) at the Stipulated Equity Value (as defined in the Joint Plan as in effect on the date hereof).

<u>Fees</u>: None, other than a customary annual administrative agency fee to be agreed.

<u>Security</u>:  A (x) first-priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitute Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), and a first-priority lien on (A) that certain real property of the Reorganized Debtors located at 2368 Corporate Lane, Suite 112, Naperville, IL 60563 and (B) any other owned real property of the Reorganized Debtors and (y) a second-priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitutes ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), which second-priority liens shall be subordinated to the liens on such

11

**App. 805**

| | |
|---|---|
| | collateral securing the Exit ABL Facility, in the case of either clause (x) or (y) above, subject to customary exclusions consistent with the exclusions under the Prepetition First Lien Credit Agreement (including the exclusion of 35% of the equity interests of any first-tier foreign subsidiaries) and otherwise as may be agreed by the Reorganized Debtors and the Required Consenting Lenders. |
| | Documentation Principles:  The Exit Term Loan Credit Agreement with respect to the Exit Term Loan Facility shall (i) be based upon the Prepetition First Lien Term Loan Credit Agreement and be in form and substance satisfactory to the Required Exit Lenders; (ii) include such provisions as are necessary to reflect the Restructuring Transaction (as modified by the Alternative Proposal), as implemented through the Chapter 11 Cases, and the fact that the Exit Term Loan Facility is an exit financing; (iii) include appropriate modifications to reflect changes in law or accounting standards since the date of such precedent; and (iv) incorporate the following: |
| | • Affirmative Covenants: Consistent with the First Lien Term Loan Credit Agreement (but modified in a manner acceptable to the Debtors and the Required Exit Lenders to provide for modified reporting requirements and information rights that are customary for facilities of this type and relate to reporting and information readily available to the Debtors in the ordinary course of business). |
| | • Negative Covenants: Consistent with the First Lien Term Loan Credit Agreement, but modified as may be required to effectuate the Restructuring Transaction (as modified by the Alternative Proposal), in each case, in a manner acceptable to the Debtors and the Required Exit Lenders. |
| | • Minimum Liquidity Covenant:  A minimum liquidity covenant set at $15 million and otherwise consistent with the minimum liquidity covenant applicable to the Existing DIP Term Loan Facility. |
| | • Miscellaneous:  Shall also include certain customary liability management protections in form and substance acceptable to the Debtors and the Required Exit Lenders. |
| | Intercreditor Agreements: The Exit Term Loan Facility shall be subject to an intercreditor agreement, which shall be based on the Exit Intercreditor Agreement and be in form and substance satisfactory to the Required Exit Lenders. |
| | Ratings: The Reorganized Debtors shall use commercially reasonable efforts to have the Exit Term Loans rated by Moody's and S&P within sixty days of the Effective Date. |
| **Treatment of First Lien Claims Upon Consummation of an Acceptable Amended Plan:** | Upon the effective date of, and in connection with, the consummation of an Acceptable Amended Plan, each Holder (as defined in the Joint Plan as in effect on the date hereof) of a First Lien Claim (as defined in the Joint Plan as in effect on the date hereof) (or its designated affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim (as defined in the Joint Plan as in effect on the date hereof), its *pro rata* share of $388.6 million of New |

|  | Equity Interests at the Stipulated Equity Value (as defined in the Joint Plan as in effect on the date hereof). |
|--|--|

13

May 9, 2024

<u>PERSONAL AND CONFIDENTIAL</u>

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Attn: Bojan Guzina (bojan.guzina@whitecase.com)

<u>$245 Million Replacement Super-Priority Senior Secured</u>
<u>Debtor-In-Possession Term Loan Credit Facility Commitment Letter</u>

      ConvergeOne Holdings, Inc. (the "<u>Company</u>", "<u>you</u>" or "<u>your</u>"), certain of your subsidiaries (the "<u>Subsidiary Debtors</u>") and the direct parent of the Company ("<u>Holdings</u>" and, collectively with the Company and the Subsidiary Debtors, the "<u>Debtors</u>"), are debtors in voluntarily commenced Chapter 11 Cases, jointly administered under Chapter 11 Case No. 24-90194 (collectively, the "<u>Chapter 11 Cases</u>" and each individually a "<u>Chapter 11 Case</u>") in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"), the Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, and you are the borrower under that certain Super-Priority Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of April 5, 2024, among PVKG Intermediate Holdings Inc., as Holdings ("<u>Holdings</u>"), the Company, as the Borrower (as defined therein), the lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent (the "<u>Existing DIP Term Loan Credit Agreement</u>", and the term loan credit facility thereunder, the "<u>Existing DIP Term Loan Facility</u>"). The parties listed on <u>Annex I</u> hereto that are identified as Commitment Parties (each, a "<u>Commitment Party</u>", and collectively (severally, and not jointly or jointly and severally) the "<u>Commitment Parties</u>", "<u>we</u>", "<u>us</u>" or "<u>our</u>"), agree to commit to provide a $245 million super-priority senior secured debtor-in-possession term loan credit facility for the Company under Sections 364(c) and 364(d) of the Bankruptcy Code in full replacement of the Existing DIP Term Loan Facility on the terms and subject to the conditions set forth herein (the "<u>Replacement DIP Term Loan Facility</u>"). Unless otherwise specified in this Commitment Letter, all references to "$" shall refer to U.S. dollars. Capitalized terms used in this Commitment Letter without definition shall have the meanings assigned to them in the DIP Term Sheet.

1.  <u>Commitment</u>.

      To provide assurance that the Replacement DIP Term Loan Facility shall be available on the terms and conditions set forth in this Commitment Letter and in the DIP Term Sheet, each Commitment Party is pleased to advise the Company of its several, but not joint, commitment (the "<u>Commitment</u>") to provide the amount of the Replacement DIP Term Loan Facility set forth on <u>Annex I</u> hereto, on the terms set forth in the DIP Term Sheet attached as <u>Exhibit A</u> (the "<u>DIP Term Sheet</u>" and, together with this letter, this "<u>Commitment Letter</u>"), subject solely to the conditions set forth in the "*Conditions Precedent to the Closing*" section of the DIP Term Sheet referenced below (collectively, the "<u>Conditions Precedent</u>").

2.  <u>Information</u>.

      You represent, warrant and covenant that (a) all written information concerning you and your subsidiaries and your and their respective business, including all disclosure statements filed with the Bankruptcy Court in connection with the Chapter 11 Cases (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "<u>Projections</u>") and information of a general economic or industry specific nature) (the "<u>Information</u>") that has been or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished,

1

**App. 808**

to the Company's knowledge, complete and correct in all material respects and not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the first sentence  the immediately succeeding paragraph) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates.  We acknowledge that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control and (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results. Consequently, we acknowledge and agree that the Company makes no guarantee with respect to the Projections.

You agree that if, at any time prior to the entry of the Final DIP Order approving the Replacement DIP Term Loan Facility, you become aware that any of the representations, warranties and covenants in the preceding paragraph would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be, to the Company's knowledge, correct in all material respects. Notwithstanding the foregoing, for the avoidance of doubt, there will be no requirement to update previously delivered Projections to reflect new assumptions so long as the assumptions were reasonable at the time made and made available to us or any of our affiliates.  Without limiting the representations, warranties and covenants to be contained in the definitive documentation for the Replacement DIP Term Loan Facility or the Conditions Precedent that are applicable to the relevant borrowing, the accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Commitment Parties under this Commitment Letter or the availability of the Replacement DIP Term Loan Facility.

3.  <u>Fees</u>.

As consideration for the Commitments and agreements of the Commitment Parties under this Commitment Letter, the Company agrees to pay (or cause to be paid) the fees set forth in the DIP Term Sheet. The parties to this Commitment Letter (the "<u>parties</u>") acknowledge and agree that the obligation of the Company to pay such fees shall constitute an "Obligation" under and as defined in the definitive documentation for the Replacement DIP Term Loan Facility.

4.  <u>Conditions</u>.

The Commitment Parties' Commitments and agreements under this Commitment Letter in respect of the Replacement DIP Term Loan Facility are subject solely to the satisfaction (or waiver by the Commitment Parties) of the Conditions Precedent.  The Commitment Parties' commitments to fund the Replacement DIP Term Loan Facility on the date of the relevant borrowing are subject solely to the satisfaction (or waiver by the Commitment Parties) of the Conditions Precedent that are applicable to the relevant borrowing.  There are no conditions (implied or otherwise) to the Commitments under this Commitment Letter in respect of the Replacement DIP Term Loan Facility, and there will be no conditions (implied or otherwise) to the availability of the Replacement DIP Term Loan Facility on the date of the relevant borrowing, including compliance with the terms of this Commitment Letter or the DIP Term Sheet, other than the Conditions Precedent that are applicable to the relevant borrowing.

5.  <u>Indemnification and Expenses</u>.

You agree to (a) indemnify and hold harmless each Commitment Party and the Term DIP Agent (as defined in the DIP Term Sheet), their respective affiliates and their and their affiliates' respective officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers, financial advisors and advisers), consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses") to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Replacement DIP Term Loan Facility, the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, and (b) reimburse each Commitment Party promptly (but in any event within ten business days) upon receipt of a reasonably detailed invoice in respect of the same for any reasonable and documented out-of-pocket (i) fees and expenses of Proskauer Rose LLP and any reasonably necessary local legal counsel and (ii) fees and expenses of Uzzi & Lall , in each case, incurred in connection with the Replacement DIP Term Loan Facility, the enforcement of this Commitment Letter, the definitive documentation for the Replacement DIP Term Loan Facility, and any ancillary documents and security arrangements in connection with the same, but no other third-party financial advisors without your prior written consent, not to be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith, actual fraud or willful misconduct or (ii) material breach of its obligations under this Commitment Letter or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Debtors or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the Term DIP Agent, in its capacity or in fulfilling its role as such).

None of you, Holdings, the other Debtors, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to any another such person for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the Replacement DIP Term Loan Facility, the enforcement of this Commitment Letter, the definitive documentation for the Replacement DIP Term Loan Facility, or any ancillary documents and security arrangements in connection with the Replacement DIP Term Loan Facility.

6.   Assignments, Amendments.

This Commitment Letter shall not be assignable by you or us without the prior written consent of the other parties to this Commitment Letter (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties to this Commitment Letter, the Indemnified Persons and with respect to Section 5 and this Section 6, the Term DIP Agent, and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties to this Commitment Letter, the Indemnified Persons, and with respect to Section 5 and this Section 6, the Term DIP Agent. Notwithstanding the foregoing, for the avoidance of doubt, any Term DIP Lender may assign its rights, commitments and obligations under this Commitment Letter to any Term DIP Lender or any Lender Affiliate (as defined in the DIP Term Sheet) as set forth in the DIP Term Sheet.  This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by (a) each Commitment Party and (b) you.

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof.  Section headings used in this Commitment Letter are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in

interpreting, this Commitment Letter.  The words "execution," "signed," "signature," "delivery," and words of like import in this Commitment Letter shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.  You acknowledge that information and documents relating to the Replacement DIP Term Loan Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Commitment Party nor the Term DIP Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the Replacement DIP Term Loan Facility.

7.   Governing Law, Etc.; Jurisdiction.

This Commitment Letter and any claim, controversy or dispute arising under or related to this Commitment Letter (including, without limitation, any claims sounding in contract law or tort law arising out of the subject matter hereof) shall be governed by, and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the laws of any jurisdiction other than the State of New York.

Any and all suits, legal actions or proceedings arising out of or relating to this Commitment Letter or the Replacement DIP Term Loan Facility shall, (x) prior to a Filing, be brought solely in the New York State court or Federal Court located in the Borough of Manhattan in New York City, and any appellate court from any thereof, and, (y) following a Filing, be brought solely in the Bankruptcy Court (the foregoing courts collectively, the "Chosen Courts").  Each party submits to and accepts the jurisdiction of the Chosen Courts for the purpose of such suits, legal actions or proceedings, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, or, to the extent applicable, the Bankruptcy Court; provided that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter or the Replacement DIP Term Loan Facility in any New York State court, in any such Federal court or in Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

You hereby agree that you shall not bring any suit, action, proceeding, claim or counterclaim under this Commitment Letter or with respect to the transactions contemplated hereby in any court other than such New York State court or Federal Court of the United States of America sitting in the Borough of Manhattan in New York City or the Bankruptcy Court. Service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

8.     Waiver of Jury Trial. EACH OF THE PARTIES TO THIS COMMITMENT LETTER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT

4

TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

9.   Confidentiality.

This Commitment Letter is delivered to the Company on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you, Holdings and its subsidiaries and your and their respective officers, directors, employees, legal counsel, accountants, financial advisors on a confidential and "need to know" basis and, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you, Holdings or any of its subsidiaries, as applicable, of the confidential nature of this Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any ad-hoc or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (d) to the Bankruptcy Court, (e) as and to the extent required in any financial statements or for other customary accounting purposes, (f) in connection with the exercise of remedies hereunder or any suit, action or proceeding relating to this Commitment Letter or the enforcement hereof, (g) to the extent such information becomes publicly available other than by reason of improper disclosure by you or your officers, directors, employees, legal counsel, accountants or financial advisors in violation of any confidentiality obligations hereunder, (h) to the Lenders (as defined in the Existing DIP Term Loan Credit Agreement) and their respective affiliates, officers, directors, employees, members, partners, equityholders, attorneys, accountants, agents and advisors on a "need to know" basis, in each case, in connection with the Chapter 11 Cases, if subject to the same or similar confidentiality restrictions, and (i) you may disclose the aggregate amount of the premiums and fees under this Commitment Letter as part of projections, pro forma information and a generic disclosure of aggregate sources and uses.

Each Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated by this Commitment Letter or obtained from or on behalf of you, Holdings or your and its respective affiliates in the course of the transactions contemplated by this Commitment Letter, except that the Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants and advisors involved in the transactions contemplated by this Commitment Letter on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Commitment Party responsible for such persons' compliance with this paragraph), (b) on a confidential basis to any bona fide prospective Term DIP Lender, prospective participant or swap counterparty (in accordance with the terms of the DIP Term Sheet) that agrees to keep such information confidential in accordance with the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Commitment Parties promptly in advance thereof), (d) to the extent such information:  (i) becomes publicly available other than as a result of a breach of this Commitment Letter or other confidentiality obligation owed by such Commitment Party to you or your affiliates or (ii) becomes available to the Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Commitment Party's knowledge, is not in violation of any confidentiality obligation

owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Commitment Parties' rights with respect to this Commitment Letter and/or the Replacement DIP Term Loan Facility, (g) to the extent independently developed by such Commitment Party or its affiliates without reliance on confidential information, (h) with respect to the existence and contents of the DIP Term Sheet and definitive documentation for the Replacement DIP Term Loan Facility, in consultation with you, to the rating agencies or (i) with respect to the existence and contents of this Commitment Letter and the Replacement DIP Term Loan Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the Replacement DIP Term Loan Facility and to industry trade organizations where such information with respect to the Replacement DIP Term Loan Facility is customarily included in league table measurements.  The Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provisions in the definitive documentation for the Replacement DIP Term Loan Facility upon the effectiveness thereof and, in any event, will terminate one year from the date of this Commitment Letter.

10. Miscellaneous.

You acknowledge and agree that nothing in this Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Commitment Party, the Term DIP Agent or any of their respective affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Commitment Party, the Term DIP Agent or any of their respective affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Commitment Letter or the transactions contemplated hereby, and agree that no Commitment Party, Term DIP Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated by this Commitment Letter (including the exercise of rights and remedies under this Commitment Letter) are arm's-length commercial transactions and that we and the Term DIP Agent are acting as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated by this Commitment Letter are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the Term DIP Agent may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning the Company and other companies that may be the subject of the transactions contemplated by this Commitment Letter and such affiliates will be entitled to the benefits afforded to us and the Term DIP Agent under this Commitment Letter, so long as any such affiliates receiving information concerning the Company and other companies in accordance with this paragraph shall be subject to the same confidentiality obligations provided for in this Commitment Letter (with each Commitment Party responsible for its affiliates' compliance with this paragraph).

The Commitment Parties notify the Company that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act") and the requirements of 31 C.F.R. § 1010.230 (the "Beneficial Ownership Regulation"), it and its affiliates are required to obtain, verify and record information that identifies each Credit Party, which information includes names, addresses, tax identification numbers and other information that will allow Commitment Parties and its affiliates to identify each Credit Party in accordance with the PATRIOT Act and the Beneficial Ownership Regulation.  This notice is given in accordance with the requirements of the

PATRIOT Act and the Beneficial Ownership Regulation and is effective for Commitment Parties and its affiliates.

Each of the parties agrees that this Commitment Letter is a binding and enforceable agreement (subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law)) with respect to its subject matter, including an agreement to negotiate in good faith the definitive documentation for the Replacement DIP Term Loan Facility by the parties in a manner consistent with this Commitment Letter.  It being acknowledged and agreed that the availability of the Replacement DIP Term Loan Facility is subject solely to the Conditions Precedent that are applicable to the relevant borrowing.

If the foregoing correctly sets forth our agreement, please indicate the Company's acceptance of the terms of this Commitment Letter by returning to the Commitment Parties executed counterparts of this Commitment Letter not later than 11:59 p.m., New York City time, on May 17, 2024. This offer will automatically expire at such time if the Commitment Parties have not received such executed counterparts in accordance with the preceding sentence.   This Commitment Letter and the Commitments and agreements under this Commitment Letter shall automatically terminate on the earlier of (i) the date of the effectiveness of the definitive documentation for the Replacement DIP Term Loan Facility and (ii) unless the Commitment Parties shall, in their sole discretion, agree in writing to an extension, 11:59 p.m., New York City time, on August 15, 2024.  Notwithstanding the immediately preceding sentence, Section 3 above, as well as the indemnification and expenses, confidentiality, information, jurisdiction, governing law and waiver of jury trial provisions contained in this Commitment Letter shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Commitment Letter or the Commitment Parties' Commitments under this Commitment Letter.  Notwithstanding the foregoing, your obligations under this Commitment Letter, other than those pursuant to Section 3 and with respect to confidentiality, shall automatically terminate and be superseded by the applicable provisions in the definitive documentation for the Replacement DIP Term Loan Facility, in each case, to the extent covered by the same, on the date of the effectiveness of the definitive documentation for the Replacement DIP Term Loan Facility, and you shall be released from all liability in connection therewith at such time.

*[Signature Pages Follow]*

**App. 814**

Very truly yours,

David M. Hillman
Title: Member of the Firm
        Proskauer Rose LLP

[*Signature Page to Commitment Letter*]

App. 815

DocuSign Envelope ID: 7538BEC0-5F91-455D-8C83-82E6A963BA45

Very truly yours,

BLUE TORCH FINANCE LLC

By:  Blue Torch Capital LP, its managing member

By: _____

Name: Kevin Genda

Title:  Authorized Signatory

[*Signature Page to Commitment Letter*]

CERBERUS CAPITAL MANAGEMENT, L.P., on behalf of its affiliated funds and accounts



Alex Benjamin (May 8, 2024 13:41 EDT)

Name:  Alex Benjamin

Title:  Chief Legal Officer

[*Signature Page to Commitment Letter*]

ELLINGTON MANAGEMENT GROUP, L.L.C.,
on behalf of certain funds and accounts it or its
affiliates, manage or advises

_____

Name: Daniel Margolis

Title: General Counsel

[*Signature Page to Commitment Letter*]

LIVELLO CAPITAL MANAGEMENT LP,
on behalf of itself and its affiliated funds and
managed funds

Name: Joseph Salegna

Title:  Chief Financial Officer

*[Signature Page to Commitment Letter]*

PALMER SQUARE CAPITAL
MANAGEMENT, on behalf of itself and its
affiliated funds and managed funds

_____

Name: Scott A Betz

Title: Chief Operating Officer

[*Signature Page to Commitment Letter*]

**App. 820**

STEELE CREEK INVESTMENT
MANAGEMENT, on behalf of itself and its
affiliated funds and managed funds

*Andre Monitto*

Name: Andre Monitto

Title: Research Analyst

[*Signature Page to Commitment Letter*]

**App. 821**

Accepted and agreed to as of _____, 2024:

CONGERGEONE HOLDINGS, INC.


By: _____
    Name:
    Title:

[*Signature Page to Commitment Letter*]

**Annex I**

**Commitment Parties and Commitments**

| Commitment Party[1] | Commitment Amount |
|---|---|
| CERBERUS CAPITAL MANAGEMENT, L.P. | $32,500,000 |
| ELLINGTON CLO MANAGEMENT LLC | $2,500,000 |
| LIVELLO CAPITAL MANAGEMENT | $10,000,000 |
| PALMER SQUARE CAPITAL MANAGEMENT | $25,000,000 |
| STEELE CREEK INVESTMENT MANAGEMENT | $5,000,000 |
| BLUE TORCH FINANCE LLC | $170,000,000 |

---

[1] Certain entities are listed in this Annex I on behalf of certain funds and/or accounts for which they serve as investment manager or adviser.

**Exhibit A**

**CONVERGEONE HOLDINGS, INC., ET AL.**

**$245 MILLION SUPER-PRIORITY SENIOR SECURED
DEBTOR-IN-POSSESSION TERM LOAN CREDIT FACILITY**

The terms set forth in this Summary of Principal Terms and Conditions (the "DIP Term Sheet") are being provided on a confidential basis as part of a comprehensive proposal, each element of which is consideration for the other elements and an integral aspect of the proposed Term DIP Facility (as defined below). Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Commitment Letter.

**Summary of Proposed Terms and Conditions**

| | |
|---|---|
| **Term DIP Facility:** | A super-priority senior secured debtor-in-possession term loan facility in an aggregate principal amount of $245 million (the "Term DIP Facility"; the Term DIP Lenders' commitments thereunder, the "Term DIP Commitments"; the loans thereunder, the "Term DIP Loans" and, together with the Term DIP Commitments, the "Term DIP Loan Exposure"; the Term DIP Lenders' claims thereunder, the "Term DIP Superpriority Claims"; and the proceeds received by the Borrower from the Term DIP Loans, the "Term DIP Proceeds"), subject to the terms and conditions set forth in this DIP Term Sheet and the Term DIP Loan Documents (as defined below). |
| | The Term DIP Loans will be available to be made in a single draw in an amount equal to $245 million. |
| **ABL DIP Facility:** | The Term DIP Loan Documents shall permit the Debtors to incur the ABL DIP Facility on terms and conditions consistent with the Existing DIP Term Loan Credit Agreement (as in effect on the date hereof). |
| **Borrower:** | ConvergeOne Holdings, Inc. (the "Borrower"), as a debtor and debtor-in-possession in the Chapter 11 Cases. |
| **Guarantors:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Administrative Agent and Administrative Agent Fee:** | A financial institution acceptable to the Required Term DIP Lenders (as defined below) (in such capacity, the "Term DIP Agent"). |
| | The Term DIP Agent shall be paid an annual agency fee to be agreed by the Term DIP Agent, the Borrower and the Required Term DIP Lenders. |
| **Term DIP Lenders:** | Each of the entities set forth on Annex 1 hereto (each, an "Initial Term DIP Lender" and collectively the "Initial Term DIP Lenders") that commits to provide the amount of the Term DIP Facility set forth opposite its name on Annex 1, subject to the Term DIP Pro Rata Participation Right (as defined below) (all lenders in respect of the Term DIP Facility, including the Initial Term DIP Lenders and any lenders that elect to become lenders in respect of |

| | |
|---|---|
| | the Term DIP Facility through the Term DIP Pro Rata Participation Right, collectively, the "<u>Term DIP Lenders</u>" and each, a "<u>Term DIP Lender</u>").

Each Term DIP Lender may participate in the Term DIP Facility on behalf of some or all accounts and funds managed by such Term DIP Lender and some or all accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such Term DIP Lender or any other affiliate of such Term DIP Lender (any such managed account or fund, or affiliate, a "<u>Lender Affiliate</u>"), and may allocate its Term DIP Commitments among Lender Affiliates in its sole discretion; <u>provided</u> that any such Lender Affiliate to which any such allocation is made shall immediately become a party to the Commitment Letter and commit to provide its applicable portion of the Term DIP Facility; <u>provided</u> <u>further</u> that any Term DIP Lender may elect to participate in the Term DIP Facility, initially, through a fronting lender and any associated fees and expenses in connection with such fronting arrangement shall be paid out of the Term DIP Proceeds.

"<u>Required Term DIP Lenders</u>" means two or more unaffiliated Term DIP Lenders holding at least 50.1% of the aggregate Term DIP Loan Exposure. |
| **Term DIP Premium:** | The following premiums shall be applicable to all Term DIP Loans (the "<u>Term DIP Premiums</u>"):

- "<u>Term DIP Commitment Premium</u>": (a) a premium payable to Blue Torch Finance LLC (together with its affiliates and managed funds, "<u>Blue Torch</u>") in its capacity as an Initial Term DIP Lender in an aggregate amount equal to $8.5 million (i.e., 5.00% of Blue Torch's $170 million commitment in respect of the Term DIP Facility that is set forth on <u>Annex I</u> as in effect on the date hereof), and (b) a premium payable to all Term DIP Lenders that are not Blue Torch in an aggregate amount equal to $3.75 million (i.e., 5.00% of the $75 million of commitments made by persons other than Blue Torch on the date hereof) on a *Pro Rata* basis, earned upon entry of the Final DIP Order and payable upon, but immediately prior to the occurrence of, the earlier of the Plan Effective Date or the Maturity Date (defined below).

- "<u>Term DIP Exit Premium</u>": a premium totaling 5.00% of the Term DIP Loans, payable to all Term DIP Lenders on a *Pro Rata* basis, earned upon entry of the Final DIP Order and payable upon, but immediately prior to the occurrence of, the earlier of the Plan Effective Date or the Maturity Date (defined below).

The Term DIP Commitment Premium and the Term DIP Exit Premium are payable in cash; <u>provided</u>, that, in the event that an Acceptable Amended Plan (as defined below) is consummated and made effective, the Term DIP Commitment Premium and the Term DIP Exit Premium may instead be paid in New Equity Interests (as defined in the Joint Plan) at the Stipulated Equity Value (as defined in the Joint Plan) on the effective date of such Acceptable Amended Plan; <u>provided</u>, <u>further</u>, that in the event that the Term DIP Commitment Premium and the Term DIP Exit Premium are paid in New Equity Interests (as defined in the Joint Plan) at the Stipulated Equity Value (as defined in the Joint Plan) on the effective date of such Acceptable |

5

| | |
|---|---|
| | Amended Plan, the New Equity Interests paid to Blue Torch Capital and its affiliates (if any), in their capacities as Initial Term DIP Lenders or Term DIP Lenders, as applicable, shall include a customary put right exercisable by the holders of such New Equity Interests on or after the third anniversary of the effective date of such Acceptable Amended Plan. |
| **Maturity:** | All obligations under the Term DIP Loan Documents (collectively, the "Term DIP Obligations") will be due and payable in full in cash (subject to the DIP Term Loan Rights (defined below)) on the earliest of: (i) the date that is six months after the Closing Date (as defined below); (ii) the date of acceleration of the Term DIP Loans pursuant to the terms of the Term DIP Credit Agreement and the other Term DIP Loan Documents; (iii) the date the Bankruptcy Court orders a conversion of any Chapter 11 Case to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Debtor; (iv) the substantial consummation of a plan of reorganization or liquidation of the Debtors, which has been confirmed by an order entered by the Bankruptcy Court (the "Plan"), (v) the appointment of a chapter 11 trustee or other Bankruptcy Court-mandated fiduciary with decision-making authority (including an examiner with expanded powers), (vi) the date of consummation of a sale of all or substantially all of the Debtors' assets, and (vii) the date of the Milestone relating to entry of the Final DIP Order, to the extent the Final DIP Order is not entered into on or prior to such date (the earliest date to occur, the "Maturity Date"). |
| | On the Maturity Date, the Term DIP Loan Obligations shall be paid in full in cash; provided, however, that in the event of a Maturity Date triggered pursuant to clause (iv) above as a result of the consummation and effectiveness of an amended plan of reorganization of the Debtors that is consistent with the Alternative Transaction described (and as defined in) the April 26, 2024 letter from Proskauer Rose to White & Case describing the Alternative Proposal (as defined in the letter) (the "Board Letter"), consistent with this DIP Term Sheet, and in form and substance acceptable to the Loan Parties, the Term DIP Lenders, the Term DIP Agent (an "Acceptable Amended Plan"), then each Term DIP Lender shall exchange all of its Term DIP Obligations, on a dollar for dollar basis, for Exit Term Loans (as defined below). |
| **Use of Proceeds:** | Solely in accordance with and subject to the Approved Budget (in each case where used herein, to be defined in the Term DIP Credit Agreement (as defined below) in the same way as in the Existing DIP Term Loan Facility (as in effect on the date hereof) subject to Permitted Variances (in each case where used, to be defined in the Term DIP Credit Agreement (as defined below) in the same way as in the Existing DIP Term Loan Facility (as in effect on the date hereof)), and the Final DIP Order (as defined below), the Term DIP Proceeds may be used only (i) to pay in full in cash all outstanding obligations under the Existing DIP Term Loan Facility, which shall be required upon the initial funding of the Term DIP Loans, (ii) to pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with the Chapter 11 Cases (including payments benefiting from the Carve Out), (iii) for working capital and general corporate purposes of the Loan Parties, and (iv) for such other |

6

| | purposes as may be detailed in the Approved Budget (subject to Permitted Variances). |
|---|---|
| **Interest:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Default Interest:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Permitted Liens:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Collateral:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Covenants, Etc.:** | Representations, warranties, reporting requirements, mandatory prepayment requirements, voluntary prepayment requirements, affirmative covenants, negative covenants, and "sacred rights" will be substantially the same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Financial Covenants:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Events of Default:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Ratings Requirement:** | Same as under the Existing DIP Term Loan Facility (as in effect on the date hereof). |
| **Term DIP Loan Documents:** | The Term DIP Facility will be documented by a Senior Secured Super-priority Debtor-in-Possession Term Loan Credit Agreement (the "Term DIP Credit Agreement") and other guarantee, security and loan documentation (together with the Term DIP Credit Agreement, the "Term DIP Loan Documents") in each case substantially the same as those that document the Existing DIP Term Loan Facility (as in effect on the date hereof), as modified to the extent necessary to reflect the terms and provisions set forth in this DIP Term Sheet and otherwise in form and substance satisfactory to the Required Term DIP Lenders. |
| **Final DIP Order:** | The final DIP order, which shall be satisfactory in form and substance to the Term DIP Agent and the Required Term DIP Lenders, shall authorize and approve, among other matters to be agreed, (i) the Debtors' entry into the Term DIP Loan Documents, (ii) the making of the Term DIP Loans, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets as required by this DIP Term Sheet in accordance with the Term DIP Loan Documents with respect to the DIP Collateral, (iv) the granting of adequate protection as set forth below, (v) the Term DIP Premiums, (vi) the waivers and marshalling provisions set forth below, (vii) stipulations as to the amount, validity, enforceability, perfection and priority of the prepetition indebtedness, (viii) waiver of any requirement of the Term DIP Lenders and prepetition secured lenders to file any proof of claim, (ix) the "Carve Out" |

|  | referenced and defined below, and (x) customary indemnification and payment of all fees and expenses of Proskauer Rose LLP, as counsel to the Term DIP Lenders, Uzzi & Lall, as financial advisor to the Term DIP Lenders, applicable local counsel, and other necessary advisors (collectively, the "Term DIP Advisors"), as well as advisors to the Term DIP Agent (such a final DIP order that satisfies the foregoing criteria, the "Final DIP Order"). |
|---|---|
| **Adequate Protection:** | The Final DIP Order shall approve adequate protection that is substantially the same under the existing DIP orders that have been entered in the Chapter 11 Cases prior to the date hereof. |
| **Carve Out:** | The liens on and security interests of the Term DIP Lenders in the DIP Collateral, the adequate protection liens, and all super-priority administrative expense claims granted under the Final DIP Order, shall be subject and subordinate to the Carve Out.<br><br>For purposes hereof, "Carve Out" shall have substantially the same meaning as under the existing DIP orders that have been entered in the Chapter 11 Cases prior to the date hereof. |
| **Waivers; Marshaling:** | The Final DIP Order shall provide for waivers of (i) section 506(c) and the "equities of the case" exception set forth in section 552 of the Bankruptcy Code and (ii) the doctrine of marshaling with respect to the Prepetition ABL Claims, the Prepetition First Lien Claims and the collateral securing the Prepetition ABL Obligations, the Prepetition First Lien Claims and the Prepetition Second Lien Claims. |
| **Conditions Precedent to the Closing:** | The closing date (the "Closing Date") under the Term DIP Facility shall be subject solely to the following conditions:<br><br>(i)  execution and delivery of the Term DIP Credit Agreement and any other Term DIP Loan Document being executed and delivered on the Closing Date, in form and substance consistent with this Term Sheet and otherwise acceptable to the Loan Parties, the Term DIP Lenders, and the Term DIP Agent;<br><br>(ii)  delivery of the Initial DIP Budget, in form and substance satisfactory to the Required Term DIP Lenders;<br><br>(iii)  entry of the Final DIP Order, and the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required Term DIP Lenders;<br><br>(iv)  the payment of (x) all fees required to be paid on the Closing Date under the Term DIP Credit Agreement and the other Term DIP Loan Documents (including any applicable fee letters) and (y) all reasonable and documented fees and expenses of the Term DIP Advisors;<br><br>(v)  delivery of a borrowing request;<br><br>(vi)  the Chapter 11 Cases of the Debtors shall not have been dismissed or converted to cases under Chapter 7 of the |

8

| | | Bankruptcy Code; no trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases; |
|---|---|---|
| | (vii) | delivery of a secretary's (or other officer's) certificate of the Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments (including good standing certificates); |
| | (viii) | the Term DIP Agent shall have received at least five (5) Business Days prior to the Closing Date all documentation and information as is reasonably requested by Term DIP Agent or any Term DIP Lender that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations in applicable jurisdictions, including, without limitation, the PATRIOT Act, in each case to the extent requested in writing at least seven (7) Business Days prior to the Closing Date, provided, that, the Loan Parties will use reasonable efforts to promptly provide any additional information requested thereafter; |
| | (ix) | the representations and warranties set forth in the Term DIP Credit Agreement and any other Term Loan DIP Facility Documents entered into on the Closing Date shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties will be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) as of such earlier date); |
| | (x) | on the Closing Date and immediately after giving effect to the funding of the Term DIP Loans, no default or Event of Default shall have occurred and be continuing or would result therefrom; |
| | (xi) | delivery of customary legal opinions; |
| | (xii) | no material modifications shall have been made to the ABL DIP Loan Documents (in each case where used herein, as defined in the Existing DIP Term Loan Credit Agreement as in effect on the date hereof) since the date hereof that are adverse to the interests of the Term DIP Lenders, and no default or event of default shall exist arise under the ABL DIP Loan Documents or be caused as a result of the occurrence of the Closing Date, the funding of the Term DIP Loans and the other transactions contemplated hereby to occur on the Closing Date; |
| | (xiii) | the Term DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the Term DIP Loan |

9

|  | Documents and the Final DIP Order, having the priorities set forth in the Final DIP Order; |
|--|--|
|  | (xiv) the Closing Date shall have occurred on or before the date that is five calendar days after the date of entry of the Final DIP Order; |
|  | (xv) after giving effect to the transactions occurring on the Closing Date, there shall be no default or event of default under the Pre-Petition ABL Credit Agreement (as defined in the Existing DIP Term Loan Credit Agreement as in effect on the date hereof); |
|  | (xvi) (a) the RSA shall have been terminated, (b) the Joint Plan shall have been withdrawn, and (c) a restructuring support agreement in support of an Acceptable Amended Plan shall have been executed by the Debtors; |
|  | (xvii) delivery of an officer's certificate of the Borrower confirming compliance with the each of the conditions precedent (other than any matters which are to be delivered by, provided by, or subject to the satisfaction of, any party other than the Loan Parties). |
| **Term DIP Pro Rata Participation Right:** | Each Holder (as defined in the Joint Plan as in effect on the date hereof) of a First Lien Claim (as defined in the Joint Plan as in effect on the date hereof) (or its designated affiliate, managed fund or account or other designee) shall be offered the opportunity to participate on a *Pro Rata* basis in the Term DIP Facility until the date that is ten business days prior to the hearing date for the proposed Final DIP Order (the "Term DIP Pro Rata Participation Right"). The Term DIP Loan commitments of the Initial Term DIP Lenders set forth on Annex I shall be reduced on a *Pro Rata* basis by any amounts committed in respect of the Term DIP Facility by Holders exercising the Term DIP Pro Rata Participation Right.  For the avoidance of doubt, the Term DIP Commitment Premium described in clause (b) of the definition thereof, and the Term DIP Exit Premium shall both be payable on a *Pro Rata* basis to all Term DIP Lenders (in the case of the Term DIP Premium described in clause (b) of the definition thereof, other than Blue Torch) that exercise the Term DIP Pro Rata Participation Right. |
| **Exit Term Loan Facility and Exit Term Loans:[2]** | In lieu of the Rights Offering and Direct Investment (in each case, as defined in the Joint Plan (as defined in the Existing DIP Term Loan Credit Agreement as in effect on the date hereof (the "Joint Plan"))), on the effective date of an Acceptable Amended Plan, the reorganized Debtors shall be capitalized through a secured term loan facility in the aggregate principal amount of $245 million consisting entirely of the cashless roll of outstanding principal under the Term DIP Facility (the "Exit Term Loan Facility") under an exit financing credit agreement on substantially the same terms as the Exit Term Loan Facility described in the Joint Plan, and as set forth below. |

---

[2] All capitalized terms used in this section that are not defined in the Commitment Letter shall have the meanings given to them in the Joint Plan as in effect on the date hereof, or, if not defined therein, in the Board Letter.

Interest Rate:  At the option of the Debtors, (i) SOFR (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate or (ii) Base Rate (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate, in each case payable in cash; provided that at any time an event of default exists under the Exit Term Loan Facility, the Debtors shall not be able to elect SOFR.

Applicable Rate:  4.65% in the case of Base Rate loans and 5.65% in the case of SOFR loans.

Default Interest:  During the continuance of an Event of Default, the Exit Term Loans will bear interest at an additional 2.00% per annum and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum. Default interest shall be payable in cash on demand.

Interest Payment Dates:  Interest on (i) Base Rate loans shall be payable on the last business day of each fiscal quarter in arrears and (ii) SOFR loans shall be payable on the last day of each Interest Period in arrears (or, if earlier, the three-month anniversary of the commencement of such Interest Period).

Interest Period:  At the option of the Debtors, one, three, or six months.

Amortization:  None.

Tenor:  Six years; provided that if, in the reasonable determination of two or more unaffiliated lenders holding at least 50.1% of the aggregate Exit Term Loan Facility exposure (the "Required Exit Lenders") in good faith consultation with the Debtors, the Restructuring Transaction (as modified by the Alternative Proposal) cannot be effectuated in a manner that causes a taxable transaction to the lenders for U.S. federal and applicable state and local income tax purposes by causing a Reorganized Debtor, other than the Borrower to be the issuer of the Exit Term Loans, because such structure would reasonably be expected to result in material adverse tax consequences to the Reorganized Debtors as compared to the tax consequences to the Reorganized Debtors had the Borrower been the issuer of the Exit Term Loans, subject to the consent of the Required Exit Lenders, the tenor will be reduced to 4.75 years and in that case the Applicable Rate will be reduced to 4.25% in the case of Base Rate loans and 5.25% in the case of SOFR loans.

Premiums:  None, other than the Term DIP Commitment Premium and the Term DIP Exit Premium (as defined and described above), which shall, on the closing date of the Exit Term Loan Facility, be paid in New Equity Interests (as defined in the Joint Plan as in effect on the date hereof) at the Stipulated Equity Value (as defined in the Joint Plan as in effect on the date hereof).

Fees: None, other than a customary annual administrative agency fee to be agreed.

Security:  A (x) first-priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitute Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), and a first-priority lien on (A) that certain real property of the

Reorganized Debtors located at 2368 Corporate Lane, Suite 112, Naperville, IL 60563 and (B) any other owned real property of the Reorganized Debtors and (y) a second-priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitutes ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), which second-priority liens shall be subordinated to the liens on such collateral securing the Exit ABL Facility, in the case of either clause (x) or (y) above, subject to customary exclusions consistent with the exclusions under the Prepetition First Lien Credit Agreement (including the exclusion of 35% of the equity interests of any first-tier foreign subsidiaries) and otherwise as may be agreed by the Reorganized Debtors and the Required Consenting Lenders.

<u>Documentation Principles</u>:  The Exit Term Loan Credit Agreement with respect to the Exit Term Loan Facility shall (i) be based upon the Prepetition First Lien Term Loan Credit Agreement and be in form and substance satisfactory to the Required Exit Lenders; (ii) include such provisions as are necessary to reflect the Restructuring Transaction (as modified by the Alternative Proposal), as implemented through the Chapter 11 Cases, and the fact that the Exit Term Loan Facility is an exit financing; (iii) include appropriate modifications to reflect changes in law or accounting standards since the date of such precedent; and (iv) incorporate the following:

- <u>Affirmative Covenants</u>: Consistent with the First Lien Term Loan Credit Agreement (but modified in a manner acceptable to the Debtors and the Required Exit Lenders to provide for modified reporting requirements and information rights that are customary for facilities of this type and relate to reporting and information readily available to the Debtors in the ordinary course of business).

- <u>Negative Covenants</u>: Consistent with the First Lien Term Loan Credit Agreement, but modified as may be required to effectuate the Restructuring Transaction (as modified by the Alternative Proposal), in each case, in a manner acceptable to the Debtors and the Required Exit Lenders.

- <u>Minimum Liquidity Covenant</u>:  A minimum liquidity covenant set at $15 million and otherwise consistent with the minimum liquidity covenant applicable to the Existing DIP Term Loan Facility.

- <u>Miscellaneous</u>: Shall also include certain customary liability management protections in form and substance acceptable to the Debtors and the Required Exit Lenders.

<u>Intercreditor Agreements</u>: The Exit Term Loan Facility shall be subject to an intercreditor agreement, which shall be based on the Exit Intercreditor Agreement and be in form and substance satisfactory to the Required Exit Lenders.

<u>Ratings</u>: The Reorganized Debtors shall use commercially reasonable efforts to have the Exit Term Loans rated by Moody's and S&P within sixty days of the Effective Date.

| **Treatment of First Lien Claims Upon Consummation of an Acceptable Amended Plan:** | Upon the effective date of, and in connection with, the consummation of an Acceptable Amended Plan, each Holder (as defined in the Joint Plan as in effect on the date hereof) of a First Lien Claim (as defined in the Joint Plan as in effect on the date hereof) (or its designated affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim (as defined in the Joint Plan as in effect on the date hereof), its *pro rata* share of $388.6 million of New Equity Interests at the Stipulated Equity Value (as defined in the Joint Plan as in effect on the date hereof). |
|---|---|

13

May 89, 2024

PERSONAL AND CONFIDENTIAL

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Attn: Bojan Guzina (bojan.guzina@whitecase.com)

$245 Million Replacement Super-Priority Senior Secured
Debtor-In-Possession Term Loan Credit Facility Commitment Letter

ConvergeOne Holdings, Inc. (the "Company", "you" or "your"), certain of your subsidiaries (the "Subsidiary Debtors") and the direct parent of the Company ("Holdings" and, collectively with the Company and the Subsidiary Debtors, the "Debtors"), are debtors in voluntarily commenced Chapter 11 Cases, jointly administered under Chapter 11 Case No. 24-90194 (collectively, the "Chapter 11 Cases" and each individually a "Chapter 11 Case") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), the Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, and you are the borrower under that certain Super-Priority Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of April 5, 2024, among PVKG Intermediate Holdings Inc., as Holdings ("Holdings"), the Company, as the Borrower (as defined therein), the lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent (the "Existing DIP Term Loan Credit Agreement", and the term loan credit facility thereunder, the "Existing DIP Term Loan Facility").  The parties listed on Annex I hereto that are identified as Commitment Parties (each, a "Commitment Party", and collectively (severally, and not jointly or jointly and severally) the "Commitment Parties", "we", "us" or "our"), agree to commit to provide a $245 million super-priority senior secured debtor-in-possession term loan credit facility for the Company under Sections 364(c) and 364(d) of the Bankruptcy Code in full replacement of the Existing DIP Term Loan Facility on the terms and subject to the conditions set forth herein (the "Replacement DIP Term Loan Facility").  Unless otherwise specified in this Commitment Letter, all references to "$" shall refer to U.S. dollars.  Capitalized terms used in this Commitment Letter without definition shall have the meanings assigned to them in the DIP Term Sheet.

1.  Commitment.

To provide assurance that the Replacement DIP Term Loan Facility shall be available on the terms and conditions set forth in this Commitment Letter and in the DIP Term Sheet, each Commitment Party is pleased to advise the Company of its several, but not joint, commitment (the "Commitment") to provide the amount of the Replacement DIP Term Loan Facility set forth on Annex I hereto, on the terms set forth in the DIP Term Sheet attached as Exhibit A (the "DIP Term Sheet" and, together with this letter, this "Commitment Letter"), subject solely to the conditions set forth in the "Conditions Precedent to the Closing" section of the DIP Term Sheet referenced below (collectively, the "Conditions Precedent").

2.  Information.

You represent, warrant and covenant that (a) all written information concerning you and your subsidiaries and your and their respective business, including all disclosure statements filed with the Bankruptcy Court in connection with the Chapter 11 Cases (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "Projections") and

| | |
|---|---|
| | Each Term DIP Lender may participate in the Term DIP Facility on behalf of some or all accounts and funds managed by such Term DIP Lender and some or all accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such Term DIP Lender or any other affiliate of such Term DIP Lender (any such managed account or fund, or affiliate, a "<u>Lender Affiliate</u>"), and may allocate its Term DIP Commitments among Lender Affiliates in its sole discretion; <u>provided</u> that any such Lender Affiliate to which any such allocation is made shall immediately become a party to the Commitment Letter and commit to provide its applicable portion of the Term DIP Facility; <u>provided</u> further that any Term DIP Lender may elect to participate in the Term DIP Facility, initially, through a fronting lender and any associated fees and expenses in connection with such fronting arrangement shall be paid out of the Term DIP Proceeds. <br><br> "<u>Required Term DIP Lenders</u>" means two or more unaffiliated Term DIP Lenders holding at least 50.1% of the aggregate Term DIP Loan Exposure. |
| **Term DIP Premium:** | The following premiums shall be applicable to all Term DIP Loans (the "Term DIP Premiums"): <br><br> • "<u>Term DIP Commitment Premium</u>": ~~(a)~~ a premium ~~totaling 5.00% of the Term DIP Loans, payable to the Initial Term DIP Lenders on a *pro rata* basis based on their commitments~~payable to Blue Torch Finance LLC (together with its affiliates and managed funds, "Blue Torch") in its capacity as an Initial Term DIP Lender in an aggregate amount equal to $8.5 million (i.e., 5.00% of Blue Torch's $170 million commitment in respect of the Term DIP Facility that is set forth on Annex I as ~~of~~in effect on the date hereof), and (b) a premium payable to all Term DIP Lenders that are not Blue Torch in an aggregate amount equal to $3.75 million (i.e., 5.00% of the $75 million of commitments made by persons other than Blue Torch on the date hereof) on a *Pro Rata* basis, earned upon entry of the Final DIP Order and payable upon, but immediately prior to the occurrence of, the earlier of the Plan Effective Date or the Maturity Date (defined below). <br><br> • "<u>Term DIP Exit Premium</u>": a premium totaling 5.00% of the Term DIP Loans, payable to all Term DIP Lenders on a *Pro Rata* basis, earned upon entry of the Final DIP Order and payable upon, but immediately prior to the occurrence of, the earlier of the Plan Effective Date or the Maturity Date (defined below). <br><br> The Term DIP Commitment Premium and the Term DIP Exit Premium are payable in cash; <u>provided</u>, that, in the event that an Acceptable Amended Plan (as defined below) is consummated and made effective, the Term DIP Commitment Premium and the Term DIP Exit Premium may instead be paid in New Equity Interests (as defined in the Joint Plan) at the Stipulated Equity Value (as defined in the Joint Plan) on the effective date of such Acceptable Amended Plan; <u>provided</u>, <u>further</u>, that in the event that the Term DIP Commitment Premium and the Term DIP Exit Premium are paid in New Equity Interests (as defined in the Joint Plan) at the Stipulated Equity Value (as defined in the Joint Plan) on the effective date of such |

5

|  | Date, there shall be no default or event of default under the Pre-Petition ABL Credit Agreement (as defined in the Existing DIP Term Loan Credit Agreement as in effect on the date hereof); |
|  | (xvi)  (a) the RSA shall have been terminated, (b) the Joint Plan shall have been withdrawn, and (c) a restructuring support agreement in support of an Acceptable Amended Plan shall have been executed by the Debtors; |
|  | (xvii)  delivery of an officer's certificate of the Borrower confirming compliance with the each of the conditions precedent (other than any matters which are to be delivered by, provided by, or subject to the satisfaction of, any party other than the Loan Parties). |
| **Term DIP Pro Rata Participation Right:** | Each Holder (as defined in the Joint Plan as in effect on the date hereof) of a First Lien Claim (as defined in the Joint Plan as in effect on the date hereof) (or its designated affiliate, managed fund or account or other designee) shall be offered the opportunity to participate on a *Pro Rata* basis in the Term DIP Facility until the date that is ten business days prior to the hearing date for the proposed Final DIP Order (the "Term DIP ~~Limited~~ Pro Rata Participation Right"). The Term DIP Loan commitments of the Initial Term DIP Lenders set forth on <u>Annex I</u> shall be reduced on a *Pro Rata* basis by any amounts committed to the Term DIP Facility by Holders exercising the Term DIP Pro Rata Participation Right. <u>For the avoidance of doubt, the Term DIP Commitment Premium described in clause (b) of the definition thereof, and the Term DIP Exit Premium shall both be payable on a *Pro Rata* basis to all Term DIP Lenders (in the case of the Term DIP Premium described in clause (b) of the definition thereof, other than Blue Torch), including those that exercise the Term DIP Pro Rata Participation Right.</u> |
| **Exit Term Loan Facility and Exit Term Loans:[2]** | In lieu of the Rights Offering and Direct Investment (in each case, as defined in the Joint Plan (as defined in the Existing DIP Term Loan Credit Agreement as in effect on the date hereof (the "Joint Plan"))), on the effective date of an Acceptable Amended Plan, the reorganized Debtors shall be capitalized through a secured term loan facility in the aggregate principal amount of $245 million consisting entirely of the cashless roll of outstanding principal under the Term DIP Facility (the "Exit Term Loan Facility") under an exit financing credit agreement on substantially the same terms as the Exit Term Loan Facility described in the Joint Plan, and as set forth below.<br><br><u>Interest Rate</u>:  At the option of the Debtors, (i) SOFR (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate or (ii) Base Rate (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate, in each case payable in cash; *provided* |

---

[2] All capitalized terms used in this section that are not defined in the Commitment Letter shall have the meanings given to them in the Joint Plan as in effect on the date hereof, or, if not defined therein, in the Board Letter.

**EXHIBIT 5**

1

**WHITE & CASE**

May 10, 2024

VIA E-MAIL

**Confidential – Subject to FRE 408**

Proskauer Rose LLP
Eleven Times Square
New York, NY
10036-8299
Attn: David M. Hillman (DHillman@proskauer.com)

White & Case LLP
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606-4302
**T** +1 312 881 5400

**whitecase.com**

RE:     _May 8, 2024 Letter – ConvergeOne Holdings, Inc., et. al._ (Case No. 24-90194-CML)

Dear David:

I am responding to your letter dated May 8, 2024 regarding ConvergeOne Holdings, Inc. and its affiliated debtors ("ConvergeOne" or the "Debtors").[1]  The Independent Directors have considered the Modified Alternative Proposal and have determined that it would not result in higher or otherwise better recoveries for the Debtors' stakeholders than the restructuring transaction that is embodied in the Plan.  The Modified Alternative Proposal is rejected.  The Debtors will move forward with confirmation of the Plan.

The Modified Alternative Proposal has significant deficiencies that render it not actionable.  First, it would prolong the Debtors' chapter 11 cases and result in additional costs (including materially higher professional fees) and lost business opportunities for the Debtors.  Any material delays in the Debtors' exit from bankruptcy would also create additional funding needs beyond what is provided by the proposed $245 million replacement DIP term loan facility.  As a result, replacing the existing DIP term loan facility is not cost-neutral to the Debtors.  Your proposal creates materially higher costs to the Debtors that would require more funding than your clients (and Blue Torch) appear willing to provide.

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in your letter dated April 26, 2024, this letter, or the Plan, as applicable.

**App. 838**

WHITE & CASE

May 10, 2024

      Second, you have not proposed a confirmable alternative.  You are asking the Debtors to abandon a Plan that has been accepted by all voting classes, in favor of an alternative that is not supported by any voting class and delivers no additional aggregate consideration.  This is not a close call.  The Independent Directors will not abandon the Plan.

Best regards,

*/s/ Bojan Guzina*

**Bojan Guzina**

**T** +1 312 881 5365
**E** bojan.guzina@whitecase.com

2

**App. 839**

**WHITE & CASE**



April 29, 2024

VIA E-MAIL

**Confidential – Subject to FRE 408**

Proskauer Rose LLP
Eleven Times Square
New York, NY
10036-8299
Attn: David M. Hillman (DHillman@proskauer.com)

White & Case LLP
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606-4302
**T** +1 312 881 5400

**whitecase.com**

RE:     _April 26, 2024 Letter – ConvergeOne Holdings, Inc., et. al._ (Case No. 24-90194-CML)

Dear David:

I am responding to your letter dated April 26, 2024 regarding ConvergeOne Holdings, Inc. and its affiliated debtors ("ConvergeOne" or the "Debtors").[1] The Debtors appreciate the interest of the ad hoc group of minority first lien lenders (the "Minority Ad Hoc Group") in providing exit financing for the Debtors as part of the Alternative Proposal. The Independent Directors have considered the Alternative Proposal. The Independent Directors have determined that the Alternative Proposal would not result in higher or otherwise better recoveries for the Debtors' stakeholders than the restructuring transaction that is embodied in the RSA and the Plan.

The Alternative Proposal suffers from three principal deficiencies that render it unworkable:

- **Lack of Financing Commitments**. The Alternative Proposal is not backed by committed capital. Your letter states that the Minority Ad Hoc Group is "interested in providing a backstop for some or all of the Exit Term Loan Facility and [is] in active dialogue with third parties who have expressed interest in providing the backstop." This "interest" is not sufficient to make the Alternative Proposal a viable option. Committed capital is essential. While we appreciate that your clients may be in "active dialogue" with potential third party lenders, this is far short of committed capital. New lenders will likely require significant due diligence before they commit capital and we do not know the terms of any potential commitment. We also ask that you disclose the identities of all third parties that the Minority Ad Hoc Group has approached regarding a potential financing commitment.

- **Potential Loss of DIP Loan Commitments**. If the Debtors were to abandon the RSA and pivot to the Alternative Proposal, the Debtors would risk losing the DIP term loan (which cross-defaults to the RSA) and would be forced to find alternative DIP financing. The Debtors would

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in your letter or the Plan, as applicable.

**App. 840**

**WHITE & CASE**

April 29, 2024

also face a cross-default on the ABL DIP facility.  The Alternative Proposal does nothing to address any of these consequences.  Your clients have not offered to replace the current DIP facilities, nor does your letter explain how the chapter 11 cases or the Debtors' business would be funded while the Debtors pursue the Alternative Proposal, which would require a longer timeline to confirmation than the current Plan.

- **Extension of Current Timeline**.  The confirmation hearing for the current Plan is in less than three weeks.  If the Debtors were to abandon the Plan and pivot to the Alternative Proposal, the current case timeline would be extended by several weeks if not months.  Pivoting to the Alternative Proposal would require a new plan and disclosure statement, and a new solicitation and voting period.  Your letter completely ignores the negative impacts that this would have on the Debtors' business, and does not account for the additional administrative costs that the Debtors would incur.  There are significant business harms resulting from additional time in chapter 11, in addition to significant professional fees that accrue with each additional day in bankruptcy.

The Alternative Proposal also lacks any meaningful stakeholder support.  Your group appears to speak for less than 10% in amount of the Class 3 claims.  In contrast, the Proposed Transaction is not only fully funded and backstopped, but is supported by approximately 89% in amount of Class 3 claims and 100% in amount of the Class 4 claims that voted on the Plan.

Stakeholder support for the Proposed Transaction under the RSA is based in part on the opportunity for Class 3 to receive takeback debt.  The takeback debt structure included in the Proposed Transaction is important to certain Class 3 Holders that cannot, or do not wish to, receive equity as part of their Plan treatment.  Approximately 8% of the Class 3 Holders of First Lien Claims elected to receive takeback debt and no equity as their Plan treatment.  They would not have that option under the Alternative Proposal.

Your suggestion that the Debtors' current path is the result of an abdication of the Independent Directors' fiduciary duties is outrageous and wrong.  Your supposedly superior proposal is premised on a nearly identical equity value and pro forma capital structure as the Proposed Transaction.  It does nothing to increase the value of the business post-emergence relative to the Proposed Transaction, but would add significant cost, delay, and risk to the process.  The Independent Directors could not possibly discharge their fiduciary duties by abandoning the fully-committed and backstopped Plan in favor of this uncommitted Alternative Proposal.

There is no basis to question the integrity of the Independent Directors or the process that resulted in the RSA and the Plan.  The Independent Directors are highly experienced restructuring professionals.  They have served the Debtors with professionalism, care, and integrity.  For more than three months, the Independent Directors and Mr. Russell have diligently explored all potential restructuring alternatives for the Debtors.  The Proposed Transaction was the best, and indeed the only, viable option available to the Debtors.  It is the result of hard-fought negotiations that resulted in significantly improved terms for the Debtors.  Members of the Minority Ad Hoc Group were well aware of the ongoing restructuring discussions that were taking place during this time, but they did not present an alternative proposal to the Debtors until more than three weeks after the Petition Date and less than three weeks before the Confirmation Hearing.  The Independent Directors and Mr. Russell made a reasonable and justified decision to embrace the Proposed Transaction as the best alternative available to the Debtors.  The overwhelming creditor support for the Plan is clear indication that the Debtors' stakeholders agree with that decision.

**App. 841**

# WHITE & CASE

April 29, 2024

       If you want the Debtors to re-consider the Alternative Proposal, please fix the infirmities identified above and submit an actionable proposal that would allow the Debtors to emerge from bankruptcy on a substantially similar timeline as the current Plan.  We will continue to engage with you in good faith, consistent with our fiduciary duties.  Time is of the essence.  All rights are reserved.

Best regards,


*/s/ Bojan Guzina*

**Bojan Guzina**

**T** +1 312 881 5365
**E** bojan.guzina@whitecase.com

3

**App. 842**

**WHITE & CASE**

May 10, 2024

VIA E-MAIL

**Confidential – Subject to FRE 408**

White & Case LLP
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606-4302
**T** +1 312 881 5400

**whitecase.com**

Proskauer Rose LLP
Eleven Times Square
New York, NY
10036-8299
Attn: David M. Hillman (DHillman@proskauer.com)

RE:   _May 8, 2024 Letter – ConvergeOne Holdings, Inc., et. al._ (Case No. 24-90194-CML)

Dear David:

I am responding to your letter dated May 8, 2024 regarding ConvergeOne Holdings, Inc. and its affiliated debtors ("ConvergeOne" or the "Debtors").[1]  The Independent Directors have considered the Modified Alternative Proposal and have determined that it would not result in higher or otherwise better recoveries for the Debtors' stakeholders than the restructuring transaction that is embodied in the Plan.  The Modified Alternative Proposal is rejected.  The Debtors will move forward with confirmation of the Plan.

The Modified Alternative Proposal has significant deficiencies that render it not actionable.  First, it would prolong the Debtors' chapter 11 cases and result in additional costs (including materially higher professional fees) and lost business opportunities for the Debtors.  Any material delays in the Debtors' exit from bankruptcy would also create additional funding needs beyond what is provided by the proposed $245 million replacement DIP term loan facility.  As a result, replacing the existing DIP term loan facility is not cost-neutral to the Debtors.  Your proposal creates materially higher costs to the Debtors that would require more funding than your clients (and Blue Torch) appear willing to provide.

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in your letter dated April 26, 2024, this letter, or the Plan, as applicable.



App. 843

# WHITE & CASE

May 10, 2024

      Second, you have not proposed a confirmable alternative.  You are asking the Debtors to abandon a Plan that has been accepted by all voting classes, in favor of an alternative that is not supported by any voting class and delivers no additional aggregate consideration.  This is not a close call.  The Independent Directors will not abandon the Plan.

Best regards,

*/s/ Bojan Guzina*

**Bojan Guzina**

**T** +1 312 881 5365
**E** bojan.guzina@whitecase.com

2

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

May 23, 2024

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90194 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
(I) APPROVING THE DEBTORS' DISCLOSURE STATEMENT
ON A FINAL BASIS AND (II) CONFIRMING THE JOINT
PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF
CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

ConvergeOne Holdings, Inc. and its debtor affiliates in the above-captioned Chapter 11

Cases (collectively, the "**Debtors**"),[2] having:

a.   entered into that certain Restructuring Support Agreement by and among the Consenting Stakeholders and the Second Lien Consenting Lenders, dated as of April 3, 2024 (as may be modified, amended, or supplemented from time to time, and together with all term sheets, schedules, annexes, and exhibits appended thereto, the "**RSA**");

b.   commenced distribution, on April 3, 2024, of (i) the *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 27] (as amended, supplemented, or otherwise modified from time to time including by virtue of the Plan Modifications, the "**Plan**"), (ii) the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 26] (the "**Disclosure Statement**"), (iii) ballots for voting on the Plan to Holders of Class 3

---

[1]   The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightLine, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

[2]   Unless otherwise noted, capitalized terms used but not otherwise defined in this order (the "**Confirmation Order**") shall have the meanings ascribed to them in the Plan (as defined below). The rules of interpretation set forth in **Article I.B** of the Plan shall apply to this Confirmation Order.

      Claims [Docket No. 81, Ex. 6A] (the "**First Lien Claims**") and Class 4 Claims [Docket No. 81, Ex. 6B] (the "**Second Lien Claims**"), (iv) with respect to Class 3, (A) the Election/Subscription Form [Docket No. 81, Ex. 8B], and (B) the Rights Offering and Election Procedures [Docket No. 81, Ex. 8A], in each case in accordance with the terms of title 11 of the United States Code (the "**Bankruptcy Code**"), the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), and the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**");

c.      commenced the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") on April 4, 2024 (the "**Petition Date**");

d.      filed, on April 4, 2024, (i) the *Declaration of Salvatore Lombardi in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 4], (ii) the *Debtors' Emergency Motion for Entry of an Order (I)  Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline, Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline, (IV) Waiving the Requirement to Hold the Creditors' Meeting and File SOFAs, Schedules, and 2015.3 Reports, and (V) Granting Related Relief* [Docket No. 25] (the "**Scheduling Motion**"), (iii) the Disclosure Statement, and (iv) the Plan;

e.      obtained, on April 4, 2024, entry of the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline, Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline, (IV) Waiving the Requirement to Hold the Creditors' Meeting and File SOFAs, Schedules, and 2015.3 Reports, and (V) Granting Related Relief* [Docket No. 81] (the "**Scheduling Order**");

f.      caused the *Notice of (I) Commencement of Chapter 11 Bankruptcy Cases, (II) Hearing on the Disclosure Statement, Confirmation of the Joint Prepackaged Chapter 11 Plan, and Related Matters, and (III) Objection Deadlines and Summary of the Debtors' Joint Prepackaged Chapter 11 Plan* [Docket No. 81, Ex. 2] (the "**Combined Hearing Notice**"), the *Notice of (A) Non-Voting Status to Holders or Potential Holders of (I) Unimpaired Claims or Equity Interests Conclusively Presumed to Accept the Plan and (II) Impaired Claims or Equity Interest Conclusively Deemed to Reject the Plan and (B) Opportunity for Holders of Claims and Equity Interest to Opt Out of the Third Party Release* [Docket No. 81, Ex. 4] (the "**Non-Voting Status Notice**"), and the *Holders of Claims and Holders of Interest Opt-Out Form* [Docket No. 81, Ex. 5] (the "**Opt-Out Form**") to be distributed on or about April 8, 2024, in accordance with the Bankruptcy Code, the

2

Bankruptcy Rules, the Bankruptcy Local Rules, the *Procedures for Complex Chapter 11 Bankruptcy Cases* for the U.S. Bankruptcy Court for the Southern District of Texas, and the Scheduling Order, as evidenced by the certificate of service filed on April 15, 2024 [Docket No. 153] (together with all the exhibits thereto, the "**Combined Notice Affidavit**");

g.  caused the Confirmation Hearing Notice to be published in *The New York Times* (National Edition) on April 8, 2024 [Docket No. 81, Ex. 3] (the "**Publication Notice**"), as evidenced by the *Proof of Publication* filed on April 9, 2024 [Docket No. 129] (the "**Publication Affidavit**");

h.  entered into that certain Equity Backstop Commitment Agreement by and among PVKG Investment, C1 Holdings, PVKG Intermediate, and the Investors, dated as of May 10, 2024 (as may be modified, amended, or supplemented from time to time, and together with all schedules and exhibits appended thereto, the "**Backstop Agreement**");

i.  filed, on May 10, 2024, the *Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 295] (the "**Initial Plan Supplement**");

j.  filed, on May 14, 2024, (i) the *Debtors' (I) Memorandum of Law in Support of Confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates and (II) Omnibus Reply to Plan Confirmation Objections* [Docket No. 324] (the "**Confirmation Brief**"); (ii) the *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 325] (the "**Solicitation Affidavit and Voting Report**" and, together with the Combined Notice Affidavit and Publication Affidavit, the "**Affidavits**"); (iii) the *Declaration of Rui Goncalves in Support of (I) Approval of the Debtors' Disclosure Statement and (II) Confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 326] (the "**Goncalves Declaration**"); (iv) the *Declaration of Stephen A. Spitzer in Support of (I) Approval of the Debtors' Disclosure Statement and (II) Confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 327] (the "**Spitzer Declaration**" and, together with the Goncalves Declaration, the "**Confirmation Declarations**"); and (v) the *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates (Technical Modifications)* [Docket No. 328];

k.  filed, on May 17, 2024, the *First Amended Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 357] (together with the Initial Plan

Supplement and any amendments and supplements thereto filed prior to the Effective Date, the "**Plan Supplement**"); and

l.      continued to operate their businesses and manage their properties during these Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Court having:

a.      entered the Scheduling Order on April 4, 2024;

b.      set April 17, 2024 at 4:00 p.m. (prevailing Central Time) as the deadline for voting on the Plan (the "**Voting Deadline**");

c.      set May 7, 2024 at 4:00 p.m. (prevailing Central Time) as the deadline for filing objections to final approval of the Disclosure Statement and Confirmation of the Plan (the "**Objection Deadline**");

d.      scheduled May 17, 2024 at 1:00 p.m. (prevailing Central Time) as the date and time for the hearing to consider approval of the Disclosure Statement on a final basis and Confirmation of the Plan pursuant to sections 1125, 1126, 1128, and 1129 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018, as set forth in the Scheduling Order, as continued to May 22, 2024 at 11:00 a.m. (prevailing Central Time) (the "**Combined Hearing**");

e.      reviewed the Plan, the Disclosure Statement, the Scheduling Motion, the Plan Supplement, the Confirmation Brief, the Confirmation Declarations, the Affidavits, the Combined Hearing Notice, the Publication Notice, and all filed pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement on a final basis and Confirmation of the Plan, including all objections, statements, and reservations of rights;

f.      considered the Restructuring Transactions incorporated and described in the Plan or Plan Supplement, as applicable;

g.      held the Combined Hearing;

h.      reviewed the discharge, compromises, settlements, releases, exculpation, and injunctions set forth in the Plan;

i.      heard the statements and arguments made by counsel in respect of approval of the Disclosure Statement on a final basis and Confirmation of the Plan;

j.      considered all oral representations, live testimony, proffered testimony, documents, filings, exhibits, and other evidence regarding approval of the Disclosure Statement on a final basis and Confirmation of the Plan;

007136

**App. 848**

k.      overruled (i) any and all objections to final approval of the Disclosure Statement and Confirmation, except as otherwise stated or indicated on the record, and/or (ii) all statements and reservations of rights not consensually resolved, agreed to, or withdrawn, unless otherwise indicated; and

l.      taken judicial notice of all pleadings and other documents filed, all orders entered, and all evidence and arguments presented in these Chapter 11 Cases.

NOW, THEREFORE, it appearing to the Court that notice of the Combined Hearing and the opportunity for any party in interest to object to Confirmation of the Plan having been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of approval of the Disclosure Statement on a final basis and Confirmation of the Plan and other evidence presented at the Combined Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefore, the Court makes and issues the following findings of fact and conclusions of law, and orders:

<u>**Findings of Fact and Conclusions of Law**</u>

**IT IS HEREBY FOUND, DETERMINED, ADJUDGED, DECREED, AND ORDERED THAT:**

**A.**      **Findings and Conclusions.**

1.      The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7052 and 9014. To the extent any of the following conclusions of law constitute findings of fact, or vice versa, there are adopted as such.

**B.**      **Jurisdiction, Venue, and Core Proceeding.**

2.      This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. The Court has exclusive jurisdiction to determine

whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, respectively. Consideration of whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code are core proceedings as defined in 28 U.S.C. § 157(b)(2). This Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper in this district pursuant to sections 1408 and 1409 of title 28 of the United States Code.

### C. Eligibility for Relief.

3.     The Debtors were and are Entities eligible for relief under section 109 of the Bankruptcy Code. The Debtors are a proper plan proponent under section 1121(a) of the Bankruptcy Code.

### D. Commencement and Joint Administration of These Chapter 11 Cases.

4.     On the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code. In accordance with the *Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 41], these Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015. Since the Petition Date, the Debtors have operated their businesses as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

### E. Judicial Notice.

5.     The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court, including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases.

007138

**App. 850**

**F.      Plan Supplement.**

6.      The Plan Supplement (including as amended, supplemented, or otherwise modified from time to time) complies with the Bankruptcy Code and the terms of the Plan, and the Debtors provided good and proper notice of the filing of the Plan Supplement in accordance with the Scheduling Order, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all other applicable rules, laws, and requirements.  No other or further notice will be required with respect to the Plan Supplement or any of the documents contained therein or related thereto.  All documents included in the Plan Supplement and all other documents necessary or appropriate to implement the Plan are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan and the RSA, and only consistent therewith and subject to all consent rights provided therein, the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement and any of the documents contained therein or related thereto or the Plan before the Effective Date.

**G.      Modifications to the Plan.**

7.      Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan described or set forth in this Confirmation Order constitute technical or clarifying changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest under the Plan.  These modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and notice of these modifications was adequate and appropriate under the facts and circumstances of these Chapter 11 Cases.  In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes on the Plan under section 1126 of the Bankruptcy Code, and they do not require the Holders of Claims or Interests be

7

afforded an opportunity to change previously cast votes accepting or rejecting the Plan. Accordingly, the Plan is properly before this Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

**H.   Objections Overruled.**

8.   Any resolution or disposition of objections (whether formal or informal), reservations of rights, statements, or joinders with respect to approval of the Disclosure Statement on a final basis and Confirmation explained or otherwise ruled upon by the Court on the record at the Combined Hearing is hereby incorporated by reference.   All unresolved objections, reservations of rights, statements, and joinders are hereby overruled on the merits.

**I.   Adequacy of the Disclosure Statement.**

9.   The Disclosure Statement contains "adequate information" as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code with respect to the Debtors, the Plan, and the transactions contemplated therein.

**J.   Scheduling Order and Notice.**

10.   The Scheduling Order conditionally approved the Disclosure Statement and established the Voting Deadline and the Objection Deadline.   As evidenced by the Affidavits, and the record in the Chapter 11 Cases, the Debtors provided due, adequate, and sufficient notice of the Plan and Disclosure Statement, the Scheduling Order, the Solicitation Materials, the Plan Supplement, the discharge, compromise, settlement, release, exculpation, and injunction provisions contained in the Plan, the ability to opt-out of the Third-Party Release (as defined below), the Combined Hearing, the Voting Deadline, the Objection Deadline, and any other applicable dates described in the Scheduling Order in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3016, 3017, and 3020(b), the Bankruptcy

007140
**App. 852**

Local Rules, the Complex Case Procedures, the Solicitation Procedures, and the Scheduling Order. No other or further notice is or shall be required.

     **K.**     **Notice.**

     11.     As evidenced by the Affidavits, the Debtors provided due, adequate, and sufficient notice of the commencement of these Chapter 11 Cases, the Plan (and the opportunity to opt out of the Third-Party Release), the Rights Offering, the Disclosure Statement, the Combined Hearing, the Plan Supplement, and all of the other materials distributed by the Debtors in connection with Confirmation of the Plan in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Bankruptcy Local Rules, and the procedures set forth in the Scheduling Order.  The Debtors provided due, adequate, and sufficient notice of the Objection Deadline, the Combined Hearing, and any applicable bar dates and hearings described in the Scheduling Order or the Plan, as applicable, in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Scheduling Order. No other or further notice is or shall be required.

     **L.**     **Ballots.**

     12.     The Classes of Claims entitled under the Plan to vote to accept or reject the Plan (the "**Voting Classes**") are set forth below:

| Class | Designation |
|-------|-------------|
| 3 | First Lien Claims |
| 4 | Second Lien Claims |

     13.     The ballots (the "**Ballots**") the Debtors used to solicit votes to accept or reject the Plan from Holders in the Voting Classes adequately addressed the particular needs of these Chapter 11 Cases and were appropriate for Holders in the Voting Classes to vote to accept or reject the Plan.

007141

**App. 853**

**M.     Solicitation.**

14.     As described in the Solicitation Affidavit and Voting Report, the solicitation of votes on the Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases and complied with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any other applicable rules, laws, and regulations, including the registration requirements under the United States Securities Act of 1933 (as amended, the "**Securities Act**").

15.     As described in the Solicitation Affidavit and Voting Report, as applicable, the Solicitation Packages were transmitted and served on all holders in the Voting Classes in compliance with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Bankruptcy Local Rules, the Scheduling Order, and any applicable non-bankruptcy law.   Transmission and service of the Solicitation Packages was timely, adequate, and sufficient under the facts and circumstances of these Chapter 11 Cases.

16.     As set forth in the Solicitation Affidavit and Voting Report, the Solicitation Packages were distributed to Holders in the Voting Classes that held a Claim as of April 1, 2024 (the "**Voting Record Date**").   The establishment and notice of the Voting Record Date was reasonable and sufficient.

17.     The period during which the Debtors solicited acceptances of or rejections to the Plan was a reasonable and sufficient period of time for each Holder in the Voting Classes to make an informed decision to accept or reject the Plan.

18.     Under section 1126(f) of the Bankruptcy Code, Holders of Claims in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), and Class 5 (General Unsecured Claims) (collectively, the "**Deemed Accepting Classes**") are Unimpaired and conclusively presumed to

10

have accepted the Plan.  The Debtors were therefore not required to, and did not, solicit votes from the Deemed Accepting Classes.  Further, the Debtors were not required to, and did not, solicit votes from the Holders of Claims or Interests in Class 7 (Section 510 Claims) and Class 9 (Existing C1 Interests) (collectively, the "**Deemed Rejecting Classes**"), which are Impaired and deemed to reject the Plan.  Holders of Claims in Class 6 (Intercompany Claims) and Holders of Interests in Class 8 (Intercompany Interests) are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or are Impaired and deemed to reject the Plan (to the extent cancelled), and, in either event, are not entitled to vote to accept or reject the Plan.  The Debtors served Holders in the non-voting Classes with the Combined Notice and the Non-Voting Status Notice, including the Opt-Out Form.

19.     The Debtors served the Combined Hearing Notice and/or the Non-Voting Status Notice on the entire creditor matrix, including all creditors who hold debt issued by the Debtors, and all equity holders of record, as applicable.  The Combined Hearing Notice and/or the Non-Voting Status Notice adequately summarized the material terms of the Plan, the classification and treatment of claims and the release, exculpation, and injunction provisions of the Plan.  Further, because stakeholders were able to opt out of the Third-Party Release through the Ballot or the Opt-Out Form, every known stakeholder (including Unimpaired creditors and equity holders) was provided with the means by which the stakeholders could opt out of the Third-Party Release.

**N.     Voting.**

20.     As evidenced by the Solicitation Affidavit and Voting Report, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Disclosure Statement, the Scheduling Order, and any applicable non-bankruptcy law, rule, or regulation.  As evidenced

11

by the Solicitation Affidavit and Voting Report, Class 3 and Class 4 have voted to accept the Plan in accordance with the requirements of sections 1126 and 1129 of the Bankruptcy Code.

**O.     Bankruptcy Rule 3016.**

21.     The Plan and any modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b).  The injunction, release, and exculpation provisions in the Disclosure Statement and Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined by such injunction and identify the Entities that will be subject to such injunction, thereby satisfying Bankruptcy Rule 3016(c).

**P.     Burden of Proof.**

22.     The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.  In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard. Each witness who testified or submitted a declaration on behalf of the Debtors or any other party, in support of the Disclosure Statement, Plan, and Confirmation in connection with the Combined Hearing was credible, reliable, and qualified to testify as to the topics addressed in their testimony.

**Q.     Compliance with Bankruptcy Code Requirements – 11 U.S.C. § 1129(a)(1).**

23.     The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

**i.     Proper Classification – 11 U.S.C. §§ 1122 and 1123.**

24.     The classification of Claims under the Plan is proper and satisfies the requirements of section 1122(a) and 1123(a) of the Bankruptcy Code.  **Article III** of the Plan provides for the

12

separate classification of Claims and Interests into nine (9) Classes other than Administrative Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, and Claims for Restructuring Expenses, which need not be classified.  Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests.  The classifications reflect no improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests.  Each Class of Claims and Class of Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

### ii.        Specified Unimpaired Classes – 11 U.S.C. § 1123(a)(2).

25.        The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code. **Article III** of the Plan specifies that Claims, as applicable, in the following Classes are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code:

| Class | Claims |
|-------|--------|
| 1 | Other Secured Claims |
| 2 | Other Priority Claims |
| 5 | General Unsecured Claims |

Additionally, **Article II** of the Plan specifies that Allowed Administrative Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, and Claims for Restructuring Expenses will be paid in full in accordance with the terms of the Plan, although these Claims are not classified under the Plan.

### iii.        Specified Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3).

26.        The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. **Article III** of the Plan specifies that Claims and Interests, as applicable, in the following Classes (the "**Impaired Classes**") are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes:

13

| Class | Claims and Interests |
|-------|---------------------|
| 3 | First Lien Claims |
| 4 | Second Lien Claims |
| 7 | Section 510 Claims |
| 9 | Existing C1 Interests |

### iv.    No Discrimination – 11 U.S.C. § 1123(a)(4).

27.    The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to less favorable treatment of such Claim or Interest.

### v.    Adequate Means for Plan Implementation – 11 U.S.C. § 1123(a)(5).

28.    The Plan satisfies the requirements of 1123(a)(5) of the Bankruptcy Code.  The provisions in **Article IV** and elsewhere in the Plan, and in the exhibits and attachments to the Plan (including the Plan Supplement) and the Disclosure Statement, provide, in detail, adequate and proper means for the Plan's implementation, including: (a) the general settlement of Claims and Interests; (b) authorization for the Debtors and/or Reorganized Debtors to take all actions necessary to effectuate the Plan, including those actions necessary or appropriate to effectuate the Restructuring Transactions, the Rights Offering, the Backstop Agreement, and any restructuring transaction steps set forth in the Plan Supplement and the Transaction Steps, as the same may be modified or amended from time to time prior to the Effective Date; (c) the entry into, delivery of and implementation of the Definitive Documents and other transaction documents contemplated by the Plan; (d) the funding and sources of consideration for the Plan distributions, including the Exit Facilities, the Rights Offering and the Backstop Agreement, the New Equity Interests, and Cash on hand; (e) preservation of the Debtors' corporate existence following the Effective Date (except as otherwise provided in the Plan); (f) the vesting of the Estates' assets in the respective

14

Reorganized Debtors; (g) cancellation of the Interests, (h)  the cancellation of certain existing agreements as provided in the Plan and Confirmation Order; (i) the authorization and approval of corporate actions under the Plan; (j) the adoption and authorization of and entry into the Governance Documents; (k) the appointment of the New Board; (l) the effectuation and implementation of other documents and agreements contemplated by, or necessary to effectuate, the transactions contemplated by the Plan; (m) the assumption of certain employment obligations; (n) the preservation of Claims and Causes of Action not released pursuant to the Plan; and (o) the closing of certain of the Chapter 11 Cases.

29.     The precise terms governing the execution of these transactions are set forth in greater detail in the applicable Definitive Documents or form of agreements or other documents included in the Plan Supplement or other documents related to the Plan.

### vi.     Voting Power of Equity Securities – 11 U.S.C. § 1123(a)(6).

30.     The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code. **Article IV.J** of the Plan provides that the Governance Documents will comply with section 1123(a)(6) of the Bankruptcy Code.  The Governance Documents prohibit the issuance of non-voting equity securities to the extent required to comply with section 1123(a)(6) of the Bankruptcy Code.

### vii.     Directors and Officers – 11 U.S.C. § 1123(a)(7).

31.     The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. **Article IV.K** of the Plan sets forth the structure of the New Board, which shall consist of members as designated in accordance with the Governance Term Sheet.

007147
**App. 859**

**viii.    Impairment / Unimpairment of Classes – 11 U.S.C. § 1123(b)(1).**

32.    The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.  **Article III** of the Plan impairs or leaves Unimpaired each Class of Claims and Interests.

**ix.    Assumption – 11 U.S.C. § 1123(b)(2).**

33.    The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.  **Article V** of the Plan provides for the assumption of all of the Debtors' Executory Contracts and Unexpired Leases, other than the Rejected Contracts and/or Unexpired Leases identified on the Rejected Executory Contract and Unexpired Lease List and as otherwise provided in **Article V.A** of the Plan, and the payment of Cure Claims, if any, related thereto, not previously assumed, assumed and assigned, or rejected during these Chapter 11 Cases under section 365 of the Bankruptcy Code. The assumption of Executory Contracts and Unexpired Leases may include the assignment of certain of such contracts to Affiliates.

34.    The Debtors' determinations regarding the assumption (or assumption and assignment) or rejection of Executory Contracts and Unexpired Leases are based on, and within, the sound business judgment of the Debtors, are necessary to the implementation of the Plan, and are in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties-in-interest in the Chapter 11 Cases.  Entry of this Confirmation Order by the Court shall constitute approval of such assumptions, assumption and assignments, and/or rejections, as applicable, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**x.    Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action – 11 U.S.C. § 1123(b)(3).**

35.    **Compromise and Settlement.**  In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification,

16

007148

**App. 860**

distributions, releases, and other benefits provided pursuant to the Plan, including the PVKG Note Claims Settlement, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims, Interests, and controversies (including the PVKG Note Claims Settlement) resolved pursuant to the Plan, including any challenge to the amount, validity, perfection, enforceability, priority, or extent of the First Lien Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise.  Entry of this Confirmation Order shall constitute the entry of an order approving the settlement of all such Claims, Interests, and controversies under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  The compromise and settlement of such Claims and Interests embodied in the Plan and reinstatement and unimpairment of other Classes identified in the Plan are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

36.      **Debtor Release.**  **Article VIII.C** of the Plan describes certain releases granted by the Debtors (the "**Debtor Release**").  The Debtors have satisfied the business judgment standard under Bankruptcy Rule 9019 with respect to the propriety of the Debtor Release.  The Debtor Release is a necessary and integral element of the Plan, and is fair, reasonable, and in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.  The Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) narrowly tailored to the circumstances of the Chapter 11 Cases; and (g) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any

007149
**App. 861**

Claim or Cause of Action released pursuant to the Debtor Release.  The Debtor Release for the Debtor Related Parties is appropriate because the Debtor Related Parties share an identity of interest with the Debtors, supported the Plan and these Chapter 11 Cases, and actively participated in meetings, negotiations, and implementation during these Chapter 11 Cases, and have provided other valuable consideration to the Debtors to facilitate the Debtors' reorganization.

37.    **Third-Party Release.  Article VIII.D** of the Plan describes certain releases granted by the Releasing Parties (the "**Third-Party Release**").  The Third-Party Release provides finality for the Debtors, the Reorganized Debtors, and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Reorganized Debtors.  The Combined Notice sent to Holders of Claims and Interests, the Publication Notice published in the *New York Times* on April 8, 2024, the Non-Voting Status Notice sent to all Holders of Claims and Interest not entitled to vote on the Plan, the Ballots sent to all Holders of Claims entitled to vote on the Plan, in each case, unambiguously stated that the Plan contains the Third-Party Release.  Such release is a necessary and integral element of the Plan, and is fair, equitable, reasonable, and in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests.  Also, the Third-Party Release is: (a) consensual; (b) essential to the formulation, Confirmation, and implementation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good-faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; (h) narrowly tailored to the circumstances of the Chapter 11 Cases; and (i) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

007150
**App. 862**

38.     The Third-Party Release is consensual as to all relevant parties, including all Releasing Parties, and such parties were provided notice of the Chapter 11 Cases, the Plan, and the deadline to object to Confirmation of the Plan, received the Combined Hearing Notice and/or the Non-Voting Status Notice, and were properly informed that any Holder of a Claim against or Interest in the Debtors that did not check the "Opt Out" box on the applicable Ballot or Opt Out Form, returned in advance of the Voting Deadline, would be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all claims and Causes of Action against the Debtors and the Released Parties. Additionally, the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, the Non-Voting Status Notice, and the Combined Hearing Notice.

37.     The Third-Party Release provides finality for the Debtors, the Reorganized Debtors, and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Reorganized Debtors.  The scope of the Third-Party Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases.

39.     **Exculpation.**  The exculpation, described in **Article VIII.E** of the Plan (the "**Exculpation**"), is appropriate under applicable law, including *In re Highland Capital Mgmt., L.P.*, 48 F. 4th 419 (5th Cir. 2022), because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope.  Without limiting anything in the Exculpation, each Exculpated Party has participated in these Chapter 11 Cases in good faith and is appropriately released and exculpated from any obligation, Cause of Action, or liability for any prepetition or post-petition act taken or omitted to be taken in connection with, relating to, or arising out of the Debtors'

19

restructuring efforts, the RSA, the Rights Offering, and the Backstop Agreement, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or the Plan or any contract, instrument, release, or other agreement or document created or entered into, in connection with, or pursuant to the RSA, the Disclosure Statement or the Plan, the filing of these Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. The Exculpation, including its carveout for actual fraud, willful misconduct, and gross negligence, is consistent with applicable law in this jurisdiction.

40.     The Exculpated Parties shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan (including the Rights Offering and the Backstop Agreement).

20

41.     **Injunction.**  The injunction provision set forth in **Article VIII.F** of the Plan is necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Releases, the Third-Party Release, and the Exculpation, and is narrowly tailored to achieve this purpose.

42.     Notwithstanding anything to the contrary in this Confirmation Order, no Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to **Articles VIII.C**, **VIII.D**, **VIII.E**, or **VIII.F** of the Plan, without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party, as applicable.

43.     **Preservation of Causes of Action.**  The provisions set forth in **Article IV.Q** of the Plan regarding the preservation of Causes of Action in the Plan, subject to the PVKG Note Claims Settlement and **Article VIII** of the Plan, are appropriate and are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights, as applicable, to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the PVKG Note Claims Settlement and the releases

007153
**App. 865**

and exculpations contain in the Plan, including in **Article VIII** thereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

44.    **Lien Release**.    The release and discharge of mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in **Article VIII.B** of the Plan (the "**Lien Release**") is essential to the Plan and necessary to implement the Plan.  The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

### xi.    Additional Plan Provisions – 11 U.S.C. § 1123(b)(6).

45.    The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

### R.    Debtor Compliance with the Bankruptcy Code – 11 U.S.C. § 1129(a)(2).

46.    The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code and, thus, have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1128, and 1129, and Bankruptcy Rules 2022, 3017, 3018, and 3019.  The Debtors and their agents transmitted the Solicitation Materials and related documents and solicited and tabulated votes with respect to the Plan fairly, in good faith, and in compliance with the Scheduling Order, the Solicitation Procedures, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Case Procedures, including, but not limited to, sections 1125 and 1126(b) of the Bankruptcy Code.

### S.    Plan Proposed in Good Faith – 11 U.S.C. § 1129(a)(3).

47.    The Debtors have proposed the Plan (including the Plan Supplement and all other documents necessary or appropriate to effectuate the Plan) in good faith and not by any means

007154

forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of these Chapter 11 Cases, the Plan, the RSA, the Backstop Agreement, the process leading to Confirmation, including the overwhelming support of Holders of Claims for the Plan, and the transactions to be implemented pursuant thereto.  The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Plan, the Disclosure Statement, the hearing to conditionally approve the Disclosure Statement, and the record of the Combined Hearing and other proceedings held in the Chapter 11 Cases.  These Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate and honest purpose of maximizing the value of the Estates and allowing the Debtors to implement the Restructuring Transactions, reorganize, and emerge from bankruptcy with a capital structure that will allow them to conduct their businesses and satisfy their obligations with sufficient liquidity and capital resources.  Further, the Plan's classification, settlement, discharge, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's-length, are consistent with sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and each is integral to the Plan, supported by valuable consideration, and necessary to the Debtors' successful reorganization.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

     **T.**     **Payment for Services or Costs and Expenses – 11 U.S.C. § 1129(a)(4).**

48.    The procedures set forth in the Plan for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

007155

**App. 867**

  U.  **Directors, Officers, and Insiders – 11 U.S.C. § 1129(a)(5).**

  49.  **Article IV.K** of the Plan sets forth the structure of the New Board, which shall consist of members as designated in accordance with the Governance Term Sheet.  The members of the New Board and the officers of the Reorganized Debtors will be disclosed on or before the Effective Date.  Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

  V.  **No Rate Changes – 11 U.S.C. § 1129(a)(6).**

  50.  Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases.  Further, as the Plan proposes no rate change subject to the jurisdiction of any governmental regulatory commission, section 1129(a)(6) of the Bankruptcy Code is satisfied.

  W.  **Best Interest of Creditors – 11 U.S.C. § 1129(a)(7).**

  51.  The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The liquidation analysis attached as **Exhibit E** to the Disclosure Statement, the Spitzer Declaration, and the other evidence related thereto in support of the Plan that was proffered prior to, or in connection with the Combined Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims in each Class will recover at least as much under the Plan on account of such Claim, as of the Effective Date, as such Holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code. As a result, the Debtors have demonstrated that the Plan is in the best interests of their creditors, and the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

X.       **Acceptance by Certain Classes – 11 U.S.C. § 1129(a)(8).**

52.      Classes 1, 2, and 5 constitute the Unimpaired Classes, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code. As evidenced by the Solicitation Affidavit and Voting Report, Classes 3 and 4 have voted to accept the Plan.  Holders of Claims and Interests in Classes 6 and 8 are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or are Impaired and deemed to reject the Plan (to the extent cancelled), and, in either event, are not entitled to vote to accept or reject the Plan.  Holders of Claims and Interests in Classes 7 and 9 receive no recovery on account of their Claims and Interests under the Plan and are deemed to reject the Plan.  Notwithstanding the foregoing, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Y.       **Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code – 11 U.S.C. § 1129(a)(9).**

53.      The treatment of Administrative Claims, DIP Claims, Professional Fee Claims, DIP Claims, Priority Tax Claims, and Claims for Restructuring Expenses under **Article II** of the Plan, and of Other Priority Claims under **Article III** of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

Z.       **Acceptance by At Least One Impaired Class – 11 U.S.C. § 1129(a)(10).**

54.      The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Solicitation Affidavit and Voting Report, Class 4, which is Impaired, voted to accept the Plan by the requisite number and amount of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), as specified under the Bankruptcy Code.  Accordingly, the requirements of section 1129(a)(10) of the Bankruptcy Code are satisfied.

007157
**App. 869**

**AA.    Feasibility – 11 U.S.C. § 1129(a)(11).**

55.    The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The financial projections attached as **<u>Exhibit C</u>** to the Disclosure Statement and the other evidence supporting Confirmation of the Plan proffered or adduced by the Debtors at, prior to, or in the Confirmation Declarations filed in connection with the Combined Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been rebutted by other evidence; (d) establish that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors under the Plan, except as provided in the Plan; and (e) establish that the Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan.   Accordingly, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**BB.    Payment of Fees – 11 U.S.C. § 1129(a)(12).**

56.    **<u>Article XII.D</u>** of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).  Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**CC.    Continuation of Employee Benefits – 11 U.S.C. § 1129(a)(13).**

57.    The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code. **<u>Article IV.O</u>** of the Plan provides that, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

26

**DD.    Non-Applicability of Certain Sections – 11 U.S.C. § 1129(a)(14), (15), and (16).**

58.    Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases.  The Debtors owe no domestic support obligations, are not individuals, and are not non-profit corporations.

**EE.    "Cram Down" Requirements – 11 U.S.C. § 1129(b).**

59.    The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes and Classes 6 and 8, as applicable, have rejected or been deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code.  *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met.  *Second*, the Plan is fair and equitable with respect to the Deemed Rejecting Classes and Classes 6 and 8, as applicable.  The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and (b) no Holder of a Claim or Interest in a Class senior to each such Class is receiving more than 100% on account of its Claim or Interest. Accordingly, the Plan is fair and equitable to all Holders of Claims and Interests in the Deemed Rejecting Classes and Classes 6 and 8.  *Third*, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes and Classes 6 and 8 because all similarly situated creditors and interest holders will receive substantially similar treatment on account of their Claims and Interests irrespective of Class.  Holders of First Lien Claims and Second Lien Claims voted to accept the Plan in sufficient number and in sufficient amount to constitute accepting classes under the Bankruptcy Code.  Therefore, the Plan satisfies section 1129(b) of the Bankruptcy Code and can be confirmed.

27

**FF.      Only One Plan – 11 U.S.C. § 1129(c).**

60.      The Plan (including previous versions thereof) is the only chapter 11 plan filed in each of these Chapter 11 Cases and, accordingly, satisfies section 1129(c) of the Bankruptcy Code.

**GG.      Principal Purpose of the Plan – 11 U.S.C. § 1129(d).**

61.      No Governmental Unit has requested that the Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  As evidenced by its terms, the principal purpose of the Plan is not such avoidance.   Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

**HH.      Not Small Business Cases – 11 U.S.C. § 1129(e).**

62.      None of these Chapter 11 Cases is a "small business case," as that term is defined in the Bankruptcy Code, and accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

**II.      Good Faith Solicitation – 11 U.S.C. § 1125(e).**

63.      The Debtors and each of the Released Parties and Exculpated Parties have acted fairly, in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the negotiation, execution, delivery, and performance of the RSA, the Rights Offering and Election Procedures, the Backstop Agreement, the solicitation and tabulation of votes on the Plan, and the activities described in 1125 of the Bankruptcy Code, as applicable, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code, and solicitation of acceptances of the Plan, as applicable, are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

64.     The Debtors and their Related Parties have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(g), with regard to the offering, issuance, and distribution of recoveries under the Plan and the Backstop Agreement and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

**JJ.     Satisfaction of Confirmation Requirements.**

65.     Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

**KK.     Valuation.**

66.     The valuation analysis attached as **Exhibit D** to the Disclosure Statement (the "**Valuation Analysis**"), the evidence adduced at the Combined Hearing, and the estimated post-emergence enterprise value of the Reorganized Debtors are reasonable and credible.  All parties in interest have been given a fair and reasonable opportunity to challenge the Valuation Analysis. The Valuation Analysis is: (a) reasonable, persuasive, and credible as of the date such analysis was prepared, presented, or proffered; and (b) uses reasonable and appropriate methodologies and assumptions.

**LL.     Likelihood of Satisfaction of Conditions Precedent to the Effective Date.**

67.     Each of the conditions precedent to the Effective Date, as set forth in **Article IX.A** of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with **Article IX.B** of the Plan.

**MM.   Implementation.**

68.     All documents and agreements necessary to implement the Plan, including the Definitive Documents, the Plan Supplement, and all other relevant and necessary or desirable documents have been negotiated in good faith and at arm's-length and shall, upon completion of documentation and execution, including any securities issued thereunder, be valid, binding, and enforceable agreements, not avoidable and not in conflict with any federal, state, or foreign law. Consummation of the transactions contemplated by each such document or agreement is in the best interest of the Debtors, their Estates, and Holders of Claims.  The Debtors have exercised reasonable business judgment in determining which documents and agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.

**NN.   Disclosure of Facts.**

69.     The Debtors have disclosed all material facts regarding the Plan, including with respect to the Restructuring Transactions, and the fact that each Reorganized Debtor will emerge from its Chapter 11 Case as a validly existing corporation, limited liability company, partnership, or other form, as applicable.

**OO.   Essential Elements of the Plan.**

70.     The Debtors, the Released Parties, and the Exculpated Parties have been, are, and will continue to be acting in good faith within the meaning of section 1125(e) of the Bankruptcy Code if they proceed to: (a) consummate the Plan, the Restructuring Transactions, the Rights Offering, the Backstop Agreement, the Exit Facilities Documents, and the agreements, settlements, transactions, transfers, and other actions contemplated thereby, regardless of whether such agreements, settlements, transactions, transfers, and other actions are expressly authorized by this Confirmation Order; and (b) take any actions authorized and directed or contemplated by this Confirmation Order.

007162

**App. 874**

**PP.    New Equity Interests.**

71.    The issuance of New Equity Interests is a necessary and integral component of these Restructuring Transactions, fair, reasonable, customary, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are based on good, sufficient, and sound business purposes and justifications, and are supported by reasonably equivalent value and consideration.  The Debtors, the parties to the RSA, and their respective professional advisors negotiated the Plan in good faith and at arm's-length.

**QQ.    Rights Offering.**

72.    The Debtors solicited subscriptions to the Rights Offering in good faith pursuant to the Rights Offering and Election Procedures, applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules and any applicable non-bankruptcy laws, rules, or regulations.  The Rights Offering has complied with the Rights Offering and Election Procedures approved by the Scheduling Order, which are fair, equitable, and reasonable and provide for the Rights Offering to be conducted in a manner that is in the best interests of the Debtors, their Estates, and all stakeholders.

**RR.    Backstop Agreement.**

73.    The evidence in support of the Plan proffered or adduced at the Combined Hearing establishes that the entry into the Backstop Agreement is a necessary and integral component of these Restructuring Transactions, and the terms and conditions under the Backstop Agreement are fair, reasonable, customary, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are based on good, sufficient, and sound business purposes and justifications, and are supported by reasonably equivalent value and consideration.  The Debtors, the Backstop Parties, and their respective professional advisors negotiated the Backstop Agreement in good faith and at arm's-length.

31

**SS.     Exit Facilities.**

74.     The terms and conditions of the Exit Facilities and the Debtors' entry into the Exit Facilities Documents, including all actions, undertakings, and transactions contemplated thereby, and payment of all fees, indemnities, and expenses provided for thereunder, are essential elements of the Plan, necessary for the consummation thereof, and in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.  The Exit Facilities are critical to the overall success and feasibility of the Plan, and the Debtors have exercised reasonable business judgment in determining to enter into the Exit Facilities Documents, which have been negotiated in good faith and at arm's-length, without the intent to hinder, delay, or defraud any creditor of the Debtors, and any credit extended and loans made or deemed to be made to the Debtors prior to the Effective Date or the Reorganized Debtors pursuant to the Exit Facilities, and any fees paid thereunder, are deemed to have been extended, issued, and made, or deemed made in good faith and for legitimate business purposes.

<u>**Order**</u>

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

75.     <u>**Findings of Fact and Conclusions of Law**</u>.  The above findings of fact and conclusions of law, as well as any additional findings of fact and conclusions of law announced by the Court at the Combined Hearing, are hereby incorporated in this Confirmation Order.

76.     <u>**Approval of the Disclosure Statement**</u>.  The Disclosure Statement is approved in all respects on a final basis pursuant to section 1125 of the Bankruptcy Code.

77.     <u>**Confirmation of the Plan**</u>.  The Plan, including (a) all modifications to the Plan filed with the Court prior to or during the Combined Hearing and (b) all documents incorporated into the Plan through the Plan Supplement is approved in its entirety and **CONFIRMED** under

section 1129 of the Bankruptcy Code. All terms of the Plan and the Plan Supplement are incorporated herein by reference and are an integral part of this Confirmation Order. The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

78.     This Confirmation Order approves the Plan Supplement, including the documents contained therein, as they may be amended through and including the Effective Date in accordance with and as permitted by the Plan, subject to the consent rights set forth therein and in the RSA. The terms of the Plan, the Plan Supplement, and the exhibits thereto are incorporated herein by reference and are an integral part of this Confirmation Order; *provided* that if there is any direct conflict between the terms of the Plan (including the Plan Supplement) and the terms of this Confirmation Order, the terms of this Confirmation Order shall control solely to the extent of such conflict.

79.     **Objections Overruled.** All parties have had a full and fair opportunity to be heard on all issues raised by the objections to final approval of the Disclosure Statement and Confirmation of the Plan, and the objections have been fully and fairly litigated or resolved, including by agreed-upon provisions as set forth in this Confirmation Order. All objections, responses, statements, reservations of rights, and comments in opposition, if any, to final approval of the Disclosure Statement or Confirmation of the Plan that have not been withdrawn, waived, settled, or resolved prior to the Combined Hearing or otherwise resolved on the record of the Combined Hearing or in this Confirmation Order are hereby **OVERRULED** and **DENIED** on the merits, with prejudice. All objections to entry of this Confirmation Order or to the relief granted

007165
**App. 877**

herein that were not timely filed and served prior to the Objection Deadline are deemed waived and forever barred.  All withdrawn objections are deemed withdrawn with prejudice.

81.     **Headings**.  Headings utilized herein are for convenience and reference only and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

81.     **Plan Modifications**.  Subsequent to filing the Plan on April 4, 2024, the Debtors made certain technical modifications to the Plan (the "**Plan Modifications**").  The Plan Modifications, which were made in accordance with the RSA, do not materially adversely affect the treatment of any Claim or Interest under the Plan.  After giving effect to the Plan Modifications, the Plan continues to satisfy the requirements of sections 1122 and 1123 of the Bankruptcy Code.  The Debtors provided due and sufficient notice of the Plan Modifications under the circumstances.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

82.     **Deemed Acceptance of Plan**.  In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, Holders of Claims who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan, as modified by the Plan Modifications and this Confirmation Order.  No Holder of a Claim shall be permitted to change its vote as a consequence of the Plan Modifications.

83.     **No Action Required**.  Under the provisions of the Delaware General Corporation Law, including section 303 thereof, and the comparable provisions of the Delaware Limited Liability Company Act, section 1142(b) of the Bankruptcy Code, and any other comparable

007166
**App. 878**

provisions under applicable law, no action of the respective directors, equity holders, managers, or members of the Debtors is required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, the Restructuring Transactions (subject, in each case, to any consent rights set forth or incorporated therein), and any contract, assignment, certificate, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including the Plan Supplement, and the RSA.

84.    **Binding Effect.**    Pursuant to **Article XII.A** of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and this Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests voted or are deemed to have accepted the Plan, voted or are deemed to have rejected the Plan, or failed to vote to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, including, without limitation, participants in the Rights Offering and the Investors, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors or the Reorganized Debtors, as applicable.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan and this Confirmation Order, regardless of whether any such Holder of a Claim or Interest has voted on the Plan.  Pursuant to section 1142(a) of the Bankruptcy Code, the Plan, the Plan Supplement, and this Confirmation Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

007167
**App. 879**

85.     **Incorporation by Reference.**  The terms and provisions of the Plan, the Definitive Documents, all other relevant and necessary documents, and each of the foregoing's schedules and exhibits are, on and after the Effective Date, incorporated herein by reference and are an integral part of this Confirmation Order.

86.     **Vesting of Assets in the Reorganized Debtors.**  Except as otherwise provided in the Plan, this Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan or this Confirmation Order, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

87.     **Cancellation of Existing Agreements and Interests.**  On the Effective Date, except with respect to the Exit Facilities, or to the extent otherwise provided in the Plan, including in **Article V.A** of the Plan, this Confirmation Order, or any other Definitive Document, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect; *provided, however*, that notwithstanding anything to the contrary contained herein, any agreement that governs the rights of the DIP Agents shall continue in effect solely for purposes of allowing the DIP Agents to (i) enforce their rights against

007168
**App. 880**

any Person other than any of the Released Parties, pursuant and subject to the terms of the DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (ii) receive distributions under the Plan and to distribute them to the Holders of the Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (iii) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed ABL DIP Facility Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, and (iv) appear and be heard in the Chapter 11 Cases or in any proceeding in this Court, including to enforce any obligation owed to the DIP Agents, or Holders of the ABL DIP Facility Claims and Term DIP Facility Claims under the Plan, as applicable. Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan.

88.     Notwithstanding the preceding paragraph, any credit agreement or other instrument that governs the rights, claims, and remedies of the Holder of a Claim shall continue in full force and effect for the limited purposes of allowing Holders of Allowed Claims to receive distributions under the Plan and permitting the Reorganized Debtors and any other Distribution Agent, as applicable, to make distributions on account of the applicable Claims.

89.     On the Effective Date, each holder of a certificate or instrument evidencing a Claim or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture or agreement that governs the rights of

007169
**App. 881**

such holder of such Claim or Interest.  Such surrendered certificate or instrument shall be deemed canceled as set forth in, and subject to the exceptions set forth in, **Article IV.H** of the Plan.

90.     **Governance Documents.**  On or immediately prior to the Effective Date, the Governance Documents shall be adopted or amended in a manner consistent with the terms and conditions set forth in the Plan and the Plan Supplement, as may be necessary to effectuate the transactions contemplated by the Plan.  Each Reorganized Debtor will file its Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The Governance Documents shall prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

91.     On the Effective Date, New C1 shall enter into and deliver the New Equityholders' Agreement to each Holder of New Equity Interests, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.  On the Effective Date, holders of New Equity Interests shall be deemed to have executed the New Equityholders' Agreement and be parties thereto, in privity of contract with the other parties to the New Equityholders' Agreement and be bound thereby, whether their ownership is recorded in a register maintained with New C1's transfer agent, without the need to deliver signature pages thereto.

007170

**App. 882**

92.     **Effectiveness of All Actions.**  All actions contemplated by the Plan, the RSA, and the Definitive Documents, as the same may be modified from time to time prior to the Effective Date subject, in each case, to the consent rights set forth or incorporated therein (including, for the avoidance of doubt, the Description of Transaction Steps), are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or the Reorganized Debtors and with the effect that such actions had been taken by the unanimous action, consent, approval and vote of each of such officers, directors, managers, members, or equity holders.

93.     **Approval of Restructuring Transactions.**  The Restructuring Transactions set forth in the Plan are hereby approved and authorized in all respects.  After the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, are authorized to consummate the Restructuring Transactions (which, for the avoidance of doubt, shall be in form and substance acceptable to the Required Consenting Lenders, and, subject to the consent rights set forth in the Restructuring Support Agreement, reasonably acceptable to the Required Consenting Second Lien Lenders, and otherwise consistent with the Restructuring Support Agreement) and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan.  Any transfers of assets or equity interests effected, or any obligations incurred through the Restructuring Transactions are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

94.     **Rights Offering.**  The Rights Offering complied with the Rights Offering and Election Procedures set forth in the Scheduling Motion and approved in the Scheduling Order, was

appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, was conducted in good faith and was in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules and any applicable non-bankruptcy rules, laws, and regulations, including to the extent applicable the registration requirements under the Securities Act.  On the Effective Date, the Debtors are authorized to consummate the Rights Offering in accordance with and pursuant to the applicable terms and conditions of the Rights Offering Documents.

95.  **Backstop Agreement.**  The proposed terms and conditions of, and the Debtors' performance under the Backstop Agreement is an essential element of the Plan and is in the best interest of the Debtors, the Estates, and Holders of Claims and Interests.  The terms and conditions of the Backstop Agreement are fair and reasonable, reflect the Debtors' exercise of reasonable business judgment consistent with their fiduciary duties and is supported by reasonably equivalent value and fair consideration.  The Backstop Agreement was negotiated at arms' length and in good faith, without the intent to hinder, delay, or defraud any creditor of the Debtors.

96.  The Backstop Agreement and the terms and provisions included therein are approved in their entirety pursuant to section 105 and section 363(b) of the Bankruptcy Code, and the Debtors are authorized to enter into the Backstop Agreement and to take any and all actions reasonably necessary and proper to implement the terms of the Backstop Agreement and to fully perform all obligations thereunder on the conditions set forth therein.  The specified premiums, payments, obligations, indemnification obligations, and expenses contemplated to be paid by the Debtors pursuant to the Backstop Agreement, including the Direct Investment, the Backstop Commitment, the Direct Investment Commitment, and the Put Option Premium are hereby approved as reasonable and shall not be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable, or otherwise),

007172

**App. 884**

counterclaims, cross-claims, defenses, disallowance, impairment, disgorgement, or any other challenges under any theory at law or in equity by any person or entity.  The Direct Investment, the Backstop Commitment, the Direct Investment Commitment, and the Put Option Premium contained in the Backstop Agreement shall be payable by the Debtors as provided in the Backstop Agreement without further order of the Court.

97.     **Distributions.**  The procedures governing distributions contained in **Article VI** of the Plan shall be, and hereby are, approved in their entirety.

98.     **Claims Register.**  Any Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without the Debtors or the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest without any further notice to or action, order, or approval of the Court.

99.     **Exit Facilities.**  On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facilities Documents. Confirmation of the Plan pursuant to this Confirmation Order shall be deemed final approval of the Exit Facilities and the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including, without limitation, ratification, assumption and restatement of all of the ABL DIP Facility Claims into "Obligations" under and as defined in the Exit ABL Facility, the incurrence of the loans under the Exit ABL Facility and the Exit Term Loan Facility, the provision of guarantees by the Debtors and the Reorganized Debtors (as the case may be), the payment of all fees, indemnities, expenses, and other payments provided for therein, the authorization of the Reorganized Debtors to enter into and execute the Exit Facilities Documents

41

and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities, and the granting, including the ratification, assumption, amendment and restatement, of Liens on and security interests in, and pledges of, the assets of the Debtors and the Reorganized Debtors (as the case may be) (including entry into, and filing of, any mortgages, security agreements or other instruments in favor of the Exit ABL Agent or the Exit Term Loan Agent (for itself or on behalf of the secured parties under the Exit Term Loan Facility), as applicable, to secure the indebtedness and other obligations under the Exit ABL Facility or the Exit Term Loan Facility, as applicable), are (i) hereby fully and finally approved and (ii) shall be deemed to be legal, valid, binding and fully and unconditionally enforceable against each of the Debtors, the Reorganized Debtors, and their Affiliates party thereto in accordance with their terms, without any further corporate authorization or other action required by the Debtors or the Reorganized Debtors, as the case may be. Execution of the Exit Term Loan Credit Agreement by the Exit Term Loan Agent shall be deemed to bind all Holders of First Lien Claims and all Exit Term Loan Facility Lenders as if each such Holder or Exit Term Loan Facility Lender had executed the Exit Term Loan Credit Agreement with appropriate authorization.

100.    In accordance with the terms of the Plan and the Exit ABL Facility Documents, subject to and upon the effectiveness of the Exit ABL Facility, the ABL DIP Documents shall be amended and restated upon the execution, delivery, and the satisfaction or waiver by the Exit ABL Agent of all conditions precedent to the Exit ABL Credit Agreement and the other Exit ABL Facility Documents in accordance with their terms. All ABL DIP Facility Claims (including, without limitation, any outstanding Letters of Credit (as defined in the ABL DIP Credit Agreement), Floorplan Approvals (as defined in the ABL DIP Credit Agreement) and Floorplan Advances (as defined in the ABL DIP Credit Agreement) shall be deemed to have been issued

007174

**App. 886**

and/or extended under and in accordance with the terms of the Exit ABL Facility Documents, upon the effectiveness thereof), plus all accrued, unpaid interest, fees, costs and expenses, shall be ratified, assumed and automatically deemed included in, and part of the Obligations under and as defined in the Exit ABL Facility Documents. Each of the Debtors and the Reorganized Debtors are authorized (in accordance with the terms of the Exit ABL Facility Documents), without further approval of the Court, to enter into, execute, negotiate and deliver, or cause to be executed, negotiated and delivered, the Exit ABL Credit Agreement and the Exit ABL Facility Documents, including all related agreements, documents, instruments and certificates relating to the Exit ABL Facility.

101.    Subject to and upon the effectiveness of the Exit ABL Facility or the Exit Term Loan Facility, as applicable, and without further notice to any party, or further order or other approval of, or action by, the Court, or further act or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person, the Debtors, and/or the Reorganized Debtors, shall be and hereby are authorized to enter into, incur indebtedness and other obligations under, and perform any duties and obligations under, the Exit ABL Credit Agreement and the other Exit ABL Facility Documents or the Exit Term Loan Credit Agreement and the other Exit Term Loan Facility Documents, as applicable.  This Confirmation Order shall constitute (a) approval of the Exit ABL Credit Agreement, the other Exit ABL Facility Documents, the Exit Term Loan Credit Agreement, and the other Exit Term Loan Facility Documents, all transactions contemplated thereby, and all actions to be taken, agreements and other documents to be entered into, undertakings to be made, and indebtedness and other obligations to be incurred by the Debtors and the Reorganized Debtors, or in connection therewith, including the payment of all fees, indemnities, costs and expenses provided for therein or relating thereto and (b) authorization for

007175
**App. 887**

the Debtors and the Reorganized Debtors to enter into, execute and deliver, incur and perform their obligations under, and grant Liens on and security interests in their assets and properties pursuant to the Exit ABL Credit Agreement, the other Exit ABL Facility Documents, the Exit Term Loan Credit Agreement, and the other Exit Term Loan Facility Documents.

102.    Subject to and upon the effectiveness of the Exit ABL Facility, the Exit ABL Facility Documents, the Exit Term Loan Credit Agreement, the other Exit Term Loan Facility Documents, and any Liens and security interests granted by the Debtors and the Reorganized Debtors, in favor of the Exit ABL Agent under the Exit ABL Credit Agreement and other Exit ABL Facility Documents and the Exit Term Loan Agent (for itself or on behalf of the secured parties under the Exit Term Loan Facility) securing the indebtedness and all obligations of the Debtors, under the Exit ABL Facility and the Exit Term Loan Facility shall constitute the legal, valid, and binding obligations of the Debtors and the Reorganized Debtors, and shall be deemed to be validly created, attached and enforceable and perfected Liens on and security interests in the assets and properties of the Debtors and the Reorganized Debtors, and shall be fully and unconditionally enforceable in accordance with their respective terms and shall be, and hereby are, not subject to recharacterization or equitable subordination or avoidance for any purposes whatsoever, and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable nonbankruptcy law.  The Exit ABL Facility and the Exit Term Loan Facility shall be deemed to be reasonable and to have been entered into in good faith, for reasonably equivalent value, for legitimate business purposes, and as an inducement to the Exit ABL Agent, the Exit Term Loan Agent, and the other secured parties thereunder to extend credit thereunder. Notwithstanding anything to the contrary in this Confirmation Order or the Plan, on and after the Effective Date, the Court's retention of jurisdiction shall not govern the enforcement

007176

**App. 888**

of the Exit ABL Facility Documents, the Exit Term Loan Facility Documents, or any other documents executed in connection with the Exit ABL Credit Facility or the Exit Term Loan Facility, or any rights or remedies related thereto or exercised in connection therewith.

103.    On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

104.    **DIP Claims**.  All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the "Obligations" (as defined in the ABL DIP Documents or the Term DIP Loan Documents, as applicable), including without limitation, (a) the principal amount outstanding

45

under the ABL DIP Credit Agreement or the Term DIP Credit Agreement, as applicable, on such date, (b) all accrued and unpaid interest thereon to the date of payment and (c) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the ABL DIP Credit Agreement or the Term DIP Credit Agreement, as applicable.

105.    Each Allowed ABL DIP Facility Claim and all Liens securing such Allowed ABL DIP Facility Claim shall continue in full force and effect on and after the Effective Date, as amended and restated by and in accordance with the Exit ABL Credit Agreement and the Exit ABL Facility Documents, and nothing in the Plan, the Plan Supplement or this Confirmation Order shall or shall be construed to release, discharge, relieve, limit, or impair in any way the rights of any Holder of an ABL DIP Facility Claim or any Lien securing such Claim, all of which shall be amended and restated by the Exit ABL Facility.

106.    **Effectiveness of Final DIP Order**.  Notwithstanding the entry of this Confirmation Order, from the Confirmation Date through the Effective Date (the "**Pre-Consummation Period**"), including without limitation, the substantial consummation of the Restructuring Transactions, all of the Loans, Letters of Credit, Floorplan Advances, and all other "Obligations" as defined in the ABL DIP Credit Agreement and all "Obligations" as defined in the Term DIP Credit Agreement, as incurred during the Pre-Consummation Period, and all claims, liens, interest, rights, priorities, protections and remedies afforded to the ABL DIP Agent, ABL DIP Lenders, Term DIP Agent, and the other Term DIP Secured Parties (as defined in the Final DIP Order) in the Final DIP Order shall remain in full force and effect, and shall continue to constitute the legal, valid, binding and enforceable obligations of Debtors and Reorganized Debtors, which shall not be impaired, prejudiced or modified in any way at any time prior to the Effective Date.  Until such time as all of the conditions precedent to the effectiveness of the Exit ABL Facility Documents or

the Exit Term Loan Facility Documents, as applicable, have been satisfied, including the occurrence of the Effective Date, the rights and remedies of each of the ABL DIP Agent and the ABL DIP Lenders under the ABL DIP Facility and the Term DIP Agent and the other Term DIP Secured Parties (as defined in the Final DIP Order) under the Term DIP Facility shall remain in full force and effect.

107.    For the avoidance of doubt, prior to the effectiveness of the Exit ABL Credit Agreement or the Exit Term Loan Credit Agreement, as applicable, the ABL DIP Lenders and the Term DIP Lenders shall have the rights and remedies available to the ABL DIP Lenders and the Term DIP Lenders, respectively, under the DIP Orders, the ABL DIP Credit Agreement, and the Term DIP Credit Agreement (as applicable), and the relative ranking and priorities between the ABL DIP Facility, on the one hand, and the Term DIP Facility or the Exit Term Loan Facility (as the case may be), on the other hand, shall be consistent with the ranking and priorities between the ABL DIP Facility and the Term DIP Facility set forth in the Final DIP Order.

108.    Upon the Effective Date, the DIP Secured Parties (as defined in the Final DIP Order) shall be released from any and all liability, responsibility, and/or obligation to hold, reserve for, or otherwise fund or ensure the funding of the Carve Out (as defined in the Final DIP Order), or any other expenses included within the Carve Out and from any obligation, responsibility or liability to the Debtors, any of the Professionals (as defined in the Final DIP Order) or any other third party to pay, fund or otherwise satisfy the fees and expenses of such Professionals.

109.    **New Equity Interests.**  On the Effective Date, subject to the terms and conditions of the Plan, the Backstop Agreement, and the Restructuring Transactions, New C1 shall issue the New Equity Interests, which distribution and issuance shall be governed by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, and/or dilution,

47

as applicable, including the Governance Documents (including the New Equityholders' Agreement). The issuance of the New Equity Interests is authorized without the need for any further corporate action. On the Effective Date, the New Equity Interests shall be issued and distributed as provided for in the Description of Transaction Steps to the Entities entitled to receive the New Equity Interests pursuant to, and in accordance with, the Plan and Backstop Agreement.

110.    All of the shares of New Equity Interests issued pursuant to the Plan and this Confirmation Order shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in **Article VI** of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of New Equity Interests shall be deemed as its agreement to the Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New Equity Interests will not be registered under the Securities Act or listed on any exchange as of the Effective Date and are not expected to meet the eligibility requirements of the DTC.

111.    **Effectuating Documents; Further Transactions.** On and after the Effective Date, the Reorganized Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors without the

48

need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

112.    **Certain Securities Law Matters**.  The Debtors' solicitation of Holders of Claims receiving Securities under the Plan prior to the Petition Date was subject to the Securities Act and the regulatory authority of various states under state securities laws.  Accordingly, the offering of New Equity Interests before the Petition Date to Holders of First Lien Claims and Second Lien Claims was exempt from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

113.    No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of Securities under the Plan.  The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Equity Interests, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on (a) with respect to the New Equity Interests issued pursuant to the Rights Offering (other than with respect to the Backstop Commitment and the Direct Investment Commitment), section 1145 of the Bankruptcy Code, (b) with respect to the New Equity Interests issuable pursuant to the Plan as the Second Lien Recovery, section 1145 of the Bankruptcy Code, and (c) with respect to the New Equity Interests issued pursuant to the Direct Investment, the Put Option Premium, and the unsubscribed New Equity Interests issued to the Investors pursuant to the Backstop Agreement, section 4(a)(2) of the Securities Act or Regulation D or Regulation S promulgated thereunder.

114.    The New Equity Interests issued pursuant to section 1145 of the Bankruptcy Code (i) shall not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and

007181
**App. 893**

(ii) shall be freely transferable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the provisions of Rule 144 under the Securities Act with respect to a holder thereof that (x) is, or within 90 days of such transfer has been, an "affiliate" of the Debtors within the meaning of Rule 144(a)(1) or (y) has acquired the New Equity Interests from an "affiliate" of the Debtors in a transaction or chain of transactions not involving any public offering within one year of such transfer; and (c) any restrictions on the transferability of such New Equity Interests in the Governance Documents.

115.    The New Equity Interests, including those issued pursuant to the Backstop Agreement and the New Equity Interests reserved for issuance under the Management Incentive Plan Pool, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S thereunder, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

116.    **Compromise of Controversies.**  In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests, and controversies (including the PVKG Note Claims Settlement) resolved under the Plan and the entry of this Confirmation Order

007182

**App. 894**

constitutes approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

117.    **Approval of the PVKG Note Claims Settlement.**  The PVKG Note Claims Settlement is fair, equitable, within the range of reasonableness, and in the best interests of the Debtors and their Estates.  Entry of this Confirmation Order shall constitute the entry of an order approving the PVKG Note Claims Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

118.    **Assumption and Assignment of Contracts and Leases.**  On the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed, unless such Executory Contract and Unexpired Lease: (a) was assumed or rejected previously by the Debtors; (b) previously expired or terminated pursuant to its own terms; (c) is the subject of a motion or notice to reject pending as of the Effective Date; or (d) is identified on the Rejected Executory Contract and Unexpired Lease List, without the need for any further notice to or action, order, or approval of the Court, under section 365 of the Bankruptcy Code and the payment of Cure Claims, if any, shall be paid in accordance with **Article V.D** of the Plan.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the

007183
**App. 895**

prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

119.   The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in **Article V** of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption and assignment, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.

120.   Nothing in this Confirmation Order or in any notice or any other document is or shall be deemed an admission by the Debtor or Reorganized Debtors that any assumed contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code.

121.   Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim pursuant to **Article V.D** of the Plan shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to this Confirmation Order, and for which any Cure Claim has been fully paid pursuant to **Article V.D** of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Court.

122.   All Claims for damages resulting from the rejection of an Executory Contract or Unexpired Lease shall be asserted in accordance with **Article V.C** of the Plan and shall be treated as General Unsecured Claims pursuant to **Article III.C** of the Plan and may be objected to in

52

accordance with the provisions of **Article VII** of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

123.   **Exemption from Transfer Tax and Recording Fees.**   To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (a) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security for any or all of the Exit Facilities; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall

007185

**App. 897**

forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

124.    **Plan Supplement.**  Without further order or authorization of this Court, subject to the consent and approval rights of applicable parties set forth in the Plan and the RSA, the Debtors, Reorganized Debtors, and their successors are authorized and empowered to make all modifications to all documents included as part of the Plan Supplement that are consistent with the Plan, unless such modifications require relief under section 1127 of the Bankruptcy Code. Execution versions of the documents comprising or contemplated by the Plan Supplement shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms and, to the extent applicable, shall create, as of the Effective Date, all mortgages, Liens, deeds of trust, pledges, and security interests purported to be created thereby.

125.    **Professional Compensation.**  All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than forty-five (45) days after the Effective Date.  The Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Court.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, from the Professional Fee Escrow Account as soon as practicable after such Professional Fee Claims are Allowed.

126.    On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with an amount of Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not

007186
**App. 898**

be considered property of the Estates of the Debtors or the Reorganized Debtors.  When all Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

127.    **Release, Exculpation, Discharge, Injunction, and Related Provisions**.  The release, exculpation, discharge, injunction, and related provisions embodied in the Plan, including those contained in **Article VIII.A–G** of the Plan shall be, and hereby are, approved and authorized in their entirety and shall be effective and binding on all Persons and Entities, to the extent provided in the Plan, without further order or action by the Court.

128.    **Restructuring Expenses**.  The Claims for Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date matters, after the Effective Date), shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the RSA, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Claims for Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided, however*, that such estimates shall not be considered an admission or

007187
**App. 899**

limitation with respect to such Restructuring Expenses.  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before, or after the Effective Date.

129.    **Term of Injunctions or Stays.**  Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays arising under or entered during these Chapter 11 Cases under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

130.    **Nonseverability of Plan Provisions Upon Confirmation.**  Each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable, *provided* that any such deletion or modification shall be consistent with the RSA and the Backstop Agreement and the consent rights contained in each of them; and (c) non-severable and mutually dependent.

131.    **Post-Confirmation Modifications.**  Without need for further order or authorization of the Court, the Debtors or the Reorganized Debtors, as applicable, are authorized and empowered to make any and all modifications to any and all documents that are necessary to effectuate the Plan that do not materially modify the terms of such documents and are consistent with the Plan (subject to the consent rights contained in each of the Plan, the RSA, and the Backstop Agreement).  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth

in the Plan, the RSA, and the Backstop Agreement, the Debtors and the Reorganized Debtors expressly reserve their respective rights to revoke or withdraw, or to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan (subject to the consent rights contained or incorporated in each of the Plan, the RSA, and the Backstop Agreement).  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with **Article X.A** of the Plan.

132.    **Chubb Insurance Program.**   Notwithstanding anything to the contrary in the Definitive Documents, any other document related to any of the foregoing, or any other order of this Court (including, without limitation, any other provision that purports to be peremptory or supervening, grants an injunction, discharge or release, confers Court jurisdiction, or requires a party to opt out of any releases):

a.       on the Effective Date, all of the insurance policies which have been issued by ACE American Insurance Company, Federal Insurance Company and any of their respective U.S.-based affiliates and predecessors (collectively, and solely in their capacities as insurers and third party administrators, the "**Chubb Companies**") to, or which provide coverage to, any of the Debtors (or any of their predecessors) at any time and for any line of coverage (collectively and together with any agreements, documents or instruments related thereto and each as amended, modified or supplemented and including any exhibit or addenda thereto, the "**Chubb Insurance Program**") shall be assumed by the Debtors and assigned to the Reorganized Debtors, jointly and

57

severally, in their entireties pursuant to sections 105 and 365 of the Bankruptcy Code, and shall continue in full force and effect thereafter in accordance with their respective terms;

       b.      on and after the Effective Date, the Reorganized Debtors shall become and remain liable in full for all of their and the Debtors' obligations under the Chubb Insurance Program in the ordinary course of business pursuant to the terms of the Chubb Insurance Program (including, but not limited to, obligations for payment of any outstanding or not-yet-owed premium installments owing thereunder and any outstanding SIR or deductible amounts), regardless of whether such obligations arise before or after the Effective Date, and without the need or requirement for the Chubb Companies file a Proof of Claim or an Administrative Claim, Cure Claim, cure objection, or provide any notice of recoupment;

       c.      nothing (including **Articles V.B**, **V.F** and **VI.L** of the Plan) alters, modifies or otherwise amends the terms and conditions of the Chubb Insurance Program, and any rights and obligations thereunder shall be determined under the Chubb Insurance Program and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred;

       d.      the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in **Article VIII.F** of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit:  (i) claimants with valid workers' compensation claims or direct action claims against the Chubb Companies under applicable non-bankruptcy law to proceed with their claims; (ii) the Chubb Companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against the Chubb Companies under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the

007190

**App. 902**

injunctions set forth in **Article VIII.F** of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; (iii) the Chubb Companies to cancel any policies under the Chubb Insurance Program, and take, in their sole discretion, any other actions relating to the Chubb Insurance Program (including effectuating a setoff); and

e.      for the avoidance of doubt, nothing in Section F of **Article VIII** of the Plan applies or shall be deemed to apply to any claims covered by the Chubb Insurance Program.

133.    **Bond Obligations.**    Notwithstanding any other provisions of the Definitive Documents, any other document related to any of the foregoing, or any order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases), on the Effective Date, all contractual and common law rights and obligations of Liberty Mutual Insurance Company, Travelers Casualty and Surety Company of America, Lexon Insurance Company, Endurance Assurance Corporation, Federal Insurance Company, Westchester Fire Insurance Company, SiriusPoint America Insurance Company and their affiliated sureties (collectively, and each as surety in their role as an issuer of surety bonds, surety guaranties, or surety-related products, each a "**Surety**" and together, the "**Sureties**") related to (i) bonds of any kind issued by the Sureties, whether prior to or after the Petition Date (the "**Surety Bonds**") on behalf of any of the Debtors, all of which are maintained in the ordinary course of business, (ii) payment and/or indemnity agreements between the Debtors and the Sureties, setting forth the Sureties' rights against the Debtors, and the Debtors' obligations to pay and indemnify the Sureties from any loss, cost, or expense that the Sureties may incur, in each case, on account of the issuance of any Surety Bonds, (iii) the Sureties' collateral agreements, if any, governing collateral (and proceeds thereof) in connection with the Surety Bonds, including

as applicable control agreements, pledge agreements, trust agreements, deposit account agreements, letters of credit and proceeds of all of the foregoing; and/or (v) premiums payable to the Sureties on account of the Surety Bonds (whether prepetition or post-petition, collectively, the "**Bond Agreements**," and the Debtors' obligations arising therefrom, the "**Bond Obligations**") shall continue in full force and effect according to their terms and applicable non-bankruptcy law and are not altered, modified, enjoined, impaired, discharged or released by the Definitive Documents or any order of the Court; *provided*, *however*, for the avoidance of doubt nothing herein shall extend the tail period of a Surety Bond or affect any prior cancellation of a Surety Bond. The Sureties' rights, including but not limited to the Sureties' common law rights, right of subrogation to the extent any claim is paid by a Surety, setoff and recoupment rights, lien rights and trust claims, are not primed, subordinated, affected or impaired by the Definitive Documents (including but not limited to **Articles IV.H**, **VI.L**, **VIII.B** and **VIII.F(d)** of the Plan) or any order of the Court, and neither are the rights of any party to whom a Surety may be subrogated. **Articles IV.H**, **VI.L**, **VIII.B** and **VIII.F(d)** of the Plan shall not apply to the Sureties or to any Claim to which a Surety may be subrogated. For the avoidance of any doubt, and solely to the extent applicable, if any of the Bond Agreements are deemed to be one or more executory contracts, such agreements are assumed by the Debtors and the Reorganized Debtors pursuant to section 365 of the Bankruptcy Code upon the Effective Date with the consent of the Sureties, as applicable. On the Effective Date, each Bond Agreement shall not be cancelled under the Plan but shall instead be deemed Reinstated or ratified by the Debtors and Reorganized Debtors on the terms of such Bond Agreement that existed immediately prior to the Effective Date. The Debtors and Reorganized Debtors shall execute and deliver new general contracts of indemnity as requested by the Sureties following the Effective Date in the ordinary course of business in accordance with the terms of the

applicable Bond Agreements.  Nothing in the Definitive Documents or any order entered by the Court shall prime, modify, subordinate, impair or affect the Sureties' rights against any non-Debtor, or any non-Debtor's rights against the Sureties.  For the avoidance of doubt, the Sureties (and the holders of claims to which the Sureties may be subrogated) shall be deemed to have opted out of any releases provided in the Plan, and the Sureties (and the holders of claims to which the Sureties may be subrogated) are not "Releasing Parties" or "Released Parties" under the Plan.  The Sureties' Claims against the Debtors are Unimpaired and shall be Allowed under the Plan to the same extent the Sureties' claims would be allowed under applicable non-bankruptcy law, and the Reorganized Debtors shall retain any claims and defenses under applicable non-bankruptcy law with respect to any such Allowed Claims.  The Reorganized Debtors and the Sureties reserve all rights and defenses under applicable law with respect to any right, claim, interest, or obligation arising under the Surety Bonds, indemnity agreements, or any documents related to the foregoing, and on the Effective Date, all claims arising under or granted to the Sureties in connection with the Surety Bonds shall not be impaired, discharged, or released by any provision of the Definitive Documents.  Finally, the Debtors and Reorganized Debtors, as applicable, shall pay any unpaid premiums, attorneys' costs and fees (including but not limited to those in connection with these cases), and loss adjustment expenses to the Sureties pursuant to the terms of the applicable payment and indemnity agreements under the Bond Agreements in the ordinary course of business, including and such costs and fees that may be due and owing.  For the avoidance of doubt, paragraph 42 of this Confirmation Order shall not supersede this paragraph (Bond Obligations).

134.  **Notice of Entry of Confirmation and Effective Date.**  In accordance with Bankruptcy Rules 2002 and 3020(c), no later than seven (7) business days after the Effective Date, the Reorganized Debtors shall file with the Court and serve by email and first class mail or

007193
**App. 905**

overnight delivery service a notice of the entry of this Confirmation Order and occurrence of the Effective Date (the "**Confirmation Notice**") on all Holders of Claims and/or Interests and to all parties on the *Master Service List* maintained by the Claims and Noticing Agent.  Notwithstanding the above, no Confirmation Notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed notice of the Combined Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.  To supplement the notice procedures described in the preceding sentences, no later than fourteen (14) days after the Effective Date, the Reorganized Debtors shall cause the Confirmation Notice, modified for publication, to be published on one occasion in the *New York Times* (National Edition).  Mailing and publication of the Confirmation Notice in the time and manner set forth in this paragraph shall be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c).  No further notice will be necessary.

135.  **Waiver of Filings.**  Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court of the Office of the U.S. Trustee is permanently waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

136.  **Waiver of Section 341 Meeting of Creditors or Equity Holders; Waiver of Schedules and Statements and 2015.3 Reports.**  Any requirement under section 341(e) for the U.S. Trustee to convene a meeting of creditors or equity holders is permanently waived as of the Confirmation Date. Any requirements for the Debtors to file the following are permanently waived as of the Confirmation Date: (a) schedules of assets and liabilities and statements of financial

007194
**App. 906**

affairs and (b) their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Bankruptcy Rule 2015.3.

137.   **Waiver of 11 U.S.C. § 345.**  Section 345 of the Bankruptcy Code and any provision of the U.S. Trustee Guidelines requiring that the bank accounts listed in the Debtors' Cash Management Motion be U.S. Trustee authorized depositories is waived with respect to the bank accounts existing as of the Petition Date.

138.   **Reservation of Rights.**  Except as expressly set forth in the Plan, the Plan shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

139.   **Authorization to Consummate.**  The Debtors and the Reorganized Debtors, as applicable, are authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in **Article IX** of the Plan.

140.   **Substantial Consummation.**  Consummation of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

141.   **Failure of Consummation.**  Notwithstanding entry of this Confirmation Order, if Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the RSA shall: (a) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission,

acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

142.     **Effect of Conflict.**  This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  In the event of an inconsistency between this Confirmation Order and the Plan, the Disclosure Statement, or the Plan Supplement, this Confirmation Order shall control.

143.     **Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Court.

144.     **Waiver or Estoppel.**  Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Court prior to the Confirmation Date.

145.     **Final Order.**  This Confirmation Order is a Final Order, and the period in which an appeal must be filed shall commence upon the entry hereof.

007196
**App. 908**

146.   **Retention of Jurisdiction.**  The Court may properly, and upon the Effective Date

shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising out of, and

relating to, the Chapter 11 Cases, this Confirmation Order, and the Plan, including the matters set

forth in **Article XI** of the Plan and sections 105(a) and 1142 of the Bankruptcy Code.


Signed:  May 23, 2024

Christopher Lopez
United States Bankruptcy Judge

65

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | |
| | § | Chapter 11 |
| CONVERGEONE HOLDINGS, INC., et al., [1] | § § | Case No. 24-90194 (CML) |
| Debtors. | § § § § | (Jointly Administered) |

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

### Part 1: Identify the appellant(s)

1. Name(s) of appellant(s):    **Ad Hoc Group of Excluded Lenders**

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

   For appeals in a bankruptcy case
   and not in an adversary proceeding.
   ☐    Debtor
   ☒    Creditor
   ☐    Trustee
   ☐    Other (describe) _____

### Part 2: Identify the subject of this appeal

1. Describe the judgment, order, or decree appealed: **Findings of Fact, Conclusions of Law, and Order (I) Approving the Debtors' Disclosure Statement on a Final Basis and (II) Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

**Debtor Affiliates [Docket No. 396]**

   2.  State the date on which the judgment, order, or decree was entered: May 23, 2024

**Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

| | | |
|---|---|---|
| 1. | Ad Hoc Group of Excluded Lenders | Jason S. Brookner<br>Texas Bar No. 24033684<br>**GRAY REED**<br>1300 Post Oak Blvd., Suite 2000<br>Houston, Texas 77056<br>Telephone:    (713) 986-7000<br>Facsimile:    (713) 986-7100<br>Email:  jbrookner@grayreed.com |
| | | **PROSKAUER ROSE LLP**<br>David M. Hillman (*pro hac vice*)<br>Michael T. Mervis (*pro hac vice*)<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: (212) 969-3000<br>Facsimile:  (212) 969-2900<br>Email:  dhillman@proskauer.com<br>          mmervis@proskauer.com |
| | | **PROSKAUER ROSE LLP**<br>Peter J. Young (*pro hac vice*)<br>Steve Y. Ma (*pro hac vice*)<br>2029 Century Park East, Suite 2400<br>Los Angeles, CA 90067-3010<br>Telephone: (310) 284-4542<br>Facsimile:  (310) 557-2193<br>Email:  pyoung@proskauer.com<br>          sma@proskauer.com |
| 2. | ConvergeOne Holdings, Inc. | Charles R. Koster<br>Texas Bar No. 24128278<br>**WHITE & CASE LLP**<br>609 Main Street, Suite 2900<br>Houston, TX 77002<br>Telephone:  (713) 496-9700<br>Facsimile:  (713) 496-9701<br>Email:  charles.koster@whitecase.com |

2

007199
**App. 911**

Bojan Guzina (*pro hac vice*)
Jason N. Zakia (*pro hac vice*)
Andrew F. O'Neill (*pro hac vice*)
Erin R. Rosenberg (*pro hac vice*)
Blair M. Warner (*pro hac vice*)
Adam T. Swingle (*pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone:  (312) 881-5400
Email:bojan.guzina@whitecase.com
       aoneill@whitecase.com
       erin.rosenberg@whitecase.com
       blair.warner@whitecase.com
       adam.swingle@whitecase.com

3.    First Lien Ad Hoc Group

John F. Higgins
Texas Bar No. 09597500
Eric M. English
Texas Bar No. 24062714
James A. Keefe
Texas Bar No. 24122842
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, TX 77002
Telephone: (713) 226-6000
Facsimile:  (713) 226-6248
E-mail:  jhiggins@porterhedges.com
       eenglish@porterhedges.com
       jkeefe@porterhedges.com

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (*pro hac vice*)
Keith R. Martorana (*pro hac vice*)
C. Lee Wilson (*pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Email: sgreenberg@gibsondunn.com
       kmartorana@gibsondunn.com
       clwilson@gibsondunn.com

**GIBSON, DUNN & CRUTCHER LLP**
Michelle Choi (*pro hac vice*)
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email:  mchoi@gibsondunn.com

3

007200
**App. 912**

## Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

⊠ Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

## Part 5: Sign Below

Respectfully submitted this 24th day of May, 2024.

**GRAY REED**

By: */s/ Jason S. Brookner*
     Jason S. Brookner
      Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:        jbrookner@grayreed.com

- and -

**PROSKAUER ROSE LLP**
     David M. Hillman (*pro hac vice*)
     Michael T. Mervis (*pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
Email:        dhillman@proskauer.com
                 mmervis@proskauer.com

- and -

4

007201
**App. 913**

**PROSKAUER ROSE LLP**
    Peter J. Young (*pro hac vice*)
    Steve Y. Ma (*pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
Telephone:  (310) 284-4542
Facsimile:  (310) 557-2193
Email:      pyoung@proskauer.com
            sma@proskauer.com

**COUNSEL TO THE AD HOC GROUP**
**OF EXCLUDED LENDERS**

<u>**Certificate of Service**</u>

    The undersigned hereby certifies that on the 24th day of May, 2024, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system.

                    */s/ Jason S. Brookner*
                    Jason S. Brookner

007202
**App. 914**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| CONVERGEONE HOLDINGS, INC., et al., [1] | § § | Case No. 24-90194 (CML) |
| Debtors. | § § § § | (Jointly Administered) |

## AMENDED NOTICE OF APPEAL AND STATEMENT OF ELECTION

### Part 1: Identify the appellant(s)

1. Name(s) of appellant(s):        **Ad Hoc Group of Excluded Lenders**

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

   For appeals in a bankruptcy case
   and not in an adversary proceeding.
   ☐   Debtor
   ☒   Creditor
   ☐   Trustee
   ☐   Other (describe) _____

### Part 2: Identify the subject of this appeal

1. Describe the judgment, order, or decree appealed: **Findings of Fact, Conclusions of Law, and Order (I) Approving the Debtors' Disclosure Statement on a Final Basis and (II) Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

**Debtor Affiliates [Docket No. 396], attached hereto as Exhibit A.**

2.  State the date on which the judgment, order, or decree was entered: May 23, 2024

**Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

| | | |
|---|---|---|
| 1. | Ad Hoc Group of Excluded Lenders | Jason S. Brookner |
| | | Texas Bar No. 24033684 |
| | | **GRAY REED** |
| | | 1300 Post Oak Blvd., Suite 2000 |
| | | Houston, Texas 77056 |
| | | Telephone: (713) 986-7000 |
| | | Facsimile:  (713) 986-7100 |
| | | Email:  jbrookner@grayreed.com |
| | | |
| | | **PROSKAUER ROSE LLP** |
| | | David M. Hillman (*pro hac vice*) |
| | | Michael T. Mervis (*pro hac vice*) |
| | | Eleven Times Square |
| | | New York, New York 10036 |
| | | Telephone: (212) 969-3000 |
| | | Facsimile:  (212) 969-2900 |
| | | Email:  dhillman@proskauer.com |
| | | mmervis@proskauer.com |
| | | |
| | | **PROSKAUER ROSE LLP** |
| | | Peter J. Young (*pro hac vice*) |
| | | Steve Y. Ma (*pro hac vice*) |
| | | 2029 Century Park East, Suite 2400 |
| | | Los Angeles, CA 90067-3010 |
| | | Telephone: (310) 284-4542 |
| | | Facsimile:  (310) 557-2193 |
| | | Email:  pyoung@proskauer.com |
| | | sma@proskauer.com |
| | | |
| 2. | ConvergeOne Holdings, Inc. | Charles R. Koster |
| | | Texas Bar No. 24128278 |
| | | **WHITE & CASE LLP** |
| | | 609 Main Street, Suite 2900 |
| | | Houston, TX 77002 |
| | | Telephone: (713) 496-9700 |
| | | Facsimile:  (713) 496-9701 |
| | | Email:  charles.koster@whitecase.com |

2

007209
**App. 916**

Bojan Guzina (*pro hac vice*)
Jason N. Zakia (*pro hac vice*)
Andrew F. O'Neill (*pro hac vice*)
Erin R. Rosenberg (*pro hac vice*)
Blair M. Warner (*pro hac vice*)
Adam T. Swingle (*pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone:  (312) 881-5400
Email: bojan.guzina@whitecase.com
        aoneill@whitecase.com
        erin.rosenberg@whitecase.com
        blair.warner@whitecase.com
        adam.swingle@whitecase.com

3.     First Lien Ad Hoc Group            John F. Higgins
                                          Texas Bar No. 09597500
                                          Eric M. English
                                          Texas Bar No. 24062714
                                          James A. Keefe
                                          Texas Bar No. 24122842
                                          **PORTER HEDGES LLP**
                                          1000 Main Street, 36th Floor
                                          Houston, TX 77002
                                          Telephone: (713) 226-6000
                                          Facsimile:  (713) 226-6248
                                          E-mail:  jhiggins@porterhedges.com
                                               eenglish@porterhedges.com
                                               jkeefe@porterhedges.com

                                          **GIBSON, DUNN & CRUTCHER LLP**
                                          Scott J. Greenberg (*pro hac vice*)
                                          Keith R. Martorana (*pro hac vice*)
                                          C. Lee Wilson (*pro hac vice*)
                                          200 Park Avenue
                                          New York, New York 10166
                                          Telephone: (212) 351-4000
                                          Facsimile:  (212) 351-4035
                                          Email: sgreenberg@gibsondunn.com
                                               kmartorana@gibsondunn.com
                                               clwilson@gibsondunn.com

                                          **GIBSON, DUNN & CRUTCHER LLP**
                                          Michelle Choi (*pro hac vice*)
                                          333 South Grand Avenue
                                          Los Angeles, California 90071
                                          Telephone: (213) 229-7000
                                          Facsimile:  (213) 229-7520
                                          Email:  mchoi@gibsondunn.com

3

007210
**App. 917**

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

        ☒ Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

**Part 5: Sign Below**

Respectfully submitted this 25th day of May, 2024.

                      **GRAY REED**

                      By: */s/ Jason S. Brookner*
                        Jason S. Brookner
                        Texas Bar No. 24033684
                      1300 Post Oak Blvd., Suite 2000
                      Houston, Texas 77056
                      Telephone:  (713) 986-7000
                      Facsimile:  (713) 986-7100
                      Email:        jbrookner@grayreed.com

                      - and -

                      **PROSKAUER ROSE LLP**
                        David M. Hillman (*pro hac vice*)
                        Michael T. Mervis (*pro hac vice*)
                      Eleven Times Square
                      New York, NY 10036-8299
                      Telephone:  (212) 969-3000
                      Facsimile:  (212) 969-2900
                      Email:        dhillman@proskauer.com
                                  mmervis@proskauer.com

                      - and -

007211

4863-1301-0369                                         **App. 918**

**PROSKAUER ROSE LLP**
Peter J. Young (*pro hac vice*)
Steve Y. Ma (*pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
Telephone:  (310) 284-4542
Facsimile:  (310) 557-2193
Email:        pyoung@proskauer.com
                 sma@proskauer.com

**COUNSEL TO THE AD HOC GROUP**
**OF EXCLUDED LENDERS**

<u>**Certificate of Service**</u>

The undersigned hereby certifies that on the 25th day of May, 2024, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system.

*/s/ Jason S. Brookner*
Jason S. Brookner

5

007212
**App. 919**

## **EXHIBIT A**

### **Judgment/Order Being Appealed**

Docket No. 396, Findings of Fact, Conclusions of Law, and Order (I) Approving the Debtors' Disclosure Statement on a Final Basis and (II) Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its Debtor Affiliates

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

May 23, 2024

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90194 (CML) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
## (I) APPROVING THE DEBTORS' DISCLOSURE STATEMENT
## ON A FINAL BASIS AND (II) CONFIRMING THE JOINT
## PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF
## CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES

ConvergeOne Holdings, Inc. and its debtor affiliates in the above-captioned Chapter 11

Cases (collectively, the "**Debtors**"),[2] having:

    a.    entered into that certain Restructuring Support Agreement by and among the Consenting Stakeholders and the Second Lien Consenting Lenders, dated as of April 3, 2024 (as may be modified, amended, or supplemented from time to time, and together with all term sheets, schedules, annexes, and exhibits appended thereto, the "**RSA**");

    b.    commenced distribution, on April 3, 2024, of (i) the *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 27] (as amended, supplemented, or otherwise modified from time to time including by virtue of the Plan Modifications, the "**Plan**"), (ii) the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 26] (the "**Disclosure Statement**"), (iii) ballots for voting on the Plan to Holders of Class 3

---

[1]    The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

[2]    Unless otherwise noted, capitalized terms used but not otherwise defined in this order (the "**Confirmation Order**") shall have the meanings ascribed to them in the Plan (as defined below). The rules of interpretation set forth in **Article I.B** of the Plan shall apply to this Confirmation Order.

Claims [Docket No. 81, Ex. 6A] (the "**First Lien Claims**") and Class 4 Claims [Docket No. 81, Ex. 6B] (the "**Second Lien Claims**"), (iv) with respect to Class 3, (A) the Election/Subscription Form [Docket No. 81, Ex. 8B], and (B) the Rights Offering and Election Procedures [Docket No. 81, Ex. 8A], in each case in accordance with the terms of title 11 of the United States Code (the "**Bankruptcy Code**"), the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), and the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**");

c.      commenced the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") on April 4, 2024 (the "**Petition Date**");

d.      filed, on April 4, 2024, (i) the *Declaration of Salvatore Lombardi in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 4], (ii) the *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline, Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline, (IV) Waiving the Requirement to Hold the Creditors' Meeting and File SOFAs, Schedules, and 2015.3 Reports, and (V) Granting Related Relief* [Docket No. 25] (the "**Scheduling Motion**"), (iii) the Disclosure Statement, and (iv) the Plan;

e.      obtained, on April 4, 2024, entry of the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline, Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline, (IV) Waiving the Requirement to Hold the Creditors' Meeting and File SOFAs, Schedules, and 2015.3 Reports, and (V) Granting Related Relief* [Docket No. 81] (the "**Scheduling Order**");

f.      caused the *Notice of (I) Commencement of Chapter 11 Bankruptcy Cases, (II) Hearing on the Disclosure Statement, Confirmation of the Joint Prepackaged Chapter 11 Plan, and Related Matters, and (III) Objection Deadlines and Summary of the Debtors' Joint Prepackaged Chapter 11 Plan* [Docket No. 81, Ex. 2] (the "**Combined Hearing Notice**"), the *Notice of (A) Non-Voting Status to Holders or Potential Holders of (I) Unimpaired Claims or Equity Interests Conclusively Presumed to Accept the Plan and (II) Impaired Claims or Equity Interest Conclusively Deemed to Reject the Plan and (B) Opportunity for Holders of Claims and Equity Interest to Opt Out of the Third Party Release* [Docket No. 81, Ex. 4] (the "**Non-Voting Status Notice**"), and the *Holders of Claims and Holders of Interest Opt-Out Form* [Docket No. 81, Ex. 5] (the "**Opt-Out Form**") to be distributed on or about April 8, 2024, in accordance with the Bankruptcy Code, the

2

Bankruptcy Rules, the Bankruptcy Local Rules, the *Procedures for Complex Chapter 11 Bankruptcy Cases* for the U.S. Bankruptcy Court for the Southern District of Texas, and the Scheduling Order, as evidenced by the certificate of service filed on April 15, 2024 [Docket No. 153] (together with all the exhibits thereto, the "**Combined Notice Affidavit**");

g.  caused the Confirmation Hearing Notice to be published in *The New York Times* (National Edition) on April 8, 2024 [Docket No. 81, Ex. 3] (the "**Publication Notice**"), as evidenced by the *Proof of Publication* filed on April 9, 2024 [Docket No. 129] (the "**Publication Affidavit**");

h.  entered into that certain Equity Backstop Commitment Agreement by and among PVKG Investment, C1 Holdings, PVKG Intermediate, and the Investors, dated as of May 10, 2024 (as may be modified, amended, or supplemented from time to time, and together with all schedules and exhibits appended thereto, the "**Backstop Agreement**");

i.  filed, on May 10, 2024, the *Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 295] (the "**Initial Plan Supplement**");

j.  filed, on May 14, 2024, (i) the *Debtors' (I) Memorandum of Law in Support of Confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates and (II) Omnibus Reply to Plan Confirmation Objections* [Docket No. 324] (the "**Confirmation Brief**"); (ii) the *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 325] (the "**Solicitation Affidavit and Voting Report**" and, together with the Combined Notice Affidavit and Publication Affidavit, the "**Affidavits**"); (iii) the *Declaration of Rui Goncalves in Support of (I) Approval of the Debtors' Disclosure Statement and (II) Confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 326] (the "**Goncalves Declaration**"); (iv) the *Declaration of Stephen A. Spitzer in Support of (I) Approval of the Debtors' Disclosure Statement and (II) Confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 327] (the "**Spitzer Declaration**" and, together with the Goncalves Declaration, the "**Confirmation Declarations**"); and (v) the *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates (Technical Modifications)* [Docket No. 328];

k.  filed, on May 17, 2024, the *First Amended Plan Supplement for the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 357] (together with the Initial Plan

007216

**App. 923**

Supplement and any amendments and supplements thereto filed prior to the Effective Date, the "**Plan Supplement**"); and

l.      continued to operate their businesses and manage their properties during these Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Court having:

a.      entered the Scheduling Order on April 4, 2024;

b.      set April 17, 2024 at 4:00 p.m. (prevailing Central Time) as the deadline for voting on the Plan (the "**Voting Deadline**");

c.      set May 7, 2024 at 4:00 p.m. (prevailing Central Time) as the deadline for filing objections to final approval of the Disclosure Statement and Confirmation of the Plan (the "**Objection Deadline**");

d.      scheduled May 17, 2024 at 1:00 p.m. (prevailing Central Time) as the date and time for the hearing to consider approval of the Disclosure Statement on a final basis and Confirmation of the Plan pursuant to sections 1125, 1126, 1128, and 1129 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018, as set forth in the Scheduling Order, as continued to May 22, 2024 at 11:00 a.m. (prevailing Central Time) (the "**Combined Hearing**");

e.      reviewed the Plan, the Disclosure Statement, the Scheduling Motion, the Plan Supplement, the Confirmation Brief, the Confirmation Declarations, the Affidavits, the Combined Hearing Notice, the Publication Notice, and all filed pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement on a final basis and Confirmation of the Plan, including all objections, statements, and reservations of rights;

f.      considered the Restructuring Transactions incorporated and described in the Plan or Plan Supplement, as applicable;

g.      held the Combined Hearing;

h.      reviewed the discharge, compromises, settlements, releases, exculpation, and injunctions set forth in the Plan;

i.      heard the statements and arguments made by counsel in respect of approval of the Disclosure Statement on a final basis and Confirmation of the Plan;

j.      considered all oral representations, live testimony, proffered testimony, documents, filings, exhibits, and other evidence regarding approval of the Disclosure Statement on a final basis and Confirmation of the Plan;

007217

**App. 924**

k.      overruled (i) any and all objections to final approval of the Disclosure Statement and Confirmation, except as otherwise stated or indicated on the record, and/or (ii) all statements and reservations of rights not consensually resolved, agreed to, or withdrawn, unless otherwise indicated; and

l.      taken judicial notice of all pleadings and other documents filed, all orders entered, and all evidence and arguments presented in these Chapter 11 Cases.

NOW, THEREFORE, it appearing to the Court that notice of the Combined Hearing and the opportunity for any party in interest to object to Confirmation of the Plan having been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of approval of the Disclosure Statement on a final basis and Confirmation of the Plan and other evidence presented at the Combined Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefore, the Court makes and issues the following findings of fact and conclusions of law, and orders:

### Findings of Fact and Conclusions of Law

**IT IS HEREBY FOUND, DETERMINED, ADJUDGED, DECREED, AND ORDERED THAT:**

**A.      Findings and Conclusions.**

1.      The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7052 and 9014. To the extent any of the following conclusions of law constitute findings of fact, or vice versa, there are adopted as such.

**B.      Jurisdiction, Venue, and Core Proceeding.**

2.      This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. The Court has exclusive jurisdiction to determine

007218
**App. 925**

whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, respectively.  Consideration of whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code are core proceedings as defined in 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this district pursuant to sections 1408 and 1409 of title 28 of the United States Code.

**C.**     **Eligibility for Relief.**

3.     The Debtors were and are Entities eligible for relief under section 109 of the Bankruptcy Code.  The Debtors are a proper plan proponent under section 1121(a) of the Bankruptcy Code.

**D.**     **Commencement and Joint Administration of These Chapter 11 Cases.**

4.     On the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  In accordance with the *Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 41], these Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015.  Since the Petition Date, the Debtors have operated their businesses as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

**E.**     **Judicial Notice.**

5.     The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court, including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases.

F.      **Plan Supplement.**

6.      The Plan Supplement (including as amended, supplemented, or otherwise modified from time to time) complies with the Bankruptcy Code and the terms of the Plan, and the Debtors provided good and proper notice of the filing of the Plan Supplement in accordance with the Scheduling Order, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all other applicable rules, laws, and requirements.  No other or further notice will be required with respect to the Plan Supplement or any of the documents contained therein or related thereto.  All documents included in the Plan Supplement and all other documents necessary or appropriate to implement the Plan are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan and the RSA, and only consistent therewith and subject to all consent rights provided therein, the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement and any of the documents contained therein or related thereto or the Plan before the Effective Date.

G.      **Modifications to the Plan.**

7.      Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan described or set forth in this Confirmation Order constitute technical or clarifying changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest under the Plan.  These modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and notice of these modifications was adequate and appropriate under the facts and circumstances of these Chapter 11 Cases.  In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes on the Plan under section 1126 of the Bankruptcy Code, and they do not require the Holders of Claims or Interests be

7

afforded an opportunity to change previously cast votes accepting or rejecting the Plan. Accordingly, the Plan is properly before this Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

**H.** **Objections Overruled.**

8.     Any resolution or disposition of objections (whether formal or informal), reservations of rights, statements, or joinders with respect to approval of the Disclosure Statement on a final basis and Confirmation explained or otherwise ruled upon by the Court on the record at the Combined Hearing is hereby incorporated by reference.   All unresolved objections, reservations of rights, statements, and joinders are hereby overruled on the merits.

**I.** **Adequacy of the Disclosure Statement.**

9.     The Disclosure Statement contains "adequate information" as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code with respect to the Debtors, the Plan, and the transactions contemplated therein.

**J.** **Scheduling Order and Notice.**

10.     The Scheduling Order conditionally approved the Disclosure Statement and established the Voting Deadline and the Objection Deadline.  As evidenced by the Affidavits, and the record in the Chapter 11 Cases, the Debtors provided due, adequate, and sufficient notice of the Plan and Disclosure Statement, the Scheduling Order, the Solicitation Materials, the Plan Supplement, the discharge, compromise, settlement, release, exculpation, and injunction provisions contained in the Plan, the ability to opt-out of the Third-Party Release (as defined below), the Combined Hearing, the Voting Deadline, the Objection Deadline, and any other applicable dates described in the Scheduling Order in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3016, 3017, and 3020(b), the Bankruptcy

Local Rules, the Complex Case Procedures, the Solicitation Procedures, and the Scheduling Order. No other or further notice is or shall be required.

### K.   Notice.

11.   As evidenced by the Affidavits, the Debtors provided due, adequate, and sufficient notice of the commencement of these Chapter 11 Cases, the Plan (and the opportunity to opt out of the Third-Party Release), the Rights Offering, the Disclosure Statement, the Combined Hearing, the Plan Supplement, and all of the other materials distributed by the Debtors in connection with Confirmation of the Plan in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Bankruptcy Local Rules, and the procedures set forth in the Scheduling Order.   The Debtors provided due, adequate, and sufficient notice of the Objection Deadline, the Combined Hearing, and any applicable bar dates and hearings described in the Scheduling Order or the Plan, as applicable, in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Scheduling Order. No other or further notice is or shall be required.

### L.   Ballots.

12.   The Classes of Claims entitled under the Plan to vote to accept or reject the Plan (the "**Voting Classes**") are set forth below:

| Class | Designation |
|-------|-------------|
| 3 | First Lien Claims |
| 4 | Second Lien Claims |

13.   The ballots (the "**Ballots**") the Debtors used to solicit votes to accept or reject the Plan from Holders in the Voting Classes adequately addressed the particular needs of these Chapter 11 Cases and were appropriate for Holders in the Voting Classes to vote to accept or reject the Plan.

9

**M.    Solicitation.**

14.    As described in the Solicitation Affidavit and Voting Report, the solicitation of votes on the Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases and complied with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any other applicable rules, laws, and regulations, including the registration requirements under the United States Securities Act of 1933 (as amended, the "**Securities Act**").

15.    As described in the Solicitation Affidavit and Voting Report, as applicable, the Solicitation Packages were transmitted and served on all holders in the Voting Classes in compliance with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Bankruptcy Local Rules, the Scheduling Order, and any applicable non-bankruptcy law.  Transmission and service of the Solicitation Packages was timely, adequate, and sufficient under the facts and circumstances of these Chapter 11 Cases.

16.    As set forth in the Solicitation Affidavit and Voting Report, the Solicitation Packages were distributed to Holders in the Voting Classes that held a Claim as of April 1, 2024 (the "**Voting Record Date**").  The establishment and notice of the Voting Record Date was reasonable and sufficient.

17.    The period during which the Debtors solicited acceptances of or rejections to the Plan was a reasonable and sufficient period of time for each Holder in the Voting Classes to make an informed decision to accept or reject the Plan.

18.    Under section 1126(f) of the Bankruptcy Code, Holders of Claims in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), and Class 5 (General Unsecured Claims) (collectively, the "**Deemed Accepting Classes**") are Unimpaired and conclusively presumed to

007223
**App. 930**

have accepted the Plan. The Debtors were therefore not required to, and did not, solicit votes from the Deemed Accepting Classes. Further, the Debtors were not required to, and did not, solicit votes from the Holders of Claims or Interests in Class 7 (Section 510 Claims) and Class 9 (Existing C1 Interests) (collectively, the "**Deemed Rejecting Classes**"), which are Impaired and deemed to reject the Plan. Holders of Claims in Class 6 (Intercompany Claims) and Holders of Interests in Class 8 (Intercompany Interests) are Unimpaired and conclusively presumed to have accepted the Plan (to the extent reinstated) or are Impaired and deemed to reject the Plan (to the extent cancelled), and, in either event, are not entitled to vote to accept or reject the Plan. The Debtors served Holders in the non-voting Classes with the Combined Notice and the Non-Voting Status Notice, including the Opt-Out Form.

19.     The Debtors served the Combined Hearing Notice and/or the Non-Voting Status Notice on the entire creditor matrix, including all creditors who hold debt issued by the Debtors, and all equity holders of record, as applicable. The Combined Hearing Notice and/or the Non-Voting Status Notice adequately summarized the material terms of the Plan, the classification and treatment of claims and the release, exculpation, and injunction provisions of the Plan. Further, because stakeholders were able to opt out of the Third-Party Release through the Ballot or the Opt-Out Form, every known stakeholder (including Unimpaired creditors and equity holders) was provided with the means by which the stakeholders could opt out of the Third-Party Release.

**N.     Voting.**

20.     As evidenced by the Solicitation Affidavit and Voting Report, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Disclosure Statement, the Scheduling Order, and any applicable non-bankruptcy law, rule, or regulation. As evidenced

by the Solicitation Affidavit and Voting Report, Class 3 and Class 4 have voted to accept the Plan in accordance with the requirements of sections 1126 and 1129 of the Bankruptcy Code.

**O.      Bankruptcy Rule 3016.**

21.      The Plan and any modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b).  The injunction, release, and exculpation provisions in the Disclosure Statement and Plan describe, in bold font and with specific and conspicuous language, all acts to be enjoined by such injunction and identify the Entities that will be subject to such injunction, thereby satisfying Bankruptcy Rule 3016(c).

**P.      Burden of Proof.**

22.      The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.  In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard. Each witness who testified or submitted a declaration on behalf of the Debtors or any other party, in support of the Disclosure Statement, Plan, and Confirmation in connection with the Combined Hearing was credible, reliable, and qualified to testify as to the topics addressed in their testimony.

**Q.      Compliance with Bankruptcy Code Requirements – 11 U.S.C. § 1129(a)(1).**

23.      The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code.

**i.      Proper Classification – 11 U.S.C. §§ 1122 and 1123.**

24.      The classification of Claims under the Plan is proper and satisfies the requirements of section 1122(a) and 1123(a) of the Bankruptcy Code.  **Article III** of the Plan provides for the

separate classification of Claims and Interests into nine (9) Classes other than Administrative Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, and Claims for Restructuring Expenses, which need not be classified.  Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests.  The classifications reflect no improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests.  Each Class of Claims and Class of Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

        ii.        **Specified Unimpaired Classes – 11 U.S.C. § 1123(a)(2).**

25.      The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code. **Article III** of the Plan specifies that Claims, as applicable, in the following Classes are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code:

| Class | Claims |
|-------|--------|
| 1 | Other Secured Claims |
| 2 | Other Priority Claims |
| 5 | General Unsecured Claims |

Additionally, **Article II** of the Plan specifies that Allowed Administrative Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, and Claims for Restructuring Expenses will be paid in full in accordance with the terms of the Plan, although these Claims are not classified under the Plan.

        iii.       **Specified Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3).**

26.      The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. **Article III** of the Plan specifies that Claims and Interests, as applicable, in the following Classes (the "**Impaired Classes**") are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes:

13

| Class | Claims and Interests |
|---|---|
| 3 | First Lien Claims |
| 4 | Second Lien Claims |
| 7 | Section 510 Claims |
| 9 | Existing C1 Interests |

    **iv.**    **No Discrimination – 11 U.S.C. § 1123(a)(4).**

27.    The Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code. The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to less favorable treatment of such Claim or Interest.

    **v.**    **Adequate Means for Plan Implementation – 11 U.S.C. § 1123(a)(5).**

28.    The Plan satisfies the requirements of 1123(a)(5) of the Bankruptcy Code. The provisions in **Article IV** and elsewhere in the Plan, and in the exhibits and attachments to the Plan (including the Plan Supplement) and the Disclosure Statement, provide, in detail, adequate and proper means for the Plan's implementation, including: (a) the general settlement of Claims and Interests; (b) authorization for the Debtors and/or Reorganized Debtors to take all actions necessary to effectuate the Plan, including those actions necessary or appropriate to effectuate the Restructuring Transactions, the Rights Offering, the Backstop Agreement, and any restructuring transaction steps set forth in the Plan Supplement and the Transaction Steps, as the same may be modified or amended from time to time prior to the Effective Date; (c) the entry into, delivery of and implementation of the Definitive Documents and other transaction documents contemplated by the Plan; (d) the funding and sources of consideration for the Plan distributions, including the Exit Facilities, the Rights Offering and the Backstop Agreement, the New Equity Interests, and Cash on hand; (e) preservation of the Debtors' corporate existence following the Effective Date (except as otherwise provided in the Plan); (f) the vesting of the Estates' assets in the respective

14

Reorganized Debtors; (g) cancellation of the Interests, (h) the cancellation of certain existing agreements as provided in the Plan and Confirmation Order; (i) the authorization and approval of corporate actions under the Plan; (j) the adoption and authorization of and entry into the Governance Documents; (k) the appointment of the New Board; (l) the effectuation and implementation of other documents and agreements contemplated by, or necessary to effectuate, the transactions contemplated by the Plan; (m) the assumption of certain employment obligations; (n) the preservation of Claims and Causes of Action not released pursuant to the Plan; and (o) the closing of certain of the Chapter 11 Cases.

29.     The precise terms governing the execution of these transactions are set forth in greater detail in the applicable Definitive Documents or form of agreements or other documents included in the Plan Supplement or other documents related to the Plan.

**vi.     Voting Power of Equity Securities – 11 U.S.C. § 1123(a)(6).**

30.     The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code. **<u>Article IV.J</u>** of the Plan provides that the Governance Documents will comply with section 1123(a)(6) of the Bankruptcy Code.  The Governance Documents prohibit the issuance of non-voting equity securities to the extent required to comply with section 1123(a)(6) of the Bankruptcy Code.

**vii.     Directors and Officers – 11 U.S.C. § 1123(a)(7).**

31.     The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. **<u>Article IV.K</u>** of the Plan sets forth the structure of the New Board, which shall consist of members as designated in accordance with the Governance Term Sheet.

15

viii.   **Impairment / Unimpairment of Classes – 11 U.S.C. § 1123(b)(1).**

32.   The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.  **Article III**

of the Plan impairs or leaves Unimpaired each Class of Claims and Interests.

ix.   **Assumption – 11 U.S.C. § 1123(b)(2).**

33.   The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.  **Article V**

of the Plan provides for the assumption of all of the Debtors' Executory Contracts and Unexpired

Leases, other than the Rejected Contracts and/or Unexpired Leases identified on the Rejected

Executory Contract and Unexpired Lease List and as otherwise provided in **Article V.A** of the

Plan, and the payment of Cure Claims, if any, related thereto, not previously assumed, assumed

and assigned, or rejected during these Chapter 11 Cases under section 365 of the Bankruptcy Code.

The assumption of Executory Contracts and Unexpired Leases may include the assignment of

certain of such contracts to Affiliates.

34.   The Debtors' determinations regarding the assumption (or assumption and

assignment) or rejection of Executory Contracts and Unexpired Leases are based on, and within,

the sound business judgment of the Debtors, are necessary to the implementation of the Plan, and

are in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other

parties-in-interest in the Chapter 11 Cases.  Entry of this Confirmation Order by the Court shall

constitute approval of such assumptions, assumption and assignments, and/or rejections, as

applicable, including the assumption of the Executory Contracts or Unexpired Leases as provided

in the Plan Supplement pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

x.   **Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action – 11 U.S.C. § 1123(b)(3).**

35.   **Compromise and Settlement.**  In accordance with section 1123(b)(3)(A) of the

Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification,

16

distributions, releases, and other benefits provided pursuant to the Plan, including the PVKG Note Claims Settlement, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims, Interests, and controversies (including the PVKG Note Claims Settlement) resolved pursuant to the Plan, including any challenge to the amount, validity, perfection, enforceability, priority, or extent of the First Lien Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise.  Entry of this Confirmation Order shall constitute the entry of an order approving the settlement of all such Claims, Interests, and controversies under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  The compromise and settlement of such Claims and Interests embodied in the Plan and reinstatement and unimpairment of other Classes identified in the Plan are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

36.    **Debtor Release.**  **Article VIII.C** of the Plan describes certain releases granted by the Debtors (the "**Debtor Release**").  The Debtors have satisfied the business judgment standard under Bankruptcy Rule 9019 with respect to the propriety of the Debtor Release.  The Debtor Release is a necessary and integral element of the Plan, and is fair, reasonable, and in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.  The Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; (f) narrowly tailored to the circumstances of the Chapter 11 Cases; and (g) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any

Claim or Cause of Action released pursuant to the Debtor Release.  The Debtor Release for the Debtor Related Parties is appropriate because the Debtor Related Parties share an identity of interest with the Debtors, supported the Plan and these Chapter 11 Cases, and actively participated in meetings, negotiations, and implementation during these Chapter 11 Cases, and have provided other valuable consideration to the Debtors to facilitate the Debtors' reorganization.

37.  **Third-Party Release.  Article VIII.D** of the Plan describes certain releases granted by the Releasing Parties (the "**Third-Party Release**").  The Third-Party Release provides finality for the Debtors, the Reorganized Debtors, and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Reorganized Debtors.  The Combined Notice sent to Holders of Claims and Interests, the Publication Notice published in the *New York Times* on April 8, 2024, the Non-Voting Status Notice sent to all Holders of Claims and Interest not entitled to vote on the Plan, the Ballots sent to all Holders of Claims entitled to vote on the Plan, in each case, unambiguously stated that the Plan contains the Third-Party Release.  Such release is a necessary and integral element of the Plan, and is fair, equitable, reasonable, and in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests.  Also, the Third-Party Release is: (a) consensual; (b) essential to the formulation, Confirmation, and implementation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good-faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; (h) narrowly tailored to the circumstances of the Chapter 11 Cases; and (i) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

007231

**App. 938**

38.     The Third-Party Release is consensual as to all relevant parties, including all Releasing Parties, and such parties were provided notice of the Chapter 11 Cases, the Plan, and the deadline to object to Confirmation of the Plan, received the Combined Hearing Notice and/or the Non-Voting Status Notice, and were properly informed that any Holder of a Claim against or Interest in the Debtors that did not check the "Opt Out" box on the applicable Ballot or Opt Out Form, returned in advance of the Voting Deadline, would be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all claims and Causes of Action against the Debtors and the Released Parties. Additionally, the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, the Non-Voting Status Notice, and the Combined Hearing Notice.

37.     The Third-Party Release provides finality for the Debtors, the Reorganized Debtors, and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Reorganized Debtors.  The scope of the Third-Party Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases.

39.     **Exculpation.**  The exculpation, described in **Article VIII.E** of the Plan (the "**Exculpation**"), is appropriate under applicable law, including *In re Highland Capital Mgmt., L.P.*, 48 F. 4th 419 (5th Cir. 2022), because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope.  Without limiting anything in the Exculpation, each Exculpated Party has participated in these Chapter 11 Cases in good faith and is appropriately released and exculpated from any obligation, Cause of Action, or liability for any prepetition or post-petition act taken or omitted to be taken in connection with, relating to, or arising out of the Debtors'

19

restructuring efforts, the RSA, the Rights Offering, and the Backstop Agreement, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or the Plan or any contract, instrument, release, or other agreement or document created or entered into, in connection with, or pursuant to the RSA, the Disclosure Statement or the Plan, the filing of these Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. The Exculpation, including its carveout for actual fraud, willful misconduct, and gross negligence, is consistent with applicable law in this jurisdiction.

40.    The Exculpated Parties shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan (including the Rights Offering and the Backstop Agreement).

007233

**App. 940**

41.   **Injunction.**   The injunction provision set forth in **Article VIII.F** of the Plan is necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Releases, the Third-Party Release, and the Exculpation, and is narrowly tailored to achieve this purpose.

42.   Notwithstanding anything to the contrary in this Confirmation Order, no Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to **Articles VIII.C**, **VIII.D**, **VIII.E**, or **VIII.F** of the Plan, without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (b) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party, as applicable.

43.   **Preservation of Causes of Action.**   The provisions set forth in **Article IV.Q** of the Plan regarding the preservation of Causes of Action in the Plan, subject to the PVKG Note Claims Settlement and **Article VIII** of the Plan, are appropriate and are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights, as applicable, to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the PVKG Note Claims Settlement and the releases

007234
**App. 941**

and exculpations contain in the Plan, including in **Article VIII** thereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

44.     **Lien Release.**   The release and discharge of mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in **Article VIII.B** of the Plan (the "**Lien Release**") is essential to the Plan and necessary to implement the Plan.   The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

<h3 style="text-align:center">xi.      Additional Plan Provisions – 11 U.S.C. § 1123(b)(6).</h3>

45.     The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

<h3 style="text-align:center">R.      Debtor Compliance with the Bankruptcy Code – 11 U.S.C. § 1129(a)(2).</h3>

46.     The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code and, thus, have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1128, and 1129, and Bankruptcy Rules 2022, 3017, 3018, and 3019.   The Debtors and their agents transmitted the Solicitation Materials and related documents and solicited and tabulated votes with respect to the Plan fairly, in good faith, and in compliance with the Scheduling Order, the Solicitation Procedures, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Case Procedures, including, but not limited to, sections 1125 and 1126(b) of the Bankruptcy Code.

<h3 style="text-align:center">S.      Plan Proposed in Good Faith – 11 U.S.C. § 1129(a)(3).</h3>

47.     The Debtors have proposed the Plan (including the Plan Supplement and all other documents necessary or appropriate to effectuate the Plan) in good faith and not by any means

22

forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of these Chapter 11 Cases, the Plan, the RSA, the Backstop Agreement, the process leading to Confirmation, including the overwhelming support of Holders of Claims for the Plan, and the transactions to be implemented pursuant thereto.  The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Plan, the Disclosure Statement, the hearing to conditionally approve the Disclosure Statement, and the record of the Combined Hearing and other proceedings held in the Chapter 11 Cases.  These Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate and honest purpose of maximizing the value of the Estates and allowing the Debtors to implement the Restructuring Transactions, reorganize, and emerge from bankruptcy with a capital structure that will allow them to conduct their businesses and satisfy their obligations with sufficient liquidity and capital resources.  Further, the Plan's classification, settlement, discharge, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's-length, are consistent with sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and each is integral to the Plan, supported by valuable consideration, and necessary to the Debtors' successful reorganization.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

     **T.**     **Payment for Services or Costs and Expenses – 11 U.S.C. § 1129(a)(4).**

48.     The procedures set forth in the Plan for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

U.      **Directors, Officers, and Insiders – 11 U.S.C. § 1129(a)(5).**

49.      **Article IV.K** of the Plan sets forth the structure of the New Board, which shall consist of members as designated in accordance with the Governance Term Sheet.  The members of the New Board and the officers of the Reorganized Debtors will be disclosed on or before the Effective Date.  Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

V.      **No Rate Changes – 11 U.S.C. § 1129(a)(6).**

50.      Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases.  Further, as the Plan proposes no rate change subject to the jurisdiction of any governmental regulatory commission, section 1129(a)(6) of the Bankruptcy Code is satisfied.

W.      **Best Interest of Creditors – 11 U.S.C. § 1129(a)(7).**

51.      The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The liquidation analysis attached as **Exhibit E** to the Disclosure Statement, the Spitzer Declaration, and the other evidence related thereto in support of the Plan that was proffered prior to, or in connection with the Combined Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims in each Class will recover at least as much under the Plan on account of such Claim, as of the Effective Date, as such Holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code. As a result, the Debtors have demonstrated that the Plan is in the best interests of their creditors, and the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

007237

**X.     Acceptance by Certain Classes – 11 U.S.C. § 1129(a)(8).**

52.     Classes 1, 2, and 5 constitute the Unimpaired Classes, each of which is conclusively

presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.

As evidenced by the Solicitation Affidavit and Voting Report, Classes 3 and 4 have voted to accept

the Plan.  Holders of Claims and Interests in Classes 6 and 8 are Unimpaired and conclusively

presumed to have accepted the Plan (to the extent reinstated) or are Impaired and deemed to reject

the Plan (to the extent cancelled), and, in either event, are not entitled to vote to accept or reject

the Plan.  Holders of Claims and Interests in Classes 7 and 9 receive no recovery on account of

their Claims and Interests under the Plan and are deemed to reject the Plan.  Notwithstanding the

foregoing, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the

Bankruptcy Code.

**Y.     Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code – 11 U.S.C. § 1129(a)(9).**

53.     The treatment of Administrative Claims, DIP Claims, Professional Fee Claims, DIP

Claims, Priority Tax Claims, and Claims for Restructuring Expenses under **Article II** of the Plan,

and of Other Priority Claims under **Article III** of the Plan, satisfies the requirements of, and

complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**Z.     Acceptance by At Least One Impaired Class – 11 U.S.C. § 1129(a)(10).**

54.     The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

As evidenced by the Solicitation Affidavit and Voting Report, Class 4, which is Impaired, voted

to accept the Plan by the requisite number and amount of Claims, determined without including

any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the

Bankruptcy Code), as specified under the Bankruptcy Code.  Accordingly, the requirements of

section 1129(a)(10) of the Bankruptcy Code are satisfied.

**AA.**     **Feasibility – 11 U.S.C. § 1129(a)(11).**

55.     The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The financial projections attached as **Exhibit C** to the Disclosure Statement and the other evidence supporting Confirmation of the Plan proffered or adduced by the Debtors at, prior to, or in the Confirmation Declarations filed in connection with the Combined Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been rebutted by other evidence; (d) establish that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors under the Plan, except as provided in the Plan; and (e) establish that the Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan.   Accordingly, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**BB.**     **Payment of Fees – 11 U.S.C. § 1129(a)(12).**

56.     **Article XII.D** of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).   Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**CC.**     **Continuation of Employee Benefits – 11 U.S.C. § 1129(a)(13).**

57.     The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code. **Article IV.O** of the Plan provides that, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

007239
**App. 946**

DD.   **Non-Applicability of Certain Sections – 11 U.S.C. § 1129(a)(14), (15), and (16).**

58.   Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases.  The Debtors owe no domestic support obligations, are not individuals, and are not non-profit corporations.

EE.   **"Cram Down" Requirements – 11 U.S.C. § 1129(b).**

59.   The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that the Deemed Rejecting Classes and Classes 6 and 8, as applicable, have rejected or been deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code.  *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met.  *Second*, the Plan is fair and equitable with respect to the Deemed Rejecting Classes and Classes 6 and 8, as applicable.  The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and (b) no Holder of a Claim or Interest in a Class senior to each such Class is receiving more than 100% on account of its Claim or Interest. Accordingly, the Plan is fair and equitable to all Holders of Claims and Interests in the Deemed Rejecting Classes and Classes 6 and 8.  *Third*, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes and Classes 6 and 8 because all similarly situated creditors and interest holders will receive substantially similar treatment on account of their Claims and Interests irrespective of Class.  Holders of First Lien Claims and Second Lien Claims voted to accept the Plan in sufficient number and in sufficient amount to constitute accepting classes under the Bankruptcy Code.  Therefore, the Plan satisfies section 1129(b) of the Bankruptcy Code and can be confirmed.

007240

**App. 947**

FF.     **Only One Plan – 11 U.S.C. § 1129(c).**

60.     The Plan (including previous versions thereof) is the only chapter 11 plan filed in each of these Chapter 11 Cases and, accordingly, satisfies section 1129(c) of the Bankruptcy Code.

GG.     **Principal Purpose of the Plan – 11 U.S.C. § 1129(d).**

61.     No Governmental Unit has requested that the Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  As evidenced by its terms, the principal purpose of the Plan is not such avoidance.  Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

HH.     **Not Small Business Cases – 11 U.S.C. § 1129(e).**

62.     None of these Chapter 11 Cases is a "small business case," as that term is defined in the Bankruptcy Code, and accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

II.     **Good Faith Solicitation – 11 U.S.C. § 1125(e).**

63.     The Debtors and each of the Released Parties and Exculpated Parties have acted fairly, in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the negotiation, execution, delivery, and performance of the RSA, the Rights Offering and Election Procedures, the Backstop Agreement, the solicitation and tabulation of votes on the Plan, and the activities described in 1125 of the Bankruptcy Code, as applicable, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code, and solicitation of acceptances of the Plan, as applicable, are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

007241
**App. 948**

64.     The Debtors and their Related Parties have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(g), with regard to the offering, issuance, and distribution of recoveries under the Plan and the Backstop Agreement and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

**JJ.     Satisfaction of Confirmation Requirements.**

65.     Based on the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

**KK.     Valuation.**

66.     The valuation analysis attached as **Exhibit D** to the Disclosure Statement (the "**Valuation Analysis**"), the evidence adduced at the Combined Hearing, and the estimated post-emergence enterprise value of the Reorganized Debtors are reasonable and credible.  All parties in interest have been given a fair and reasonable opportunity to challenge the Valuation Analysis. The Valuation Analysis is: (a) reasonable, persuasive, and credible as of the date such analysis was prepared, presented, or proffered; and (b) uses reasonable and appropriate methodologies and assumptions.

**LL.     Likelihood of Satisfaction of Conditions Precedent to the Effective Date.**

67.     Each of the conditions precedent to the Effective Date, as set forth in **Article IX.A** of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with **Article IX.B** of the Plan.

007242
**App. 949**

**MM.   Implementation.**

68.     All documents and agreements necessary to implement the Plan, including the Definitive Documents, the Plan Supplement, and all other relevant and necessary or desirable documents have been negotiated in good faith and at arm's-length and shall, upon completion of documentation and execution, including any securities issued thereunder, be valid, binding, and enforceable agreements, not avoidable and not in conflict with any federal, state, or foreign law. Consummation of the transactions contemplated by each such document or agreement is in the best interest of the Debtors, their Estates, and Holders of Claims.  The Debtors have exercised reasonable business judgment in determining which documents and agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.

**NN.   Disclosure of Facts.**

69.     The Debtors have disclosed all material facts regarding the Plan, including with respect to the Restructuring Transactions, and the fact that each Reorganized Debtor will emerge from its Chapter 11 Case as a validly existing corporation, limited liability company, partnership, or other form, as applicable.

**OO.   Essential Elements of the Plan.**

70.     The Debtors, the Released Parties, and the Exculpated Parties have been, are, and will continue to be acting in good faith within the meaning of section 1125(e) of the Bankruptcy Code if they proceed to: (a) consummate the Plan, the Restructuring Transactions, the Rights Offering, the Backstop Agreement, the Exit Facilities Documents, and the agreements, settlements, transactions, transfers, and other actions contemplated thereby, regardless of whether such agreements, settlements, transactions, transfers, and other actions are expressly authorized by this Confirmation Order; and (b) take any actions authorized and directed or contemplated by this Confirmation Order.

30

**PP.   New Equity Interests.**

71.     The issuance of New Equity Interests is a necessary and integral component of these Restructuring Transactions, fair, reasonable, customary, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are based on good, sufficient, and sound business purposes and justifications, and are supported by reasonably equivalent value and consideration.   The Debtors, the parties to the RSA, and their respective professional advisors negotiated the Plan in good faith and at arm's-length.

**QQ.   Rights Offering.**

72.     The Debtors solicited subscriptions to the Rights Offering in good faith pursuant to the Rights Offering and Election Procedures, applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules and any applicable non-bankruptcy laws, rules, or regulations.   The Rights Offering has complied with the Rights Offering and Election Procedures approved by the Scheduling Order, which are fair, equitable, and reasonable and provide for the Rights Offering to be conducted in a manner that is in the best interests of the Debtors, their Estates, and all stakeholders.

**RR.   Backstop Agreement.**

73.     The evidence in support of the Plan proffered or adduced at the Combined Hearing establishes that the entry into the Backstop Agreement is a necessary and integral component of these Restructuring Transactions, and the terms and conditions under the Backstop Agreement are fair, reasonable, customary, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are based on good, sufficient, and sound business purposes and justifications, and are supported by reasonably equivalent value and consideration.   The Debtors, the Backstop Parties, and their respective professional advisors negotiated the Backstop Agreement in good faith and at arm's-length.

007244
**App. 951**

**SS.    Exit Facilities.**

74.    The terms and conditions of the Exit Facilities and the Debtors' entry into the Exit Facilities Documents, including all actions, undertakings, and transactions contemplated thereby, and payment of all fees, indemnities, and expenses provided for thereunder, are essential elements of the Plan, necessary for the consummation thereof, and in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.  The Exit Facilities are critical to the overall success and feasibility of the Plan, and the Debtors have exercised reasonable business judgment in determining to enter into the Exit Facilities Documents, which have been negotiated in good faith and at arm's-length, without the intent to hinder, delay, or defraud any creditor of the Debtors, and any credit extended and loans made or deemed to be made to the Debtors prior to the Effective Date or the Reorganized Debtors pursuant to the Exit Facilities, and any fees paid thereunder, are deemed to have been extended, issued, and made, or deemed made in good faith and for legitimate business purposes.

<u>Order</u>

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

75.    <u>**Findings of Fact and Conclusions of Law.**</u>  The above findings of fact and conclusions of law, as well as any additional findings of fact and conclusions of law announced by the Court at the Combined Hearing, are hereby incorporated in this Confirmation Order.

76.    <u>**Approval of the Disclosure Statement.**</u>  The Disclosure Statement is approved in all respects on a final basis pursuant to section 1125 of the Bankruptcy Code.

77.    <u>**Confirmation of the Plan.**</u>  The Plan, including (a) all modifications to the Plan filed with the Court prior to or during the Combined Hearing and (b) all documents incorporated into the Plan through the Plan Supplement is approved in its entirety and **CONFIRMED** under

section 1129 of the Bankruptcy Code.  All terms of the Plan and the Plan Supplement are incorporated herein by reference and are an integral part of this Confirmation Order.  The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

78.    This Confirmation Order approves the Plan Supplement, including the documents contained therein, as they may be amended through and including the Effective Date in accordance with and as permitted by the Plan, subject to the consent rights set forth therein and in the RSA. The terms of the Plan, the Plan Supplement, and the exhibits thereto are incorporated herein by reference and are an integral part of this Confirmation Order; *provided* that if there is any direct conflict between the terms of the Plan (including the Plan Supplement) and the terms of this Confirmation Order, the terms of this Confirmation Order shall control solely to the extent of such conflict.

79.    **Objections Overruled.**  All parties have had a full and fair opportunity to be heard on all issues raised by the objections to final approval of the Disclosure Statement and Confirmation of the Plan, and the objections have been fully and fairly litigated or resolved, including by agreed-upon provisions as set forth in this Confirmation Order.  All objections, responses, statements, reservations of rights, and comments in opposition, if any, to final approval of the Disclosure Statement or Confirmation of the Plan that have not been withdrawn, waived, settled, or resolved prior to the Combined Hearing or otherwise resolved on the record of the Combined Hearing or in this Confirmation Order are hereby **OVERRULED** and **DENIED** on the merits, with prejudice.  All objections to entry of this Confirmation Order or to the relief granted

33

herein that were not timely filed and served prior to the Objection Deadline are deemed waived and forever barred.  All withdrawn objections are deemed withdrawn with prejudice.

80.   **Headings.**  Headings utilized herein are for convenience and reference only and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

81.   **Plan Modifications.**  Subsequent to filing the Plan on April 4, 2024, the Debtors made certain technical modifications to the Plan (the "**Plan Modifications**").  The Plan Modifications, which were made in accordance with the RSA, do not materially adversely affect the treatment of any Claim or Interest under the Plan.  After giving effect to the Plan Modifications, the Plan continues to satisfy the requirements of sections 1122 and 1123 of the Bankruptcy Code.  The Debtors provided due and sufficient notice of the Plan Modifications under the circumstances.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

82.   **Deemed Acceptance of Plan.**  In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, Holders of Claims who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan, as modified by the Plan Modifications and this Confirmation Order.  No Holder of a Claim shall be permitted to change its vote as a consequence of the Plan Modifications.

83.   **No Action Required.**  Under the provisions of the Delaware General Corporation Law, including section 303 thereof, and the comparable provisions of the Delaware Limited Liability Company Act, section 1142(b) of the Bankruptcy Code, and any other comparable

34

provisions under applicable law, no action of the respective directors, equity holders, managers, or members of the Debtors is required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, the Restructuring Transactions (subject, in each case, to any consent rights set forth or incorporated therein), and any contract, assignment, certificate, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including the Plan Supplement, and the RSA.

84. **Binding Effect.** Pursuant to **Article XII.A** of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and this Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests voted or are deemed to have accepted the Plan, voted or are deemed to have rejected the Plan, or failed to vote to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, including, without limitation, participants in the Rights Offering and the Investors, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors or the Reorganized Debtors, as applicable. All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan and this Confirmation Order, regardless of whether any such Holder of a Claim or Interest has voted on the Plan. Pursuant to section 1142(a) of the Bankruptcy Code, the Plan, the Plan Supplement, and this Confirmation Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

007248
**App. 955**

85.    **Incorporation by Reference.**  The terms and provisions of the Plan, the Definitive Documents, all other relevant and necessary documents, and each of the foregoing's schedules and exhibits are, on and after the Effective Date, incorporated herein by reference and are an integral part of this Confirmation Order.

86.    **Vesting of Assets in the Reorganized Debtors.**  Except as otherwise provided in the Plan, this Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan or this Confirmation Order, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

87.    **Cancellation of Existing Agreements and Interests.**  On the Effective Date, except with respect to the Exit Facilities, or to the extent otherwise provided in the Plan, including in **Article V.A** of the Plan, this Confirmation Order, or any other Definitive Document, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and any non-Debtor Affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect; *provided, however*, that notwithstanding anything to the contrary contained herein, any agreement that governs the rights of the DIP Agents shall continue in effect solely for purposes of allowing the DIP Agents to (i) enforce their rights against

36

any Person other than any of the Released Parties, pursuant and subject to the terms of the DIP

Orders and the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (ii) receive

distributions under the Plan and to distribute them to the Holders of the Allowed ABL DIP Facility

Claims and Allowed Term DIP Facility Claims, in accordance with the terms of DIP Orders and

the ABL DIP Credit Agreement and the Term DIP Credit Agreement, (iii) enforce its rights to

payment of fees, expenses, and indemnification obligations as against any money or property

distributable to Holders of Allowed ABL DIP Facility Claims and Allowed Term DIP Facility

Claims, in accordance with the terms of DIP Orders and the ABL DIP Credit Agreement and the

Term DIP Credit Agreement, and (iv) appear and be heard in the Chapter 11 Cases or in any

proceeding in this Court, including to enforce any obligation owed to the DIP Agents, or Holders

of the ABL DIP Facility Claims and Term DIP Facility Claims under the Plan, as applicable.

Holders of or parties to such cancelled instruments, securities, and other documentation will have

no rights arising from or relating to such instruments, securities, and other documentation, or the

cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the

Plan.

88.     Notwithstanding the preceding paragraph, any credit agreement or other instrument

that governs the rights, claims, and remedies of the Holder of a Claim shall continue in full force

and effect for the limited purposes of allowing Holders of Allowed Claims to receive distributions

under the Plan and permitting the Reorganized Debtors and any other Distribution Agent, as

applicable, to make distributions on account of the applicable Claims.

89.     On the Effective Date, each holder of a certificate or instrument evidencing a Claim

or Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or

instrument in accordance with the applicable indenture or agreement that governs the rights of

37

such holder of such Claim or Interest.  Such surrendered certificate or instrument shall be deemed canceled as set forth in, and subject to the exceptions set forth in, **Article IV.H** of the Plan.

90.     **Governance Documents.**  On or immediately prior to the Effective Date, the Governance Documents shall be adopted or amended in a manner consistent with the terms and conditions set forth in the Plan and the Plan Supplement, as may be necessary to effectuate the transactions contemplated by the Plan.  Each Reorganized Debtor will file its Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The Governance Documents shall prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, each Reorganized Debtor may amend and restate its constituent and governing documents as permitted by the laws of its jurisdiction of formation and the terms of such documents.

91.     On the Effective Date, New C1 shall enter into and deliver the New Equityholders' Agreement to each Holder of New Equity Interests, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.  On the Effective Date, holders of New Equity Interests shall be deemed to have executed the New Equityholders' Agreement and be parties thereto, in privity of contract with the other parties to the New Equityholders' Agreement and be bound thereby, whether their ownership is recorded in a register maintained with New C1's transfer agent, without the need to deliver signature pages thereto.

007251
**App. 958**

92.     **Effectiveness of All Actions.**  All actions contemplated by the Plan, the RSA, and the Definitive Documents, as the same may be modified from time to time prior to the Effective Date subject, in each case, to the consent rights set forth or incorporated therein (including, for the avoidance of doubt, the Description of Transaction Steps), are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or the Reorganized Debtors and with the effect that such actions had been taken by the unanimous action, consent, approval and vote of each of such officers, directors, managers, members, or equity holders.

93.     **Approval of Restructuring Transactions.**  The Restructuring Transactions set forth in the Plan are hereby approved and authorized in all respects.  After the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, are authorized to consummate the Restructuring Transactions (which, for the avoidance of doubt, shall be in form and substance acceptable to the Required Consenting Lenders, and, subject to the consent rights set forth in the Restructuring Support Agreement, reasonably acceptable to the Required Consenting Second Lien Lenders, and otherwise consistent with the Restructuring Support Agreement) and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan.  Any transfers of assets or equity interests effected, or any obligations incurred through the Restructuring Transactions are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

94.     **Rights Offering.**  The Rights Offering complied with the Rights Offering and Election Procedures set forth in the Scheduling Motion and approved in the Scheduling Order, was

007252
**App. 959**

appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, was conducted in good faith and was in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules and any applicable non-bankruptcy rules, laws, and regulations, including to the extent applicable the registration requirements under the Securities Act.  On the Effective Date, the Debtors are authorized to consummate the Rights Offering in accordance with and pursuant to the applicable terms and conditions of the Rights Offering Documents.

95.     **Backstop Agreement.**  The proposed terms and conditions of, and the Debtors' performance under the Backstop Agreement is an essential element of the Plan and is in the best interest of the Debtors, the Estates, and Holders of Claims and Interests.  The terms and conditions of the Backstop Agreement are fair and reasonable, reflect the Debtors' exercise of reasonable business judgment consistent with their fiduciary duties and is supported by reasonably equivalent value and fair consideration.  The Backstop Agreement was negotiated at arms' length and in good faith, without the intent to hinder, delay, or defraud any creditor of the Debtors.

96.     The Backstop Agreement and the terms and provisions included therein are approved in their entirety pursuant to section 105 and section 363(b) of the Bankruptcy Code, and the Debtors are authorized to enter into the Backstop Agreement and to take any and all actions reasonably necessary and proper to implement the terms of the Backstop Agreement and to fully perform all obligations thereunder on the conditions set forth therein.  The specified premiums, payments, obligations, indemnification obligations, and expenses contemplated to be paid by the Debtors pursuant to the Backstop Agreement, including the Direct Investment, the Backstop Commitment, the Direct Investment Commitment, and the Put Option Premium are hereby approved as reasonable and shall not be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable, or otherwise),

007253
**App. 960**

counterclaims, cross-claims, defenses, disallowance, impairment, disgorgement, or any other challenges under any theory at law or in equity by any person or entity.  The Direct Investment, the Backstop Commitment, the Direct Investment Commitment, and the Put Option Premium contained in the Backstop Agreement shall be payable by the Debtors as provided in the Backstop Agreement without further order of the Court.

97.     **Distributions.**  The procedures governing distributions contained in **Article VI** of the Plan shall be, and hereby are, approved in their entirety.

98.     **Claims Register.**  Any Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without the Debtors or the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest without any further notice to or action, order, or approval of the Court.

99.     **Exit Facilities.**  On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facilities Documents. Confirmation of the Plan pursuant to this Confirmation Order shall be deemed final approval of the Exit Facilities and the Exit Facilities Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including, without limitation, ratification, assumption and restatement of all of the ABL DIP Facility Claims into "Obligations" under and as defined in the Exit ABL Facility, the incurrence of the loans under the Exit ABL Facility and the Exit Term Loan Facility, the provision of guarantees by the Debtors and the Reorganized Debtors (as the case may be), the payment of all fees, indemnities, expenses, and other payments provided for therein, the authorization of the Reorganized Debtors to enter into and execute the Exit Facilities Documents

007254
**App. 961**

and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities, and the granting, including the ratification, assumption, amendment and restatement, of Liens on and security interests in, and pledges of, the assets of the Debtors and the Reorganized Debtors (as the case may be) (including entry into, and filing of, any mortgages, security agreements or other instruments in favor of the Exit ABL Agent or the Exit Term Loan Agent (for itself or on behalf of the secured parties under the Exit Term Loan Facility), as applicable, to secure the indebtedness and other obligations under the Exit ABL Facility or the Exit Term Loan Facility, as applicable), are (i) hereby fully and finally approved and (ii) shall be deemed to be legal, valid, binding and fully and unconditionally enforceable against each of the Debtors, the Reorganized Debtors, and their Affiliates party thereto in accordance with their terms, without any further corporate authorization or other action required by the Debtors or the Reorganized Debtors, as the case may be. Execution of the Exit Term Loan Credit Agreement by the Exit Term Loan Agent shall be deemed to bind all Holders of First Lien Claims and all Exit Term Loan Facility Lenders as if each such Holder or Exit Term Loan Facility Lender had executed the Exit Term Loan Credit Agreement with appropriate authorization.

100.    In accordance with the terms of the Plan and the Exit ABL Facility Documents, subject to and upon the effectiveness of the Exit ABL Facility, the ABL DIP Documents shall be amended and restated upon the execution, delivery, and the satisfaction or waiver by the Exit ABL Agent of all conditions precedent to the Exit ABL Credit Agreement and the other Exit ABL Facility Documents in accordance with their terms. All ABL DIP Facility Claims (including, without limitation, any outstanding Letters of Credit (as defined in the ABL DIP Credit Agreement), Floorplan Approvals (as defined in the ABL DIP Credit Agreement) and Floorplan Advances (as defined in the ABL DIP Credit Agreement) shall be deemed to have been issued

007255
**App. 962**

and/or extended under and in accordance with the terms of the Exit ABL Facility Documents, upon the effectiveness thereof), plus all accrued, unpaid interest, fees, costs and expenses, shall be ratified, assumed and automatically deemed included in, and part of the Obligations under and as defined in the Exit ABL Facility Documents. Each of the Debtors and the Reorganized Debtors are authorized (in accordance with the terms of the Exit ABL Facility Documents), without further approval of the Court, to enter into, execute, negotiate and deliver, or cause to be executed, negotiated and delivered, the Exit ABL Credit Agreement and the Exit ABL Facility Documents, including all related agreements, documents, instruments and certificates relating to the Exit ABL Facility.

101.    Subject to and upon the effectiveness of the Exit ABL Facility or the Exit Term Loan Facility, as applicable, and without further notice to any party, or further order or other approval of, or action by, the Court, or further act or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any Person, the Debtors, and/or the Reorganized Debtors, shall be and hereby are authorized to enter into, incur indebtedness and other obligations under, and perform any duties and obligations under, the Exit ABL Credit Agreement and the other Exit ABL Facility Documents or the Exit Term Loan Credit Agreement and the other Exit Term Loan Facility Documents, as applicable.  This Confirmation Order shall constitute (a) approval of the Exit ABL Credit Agreement, the other Exit ABL Facility Documents, the Exit Term Loan Credit Agreement, and the other Exit Term Loan Facility Documents, all transactions contemplated thereby, and all actions to be taken, agreements and other documents to be entered into, undertakings to be made, and indebtedness and other obligations to be incurred by the Debtors and the Reorganized Debtors, or in connection therewith, including the payment of all fees, indemnities, costs and expenses provided for therein or relating thereto and (b) authorization for

43

the Debtors and the Reorganized Debtors to enter into, execute and deliver, incur and perform their obligations under, and grant Liens on and security interests in their assets and properties pursuant to the Exit ABL Credit Agreement, the other Exit ABL Facility Documents, the Exit Term Loan Credit Agreement, and the other Exit Term Loan Facility Documents.

102.    Subject to and upon the effectiveness of the Exit ABL Facility, the Exit ABL Facility Documents, the Exit Term Loan Credit Agreement, the other Exit Term Loan Facility Documents, and any Liens and security interests granted by the Debtors and the Reorganized Debtors, in favor of the Exit ABL Agent under the Exit ABL Credit Agreement and other Exit ABL Facility Documents and the Exit Term Loan Agent (for itself or on behalf of the secured parties under the Exit Term Loan Facility) securing the indebtedness and all obligations of the Debtors, under the Exit ABL Facility and the Exit Term Loan Facility shall constitute the legal, valid, and binding obligations of the Debtors and the Reorganized Debtors, and shall be deemed to be validly created, attached and enforceable and perfected Liens on and security interests in the assets and properties of the Debtors and the Reorganized Debtors, and shall be fully and unconditionally enforceable in accordance with their respective terms and shall be, and hereby are, not subject to recharacterization or equitable subordination or avoidance for any purposes whatsoever, and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable nonbankruptcy law.  The Exit ABL Facility and the Exit Term Loan Facility shall be deemed to be reasonable and to have been entered into in good faith, for reasonably equivalent value, for legitimate business purposes, and as an inducement to the Exit ABL Agent, the Exit Term Loan Agent, and the other secured parties thereunder to extend credit thereunder. Notwithstanding anything to the contrary in this Confirmation Order or the Plan, on and after the Effective Date, the Court's retention of jurisdiction shall not govern the enforcement

007257

of the Exit ABL Facility Documents, the Exit Term Loan Facility Documents, or any other documents executed in connection with the Exit ABL Credit Facility or the Exit Term Loan Facility, or any rights or remedies related thereto or exercised in connection therewith.

103.    On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

104.    **DIP Claims**.  All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the "Obligations" (as defined in the ABL DIP Documents or the Term DIP Loan Documents, as applicable), including without limitation, (a) the principal amount outstanding

007258
**App. 965**

under the ABL DIP Credit Agreement or the Term DIP Credit Agreement, as applicable, on such date, (b) all accrued and unpaid interest thereon to the date of payment and (c) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the ABL DIP Credit Agreement or the Term DIP Credit Agreement, as applicable.

105.    Each Allowed ABL DIP Facility Claim and all Liens securing such Allowed ABL DIP Facility Claim shall continue in full force and effect on and after the Effective Date, as amended and restated by and in accordance with the Exit ABL Credit Agreement and the Exit ABL Facility Documents, and nothing in the Plan, the Plan Supplement or this Confirmation Order shall or shall be construed to release, discharge, relieve, limit, or impair in any way the rights of any Holder of an ABL DIP Facility Claim or any Lien securing such Claim, all of which shall be amended and restated by the Exit ABL Facility.

106.    **Effectiveness of Final DIP Order**.  Notwithstanding the entry of this Confirmation Order, from the Confirmation Date through the Effective Date (the "**Pre-Consummation Period**"), including without limitation, the substantial consummation of the Restructuring Transactions, all of the Loans, Letters of Credit, Floorplan Advances, and all other "Obligations" as defined in the ABL DIP Credit Agreement and all "Obligations" as defined in the Term DIP Credit Agreement, as incurred during the Pre-Consummation Period, and all claims, liens, interest, rights, priorities, protections and remedies afforded to the ABL DIP Agent, ABL DIP Lenders, Term DIP Agent, and the other Term DIP Secured Parties (as defined in the Final DIP Order) in the Final DIP Order shall remain in full force and effect, and shall continue to constitute the legal, valid, binding and enforceable obligations of Debtors and Reorganized Debtors, which shall not be impaired, prejudiced or modified in any way at any time prior to the Effective Date.  Until such time as all of the conditions precedent to the effectiveness of the Exit ABL Facility Documents or

007259

the Exit Term Loan Facility Documents, as applicable, have been satisfied, including the occurrence of the Effective Date, the rights and remedies of each of the ABL DIP Agent and the ABL DIP Lenders under the ABL DIP Facility and the Term DIP Agent and the other Term DIP Secured Parties (as defined in the Final DIP Order) under the Term DIP Facility shall remain in full force and effect.

107.    For the avoidance of doubt, prior to the effectiveness of the Exit ABL Credit Agreement or the Exit Term Loan Credit Agreement, as applicable, the ABL DIP Lenders and the Term DIP Lenders shall have the rights and remedies available to the ABL DIP Lenders and the Term DIP Lenders, respectively, under the DIP Orders, the ABL DIP Credit Agreement, and the Term DIP Credit Agreement (as applicable), and the relative ranking and priorities between the ABL DIP Facility, on the one hand, and the Term DIP Facility or the Exit Term Loan Facility (as the case may be), on the other hand, shall be consistent with the ranking and priorities between the ABL DIP Facility and the Term DIP Facility set forth in the Final DIP Order.

108.    Upon the Effective Date, the DIP Secured Parties (as defined in the Final DIP Order) shall be released from any and all liability, responsibility, and/or obligation to hold, reserve for, or otherwise fund or ensure the funding of the Carve Out (as defined in the Final DIP Order), or any other expenses included within the Carve Out and from any obligation, responsibility or liability to the Debtors, any of the Professionals (as defined in the Final DIP Order) or any other third party to pay, fund or otherwise satisfy the fees and expenses of such Professionals.

109.    **New Equity Interests.**  On the Effective Date, subject to the terms and conditions of the Plan, the Backstop Agreement, and the Restructuring Transactions, New C1 shall issue the New Equity Interests, which distribution and issuance shall be governed by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, and/or dilution,

007260

as applicable, including the Governance Documents (including the New Equityholders'
Agreement).  The issuance of the New Equity Interests is authorized without the need for any
further corporate action.  On the Effective Date, the New Equity Interests shall be issued and
distributed as provided for in the Description of Transaction Steps to the Entities entitled to receive
the New Equity Interests pursuant to, and in accordance with, the Plan and Backstop Agreement.

110.    All of the shares of New Equity Interests issued pursuant to the Plan and this
Confirmation Order shall be duly authorized, validly issued, fully paid, and non-assessable.  Each
distribution and issuance referred to in **Article VI** of the Plan shall be governed by the terms and
conditions set forth in the Plan applicable to such distribution or issuance and by the terms and
conditions of the instruments evidencing or relating to such distribution or issuance, including the
Governance Documents, which terms and conditions shall bind each Entity receiving such
distribution or issuance.  Any Entity's acceptance of New Equity Interests shall be deemed as its
agreement to the Governance Documents, as the same may be amended or modified from time to
time following the Effective Date in accordance with their terms.  The New Equity Interests will
not be registered under the Securities Act or listed on any exchange as of the Effective Date and
are not expected to meet the eligibility requirements of the DTC.

111.    **Effectuating Documents; Further Transactions.**  On and after the Effective Date,
the Reorganized Debtors, and their respective officers and boards of directors and managers, are
authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments,
releases, and other agreements or documents and take such actions as may be necessary to
effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities
issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors without the

need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

112.    **Certain Securities Law Matters.**  The Debtors' solicitation of Holders of Claims receiving Securities under the Plan prior to the Petition Date was subject to the Securities Act and the regulatory authority of various states under state securities laws.  Accordingly, the offering of New Equity Interests before the Petition Date to Holders of First Lien Claims and Second Lien Claims was exempt from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

113.    No registration statement will be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of Securities under the Plan.  The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Equity Interests, will be exempt from the registration requirements of section 5 of the Securities Act or any similar federal, state, or local law in reliance on (a) with respect to the New Equity Interests issued pursuant to the Rights Offering (other than with respect to the Backstop Commitment and the Direct Investment Commitment), section 1145 of the Bankruptcy Code, (b) with respect to the New Equity Interests issuable pursuant to the Plan as the Second Lien Recovery, section 1145 of the Bankruptcy Code, and (c) with respect to the New Equity Interests issued pursuant to the Direct Investment, the Put Option Premium, and the unsubscribed New Equity Interests issued to the Investors pursuant to the Backstop Agreement, section 4(a)(2) of the Securities Act or Regulation D or Regulation S promulgated thereunder.

114.    The New Equity Interests issued pursuant to section 1145 of the Bankruptcy Code (i) shall not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and

(ii) shall be freely transferable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the provisions of Rule 144 under the Securities Act with respect to a holder thereof that (x) is, or within 90 days of such transfer has been, an "affiliate" of the Debtors within the meaning of Rule 144(a)(1) or (y) has acquired the New Equity Interests from an "affiliate" of the Debtors in a transaction or chain of transactions not involving any public offering within one year of such transfer; and (c) any restrictions on the transferability of such New Equity Interests in the Governance Documents.

115.    The New Equity Interests, including those issued pursuant to the Backstop Agreement and the New Equity Interests reserved for issuance under the Management Incentive Plan Pool, in each case, that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D thereunder, Regulation S thereunder, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

116.    **Compromise of Controversies.**  In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests, and controversies (including the PVKG Note Claims Settlement) resolved under the Plan and the entry of this Confirmation Order

50

constitutes approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

117. **Approval of the PVKG Note Claims Settlement.** The PVKG Note Claims Settlement is fair, equitable, within the range of reasonableness, and in the best interests of the Debtors and their Estates. Entry of this Confirmation Order shall constitute the entry of an order approving the PVKG Note Claims Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

118. **Assumption and Assignment of Contracts and Leases.** On the Effective Date, each Executory Contract and Unexpired Lease shall be deemed assumed, unless such Executory Contract and Unexpired Lease: (a) was assumed or rejected previously by the Debtors; (b) previously expired or terminated pursuant to its own terms; (c) is the subject of a motion or notice to reject pending as of the Effective Date; or (d) is identified on the Rejected Executory Contract and Unexpired Lease List, without the need for any further notice to or action, order, or approval of the Court, under section 365 of the Bankruptcy Code and the payment of Cure Claims, if any, shall be paid in accordance with **Article V.D** of the Plan. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the

007264

**App. 971**

prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

119.     The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in **Article V** of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption and assignment, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.

120.     Nothing in this Confirmation Order or in any notice or any other document is or shall be deemed an admission by the Debtor or Reorganized Debtors that any assumed contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code.

121.     Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim pursuant to **Article V.D** of the Plan shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to this Confirmation Order, and for which any Cure Claim has been fully paid pursuant to **Article V.D** of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Court.

122.     All Claims for damages resulting from the rejection of an Executory Contract or Unexpired Lease shall be asserted in accordance with **Article V.C** of the Plan and shall be treated as General Unsecured Claims pursuant to **Article III.C** of the Plan and may be objected to in

007265
**App. 972**

accordance with the provisions of **Article VII** of the Plan and the applicable provisions of the

Bankruptcy Code and Bankruptcy Rules.

123.     **Exemption from Transfer Tax and Recording Fees.**   To the fullest extent

permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a

Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (a) the

issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other

interest in the Debtors or the Reorganized Debtors; (b) the Restructuring Transactions; (c) the

creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage,

deed of trust, or other security interest, or the securing of additional indebtedness by such or other

means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral

as security for any or all of the Exit Facilities; or (f) the making, delivery, or recording of any deed

or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including

any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with

any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be

subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax,

mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment,

and upon entry of this Confirmation Order, the appropriate state or local governmental officials or

agents shall forego the collection of any such tax or governmental assessment and accept for filing

and recordation any of the foregoing instruments or other documents without the payment of any

such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any

other Person with authority over any of the foregoing), wherever located and by whomever

appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall

007266

**App. 973**

forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

124.    **Plan Supplement.**  Without further order or authorization of this Court, subject to the consent and approval rights of applicable parties set forth in the Plan and the RSA, the Debtors, Reorganized Debtors, and their successors are authorized and empowered to make all modifications to all documents included as part of the Plan Supplement that are consistent with the Plan, unless such modifications require relief under section 1127 of the Bankruptcy Code. Execution versions of the documents comprising or contemplated by the Plan Supplement shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms and, to the extent applicable, shall create, as of the Effective Date, all mortgages, Liens, deeds of trust, pledges, and security interests purported to be created thereby.

125.    **Professional Compensation.**  All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than forty-five (45) days after the Effective Date.  The Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Court.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, from the Professional Fee Escrow Account as soon as practicable after such Professional Fee Claims are Allowed.

126.    On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with an amount of Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not

007267
**App. 974**

be considered property of the Estates of the Debtors or the Reorganized Debtors.  When all Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

127.   **Release, Exculpation, Discharge, Injunction, and Related Provisions.**   The release, exculpation, discharge, injunction, and related provisions embodied in the Plan, including those contained in **Article VIII.A–G** of the Plan shall be, and hereby are, approved and authorized in their entirety and shall be effective and binding on all Persons and Entities, to the extent provided in the Plan, without further order or action by the Court.

128.   **Restructuring Expenses.**  The Claims for Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date matters, after the Effective Date), shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein and in the RSA, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Claims for Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided, however*, that such estimates shall not be considered an admission or

55

limitation with respect to such Restructuring Expenses.  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before, or after the Effective Date.

129.  **Term of Injunctions or Stays.**  Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays arising under or entered during these Chapter 11 Cases under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

130.  **Nonseverability of Plan Provisions Upon Confirmation.**  Each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable, *provided* that any such deletion or modification shall be consistent with the RSA and the Backstop Agreement and the consent rights contained in each of them; and (c) non-severable and mutually dependent.

131.  **Post-Confirmation Modifications.**  Without need for further order or authorization of the Court, the Debtors or the Reorganized Debtors, as applicable, are authorized and empowered to make any and all modifications to any and all documents that are necessary to effectuate the Plan that do not materially modify the terms of such documents and are consistent with the Plan (subject to the consent rights contained in each of the Plan, the RSA, and the Backstop Agreement).  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth

007269
**App. 976**

in the Plan, the RSA, and the Backstop Agreement, the Debtors and the Reorganized Debtors expressly reserve their respective rights to revoke or withdraw, or to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan (subject to the consent rights contained or incorporated in each of the Plan, the RSA, and the Backstop Agreement).  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with **Article X.A** of the Plan.

132.   **Chubb Insurance Program.**   Notwithstanding anything to the contrary in the Definitive Documents, any other document related to any of the foregoing, or any other order of this Court (including, without limitation, any other provision that purports to be peremptory or supervening, grants an injunction, discharge or release, confers Court jurisdiction, or requires a party to opt out of any releases):

a.   on the Effective Date, all of the insurance policies which have been issued by ACE American Insurance Company, Federal Insurance Company and any of their respective U.S.-based affiliates and predecessors (collectively, and solely in their capacities as insurers and third party administrators, the "**Chubb Companies**") to, or which provide coverage to, any of the Debtors (or any of their predecessors) at any time and for any line of coverage (collectively and together with any agreements, documents or instruments related thereto and each as amended, modified or supplemented and including any exhibit or addenda thereto, the "**Chubb Insurance Program**") shall be assumed by the Debtors and assigned to the Reorganized Debtors, jointly and

007270
**App. 977**

severally, in their entireties pursuant to sections 105 and 365 of the Bankruptcy Code, and shall

continue in full force and effect thereafter in accordance with their respective terms;

        b.        on and after the Effective Date, the Reorganized Debtors shall become and

remain liable in full for all of their and the Debtors' obligations under the Chubb Insurance

Program in the ordinary course of business pursuant to the terms of the Chubb Insurance Program

(including, but not limited to, obligations for payment of any outstanding or not-yet-owed premium

installments owing thereunder and any outstanding SIR or deductible amounts), regardless of

whether such obligations arise before or after the Effective Date, and without the need or

requirement for the Chubb Companies file a Proof of Claim or an Administrative Claim, Cure

Claim, cure objection, or provide any notice of recoupment;

        c.        nothing (including **Articles V.B**, **V.F** and **VI.L** of the Plan) alters, modifies

or otherwise amends the terms and conditions of the Chubb Insurance Program, and any rights and

obligations thereunder shall be determined under the Chubb Insurance Program and applicable

non-bankruptcy law as if the Chapter 11 Cases had not occurred;

        d.        the automatic stay of Bankruptcy Code section 362(a) and the injunctions

set forth in **Article VIII.F** of the Plan, if and to the extent applicable, shall be deemed lifted without

further order of this Bankruptcy Court, solely to permit:  (i) claimants with valid workers'

compensation claims or direct action claims against the Chubb Companies under applicable non-

bankruptcy law to proceed with their claims; (ii) the Chubb Companies to administer, handle,

defend, settle, and/or pay, in the ordinary course of business and without further order of this

Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct

claim against the Chubb Companies under applicable non-bankruptcy law, or an order has been

entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the

007271

**App. 978**

injunctions set forth in **Article VIII.F** of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; (iii) the Chubb Companies to cancel any policies under the Chubb Insurance Program, and take, in their sole discretion, any other actions relating to the Chubb Insurance Program (including effectuating a setoff); and

       e.    for the avoidance of doubt, nothing in Section F of **Article VIII** of the Plan applies or shall be deemed to apply to any claims covered by the Chubb Insurance Program.

133.    **Bond Obligations.**  Notwithstanding any other provisions of the Definitive Documents, any other document related to any of the foregoing, or any order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases), on the Effective Date, all contractual and common law rights and obligations of Liberty Mutual Insurance Company, Travelers Casualty and Surety Company of America, Lexon Insurance Company, Endurance Assurance Corporation, Federal Insurance Company, Westchester Fire Insurance Company, SiriusPoint America Insurance Company and their affiliated sureties (collectively, and each as surety in their role as an issuer of surety bonds, surety guaranties, or surety-related products, each a "**Surety**" and together, the "**Sureties**") related to (i) bonds of any kind issued by the Sureties, whether prior to or after the Petition Date (the "**Surety Bonds**") on behalf of any of the Debtors, all of which are maintained in the ordinary course of business, (ii) payment and/or indemnity agreements between the Debtors and the Sureties, setting forth the Sureties' rights against the Debtors, and the Debtors' obligations to pay and indemnify the Sureties from any loss, cost, or expense that the Sureties may incur, in each case, on account of the issuance of any Surety Bonds, (iii) the Sureties' collateral agreements, if any, governing collateral (and proceeds thereof) in connection with the Surety Bonds, including

as applicable control agreements, pledge agreements, trust agreements, deposit account agreements, letters of credit and proceeds of all of the foregoing; and/or (v) premiums payable to the Sureties on account of the Surety Bonds (whether prepetition or post-petition, collectively, the "**Bond Agreements**," and the Debtors' obligations arising therefrom, the "**Bond Obligations**") shall continue in full force and effect according to their terms and applicable non-bankruptcy law and are not altered, modified, enjoined, impaired, discharged or released by the Definitive Documents or any order of the Court; *provided*, *however*, for the avoidance of doubt nothing herein shall extend the tail period of a Surety Bond or affect any prior cancellation of a Surety Bond.  The Sureties' rights, including but not limited to the Sureties' common law rights, right of subrogation to the extent any claim is paid by a Surety, setoff and recoupment rights, lien rights and trust claims, are not primed, subordinated, affected or impaired by the Definitive Documents (including but not limited to **Articles IV.H**, **VI.L**, **VIII.B** and **VIII.F(d)** of the Plan) or any order of the Court, and neither are the rights of any party to whom a Surety may be subrogated.  **Articles IV.H**, **VI.L**, **VIII.B** and **VIII.F(d)** of the Plan shall not apply to the Sureties or to any Claim to which a Surety may be subrogated.  For the avoidance of any doubt, and solely to the extent applicable, if any of the Bond Agreements are deemed to be one or more executory contracts, such agreements are assumed by the Debtors and the Reorganized Debtors pursuant to section 365 of the Bankruptcy Code upon the Effective Date with the consent of the Sureties, as applicable.  On the Effective Date, each Bond Agreement shall not be cancelled under the Plan but shall instead be deemed Reinstated or ratified by the Debtors and Reorganized Debtors on the terms of such Bond Agreement that existed immediately prior to the Effective Date.  The Debtors and Reorganized Debtors shall execute and deliver new general contracts of indemnity as requested by the Sureties following the Effective Date in the ordinary course of business in accordance with the terms of the

applicable Bond Agreements.  Nothing in the Definitive Documents or any order entered by the Court shall prime, modify, subordinate, impair or affect the Sureties' rights against any non-Debtor, or any non-Debtor's rights against the Sureties.  For the avoidance of doubt, the Sureties (and the holders of claims to which the Sureties may be subrogated) shall be deemed to have opted out of any releases provided in the Plan, and the Sureties (and the holders of claims to which the Sureties may be subrogated) are not "Releasing Parties" or "Released Parties" under the Plan.  The Sureties' Claims against the Debtors are Unimpaired and shall be Allowed under the Plan to the same extent the Sureties' claims would be allowed under applicable non-bankruptcy law, and the Reorganized Debtors shall retain any claims and defenses under applicable non-bankruptcy law with respect to any such Allowed Claims.  The Reorganized Debtors and the Sureties reserve all rights and defenses under applicable law with respect to any right, claim, interest, or obligation arising under the Surety Bonds, indemnity agreements, or any documents related to the foregoing, and on the Effective Date, all claims arising under or granted to the Sureties in connection with the Surety Bonds shall not be impaired, discharged, or released by any provision of the Definitive Documents.  Finally, the Debtors and Reorganized Debtors, as applicable, shall pay any unpaid premiums, attorneys' costs and fees (including but not limited to those in connection with these cases), and loss adjustment expenses to the Sureties pursuant to the terms of the applicable payment and indemnity agreements under the Bond Agreements in the ordinary course of business, including and such costs and fees that may be due and owing.  For the avoidance of doubt, paragraph 42 of this Confirmation Order shall not supersede this paragraph (Bond Obligations).

134.  **Notice of Entry of Confirmation and Effective Date.**  In accordance with Bankruptcy Rules 2002 and 3020(c), no later than seven (7) business days after the Effective Date, the Reorganized Debtors shall file with the Court and serve by email and first class mail or

007274
**App. 981**

overnight delivery service a notice of the entry of this Confirmation Order and occurrence of the

Effective Date (the "**Confirmation Notice**") on all Holders of Claims and/or Interests and to all

parties on the *Master Service List* maintained by the Claims and Noticing Agent.  Notwithstanding

the above, no Confirmation Notice or service of any kind shall be required to be mailed or made

upon any Entity to whom the Debtors mailed notice of the Combined Hearing, but received such

notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or

"forwarding order expired," or similar reason, unless the Debtors have been informed in writing

by such Entity, or are otherwise aware, of that Entity's new address.  To supplement the notice

procedures described in the preceding sentences, no later than fourteen (14) days after the Effective

Date, the Reorganized Debtors shall cause the Confirmation Notice, modified for publication, to

be published on one occasion in the *New York Times* (National Edition).  Mailing and publication

of the Confirmation Notice in the time and manner set forth in this paragraph shall be good,

adequate, and sufficient notice under the particular circumstances and in accordance with the

requirements of Bankruptcy Rules 2002 and 3020(c).  No further notice will be necessary.

135.  **Waiver of Filings.**  Any requirement under section 521 of the Bankruptcy Code or

Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court

of the Office of the U.S. Trustee is permanently waived as to any such list, schedule, or statement

not filed as of the Confirmation Date.

136.  **Waiver of Section 341 Meeting of Creditors or Equity Holders; Waiver of**

**Schedules and Statements and 2015.3 Reports.**  Any requirement under section 341(e) for the

U.S. Trustee to convene a meeting of creditors or equity holders is permanently waived as of the

Confirmation Date. Any requirements for the Debtors to file the following are permanently waived

as of the Confirmation Date: (a) schedules of assets and liabilities and statements of financial

007275

**App. 982**

affairs and (b) their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Bankruptcy Rule 2015.3.

137.     **Waiver of 11 U.S.C. § 345.**  Section 345 of the Bankruptcy Code and any provision of the U.S. Trustee Guidelines requiring that the bank accounts listed in the Debtors' Cash Management Motion be U.S. Trustee authorized depositories is waived with respect to the bank accounts existing as of the Petition Date.

138.     **Reservation of Rights.**  Except as expressly set forth in the Plan, the Plan shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

139.     **Authorization to Consummate.**  The Debtors and the Reorganized Debtors, as applicable, are authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in **Article IX** of the Plan.

140.     **Substantial Consummation.**  Consummation of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

141.     **Failure of Consummation.**  Notwithstanding entry of this Confirmation Order, if Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the RSA shall: (a) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission,

acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

142.    **Effect of Conflict.**    This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  In the event of an inconsistency between this Confirmation Order and the Plan, the Disclosure Statement, or the Plan Supplement, this Confirmation Order shall control.

143.    **Waiver of Stay.**    For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Court.

144.    **Waiver or Estoppel.**    Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Court prior to the Confirmation Date.

145.    **Final Order.**    This Confirmation Order is a Final Order, and the period in which an appeal must be filed shall commence upon the entry hereof.

007277
**App. 984**

146.    **Retention of Jurisdiction.**  The Court may properly, and upon the Effective Date

shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising out of, and

relating to, the Chapter 11 Cases, this Confirmation Order, and the Plan, including the matters set

forth in **Article XI** of the Plan and sections 105(a) and 1142 of the Bankruptcy Code.


          Signed:  May 23, 2024

                                                Christopher Lopez
                                                United States Bankruptcy Judge


                                            65

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 24-90194-11 |
| | § | HOUSTON, TEXAS |
| CONVERGEONE HOLDINGS, INC., | § | WEDNESDAY, |
| | § | MAY 22, 2024 |
| DEBTORS. | § | 11:02 A.M. TO 4:15 P.M. |

## **COMBINED DISCLOSURE STATEMENT AND CONFIRMATION HEARING**

BEFORE THE HONORABLE CHRISTOPHER LOPEZ
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:                    SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER:   ZILDE COMPEAN

COURTROOM DEPUTY:               ZILDE COMPEAN

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

2

**APPEARANCES:**


FOR THE DEBTOR:                    WHITE AND CASE LLP
                                   Jason N. Zakia, Esq.
                                   111 S. Wacker Dr., Ste. 5100
                                   Chicago, IL  60606-5055
                                   312-881-5400


FOR THE AD HOC GROUP OF
EXCLUDED LENDERS:                  PROSKAUER ROSE LLP
                                   David M. Hillman, Esq.
                                   Julia Alonzo, Esq.
                                   Javier Sosa, Esq.
                                   Eleven Times Square
                                   New York, NY  10036
                                   1-212-969-3000



(Please also see Electronic Appearances.)

3

**<u>INDEX</u>**

| WITNESSES: | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| SHERMAN EDMISTON | | | | |
| By Mr. Zakia | 7 | . | 98 | . |
| By Ms. Alonzo | . | 49 | . | . |

| EXHIBITS: | <u>Admitted</u> |
|---|---|
| ECF 375-73 through -87 | 47 |
| Debtor's Exhibit 71 | 101 |
| Ad Hoc Group Exhibit 340 | 102 |

\*\*\*

4

1          **HOUSTON, TEXAS; WEDNESDAY, MAY 22, 2024; 11:02 A.M.**

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.  Okay.  Good morning,

4     everyone.  This is Judge Lopez.  Today is May 22nd.  I'm going

5     to call the continued combined Disclosure Statement and

6     Confirmation Hearing, ConvergeOne Holdings, 24-90194.

7          I'd ask the parties to just make an electronic

8     appearance for purposes of today.  Let's -- let me just hear

9     from Debtors' counsel and let's hear where we are.

10         MR. ZAKIA:  Good morning, Your Honor, Jason Zakia of

11    White and Case on behalf of the Debtors.

12         So, first of all, Your Honor, I understand that you

13    have made time in your schedule to help us in our other case

14    as mediator, so thank you.  We hope that you don't hold

15    against us burdening your schedule.  So thank you for that.

16    With regard to where we stand today, I think as expected, we

17    are here to complete the confirmation hearing.

18         The parties have conferred.  I think at one point

19    last week we had thought there would be two live witnesses

20    today.

21         One of those witnesses had a family situation with

22    regard to the loss of a family member and so we have conferred

23    and agreed to proceed without that person's testimony.  So

24    that means we will have just one live witness.

25         As I think Your Honor saw from the briefing

5

1    submitted over the weekend, I think we've reached resolution

2    on the document dispute that was raised on Friday.  All of

3    those documents that were at issue were produced to the

4    objectors.

5            I think they'll be moving some of those into

6    evidence.  I think we have agreement on how that's going to be

7    treated.

8            We have one supplemental exhibit.  And I think all

9    of that will be done consensually.

10           THE COURT:  Okay.

11           MR. ZAKIA:  So I think, Your Honor, we have our one

12   live witness to present and closing argument.

13           THE COURT:  Can you just -- I don't know who the

14   witness was.  But to the extent you just extend my condolences

15   to that individual witness who lost a family member.

16           MR. ZAKIA:  We -- of course, Your Honor.

17           THE COURT:  Okay.  Let me just -- Mr. Hillman, let

18   me just hear from you from just in terms of the what I will

19   call the -- your -- the motions that were filed over the

20   weekend.  Is there anything else we need to kind of take up

21   substantively?

22           MR. HILLMAN:  Thank you, Your Honor.  David Hillman

23   for the record, Proskauer Rose, joined also by my colleague

24   Julia Alonzo and Javier Sosa.

25           I think it was 107 documents that were produced over

6

1    the weekend.  So we went through those documents.  And my

2    colleague Ms. Alonzo will introduce some of those exhibits as

3    part of the supplemental record.

4            But I think everything you heard from Mr. Zakia is

5    accurate.  And I think we just move on to the first witness and

6    then direct, cross, closing.  So --

7            THE COURT:  Okay.  I just wanted to make just -- is it

8    fair to just say that the matter will be -- I don't need to rule

9    on anything in connection with any of the motions or the papers.

10   It'll be resolved by agreement of the parties of the parties or

11   something.

12           MR. HILLMAN:  That's correct.

13           THE COURT:  Okay.  That's all I needed to know.

14           MR. HILLMAN:  Okay.

15           THE COURT:  All righty.  Who are we calling?

16           MR. ZAKIA:  Thank you, Your Honor.  Debtors call

17   Sherman Edmiston.

18           THE COURT:  Okay.  And can you please raise your right

19   hand?

20            SHERMAN EDMISTON, DEBTORS' WITNESS, SWORN

21           THE COURT:  Okay.  Please be seated.  And let the

22   record reflect that the witness has been properly sworn in.

23           Mr. Edmiston, I just note the trick with this mic is

24   to just kind of have the -- just kind of pointing in your

25   general direction where you're speaking and it should pick you

1    up just fine.

2                    THE WITNESS:  Okay, great.

3                    THE COURT:  Okay.  You've got the hang of it, perfect.

4                    Please proceed.

5                    MR. ZAKIA:  Thank you, Your Honor.

6                    Mr. Edmiston, good morning.  Please introduce yourself

7    to Judge Lopez.

8                    THE WITNESS:  Good morning, Your Honor.

9                    THE COURT:  Good morning.

10                    DIRECT EXAMINATION

11   BY MR. ZAKIA:

12   Q    And what do you do for a living, sir?

13   A    I provide strategic and financial advice to private equity

14   firms, credit funds, hedge funds, and corporations.

15                    THE COURT:  Mr. Edmiston, can you spell your last

16   name?

17                    THE WITNESS:  It's E-D-M-I-S-T-O-N.

18                    THE COURT:  That's so I don't get in trouble with the

19   courtroom deputy.  So it's my -- please proceed.

20   BY MR. ZAKIA:

21   Q    And where are you currently employed?

22   A    I'm employed by HI CapM Advisors, LTD.

23   Q    And could you just generally describe for the Court what is

24   HI CapM Advisors?

25   A    It's just an LLC that I conduct my business through.  And

1    HI is an acronym for the Japanese term for changing poison into

2    medicine.

3            MR. ZAKIA:  Learn something new everyday.

4    Q    Could you please describe for the Court your education

5    background?

6    A    Sure.  I have a BSE in mechanical engineering from Arizona

7    State University and a MBA from the -- an MBA in finance and

8    accounting from the University of Michigan.

9    Q    And could you please generally describe your work history

10   for us, sir?

11   A    For the last six or seven years I've been very active as a

12   professional independent director.

13           Prior to that I was a partner and managing director at

14   Zolfo Cooper, which is now part of AlixPartners.

15           And prior to that I spent years in various capacities, M

16   and A banker, leverage finance, restructuring banker.  I worked

17   for a few years on the distressed debt investment side.

18           So a lot of the seats or a lot of the hats that are

19   involved in these types of restructurings are seats that I've

20   sat in and hats that I've worn.

21   Q    And just generally, roughly how many years have you worked

22   as a restructuring professional?

23   A    How many?

24   Q    Years.

25   A    Twenty-five plus.

1    Q    Now, I think you mentioned that one of the things that you

2    do is you serve as a independent director.  Roughly how many

3    corporate boards have you served on over the course of your

4    career?

5    A    In excess of 40.

6    Q    Okay.  Any of those boards involve companies that were in

7    financial distress?

8    A    Yes, many of them.

9    Q    Okay.  Any that involve debtors in Chapter 11?

10   A    Yes, many of them.

11   Q    And just general estimate, how many times would you say,

12   sir, you served as a director of a board of a company that was

13   in bankruptcy?

14   A    I can't even, but many of the 40 are -- were

15   restructurings.  I -- this -- so generally I work on

16   restructuring situations where I get hired by law firms or I

17   get put on boards by credit funds and lenders as a result of

18   an amendment or new money being put into these companies.

19        And then I also do a lot of work on post-restructuring

20   boards where I get put on those boards primarily by credit

21   funds and private equity firms.

22        But as to your last question in terms of how many, most

23   of them are restructurings.  Most of these deals involve some

24   sort of company transformation.

25   Q    And are you familiar with an entity known as CVC?

1      A    Yes, I am.

2      Q    And prior to the present matter have you ever been

3      involved as a director for a company in which CVC was

4      involved?

5      A    No, not at all.

6      Q    Now could you please tell the Court, sir, when did you

7      join the board of these Debtors?

8      A    December, 2023.

9      Q    And how you come to become involved in this case?  How

10     did you become aware of the need for an independent director?

11     A    I got a call from or call or an email from Bojan Guzina

12     and Andy O'Neill from White and Case.

13     Q    Now could you please describe for us your -- sir, your

14     understanding of the role that you were undertaking when you

15     agreed to serve on this board?

16     A    Sit on the company's board and help the company navigate

17     its restructuring process.

18     Q    And did you have an understanding as to why the company

19     was deciding to add additional board members at this time?

20     A    Because there were potential conflicts in issues that it

21     would be helpful to have independent directors address.

22     Q    When you say conflicts and issues, with respect to whom?

23     A    Primarily CVC.

24     Q    Now, prior to your work on this case had -- did you have

25     any experience of working with CVC before?

1    A    None at all.
2    Q    Okay.  Do you have any connection, financial or
3    otherwise, with CVC?
4    A    None at all.
5    Q    How about could you tell us a little bit about your
6    experience with Evercore; prior to this case have you been
7    involved in cases that involved Evercore?
8    A    Yeah.  I've worked on many deals with Evercore before.
9    Q    And what was the nature of your experience with Evercore?
10   A    Primarily serving on boards and Special Committees where
11   Evercore was the restructuring advisor, the financial advisor.
12   Q    How about White and Case; prior to your work on this case
13   had you been involved in cases where White and Case was
14   counsel to the company?
15   A    Yes.
16   Q    Okay.  About how many times?
17   A    White and Case specifically one prior time, Riverbed
18   Technologies.  But there were members of the White and Case
19   team that I have worked with before when they were at Sidley,
20   a former firm.
21   Q    And about how many cases did you work with some of the
22   White and Case team members when they were Sidley?
23   A    Two, maybe three.
24   Q    Okay.  So out of the roughly 40 cases in which you've
25   served as an independent director, somewhere between three or

1    four involved White and Case or members of the White and Case

2    team when they were at their prior firm.

3    A    Correct.

4    Q    Now, could you please describe the situation at the

5    company when you first joined the board of directors?

6    A    Well, the company was in a fragile situation.  Revenue

7    had been declining for a few years and had not yet stabilized.

8    A new management team had been brought in.

9         Once again, the liquidity situation was very challenged.

10   And it was evident that a restructuring was going to be

11   required.

12   Q    And how frequently did the board of directors meet during

13   that initial timeframe?

14   A    During the initial time, at least once a week, maybe and

15   sometimes more.

16   Q    And from your perspective, when you first joined the

17   board, what were you trying to accomplish?

18   A    I think I can -- in you know, any situation, you know,

19   initially you're trying to get a better understanding of the

20   company.

21        You're trying to get a better understanding of the

22   liquidity situation, its capital structure, its capital

23   structure needs, its investment needs, the state of the

24   business.

25        So we spent -- for that first month or so we spent a lot

1     of time on business operations, a lot of time on liquidity,

2     and quite a bit of time preparing the company -- you know, a

3     company presentation and also a business plan that would

4     eventually be shared with the company's lenders.

5     Q    Now, did there come a time when a Special Committee of

6     the board was formed?

7     A    Yes.

8     Q    And when did that occur?

9     A    Mid-January.

10    Q    And why was a Special Committee of the board formed?

11    A    It was formed around a time where we commenced

12    negotiations with the First Lien Ad Hoc Group.

13    Q    And why from -- why in your view was a Special Committee

14    of the board necessary or advisable?

15    A    Because it was at that point where the interest of the

16    company and CVC may diverge.

17    Q    And were there members of the whole board that were

18    affiliated with CVC?

19    A    Yes, there were.

20    Q    How many?

21    A    Two, maybe three.

22    Q    Okay.  Now, who was -- who served on the Special

23    Committee?

24    A    Myself, Larry Nyhan, and Jeffrey Russell.

25    Q    Who is Mr. Nyhan?

1    A    Larry Nyhan is a former Sidley Austin partner who has

2    extensive experience in corporate restructurings.

3    Q    And have you ever worked with Mr. Nyhan before this

4    matter?

5    A    Yes, I have.

6    Q    And could you just generally describe for us the nature

7    of the matters with which you've worked with him?

8    A    Yeah.  Larry and I were on the Special Committee for the

9    Mallinckrodt Pharmaceuticals Generics entities as part of

10   their first bankruptcy and restructuring.

11   Q    Okay.  And, I'm sorry, who was the third member of the

12   Special Committee?

13   A    In ConvergeOne?

14   Q    Back to this case, yes.

15   A    In ConvergeOne it's Jeffrey Russell, who is the company's

16   CEO.

17   Q    Okay.  And had you ever worked with Mr. Russell before

18   this case?

19   A    No.

20   Q    Now, what was the role of the Special Committee?

21   A    So the role of the Special Committee was to review,

22   analyze, and approve all strategic and financial transactions.

23   Q    Now, after the Special Committee was formed, what was the

24   role of the whole board with regard to governance?

25   A    Well, after the committee was formed, the committee took

1     the lead and was wholly responsible for restructuring

2     negotiations.

3         The full board met maybe weekly to stay appraised of how

4     the restructuring was going, to discuss business operations,

5     and to discuss the company's liquidity situation.

6     Q    I think you told us a little bit earlier about your

7     experience serving as member of a board of directors of a

8     distressed company.  And have you ever served on a Special

9     Committee before?

10    A    Yes, I have.

11    Q    Roughly how many?

12    A    At least ten.

13    Q    Now, were you satisfied that all of the members of the

14    Special Committee were independent of CVC?

15    A    Absolutely.

16    Q    Okay.  And could you describe for us, sir, when you say

17    independent, when you use that term as an independent

18    director, what do you mean by that?

19    A    Members of the committee have no competing allegiances or

20    interest other than to the company.

21    Q    Now, why was the CEO included on the Special Committee?

22    A    Because he had intimate knowledge of the company's

23    operations, and it was important to have his input as relates

24    to various aspects of the negotiation that were going to have

25    direct impact on the company.

1    Q    And were you comfortable that he was independent of CVC?

2    A    Yes.  It was clear to me that Jeffrey's allegiances were

3    to the company and its employees and its stakeholders.

4    Q    Now, was the Special Committee advised by any advisors in

5    the course of its work?

6    A    Yes.  The Special Committee was advised by Evercore,

7    White and Case, and AlixPartners.

8    Q    And did those advisors also represent the company?

9    A    Yes, they did.

10   Q    Now, in your experience, sir, have you been involved in

11   Special Committees where Special Committees hired separate

12   advisors separate and apart from the company's advisors?

13   A    Yes.

14   Q    Have you been involved in cases where you served as a

15   member of the Special Committee where the Special Committee

16   did not have separate advisors separate and apart from the

17   company's?

18   A    Yes, I have.  It's not unusual.

19   Q    Okay.  So in this case why did you make the decision not

20   to hire separate advisors as distinct from the company's

21   advisors?

22   A    The company's interests and the interest of the Special

23   Committee were in complete alignment so I didn't see any -- I

24   didn't see a need to duplicate efforts and increase costs.

25   Q    Okay.  With regard to their work in this case, who was

1    Evercore, White and Case, and Alix, who's their client?

2    A    Their client was the company and the Special Committee.

3    Q    Anybody else?

4    A    No one else.

5    Q    Okay.  Were any of them representing CVC in connection

6    with this?

7    A    No.

8    Q    So when you made the decision to take advice as the

9    Special Committee from White and Case, were you aware of the

10   fact that White and Case had represented CVC in the past?

11   A    Yes.

12   Q    How, if at all, did that factor into your decision to use

13   White and Case as an advisor to the Special Committee?

14   A    It did not factor at all.

15   Q    Why not?

16   A    Because in this particular case White and Case was

17   representing the company, and CVC had its own legal counsel,

18   Latham and Watkins.

19   Q    Now, did CVC have any role on the Special Committee?

20   A    No, not at all.

21   Q    Did CVC attend any Special Committee meetings?

22   A    None at all.

23   Q    At any time during your service on the Special Committee

24   or the board of these debtors did CVC ever do anything to try

25   and influence how you exercised your judgment?

1    A    None at all.  That would be inappropriate.

2    Q    Now let's talk a bit -- a little bit about what the

3    Special Committee did after it was formed.  So when the

4    Special Committee was formed back in January, could you please

5    just describe for the Court what was its first task, what was

6    it focused on?

7    A    Well, by the time the Special Committee had been formed,

8    a strawman proposal had already been put forth to the first

9    lien lender group.

10       So we were awaiting their response.  And during that time

11    we just, you know, reviewed company projections, comparable

12    transactions, debt capacity analyses, all the things that we

13    would need to have -- all the information and data we would

14    need to have to sort of inform our decision-making and our

15    negotiation stance as the restructuring proceeded.

16    Q    Okay.  And when you say a proposal had been made, just

17    describe for us, a proposal for what?

18    A    So it was, you know, a generic strawman proposal that was

19    designed to sort of like socialize what the company thought

20    was maximum debt capacity, socialize that it was going to be

21    an extensive equitization of the first lien loans, and that

22    the second lien were pretty much out of the money, to kind of

23    get that out there and set the stage for the negotiation.

24    Q    Okay.  And you talk about the negotiations.  Could you

25    please describe what the role of the Special Committee was in

1    those negotiations as they proceeded?

2    A    Yeah, once again our role was to review, evaluate, and

3    approve the key items of the restructuring.  We get a term

4    sheet, we sent, you know, back from the, you know, the 1L

5    advisors.  We would review that term sheet with the help of

6    our advisors and respond in kind.

7    Q    And with regard to the negotiations that you're

8    describing, how long did those last?

9    A    This committee was formed on January 16th.  I think we

10   filed on April 2nd.  Those negotiations lasted up until hours

11   before we filed.

12   Q    Now, during this time period when the Special Committee

13   was participating in these negotiations, how frequently did it

14   meet?

15   A    The Special Committee?

16   Q    Yes, sir.

17   A    At least once a week, often times more.

18   Q    Now, with regard to the negotiations that were occurring

19   during this period, what was the Special Committee's goal?

20   A    Well, our goal was to maximize value and recoveries for

21   all stakeholders, to fix the company's capital structure, and

22   to get the company in bankruptcy and out as quickly and

23   efficiently as possible.

24   Q    And who was the special negotiating with -- sorry, the

25   Special Committee negotiating with?

1      A    With the ad hoc, steering committee, ad hoc committee of

2      the first lien lenders, and then later the second lien

3      lenders.

4      Q    Okay.  And how would you --

5      A    And CVC.

6      Q    And how would you describe those negotiations?

7      A    They were pretty intense, arm's length but pretty

8      intense.

9      Q    Now, who was in charge of communicating with other

10     stakeholders on behalf of the Debtors as part of this

11     negotiation?

12     A    Evercore, White and Case, and AlixPartners.

13     Q    Now I'd like to ask you a couple of questions about CVC.

14     What, if any, role did CVC play in the restructuring

15     negotiations?

16     A    Well, CVC had potentially the largest single impaired

17     claim in the case.  So their role was to sort of negotiate

18     from that position.

19          And as far as -- once again, they did not participate in

20     any steering committee meetings.  But they offered, you know,

21     their opinions and their position, you know, in board

22     meetings.

23          And as far as -- and I think this is an important point.

24     As far as the negotiations went and the term sheets that went

25     back and forth, the term sheets that the company put forth

1    would have company -- the company's positions clearly

2    delineated in red and CVC's positions delineated in blue,

3    right.

4         So it was clear, right, for everyone what the company's

5    positions were, what CVC's positions were.

6    Q    And just so that we're clear, who was in charge of

7    deciding what the company's positions were?

8    A    The steering -- the Special Committee.  I keep on calling

9    it the steering.  It was the Special Committee.

10   Q    Did CVC play any role in deciding what the company's

11   position --

12   A    Not at all.

13   Q    Now, during this time period when the Special Committee

14   was leading these investigations, what, if any, role did the

15   whole board play?

16   A    So once again we met with the full board to update on the

17   restructuring process, deal with business issues, update on

18   the liquidity situation.

19        But the resolutions had clearly empowered the Special

20   Committee, right, with all the key decisions as related to the

21   restructuring, you know, negotiations.

22        So we'd get, you know, CVC would offer their opinion but

23   they could not direct or force the Special Committee to do

24   anything.

25   Q    Did you have a view as to whether CVC's participation in

1    these negotiations, as you described, was helpful with regard

2    to what you were trying to accomplish on behalf of the

3    company?

4    A    It absolutely was helpful.  Once again, they had a large

5    claim.  And in terms of our goal, one of our goals was to get

6    the company into -- in and out of bankruptcy as efficiently as

7    possible.  It was going to be important to settle that claim

8    before we filed.

9    Q    Okay.  Now, just to be clear, was the specials

10   committee's willingness to approve a restructuring transaction

11   ever conditioned on CVC's agreement?

12   A    Not at all.

13   Q    Now, I think you told us a few minutes ago that Evercore

14   was one of the parties responsible for communicating with

15   stakeholders in connection with the restructuring

16   negotiations.

17   A    Yes.

18   Q    Were you aware that during the course of negotiations

19   Evercore was providing information, financial information to

20   CVC?

21   A    Yes.

22   Q    Okay.  And did you approve that?

23   A    Yes, I did.

24   Q    Okay.  Could you explain to the Court why?

25   A    Evercore's job was to mediate between the stakeholder

1    parties, the company, the First Lien Ad Hoc Group, which was

2    led by PJT and Gibson Dunn, and CVC and Latham and Watkins.

3        And it is typical in these cases for the restructuring

4    banker to have conversations and share information with all of

5    the parties involved.  It was not unusual in my experience.

6    Q    Okay.  And, again, during these negotiations, who was

7    Evercore answering to?

8    A    The Special Committee.

9    Q    Anybody else?

10   A    No one else.

11   Q    Now, I think you told us a little bit about the fact that

12   when the Special Committee was appointed, an initial proposal

13   had already gone over to the First Lien Ad Hoc Group.

14   A    Yes.

15   Q    Okay.  Could you describe for us what was the purpose of

16   that proposal?

17   A    As I said earlier, it was to socialize with the creditor

18   constituencies the maximum amount of leverage that the Debtor

19   or the -- and the special -- well not, they weren't a debtor

20   at that point -- the company and the Special Committee thought

21   was appropriate, to socialize everyone that there was going to

22   be a significant deleveraging in equitization, and then

23   socialize that from the standpoint of the company's valuation

24   that the second lien debt was out of the money.

25   Q    And could you describe for us what, if any, role CVC or

1      the CVC directors played in the development of that initial

2      proposal?

3      A    Minimal.  This work was all done by Evercore, White and

4      Case, and Alix, presented to the board, and they offered their

5      opinions.

6      Q    Now, with regard to the proposal, I think you said it was

7      sent to the First Lien Ad Hoc Group.

8      A    It was sent to their advisors.

9      Q    Okay.  And what was your understanding of what the First

10     Lien Ad Hoc Group was at this point?

11     A    I don't understand the question.

12     Q    Let me ask a better question.  Did you send the proposal

13     to all the lenders of the company?

14     A    No.  We sent it to PJT and Gibson Dunn.  They were

15     representing an ad hoc group of large lenders that were taking

16     the lead for the entire lender group as part -- you know, as

17     part of the negotiations.

18          At the time that we sent that initial strawman proposal

19     out, it wasn't clear whether or not the lender group had even

20     gotten restricted.  So the initial proposal was sort of

21     advisor to advisor.

22     Q    Now, could you please describe for us the process that

23     followed after the Debtors sent over that initial proposal to

24     the 1L group advisors?

25     A    Yeah, after a couple weeks they sent us back their

1    response to our proposal.

2    Q    And who was responsible for reviewing that response on

3    behalf of the company?

4    A    On behalf of the company it was our group of advisors,

5    Evercore, White and Case, AlixPartners.

6    Q    And I'm not going to ask you for a count but roughly

7    speaking how many times was there a back and forth between the

8    company and the 1L group with regard to various competing term

9    sheets?

10   A    It could be ten or more.

11   Q    Okay.  And with regard to all of those --

12   A    I just -- I can't, you know, --

13   Q    Fair enough.

14   A    -- paper's flying back and forth, I'm not counting.

15   Q    With regard to each of those proposals, who was

16   responsible for reviewing and evaluating them on behalf of the

17   Debtors?

18   A    Evercore, White and Case, AlixPartners.

19   Q    And who was responsible for making decisions on behalf of

20   the company with regard to what to accept, what to reject, or

21   how to respond on behalf of the company?

22   A    The Special Committee and the Special Committee only.

23   Q    And what, if any, role did the entire board play with

24   regard to these proposals that were going back and forth

25   during this time?

1    A    The entire board would get updated, and the non-Special

2    Committee members would offer up their opinions and thoughts.

3    Q    Now, I think you mentioned before that CVC, in addition

4    to being the equity holder, also had a claim against the

5    Debtors.

6    A    That's correct.

7    Q    Now, do you know how CVC came to become a creditor of the

8    Debtors?

9    A    Yes, I do.

10   Q    And how did that happen.

11   A    In -- there was a time period between March and July of

12   2023 where the company had significant liquidity challenges.

13         And the company's advisors, White and Case and Evercore,

14   had spoken to a group of 1L lenders, a group of 2L lenders,

15   and CVC around various financing transactions to sort of, you

16   know, help deal with that liquidity challenge.

17   Q    And how did the company ultimately decide to deal with

18   that liquidity challenge?

19   A    The company ultimately accepted a proposal from CVC.

20   Q    And who approved the acceptance of that proposal on

21   behalf of the company?

22   A    There was a board and there was a group of then, you

23   know, independent directors on the board at that time who

24   accepted that proposal.

25   Q    And just to make sure the record's clear, that was -- you

1    weren't one of --

2    A    No.  This predates -- it predates me and Larry joining

3    the board.

4    Q    Okay.  Now, back to the CVC claim that was asserted in

5    the bankruptcy, what was the full face amount of the stated

6    claim that CVC put forth?

7    A    As of March 31st, 2024 I believe was in the range of 350

8    to $360 million.

9    Q    And could you please describe for us, sir, what the

10   different components of that claim were?

11   A    Sure.  I can't give all the numbers, I know that.  It was

12   the original funded amount of around $182 million.

13        The debt had a pick feature.  It did not pay in cash.  So

14   it had a pick interest component to it.  It had an original

15   issued discount component to it.  And it had a make whole

16   component to it.

17   Q    And what was the priority of that claim in the capital

18   structure?

19   A    It was pari passu with the other first lien debt.

20   Q    And at the time that that investment was made do you know

21   what the first lien debt of the company was trading at?

22   A    I can't remember what it was trading at but it was a

23   significant discount to par.  So they put 100-cent dollars in

24   against the cap structure that was trading at a significant

25   discount.

1     Q    Now, as part of your work on the Special Committee, did

2     the Special Committee do anything to evaluate the CVC claim?

3     A    Yes.  We charged White and Case with investigating those

4     transactions.

5     Q    Okay.  Now, I think you said one of the elements of the

6     claim, it involved a make whole.

7     A    Yes.

8     Q    Is that something that the Special Committee looked at?

9     A    Yes, we did.

10    Q    And roughly how long did the Special Committee take to

11    evaluate the issues concerning the CVC claim?

12    A    It was ongoing but it went months.

13    Q    And how often was the Special Committee briefed on White

14    and Case's work with respect to this specific workstream, this

15    specific issue?

16    A    Quite often.  I would say weekly as part of the Special

17    Committee meetings.

18    Q    At any point during this process were you concerned or

19    have any reason to believe White and Case was conflicted with

20    regard to its work or not acting on behalf of the company?

21    A    No concern at all.  Once again, the company and the

22    Special Committee were aligned.  CVC was represented by

23    Latham.  So there was, you know, the -- things had been setup

24    correctly.

25    Q    Now, as part of the proposed prepackaged plan that is

1    before the Court, is there a resolution to the CVC claim

2    included in the plan?

3    A    Yes, there is.

4    Q    Now could you please explain to the -- or what is that

5    resolution?

6    A    They have an allowed claim of I believe $213 million.

7    Q    And that compares to the original stated amount of what?

8    A    Of 350 to 360.  So it's a significant discount to the

9    stated claim.

10   Q    Now, how did the amount of that agreed claim come to be?

11   A    It -- so that claim amount was negotiated between CVC and

12   the First Lien Ad Hoc Group that was led by PJT and Gibson

13   Dunn.  And it was heavily negotiated.  There was a lot of back

14   and forth on that potential claim amount.

15   Q    And what, if any, role did the Special Committee play

16   with regard to that negotiation between CVC and the 1L

17   lenders?

18   A    Yeah, I mean, we were involved.  We did not abdicate our

19   fiduciary responsibilities as it related to that.  We

20   maintained our awareness of how that transaction -- how that

21   -- how those negotiations were proceeding.

22        And we continued to get sort of updates from White and

23   Case in regards to what -- based on the issues and the facts,

24   what the appropriate range, you know, settlement range for

25   that claim, you know, might be.

1    Q    Okay.  And when -- how long did the negotiations between
2    CVC and the first lien lenders last with regard to the claim
3    amount?
4    A    I think we -- that final settlement amount, it wasn't
5    agreed to until maybe the last week before we filed, maybe
6    even later than that.
7    Q    Okay.  And when the first lien lenders and CVC came to an
8    agreement on that amount, did the Special Committee have a
9    view as to whether that amount was reasonable?
10   A    We thought that it was fair and reasonable and in the
11   best interest of the estate because it fell within the range
12   of the acceptable settlement amounts that we had determined.
13   Q    To the best of your -- well, did any other creditor
14   constituency ever voice to your knowledge any objection to the
15   amount of the claim that was agreed as a result of those
16   negotiations?
17   A    Not to my knowledge.
18   Q    Now I'd like to talk about a couple of other provisions
19   of the proposed prepackaged plan which is up before the Court
20   for confirmation.
21        One of the provisions of the plan is an equity rights
22   offering, correct?
23   A    Correct.
24   Q    Okay.  Could you please describe for the Court what the
25   purpose of the equity rights offering is?

1      A      So the purpose of the equity rights offering was to repay

2      the $215 million DIP term loan and also put cash on the

3      balance sheet for the company post-restructuring.

4      Q      Did the company consider ways to potentially raise that

5      capital other than an equity rights offering?

6      A      Yes, we did.

7      Q      What other options did you consider?

8      A      Raising it as debt.

9      Q      And why did the company ultimately determine to use the

10     equity rights offering as a mechanism for raising this money?

11     A      Because it minimized the company's debt level, which was

12     -- which we thought was important in terms of solidifying the

13     company's go-forward prospects.

14            You don't want to put too much leverage on a company like

15     ConvergeOne, right.  So we thought less debt was better.  And

16     we agreed, you know, with the approach of the equity rights

17     offering.

18     Q      And was this a term that was subject to negotiations

19     between the company and its constituencies?

20     A      Yes.  It was heavily negotiated.

21     Q      And who were the parties that were involved in that

22     negotiation?

23     A      It was the Special Committee, the company, the First Lien

24     Ad Hoc Group, and CVC.

25     Q      And I don't want to be too repetitive here.  And we

32

1     talked about this a little bit more general, but it's

2     important.  With regard to the decisions made with regard to

3     the equity rights offering, who made decisions on behalf of

4     the company?

5     A    The Special Committee.

6     Q    Anybody else?

7     A    No one else.

8     Q    And just to be clear, did the company need the money that

9     was being raised through the equity rights offering?

10    A    Oh, absolutely.

11    Q    Why?

12    A    Once again, we needed the money to put cash on the

13    balance sheet to provide sufficient liquidity for the

14    post-reorg entities to be able to operate.

15    Q    Does the --

16    A    And we also needed to pay that -- pay back the term loan.

17    Q    Does the equity rights offering included in the plan

18    include a backstop?

19    A    Yes, it does.

20    Q    And what is the purpose of the backstop?

21    A    To ensure that the equity rights offering is fully

22    funded.

23    Q    And was a backstop necessary from the Debtors'

24    perspective?

25    A    Absolutely.  And it's typical.

1    Q    And why was the equity rights offering necessary, in your

2    view?

3    A    Because we had a CLO-heavy bank group.  And CLOs

4    typically are adverse to receiving equity in restructuring

5    transactions and averse to putting in new money as equity into

6    -- in restructuring transactions.

7    Q    And how does the backstop protect against that risk?

8    A    It guarantees that the -- you know, the portion of the

9    lender group that does not participate, that those amounts are

10   made up by participating lenders who are willing to fund the

11   equity.  So it sort of guarantees that the equity rights

12   offering is going to get done.

13   Q    And who is providing the backstop in this case?

14   A    Various members of the First Lien Ad Hoc Group and CVC.

15   Q    Now, was the backstop part of the negotiations that we

16   have previously talked about with respect to the development

17   of the plan?

18   A    Yes, it was.

19   Q    Okay.  And again who was involved in the negotiations

20   with regard to the backstop?

21   A    From the company's perspective it was -- those

22   negotiations were led by Evercore and White and Case.

23   Q    And who was making decisions on behalf of the company

24   with regard to that aspect of the negotiations?

25   A    The Special Committee.

1     Q     Anybody else?

2     A     No one else.

3     Q     And who was the Special Committee negotiating with?

4     A     With the first lien lender group and CVC.

5     Q     Now, does the backstop involve -- do all of the lenders

6     in the 1L class have the option to participate in the

7     backstop?

8     A     No, they don't.

9     Q     Why not?

10    A     Once again, because it was a CLO-heavy group, and many --

11    it was anticipated that many of the 1L lenders would decline

12    to participate.

13          And so what you -- and so what is done, right, in these

14    typical situations is you set up an incentive for people to

15    want to participate in the backstop.  And so you incent them

16    by offering them a holdback and a fee.

17    Q     And how was the amounts of the incentive, the holdback

18    and the fee, determined in this case?

19    A     It was determined by arm's length negotiations between

20    the company, the 1L lenders, and CVC.

21    Q     Just fast-forwarding, ultimately did all of the eligible

22    lenders exercise their right to participate in the rights

23    offering?

24    A     No.

25    Q     Okay.  Now, I think you said that the -- could you just

1    basically explain for us again what the components of the

2    backstop consideration are?

3    A    Yeah.  It was holdback and a fee that was paid in equity.

4    Q    And I think you testified that that was negotiated

5    between the company on the one hand and the 1L group and CVC

6    on the other.

7    A    Correct.

8    Q    And what was your goal as a member of the Special

9    Committee with regard to those negotiations?

10   A    To make sure that those conditions were fair and

11   reasonable and in the best interest of the company.  And we

12   had been provided data and market comparables by Evercore that

13   gave us comfort that the ultimate negotiating provisions were

14   well within market-accepted terms.

15   Q    And how, if at all, did the analysis that you received

16   from Evercore influence your decision as member of the Special

17   Committee with regard to the backstop?

18   A    It gave us comfort that the negotiations were handled

19   appropriately and that -- and, once again, and that the terms

20   that were ultimately agreed to were market and defendable.

21   Q    When were the terms of the backstop commitment finalized?

22   A    All of this came together like in the last 24 hours.  I

23   mean, there were term sheets going back and forth.  But

24   ultimately those terms were finalized within like the last 24

25   to 48 hours.  It was a very hectic and frenzied time period.

1    Q    Now, during the time that the company was negotiating the
2    backstop with the 1L lender ad hoc group and CVC, did the
3    company look for a better deal with regard to the backstop
4    from other parties?
5    A    No, we did not.
6    Q    Why not?
7    A    Because we didn't have time.  The amount of time between
8    finalizing all these terms, getting the Wells Fargo on board
9    so to provide the ABL financing.
10        Once again, there might have been 20 to 48 hours.  But
11   from a practical standpoint there was absolutely no time to
12   take those agreed-upon terms and then go shop it.
13   Q    Now, with regard to when you say 20 to 48 hours, 20 to 48
14   hours before what?
15   A    Before we signed the RSA and then filed.  We were running
16   out of money, like literally running out of money.
17   Q    Now, we talked a bit about the negotiations that the
18   company and the Special Committee had with the 1L lender
19   group.  Did the 1L -- the composition of the 1L lender group
20   change over the time that you were negotiating with them?
21   A    To the best of my knowledge, yes.
22   Q    And how did it change?
23   A    Well, because certain lenders were selling, certain
24   lenders were buying more, certain lenders were selling out.
25   So that composition was -- you know, was changing as a result,

1    you know, of trades that were taking place during the

2    negotiation.

3    Q    Did the company or the Special Committee have any say as

4    to who the members of the ad hoc group were or were not?

5    A    Not at all.  That's an intercreditor issue.

6    Q    Now, did the company have any -- was there a size

7    threshold of the ad hoc group participation that was important

8    from the company's perspective?

9    A    Yeah, we needed to get to 66 and two-thirds so we had

10   enough votes to confirm a plan.

11   Q    Now, with regard to the plan, I think you were telling us

12   that that all kind of came together at the last minute.  Why

13   did the company need to file for bankruptcy so quickly after

14   reaching an agreement on the RSA?

15   A    Because we were running out of money and we were not --

16   the only way for us to get money to maintain our operations

17   and provide sufficient liquidity would be through a DIP.  In

18   order to get a DIP, you have to file.  There was no other way

19   that we were going to get financing.

20   Q    Now could you please describe what happened during the

21   time between the RSA was signed and when the bankruptcy case

22   was filed?

23   A    I mean, ask that question again.

24   Q    Sure.  What happened in between the time when the RSA was

25   signed and the Chapter 11 case was filed?

1      A    I'm not sure I understand the question.  But pretty soon

2      after the RSA, right, the company, you know, filed bankruptcy.

3      Q    And who made the decision to authorize the Debtor's

4      filing --

5      A    Oh, the Special Committee.

6      Q    I'm sorry, I stepped on you.  Could you just repeat your

7      answer?

8      A    I'm sorry, the Special Committee.

9      Q    Okay --

10     A    And we -- you know, we had a meeting to review the terms

11     and the conditions.  We decided that signing up to the RSA and

12     filing bankruptcy was in the best interest of the company and

13     its stakeholders.

14     Q    And at the time that you mad ethe decision to file the

15     Chapter 11 case, what, if any, creditor support did the

16     company have for the proposed plan?

17     A    Well, I believe my memory serves me correct, 81 percent

18     of the 1L lenders signed up, 81 percent of the 1L lenders and

19     81 percent of the second lien lenders signed up to the RSA.

20     Q    And was that fact important to you?

21     A    Extraordinarily important.  It gave -- it told us we had

22     enough votes to confirm a plan.  And it was pretty strong

23     support.

24     Q    And are you -- does the term prepack mean anything to

25     you?

1      A    Yes, it does.

2      Q    What's a prepack?

3      A    It's pretty much when you sort of go and you file with a

4      plan that's already voted on by the key constituency, so it

5      makes the banks -- it makes the bankruptcy process more

6      efficient, and it limits, you know, cost.

7      Q    Did you have a view as to whether through the course of

8      the negotiations you were conducting whether the ability to

9      file prepack was a good thing?

10     A    It's a great thing.

11     Q    Okay.

12     A    And it was important to -- in terms of preserving the

13     company's enterprise value.

14     Q    Now, during the time between when the RSA was filed and

15     the filing of the -- sorry, when the RSA was finalized and the

16     filing of the Chapter 11 cases, did the Debtors make any

17     effort to shop for a new deal?

18     A    Okay, so once we signed the RSA, that RSA included a no

19     shop provision.  So we were precluded by the terms of the RSA

20     from -- you know, from going out and seeking an alternative.

21     Q    At the time that the company decided to file for

22     bankruptcy, did it have any competing proposals or

23     alternatives?

24     A    We did not.

25     Q    Prior to filing for bankruptcy had the company ever

1    received any financing proposal from any member of the ad hoc

2    minority lender group that's objecting here today?

3    A    No.

4    Q    Now, did the RSA include a fiduciary out?

5    A    Yes, it does.

6    Q    And what is your understanding of what a fiduciary out

7    is?

8    A    It compels us -- it gives -- the fiduciary out is

9    important because if -- you know, it allows for higher and

10   better offers to be reviewed by the company.

11        So we can't solicit but we can receive alternative

12   offers.  And if there's an offer that we believe was higher

13   and better and in the best interest of the company and its

14   stakeholders, it would allow us to get out of the RSA.

15   Q    And who was the fiduciary that had the power to exercise

16   that fiduciary out?

17   A    The Special Committee.

18   Q    Let's talk a little bit about alternative proposals.  I

19   think you told me that prior to the bankruptcy filing you had

20   not received any financing proposal from the minority lender

21   group, right?

22   A    That's correct.

23   Q    Did there come a time after the bankruptcy filing that

24   you did receive such proposal?

25   A    Yes.  I believe in late April.

1    Q    Okay.  Now, what, if anything, did the Special Committee

2    do to consider that proposal?

3    A    We used one of our Special Committee meetings to review

4    that proposal.  And that proposal had been analyzed and

5    reviewed by our advisors, and they made a presentation to the

6    Special Committee.

7    Q    And how, if at all, did the financial terms of the

8    proposal received from the minority lender group compare to

9    the financing terms embodied in the proposed -- Debtor's

10   proposed plan?

11   A    Yeah, they were not superior.

12   Q    Why not?

13   A    Strictly from a financial perspective, the recoveries

14   under our plan were slightly higher than the recoveries to the

15   overall 1L group that -- you know, from the alternative

16   proposal.

17   Q    Other problems or reasons that you considered when

18   deciding that the competing plan was not superior?

19   A    Yes, absolutely.  So --

20   Q    Could you tell us what some --

21   A    -- besides the fact that it was not superior, that plan

22   also only had support from 11 percent of the 1L lender group

23   but did not have support from the 2L lenders.  So there were

24   questions about the confirmability of that alternative

25   proposal.

1          It also did not have committed financing associated with

2     it.

3          It -- and then just, you know, I would say generally,

4     okay, it would have added more time, more complexity, more

5     cost to the case.

6          And it would have increased uncertainty, right, which is,

7     you know, not in the best interest, you know, of the company

8     whose enterprise value it's our job to preserve.

9     Q    And how -- just explain to us, sir, how the possible

10    expansion -- extension of the timeline would impact the

11    company from your perspective.

12    A    Well, it would increase uncertainty.  Like we're all

13    professionals here, and we, you know, look at bankruptcy and

14    restructuring in a certain way.

15         But to customers, to vendors, and employees, right, it's

16    viewed very, very differently.  Customers are unwilling to

17    sign new contracts.

18         Key employees are going to go out and look -- you know,

19    if they don't think that the enterprise is going to survive,

20    you lose key employees.

21         Vendors don't want to ship to you, right.  So it

22    increases -- so the more uncertain the outcome of the case is,

23    the more detrimental it is to the future prospects of the

24    company.

25    Q    Now, did the Special Committee communicate its conclusion

1    concerning the proposed alternative financing back to the

2    minority group?

3    A    Yes, we did.

4    Q    Okay.  And what, if anything, did you receive in

5    response?

6    A    We got another response, I believe it was around May 8th,

7    in which they addressed the concerns around having no

8    committed financing.  But it did not address any of the other

9    material shortcomings of that alternative proposal.

10   Q    Okay.  And could -- what, if anything, did the Special

11   Committee do to evaluate that second proposal?

12   A    Once again our advisors put together a pretty thorough

13   presentation.

14        One of the things that they presented to us was a long --

15   you know, was an estimate of how long the case would take and

16   analysis of the company's liquidity over that elongated time

17   period.  We had pretty vigorous and thorough discussions about

18   all of that.

19   Q    And so did your view change with regard to the May 8th

20   proposal as compared to the earlier proposal you received at

21   the end of April from the minority 1L group?

22   A    No, not at all.  I mean, once again, to accept that plan

23   would have been to take on, you know, subject the company to

24   unacceptable risk.

25   Q    And what were the challenges the company would have faced

1     if the Special Committee had decided to terminate the RSA in

2     favor of the minority lender proposal?

3     A    Well, if the RSA had been terminated, then the DIP term

4     loan would have been in default.  So we would have had to have

5     found alternative financing, which the minority lenders had

6     provided commitments for.

7          But the problem with that would be is that it would be a

8     priming term loan, right, against the wishes of the -- you

9     know, the 1L term loan group.

10         And it just would have gotten it messy, right?  And so

11    once again, unacceptable risk.

12    Q    Did the Debtors have sufficient liquidity to have

13    attempted to execute on the minority 1L's proposal?

14    A    Not under the terms that they provided to us.

15    Q    Now, sir, I just want to be clear about a couple of

16    things before we wrap up here.

17         During the course of your work as an independent director

18    for the Debtors, whose interest were you advocating for?

19    A    I was -- the company's and all of its stakeholders.

20    Q    Anybody else?

21    A    No one else.

22    Q    During the course of your work on this engagement, has

23    anybody tried to tell you how you should exercise your

24    judgment as an independent director?

25    A    No one can tell me how to exercise -- to do my job as an

1    independent director.  I would not allow that.

2    Q    Did CVC ever try to instruct you or influence you with

3    regard to any of the exercise of your duties as an independent

4    director?

5    A    No, they did not.  And I would not have responded

6    favorably to that.

7    Q    Sir, as an independent fiduciary of these Debtors and the

8    estates, do you have a view as to whether confirmation of the

9    Debtor's proposed prepackaged plan is in the interest of these

10   estates and their stakeholders?

11   A    It's clearly in the best interest of this company.  It --

12   you know, we have fixed the capital structure; significant

13   deleveraging.

14        We have, you know, provided for sufficient liquidity for

15   the company to operate its business on a day-to-day basis

16   without having to rob Peter to pay Paul.

17        We have a capital structure that makes the management

18   incentive plan real and will allow the company to maintain its

19   top talent, attract, you know, top talent.

20        If this plan is confirmed today, right, it'll be a

21   relatively quick bankruptcy which addresses all of the issues

22   around customers and vendors.

23        Look, from my perspective, approving this plan is in the

24   best interest of the company and all of its stakeholders as a

25   whole.

1          MR. ZAKIA:  Mr. Edmiston, thank you very much.

2          I have no further questions at this time, Your

3     Honor.

4          THE COURT:  Thank you.  Does anyone who supports the

5     plan wish to ask any questions of this witness?

6          (No audible response.)

7          Okay.  Let's proceed to cross examination.

8          MS. ALONZO:  Good afternoon, Your Honor, --

9          THE COURT:  Let me give you the option then.  I know

10    that we're at this weird hour.  I'll give you -- you want to

11    power through, I am a hundred percent on board.

12          If you want to take a short break and grab a

13    sandwich, I just don't know when folks have eaten, and I'm

14    trying to be as sensitive to everyone's needs.

15          If you want to go, I'm ready to go.  If you want a

16    break, I'll give you a break.  I'll let you kind of -- just

17    I'll take guidance from you on that.

18          MS. ALONZO:  No, we can take a half an hour break.

19          THE COURT:  Okay.

20          MS. ALONZO:  But I will just ask before we begin,

21    the new exhibits that were on our amended witness or exhibit

22    list --

23          THE COURT:  Okay.

24          MS. ALONZO:  -- yesterday, --

25          THE COURT:  Yes.

1          MS. ALONZO:  -- I have binders of those and I was

2    just going to bring them up.  But we can do that when we come

3    back as well.

4          THE COURT:  I'll take guidance from you on that.  Do

5    you want to get them in now?  Do you want to --

6          MS. ALONZO:  Sure.  If we -- yeah, and I believe we

7    have stipulations.

8          THE COURT:  If you have stipulated to it then why

9    don't we do that?

10          MS. ALONZO:  Okay.  So these are Exhibits 73 through

11   87.  And we listed them individually on our amended witness

12   and exhibit list, which is at Document No. 375.

13          That document also lists exhibits -- Excluded

14   Lenders' Exhibits 1 through 72 as well, just so you have

15   everything in one spot.

16          THE COURT:  One spot.  Okay.  Any -- Mr. Zakia, can

17   you confirm exhibit -- document 375-73 through 87, no

18   objection to their admission?

19          MR. ZAKIA:  Correct, Your Honor.

20          THE COURT:  Okay.  They're admitted.

21       (ECF 375-73, 375-74, 375-75, 375-76, 375-77, 375-78,

22   375-79, 375-80, 375-81, 375-82, 375-83, 375-84, 375-85,

23   375-86, and 375-87 received in evidence.)

24          Are they on the docket as well?

25          MS. ALONZO:  They are on the docket.  And then I

1    have hard copies for Your Honor and for the witness.

2                THE COURT:  Okay.  Why don't you pass that up just

3    so I've got them here just in case?

4                MS. ALONZO:  Sure.

5                THE COURT:  Any other housekeeping we can do before

6    we take our break?

7                MR. ZAKIA:  I don't think we need to do anything

8    now, Your Honor.  I have one additional exhibit to add, but I

9    could do that at the end of the case.  It's not a problem.

10               THE COURT:  Okay.  Mr. Edmiston, we're going to take

11   a break.  I'm going to remind you that you're still under oath

12   and you speak with no one about your testimony.

13               And let's see, it's 12:04.  Why don't we come back

14   just -- let's just call it 12:40, okay?

15               Thank you.

16               MS. ALONZO:  Thank you, Your Honor.

17               THE CLERK:  All rise.

18         (Recess taken from 12:04 p.m. to 12:41 p.m.)

19               THE COURT:  Good afternoon.  We're back on the

20   record in Converge One.  Mr. Edmiston, I remind you that

21   you're still under oath, and we'll proceed with cross

22   examination.

23               Counsel, whenever you're ready.

24               MS. ALONZO:  Thank you.  Julia Alonzo, from

25   Proskauer Rose, for the excluded lenders.

SHERMAN EDMISTON - CROSS BY MS. ALONZO                    49

1                          CROSS-EXAMINATION

2     BY MS. ALONZO:

3     Q    Good afternoon.

4     A    Good afternoon, how are you?

5     Q    Well, nice to see you again.  CVC directly or indirectly

6     was -- is the owner of 100 percent of the debtor's equity, is

7     that right?

8     A    That's correct.

9     Q    And CVC was the sole owner of the debtor's equity before

10    you were appointed as an independent director, correct?

11    A    That's correct.

12    Q    And they still remain the sole equity owner to this day?

13    A    Up until the point the plan is confirmed, that would be

14    correct.

15    Q    You testified earlier that CVC's claim consisted of

16    certain notes that were issued by the debtors to CVC

17    affiliates, correct?

18    A    That's correct.

19    Q    And that included a $160 million note in July, 2023?

20    A    I believe so, yes.

21    Q    That 160 million is a secured lien, right?

22    A    Yes, it is.

23    Q    And that note from July, 2023, rolled up several

24    outstanding notes that were already issued to CVC affiliates

25    by the debtors?

1       A    That's correct.

2       Q    And those outstanding notes were from March, 2023, is

3    that right?

4       A    Some portion of those notes, yes.

5       Q    And those outstanding -- excuse me, those rolled up notes

6    totaled approximately $33 million?

7       A    Yes.

8       Q    The notes that were rolled up were originally unsecured,

9    is that right?

10      A    That's correct.

11      Q    And in May, 2023, the 33 million in the unsecured notes

12   went to -- were amended and secured through an agreement

13   between a CVC affiliate and the debtors, is that right?

14      A    That's correct.

15      Q    Who was representing CVC in March, 2023, when the 33

16   million in notes were originally issued, do you know?

17      A    To the best of my knowledge, no one was representing CVC.

18      Q    White & Case wasn't representing CVC at that point?

19      A    To the best of my knowledge, White & Case was

20   representing the company at that time.

21      Q    Okay.  And how about in May, 2023, when the unsecured

22   notes were amended to be secured, do you know who was

23   representing CVC at that point?

24      A    I think the answer would be the same, that no one was.

25      Q    Okay.  And just to be clear, excuse me, the CVC affiliate

1    note purchase agreement with the debtors with the additional

2    $160 million, that was from July 6, 2023, is that right?

3    A    Believe so, correct.

4    Q    And do you know who represented CVC at that time?

5    A    I think the answer would be the same, that no one

6    represented CV -- they acted upon -- they acted on their own.

7    Q    Okay.  You knew when you were serving as a member of the

8    Special Committee that the $160 million, excuse me, had

9    occurred only the prior July, correct?

10   A    Yes, I did.

11   Q    And you knew that CVC provided this funding during a

12   period when the debtors were already in financial distress?

13   A    Yes, I did.

14   Q    The debtors were on the brink of failure at that point?

15   A    That's a characterization that I can't make.

16   Q    Okay.  Or they needed immediate access to capital?

17   A    They did need, and they were facing a cash liquidity

18   crunch, and they did need immediate access to capital, that's

19   correct.

20   Q    Okay.  You testified already about being appointed to the

21   Special Committee that was formed on January 16, 2024, right?

22   A    Yes.

23   Q    And you said that you joined the board in December, 2023,

24   because of a potential conflict with CVC, right?

25   A    I joined the board in December because of a potential

1   restructuring.

2   Q    Was one of the reasons that you joined the board because

3   of a potential conflict between CVC and the debtors?

4   A    Any potential conflicts were not discussed as part of the

5   original conversations of me joining the board.

6   Q    Was one of the reasons that the Special Committee was

7   formed because of what you testified to as a potential

8   conflict between CVC and the debtors?

9   A    Yes, that's correct.

10   Q    And you testified that the company's interests might

11   diverge from CVC's, is that right?

12   A    That's correct.

13   Q    CVC was in control of the debtors effectively, right?

14   A    I don't think that that characterization is correct

15   because once the Special Committee was formed, right, the

16   power to negotiate, to approve, to do anything as it relates

17   to the strategic or financial aspects of Converge One, right,

18   was bestowed upon the Special Committee.  So I don't -- the

19   characterization of CVC controlling the debtor, I don't think

20   fits with the situation.

21   Q    That's fair.  I should have been more specific.  Prior to

22   the formation of the Special Committee, CVC was in control of

23   the company.  Would you agree with that?

24   A    I would also think -- so based on what I've been made

25   aware of, that certain decisions like decisions as related to

1    those financings, was ultimately approved by a group of

2    independent directors that were sitting on the board at that

3    particular time.

4         So I think the characterization that CVC controlled the

5    company, even as it relates to that time, is not necessarily

6    accurate.

7    Q    The potential conflict between CVC and the debtors that

8    led to the formation of the Special Committee, was that

9    because CVC was a creditor and an equity holder?

10   A    That potential conflict was solely in respect to CVC's

11   claim as a result of the financings that were done over the

12   time frame that we're discussing.

13   Q    Which resulted in CVC being a creditor of the company --

14   A    Correct.

15   Q    It wasn't a potential conflict at the point that the

16   Special Committee was formed.  It was an actual conflict

17   because CVC was asserting its secured claim, is that right?

18   A    CVC was asserting its secured claim, that's correct.

19   Q    And that claim was against the company, right?

20   A    That's correct.

21   Q    And you testified that it was valued at between $350-360

22   million?

23   A    Somewhere in that range, yeah.

24   Q    Okay.  And that included make whole?

25   A    That's correct.

1    Q    You testified that in early January, before the Special

2    Committee was formed, the debtors made a proposal to the one-L

3    ad hoc group, right?

4    A    That's correct.

5    Q    So you have two binders in front of you.  These are our

6    exhibits.  In the bigger one, if you could turn to exhibit EL-

7    10.  It should be --

8    A    Exhibit 10?

9    Q    Yeah.  Are you there?

10   A    I'm there.  I'm just trying to --

11            THE COURT:  I've got my binder in the back.  Can I

12   just --

13            MS. ALONZO:  Of course.

14            THE COURT:  Give me 30 seconds to go grab it?

15            MS. ALONZO:  Sure.

16            THE COURT:  Thank you.  Sorry.  All right.

17            MS. ALONZO:  Thank you, Your Honor.

18   BY MS. ALONZO:

19   Q    Mr. Edmiston, excuse me, is exhibit 10 the January

20   proposal that the debtors sent to the one-L ad hoc group

21   before the Special Committee was formed?

22   A    Yes, I believe so.

23   Q    Okay.  And this proposal from the debtors proposed to

24   treat the one-L term lenders and CVC in the same way, is that

25   right?

1    A    That's correct.

2    Q    And if you look at page 2, of the exhibit, there's a box

3    that says one-L term loan, one-L note and CVC note, and that's

4    where that treatment is included?

5    A    What box are we looking at?

6    Q    So it's on page 2, of the exhibit.  It says term sheet

7    proposal at the very top of the page?

8    A    Okay.

9    Q    And one, two, three, it's the fifth box down on the left,

10   one-L term, one-L note and CVC note.  Do you see that?

11   A    No, I'm trying to find it where it said Cvc.

12              THE COURT:  Look at the page about --

13              MR. EDMISTON:  Oh, okay, that's page 1.

14   BY MS. ALONZO:

15   Q    Oh, sorry, I was counting the cover page.

16   A    Okay.

17   Q    I apologize.  Sorry.  So yes, on page 1, of the actual

18   presentation, one-L term loan, one-L note and CVC note is all

19   included in one treatment, is that right?

20   A    That's correct.

21   Q    And this proposal from the debtors proposed that the

22   claim amount would -- if you look at the last bullet, include

23   make hold premiums and prepayment premiums.  Do you see that?

24   A    Yeah.

25   Q    This proposal was -- well, was this proposal reviewed by

1    the boards of directors that you sit on at the company?

2    A    Yes.

3    Q    And you authorized Evercore to share it with the one-L

4    term lenders advisors?

5    A    That's correct.

6    Q    I wanted to ask a bit about the Special Committee.  You

7    testified that Jeffrey Russell, the company's CEO, was on the

8    Special Committee, is that right?

9    A    That's correct.

10   Q    And Mr. Russell is slated to receive equity in the

11   reorganized company as part of the management incentive plan

12   that's part of the proposed plan, is that right?

13   A    That's correct.

14   Q    The proposed plan reserves 10 percent of go forward

15   equity for the management incentive plan, right?

16   A    Yes, that's typical.

17   Q    And it's expected that Mr. Russell will be a part of the

18   management team that will receive that equity?

19   A    That's correct.

20   Q    You also testified about the Special Committee using the

21   debtors advisors as the Special Committee's own advisors,

22   correct?

23   A    That's correct.

24   Q    And just to be clear, that's White & Case, Evercore and

25   Alex Partners?

1      A    Yes.

2      Q    You never suggested that the Special Committee hire its

3      own advisors, did you?

4      A    I never suggested that, no.

5      Q    And to your knowledge, no one else suggested that the

6      Special Committee should its own advisors?

7      A    That's correct.  So -- and let me clear, right,

8      considered but not moved on, right.  So we thought about it

9      but not moved on it because we didn't -- it didn't feel like

10     it was necessary.

11     Q    You did consider that the Special Committee appoint its

12     own -- or retain its own advisors?

13     A    I personally considered it, yes.

14     Q    Okay.  Did you put that in writing anywhere?

15     A    No.

16     Q    And did you discuss that with other members of the

17     Special Committee?

18     A    I actually don't recall.

19     Q    Evercore was working directly with CVC.  You testified to

20     that earlier, correct?

21     A    Evercore was working for the company and was interacting

22     with CVC as it related to, you know, mediating the

23     negotiations.

24     Q    Okay.  In your smaller binder, and I apologize for the

25     two, can you turn to tab 73.  It should be the first tab.  And

1    that's exhibit EL-73.

2    A     Okay.

3    Q     Are you there?

4    A     Yes.

5    Q     Okay.  This is an email from Evan Levine at Evercore,

6    right?

7    A     Sorry, say that again?

8    Q     This is an email from Evan Levine at Evercore, is that

9    right?

10   A     According to this document, yes.

11   Q     Do you know who Evan Levine is?

12   A     Yes, I do.

13   Q     Who is he?

14   A     So Evan Levine is an Evercore banker.

15   Q     Okay.  And was he senior in the Evercore team that was

16   working with the debtors?

17   A     Yes.

18   Q     Okay.  And in this email, Evan Levine is emailing several

19   people at CVC, right?

20   A     That's correct.

21   Q     Everyone on the to line of the email has a CVC email

22   address?

23   A     That's correct.

24   Q     And then he copies some folks at Evercore and Bojan

25   Guzina, from White & Case, is that right?

1    A    That's correct.

2    Q    So this email was sent, if you look at the top, on

3    January 23rd, right?

4    A    That's correct.

5    Q    And that was a week after the Special Committee was

6    formed?

7    A    Yes.

8    Q    In this email, Mr. Levine is forwarding a reorg alert

9    about another company's restructuring.  Do you see that?

10   A    Yes.

11   Q    And the company is called Charismatic, I believe?

12   A    I don't -- could be.  I'm not familiar with this email,

13   I'm not familiar with -- okay, I see, Charismatic --

14   Q    Yes.  Can you read the first line of Mr. Levine's email?

15   A    Interesting comp for us, obviously different set of facts

16   but a lot of comparability here.

17        MS. ALONZO:  Who do you think Mr. Levine is

18   referring to when he says us in that sentence?

19        MR. ZAKIA:  Objection, Your Honor, speculation.

20        THE COURT:  He can answer if he knows.

21   BY MS. ALONZO:

22   Q    If you know?

23   A    I don't know.

24   Q    All of the people in the to line of this email are to

25   CVC, correct?

1    A    That's correct.

2    Q    Okay.  Were you aware that the one of your advisors was

3    discussing directly with CVC an example of a bankruptcy filing

4    that they thought was an interesting comp?

5    A    I was aware that Evercore was having conversations and

6    discussions with CVC, like I was aware they were having

7    conversations with the one-L group.

8    Q    You weren't aware of the specific conversation though,

9    correct?

10   A    I was not aware of the specific conversation, no.

11   Q    Okay.  Can you turn to the next tab which is exhibit 74.

12   A    So -- okay.

13   Q    Do you see that?

14   A    Yes.

15   Q    Okay.  And if you go to the second page --

16   A    Okay.

17   Q    -- about halfway down the second page, there's another

18   email from Evan Levine.  Do you see that?

19   A    From Evan?

20   Q    Yes, about halfway down the second page?

21   A    Okay.  I see it now.

22   Q    And that's dated February 5, 2024, do you see that?

23   A    Yes.

24   Q    Okay.  And if you need a moment, take your time to review

25   this email but he's sending the email to a similar set of CVC

1      employees in the to line?  Everyone has a CVC email address?

2      A     Yes.

3      Q     And he's also sending it to Mr. Guzina, from White &

4      Case?

5      A     Yes.

6      Q     And the Evercore team?

7      A     Correct.

8      Q     And he's forwarding another reorg article about a

9      different company.  This one is called Cano Health (phonetic),

10     is that right?

11     A     It appears so, yes.

12     Q     Okay.  And the first line of Mr. Levine's email which is

13     again on the second page of this exhibit says all, for

14     reference another example of a BK filing that looks very

15     similar to what we are discussing.  Do you see that?

16     A     I do see that, yes.

17     Q     To the extent you know, who was we in that email?

18     A     I don't know who we is.

19     Q     If you could turn to page -- or I'm sorry, to tab 76

20     which is exhibit EL-76.  Let me know when you're there?

21     A     I'm here.

22     Q     Okay.  Now if you go to the second page of this exhibit,

23     there's an email from Stephen Florant (phonetic).  I apologize

24     if I --

25     A     Which page am I looking at now?

1    Q    The second page of exhibit 76.

2    A    Okay.

3    Q    Do you see that email from Stephen Florant?

4    A    Yes.

5    Q    Do you know who Stephen Florant is?

6    A    Stephen Florant is a member of the Evercore team but I

7    have never met him.

8    Q    Okay.  And he's sending this email to P.J. Heyer, Cameron

9    Hishensota (phonetic) and Bruce Lee, all at CVC, correct?

10   A    It appears so, yes.

11   Q    And copying an Evercore email?

12   A    Yes.

13   Q    And the subject line in his email is C-One weekly call

14   materials, do you see that?

15   A    Yes.

16   Q    Do you know what weekly call materials -- withdrawn.  Do

17   you know what weekly calls he's referring to?

18   A    No, I don't.

19   Q    Were there weekly board calls that you were participating

20   in around February 5th, the date of this email?

21   A    Yes.

22   Q    Okay.  And that was a weekly call that you and Mr. Nihan

23   (phonetic) and Mr. Russell were on, among others?

24   A    Correct.

25   Q    If you keep reading Mr. Florant's email, it says P.J.,

1      please find attached the weekly call materials for tomorrow.

2      Let us know if there's anything else you would like to cover.

3      Do you see that?

4      A      Correct.

5      Q      P.J. Heyer, to be clear, is not an employee of the

6      debtors, right?

7      A      No.

8      Q      He's an employee of CVC?

9      A      He's a CVC employee.

10     Q      If you go now to the first page of this exhibit which is

11     a more recent email in the chain from P.J. Heyer, do you see

12     that?

13     A      Yes.

14     Q      And he adds a couple of recipients in the to line, Lars

15     Hague, and also Mr. Guzina, from White & Case, do you see

16     that?

17     A      I see that.

18     Q      Okay.  And the first -- or the second line in his email,

19     second paragraph, sounds like we're not ready to discuss

20     compensation at the board level.  Do you see that?

21     A      Yes.

22     Q      So do you understand that in this email, Mr. Heyer is

23     saying that he doesn't think we are ready to discuss

24     compensation with the board?

25     A      Yes.

1    Q    Did you know -- do you know what CVC and Evercore were

2    discussing regarding compensation?

3    A    It would not be clear to me based on the details of this

4    email what they were talking about in particular.  What I can

5    say is that during this time, the board was discussing sort of

6    like stay bonuses, retention bonuses, those sorts of things

7    for key management and key employees.  But I can't say with

8    any certainty that that's specifically what they were talking

9    about in that email.

10   Q    Okay.  But they were, from this email, it appears to you

11   that Evercore was asking CVC what should be discussed at a C-

12   One board meeting, correct?

13   A    Well, the email is from P.J., to Evercore.

14   Q    Right.  So P.J. is telling Evercore what should be

15   discussed at a C-One board meeting?

16   A    I think they're offering their opinions about what they

17   would like to see covered at the board meeting.  I don't think

18   they were telling, or directing Evercore.

19   Q    Okay.  You can set that aside for now.  You testified

20   that CVC and the one-L ad hoc group were negotiating the

21   amount of CVC's claim, correct?

22   A    Can you repeat that question again?

23   Q    Sure.  You testified that CVC and the one-L ad hoc group

24   were negotiating the amount of CVC's claim?

25   A    That's correct.

1    Q    You weren't aware of CVC making its own proposals

2    directly to the one-L ad hoc group, correct?

3    A    No, I was aware that CVC was making direct -- I mean it

4    was their claim, right.  It was their negotiation so it

5    wouldn't surprise me if they were making direct proposals to

6    the one-L group.  But I was not -- I did not see them.

7    Q    So you're not personally aware of any direct proposals

8    made from CVC to the one-L ad hoc group?

9    A    No, I am not.  I am aware that negotiations were going

10   on.

11   Q    CVC would make its proposals through the debtors

12   advisors, correct?

13   A    Correct.

14   Q    And through Evercore in particular?

15   A    In particular.

16   Q    Okay.  If you could go back to your larger binder, and go

17   to tab 24.  And let me know when you're there.

18   A    Okay.

19   Q    And this is exhibit EL-24, for the record.  You've seen

20   this document before, correct?

21   A    I'm sure I have, yes.

22   Q    And it's a term sheet that the debtors prepared dated

23   February 13, 2024?

24   A    Yes.

25   Q    And it was sent to the one-L ad hoc group, right?

1       A     I believe so.

2       Q     Before it was sent to them, it would have been reviewed

3       by the Special Committee, right?

4       A     Correct.

5       Q     And if you go to page -- the top of the second page, the

6       first page of the proposal, I believe you testified about this

7       on direct.  There's a red and a blue box to denote whether a

8       proposal came from the debtors or from CVC --

9       A     Correct.

10      Q     -- do you see that?  And that's what those boxes mean?

11      A     Yes.

12      Q     At the bottom of that page, there's -- the bottom left, a

13      row that's called incremental capital raised at emergence, do

14      you see that?

15      A     Yes.

16      Q     Okay.  And this row is about the equity rights offering,

17      right?

18      A     Yes.

19      Q     In the second column of that row which is the one-L ad

20      hoc group, February 8th counter, that row says that the ERO --

21      that the equity rights offering will be backstopped only by

22      the one-L ad hoc group.  Do you see that?

23      A     That's correct.

24      Q     And then one column over is the debtors February 13th

25      counteroffer, is that right?

1     A     Correct.

2     Q     And that says that the backstop will be backstopped by

3     the one-L ad hoc group and CVC, right?

4     A     That's correct.

5     Q     And CVC's written in blue?

6     A     It's in blue.

7     Q     So --

8     A     The evidence is CVC's position, not the company's

9     position.

10    Q     So if you go to the next page, the second row that says

11    one-L term loan and one-L note.  The second column which is

12    the one-L ad hoc group's February 8th counter, the last bullet

13    says reject, right?

14    A     Yes.

15    Q     And that is rejecting what is in the first column, C-

16    One's initial proposal that the claim amount would include

17    make hold premiums and prepayment premiums?

18    A     Yes.

19    Q     So in the third column, there's now a counteroffer also

20    in blue that says CVC's claim settlement at the amount of 330

21    million, is that right?

22    A     Yes.

23    Q     Okay.  And CVC added that as well?

24    A     Correct.  This is -- once again, when it's in blue, it's

25    evidence that it is a CVC position.

1    Q    Okay.  Going down one row, there's a lot of text in blue.

2    I'm not going to go through all of these bullet points with

3    you, but does it include CVC sharing pro rata with the one-L

4    lenders in the equity rights offering?

5    A    Yes.

6    Q    And also in here, there's a bullet about, again, CVC's

7    claim being allowed in the amount of 330 million?

8    A    Yes.

9    Q    Before this proposal was sent to the one-L ad hoc group,

10   CVC didn't make a proposal to the Special Committee regarding

11   the text that's in blue in this document, correct?

12   A    No, they didn't make a proposal to us.

13   Q    The Special Committee never reviewed any proposals from

14   CVC regarding the treatment of its claim, did it?

15   A    We reviewed term sheets such as this in our Special

16   Committee meetings.

17   Q    You never engaged in negotiations with CVC, right?

18   A    Right, but we -- as it relates to these specific items,

19   we did not engage in negotiations with CVC.  Our strategy was

20   allow CVC and the one-L group to hash out those negotiations

21   amongst themselves.

22   Q    And as part of that --

23   A    We would step in if needed.

24   Q    -- CVC's proposals were worked into the company's

25   proposals and this exhibit is one example of that?

1     A     That's correct.

2     Q     Okay.  CVC did have one-on-one communications with the

3     debtors advisors about items that affected the debtors

4     interest -- or I'm sorry, withdrawn.  CVC did have one-on-one

5     communications with the debtors advisors about items that

6     affected the CVC's interest, right?

7     A     That's correct.

8     Q     And CVC would make its position known at full board

9     meetings, correct?

10    A     That's correct.

11    Q     Now I want to ask you a bit about some emails that

12    preceded the February 13th discussion materials -- or February

13    13th term sheet that we were just discussing.  And I

14    apologize, we might have to go back and forth a bit.

15    A     Going back to the small book now?

16    Q     For now, and I apologize if you have to go back to the

17    big one.  So let's look at -- actually, before you do that,

18    there was a Special Committee meeting that was on February

19    12th, where you reviewed the materials that are in the deck we

20    were just discussing, right?

21    A     That's correct.

22    Q     Okay.  In the days leading up to that meeting, are you

23    aware that CVC was discussing the one-L ad hoc group's

24    proposal directly with Evercore?

25    A     Yes, I was.

1    Q    And Evercore was actively advising CVC on what CVC's

2    recovery would be under the one-L ad hoc group's February 8th

3    proposal?

4    A    CVC was providing analysis to -- I'm sorry.  Evercore,

5    right, was providing CVC with analysis and information for

6    which CVC -- to inform CVC and their position, but they were

7    not advising CVC.

8    Q    Okay.  So now let's turn, in the little binder, to

9    exhibit EL-78, which is tab 78.  Are you there?

10   A    Yes.

11   Q    So this is a February 10th email from Evan Levine, right?

12   A    Yes.

13   Q    And it's sent to the C-One deal team at CVC, right?

14   A    Yes.

15   Q    And also Mr. Guzina, at White & Case?

16   A    That's correct.

17   Q    And also Mr. Sal Lombardi, do you see that?

18   A    Yes.

19   Q    Who is Sal Lombardi?

20   A    Sal is the CFO, of C-One.

21   Q    And there's also a bunch of Evercore folks, CVC, right?

22   A    There's a whole army of Evercore folks on this email.

23   Q    In the first paragraph of this email, Mr. Levine says we

24   spoke with PJT yesterday specifically to confirm our

25   understanding re the two options presented on the treatment of

1     your claim.  Do you see that?

2     A     Yes.

3     Q     Do you have any reason to think that CVC was incapable of

4     asking PJT to explain the one-L ad hoc group's proposal to

5     them directly?

6     A     It would be unusual for them to do so.

7     Q     Was there anything prohibiting them from doing so?

8     A     There was nothing prohibiting from them, but it would be

9     unusual for them to not have these conversations with the

10    company's advisors.

11    Q     In the bullet points that are listed in Mr. Levine's

12    email, there was a lot of information about two options that

13    the one-L ad hoc group proposed -- presented for treatment of

14    CVC's claim.  Do you see that?

15    A     I see a lot of bullet points, yes.

16    Q     Yeah.  And there's a bullet point that says option one,

17    your claim is 145 million.  Do you see that?

18    A     Yes.

19    Q     And then about halfway down, option two, your claim is

20    182 million?

21    A     Yes.

22    Q     Okay.  And underneath each of those bullet points, there

23    are other bullet points where Mr. Levine is telling CVC what

24    that claim amount would result in, in percentage of the class.

25    Do you see that?

1       A     What bullet point are we talking about?

2       Q     So for example, the second bullet point, total one-L debt

3       pool excluding ABL is 128 -- 1.281 billion.  So you get 11

4       percent of the class.  Do you see that?

5       A     Okay, yes.

6       Q     And then there are some additional bullet points

7       underneath that convert that 11 percent to a dollar amount in

8       certain different scenarios, right?

9       A     Yeah.

10      Q     And then he does the same thing with option two?

11      A     Correct.

12      Q     Okay.  Do you know why CVC couldn't do these calculations

13      themselves?

14      A     So CVC -- I don't know why.  But I can conjecture that

15      although CVC's a very sophisticated financial party, these

16      types of constructs are more typical to restructuring

17      situations than maybe other situations that CVC is used to.

18      Okay.

19            And so it would not surprise me, right, that in order for

20      CVC to have a complete understanding of the impact of these

21      options to their particular claim, they would want Evercore,

22      the company's advisors, to walk them through the financial

23      impacts to them of these different constructs.

24      Q     And that's because Evercore was a financial advisor that

25      was well versed in these types of restructuring transactions?

1       A    Extraordinarily well versed.

2       Q    Do you know why CVC didn't hire its own financial

3    advisor?

4       A    I do not know.

5       Q    Okay.  So -- and I just want to point out, this email,

6    exhibit 78, was sent on February 10th, at 8:35 a.m.  Do you

7    see that at the very top?

8       A    Yes.

9       Q    Okay.  Now if you go back to your big binder, to tab 21.

10      A    Twenty-one?

11      Q    Twenty-one, and this is exhibit EL-21, for the record.

12   And let me know when you're there.

13      A    I'm getting there.  Okay.

14      Q    So if you look at the bottom email on the first page of

15   this exhibit, it's an email from Patrick Griffin at Evercore.

16   Do you see that?

17      A    Yes.

18      Q    Do you know who Patrick Griffin is?

19      A    He's an Evercore employee.

20      Q    And he was working on the C-One restructuring?

21      A    I've seen his name on emails.

22      Q    And he's sending this email to several other Evercore

23   employees, right?

24      A    Yes.

25      Q    And it's sent on February 10th, at 10:03 a.m.?

1    A   Yes.

2    Q   The second paragraph of Mr. Griffin's email says in the

3    meantime, we're laying out another page to just illustrate the

4    option one versus option two tradeoffs clearly as Evan laid

5    out in email to CVC.  Do you see that?

6    A   Yes.

7    Q   Okay.  That parenthetical at the end of this email, as

8    Evan laid out in email to CVC, that's a reference to the email

9    that we were just discussing, exhibit 78, that talked about

10    the two options, correct?

11    A   I don't know factually because I was not involved in this

12    email chain.  But I would assume that they're connected but I

13    have no factual knowledge there.

14    Q   Sure.  And just to point out again, this email was sent

15    at 10:03 a.m., on February 10th, about an hour and a half

16    after the email at exhibit 78 was sent, is that right?

17    A   It appears so, yes.

18    Q   Okay.  Now if you could go back to the little binder, to

19    tab 79, exhibit EL-79.  Are you there?

20    A   Yes.

21    Q   Okay.  The bottom -- or on the first page, about halfway

22    down is the email from Mr. Levine on February 10th, at 8:30,

23    that we were just discussing, right?

24    A   Yes.

25    Q   And then the top email is another email from Mr. Griffin

1    at Evercore to the C-One deal team at CVC, plus a lot of

2    Evercore people and Mr. Guzina and Mr. Lombardi, do you see

3    that?

4    A    Say it again, please?

5    Q    Sure.  So this email at the top of exhibit 79 is to the

6    CVC deal team -- or the C-One deal team at CVC, a bunch of

7    Evercore people, Mr. Guzina and Mr. Lombardi?

8    A    Yes.

9    Q    Okay.  And you're not on this email, right?

10   A    No, I'm not.

11   Q    And Mr. Nihan isn't on this email?

12   A    No, he's not.

13   Q    Mr. Griffin's email says please find attached additional

14   materials that describe the option one versus option two math

15   below, and also illustrate how the ERO and backstop economics

16   may impact pro forma equity splits under a range of claim

17   sizes.  Do you see that?

18   A    Yes.

19   Q    Okay.  Now if you keep on flipping in this email, you'll

20   get to an attachment.  It's discussion materials dated

21   February 11th.  Do you see that?

22   A    Yes.

23   Q    And then there's a page that says at the top, 28 one-L

24   AHG term sheet, illustrative CVC treatment, right?

25   A    Okay.

1 Q And then the next two pages are titled illustrative

2 equity ownership from the equity rights offering, and

3 illustrative CVC equity recoveries, do you see that?

4 A Uh-huh.

5 Q If you go to -- and these two last pages, they provide

6 additional analysis on CVC's potential equity ownership and

7 recovery based on different scenarios, right?

8 A Am I looking at the last page?

9 Q The last two pages, but yes?

10 A Yes.

11 Q Okay.  So now if you do go to the last page, and you'll

12 see a box on the right with a header commentary, do you see

13 that?

14 A Yes.

15 Q And that says even after deducting the dollars invested

16 in the ERO, CVC's recovery on account of claims materially

17 improves if it is a backstop party.  Do you see that?

18 A Yes, I see that.

19 Q So this is Evercore providing its conclusion to CVC, that

20 CVC's recovery will materially improve if it's part of the

21 backstop group, right?

22 A That's correct.

23 Q So Evercore's telling CVC it's better for you if you get

24 into the backstop group?

25 A It would appear.

1       Q    Have you seen this presentation before?

2       A    I believe so.

3       Q    Do you know when you've seen it?

4       A    I can't recall.  I've seen so many presentations and so

5       many numbers that I could not specifically tell you what --

6       Q    So you don't have any specific recollection of seeing

7       this presentation?

8       A    I've seen this type of analysis, okay.  Once again, the

9       Special Committee was actively involved.  And these sorts of

10      analyses would be analyses that would be also shared with us,

11      okay.  So I believe I have this analysis before.

12      Q    Okay.  Were you aware of these specific communications

13      that are in exhibit 79, that were happening between Evercore

14      and --

15      A    The plethora --

16      Q    -- CVC?

17      A    -- of emails that we just went through?

18      Q    Correct.

19      A    I was not specifically aware of those communications.

20      Q    Okay.  Thank you.  So you can put that aside.  Almost a

21      month prior to the filing, the debtors reached an agreement in

22      principle with CVC and the one-L ad hoc group on CVC's claim

23      amount and treatment, is that right?

24      A    I can't recall when it happened, when we actually got to

25      a final agreement.

1       Q    Okay.

2       A    But it could have been within the month.

3       Q    Can you turn in your big binder to exhibit 40, tab 40.

4       A    Okay.

5       Q    And these are minutes from a meeting of the Special

6       Committee dated March 8, 2024, right?

7       A    Yes.

8       Q    And you were at this meeting?

9       A    Yes, I was.

10      Q    Okay.  If you go to the second page of the minutes, the

11      third paragraph says next Mr. Levine provided an update.  Do

12      you see that?

13      A    Uh-huh.

14      Q    And right before the redaction -- or I'm sorry,

15      withdrawn.  Provided an update on negotiations between the AHG

16      and CVC, explaining that significant progress had been made

17      and that an agreement had been reached in principle regarding

18      the CVC claim amount.  Is that right?

19      A    Yes.

20      Q    Okay.  So either before or on the date of this meeting

21      which was, excuse me, March 8th, the ad hoc group and CVC had

22      come to an agreement on CVC's claim amount, right?

23      A    Correct.

24      Q    Okay.  And they'd also come to an agreement that CVC

25      would be in the backstop group by this point, correct?

1      A    I can't recall.

2      Q    Let's go to your little binder again, to exhibit 87.

3      It's the last tab in the binder.

4      A    Okay.

5      Q    Are you there?

6      A    Yes.

7      Q    Okay.  This email is dated March 4th, right?

8      A    Yes.

9      Q    Just a couple of days before the March 8th meeting we

10     were just discussing?

11     A    Yes.

12     Q    And it's an email again from Mr. Levine at Evercore,

13     right?

14     A    Yes.

15     Q    To P.J. Heyer at CVC?

16     A    Correct.

17     Q    And it copies Rupesh Shaw at Evercore, do you see that?

18     A    Yes, I do.

19     Q    Who is Rupesh Shaw?

20     A    Rupesh is another Evercore banker.  There were two senior

21     Evercore bankers on the deal, Rupesh and Evan.

22     Q    All right.  And Evan also copies Mr. Guzina at White &

23     Case, and then Steve Spitzer at Alex Partners?

24     A    Yes.

25     Q    Who's Steve Spitzer?

1    A    Steve Spitzer is a partner at Alex, and he was the lead
2    person from Alex on the deal.
3    Q    Okay.  So this is an email to all of the debtors advisors
4    and CVC, right?
5    A    Yes.
6    Q    Okay.  And take a moment to review this email, and let me
7    know when you're finished.  And I'll tell you, I'm only going
8    to ask about the first page.
9    A    You want me to read the whole thing, okay.
10   Q    I'm only going to ask you about the first page but if
11   you'd like to read the whole thing, go ahead.
12   A    Okay.
13   Q    Okay.  So this email lays out proposed schedules for what
14   Mr. Levine calls plan A, right?
15   A    Yes.
16   Q    And the first few bullet points of this email are about
17   negotiations with one-L's, right?
18   A    Correct.
19   Q    And the second bullet, right underneath negotiations with
20   one-L's says we have three, four finalized strawman
21   transaction structure including CVC treatment with big four in
22   quotes.  Do you see that?
23   A    Yes.
24   Q    Do you know what big four means?
25   A    So I don't have direct knowledge of what big four means,

1    but I would assume that it means the four largest holders of

2    the one-L ad hoc group.  But I don't know for sure.

3    Q    Do you know who those four largest holders are?

4    A    Kennedy Lewis, Silver Point, couple others.  I don't --

5    can't immediately recall.

6    Q    Sure.  And by this point, March 4th, the negotiations

7    with these parties were pretty advanced, right?

8    A    Yes.

9    Q    The next bullet says by end of week of 3/4, begin

10   outreach to broader AHG members to achieve requisite consent

11   thresholds, is that right?

12   A    Correct.

13   Q    So this email means that as of March 4th, the claims held

14   by the first lien lenders that the debtors were negotiating --

15   withdrawn.  This means that as of March 4th, the debtors

16   weren't negotiating with the entire one-L class, they were

17   just negotiating with what they called the big four, is that

18   right?

19   A    Well, they were negotiating with the ad hoc steering

20   committee, okay.  Whether or not that steering committee and

21   the big four are the same group, I couldn't tell you.

22   Q    Okay.  And just to be clear, the second bullet that talks

23   about the finalized strawman transaction structure including

24   CVC treatment, CVC's claim treatment was already agreed or was

25   pretty close to being agreed on by March 4th, right?

1    A    No, because it's saying finalized strawman transaction

2    structure.  Okay.  So there was a framework, all right, in

3    which to agree but from that point on -- so we still needed to

4    get 66 and two-thirds or more on board in order to be able to

5    confirm a plan, and ultimately we were going to need to get

6    the two-L's on board.

7         There was a framework for what we call a strawman for the

8    transaction structure including CVC's treatment.  But at that

9    time, to the best of my recollection, we did not have the

10   requisite 66 and two-thirds votes on board.

11   Q    So --

12   A    Okay.  To either CVC's claim, or any of the economics on

13   the equity rights offering, backstop agreement, and those

14   structures changed as we moved toward getting to an RSA and

15   filing because as we needed -- actually as the one-L lenders

16   needed more votes to get people to come on board all of these

17   terms, right, changed to some degree.

18   Q    Right.  So I'm just talking about as of March 4th, when

19   you were just negotiating with the big four, you hadn't

20   reached out to the broader AHG members yet, is that right?

21   A    Correct.

22   Q    And that was something that --

23   A    That's --

24   Q    -- as it says here was going to start by the end of the

25   week of March 4th?

1      A    Correct.

2      Q    Okay.  And the big four, those -- they didn't represent

3      66 and two-thirds percent yet, right?

4      A    To the best of my knowledge, no.

5      Q    Okay.  Can you go back to the big binder and take a look

6      at tab 39.  This is exhibit EL-39.  This is a term sheet from

7      the one-L ad hoc group's advisors, right?

8      A    Yes.

9      Q    PJT and Gibson Dunn?

10     A    Yes.

11     Q    And if you look at the top right corner of the cover,

12     it's dated March 5, 2024?

13     A    Yes.

14     Q    Okay.  And that's the day after the email that we were

15     just discussing, right?

16     A    Correct.

17     Q    So this term sheet, like the other one we were looking

18     at, has three columns.  The first is the one-L ad hoc group's

19     February 27th proposal.  The second is C-One's February 29th

20     proposal, and the third is the current proposal from the ad

21     hoc group dated March 5th, right?

22     A    Yes.

23     Q    Okay.  And do you see on the third page, it has number

24     three at the bottom --

25     A    Okay.

1    Q    -- the top of that page, a row that has incremental

2    capital raised at emergence in a dark blue box?

3    A    Yes.

4    Q    And in that row, there's a bullet point in each column

5    that says backstop.  Do you see that?

6    A    Yes.

7    Q    So in the first column, the backstop bullet just says

8    backstop by one-L AHG, right?

9    A    Yes.

10   Q    And so that means in the ad hoc group's February 27th

11   counter, only the ad hoc group is going to backstop the rights

12   offering, right?

13   A    That's correct.

14   Q    The next column, C-One's 2/29 counter, it says backstop

15   by one-L AHG and CVC, right?

16   A    Correct.

17   Q    So the debtors were proposing that CVC along with the ad

18   hoc group being -- would be in the backstop group, right?

19   A    Say it again?

20   Q    Sorry.  That was confusing.  In the debtors February 29th

21   counter, the company was proposing that the one-L ad hoc group

22   and CVC would both be participating in the backstop, right?

23   A    So I would have to refresh my memory by looking at the

24   actual term sheet.

25   Q    The February 29th counter?

1    A    What the February 29th counter in order to tell you

2    definitively whether or not that was the company's position or

3    whether or not that was the company's position around the

4    general restructuring and it was CVC's position as it relates

5    to the backstop.

6    Q    Understood.  So --

7    A    Right.  This is -- remember, for the most part, this is

8    an inter-creditor negotiation.  From the company's perspective

9    and the Special Committee's perspective, right, the sausage

10   making around the backstop, the equity rights offering, and

11   the actual economics as long as they were within market, okay,

12   we would be fine with that.  Our main concern, right, was

13   getting to a deal.

14   Q    So -- understood.  The document that was sent to the ad

15   hoc group, and we can take a look at it if you want, but there

16   was one document that said that the backstop group parties

17   would be the one-L ad hoc group and CVC, and that was sent

18   from Evercore to the one-L ad hoc group's advisors, right?

19   A    Without seeing the document, I'm going to take your word

20   for it.  I haven't seen it.  I can't recall the document.

21   Q    Okay.  That's fine.  So now if we go to the one-L ad hoc

22   group's 3/5 counter in the third column, the backstop bullet

23   point says agreed, right?

24   A    Correct.

25   Q    So that means that the one-L ad hoc group was agreeing to

1    the one-L ad hoc group and CVC both participating in the

2    backstop?

3    A    Correct.

4    Q    Okay.  At the bottom of that page, there's another row

5    that says CVC note?

6    A    Yes.

7    Q    In the first column which is the ad hoc group's February

8    27th counter, sets the value of the CVC note at 155 million,

9    right?

10   A    Correct.

11   Q    And the next bullet point, excuse me, in that same column

12   says CVC will be able to participate in certain elements of

13   the DIP and the ERO backstop.  Do you see that?

14   A    Yes.

15   Q    But in that proposal, as we just discussed, CVC was not a

16   full member of the backstop group, right?

17   A    Say that again, please?

18   Q    Sure.  So in the one-L ad hoc group's February 27th

19   proposal, CVC was not a full member of the backstop group?

20   A    In the one-L group proposal, that's correct.

21   Q    Correct.  So now in the next column, on the CVC note row,

22   there is a proposal for a whole host of things for CVC's

23   treatment?

24   A    Correct.

25   Q    That CVC would participate in the backstop and the ERO,

1    etcetera?

2    A    Correct.

3    Q    And the claim amount is blank, right?

4    A    Yes, that's correct.

5    Q    In the second to last bullet.  So in the February 29th

6    proposal, CVC was getting all of the treatment in that box but

7    there wasn't a specific claim amount that was proposed in

8    response to the 155 million from the ad hoc group?

9    A    That's correct.

10   Q    In the third column which is the ad hoc group's March 5th

11   counteroffer, the first, second and fourth bullet points all

12   say agreed, right?

13   A    Yes.

14   Q    So the ad hoc group is agreeing with most of what's in

15   that second column, correct?

16   A    (No verbal response.)

17   Q    And the only thing new is CVC's secured note to be

18   allowed in an aggregate amount of par, plus accrued including

19   matured portion of OIB.  And then there's 213 million in

20   bracket, assuming a 331 filing.  Do you see that?

21   A    Correct.

22   Q    And CVC's claim is valued at 213 million in the plan on

23   file, right?

24   A    That's correct.

25   Q    So now go back to the top row on this page, there's

1    another bullet point that's called backstop fees.  Do you see

2    that?

3    A    Yes.

4    Q    In the first column backstop fees are 10 percent payable

5    in equity, right?

6    A    Correct.

7    Q    And that's again the one-L ad hoc group's proposal on

8    February 27th?

9    A    Yes.

10   Q    The next column, the company proposes a lower fee of

11   eight percent instead of 10 percent, right?

12   A    Right.

13   Q    Payable in equity before delusion by the management

14   incentive plan and the two-L's?

15   A    Correct.

16   Q    And then in the third column, excuse me, the one-L ad hoc

17   group goes back to a 10 percent backstop fee, right?

18   A    Correct.

19   Q    So this is the ad hoc group basically saying we'll let

20   CVC into the backstop group, and we'll give CVC everything

21   else that it wanted in that bottom row, and we'll value their

22   claim at 213 million, but the fee has to be 10 percent, right?

23   A    So the way you're asking me that question is you're tying

24   all of those individual elements together, all right, and

25   assuming that the 10 percent fee, that there's some sort of

1    quid pro quo there, and I think that's not necessarily the way

2    that this all happened.

3    Q    But it was -- all of those points were provided in a

4    single document, and I understand different text color but in

5    a single document that was sent from Evercore to the 1L ad hoc

6    group's advisors.  Right?

7    A    Yes.

8    Q    Okay.  And the backstop fee in the Plan is 10 percent?

9    A    That's correct.

10   Q    Okay.  Now you testified -- you can put that aside for

11   now --

12   A    Okay.  This whole binder?

13   Q    Well, we'll go back to it in a second.

14   A    Okay.

15   Q    But I don't think we'll need the little one anymore.

16   A    Okay.

17   Q    Thanks for bearing with me on that.  You testified on

18   your direct about the excluded lenders' alternative proposals.

19   Right?

20   A    Correct.

21   Q    And you said that -- withdrawn.  Let's just go through

22   them.  If you can, in the big binder go to Exhibit 58.

23   A    Okay.

24   Q    This is an April 26 letter from David Hillman at

25   Proskauer.  Right?

1    A    Yes.

2    Q    And this is the excluded lenders' first alternative

3    proposal?

4    A    That's correct.

5    Q    You reviewed this letter?

6    A    Yes, we did.

7    Q    And the Special Committee considered the proposal that's

8    included in this letter?

9    A    As I testified previously, yes.

10   Q    And you authorized White & Case to resign.

11   A    Correct.

12   Q    So now if you'd flip to Tab 60, Exhibit 60, EL60.  This

13   is White & Case's response?

14   A    Yes, it is.

15   Q    And just to be clear, this is the response that the

16   Special Committee authorized.  Right?

17   A    Correct.

18   Q    And it's sent 3 days later on April 29.  Right?

19   A    Yes.

20   Q    So there's 3 bullet points on the first and second pages

21   of this letter.  And right above the first one it says, The

22   alternative proposal suffers from 3 principal deficiencies

23   that render it unworkable.  Do you see that?

24   A    Yes.

25   Q    And the first bullet point says, Lack of financing

1    commitments.  Right?

2    A    Correct.

3    Q    The second one says, Potential loss of DIP loan

4    commitments.  Right?

5    A    Correct.

6    Q    And the third one on the next page says, Extension of

7    current time line.  Right?

8    A    Correct.

9    Q    So those are the Debtor's 3 main problems with the

10   excluded lenders' April 26 proposal, that's how this letter is

11   framed.  Right?

12   A    Those are 3 important problems that the Debtor had with

13   this proposal.  Okay.  And I am not reading this letter in

14   depth, all right, because I testified previously there were

15   other issues, such as the fact that this proposal did not have

16   sufficient lender support from the 1Ls or the 2Ls to be

17   confirmable.

18   Q    So --

19   A    Okay.  That it would also add significant risk as to the

20   outcome of the case, risk and uncertainty that was potentially

21   damaging to the enterprise value of the business.  So there

22   are both qualitative and quantitative issues as it relates to

23   the alternative proposal.  Not all of them are necessarily

24   incorporated in this response letter.

25   Q    So, and just going back to the first page of this letter,

1     of Exhibit 60, those 3 bullet points that we went through,

2     those are described as 3 principal deficiencies.  Right?

3     A    Correct.

4     Q    Okay.  If you go to the last page of this letter, the

5     last paragraph, it says, If you want the Debtors to reconsider

6     the alternative proposal, please fix the infirmities

7     identified above and submit an actionable proposal.  Do you

8     see that?

9     A    Yes.

10     Q    And it says a little bit farther down, We will continue

11     to engage with you in good faith consistent with our fiduciary

12     duty.  You see that.  Right?

13     A    Yes, I do.

14     Q    Okay.  So now if you go to Exhibit 62, and this is the

15     excluded lenders' modified alternative proposal.  Right?

16     A    Uh-huh.

17     Q    And it was sent on May 8.  Is that right?

18     A    Correct.

19     Q    Now you just testified in the Debtor's April 29 letter

20     that the first problem listed in that letter with be excluded

21     lenders original proposal was that it didn't have a financing

22     commitment.  Right?

23     A    Correct.

24     Q    And this modified proposal does have a financing

25     commitment.  Right?

1    A    It does have a financing -- it does have a financing

2    commitment.  The amount of that commitment was not sufficient

3    to provide sufficient liquidity to carry the Debtor through a

4    60- to 90-day extended case.

5    Q    Okay.  So I apologize if there aren't page numbers here,

6    but if you keep going through this exhibit, you'll see a bunch

7    of signature pages and then there's a page, it says on the

8    top, Page 19 of 29, and it says Annex 1.

9    A    Yes.

10   Q    Do you see that?

11   A    Uh-huh.

12   Q    This lists all of the parties to the commitment letter

13   and the amounts that they are committing to fund.  Right?

14   A    Correct.

15   Q    All right.  Did you review this page when you considered

16   this letter?

17   A    Absolutely.

18   Q    You didn't have --

19   A    I know Blue Torch very well.  Absolutely.

20   Q    And so you don't have any concerns with the credit

21   worthiness of anyone listed here?

22   A    I have no concerns with Blue Torch or Cerberus, I can't

23   speak to the other firms who are much smaller participants

24   because I don't know them.

25   Q    Okay.  So just to be clear, this proposal addresses the

1    first point in the April 29 letter.

2    A    Partially, yes.  It addresses it.

3    Q    Partially addresses it.  So now if you go back to the

4    first page of this letter, in the bottom paragraph -- are you

5    there?

6    A    Okay.  I'm trying to.  The first page of the letter.

7    Q    Yes.

8    A    Okay.

9    Q    All right.  In the bottom paragraph you'll see that this

10   letter also addresses the second point in the April 29 letter

11   because it provides a replacement DIP.  Right?

12   A    Correct.

13   Q    And so that resolved the second issue that White & Case

14   put in its response about the potential loss of DIP financing.

15   Right?

16   A    No, it doesn't.

17   Q    Why doesn't it?

18   A    It doesn't because it would be actually a priming DIP.

19   Q    Uh-huh.

20   A    Right.  Blue Torch is not a current member of the bank

21   group, is not a current member of the existing DIP term loan.

22   Okay.  Right?  And so therefore, right, it doesn't have any

23   sharing in the collateral in order for this deal, okay.  In

24   order for this deal to be approved it would have to be -- we

25   would have to be giving them a priming DIP.  Right?  Priming

1    collateral, and that would be -- and the existing lenders who

2    are fine priming themselves may not be -- may not be fine

3    having an outside party such as Blue Torch priming them.

4    Q    So it --

5    A    And so whereas we have a DIP term loan that has

6    certainty, no priming issues.  Right?  This deal, okay,

7    inserts uncertainty and it's not clear if it's

8    transactionable.

9    Q    So if you could turn now to Tab 65 in your binder,

10   Exhibit EL65.  Are you there?

11   A    Yes.

12   Q    This is White & Case's May 10 response to the excluded

13   lenders' modified alternative proposal.  Right?

14   A    Yes.

15   Q    And if you could just read the second paragraph to

16   yourself on the first page, and let me know when you're done.

17   A    (Perusing document.)  Yes.

18   Q    Okay.  This letter doesn't say anything about the priming

19   DIP issue that you just discussed.  Right?

20   A    No, it does not.

21   Q    And separate from delays it doesn't talk about any

22   uncertainty.  Right?

23   A    No, it doesn't.

24   Q    Okay.  So this --

25   A    But it's not necessary, right, in this letter to outline

SHERMAN EDMISTON - CROSS BY MS. ALONZO                96

1      all of the many concerns that the Special Committee had with

2      that proposal, just a few of them.

3      Q    So you're just complaining about delay and materially

4      higher professional fees and other costs that result from that

5      delay?

6      A    We're not complaining.

7      Q    Okay.  I --

8      A    Okay.  We're pointing out the issues --

9      Q    Okay.  So --

10     A     -- okay, with the alternative proposal.  It's not a

11     complaint, these are very real issues.

12     Q    All right.

13     A    Okay.  And --

14     Q    Point taken.

15     A    Okay.

16     Q     So to be clear this letter is just stating that there

17     are additional costs that will result from a delay of

18     confirmation.  Right?

19     A    Additional costs, the letter is stating additional costs.

20     Q    Okay.  This letter doesn't ask the excluded lenders to

21     cover that additional cost.  Right?

22     A    No, it doesn't.

23     Q    And no one from the company picked up the phone and

24     called anyone to see if the excluded lenders would cover that

25     additional cost?

1    A    Not to my knowledge.

2    Q    Okay.  Can you turn to the second page of this letter?

3    And the last 2 sentences of this letter say, This is not a

4    close call.  The independent directors will not abandon the

5    Plan.  Do you see that?

6    A    That's correct.

7    Q    So at this point the Debtors are simply choosing not to

8    engage with the excluded lenders any further.  Is that right?

9    A    I don't think that's accurate.  What we're saying is this

10   modified proposal, okay, as presented to us, is not -- it

11   doesn't work.  Right?  On many, many levels it doesn't work

12   and doesn't provide enough value to the Debtor, okay, to take

13   on the additional risk and uncertainty.  Right?  The words,

14   Not a close call, is correct.  The fact that the independent

15   directors will not abandon the Plan or the modified Plan is

16   correct.

17        MS. ALONZO:  If you could just give me one moment to

18   consult with my colleague.

19        (Pause in the proceedings.)

20        MS. ALONZO:  Thank you, Mr. Edmiston.  I have no

21   further questions.

22        THE COURT:  Any redirect?

23        MR. ZAKIA:  Just briefly, Your Honor.

24                    REDIRECT EXAMINATION

25   BY MR. ZAKIA:

1    Q    Mr. Edmiston, a couple of questions.  Counsel spent a

2    fair bit of time on cross detailing a number of discussions

3    between the company's advisors and CVC related to the

4    negotiation of the Plan.  Do you recall those questions that

5    you were asked?

6    A    Yes, I do.

7    Q    I just want to make sure we're clear on a couple of

8    things.  Was CVC's agreement ever, from the Special

9    Committee's perspective, a pre-condition to the company

10   agreeing to enter into a restructuring plan?

11   A    No.

12   Q    Okay.  Was CVC's agreement, if you could get it, seen as

13   beneficial to the company?

14   A    Helpful and beneficial.  Well, we, as a Special

15   Committee, in an exercise of our fiduciary responsibilities

16   would have moved on in a plan that did not include CVC if it

17   had sufficient votes to confirm the Plan and sufficient

18   financing.

19   Q    Okay.  But why was it beneficial from the company's

20   perspective to include CVC and try to get a deal that included

21   them?

22   A    Because it would avoid litigation, it would help us to

23   get to a pre-pack, and as I discussed earlier, right, getting

24   the company in and out of bankruptcy as swiftly as possible

25   was essential to preserving the company's enterprise value.

1    Q    Now at the time that the Special Committee approved the

2    Plan did you have a view as to whether the backstop economics

3    that were embodied in it were fair and reasonable?

4    A    The view was, based on the analysis provided to us, that

5    the backstop economics were fair and reasonable, and to the

6    extent that it helped us get to a deal were in the best

7    interest of the Debtor.

8    Q    Have you heard anything since that time, up to and

9    including today, that's caused you to change your view?

10   A    Nothing.

11   Q    Now, sir, with regard to -- counsel showed you a number

12   of communications between Evercore and CVC in the course of

13   your cross-examination.  Right?

14   A    Correct.

15   Q    I think you testified that some of those you had not been

16   familiar with the specific communications, hadn't seen them.

17   A    Yes.

18   Q    Is there anything that you saw during your cross-

19   examination, any of those documents or anything that you've

20   learned at any point up until this minute that's caused you to

21   question or reconsider your view that Evercore was acting in

22   the best interests of the company?

23   A    Nothing.  Evercore did a great job.

24   Q    With regard to the alternate proposal let's talk about

25   the modified alternate proposal that counsel was asking you

1        about just a couple of seconds ago.  Who made the decision

2        that that proposal was not superior to the Plan that the

3        Debtors -- we just looked at.

4        A        The Special Committee.

5        Q        And was it a close call?

6        A        Not a close call.

7        Q        Why not?

8        A        In fact, it would have been an abandonment of our

9        fiduciary responsibilities to blow up the RSA and pursue the

10       modified proposal.

11       Q        Why is that?

12       A        Once again, it didn't have sufficient support from the

13       lenders to confirm the Plan.  It added time and expense, it

14       added risk and uncertainty.  Right?  And it would increase the

15       likelihood of litigation.  There were a whole host of reasons

16       why it did not make sense to blow up the deal that we had that

17       had been approved by a significant amount of the 1L and 2L

18       lenders to pursue a plan that did not provide superior value

19       to the one -- to the Plan that we had already had agreed upon

20       would increase risk and uncertainty.

21       Q        Thank you.

22                MR. ZAKIA:  No further questions, Your Honor.

23                THE COURT:  Any further recross?

24                MS. ALONZO:  No, Your Honor.

25                THE COURT:  Thank you very much for your time, sir.

1              THE WITNESS:  Thank you, Your Honor.

2          (Witness steps down.)

3              THE COURT:  Okay.  Any further -- we'll give the

4      witness an opportunity to get off the stand and then we'll ask

5      questions.

6          (Pause in the proceedings.)

7              THE COURT:  Mr. Zakia, anything --  --

8          MR. ZAKIA:  What?

9              THE COURT:   -- any other witnesses?

10             MR. ZAKIA:  No other witnesses, Your Honor, from the

11     Debtors.

12             THE COURT:  Okay.

13             MR. ZAKIA:  One last evidentiary issue just to close

14     the Record from our perspective, we filed last night at Docket

15     Number 372 a supplemental exhibit list that includes Debtors'

16     Exhibit Number 71.  This was just some amended responses to

17     some discovery requests.  We had the original version admitted

18     at the first hearing, and we have consulted with the objecting

19     parties and have agreed that we would be able to supplement to

20     add Exhibit 71.  So I'd ask that that be admitted at this

21     time.

22             THE COURT:  Any objection?

23             MS. ALONZO:  No.

24             THE COURT:  Okay.  It's admitted.

25         (Debtors' Exhibit No. 71 received in evidence.)

102

1        MR. ZAKIA:  Your Honor, at this point the Debtors

2    rest.

3        THE COURT:  Okay.  Any other evidence from any other

4    parties in support of the Plan or any --

5        (No audible response.)

6        THE COURT:  Okay.  Let me turn to the objecting

7    parties, the excluded lenders.  Any other evidence or any

8    other witnesses?

9        MS. ALONZO:  No additional evidence beyond what I

10   already proffered that is listed at Document No. 375.  We have

11   an Amended Declaration of Kesha Lowe (phonetic), which is at

12   Docket Number 340, and there are several exhibits attached to

13   that document.  And we've had agreement from counsel for the

14   Debtors to move that Declaration and its exhibits into

15   evidence.

16       THE COURT:  That's at 340?

17       MR. ZAKIA:  No objection.

18       THE COURT:  Okay.  Thank you.  Counsel, can you just

19   remind me of the numbers again?  It's 340 -- oh, I see it.

20   The 340 includes exhibits attached to it?

21       MS. ALONZO:  It does, yes.

22       THE COURT:  Got it.  Okay.  Thank you.  They're

23   admitted.

24       MS. ALONZO:  Thank you.

25       (Ad Hoc Group's Exhibit No. 340 received in evidence.)

1           MS. ALONZO:  And no further evidence or witnesses --

2           THE COURT:  Okay.

3           MS. ALONZO:   -- from us.

4           THE COURT:  At this point can I consider the

5    evidentiary record closed?

6           MR. ZAKIA:  I believe so, Your Honor.

7           MS. ALONZO:  Yes, Your Honor.

8           THE COURT:  Okay.  Thank you.  Let's proceed to

9    closing argument.

10          MR. KOSTER:  Good afternoon, Your Honor.  Charles

11   Koster, White & Case, counsel to the Debtors.  I'd like to

12   start where we began.  Last Friday during openings I had

13   stated that in order to confirm this Plan, Your Honor only

14   needs to find that the backstop is necessary and its terms are

15   reasonable and negotiated at arms length, and I said that the

16   evidence will unequivocally prove those points.  And it has.

17          Confirmation of this pre-packaged Plan will achieve

18   remarkable results for this global business and its thousands

19   of employees, customers and stakeholders.  It will eliminate

20   more than $1 billion in secured debt and allow the Debtors to

21   raise 245 million of critical new capital through the equity

22   rights offering.

23          But the Plan itself as I said last week is

24   unremarkable.  And the rights offering is neither novel nor

25   controversial.  Courts routinely approve similar transactions

104

1    and that is why we have the support of 89 percent in the

2    amount of our first lien lenders and 100 percent of our second

3    lenders.

4         There's 1 objection, as Your Honor knows, from the

5    minority group.  They complain about being left out of the new

6    financing, which was organized and committed by other

7    creditors and they attempt to find flaw in the process that

8    resulted in the Debtors determining to pursue that financing.

9    But they have no inherent right to participate in that

10   financing or receive consideration for doing so.

11        Parties have been making identical arguments for

12   years and courts have repeatedly rejected them.  The objection

13   ignores mountains of precedent and demands a change in the law

14   that courts cannot make and have repeatedly declined to make.

15        In short the objection is as unpersuasive as the

16   Plan is unremarkable.  During openings we anticipated that the

17   minority group would attempt to skirt the sheet volume of

18   legal authority and confuse the straightforward confirmation

19   case by conflating the backstop consideration with the Plan

20   treatment for pre-petition claims, casting doubt on the

21   independence of the Special Committee, using communications

22   among the Debtors' advisors and CVC to suggest that the

23   process and Plan are fatally flawed, and citing their own

24   half-baked 11th hour proposals and the Debtors' responses to

25   them as evidence of the Debtors' biases.

105

1            Sure enough, the objectors have attempted to do

2      exactly that.  But the evidence clarifies rather than

3      confuses.  The backstop is necessary and the backstop terms

4      are reasonable and were negotiated at arms length.

5            Your Honor has now heard live testimony from Mr.

6      Shaw, from Evercore, our independent director, Mr. Edmiston

7      from the Special Committee over 2 days.  You've reviewed

8      written Declarations from our general counsel, Mr. Goncalves,

9      and Mr. Keysha Lowe (phonetic) for the minority group.  You've

10     reviewed a written Declaration and proffered testimony from

11     Mr. Spitzer, our lead financial advisor from AlixPartners.

12     The evidentiary record includes numerous communications

13     informing now the Debtors developed the Plan and negotiated

14     with the stakeholders.

15           The robust record shows, among other things, the

16     following, members of the minority group knew about the

17     restructuring negotiation from the very beginning.  The

18     minority group nevertheless waited until weeks after the

19     petition date to approach the company or make an alternative

20     proposal.  And when they finally made a proposal it was based

21     on the exact same economics as the Plan transaction.  There

22     was no improvement for the company.

23           It was also fatally flawed due to its lack of

24     stakeholder support and necessity to extend the Chapter 11

25     process by months, if not longer, at great cost and risk to

1    the business.  And as Mr. Edmiston just testified, the DIP

2    commitment which, while we had every reason to believe was

3    fully committed, was itself not in his words transactionable

4    due to the inability to prime the existing lenders in the

5    capital structure.

6           There were no conflicts in negotiation over the Plan

7    transaction.  The Special Committee was fully empowered to

8    make all restructuring decisions on behalf of the Debtors, and

9    it was free of CVC's control and influence.  There's not a

10    single piece of evidence showing any attempted or actual

11    interference by CVC with the Special Committee, because there

12    was none.

13           The Special Committee oversaw the negotiations with

14    several stakeholders, including CVC.  The Debtors' advisors

15    communicated with CVC where appropriate to help guide the

16    Debtors to the best possible outcome, which was a consensual

17    and confirmable transaction.

18           Evercore showed CVC math to ensure that they were

19    not talking past each other which is entirely typical and

20    expected in a transaction like this.  Any sloppy language in

21    banker presentation used in describing the aggregate

22    consideration that a party would receive is not determinative

23    on the pure legal issue of what on account of means.

24           The Debtors and the first lien lenders needed to

25    engage with CVC to resolve its claim amount.  Failing to do so

107

1    would lead to time consuming and costly litigation in Chapter

2    11.  And the parties achieved this goal.  CVC's claim is

3    allowed in a fraction of the amount initially asserted and the

4    Debtors are poised to complete a fast and efficient

5    restructuring process as a result.

6         The backstop is necessary and the backstop

7    consideration is reasonable based on the Debtors' review of a

8    comprehensive set of comparable transactions.  There is no

9    evidence for the Court to even theoretically conclude that

10   this backstop is not on market terms.  The Plan is the result

11   of a fair process that achieves the best result available for

12   the estates.  And the Special Committee considered the

13   minority group's alternative proposals in good faith and

14   determined that pivoting to them would place the estates at

15   substantial risk for all the reasons that Mr. Edmiston just

16   articulated so well.

17        These facts support confirmation of the Plan even

18   under the strictest scrutiny.  The evidence does not support

19   the minority group's theories and the Court should overrule

20   the objection on that basis alone.

21        But even if there were any factual support for their

22   position, Your Honor, they're wrong in the law.  First,

23   there's no basis to replace the well-settled confirmation

24   requirements under Section 1129(a)(3) of the Bankruptcy Code

25   with a standard of review relevant to second guessing a

1    corporate fiduciary's business decisions.  Section 1129(a)(3)

2    of the Bankruptcy Code does not carry the heavy load that the

3    objectors place on it.  The Court only needs to consider

4    whether a debtor proposed a plan with a legitimate and honest

5    purpose of reorganizing and whether the plan has a reasonable

6    hope of success.

7         And that is absolutely the case here, Your Honor.

8    This holistic transaction was the best available option for

9    the estates and it remains the best available option today.

10   Even if the Debtors negotiated the transaction with CVC on

11   anything less than arms length, which they did not, it is

12   uncontroverted that CVC agreed to a substantial reduction in

13   its claim amount making the pre-packaged plan possible.  The

14   minority group cannot shoehorn their concerns into the good

15   faith inquiry.

16        Second, a non-pro rata backstop does not offend the

17   equal treatment requirement under the Code.  Minority debt

18   holders that do not participate in financing opportunities

19   frequently argue that such arrangements provide additional

20   distribution to similarly situated debt holders in violation

21   of Section 1123(a)(4).  Courts consistently reject this

22   argument, and efforts to derail backstop agreements on this

23   basis fail without exception.

24        Courts have interpreted Section 1123(a)(4) which

25   requires that a plan provide the same treatment for each claim

1     or interest of a particular class, to require equal treatment

2     for claims but not necessarily claimants.  The opportunity to

3     provide new financing is separate from the treatment of

4     existing claims.

5            The 8th Circuit addressed this issue directly and

6     most recently in *Peabody*, which we cite in our response.

7     There the plan had contemplated raising new capital through a

8     private placement of preferred equity and was offered at a 35

9     percent discount to plan value.  Noteholders in that case had

10    to commit to support the plan to participate, and they would

11    receive larger premiums based on the timing of their

12    commitment.

13           This allowed holders of less than 1/3 of the

14    relevant claims to obtain more than 2/3 of the preferred

15    equity.  The deal was cut in a mediation over the scope of

16    pre-petition liens where only certain of the creditors had

17    participated.  So the exclusive opportunity to participate for

18    the highest backstop premiums was only available to the

19    original participants, and the Bankruptcy Court confirmed the

20    plan, the District Court affirmed and the 8th Circuit affirmed

21    as well, holding that the right to participate in the private

22    placement was not treatment for a pre-petition claim but

23    rather consideration for a valuable new commitment.

24           Likewise, Your Honor, in *Latam* (phonetic), which we

25    also cited in our response,  creditors opposed the plan

1    arguing that certain creditors in a class received a superior

2    opportunity for recovery relative to other creditors in the

3    same class on account of the backstop fees, and the objectors

4    compared the 20 percent all in recovery for non-backstop

5    parties to the 44 percent all in recovery for the backstop

6    parties.

7          And the Bankruptcy Court overruled that objection as

8    well, explaining that Section 1123(a)(4) addresses plan

9    treatment of claims in a specified class, not treatment class

10   members may separately receive other rights or contributions.

11   The objectors appealed the confirmation order and the District

12   Court there affirmed as well.

13         In doing so it noted that other sections of the

14   Bankruptcy Code, including the provisions that required the

15   backstop be reasonable and made in good faith "allay concerns

16   that the parties may use backstop agreements as a pretext for

17   unjustifiable unequal treatment of creditors".  And for the

18   reasons discussed, Your Honor, this Plan does not offend those

19   other provisions of the Code either.

20         Many Bankruptcy Courts, including this Court, have

21   reached the same conclusion.  In *EP Energy* Judge Isgur

22   confirmed a plan where only certain creditors in a class

23   received backstop consideration.  In *CHC* the Bankruptcy Court

24   for the Northern District of Texas the Court also confirmed a

25   plan with a financing premium paid in equity to the RSA

111

1    parties noting that a premium to the plan sponsors did not

2    result in disparate treatment.  We cite those cases and

3    several others in our response as well.

4         Even the courts, Your Honor, that have expressed

5    some concerns that a non-pro rata backstop may result in

6    disparate treatment have concluded that Section 1123(a)(4) is

7    not the right vehicle to advance this objection.  In *Pacific*

8    *Drilling*, which both we and the objectors cite, the Bankruptcy

9    Court for the Southern District of New York declined to

10   approve a consensual backstop agreement stating that the Code

11   is loathe to big creditors negotiating a deal if little

12   creditors in the same boat do not get the same deal.

13        But the Court also acknowledged that the Code allows

14   for reasonable financing terms that are not a disguised means

15   of giving bigger creditors a preferential recovery, and that

16   backstop fees are appropriate when the risk taken and the fees

17   are proportional to that risk.  And the Court ultimately

18   approved a slightly reduced backstop fee to the exact same

19   parties, despite earlier expressing its misgivings.

20        So again, Your Honor, the protection to creditors

21   outside the new money commitment is the reasonableness of the

22   backstop fees, not disparate treatment.  And for the reasons

23   previously articulated the new money terms here are eminently

24   reasonable.

25        Third, Your Honor, the minority group attempts to

112

1    skirt the sheer weight of the decisional case law that is

2    directly on point by suggesting that the Supreme Court

3    decision from *LaSalle* mandates shopping the financing

4    opportunity like the equity commitment here to the universe.

5           Well, *LaSalle* does not even provide a framework for

6    reviewing the backstop under this Plan, let alone require that

7    it be open to the minority group.  Parties have attempted to

8    apply *LaSalle* in this context for years, and courts as well

9    have repeatedly rejected the invitation to do so.

10          Let's talk briefly about *LaSalle*.  In *LaSalle*

11   existing equity had the exclusive opportunity to purchase new

12   equity under the plan.  The unsecured creditors in that case

13   had rejected the plan, so it had to comply with the absolute

14   priority rule to be confirmed.  And if the opportunity to

15   purchase new equity was provided on account of the pre-

16   petition equity interests, it would violate the absolute

17   priority rule.

18          And the Supreme Court held that in order to

19   demonstrate that existing equity was receiving new equity on

20   account of new value and not on account of existing out-of-

21   the-money interest, it had to demonstrate that it was

22   investing on the best terms available to the Debtor.  In other

23   words, by providing evidence of a market test.

24          The minority group's efforts to extend *LaSalle* to

25   this case where senior creditors voted overwhelmingly to

**App. 1097**

113

1    accept the Plan and absolute priority is not implicated falls

2    flat.  *LaSalle* did not address a rights offering or a backstop

3    agreement and no court has applied it in this context.

4          The minority group has raised TPC several times

5    throughout this hearing, including in an effort to undermine

6    Evercore's comp set.  Counsel, as we learned, was involved in

7    that case and seized upon dicta from a hearing approving a DIP

8    in which the court expressed concerns that fees majority

9    noteholders were slated to receive under the Plan in

10   connection with the debt and equity rights offering were not

11   market tested and could signify discriminatory treatment.  But

12   the court did not articulate those concerns again during the

13   case.  The parties had ultimately settled, and its musings

14   have no persuasive value here.

15         But even assuming *LaSalle* were applicable, Your

16   Honor, the minority group still ignores the fundamental truth

17   that this was not an exclusive opportunity.  Other parties

18   were free to make competing proposals.  And indeed the

19   minority group did.  The Debtors had a fiduciary out under the

20   RSA that allowed them to pursue a superior proposal.  None

21   materialized for all the reasons that Mr. Edmiston articulated

22   so clearly today.  The minority group's proposals were not

23   superior and did not activate the Special Committee's

24   fiduciary duties nor require them to exercise the fiduciary

25   out to pursue those alternatives in lieu of the Plan.

114

1          And of course if *LaSalle* had any of the relevance

2     that the minority group ascribes to it, that could not be

3     squared with the numerous non-pro rata backstops in the 25

4     years since that decision.  Non-pro rata backstops are common

5     and routinely approved in this district and others.

6          Your Honor, I have a list that my team prepared

7     which is approximately 30 cases long of non-pro rata exclusive

8     backstop opportunities.  I am not going to go through that

9     list, but just to highlight a few, some of which --

10         THE COURT:  Thank you.

11         MR. KOSTER:   -- deal with exclusivity.

12         So *LaSalle*, Your Honor, and any market test

13    necessary to ensure that the new value exception to the

14    absolute priority rule is satisfied is irrelevant in this

15    context.  The proper inquiry is whether the backstop is

16    necessary and its terms are reasonable.  And that of course

17    makes sense.

18         How could a Debtor ever maximize value if it was

19    forced to forsake bird-in-hand financing from creditors

20    capable of delivering a confirmable plan with a cost delay and

21    ultimate pointlessness of canvassing the market for

22    alternatives that would only jeopardize the Debtors' ability

23    to reorganize.  A marketing process in this context would be a

24    practical impossibility.

25         So the minority group ignored the folly of the rule

115

1    they seek to impose, and they do so by waiving the supposed

2    superiority of their alternative proposals.  Of course a

3    creditor cannot force a debtor to abandon a plan merely by

4    providing an alternative, and the Court cannot supplant the

5    Debtors' business judgment absent extraordinary relief like

6    the appointment of a trustee which the objectors are not

7    seeking and for which there is clearly no basis under the

8    circumstances.

9        The Debtors still enjoy exclusivity and would be a

10   clear abdication of fiduciary duties to toggle to a plan with

11   no accepting class on the premise that the minority group can

12   then designate the votes of all other creditors.  The

13   suggestion that the Debtors do so informs their obstructionist

14   motives.  Your Honor, we are through the looking glass.

15       So after 2 days of evidence we can say with more

16   confidence that we did at the start of the hearing that this

17   confirmation case is easy.  The backstop is necessary and its

18   terms are reasonable and were negotiated at arms length.  The

19   objection is one that has been made repeatedly under virtually

20   identical circumstances and courts have repeatedly rejected

21   it.  It ignores volumes of precedent, cases approving similar

22   transactions and declining to rewrite the law on the terms

23   that the objectors seek.

24       The objection is, in short, a law review article.

25   And to counsel's credit, a very well written one at that.  In

**App. 1100**

116

1    fact, there are several law review articles advocating for a

2    similar change in the law, but that is an argument for

3    Congress and not for this Court.  Your Honor faithfully

4    applies statute as written and case law that is binding upon

5    this Court.

6         And if the Code or case law prohibit a non-pro rata

7    backstop, we lose.  But that's not the law.  Neither the

8    statute nor decisional case law support that proposition.  The

9    standard is whether the backstop is reasonable and this

10   backstop clearly is.

11        Your Honor, I'm happy to address any questions that

12   the Court has on these points or on the Plan generally.  And

13   if none, I'd kindly request an opportunity to respond after

14   counsel's argument.

15        THE COURT:  Okay.  Thank you.

16        MR. KOSTER:  Thank you.

17        THE COURT:  Anyone else who supports the Plan wish

18   to address the Court?

19        MR. MARTORANA:  Good afternoon, Your Honor.  Keith

20   Martorana of Gibson Dunn & Crutcher, counsel for the first

21   lien ad hoc group.  Your Honor, I will be brief and I'll try

22   to avoid duplicating arguments that were raised by counsel as

23   much as possible, but I do think there are certain items that

24   are worth re-highlighting here.

25        Your Honor, the excluded lenders here go to pains to

117

1    paint a picture of bad faith and conflicts of interest.  They

2    also muddy the waters on the legal standard and raise

3    significant red herrings related to Section 1123(a)(4) of the

4    Bankruptcy Code.  They do this because they know that unless

5    they can show something truly nefarious here, there's simply

6    nothing to see here, Your Honor.

7         The transaction here is completely ordinary.  And if

8    Your Honor agrees that the evidence has shown both a need for

9    the backstop and that the fees were reasonable as counsel

10   indicated, then the Plan must be confirmed.

11        Starting with the legal standard, the minority

12   lender group argues that the right standard here is the

13   heightened entire fairness standard.  They get to the standard

14   in a roundabout way by starting with Section 1123(a) --

15   1129(a)(3) of the Bankruptcy Code which requires that a plan

16   be proposed in good faith and not by any means forbidden by

17   law.

18        Looking at the second prong they then argue that the

19   applicable law here is Delaware law and following therefrom

20   the insider status of CVC requires application of the entire

21   fairness standard.  The problem with this analysis is two-

22   fold.  First off it assumes that the applicable law for

23   approval of the Plan is Delaware corporate law.  It's not,

24   it's federal bankruptcy law.

25        So where does federal bankruptcy law deal with

118

1    things like fees on EROs?  It's really just one sentence down,

2    which is in Section -- Subsection 1129(a)(4) of the Bankruptcy

3    Code.  That section states the following, "Any payment made or

4    to be made by the proponents, by the debtor or by a person

5    issuing securities or acquiring property under the plan for

6    services or for costs and expenses in connection with the case

7    or in connection with the plan and incidents of there case has

8    been approved by or is subject to the approval of the Court as

9    reasonable".

10        This section directly applies to the ERO and the

11    fees thereunder.  Here, the Debtor, who is also the Plan

12    proponent, and also the person issuing securities under the

13    Plan, is making a payment for costs and expenses in connection

14    with the Plan and in connection with the case which is mainly

15    to put option premium and the direct investment opportunity.

16        And this section sets its own standard for approval,

17    reasonableness.  It does not look to state law.  Accordingly,

18    the entire issue related to the entire fairness standard is a

19    red herring.  That standard was applied on almost exactly the

20    same facts in the *Latam* case, which is what was indicated by

21    counsel to the Debtors as well.

22        But even if the minority group were right that

23    Section 1129(a)(3) governs, the only testimony that we've had

24    here is that the Debtor carefully crafted its corporate

25    governance with independent directors, who you've heard from,

**App. 1103**

119

1    to ensure an entirely fair process and results.

2            I won't reiterate the Debtors' arguments on these

3    points, Your Honor, but we fully endorse it.  Accordingly,

4    whether you look to the statute, 1129(a)(4), or you look to

5    Delaware law, the standard of analysis here is ultimately the

6    same, it's reasonableness.

7            Now turning to Section 1123(a)(4) of the Bankruptcy

8    Code, the minority lenders argue that this is a fatal flaw

9    with the Plan because they view the put option premium and the

10   direct investment as being "on account of the ad hoc group's

11   pre-petition holdings rather than compensation for their

12   commitments".  But this argument is not consistent with any of

13   the testimony that was offered to the Court.

14           The Debtors' investment banker, Mr. Shaw, testified

15   that the backstop and direct investment were "essential" to

16   the Debtors because they provided "certainty" at a very

17   uncertain time.  The Debtors' independent direct, Mr.

18   Edmiston, testified today that the backstop was "absolutely

19   necessary and a typical structure".  He went on to say that it

20   is necessary and typical to incentivize parties to provide

21   backstop commitments with fees and hold backs.

22           The minority lenders point to the Supreme Court's

23   *LaSalle* case arguing that that case provides an absolute bar

24   to the type of structure we see here.  If that were true, Your

25   Honor, then frankly no backstop fees ever would be possible

120

1    from creditors within the structure, and yet as noted by

2    counsel to the Debtors, we seen them in virtually every case.

3         Moreover, *LaSalle* is completely opposite.  *LaSalle*

4    was what I would call a something for nothing case.  In

5    *LaSalle* former equity holders were given an exclusive

6    opportunity to invest in the *LaSalle* debtors new equity

7    issuance simply because they were the equity owners.  Those

8    equity owners did not provide any backstop or other material

9    support for the plan.  So of course in that case the exclusive

10   opportunity was on account of their pre-petition interests.

11        And in addition, as the Debtors had mentioned in

12   their closing, the court in *LaSalle* considered this issue

13   under the cram down standards in a case where the creditors

14   were not voting in favor of the plan and did not even mention

15   Section 1123(a)(4) of the Bankruptcy Code at all.

16        Since then *LaSalle* has been distinguished many times

17   as the Debtors indicated, most notably in the 8th Circuit

18   *Peabody* case.  In *Peabody* the 8th Circuit held that *LaSalle*

19   was not applicable to an opportunity to participate in a

20   private placement of preferred stock that was afforded only to

21   certain creditors who had backstopped a new common equity

22   issuance.

23        The Court specifically distinguished *LaSalle* holding

24   that the opportunity was not treatment for the participating

25   creditors claims.  Instead, the Court held that such exclusive

**App. 1105**

1    opportunity was, as is the case here, "consideration for

2    valuable new commitments made by the participating creditors

3    who promised to support the plan, buy preferred stock -- buy

4    preferred stock that did not sell in the private placement,

5    effectively backstop, and backstop the rights offering, and to

6    compensate them for shouldering significant risks".  Your

7    Honor, that's exactly the fact pattern that we have here.

8            More recently, Your Honor, in the *Latam* bankruptcy

9    case Judge Garrity in the Southern District of New York

10   considered a similar structure to the one presented here.  He

11   held that the backstop fees and direct allocation which were

12   distributed to only certain creditors in that case were,

13   again, "in consideration for their backstop commitments

14   described in the commitment creditors' backstop agreement and

15   did not violate 11 USC 1123(a)(4)".

16           He viewed the key question as whether the direct

17   allocation and backstop fee were reasonable under Section

18   1129(a)(4) of the Bankruptcy Code, the standard I indicated

19   earlier.   In determining whether the fees were reasonable, he

20   specifically looked to whether they were "market".  If they

21   didn't -- if they -- if so, they did not present any issue

22   under *LaSalle* according to Judge Garrity.

23           So accordingly the analysis here all comes back to

24   the reasonableness of the terms of the ERO, and the only

25   evidence in the Record of this case after 2 days of

122

1    confirmation hearing is that the terms of the ERO are market

2    and reasonable.

3           The Debtors spoke about the comps presented to their

4    board at length and I won't repeat it here, Your Honor, but

5    needless to say, the evidence presented at trial was that the

6    fees all fall well within the range of the market comps and

7    the objecting lenders here presented no testimony to the

8    contrary despite having every opportunity to do so.

9           The minority lenders also place a lot of weight on

10   the fact that the ERO was not market tested.  But the

11   testimony was clear, market testing for equity rights offering

12   is not the norm.  The Debtors' investment banker testified

13   that in 25 years he had not market tested an ERO because it is

14   not effective or practical.

15          In any event, the question ultimately leads back to

16   whether the fees are reasonable in light of the evidence

17   presented to the Court.  The only testimony that has been

18   presented here is a resounding yes.

19          Your Honor, in conclusion the testimony in this case

20   is clear and there's been nothing offered to the contrary.

21   The ERO and its terms are well in line with the comps and

22   market testing is not required.  Reasonableness is the

23   standard and the terms are eminently reasonable.  Respectfully

24   we would request that you confirm the Plan.

25          Unless Your Honor has any questions, I'm happy to

123

1     cede the podium.

2           THE COURT:  Thank you very much.

3           MR. MARTORANA:  Thank you.

4           THE COURT:  Anyone else?

5       (No audible response.)

6           THE COURT:  All right.  I'll hear from the excluded

7     lenders.

8           MR. HILLMAN:  David Hillman, Proskauer Rose, counsel

9     to the excluded lenders.  A couple of housekeeping items.  Can

10    the Court staff give my colleague, Steve Mah (phonetic) screen

11    sharing permission?

12          THE COURT:  Sure.

13          MR. HILLMAN:  And I offer to Your Honor a binder of

14    some documents that are in evidence I'm going to reference in

15    closing rather than jump from binder-to-binder.

16          THE COURT:  Okay.

17          MR. HILLMAN:  Okay.

18          THE COURT:  Let's see, yeah.  Who --

19          MR. HILLMAN:  Steven Mah.

20          THE COURT:  Steven Mah.  Oh, I see you there.  You

21    got it.

22          MR. HILLMAN:  Thanks.

23       (Pause in the proceedings.)

24          MR. HILLMAN:  Good afternoon.  There's a lot of

25    agreement that I have with the other side on a lot of issues,

124

1    and there's just this extreme gulf as to what the law is, what

2    the facts are and what the Supreme Court has said, so I intend

3    to methodically walk you through and to set the Record

4    straight.

5         I'll hit the punchline first.  The Plan can't be

6    confirmed based on the evidence and Supreme Court precedent.

7    I'll address 3 points, unequal treatment, entire fairness, and

8    I'll touch on the reasonableness of the fees under both

9    Section 363 and 1129(a)(4).  I would note as a threshold

10   matter the Debtors have the burden of proof here to

11   demonstrate by a preponderance of the evidence that the Plan

12   meets the confirmation requirements.

13        Let's start with unequal treatment.  The first

14   principles that start with the words of the statute,

15   1123(a)(4) says that a plan shall provide the same treatment

16   for each claim of a particular class.  It's a mandatory

17   provision of the Code because Congress uses the word Shall.

18   It's mandatory because equality of treatment is a central

19   policy of the Bankruptcy Code.

20        So let's turn to the phrase Same treatment.  Same

21   treatment is not defined in the statute, but it has been

22   defined by courts, including the 3rd Circuit Court of Appeals

23   in *W.R. Grace* in our brief.  It means that claimants in the

24   same class have the same opportunity for recovery.

25        Now the Debtors don't address what is required by

125

1    same treatment.  They argue that they aren't providing

2    additional consideration on account of the claim.  We're going

3    to focus on that.

4          So let's talk about the Plan, because we have to

5    look what does the Plan say.  The Plan, as Your Honor has

6    seen, Exhibit -- Debtors' Exhibit 58, if you start with Class

7    3, the excluded lenders, the majority lenders and the insider,

8    they're all in Class 3, top of Page 26.  Facially it provides

9    the same treatment for the majority, the excluded lenders and

10   the insider.  And while the inquiry may start with Class 3

11   treatment, it certainly doesn't end there.  And how do we know

12   that?  Because the words of 1123(a)(4) tell us that we have to

13   look at the Plan not just the class treatment section.

14         So we know, this is undisputed, that the Plan only

15   provides the majority lenders and the insider with an

16   investment opportunity to buy discounted equity.  You have to

17   work through several definitions but none of this is disputed.

18   The Plan provides that the Debtors will raise $245 million,

19   they will raise that by selling equity.  The Plan provides

20   that the Debtors will sell that equity at a discount.  The

21   Plan provides that the equity will be sold at a 35 percent

22   discount to plan value.

23         The Plan provides, of the $245 million that they

24   want to raise, that 86 million will be raised by selling

25   discounted equity solely to a subset of the majority lenders

1    and the equity -- and the insider.  That's the direct

2    investment, or the stated hold back as you can see in Mr.

3    Shaw's comparative analysis on Exhibit 70.  The Plan also

4    provides that only a subset of the majority and the insider

5    will have the investment opportunity to buy discounted stock

6    that's not sold in the open allocation.  And finally the Plan

7    provides that only a subset of the majority lenders and the

8    insider get $38 million of alleged -- of additional discounted

9    equity as a backstop fee.  That's the put option premium.

10        The parties dispute a connection between those, what

11    I'm referring to as exclusive investment opportunities, I said

12    this in my opening, it's a causation dispute.  There's a

13    dispute about the causal relationship between Class 3 claims

14    and these investment opportunities.  This is a dispute about

15    why a favored group of creditors and an insider are getting a

16    sweetheart deal and Class 3 claimants are excluded.

17        Let's look at the Debtors' brief.  I'd ask my

18    colleague just to put that on just so you could see how the

19    Debtors describe the issue that's before Your Honor.

20        (Pause in the proceedings.)

21        MR. HILLMAN:  To Paragraph 7 of their brief.  Look,

22    they say, The law is clear, I'm in the second sentence,

23    creditors can receive value on account of new money

24    commitments that's not provided to all creditors in a class.

25    The only requirement is that this value be provided in

1    exchange for the new money commitment.  That's their

2    description, which I happen to agree with, of the issue that's

3    before Your Honor.

4             You can take that down now.

5             So again, what we're talking about is the connection

6    between the value, the exclusive investment opportunity, and

7    whether or not it's a claim distribution.  Now the Debtors get

8    up here and they say it is not treatment for the first lien

9    claims.  And they're emphatic about it.  They're absolutely

10   wrong.  They are wrong because the evidence and the Supreme

11   Court eviscerate their theory.

12            So let's, again, let's be methodical.  Let's look at

13   the evidence and the law because it shows that the

14   opportunity, the exclusive opportunity is 100 percent on

15   account of the claim.  So we start with Mr. Shaw.  He admitted

16   the connection.  He testified that Evercore couldn't conduct a

17   market test and seek third party capital to raise 245 million

18   to implement the Plan.

19            Why?  You remember the exchange got a little testy,

20   he said -- these are my words, he said the majority lenders

21   and the insider wouldn't allow it.  Right?  He used this term

22   which resonated with me, he says -- he was adamant it wouldn't

23   be implementable.  I don't know if you remember, he said it 3

24   or 4 times, and I really tried to get him to at least

25   acknowledge that there is a way to search for equity capital,

128

1    just like you could search for DIP capital, and he resisted

2    it.

3         And then he explains why there was resistance.  He

4    explained that the 80 percent group had a voting block with

5    their claim and the attendant voting rights, the majority

6    would block any other party from providing capital and getting

7    their valuable opportunity.  This is damning testimony because

8    it ties the investment opportunity to the claim.  And it's

9    proof positive that the Plan gives the majority lenders and

10   the insider the exclusive investment opportunities because of

11   their status as a creditor.

12        Now Mr. Shaw, he didn't make a blunder.  This wasn't

13   like a mistake.  This is the game.  This is the playbook, the

14   80 percent majority with their voting block get to set the

15   rules.  They use their power to capture disproportionate

16   benefits relative to the minority.  They use voting power to

17   improve their claim recoveries.  They use voting power to get

18   benefits.  Voting is inextricably tied to the claim.  We know

19   that because 1126 says only the holder of a claim can vote.

20        And all this is happening in plain sight.  Right?

21   The RSA makes clear, and Mr. Shaw said this too, that --

22   excuse me, the RSA, like Mr. Shaw's testimony, the claim is

23   tied to the investment opportunity.  Votes in favor of the

24   Plan are tied to the investment opportunity.  The RSA says

25   this isn't -- again, this isn't hidden.

129

1    You don't get the investment opportunity unless you

2    vote for the Plan, and you don't get to vote -- you don't get

3    the votes for the Plan unless the majority and insider get the

4    investment opportunity.  They're inextricably linked.  You

5    could see this at Exhibit Number 72, that's the RSA, excuse

6    me, that's the excluded lenders exhibit.

7    And you could look at Section 4.02(a)(ii) and 12.01

8    Subsection Q, votes are tied to the exclusive investment

9    opportunity.  If you don't give the majority the exclusive

10   investment opportunity, they yank the vote.  You don't -- they

11   don't get the investment opportunity unless they vote "yes."

12   Mr. Edmonston, he says the same thing when he talks

13   about the alternative proposal that they reduced the DIP to

14   block it.  But I want to get to LaSalle.  So even without Mr.

15   Shah's helpful admission or the RSA, the law absolutely

16   demolishes the Debtor's position.  And it's not just any law.

17   We're talking about the Supreme Court in its 203 North LaSalle

18   decision, a decision that is powerfully applicable here, a

19   decision, Your Honor, I submit has answered the causation

20   question before you today.

21   Remember, the Debtor asked you, as did I, to rule on

22   a causation question: Is the investment opportunity on account

23   of the claim?  And the Supreme Court directly ruled that when

24   an investment opportunity to buy -- the Supreme Court directly

25   ruled on the issue of when an investment opportunity to buy

**App. 1114**

1    equity is a planned distribution, our argument, as opposed to

2    consideration for a separate committee -- commitment, the

3    other side's argument.

4         The Supreme Court has said when the investment

5    opportunity is exclusive and not market-tested, it is a Plan

6    distribution, it is treatment of a claim, period.

7         So the question is not whether the equity that the

8    majority and insiders are getting in the ERO is a claim

9    distribution.  That's the same mistake that the Plaintiff made

10   in LaSalle.  The question is the exclusive investment

11   opportunity.  So it's the exclusive nature of that investment

12   opportunity that doomed the Plan in LaSalle, and dooms the

13   Plan here.

14        I would ask that you pull up the demonstrative, and

15   we can just walk through, Your Honor -- if it's okay, can I

16   step where I can see the scree?

17             THE COURT:  Of course.

18             MR. HILLMAN:  Let's walk through LaSalle

19   methodically and compare to ConvergeOne.  Is Your Honor able

20   to see the screen?

21             THE COURT: Yes, I can.

22             MR. HILLMAN:  Okay.  In LaSalle -- excuse me, we're

23   going to go through the issue, when you compare it, this case

24   to LaSalle.  The Plan proposes to raise capital by selling

25   reorganized equity.  That was true in LaSalle; that's true

1      here.

2              Only favored stakeholders have the investment

3      opportunity to purchase reorganized equity.  That's true in

4      LaSalle; that's true here.

5              The next one.  Sorry, the technology's a little

6      slow.  Favored stakeholders argue that the value is on account

7      of a new money contribution.  That's exactly the same argument

8      that the Debtors and Majority are making here.  It was made in

9      LaSalle and it is being made here.

10             Next issue.  The Court, the Supreme Court described

11     this as a causation question.  The Court had to determine, is

12     the exclusive investment opportunity on account of claim or

13     interest or for new money.  Now, admittedly, they make -- they

14     want to make a distinction that here it was an equity holder

15     in LaSalle, and here it's a secured -- it's a claim.  That's a

16     distinction without a difference.  It's a causation question.

17             The Court has to determine, is the dis -- is the

18     value on account of the claim or interest or new money?  Same

19     exact issue.

20             Next.  The Court ruled that if the investment

21     opportunity is on account of the claim or interest, the Plan

22     can't be confirmed.  Now, in LaSalle, that would raise an

23     1129(b)(2) issue, and here it's the same thing except

24     admittedly it's under 1123(a)(4).

25             The causation question, not the statute, is what's

1      key, what's common, what's compelling, what's binding.

2             Next one.  The investment opportunity was not market

3      tested.  In LaSalle, it was not market tested, and here it was

4      not market tested.  And so when the Supreme Court is faced

5      with these items, it had to reach a conclusion.  In the

6      absence of a market test exclusive -- the exclusive investment

7      opportunity is on account of the claim in interest.

8             I gave you the key quote here from the Supreme

9      Court.  It's the exclusiveness of the opportunity, with its

10     protection against the market scrutiny of the purchase price,

11     by means of competing bids, or even competing Plan proposals,

12     that renders the partners' right of property interest extended

13     on account of Old Equity's position, and therefore subject to

14     the unpaid Senior President class objection.  Same framework

15     applied here.  It's the exclusiveness of the opportunity that

16     renders the majority lenders and insiders investment

17     opportunity extended on account of their first lien claims,

18     and therefore violative of 1123(a)(4).

19            The parallel of the causation question destroys the

20     Debtor's argument that the investment opportunity is separate

21     consideration for a separate promise.

22            They say LaSalle is limited to Section 1129.  I

23     submit, Your Honor, that the causation question is not limited

24     to 1129.  And it turns out the 11th Circuit agrees.

25            The 11th Circuit, America - CV Station Group, Inc.,

133

56 F4th 1302, an 11th Circuit decision in 2023, looked to

LaSalle to answer the same causation question in connection

with Section 1126 of the Bankruptcy Code.  In this decision,

America - CV Station, four shareholders had the exclusive

right to buy new equity.

Shortly before the Plan was confirmed, the Plan was

amended, and only one of the four shareholders was afforded

the exclusive opportunity to buy new equity.  The exclusive

shareholders, who were shut out by the Amended Plan, they

complained.  The Debtor said:  Sit down, you don't have a

basis to complain, three shareholders who lost your

opportunity to buy the equity of the reorganized business,

because you're deemed to reject the Plan under 1126(g).  Look,

the Plan wipes out your equity interests so you're deemed to

reject.  We don't need your vote.

And the 11th Circuit looked at the entire of the

Plan and concluded that they were in fact receiving a

distribution, therefore 1126(g) wouldn't apply because they

were receiving the right to buy reorganized equity.  And so

the 11th Circuit says:  So the question is whether equity

holders were entitled to receive or retain property under the

Unmodified Plan on account of their interests.  That's the

causation question.

Answering that question turns out as straightforward

because of Supreme Court precedent in LaSalle.  And in

134

1    applying <u>LaSalle</u>, the Court held that the three shareholders

2    were in fact receiving a distribution on account of their

3    equity because they were receiving the right, the exclusive

4    right, to buy reorganized equity.

5         So just last year, the 11th Circuit applied <u>LaSalle</u>

6    to a different section.

7         I want to hit a topic that hasn't been disputed, but

8    I want you to see it.  And that is unequal treatment.  The

9    math showing the disparity of treatment, because I'm bringing

10   us back to the statute.  Unequal treatment is undisputed.

11   Interestingly, you heard Mr. Shah say that the investment

12   opportunities are valuable, and we're going to get into that.

13   He acknowledged that there's value there, and he testified to

14   this when he was communicating to the insider when they were

15   originally cut out of the investment.

16        So when it comes to the math, let's look at Exhibit

17   1 to the Lahl Declaration.  I believe it's in your binder, but

18   I'm going to -- I'm going to put it up on the chart to make it

19   easy for you.  It's Docket No. 340.  If you can put that up to

20   the chart, I'd appreciate it.

21        Let's walk through the math.  This was -- Mr. Lahl

22   wasn't here to testify by agreement with the Debtors, because

23   the math was undisputed.  So this is -- this is what we're

24   talking about when we look at the math.

25        The majority lenders and the insiders recover 31.5

135

1    percent on account of their first lien claims.  And if you

2    compare and contrast, the excluded lenders recover 24 percent

3    if they elect to participate in the open allocation, and 20

4    percent if they elect to take back debt only.

5         And so the difference in recovery as between the

6    included group, the majority and insiders, and the excluded is

7    a 7-1/2 percent difference on the -- if it's -- if they

8    participate in the open election, and it climbs to 11.5 for

9    those who take take-back debt.

10        So when -- the punchline is, when you compare the

11   relative recovery, the majority and insiders get an enhanced

12   recovery of more than 31 percent on account of their claims,

13   compared to the excluded lenders on their first lien claims.

14        This part is interesting, and it just came to me as

15   I heard the closings.  The Plan could have been structured

16   differently.  The Debtors chose to structure their Plan -- you

17   can take that one down when you get a chance.  They could have

18   structured the Plan to provide equal treatment to all first

19   lien creditors.

20        So when you hear the sky is falling, the practical

21   implications, the bankruptcy ecosystem will collapse if

22   there's a market test.  Well, they drove to this place.  The

23   Debtor structured a Plan that didn't provide pro rata

24   treatment.

25        I didn't structure the Plan.  The Debtor structured

**App. 1120**

136

1    the Plan that way.  And if they would have structured the Plan

2    where all of those investment opportunities were available to

3    everybody, they wouldn't have to market-test.  They chose this

4    path, and so they cannot now complain about the cost or delay,

5    which I submit, of course they could have done it.

6         This is why there's unequal treatment for this Plan,

7    which violates 1123(a)(4).  And if the equity were distributed

8    ratably, the majority lenders, my math is they'd be giving up

9    $22 million of value.  And that's if ev -- that assumes if

10   everyone participated in the rights offering.  So this is

11   telling, right?

12        The majority, if they opened it up to everybody,

13   would go from owning 89 percent of the Reorganized Debtor to

14   77 percent, a 12 percent difference.

15        So the Supreme Court says -- answers the causation

16   test:  If you don't provide equal treatment, then you'd btter

17   provide a market test.

18        So what you're -- what's happening before you, Your

19   Honor, this is a test case.  They want to see how far they

20   can push this, right?  This is what?  12 points of equity,

21   $22 million.  You heard about the parade of horribles, which

22   I'm going to get into.

23        The other side wants you to believe that this is a

24   routine exercise.  I paid careful attention to the openings,

25   and they talked about 25 years of history.  They want you to

**App. 1121**

137

1    believe that you're walking down a well-traveled path.  You're

2    not.  I'm going to walk you through.

3         They're wrong.  This is an expansion of what you're

4    seeing on the lender-on-lender violence.  It's happening.

5    Instead of happening in the four corners of a credit

6    agreement, it's happening under a Plan, and the rules are

7    different.  The Code has protections.

8         So, remember, we looked at the cases -- and you can

9    bring up the demonstrative on this.  We looked at a bunch of

10   cases in the demonstrative for Mr. Shah, but we went through

11   every one.  He's 0 for 24.  Evercore is 0 for 24 on whether

12   any of the comps identified in the chart survived a LaSalle

13   challenge.

14        If you look at this chart, and I'm going to talk

15   about Peabody, and now apparently I have to talk about Latam

16   because I think there were mistakes made about the description

17   of Latam.

18        No Court has been asked to do what you're being

19   asked to do.  No Court.  No Court has confronted -- and I want

20   to come back to Peabody -- a rights offering, not market

21   tested, exclusive for some holders -- exclusive including an

22   insider, that's a new one here -- and sustained a challenge

23   under LaSalle.

24        I put on this chart nine other cases that were in

25   their brief, so you have the 24 that were in the chart, and

1   every other case in the brief.  To suggest that you're walking

2   down a well-traveled path is misleading and wrong.

3          So let's talk about Peabody.  Peabody considered

4   LaSalle.  Peabody didn't throw LaSalle out.  The 8th Circuit

5   didn't throw LaSalle out.  The 8th Circuit distinguished

6   LaSalle.  The 8th Circuit found that the opportunity was not

7   exclusive.  Peabody said the objectors could have

8   participated.  In Peabody, the Plan was developed in

9   mediation.  Everyone had notice of mediation and the Court

10  makes clear that Pea -- that the objectors could have, but

11  failed to intervene in the mediation pursuant to Bankruptcy

12  Rule 2018(a).  They could have but didn't.

13         We didn't have that opportunity.

14         THE COURT:  They could have participated in the

15  mediation.

16         MR. HILLMAN:  I'm sorry.  One more time?

17         THE COURT:  They could have participated in the

18  mediation, but there's no guarantee that the mediation would

19  have cut a deal where they wouldn't have been right in the

20  same position.  But they had the opportunity to participate in

21  the mediation.

22         MR. HILLMAN:  I think -- I certainly have to agree

23  that I would not know what would happen in the mediation.

24         THE COURT:  But they had the right to -- but your --

25  but they were afforded an opportunity to be a part of the Plan

139

1    process.

2                MR. HILLMAN:  Correct.

3                THE COURT:  Okay, I got that.

4                MR. HILLMAN:  So, here, the Plan wasn't developed in

5    the bankruptcy.  It was outside of a mediation.  There was no

6    process to participate in.  It was an exclusive club.  We were

7    excluded.  We're not just the minority lenders, we're not just

8    the objectors.  We were denied participation.

9                I'd like to show you Exhibit 50 in the binder I gave

10   you.  Mr. Hoffman was the witness who couldn't make it as a

11   result of the death in his family.  And we have agreement that

12   these are in the record, these emails.

13               Exhibit 50, I'm just going to find the page and walk

14   you through.  Okay, I don't know if you can see the Bates

15   stamp number.

16               THE COURT:  I can.

17               MR. HILLMAN:  It's the one that ends in 38.

18               THE COURT:  Yes.  Page 3 of 6 at the top?

19               MR. HILLMAN:  Mine says 309 at the top.  Okay, I'm

20   -- it's --

21               THE COURT:  I'm looking at the -- I'm sorry, the

22   header.

23               MR. HILLMAN:  Yeah.

24               THE COURT:  It should say page 3 of 6.  It's Bates

25   labeled 30 -- you said 38 at the bottom?

**App. 1124**

140

1          MR. HILLMAN:  Yes.

2          THE COURT:  Okay, we're there.

3          MR. HILLMAN:  The bottom email, you can see, it's

4    Matt Hoffman of Cerberus, writing to Scott Greenberg of Gibson

5    Dunn --

6          THE COURT:  Yup.

7          MR. HILLMAN:  -- and some other Gibson Dunn

8    people --

9          THE COURT:  Yup.

10          MR. HILLMAN:  -- and Mr. Mer -- to other folks from

11    Gibson Dunn and Cerberus.  He writes:  Guys, hope -- this is

12    March 26th.  I know you've been busy.  I spoke to, yes, W and

13    C earlier, White -- presumably White and Case.  It seems like

14    we're close to some process kicking off.  I've asked them to

15    pass that we be included in the group, as had been the case in

16    early-mid 2023.

17          We've offered a few times to get restricted.  We own

18    roughly 20 million of 1L and I noted in the past, have some

19    quite useful operational resources we think we can bring to

20    bear here.  We would like to be part of the solution, and

21    I've expressed the same to Silverpoint, Monarch and Kennedy

22    Lewis.  I think with respect to the go-forward business, we

23    can be helpful.  Let me know your thoughts.

24          You could see -- I'm not going to read every email.

25    April 4th is another email.  This is Bates ending in 37.  It's

1   the first email of the exhibit, Your Honor.

2            THE COURT:  Okay.  Yup.

3            MR. HILLMAN:  Also, trying to get -- these are my

4   words -- cut in, trying to -- trying to participate.

5            If you take a look at Exhibit No. 48 in the binder.

6   I'm just going to get there myself.  The exhibits are on

7   chronological order.

8            THE COURT: Yup.

9            MR. HILLMAN:  Again, I don't plan to read all of

10  these into the record, but this is March 19th, Matt Hoffman of

11  Cerberus writing to Paul Schaffer.  You can see below Mr.

12  Schaffer's from PJT.  Then:  Hope all is well.  The loan is

13  now trading on a big boy and I know guys on the inside.  This

14  small group are buying.  We would like to be included, as I

15  have noted to Silverpoint, Monarch and Kennedy Lewis Barry

16  directly.

17           I don't see why we would be on the outside here.  As

18  we've noted, we have very close relationship with the com --

19  relationships with the company's board.  I would ask you and

20  Scott G. to request that we be brought into the fold.  If

21  there's some level of entry on size, let me know.  We're

22  involved in many names with these folks.  Don't poke us in the

23  eye, please.  I'm around to chat today if helpful.

24           There are other emails and Cerbersus asked to be

25  included, as did other members.  They tried.  CHC -- oh, let's

142

1    talk about Latam.  The reason why we went to those emails is

2    we talked about Peabody saying:  Look, you could have been

3    included had you only tried to get into the mediation.

4         And what I'm hearing is this Peabody-like argument.

5    Well, the excluded lenders could have been included.  All they

6    needed to do is ask.  We asked.  We were excluded.

7         So in Latam, I think you heard in the closings, that

8    the Latam judge, I think it was Judge Garrity, addressed this

9    LaSalle issue.  That was a first for me.  I asked my colleague

10   very quickly to do a key word search in the decision because I

11   couldn't re-read the 100-page decision.

12        There's no LaSalle other than a generic reference in

13   a different context.

14        THE COURT:  Right.

15        MR. HILLMAN:  The Latam court, in the Southern

16   District of New York, did not decide this.  Like Peabody, the

17   rights offering in LaSalle was the product of -- and I'm

18   quoting, "hard fought and lengthy mediation before Judge

19   Gropper."  Like Peabody, the objectors could have intervened

20   in the mediation.  And Latam also notes that the Debtors

21   considered and explored multiple proposals from third parties.

22        I think I heard reference to a Judge Isgur case in

23   closing.  I think it was EP Energy, a 2020 case.

24   Interestingly, the objectors in that case, their claims were

25   being reinstated, and they didn't have the opportunity to

1    convert to equity, and that's what they were complaining

2    about.

3           Okay, complaining about reinstatement's a little bit

4    hard, and if you look at the docket -- which I would ask the

5    Court to take public notice of the docket in the cases in this

6    Circuit -- in this District, at Docket No. 910, it wasn't

7    exclusive to the supporting noteholders.  According to the

8    Debtors in EP Energy, Docket No. 910 at paragraph 253, the

9    objectors had the opportunity to participate but declined.

10    And, most importantly, the objectors didn't raise LaSalle.

11           So in Seadrill, Judge Jones -- I guess SVP was

12    looking to get into a backstop here.  He didn't -- the

13    objectors didn't raise LaSalle.  Judge Jones didn't rule on

14    LaSalle.  In Cineworld, there was an objection, and at the

15    hearing Kirkland came in and announced that the minority group

16    was invited to participate in all aspects of the equity rights

17    offering, including the direct allocation and backstop.  And

18    Judge Jones didn't rule in that case either.

19           The issue did come up in TPC.  That's before Judge

20    Goldblatt in Delaware.  You heard the exchange with Mr. Shah.

21    We were both involved with the case.  I represented minority

22    lenders.  And I agree, Judge Goldblatt did not decide the

23    issue.  At the DIP hearing, he did make some commentary.  He

24    was critical of it but he didn't rule.

25           And so I submit, based upon the demonstrative that I

1    showed you, which I obviously completely stand behind, no

2    Court has made the decision that you've been asked to make

3    about a rights offering, it's exclusive, and that includes an

4    insider, that wasn't market tested, and faced a LaSalle

5    challenge.  And I think Peabody, because of the mediation, is

6    different.

7          So let's talk about the parade of horribles.  To

8    justify the Plan, the Debtors emphasized this parade of

9    horribles that will ensue if you deny confirmation.  And you

10    heard Mr. Edmonston, and at the beginning you may have heard

11    that they read a stipulation into the record.  And we added it

12    all up; it's something like $50 million.  And they say:  If

13    you don't allow us to go forward, they throw out the jobs,

14    customers, trade creditors.  $50 million, and it's just not

15    credible.  It's a red herring, right?

16          That is designed for one thing.  It's designed to

17    create leverage, to create pause in denying confirmation.

18    It's the threat of delay in this cause.  It's illusory,

19    because you know what will happen.  We all know what will

20    happen.  This is twelve percentage points of equity.  This is

21    $22 million.

22          No one's going to risk $22 million of value, moving

23    around on the equity side of the business.  So what happens

24    is, the other side says, "Oh, well, we tried, we got shot

25    down."  And in five minutes we get cut in pro rata to a

145

1    backstop and you're back at the next day confirming the Plan.

2    Okay?  What are they going to do?

3         They don't want to own 77 percent of the business?

4    They have to own 89?  They have to -- they have to -- they

5    can't open it up pro rata?  So this is a ploy, it's a

6    distraction.  That threat of collapse, that threat is just not

7    credible on this record.

8         Interestingly, they again concede that it's the

9    claim power that's controlling the destiny.  They say, "Look,

10   our hands are tied.  The RSA gives the majority lenders all

11   the leverage."  You know, I -- the Debtors say, "I can't help

12   you.  I would love to stroke a pen to make it pro rata to make

13   all this go away, but it's the majority and insiders that

14   control the process."

15        And they won't make the change unless confirmation

16   is denied.  And the Supreme Court has made clear in <u>Jevic</u>

17   <u>Holdings</u> 2017 case that there aren't rare exceptions that

18   allow distributions in violation of the Bankruptcy Code.

19        I want to just pause for a minute to just talk about

20   the RSA.  Same thing about the no-shop.  You can't say, "I

21   couldn't market test because of the no-shop."  You shouldn't

22   have tied your hands in a way that prevented you from

23   complying with law.  Either equal treatment or a market test.

24        The alternative transaction.  This case is not about

25   which plan is better.  It was never about that, all right?  If

1    we didn't get to a deal and the excluded lenders had to come

2    before you, I wanted to make sure that we weren't just saying

3    there's -- I wanted to show there was a safety net.  I wanted

4    to show that there was an alternative.  And I knew, no matter

5    what we put in the letter, they would have a hundred reasons

6    why they didn't like it.

7            But what you didn't hear -- and I would like just to

8    -- Exhibit No. 59 is not in my little binder, I did this on

9    the fly.  If you have it, it's in the larger binder, Exhibit

10   No. 59.  When you're there, I'll just point you to the spot.

11   This is the first letter that I wrote April 26th to White &

12   Case with the alternative proposal.  I highlighted -- you see

13   on page 2 -- the LaSalle issue.

14           And what the proposal was designed to do was fix the

15   problem.  The problem was unequal treatment.  So if you look,

16   the alternative proposal is superior for -- at least for a

17   reason.  The alternative proposal respect the equal treatment

18   because every first lien creditor in Class 3 would receive

19   their pro rata share of equity in the Reorganized Debtor.

20           There was no rights offering, so to raise capital,

21   we said:  Look, this company is prepared to have only $245

22   million of debt on the balance sheet.  You heard Mr. Edmonston

23   talk about this.  Only $245 million.

24           So we said:  Look, we'll provide $245 million of

25   financing and everyone can participate pro rata in providing

147

1    the debt financing.

2         So what I found interesting is Mr. Edmonston, the

3    closing arguments, maybe even Mr. Shah said it wasn't better

4    for the company.  I don't know if you recall hearing that

5    testimony, "It wasn't a better recovery."  Well, that's not

6    true.  Look at the letter.  We highlighted this in terms of

7    the substance of the letter and the math behind it.

8         Point 2 of the letter on page 2, it provides Class 3

9    holders with significantly enhanced recovery.  It provides a

10   recovery for all Class 3.  That's excluded lenders, the

11   insider, the majority, between 28 percent and 29 percent on

12   their first lien claim, as opposed to between 20 and 24.  It

13   treated them fairly.

14        When you heard them -- Mr. Edmonston say it didn't

15   change the recoveries, well, yeah, the insider and majority,

16   they got cut back, but Mr. Edmonston is now conflating claim

17   versus the other treatment.  See, it's all part of the same

18   thing, it helps your claim, those investment opportunities.

19        So, again, I'm not -- I'm not going to try to argue

20   the Debtor should have abandoned the Plan, they should have

21   come to us, they should have engaged with us, they should have

22   told us how much more do you need for a DIP, but they were

23   never going to do it because here's, again, the connection.

24        They say:  Well, you don't have the votes.  It's

25   part of the claim.  Again, it's using the votes to control the

**App. 1132**

148

1    goodies that the majority gets.  That's another example of how

2    the record shows that the distributions that the exclusive

3    investment opportunity was tied to the claim.

4         Let me move on to entire fairness.  Transactions

5    with insiders are inherently suspect because they're rife for

6    the possibility of abuse.  So they're subject to a heightened

7    scrutiny.  Instead of applying a more deferential business

8    judgment standard, the Debtor has the burden to show entire

9    fairness, fair price, fair dealings.

10        So we have a skirmish on this threshold issue.  is

11   it a confirmation standard or not?  Is it embedded or imported

12   into 1129(a)(3)?  Look, there it is, case law we cited,

13   Zenith, 241 B.R. 92, that says applicable law, as used in

14   1129(a)(3)is broader than bankruptcy law, it includes

15   applicable non-bankruptcy law.  Here, we're dealing with

16   Delaware boxes, Delaware entities.  So Delaware, that state

17   governs the fiduciary duties and corporate governance issues

18   like entire families.

19        The Debtors say:  Not so fast, applicable law is

20   more narrow and it only applies to the proposal of the Plan.

21   I don't know.  That seems to be a distinction without a

22   difference.  I will focus on the fairness of proposing the

23   Plan.  I'll use the Debtor's structure.  That's what they

24   said.

25        So let's look at the evidence.  Let's ask a question

149

1    and then look at the evidence.  But the following fact is
2    undisputed; the Plan treats CVC more favorably than the
3    excluded lenders.  That's clear.

4         How'd it happen?  It seems pretty obvious.  It's
5    about influence and control.  I don't know, Mr. Edmonston went
6    out on a limb and he said:  Oh, you know, really helpful and
7    beneficial.  No, it's not helpful and beneficial, they're an
8    insider, their vote doesn't count for purposes of determining
9    class acceptance under 1129(a)(10), all right?

10        So let's methodically walk through the evidence.
11   CVC's an insider, right?  100 percent of the equity.  Its
12   legal counsel, White & Case, represented the Debtor and CVC
13   until January 2024.

14        Under CVC's control, the Debtor retained Evercore as
15   the investment banker.  The CEO was appointed in January 2023
16   when CVC controlled the company.  Nine months before the case
17   was filed, CVC provides rescue financing.  The CFO, according
18   to the First Day Affidavit, says at that point the company was
19   on the brink of failure.  Those were the CFO's words.

20        The financing included new capital, $149 million of
21   principal.  You can see that at our Exhibit 84.  It was first
22   lien.  I'm sure you caught this.  $33 million of worthless
23   paper.  Unsecured debt was rolled up as part of the summer
24   financing.  It included a very chunky make-whole.  I think the
25   make-whole, we're going to walk through this, is like $160

150

1       million.

2               There was an OID portion.  You can see this at

3       number -- at Tab 84 -- excuse me, Exhibit 84.  You can see --

4       I hope I got that right.  Maybe I got that wrong, hold on.

5       Where's the -- which is the build-up exhibit?

6               Oh, if you look at tab 84, Your Honor, you can see

7       the build-up.  And I said the make-whole was 160.  It was 140.

8       You can see about, you know, 11 million of OID.  Those are

9       just the components of the -- of that claim.

10              So let's just pause here.  Why does a sponsor

11      provide rescue capital for a company on the brink of failure?

12      All right, this is standard playbook.  It's a win-win, right?

13      If the company turns around, well then it's a win.  And if

14      performance deteriorates, well then it's like a re-buy in

15      Texas Hold-em, right?  You put your capital in at a very high

16      point in the stack, you're buying into the fulcrum security.

17      So you're -- that summer of financing in July of 2023 was very

18      strategic for repositioning itself ahead of the ultimate

19      Chapter 11, all right?  So they're thinking about the

20      gameboard.

21              So flash-forward six months, so now we're in

22      January.  This is the kickoff for the negotiations.  And, I

23      mean, look, CVC has significant leverage at this point because

24      it controls the company.  What does control mean?  It means no

25      deal can get done with the ad-hoc group unless the company's

151

1   on board, right?  It takes two to get this dance going, and so

2   before the Special Committee was appointed -- you heard this

3   from Edmonston -- the CVC-controlled board -- and I'll use

4   Edmonston's term -- sets the stage, all right?

5           They set the stage.  The Debtor, controlled by CVC,

6   makes the first proposal and it's a hundred million dollar

7   rights offering backstopped by the ad-hoc group and CVC, and

8   they get a fully loaded allowed claim.  See, that's what this

9   was about; right?  Using the claim quantum as currency.

10          The CVC-controlled board makes the first move.  A

11  week later, January 16th -- you can see this in Exhibit No. 12

12  and you heard it from Edmonston -- is when the Special

13  Committee's formed.  The Special Committee's flawed, okay?

14  You have the CEO on the Special Committee.  That's the same

15  CEO that's -- that CVC picked.  The CVC is interested by

16  virtue of the myth.

17          But by the time the special committe's appointed,

18  the Debtor's already put in motion high claim quantum and CVC

19  to participate.  It's doing -- it's doing CVC's work.  So it

20  doesn't ask for a market test, doesn't say, "Let's do pro

21  rata."  That's interesting.

22          You know, the fact that the Special Committee

23  doesn't have independent advisors, that's not business as

24  usual.  The Special Committee here was relying on who?  White

25  & Case and evercore.  Those are the same professionals that

152

1     were representing CVC.  In fact, in White & Case's retention

2     application, they acknowledge that up until -- I think it's

3     January of '24, they've been representing CVC.

4              Why do you think CVC is willing to do financing

5     without advisors.  You heard Mr. Edmonston say, like, "They

6     didn't name anybody."  Of course they didn't name anybody.

7     They trusted the advisors who were at the company's side,

8     White & Case and Evercore.  So the Special Committee never got

9     independent advice or analysis.  And Mr. Edmonston's testimony

10    here was a little bit inconsistent at times because he said,

11    "Look, they were appointed as the Special Committee to deal

12    with potential conflicts."  And then later in his testimony,

13    he talked about complete alignment.

14              So for two months, from January to March, the record

15    reflects the Debtors were actively coordinating -- excuse me.

16    The Debtor's professionals are actively coordinating and

17    advising CVC.  They're not looking for any other capital.  And

18    during this critical two-month period, the Debtor's advisors

19    were, you know, again, trying to get them cut in.

20              I'm not going to go through all the exhibits that

21    you heard on Cross, but I will reference Exhibit 17, 32, 73,

22    74 to 84.  You know, it's not shuttle diplomacy, it's not

23    mediation, as Edmonston said.  This was advocacy.  Where was

24    Latham?  You don't see Latham on any of those emails.

25              The Debtors used its investment banker and lawyers,

1       and their skill and work product to help the insider get cut

2       into the valuable investment opportunity.

3              Look at Exhibit No. 79, and it's the last page of

4       the exhibits, Your Honor.  79, last page.  The Evercore deck

5       -- and you heard this on Edmonston -- you know, it goes to

6       everybody who's at CVC, and they want you to believe it's just

7       math, it's just helping out doing some calculations.

8              Look at the commentary.  Even after deducting

9       dollars invested in the ERO, CVS's recovery on account of

10      claim materially improves if it's a backstop argument.  I

11      mean, the record -- the record shows that the Debtor and CVC

12      were acting as a single team.  They communicated as a single

13      team.  They acted like a single team.  They negotiated

14      together -- I think I heard Mr. Edmonston say holistic

15      agreements.

16             I noticed this.  The C-1 deal team was a list served

17      for CVC personnel.  Evercore analyzed the most advantageous

18      ways for CVC to maximize its recovery.  Even when they used --

19      someone called it maybe loose language.  Exhibit No. 73, look

20      at this comp for us.  Exhibit No. 74, comps for what we

21      discussed.

22             And I'm not saying that there's some culpable

23      activity here.  I'm saying, is this the process that rigorous

24      scrutiny demands when you're dealing with an insider?  This is

25      not a fair process.  At the time they struck the deal with the

1      ad-hoc group on March 5th, the ad-hoc group didn't have enough

2      claims to achieve requisite class threshold.  Did you hear

3      that testimony from Mr. Edmonston?  He was shown a milestone

4      timeline, which is in Exhibit No. 87.

5              After CVC's cut in, that's when they intend to begin

6      the outreach to, quote, broader ad-hoc group members to

7      achieve requisite thresholds.  Why?  Why did they do that?

8              They do it because they want to insure that CVC gets

9      cut into the deal before it changes.  They want it locked --

10     they want it fully baked before they start expanding.  They

11     want to help CVC.

12             And this notion that Edmonston says:  This is a

13     distraction.  It's the single largest impaired claim in the

14     case.  So what?  They're both going to count.

15             You couldn't confirm a Plan and fight over equity

16     that's held in reserve to a later time.  That's not litigation

17     that's going to derail the case.  Why do they do it?  It's not

18     because it's the single largest claim.  We know why they do

19     it.  It's the sponsor.  They all have relationships, right?

20             It happens.  I was involved with one case, it

21     happens infrequently, where independents go rogue as against

22     the sponsor.  They're trying to do them a solid, they're

23     trying to do them a favor, they're trying to keep them in.

24     They're trying to maximize the value on account of the claim.

25     That's not my testimony; that's what Evercore says.  That's

155

1    their advice.

2              So the Debtors intentionally got CVC cut in before

3    -- before going out further.  And so as I conclude this second

4    of my closing, it's the Debtor's failure to insist on pro rata

5    treatment or to expose the investment opportunities to

6    competition.  That's additional evidence against the fair

7    process.

8              It's their failure to assist on equal treatment for

9    all lass 3.  And you know what you didn't hear?  You didn't

10   hear any evidence that the Debtors tried to negotiate with CVC

11   to settle the claim despite some obvious recharacterization

12   risk for the 160 million invested nine months before the

13   filing.  I mean, there's risk.

14             You didn't hear any evidence of the Debtors trying

15   to avoid the deal with the lien avoidance risk for $33 million

16   of rolled-up unsecured debt during the insider preference

17   period.

18             You didn't hear anything about trying to reduce the

19   $11 million of OID which is disallowable under 502(b)(2).  You

20   didn't hear anything about the Debtors trying to negotiate

21   with CVC on the 140 make-whole which, based on the 5th

22   Circuit's Ultra Petroleum decision, has some risk to it.

23             To the contrary, look at -- on the make-whole, look

24   at Exhibit No. 73.  Oh, here it is.  Sorry, Your Honor.  83.

25   Look at 83.  Talking about -- 83, sorry.  I'm moving fast.

156

1          So 83, it's comps for make-whole settlements.  So
2     Evercore sends to the C-1 deal team the comps for make-whole
3     settlements.  So when -- I mean, you saw the language before,
4     interesting comps for us.  This isn't arm's-length.  With
5     Evercore's help, the evidence show -- shows that CVC traded a
6     high quantum claim amount.  All right, the opening bid was,
7     what?  350, 60 million dollars, right?  That's what we heard
8     from -- from Edmonston.  And it allowed CVC basically to trade
9     claim quantum for the benefits of being a backstop.
10          So Edmonston says, "Yeah, we knew this was
11     happening.  We let other people hash out the claim battle, all
12     right?  That's what Edmonston talked about.  They outsourced
13     -- the record shows the Debtors outsourced the negotiation to
14     the ad-hoc group.  Really?
15          The ad-hoc group, they don't have -- they're not
16     fiduciaries to the estate.  Yeah, they were -- they knew, for
17     every dollar of allowed claim, there would be dilution in the
18     -- in the backstop.  That's not a fair process.
19          Fair process focuses on the actual conduct of
20     corporate fiduciaries in effecting a transaction, a structure
21     in negotiations.  This process wasn't fair.
22          I did also want to make a note.  I think you heard
23     from Edmonston -- oh, the company, the Special Committee
24     looked at these issues, the make-whole and the OID and the
25     recharacterization.  Who did they give that to?  White & Case.

157

1         The record doesn't have this information. I'm

2    willing to bet it's out there that White & Case probably

3    negotiated those documents.  We know White & Case was CVC's

4    counsel.  Really?  That White & Case is now going to

5    investigate CVC's claims?  You can't outsource that.  that's

6    not a fair process.

7         So let's talk about fair price.  When we talk about

8    fair price, we might as well just jump into this

9    reasonableness discussion, okay?  So I'm going to combine

10   these parts of my presentation, fair price and reasonableness

11   feel to be significantly overlapping.

12        So this is an argument that is separate from, and

13   distinct from our LaSalle argument.  And, you know, by making

14   the argument about the unreasonableness of fees, it is

15   separate from LaSalle.

16        The Debtors seek approval of the fees under 363(b)

17   and 105, and I agree with Gibbs & Dunn.  It actually also

18   falls under 1129(a)(4).  There's a reasonableness requirement

19   there.

20        So when we think about reasonableness or fair price,

21   what we have to think about is the fees which come in two

22   components, and I recognize that the words here -- we have so

23   many different words.  There's the direct investment.

24   Sometimes we call that the stated holdback.  Then there's the

25   backstop fee.  Sometimes we call that the put option premium.

**App. 1142**

158

1    Thos are the -- that's the universe of fees.  So the direct

2    investment is $47 million of value in equity.  The math is not

3    in dispute.

4           The backstop fee is $38 million of value in equity.

5    Again, math isn't disputed.  Add those two up and you're

6    basically at roughly $85 million of consideration for the

7    backstop commitment.

8           So we have to ask a question.  Whether it's fair

9    price or reasonableness, what do you get for $85 million of

10   value?  Now, interestingly, when you think about giving away

11   discounted equity, the Debtor -- it's easy to print equity,

12   right?  It's not that expensive.  The only people whose ox is

13   gored are the other holders, especially the people who are cut

14   out of the backstop.

15          So this is as printing press to create consideration

16   that doesn't hurt leverage.  It's not cash.  It doesn't hurt

17   debt leverage.  It's pretty easy to create.

18          So we're dealing with $85 million of value.  Again,

19   not a disputed number.  So what do they get?  Well, on the

20   backstop commitment, that's where the insider and majority

21   lenders, they say:  Look, we'll buy -- we'll commit to buy

22   whatever's left open from the open allocation.  And the open

23   allocation is where they try to raise $160 million of their

24   rights offering.

25          But don't think about this as the Debtor paying 85

159

1    million to backstop on 60.  Why?  Because the majority lenders

2    and insiders are already committed under the RSA to buy their

3    pro rata share of discounted equity in the open allocation.

4              So -- and you can see this in the RSA at our Exhibit

5    No. 72.  There's already a commitment.  So what are they

6    actually backstopping?  Well, since they make up 81 percent of

7    the class, they're actually backstopping 19 percent of the

8    rights offering, or about $30 million.  19 percent of 160.

9              So the proper framework for fair price or

10   reasonableness is $85 million of value to assume $30 million

11   of risk.  That doesn't make sense.  That's almost three times

12   return, right?  283 percent.  Under any measure, that's

13   excessive and unreasonable, and this is how Judge Drain looked

14   at it in Momentum.  Looking at the backstop fees against the

15   actual risk of the actual uncommitted portion.

16             So I think when you look at reasonableness, and you

17   have an insider, I think you look even closer, which brings us

18   back, in some sense, to LaSalle.  The best way -- we know what

19   the gold standard is to determine value  We know what the gold

20   standard is to determine the reasonableness of fees.  Expose

21   it to the market.  And actually that is a quote from LaSalle.

22             The Supreme Court said the best way to determine

23   value is exposure to the market.  And in this case, it has the

24   added benefit of adding transparency to the bankruptcy

25   process.  It avoids private back-room deals where size is

160

1    power and power can be abused.

2            So, in sum, the Debtors failed to carry their burden

3    of proof, the Plan violates the equal treatment under Section

4    1123(a)(4), the Debtors can't satisfy the entire fairness

5    standard, the backstop fees are unreasonable under Section 363

6    and 1129(a)(4).

7            I hate this part of my presentation, but I have to

8    address it.  The Debtors seek a waiver of Bankruptcy Rules

9    3020, 6004 and 6006, which provide for an automatic 14-day

10   stay of confirmation.

11           To the extent that the Court does confirm the Plan

12   and overrules our objection, we oppose that waiver and we

13   would request the full 14-day period not be truncated, to

14   allow our clients to evaluate and, if appropriate, prosecute

15   an appeal.

16           Despite making those comments, I don't think,

17   echoing the Debtor's closing remarks, that this is a close

18   call.  It's not.  I'm reluctant to sit down  If you have a

19   shred of doubt on my position on the law on anything I've

20   said, I would really value the opportunity to make sure that I

21   address any lingering concerns you have.

22           THE COURT:  I'll ask you one question.  Justice

23   Souter, in the last paragraph of LaSalle, says:  Whether a

24   market test would require an opportunity to offer competing

25   plans, I would be satisfied by a right to defer the same

1    interest sought by old equity, is a question we don't decide

2    here.

3         It's enough to say, assuming a new value coloring

4    (phonetic), that plans providing junior interest holders with

5    exclusive opportunities free from competition and without

6    benefit of the market valuation, fall within the prohibition

7    of 1129(b)(2)(B)(2).

8         Justice Thomas, in his concurrence, machinations

9    about market test are not even required.  This doesn't satisfy

10   1129(b)(2) because of the on account of a strict textualist

11   perspective.  And Justice Thomas, he was a big fan of writing

12   about 506(b) inducing it for all those fans of Chapter 13

13   cases.  What do I do with that language?

14        MR. HILLMAN:  Well, maybe we could start with

15   Justice Souter's comments.

16        THE COURT:  More focused on Justice Souter's

17   comments, right, because --

18        MR. HILLMAN:  An eight to one decision.  Justice

19   Souter's comments are about whether or not you can achieve the

20   same result by breaking Plan exclusivity.  I don't think --

21   I'm just looking for the language now -- that --

22        THE COURT:  He's quoting Douglas Baird's article in

23   the paragraph before.

24        MR. HILLMAN:  I have the decision in front of me.

25   Would you be so kind as to just tell me where -- where you're

162

1    at.

2            THE COURT:  Literally right before the concurrence.

3    The last paragraph right before the concurrence.

4            MR. HILLMAN:  Whether a market test would require an

5    opportunity?

6            THE COURT:  Uh-huh.  I guess it's -- I don't know

7    which version you're looking at.  I don't want to mark -- I

8    don't want to give marketing which version I'm looking at here

9    -- headnote.  But it's the last paragraph right before the

10   concurrence.  It's something I've been thinking about, or what

11   that means.  No one every talks about, is what made me --

12           MR. HILLMAN:  Whether a market test would require an

13   opportunity to offer competing plan, or would be satisfied

14   with a right to bind on the same interest.  So --

15           THE COURT:  So in other words -- I'll tell you what

16   I'm thinking.  There were two proposals for competing plans.

17   Provided -- the Supreme Court's saying, whether it's that or

18   you've got to offer it to everyone.  I'm not going to decide

19   it.  We don't need to decide that because this is an 1129

20   case, and the new value coloring on the "on account of"

21   language.

22           MR. HILLMAN:  Yes.

23           THE COURT:  And so --

24           MR. HILLMAN:  I have an answer.  I believe that when

25   we talk about requiring an opportunity to offer competing

1    plans, I've been so deep into this, I've actually listened to

2    the oral argument of 203 North LaSalle over the past few days.

3          I believe the context is about plan exclusivity and

4    terminating plan exclusivity.  Not merely sending a letter to

5    the Debtor's counsel offering an alternative plan, but an

6    opportunity to propose a competing plan not withstanding

7    Debtor's exclusivity.

8          And there have been many cases and discussions about

9    if you're not going to market test the sale of new equity and

10   bust open plan exclusivity and allow someone to offer and

11   propose a competing plan, it's not enough.  If this is the

12   avenue that Your Honor is thinking about.

13        THE COURT:  No I'm not saying -- everybody has been

14   talking about LaSalle and I'm just -- you asked for something

15   that may be in my mind that I don't think anybody has talked

16   about.  This is it.

17        MR. HILLMAN:  It can't be enough to say well

18   minority you sent me a piece of paper.  It is "a competing

19   plan" so the unequal treatment is satisfied when the response

20   will always be but you're competing plan doesn't have the

21   votes.  It doesn't have a laundry list.  It'll never overcome

22   the power of the majority.

23        THE COURT:  But what's wrong with that?  I'm not

24   agreeing or disagreeing.  I'm just playing -- pushing on all

25   sides here.

1           MR. HILLMAN:  I encourage it.

2           THE COURT:  What's wrong with that?  In other words,

3     1126 says holders of allowed claims can vote.  It doesn't say

4     why they can vote.  They can vote for whatever reason.

5           Maybe they don't like management.  They vote no, all

6     right.  We don't tell creditors why you can't vote.

7           1123(a)(4) says you've got to provide similar

8     treatment on the claim in the plan.  And 1123 is just -- I

9     know people think differently.  It just talks about the

10    contents of the plan.  What does this thing have to have

11    before people can go vote on it.  That's what it says.

12          And 1125 says it satisfies that, you can send it out

13    and go vote.  But it's got to have certain things in there and

14    we're going to make sure.  It's a structural statute.  But

15    you've got to provide for the same treatment.

16          You're arguing and there are other sections of the

17    code that can deal with that 1129(a)(3) can say, look, was

18    this thing proposed in good faith, right?  Is there -- and the

19    Fifth Circuit in some cases has talked about scoping out

20    chicanery, you know.  Is that what's really going on, right?

21    Like you put this on paper to satisfy 1123(a)(4).  But really

22    what you're doing is giving people more on account of their

23    claim because when you look at this other stuff that they're

24    getting it's really on account of their claim.

25          And so, I'm not getting the same treatment.  Here

165

1    this plan wasn't providing -- wasn't proposed, I should say,

2    in good faith because this plan meets technical requirements.

3    But they're getting more and they're just calling it something

4    else.

5            I think that's what you're arguing.  And I'm just --

6    I'm trying to crystalize the argument.  Maybe you're arguing

7    this with in the 1123(a)(4) bucket, but the on-account of

8    language I think gets lost in LaSalle because LaSalle talks

9    about the specific term on account of junior interest.  Which

10   is a cram down provision.

11           But I still think what you're arguing is the

12   principal of receiving more.  It's what I think Judge

13   Goldblatt and others were contemplating when he said I think

14   there's a LaSalle issue or maybe Judge Wiles (phonetic) was

15   saying impact drilling.

16           I think you got it.  I may not agree that it falls

17   within the bucket, but it means I've got to look at it one way

18   or the other.

19           MR. HILLMAN:  And yes, Your Honor.  And clearly I'm

20   making a good faith argument.  But I am not --

21           THE COURT:  I know you're not conceding the point.

22   I'm just --

23           MR. HILLMAN: ` Right.

24           THE COURT:  -- I'm saying -- I just want to

25   crystalize that's your argument right, is that when you can

166

1    look at something on paper and then you can look in terms of

2    what's really there.  And this may not -- these two things

3    maybe the same.

4         MR. HILLMAN:  And I would submit look how the

5    Debtor's framed it on paragraph 7 which was the first

6    demonstrative.  They put the same question before Your Honor.

7    I don't know if you have paragraph 7.

8         THE COURT:  I put it up to you.  What's a Debtor to

9    do?  We're going to put together -- we're going to go -- let's

10   go with proposal two's plan which is DOA.  Right.  Or we now

11   have to say well let's shop it.

12        People can vote for whatever reason they want to

13   vote, right.  And so they can just say I'm not voting for that

14   and good luck getting a DIP.  Good luck getting everything and

15   good luck getting a plan.  What's the Debtor to do?

16        Surely people can -- people have settled before.

17   But what -- why is a debtor and it's fiduciary put itself in a

18   position where it has to try to get its lenders to play nice.

19   I think about that.  And I'm not saying I have this situation

20   in mind in this case, but that's what they're saying.

21        That's what the Debtor's are saying.  They're not

22   saying hey look I've got a pre-pack here.  I can get in and

23   out in 45 days and unsecured creditors can get paid in full

24   and my business can continue and I get the money I need.  And

25   I've 66 and 2/3.

1      Why in the -- how in the world do I not propose

2  this?  I'm going to turn around and get sued if I don't go

3  forward with the Plan and I -- it's elect instead to go

4  forward with a contested plan where I'm going to try to -- I

5  have to then have a war with equity and go have a battle for a

6  DIP.  Like somebody's going to start questioning whether I

7  should, as a fiduciary, thought about this in another way.

8      So I'm blank if I do, blank if I don't.

9      MR. HILLMAN:  Well, I'm --

10     THE COURT:  I'm just kind of just posing both sides

11  of where I think you-all are.  And you're saying I'm a

12  minority lender.

13     I think this case is a little different too.  Which

14  is what makes this case complicated in some ways is that

15  there's not a document saying you've got to offer me pro-rata.

16  Right?  That's lender on lender.  That's next week or

17  tomorrow.  Right.

18     That's a whole other issue, right.  That's someone

19  arguing this piece of paper -- whether they're right or wrong,

20  we'll find out -- but that's a piece of paper saying you

21  promised X and someone else saying, you know, the document

22  says I can do Y under paragraph Z.

23     Here what we're saying is that the code itself

24  mandates this and I'm asking you for the specific --

25     MR. HILLMAN:  The Supreme Court --

168

1    THE COURT:  -- I'm asking you what do I do with

2    that?  Because the Supreme Court seems to be saying yeah you

3    got to market test it.  I don't know if market testing means I

4    considered two proposals.  And the best you could do didn't do

5    anything more.

6    Maybe that established the market that I needed to

7    get -- to do what I had to do.

8    MR. HILLMAN:  Well, I'd like an opportunity to

9    respond.

10    THE COURT:  No, no.  I'm just throwing out thoughts

11    because I'm going to ask the other side.  I know I was going

12    to ask them all this stuff on response and I might as well

13    throw it out now.

14    MR. HILLMAN:  So, let me give you two responses.

15    Your Honor can call balls and strikes.  Either the plan

16    provides equal treatment and the direct allocation, back stop

17    fees are open to all.  Or you go market test.  They can figure

18    that out.  You know what they're going to do.

19    They're going to open it up to all it's done.  I

20    believe that this easier than tomorrow's case.  It's easier

21    the credit agreement for a corner's examination looking for

22    the words, based upon LaSalle.

23    THE COURT:  But where in LaSalle are you pointing me

24    to?  That's the part that I'm getting at because I'm trying to

25    read LaSalle holistically and I'm going to ask Mr. Koster the

1    same question.  How do I read LaSalle holistically?

2              MR. HILLMAN:  I don't think there's a dispute that

3    LaSalle holistically was looking to answer a question of why

4    is one stakeholder getting a property right.  And the property

5    right was an exclusive investment opportunity.

6              Why are they -- that's what they -- they went

7    through causation multiple types of interpretation of

8    causation.  And they were focused on why are they getting the

9    new equity?  Well we know why they're getting a new equity on

10   account of the new money.

11             That's new value for equity. And that's what they're

12   arguing.  Equity for promise to backstop.  That's the

13   parallel.  And the Supreme court says it's the wrong question.

14             The thing that is of value is not the new money for

15   equity or in this case this commitment for equity.  The thing

16   that was volitive was this exclusive option which the Court

17   concluded is a property right.  There's no debate I can show

18   you the language in the decision where the Court says the

19   exclusive right to buy equity is a property right.

20             THE COURT:  Right, it was offered to equity in a

21   plan in which -- I had a case recently.  A case none of you

22   know about.  Single asset real estate on a building in the

23   Gallery area said oh my lender is about $18 million.  I'm

24   going to pay them interest.  They're going to refi or sell it

25   within the next 10 years.  I'm just going to pay them over the

170

1    next 10 years.  But I as the equity holder, I'm going to put

2    in two and half million dollars and I'm going to put new money

3    in to pay the taxes and that's going to be -- that's a LaSalle

4    problem.

5         Right.  What do I do?  How do I know that this two

6    and half million dollars that you're going to put into this

7    new company means something when you're going to stretch out

8    your lenders for the next 10 years and pay them -- how come

9    the lenders didn't have an opportunity to at least say we'd

10   like to credit bid.

11        Here that's LaSalle.  That's -- those are the facts

12   of LaSalle.  Right, I'm going to cram these people down.  I'm

13   going to stretch them out over 10 years.  They're going to say

14   no that's okay.  I've got a little class here.  I'm going to

15   pay them.

16        I've got my one impaired accepting class and then

17   I'm going to stretch these folks out for 10 years and I've got

18   equity.

19        MR. HILLMAN:  But why is it a LaSalle issue?

20   Clearly it's 1129 so it's cram down for LaSalle.

21        THE COURT:  It's a LaSalle issue because the

22   only -- the equity holder came in and said I'm going to put

23   two and half million dollars and that's it.  No one else.

24   That's my plan, go load on it.

25        This seems to be, you know, I've got to raise new

1     money.  And I negotiated at arms length.  It may be market as

2     what willing participants are willing to do.  And maybe that

3     means that I don't want to have to do business with these

4     other folks.

5          Maybe that's okay.  Maybe that's market too, right.

6     Maybe market is I only want to do business with these four

7     people.  And I don't want to do business with these other two

8     for whatever reasons.  And maybe that's market.

9          MR. HILLMAN:  I would submit instead of the market

10     focus, the predicate question is there something being given

11     to the majority of insiders that is plan treatment.  And I

12     would submit that the answer to that, based on LaSalle, is an

13     exclusive right, before you get to market.

14          THE COURT:  But is it on account of their claim?

15          MR. HILLMAN:  Well, and so LaSalle says that the --

16     and I'll point you to the language.  It says that that

17     property right is value.

18          THE COURT:  Correct.

19          MR. HILLMAN:  And then it has to answer that

20     question.  Is it on account of the claim?

21          THE COURT:  But that's an 1129 analysis.  That's --

22          MR. HILLMAN:  Because of the words, "on account of?"

23          THE COURT:  And if you look at the concurrence

24     that's exactly what 1129 is.  That's the central question.

25     What does the phrase of "on account of" mean and the junior

172

1    equity interest that that's the problem with my single asset

2    real estate person is you're getting that on account of your

3    equity because you're keeping that equity.

4              And here equity is getting wiped out.

5              MR. HILLMAN:  And here even the Debtors say the

6    things that the other class reclaimants are getting are not on

7    account of their claim.  It's the same causation question.

8    Why are they getting an exclusive right?

9              THE COURT:  So I think what they're going to argue

10   is there's a bunch of people who got together and they said

11   here's who we want to do business with.  And here's what we're

12   going to raise the money with.

13             MR. HILLMAN:  And I would submit that they run into

14   the bankruptcy code and can't do that.

15             THE COURT:  Where in the code?

16             MR. HILLMAN:  This brings us back to 1123 same

17   treatment.

18             THE COURT:  It's not account of the claim.

19             MR. HILLMAN:  That's what we're --

20             THE COURT:  That's what Peabody is saying. And

21   Peabody is saying look you had the opportunity to stay in --

22   to go to the mediation.  There's no telling what would have

23   happened if you had got in the medication.

24             People get -- people get cornered out of mediation

25   all the time.  That may mean you go cut a deal.  As a mediator

173

1    you do the 66 and 2/3 thirds however you can.

2            MR. HILLMAN:  You're in the room.  There's a

3    mediator.  It happens to be a judge.  I don't remember if it

4    was Houser who was the decision -- 8th circuit, sorry.  We're

5    not in the room.  This is very different than Peabody and I

6    would submit that Peabody distinguished LaSalle.

7            Why does it -- why does Peabody have to distinguish

8    LaSalle and say it's not exclusive.  If it was exclusive, it's

9    a problem.

10           THE COURT:  It's exclusive because they could have

11   shown up to mediation.  That's what Peabody says, right.  Like

12   you could have gone --

13           MR. HILLMAN:  It wasn't exclusive because you could

14   have.

15           THE COURT:  And how is that different than you sent

16   two proposals?  In other words, this is really about

17   financing.  And I haven't seen anything about a better

18   financing deal.  That's the -- but I do take your point

19   seriously.

20           MR. HILLMAN:  Well, when you say it's not better --

21           THE COURT:  The Supreme --

22           MR. HILLMAN:  -- I mean it treats creditors -- if we

23   came up with a billion dollars, they would still say but you

24   don't have the votes.

25           THE COURT:  I don't know that.  I don't know that.

174

1        But maybe that's your point.

2              Or what happens if I say you've got to go shop it

3        and they show up two weeks later and say I shopped it.  And

4        this is the best deal that's on the table with these people

5        who agreed to come up with this financing.

6              That's the -- it's the conundrum that we find

7        ourselves in.  But what does the bankruptcy code even speak to

8        this is the question.

9              MR. HILLMAN:  Well I think we reached the point

10       where -- I keep coming back to 1123 and LaSalle.

11             THE COURT:  No, no.  But I think that's right.  I

12       think that's right.  I just kind of pushing around.  We

13       ultimately get down to the same place.  And I think the

14       insider question then makes one dive deeper into the analysis.

15             I think -- I don't think I'm required to do a 50

16       state survey.  But I do think the totality of the

17       circumstances and what the Fifth Circuit tells me to do with

18       respect to 1129(a)(3) tells me I've got to look at the

19       totality of the circumstances.  Tells me I've got lots of

20       flexibility to go in there and look to see what really went on

21       and what happened and why.

22             And I think it engulfs that, but I can do more in

23       the totality of the circumstances.  I think I'm not bound by,

24       you know, if this was Utah law what they would say.  I don't

25       think I'm bound by that.  I think what I am -- I think I have

1    flexibility under 1129(a)(3) to go look at everything.

2              Or not to be constrained in any way.  In some cases

3    with and in others.  I think I have the ability to go look

4    everywhere.  And the question -- what you're asking me is look

5    everywhere and this is what you see.  They negotiated with an

6    insider is what you're telling me.  I get the point.

7              MR. HILLMAN:  Well I'm happy to come back up.  I'm

8    happy to answer more questions.

9              THE COURT:  No, no.  I think --

10             MR. HILLMAN:  I'm trying to be as comprehensive as I

11   can to package all the evidence and law.

12             THE COURT:  No, no.  It's given me a lot to think

13   about.  I very much appreciate it.

14             Let me hear from Mr. Koster.  Mr. Koster, why isn't

15   Mr. Hillman's analysis correct that -- maybe if this was just

16   the one L's.

17             Wait and an ad hoc group of one L's decided to do

18   this.  But when you bring in an equity now you're numbering an

19   existing equity sponsor into the table.  How do I construe

20   that in light of LaSalle, in light of what, you know, -- I

21   know TPC didn't decide anything.

22             But just the thought about 1123(a)(4) and the

23   concerns that were raised by some of my colleagues across the

24   country.

25             MR. KOSTER:  Yeah, thank you, Your Honor.  Let me

176

1    address the factual question first.  What changes when you

2    bring in equity.

3            We didn't bring in equity.  Equity is not

4    participating in this backstop.  They are not participating in

5    recoveries under the plan.  The existing 100 percent owner of

6    the equity by virtue of having a very sizeable first lien

7    claim that was settled and compromised at a substantial

8    discount.  Through the business judgment of the independent

9    fiduciaries is participating on certain terms.

10           And you ask -- you look at the totality of the

11   circumstances, I think you have look no further than all of

12   the evidence before Your Honor about the sound corporate

13   governance that was undertaken here which, and you know, one

14   of the had drafted out 11 points.  I wanted to make a

15   response.

16           And when I heard the back and forth between Your

17   Honor and Mr. Hillman, I think I should scrap that and address

18   Your Honor's questions.  But one point I was going to get to

19   was the effort to undermine that without pointing to any

20   evidence, but relying on fantasy and counsel's views of the

21   way that this process should work.

22           And certainly there's zero evidence of that before

23   Your Honor.  But absolutely, you need to look at the totality

24   of the circumstances of who participated and under what

25   circumstances.

1                    THE COURT:  How then do I deal with what the Supreme

2         Court has talked about.  Let's just --

3                    MR. KOSTER:  Yeah, so that's your second question --

4                    THE COURT:  -- going to the guts of LaSalle.

5                    MR. KOSTER:  -- on LaSalle.

6                    THE COURT:  It does say equity is a property right.

7                    MR. KOSTER:  Yeah.  So, you know, the LaSalle and

8         the comparison to LaSalle and the ability to port LaSalle and

9         it's holdings into this context is certainly interesting and

10        it's something that we've been grappling with since seeing the

11        objection.

12                   We've been doing a lot of thinking about it and I

13        think we've all thought a lot about LaSalle throughout our

14        careers.  And Mr. Hillman put demonstrative up on the screen

15        that cherry picked a bunch of facts and tried to draw

16        comparisons between this case and LaSalle.

17                   But what was missing is the most basic statutory

18        construction analysis that was undertaken in LaSalle.  So

19        La Salle was looking at the cram down provision of section

20        1129 of the Bankruptcy Code and the requirement or the

21        prohibition on giving a junior class any recovery or property

22        on account of the "on account of" it's claim where a senior

23        creditor has not been paid in full.  The absolute priority

24        rule.

25                   Section 1123 uses different language and the Court

1   and LaSalle undertook that exact same statutory construction

2   analysis.  What does "on account of" mean, what does for mean.

3   Why is 1129 and the language there not the same thing as 1123.

4   What is the difference in the use of on account of and the

5   direct causation that that implies as well as for.

6           And what is the difference between Section 1129 of

7   the Bankruptcy Code and 1123, which as Your Honor mentioned,

8   is a constructional provision of the Bankruptcy Code.

9           What did the contents of the plan need to be in

10  order to solicit and allow creditors to vote on it.  Even if

11  we apply LaSalle, I think that Your Honor hit the most

12  relevant point.  LaSalle, contrary to counsel's argument, does

13  not necessarily dictate a market test.

14          And while the last paragraph is dicta, it gives

15  alternatives to that process and you hit the nail on the head.

16  Why are the proposals that we received after the fact not

17  within the universe of things that LaSalle contemplated in an

18  open process?  I think clearly they are.

19          They had the opportunity to submit competing

20  proposals.  They submitted two competing proposals neither of

21  which came close to satisfy --

22          THE COURT:  The question is, is it a burden that the

23  Debtor must do if the Debtor wants to sell equity in the

24  reorganized company.  Does the Debtor have an affirmative duty

25  to confirm that it's market tested?

1      MR. KOSTER:  Well, certainly, Your Honor, it was no

2  secret that there was a restructuring in process.  You have

3  evidence in the record that members of the minority group knew

4  that was in process.  And all we have in the evidence that

5  Mr. Hillman cited during his closing is that they approached

6  members of another creditor group.

7      I fail to understand how that could activate the

8  Debtors fiduciary duties if they never came to us.  And when

9  they finally did -- and this I think is the most relevant

10  point and the comments that Mr. Hillman made about the

11  gamesmanship behind their own proposals is interesting and in

12  fact shocking to me.

13      They waited weeks until after the filing and then

14  deliberately failed to come correct.  Deliberately failed to

15  come correct on the assumption that whatever they did wasn't

16  going to be good enough.

17      They did just enough in an effort to activate the

18  fiduciary duties of our directors, but never with a serious

19  proposal.

20      And if you take Mr. Hillman's comments on their

21  face, why not make the billion dollar proposal?  Why not give

22  this company what it needed if it was ever serious, if it was

23  ever anything more than a litigation tactic.

24      It's not a market test that they're asking for.  It

25  is something entirely different.

180

1        THE COURT:  How do you view Peabody and

2   Mr. Hillman's comments that, you know, Peabody at least those

3   creditors were invited to the table.  They could -- you know,

4   they elected not to do so.  So it was -- I got it, Peabody is

5   the cautionary tale that when you get invited to mediation,

6   you better go or you get locked out of the room.

7        MR. KOSTER:  Although --

8        THE COURT:  But a deal comes out of it.  But putting

9   that, it kind of here I think the excluded lenders are the

10  objecting parties are -- would argue they never were invited.

11       MR. KOSTER:  If Peabody is a cautionary tale I'd put

12  it in the category of like a Grimms Fairy Tale, right.

13  Because there, there is a mediation that was limited and about

14  a very specific thing that creditors didn't necessarily care

15  about or have cause to care about.

16        It then warped into something else as mediation

17  orders often contemplate.  And once it did, the parties

18  weren't necessarily there to pay attention and the mediators

19  and the parties in the room knew that.

20        But even if they were there, to Your Honor's point,

21  that doesn't mean they would have been given the opportunity

22  to participate in the deal that the folks who went to the

23  corner of the room cut.  We've all been involved in mediations

24  where we're ignored.

25        We go to the room.  I've sat on the top floor of

**App. 1165**

181

1    Kirkland's offices in New York and been put in a corner room

2    and gotten the popcorn but not even the sandwich and no one

3    even coming to talk to me.

4         So being invited and having the opportunity to

5    participate in a mediation on different issues than you care

6    about is not openness.

7         THE COURT:  I don't know if you guarantee that

8    you'll never get another sandwich from them again or that you

9    will.  Your next mediation, but.

10        Let me -- how does one view that CVC was invited to

11   negotiate and not the excluded lenders?  How do you view that?

12   I mean, that's the crux of their argument, quite frankly.  And

13   I'm --

14        MR. KOSTER:  I think it's not the crux.--

15        THE COURT:  -- or not the crux.  An important part

16   of their argument that -- I don't know the CEO.  And I don't

17   have any evidence that the CEO didn't uphold fiduciary duties.

18   I have testimony from an independent representative on the

19   special counsel saying loyalties is with the company.

20        And certainly Mr. Edminston testified that his

21   loyalties were with the company.  And he may not know about

22   what happened, but he may not know all the back and forth that

23   might have gone on between advisors, but when he analyzed a

24   proposal that he felt incredibly sure that he was exercising

25   his fiduciary duties, so.  I found him credible.

182

1          MR. KOSTER:  And we appreciate that.

2          THE COURT:  But, you know, again so I've got two

3     questions for you.  How do you view the negotiations with one

4     group and then not opening it up to another group of

5     creditors?  Second question, what do you make of the phrase

6     and I think Mr. Hillman and I talked about it a little bit,

7     but the entire fairness standard argument by 1129(a)(3) saying

8     the plan must be proposed in good faith and not by any means

9     forbidden by law.

10         I didn't get your take on that.

11         MR. KOSTER:  Sure.  On the first point, Your Honor,

12    I think that you have one, ample testimony about the soundness

13    of the corporate governance here that Your Honor has

14    recognized and it.  You also have ample testimony about the

15    reasons why CVC was brought into this negotiations and it was

16    not ever for the expressed purpose of giving them backstop

17    economics.  It was based on the necessity that we needed to

18    solve CVC's claim amount.

19         You also have despite counsel's efforts to say it

20    was unreasonable to agree to settle that claim for that

21    amount.  The only evidence in the record is that advice and

22    ample advice on what that claim was, how it was originated,

23    what the components were our Special Committee believed that

24    the settlement of that claim amount was right in the range of

25    reasonableness.

183

1       And that was the predicate that made this

2   pre-packaged plan possible and didn't invite a lot of

3   litigation in this bankruptcy that would have extended it long

4   beyond what Mr. Edmiston also indicated the company could

5   tolerate.

6       On the second point, about the entire fairness and

7   how that works into 1129(a)(3).  I think I touched closer to

8   the beginning of my argument on the law that 1129(a)(3) just

9   does not do the type of heavy lifting that counsel has

10  suggested.

11      It is about the proposal of a plan.  Are you

12  proposing a plan with the hopes of reorganizing and with the

13  belief that it is confirmable?  And we certainly believe that

14  it has done that and more.  And the presence of CVC in an

15  aspect of this negotiation is what made that possible.  And

16  knowing that it needed to happen is exactly why the Special

17  Committee was set up and exactly why it operated the way it

18  did.  And despite counsel's suggestion that he's always seen

19  Special Committees with independent advisors and certainly not

20  the advisor to the private equity fund who's portfolio company

21  is being restructured, which happens all the time.

22      As Your Honor is well aware, you also have testimony

23  saying that our Special Committee did not think that was

24  necessary in this case.  That is the only testimony before

25  Your Honor, not counsel's experience and desires to have

184

1    someone else at the table negotiating for the company.

2           THE COURT:  Okay.  Folks I'm going to think about

3    this overnight.  I'm going to get you an answer tomorrow.  I'm

4    going to figure out a time to get you in.  I've got a bunch of

5    people with a bunch of boxes, so it might be easier to just --

6    there were a number of exhibits that were admitted today that

7    I have never seen before.

8           And I think -- I need to review everything.  It's an

9    important issue with important exhibits that were just

10   admitted today.  And there was a new Declaration.  And I just

11   haven't had the opportunity to read it and I think I need to

12   read everything.

13          I'm going to read LaSalle again.  Read a couple of

14   other cases.  You-all are welcome to come in, but I don't know

15   how many people are going to be here.  But you're free to

16   video in and I'll pick a time.

17          And I don't know if folks are traveling back

18   tonight.  I will pick a time that is convenient for folks.

19   And maybe we can kind of -- might be easier to just pick a

20   time probably early afternoon just to make sure that folks are

21   kind of where they're going to be.

22          But you-all tell me.  I will have made in my mind, I

23   will -- I'm going to get right to this and I'll be ready in

24   the morning.  I just need to go back and think about some

25   things and keep going.

185

1          MR. HILLMAN:  Whatever time is good for the Court is
2     good for me.  The 30 seconds more I told you I would come back
3     with just a cite within LaSalle which I know you're going back
4     to read again.
5          At page 455, the opportunity to buy equity is an
6     item of property in it's own right. That's the piece that I
7     couldn't find the cite to.
8          THE COURT:  No, no, no.  I -- okay.  Thank you very
9     much.  I thank everyone.  This is an important issue.  I just
10    want to I think I'm going to read something into the record
11    obviously, but I think because the case demands an answer and
12    I think you need an answer.
13         And so I'd rather just read the cases out and give
14    you my -- you know, make sure that my blue booking is right on
15    stuff.  And organize my thoughts in a way that for all parties
16    involved that I can at least articulate a decision in an
17    organized way as much as possible.
18         So, I thank everyone for the arguments.  It's a real
19    honor to have been a part of this.  I will get right to work.
20    Everyone is excused.  I'm going to just gather up all these
21    heavy binders and take them back and get right to work.
22         Thank you very much.
23         MR. HILLMAN:  Thank you, Your Honor.
24         MR. KOSTER:  Thank you, Your Honor.
25         THE CLERK:  All rise.

**App. 1170**

186

1          THE COURT:  Everyone's excused.  Thank you.

2                    *  *  *  *  *

3          *I certify that the foregoing is a correct transcript*

4     *to the best of my ability produced from the electronic sound*

5     *recording of the Zoom/telephonic proceedings in the*

6     *above-entitled matter.*

7          __/S./  MARY D. HENRY_____

8     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

9     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

10    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

11    *JTT TRANSCRIPT #68686*

12    *DATE FILED:  MAY 31, 2024*

13

14

15

16

17

18

19

20

21

22

23

24

25

**App. 1171**

1

```
1              IN THE UNITED STATES BANKRUPTCY COURT

2             FOR THE SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4   IN RE:                    §     CASE NO. 24-90194-11
                              §     HOUSTON, TEXAS
5   CONVERGEONE HOLDINGS, INC.,  §   THURSDAY,
                              §     MAY 23, 2024
6            DEBTOR.          §     6:01 P.M. TO 6:40 P.M.

7         ORAL RULING CONFIRMATION OF PLAN (VIA ZOOM)

8        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE
9

10

11

12     APPEARANCES:    PLEASE SEE ELECTRONIC APPEARANCES

13

14               (RECORDED VIA COURTSPEAK)

15

16

17

18

19

20             TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
               935 Eldridge Road, #144
22             Sugar Land, TX  77478
                   281-277-5325
23             www.judicialtranscribers.com

24

25    Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.
```

2

1          **HOUSTON, TEXAS; THURSDAY, MAY 23, 2024; 6:01 P.M.**

2          THE COURT:  Okay, good afternoon everyone.  This

3   is Judge Lopez.  We'll get started in just one minute.

4       (Pause in the proceedings.)

5          THE COURT:  Okay, this is Judge Lopez.  I'm going

6   to call the ConvergeOne case here in connection with a

7   ruling in connection Plan Confirmation.

8          I want to just begin by thanking all of the

9   parties for the incredible presentation.  It really took a

10  lot of time and thought well into the night and made sure I

11  reviewed everything.  And wanted to organize my thoughts in

12  a way that hopefully articulates the Court's position in the

13  best way possible.

14         So I'm just going to read into the Record the

15  decision.  And I'll begin.

16         The Court conducted a hearing on the Debtor's

17  Joint Chapter 11 Plan of reorganization.  This is a core

18  proceeding under 28 USC 157(b)(2)(L).  The Court has

19  jurisdiction at 28 USC 1334.

20         I know the Debtor started this case on a

21  pre-packaged basis.  The proposed transaction enjoys broad

22  support under an RSA with holders of well over 80 percent of

23  the Debtor's first lien debt and 100 percent in voting of

24  the Debtors second lien debt through a Plan of

25  Reorganization.

1          The Plan provides a few things.  I'll outline

2   them.  They're far more specific, but here's kind of the

3   general outline.

4          The company is going to conduct a hydrogen

5   $59 million rights offering that's fully backstopped by

6   certain members of the First Lien Ad Hoc Group and the PVKG

7   Lender receive about an $85.75 million direct investment

8   commitment from those parties for new equity interest in the

9   Reorganized Debtors.

10          As part of those transactions, over 90 -- about

11   96 percent of the new equity interest is going to be

12   distributed to hold as a first lien claims and the backstop

13   parties, as part of the rights offering, 65 percent of that

14   96 percent of that new equity interest is going to be

15   offered to all holders of first lien claims on a pro-rata

16   basis subject to a 10 percent put option premium owed to the

17   backstop parties and subject to dilution by the management

18   incentive Plan.

19          And as part of a direct investment commitment, the

20   backstop parties have committed to purchase 35 percent of

21   the 96 percent of new equity interest subject to a

22   10 percent put option premium owed to the backstop parties.

23          The proceeds of the rights offering in direct

24   investment committee, are going to be used to repay a term

25   DIP facility and provide the Reorganized Debtors with

4

1    working capital.

2         So what do holders of first lien claims get?

3    Those under the Plan, first lien claims are going to be

4    allowed -- and a little over about 1.1 billion or some KO

5    note claims that are going to be approved in a little over

6    78 million and PVKG note claim is going to be allowed at

7    about $213 million.

8         Holders of first lien claims can elect to take --

9    to receive take back term loans in a principal amount equal

10   to their first lien claims multiplied by a specific percent

11   or they can take take-back term loans in a principal amount

12   equal to their first lien claims multiplied by a lower

13   percent and they get the right to purchase through the

14   rights offering some new equity interest.

15        I note that second lien claims are -- have agreed

16   to receive an allowed claim of 286.5 million and they'll

17   receive pro-rata shares and a second lien recovery, which is

18   a percent essentially of the new equity interest in the

19   Reorganized Debtors.

20        General unsecured creditors are unimpaired.  All

21   existing equity interest will be cancelled and no

22   distributions will be made on account of that.  I noted a

23   little earlier under a global settlement of all disputes

24   related to the allowance of claims, a particular note held

25   by PVKG Lender is going to be allowed in the amount of

5

1   $213 million.  Separately.  And at the same time there are

2   pre-petition ABL secured parties delivered a commitment

3   letter to agree to continue providing access to the Debtors

4   $250 million ABL facility during these Chapter 11 cases.

5          So the Plan, if approved, contemplates the

6   equitization, cancellation of over a billion dollars of

7   funded debt and any un-impairment of general unsecured

8   claims.  Make note there was two classes of claims that were

9   eligible to vote on the Plan.

10          Class 3 consists of first lien claims.  According

11  to the evidence in the record, the voting tabulation, it was

12  approved by about 88.8 percent in amount and about

13  80.98 percent in number of holders.  It was rejected by 11.2

14  percent of the claim holders and about 19 percent in number.

15          Class 3 includes a vote from PVKG Lender, who

16  arguably may have been considered an insider for purposes of

17  voting.  But even if you take them out, the Plan still --

18  class still has over 86 percent in amount and over

19  80 percent in number.

20          Class 4, which was the second lien claims also

21  voted.  That consisted of the second lien claims.  It was

22  approved by 100 percent of the voting creditors.

23          Prior to the objection deadline, the Debtors

24  received some comments from several parties-in-interest,

25  including the United States Trustee.  The Debtors resolved

1    all these commitments through technical modifications and

2    agreed language in a proposed confirmation order.

3            There's only one objection to the confirmation of

4    the Plan.  They call themselves the excluded lenders'

5    objection.

6            Argue a few things.  They argue that the Plan

7    should not be confirmed because the Plan does not satisfy

8    Section 1129(a)(3) of the Code which says that the Plan must

9    be proposed in good faith and not by any means forbidden by

10   law.

11           It's subject to review under the heightened

12   Delaware Entire Fairness Standard and does not pass muster

13   under that standard.  It doesn't provide the same treatment

14   to holders of first lien claims in Class 3, the 1L claims,

15   as some class members are going to receive, they argue,

16   consideration on account of their new money commitments that

17   other members of the Class 3 have not been provided.

18           They think it fails Section 1123(a)(4) because

19   those parties would be receiving additional consideration on

20   account of their claim.  They also, importantly, big point

21   they emphasize is that the Plan runs afoul of the Supreme

22   Court ruling in *Bank of America National Trust and Savings*

23   *Association versus 203 North LaSalle Street Partnership*,

24   526 US 434.

25           They argue that the Supreme Court held in that

7

1  case that Chapter 11 Plans providing exclusive investment

2  opportunity to existing stakeholders are, in the absence of

3  a legitimate market test, unconfirmable as a market of law.

4        Here they say there was no effort to market test

5  the exit financing on the backstop deal.  Note that the Plan

6  is supported by a large number of parties.  And that's

7  obviously good for the Debtors.

8        There's also an RSA that was entered into

9  pre-petition.  That Debtors negotiating with constituents of

10  creditors pre-petition and entering into RSAs whether either

11  before or during a case I think is a good thing.  You know,

12  it locks in commitments from parties as those who see have

13  complex cases.

14        Many times creditors trade in and out of

15  positions.  And so you don't have a deal until you have one.

16  And so sometimes an RSA can be useful.  But that doesn't

17  guarantee confirmation.

18        And neither does the fact that everybody is

19  standing on one side and the creditor is standing alone on

20  the other side.  The Debtors must still satisfy the

21  confirmation standards under the Bankruptcy Code by a

22  preponderance of the evidence.

23        In this case, the Court conducted a multi-day

24  hearing on Plan confirmation.  After carefully considering

25  the Record and taking the matter under advisement, I'm going

8

1   to overrule the objection and I'm going to confirm the Plan.

2           Interrupting the Bankruptcy Code begins with

3   analyzing the text.  *Whitlock versus Lowe*, 945 F3d 943, 947,

4   Fifth Circuit 2019.  It says, "In matters of statutory

5   interpretation, text is always the alpha."

6           *Bedrock LTD LLC v. United States*, 541 176 pinpoint

7   cite 183, 2004.  "The preeminent cannon of statutory

8   interpretation requires the Court to presume that the

9   Legislature says in a statute what it means and means in a

10  statute what it says there."  That's what the Supreme Court

11  said.

12          I'm going to start with Section 1129(a)(3).

13  "Requires a Plan to have been proposed in good faith and not

14  by any means forbidden by law."  The text is clear.  The

15  focus is on the proposal of the Plan.  Rephrases "in good

16  faith and not by any mean forbidden by law" modify the verb

17  proposed.

18          Proposed is the passive form of the verb propose.

19  I agree with Collier and Bankruptcy on this point.  This

20  textural analysis supports the focus on the process of

21  proposing a Plan.  And since the mid-1980s the Fifth Circuit

22  adopted its standard for assessing good faith and it hasn't

23  changed in over 40 years.  And it supports the textual

24  analysis.

25          In the Fifth Circuit, the requirement of good

1 faith must be viewed in light of the totality of the

2 circumstances surrounding proposal of a Chapter 11 Plan,

3 keeping in mind the purpose of Chapter 11 and the Bankruptcy

4 Code is to give Debtors a reasonable opportunity to make a

5 fresh start.

6       So *In re: Sun Country Development, Inc.*, 764 F2d

7 406, 408; Fifth Circuit 1985.  I'd also note that concept is

8 also that concept is also in *In re: Jasik, 727 F2d, 1379,* a

9 Fifth Circuit 1984 case.

10       That means process with purpose in mind.  In the

11 Sun Country Development case, the Fifth Circuit said, "Where

12 the Plan is proposed with a legitimate and honest purpose to

13 reorganize and has a reasonable hope of success, the good

14 faith requirement of 1129(a)(3) is satisfied."

15       It also said, "The Debtor may satisfy the good

16 faith requirement even though the Plan may not be the one

17 the creditors would themselves design and indeed may not be

18 confirmable."  That came out of *In re: Brisco Entertainment*

19 *LTD*, 994 F2d 1160, pincite 1167; a Fifth Circuit 1993 case.

20       You can see the same standard articulated in 1997

21 in the *TH New Orleans Limited Partnership* decision.

22 116 F3d, 790, Fifth Circuit 1997.  In that case the Court

23 says, "Plans that may not be the ones which creditors would

24 themselves design and indeed may not be confirmable, they

25 may still be in good faith."

1        The totality of circumstance is continued into the

2   well known 2013 Fifth Circuit decision, *The Village at Camp*

3   *Bowie*.  In that case -- that's 710 F3d 239.  In that case

4   the Court also said that "An inference of bad faith might be

5   stronger where Debtor cuts an impaired class out of whole

6   cloth by incurring a debt with a related party particularly

7   if there is evidence that the lending transaction is a sham.

8   Ultimately the Section 1129(a)(3) is fact specific, fully

9   empowering Bankruptcy Courts to deal with chicanery."

10  Those are the words of the Fifth Circuit.

11       The objectors focus a lot on the words, "forbidden

12  by law".  And they want the Court to view the proposed Plan

13  incorporating the Delaware Corporate Entire Fairness

14  Standard to evaluate a Plan because it involves a

15  transaction involving the Debtor's private equity sponsor.

16       But that's not mandated or required under the

17  Code.  The Court is not required to do a 50-state survey

18  about, you know, what the appropriate forbidden by law

19  means.

20       The focus, again, is -- that focuses on an after

21  the fact outcome and not a proposal.  The proposal of the

22  Plan can't violate a law.  And there's nothing in the Record

23  that says this Debtor violated law by proposing this Plan.

24       Go back to the text, right?  A proposed a Plan --

25  can propose a Plan that is not in good faith and by any

1   means forbidden by law.  Proposal in good faith and not by

2   any means forbidden by law.

3          Proposal in good faith, right, and by any means

4   forbidden by law modify by proposed.

5          Again the text matters here.  The focus is on

6   proposal of the Plan.  No law that this Court is aware of

7   prevents this Debtor from proposing the Plan.

8          The Record show that the Debtor had the requisite

9   corporate authority to propose it.  It also makes sense that

10  proposal of the Plan is the emphasis.

11         Debtors propose a Plan and get permission to

12  solicit votes on the Plan.  Creditors vote on the Plan.  And

13  that's why you need the requisite votes from creditors to

14  confirm the Plan.

15         That's why creditors are required to receive a

16  Disclosure Statement with adequate information to allow them

17  to make an informed decision about whether to accept or

18  reject the Plan.  And if the Debtor's proposed Plan impairs

19  claims, creditors get to vote on that Plan.

20         All classes vote to accept the Plan.  The Plan can

21  be confirmed assuming all other applicable sections of the

22  Code are satisfied.

23         Creditors get to evaluate their potential upside

24  and downside risk in evaluating a Plan.  A class of

25  creditors may evaluate a Plan and decide that the proposed

1   recovery is worth accepting even if it's less than

2   100 percent.  That's what the 2L class did.

3            One hundred percent of voting creditors supported

4   the Plan.  The Code also says that if enough creditors in

5   the amount of debt in the number of class vote to accept the

6   Plan, they can carry the class over the objecting of the

7   dissenting creditors in that class.

8            In other words, creditors in a class bind other

9   creditors.  And the Code says that creditors who vote to

10   reject are entitled to some protection.  To have a recovery

11   on their claim, they get at least what they would receive in

12   a liquidation.  I'm just talking Code-speak here.

13            But they have to accept the treatment under the

14   Plan.  Again, the Debtors proposed the Plan, but creditors

15   are the vital party.  That's what happened in the 1L class

16   situation.  About 88 to 99 percent voted to approve, so the

17   class accept it.  Eleven percent vote is overruled by fellow

18   similarly situated creditors.

19            The objecting parties believe that the Debtors are

20   really being controlled by their pre-petition private equity

21   sponsor who is an RSA party, first lien lender and a

22   backstop party.

23            Analyzing the Chapter 11 Plan with a proposed

24   transaction with an insider is properly analyzed under the

25   good faith prong.  Was the Plan formulated to benefit the

1   insider?  Was there a sweetheart deal?  Or was it formulated

2   with the Code's purposes in mind?

3           This is analyzed under the Fifth Circuit totality

4   of the circumstances test.  Totality of the circumstance

5   certainly includes aspects of an entire fairness allowances.

6   But I'm not bound to analyze Delaware law here only.  Again,

7   I don't have to conduct a 50-state survey depending on the

8   Debtor's state of incorporation.

9           I can look to more than one part of the Plan

10  formation.  I can look -- I can consider the totality.

11  bankruptcy judges can look at everything related to the

12  formation of the Plan.  I'm not constrained by state law.

13          But even if the entire fairness standard was the

14  standard, it's easily satisfied here.  Regardless, when

15  analyzed through the proper lens, the answer becomes

16  apparent that it was proposed in good faith and as stated

17  there no law that runs afoul in proposing the Plan.

18          The Debtors negotiated with the overwhelming

19  majority of holders of 1L debt extensively and reached

20  consensus on a proposed Plan.  The negotiations were

21  extensive and at arm's-length.

22          The board had an independent Special Committee.

23  Mr. Edmitson testified.  Served on that Special Committee.

24  I found him very credible.  He took his fiduciary duty

25  seriously.  I believe him.

1          He also felt the other members did too and there's

2     no evidence to the contrary.  They didn't hire independent

3     counsel.  It's not required.  But I'll say for the Record,

4     it sure would have given the Court greater comfort.

5          That made me look even closer at the deal with

6     Mr. -- even with Mr. Edmitson testifying about the board's

7     analysis and negotiations.  CVC was not a part of their

8     meetings.

9          I still looked closer to make sure that the board

10    was not directly or indirectly on both sides of the deal.  I

11    looked through every piece of paper that was submitted into

12    the evidence.  I listened carefully to the testimony.  I

13    didn't find anything to suggest that this Special Committee

14    did not exercise their fiduciary duty seriously or that they

15    failed in exercising that duty.

16         I am satisfied with the work of the Special

17    Committee, their analysis and their independence.  I looked

18    deep.  And I gave it a hard look.  And that's my answer.

19         At the direction of the Special Committee, in

20    January of 2024, the Debtors and their advisors engaged with

21    the First Lien Ad Hoc Group and the pre-petition ABL Secured

22    Parties about the terms of the potential transaction and DIP

23    financing facilities.

24         The Debtors and their advisors also engaged with

25    Latham as Counsel to the PVKG Lenders.  Negotiations

1   continued and culminated in an agreement on the terms of the

2   restructuring transaction and DIP facilities with

3   overwhelming support.

4          Based upon the Record before me, there is no deal

5   to reduce of a billion dollars of debt without the 1L Ad Hoc

6   Group.  The 2L's are on board with 100 percent of this Plan.

7   Onboard 100 percent.  And they aren't even receiving a full

8   or even 50 percent recovery.

9          And unsecured creditors are unimpaired.  The

10  overwhelming support for this Plan is remarkable.  There's

11  also no formal requirement for the objecting parties to have

12  been included in the negotiations on the Plan or the related

13  backstop agreement.

14         There's nothing in the docs that says that they

15  had to be involved.  Right?  The Plan also avoids

16  potentially costly litigation over a make whole involving

17  the private equity sponsor.

18         This District knows a lot about make wholes and

19  consent, if possible, makes a lot of sense.  Protracted

20  litigation is expensive and it's time consuming.  It appears

21  the Debtors analyzed defenses to the make whole, but

22  settling in connection with a pre-packaged Plan with the

23  majority of holders of first lien debt and second lien debt

24  and paying unsecured creditors in full confirms good faith

25  viewed in light of the totality of the circumstances

1   surrounding the establishment of the Plan, keeping in mind

2   the purpose of the Code.

3            Let me turn to Section 1123(a)(4) next.  That

4   requires a Plan to provide the same level of treatment to

5   the same -- provide the same treatment for each claim within

6   a particular class.

7            There's a statutory exception to this requirement

8   where a holder of a claim agrees to less favorable

9   treatment.  Section 1123(a)(4) extends only to the treatment

10  of the members of the claims, the class of claims and not to

11  the Plan's overall treatment of creditors holding such

12  claims.

13           Creditors should not confuse similar treatment of

14  claims with equal treatment of claimants.  Parties can

15  receive the same distribution in a class and then a subset

16  of those creditors can receive other forms of compensation

17  for matters unrelated to their claim assuming there's a

18  justification for it.

19           Remember, the Court considers totality of the

20  circumstances in good faith.  There is a way to stop it.

21  I'm well aware of other cases in transcripts.  For example,

22  in *Pacific Drilling*, the Bankruptcy Court rejected a motion

23  to approve an equity committee commitment agreement that

24  would have provided lenders that agree to a backstop, the

25  rights offering with an 8 percent backstop fee and a private

1  placement opportunity to purchase, I think it was

2  100 million of reorganized equity at a 46.9 percent discount

3  to Plan value.

4       In *TPC Group*, which was ultimately resolved

5  consensually by allowing others to participate prior to a

6  consensual resolution, the bankruptcy judge commented on

7  whether an exclusive offer was market tested and raised

8  *LaSalle*.

9       I know those cases.  I'm aware of the other cases

10 cited.  And I hold those bankruptcy judges in the highest

11 regards.  And I'm just focused on this case with these facts

12 and this Plan, just as they were focused on their cases and

13 the legal issues presented in those cases.

14      These cases are not on all fours with the other

15 cases.  So I just stress Justice Ketanji Brown Jackson

16 concurrence in a recent Supreme Court decision in *Gonzales*

17 *versus Google*.  It's a non-bankruptcy case, but I stress

18 what she said.

19      She wrote, "Other cases presenting different

20 allegations and different records may lead to different

21 conclusions."  Right?  That's the point.  You can pull

22 quotes out of a case, but other cases present different

23 allegations and different records and could lead to

24 different conclusions.

25      The objecting parties have also argued that the

1  financings offered to select groups violates Section 1123 --

2  excuse me -- violates *Bank of America National Trust and*

3  *Savings Association*.

4         Let me just kind of note one other point.  Nope,

5  let me stick with *LaSalle*.  They argue that market texting

6  is lacked in here.

7         Let me tell you a little bit about *LaSalle*.

8  *LaSalle* involved a Plan where the secured debt was being

9  crammed down in a Plan.  Supreme Court said that the

10  Debtor's principal objective was to ensure its partners

11  retained title to the property so as to avoid roughly

12  20 million in personal tax liability which become due if the

13  bank foreclosed.

14         So the bank got proposed impaired treatment.  But

15  certain former partners of the Debtors would contribute six

16  million over five years and get the partnership's entire

17  ownership of the reorganized entity.

18         And the Plan said the old equity were the only

19  ones who could contribute new capital.  The bank objected.

20  So the Debtor went the cram down route.  The bank said its

21  unsecured deficiency claim would not be paid in full, but

22  old equity was getting property.

23         This prompted a fight that ultimately found its

24  way to the Supreme Court about the absolute priority rule

25  and the new value corollary.  The Supreme Court held that in

1   a cram down Plan exclusive investment opportunities granted

2   to existing stakeholders to buy discounted equity could not

3   constitute legitimate consideration if such investment is,

4   and I quote, "on account of or in consideration for the

5   existing equity interest.  Especially," as the Supreme Court

6   said, "an exclusive right at no cost whatsoever."

7           This was a cram down case and the Supreme Court

8   specifically analyzed what it meant to receive property on

9   account of an equity interest.  On account of language is

10  specific text found in the cram down sections of

11  Section 1129 of the Bankruptcy Code.

12          The Supreme Court found that receiving new equity

13  is property and a market test was necessary to prove that

14  the property was not given to equity on account of their

15  existing equity interest.

16          So what type of market test was required in this

17  cram down?  Supreme Court left that question unanswered.

18  They said it's enough here to say assuming a new value

19  corollary violated the prohibition in that case under

20  Section 1129(b)(2)(B)(2).

21          I can't over emphasize that *LaSalle* is a cram down

22  case and the Court was analyzing text under Section 1129(b)

23  and whether the absolute priority rule was violated, which

24  says that equity can't receive any property on account of

25  its interest unless creditors are paid in full.  That's

1   exactly what was emphasized in the current.  Why is it

2   important that it's a cram down Plan?

3          Because in a cram down Plan, class of creditors

4   reject the Plan and the votes of a class of creditors who is

5   impaired under the Plan, but who has accepted it, can be

6   used to cram the Plan down on the non-accepting class.

7          This is not a case that I described earlier where

8   a majority of votes within a class wins.  This is a majority

9   in a class -- the creditors in class say no thank you.  And

10  a separate class of impaired creditors saying we accept it,

11  you're going to have to accept it.

12         And in that scenario, the Plan will get crammed

13  down on the dissenting class of creditors.  And in that

14  scenario the Code gives the rejecting class protections.

15  One of them is that a junior class or equity won't receive

16  any property on account of their interest unless that class

17  is paid in full.

18         Back to my theme.  Debtors propose, creditors

19  vote.  This is not a cram down case in this case.  And

20  equity is not being offered for the sole right for nothing.

21  Here the participating parties are putting in new money and

22  backstopping a deal.  We don't have a *LaSalle* problem here.

23         Going back to 1123(a)(4).  The class one

24  treatment is similar for all 1L lien holders.  Look at the

25  text.  What's the purpose of Section 1123?  1123 is labeled

1  "Contents of the Plan."  It is structural.  It says what

2  must be included in a Plan.

3          And while you're at it, really focus on the way,

4  you know, what we call subpart (2) of the Code is presented.

5  Look at 1121.  Look at 1122.  Look at 1123.  Look at 1124.

6  Look at 1125.  Look at 1126.  Structural.  Look at -- right?

7          Look at 1127.  Look at 1128.  1128 says you can

8  have a confirmation hearing and parties can object.  Then

9  you get 1129 and it says -- right, now we start to get into

10  if you want a Plan confirmed, here's where the Code kicks

11  in.  Good faith, right?  Not by any means forbidden by law.

12  Not for -- you've got to comply with the other sections of

13  the Code.

14          Creditors are entitled to certain protections.

15  That's where you go.  Here there was a thorough negotiation

16  with a majority of lenders about Plan terms and a new money

17  commitment.

18          It's undisputed that the Debtors needed to raise

19  exit financing.  And that they needed new money on a

20  reorganized -- as a Reorganized Debtor.  They accomplished

21  this.  The compensation to these lenders who are

22  participating parties is not on account of the claim.

23          The negotiation itself is what a third party

24  creditor group.  Right?  This isn't like equity proposing a

25  Plan and then saying here's what we're going to get under

1   that Plan.

2            This is a market deal.  I can assess it.  I have

3   evidence in the Record about the negotiation and comps.

4   This deal was not struck in the dark exclusively between

5   Debtor and the equity.  That's a *LaSalle* problem.

6            We don't have a cram down here.  All classes of

7   creditors eligible to vote, voted yes.  That sometimes mean

8   they can agree to things that cram down you wouldn't get

9   under 1129(b).

10            I stress cram down under 1129 is very different in

11   confirmation under Section 1129(a).  So let's analyze the

12   exit financing and the rights offering in the backstop.  The

13   market comps support that this deal is not too rich.  That

14   was in part the pack drilling problem.

15            Importantly, there were two proposals from the

16   excluded lender group.  They couldn't guarantee better

17   economics.  That's another market test and it was not in

18   a -- it was in a non-cram down scenario.

19            But I have a market analysis anyway.  I note that

20   the objecting lender proposal is not just for the financing

21   part.  And that's really important to them, though.  Note

22   the proposal included Plan treatment to excluded lenders

23   wanted the Debtors to drop the current deal with broad

24   creditor support and take the entire -- and take this entire

25   new deal with no guarantee of broad support.  And then say

1    that it was the Bankruptcy Code is the reason for the hopes

2    that lenders settle.

3            But Mr. Edmitson noted that this is a real company

4    with real employees and real customers.  And the Debtor's

5    decision was easy here.  They went with the best economic

6    deal, got them the exit financing and guaranteed it with a

7    backstop.  I have no issue and the Bankruptcy Code has

8    requirement otherwise that a Debtor worked with a set of

9    lenders to raise money.

10           I'd note, no one put on a better deal for the

11   financing.  The Fifth Circuit has dealt with these issues,

12   too.  *In re:  Cajun* Electric.  The Fifth circuit concluded

13   that a Plan proponents payments to certain members of a

14   Debtor power cooperative didn't violate Section 1123(a)(4)

15   because the payments were reimbursement for Plan and

16   litigation expenses not payments made in satisfaction of

17   their claims against the Debtor.

18           Everybody knows that it's *Cajun Electric Power*,

19   150 F3d 503, 518; Fifth Circuit 1998 case.

20           Here's where I turn to *Peabody*.  The Eighth

21   Circuit confronted the issues there, too.  A group of

22   creditors objected and said they weren't afforded the right

23   to participate in a private placement and a backstop.

24           The Court citing *Cajun Electric*, cites the Fifth

25   Circuit and Chase, I know as well, disagreed.  They said

24

1   1123, 1129 were not violated.

2          Also noted in that case was that *LaSalle* was

3   distinguishable.  Among other things it said, "Unlike the

4   equity holders in *LaSalle*, creditors who participated in the

5   private placement gave something of value up front in

6   exchange for their right to participate.

7          They promised to support the Plan, buy preferred

8   stock that did not sell in the private placement and they

9   backstopped the rights offering.  Third, and they also said

10  unlike the Debtor in *LaSalle,* the Debtors considered several

11  alternative ways to raise capital including proposals.

12         The Debtors in this case reviewed each alternative

13  Plan with their advisors and analyzed the merits at

14  meetings.  That's what they did as well in Peabody.  With

15  each proposal, the Debtors determined that the proposal

16  alternative would be less effective at accomplishing their

17  goals than their Plan or it would cost too much in terms of

18  time and money.

19         *Peabody*, citing Fifth Circuit, Fifth Circuit

20  looking at 1123(a)(4) considering 1123(a)(4) on account is

21  it because of the claim or is it something separate?  The

22  Fifth Circuit has dealt with these issues since 1990, over

23  20 years because it's indistinguishable it agreed with

24  the -- *Peabody* agreed with the Bankruptcy Code that it had a

25  right to participate and the private placement was not a

1   treatment for a claim.

2          That's what we have here.  So the Plan doesn't

3   violate the equal treatment rule of Section 1123(a)(4) and

4   it was proposed in good faith and not by any means forbidden

5   by law.

6          I'm comfortable with the Record before me.  In the

7   end, the best of the best lawyers argued this case.  Cannot

8   think of a better argument, briefing evidence.  It's very

9   complicated transaction, but not a close call.

10         We have a Plan approved by all classes of eligible

11  voters.  No cram down.  The financing is reasonable and it's

12  in the best interest of the estate.  Even under close

13  examination from this Court, no undue insider influence and

14  the price to pay for certainty and funding was a key

15  component.

16         I note based upon the Record before me as well, it

17  wasn't raised, it was submitted -- raised in specific

18  objections.  I would note that the Plan satisfies

19  Section 1125 of the Bankruptcy Code.

20         There was an appropriate Disclosure Statement.  I

21  did read every word of that Disclosure Statement and I

22  determined that it contains adequate information within the

23  meaning of Section 1125 of the Bankruptcy Code.

24         I would note that the parties who received that

25  Disclosure Statement, no one raised an objection to it as

1  well.  But I still think there's an independent duty for the

2  Court to determine that as well.

3         I would note that every other applicable section

4  of Section 1129 of the Bankruptcy Code and Section 1123 of

5  the Bankruptcy Code has been satisfied.

6         I'm going to confirm the Plan.

7         The Court has reviewed the proposed order.  The

8  Court has considered the request and I'm going to deny it.

9  I think the Debtor -- I think the law is clear on this case.

10        I'm going to sign the proposed confirmation order

11  that was submitted to the Court.  I know there was a lot of

12  argument saying no Court is ever going to ask this.  I just

13  think the case law showed otherwise.  I think this has been

14  argued.  This is just a new set of facts, different private

15  placement.  But I still have a rights offering, a backstop.

16  1123 of the Code, nothing has changed.  Just a different set

17  of facts.

18        I wouldn't call them -- I'd just call them a

19  different set of facts, issues that have been confronted by

20  the Fifth Circuit for over 20 years.

21        I hope that provided some clarity.  I thank all

22  the parties.  I'm confirming the Plan.  And I'll sign that

23  order and it'll hit the docket shortly.

24        Thank you very much.  We're adjourned.

25     (Hearing adjourned at 4:20 p.m.)

27

1                              *  *  *  *  *

2              I certify that the foregoing is a correct

3    transcript to the best of my ability produced from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6    /S/ MARY D. HENRY

7    CERTIFIED BY THE AMERICAN ASSOCIATION OF

8    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

9    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

10   JTT TRANSCRIPT #68687

11   DATE FILED:  MAY 31, 2024

12

13

14

15

16

17

18

19

20

21

22

23

24

25