**Case No. 24-cv-02001 (ASH)**

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---

**In re: CONVERGEONE HOLDINGS, INC., *ET AL.*,**
**Reorganized Debtors.**

---

**AD HOC GROUP OF EXCLUDED LENDERS,**
*Appellant,*

**v.**

**CONVERGEONE HOLDINGS, INC., *ET AL.*,**
*Appellees.*

Appeal from the United States Bankruptcy Court for the
Southern District of Texas, Houston Division (Case No. 24-90194 (CML))

---

**APPENDIX IN SUPPORT OF ANSWERING BRIEF OF**
**INTERVENOR-APPELLEE FIRST LIEN AD HOC GROUP**

---

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
C. Lee Wilson (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
   Email:
     sgreenberg@gibsondunn.com
     kmartorana@gibsondunn.com
     clwilson@gibsondunn.com

(Additional counsel listed on inside cover)

**GIBSON, DUNN & CRUTCHER LLP**

Michelle Choi (admitted *pro hac vice*)
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: mchoi@gibsondunn.com

**PORTER HEDGES LLP**

John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
James A. Keefe (TX 24122842)
100 Main Street, 36th Floor
Houston, TX 77002
Telephone: (713) 226-6000
Facsimile:  (713) 226-6248
Email: jhiggins@porterhedges.com
        eenglish@porterhedges.com
        jkeefe@porterhedges.com

*Counsel for Intervenor-Appellee the First Lien Ad Hoc Group*

ii

**APPENDIX IN SUPPORT OF ANSWERING BRIEF OF
INTERVENOR-APPELLEE FIRST LIEN AD HOC GROUP**

| Tab | Bankruptcy Docket No. | Appendix Page No. | Document |
|---|---|---|---|
| 1. | 411 | Supp. App. 001-162 | Combined Disclosure Statement and Confirmation Hearing Transcript [taken on May 17, 2024] |
| 2. | 324 | Supp. App. 163-250 | *Debtors' Memorandum of Law in Support of (I) Approval of the Disclosure Statement on a Final Basis and (II) Confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its Debtor Affiliates* |
| 3. | 325 | Supp. App. 251-257 | *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Joint Prepackaged Chapter 11 Plan of Reorganization of Convergeone Holdings, Inc. and its Debtor Affiliates* [Reproduced Without Exhibits] |
| 4. | 263 | Supp. App. 258-290 | *Ad Hoc Group of Excluded Lenders' Objection to Confirmation of Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and its Debtor Affiliates* [Reproduced Without Exhibits] |

Dated:  September 3, 2024
      Houston, Texas

Respectfully submitted,

**PORTER HEDGES LLP**

*/s/ John F. Higgins*

John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
James A. Keefe (TX 24122842)
1000 Main Street, 36th Floor
Houston, TX 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
E-mail:    jhiggins@porterhedges.com
          eenglish@porterhedges.com
          jkeefe@porterhedges.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**

Scott J. Greenberg (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
C. Lee Wilson (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile:  (212) 351-4035
Email:    sgreenberg@gibsondunn.com
        kmartorana@gibsondunn.com
        clwilson@gibsondunn.com

**GIBSON, DUNN & CRUTCHER LLP**

Michelle Choi (admitted *pro hac vice*)
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
Facsimile:  (213) 229-7520
Email:    mchoi@gibsondunn.com

*Counsel for the First Lien Ad Hoc Group*

2

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing brief was served upon all parties registered to receive service through this Court's ECF notification system, on September 3, 2024. Additionally, a copy of the pleading was sent by electronic mail to the following:

**WHITE & CASE LLP**
Charles R. Koster
609 Main Street, Suite 2900
Houston, TX 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

-and-

**WHITE & CASE LLP**
Bojan Guzina
Jason N. Zakia
Andrew F. O'Neill
Erin R. Rosenberg
Blair M. Warner
Adam T. Swingle
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
Email: bojan.guzina@whitecase.com
        jzakia@whitecase.com
        aoneill@whitecase.com
        erin.rosenberg@whitecase.com
        blair.warner@whitecase.com
        adam.swingle@whitecase.com

*Counsel for the Debtors*

3

**GRAY REED**
Jason S. Brookner
William N. Drabble
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
         wdrabble@grayreed.com


-and-


**PROSKAUER ROSE LLP**
David M. Hillman
Michael T. Mervis
Eleven Times Square
New York, NY 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: dhillman@proskauer.com
         mmervis@proskauer.com

-and-


**PROSKAUER ROSE LLP**
John E. Roberts
One International Place
Boston, MA 02110-2600
Telephone: (617) 526-9600
Facsimile: (617) 526-9899
Email: jroberts@proskauer.com


-and-


**PROSKAUER ROSE LLP**
Steve Y. Ma
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
Telephone: (310) 284-4542
Facsimile: (310) 557-2193
Email: sma@proskauer.com

*Counsel for the First Lien Ad Hoc Group of Excluded Lenders*


*/s/ John F. Higgins*

John F. Higgins

4

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE:                              §    CASE NO. 24-90194-11
                                    §    HOUSTON, TEXAS
CONVERGEONE HOLDINGS, INC.          §    FRIDAY,
                                    §    MAY 17, 2024
           DEBTOR.                  §    1:02 P.M. TO 4:51 P.M.

**COMBINED DISCLOSURE STATEMENT AND CONFIRMATION HEARING**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

     APPEARANCES:                        SEE NEXT PAGE

     ELECTRONIC RECORDING OFFICER: Zilde Compean

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 001

2

**APPEARANCES (VIA ZOOM):**


FOR THE DEBTOR:                         WHITE & CASE
                                        Charles R. Koster
                                        Jason Zakia
                                        Bojan Guzina
                                        Blair Warner
                                        Adam Swingle
                                        609 Main St., Suite 2900
                                        Houston, TX  77002
                                        1-832-786-6118


FOR FIRST LIEN AD HOC GROUP:            GIBSON, DUNN & CRUTCHER
                                        Matthew Williams
                                        Michelle Choi
                                        200 Park Avenue
                                        New York, NY  10166
                                        1-212-351-4000


FOR UNITED STATES TRUSTEE:              OFFICE OF U.S. TRUSTEE
                                        Jayson Ruff
                                        515 Rusk St., Suite 3516
                                        Houston, TX  77002
                                        1-713-718-4650


THE AD HOC GROUP OF                     PROSKAUER ROSE LLP
EXCLUDED LENDERS:                       David Hillman
                                        Mike Mervis
                                        Julia Alonzo
                                        Javier Sosa
                                        Steve Ma
                                        Libbie Osaben
                                        Eleven Times Square
                                        New York, NY   10036
                                        1-212-969-3000

                                        GRAY, REED & MCGRAW, LLP
                                        Jason Brookner
                                        1601 Elm St., Suite 4600
                                        Dallas, TX  75201
                                        1-469-320-6132

Supp. App. 002

3

**<u>APPEARANCES (VIA ZOOM)</u>:**

```
FOR AD HOC GROUP OF SECOND        DAVIS, POLK & WARDELL
LIEN LENDERS:                     Abraham Bane
                                  450 Lexington Avenue
                                  New York, NY  10017
                                  1-212-450-4000


FOR WELLS FARGO COMMERCIAL        BRACEWELL, LLP
DISTRIBUTION FINANCE, LLC:        William Afred Wood, III
                                  711 Louisiana, Suite 2300
                                  Houston, TX  77002-2781
                                  1-713-223-2300

                                  OTTERBOURG, P.C.
                                  Daniel Fiorillo
                                  Chad Simon
                                  230 Park Avenue
                                  New York, NY  10169
                                  1-212-661-9100


FOR CVC CAPITAL PARTNERS, INC.:   LATHAM AND WATKINS, LLP
                                  Keith Simon
                                  1271 Avenue of the Americas
                                  New York, NY  10020
                                  1-212-906-1200
```

(Please also see Electronic Appearances.)

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

4

**INDEX**

| DEBTORS'<br>WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| ROOPESH SHAW | | | | |
| By Mr. Zakia | 54 | . | 142 | . |
| By Mr. Mervis | . | 85 | . | 150 |

| DEBTORS'<br>EXHIBITS: | Received |
|---|---|
| 1 through 70 | |
| 325 | 52 |
| 326 | 51 |
| 327 | 48 |

OBJECTORS'
EXHIBITS:

(None offered)

\*\*\*

5

**HOUSTON, TEXAS; FRIDAY, MAY 17, 2024; 1:02 P.M.**

THE COURT: Okay. Good afternoon, everyone. This is Judge Lopez. Today is May 17th. We're going to call the 1:00 p.m. case, a combined Disclosure Statement and Confirmation hearing, ConvergeOne Holdings, Case No. 24-90194.

I started my last hearing out by saying a little something, and I'll start here before we take appearances.

Just want to just tell everyone I'm glad everyone is safe and doing okay. Interesting weather took place here in Houston yesterday, and some individuals reported to have lost their lives.

So I'm glad everybody's okay and doing okay; and sending well wishes to everyone who may be listening. And hope everyone's okay. I know a bunch of folks are without power.

Houston is an incredibly resilient city and will bounce back from this. But I'm glad everyone is doing okay and that we are able to conduct and continue court today.

So with that in mind, why don't I just take appearances? I'll start in the courtroom.

And if anyone wishes to be unmuted on the line, I will -- please hit five star. But I'd also ask you to please make an electronic appearance as well.

All right. Mr. Koster, good morning.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

6

MR. KOSTER:  Good afternoon, --

THE COURT:  Good afternoon.

MR. KOSTER:  -- Your Honor.  Charles Koster, White & Case, counsel to the Debtors.

Extend the same wishes to you, your staff, your family.  It was quite a surprise with the weather event last night.  We appreciate you hearing us.

Joined in the courtroom today by my colleagues Jason Zakia, Bojan Guzina, Blair Warner, Adam Swingle; Roopesh Shah from Evercore, our lead investment banker; Steve Spitzer from AlixPartners, our lead financial advisor; and Rui Concalves, the company's general counsel.

THE COURT:  Okay.

MR. KOSTER:  Thank you, Your Honor.

THE COURT:  Good afternoon.

And my law clerks are telling me my camera is off.  And that's value add, that's fantastic.  I'm glad.  Thank you.

MR. WILLIAMS:  Good afternoon, Your Honor.  Matthew Williams, Gibson Dunn & Crutcher.  With me -- for the First Lien Ad Hoc Group.  With me is my colleague Michelle Choi.

THE COURT:  Okay.  Good afternoon.

THE COURT:  Mr. Ruff, good --

MR. RUFF:  Good afternoon, Your Honor.  It's been

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

7

a little while, but Jayson Ruff for the United States Trustee.

THE COURT:  Good afternoon.  Been doing the virtual thing for a while.

Mr. RUFF:  Yeah.

THE COURT:  Good to see you.

MR. HILLMAN:  Good afternoon, Your Honor, --

THE COURT:  Good afternoon.

MR. HILLMAN:  -- David Hillman, Proskauer Rose, here on behalf of the Ad Hoc Group of Excluded Lenders.

I'm joined by my colleagues at Proskauer.  You have my partner Mike Mervis, Julia Alonzo, Javier Sosa, Steve Ma, Libbie Osaben, and of course, Jason Brookner as well.

THE COURT:  Good afternoon.

MR. BANE:  Good afternoon, Your Honor.  Abraham Bane from Davis Polk & Wardwell on behalf of the Second Lien Ad Hoc Group.

THE COURT:  Good afternoon.

MR. WOOD:  Good afternoon, Your Honor.

THE COURT:  Good --

MR. WOOD:  Trey Wood with Bracewell on behalf of -- we serve as local counsel for Wells Fargo Commercial Distribution Finance, LLC in its capacity as ABL DIP Agent.

Lead counsel is Dan Fiorillo and Chad Simon with

Supp. App. 007

8

the Otterbourg law firms, and they'll be appearing virtually.

THE COURT:  Okay.

MR. WOOD:  Thank you, Your Honor.

THE COURT:  Good afternoon.

Anyone else in the courtroom before I turn to video?

(No audible response.)

THE COURT:  Okay.  I'm just going to go in the order in which I see them.  If -- please hit five star. There's a 212 number.

MR. FIORILLO:  Good afternoon, Your Honor.  Dan Fiorillo here with Chad Simon at the law firm of Otterbourg, P.C., co-counsel for Wells Fargo.

THE COURT:  Okay.  Good afternoon.

And here's a 312 number.

MR. SIMON:  Good afternoon, Your Honor.  Keith Simon with Latham & Watkins for CVC.  And I lost my innocuous earbuds so you're going to see my extensive headphones here.

(Laughter)

THE COURT:  Good afternoon.

(Pause in the proceedings.)

THE COURT:  Okay.  I think I've covered everyone. Let me turn it over to the Debtors.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9

MR. KOSTER:  Thank you, Your Honor.  For the Record, Charles Koster, White & Case, counsel for the Debtors.

We propose the following agenda for today.  The minority group had requested brief openings.  We've agreed to accommodate that.  We'd like to start with brief opening statements from any party wishes to make them.

We'll then proceed with the evidentiary portion of the hearing.  Mr. Zakia will run that for the Debtors.  We expect to put on at least one live witness today, Mr. Shah, and see how far we get.

And there will be some other evidence coming in by Declaration and stipulation, which Mr. Zakia will handle.

And then we will figure out what time we can resume when we return next Wednesday on the 22nd.

THE COURT:  Can we just talk -- and everyone's invited to participate in this -- just in terms of scheduling for today, how late parties intend to go today and maybe when we come back before we get into the openings, just to kind off talk housekeeping?

What were your -- what are the Debtors' thoughts?  And I'll certainly open it up to everyone else.

Yesterday obviously with all the weather, and I don't know what travel looks like, and so I just at least wanted to make sure that I understood kind of where we were.

10

MR. KOSTER:  From the Debtors' perspective, Your Honor, with one live witness, we would be surprised if we went much past 4:00.

The issue of course with not continuing further than that is one of our witnesses is not with us and is not available today, and we need to put him on Wednesday.

THE COURT:  Okay.  And in terms of from Wednesday, the 22nd, I've got no issues.

I've got a First Day in another case that starts around 9:30 in the morning.  It was technically in Victoria but I'm going to do it virtually so I can remain here.

So I think we'll be able to start at like 11:00.  But I've had -- I'm making that hearing completely virtual.  That'll be the earliest that we can get started.  But then we can go as late as anyone else needs.

I just -- that's the only one that I've got to --

MR. KOSTER:  We are confident that if we start at 11:00 we could finish within normal business hours.

THE COURT:  Okay.  All right.  I'll just give it to the parties.  And, you know, it may trail a little bit, just depending on, you know, kind of what happens in that hearing and what's being requested.

But maybe we can at least -- let's finish the one witness today and then plan on 11:00 o'clock on -- and we'll take appropriate breaks for lunch and all that stuff.  But

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

11

I'm more of a, you know, 35-minute-grab-a-sandwich kind of a judge now so I -- than the full hour.

So if folks -- I will make sure that we have rooms available on Wednesday, so if people want to kind of bring stuff in -- and obviously free to go to the tunnels and all that stuff.

But just the -- you know, I suspect we'll go, I don't know, 11:00 to like 12:30, take a break from like 12:30 to 1:00, and then just go from 1:00 until we're done.

MR. KOSTER:  I think that makes a lot of sense. And I also think if we wanted to start it at noon or thereabouts, that would --

THE COURT:  Okay.

MR. KOSTER:  -- also work.

THE COURT:  Okay.  We'll figure it out.  Okay. Let me hear from the --

MR. MERVIS:  Good afternoon, Your Honor.  Michael Mervis, Proskauer Rose, for the excluded lender group.

I think that what's been described to the Court sounds about right to us.  There's one witness today.  There are some proffers and some stipulations, there's some housekeeping.

And we want to raise a couple of discovery issues that -- after the evidence.  But I don't think it'll take very long.

12

And as for Wednesday, although I -- personally I'm going to be on a round number birthday with my wife, so I will not be here, but I think that's right.  I think we can finish this on Wednesday.

THE COURT:  Okay.  Great.

All righty.  In terms of openings, how do you wish to proceed?

MR. KOSTER:  The Debtors will start.  If anyone wishes to speak in support of the plan, I suggest they go next, followed by the minority group.

THE COURT:  Let's do it.

MR. KOSTER:  Great, thank you, Your Honor.

This Court has heard some of the most complex bankruptcy disputes in modern history.

You've been asked to consider whether a company can escape its liabilities by transferring them to a thinly capitalized shell and limit creditor recourse to that entity.

You've been asked to determine whether a slim majority of lenders can enhance their position in a capital structure relative to other creditors with identical rights under a contract.

Those are the hard cases where the law is unclear and the facts are problematic.

This case, Your Honor, is unremarkable by

Supp. App. 012

13

comparison.  We are seeking confirmation of a prepackaged plan supported by 89 percent of our first lien lenders and 100 percent of our second lien lenders.

THE COURT:  Mr. Koster, let me just see if we can get that mic just a little closer to you to make sure that we can totally hear you okay.

MR. KOSTER:  Certainly.

The plan eliminates more than $1 billion in funded debt, and provides for the payment in full of unsecured creditors.

It'll allow the Debtors to raise $245 million in new equity capital.  And that funding is fully committed by a group of existing lenders that believe in the company's turn around story and are willing to underwrite that risk.

The law is clear and the facts are straightforward.  The Court should confirm this plan.

Doing so will allow this business, which is a global infrastructure technology services company with more than 3,000 employees and 6,000 private and public sector customers, to emerge with a sustainable capital structure and thrive for the benefit of its employees, customers, and stakeholders.

There's one objection from a group of first lien lenders.  They allege that the consideration provided to the backstop parties results in disparate treatment on account

14

of prepetition claims.

And they assert that the Court should review the plan under a novel standard, untethered to Section 1129 of the Bankruptcy Code because the Debtors' equity sponsor is one of several parties that has agreed to commit new equity capital under the plan.

Weeks after the Debtors filed these cases, the minority group made two alternative proposals.  Both proposals were premised on the same valuation underpinning the plan.

The Debtors, through their special committee, rejected those proposals because they did not provide any improvement for the estates.

To the contrary, it would result in a material delay and substantial additional costs.

It would expose the business, employees, and stakeholders to considerable risk.

The Debtors, through the special committee, declined to pursue these alternatives.  It was not a close call.

This confirmation case is not difficult.  It's ultimately about two things:  Is the backstop necessary, and is the consideration that the Debtors are providing on account of the backstop reasonable?

The evidence will show that the answer to those

15

questions is a resounding "yes."

You will hear from Mr. Shah from Evercore, the Debtors' lead investment banker.  Mr. Shah will describe the negotiations that led to the RSA and the plan, all of which were conducted at arm's length with the First Lien Ad Hoc Group and CVC; the determination to raise equity capital and the sizing of the rights offering; the necessity of the backstop; the Debtors' analysis regarding the cost of the backstop; and the Debtors' review of the alternative proposals.

You will also hear from Mr. Edmonston (phonetic), one of the Debtors' independent directors.  Mr. Edmonston will explain the special committee's review, valuation, and approval of the RSA and plan transaction, and the special committee's review, evaluation, and rejection of the alternative proposals based on the risk they pose to the estates with no upside.

Parties have also stipulated to analysis regarding the cost of abandoning the plan to pursue the minority group's alternative.  And those costs are substantial.

Minority group will try to make this confirmation case about several other things.  They will conflate backstop consideration with plan treatment on account of prepetition claims.

They'll try to undermine the Debtors' corporate

Supp. App. 015

16

governance and the role of the special committee.

They will characterize their eleventh-hour proposals as superior to the plan, even though they offer no benefit to the estates or creditors on the whole, lack any meaningful stakeholder support, and force the Debtors to extend these cases by months, if not longer, with no viable path to confirmation or emergence, which they attempt to solve by suggesting that they can disenfranchise the vast majority of the Debtors' creditors.

They will describe this as a deal with a group of influential stakeholders, negotiated under the cloak of darkness, to enhance their recoveries to the detriment of the *pari* stakeholders.

The evidence will not support these theories, nor will the law.  These cases are unremarkable, and this confirmation case is easy.  Like the Debtors' decision to reject the alternative proposals, this is not a close call.

The Court should confirm the plan and let the Debtors begin the work of growing the business for the benefit of its employees, customers, and stakeholders. Thank you, Your Honor.

THE COURT:  Thank you.

Anyone else who supports confirmation wish to make a brief opening?  The two, one, four line, I'm going to unmute your line here.  Just ask that you please remain

17

silent for now.  Thank you.

MR. WILLIAMS:  Good afternoon, Your Honor.  Again, Matthew Williams of Gibson, Dunn, and Crutcher, counsel to the Ad Hoc Group of first term loans.

Our updated 2019 statement was filed this morning.  It's located at docket 356.

Your Honor, our clients here, holder of approximately 81 percent of the first lien term loans, we've stepped up repeatedly in this case.  I don't think anyone disputes that.

And up until this confirmation hearing Your Honor hasn't seen a lot of dislocation or fireworks in this case.

But I can tell you that when the company came to us earlier this year and told -- and we were told by the company we're facing a severe liquidity crisis, had an emergency, and that was going to require our clients to devote a significant amount of time and energy, and money to restructure this company, we weren't exactly happy, particularly against a backdrop where the sponsor just put in $160 million in a loan a couple of months prior.

Nonetheless, our clients got immediately to work.  We began in good faith extensive negotiations with the company and its advisors regarding how to save this company.

In particular, we provided 250 -- I'm sorry, $215 million DIP financing.

18

We agreed to an RSA that bound us to support a plan, that while paying our clients cents on the dollar in equity and takeback debt, paid junior unsecured creditors in full, thereby ensuring that the Debtors could exit Chapter 11 in the most efficient way possible.

And realizing that the Debtors needed a long-term solution here to fund their exit from Chapter 11 in a go-forward business, we agreed to invest capital in the form of a direct investment in the Debtors' reorganized equity as well as the backstop of the equity rights offering that you heard about.

This all ensured that the Debtors would have access to $245 million in capital in the backend of this case.

Put simply, Your Honor, the ad hoc first lien lender group has stepped up here time and time again. We've done so quickly, we've done so efficiently.

And we are hopeful that those efforts will ultimately inure to the benefit of all the stakeholders, including the minority lender group.

Your Honor, the crux of the minority lender objection here is really that the plan -- to the objection to the plan, I'm sorry, is that the commitment fees associated with the new capital that we're providing are really an extra distribution on account of our claim and

19

that, therefore, the plan violates 1123(a)(4).

And there are a lot of legal arguments in the -- in their briefs, Your Honor, about the proper legal standard of review.  The minority lenders think that the plan is subject to an entire fairness review.  We think 1129 governs.

About vote designation, they seem to think they can designate our votes.  We think that's just irrelevant.

They -- the -- *LaSalle* and the applicability of *LaSalle* and 1123(a)(4), I don't need to rehash them all, but when you cut through it, at least what I got from all the cases -- a lot of them unreported, right.

But when you go through the cases and when you go through the transcripts, a couple of things become pretty clear both from a factual and a legal perspective.

The first is I don't think there's any real dispute that when you've got a company operating in Chapter 11 that needs capital, often -- not always but often it's a subset of the existing stakeholders that provide that capital.

And this is not surprising obviously because it's the existing stakeholders that know the business and are seeking to protect their preexisting investment.  That's what happened here.

And from the company's perspective, all things

Supp. App. 019

20

being equal, those existing stakeholders, right, they're the ones that are likely to be the cheapest source of capital because the existing stakeholders know the company and they want to protect their preexisting investment.

A rule that disqualifies them from providing new capital would not only be bad for the stakeholders, it would be back for the company.

Second, if you look at all the cases in all the briefs, I don't think there's any real dispute that where the proposed terms of new capital are reasonable under 1129(a)(4), because there is a standard in 1129(a)(4), where they're reasonable courts generally have not considered the related fees as distributions on account of existing claims.

Instead they're payments for the new capital commitment, subject to business judgment and reasonableness under 1129(a)(4).

And I'll be the first to admit, Your Honor, as minority lenders note there's at least one court in an unreported decision that has voiced some trepidation that these new capital fees, right, could be creeping in as disguised distributions on account of claims. And I get that, right? Could implicate 1123(a)(4).

But, Your Honor, in that case the court's skepticism was largely based on the fact that the fees proposed were in the court's view excessive. And,

21

accordingly, they were likely disguised distributions on account of claims.

So I'd submit that regardless of whether you look at this as an 1123(a)(4) standard -- I'm sorry, as an 363 business judgment standard or through an 1123(a)(4) lens, or through an 1129(a)(4) lens, right, the -- it's the same standard. It's whether it's reasonable.

If the fees are reasonable, you're going to meet 1129(a)(4), and the Court's not going to say 1123(a)(4) is implicated because it's not a distribution on account of the claim, right?

If the fees are unreasonably high, it won't meet 363 business judgment, it won't meet 1129(a)(4) reasonable standard.

And maybe in that scenario they're so high, okay, it's on account of something else so maybe 1123(a)(4) is implicated, right?

So here it seems to me when you boil it all down, the only question Your Honor needs to ask is whether proposed fees are reasonable or not based upon the facts and circumstances of this case.

And the evidence is going to show, right, the Debtors are going to be putting on evidence to Your Honor that the fees are imminently reasonable.

They're going to provide evidence showing both the

22

structure and the quantum of the direct allocation and the fees in this case are entirely within the range of comparable market transactions.

And while you might hear noise from the minority lenders about the fees being too high, we think the comps themselves are -- the evidence is going to show what the market believes and dictates otherwise.

Your Honor, just to close, sitting here today at confirmation it might seem like this was an easy check to write.  But I can tell you it certainly was not.

And but for the stability and support provided by our clients through both the RSA, through the DIP financing, and, yes, the backstop, we'd be in a very, very different place than we were today.

We wouldn't be sitting on the verge of confirmation, right.  This company would be in a potentially dire situation.

And our work, our hard work has benefitted not just the company but all of its stakeholders, including the minority stakeholders.

We strongly support confirmation.  We think it's in the best interest of all stake constituencies.  And we look forward to working with the company and with the minority lenders on the backend of this case.

Thank you, Your Honor.

Supp. App. 022

23

THE COURT:  Thank you.

Anyone else?

(Pause)

MR. BANE:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. BANE:  Again, Abraham Bane from Davis, Polk, and Wardwell on behalf of the Ad Hoc Group of Second Lien Lenders.

As set forth in our Rule 2019 statement at docket number 127, the second lien Ad Hoc Group holds approximately 60 percent of the Debtors' second lien term loans.

I just wanted to rise briefly to echo the sentiments of the Debtors and the 1L Ad Hoc Group, and just to say a few words on behalf of the second lien Ad Hoc Group.

Your Honor, the second lien Ad Hoc Group fully supports the Debtors and the plan of reorganization that the Debtors seek to have confirmed today.

While the second lien lenders are not receiving a particularly large recovery on their claims, we, along with the other second lien lenders, recognize that the plan provides for the best possible outcome under the circumstances.

And it's therefore unsurprising that the plan enjoys the unanimous support from class four second lien

Supp. App. 023

24

claims.

We would also note that we share the concerns raised by the Debtors and the 1L Ad Hoc Group with respect to the minority Ad Hoc Group's alternative plan proposal.

We have no confidence that the alternative proposal is actionable; and, like the Debtors, believe that pursuing any other alternative at this stage would result in prolonging these Chapter 11 cases, and result in additional costs.

In conclusion, we're hopeful Your Honor will confirm the Debtors' proposed plan, and are optimistic that the company's quick trip through Chapter 11 will provide a robust foundation to promote the company's future success.

Unless Your Honor has any questions for me, I will now turn the podium to the next speaker.

THE COURT:  Thank you.  Anyone else who supports?

I'm going to call the other side the objectors so I don't have to choose between minority or excluded lenders. I'm going to just call them the objectors to plan confirmation.  I'll let you make an opening.

MR. FIORILLO:  Your Honor?

THE COURT:  Oh, yes, I apologize.  I should have turned to the video.

MR. FIORILLO:  No worries, Your Honor.  Again for the record, Dan Fiorillo, counsel for Wells Fargo Commercial

25

Distribution Finance.  I'll be brief, Your Honor, if I may.

THE COURT:  Yes.

MR. FIORILLO:  Your Honor, Wells Fargo and the ABL DIP lenders, who are also the ABL prepetition lenders to the Debtors, support the plan as presented for Your Honor today.

We're also happy to report that as of this morning, the Wells Fargo, in addition to other proposed exit ABL lenders, have signed a commitment letter to provide exit financing to the Debtors which effectively will amend and restate the existing ABL DIP credit facility into an exit ABL facility on terms and conditions that have been negotiated and agreed between the Debtors and the ABL exit lenders, again led by Wells Fargo.

Your Honor, among the conditions that the exit financing terms contain is in fact the plan that's before this Court being approved.

We do not have any approval or any commitment to finance this -- these Debtors in the event that the plan is somehow modified or effectively not approved in favor of any plan that the minority and first lien term loan lenders would like to have this Court consider.

And, Your Honor, as you know from prior hearings in this matter, Wells Fargo has provided this company with the unique blend of financing compromised of both revolving line of credit, which is more traditional, working capital

26

lines of credit to companies of this size, but in addition, Your Honor, also provides floorplan financing, which is very specific to -- is part of Wells Fargo that finances this company and has provided the company with benefits that would be jeopardized in the event this plan is not approved in the course terms, conditions that the parties have agreed thus far, Your Honor.

THE COURT:  Thank you.  Okay.

MR. HILLMAN:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. HILLMAN:  David Hillman, Proskauer Rose, on behalf of The Ad Hoc Group of Excluded Lenders.

We also filed a 2019 statement earlier in the month.  It's at docket number 233.

THE COURT:  Mr. Hillman, let me get that mic just a little closer --

MR. HILLMAN:  Oh, sorry.

THE COURT:  -- to you just --

MR. HILLMAN:  Now, we --

THE COURT:  -- no, that's perfect.  I just want to make sure we have a good record.

MR. HILLMAN:  We filed a Rule 2019 statement that appears at docket number 233.

I asked for the opportunity to do some openings. This is a fast-moving case, filed as a pre-pack on April

Supp. App. 026

27

4th.

I think this actually might be the second hearing in the case. I think you had a first day hearing and there wasn't any -- another hearing. So a little bit of context.

The excluded lenders hold roughly $164 million of first lien claims. They're in class three. It's about 12 percent of the class. And they have voted to reject the plan and now oppose confirmation.

I recognize that I'm standing before you in front of the confirmation express. And I'm asking you to derail the plan.

And I wish that the circumstances were different. I wish that we were successful in persuading the Debtors to pivot. We tried. We offered alternatives.

We explored settlement. I won't get into any of that detail. But here we are.

That said, the facts and -- are largely undisputed. And I agree with Mr. Koster. It's not a close call. He's just wrong on which side the call should go. The law is squarely on our side. The plan cannot be confirmed.

It's remarkable that they had multiple people come up and make an opening, some of whom never filed any pleadings in support or -- of the plan.

No one mentions the fatal piece. It's the

28

exclusivity piece of the investment opportunity that is the death nell of this plan.  Let me back up a little bit.

Eleven 23(a)(4) first principle says a plan shall provide the same treatment for each claim of a particular class.

Here, the plan has a rights offering.  And it gives the majority lenders and the equity sponsor, CVC, different treatment.  It treats them differently.  The plan treats those creditors differently.  They don't provide the same treatment.

And the piece of the plan that you'll hear about today that is the offending provision is the rights offering.

And when we think about the rights offering, there's a lot of defined terms that don't really give insight and meaning as to what's going on.  You'll hear put option premium, direct allocation, open allocation.

Let's be simple.  It's an investment opportunity to buy stock.  This plan contemplates that to raise capital, to fund the distributions, this Debtor will sell stock at a steep discount, 35 percent discount, to its value, to its assumed plan value.

And the only people who get this investment opportunity are the in-crowd, the favored crowd, the majority lenders and the sponsor.

29

Now, you'll hear -- and this shouldn't be surprising -- the math isn't disputed.  The other side won't deny that there is an impact on the different treatment that the majority and insiders, they get an enhanced recovery.

They won't deny that the investment opportunity wasn't market tested, right.  It's an undisputed fact.

So the opportunity to buy discounted equity under the plan is exclusively reserved for the favored few, the majority lenders and the sponsor.

So the other side, you'll hear through the trial, is going to convince you it's okay to syphon value from the minority lenders in the same class to the majority lenders, and it's because it's legal and proper.

They want to convince you this is -- what are we fighting about?  It's just the allocation of reorganized equity.  Someone gets more, someone gets less.  It's a zero sum game.

The majority and the insider get more because it comes from the excluded lenders.  And a plan that hardwires by plumbing to allow one group to take value from another is wrong.

You heard -- I don't know if it was Mr. Koster for the Debtor or Mr. Williams for the Ad Hoc Group saying sort of unremarkable, business as usual, happens all the time. Not the case, not the case.

Supp. App. 029

30

They're going to argue -- you already heard this preview -- different treatments, okay, because it's not a plan distribution.

The thing that they're getting, this investment opportunity, they're going to try to convince you is not on account of their claim. You heard that today. It's in their briefs, it's in their oral argument.

They're going to say the investment opportunity is in exchange for or on account of new value commitments. And they're going to make this hearing about the reasonableness. And they're going to try to compare this fee, these investment opportunities, to other cases.

We know that this case is about one thing: the connection between the investment opportunity and the claim. This case is about causation. This case is about the causal relationship between the investment opportunity and the claim.

This is about why, why is the favored group getting a nonmarket-tested exclusive opportunity? Why have a show stopper? We know that the investment opportunity is on account of the claim. We know this.

How do we know? Interesting. Maybe they're saving it for closing because it's legal. We know this because the Supreme Court told us.

*LaSalle* already answered this causation question.

31

*LaSalle* already looked at the relationship between an exclusive investment opportunity to fund the plan and plan distributions to stakeholders.  That was what the court looked at in *LaSalle*.

And when the investment opportunity is exclusive and not market-tested, the Supreme Court of the United States has said that the investment opportunity is a plan distribution, period.  It's a show stopper.

They didn't mention anything about the exclusive nature of the investment opportunity.  That's what dooms this plan.  That's what doomed the plan in *LaSalle*.

So you're going to hear testimony about the rights offering.  So I just want to sort of demystify some terms so when you hear the language, you can start to think about what's happening here.

No dispute, company has determined it needs to raised $245 million.  You're going to hear testimony that the Debtors, to raise the capital, want to sell reorganized equity.  That's a perfectly fine means to implement a plan, to raise capital.

So they want to raise capital, and they're offering to sell the capital -- excuse me, sell the equity at a 35 percent discount to plan value.

And there's three critical components to the rights offering:  the open allocation, the direct

32

allocation, and the backstop.  And there's different words that people use here.

So the open allocation, this is the easy one, of $245 million, the open allocation says to everyone in class three, you have the opportunity pro rata to buy up to -- to raise 160 million of the 245 to everyone in class three.

I can't complain about that.  I mean, it's open to everybody.  Everyone in class three has the opportunity to buy discounted equity at a 35 percent discount.

The direct allocation, and this is where the mischief comes in, it's this exclusive allocation where the Debtors say of the 245 million, they're going to sell discounted equity to raise $86 million just from the majority lenders and the equity holder.

And unlike the open allocation, you can't get into this one.  It's not open to anyone.  It's exclusive.  No market test.  And this is a valuable right to buy discounted equity.  You're going to also here that this is also called the put option premium.

So then we get to the backstop, another place for some shenanigans.  A subset of the majority lenders get an investment opportunity to buy more discounted equity if it's not subscribed in the open allocation.  And this is just an investment opportunity.

And so the -- here you will hear some testimony

33

about the reasonableness of this fee.  It's separate from the 1123(a)(4) and *LaSalle* issue.

But when you think about the backstop, the fee is payable in discounted equity; that's not uncommon.  And it's roughly $38 million.

So the majority is going to frame this as they're getting a $38 million fee for backstopping the open allocation 160 million.  They get paid a $38 million fee to backstop $160 million that they're trying to raise.

Well, I think that would be expensive.  But it's seriously misleading because the fee is only for backstopping the open allocation.

They don't need a fee to backstop 80 percent of the open allocation because the first lien lenders already signed an RSA committing to buy their share of equity in the open allocation.

So what they're really only backstopping is the 20 percent, which they don't know would be subscribed.

So when you think about the fee -- and, again, the math here, we'll give you an affidavit, it's an undisputed fact, it's basically a $38 million fee to backstop a potential purchase of 30 million.  So $38 million fee to backstop 30 million.

So when you put all this together, it reveals a plan that provides a subset of lenders with different

Supp. App. 033

34

treatment.  It violates 1123(a)(4).

And the only way to cure the defect, the Supreme Court has said, market test.

Let's talk about the parade of horribles.  You knew this was coming.  The Debtors will present evidence about everything that will happen -- that will doom this company if the Court denies confirmation.

Look, there's no dispute that -- and we're not going to dispute this during the case, that if the plan can't be confirmed, there is going to be delay and expense. We didn't design the plan.

You heard Mr. Koster talk about employees and stakeholders.  I have been before Your Honor enough to know that employees are very important to the Court and want to make sure there's a going concern.

Hard to see this company failing because the majority and the insider are forced to share more equity with the excluded lenders.

The parade of horribles you just shouldn't buy. But it's unfortunate, but it's not a justification to rewrite the Bankruptcy Code or ignore the Supreme Court precedent.

And you'll hear -- you've already heard a preview, evidence about the alternatives that we put out to the Debtor.  That's because I didn't want to come before Your

Supp. App. 034

35

Honor and just complain.  I wanted to give the board, the independent directors something to pivot to.

So we offered alternatives.  You'll hear about it. You'll hear no matter what we came up with where we tried to address their concerns, they always had more reasons to say no.  And we never got substantive engagement.

But the thing that they -- I find interesting in the opening, and you'll hear this during the testimony, the proposals did one thing.

They tried to not make changes anywhere else in the plan except for one critical feature:  provide pro rata treatment for people in the same class.

So we tried to offer things that would -- a proposal that wouldn't do violence but that would preserve the one piece that was causing our concern.

You'll also hear testimony -- I call this the blaming the victim argument -- that the excluded lenders didn't do enough, they didn't do it fast enough, so they're responsible for their fate.  You'll hear evidence that that's just not true.

The reason why we chose the name excluded lenders, we were excluded.  They tried to get in.  You'll hear testimony, calling bankers, the majority holders, other professionals, we want to participate.

It was interesting.  Mr. Williams says we stepped

36

up.  Well, we would have stepped up, we would have participated.

We were excluded.  We were shut out.  And that's why we organized to enforce our rights.

Let me just hit a couple of fast notes on entire fairness.  I think I heard Mr. Koster say it's a novel standard.  I mean, I recognize that we're far away from Delaware where probably the most robust case law exists on entire fairness.

But last time I checked, it still applies in this court.  And it's about the question of whether or not you should use a deferential standard to look at what's happened or use the exacting lens, a more rigorous lens of entire fairness to figure out what happens here.

This is not like other cases that you'll hear. And we're going to focus on this because here, the role of the Debtor's equity sponsor played a pivotal role.  That's CVC.  They're the controlling insider here.

And they wear lots of hats.  They're the controlling insider.  They're one of the largest single creditors based on rescue capital that they infused I think it was in May, 2023.

They're an RSA party.  They're a backstop party. In fact, I just found out this morning they would have the third largest direct allocation, 21 percent.  I mean, they

Supp. App. 036

37

are significant in this transaction.

They're on multiple sides of the negotiating table. And that means when you're -- when you have an insider who's at multiple places on the negotiating table, you need to look carefully.

And this isn't about casting aspersions on the Debtors' professionals. This is a question of what do you need to do to avoid this exacting standard.

And you will hear testimony that when the original deal was formulated, the insider was left out. They weren't cut in. They were an excluded lender.

They weren't in the rights offering. They didn't have backstop rights. They didn't have a direct allocation. Even their claim was treated at a lower level.

And so, yeah, at some point they did appoint a special committee. Interestingly, and I think in a flawed way, the special committee included the CEO, who was picked by CVC. So the special committee wasn't truly independent.

You'll hear that the special committee didn't hire its own advisors and that they took advice from the Debtors' counsel and investment banker.

And so what I think is very different here is that CVC, the insider, uses its control and influence to get what we couldn't get. It got cut in to the backstop and the direct allocation.

Supp. App. 037

38

And it used the Debtors' investment banker to go get cut into the deal, right. You'll hear this. I mean, the facts aren't disputed.

And the Debtors' professionals were working for CVC, helping them do the math, helping them negotiate. That's not how this is supposed to work.

So in the end, while the insider got cut in and got cut into the backstops and an agreed claim that gets to participate roughly $213 million, you know, the context of how this occurs matters.

Entire fairness demands that a Debtor act independently from the insider. Here, that didn't happen.

So you'll hear that the Debtors will try to say, look, the special committee cures this noise about the insider.

But you'll hear the evidence. The special committee included the sponsor's hand-picked CEO. The special committee didn't have independent advisors.

The insider got a sweetheart deal using the Debtors' professionals to negotiate on their behalf. And these facts, they just don't cleanse the conflict. They don't demonstrate a fair process.

So in sum, this plan violates 1123(a)(4). The Supreme Court in *LaSalle* has given the analytic framework of how we are supposed to look at this issue. The facts cannot

Supp. App. 038

39

satisfy the entire fairness standard.  And for all these reasons confirmation must be denied.

While I'm at the podium, I want to address one small housekeeping item.  We're moving fast, lightning fast. People have been working around the clock.

There's a witness who's going to testify today, Roopesh Shah.  My partner Mike Mervis and I have been doing the best we can to divide and conquer.  There's an aspect of Mr. Shah's testimony that I have asked the Debtors' counsel if it's okay that I take one piece and Mr. Mervis takes the entirety.

I know that's unusual.  The Debtor doesn't object to it.  I wanted to beg the Court's indulgence as a --

THE COURT:  I've got no issues.

MR. HILLMAN:  Excuse me?

THE COURT:  No issues with it.

MR. HILLMAN:  Thank you, Your Honor.

THE COURT:  Thank you.  Okay.

Give me one second.  Just making sure I have done -- making sure no one's waving at me here.  Okay. Mr. Zakia, how do you wish to proceed?

MR. ZAKIA:  Good afternoon, Your Honor.  So I'd like to very briefly just give you an overview of how we're going to handle the evidence.

So while the parties vigorously disagree on what

Supp. App. 039

40

the evidence means and how Your Honor should interpret it, I think we do have an agreed process as to how to present it.

And what we tried to do is to segregate out the issues that really go to the heart of the objector's objection from some of the other evidentiary issues that go more generally to the uncontested areas of confirmation.

And we've agreed to a process that would allow kind of the undisputed evidentiary issues to be handled purely in paper while presenting to the Court live the meaty issues.

So, first step, the parties have conferred and have agreed that all of the exhibits on the parties' proposed witness and exhibit list -- so for the case of the Debtors, that's exhibits one through --

THE COURT:  Which docket number are we --

MR. ZAKIA:  Sorry, Your Honor.  Docket number 333.

THE COURT:  Okay.

MR. ZAKIA:  So that's Exhibits 1 through 70 would be admitted without objection.

And I'm going to do Mr. Mervis a favor because we've agreed that the exhibits on his list, which are -- is docket number 346, and that's -- I don't adopt his language.

But just so I'm properly identifying what they call their list, the Excluded Lenders' exhibit list self-entitled, Exhibits 1 through 71, that the parties would

41

agree to the admission of all those exhibits without objection.

THE COURT:  Okay.

MR. MERVIS:  Your Honor, I'm sorry to interrupt. First of all, no problem with the objectors.  We don't have to keep going back and forth with --

THE COURT:  Oh, no, no, no, I'm fine with it.  I just --

MR. MERVIS:  But I just need to check with my colleagues, Your Honor.

First of all, let me apologize.  I know we've been flooding chambers with slightly updated exhibit and witness lists for various reasons that if the Court --

THE COURT:  It happens.

MR. MERVIS:  -- cares -- yeah, it happens.

I just need to check with my colleagues that the docket number that Mr. Zakia provided is our most updated list.  So I'll come back on that.

MR. ZAKIA:  Okay.  And if I left something out, we can add it after.

THE COURT:  Okay.  So you'll confirm 333-1 through 70 are the Debtors, that you're okay with.

And then you'll confirm for me whether 346-1 through 71 --

MR. MERVIS:  Oh, I'm definitely okay with the

42

Debtors' exhibits.  I just need to confirm the docket number of our list.

THE COURT:  Okay.  The only one question is I know at 358 there are I guess 62 through 70.  Is that included in this, Mr. Zakia?

MR. ZAKIA:  I believe it is, Your Honor, yeah.

THE COURT:  Okay.  I just wanted to confirm.  I think it completes the one through 70 --

MR. ZAKIA:  Okay.

THE COURT:  -- on your exhibit list.

MR. ZAKIA:  Yeah.  And there is some sealing issues, Your Honor.  The way we're going to deal with that, I mean, --

THE COURT:  Right.

MR. ZAKIA:  -- the large majority of these --

THE COURT:  That's what I mean, the sealing issues on both sides just to kind of --

MR. ZAKIA:  The large -- and, again, this is a result of kind of going quickly, and we want to make sure we don't accidentally make public anything that's going to be problematic.

I think the way we're going to handle it at the hearing is, first of all, a lot of the exhibits that are in evidence won't necessarily be dealt with.

I think both sides plan on using paper.  And I

43

think we're just going to work reasonably, to the extent there are confidentiality sensitivities, we're not going to say those parts out loud.

THE COURT:  Got it.

MR. ZAKIA:  And I don't think the issues that the parties are going to focus on are going to make that problematic.

THE COURT:  Okay.

MR. MERVIS:  Yeah.  I agree.  I mean, we're at a -- we've worked well together and we're going to work well on confidentiality.

To confirm, Your Honor, the most current exhibit list is docket 353, which goes through Exhibit 72.

MR. ZAKIA:  Oh, so I must have missed one.  I'm sorry.  I was going off what I had last night.

THE COURT:  Oh, that's right, one -- are you okay with 72, 35.

MR. ZAKIA:  Sorry.  I just -- I think I probably am but I -- no objection, Your Honor.

THE COURT:  Okay.  So I'm going to go 333-1 through 70, and it includes some sealed things on 358.

And then 346 and 353 are one through 72 on your witness and exhibit list.  Okay.

MR. MERVIS:  That's correct, Your Honor.  Thank you.

44

THE COURT:  I'm looking at the folks who are doing the real work back there.  They --

MR. MERVIS:  As you can tell, --

THE COURT:  -- gave me the nod.

MR. MERVIS:  -- I had no idea so, yes.

THE COURT:  They gave me the nod.  I know we're good.

MR. MERVIS:  Not going to deny it.

MR. ZAKIA:  So, Your Honor, that's category number one, the documents.

Category number two is also being done by agreement.  I have several Declarations that I'm going to offer into evidence.  And these are the witnesses for whom the parties have agreed no cross-examination will be necessary.

THE COURT:  Okay.

MR. ZAKIA:  And there are in two of the three cases -- in one case a stipulation I'm going to read into the record, and the other couple of reservations of rights that we've agreed with the other side as to the use of those Declarations.

And, again, the purpose of this, Your Honor, is all to get to the point that what's happening in the paper is kind of the uncontested piece.

So, first, Your Honor, we have at docket number

45

327 the Declaration of Steven Spitzer from AlixPartners, who is the Debtors' lead financial advisor.

And the parties have agreed that, subject to the agreement to a stipulation that I'll read in one second, that this Declaration could be admitted into evidence without the need to cross-examine Mr. Spitzer.

THE COURT:  Okay.

MR. ZAKIA:  If Your Honor will indulge me, it's only one page.  But I'm just going to read the stipulation that the parties have agreed to.

"AlixPartners forecast the following incremental impacts to the Debtors' liquidity if the Debtors do not continue to prosecute the plan and instead pursue the Ad Hoc Group's May 8th proposal:

"(a) Twenty-two million in fees in addition to any accrued interest payable to the current DIP lenders;

"(b) One million fee payable to Wells Fargo;

"(c) Seven million exit fee in addition to any accrued interest payable to the term DIP lenders which fee, under the plan, would have been paid with the proceeds from the equity rights offering;

"(d) Two million in savings from a reduction to Evercore's success fee as a result of the equity rights offering not being consummated;

46

"(e) Twelve point five million to cash collateralize surety bonds which amount would be posted additionally each month the company remains in bankruptcy, e.g., 25 million for two months; and

"(f) Seven million in professional and bankruptcy administration, example United States Trustee, fees for each month the company remains in bankruptcy.

"Second, the parties have stipulated that items (a) through (d) listed above are expenses and savings the company is forecast to incur by virtue of a new DIP replacing the existing one, and the equity rights offering proposed to the plan not proceeding.

"Items (e) and (f) are expenses the company is forecast to incur by virtue of prolonging the company's time in bankruptcy.

"Three, the above analyses does not include any breakup fee payable to the RSA parties.  Any such expenses would be in addition to the amounts listed above.

"And, finally, four, the current DIP budget includes forecasts to the week ending August 9, 2024 but assumes a May 31, 2024 exit.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

47

"AlixPartners did not prepare a separate budget for the incremental impact on liquidity that assumes confirmation of the plan is denied.  And certain Chapter 11 expenses, including professional fees, continue past May."

So with that, Your Honor, --

MR. MERVIS:  And, Your Honor, I will confirm I was following every word.  He read it right.

Just to make one point, this was evidence proffered by the Debtors, and we didn't want to put the Court through a cross-examination.

From our perspective, the -- a minor piece of advocacy I would just say Roman numeral four is the part that to us is significant.  But I agree to all of it.

THE COURT:  Can you repeat what Roman numeral four was?

MR. MERVIS:  Sure, Your Honor.  Yeah, it's --

MR. ZAKIA:  Now his advocacy works, he gets to do his part twice.

MR. MERVIS:  Sure.  Well, actually the second sentence so it's even shorter.  "AlixPartners did not prepare a separate budget for the incremental impact on liquidity that assumes confirmation of the plan is denied. And certain Chapter 11 expenses, including professional fees, continue past May."

48

THE COURT:  Got it.

MR. MERVIS:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. ZAKIA:  And so, Your Honor, with that -- and the purpose of that was to truncate the need for additional testimony from Mr. Spitzer.  His testimony is accepted.

THE COURT:  All right.  Let me -- before you do that, let me just kind of do this one at a time, if we can.

MR. ZAKIA:  Sure.

THE COURT:  I just want to confirm whether -- I know that's the objecting parties' understandings.  But if there's anyone who objects to the admission of the Spitzer Declaration --

(No audible response.)

THE COURT:  Okay.  It's admitted.

(Debtors' Exhibit Number 327 was received in evidence.)

MR. ZAKIA:  Thank you.  And for the Record, Mr. Spitzer is present in the courtroom.

Second, Your Honor, we offer the Declaration of Mr. Concalves -- I apologize if I got that wrong -- who, as Mr. Koster indicated, is also present in the courtroom.  That is found at document -- at docket number 326.

His Declaration deals with most of the -- all testimony is important, but some of the, what we would call

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 048

49

the routine confirmation issues.  And we agreed to a few limitations --

THE COURT:  Okay.

MR. ZAKIA:  -- with the objecting parties in exchange for their agreement that this could be admitted.

First, the Debtors will withdraw paragraph 9(c) from the Declaration.  That overlaps with some of the issues that the witnesses will be testifying live about.

And we'll rely on the live testimony to establish that point.  So for purposes of this Declaration, that paragraph is withdrawn.

Second, with regard to paragraph 14, the Debtors and the objectors have agreed that for purposes of evaluating that objection, Your Honor will rely on the live testimony you're going to hear and not on the contents of paragraph 14 of this Declaration.

And then, finally, with regard to paragraph 18, the objectors have asked that we put on the record the following reservation:  with respect to paragraph 18, the objecting parties, by not objecting to the admission of this Declaration, they are not waiving their right to argue that the stay should not be waived in the event their confirmation objection is overruled.

And so that's just a reservation of rights that we agreed to put on the record in connection with the admission

Supp. App. 049

50

of this Declaration.

THE COURT:  Thank you.

Counsel, can you confirm?

MR. MERVIS:  I can, Your Honor.  I just -- just one quick point, the paragraph 14 point.  Our understanding, I think we agree, is that that has to -- the statements in there are to support releases.  We don't have any problem with that language insofar as it supports releases.

What we've agreed is that for the two issues that we're objecting on, that sentence -- that language --

THE COURT:  Rely on the --

MR. MERVIS:  -- won't have any impact.

THE COURT:  -- live testimony.

MR. MERVIS:  Yeah, exactly.

THE COURT:  Makes sense.

MR. ZAKIA:  Yeah.  That's what I meant to say. And if not --

MR. MERVIS:  No, and I wasn't being critical.

THE COURT:  All right.

MR. MERVIS:  I just wanted to be clear.

THE COURT:  Anyone wish to be heard with the Concalves Declaration?

(No audible response.)

THE COURT:  Okay.  It's admitted as agreed to between the parties.

51

(Debtors' Exhibit Number 326 was received in evidence.)

MR. ZAKIA:  Thank you, Your Honor.

And, finally, --

THE COURT:  Subject to the reservations as well.

MR. ZAKIA:  -- we offer the Declaration -- and I'm really going to apologize on this one -- of Stephanie Kjontvedt of Epiq.  And that is found at docket number 325.  Fortunately there are no stipulations or reservations with regard to this one.

I believe she is on the -- virtually in the virtual courtroom.  And we'd offer her Declaration as well.

THE COURT:  Any objection to the Epiq Declaration?

(No audible response.)

THE COURT:  Okay.  It's admitted.

(Debtors' Exhibit Number 325 was received in evidence.)

MR. ZAKIA:  And so, Your Honor, that's going to leave the Debtors with two witnesses to present live.  As Mr. Koster indicated, one is going to go today and then the second will go on Wednesday.

And so I guess now we can get to the interesting part of the afternoon.  The Debtors call Roopesh Shah.

THE COURT:  Okay.  Mr. Shah, just give us a second.  We're going to turn on the witness cam.  So why

52

don't I swear you in and then you can sit down and we'll turn the camera -- let me have you raise your right hand.

ROOPESH SHAW, DEBTORS' WITNESS, SWORN

THE COURT:  Okay.  I'm going to let the record reflect that the witness has been properly sworn in.  Give it a second and we'll turn this camera on and we'll get started.

There going to be any binders or --

MR. ZAKIA:  So not for this one.  Not from us, Your Honor.  You may get a binder from them.

THE COURT:  Okay.

MR. MERVIS:  Your Honor, I apologize.  We went paper today in the crush of time.  But you have electronic copies of our exhibits.

THE COURT:  Okay.  No, no, not a problem at all. I was just trying to --

MR. ZAKIA:  I have --

THE COURT:  -- do as much housekeeping as possible.

MR. ZAKIA:  Well, Your Honor, if you want I can hand you -- I have a couple of loose exhibits.  We didn't do binders but I can give you the first one.  Well, we'll do it when we get to it.

THE COURT:  Yeah.  Here we are.  I want everybody to see, you.

All righty.  Please proceed when you're ready.

MR. ZAKIA:  Thank you, Your Honor.

Mr. Shah, good afternoon.

THE WITNESS:  Good afternoon.

MR. ZAKIA:  Please introduce yourself to Judge Lopez.

THE WITNESS:  Good afternoon, Your Honor.  My name is Roopesh Shah, and I'm senior managing director at Evercore.

DIRECT EXAMINATION

By MR. ZAKIA:

Q    And how long have you been a senior managing director at Evercore?

A    I've been a senior managing director at Evercore for a little over seven years.

Q    And with regard to your job as -- could you just please describe for us generally what you do as part of that job?

A    Sure.  I'm a senior managing director in the restructuring group at Evercore.  So as part of that function I lead teams working on in-court and out-of-court restructuring and financing activities representing both companies and creditors.

Q    And for how long have you worked as a restructuring professional?

A    I'm getting too old to count, but something like 25

Supp. App. 053

years.

Q    And could you please just generally speaking describe for us the types of experience you've had working as a professional in Chapter 11 cases?

A    As mentioned before, I represent both companies and creditors in in-court cases, obviously matters of, you know, a company that needs deleveraging, needs to raise capital, DIP capital, exit capital, equity capital, you know, the gamut of activities required to consummate a Chapter 11 case.

Q    And not trying to keep count or to test you but just to give us a sense, roughly how many Chapter 11 cases would you say you've worked at as an investment banker over the course of your career?

A    At least two dozen.

Q    Now, could you -- over the course of that experience have you been involved in other deals that involved equity rights offering in bankruptcy?

A    Yes.

Q    Okay.  And could you just describe for us what an equity rights offering is?

A    So an equity rights offering is an offering to shareholders to subscribe to equity in the target company. It's a right, not an obligation, for those shareholders to subscribe.

Supp. App. 054

Q    And what's the purpose of it?

A    To raise capital for a company.

Q    Now, in the course of your career have you been involved in other transactions that involve backstops?

A    I have.

Q    And could you please describe for us, sir, what's a backstop?

A    A backstop is akin to an underwriting.  It's a commitment that the capital will be there.  It's one thing in a plan to say the Debtor intends to raise capital.  It's another to say that it's there and committed for certain. So a backstop is really the same as a commitment.

Q    And from a Debtor's perspective is a backstop generally helpful?

A    It is.  A Debtor typically wants certainty of those proceeds.  Again, having a plan that says we intend to raise does not commit a level of certainty.

     And there's no guarantee that that capital is ultimately there.  So getting commitments for that capital, similar to getting commitments for DIP capital, commitments and certainty are of paramount importance to a Debtor.

Q    And are backstops common in transactions that involve equity rights offerings?

A    In my experience they are.

Q    And is that true including in equity rights offerings

taking place in bankruptcy?

A    I believe so.

Q    Now let's talk a little bit more specifically about this case.  When did you first become involved in this restructuring?

A    With respect to these restructuring matters, sometime in the fall of last year.

Q    Okay.  And what was -- what is your role in connection with this restructuring?

A    Our role is to advise the company through all matters of restructuring, the negotiations between the stakeholders determining proforma leverage, working through the liquidity constraints, ultimately moving towards plan negotiations, if that's the way it's going to go, into an in-court restructuring plan negotiations among the stakeholders, raising DIP financing, and raising equity financing.

Q    And are you the -- sorry.

A    I meant to say exit financing.  In this case it's equity financing, but exiting financing as well as DIP financing.

Q    And are you the senior professional at Evercore on this deal team?

A    That's correct.

Q    I want to be clear about something because I think we've heard a little preview of what may come.  Who is

Evercore's client in connection with this restructuring transaction?

A    Our client is the company, or the Debtors in this case.

Q    And from whom do you take or look for direction and decisions with respect to the work that you are performing for the Debtors?

A    With respect to the restructuring matters, we look to the special committee of the board.  Initially it was the board.  And when a special committee was put in place, then the special committee of the board.

Q    And who are the people that serve on that special committee?

A    There were three people:  Larry Nyhan, Sherman Edmiston, and Jeffrey Russell.

Q    Okay.  And could you describe for the Court what you saw as your objective or your goal as the Debtors' lead investment banker; what were you trying to accomplish?

A    Ultimately we were trying to accomplish a restructuring of the company that maximized value dealing with all the constraints companies have, whether from liquidity, leverage, etcetera, achieve a value maximizing restructuring of the company's balance sheet that would result in less leverage, more liquidity, and a more stable platform.

Q    And were you ultimately able to accomplish that objective with the plan that is being presented to the Court

today for confirmation?

A    We believe so.  It results in materially lower leverage, materially higher liquidity, broad consensus among stakeholders.  It provides for go-forward stability for the company to grow, to preserve jobs, and get back on its feet.  So we think so.

Q    And how did that -- if you could tell us, how did that plan come to be, how was it developed?

A    It was really developed through extensive negotiation with the Debtors' stakeholders, first lien lenders, second lien lenders, DIP lenders, backstop parties, to put all those pieces together over several months of really intense structuring and negotiations amongst all those parties.

Q    And just to give us a little bit of a sense of the timeline here, when did those negotiations begin?

A    Well, I'd say the planning of it and the laying it out started really in the fall.  And then the negotiations with stakeholders started sometime in December, mid to late December of last year.

Q    Okay.  And you identified a number of creditor constituencies that participated in these negotiations.  Did the Debtors' equity sponsor participate the negotiations of the plan?

A    They did.

Q    And could you please describe for us what was the

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    59

sponsor's role in those negotiations?

A     Well, the sponsor's role in their capacity as a sponsor or shareholder is more of a shepherding role, right.

In this case there's no recovery to the shareholders, but they are on the board, they do own the company.  They have a duty, whether official or otherwise, to make sure things land in the right place.

It doesn't serve anyone if the stewards of the company leave a, you know, a mess behind.  So they, you know, monitor the case and make sure it's going smoothly and make sure they put the pieces in place to ensure a smooth and successful outcome.

Q     Now, was the equity sponsor here, CVC, represented by counsel in connection with these negotiations?

A     They were.

Q     Okay.  And who was that counsel?

A     Latham and Watkin.

Q     Now, in your experience is it typical for equity sponsors to participate in the negotiations of a company's restructuring plan?

A     Yes.

Q     Indeed in your -- have you ever been involved in a case that you're aware of where there was an equity sponsor and then that equity sponsor did not participate in restructuring negotiations?

ROOPESH SHAH - DIRECT BY MR. ZAKIA                60

A      I can't recall any.

Q      Now, did the sponsor, CVC, have any interest in the company's capital structure other than its equity position?

A      Yes.  They were also a senior secured lender.

Q      And did they participate in the negotiations with regard to that creditor position?

A      They did.

Q      And, again, as part of their participation were they represented by their own counsel?

A      They were.

Q      That -- was that also Latham?

A      Yes.

Q      Now, back to the negotiations.  Could you just give us a sense as to who the parties were, the actual people that were involved in the various negotiations for the various parties?  So who participate and led the negotiations on behalf of the Debtors?

A      On behalf of the Debtors it was Evercore and White and Case.

Q      And with regard to your role leading the negotiations for Evercore, again, who did you report to or look to for decisions being made by the Debtor in connection with the plan development?

A      Special committee.

Q      Now, who participated on behalf of the 1L?

Supp. App. 060

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    61

A    There were an Ad Hoc Group of 1L lenders represented by PJT and Gibson Dunn.

Q    Okay.  And with regard to CVC's participation in the negotiation, who participated on behalf of CVC?

A    There were professionals from CVC.

Q    Okay.  And legal counsel.

A    Latham and Watkins.

Q    Now, when the company had to make decisions with respect to its position with regard to the various issues being negotiated amongst the parties, who made the decisions on behalf of the company?

A    The special committee of the board.

Q    I'd like to talk to -- about something that we heard a preview from objector's counsel about.  During the course of Evercore's work in the development of the plan, did you or members of your team ever provide information or analysis to any other stakeholders?

A    We did.

Q    Okay.  And could you explain to the Court why that would be?

A    We typically provide analysis or numbers to all stakeholders really to interpret positions.

      There's the words on the page, then there's the numbers behind them, and trying to forge consensus.  We don't want there to be misunderstandings around those.

Supp. App. 061

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    62

We would typically interpret numbers, provide analysis, help explain positions to whoever it is we were negotiating with, whether it was the lenders, the second lien lenders, CVC, whoever the stakeholders were that we were trying to negotiate as the go-between.  We would provide analysis to those parties.

Q    And so specifically with regard -- is that an unusual process?

A    Not at all unusual, no.

Q    Okay.  So in your other engagements other than this case is it typical for Evercore to provide analyses or information to negotiating counterparties that aren't its client?

A    Absolutely typical.

Q    Okay.  And in this particular case could you give us examples of specific other stakeholders that you provided analysis or information to?

A    We were routinely negotiating with the first lien lenders, the second lien lenders, and CVC.  And the primary negotiation was between CVC and the first lien lenders, though we had DIP lenders as well.

All those were stakeholders that at different times we would provide numbers, supporting analysis, interpretations of terms we were negotiating.

Q    Okay.  And that included providing information like

Supp. App. 062

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    63

that to CVC.

A    Correct.

Q    And I just want to be crystal clear about this.  Did the fact that you were providing information to other stakeholders, be it CVC, be it the first lien group, change who you saw as the party that you were responsible for negotiating for?

A    Not at all.

Q    Okay.  And at all times throughout this case, who was the party whose interest you were looking out for as the Debtors' lead investment banker?

A    The company.

Q    Now, could you -- and you personally participated in these negotiations throughout the entire process, right?

A    Correct.

Q    And I think you told us you led the Evercore team that was responsible for serving as the Debtors' investment banker.

A    That's correct.

Q    How would you describe to the Court the negotiations?

A    As is typical in these cases, right, extensive and hard-fought.

     I mean, you'll see there was a lot of back and forth from where we started to where we ended, a lot of negotiation over every minute term.  It took several months.

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    64

We started in late December, didn't file these cases until early April.

     We were negotiating right up until unfortunately the very last minute, which even delayed the filing of these cases by a couple of weeks, in order to hash out, you know, final terms with the various parties.  So very extensive.

Q    And so I -- did the negotiations ultimately result in an agreement?

A    They did.

Q    Okay.  And when did that occur?

A    About probably five minutes before we filed this cases.

Q    So stole my next question.  What happened immediately after the reaching the agreement on the negotiations?

A    As, again, the company was really on fumes liquidity-wise, lots of negotiations happening simultaneously.  As soon as that was done, literally as soon as they were done, those papers were finalized and the company filed their petition.

Q    And could you just explain for us a little bit why it was that the bankruptcy filing had to occur when it did?

A    The company needed access to liquidity.  It was dangerously low on liquidity for not just days, probably weeks while parties negotiated.

     Much to the Debtors' chagrin, those negotiations took a long time, so they needed the relief of the DIP and other

Supp. App. 064

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    65

relief immediately in order to access capital, in order to quell employees and customer concern.  There were customers who were holding orders, revoking orders.

The filing was really the way to show a path forward and get relief, you know, financially.

Q    Now, I think you said that one of the principal parties that you were negotiating with throughout this process was the one leading Ad Hoc Group, right?

A    Correct.

Q    Okay.  And how did that negotiation begin?

A    That negotiation began with an outreach from Evercore to PJT to say that the company probably needed to pursue a restructuring, including a capital raise, and that we should begin that process of due diligence and negotiation A-S-A-P. And that started, as I said, in late December.

Q    And did the Debtors play any role in determining which lenders were included within the Ad Hoc Group?

A    No.

Q    Did the membership of the ad group change over time?

A    It did.

Q    And during the course of the negotiations were you ever approached by any lenders that wanted to join the Ad Hoc Group?

A    Yes.

Q    And what did you do with regard to that -- those

Supp. App. 065

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    66

approaches, if anything?

A    We informed PJT of parties who approached us and urged them to include them in the process.

Q    And did any of these lenders end up joining the Ad Hoc Group?

A    Yes.

Q    Now, at any point in this process did the Debtors ever refuse to negotiate with any party while they were developing the plan?

A    Not to my knowledge.

Q    Okay.  Now, did the Debtors -- from the Debtor perspective, did you have any concerns concerning the size or makeup of the Ad Hoc Group?

A    Not specifically.  Our goal against that race for time is to get to a confirmable majority.  But I don't think we had a specific -- and then obviously there's unwieldiness and time in how you get there.

     But per se the Debtor did not have any problem with anyone being in that group who wanted to be in that group.

Q    And you say that the Debtors were interested in getting to a confirmable majority; what do you mean by that?

A    I mean more than 51 percent in number and two-thirds in value of the requisite classes.  That's, you know, in a race to try to get into court and get the relief it needs, that's at least the first and foremost hurdle that we were looking

to achieve.

Q    And did that occur?

A    It did.

Q    Couple of question about the plan.  How did the equity rights offering come to be included in the plan?

A    The company required capital to repay its DIP.  And it was proposed in that form by the first lien Ad Hoc Group.

Q    Now, did at any point the company consider other ways of raising that capital?

A    We did.  We did look at other ways -- there was no -- there were no other ways.  Given the constituents at the table and the structure that was being considered at that time, there were no other ways.  But we did consider other ways.

Q    And was the equity rights offering a heavily negotiated part of the plan?

A    It was.

Q    And, again, who were the parties that participated in the negotiation of that provisions of the plan?

A    The company on the one hand and the first lien Ad Hoc Group on the other.

Q    Now I'd like to talk a little bit about the backstop. Was that a heavily negotiated provision of the plan?

A    Yes.

Q    Okay.  And, again, who were the parties that

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    68

participated in the negotiation of the backstop provisions?

A    The same parties, the Debtor on the one hand and the first lien Ad Hoc Group on the other.

Q    And who is ultimately providing the backstop under the proposed plan?

A    Members of the first lien Ad Hoc Group, plus CVC.

Q    Now, was the inclusion of the backstop an important or necessary provision from the Debtors' perspective?

A    Once the Debtors agreed or decided that it needed to raise equity, at that point a commitment or a backstop was an important, essential element of -- from the Debtors' perspective.

Q    And could you explain to the Court, please, sir, why the inclusion of the backstop was an essential element from the Debtors' perspective?

A    The backstop is what provides certainty.  Again, saying we need to raise $245 million of equity is very different than saying $245 million of equity is guaranteed to be there.

     The company could launch a solicitation and nobody shows up, there's no equity, there's no consummation of a plan.

     So going into a Chapter 11, particularly where the goal is for it to be prepackaged and for that message to customers and vendors and everything else to be clear, it

Supp. App. 068

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    69

was really essential to have committed financing.

I'd say sort of no different than a DIP and exit financing to know that the path in and out are committed and secure.

Q   Now, does -- are the parties that are providing the backstop receiving any consideration in exchange for their participate in the backstop?

MR. MERVIS:  Your Honor, just objection to the extent it calls for a legal conclusion.

THE COURT:  I'll hear the answer.  Thank you.

THE WITNESS:  Could you repeat the question, please?

MR. ZAKIA:  Sure.

BY MR. ZAKIA:

Q   Are the parties that are participating in the backstop receiving any consideration in exchange for their participation in the backstop?

A   They are.

THE COURT:  Just -- I'll take it just as kind of lay term for consideration and not the -- not a legal conclusion.  Thank you.

A   Yes, they are.

Q   Okay.  And could you please describe what that consideration is?

A   They're receiving really two main forms of

Supp. App. 069

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    70

consideration.  One is the put option premium or the backstop fee.  The second is what we call the holdback or the direct allocation of 35 percent of the amount to be raised.

MR. ZAKIA:  Okay.  I apologize, but you're going to have to help me a little bit with some of that.

Q    Could you please describe for us what the put option -- sorry, the put option holdback, you said.

A    Put option premium.

Q    Put option premium, could you please describe for us what that is?

A    It's the same as the backstop fee.  It's interchangeable terminology.  It was I believe ten percent of the rights offering amount payable at the discounted equity value.  So that was the fee for -- that was one portion of the fee for committing or backstopping the capital.

Q    Okay.  And I think you told me there was a second component of consideration being provided.

A    Correct.  That's the direct investment or the holdback interchangeable terms where the backstopping parties had the right to subscribe to 35 percent of the amount that was being raised.

Q    Now, was the terms of consideration being provided to the backstop parties a negotiated provision?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 070

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    71

A    Yes, they were.

Q    Okay.  And could you describe those negotiations for us, please?

A    There was a lot of back and forth over those terms, the size of the rights offering, the backstop fee, the holdback, among other terms.  Those were all negotiated points.

        MR. ZAKIA:  Okay.  Sorry, one second, Your Honor.  Your Honor, may I approach?

        THE COURT:  Yes.

    (Pause)

BY MR. ZAKIA:

Q    So, Mr. Shah, I've handed you what's been previously admitted as Objectors' Exhibit 46.  And I would like to direct your attention to the presentation which can be found about -- begins about four pages into the document; do you recognize that, sir?

A    I do.

Q    Okay.  Did their come a time when Evercore performed an analysis of the reasonableness of the backstop consideration that was going to be provided?

A    Yes.

Q    Okay.  And does -- is your analysis included in this presentation that can be found in Objectors' Exhibit 46?

A    It is.  There was really a continuing analysis whenever there were negotiations around these terms.  I don't know if

these were the only ones.  But this was -- within this
package there is an analysis of rights offering.

Q    Okay.  So let's talk for a second before we look at the
particular pages.  Could you describe for the Court the
analysis that Evercore conducted with regard to the
reasonableness of the consideration being provided to the
backstop parties?

A    Among other things, we develop a list of comps from
previous rights offering, precedence in cases, and look at
comparable elements, the backstop fee, the holdback, the
discount to plan value, the termination fee, and look at
those across a range of sizes and dates to determine, you
know, where in the range the proposed terms in the
negotiation would be.

Q    Okay.  Is this an analysis that you have undertaken in
other cases?

A    Yes.

Q    Okay.  And is the type of analysis that you undertook
here similar to what you do in your other engagements?

A    That's right.

Q    And how many comparable transactions did you look at in
trying to analyze the reasonableness of the consideration to
be provided to the backstop parties?

A    Somewhere around 25.

Q    Okay.  And how does that number compare to what you

would typically look at when trying to judge -- to perform a similar analysis?

A    A comparable number.

Q    Okay.  And if we turn, please, sir, to page 15 of the exhibit, it's a page entitled Select Common Equity Rights Offering Backstop Commitment; you see that?

A    Mine doesn't look like it's page 15.

Q    Oh, sorry, 14.

A    Okay, yes.

Q    Could you tell us what does this page represent?

A    It represents those comparables looking at Chapter 11 transactions that required a rights offering of a hundred million dollars or more since 2018 where we looked at different elements of consideration and other pertinent facts about those rights offerings.

Q    Now, could you tell us -- so was your analysis sufficient to allow you to form a view as to whether the -- as to the reasonableness of the consideration being provided to the backstop parties?

A    Yes.

Q    And what was that view?

A    The view was that the -- after the negotiation and the back and forth, that the terms we were settling on for the rights offering and for the backstop were within the range of precedent transactions.

Q    And did you provide that analysis to anybody?

A    We provided it to the special committee.

Q    Now, we heard a little bit about this at the beginning of the hearing.  Did you market test the backstop?

A    We did not.

Q    Okay.  Now, in your career as an investment banker in bankruptcy have you ever market-tested a backstop in a Chapter 11 case?

A    A backstop for equity rights offering, not that I'm aware of.

Q    Okay.  And in your experience are you aware of any Chapter 11 case in which a Debtor has marketed a backstop for an equity rights offering?

A    I can't say it's never been done, just none come to mind.

Q    Now, at the time that the company filed for bankruptcy, what stakeholder support did it have for the proposed plan?

A    At the time of the filing, I believe they had more than 80 percent support from the first lien and second lien lenders.

Q    And was that important to the Debtors?

A    It was in order to have this be a prepackaged plan and have those requisite majorities getting to more than two-thirds of both classes was highly important.

Q    And could you please explain to the Court what the

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    75

benefits of having a prepackaged plan was from the Debtors'
perspective?

A    The goal of the prepackaged plan was to (a) have as
short a time in bankruptcy with all the uncertainties that
come with that with your business and employees and vendors.

Also to be able to tell a positive story on day one of
the case of having broad consensus among stakeholders,
hopefully a lack of a dispute and, therefore, a short stay
in Chapter 11 where business can return to normal after
that, and again customers, vendors, employees can all feel
that the company is on stable footing.

So having this be a prepackaged plan rather than a, for
lack of a better word, freefall with an uncertain outcome
was important to the Debtors given their business.

Q    Now, as part of reaching the prepackaged plan with the
company's lenders, was there a restructuring support
agreement?

A    There was.

Q    Okay.  Prior to the filing of the bankruptcy did the
company have any other proposals from any other stakeholders
that provided for the restructuring of the company?

A    Not that I'm aware of.

Q    Did the RSA that was entered into as part -- at the
time of the filing of the prepackaged plan include a
fiduciary out?

A    It did.

Q    Could you please describe for us, sir, what is a fiduciary out?

A    It's a clause whereby the Debtors or the company can terminate the RSA if there is another transaction that is deemed to be higher and better in so rt of furtherance of their fiduciary duties.  So they're not bound to that agreement to the extent a superior proposal were to emerge.

Q    Now, did there come a time after the filing of the Chapter 11 cases that the Debtors received an alternative proposal?

A    Yes.

        (Counsel confer.)

            MR. ZAKIA:  May I approach, Your Honor?

            THE COURT:  Please.

        (Pause)

BY MR. ZAKIA:

Q    Mr. Shah, is this letter that alternative proposal?

A    I believe so.

            MR. ZAKIA:  And just for the record, Your Honor, I've handed the witness what's been previously admitted as the Objectors' Exhibit 59.

            THE COURT:  Okay.

BY MR. ZAKIA:

Q    Now, could you please describe for the Court what, if

anything, the Debtors did to consider that proposal?

A    We reviewed it and conducted an analysis of the sources and uses and the viability of implementation of the alternative proposal, you know, and a view as to whether in fact it provided incremental benefits, recovery, value to the estate.

Q    And did you form a view as to whether the proposal provided incremental value or benefit to the estate?

A    Taken together with a valuation of the viability, yes, we took that -- we did that analysis.

Q    Okay.  And what was your conclusion?

A    Our conclusion was that it did not.

Q    And did you provide that conclusion to anyone?

A    We did.  We provided that conclusion to the special committee of the board.

Q    Okay.  And -- okay.  At some -- when did the Debtors receive that initial proposal?

A    I note that it's dated April 26th so on or about there.

Q    Okay.  And did the Debtors communicate -- well, did the special committee form a judgment as to how the Debtors should respond to the alternative proposal?

A    They did.

Q    And was that -- what was that decision?

A    The decision was to indicate that it was not a superior alternative and to point out some of the deficiencies in it.

ROOPESH SHAH - DIRECT BY MR. ZAKIA                78

Q    And what were some of the deficiencies in it?

A    In this proposal I think one of the deficiencies was that the capital wasn't committed, there was no guarantee that it would be there.

     The second deficiency was that if we were to pursue this alternative, it would result in a default, cross default to the DIP, and there was no provision for replacing that DIP, so the Debtors would be left with a defaulted DIP.

     It also didn't come with any indication that it had requisite majorities in favor of it to confirm a plan --

Q    Let me stop you there.  Why was that important?

A    Debtors' goal is to get out of bankruptcy one day, and to do so would need a certain majority voting for a plan.

Q    And I didn't mean to interrupt you.  Any other issues?

A    There were likely others.  There was additional cost associated with it, additional delays, professional fees, or the entire just process cost of it.

     But I focused on the real elements of the proposal, among others, that were kind of viewed as the primary deficiencies.

Q    And did the Debtors communicate the special committee's decision back to the objectors?

A    Yes.

Q    Did there come a time when the Debtors received a further alternative proposal from the minority lender group?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 078

A    Yes.

MR. ZAKIA:  Okay.  Your Honor, may I approach?

THE COURT:  Please.  Thank you.

BY MR. ZAKIA:

Q    Mr. Shah, I've handed you what's been previously admitted as Objectors' Exhibit 62.  Is that the further proposal that the Debtors received?

A    I believe so.

Q    Okay.  And could you please describe for the Court what the Debtors did to consider that proposal?

A    Similarly reviewed the proposal and all the elements in it and considered the economics and the viability and the implementation and impact on the Debtors in trying to determine whether or not it was superior to the RSA.

Q    And did you form a view as to whether or not this proposal was superior to the RSA?

A    Yes, we did.

Q    And what was your view?

A    Our view was that it was not superior.

Q    And did you communicate that to anybody?

A    We did.  We communicated that in discussion with the special committee.

Q    And did the special committee make a decision with regard to how to respond?

A    They did.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    80

Q    Okay.  And what was that decision?

A    To promptly communicate back the response and the fact that the proposal was not deemed superior.

Q    And could you please explain to the Court how the initial proposal, alternate proposal differed from the original proposal?

A    Sure.  Well, I'll focus on the plus side.  The deficiencies of it not being committed or not offering a replacement DIP were addressed.

However, there wasn't a discernable benefit to the company.  It didn't provide any more liquidity.  It didn't account for the delayed case costs.  It didn't result in any different overall recoveries to the lenders.

Really all it did was just create a different group of lenders who had somewhat higher recovery -- a much smaller group of lenders with a much higher recovery than others.

And, importantly, it also still did not have the support of a confirmable majority of the lenders.

Q    Okay.  Now, with regard to the second alternate proposal, could you please just explain to the Court some of the potential consequences that the Debtors would have found should they have chosen to terminate the RSA and pivot to the alternate proposal; would that have presented any challenges?

A    The company would have incurred more fees for which

there was no incremental liquidity being offered.

There would have been, from what I understand from management, disruptions to the business in terms of delays and emergence, and ultimately be left without a plan that had support from requisite creditors.  It would in essence be stuck in a bankruptcy looking for a way out.

Q    Now, Mr. Shah, as the company's lead investment banker, do you have a view as to whether confirmation of the Debtors' proposed plan is in the best interest of the Debtors and their estates?

A    I do.

Q    And could you please tell the Court what your view is on that question?

A    My view is simply that the confirmation of the existing plan is in the best interest of the Debtors.  It provides for a prompt exit.

It provides for a plan that has acceptance from the vast majority of the company's creditors.

And it provides stability for an operating business with lots of employees to emerge from bankruptcy.

It reduces leverage significantly, provides for significant additional liquidity, and resolves these Chapter 11 cases promptly for the company to emerge.

MR. ZAKIA:  Thank you, Mr. Shah.

Your Honor, I have no further questions at this

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    82

time.

THE COURT:  Okay.  Let me just -- I don't think there's any.  But just to confirm, anyone who supports the plan?

(No audible response.)

THE COURT:  All right.  Let's turn to cross-examination.

MR. MERVIS:  Your Honor, we have witness binders.  I think there's one in front of the witness.  Would you -- would --

THE COURT:  Yeah.  That'd be great.

MR. MERVIS:  Would the Court like one?

THE COURT:  Thank you.

MR. MERVIS:  So let me pass that up.  And, Your Honor, as a housekeeping matter, there were -- there are several exhibits that I'm going to show the witness that when they were produced to us were in black and white.

Yesterday morning I go them in color and so it didn't make it into the filed copies.  But if it's all right with Your Honor, I would like to hand up the color copies.  The Debtors already have them so --

THE COURT:  Okay.  Any -- Mr. Zakia, are you okay with that?

MR. ZAKIA:  I wouldn't mind if he gave me an extra copy if you have it because I'm sure we have them.  But I

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    83

don't know --

MR. MERVIS:  I can do that, Your Honor.

MR. ZAKIA:  We're good.  That's fine, Your Honor.

MR. MERVIS:  It will just take me a minute to un-paper clip.

THE COURT:  Okay.

(Pause from 2:43 to 2:44 p.m.)

MR. MERVIS:  I probably should have let the people who do the real work do that.  Sorry it took so much time.

THE COURT:  No worries.

(Pause)

MR. MERVIS:  Your Honor, before I begin, Mr. Zakia and I agreed to three stipulations of fact that I'd like to proffer because I think it'll help set the chronology for the questions that I'm going to be asking the witness.

THE COURT:  Okay.

MR. MERVIS:  So the first I guess we've already had the testimony is that CVC is the Debtors' private equity sponsor.  So that's already in evidence.

The second, you heard, Your Honor, some testimony about a note that CVC -- note purchase that CVC made. And the stipulation is that that transaction occurred in the summer of 2013, before the two independent directors that the witness talked about on direct had joined the board of C1.

Supp. App. 083

ROOPESH SHAH - DIRECT BY MR. ZAKIA                    84

And the third is that the special committee was formed on January 16th, 2024.

THE COURT:  Okay.

MR. MERVIS:  Oh, apparently when I was mentioning the CVC note I said that it was -- that transaction was in 2013.  That's not right.  It was in the summer of 2023.

THE COURT:  Yeah, no, no, I --

MR. MERVIS:  I don't know why I did that.  So --

MR. SPEAKER:  It was a test to see if I was listening.

(Laughter)

MR. MERVIS:  All right.  So, Mr. Shah, good to see you again.

THE WITNESS:  Good afternoon.

MR. MERVIS:  I want to quickly go back on some questions that Mr. Zakia asked you.

CROSS-EXAMINATION

BY MR. MERVIS:

Q   I think you testified that an equity rights offering is something that's common to be offered to shareholders of an existing company; is that right?

A   Correct.

Q   Okay.  But an equity rights offering can also be offered to folks who are not shareholders of an existing company, right?

ROOPESH SHAH - CROSS BY MR. MERVIS                    85

A     Well, at the end of the day it's a right.  I think of -- I guess I think of it as rights.  They're being given to shareholders.  They're rights.

Actually I guess they could trade them to someone else or someone else could exercise them.  But I guess I tend to think of rights offerings as rights for existing shareholders.

Maybe there's a broader definition but I guess that's not how I think about them.

MR. MERVIS:  My question may not have been clear.

Q    Equity rights offerings can be used to raise money and can be offered to the existing shareholders of a company, correct?

A     Correct.

Q    But parties who are not shareholders of a company can also be offered the right to purchase equity in a company; that can happen, right?

A     Third parties can -- I don't think of them as rights per se.  I just think of that as a third party making an investment, sure.

Q    Fair enough.  You mentioned there were three members of the special committee, one of who was Mr. Russell; is that right?

A     That's correct.

Q    And he's the CEO of the Debtors.

Supp. App. 085

A    That's correct.

Q    And he joined as CEO when?

A    I don't know exactly.

Q    It was -- was it in 2023 -- well, let me put it this way.  It was before 2024, correct?

A    That's correct.

Q    You mentioned that in your experience in bankruptcy cases it is not uncommon for equity sponsors to be involved in negotiations around the plan, correct?

A    To be involved in the -- in plan discussions.  I don't know if I said negotiations, but certainly involved in and around those discussions, correct.

Q    Fair enough.  And sometimes when that happens, companies will bring in independent directors or will appointment a special committee, right?

A    Correct.

Q    And that's what happened here.  There were two independent directors brought in and a special committee was formed.

A    That's correct.

Q    Okay.  In some cases that you've been involved in the independent directors are the special committee have retained their own professionals.

    In other words, professionals separate from the Debtors as part of their carrying out their duties as independent or

ROOPESH SHAH - CROSS BY MR. MERVIS                87

as a special committee, correct?

A    That's generally not my experience, no.

Q    Well, but you have seen that in cases, have you not?

A    I'm not sure I've seen that in any cases that I've ever worked on.  I guess I'm aware that in some cases that does occur.  But that's not in any I've worked on.

Q    Okay.  Thank you.

A    As far as I know.

Q    You also mentioned deliberations around the two alternative proposals that the group that we represent had pushed forward.

     And I think you mentioned that was part of what was considered was the negative -- potential negative impact on the company, correct?

A    Correct.

Q    As part of those negotiations did anybody do a consideration assuming that the plan that's currently on file would not be confirmed?

A    I don't know if that explicit analysis was done.

Q    If you could turn to EL Exhibit 71, please.

A    I'm sorry, which number?

Q    EL.

A    Is that tab 71?

Q    Probably, yeah.

     (Pause)

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

ROOPESH SHAH - CROSS BY MR. MERVIS                    88

A    Okay.

Q    Okay.  You recognize this document?

A    I do.

Q    And what is it?

A    It seems to be a term sheet for an equity rights offering.

Q    All right.  And is this -- to your understanding is this at least a term sheet, if not the term sheet, the final term sheet for the equity rights offering in this case?

A    It certainly is a term sheet for an equity rights offering in this case.  I guess I can't tell right off the bat if it's the final term sheet or not.

Q    Fair enough.  If you could go to the third page, please.

        MR. MERVIS:  And, Your Honor, you have this.

        THE COURT:  Yes.

        MR. MERVIS:  Yeah.

BY MR. MERVIS:

Q    I'd like you to take a look at the first box on the lefthand side.  It's called -- it's titled investors; do you see that?

A    Yes.

Q    Okay.  And if you could read that text to yourself and let me know when you're finished.

        (Pause)

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 088

A    Okay.

Q    And you see there's a defined term in there, investors, right?

A    Yes.

Q    Okay.  And the -- it says here the investors will be the parties set forth on Schedule 1 here, too.

A    Yes.

Q    All right.  And then if you go down two boxes, there's something called backstop commitment; do you see that?

A    Yes.

Q    If you could just read the first paragraph there to yourself and let me know when you're finished.

     (Pause)

A    Okay.

Q    Okay.  And at a high level do you understand what this term of the term sheet is about?

A    I believe so.

Q    Can you tell me?  Or tell the Court, I should say.

A    It's an obligation for the investors on the schedule to backstop or commit to fund equity that is not otherwise subscribed to.

Q    And that would be the -- any portion of the open allocation that would not be subscribed to.

A    I'd have to track all the definitions.

Q    All right.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

A     I can make it --

            MR. MERVIS:  I can withdraw the questions.

            THE WITNESS:  Yeah.

BY MR. MERVIS:

Q     And then finally I'd like -- well, almost finally.
Secondarily, I'd like you to look at the put option premium
box.  And, again, if you could read that paragraph to
yourself.

A     Okay.

Q     And that discusses a put option premium of ten percent;
is that right?

A     Correct.

Q     And another word for put option premium is backstop
fee, or another phrase for that.

A     Can be, yeah.

Q     Okay.  And, again, looking at this do you have an
understanding as to whether the -- what the relationship is
between the investors and the right to receive the put
option premium?

A     The investors were committing or, if you will,
backstopping the entirety of the capital the company was
looking for and, in exchange for that, would get their pro
rata share based on the percentages presumably on exhibit --
Schedule 1 of that put option premium.

Q     Okay.  Let's take a look at schedule one where it says,

the last page of the exhibit.

A      Okay.

Q      What does that show in terms of -- you have some names on the left and some percentages on the right.  What does that -- what do that show?

A      Those are the investors who are investing in and backstopping the rights offering, and then their respective percentages of that backstop.

Q      And in terms of the respective percentages, CVC, the Debtors' equity sponsor, has the third largest percentage; does it not?

A      That's correct.

        (Pause)

Q      Mr. Shah, during the negotiations around the equity rights offering, the Evercore met with and provided analysis to the special committee; is that right?

A      Correct.

Q      And you're not aware, are you, that the special committee had its own investment banker, right?

A      Not that I'm aware of.

Q      And why don't we go to Exhibit EL-10?  Let me know when you're there.

        (Pause)

A      Okay.

        MR. MERVIS:  Your Honor, you have the document?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Great.

Q Mr. Shah, what is Exhibit EL-10?

A It looks to be the initial restructuring proposal that the company made to the Ad Hoc Group of first lien lenders.

Q Okay. I'd like you to turn to the second page of the exhibit, which has a slide. It's hard to see but at the very lower lefthand corner there's a slide number one; do you see that?

A I do.

Q Okay. And if you go to -- there's a few boxes on the lefthand side. And if you go to incremental capital raised at emergence, the very first line, could you read that to yourself, the one that starts with a hundred million dollars in brackets? Just let me know when you're finished.

A Okay.

Q This was proposing an equity rights offering and a debts right -- and a debt rights offering or delayed draw term loan to be backstopped by two parties, right?

A That's correct.

Q One is the 1L Ad Hoc Group and the other is the Debtors' private equity sponsor, CVC, correct?

A Correct.

Q Okay. And if you could go down to the box that says, 1L Term Loan, 1L Note, and CVC note; do you see that?

A I do.

ROOPESH SHAH - CROSS BY MR. MERVIS                    93

Q    And you understand what the CVC note is, right?

A    I do.

Q    Okay.  And at the bottom of that box it says, claim amount to include make whole premiums/prepayment premiums. What's your understanding of what that means?

A    That all claim amounts would include any applicable make whole premium or prepayment premiums in their claim.

Q    And that would include whatever claim CVC made.

A    Correct.

Q    And at the time -- and in terms of the first point, in other words that CVC be part of the backstop -- be one of the backstop parties, your understanding is that that would be a requirement that CVC would have to be a backstop party, correct?  That's what CVC wanted.

A    It was a requirement for CVC to support the plan in their capacity as lender.  I think you said backstop party. It was a requirement for CVC to have these terms as outlined here in order to support the plan.

        MR. MERVIS:  You said that better than I did.

Q    And Evercore's understanding of that came from CVC, correct?

A    That's correct.

        (Pause)

Q    And in terms of the make whole amount and the prepayment premium, that was also something that CVC made

clear to Evercore it wanted, correct?

A    Correct.

Q    If we could go now to Exhibit EL-15, please.  Let me know when you're there.

A    I'm there.

Q    So this is dated February 8.  Do you recognize what EL-15 is?

A    Yes.  It looks to be a response from the first lien Ad Hoc Group to perhaps those -- that proposal we just saw or a different proposal.  But it looks to be a response.

Q    Okay.  And so the original proposal was sometime in January, early January, I think.  And this is the -- and what we're looking at here, EL-15, is the response.

A    I think so.  I can't promise there wasn't anything in between.  But I can accept that as a stipulation.

MR. MERVIS:  I'll represent to you that I didn't see anything.

Q    If you can go to the second page of Exhibit EL-15.  And if you go down to the bottom of the page, there's a box for rights offering on the lefthand side; do you see that?

A    I do.

Q    And at the bottom there's a box for backstop; do you see that?

A    Yes.

Q    And it says, backstop by 1L-A-H -- Ad Hoc Group fees

and holdback to be determined.  So there's no mention there of CVC as a backstop party, right, in terms of the Ad Hoc Group's proposal?

A    That's correct.

Q    And in fact they make it more explicit in the next page, page three, under CVC note.  And if you just look to the right of that so, for example, it says no participation in backstop of DIP or rights offering.

And then it provides a CVC note settlement; do you see that?

A    I do.

Q    And there's two alternative claim amounts.

A    Correct.

Q    By the way, the actual amount of funded debt that CVC had put in was in the ballpark of 160, $170 million; is that right?

A    I don't remember exactly, somewhere in that ballpark.

Q    That range.

        MR. MERVIS:  Your Honor, could I indulge the Court just for a quick bio break?

        THE COURT:  Oh, absolutely.

        MR. MERVIS:  Yeah.  It just we've been going for a while so --

        THE COURT:  Yeah, no problem at all.  It's 3:02.  Would 3:10 work for everyone?

Supp. App. 095

ROOPESH SHAH - CROSS BY MR. MERVIS                96

MR. MERVIS:  Oh, yeah, more than enough, thank you.

THE COURT:  Okay.  I'll come back at 3:10.  Thank you.

MR. MERVIS:  Thank you.

THE CLERK:  All rise.

(Recess taken from 3:02 p.m. to 3:11 p.m.)

THE COURT:  Okay.  We are back on the Record. I'll remind the witness that he's still under oath.

Counsel, you may proceed whenever you're ready.

MR. MERVIS:  Thank you, Your Honor.

CROSS-EXAMINATION (CONT'D)

BY MR. MERVIS:

Q    Mr. Shah, on Direct, I think we established by CVC had its own counsel, Latham, is that right?

A    That's correct.

Q    To your knowledge, did CVC have its own investments?

A    Not that I'm aware of.

Q    Now we were just looking at EL-15, which is a proposal from the Ad Hoc Group, dated February 8th.  I'd like you to now turn to EL-17, which is an email chain.

And you know, as one read email chains, why don't we start from the back and go forward, okay?  Turn to the last page.  This email is also dated February 8th, right?

A    Correct.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

ROOPESH SHAH - CROSS BY MR. MERVIS                    97

Q    Let's just get a handle first on who is on this email.
So we've got Mr. Russell, the CEO, right?

A    Correct.

Q    And we've got Mr. Lombardi, who is the CFO of the
Debtors, is that right?

A    That's correct.

Q    And then Mr. Nyan (phonetic), who's one of the
independent directors?

A    Correct.

Q    And Mr. Edmisston (phonetic), I keep saying this wrong,
who was one of the independent directors, right?

A    Correct.

Q    And then we come -- by the way, do you know who
A. Singh, at A. Singh US is?

A    He's one of the directors.

Q    Of what?

A    He's not on the special committee, but he's an
independent director at the parent corp.

Q    He's a CVC director?

A    I don't know that he's -- he's not a --

Q    Oh, sorry, I keep saying it.  C-One director?

A    He's a C-One director.

Q    And you say he's independent.  What is that based on?

A    I meant not management, not, as far as I know, an
employee of CVC.  I don't know if it was capitalized

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

ROOPESH SHAH - CROSS BY MR. MERVIS                98

independent, or lower case independent, but --

Q    Okay.  Fair enough.  Then we have this address, C-One deal team, and then it says C-One, at CVC dot com.  Do you see that?

A    I do.

Q    And that's a list serve, right?

A    It is.

Q    It's a CVC list serve?

A    Correct.

Q    You don't know who's on it then?

A    I don't know.

Q    Okay.  And then there's some people from White & Case, who are professionals for the Debtors, right?

A    Correct.

Q    And from Alex, another Debtor professional?

A    Correct.

Q    And from Evercore, there's a list serve, project -- I'm going to say it wrong, project -- can you say that for me, project?

A    Sentrian (phonetic).

Q    Sentrian, right.  And you think you were on that list serve?

A    I believe so.

Q    Latham & Watkins is not on this email though, are they?

A    They're not.

Q    So looking at the email, it's from a Mr. Florant (phonetic).  He's a member of your team?

A    That's correct.

Q    Okay.  And he writes, we just had a call of PJT covering the one-L AG term sheet proposal attached.  And it offers to schedule a call.  Do you see that?

A    Yes.

Q    Okay.  Let's turn the page forward, so to the page that ends on Bates 2073.  And at the bottom of the page, there's an email from -- I'll use the source name, Comran (phonetic).  Do you see that?

A    Yes.

Q    And Comran's a CVC person?

A    Correct.

Q    Okay.  And there are three Evercore people on here, but not you, do you see that?

A    Yes.

Q    And I think we already established Mr. Florant was a member of your team.  Mr. Lieu (phonetic), he was a member of your team, yes?

A    Correct.

Q    And Mr. Levine, he was the second most senior person at Evercore on the engagement behind you, correct?

A    Correct.

Q    Okay.  And there was also somebody named P-J Hyer

(phonetic), at CVC, do you see that?

A    I do.

Q    And you know who Mr. Hyer is, right?

A    I do.

Q    Works at CVC?

A    Correct.

Q    Somebody that you've met in person?

A    I believe so, yeah.

Q    And then there's another person, I don't know if you know him, Bruce Lee, at CVC.  Do you know who Mr. Lee is?

A    I do.

Q    Okay.  So let's see what Mr. Comran writes.  He says, Evan, do you have a few minutes to specifically discuss the range of outcomes around the backstop provision.  Would be helpful for us to have a clearer sense of the range of values around that at various scenarios.  Do you see that?

A    I do.

Q    And you understood that Comran was asking your colleagues to provide them with some analytical work product, correct?

A    Correct.

Q    And let's go to the next email up in the chain.  And that one is written by Mr. Levine, and you're not on this email, right?

A    Correct.

Q    Okay.  And Mr. Levine, in the second paragraph of his email says, we are working on laying out some supporting analysis for you guys, re what participation slash non-participation in the backstop would mean from a delusion prospective.  Do you see that?

A    I do.

Q    And you guys refers to the CVC people on this email, correct?

A    I believe so.

Q    All right.  Why don't we go now to EL exhibit 19.  Let me know when you're there.

A    I see it.

Q    Okay.  And this is another email chain, right?

A    Yes.

Q    Okay.  So Your Honor, you have it?  Yeah.  So if you go to the very last page of the exhibit, page 3160, there's an email from Mr. Levine.  It's an internal email from Mr. Levine.  We've already seen Mr. Florant and Mr. Lieu.  And there's a Patrick Griffin.  He's also on your team?

A    Correct.

Q    Okay.  And Mr. Levine writes, you guys good on Rup-one pager.  Do you see that?

A    I do.

Q    And Rup is you?

A    I think so.

Q    Yeah.  And one would assume.  And then he writes, I'm going to play around with hold back math this a.m.  Do you see that?

A    Yes.

Q    And what hold back refers to is what has been talked about here as a direct allocation, is that right?

A    Correct.

Q    Okay.  It's the part of a rights offering that's offered only to certain parties, correct, as opposed to all, in this case, term lenders?

A    Correct.

Q    All right.  Let's turn the page.  And page 3159, well, actually we can skip that one.  Why don't we go over to the next page which is Bates labeled 3158.  Do you see that?

A    I do.

Q    And there's an email from Mr. Griffin.  If you could read that email to yourself please, and let me know when you're finished.

A    Okay.

Q    And this is discussing, among other things, a call that at least some members of your team had with PJT, agreed?

A    Correct.

Q    And in fact what it says is that they screen shotted a table, and if you look on the page 3159, that's the table that was screen shotted, correct?

ROOPESH SHAH - CROSS BY MR. MERVIS                103

A    Correct.

Q    Okay.  And in the last sentence, Mr. Griffin writes, in short, they wanted us to think of this as being no more than an offer to CVC to get a bigger claim if they'd be willing to take more equity, parens, although they wanted to know what CVC preferred.  Let's just unpack the theys there because there are three of them.  So the first they, in short, they wanted us, the they there is PJT, right?

A    Correct.

Q    And then the second they, right, which says to CVC to get a bigger claim if they'd be willing to take more equity, the they there refers to CVC, right?

A    That's right.

Q    And then in the parenthetical, it says although they wanted to know what CVC preferred, so they in that is again PJT, right?

A    Correct.

Q    And so PJT was asking your team about CVC's preferences, correct?

A    No.

Q    That's not correct?

A    No.

Q    Where did I go wrong?

A    PJT wants to know what CVC preferred.  They're not asking us what we think they'd prefer or to decide what they

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

prefer.  Our job as a go between is to go to CVC, figure out what they prefer and tell the other side of the table just -- we figure out what PJT prefers and tell it to CVC.

Q    Fair enough.  They were asking you to go find out what CVC preferred?

A    That's right.  Well, I don't even deny asking me to find it.  They're just saying they want to know whether they want us to find it.  They'll go find it eventually.  It'll come out in negotiations.  There's no direction telling us to go do it, but it's a stated desire that they want to know what CVC prefers.

Q    Okay.  Well, I'll leave it with what it says.  If you go to the next page forward, page 3157, there's -- this is another email from Mr. Levine, and in it, he writes, was this labeled as PEO.  Otherwise I want to share with CVC. PEO means professional eyes only?

A    Correct.

Q    Okay.  And when he says was this labeled as PEO, he's referring to the screen shot two pages later, correct?

A    That'd by my understanding.

Q    Okay.  And if we go to -- forward, to page -- actually we can skip that one.  Let's go to that first page of this email which is 3155.  There's an email at the top of the chain from Mr. Griffin to the members of your team that again you're not on.  I'd like you to read that whole

Supp. App. 104

ROOPESH SHAH - CROSS BY MR. MERVIS                    105

paragraph to yourself and let me know --

A    Okay.

Q    Okay.  Focusing on the very last sentence, Mr. Griffin writes, but clearly even after netting the invested amounts, the incremental recovery benefit of being a backstop party is meaningful.  Do you see that?

A    I do.

Q    And your understanding is that your team did some work, and what they ultimately concluded was that there would be meaningful value in a party being a backstop party, correct?

A    Correct.

Q    All right.  Let's go to EL-21.  Let me know when you're there.

A    Okay.

Q    And this one's dated February 11th, so now three days have gone by since we've seen that PJT proposal, right?

A    Correct.

Q    Okay.  And I want you to go to the bottom of the first page.  There's an email again from Patrick Griffin, and again you're not on it.  And in the first sentence, he mentions that he's sending you a one pager.  I want to focus on the second sentence.  He says, in the meantime, we're laying out another page to illustrate option one versus option two trade-offs clearly, parens, as Evan laid out in an email to CVC.  Do you see that?

ROOPESH SHAH - CROSS BY MR. MERVIS                106

A    Yeah.

Q    And Evan there is Evan Levine, correct?

A    Correct.

Q    And you don't know what that email is, do you?

A    I don't know at that time if I knew it or didn't know it.  I'm not -- sitting here today, I don't know what it is.

Q    And you don't know whether that email didn't produce to us in this case, do you?

A    I'm not aware.

Q    All right.  Let's go to EL-18.  Let me know when you're there.

A    I'm there.

Q    And you recognize EL-18?

A    I do.

Q    And what is it?

A    It's an analysis of the rights offering, varying claim sizes and rights offering sizes and looking at equity, pro forma equity ownerships, lots of numbers on this page obviously.  But it's dealing equity ownerships, pro forma for various rights offering assumptions.

Q    Okay.  And let's take a look at -- I'd like you to read to yourself, there's text at the top of this, we'd call it a one pager?

A    Sure.

Q    Okay.  There's text at the top of this one pager.  It

ROOPESH SHAH - CROSS BY MR. MERVIS                107

starts with assumes highly illustrative 1.2 billion set up.

Just read that till the end, to where it says backstop.

A    I'm there.

Q    You've had a chance to read it?

A    Yeah.

Q    And what this means is that depending on various assumptions around the rights offering, it could have a material effect on equity splits, and there was a cost to participating versus not participating.  Is that fair?

A    That's fair.

Q    Go to the right hand side, please.  You'll see there's a one, two, three on the far right hand side?

A    Yes.

Q    And under three, it says ERO discount results in ERO participants taking outside share of pro forma equity per dollar invested.  You see that?

A    Correct.

Q    Do you know whether this one pager was shared with CVC?

A    I'm not sure.

Q    Would there be a way for you to find out?

A    I'm not sure.

Q    Okay.  Let's go to Shah exhibit 23.  Oh, I'm sorry. Yes, EL-23.  I have -- yes, you're correct, EL-23.  You there, Mr. Shah?

A    I am.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Q    All right.  This is a pretty dense email so I'm going to have a bunch of questions for you.  Again, this is another one of these emails that your team is on but you're not on, correct, email chains?

A    Correct.

Q    All right.  So let's look at the first email in time which is on the first page of exhibit 23.  That's from Mr. Griffin, and the subject is C-One to dos.  You see that?

A    Yes.

Q    And he writes, what I'm tracking today, and then there's a one.  And then he says, clean up share claims breakout calc with PJ.  Do you see that?

A    I do.

Q    And PJ refers to P-J Hyer at CVC, does it not?

A    Presumably.

Q    And if you go to the second page, Bates stamp 3076, you'll see, if you go a couple lines down, there's a reference that says term sheet will reflect the following updates.  Do you see that?

A    Yes.

Q    And the first one is -- it says, $330 million settlement claim size, and then it says, subject to agreement with CVC on MW calc.  You see that, right?

A    I do.

Q    Okay.  And MW there refers to make whole, doesn't it?

ROOPESH SHAH - CROSS BY MR. MERVIS                    109

A      I believe so.

Q      Okay.  And if you go down a little bit further, there's like a B, on the left hand side.  And Mr. Griffin writes, will share the PPT with PJ who requested it.  And the PPT means power point, right?

A      Correct.

Q      And PJ again is P-J Hyer, at CVC?

A      Correct.

Q      Then if you go to the first page of exhibit 23, Bates stamp 3075, and again this is an email from Mr. Griffin to various of your colleagues but not you, do you see that?

A      Yes.

Q      And what Mr. Griffin writes is by the way, minor text edits here.  Will send to PJ shortly, again P-J Hyer?

A      Presumably.

Q      Parens, he had requested the PPT version along with the MW calc.  And again power point refers -- PPT refers to power point?

A      Correct.

Q      And MW calc refers to Make Whole calculation, correct?

A      I believe so.

Q      What is shown below that line of text, Mr. Shah?

A      It's a snip from a side-by-side evaluation of various offers going back and forth with presumably some minor text edits in the part that's circled.

ROOPESH SHAH - CROSS BY MR. MERVIS          110

Q    Well, when you say going back and forth, going back and forth within your team?

A    These side by sides were ultimately for the benefit of the special committee to see the progress of where the negotiations are.  So at this point, we may have been drafting it among the team for the ultimate -- with input, but for the ultimate goal of sharing it with the special committee to evaluate offers and counteroffers.

Q    I see.  All right.  So we've now seen a few emails. We've had -- and if you need to flip back and forth, just let me know.  But we had exhibit EL-17 that was dated February 9th, the day after the PJT proposal, right?

A    PJT, yes.

Q    Yeah.  And then there was exhibit 19, which was February 10th, and then there was also exhibit 21 which was February 10th, and then there was also the one we just looked at, exhibit 23, which is February 12th.  Those are all internal discussions and communications and exchange of work product for your team, correct?

A    Correct.

Q    Okay.  Let's go to EL-24.  Let me know when you're there.

A    I'm there.

Q    Oh, great.  What is EL-24?

A    It's a side-by-side analysis of three iterations of

ROOPESH SHAH - CROSS BY MR. MERVIS                 111

proposal, the first proposal on Jan 10, the Ad Hoc Group
counter on Feb 8, and the Feb 13, presumably a proposed
counter back.

Q    And this was sent to PJT and -- this was sent to PJT,
correct?

A    I don't think this was sent -- I'm not sure.  I don't
think this was sent to PJT.

Q    You don't think it was -- okay.

A    I'm not sure, actually.

Q    All right.  You think this was a draft?

A    No.  What I don't know is whether this exact document
to PJT, or we only take the last column.  I just don't know
whether -- I don't recall whether we shared a side by side,
or we would sometimes just take the last column and share
that as the terms.  I just don't know.

Q    Okay.  Well, this is dated February 13th, yeah?

A    It is.

Q    Okay.  Could you -- well, I'm going to come back to
this, but can you go to exhibit EL-25.

A    Yeah, I'm there.

Q    At the bottom of the page -- well, why don't you tell
me, what is the email at the bottom of the page dated
February 13th?

A    It's communicating a term sheet counter.

Q    To who?

A    To PJT.

Q    Okay.  And by the way, looking at the folks who are copied on this, again we see Evercore, we see White & Case, we see AlixPartners, correct?

A    Correct.

Q    Latham's not copied?

A    Latham is not copied on it, no.

Q    All right.  Let's go back to EL-24.  Now on the second page, the first one that has terms on it, there's three columns.  You see that?

A    Yes.

Q    What are those three columns?

A    Again, it was the first column is summary of the terms from the initial company, January 10, term sheet, then a summary of the counter from the one-L Ad Hoc Group on February 8th, and then a counter, or a proposed counter back from the company dated as of February 13th.

Q    Okay.  And there's a box at the top of the page with like a color key.  Do you see that?

A    I do.

Q    That one says C-One response, and the other one says CVC response?

A    Yes.

Q    Okay.  Now if you look at the -- you go to the next page, and you look at the box that says one-L term loan,

one-L note.  So we see in the original company proposal from January, claim amount to include Make Whole premiums slash prepayment premiums.  Do you see that?

A    I do.

Q    And then you see the counter on the 28th, from the PJT Gibson group reject.  Do you see that?

A    I do.

Q    And then there's the new C-One counter.  CVC claim amount of $330 million.  Do you see that?

A    I do.

Q    And isn't it true that that figure likely includes at least some amount of Make Whole, correct?

A    Correct.

Q    And in the email that we saw -- go back to exhibit 23, the email that we saw one day earlier, your colleague, Mr. Griffin, was talking about sending PJ a Make Whole calculation.  Do you see that?

A    I do.

Q    All right.  Let's go back to exhibit 24.  And let's go to the next box on the third page of the exhibit page -- slide page two.  And it says CVC note.  And if you look at the top line, the original company proposal was NA.  Do you see that?

A    Well, there's other bullets there, not just --

Q    Yeah, I'm talking about the top line, just that first

ROOPESH SHAH - CROSS BY MR. MERVIS                    114

line, or the first bullet?

A     Yes.

Q     Okay.  And then directly to the right, the PJT group counters and says no participation in backstop for DIP rights offering.  Do you see that?

A     I do.

Q     Okay.  Look at the counter, the 2/23 -- the 2/13 counter.  There's a lot of text there in blue.  Can you explain for the Court what it is that's being proposed there?

A     It's that the proposal -- it's CVC's feedback on this proposal to participate pro rata with the first lien lenders on all matters, and to propose that their claim be allowed in an amount of 330 million.  There's obviously other things there but the bulk of it is that the claim amount of 330 million and to be able to participate pro rata with the one-L lenders on all matters.

Q     So in this deck from Evercore, White & Case and AlixPartners, that proposal's being made, correct?

A     Correct.

Q     All right.  Why don't we go to exhibit EL-25.  And again this is another -- oh, actually we looked at this one, so we can skip this one.  All right.  Let's go to EL-32.  Let me know when you're there.

A     I'm there.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

ROOPESH SHAH - CROSS BY MR. MERVIS                    115

Q    Okay.  And again, let's go back to the -- let's go to the last page, or the second to the last page, 2704.  Let me know when you're there.

A    Okay.

Q    And this is dated February 27th, right?

A    Yes.

Q    And actually, let me go back one.  Go to EL-29.

A    Okay.

Q    Let me know when you're there?

A    I'm there.

Q    Okay.  Great.  You recognize this document?

A    I do.

Q    What is it?

A    It looks to be a term sheet response from the one-L Ad Hoc Group dated February 27th.

Q    Okay.  Now let's go back to EL-32.  And again, if you go to the Bates page with 2704, there's an email also dated February 27, 2024.  Do you see that?

A    Yes.

Q    And it is from P-J Hyer at CVC, to Evan Levine at Evercore.  Do you see that?

A    I do.

Q    And Mr. Hyer writes, Evan, we're trying to get in front of our senior team tomorrow a.m.  Do you see that?

A    I do.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 115

Q      You don't know what that means, do you?

A      Right.  I do.

Q      Oh, really, okay.  What does it mean?

A      They're trying to get in front of their senior team tomorrow a.m.

Q      Fair enough.  But you don't know what about?  Mr. Shah, you got me.

A      I didn't know if that was the question.  I'm not trying to get you.  I did not know --

Q      And I wasn't suggesting you were, but what I meant -- maybe I'll ask a better question.  You're not sure what they were getting in front of their senior team about, right?

A      I have a pretty good sense.  I mean they -- whenever we got a proposal, they would then have to communicate to the senior team and figure out how to respond.  So I guess I can't say that for sure because I'm not PJ.  But it was typical that when there were term sheets going back and forth, when there was a response, they would want to get in front of their senior team, brief them and figure out how to respond.

Q      Fair enough.  Next sentence says the sooner you are able to share a strawman of the term sheet math, or hop on the phone to discuss with us and walk through live the better.  And you understand that when he says the sooner you, he means at least Mr. Levine if not your entire team,

ROOPESH SHAH - CROSS BY MR. MERVIS                117

correct?

A    Correct.

Q    Let's go to the first page, page 2703.  And there's an email in the middle from Mr. Lieu.  Do you see that?

A    I do.

Q    And again, you're not on this email.  But the recipients are Mr. Hyer and -- Mr. Hyer from CVC, and Mr. Levine from Evercore.  Do you see that?

A    I do.

Q    And Mr. Lieu writes, PJ, please find attached an updated ERO spreadsheet with a couple of clarifications after discussion with PJT.  Do you see that?

A    I do.

Q    And the third bullet, he writes, CVC inclusion in the steer co (phonetic) would increase steer co claims, I-E, the AHG excluding CVC is meant to represent 67 percent of the one-L claims.  Do you see that?

A    I do.

Q    And do you have any understanding of the significance of the reference to 66.7 percent?

A    Well, that's obviously a confirmable majority in court, and so when we were looking at numbers and equity splits and things like that, we always had to assume that the Ad Hoc Group got to that majority because there was no guarantee there was ever going to be a deal with CVC.  So we wanted to

Supp. App. 117

make sure that in the math we ran, there was a scenario where the Ad Hoc Group was at two-thirds.

Q    At the time this was written though, the members of the Ad Hoc Group did not have, at least by claim amount, 66.7, correct, in class three?

A    I think that's right.

Q    Or I shouldn't say class three.  In the one-L group?

A    Correct.

Q    All right.  Let's go to EL-33, please.  And again this is a shorter email chain.  You've got it in front of you?

A    I do.

Q    Okay.  So we'll see there's an email from Mr. Hyer, to Mr. Florant, copying Mr. Levine and Mr. Lee, and it says can you please share the file we're reviewing -- we were reviewing.  I don't -- I know it won't be clean and final, but the math is fine as I need it for modeling asap.  Do you see that?

A    I do.

Q    And do you know what file that is that's being referred to there?

A    I don't know offhand.

Q    And you can't say with any specificity why your team was reviewing whatever this file was with CVC, correct?

A    I don't know the file, but I know why we were -- I do know why we were continually reviewing files and analysis

ROOPESH SHAH - CROSS BY MR. MERVIS                    119

with CVC.

Q    Let's go to EL-35.

A    Okay.

Q    What is EL-35?

A    Another side-by-side analysis as between the Ad Hoc Group's 2/27 proposal to the company's proposed 2/29 counter.

Q    Well, okay, it is a side-by-side analysis, but it also represents a proposal, right, from the -- the Debtors are sending this as a proposal, a counter to the last Ad Hoc Group proposal?

A    Correct.  The only reason I come -- coming back to it is that may be right.  If this was what was attached, I have no reason to quibble.

Q    Okay.

A    Oftentimes, you go to a special committee, you'll show the side by sides.  We don't always communicate the side by sides to the other side just as PJT often came back and only showed the latest proposal.  So I'm happy to accept that it was if it was.  But I can't say sitting here for certain, this is what went across with the two columns, as opposed to just the last column.

Q    Okay.  And the date of this document is February 29, 2024?

A    Correct.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

ROOPESH SHAH - CROSS BY MR. MERVIS                    120

Q    And the exhibit EL-32, which is again an exchange between Mr. Hyer and your team was dated the day before, correct?

A    Correct.

Q    And in fact, there were two emails that were -- well, one was -- yeah, there was one dated the 28th, and then EL-33 was dated the 27th, right?

A    Yes.

Q    Okay.  Let's take a look at AHG 35, and again, this is labeled Evercore, White & Case and AlixPartners, right?

A    Yes.

Q    Latham is not on this deck, is it?

A    No.

Q    Okay.  I want to focus on two places.  If you can go to the first page -- well, I guess it's the second page of the exhibit, first page with the columns.  And actually, let me go down, let's go down to the next page and go to the column that says exit capitalization.  Do you see that?  I'm sorry, exit capitalization, and then there's a subcolumn, incremental capital raised at emergency.  You see it?

A    I do.

Q    Okay.  I want to focus on a few of these line items. So in the one-L AHG 2/27 counter, there's a bullet point. It's about five down, I think, that says backstop, colon, backstop by one-L AHG.  Do you see that?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

A    I do.

Q    And then if you trace it to the right, you'll see the Debtors response, correct?

A    Correct.

Q    And it says backstop by the one-L AG, and CVC.  Do you see that?

A    Right.  You said it's the Debtors response.  The Debtor was going back.  This particular response is coded blue. That was input from CVC which we were communicating back to the other side in a consolidated response.

Q    Okay.  I didn't mean to ignore the color.  I'm saying the deck came from the Debtors, yeah?

A    Correct.

Q    So then let's look at something we haven't looked at before.  Backstop fee, that's on the -- if you look at the one-L AHG 2/27 counter, backstop fee, 10 percent payable in equity.  And I think we talked about this before, but backstop fee is another way of saying put option premium?

A    Correct.

Q    Okay.  And so what the one-L AHG group, or the AHG was proposing was a 10 percent backstop fee.  And then if you go back -- if you go across to the 2/29 counter, you see backstop fees, and I guess this one's in red, so we'll call it the C-One response.  And the proposal is eight percent, right?

ROOPESH SHAH - CROSS BY MR. MERVIS          122

A    Correct.

Q    Okay.  Let's go to -- just give me one second.  Let's go to EL-39, please.  And what is EL-39?

A    A restructuring proposal from the one-L Ad Hoc Group dated March 5.

Q    Okay.  And if you could flip, you know, the page, and let's go to the third, or the slide number three, in the lower right hand corner.  And again, this is showing three columns, right, the one-L AHG 2/27 counter is on the left, the 2/29 counter is in the center, and the latest, the AHG counter on March 5 is on the right.  Do you see that?

A    I do.

Q    Okay.  And here we see the AHG agreeing to a change.  They have now agreed to let CVC be a backstop party.  Do you see that?

A    I do.

Q    But there's also a change to the backstop fee, right?  The Debtors proposed eight percent, and the AHG came back with 10 percent.  Do you see that?

A    I do.

Q    And 10 percent is the amount in the plan, is it not?

A    It is.

Q    So the AHG got -- the AHG at least on this one term got two points higher than what the Debtors had proposed, correct?

A    They'd initially proposed 10.  We countered at eight which would say the Debtors money, or if you will, and then they came back and repeating at 10.

Q    Okay.  So at the same time that the AHG agreed to let CVC into the backstop, it also stuck with its guns on a 10 percent fee, same term sheet?

A    It did.

Q    And then if you look down at the CVC note, and I think we've looked at the back and forth here, the AHG's response on 335 is agreed, and then the claim amount that they arrive at is -- or that they proposed is 213 million, correct?

A    Correct.

Q    And that is the amount of the allowed claim in the plan, is it not?

A    Correct.

Q    All right.  Just give me one second, Your Honor.  You talked a lot on direct about the value of negotiating with constituents, right, Debtors constituents?

A    Sure.

Q    And that's negotiating with different constituents is one way to try to forge consensus to get to an agreed plan of reorganization, correct?

A    Correct.

Q    Lenders in a particular group, say one-L term lenders, from the Debtors prospective, aren't they all the Debtors

ROOPESH SHAH - CROSS BY MR. MERVIS                    124

constituents?

A    The Debtor has many constituents for sure.

Q    Well, I guess what I'm asking, Mr. Shah, is Debtors negotiated with a particular group of one-L lenders, and I think you referred to them as constituents.  But the ones that -- the one-L lenders that you weren't negotiating with, they are also constituents of the Debtors, correct?

A    They are.

Q    And prior to the filing of the Chapter 11 cases, Evercore had a list from the company identifying -- it may not have been up to date, but identifying at least at some point in time who -- all the first lien term loan holders were, correct?

A    Correct.

Q    And originally, the very first iteration of the one-L group was Silver Point, Monarch and Kennedy Lewis, correct, those three bond holders?

A    Correct.

Q    And Evercore -- you already talked about -- I think you mentioned to Mr. Zakia that there were some one-L lenders who came to you and you sort of introduced them to the Ad Hoc Group, is that fair?

A    Yes.

Q    Okay.  But what you didn't ever do was reach out to any of the lenders on that one-L list to see if they might be

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 124

ROOPESH SHAH - CROSS BY MR. MERVIS                125

interested in engaging in negotiations with the Debtors,
correct?

A    I don't think I've ever done that but I didn't do that
here.

Q    You didn't do it here.  Okay.  Mr. Shah, you don't
recall ever seeing a proposal from CVC in the form of a term
sheet, or term sheet comments that were actually in writing,
correct?

A    I'm not sure of the form they came.  Bullets came from
somewhere, sometimes from counsel to counsel, or
communicated over the phone, or there may have been emails.
I just -- I don't recall sitting here today what the form of
it was.

Q    Well, you certainly don't recall during the course of
these negotiations seeing CVC sent a term sheet itself,
alone, with the one-L AHG, correct?

A    Sending a term sheet directly from CVC to the one-L
AHG?

Q    Correct.

A    Correct.

Q    You have not seen it?

A    I have not seen that.  Typically we were -- they were
giving us their viewpoints on what was acceptable treatment
to them, and we would put it in a term sheet and color code
it, and send it to the other side.  But I don't believe to

ROOPESH SHAH - CROSS BY MR. MERVIS          126

the best of my knowledge, they shared a term sheet directly to the AHB.

MR. MERVIS:  Your Honor, let me just check with the people who do the work, before I pass the baton to --

THE COURT:  Absolutely.  Take your time.

MR. MERVIS:  -- Mr. Hillman.  Thank you, Mr. Shah. I'm going to turn it over to my partner.

THE COURT:  Okay.

MR. MERVIS:  Thank you, Your Honor.

MR. HILLMAN:  Thank you, appreciate the indulgence.

THE COURT:  No.

MR. HILLMAN:  We're tag teaming.  David Hillman, Proskauer Rose, for the record.

BY MR. HILLMAN:

Q    Good afternoon.  Mr. Shah, how are you?

A    Good.  How are you?

Q    Great.  I think you have the document that you discussed under direct.  I have it as EL-46.  Let me know if you can get your hands on that.

A    I have it.

Q    Your Honor, do you have that?  And you recognize this document, right?

A    I do.

Q    This is the bench marking analysis, right, comparing

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

ROOPESH SHAH - CROSS BY MR. MERVIS                127

the rights offering in converge one, to other rights offerings, right?

A    The document is the minutes but yes, that is a page as part of that.

Q    Sorry.  Yeah, I already jumped to that page.  I'm at, for the record, it looks like it's page 22 of 28.  I'm going on the top.  There's a Bates stamp for the filing number, page 28 -- 22 of 28.  Let me know when you're there.

A    I'm there.

Q    This is the bench marking analysis?

A    Yes.

Q    And you created this document?

A    I oversaw the creation.  My team would have.

Q    Yeah.  And you're familiar with the comps that are in this analysis, right?

A    Again I can't recite every detail.  I'm familiar generally with the comp, yeah.

Q    All right.  Ultimately, as the leader of the team, you vetted the comps that went into this analysis, right?

A    Correct.

Q    And you are presenting it to the Court as an illustration of 24 rights offerings that you believe are comparable to the rights offering here in converge one, right?

A    Well, I think we're not saying that we're presenting

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 127

exactly what they were.  All of the rights offerings that are $100 million or greater since 2018, and we're not opining on any individual one's comparability per se.

Q    But you picked them because you believe they're comparable, right?

A    We picked them because it's a stated -- they weren't cherry picked or hand picked.  There were by the criteria that's clear.  It was since 2018, 100 million or greater. So  may be more, some may be less.  The point of presenting a wide set is to even out differences of any one if you're trying to select them.  There's no -- I didn't pick per se these comps.  There was a date range and an amount range but they weren't otherwise selected in any way.

Q    That's helpful. And all of these comps, one through 24, involved an equity rights offering, right?

A    Correct.

Q    In a Chapter 11 case, right?

A    I believe so.

Q    Now you list the exhibit lists a host of metrics that you looked at for each comp, right?

A    Correct.

Q    Generally it's the top row company name, filing date, you see that, right?

A    I do.

Q    And so you looked at the rights offering amount, right?

A    Yes.

Q    And one of the things you looked at in this heading of backstop consideration is two components, or more than two components, but you looked at the stated hold back, right?

A    Correct.

Q    And we've been using so many terms here today.  The stated hold back is the put option premium?

A    No.

Q    Okay.  The stated hold back is not the put option premium?

A    No.

Q    Which column is the stated -- excuse me, is the put option premium?

A    The stated backstop --

Q    And the stated hold back is what we've been calling the backstop?

A    No.

Q    Which is the stated -- which line here is the backstop?

A    The one that says stated backstop.

Q    Okay.  So I apologize.  Which column is the direct allocation?

A    The one that says stated hold back.

Q    Thank you.  I apologize about that confusion.  That was confusion on my part.  For the chart, you don't list whether there was a market test for any of the rights offerings in

ROOPESH SHAH - CROSS BY MR. MERVIS                130

the 24 comparable companies, right?

A    Correct.

Q    And in the chart, you don't list whether there was an objection by a creditor to the equity rights offering, right?  You don't identify that, right?

A    Correct.

Q    And you don't identify in the chart whether there was a court ruling on the objection to the rights offering, right?

A    Correct.

Q    And on the chart, you don't list whether there was a settlement of a dispute over the equity rights offering, right?  I'm just asking you if it's on the chart?  You don't show it on the chart, right?

A    No.  What I don't know is whether these numbers would reflect a settlement which is possible, but there's no notation of a settlement, correct.

Q    Okay.  So let's look at one that I know you're familiar with, number four on the list, TPC Group.  You see that one, right?

A    I do.

Q    And you're familiar with that one because you were involved in the case, right?

A    I was involved.

Q    I was involved in the case too.  You remember that?

A    I wouldn't necessarily lead it day to day, but I do

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 130

ROOPESH SHAH - CROSS BY MR. MERVIS                131

recall that.

Q    Right.  And that's because your firm was the banker for the first lien ad hoc majority group, right?

A    Correct.

Q    You were working with the Paul Hastings team, right?

A    Correct.

Q    You were involved with it.  It's just that it's Evercore.  You were personally involved, right?  You might not have been leading but you were involved?

A    I was involved.  You're going to test my memory and I don't know where that is, but yes, I was involved.

Q    It's not that long ago.  It's 2022.  That ring a bell?

A    I don't remember what I had for breakfast yesterday morning, but yes, it was 2022.

        MR. HILLMAN:  Yeah, I feel the same way.  So it was the same play book used in TPC for an equity rights offering, right?

        MR. ZAKIA:  Objection, Your Honor.

        THE COURT:  I didn't hear the objection.

        MR. ZAKIA:  I don't know what he means by play book in the question.

        MR. HILLMAN:  I'll withdraw the question.

        THE COURT:  I think that's a fair --

BY MR. HILLMAN:

Q    In TPC, there was an equity rights offering, right?

A    There was.

Q    In TPC, there was a direct allocation, right?

A    I believe that's right.

Q    In TPC, there was a backstop fee, right?

A    Correct.

Q    In TPC, there was no market test for the direct allocation or the backstop fee, right?

A    I believe that's right.

Q    And it was the direct allocation and the backstop in TPC were exclusively reserved for the majority lenders, your client, right?

A    I believe that's right.

Q    And there was no market test, right?

A    Not that I recall.

Q    And that case was before Judge Goldblatt in Delaware, right?

A    Yes.

Q    And there was a minority group, an excluded group that was challenging the equity rights offering, right?

A    Correct.

Q    I was representing the excluded group, right?

A    I believe so.

Q    Made the same arguments before Judge Goldblatt about 203 North LaSalle and unequal treatment, right?  You remember that?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

ROOPESH SHAH - CROSS BY MR. MERVIS                    133

A    Vaguely.  I was not -- I understand.

MR. HILLMAN:  And you remember Judge Goldblatt was critical of the equity rights offering in TPC?  You remember that, right?

MR. ZAKIA:  Objection, Your Honor, the witness is asked to opine on how the Court ruled in another case, and also have a chance to (indiscernible).

MR. HILLMAN:  I'm not asking him to opine on the efficacy of what Judge Goldblatt said.  He was involved with another case that is remarkably similar, and there was discussion in court, and I just want to explore that discussion with the witness.

THE COURT:  I'll allow it.

BY MR. HILLMAN:

Q    Judge Goldblatt was critical of the equity rights offering, right?

A    I don't believe I listened to that hearing.  As I said, I did not lead it day to day, so my memory of it is beyond being hazy is also highly imperfect.  I did not lead that --

Q    You have a general recollection of that?

A    I don't really at this point.

Q    So if I gave you the transcript of the hearing where the court was critical of the equity rights offering, I think you'd agree with me that would help refresh your recollection of what he said?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 133

ROOPESH SHAH - CROSS BY MR. MERVIS                134

A    I'd be seeing the words for the first time.  I did not listen to that hearing, nor read the transcript.  So I don't know if I would agree with or not.

Q    But -- well, you were involved in the case, right?

A    As I said, I did not lead it day to day.  Being a member of the team, copied on a few emails does not necessarily mean that I recall all of it, or was seeing the blow by blow.

MR. HILLMAN:  Your Honor, I've given opposing counsel a full copy of the transcript.  I wanted to show the witness one page, and I have for Your Honor, just so we didn't kill a lot of trees, the first page, the one page and the last page.  I would appreciate the opportunity to just show this to the witness and hand it up to Your Honor.

MR. ZAKIA:  Your Honor, at this point, I'm going to object (indiscernible).

THE COURT:  Yeah, I'm going to sustain --

MR. ZAKIA:  (Indiscernible).

THE COURT:  -- the objection.  He said he hadn't listened to the hearing and doesn't recall so he wouldn't know what would -- the recollection would be refreshed at this point.  He said he didn't listen to the hearing, so I'm not sure what recollection is being refreshed.

MR. HILLMAN:  Allow me two foundational questions --

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 134

THE COURT:  I think that's fair.

MR. HILLMAN:  -- and if they don't succeed, then I'll move on.

BY MR. HILLMAN:

Q    I appreciate, sir, that you may not recall being at the hearing, or hearing the words for the first time by Judge Goldblatt.  But do you have a general recollection of your involvement in TPC, that there was some comments from the judge about the equity rights offering during the hearing? Do you just have that general recollection?  That's my only question.

A    I do not.

Q    Okay.  Thank you.  There was a settlement in TPC, right?

A    Even of that I'm not sure which maybe shows you how much I put things out of my mind after they're done.

Q    Okay.  On direct, I think you said -- strike that.  You can market test an equity rights offering, right?  Yes, or no, you can market test an equity rights offering, correct?

A    I don't know that that's a yes or no question, right. What I was going to say is I think you can physically go approach third parties with an offer to invest equity, and I think the viability and implementation of it.  So I don't know when you say you can but I don't know that it's a viable market test.

Q    Well --

A    The point of a market test is to solicit viable, implementable alternatives.  I just wanted to -- you know.

Q    Let's now talk about converge one for a moment.  You're a banker doing this.  Did you say more than 25 years?

A    Correct, and it's a hazy memory, so --

Q    You know what a market test is, right?

A    I do.

Q    Market test is exposing an investment opportunity to some competitive tension, to third parties, right?

A    Correct.

Q    And in your career, I'd bet -- I know you said 24 cases, but I'd bet you have sought market indications of interest for DIP financing all the time, right?

A    Correct.

Q    It's a market test.  You go out with a teaser to seek capital for a DIP, right?

A    Under a DIP, correct.

Q    And I'd bet you've done that countless times for exit debt financing where a company needs debt financing, and you go out and you market exit financing, right?

A    For exit debt financing, correct.

Q    But when it comes to selling equity as a means to raise capital, are you suggesting you can't market test a capital raised at the forum of distribution is equity rather than

ROOPESH SHAH - CROSS BY MR. MERVIS                137

debt?  You're not suggesting that, right?

A    Well, I'm suggesting -- you said you can have a market test at debt.  Typically not, you can but typically not.  The difference with equity -- again I'm not trying to quarrel with could you go out and ask the question.  But I believe there's perhaps a difference in implementing a market test of third party debt versus raising -- versus the equity stock.

Q    I want to get this straight.  The company, converge one is looking to raise $245 million, right?

A    Correct.

Q    The company chose to raise to raise that capital by issuing equity, right?

A    Correct.

Q    I want to know, yes or no, could you go and solicit third parties for that capital?  Yes or no?

A    I don't know that I can because I don't know that I can implement it, so I don't know how to solicit something that I don't know that I can implement.  The point of competitive tension is to create tension on alternatives that one can implement so --

Q    Well, maybe what you're getting at is that nobody would -- if you found third party capital, the Ad Hoc Group that controls 80 percent of the votes wouldn't -- it's not implementable because they would vote against it?  Is that

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

ROOPESH SHAH - CROSS BY MR. MERVIS                138

what you're suggesting?

A    I didn't have support for any other plan.

Q    Oh, so the 80 percent blocker that the Ad Hoc Group holds means it would be a fool's errand to run a market test to raise capital?  Is that your testimony?

A    I don't know that I'm under any obligation to but among all the goals as I stated before, one of which for the Debtor was to find an implementable proposal, an implementable restructuring plan.  I don't know that alternative equity a way from the voting majority is an implementable proposal.

Q    Got it.  So your point is not that you can't seek (indiscernible), but in this case, because the 80 percent holders wanted to provide the capital, it wouldn't be implementable?  That's your testimony, right?

A    I didn't have support for any alternative equity.

Q    But I want the Judge to understand from an experienced banker, isn't it possible to raise equity capital by going to the market, separate and apart from whether or not there's an 80 percent block?  It's possible to raise equity capital through the market test, right?

A    The point --

Q    It's a simple question.

A    I think the point of the exercise is you raise equity capital for a plan that can be confirmable.  Raising equity

Supp. App. 138

capital for a plan that is not confirmable doesn't sound to me like a viable exercise.

Q   I know.  You keep resisting this notion -- I'm going to ask you one last time.  Putting aside whether or not a majority of lenders who have the votes to block anything, don't you agree with me that it is possible to raise equity capital in the market, yes or no?

MR. ZAKIA:  Objection, Your Honor, asked and answered.

MR. HILLMAN:  Actually he --

THE COURT:  Overruled.

MR. HILLMAN:  -- refuses to answer this question.

THE COURT:  I don't know that he refuses but you can ask him that question.

MR. SHAH:  I don't know how to answer.  When you ask me to presume a antithetical, you've said presume -- take one piece of logic and ignore it, and then is the other thing possible.  I guess if I take the thing that makes it impossible, sure it's possible.

BY MR. HILLMAN:

Q   Okay.  In fact, you're aware of other instances where bankers have been in Chapter 11 bankruptcy cases and they have sought to go to the market to raise equity capital, right?

A   Sitting here today, I'm not sure.

ROOPESH SHAH - CROSS BY MR. MERVIS                    140

Q    Well, one of them's on your list, right, Monatronics (phonetic)?

A    Yeah, I'm not familiar with all of the differences. That was equity provided by -- I don't have the details in front of me.

Q    Well, Monatronics was actually a case here in the Southern District of Texas.  Did you know that?

A    I'm not sure.

Q    Actually before Judge Lopez, did you know that?

A    No, I don't know the jurisdiction of each of the cases here offhand.

Q    Actually PJT was the banker for the Debtor in that case, did you know that?

A    I did know that.

Q    In the disclosure statement in that case, it says the company with its advisors launched a marketing process to explore options to raise capital to potentially sell the company business for a goal of maximizing value to the company's stakeholders.  In connection with the strategic capital process, the company solicited proposals for potential equity investments, financing transactions, mergers or any combination of these options.  The company's advisors contacted over 40 parties that they believed could be interested in a strategic transaction with the company.

        MR. ZAKIA:  Objection, Your Honor, counsel is

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

ROOPESH SHAH - CROSS BY MR. MERVIS                    141

testifying from a document that's not in evidence.

MR. HILLMAN:  Sorry, I didn't hear, Your Honor.

THE COURT:  I'll sustain the objection.

BY MR. HILLMAN:

Q    That doesn't surprise you what I just read, right?

A    I have no basis to know.  It's hard to opine on an entire case from a few lines.

Q    Does the RSA prohibit the Debtor from seeking third party capital?

A    It has a fiduciary out so presumably it can do -- I don't know if -- I would have to refer to specific terms on whether it can affirmatively do it, but certainly if a superior offer were available, it did have an out to pursue that.

Q    And just to be clear, there was no search for alternative capital or equity capital in this case, right?

A    Correct.

MR. HILLMAN:  Thank you.

One second, Your Honor.

THE COURT:  Sure.

MR. HILLMAN:  No further questions, Your Honor.

THE COURT:  Thank you.  Any Redirect?

MR. ZAKIA:  Can we take five minutes, Your Honor?

THE COURT:  Sure.

THE CLERK:  All rise.

(Recess taken from 4:18 p.m. to 4:25 p.m.)

REDIRECT EXAMINATION

BY MR. ZAKIA:

Q    Before the cross-examination began, counsel put a couple of stipulations on the Record which we agreed to. One of them I think you heard was that the CVC loan was made prior to the appointment to the board of two independent directors that sit on the independent -- on the special committee, right?

A    Correct.

Q    Did you hear that?  Okay.

Prior to the appointment of those two independent directors, were there other independent directors already on the board?

A    I believe so.

Q    Okay.  Now we heard a lot of questions from counsel about the negotiations concerning the CVC claim amount.  Do you recall those questions that you were asked on cross-examination?

A    Yes.

Q    Now could you please explain to the judge what was the full claim amount that CVC originally sought in those negotiations?

A    It was the full amount of their claim plus fees plus accrued interest plus make whole, which was -- I don't

remember the exact number, but it was something like 350 million.

Q    And counsel talked a lot about the negotiations back and forth between CVC -- well, who is CVC negotiating with with regard to its participation in the restructuring and its claim amount in this case?

MR. MERVIS:  Your Honor, I object to the form of that question.  I think it's fine for him to --

THE COURT:  Well, I'm going to sustain it because I didn't even understand it.

(Laughter)

MR. ZAKIA:  Well you helped me out.  Thank you.

MR. MERVIS:  I was going to try to help, but yes.

BY MR. ZAKIA:

Q    When CVC was negotiating, who were it's counterparties?

A    CVC was --

MR. MERVIS:  Sorry, Your Honor.  Again, that's stated as a fact.

THE COURT:  Hold on a second.

MR. MERVIS:  That's stated as a fact.  There's no CVC witness here to talk about who the counterparties are. So my objection to the form is perception, that's fine.  But stating it as a fact, that's not fine.

THE COURT:  I think that's fair.  I'll take it as perception.

ROOPESH SHAH - REDIRECT BY MR. ZAKIA                144

THE WITNESS:  From my perspective, they were negotiating the terms under which they would support a plan and were negotiating that as between basically the Debtor and the other -- the first lien lenders.

BY MR. ZAKIA:

Q    Okay.  And counsel asked you some questions about things that changed to the benefit of CVC through the course of those negotiations, right?

A    Correct.

Q    Did CVC give up anything in connection with those negotiations?

A    There were things that definitely went the other way, the claim sizing being one of the largest ones.

Q    Okay.  So could you explain to Judge Lopez what you mean by that?

A    The full amount of their claim again was -- I don't know the exact number, something in the order of magnitude of $350 million and over the course of negotiations, as we saw, they came down to 330.  Ultimately they settled on a claim amount of $213 million.

Q    And so what is the claim amount for CVC's debt position that's included in the calculations used for the Plan that's being -- we're seeking confirmation?

A    213 million.

Q    And again, how does that concur to the original full

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 144

ROOPESH SHAH - REDIRECT BY MR. ZAKIA                    145

claim amount that they sought?

A    Significantly less.  They sought the full amount, which as I said was around 350 million.

Q    Now one of the other areas that you were asked about was your evaluation of the fees being paid in connection with the backstop.  Did you hear that?

A    Yes.

Q    Now counsel asked you a whole bunch of questions about things that you did not include on your chart with regard to the various charts.  Why did you -- well, let me ask this: Does the failure to have considered whether there was an objection in the given case, whether there was a settlement in the given case for what part the case was pending?  Any of those factors change your view as to the reliability of the concept that you picked for the analysis that you made?

A    No.

Q    Why not?

A    I don't think those are ultimately relevant to the financial elements that we were comparing to, fees and hold backs and termination fees.  I think that while maybe it's nice to know, I don't think it's necessary to know specifically, but on a broad set of jurisdiction or someone objected or didn't object, those are to me extra or extraneous facts relative to what we were trying to assess.

Q    And the factors that you looked at with the concept

that your team filed for purposes of the analysis you performed in this case, how did those factors compare to what you looked at in any other case in which you run a similar analysis?

A    We run this analysis in all cases where we're assessing equity rights offerings and in this case the conclusion was -- as you can see on the page, the conclusion was that all of the elements here were well within the range of those counts.

Q    And in any of the other analyses that you have run in the various other cases in which you involved, did you include the factors that counsel asked you about in cross-examination?

A    Not that I'm aware of.

Q    Now I want to ask:  When you calculated the fees for the backstop, what size backstop did you use in order to run your analysis?

A    Whatever the proposed backstop was at the time.  So I think it was 240 for a long time.  It became 245 eventually.

Q    The full amount that the company was looking towards?

A    Correct.

Q    Why did you look at that amount as compared to the amount that needed to be raised excluding what was going to be contributed by the backstop parties?

A    Because there was no guarantee that the backstop

ROOPESH SHAH - REDIRECT BY MR. ZAKIA                147

parties would do it.  People have a right to subscribe later, once they get that right, but no obligation.  And so they were, from the company's perspective, committing to provide the full amount that was the amount that they were on risk for, and so the fee was on the full amount as it was in all the comps that we showed.

Q    And so when you -- just stepping apart from this case, in other cases when you and your industry run an analysis of backstop fees, do you use the full amount being raised or do you use the full amount being raised minus the amount to be contributed by the backstop parties?

A    All the percentages on that page were based on the amount raised because that's how they were agreed to in those backstop agreements.

Q    Now you were asked a lot of questions about a market test.  I want to ask a slightly different question.

Prior to the filing for bankruptcy, did any of the members of the minority Ad Hoc Group approach you and offer to contribute to an equity capital raise for the Debtors?

A    They did not approach us, period, let along specifically for an equity raise.  There was no contact at all that I'm aware of.

Q    At any point during these Chapter 11 cases did Debtors ever refuse to negotiate with anybody who approached them?

A    Not that I'm aware of.

ROOPESH SHAH - REDIRECT BY MR. ZAKIA                    148

Q    Now I want to be real clear about something.  You're an estate professional in this case, right?

A    Correct.

Q    Do you understand as an estate professional whom your duties run?

A    I do.

Q    To whom?

A    To the Debtors.

Q    Okay.  I want you to tell the Court in performing your duties in this case, were you working for the interest of anyone other than Debtors?

A    No.

Q    Were you working for the interest of CVC?

A    Not at all.

Q    Okay.  Could you tell us with regard to the many communications that counsel asked you about, where members of your team were providing information -- I think they even said they provided some data work product to CVC, why?  What was the role of Evercore in providing that information to CVC?  What were they doing?

A    To provide analysis and communicate offers from the First Lien Group.  It wasn't advice or recommendations, it was analysis so that CVC can go form their own view of what's acceptable and not acceptable.  The risk in any negotiation, again, there's words on a page and a party

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

ROOPESH SHAH - REDIRECT BY MR. ZAKIA                    149

misinterprets those words or doesn't know how to model them, so to make sure both sides are speaking from the same playing field, we would provide analysis to both sides. They ultimately have to go to their decision makers and take advice and make decisions.

Q    And what were you trying to accomplish by providing both sides with that information?

A    Speed and efficiency of negotiations because misunderstandings when you're moving really fast are the death of progress.  And so just making sure everybody understood the implications of what was being proposed by both sides so we could frankly push both sides together.

Q    Together towards what?

A    Toward the consensual resolution.

Q    And what did you ultimately achieve?

A    A consensual resolution.

Q    And why is that in the best interest of these Debtors and their estates?

A    Provides the speediest and most efficient path through these cases with the least disruption.

        MR. ZAKIA:  Thank you, Your Honor.  I have no further questions.

        THE COURT:  Any further Cross?

        MR. MERVIS:  Yes, Your Honor, I'll try to do it in four questions.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

RECROSS-EXAMINATION

BY MR. MERVIS:

Q    Mr. Zakia asked you about the amount of CVC's claim and I think you said 330 million?

A    I think I said with make whole, it was something around 350.  I don't remember the exact number.

Q    I guess it's going to be five questions.

That's the asserted claim amount, yes?

A    That is correct.

Q    The financing that CVC provided was provided within one year of the petition date, correct?

A    I believe that's right.

Q    And it was provided by an insider or an affiliate of an insider at the time that the Debtor was -- oh, sorry -- withdraw.  Let me ask a better question.

It was provided by an affiliate of the private equity sponsor of the Debtors at a time when the company was experiencing financial distress, correct?

MR. ZAKIA:  Your Honor, I'm just going to object to the extent that he's calling for a legal conclusion. This lay person's view was the financial condition of the company.  Those words have legally charged meaning and he's not --

THE COURT:  I agree.  I think he can speak as a lay.

ROOPESH SHAH - RECROSS BY MR. MERVIS          151

MR. MERVIS:  Yeah, I was only asking facts.

THE WITNESS:  It was provided within one year by an affiliate or an insider.  The company definitely the money, so again, I don't know if that's the indicator of distress.  I don't want to opine on distress.  The company definitely needed that money and was running out of money without it.

MR. MERVIS:  No further questions, Your Honor.

THE COURT:  Thank you.

Any further?

MR. ZAKIA:  I think we could stop here, Your Honor.  Thank you very much.

THE COURT:  Thank you very much for your time.

THE WITNESS:  Thank you, Your Honor.

(Witness steps down.)

THE COURT:  Okay.  Yes?

MR. MERVIS:  If I could speak, Your Honor?

I mentioned earlier that there was a couple of discovery issues that we wanted to raise with Your Honor.  And let me just preface it.  I'll try to be short.  I'm not asking for a ruling.  I'm really asking for guidance or put more specifically, preference of the Court.

THE COURT:  Okay.

MR. MERVIS:  In the Debtors' papers were referred to essentially as a gag flaw (phonetic) and that sort of

152

thing, but I will say that although we got into this case, you know, on a very speedy track, we have never once asked for this hearing to be adjourned and we're not asking for this hearing to be adjourned.

But we have worked very, very hard to try to understand the bases of privilege assertions over particular types of documents. And I want to explain what those documents are and then seek the Court's guidance.

So we are able to tell from privilege logs that are of various quality -- and I'm not -- when I say that, I'm not accusing anybody of anything. We're all working very fast.

That the Debtor has withheld communications between CVC on the one hand and the Debtors' professionals on the other hand. And has asserted attorney-client privilege, work product, and common interest.

Now I don't understand the attorney-client privilege assertion because in White & Case's retention application, they made clear they resigned from representing CVC back in January. And here, we're only talking about February and early March. For the same reason, I don't understand the work product assertion.

So that brings us to common interest.

Now you heard just a minute ago rather impassionately that Evercore was simply acting as a middle

153

man.  Now what Your Honor finds about that and whether that -- what the legal pickings of it is, I'm not arguing that right now.  But it is completely inconsistent with the claim that Debtor professionals acting as a middleman to say -- and at the same time it had a common interest with the private equity sponsor.

You saw, Your Honor, in Exhibit -- it was BL Exhibit 1 -- or sorry, 21, and it might help to open it.

THE COURT:  Uh-huh.

MR. MERVIS:  And it might help for me to open it, too.

(Pause in the proceedings.)

MR. MERVIS:  And this is -- yeah, if you look at -- I went over this with Mr. Shah, but the email at the bottom of the page references an email that Evan -- that's Mr. Levine -- laid out, it laid something out in an email to CVC.  That document has not been produced to us and based on the logs that we've seen, we are 97 percent confident that that is one of the documents that common interest is being claimed over.

So as I said, I'm not asking for a ruling, but this is an important issue to us, given our entire fairness position, and we do think that some expedited briefing could be of value to the Court.  And we would propose -- and again, if Your Honor says I don't need briefing, I don't

154

want it, then I won't do it, but we would propose to provide a brief at some point tomorrow.  I don't want to get into the people who really do the work in the back, they may be a little tired, but to do it fairly quickly.  Debtor is going to respond as quickly as they can.

And we're hopeful that the Court will indulge us in making a ruling.

I'm not asking the Court necessarily to hold testimony open.  I don't know what these documents say and it may be that there is no need for testimony because they're self-explanatory.  But in our view they've been improperly withheld and they could be very consequential to an issue in this case that we, at least, think is very important.

Thank you.

THE COURT:  So let me just -- before I get a response, how many docs are we talking about?  I'm just trying to get my hands around the scope.

MR. MERVIS:  I wish I knew, Your Honor, but can I ask Mr. Sosa to try to address that?

MR. SOSA:  Yes, Your Honor.  So I think in the specific context that Mr. Mervis was speaking about, we're aware of at this time that must be a couple of dozen emails that we believe have been withheld improperly under the basis he explained.  Whether those have attachments might

155

increase the number, but it's a fairly narrow universe and the parties have met and conferred many times over the weeks and resolved many of their issues, but we have come to an impasse as to the documents that remain.

THE COURT: Okay. Thank you.

Let me hear from the other side then I share a thought.

MR. ZAKIA: So Your Honor, first of all, just to be clear, we produced a host of communications that involve the Debtors, the Debtors' professionals, and CVC and we looked at a whole bunch of them during the course of the case.

So it's certainly not the case that we're asserting some sort of blanket of protection, but let's be clear. I mean, there are CVC persons still on the board of the Debtors. So when counsel scratches his head and said, if you don't represent the -- that White & Case doesn't represent CVC, which is true, how could there possibly be attorney/client privilege with regard to people at CVC email addresses? They're still directors of the Debtors.

Notwithstanding the existence of the special committee, which as Your Honor has heard and will hear more about Wednesday, has responsibility for managing huge chunks of the case. It doesn't mean that the board doesn't exist and it doesn't mean that the Debtors --

156

(Automated announcement.)

MR. ZAKIA:  Somebody on the phone is wise about how interesting it is to listen to me.

(Automated announcement.)

THE COURT:  I apologize.

MR. ZAKIA:  So there certainly are legitimate bases in which -- notwithstanding the fact that White & Case certainly does not represent CVC in connection with these cases in which the privilege could exist.

Also, with regard to common interest, counsel says if they're just the middleman, there's no common interest. We're ignoring a whole host of other issues other than the negotiations that could exist with regard to certain issue in the Plan.

So I mean, it's hard to respond in the abstract. This issue has been out there for a while, as he said. They've consulted with the team for some period of time.  If they want to file something, we're happy to respond to it and see where that leaves us.

The only issue -- and I never said he was a fight, and I'm not accusing him of anything, but where that comment came from is -- and I want to be clear with the Court as I was clear with counsel.  We are -- we've been doing discovery in this case for several weeks.  It is critically important that this confirmation hearing conclude on time

157

and so I was a little concerned about the timing of raising this now after the witness is done testifying and so what we can't have is -- we need to hold the case open.

But we'll see what he asserts and we'll give our explanation and see where that leaves us.

THE COURT:  I think that would be helpful for me to just understand which docs you're after and a little bit of the bases of it, but it would help me because then it would help me identify kind of the scope of the docs that you're looking for and then allow them to respond, but they'd have to respond over the weekend and I can give a ruling on Monday -- at least I'd like to.

So I'd need any response.  If you file something by tomorrow, I'd ask them to respond by Monday at noon.

And I think what would be helpful for me to then understand, Mr. Zakia, is I'm speaking in the abstract now, but it would help me understand -- and I'll just use EL21 as an example.  If they identify, you know, the attached updated materials here, the difference between all the other presentations where there were updated materials presented to these same folks and then that deck, what makes that deck different than this deck.  And I may ask to just see it.

MR. ZAKIA:  Understood.

THE COURT:  You know, just a --- I think, you know, once I get my hands around the scope of what's going

158

on and your understanding as to why they're being withheld, give them an opportunity to respond and then we'll take a look at it and I'll just make the call.

I don't need legal briefing on the law, I just need to get a sense of the scope of the docs that you're looking for and why they're -- briefly why they're -- kind of what you're looking for and what you think they are.  So it's more kind of identifying docs.

I don't just need Bates numbers, you know, for example, I think it would be helpful -- well, I'll give you a little guidance here.  If you refer to -- you know, "EL21 refers to a deck attached materials.  We're looking for that deck and we believe that it's been withheld," or something like that, that would at least identify the doc then I can come back in and it would give me something more than just looking for ConvergeOne Bates label.

And then give you an opportunity to respond.  Then I don't think I need a long response.  I just need to kind of get it, your response.  And I may call parties in for kind of -- I don't know when you're flying back in, but maybe we can just do it telephonically.

MR. ZAKIA:  Understood.

THE COURT:  I'll figure it.  If you give me a response by that maybe I can just deal with it, but I got it.  We're going to finish on Wednesday one way or the

159

other, so that I just need to -- I can make the call quickly.

MR. MERVIS:  First of all, the gaslight comment wasn't from Mr. Zakia.  We've had a lovely relationship.

We will do our absolute best, Your Honor.  The fly in the ointment again, these logs that we've been given are hard to understand.

THE COURT:  Well, I got it.  Tell me the ones that you really care about, that you know that you care about.

MR. MERVIS:  And I think what we can do, Your Honor, we can certainly identify the types of communications that we believe could not possibly be privileged.

THE COURT:  Uh-huh.

MR. MERVIS:  And to the extent that we can tie them to what's in the logs that we've gotten, we will do our level best and we will also, if we need to -- I don't know if it helps Your Honor, explain why in some cases we can't do that because of the nature of the log.

THE COURT:  No.  I just need -- the other thing I need to understand is why it wasn't raised before.

MR. MERVIS:  Well, Your Honor, I don't want to --

THE COURT:  No, no, no, but it's --

MR. MERVIS:  -- I don't want to give you 27,000 reams of emails but we've been going around and around and around on this for a while.  And I -- let me put it this

160

way:  It was from our perspective an effort to resolve this without court intervention, but on -- I believe it was Thursday evening -- actually, what day is today?  Today is Friday.

It may have been Wednesday evening.  It became apparent during that meet-and-confer telephone conference that this was not bridgeable.  We have started on our brief, but candidly, Your Honor, I didn't want to file a motion to compel before today.  I didn't think it was appropriate, given that you'd be hearing the evidence today.  You'd be seeing some of the documents.

And I agree with Mr. Zakia, they have produced documents in this supposed middleman context.  And so we thought that it would -- the motion would make more sense in light of the evidence that you saw today.

THE COURT:  You wanted me to get a feel for the docs themselves, and then figure out.  I got it.  Okay.

MR. MERVIS:  Thank you, Your Honor.

THE COURT:  The only thing I would ask is that tomorrow -- I know I asked you to file something by tomorrow, but avoid the Friday Night Special, to the extent you can get something on file by, you know, Friday, I don't know by 6:00 or 7:00 p.m., I would appreciate it.

It'll just give me an opportunity to read it and digest it over the weekend, as well.

161

MR. ZAKIA:  We will.

MR. MERVIS:  We will, Your Honor.

MR. ZAKIA:  Your Honor may have made a mistake that I have recently made today.  Today is Friday.

THE COURT:  Oh, God.  I keep doing that, right?

(Laughter)

MR. ZAKIA:  Your Honor, I interpret it and this is --

THE COURT:  These days just blend in together.

MR. MERVIS:  Well, we could still respond on Monday, Your Honor, if you want.

THE COURT:  Yeah.  Well, that's right.  Maybe Saturday by --

MR. ZAKIA:  Can we say 8:00 Eastern, Your Honor?

THE COURT:  Yeah, yeah, no, no, I think that's fair.

MR. ZAKIA:  I didn't want to say.

THE COURT:  No, no, no, no, I think that's fair. I think that's entirely fair.  And today is Friday and they all blend in together at some point.

But I very much appreciate everyone's time.  I'll take a look at it and everyone's adjourned -- everyone's free to travel.  We'll adjourn for today.  I'm just going to sit here and gather my stuff and wish everyone safe travels back.

162

Thank you.

MR. ZAKIA:  We'll see Your Honor at 11:00 o'clock on Wednesday, but you may be speaking.

THE COURT:  Yep, absolutely.  Thank you.

MR. ZAKIA:  Thank you.

(Proceedings adjourned at 4:51 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #68679*

*DATE FILED:  MAY 30, 2024*

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

Supp. App. 162

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90194 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MEMORANDUM OF LAW
## IN SUPPORT OF (I) APPROVAL OF THE DISCLOSURE
## STATEMENT ON A FINAL BASIS AND (II) CONFIRMATION OF THE
## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
## OF CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

**TABLE OF CONTENTS**

Preliminary Statement.................................................................................................. 1

Background .................................................................................................................... 4

    I.    The Restructuring Support Agreement and the Plan ........................................ 4
    II.   The Solicitation Process and Plan Supplement................................................. 7
    III.  Voting Results.................................................................................................. 10
    IV.  Plan Objections ............................................................................................... 11

Argument .................................................................................................................... 12

    I.    The Court Should Overrule the Minority AHG Objection ............................. 12

        A.    The Proposed Standard of Review Is Inapplicable, and the Plan Satisfies It In Any Event ............................................................. 12

        B.    The Plan Provides the Same Treatment of Claims in Class 3 ............ 17

        C.    The Alternative Proposal Is Not Actionable or Confirmable............. 21

        D.    The Minority AHG's Vote Designation Request Is Unripe and Meritless ........ 24

    II.   The Disclosure Statement Should Be Approved on a Final Basis.................. 27

        A.    Creditors Received Sufficient Notice of the Combined Hearing and Objection Deadline........................................................................ 27

        B.    The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code ............................................................................... 28

        C.    The Debtors' Solicitation of Votes Complied With the Bankruptcy Code, the Bankruptcy Rules, and Scheduling Order ........................................... 33

    III.  The Plan Satisfies the Bankruptcy Code's Requirements for Confirmation and Should Be Confirmed.......................................................... 39

        A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code – § 1129(a)(1) ..................................................... 39

        B.    The Debtors Have Complied With the Applicable Provisions of the Bankruptcy Code – § 1129(a)(2).......................................................... 57

        C.    The Plan Was Proposed in Good Faith – § 1129(a)(3) ..................... 58

        D.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval – § 1129(a)(4)............ 60

        E.    The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders – § 1129(a)(5) ................................ 61

        F.    The Plan Does Not Require Governmental Regulatory Approval For Any Rate Changes – § 1129(a)(6)....................................................... 63

        G.    The Plan Is In the Best Interests of All the Debtors' Creditors – § 1129(a)(7)....................................................................................... 63

H. The Plan Has Been Accepted by Each Impaired Voting Class – § 1129(a)(8) ................................................................................... 64

I. The Plan Provides for Payment in Full of All Allowed Priority Claims – § 1129(a)(9) ................................................................................... 65

J. At Least One Impaired Class Has Accepted the Plan – § 1129(a)(10) ............... 66

K. The Plan Is Feasible – § 1129(a)(11) ................................................................. 66

L. All Statutory Fees Have Been or Will Be Paid – § 1129(a)(12) ........................ 68

M. The Plan Provides for Post-Effective Date Payment of Retiree Benefits – § 1129(a)(13) ................................................................................ 69

N. Sections 1129(a)(14) to 1129(a)(16) Do Not Apply to the Plan ........................ 69

O. Cramdown – § 1129(b)....................................................................................... 70

P. The Debtors Have Complied with Section 1129(d) of the Bankruptcy Code..... 72

Q. Modifications to the Plan ................................................................................... 72

Waiver of Stay of Effectiveness Is Appropriate ........................................................................ 73

Conclusion ................................................................................................................................. 74

ii

# TABLE OF AUTHORITIES

## CASES

*In re Adelphia Commc'ns Corp.*,
359 B.R. 54 (Bankr. S.D.N.Y. 2006)................................................................................25

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007)..............................................................................17

*In re Aleris Int'l, Inc.*,
2010 WL 3492664 (Bankr. D. Del. May 13, 2010).........................................................18

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988).........................................................................46, 73

*In re Apex Oil Co.*,
118 B.R. 683 (Bankr. E.D. Mo. 1990).............................................................................62

*In re Applegate Prop., Ltd.*,
133 B.R. 827 (Bankr W.D. Tex. 1991).............................................................................31

*In re Armstrong World Indus.*,
348 B.R. 136 (Bankr. D. Del. 2006)...........................................................................40, 63

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006)............................................................................................70

*In re Armstrong World Indus., Inc.*,
432 F.3d 507 (3d Cir. 2005).............................................................................................71

*ASARCO LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) ........................................................................................16

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) .........................................................................71

*Bank of America Nat. Tr. and Sav. Assoc. v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)...................................................................................................20, 63

*In re Beyond.com Corp.*,
289 B.R. 138 (Bankr. N.D. Cal. 2003) ............................................................................62

*In re Bigler LP*,
442 B.R. 537 (Bankr. S.D. Tex. 2010) ............................................................................50

*Brite v. Sun Country Dev. (In re Sun Country Dev.)*,
764 F.2d 406 (5th Cir. 1985).............................................................................................59

*Cadle Co. v. Mims (In re Moore)*,
608 F.3d 253 (5th Cir. 2010) ......................................................................48, 51

*In re Cajun Elec. Power Coop., Inc.*,
230 B.R. 715 (Bankr. M.D. La. 1999) .................................................................25

*In re Camp Arrowhead, Ltd.*,
451 B.R. 678 (Bankr. W.D. Tex. 2011) ...................................................53, 54, 57

*Carlson v. Hallinan*,
925 A.2d 506 (Del. Ch. 2006)..............................................................................16

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
860 F.2d 94 (3d Cir. 1988).................................................................................31

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986)..................................................................60

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009)....................................................12, 15, 45

*In re CHC Grp. Ltd.*,
No. 16-31854 (BJH), 2017 WL 11093971 (Bankr. N.D. Tex. Mar. 3, 2017) .............17, 18, 26

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010)..................................................................60

*In re CJ Holding Co.*,
597 B.R. 597 (S.D. Tex. 2019) ............................................................................53

*In re Crimson Expl. Inc. Stockholder Litig.*,
No. 8541-VCP, 2014 WL 5449419 (Del. Ch. Oct. 24, 2014) ...............................14

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) .................................................................70

*In re Dernick*,
624 B.R. 799 (Bankr. S.D. Tex. 2020) ...........................................................25, 26

*DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
634 F.3d 79 (2d Cir. 2011)...................................................................................71

*In re Drexel Burnham Lambert Grp. Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992)..................................................................58

*In re Dune Deck Owners Corp.*,
175 B.R. 839 (Bankr. S.D.N.Y. 1995)..................................................................25

ii

*In re Fieldwood Energy LLC*,
No. 20-33948 (MI), 2021 WL 2853151 (Bankr. S.D. Tex. June 25, 2021) ............................38

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship*
*(In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790 (5th Cir. 1997).....................58, 59, 66, 67

*Floyd v. Hefner*,
No. H-03-5693, 2006 WL 2844245 (S.D. Tex. Sept. 29, 2006)................................................31

*In re Food City, Inc.*,
110 B.R. 808 (Bankr. W.D. Tex. 1990)...................................................................................13

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................................70

*In re Gen. Homes Corp. FGMC*,
134 B.R. 853 (Bankr. S.D. Tex. 1991) ..............................................................................50, 51

*In re Glob. Safety Textiles Holdings LLC*,
No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009).............................73

*In re Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) .......................................................................................67

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II*
*(In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160 (5th Cir. 1993) ...........................39, 40, 66, 67

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007).............................................................................40, 50

*In re Heritage Org., LLC*,
376 B.R. 783 (Bankr. N.D. Tex. 2007)..................................................................................25

*In re Heron, Burchette, Ruckert & Rothwell*,
148 B.R. 660 (Bankr. D. D.C. 1992) .....................................................................................17

*In re Hunt*,
146 B.R. 178 (Bankr. N.D. Tex. 1992)..................................................................................27

*In re Idearc, Inc.*,
423 B.R. 138 (Bankr. N.D. Tex. 2009)..............................................................................48, 70

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) ......................................................................................25

*In re Innkeepers*,
442 B.R. 227 (Bankr. S.D.N.Y. 2010)...................................................................................16

iii

*Jacobson v. AEG Capital Corp.*,
50 F.3d 1493 (9th Cir.1995) ...................................................................................38

*In re J.D. Mfg., Inc.*,
No. 07-36751, 2008 WL 4533690 (Bankr. S.D. Tex. Oct. 2, 2008).......................................31

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986)....................................................................71

*In re Joint E. & S. Dist. Asbestos Litig.*,
982 F.2d 721 (2d Cir. 1992).................................................................................17

*In re Kolton*,
No. 89-53425-C, 1990 WL 87007 (Bankr. W.D. Tex. Apr. 4, 1990).....................................70

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
337 F.3d 314 (3d Cir. 2003).................................................................................31

*In re Landing Assocs., Ltd.*,
157 B.R. 791 (Bankr. W.D. Tex. 1993)............................................................25, 61, 63, 66

*In re Lason, Inc.*,
300 B.R. 227 (Bankr. D. Del. 2003) ....................................................................64

*In re LATAM Airlines Group S.A.*,
No. 20-11254 (JLG), 2022 WL 790414 (Mar. 15, 2022) .........................................15

*In re LATAM Airlines Group S.A.*,
No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. July 7, 2022)...........................18

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa L.P.)*,
115 F.3d 650 (9th Cir. 1997) ...............................................................................70, 71

*In re Lincolnshire Campus, LLC*,
441 B.R. 524 (Bankr. N.D. Tex. 2010)..................................................................60

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
150 F.3d 503 (5th Cir. 1998) ...................................................................31, 59, 60

*In re Mangia Pizza Investments, LP*,
480 B.R. 669 (Bankr. W.D. Tex. 2012).................................................................25, 26

*Matter of Assadi*,
No. 22-50452, 2022 WL 17819599 (5th Cir. Dec. 20, 2022)..........................................47, 48

*In re Mayer Pollock Steel Corp.*,
174 B.R. 414 (Bankr. E.D. Pa. 1994) ...................................................................67

iv

*In re Metrocraft Publ'g Servs., Inc.*,
  39 B.R. 567 (Bankr. N.D. Ga. 1984) ...................................................................32

*Mills Acquisition Co. v. MacMillan*,
  559 A.2d 1261 (Del. 1989) ................................................................................16

*In re Mirant Corp.*,
  348 B.R. 725 (Bankr. N.D. Tex. 2006)..........................................................50, 51

*Nat'l Convenience Stores v. Shields (In re Schepps Food Stores)*,
  160 B.R. 792 (Bankr. S.D. Tex. 1993) ...............................................................13

*In re Neff*,
  60 B.R. 448 (Bankr. N.D. Tex. 1985)..................................................................64

*New Cingular Wireless, LLC v. City of Brownsville, Texas*,
  No. 19-CV-91, 2019 WL 8499340 (S.D. Tex. Dec. 20, 2019)..............................26

*NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P.*
  *(In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419 (5th Cir. 2022) ..............55, 56, 57

*NLRB v. Bildisco & Bildisco*,
  465 U.S. 513 (1984)...........................................................................................59

*In re Ocean Shores Cmty. Club, Inc.*,
  944 F.2d 909 (Table) (9th Cir. 1991)...................................................................12

*In re Pacific Drilling S.A.*,
  2018 WL 11435661 (Bankr. S.D.N.Y. Oct. 1, 2018) ...........................................21

*In re Phx. Petroleum*,
  278 B.R. 385 (Bankr. E.D. Pa. 2001) ..................................................................32

*In re Pisces Energy, LLC*,
  No. 09-36591-H5-11, 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) ........40

*In re Placid Oil Co.*,
  753 F.3d 151 (5th Cir. 2014) ..............................................................................27

*In re Prussia Assocs.*,
  322 B.R. 572 (Bankr. E.D. Pa. 2005) ..................................................................67

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)................................................................................55

*Renee F. v. O'Malley*,
  No. 22-CV-04237, 2024 WL 894964 (S.D. Tex. Mar. 1, 2024)............................26

v

*Republic Supply Co. v. Shoaf*,
  815 F.2d 1046 (5th Cir. 1987) ....................................................................................54

*In re Roqumore*,
  393 B.R. 474 (Bankr. S.D. Tex. 2008) ......................................................................48

*In re Rusty Jones, Inc.*,
  110 B.R. 362 (Bankr. N.D. Ill. 1990) ........................................................................62

*In re Scioto Valley Mortg. Co.*,
  88 B.R. 168 (Bankr. S.D. Ohio 1988)........................................................................32

*In re Seegrid Corp.*,
  No. 14-12391 (BLS) (Bankr. D. Del. 2014) [Docket No. 244-3]...............................13

*In re Sentry Operating Co. of Texas, Inc.*,
  264 B.R. 850 (Bankr. S.D. Tex. 2001) ......................................................................73

*In re Sherwood Square Assocs.*,
  107 B.R. 872 (Bankr. D. Md. 1989) ..........................................................................62

*In re Star Ambulance Serv., LLC*,
  540 B.R. 251 (Bankr. S.D. Tex. 2015) ..............................................................12, 39

*In re Stratford Assocs. Ltd. P'ship*,
  145 B.R. 689 (Bankr. D. Kan. 1992) .........................................................................62

*In re TCI 2 Holdings, LLC*,
  428 B.R. 117 (Bankr. D. N.J. 2010) ..........................................................................17

*Texas v. U.S.*,
  523 U.S. 296 (1998)...................................................................................................24

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
  844 F.2d 1142 (5th Cir. 1988) ...................................................................................31

*In re Tex. Tamale Co., Inc.*,
  219 B.R. 732 (Bankr. S.D. Tex. 1998) ......................................................................27

*In re Toy & Sports Warehouse*,
  37 B.R. 141 (Bankr. S.D.N.Y. 1984).........................................................................67

*In re U.S. Brass Corp.*,
  194 B.R. 420 (Bankr. E.D. Tex. 1996) ................................................................31, 32

*In re U.S. Fidelis, Inc.*,
  481 B.R. 503 (Bankr. E.D. Mo. 2012)........................................................................54

vi

*In re Vitro Asset Corp.*,
No. 11-32600-HDH, 2013 WL 6044453 (Bankr. N.D. Tex. Nov. 14, 2013)........................40

*W. Real Estate Equities, L.L.C. v. Vill. at Camp Bowie I, L.P.*
(*In re Vill. at Camp Bowie I, L.P.*), 710 F.3d 239 (5th Cir. 2013)...........................................13

*Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*,
157 B.R. 100 (S.D. Tex. 1993) ....................................................................................32

*In re W.R. & Grace Co.*,
475 B.R. 34 (D. Del. 2012)..........................................................................................59

*In re Wool Growers Cent. Storage Co.*,
371 B.R. 768 (Bankr. N.D. Tex. 2007)........................................................................53

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ..............................................................................59

## STATUTES, RULES, AND OTHER AUTHORITY

11 U.S.C. § 101(31) ................................................................................................61, 66

11 U.S.C. § 157(b)(2)(L) ................................................................................................55

11 U.S.C. § 328(a) ..........................................................................................................60

11 U.S.C. § 330(a) ..........................................................................................................60

11 U.S.C. § 507(a) ..........................................................................................................68

11 U.S.C. § 1114..............................................................................................................69

11 U.S.C. § 1122(a) ..........................................................................................39, 40, 41

11 U.S.C. § 1123(a)(2)....................................................................................................42

11 U.S.C. § 1123(a)(3)....................................................................................................42

11 U.S.C. § 1123(a)(4)............................................................................................ *passim*

11 U.S.C. § 1123(a)(5)..............................................................................................43, 44

11 U.S.C. § 1123(a)(6)....................................................................................................44

11 U.S.C. § 1123(a)(7)....................................................................................................45

11 U.S.C. § 1123(b)(1) ...................................................................................................46

11 U.S.C. § 1123(b)(2) ..............................................................................................46, 47

Supp. App. 172

11 U.S.C. § 1123(b)(3) ..................................................................................................47, 49, 50

11 U.S.C. § 1123(b)(6) ......................................................................................................................50

11 U.S.C. § 1124..........................................................................................................................6, 46

11 U.S.C. § 1125(a) ..............................................................................................................29, 31, 33

11 U.S.C. § 1125(e) ....................................................................................................................37, 38

11 U.S.C. § 1125(g) ..............................................................................................................28, 29, 34

11 U.S.C. § 1126(b) ......................................................................................................28, 29, 30, 31, 33

11 U.S.C. § 1126(c) ....................................................................................................................36, 65

11 U.S.C. § 1126(e) ....................................................................................................................25, 26

11 U.S.C. § 1126(f)................................................................................................................34, 64, 65

11 U.S.C. § 1126(g) ..........................................................................................................................36

11 U.S.C. § 1127(a) ..........................................................................................................................72

11 U.S.C. § 1129(a)(1)................................................................................................................39, 57

11 U.S.C. § 1129(a)(2)................................................................................................................57, 58

11 U.S.C. § 1129(a)(3)....................................................................................................... *passim*

11 U.S.C. § 1129(a)(4)................................................................................................................60, 61

11 U.S.C. § 1129(a)(5)..........................................................................................................61, 62, 63

11 U.S.C. § 1129(a)(6)......................................................................................................................63

11 U.S.C. § 1129(a)(7)................................................................................................................63, 64

11 U.S.C. § 1129(a)(8)................................................................................................................64, 70

11 U.S.C. § 1129(a)(9)......................................................................................................................65

11 U.S.C. § 1129(a)(10)....................................................................................................................66

11 U.S.C. § 1129(a)(11)...............................................................................................................68, 68

11 U.S.C. § 1129(a)(12)...............................................................................................................68, 69

11 U.S.C. § 1129(a)(13)....................................................................................................................69

viii

11 U.S.C. § 1129(a)(14) .................................................................................................69

11 U.S.C. § 1129(a)(15) .................................................................................................69

11 U.S.C. § 1129(a)(16) ............................................................................................69, 70

11 U.S.C. § 1129(b) ...........................................................................................70, 71, 72

11 U.S.C. § 1129(d) .......................................................................................................72

Fed. R. Bankr. P. 2002(b) ..............................................................................................27

Fed. R. Bankr. P. 3016(c) ..............................................................................................33

Fed. R. Bankr. P. 3017(a) ..............................................................................................27

Fed. R. Bankr. P. 3017(d) ...........................................................................28, 34, 35, 37

Fed. R. Bankr. P. 3018(b) ...........................................................................28, 35, 36

Fed. R. Bankr. P. 3018(c) ...........................................................................28, 34, 35

Fed. R. Bankr. P. 3019 ...................................................................................................73

Fed. R. Bankr. P. 3020(e) .......................................................................................73, 74

Fed. R. Bankr. P. 9019 ............................................................................................47, 48

Fed. R. Bankr. P. 6004 ............................................................................................73, 74

Fed. R. Bankr. P. 6006 ............................................................................................73, 74

7 COLLIER ON BANKRUPTCY ¶ 1129.02
   (Richard Levin & Henry J. Sommer eds., 16th ed.) ...........................................57, 62

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") submit this memorandum of law in support of (i) final approval of the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 26] (the "**Disclosure Statement**") and (ii) confirmation of the *Joint Prepackaged Chapter 11 Plan of Reorganization for ConvergeOne Holdings, Inc. and Its Debtor Affiliates (Technical Modifications)*, filed contemporaneously herewith (as it may be amended, modified, or supplemented, the "**Plan**").[2]

### Preliminary Statement

1. The Plan should be confirmed. It is the culmination of months of arms'-length, hard-fought negotiations and is the best available option for the Debtors and their stakeholders. It contemplates a significant reduction in debt and, through the equity rights offering and exit ABL facility, gives the Reorganized Debtors ample resources to run their business and service their debt. It also leaves vendor, supplier, employee, and contract counterparty claims unimpaired.

2. It is not surprising that the Plan enjoys broad stakeholder support. Holders of Claims in the two voting Classes voted overwhelmingly to accept the Plan.[3] The message from the Debtors' creditors is clear. The terms of the Plan are reasonable and value-maximizing, and the Plan should be confirmed so that the Debtors can exit these Chapter 11 Cases and return to business as usual.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

[3] *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* (the "**Voting Report**"), filed contemporaneously herewith, ¶ 13 (certifying that over 80% in number and amount of voting Class 3 First Lien Claims accepted the Plan, as did 100% of voting Class 4 Second Lien Claims).

3.      The Plan would enjoy universal support if not for an ad hoc group holding, in the aggregate, approximately 11% of the First Lien Claims (the "**Minority AHG**").[4] The members of the Minority AHG voted to reject the Plan and objected to confirmation.[5] Their objection is baseless and should be overruled.

4.      The Minority AHG Objection is based on the false premise that the Debtors' decision to propose the Plan is subject to review under a strict entire fairness standard, supposedly made applicable by section 1129(a)(3)'s requirement that "[t]he plan has been proposed in good faith and not by any means forbidden by law." This argument ignores both the facts and the law. The Minority AHG ignores the fact that the Debtors' decision to enter into the RSA and propose the Plan were made by a special committee of the Debtors' board of directors (the "**Special Committee**"). The Special Committee was responsible for reviewing, evaluating, and approving all strategic and financial decisions related to the restructuring of the Debtors. The Special Committee is comprised of three directors, none of whom has any connection to, or financial interest in, the Debtors' private equity sponsor, CVC Capital Partners ("**CVC**"). Two of the three members of the Special Committee are Larry J. Nyhan and Sherman K. Edmiston III, both of whom are independent members of the board (the "**Independent Directors**"). The third member of the Special Committee is the Debtors' CEO, Jeffrey S. Russell.

5.      CVC and its affiliated directors played no role on the Special Committee. While it is true that CVC, like nearly all of the Debtors' other stakeholders, supports the Plan, its role in this process was that of a creditor and shareholder. CVC was always represented by its own

---

[4]     *See Supplemental Verified Statement of the Ad Hoc Group of Excluded Lenders Pursuant to Bankruptcy Rule 2019* [Docket No. 233] (Minority AHG disclosing holdings of approximately $164 million in principal amount of First Lien Claims, out of approximately $1.387 billion of total First Lien Claims).

[5]     *See Ad Hoc Group of Excluded Lenders' Objection to Confirmation of Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 266] (the "**Minority AHG Objection**").

2

counsel and it had no say in whether the Special Committee accepted the RSA or the Plan. The law is clear that, given these facts, the entire fairness standard is not applicable.

6. But, regardless of what level of scrutiny the Court applies, the evidence at the confirmation hearing will be clear: the Plan is the product of a fair process and achieves the best available outcome for the estates. The Plan was proposed in good faith and the legal requirements for confirmation are easily met.

7. The Minority AHG's disparate treatment argument is likewise baseless. The Minority AHG attempts to conflate the value that members of the First Lien Ad Hoc Group and PVKG Lender will receive on account of the commitment to backstop the Debtors' $245 million Rights Offering with the treatment that those parties will receive on account of their prepetition Claims. But the law is clear that creditors can receive value on account of new-money commitments that is not provided to all creditors in a class. The only requirement is that this value be provided in exchange for the new-money commitment. The evidence will prove that this is the case here. There is no disparate treatment.

8. Perhaps recognizing the fate of its legal arguments, the Minority AHG purports to offer a superior alternative plan. The Minority AHG's proposal is neither superior nor confirmable. It merely shifts value from a supposedly preferred supermajority of creditors to a slim minority of other creditors. It also dilutes recoveries to creditors by proposing additional financing fees for a new, third-party lender, and proposes to prime creditors without their consent. The alternative proposal lacks any meaningful stakeholder support and would extend these Chapter 11 Cases by months, at great cost and potential harm to the Debtors' business. No plan based on this proposal could be confirmed. And unlike the Debtors' Plan, this so-called alternative was not proposed in good faith. The Minority AHG waited to deliver this alternative proposal until three

3

weeks prior to confirmation—even though members of the Minority AHG knew about the Debtors' potential restructuring transactions by early February 2024. And the Minority AHG's apparent solution to the fact that its proposed alternative has almost no creditor support—and is therefore doomed—is to glibly suggest that it will somehow designate the votes of nearly 90% of the Debtors' capital structure. This is a litigation tactic, not a serious alternative to the Plan. The Court should ignore it.

9. As set forth in this memorandum, and as the evidence will show, the Plan and the Disclosure Statement satisfy all applicable requirements under the Bankruptcy Code. The Debtors respectfully request that the Court overrule the Minority AHG Objection, approve the Disclosure Statement on a final basis, and confirm the Plan.

### Background

### I. The Restructuring Support Agreement and the Plan

10. The Debtors encountered liquidity challenges in 2023 and early 2024 prior to the commencement of these Chapter 11 Cases, largely as a result of increased interest expense on the Debtors' funded debt.[6] In light of the Debtors' deteriorating liquidity position, in January 2024, the Boards of Directors of Debtors PVKG Intermediate Holdings Inc. and ConvergeOne Holdings, Inc. formed the Special Committee and delegated to it exclusive authority to review and negotiate potential restructuring transactions, including transactions implemented through chapter 11.[7] The Special Committee also received sole authority to determine, on behalf of the Debtors, to enter

---

[6] *Declaration of Salvatore Lombardi in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 4] (the "**First Day Declaration**") ¶¶ 6, 52-55.

[7] *Id.* ¶ 71.

into any restructuring transaction that was fair, equitable, and in the best interests of the Debtors and their employees, lenders, and other stakeholders.[8]

11. At the direction of the Special Committee, in January 2024, the Debtors and their advisors engaged with the First Lien Ad Hoc Group and the Prepetition ABL Secured Parties regarding the terms of potential restructuring transactions and debtor-in-possession financing facilities. The Debtors and their advisors also engaged with Latham & Watkins LLP, as counsel to the PVKG Lender in its dual capacities as the Holder of First Lien Claims and Existing C1 Interests, on these matters. After making substantial progress with the First Lien Ad Hoc Group, the Prepetition ABL Secured Parties, and PVKG Lender, the Special Committee authorized the Debtors to engage with the Second Lien Ad Hoc Group in February 2024. Negotiations among the Debtors and the Second Lien Ad Hoc Group, the First Lien Ad Hoc Group, the Prepetition ABL Secured Parties, and PVKG Lender culminated in an agreement in early April 2024 on the terms of restructuring transactions and debtor-in-possession financing facilities with overwhelming stakeholder support.

12. On April 3, 2024, at the direction of the Special Committee, the Debtors entered into the RSA with the members of the First Lien Ad Hoc Group, PVKG Lender, and the members of the Second Lien Ad Hoc Group.[9] The signatories to the RSA hold in excess of 81% of the First Lien Claims and 81% of the Second Lien Claims.[10] By entering into the RSA, these parties committed to support the Plan and the Restructuring Transactions that it implements.

---

[8] *Id*. ¶ 62.

[9] *Id.* ¶¶ 72-73.

[10] *Id*. ¶ 73; *Verified Statement of the First Lien Ad Hoc Group Pursuant to Bankruptcy Rule 2019* [Docket No. 65]; *Joint Verified Statement of Davis Polk & Wardwell LLP and Haynes and Boone, LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 127].

5

13.  The Plan provides that:

- The Company will (i) conduct a $159.25 million Rights Offering that is fully backstopped by certain members of the First Lien Ad Hoc Group and PVKG Lender, and (ii) receive a $85.75 million Direct Investment Commitment from those parties for the New Equity Interests in the Reorganized Debtors (both subject to increase with the consent of the Debtors and the Required Consenting Lenders). As part of these transactions, 95.625% of the New Equity Interests will be distributed to Holders of First Lien Claims and the Backstop Parties. As part of the Rights Offering, 65% of the 95.625% of New Equity Interests will be offered to all Holders of First Lien Claims on a pro rata basis, subject to a 10% Put Option Premium owed to the Backstop Parties and subject to dilution by the Management Incentive Plan. As part of the Direct Investment Commitment, the Backstop Parties have committed to purchase 35% of the 95.625% of New Equity Interests, subject to a 10% Put Option Premium owed to the Backstop Parties and subject to dilution by the Management Incentive Plan. The proceeds of the Rights Offering and Direct Investment Commitment will be used to repay the Term DIP Facility and provide the Reorganized Debtors with working capital.

- Holders of First Lien Claims could elect to receive (a) takeback term loans in a principal amount equal to their First Lien Claims multiplied by 20%, or (b) takeback term loans in a principal amount equal to their First Lien Claims multiplied by 15% and rights to purchase, through the Rights Offering, New Equity Interests in the Reorganized Debtors, subject to dilution by the Management Incentive Plan and fees owed to the Backstop Parties, including the Put Option Premium. As set forth in the RSA, these elections would be adjusted on a pro rata basis, based on oversubscription, so that participation in each option is capped at 50% of the First Lien Claims eligible to participate.

- Holders of Second Lien Claims will receive 4.375% of the New Equity Interests in the Reorganized Debtors, also subject to dilution by the Management Incentive Plan.

- General unsecured creditors will receive either reinstatement of their General Unsecured Claims pursuant to section 1124 of the Bankruptcy Code, or payment in full in cash either on the Effective Date or the date payment is due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to the General Unsecured Claims.

- All Existing C1 Interests will be cancelled and no distributions will be made on account of such Interests.

- Pursuant to a global settlement of all disputes related to the allowance of Claims arising from the Prepetition PVKG Note Purchase Agreement, PVKG Lender, the RSA signatories, and the Debtors have agreed that PVKG Lender's First Lien Claims on account of the Prepetition PVKG Notes will be allowed in the amount of $213 million.

6

14.     In addition to agreeing to support and vote to accept the Plan, members of the First Lien Ad Hoc Group and PVKG Lender also committed to provide $215 million in Term DIP Loans, backstop the $159.25 million Rights Offering, and fund the $85.75 million Direct Investment Commitment, subject to the terms of the RSA and Plan.[11]  Separately, and at the same time as execution of the RSA, the Prepetition ABL Secured Parties delivered a commitment letter agreeing to continue providing access to the Debtors' $250 million ABL Facility during these Chapter 11 Cases, subject to the terms and conditions of the DIP Orders.[12]

15.     On April 4, 2024, at the direction of the Special Committee, each of the Debtors commenced the Chapter 11 Cases in this Court.  On that date, the Debtors filed the Plan and Disclosure Statement.  The restructuring contemplated in the Plan will equitize approximately $1.6 billion of the Debtors' funded debt, enabling the Debtors to emerge from these Chapter 11 Cases significantly de-levered, well-capitalized, and poised for long-term growth and increased profitability, with a stronger balance sheet, adequate funding, and a competitive market position. Critically, confirmation of the Plan will preserve thousands of jobs and facilitate payment in full of all obligations owed to vendors, customers, and other general unsecured creditors in the ordinary course of business.

## II.     The Solicitation Process and Plan Supplement

16.     On April 3, 2024, prior to commencing the Chapter 11 Cases, the Debtors commenced the solicitation of votes on the Plan from Holders of First Lien Claims in Class 3 and Second Lien Claims in Class 4 (the "**Voting Classes**") entitled to vote as of April 1, 2024 (the "**Voting Record Date**").  The Debtors, through their claims, noticing, and solicitation agent, Epiq

---

[11]     First Day Decl. ¶¶ 7-8.

[12]     *Id*. ¶¶ 81-86.

7

Corporate Restructuring, LLC (the "**Claims, Noticing, and Solicitation Agent**"), transmitted solicitation materials (each, a "**Solicitation Package**") to each member of the Voting Classes by electronic mail.[13] The Solicitation Packages contained the Disclosure Statement (including the Plan and all other exhibits), a cover letter, the applicable Class 3 or Class 4 ballot, and, for Holders of Class 3 Claims, an election and subscription form for participation in the Rights Offering and the procedures and instructions for participating in the Rights Offering.[14]

17. The Disclosure Statement and applicable ballot included instructions to cast a vote to accept or reject the Plan.[15] This included the requirement to submit each ballot so that it was actually received by the Claims, Noticing, and Solicitation Agent by April 17, 2024 at 4:00 p.m. (prevailing Central Time) (the "**Voting Deadline**") in order to be counted.[16]

18. On the Petition Date, the Debtors filed the Scheduling Motion,[17] by which the Debtors sought a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan. On April 4, 2024, the Court entered the Scheduling Order, which, among other things, (a) established May 7, 2024 at 4:00 p.m. (prevailing Central Time) as the deadline to file objections to the adequacy of the Disclosure Statement or confirmation of the Plan (the "**Objection**

---

[13] Voting Report ¶¶ 8-10 (affirming service of Solicitation Packages); *see also Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline, Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline, (IV) Waiving the Requirement to Hold the Creditors' Meeting and File SOFAs, Schedules, and 2015.3 Reports, and (V) Granting Related Relief* [Docket No. 81] (the "**Scheduling Order**") ¶ 14 (approving service and contents of Solicitation Packages).

[14] Voting Report ¶ 8.

[15] *See* Scheduling Order, Ex. 3 at 1-2, 12-15 (form of Class 3 ballot and submission instructions); Ex. 4 at 1-2, 12-15 (form of Class 4 ballot and submission instructions).

[16] *Id*.

[17] "**Scheduling Motion**" means the *Debtors' Emergency Motion For Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline, Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline, (IV) Waiving the Requirement to Hold the Creditors' Meeting and File SOFAs, Schedules, and 2015.3 Reports, and (V) Granting Related Relief* [Docket No. 25].

**Deadline**") and (b) approved the forms of the Solicitation Procedures and Solicitation Packages and the form and manner of notice of the Voting Deadline, Objection Deadline, the hearing to consider final approval of the Disclosure Statement and confirmation of the Plan on May 17, 2024 at 1:00 p.m. (prevailing Central Time) (the "**Combined Hearing**"), and the opportunity to opt-out of certain releases contained in the Plan.[18]

19.     On or before April 8, 2024, the Debtors, through the Claims, Noticing, and Solicitation Agent, mailed a notice (the "**Combined Hearing Notice**") to all parties listed on the creditor matrix, which informed recipients of: (a) the Debtors' commencement of these Chapter 11 Cases on April 4, 2024; (b) the scheduling of the Combined Hearing; (c) the key terms of the Plan, including classification and treatment of Claims and Interests; (d) key dates and information regarding approval of the Disclosure Statement and Confirmation of the Plan and the Objection Deadline; (e) the multiple methods by which parties may request copies of the Plan and the Disclosure Statement; and (f) the full text of the release, exculpation, and injunction provisions set forth in the Plan.[19]  The Combined Hearing Notice also informed all parties, including Holders or potential Holders of Claims or Interests in non-voting classes, that they could opt out of, or object to, the Third-Party Release contained in **Article VIII.D** of the Plan.[20]  The Debtors further caused a notice of the Combined Hearing and the Objection Deadline to be published in the national edition of the New York Times on April 8, 2024 (the "**Publication Notice**").[21]

---

[18]   Scheduling Order ¶¶ 1-19.

[19]   Certificate of Service [Docket No. 153] (the "**Combined Hearing Certificate of Service**") ¶ 2; Scheduling Order, Ex. 2 (form of Combined Hearing Notice).

[20]   *Id*.

[21]   *See Proof of Publication* [Docket No. 129] (the "**Proof of Publication**").

Supp. App. 183

20. Holders of Claims and Interests that are either unimpaired (and therefore presumed to accept the Plan) or impaired and entitled to no distribution (and therefore presumed to reject the Plan) were not provided a Solicitation Package.[22]

21. On May 10, 2024, the Debtors filed the Plan Supplement, as required by the Plan.[23]

## III. Voting Results

22. The Debtors, through their Claims, Noticing, and Solicitation Agent, completed the final tabulation of votes following the Voting Deadline.[24] The Claims, Noticing, and Solicitation Agent reviewed all ballots received before completing the final tabulation.

23. As set forth in the Voting Report, the Voting Classes voted to accept the Plan by overwhelming majorities, and in sufficient number and amount for each Voting Class to accept the Plan under section 1126 of the Bankruptcy Code:[25]

| VOTING CLASS | ACCEPT | | REJECT | |
|---|---|---|---|---|
| | AMOUNT (%) | NUMBER (%) | AMOUNT (%) | NUMBER (%) |
| **Class 3** FIRST LIEN CLAIMS | $1,169,183,874.33 **(88.80%)** | 281 **(80.98%)** | $147,490,643.25 **(11.20%)** | 66 **(19.02%)** |
| **Class 4** SECOND LIEN CLAIMS | $252,000,000.00 **(100.00%)** | 61 **(100.00%)** | $0.00 **(0.00%)** | 0 **(0.00%)** |

---

[22] Scheduling Order ¶ 16 (providing that the Debtors need not serve Solicitation Packages on Holders of Claims not entitled to vote).

[23] "**Plan Supplement**" means the *Notice of Filing of Plan Supplement for the Joint Prepackaged Plan of Reorganization for ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 295]. The Debtors intend to file an amended Plan Supplement prior to the Combined Hearing.

[24] For additional discussion about, and a certification of, the solicitation and vote tabulation processes, see the Voting Report.

[25] Voting Report, Ex. 8.

10

24. In addition, even if the Class 3 vote of PVKG Lender is excluded from the vote tabulation on account of PVKG Lender's insider status for purposes of determining whether an impaired, non-insider class has accepted the Plan, Class 3 still accepted the Plan in amount and number well in excess of the requirements of section 1126 of the Bankruptcy Code:

| VOTING CLASS | ACCEPT | | REJECT | |
|---|---|---|---|---|
| | AMOUNT (%) | NUMBER (%) | AMOUNT (%) | NUMBER (%) |
| Class 3 FIRST LIEN CLAIMS (Excluding PVKG Lender's Vote) | $956,183,874.33 (86.64%) | 280 (80.92%) | $147,490,643.25 (13.36%) | 66 (19.08%) |

## IV. Plan Objections

25. Prior to the Objection Deadline, the Debtors received informal comments on the Plan from several parties in interest, including the United States Trustee. The Debtors resolved all of these comments to the satisfaction of the relevant parties by incorporating technical modifications into the Plan and agreed language into the Proposed Confirmation Order.[26]

26. There is only one objection to confirmation of the Plan: the Minority AHG Objection. The Minority AHG argues that the Plan should not be confirmed because (a) it is subject to review under the heightened "entire fairness" standard and does not pass muster under that standard; (b) it does not provide the same treatment to Holders of Claims in Class 3, as some class members will receive consideration on account of new-money commitments that other members of Class 3 have not provided; and (c) the Minority AHG's alternative proposal is a viable confirmable path forward, assuming the Debtors elect to pursue it and the Court disenfranchises virtually every creditor through a designation remedy that has no precedent and would represent a

---

[26] The "**Proposed Confirmation Order**" means the proposed *Findings of Fact, Conclusions of Law, and Order (I) Approving the Debtors' Disclosure Statement on a Final Basis and (II) Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* [Docket No. 296] (as may be amended, modified, or supplemented).

11

sea change for chapter 11 practice.[27]  The Minority AHG did not object to approval of the Disclosure Statement on a final basis.

<u>Argument</u>

**I.      The Court Should Overrule the Minority AHG Objection**

      **A.      The Proposed Standard of Review Is Inapplicable, and the Plan Satisfies It In Any Event**

27.      The Minority AHG claims that the Plan is subject to—and fails—the entire fairness standard of review based on PVKG Lender's affiliation with CVC.  According to the Minority AHG, the requirement under section 1129(a)(3) of the Bankruptcy Code that a plan has "been proposed in good faith and not by any means forbidden by law" ports state law standards of review relevant to a corporate fiduciary's decisions into the confirmation analysis under section 1129 of the Bankruptcy Code.[28]  The Court should reject the Minority AHG's attempt to rewrite plan confirmation standards.

28.      The good faith requirement under 1129(a)(3) "does not require the bankruptcy judge to determine whether the ends achieved in the plan contravene non-bankruptcy law."[29]  Thus, section 1129(a)(3) of the Bankruptcy Code does not import state law standards relevant to review of a corporate fiduciary's decisions where a plan transaction or settlement involves a statutory insider.[30]  Instead, section 1129(a)(3) requires the Court to determine only whether the Plan "is

---

[27]   *See generally* Minority AHG Obj. ¶¶ 29-60.

[28]   Minority AHG Obj. ¶¶ 29-39.

[29]   *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 263 (Bankr. S.D. Tex. 2015).

[30]   *In re Charter Commc'ns*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009) (rejecting the application of entire fairness review through section 1129(a)(3), finding that the "plain language of section 1129(a)(3) does not require that the Plan's contents comply 'in all respects with the provisions of all nonbankruptcy laws and regulations' because it 'speaks only to the proposal of a plan. . . .'" (quoting *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 59 (Bankr. S.D.N.Y. 1990))); *see also In re Ocean Shores Community Club, Inc.*, 944 F.2d 909 (Table) (9th Cir. 1991) ("We reject OSLOA's argument that the plan violated state law.  Bankruptcy Code section 1129(a)(3) bars confirmation of plans proposed in violation of law, not those that contain terms that may contravene law."); *In re Food City,*

proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success."[31]  The Minority AHG does not attempt to address that standard.  It notes that the Plan permits a purported insider to receive consideration on account of its new-money commitment, but does not describe how the process of developing the Plan was unfair or subject to the undue influence of any insider.  It was not.

29.     The limitations of section 1129(a)(3) are well-settled and consistent with the Bankruptcy Code's confirmation scheme.   Courts recognize that importing state law into section 1129(a)(3) where a Plan has been accepted by all voting classes would convert a consensual confirmation proceeding into a contested cramdown for the benefit of a lone hold-out creditor.[32]  In *Seegrid Corp.*, a single creditor objected to a plan that had been accepted by all voting classes and argued that the court should review the transaction under the entire fairness standard because a statutory insider stood to receive consideration as a creditor.[33]  The court overruled the objection, finding that "a new standard of review would be imported into the Code for protection of dissenting creditors in plans that are otherwise fully consensual within the

---

*Inc.*, 110 B.R. 808, 812-14 (Bankr. W.D. Tex. 1990) (rejecting argument that a plan in violation of state laws cannot be confirmed under section 1129(a)(3)).

[31]  *W. Real Estate Equities, L.L.C. v. Vill. at Camp Bowie I, L.P. (In re Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 247 (5th Cir. 2013).

[32]  The Minority AHG relies on a single case holding that section 1129(a)(3) imports Delaware law.  Minority AHG Obj. ¶¶ 29-60 (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999)).  Later cases have repudiated that holding, to the extent it existed at all.  *See* Dec. 18, 2014 Hr'g Tr. 7:4–20, *In re Seegrid Corp.*, No. 14-12391 (BLS) (Bankr. D. Del. 2014) [Docket No. 244-3] ("Accordingly, to the extent that the *Zenith* decision stands for the proposition that 1129(a)(3) embodies all of Delaware corporate law, and I'm not certain that it does, but if it does, I respectfully disagree.").  The Minority AHG's other cases apply state law to the *proposal* of a plan, not its contents.  As their own authority notes, "[t]o allow state law to control governance of a Chapter 11 debtor [during bankruptcy] would be to enable disgruntled shareholders to delay, and possibly short-circuit, the reorganization policy set forth in the Bankruptcy Code." *Nat'l Convenience Stores v. Shields (In re Schepps Food Stores)*, 160 B.R. 792, 799 (Bankr. S.D. Tex. 1993).

[33]  Dec. 18, 2014 Hr'g Tr. 3:9-25, *In re Seegrid Corp.*, No. 14-12391 (BLS) (Bankr. D. Del. 2014) [Docket No. 244-3].

13

meaning of section 1129(a)."[34]  The Court explained that the "inquiry into good faith, in particular, focuses on the plan process, and also whether the plan comports with the objective and purposes underlying the Code," but does *not* ask if a plan would "comply in its implementation with the entire fairness standard under Delaware corporate law."[35]

      30.      But even if this Court were to adopt this new approach to confirmation (it should not), it should still confirm the Plan.  As a threshold matter, there is no basis to apply entire fairness on these facts.  Even if CVC is treated as a controlling shareholder, as the Minority AHG argues, "[e]ntire fairness is not triggered solely because a company has a controlling stockholder."[36]  Unless the parties "engage in a conflicted transaction," the business judgment rule will apply.[37]  But here, there was no conflict in the negotiations.  The negotiations and transactions embodied in the Plan were authorized by unanimous votes of the Special Committee, which has the exclusive authority to review, negotiate, and approve restructuring matters on behalf of the Debtors.[38]  The CVC-affiliated directors did not stand on both sides of the transaction, because all were recused from negotiating and approving the Plan transactions.  As the Minority AHG aptly observes, "[t]he Debtors will point to the fact that the Plan, RSA and Equity Rights Offering were approved by the Special Committee as evidence of entire fairness."[39]  This is exactly right—because the presence of the Independent Directors making up a majority vote on the Special Committee is the precise

---

[34]   *Id*. 3:19-4:5; 4:15-6:8.

[35]   *Id*. 6:20-25.

[36]   *In re Crimson Expl. Inc. Stockholder Litig.*, No. 8541-VCP, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014).

[37]   *Id*.

[38]   First Day Decl. ¶ 71.

[39]   Minority AHG Obj. ¶ 36.

Supp. App. 188

safeguard that courts look to in evaluating whether a transaction is conflicted.[40]  The Independent

Directors made up two of the three votes on the Special Committee, and neither of them (nor the

third member of the Special Committee, Mr. Russell) are affiliated with or controlled by CVC.[41]

31.      The Minority AHG's argument that the presence of management on a special

committee necessarily taints its independence proves too much.  By this logic, no corporate

governance measures could preserve business judgment deference.  The Debtors and PVKG

Lender implemented an appropriate process for the negotiation of the Plan and Restructuring

Transactions, including by appointing the Independent Directors, forming the Special Committee,

and engaging separate advisors, each of which make entire fairness inapplicable to the Plan.

32.      The Minority AHG's attempt to invoke "heightened scrutiny" under the

Bankruptcy Code similarly fails.[42]  That standard applies to transactions that are *entirely* between

a debtor and its insiders—but here, several non-insiders also participated in developing the

transaction, including the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group.  When

numerous third-party, non-insider stakeholders are involved in negotiating and crafting a

transaction in good faith, courts apply the deferential business judgment standard.[43]

---

[40]  *See* Nov. 21, 2019 Hr'g Tr. 290:16-291:19, *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. 2019) [Docket No. 523] (business judgment review continues to be appropriate given the appointment of an independent special committee).

[41]  First Day Decl. ¶ 71.

[42]  Minority AHG Obj. ¶ 29 (citing *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020)).

[43]  *See, e.g.*, *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 790414 at *32 (Bankr. S.D.N.Y. Mar. 15, 2022) (holding that "[w]here, as here, numerous non-insider stakeholders were involved in good faith negotiations of a transaction" and "numerous proposed compromises and settlements of billions of dollars of claims" occurred in the negotiations, the "business judgment standard is appropriately applied") (citing *In re Residential Cap., LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y June 27, 2023)); *see also In re Charter Commc'ns*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009) (holding that the entire fairness standard did not apply when the "negotiations that resulted in the settlement were initiated by [the investment banker] for the benefit of the enterprise, not by [an investor] for his benefit, and that the settlement was approved by independent members of [the debtors'] board").

15

33.     Finally, even if the Court applied entire fairness or heightened scrutiny, the Plan clearly satisfies that standard.  Entire fairness has two parts—fair dealing and fair price.[44]  "'Fair dealing' focuses on the actual conduct of the corporate fiduciaries in effecting the transaction. . . . 'This includes how the transaction was initiated, structured, and negotiated and the timing of the transaction.'"[45]  Fair dealing can be established by providing evidence of careful consideration and process, including, but not limited to, financial analyses, independent advice, and careful deliberation.[46]  Fair price "relates to the economic and financial considerations of the transaction. . . . Courts have held that this element requires proof that 'the price offered was the highest value reasonably available under all the circumstances.'"[47]

34.     There is ample evidence to satisfy the most exacting review of procedural and substantive fairness here.  With respect to process, the Debtors and their independent advisors conducted extensive financial analyses and robust deliberation.  The process was transparent and all interested parties were able to participate.  With respect to substance, the Special Committee considered comparable fees paid in recent similar cases.  As the evidence at the Combined Hearing will show, the Debtors' investment banker, Evercore, reviewed 24 chapter 11 equity rights offerings of more than $100 million consummated since 2018.  Out of those equity rights offerings with a specified discount to plan value, the Plan's discount of 35% to plan value is between the mean and high-end range.  For those equity rights offerings with a specified holdback, the 35%

---

[44]     *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 407 (S.D. Tex. 2008).

[45]     *Id.* (internal citations omitted).

[46]     *See, e.g., In re Innkeepers,* 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (analyzing the negotiation process and whether the agreement was entered into with "due care"); *Mills Acquisition Co. v. MacMillan,* Inc., 559 A.2d 1261, 1280 (Del. 1989) (focusing on "the actual conduct of corporate fiduciaries in effecting a transaction, such as its initiation, structure, and negotiation"); *Carlson v. Hallinan*, 925 A.2d 506, 531 (Del. Ch. 2006) ("Fair dealing focuses on the actual conduct of corporate fiduciaries in effecting a transaction, such as its initiation, structure, and negotiation.") (internal citations omitted).

[47]     *ASARCO LLC*, 396 B.R. at 407 (internal citations omitted).

16

holdback is below the mean of 54.3%. The Put Option Premium of 10% is below the mean of 10.2% and the termination fee of 5% is below the mean of 9.9% for those equity rights offerings with each stated fee. Based on this, the Special Committee appropriately concluded that the Restructuring Transactions presented the best available option, that there were no better available alternatives, and that they would maximize value for the Debtors' estates. For these reasons, the Court should confirm the Plan even under a heightened standard of review.

## B. The Plan Provides the Same Treatment of Claims in Class 3

35. Section 1123(a)(4) of the Bankruptcy Code provides that a chapter 11 plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest. . . ."[48] The Bankruptcy Code "does not require identical treatment for all class members in all respects under a plan."[49] Instead, "the requirements of section 1123(a)(4) apply only to a plan's treatment on account of particular claims or interests in a specific class—not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions."[50] Section 1123(a)(4) includes no requirement that a debtor provide the same precise economic "opportunity" to every single creditor in a class.[51]

---

[48]  11 U.S.C. § 1123(a)(4).

[49]  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007); *accord In re CHC Grp. Ltd.*, No. 16-31854 (BJH), 2017 WL 11093971, at *12 (Bankr. N.D. Tex. Mar. 3, 2017).

[50]  *In re Adelphia*, 368 B.R. at 249-50.

[51]  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D. N.J. 2010) (rejecting argument that a plan provides disparate treatment in violation of section 1123(a)(4) when only certain creditors from a specific class were allowed to backstop a rights offering); *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992) ("[T]he 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money."); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (Bankr. D. D.C. 1992) (distinguishing the treatment of claims regarding plan recoveries, and treatment of claimants or potential claimants regarding releases and injunction).

17

36.     Because section 1123(a)(4) of the Bankruptcy Code applies only to treatment of claims, courts have consistently overruled disparate treatment objections premised upon certain creditors in a class receiving consideration for providing a new financing commitment, even where the opportunity to provide new money is not made available to all holders ratably.[52]  This Court (and others) have confirmed numerous plans providing such benefits to some, but not all, holders of claims in a particular class.[53]  It is also well-settled that creditors committing new money financing can be required to commit to vote in favor of a plan as a condition to participating in that financing.[54]

---

[52]    *See In re CHC Grp. Ltd.*, 2017 WL 11093971, at *12 (rejecting an argument that a plan provided disparate treatment in violation of section 1123(a)(4) when only certain creditors were permitted to participate in a backstop of a rights offering because all creditors that held the same tranche of debt were classified together and the backstop fees were provided in exchange for the backstop commitment); *In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *35-36 (Bankr. S.D.N.Y. July 7, 2022) (holding that "the Plan satisfies both aspects of section 1123(a)(4) because all Holders of Allowed General Unsecured Class 5 Claims have the same opportunity for recovery, are being treated equally, and that the Backstop Fees and Direct Allocation are distributed to the Backstop Parties in consideration for their willingness to backstop the Class C Notes and the ERO Rights Offering, not on account of their General Unsecured Class 5 Claims."); *In re TCI 2 Holdings*, 428 B.R. 117 at 133 ("The Backstop Fee proposed to be paid to the Backstop Parties is not a distribution to the Second Lien Noteholders on account of their Second Lien Note claims.  Rather, the Backstop Fee is offered as consideration for the $225 million commitment made by the Backstop Parties, which will be paid only if the $225 million is funded."); *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *14 (Bankr. D. Del. May 13, 2010) ("To the extent a Backstop Party receives additional or different consideration under the Plan, the Backstop Party receives such consideration in exchange for the commitments of the Backstop Party under the Equity Commitment Agreement or as part of the 9019 Settlement.")

[53]    *See, e.g.*, *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Aug. 27, 2020) [Docket No. 1411] (confirming the plan and finding the plan did not violate 1123(a)(4) even though backstop parties received a backstop premium); *In re Seadrill Ltd.*, No. 21-30427 (DRJ) (Bankr. S.D. Tex. Oct. 26, 2021) [Docket No. 1158] (confirming plan incorporating non-pro rata backstop); *see also In re Cineworld Grp., PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. May 2, 2023) [Docket No. 1625] (order approving holdback of 50% of new equity interests for the backstop parties); *In re TPC Grp., Inc.*, No. 22-10493 (CTG) (Bankr. D. Del. Oct. 5, 2022) [Docket No. 934] (order approving holdback of 45% of new equity interests for backstop parties); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Aug. 29, 2022) [Docket No. 1133] (order approving holdback of 30% of new equity interests for backstop parties).

[54]    *In re CHC Group*, No. 16-31854 (BJH) (Bankr. N.D. Tex. Dec. 20, 2016) [Docket No. 1379] ("Pursuant to the Plan Support Agreement, the Consenting Creditor Parties have agreed to support and vote in favor of the Plan. . . ."); *In re TCI 2 Holdings LLC*, No. 09-13654 (JHW) (Bankr. N.J. Jan. 5, 2010) [Docket No. 1076-5] ("Each Investor agrees that, for the duration of the Lock-Up Period, such Investor shall . . . timely vote or cause to be voted its claims arising under the Secured Notes to accept the Noteholder plan . . . ."); *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS) (Bankr. D. Del. Mar. 23, 2010) [Docket No. 1692-1] ("As long as a Termination Event [] has not occurred, or has occurred but has been duly waived . . . the Undersigned Holder agrees for itself that . . . it shall be bound to, and will, timely vote its Aleris Claims (and not revoke or withdraw its vote) to accept the Plan.").

18

37.     The Minority AHG ignores this well-settled law in alleging that giving the Put Option Premium and Direct Investment Commitment to members of the First Lien Ad Hoc Group and PVKG Lender, rather than all Holders of Class 3 Claims, violates section 1123(a)(4) of the Bankruptcy Code.[55]     The Put Option Premium and Direct Investment Commitment are not treatment on account of any party's Claims against the Debtors.  The Put Option Premium is "*consideration* for the Investors providing the Backstop Commitment" and the Direct Investment Commitment is the Investors' agreed "*obligation*" to directly fund 35% of the $245 million Rights Offering.[56]   The consideration provided for the commitment is reasonable, squarely within the range of comparable transactions, and an essential deal term necessary to obtain adequate financing commitments.  The Minority AHG tacitly acknowledges this in its proposal, which offers substantially similar economics to the parties agreeing to commit capital under that proposal.[57]

38.     The Plan provides identical treatment to each Holder of a Class 3 Claim: each Holder will receive its elected pro rata share of either (a) the Takeback Term Loan Recovery Option or (b) the Rights Offering Rights and Takeback Term Loan Recovery Option, as adjusted for oversubscription.[58]   Each member of the Minority AHG, each member of the First Lien Ad Hoc Group, and PVKG Lender will all receive the *same* treatment and recoveries on account of their Class 3 Claims under the Plan, irrespective of the Put Option Premium and Direct Investment Commitment.[59]   The Plan therefore satisfies section 1123(a)(4) of the Bankruptcy Code.

---

[55]   RSA, Restructuring Term Sheet, Ex. 3 (Equity Rights Offering Term Sheet), at 3.

[56]   *Id*. at 6 (emphasis added).

[57]   *See* Minority AHG Obj., Ex. 2.

[58]   Plan, Art. III.C.3.

[59]   *Id*.; *see also* Disclosure Statement, at 5 (summarizing recoveries for Class 3 Claims).

39.     *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership* does not hold to the contrary.[60]  In *LaSalle*, the Supreme Court addressed when it is permissible for holders of existing equity interests to receive or retain value on account of that equity interests where senior creditors are not being paid in full and the plan is subject to the cramdown requirements under section 1129(b)(2) of the Bankruptcy Code.[61]  The decision does not cite section 1123(a)(4) or consider whether certain holders of claims in an accepting class can receive the exclusive opportunity to provide new capital under a plan transaction accepted by all impaired classes.

40.     The Minority AHG asserts, without citing a single case, that *LaSalle* applies wherever a group of creditors receives an exclusive investment opportunity, and argues that the opportunity itself results in disparate treatment under section 1123(a)(4) of the Bankruptcy Code. More specifically, the Minority AHG claims that the "legal tests" in *LaSalle* and section 1123(a)(4) "are identical" because, "just as the absolute priority rule of section 1129(b) prohibits junior stakeholders from receiving property before senior stakeholders '*on account of*' their junior claims or interests, so does the equal treatment rule of section 1123(a)(4) prohibit a plan from providing unequal treatment for claims within the same class '*on account of*' those claims."[62]  But, as discussed above, all section 1123(a)(4) requires is that "each claim or interest of a particular class" receives "the *same treatment*."[63]  Here, each Class 3 Claim is receiving identical treatment under the Plan and the Put Option Premium and Direct Investment Commitment are not being provided on account of any Claim against the Debtors.

---

[60]     Minority AHG Obj. ¶¶ 44-48 (discussing *LaSalle*, 526 U.S. 434 (1999)).

[61]     *LaSalle*, 526 U.S. at 437.

[62]     Minority AHG Obj. ¶ 47 (emphasis added).

[63]     11 U.S.C. § 1123(a)(4) (emphasis added).

20

41.     The cases cited by the Minority AHG actually undermine the new rule they want to create.  The courts in *Pacific Drilling* and *Momentive* did in fact express concern regarding the fairness of backstop premiums in the context of those transactions.[64]  But each court ultimately approved the transaction at issue after parties consensually modified the terms to ensure that the backstop parties did not receive an outsized fee relative to their risk.[65]  Because the Put Option Premium and Direct Investment Commitment are entirely reasonable under the circumstances, the concern articulated in these other cases is neither relevant nor indicative of disparate treatment under section 1123(a)(4) of the Bankruptcy Code.

## C.     The Alternative Proposal Is Not Actionable or Confirmable

42.     The Minority AHG argues that, even if the Court denies confirmation of the Plan, the Debtors still have a realistic "option[] to restructure as a going concern."[66]  The Minority AHG delivered an Alternative Proposal to the Debtors on April 26, 2024, three weeks prior to the Combined Hearing.[67]  The Minority AHG knew about the Debtors' potential restructuring no later than February 9, 2024, and has not explained why it waited two and a half months to deliver its Alternative Proposal.[68]  Regardless, the Special Committee considered the Alternative Proposal

---

[64]     Minority AHG Obj.  ¶¶ 8, 52.

[65]     *In re Pac. Drilling S.A.*, 2018 WL 11435661, at *1 (Bankr. S.D.N.Y. Oct. 1, 2018) ("Before me is the Debtors' motion for approval of the terms under which additional equity capital will be raised in connection with the proposed plan of reorganization.  I will not keep everybody in suspense: I am going to approve the arrangements. . . ."); *In re Momentive Performance Materials, Inc.*, No. 14-22503-RDD (Bankr. S.D.N.Y.), June 19, 2014 Hr'g Tr. (attached as Ex. B to the Minority AHG Obj.) 198:5-11.  In addition, the Court in *Momentive* refused to subject approval of the backstop to entire fairness scrutiny where the debtors' private equity sponsor participated in the backstop but was only one of many creditors that participated, and where the backstop was approved by an independent committee of the debtors' board.  *In re Momentive Performance Materials*, at 185:24-186:15.

[66]     Minority AHG Obj. ¶ 54.

[67]     *Id.* Ex. 2.

[68]     *Amended Responses and Objections of the Ad Hoc Group of Excluded Lenders to Debtors' First Request For Production of Documents*, Resp. to Debtors' RFP No. 1 ("[T]he Excluded Lenders represent that certain of them became aware of discussions relating to a group of lenders potentially providing new money financing as part of a future restructuring on or around the following dates: . . . Cerberus Capital Management, L.P.: February 9, 2024.").

21

and on April 29, 2024, rejected it as not providing higher and better recoveries to the Debtors' stakeholders when compared to the Plan.[69]  The Minority AHG then modified the Alternative Proposal on May 8, 2024 (approximately one week prior to the Combined Hearing) with a purported commitment for a replacement Term DIP Facility.  Again, the Special Committee considered the revisions to the Alternative Proposal and concluded that the modified proposal was not viable and would not be better for the Debtors' stakeholders than proceeding with the Plan.[70]  The Minority AHG claims that the Alternative Proposal, as modified, "remed[ies the Plan's] legal infirmities" under section 1123(a)(4) by allowing all Holders of Class 3 First Lien Claims to receive New Equity Interests and to participate in the Exit Term Loan Facility.[71]

43.     The proposal itself suffers from the same problem that is the basis of the Minority AHG Objection.  It contemplates a 5% backstop fee, taken up by certain group members of the Minority AHG[72] and the third-party financing source they have partnered with to present a replacement DIP commitment at the eleventh hour.[73]  Of course, if the Put Option Premium under the Plan is impermissible disparate treatment because "none of that value is available for distribution" to parties not participating in the backstop, this proposed backstop fee would necessarily be impermissible.[74]

44.     Regardless, the Alternative Proposal has no prospect of providing for higher or better recoveries for the Debtors' stakeholders.  The Special Committee rejected it and determined to continue to pursue confirmation of the Plan because the alternative would force the Debtors to

---

[69]  *Id.* Ex. 3.

[70]  Letter from D. Hillman to B. Guzina (May 8, 2024); Letter from B. Guzina to D. Hillman (May 10, 2024).

[71]  Minority AHG Obj. ¶¶ 54-55.

[72]  *Id.*, Ex. 2, Alternative Proposal Term Sheet at 2.

[73]  Letter from D. Hillman to B. Guzina (May 8, 2024), Ex. A.

[74]  Minority AHG Obj. ¶ 42.

linger in bankruptcy without adequate funding or a reasonable prospect of confirming a plan on an acceptable timeline. This would result in significant harm to the business (that creditors will own post-emergence) and a substantial increase in administrative costs. The Alternative Proposal does not offer to fund the extended process or account for these risks. The financing it does propose will require priming Holders of First Lien Claims and Second Lien Claims without their consent, and it will dilute recoveries to those Holders through additional financing fees payable to the members of the Minority AHG and a new third-party lender. And the Alternative Proposal is patently unconfirmable given the lack of any meaningful stakeholder support.

45. The Minority AHG speaks for only 11% in amount of the Class 3 Claims. In contrast, the Plan is fully funded, backstopped, and supported by approximately 89% in amount of Class 3 Claims and 100% in amount of the Class 4 Claims that voted on the Plan. That support is based in part on the opportunity for Class 3 to elect to receive takeback debt and not equity (referred in the Plan's Class 3 Claim treatment as the Takeback Term Loan Recovery Option)— an election made by approximately 10% of the Holders of Class 3 First Lien Claims based in part on fund structures that prevent them from receiving equity. The Minority AHG's proposal lacks this option, further decreasing the likelihood that the alternative will ever enjoy meaningful stakeholder support.

46. The proposals are a transparent effort to activate the Special Committee's fiduciary duties for the purpose of the Plan objection, but they are not serious alternatives to the Plan. The Debtors have always been receptive to serious proposals. The Minority AHG declined to make any proposal until weeks after the Petition Date, and then, with the benefit of a roadmap from the Debtors on how to improve the proposal, declined to offer any aggregate improvement for creditors

23

relative to the Plan or show any stakeholder support necessary for confirmation. The Special Committee recognized that the decision to continue to pursue the Plan was not even close.

**D.      The Minority AHG's Vote Designation Request Is Unripe and Meritless**

47.      The Minority AHG asserts that, if this Court displaces the Debtors' business judgment and requires the Debtors to seek confirmation of the Minority AHG's Alternative Proposal, the members of the First Lien Ad Hoc Group and PVKG Lender are likely to vote to reject that proposal.[75] The Minority AHG then notes that it "intend[s] to seek entry of an order designating" those creditors' rejecting votes.[76] The Court should ignore this unripe and meritless request.

48.      The argument assumes a parallel universe in which the Debtors no longer enjoy exclusivity or the Special Committee flips 180 degrees on its view of the Alternative Proposal. In that universe, the Minority AHG states that it would seek to designate the rejecting votes of virtually every voting creditor outside of its group—approximately 90% in aggregate amount of prepetition funded debt claims. The suggestion that the Court should designate votes on an unfiled plan is unripe, as "it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."[77]

49.      But even if the Court considers the prospect of designating votes as a prerequisite to confirm the inferior Alternative Proposal, there is no basis for such a remedy. Vote designation

---

[75]      Minority AHG Obj. ¶ 58.

[76]      *Id*.

[77]      *Texas v. U.S.*, 523 U.S. 296, 300 (1998).

is an extreme, "draconian measure" applied only in rare circumstances.[78]  A party seeking to disallow votes under section 1126(e) "bears a heavy burden."[79]

50.  Courts have explained that bad faith sufficient to designate votes may exist where votes "were cast primarily for some ulterior motive only incidentally related to [a party's] status as a creditor."[80]  Impermissible ulterior motives may include the intent to "assume control of the debtor; put the debtor out of business or otherwise gain a competitive advantage; destroy the debtor out of pure malice; or obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize."[81]  In sum, designation may be appropriate if votes were cast with the "purpose of obstructing a fair and feasible reorganization[.]"[82]

51.  The assertion that a potential future vote by members of the First Lien Ad Hoc Group and PVKG Lender "would not be in good faith as [they] would be motivated by a desire to impermissibly receive value unavailable to the [Minority AHG], despite being in the same class," is rote speculation.[83]  The Minority AHG cites no evidence establishing that the members of the First Lien Ad Hoc Group or PVKG Lender have ever acted, or are likely to act, with improper

---

[78]  *See, e.g., In re Heritage Org., LLC*, 376 B.R. 783, 794 (Bankr. N.D. Tex. 2007) (denying "drastic" designation remedy where "designation . . . would only serve a strategic purpose"); *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 56 (Bankr. S.D.N.Y. 2006) (noting that the "ability to vote on a reorganization plan is one of the most sacred entitlements that a creditor has in a chapter 11 case"); *In re Dune Deck Owners Corp.*, 175 B.R. 839, 844 (Bankr. S.D.N.Y. 1995) ("Designation is the exception rather than the rule, and a creditor is free to vote its self-interest with respect to its claim."); *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 742-44 (Bankr. M.D. La. 1999) ("[I]n order for the court to designate votes, the party requesting such relief must introduce evidence of some act, scheme, plan, or device on the part of the acquiring creditor sufficient to sustain a finding of bad faith.").

[79]  *In re Indianapolis Downs, LLC*, 486 B.R. 286, 296 (Bankr. D. Del. 2013).

[80]  *In re Mangia Pizza Investments, LP*, 480 B.R. 669, 682 (Bankr. W.D. Tex. 2012).

[81]  *Adelphia*, 359 B.R. at 61 (citing *Dune Deck Owners*, 175 B.R. at 844-45); *In re Landing Assocs., Ltd.*, 157 B.R. 791, 803 (Bankr. W.D. Tex. 1993) (unacceptable ulterior motives include "malice, strikes, and blackmail").

[82]  *In re Dernick*, 624 B.R. 799, 809 (Bankr. S.D. Tex. 2020).

[83]  Minority AHG Obj. ¶ 58.

intent to "obstruct[]" the Debtors' reorganization,[84] or with some "ulterior motive" unrelated to their interests as creditors of the Debtors,[85] as is required under section 1126(e).[86]

52.     To the contrary, over the past several months, the members of the First Lien Ad Hoc Group and PVKG Lender have tirelessly worked with the Debtors to formulate a Plan that maximizes the value of the Debtors' estates, pays trade creditors in full, preserves thousands of employees' jobs, and minimizes the time the Debtors must spend in chapter 11—all to the benefit of each stakeholder of the Debtors, including the members of the Minority AHG.  The fact that Class 3 accepted this Plan by over 80% in amount and number is testament to the successful contributions by the First Lien Ad Hoc Group and PVKG Lender to this chapter 11 process—not their obstruction of it.  Further, the mere fact that the Plan implements the Put Option Premium and Direct Investment Commitment cannot be evidence of bad faith or an ulterior motive warranting vote designation, or else no plan containing these market-standard provisions could ever be confirmed.[87]  To the extent designation is ever properly raised, the Debtors reserve all rights to seek to designate the votes of the members of the Minority AHG, whose obstructionist tactics actually warrant that relief.

---

[84]   *Dernick*, 624 B.R. at 809.

[85]   *Mangia Pizza*, 480 B.R. at 682.

[86]   The Minority AHG's failure to cite any evidence in support of vote designation also supports finding that their vote designation argument is waived.  "[A]rguments may nonetheless be waived where the party fails to adequately brief its arguments, and support them with facts, evidence, or applicable authority." *Renee F. v. O'Malley*, No. 22-CV-04237, 2024 WL 894964, at *4 (S.D. Tex. Mar. 1, 2024) (internal citations omitted). "Litigants 'must press and not merely intimate' their arguments to avoid waiver." *New Cingular Wireless, LLC v. City of Brownsville, Texas*, No. 19-CV-91, 2019 WL 8499340, at *11 (S.D. Tex. Dec. 20, 2019) (quoting *F.D.I.C. v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994)).

[87]   *See In re CHC Grp. Ltd.*, 2017 WL 11093971, at *12 (confirming plan of reorganization accepted by creditors participating in a backstop that was not open to all creditors).

26

## II.    The Disclosure Statement Should Be Approved on a Final Basis

### A.    Creditors Received Sufficient Notice of the Combined Hearing and Objection Deadline

53.    Under Bankruptcy Rule 3017(a), a hearing on the adequacy of a disclosure statement generally requires twenty-eight (28) days' notice.[88]  Similarly, Bankruptcy Rule 2002(b) provides that parties in interest should receive twenty-eight (28) days' notice of the objection deadline and the hearing to consider approval of the disclosure statement.[89]  Courts in the Fifth Circuit and elsewhere have adopted the general rule that due process requires that "notice be 'reasonably calculated, under all the circumstances, to inform interested parties of the pendency' of a proceeding."[90]  When evaluating whether notice was sufficient, courts will consider "[f]irst, whether the notice apprised the claimant of the pendency of the action, and second, whether it was sufficiently timely to permit the claimant to act."[91]  Whether a particular method of notice is reasonably calculated to inform interested parties is determined on a case-by-case basis.[92]

54.    Here, the Debtors provided sufficient notice of the Combined Hearing and Objection Deadline under the Bankruptcy Rules.  As noted, on April 4, 2024, the Court entered the Scheduling Order, which, among other things, scheduled the Combined Hearing, set the Objection Deadline, and approved the form and manner of notice of the Combined Hearing

---

[88]    *See* Fed. R. Bankr. P. 3017(a) ("[T]he court shall hold a hearing on at least 28 days' notice to the debtor, creditors, equity security holders and other parties in interest . . . to consider the disclosure statement and any objections or modifications thereto.").

[89]    *See* Fed. R. Bankr. P. 2002(b).

[90]    *In re Placid Oil Co.*, 753 F.3d 151, 154 (5th Cir. 2014) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

[91]    *In re Tex. Tamale Co., Inc.*, 219 B.R. 732, 739-40 (Bankr. S.D. Tex. 1998) (applying two-part test) (citing *Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 518 (5th Cir. 1994) (same)).

[92]    *See In re Hunt*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992) ("Whether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case.").

27

Supp. App. 201

Notice.[93] The Combined Hearing Notice informed recipients of the commencement of the Chapter 11 Cases, the date and time of the Objection Deadline, and the date and time set for the Combined Hearing. The Debtors, through the Claims, Noticing, and Solicitation Agent, completed service of the Combined Hearing Notice on all entities listed on the Debtors' creditor matrix on April 8, 2024—29 days in advance of the Objection Deadline and 39 days in advance of the Combined Hearing.[94] In addition, the Debtors caused the Publication Notice to be published in the national edition of the *New York Times* on April 8, 2024, which, among other things, disclosed the date of the Combined Hearing and the Objection Deadline.[95] Each of the Combined Hearing Notice and Publication Notice also included instructions on how to obtain the Plan and the Disclosure Statement free of charge through the Claims, Noticing, and Solicitation Agent's website.

55. Given the ample notice the Debtors provided to parties in interest regarding the Objection Deadline and Combined Hearing, the Debtors have satisfied the requirements of the Bankruptcy Rules and due process.

**B.      The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code**

56. The Debtors commenced the solicitation of votes on the Plan from the Voting Classes prior to the Petition Date. To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, the Court must determine whether the solicitation complied with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 3017(d), 3017(e), 3018(b), and 3018(c).

57. Section 1125(g) of the Bankruptcy Code provides that:

> [A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with

---

[93] Scheduling Order ¶¶ 2-9.

[94] Combined Hearing Certificate of Service ¶ 2.

[95] *See* Proof of Publication.

28

applicable non-bankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable non-bankruptcy law.[96]

58. Specifically, section 1126(b) of the Bankruptcy Code provides that:

> [A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if— (1) the solicitation of such acceptance or rejection was in compliance with any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.[97]

59. For the reasons set forth herein, the Debtors satisfied the requirements of the Bankruptcy Code and the Bankruptcy Rules in connection with solicitation.

### 1. The Disclosure Statement Demonstrates That the Debtors Complied With Applicable Non-Bankruptcy Law With Respect to the Prepetition Solicitation

60. Section 1126(b) of the Bankruptcy Code expressly permits a debtor to solicit votes from holders of claims and equity interests prepetition without a court-approved disclosure statement if the solicitation complies with applicable non-bankruptcy law—including generally applicable federal and state securities laws or regulations. Alternatively, if no such laws exist, the solicited holders must simply receive "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code.[98]

61. To the extent that the Debtors' prepetition solicitation was deemed to constitute an offer of new securities, that solicitation was exempt from securities law registration requirements

---

[96] 11 U.S.C. § 1125(g).

[97] 11 U.S.C. § 1126(b).

[98] *Id.*

29

pursuant to section 4(a)(2), Regulation D, Regulation S, Rule 144A, and/or Rule 501 of the Securities Act, or any similar rules, regulations, or statutes, as applicable to any recipient deemed an offeree. Specifically, section 4(a)(2) and Regulation D of the Securities Act create an exemption from the registration requirements under the Securities Act for certain transactions not involving a "public offering," and Regulation S creates an exemption from the registration requirements under the Securities Act for offerings deemed to be executed outside of the United States.

62. The Debtors have complied with the requirements of section 4(a)(2) of the Securities Act, Regulation D, and Regulation S, as applicable, with respect to the requirements for transactions exempt from the registration requirements under the Securities Act in order to address the scenario where the prepetition solicitation of votes would be deemed a private placement of securities. Specifically, the prepetition solicitation was made to those Holders of Class 3 First Lien Claims and Class 4 Second Lien Claims who certified that they were one of the following: (a) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (b) not a U.S. person (as defined in Regulation S of the Securities Act), or (c) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), (7), (8), (9), (12), and (13) under the Securities Act of 1933, as amended), and any securities acquired by such party will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

63. Therefore, the Debtors' prepetition solicitation meets the requirements of applicable non-bankruptcy law and complies with section 1126(b)(1) of the Bankruptcy Code. Moreover, no party in interest has objected to final approval of the Disclosure Statement, much less on account of noncompliance with applicable non-bankruptcy law.

Supp. App. 204

## 2. The Disclosure Statement Contains Adequate Information

64. The Debtors' prepetition solicitation also complied with section 1126(b)(2) of the Bankruptcy Code, which applies the requirements of section 1125(a) to prepetition solicitations.[99] Section 1125(a) requires that a disclosure statement provide "adequate information" to voting creditors that allows them to make an informed decision about whether to vote to accept or reject the plan.[100] "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[101] Courts within the Fifth Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code is committed to the broad discretion of the court.[102]

---

[99] 11 U.S.C. § 1126(b)(2).

[100] *See, e.g., In re J.D. Mfg., Inc.*, No. 07-36751, 2008 WL 4533690, at *2 (Bankr. S.D. Tex. Oct. 2, 2008) ("Adequacy' of information is a determination that is relative both to the entity (e.g.[,] assets/business being reorganized or liquidated) and to the sophistication of the creditors to whom the disclosure statement is addressed."); *In re U.S. Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the disclosure statement is . . . to provide enough information to interested persons so they may make an informed choice[.]"); *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr W.D. Tex. 1991) ("A court's legitimate concern under section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case[.]") (emphasis in original); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) ("Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to make an informed judgment about the Plan.") (internal quotations omitted); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.").

[101] 11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records[.]"); *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998) ("The legislative history of [section] 1125 indicates that, in determining what constitutes adequate information with respect to a particular disclosure statement, both the kind and form of information are left essentially to the judicial discretion of the court and that the information required will necessarily be governed by the circumstances of the case.") (internal citations omitted); *Floyd v. Hefner*, No. H-03-5693, 2006 WL 2844245, at *30 (S.D. Tex. Sept. 29, 2006) (noting that what constitutes "adequate information" is a "flexible standard"); *Applegate Prop., Ltd.*, 133 B.R. at 829 ("The issue of adequate information is usually decided on a case by case basis and is left largely to the discretion of the bankruptcy court.").

[102] *See, e.g., Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court.").

31

65. Courts look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

    i.    the events which led to the filing of a bankruptcy petition;

    ii.    the relationship of a debtor with the affiliates;

    iii.    a description of the available assets and their value;

    iv.    the anticipated future of the company;

    v.    the source of information stated in the disclosure statement;

    vi.    the present condition of a debtor while in chapter 11;

    vii.    the claims asserted against a debtor;

    viii.    the estimated return to creditors under a chapter 7 liquidation;

    ix.    the future management of a debtor;

    x.    the chapter 11 plan or a summary thereof;

    xi.    the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 claim;

    xii.    the information relevant to the risks posed to claimants under the plan;

    xiii.    the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

    xiv.    the litigation likely to arise in a non-bankruptcy context; and

    xv.    the tax attributes of a debtor.[103]

---

[103]   *In re U.S. Brass Corp.*, 194 B.R. at 424-25; *Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) (listing factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988) (same); *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same). Disclosure regarding all topics is not necessary in every case. *In re U.S. Brass Corp.*, 194 B.R. at 425; *In re Phx. Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).

Supp. App. 206

66.     The Disclosure Statement contains adequate information.  For instance, the Disclosure Statement contains descriptions and summaries of, among other things, the Debtors' corporate history, structure, and business (**Article IV**); the events leading to the commencement of the Chapter 11 Cases (**Article V**); the anticipated events of the Chapter 11 Cases (**Article VI**); the classification and treatment of Claims and Interests (**Article II**); the sources of consideration for Plan distributions and the means for implementing the Plan (**Article VII**); the proposed treatment of executory contracts and unexpired leases (**Article VII**); provisions governing distributions (**Article VII**); procedures for resolving disputed claims (**Article VII**); information relating to releases, injunctions, and related provisions that are conspicuously displayed in accordance with Bankruptcy Rule 3016(c) (**Article VII**); the statutory requirements for confirmation (**Article IX**); risk factors related to the Plan (**Article X**); certain securities law matters (**Article XI**); and certain U.S. federal tax consequences arising from the implementation of the Plan (**Article XII**).  In addition, the Disclosure Statement, and the Plan were subject to extensive review and comment by the 1L Ad Hoc Group, the Second Lien Ad Hoc Group, and PVKG Lender.

67.     In light of the Disclosure Statement's extensive disclosures, the Disclosure Statement contains adequate information in satisfaction of sections 1125(a) and 1126(b)(2) of the Bankruptcy Code.

**C.     The Debtors' Solicitation of Votes Complied With the Bankruptcy Code, the Bankruptcy Rules, and Scheduling Order**

68.     Prior to the Petition Date, the Debtors commenced distribution of the Solicitation Package to Holders of Claims entitled to vote on the Plan and solicited votes to accept or reject the

Supp. App. 207

Plan, in accordance with sections 1125 and 1126 of the Bankruptcy Code.[104] Bankruptcy Rule 3017(d) sets forth the materials that must be provided to Holders of Claims for the purpose of soliciting their votes to accept or reject a plan of reorganization. As set forth in more detail below, the Solicitation Procedures complied with the Bankruptcy Code, the Bankruptcy Rules, and the Scheduling Order.

69.     The solicitation was undertaken in accordance with sections 1125 and 1126 of the Bankruptcy Code. In addition, Bankruptcy Rule 3017(d) enumerates those materials that must be provided to holders of claims and interests for the purpose of soliciting votes to accept or reject a plan of reorganization.[105] As set forth in more detail below, the solicitation complied with the Bankruptcy Code and the Bankruptcy Rules.

### 1.     The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied With the Bankruptcy Rules

70.     Bankruptcy Rule 3017(d) requires debtors to distribute a ballot that conforms substantially to Official Form No. 314 only to "creditors and equity security holders entitled to vote on the plan."[106] Bankruptcy Rule 3018(c) provides that "[a]n acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form."[107] The Ballots conformed to Official Form No. 314 and were modified to address the facts of these Chapter 11 Cases and to be appropriate for each Voting Class, in each case as approved by the Scheduling Order. These modifications included bold and capitalized language regarding the

---

[104]   *See* 11 U.S.C. § 1125(g) (debtors may commence solicitation prior to filing chapter 11 petitions); 11 U.S.C. § 1126(b)(2) (holders of claims or interests that accepted or rejected a plan before the commencement of a chapter 11 case are deemed to accept or reject the plan so long as the solicitation provided adequate information).

[105]   *See* Fed. R. Bankr. P. 3017(d)

[106]   *Id*.

[107]   *See* Fed. R. Bankr. P. 3018(c).

34

Supp. App. 208

Plan's Third-Party Releases and the procedures for opposition to such releases. The Ballots were approved by the Court in the Scheduling Order, and no party has objected to the sufficiency of the Ballots. Accordingly, the Debtors have satisfied Bankruptcy Rules 3017(d) and 3018(c).

### 2. The Voting Record Date Complied With the Bankruptcy Rules and the Scheduling Order

71. In a prepetition solicitation, the holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials are to be determined "on the date specified in the solicitation."[108] The Scheduling Order, the Disclosure Statement, and the ballots clearly identify April 1, 2024 as the Voting Record Date for purposes of determining which Holders of Claims were entitled to vote on the Plan. The Court approved the Voting Record Date in the Scheduling Order and no party in interest has objected to the Voting Record Date. Accordingly, the Debtors complied with the Scheduling Order and satisfied the applicable requirements of the Bankruptcy Rules with respect to the Voting Record Date.

### 3. The Debtors' Solicitation Period Complied With Bankruptcy Rule 3018(b) and the Scheduling Order

72. The Debtors' solicitation period complied with Bankruptcy Rule 3018(b), which requires that a prepetition solicitation not provide an "unreasonably short time" for solicitation.[109] As noted, the Solicitation Packages were transmitted to all Holders of Claims in the Voting Classes on April 3, 2024, which was 14 days in advance of the Voting Deadline. The solicitation period provided sufficient time for voting creditors to return their ballots—as evidenced by the fact that creditors holding approximately 95% of the aggregate Class 3 Claims returned ballots and creditors holding approximately 90% of the aggregate Class 4 Claims returned ballots—and was not

---

[108]  *See* Fed. R. Bankr. P. 3018(b).

[109]  Fed. R. Bankr. P. 3018(b).

unreasonably short.[110]  Further, the Court approved the length of the solicitation period in the Scheduling Order and no party has objected to the solicitation period.  Accordingly, the Debtors' solicitation period complied with the Scheduling Order and satisfied the requirements of Bankruptcy Rule 3018(b).

### 4. The Debtors' Vote Tabulation Was Appropriate and Complied with the Scheduling Order

73.  As described in the Scheduling Motion and Disclosure Statement, the Debtors, through the Claims, Noticing, and Solicitation Agent, used standard tabulation procedures in tabulating votes from Holders of Claims in the Voting Classes.  Specifically, the Claims, Noticing, and Solicitation Agent reviewed all ballots received through the Voting Deadline and tabulated valid ballots in accordance with the procedures described in the Scheduling Motion and Disclosure Statement and approved by the Court under the Scheduling Order.  The Claims, Noticing, and Solicitation Agent's tabulation of votes, set forth in the Voting Report, confirms that sufficient numbers and amounts of Holders of Claims in the Voting Classes voted to accept the Plan, with the result that Class 3 and Class 4 voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.  The Debtors request that the Court approve the Debtors' tabulation of votes.

### 5. Waiver of Certain Solicitation Package Mailings Was Reasonable and Appropriate and Complied with the Scheduling Order

74.  Certain Holders of Claims and Interests were not provided a Solicitation Package because such Holders are unimpaired under the Plan (and therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code) or are impaired and not entitled to receive a distribution under the Plan (and therefore conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code), each as of the Voting

---

[110]  Voting Report, Ex. 8.

Record Date. Bankruptcy Rule 3017(d) requires transmission of a court-approved disclosure statement to, among other parties, classes of unimpaired creditors and equity security holders unless the court orders otherwise. Because Bankruptcy Rule 3017(d) depends, in relevant part, "[u]pon approval of a disclosure statement," such provision does not apply here in light of the prepetition solicitation employed by the Debtors.[111] Regardless, in the Scheduling Order, the Court approved the Combined Hearing Notice, Non-Voting Status Notice, and Opt-Out Form sent to stakeholders not entitled to vote on the Plan, which apprised them of the Objection Deadline, Combined Hearing, and opportunity to opt-out of the Plan's Third-Party Release.[112]

75. Accordingly, waiver of any applicable requirement to mail Solicitation Packages to unimpaired creditors and equity security holders was reasonable and appropriate, complied with the Scheduling Order, and did not impact those parties' substantive rights with respect to the Plan in light of other notices provided to those parties.

### 6. Solicitation of the Plan Complied With the Bankruptcy Code and Was in Good Faith

76. Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable, on account of such solicitation . . . for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan."[113] Section 1125(e) of the Bankruptcy Code "provides a safe harbor for the disclosure and solicitation process of a

---

[111] Fed. R. Bankr. P. 3017(d).

[112] Scheduling Order ¶¶ 7, 9-10, 15-17.

[113] 11 U.S.C. § 1125(e).

37

bankruptcy."[114] Courts in this District frequently enter confirmation orders with protections based on section 1125(e) of the Bankruptcy Code.[115]

77.     As set forth in the Goncalves Declaration, the Plan was solicited in good faith by the Debtors, the parties to the RSA, the Agents/Trustees, and each of their Related Parties.[116] In addition, as set forth in the Scheduling Order, the Solicitation Procedures utilized by the Debtors for distribution of the Solicitation Packages satisfy "the applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any other applicable rules, laws, and regulations, including any applicable registration requirements under the Securities Act, and any exemptions from registration under Blue Sky requirements."[117] Therefore, the Debtors request that the Court determine that the Plan was solicited in good faith pursuant to section 1125(e).

---

[114] *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir. 1995).

[115] *See, e.g., In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) [Docket No. 1760] (approving the protection of the debtors, the directors, managers, and officers of any debtor entity, the parties to the restructuring support agreement, the Official Committee of Unsecured Creditors and its members, the DIP agent and DIP lenders, and certain settling parties, among others, pursuant to section 1125(e) of the Bankruptcy Code); *In re Altera Infrastructure L.P.*, No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) [Docket No. 533] (approving protection of the debtors' and certain other plan proponents' affiliates, directors, officers, members, managers, employees, and advisors pursuant to section 1125(e) of the Bankruptcy Code); *In re Sungard AS New Holdings, LLC*, No. 22-90018 (DRJ) (Bankr. S.D. Tex. Oct. 17, 2022) [Docket No. 763] (approving of the debtors' and other plan proponents' affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys relating to the offer, issuance, sale, and purchase of securities offered and sold under the plan); *see also In re Fieldwood Energy LLC*, No. 20-33948 (MI), 2021 WL 2853151, at *10 (Bankr. S.D. Tex. June 25, 2021) ("Debtors and their directors, officers, employees, members, agents, advisors, and professionals have acted in 'good faith' within the meaning of section 1125(e) of the Bankruptcy Code . . . in connection with all their respective activities relating to the solicitation of acceptances or rejections of the Plan and their participation in the activities . . . and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in . . . the Plan.").

[116] *Declaration of Rui Goncalves in Support of (I) Approval of the Debtors' Disclosure Statement and (II) Confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* (the "**Goncalves Declaration**") ¶¶ 5-6, filed contemporaneously herewith.

[117] Scheduling Order ¶ 8.

38

## III.    The Plan Satisfies the Bankruptcy Code's Requirements for Confirmation and Should Be Confirmed

78.    To obtain confirmation of the Plan, the Debtors must demonstrate by a preponderance of the evidence that the Plan satisfies section 1129 of the Bankruptcy Code.[118]  For the reasons set forth below, the Plan satisfies the applicable requirements of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules and should be confirmed.

### A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code – § 1129(a)(1)

79.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code.  This provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing the classification of claims and interests and the contents of the plan, respectively.[119]

#### 1.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code

80.    The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[120]

---

[118]    *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[P]reponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.").

[119]    *See, e.g., In re Star Ambulance Serv., LLC*, 540 B.R. 251, 260 (Bankr. S.D. Tex. 2015) ("Courts interpret [section 1129(a)(1)] to mean that a plan must meet the requirements of Bankruptcy Code sections 1122 and 1123.") (citing, *inter alia*, *Springs Alliance, Inc. v. WSI (II)-COS, L.L.C. (In re Save Our Springs (S.O.S.) All., Inc.)*, 632 F.3d 168, 174 (5th Cir. 2011)); H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978).

[120]    11 U.S.C. § 1122(a).

39

81.    For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[121]  Instead, claims or interests placed in a particular class need only be substantially similar to each other.[122]  Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[123]  Here, the Plan classifies substantially similar claims in the same class, satisfying section 1122(a) of the Bankruptcy Code.

82.    Here, the Plan provides for nine Classes of Claims and Interests: (a) Class 1 (Other Secured Claims); (b) Class 2 (Other Priority Claims); (c) Class 3 (First Lien Claims); (d) Class 4 (Second Lien Claims); (e) Class 5 (General Unsecured Claims); (f) Class 6 (Intercompany Claims); (g) Class 7 (Section 510 Claims) (h) Class 8 (Intercompany Interests); and (i) Class 9 (Existing C1 Interests).[124]

83.    The classification scheme set forth in the Plan complies with section 1122(a) of the Bankruptcy Code because each Class contains only Claims and Interests that are substantially

---

[121]  *See, e.g., Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006) ("Section 1122(a) of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class if such claim or interest is substantially similar to the other claims or interests of such class.  A classification structure satisfies section 1122 of the Bankruptcy Code when a reasonable basis exists for the structure, and the claims or interests within each particular class are substantially similar.")

[122]  *In re Vitro Asset Corp.*, No. 11-32600-HDH, 2013 WL 6044453, at * 5 (Bankr. N.D. Tex. Nov. 14, 2013) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class").

[123]  Courts have identified grounds justifying separate classification, including: (a) where members of a class possess different legal rights, and (b) where there are good business reasons for separate classification.  *See In re Briscoe Enters.*, 994 F.2d 1160, 1167 (5th Cir. 1993) (recognizing that "there may be good business reasons to support separate classification") (citing *Matter of Greystone*, 948 F.2d 134 (5th Cir.1991); *In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009) ("[A] plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("[T]he only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan.").

[124]  Plan, Art. III.

similar to each other. Other Priority Claims, Other Secured Claims, First Lien Claims, Second Lien Claims, General Unsecured Claims, Section 510 Claims, and Intercompany Claims have each been classified separately, respectively, because of the secured or unsecured status of the underlying obligation, the specific collateral (if any) securing such Claims, and the nature and priority of the underlying obligation.[125] The Plan's classification scheme was not proposed to manufacture a consenting impaired class to manipulate voting.[126] Further, Claims (rights to payment) are also classified separately from Interests (representing ownership in the business). Finally, no party in interest has objected to the Plan's classification scheme.

84. Because each Class consists of only similar Claims and Interests, the Court should approve the classification scheme of the Plan as consistent with section 1122(a) of the Bankruptcy Code.

### 2. The Plan Satisfies the Requirements of Section 1123(a) of the Bankruptcy Code

85. The Plan complies with all subsections of section 1123(a) of the Bankruptcy Code, which sets forth seven requirements that every chapter 11 plan must satisfy.[127]

#### i. *Designation of Classes of Claims and Equity Interests – § 1123(a)(1)*

86. For the reasons set forth above, the Plan properly designates Classes of Claims and Interests in accordance with section 1122 of the Bankruptcy Code and thus satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code. The Plan complies with section

---

[125] Goncalves Decl. ¶ 8.

[126] *Id.*

[127] 11 U.S.C. § 1123(a). Section 1123(a)(8) does not apply in the Chapter 11 Cases because the Debtors are not individuals.

41

1123(a)(1) by classifying Claims and Interests in **Article III** of the Plan such that each Class consists of substantially similar Claims or Interests, and no party has asserted otherwise.

*ii.        Specification of Unimpaired Classes – § 1123(a)(2)*

87.        Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."[128]  The Plan meets this requirement by identifying each Unimpaired Class in **Article III** of the Plan, and no party has asserted otherwise.

*iii.        Treatment of Impaired Classes – § 1123(a)(3)*

88.        Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."[129]  The Plan meets this requirement by setting forth the treatment of each Impaired Class in **Article III** of the Plan, and no party has asserted otherwise.

*iv.        Equal Treatment Within Classes – § 1123(a)(4)*

89.        Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[130]  The Plan meets this requirement because the Allowed Claims or Interests in each Class will receive the same treatment as the other Allowed Claims or Interests within such Class unless the Holder of such Claim or Interest has agreed to less favorable treatment.  In addition, the Minority AHG's assertion that the Plan does not provide equal treatment to Holders of Class 3 Claims lacks merit and should be overruled for the reasons set forth above.

---

[128]    11 U.S.C. § 1123(a)(2).

[129]    11 U.S.C. § 1123(a)(3).

[130]    11 U.S.C. § 1123(a)(4).

42

*v.*     *Means for Implementation – § 1123(a)(5)*

90.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[131]   The Plan satisfies this requirement because **Article IV** of the Plan, as well as other Plan provisions, provide the means by which the Plan will be implemented. Among other things, **Article IV** of the Plan:

a.     constitutes a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan;

b.     authorizes the Debtors and/or the Reorganized Debtors to take all actions necessary to effectuate the Plan, including those actions necessary or appropriate to effectuate the Restructuring Transactions, the Rights Offering, the Backstop Agreement, and any restructuring transactions set forth in the Plan Supplement and the Description of Transaction Steps, as the same may be modified or amended from time to time prior to the Effective Date;

c.     authorizes the Debtors' entry into, delivery of, and implementation of the Definitive Documents and other transaction documents contemplated by the Plan;

d.     sets forth the funding and sources of consideration for the Plan distributions, including the Exit Facilities, the Rights Offering and the Backstop Agreement, the New Equity Interests, and Cash on hand;

e.     authorizes the Reorganized Debtors to enter into the Exit Facilities;

f.     authorizes the Debtors to distribute the Rights Offering Documents to the Eligible Offerees on behalf of the Reorganized Debtors and to issue the Rights;

g.     authorizes the Reorganized Debtors to issue the New Equity Interests;

h.     authorizes the Reorganized Debtors to adopt the Governance Documents;

i.     provides for the appointment of the members of the New Board;

j.     preserves the Debtors' corporate existence following the Effective Date (except as otherwise provided in the Plan);

k.     provides for the vesting of Estate assets in the Reorganized Debtors;

---

[131]   11 U.S.C. § 1123(a)(5).

43

l.      provides for the preservation and vesting of Claims and Causes of Action not released pursuant to the Plan in the Reorganized Debtors;

m.      authorizes the Reorganized Debtors to issue, execute, and assume certain contracts and other agreements, including certain agreements with the Debtors' employees and management;

n.      provides for the cancellation of existing securities and agreements (except as otherwise provided in the Plan);

o.      authorizes and approves all corporate actions contemplated under the Plan; and

p.      authorizes the Debtors or Reorganized Debtors to take all actions necessary or appropriate to effectuate the Plan.

91.      The precise terms governing the execution of many of these transactions are set forth in greater detail in the applicable Definitive Documents or forms of agreements included in the Plan Supplement. Accordingly, the Plan satisfies section 1123(a)(5), and no party has asserted otherwise.

*vi.*      *Issuance of Non-Voting Securities – § 1123(a)(6)*

92.      Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.[132] To that end, **Article IV.J** of the Plan provides that the Reorganized Debtors' Governance Documents shall contain a provision prohibiting the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.[133] The Governance Documents filed with the Plan Supplement comply with the Plan and section 1123(a)(6) and prohibit the issuance of non-voting securities.[134] Accordingly, the Plan satisfies section 1123(a)(6), and no party has asserted otherwise.

---

[132]    11 U.S.C. § 1123(a)(6).

[133]    Plan, Art. IV.J.

[134]    Plan Suppl., Ex. A.

44

*vii.     Disclosure of New Directors and Officers – § 1123(a)(7)*

93.     Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[135] **Article IV.K** of the Plan outlines the manner of selecting the members of the New Board, which shall consist of members designated in accordance with the Governance Term Sheet. The Plan's manner of selection of members of the New Board accords with applicable state law, the Bankruptcy Code, the interests of creditors and equity security holders, as well as public policy, and no party has asserted otherwise.[136] Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

### 3.     The Plan Complies with Section 1123(b) of the Bankruptcy Code

94.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the

---

[135]   11 U.S.C. § 1123(a)(7).

[136]   *See In re Am. Solar King Corp.*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The debtor's inability to specifically identify future board members does not mean that the debtor has fallen short of the requirement imposed in subsection (a)(5)(A)r(i), because the debtor at this point has no particular individuals whom it proposes should serve, after confirmation, as a director, officer, or voting trustee, other than those whom it has already identified on the record . . . If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i)."); *see also In re Charter Commc'ns*, 419 B.R. 221, 260 n.30 (Bankr. D. Del. 2011) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at [confirmation] the identities of the identities of the known directors.") (emphasis in original).

45

estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[137] The Plan is consistent with section 1123(b) of the Bankruptcy Code.

     *i.  Impaired and Unimpaired Classes – § 1123(b)(1)*

95.  Under **Article III** of the Plan, Classes 1 (Other Secured Claims), 2 (Other Priority Claims), and 5 (General Unsecured Claims), are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of, or otherwise provides treatment in accordance with section 1124 to, the Holders of Claims within such Classes.[138] On the other hand, Classes 3 (First Lien Claims), 4 (Second Lien Claims), 7 (Section 510 Claims), and 9 (Existing C1 Interests) are Impaired because the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated by section 1123(b)(1) of the Bankruptcy Code.[139] Additionally, Classes 6 (Intercompany Claims) and 8 (Intercompany Interests) are either Unimpaired or Impaired because the Plan provides that, at the option of the Debtors (with the consent of the Required Consenting Lenders), the legal, equitable, and contractual rights of such Claims and Interests will either be unaltered or otherwise receive treatment in accordance with section 1123(b) of the Bankruptcy Code, or be canceled and released without any distribution in accordance with section 1123(b) of the Bankruptcy Code.[140]

     *ii.  Assumption or Rejection of Executory Contracts and Unexpired Leases – § 1123(b)(2)*

96.  As set forth in section 1123(b)(2) of the Bankruptcy Code, a plan may provide for the assumption, rejection, or assignment of any executory contract or unexpired lease not

---

[137] 11 U.S.C. § 1123(b)(1)-(3), (6).

[138] Plan, Art. III.C.

[139] *Id*.

[140] *Id*.

46

previously rejected.[141] Pursuant to **Article V** of the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party, unless such contract or lease: (a) was assumed or rejected previously by the Debtors; (b) previously expired or terminated pursuant to its own terms; (c) is the subject of a motion or notice to reject pending as of the Effective Date; or (d) is identified on the Rejected Executory Contract and Unexpired Lease List.[142] The Plan provides that entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.[143] By specifying how Executory Contracts and Unexpired Leases will be assumed or rejected, the Plan complies with section 1123(b)(2).

> iii.    *The Plan Appropriately Incorporates Settlements of Claims and Causes of Actions – § 1123(b)(3)*

97.    Section 1123(b)(3) provides that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[144] Courts may approve settlements under a plan if they are "fair, equitable, and in the best interest of the estate."[145] In particular, Fifth Circuit courts apply a five-factor test for considering motions to approve bankruptcy settlements, weighing: "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any,

---

[141]    11 U.S.C. § 1123(b)(2).

[142]    Plan, Art. V.A.

[143]    *Id.*

[144]    11 U.S.C. § 1123(b)(3)(A).

[145]    *See Matter of Assadi*, No. 22-50452, 2022 WL 17819599, at *1 (5th Cir. Dec. 20, 2022) (citing *Am. Can Co. v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 605, 608 (5th Cir. 1980)); Fed R. Bankr. P. 9019.

47

to be encountered in the matter of collection; (3) the paramount interest of the creditors and a proper deference to their respective views; (4) the extent to which the settlement is truly the product of arms'-length bargaining and not fraud or collusion; and (5) all other factors bearing on the wisdom of the compromise."[146]

98. Although a debtor bears the burden of establishing that a settlement is fair and equitable based on the balance of the above factors, "the [debtor's] burden is not high."[147] Indeed, a court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness."[148]

99. The settlements embodied in the Plan are fair and equitable and satisfy the Bankruptcy Rule 9019 factors as applied in this jurisdiction. **Article IV.A** of the Plan provides for a general settlement of Claims against and Interests in the Debtors.[149] In consideration for the classification, distributions, releases, and other benefits provided under the Plan, all Claims and Interests and controversies will be considered resolved pursuant to the Plan.[150] In addition, **Article IV.B** of the Plan implements the PVKG Notes Claims Settlement, which provides for the PVKG Note Claims to be Allowed in the amount of $213.0 million.[151] The PVKG Notes Claims Settlement is a negotiated resolution of complex issues concerning the amount and allowance of the PVKG Notes Claims, was agreed to among the Debtors, PVKG Lender, the First Lien Ad Hoc

---

[146] *Matter of Assadi*, No. 22-50452, 2022 WL 17819599, at *1 (citing *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010)).

[147] *See In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).

[148] *See In re Idearc, Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009); *In re Roqumore*, 393 B.R. at 480 ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'" (citations omitted)).

[149] Plan, Art. IV.A.

[150] *Id*.

[151] Plan, Art. IV.B.

48

Group, and the Second Lien Ad Hoc Group, and avoids complex and value-destructive litigation in these Chapter 11 Cases.[152]

100. In the end, the Plan resolves a host of alleged Claims and Causes of Action, which were thoroughly analyzed by the Debtors, the RSA signatories, and each of their advisors, all of which could have potentially caused extensive delay, cost, and uncertainty in these Chapter 11 Cases, while adversely affecting the Debtors' businesses and operations.[153] As reflected by the overwhelming support of creditors for the Plan, the settlements embodied therein, which were the result of arms'-length negotiations, are in the best interests of creditors and all parties in interest. No party has objected to the settlements embodied in the Plan, and they should be approved pursuant to section 1123(b)(3).

> ### iv. The Plan's Release, Exculpation, and Injunction Provisions Comply With the Bankruptcy Code

101. The Plan includes a Debtor Release, a Third-Party Release, an exculpation provision, and injunction provisions.[154] These provisions comply with the Bankruptcy Code and applicable law because, among other things, they are fair and equitable, are given for valuable consideration, are the product of extensive good faith, arms'-length negotiations, were a material inducement for members of the First Lien Ad Hoc Group, members of the Second Lien Ad Hoc Group, and PVKG Lender to enter into the RSA, and are in the best interests of the Debtors and their Estates.[155] In addition, the Plan's Third-Party Release is consensual[156] and consistent with

---

[152] Goncalves Decl. ¶¶ 9, 13-14.

[153] *Id*. ¶¶ 13-14.

[154] *See* Plan, Art. VIII.C (Debtor Release), Art. VIII.D (Third-Party Release), Art. VIII.E (Exculpation), Art. VIII.F (Injunction).

[155] Goncalves Decl. ¶¶ 13-17.

[156] Plan, Art. VIII.D (providing the opportunity to opt-out of the Third-Party Release).

49

Fifth Circuit precedent. None of the Plan's release, exculpation, or injunction provisions are inconsistent with the Bankruptcy Code and, thus, these provisions are confirmable under section 1123(b)(6) of the Bankruptcy Code.

> **a.** *The Debtor Releases Comply With the Bankruptcy Code and Are Appropriate*

102. **Article VIII.C** of the Plan provides for a release by the Debtors and the Estates of any and all Causes of Action (the "**Debtor Release**").[157] The Released Parties made significant concessions and contributions to the Chapter 11 Cases in exchange for the Debtor Release and are an integral component of the Debtors' fresh start upon emergence.[158]

103. The Bankruptcy Code supports the inclusion of debtor releases in a chapter 11 plan. Section 1123(b)(3)(A) of the Bankruptcy Code states that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." This provision allows the Debtors to release estate causes of action as consideration for concessions made by their various stakeholders pursuant to the Plan.[159]

104. In considering the appropriateness of such releases, courts in the Fifth Circuit generally consider whether the release is (a) "fair and equitable" and (b) "in the best interests of the estate."[160] The "fair and equitable" prong is generally interpreted, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy

---

[157] Plan, Art. VIII.C.

[158] Goncalves Decl. ¶¶ 13-14.

[159] *See, e.g., In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (finding that plan release provision "constitute[d] an acceptable settlement under [section] 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 289 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 730-39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp. FGMC*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[160] *In re Mirant Corp.*, 348 B.R. at 738; *see also In re Heritage Org.*, 375 B.R. at 259.

Supp. App. 224

Code's absolute priority rule.[161]  Courts generally determine whether a release is "in the best interests of the estate" by reference to the following factors:

    i.    the probability of success of litigation;

    ii.    the complexity and likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible problems collecting a judgment;

    iii.    the interest of creditors with proper deference to their reasonable views; and

    iv.    the extent to which the settlement is truly the product of arms'-length negotiations.[162]

Ultimately, courts afford a debtor some discretion in determining for itself the appropriateness of granting plan releases of estate causes of action.[163]

105.    The Debtor Release easily meets the controlling standard for approval.  As an initial matter, the terms of the Debtor Release are fair and equitable because they comply with the Bankruptcy Code's absolute priority rule.  While certain Classes are deemed to have rejected the Plan, as discussed in greater detail below, the Debtor Release does not result in any junior Classes improperly receiving or retaining any property on account of junior Claims or Interests.  Thus, the Debtor Release is fair and equitable and in line with Fifth Circuit precedent.

106.    In addition to being fair and equitable, the Debtor Release is in the best interest of the Estates.  Based on their review, the Debtors are not aware of any claims being released that might reasonably be expected to yield material value for their Estates.[164]  Moreover, each Released

---

[161]   *See In re Mirant Corp.*, 348 B.R. at 738.

[162]   *See Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citation omitted); *In re Mirant Corp.*, 348 B.R. at 739-40 (citing *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355-56 (5th Cir. 1997)).

[163]   *See In re Gen. Homes*, 134 B.R. at 861 ("The court concludes that such a release is within the discretion of the Debtor.").

[164]   Goncalves Decl. ¶¶ 13-14.

Supp. App. 225

Party has played an integral role in the Chapter 11 Cases, made substantial concessions that underpin the consensual resolution of the Chapter 11 Cases that will allow the Debtors to expeditiously exit bankruptcy with a de-leveraged capital structure, and may be unwilling to support the Plan without the Debtor Release.[165] In addition, the Plan, including the Debtor Release, was negotiated by sophisticated entities that were represented by able counsel and financial advisors.[166] Finally, the overwhelming majority of voting creditors voted to accept the Plan, which includes the Debtor Release; General Unsecured Claims will be paid in full or are otherwise Unimpaired under the Plan; and no party in interest objected to the Debtor Release. The Debtor Release for the Debtors' Related Parties is also appropriate because the Debtors' Related Parties share an identity of interest with the Debtors, supported the Plan and these Chapter 11 Cases, and actively participated in meetings, negotiations, and implementation during these Chapter 11 Cases, and have provided other valuable consideration to the Debtors to facilitate the Debtors' reorganization.

107. Accordingly, the Debtor Release is fair, equitable, and in the best interests of the Estates, is justified under the controlling Fifth Circuit law, and should be approved.

> b. *The Third-Party Release Is Appropriate and Complies with the Bankruptcy Code*

108. **Article VIII.D** of the Plan contains a third-party release provision (the "**Third-Party Release**"). The Third-Party Release provides that each Releasing Party—including all Holders of Claims that do not specifically opt out of or timely object to the Third-Party Release—shall release any and all Causes of Action (including a list of specifically enumerated claims) that such Releasing Parties could assert against the Debtors, the Reorganized Debtors, and the Released

---

[165] *Id*.

[166] *Id*.

52

Parties, except for acts or omissions that are found to have been the product of actual fraud, willful misconduct, or gross negligence.[167]

109.    Third-party releases are justified and in conformity with Fifth Circuit precedent when the release is consensual.[168] While the Fifth Circuit has not directly defined what constitutes a consensual third-party release, courts within the Fifth Circuit have held that a claimant who received notice of a debtor's chapter 11 filing and the proposed plan, which included a third-party release, but failed to object to the plan, is deemed to have consented to the third-party release.[169] At bottom, courts focus on process—*i.e.*, whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look it over [and] the disclosure is adequate so that they can actually understand[] what they're being asked to do and the options that they're being given."[170]

110.    The Plan's Third-Party Release should be approved as a consensual release. Parties in interest were provided notice of these Chapter 11 Cases, the Plan, and the deadline to object to confirmation of the Plan. Both the Disclosure Statement (transmitted to all voting parties and

---

[167]    Plan, Art. VIII.D; Goncalves Decl. ¶¶ 15.

[168]    *See, e.g., In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.' Bankruptcy courts within the Fifth Circuit commonly exercise jurisdiction to approve nonparty releases based on agreed plans."); *see also In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex. 2011) ("the Fifth Circuit does allow permanent injunctions so long as there is consent") (emphasis omitted); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("[m]ost courts allow consensual nondebtor releases to be included in a plan").

[169]    *See In re CJ Holding*, 597 B.R. at 609 (holding that a claimant who failed to object to confirmation of the plan consented to the plan and the third-party releases contained therein).

[170]    April 21, 2016 Hr'g Tr. at 47:1-20, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. 2016) [Docket No. 730] (approving third-party releases as consensual, over objection of the U.S. Trustee, in light of sufficient notice and opportunity to object). Further, the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Procedures**"), in an effort to ensure proper notice and an opportunity to object, provide: "If a proposed plan seeks consensual pre- or post-petition releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties-in-interest. The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice." Complex Case Procedures, ¶ 40. The Debtors' compliance with paragraph 40 of the Complex Case Procedures further evidences that parties received the requisite notice and were provided adequate disclosure.

53

otherwise publicly available), the Combined Notice (transmitted to parties in interest), and the Non-Voting Status Notice and Opt-Out Form (transmitted to Holders of all non-voting Claims and Interests) expressly state in capitalized, bold-faced, underlined text that Holders of Claims and Interests that do not specifically opt out of or object to the Third-Party Release will be bound by it.[171] Each Ballot, the Combined Notice, the Non-Voting Status Notice, and the Opt-Out Form distributed also contained the full text of **Article VIII.D** of the Plan—the Third-Party Release itself.[172] While approximately 39 parties opted out of the Third-Party Release, no party has objected to its inclusion in the Plan.[173]

111.    Ultimately, chapter 11 is a collective proceeding meant to maximize the prospect for a debtor's fresh start, so long as a debtor satisfies its obligations under the Bankruptcy Code in good faith and consistent with due process. Where, as here, a debtor satisfies its due process obligations, parties in interest may waive their rights by failing to participate. Thus, "[i]f a creditor wants to preserve his right to object to confirmation, on whatever ground, he must file an objection. If he does not file an objection, he generally cannot complain about the results of the confirmation proceeding—even if he voted to reject the plan."[174] In addition to informing recipients of key elements in the Chapter 11 Cases, the Solicitation Packages and Combined Hearing Notice detailed the Third-Party Release and provided parties in interest more than an adequate opportunity to opt-

---

[171] Voting Report, Ex. 1-5.

[172] *Id*.

[173] Voting Report, Ex. 9.

[174] *In re U.S. Fidelis, Inc.,* 481 B.R. 503, 517 (Bankr. E.D. Mo. 2012); *see also In re Camp Arrowhead*, 451 B.R. 678, 702 (Bankr. W.D. Tex. 2011) ("Without an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing[.]") (citing *In re Pac. Lumber Co.*, 584 F.3d 229, 253 (5th Cir. 2009); *In re Pilgrim's Pride Corp.*, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010)); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).

54

out of the Third-Party Release. Accordingly, the Third-Party Release is appropriate under Fifth Circuit law as a consensual Third-Party Release and should be approved.

> c. The Exculpation Provision Complies With the Bankruptcy Code and Is Appropriate

112. **Article VIII.E** of the Plan provides that each Exculpated Party—*i.e.*, the Debtors—shall be released and exculpated from any Claim or Cause of Action that is in any way related to the Chapter 11 Cases or the Debtors' restructuring (each, an "**Exculpated Claim**"), except to the extent "related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud" (the "**Exculpation Provision**").[175] The Exculpation Provision limits the liability of Exculpated Parties to a standard of care of willful misconduct, gross negligence, or actual fraud in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring.

113. A bankruptcy court may approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[176] As such, an exculpation provision represents a legal conclusion resulting from certain findings a bankruptcy court must reach in confirming a plan.[177] Once the court makes its good faith finding, it is appropriate to set the standard of care of the fiduciaries involved in the formulation of that chapter 11 plan.[178] Exculpation provisions appropriately prevent future collateral attacks against the Debtors and are commonly included in chapter 11 plans

---

[175] Plan, Art. VIII.E.

[176] *See* 11 U.S.C. § 1129(a)(3); *NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 437-38 (5th Cir. 2022); *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000).

[177] *See* 11 U.S.C. § 1129(a)(3); *see also* 28 U.S.C. § 157(b)(2)(L).

[178] *In re Highland Cap. Mgmt.*, 48 F.4th at 437-38; *In re PWS Holding*, 228 F.3d at 246 (observing that creditors and professionals providing services to the debtors are entitled to a "limited grant of immunity" for actions within the scope of their duties).

55

in this jurisdiction.[179]  Accordingly, the Exculpation Provision in the Plan is appropriate because it provides protection to the Debtors, who served as fiduciaries during the restructuring process.

114.    The Exculpation Provision is consistent with Fifth Circuit law; namely *Highland Capital*, where the court expressly adopted and applied Fifth Circuit precedent providing qualified immunity to "bankruptcy trustees," which extends to a debtor in possession under section 1107 of the Bankruptcy Code.[180]  The Plan therefore appropriately includes the Debtors as Exculpated Parties, consistent with *Highland Capital* and this Court's precedent, for actions taken prior to the Effective Date.

115.    The Exculpation Provision is an integral component of the global settlement embodied in the Plan and is the product of good faith, arms'-length negotiations.[181]  The Exculpation Provision is narrowly tailored to the Debtors, excludes acts of willful misconduct, gross negligence, and actual fraud, and relates only to acts or omissions in connection with or arising out of the administration of the Chapter 11 Cases or the Debtors' restructuring.[182] Accordingly, the Exculpation Provision is appropriate under the circumstances and should be approved.

> d.    *The Injunction Provision Is Appropriate and Complies with the Bankruptcy Code*

116.    The injunction provision set forth in **Article VIII.F** of the Plan (the "**Injunction Provision**") is a necessary part of the Plan because it enforces the discharge, Release, and

---

[179]  *See Highland Cap.*, 48 F.4th at 437-39; *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) [Docket No. 350] ¶ 39; *In re Pipeline Health Sys., LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023) [Docket No. 1041] ¶¶ 44-45; *In re Talen Energy Supply, LLC, et al.*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 15, 2022) [Docket No. 1760] ¶ 37; *In re Altera Infrastructure L.P.*, No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) [Docket No. 533] ¶ 42-43.

[180]  *Highland Cap.*, 48 F.4th at 437-39.

[181]  Goncalves Decl. ¶ 16.

[182]  *Id*.

Supp. App. 230

Exculpation Provisions that are critically important to the Plan. The Injunction Provision affords the Debtors and their stakeholders (including, among others, the Released Parties and the Exculpated Parties) a greater degree of certainty with respect to the Chapter 11 Cases and the Restructuring Transactions implemented by the Plan by requiring the Court's authorization for parties to commence or pursue Claims or Causes of Action that relate to or are reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the Debtor Releases, the Third-Party Release, or the Exculpation.[183] Further, no party in interest in these Chapter 11 Cases objected to its inclusion in the Plan.[184]

117.    The Injunction Provision is an integral component of the Plan, appropriate and necessary under the circumstances, consistent with the Bankruptcy Code, narrowly tailored, and compliant with the applicable case law and precedent in the Fifth Circuit, and should be approved.

**B.      The Debtors Have Complied With the Applicable Provisions of the Bankruptcy Code – § 1129(a)(2)**

118.    Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply "with the applicable provisions of this title."[185] Whereas section 1129(a)(1) of the Bankruptcy Code focuses on the form and content of a plan itself, section 1129(a)(2) is concerned with the applicable activities of a plan proponent under the Bankruptcy Code.[186] In determining

---

[183]    *See Highland Cap.*, 48 F.4th at 439 ("Courts have long recognized bankruptcy courts can perform a gatekeeping function. . . . We . . . affirm the inclusion of the injunction and the gatekeeper provisions in the Plan."); *see also In re Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. Sept. 6, 2023) [Docket No. 1711] ¶¶ 43-46 (confirming chapter 11 plan that included an injunction and gatekeeper provision); *In re Cineworld Grp. PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. June 28, 2023) [Docket No. 1982] ¶¶ 52-53 (same); *In re Serta Simmons Bedding, LLC*, No. 23- 90020 (DRJ) (Bankr. S.D. Tex. June 14, 2023) [Docket No. 1071] ¶ 37 (same); *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr. S.D. Tex. Mar. 22, 2023) [Docket No. 350] ¶ 39 (same); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) [Docket No. 1760] ¶ 37 (same).

[184]    *See, In re Camp Arrowhead*, 451 B.R. at 701-02 ("[T]he Fifth Circuit does allow permanent injunctions so long as there is consent . . . [w]ithout an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing[.]") (citations omitted).

[185]    11 U.S.C. § 1129(a)(2).

[186]    *See* 7 COLLIER ON BANKRUPTCY ¶ 1129.02[2] (Richard Levin & Henry J. Sommer eds., 16th ed.).

57

whether a plan proponent has complied with this section, courts focus on whether the proponent has adhered to the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.[187]

119.    As set forth above and as evidenced by the Goncalves Declaration, the Voting Report, the Combined Hearing Certificate of Service, and the Proof of Publication, the Debtors have complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Scheduling Order governing notice, disclosure, and solicitation in connection with the Plan and the Disclosure Statement.  In addition, the Debtors and their professionals acted in good faith in all respects in connection with the solicitation of votes on the Plan and the tabulation of such votes.  Accordingly, the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.[188]

### C.    The Plan Was Proposed in Good Faith – § 1129(a)(3)

120.    As discussed above, section 1129(a)(3) of the Bankruptcy Code provides that the Court shall confirm a plan of reorganization only if the plan has been "proposed in good faith and not by any means forbidden by law."[189]  Section 1129(a)(3) does not define good faith, but courts generally find that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.[190]  "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding

---

[187]    The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126.  H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

[188]    *See In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (holding section 1129(a)(2) satisfied where debtors complied with all provisions of Bankruptcy Code and Bankruptcy Rules governing notice, disclosure and solicitation relating to Plan).

[189]    11 U.S.C. § 1129(a)(3).

[190]    *See Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997).

58

the establishment of a [c]hapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."[191]  The fundamental purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job losses and the adverse economic effects associated with disposing of assets at liquidation value.[192]

121.    The plan proponent must also show that the plan has not been proposed by any means forbidden by law and that the plan has a reasonable likelihood of success.[193]  Whether a plan is proposed for honest and good reasons depends on "whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or if no realistic probability for effective reorganization exists."[194]

122.    The Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  Here, the Plan will enable the Debtors to significantly deleverage their balance sheet, leave operational obligations unimpaired, and position the Debtors for long-term success.  Under the Plan, the Debtors will substantially reduce their debt load by approximately $1.6 billion, pay in full, in the ordinary course of business, all General Unsecured Claims (including Claims of vendors and suppliers), preserve thousands of jobs, and emerge with adequate capital to operate the reorganized businesses and position the Reorganized Debtors for growth and success.  Moreover, the Plan is the product of extensive arms'-length negotiations among the Debtors, their lenders, and other key

---

[191]  *In re Cajun Elec. Power Coop.*, 150 F.3d at 519 (*quoting In re T-H New Orleans*, 116 F.3d at 802); *see also Brite v. Sun Country Dev. (In re Sun Country Dev.)*, 764 F.2d 406, 408 (5th Cir. 1985); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) ("The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code'" (citations omitted)).

[192]  *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.").

[193]  *See In re T-H New Orleans*, 116 F.3d at 802 (finding that a court may only confirm a plan for reorganization if the plan has been proposed in good faith and not by any means forbidden by law and that where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied).

[194]  *In re W.R. & Grace Co.*, 475 B.R. 34, 88 (D. Del. 2012).

59

stakeholders. The Plan's overwhelming support by the Voting Classes is strong evidence that the Plan is likely to succeed. Finally, the Plan complies with bankruptcy and applicable non-bankruptcy law. These facts are the hallmarks of good faith.[195]

123. Accordingly, the Debtors proposed the Plan with honesty, good intentions, and a reasonable hope of success—all in satisfaction of section 1129(a)(3)'s requirement of good faith.

**D.** **The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval – § 1129(a)(4)**

124. Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable. Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[196]

125. All Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 or 330 of the Bankruptcy Code.[197] **Article II.C** of the Plan, moreover, provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than 45 days after the Effective Date, thereby providing a reasonable opportunity for interested parties to review such Professional Fee Claims.

---

[195] *See In re Lincolnshire Campus, LLC*, 441 B.R. 524, 530 (Bankr. N.D. Tex. 2010) (holding that a plan was proposed in good faith where plan was developed and negotiated at arms'-length among representatives of debtors and other major parties in interest); *In re Chemtura Corp.*, 439 B.R. 561, 608-09 (Bankr. S.D.N.Y. 2010) (finding that a plan was proposed in good faith where, among other things, the debtor negotiated and reached agreements with several parties in interest to put forward a chapter 11 plan which "in the aggregate" demonstrated "a good faith effort on the part of the debtor to consider the needs and concerns of all major constituencies" in the case).

[196] *See In re Cajun Elec. Power Coop.*, 150 F.3d at 518 ("Section 1129(a)(4) by its terms requires court approval of any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case.") (internal citations omitted); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[197] Plan, Art. II.C; *see also* 11 U.S.C. §§ 328(a), 330(a)(1)(A).

Supp. App. 234

126.     In addition, the Plan provides that DIP Professional Fees will be paid in accordance with the terms of the DIP Orders.[198]  In the Final DIP Order, the Court approved the Debtors' authority to pay all fees required under the DIP Documents, including the payment of all fees to the DIP Agents and the DIP Lenders and the fees and expenses of the professionals retained by the DIP Agents and the DIP Lenders, subject to certain notice requirements.[199]  For these reasons, the provisions in the Plan comply with section 1129(a)(4) of the Bankruptcy Code.

**E.     The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders – § 1129(a)(5)**

127.     Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.  Section 1129(a)(5)(B) of the Bankruptcy Code further requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.  Additionally, section 1129(a)(5)(A)(ii) provides that the appointment or continuance of such officers and directors must be consistent with the interests of creditors and equity security holders and with public policy.

128.     These requirements direct the Court to ensure that the post-confirmation governance of the Reorganized Debtors is in good hands.  In evaluating compliance with section 1129(a)(5), courts look to whether: (a) the identified directors and officers of the reorganized debtors have experience in the reorganized debtors' business and industry;[200] (b) the

---

[198]    Plan, Art. II.B.

[199]    *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 236] ¶ 24(b) (providing for payment of DIP Professional Fees upon expiration of 5-day review and objection period).

[200]    *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under [section] 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of

---

61

identified directors and officers have experience in financial and management matters;[201] (c) the debtors and creditors believe control of the entity by the proposed directors and officers will be beneficial;[202] and (d) the identified directors and officers are not likely to "perpetuate[] incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."[203] The "public policy requirement would enable [a court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[204]

129. The Debtors have satisfied section 1129(a)(5) of the Bankruptcy Code. As set forth in **Article IV.K** of the Plan, as of the Effective Date, the term of the current members of the board of directors or other governing bodies of Debtors PVKG Intermediate and C1 Holdings shall expire, and the members for the initial term of the New Board shall be appointed in accordance with the Governance Documents. After fulsome negotiations, signatories to the RSA agreed that the New Board would consist of Mr. Russell, the Debtors' CEO, and additional directors to be appointed by lenders holding more than 10% of the fully-diluted New Equity Interests after the Effective Date, as set forth in full in the Governance Documents. The terms in the Plan governing the appointment of the members of the New Board were the result of intense negotiations among the Debtors and the signatories to the RSA, and therefore reflect the interest of creditors and accord

---

this management post-confirmation will prejudice the creditors."); *In re Rusty Jones, Inc.*, 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (holding that 1129(a)(5) was not satisfied where management had no experience in the debtor's line of business).

[201] *See, e.g., In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992); *In re Sherwood Square Assocs.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989).

[202] *See, e.g., In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr. E.D. Mo. 1990).

[203] *In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[204] 7 COLLIER ON BANKRUPTCY ¶ 1129.02[5][b].

62

Supp. App. 236

with public policy.[205] Therefore, the requirements under section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied. Finally, the Debtors will satisfy section 1129(a)(5)(B) of the Bankruptcy Code because the Debtors will publicly disclose the identity of all insiders that the Reorganized Debtors will employ or retain and the nature of any compensation for such insiders in compliance with the Bankruptcy Code on or immediately prior to the Effective Date, to the extent identified and selected prior to that date. Accordingly, section 1129(a)(5) is satisfied here, and no party has objected to the Plan on these grounds.

F. **The Plan Does Not Require Governmental Regulatory Approval For Any Rate Changes – § 1129(a)(6)**

130. Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan. Section 1129(a)(6) is inapplicable to these Chapter 11 Cases.

G. **The Plan Is In the Best Interests of All the Debtors' Creditors – § 1129(a)(7)**

131. Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity holders. This "best interests" test focuses on individual dissenting creditors, rather than classes of claims.[206] The best interests test requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.[207]

---

[205] *See In re Landing Assocs.*, 157 B.R. at 817 ("Under § 1129(a)(5) the plan proponent must disclose the identity of the individuals that will manage the business post-confirmation, and the participation of these individuals in the debtor's business must be consistent with the interests of creditors."); *see also In re Armstrong World Indus.*, 348 B.R. at 165 (finding disclosure of identities and nature of compensation of persons to serve as directors and officers on the effective date sufficient for section 1129(a)(5) of the Bankruptcy Code).

[206] *See LaSalle*, 526 U.S. at 441 n.13.

[207] 11 U.S.C. § 1129(a)(7).

132.    Here, an overwhelming majority of voting creditors have voted to accept the Plan, and all Holders of Claims and Interests in all Impaired Classes will recover at least as much under the Plan as they would in a hypothetical chapter 7 liquidation.[208]  As set forth in the Spitzer Declaration[209] and Exhibit E to the Disclosure Statement, the Debtors, with the assistance of their advisors, prepared a Liquidation Analysis that estimates recoveries for Holders of Claims under the Plan.  The projected recoveries under the Plan as set forth in the Disclosure Statement are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation of the Debtors, as reflected in the Liquidation Analysis and the Spitzer Declaration.[210]  In addition, no party that rejected the Plan—including the members of the Minority AHG—has asserted that the Plan violates the best interests test.  Accordingly, the Plan complies with section 1129(a)(7).

## H.    The Plan Has Been Accepted by Each Impaired Voting Class – § 1129(a)(8)

133.    Subject to section 1129(b) of the Bankruptcy Code, section 1129(a)(8) requires that each class of claims and interests either accept or be unimpaired under the plan of reorganization.  A class of claims or interests that is not impaired under a plan is "conclusively presumed" to have accepted the plan and need not be further examined under section 1129(a)(8).[211]  As relevant here, a class of claims accepts a plan if the holders of at least two-thirds (2/3) in dollar amount and more

---

[208]    *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985), *aff'd*, 785 F.2d 1033 (5th Cir. 1986) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the Plan."); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (citations omitted).

[209]    "**Spitzer Declaration**" means the *Declaration of Stephen Spitzer in Support of (I) Approval of the Debtors' Disclosure Statement and (II) Confirmation of the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates*, filed contemporaneously herewith.

[210]    Disclosure Statement, Ex. E; Spitzer Decl. ¶¶ 8-11.

[211]    *See* 11 U.S.C. § 1126(f).

64

than one-half (1/2) in the number of claims in the class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan.[212]

134. Of the Impaired Classes of Claims and Interests under the Plan, Classes 3 (First Lien Claims) and 4 (Second Lien Claims) voted overwhelmingly to accept the Plan.[213] Classes 1 (Other Secured Claims), 2 (Other Priority Claims), and 5 (General Unsecured Claims) are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. However, Class 9 (Existing C1 Interests) is conclusively deemed to reject the Plan, and Classes 6 (Intercompany Claims) and 8 (Intercompany Interests) may be conclusively deemed to reject the Plan at the election of the Debtors and Required Consenting Lenders. Regardless, the Plan may still be confirmed pursuant to section 1129(b) of the Bankruptcy Code, discussed below.

## I. The Plan Provides for Payment in Full of All Allowed Priority Claims – § 1129(a)(9)

135. The Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code, which requires that persons holding priority claims under the Bankruptcy Code receive specified cash payments.[214] The treatment of Administrative Claims (**Article II.A**), DIP Claims (**Article II.B**), Professional Fee Claims (**Article II.C**), Priority Tax Claims (**Article II.D**), Restructuring Expenses (**Article II.E**), and Other Priority Claims (**Article III**) under the Plan is, in each case, consistent with section 1129(a)(9) of the Bankruptcy Code. No party has objected to the Plan's compliance with section 1129(a)(9).

---

[212] *See* 11 U.S.C. § 1126(c).

[213] Voting Report ¶ 13.

[214] 11 U.S.C. § 1129(a)(9). Under section 1129(a)(9), unless otherwise agreed, a plan must provide that all administrative and priority creditors be paid in full.

65

### J. At Least One Impaired Class Has Accepted the Plan – § 1129(a)(10)

136. Section 1129(a)(10) requires that, to the extent there is a class of Impaired Claims under the Plan, at least one Impaired Class of Claims must accept the plan, excluding the votes of any insiders.[215] As evidenced by the Voting Report, Class 4, which is Impaired, voted to accept the Plan by the requisite number and amount of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), as specified under the Bankruptcy Code.[216] Class 3 also voted overwhelmingly to accept the Plan even when the votes of PVKG Lender, as an insider, are excluded.[217] As such, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### K. The Plan Is Feasible – § 1129(a)(11)

137. Section 1129(a)(11) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[218] To establish that a plan is feasible, "the [bankruptcy] court need not require a guarantee of success . . . [o]nly a reasonable assurance of commercial viability is required."[219] Indeed, "[a]ll the bankruptcy court must find is that the plan offer[s] 'a reasonable probability of success.'"[220] While a debtor bears

---

[215] 11 U.S.C. § 1129(a)(10).

[216] Voting Report ¶ 13.

[217] *See, supra* ¶ 24.

[218] 11 U.S.C. § 1129(a)(11).

[219] *In re Briscoe Enters.*, 994 F.2d at 1165-66 (quoting *In re Lakeside Global II*, 116 B.R. at 507).

[220] *In re T-H New Orleans*, 116 F.3d at 801 (quoting *In re Landing Assocs.*, 157 B.R. at 820).

66

the burden of proving plan feasibility, the applicable standard is by a preponderance of the evidence, which means presenting proof that a given fact is "more likely than not."[221]

138. Courts have fashioned a series of factors that may be considered when evaluating whether a plan is feasible. These factors traditionally include: (a) the adequacy of the debtor's capital structure, (b) the earning power of its business, (c) existing economic conditions, (d) the abilities of the debtor's management, (e) the probability of the continuation of the same management, and (f) other related matters affecting successful performance under the provisions of the plan.[222]

139. Here, the Financial Projections attached to the Disclosure Statement as Exhibit C and the Spitzer Declaration demonstrate that the Plan is feasible. The Financial Projections demonstrate that the Debtors will have sufficient earnings to meet their obligations under the Plan.[223] Although the Debtors' business operates in a competitive industry and market, and although it is impossible to predict with certainty the precise future profitability of the Debtors' business or industries and markets in which the Debtors operate, confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, the Reorganized Debtors, or any successors to the Reorganized Debtors under the Plan.[224] The Plan, negotiated in good faith between the Debtors and their major creditor constituencies,

---

[221] *In re Briscoe Enters.*, 994 F.2d at 1164; *see also In re T-H New Orleans*, 116 F.3d at 801. Further, a number of courts have held that this standard constitutes a "relatively low threshold of proof." *In re Mayer Pollock Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low threshold of support for the Plan as a viable undertaking.").

[222] *See, e.g., In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226-27 (Bankr. D.N.J. 2000) (citing *In re Temple Zion*, 125 B.R. 910, 915 (Bankr. E.D. Pa. 1991)); *In re Toy & Sports Warehouse*, 37 B.R. 141, 151 (Bankr. S.D.N.Y. 1984) (citing *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D.N.J. 1980)); *see also In re T-H New Orleans*, 116 F.3d at 801 (discussing the factors that the bankruptcy court examined in its decision that the debtor's plan was feasible).

[223] Disclosure Statement, Ex. C; *see also* Spitzer Decl. ¶¶ 12-13.

[224] *Id.*

Supp. App. 241

including the First Lien Ad Hoc Group, the Second Lien Ad Hoc Group, and PVKG Lender, has more than a reasonable likelihood of success because the transactions contemplated under the Plan will enable the Debtors to continue their current operations while generating positive free cash flow and will eliminate approximately $1.6 billion of the Debtors' prepetition funded debt obligations.[225]

140.    In formulating the Plan, the Debtors and their financial advisors sought to ensure that the Plan would provide sufficient free cash flow to allow the Debtors to continue to operate their business successfully after emergence and to satisfy all of their obligations under the Plan.[226] By substantially reducing the Debtors' prepetition debt and right-sizing the Debtors' emergence capital structure, the Reorganized Debtors will be better positioned to service ongoing debt obligations and generate cash flow to reinvest in their business.[227]

141.    Accordingly, the Plan provides for a workable reorganization, with more than a reasonable likelihood of success, and no party has asserted otherwise.  The Plan is feasible and satisfies section 1129(a)(11) of the Bankruptcy Code.

### L.    All Statutory Fees Have Been or Will Be Paid – § 1129(a)(12)

142.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority status.

---

[225]    *Id*.

[226]    *Id*.

[227]    *Id*.

68

143. The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because **Article XII.D** of the Plan provides that all such fees and charges, to the extent not previously paid, will be paid for each quarter (including any fraction thereof) until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. No party, including the U.S. Trustee, has asserted otherwise.

> **M.     The Plan Provides for Post-Effective Date Payment of Retiree Benefits – § 1129(a)(13)**

144. Section 1129(a)(13) requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code. **Article IV.O** of the Plan provides that, as of the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. The Plan satisfies the requirements of section 1129(a)(13), and no party has asserted otherwise.

> **N.     Sections 1129(a)(14) to 1129(a)(16) Do Not Apply to the Plan**

145. Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.[228]

146. Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code. Because no Debtor is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.[229]

147. Finally, section 1129(a)(16) of the Bankruptcy Code provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or

---

[228]  Goncalves Decl. ¶ 10.

[229]  *Id.*

69

trust be made in accordance with any applicable provisions of non-bankruptcy law. Because each Debtor is a moneyed, business, or commercial corporation, section 1129(a)(16) is not applicable.[230]

### O.     Cramdown – § 1129(b)

148.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in section 1129(b) are satisfied. To confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[231]

149.    The Bankruptcy Code does not provide a standard for determining "unfair discrimination."[232] Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.[233] At a minimum, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[234] A plan

---

[230]    *Id.*

[231]    11 U.S.C. § 1129(b)(1); *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa L.P.)*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[232]    *See In re Idearc Inc.,* 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 434 (Bankr. S.D. Tex. 2009); *In re Armstrong World Indus*., *Inc*., 348 B.R. 111, 121 (D. Del. 2006) (citing *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004) ("[H]allmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.").

[233]    *See In re Kolton,* No. 89-53425-C, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990) (citing *In re Bowles,* 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (whether or not a particular plan unfairly discriminates is to be determined on a case-by-case basis); *see also In re Freymiller Trucking, Inc.,* 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[234]    *See Idearc Inc.,* 423 B.R. at 171 ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without

70

Supp. App. 244

does not unfairly discriminate where it provides different treatment to two or more classes that are comprised of dissimilar claims or interests.[235] Likewise, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for the disparate treatment.[236]

150.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects the plan if it follows the "absolute priority rule."[237]  The absolute priority rule provides that a junior stakeholder (*e.g.*, an equity holder) may not receive or retain property under a plan of reorganization "on account of" its junior interests unless all senior classes either (a) are paid in full or (b) vote in favor of the plan.[238]

151.    Here, Class 6 (Intercompany Claims), Class 7 (Section 510 Claims), Class 8 (Intercompany Interests), and Class 9 (Existing C1 Interests), to the extent Impaired under the Plan, have been deemed to reject the Plan.  The Plan may nonetheless be confirmed over the rejection by such Classes pursuant to section 1129(b) of the Bankruptcy Code because the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Impaired Classes.

---

compelling justifications for doing so."); *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654 (9th Cir. 1997); *In re Aztec Co.,* 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.,* 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).

[235]  *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 655; *In re Aztec Co.,* 107 B.R. at 589-91; *In re Johns-Manville Corp.,* 68 B.R. at 636.

[236]  *Aztec Co.,* 107 B.R. at 590.

[237]  *See* 11 U.S.C. § 1129(b)(2)(B)(ii); *see also DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 88 (2d Cir. 2011) (the absolute priority rule "provides that a reorganization plan may not give 'property' to the holders of any junior claims or interests 'on account of' those claims or interests, unless all classes of senior claims either receive the full value of their claims or give their consent") (citations omitted); *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) ("Under the statute, a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan 'on account of' such claims or interests.") (citations omitted).

[238]  11 U.S.C. § 1129(b)(2)(B)(ii).

Supp. App. 245

152.    *First*, the Plan does not unfairly discriminate against these Classes.  Under the Plan, all similarly situated Holders of Claims and Interests will receive substantially similar treatment. Additionally, the Plan's classification scheme rests on a legally acceptable rationale because it separates substantively dissimilar Claims into separate Classes.  Thus, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.  No party has asserted otherwise.

153.    *Second*, the Plan is fair and equitable with respect to the rejecting Impaired Classes. The Plan satisfies the "fair and equitable" requirement because there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such Classes will receive or retain any property on account of the Claims or Interests in such Class.  Again, no party has asserted otherwise.

154.    For these reasons, the Plan satisfies section 1129(b) of the Bankruptcy Code and may be confirmed notwithstanding the rejecting Impaired Classes.

**P.      The Debtors Have Complied with Section 1129(d) of the Bankruptcy Code**

155.    As set forth in the Goncalves Declaration, the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act.[239]  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.

**Q.      Modifications to the Plan**

156.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as the modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  Bankruptcy

---

[239]   Goncalves Decl. ¶ 11.

72

Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder. Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[240]

157. The Debtors have made certain technical modifications to the Plan (collectively, the "**Technical Modifications**") after solicitation in response to informal comments from certain parties in interest.[241] The Technical Modifications are either immaterial or do not adversely impact the way creditors or other stakeholders are treated, and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. Accordingly, no additional solicitation or disclosure is required on account of the Technical Modifications, and the Technical Modifications should be deemed accepted by all creditors that previously accepted the Plan.

## Waiver of Stay of Effectiveness Is Appropriate

158. Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory

---

[240] *See, e.g., In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988) (finding that nonmaterial modifications that do not adversely impact parties who have previously voted on the plan do not require additional disclosure or resolicitation); *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 857 (Bankr. S.D. Tex. 2001) (same); *see also In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation).

[241] The Debtors have filed a redline showing the limited Technical Modifications contemporaneously with the filing of this memorandum.

73

contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

159.     The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.  The restructuring contemplated in the Plan was extensively negotiated among sophisticated parties and is premised on preserving the value of the Debtors as a going concern.  In addition, to the extent necessary to facilitate closing of the Restructuring Transactions, the Debtors require the ability to immediately begin making any payments required under the Plan.

160.     Accordingly, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

## **Conclusion**

161.     For all of the reasons set forth herein, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement on a final basis and confirm the Plan by entering the Confirmation Order and granting such other and further relief as is just and proper.

[*Remainder of Page Intentionally Left Blank*]

74

Dated: May 14, 2024
      Houston, Texas

                                 */s/ Charles R. Koster*
                                 Charles R. Koster (Texas Bar No. 24128278)
                                 **WHITE & CASE LLP**
                                 609 Main Street, Suite 2900
                                 Houston, Texas 77002
                                 Telephone: (713) 496-9700
                                 Facsimile: (713) 496-9701
                                 Email: charles.koster@whitecase.com

                                 -and-

                                 Bojan Guzina (admitted *pro hac vice*)
                                 Jason N. Zakia (admitted *pro hac vice*)
                                 Andrew F. O'Neill (admitted *pro hac vice*)
                                 Erin R. Rosenberg (admitted *pro hac vice*)
                                 Blair M. Warner (admitted *pro hac vice*)
                                 Adam T. Swingle (admitted *pro hac vice*)
                                 **WHITE & CASE LLP**
                                 111 South Wacker Drive, Suite 5100
                                 Chicago, IL 60606
                                 Telephone: (312) 881-5400
                                 Email: bojan.guzina@whitecase.com
                                        aoneill@whitecase.com
                                        erin.rosenberg@whitecase.com
                                        blair.warner@whitecase.com
                                        adam.swingle@whitecase.com

                                 *Counsel to the Debtors and*
                                 *Debtors in Possession*

## Certificate of Service

I certify that on May 14, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Charles R. Koster*
Charles R. Koster

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90194 (CML) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DECLARATION OF STEPHENIE KJONTVEDT OF
EPIQ CORPORATE RESTRUCTURING, LLC, REGARDING
THE SOLICITATION AND TABULATION OF BALLOTS CAST ON
THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
OF CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

I, Stephenie Kjontvedt, being duly sworn, state the following under penalty of perjury:

1. I am a Vice President, Senior Consultant at Epiq Corporate Restructuring, LLC ("**Epiq**"), the retained claims, noticing, and solicitation agent to the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), which is located at 777 Third Avenue, 12th Floor, New York, New York 10017. I am over 18 years of age and competent to testify on the matters herein. I do not have a direct interest in the above-captioned chapter 11 cases and should be considered an impartial party.

2. I submit this declaration (this "**Declaration**") with respect to the tabulation of votes cast on the *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc.*

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

*and Its Debtor Affiliates*, dated April 3, 2024 (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "**Plan**").[2]  Except as otherwise indicated herein, all facts set forth herein are based upon my personal knowledge, or my review of relevant documents. I am authorized to submit this Declaration on behalf of Epiq.  If I were called upon to testify, I could and would testify competently as to the facts set forth herein.  I am not being specifically compensated for this testimony, and Epiq is receiving compensation only as part of its engagement letter with the Debtors as the Debtors' claims, noticing, and solicitation agent on the terms and conditions pursuant to which Epiq was retained in these Chapter 11 Cases.  *See Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent* [Docket No. 44] (the "**Retention Order**").

3.	Prior to filing these Chapter 11 Cases, the Debtors designated Epiq as their claims, noticing, and solicitation agent to assist the Debtors with, among other things, (i) the balloting process and service of solicitation materials to parties entitled to vote to accept or reject the Plan, and (ii) the tabulation of votes cast with respect to the Plan.  Epiq and its employees have considerable experience in soliciting and tabulating votes to accept or reject proposed chapter 11 plans, including without limitation, prepackaged chapter 11 plans.

4.	In accordance with (i) the Retention Order, and (ii) the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline, Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline, (IV) Waiving the Requirement to Hold the Creditors' Meeting and*

---

[2]	Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Disclosure Statement and Plan or the Solicitation Order (as defined herein), as applicable.

2

*File SOFAs, Schedules, and 2015.3 Reports, and (V) Granting Related Relief* [Docket No. 81] (the

"**Solicitation Order**"), Epiq was appointed and authorized to assist the Debtors with, among other

things, soliciting, receiving, reviewing, determining the validity of, and tabulating Ballots cast on

the Plan by holders of Claims in the Voting Classes (as defined below).

5.       Pursuant to the Plan only holders of Claims in the following Classes (collectively,

the "**Voting Classes**") were entitled to vote to accept or reject the Plan:

| **Class[3]** | **Description** |
| --- | --- |
| Class 3 | First Lien Claims |
| Class 4 | Second Lien Claims |

6.       The Solicitation Order established April 1, 2024 as the record date for determining

the holders of Claims in the Voting Classes entitled to vote on the Plan (the "**Voting Record**

**Date**"), and April 3, 2024 as the commencement date for the Solicitation Packages to Holders of

Claims in the Voting Classes.

7.       Counsel to the Debtors provided Epiq with Voting Record Date data, certain of

which was received from the First Lien Term Loan Agent and the Second Lien Agent, and this

data was used to solicit votes on the Plan.

**Service of Solicitation Packages**

8.       Solicitation commenced on April 3, 2024 and Epiq served PDF copies of the

following documents via electronic mail to the holders of Claims in the Voting Classes:

> a.  the Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of
>     Reorganization of ConvergeOne Holdings, Inc. and Its Debtor

---

[3]    The Plan does not contemplate substantive consolidation of any of the Debtors' estates and constitutes a separate
       chapter 11 plan for each of the Debtors.  Accordingly, the classification of Claims in the Voting Classes applies
       separately to each Debtor.

Affiliates, which contained as an exhibit the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates [Docket No. 26] (the "**Disclosure Statement and Plan**");

b. the Letter from the Debtors to Holders of Class 3 First Lien Claims and Class 4 Second Lien Claims (the "**Cover Letter**"), a copy of which is attached hereto as **Exhibit 1**;

c. the Ballot for Voting on the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates, Class 3 - First Lien Claims (the "**Class 3 Ballot**"), a copy of which is attached hereto as **Exhibit 2**;

d. the Ballot for Voting on the Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates, Class 4 - Second Lien Claims (the "**Class 4 Ballot**"), a copy of which is attached hereto as **Exhibit 3**;

e. with respect to Class 3, the ConvergeOne Holdings, Inc. Election/Subscription Form for Allowed First Lien Claims – Subscription Rights Offering (the "**Election/Subscription Form**"), a copy of which is attached hereto as **Exhibit 4**;

f. with respect to Class 3, the ConvergeOne Holdings, Inc. Election and Rights Offering Procedures (the "**Election and Rights Offering Procedures**"), a copy of which is attached hereto as **Exhibit 5**; and

g. with respect to Class 3, the Subscription Form Worksheet.

9. True and correct copies of the above listed documents were served as follows:

a. the Cover Letter, Disclosure Statement and Plan, Class 3 Ballot, Election/Subscription Form, Election and Rights Offering Procedures, and Subscription Form Worksheet were served on the parties listed on **Exhibit 6**;

b. the Cover Letter, Disclosure Statement and Plan, and Class 4 Ballot were served on the parties listed on **Exhibit 7**.

10. Pursuant to the Solicitation Order, on April 8, 2024, Epiq served the Combined Hearing Notice, the Non-Voting Status Notice, and the Opt-Out Form. Epiq served the Combined Hearing Notice on all Holders of Claims in the Voting Classes, and served the Combined Hearing

4

Notice, the Non-Voting Status Notice, and the Opt-Out Form on more than 25,000 Non-Voting parties. Epiq's *Certificate of Service* with respect to such service was filed on April 15, 2024 [Docket No. 153].

### Vote Declaration

11.     The procedures for the solicitation and tabulation of votes on the Plan (the "**Solicitation Procedures**") are outlined in the Disclosure Statement and Plan, the Ballots, and the Solicitation Order.

12.     In order for a Ballot to be counted as valid, the Ballot must have been properly completed in accordance with the Solicitation Procedures, executed by the relevant holder, or such holder's authorized representative, and received by Epiq no later than 4:00 p.m. (prevailing Central Time) on April 17, 2024 (the "**Voting Deadline**"). All validly completed and executed Ballots cast by the holder of Claims in the Voting Classes were processed and tabulated in accordance with the Solicitation Procedures.

13.     The results of the voting by holders of Claims in the Voting Classes are as set forth in **Exhibit 8** hereto, which is a true and correct copy of the final tabulation of votes cast by timely and properly executed Ballots received by Epiq. Additionally, set forth below is a summary of the voting results with respect to each Voting Class tabulated on a consolidated basis:

| Total Ballots Received | | | |
|---|---|---|---|
| **Accept** | | **Reject** | |
| **Number (% of Number)** | **Amount (% of Amount)** | **Number (% of Number)** | **Amount (% of Amount)** |
| **Class 3 – First Lien Claims** | | | |
| 80.98% | 88.80% | 19.02% | 11.20% |
| **Class 4 – Second Lien Claims[4]** | | | |
| 100% | 100% | 0% | 0% |

---

[4]     Class 4 does not contain any votes by an insider.

5

14. Epiq did not receive any Ballots that were excluded from the tabulation above as not satisfying the requirements for a valid Ballot as set forth in the Solicitation Order and Solicitation Procedures.

15. Epiq examined each Ballot and each Opt-Out Form to determine which parties opted out of the release. As reflected in **Exhibit 9** hereto, as of the April 30, 2024 Opt-Out Deadline, 39 parties affirmatively elected to opt out of the release. For the avoidance of doubt, this declaration does not certify the validity of any Opt-Out Election and is provided for reporting and informational purposes only with respect thereto.

*[Remainder of Page Intentionally Left Blank]*

6

Supp. App. 256

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated May 13, 2024
Westchester, New York

/s/ *Stephenie Kjontvedt*
Stephenie Kjontvedt
Vice President, Senior Consultant
Epiq Corporate Restructuring, LLC

7

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| CONVERGEONE HOLDINGS, INC., *et al.*[1] | ) Case No. 24-90194 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**AD HOC GROUP OF EXCLUDED LENDERS' OBJECTION TO CONFIRMATION OF
JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF
CONVERGEONE HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

RELEVANT BACKGROUND ...................................................................................................4
  A. The Restructuring Support Agreement and The Debtors' Insider ..........................4
  B. The Equity Rights Offering, Including The Exclusive Investment
   Opportunities..........................................................................................................5
  C. The Debtors' Restructuring-Related Governance....................................................8
  D. Impact on Excluded Lenders ................................................................................10
  E. Excluded Lenders' Alternative Proposal ..............................................................11

OBJECTION...........................................................................................................................12
  A. The Proposed Plan, Including The Equity Rights Offering, Is Subject To
   Entire Fairness Scrutiny.......................................................................................12
  B. The Proposed Plan Provides Unequal Treatment to Holders in Class 3 in
   Violation of Section 1123(a)(4) of the Bankruptcy Code......................................17
  C. The Alternative Proposal Provides the Debtors a Confirmable Path Forward
   ..............................................................................................................................23

CONCLUSION........................................................................................................................27

Supp. App. 259

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bank of Am. Nat'l Tr. & Savings Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)..............................................................................................2, 19, 20, 21

*Begier v. IRS*,
   496 U.S. 53 (1990)...........................................................................................................18

*Burtch v. Opus, LLC (In re Opus E., LLC)*,
   528 B.R. 30 (Bankr. D. Del. 2015) ..................................................................................14

*Cinerama, Inc. v. Technicolor, Inc.*,
   663 A.2d 1156 (Del. 1995) ..............................................................................................14

*Czyzewski v. Jevic Holding Corp.*,
   580 U.S. 451 (2017).............................................................................................................4

*Dunn v. Chappelle (In re Alta Mesa Res., Inc.)*,
   No. 19-35133, 2022 WL 7750353 (Bankr. S.D. Tex. Oct. 13, 2022)...................................13

*Emerald Partners v. Berlin*,
   726 A.2d 1215 (Del. 1999) ..............................................................................................16

*Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*,
   926 F.2d 1458 (5th Cir. 1991) .........................................................................................12

*Gesoff v. IIC Indus., Inc.*,
   902 A.2d 1130 (Del. Ch. 2006).........................................................................................17

*In re Charter Commc'ns*,
   419 B.R. 221 (Bankr. S.D.N.Y. 2009)................................................................................13

*In re Dana Corp.*,
   412 B.R. 53 (S.D.N.Y. 2008)............................................................................................18

*In re Dernick*,
   624 B.R. 799 (Bankr. S.D. Tex. 2020) .....................................................................13, 24, 25

*In re Featherworks Corp.*,
   25 B.R. 634 (Bankr. E.D.N.Y. 1982),
   *aff'd*, 36 B.R. 460 (E.D.N.Y. 1984).................................................................................26

*In re Food City, Inc.*,
   110 B.R. 808 (Bankr. W.D. Tex. 1990)...............................................................................13

ii

*In re Harford Sands Inc.*,
    372 F.3d 637 (4th Cir. 2004) .................................................................................................13

*In re LATAM Airlines Grp. S.A.*,
    620 B.R. 722 (Bankr. S.D.N.Y. 2020)...................................................................................12

*In re LATAM Airlines Grp. S.A.*,
    No. 20-11254, 2022 WL 790414 (Bankr. S.D.N.Y. Mar. 15, 2022) ......................................21

*In re Match Grp., Inc. Deriv. Litig.*,
    No. 368, 2024 WL 1449815 (Del. Apr. 4, 2024)...................................................................14

*In re Match Grp., Inc. Derivative Litig.*,
    No. 2020-0505, 2022 WL 3970159 (Del. Ch. Sept. 1, 2022),
    *aff'd in part, rev'd in part*, 2024 WL 1449815 (Del. Apr. 4, 2024) ......................................17

*In re MSR Hotels & Resorts, Inc.*,
    No. 13-11512, 2013 WL 5716897 (Bankr. S.D.N.Y. Oct. 1, 2013) .......................................12

*In re Pacific Drilling S.A.*,
    Case No. 17-13193 (MEW), 2018 Bankr. LEXIS 3024 (Bankr. S.D.N.Y. Oct.
    1, 2018) ..............................................................................................................................4, 23

*In re Pattern Energy Grp. Inc. S'holders Litig.*,
    No. 2020-0357, 2021 WL 1812674 (Del. Ch. May 6, 2021).................................................15

*In re Peabody Energy Corp.*,
    933 F.3d 918 (8th Cir. 2019) ...............................................................................................21

*In re Save Our Springs (S.O.S.) All., Inc.*,
    388 B.R. 202 (Bankr. W.D. Tex. 2008),
    *aff'd*, 2009 WL 8637183 (W.D. Tex. Sept. 29, 2009),
    *aff'd*, 632 F.3d 168 (5th Cir. 2011).......................................................................................24

*In re Tesla Motors, Inc. S'holder Litig.*,
    298 A.3d 667 (Del. 2023) .....................................................................................................14

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013)..................................................................................................18

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .......................................................................................13

*LaMonica v. Tilton (In re Transcare Corp.)*,
    81 F.4th 37 (2d Cir. 2023) ...................................................................................................14

*Mills Acquisition Co. v. Macmillan, Inc.*,
    559 A.2d 1261 (Del. 1989) ...................................................................................................17

Supp. App. 261

*Nat'l Convenience Stores Inc. v. Shields (In re Schepps Food Stores, Inc.)*,
  160 B.R. 792 (Bankr. S.D. Tex. 1993) ......................................................................13

*Pepper v. Litton*,
  308 U.S. 295 (1939) ....................................................................................................12

*Porretto v. Williams (In re Porretto)*,
  761 F. App'x 437 (5th Cir. 2019) ...............................................................................13

*Voigt v. Metcalf*,
  No. CV 2018-0828, 2020 WL 614999 (Del. Ch. Feb. 10, 2020) ...............................16

*Weinberger v. UOP, Inc.*,
  457 A.2d 701 (Del. 1983) ......................................................................................14, 15

*Young v. Higbee Co.*,
  324 U.S. 204 (1945)....................................................................................................25

**STATUTES**

11 U.S.C. § 101....................................................................................................16, 25, 26

11 U.S.C. § 1123.................................................................................1, 17, 18, 20, 24, 25

11 U.S.C. § 1126...........................................................................................19, 24, 25

11 U.S.C. § 1129.............................................................................13, 19, 20, 24, 25, 26

Supp. App. 262

The Ad Hoc Group of Excluded Lenders (the "Excluded Lenders")[1] object to confirmation of the *Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* (the "Proposed Plan")[2] [Docket No. 27] and respectfully represent as follows:[3]

**Preliminary Statement**

1.      Before filing these chapter 11 cases, the Debtors privately negotiated the terms of a proposed restructuring with a select group of creditors (including an affiliate of the Debtors' controlling insider) who collectively hold approximately 81% of the Debtors' First Lien Claims[4] (collectively, the "Majority Lenders").  This pact was memorialized in the Restructuring Support Agreement (the "RSA"), which requires the Debtors to raise $245 million by selling steeply discounted equity without any market test (the "Equity Rights Offering").  Only a portion of the investment opportunity is available to all members of Class 3.  The balance (roughly $86 million) is reserved *exclusively* for purchase by the Majority Lenders.  The RSA and Proposed Plan also require the Debtors to pay the Majority Lenders a "fee" in form of reorganized equity with an assumed value of $37.7 million.

2.      The Proposed Plan is fatally flawed and confirmation must be denied because the Exclusive Investment Opportunities (as defined below) violate the equal treatment requirement in section 1123(a)(4) of the Bankruptcy Code by providing vastly different recoveries for Majority Lenders as compared to the Excluded Lenders, both of whom are in Class 3.  Equality of

---

[1]   The Excluded Lenders are identified in the *Supplemental Verified Statement of the Ad Hoc Group of Excluded Lenders Pursuant to Bankruptcy Rule 2019* [Docket No. 233].

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Proposed Plan.

[3]   Attached hereto as **Exhibit A** is the *Declaration of Keshav Lall in Connection with Ad Hoc Group of Excluded Lenders' Objection to Confirmation of Joint Prepackaged Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates* (the "Lall Declaration").

[4]   In the Proposed Plan, all Holders of First Lien Claims are classified together in Class 3.

1

Supp. App. 263

distribution among creditors in the same class is a central policy and Bankruptcy Code requirement.  The Exclusive Investment Opportunities position the Majority Lenders to receive reorganized equity with an assumed value of $169.6 million in exchange for $85.75 million of new money.  Moreover, on a relative recovery basis, the Exclusive Investment Opportunities enable the Majority Lenders, as a collective group, to receive not less than a ▓▓% recovery on their First Lien Claims, and maybe more depending upon the participation in the Takeback Term Loan Recovery Option—a staggering over ▓▓% enhancement over the recovery to the Excluded Lenders electing the equity option under the Proposed Plan.  Because the Majority Lenders and Excluded Lenders are in the same class, this disparity, by definition, is unequal treatment and prohibited by the Bankruptcy Code.

3. The Debtors will try to characterize the Exclusive Investment Opportunities as compensation for new money commitments and not a distribution to the Majority Lenders on account of the First Lien Claims.  That contention ignores reality.  The Debtors agreed to provide the Exclusive Investment Opportunities for one plainly obvious reason:  it was the price they had to pay to get the consent of the majority at the expense of the minority.  Moreover, any argument that the Exclusive Investment Opportunities are on account of new money commitments fails because there was no market test here.  In *Bank of America National Trust & Savings Association v. 203 N. LaSalle St. Partnership*, 526 U.S. 434 (1999) ("LaSalle"), the Supreme Court held that exclusive investment opportunities to existing stakeholders to buy discounted equity cannot constitute legitimate consideration for a new money commitment.  An *exclusive* investment opportunity is, by definition, one without market scrutiny.  That is precisely what doomed the plan in *LaSalle*.

2

4.      Any effort to deny the direct connection between the Exclusive Investment Opportunities and the Majority Lenders' First Lien Claims is completely undercut by the fact that the Debtors have completely declined to consider even exploring a superior alternative proposal by the Excluded Lenders.  *See* Lall Decl. ¶¶ 13-15.  The alternative was rejected because the Debtors promised, as part of the RSA, to give Exclusive Investment Opportunities to the Majority Lenders on account of their agreement to vote their claims in favor of the Debtors' Proposed Plan.

5.      The Debtors will insist that the Exclusive Investment Opportunities are required under the terms of the RSA and are an inextricable part of a holistic bargain.  They will argue no other exit financing is "actionable" because it will not come with votes sufficient to carry an impaired accepting class required for plan confirmation.  As a result of the Majority Lenders' blocking position , the Debtors will maintain this is best deal they could negotiate with their limited leverage and their business judgment should not be second-guessed.  They will also point to the risk of a default under the DIP financing order, which in turn will lead to the oft-cited parade of horribles.

6.      As a threshold matter, the deferential business judgment rule does not apply here because, as explained below, the RSA and Proposed Plan reflect a deal that includes substantial benefits for the Debtors' controlling shareholder, CVC Capital Partners ("CVC"), and its affiliate PVKG Lender (defined below).  As result, the Proposed Plan (including the Equity Rights Offering) must be scrutinized under the exacting "entire fairness" standard, with the Debtors bearing the burden of proof.

7.      In any case, if the promises made in the RSA cannot be achieved without violating the equal treatment rule, it is the RSA and the Proposed Plan that must give way, not the rule.  As the Supreme Court has made clear, there are no "rare case" exceptions that allow plan distributions

3

in violation of the Bankruptcy Code. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 470 (2017) (courts lack authority to approve transactions that sanction a "departure from the protections Congress granted particular classes of creditors").

8.      Bankruptcy Judge Wiles powerfully expressed his concerns about just this type of strategy in the *Pacific Drilling* case:

> The theory of the Bankruptcy Code is that when the big creditors sit in a room and negotiate a deal, the little creditors who are in the same boat get the same deal.  The Bankruptcy Code does not permit the unequal treatment of creditors in the same class; it also does not permit the payment of extra compensation to large creditors in exchange for their commitment to vote for a plan.  The problem with special allocations in rights offerings, or with private placements that are limited to the bigger creditors who sat at the negotiating table, or big backstop fees that are paid to the bigger creditors who sat at the negotiating table but that are not even open to other creditors (and in particular to other creditors in the same class), is that it is far too easy for the people who sit at the negotiating table to use those tools primarily to take for themselves a bigger recovery than smaller creditors in the same classes will get.

*In re Pacific Drilling S.A.*, Case No. 17-13193 (MEW), 2018 Bankr. LEXIS 3024, at *5 (Bankr. S.D.N.Y. Oct. 1, 2018).

9.      For these reasons, confirmation of the Proposed Plan should be denied.

**Relevant Background[5]**

**A.      The Restructuring Support Agreement and The Debtors' Insider**

10.      On April 3, 2024, the Debtors entered into the RSA. *See Declaration of Salvatore Lombardi in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 4] (the "Lombardi Declaration") ¶ 73.  The parties to the RSA include (i) the First Lien Consenting Lenders, which includes PVKG Investment Holdings Inc. ("PVKG Lender"), as Holder of First

---

[5] The Excluded Lenders have served document requests on the Debtors and separately (by way of subpoena) on the Insiders (as defined below).  The Excluded Lenders are in the process of evaluating the documents that have been produced to date and understand that additional documents are forthcoming.  The Excluded Lenders also plan to take limited deposition discovery.  Thus, the Excluded Lenders reserve the right to supplement this factual discussion through the presentation of evidence at the confirmation hearing or otherwise.

4

Lien Claims, (ii) the Second Lien Consenting Lenders, and (iii) the Consenting Sponsors, which includes PVKG Lender as a direct or indirect Holder of Existing C1 Interests. *See* RSA at 2. The parties to the RSA hold approximately $1,119.9 million (approximately 80.7%) of First Lien Claims. *See* Lall Decl., Exhibit 1.

11.    PVKG Lender is controlled by CVC (together with PVKG Lender, the "Insider"), and holds approximately $193 million in principal amount of the Debtors' first lien debt (the "PVKG Note Claims"). Lombardi Decl. ¶ 36. Pursuant to the RSA and Proposed Plan, the PVKG Note Claims are proposed to be settled by allowing them in the amount of $213 million and treating them as First Lien Claims in Class 3. *See* Proposed Plan § IV.B; Lombardi Decl. ¶ 8.

12.    The Debtors are *also* controlled by CVC through CVC's indirect 100% ownership of Debtor PVKG Intermediate Holdings Inc. Lombardi Decl. ¶¶ 13, 26-27.

13.    The Excluded Lenders are certain holders of approximately $164 million of First Lien Claims.

**B.    The Equity Rights Offering, Including The Exclusive Investment Opportunities**

14.    The Debtors are required under the RSA to raise $245 in an Equity Rights Offering. *See* RSA, Exhibit B (Restructuring Term Sheet) at 2.

15.    Under the Equity Rights Offering, the Debtors are required to sell reorganized common stock at a price that reflects a 35% discount (the "Plan Discount") to the Debtors' estimated $434 million post-emergence equity value under the Proposed Plan ("Plan Value"). *See* RSA, Exhibit 3 (Equity Rights Offering Term Sheet) to Exhibit B (Restructuring Term Sheet) at 2.

16.    The Debtors are required to raise $159.25 million by offering discounted equity to all Holders of First Lien Claims in Class 3 on a *pro rata* basis (the "Open Equity Allocation"). *See* Proposed Plan §§ I.A.165-167, 171, III.C.3.c.

17.     The remaining $85.75 million of discounted equity (worth $131.92 million at Plan Value) is required under the RSA to be reserved exclusively for purchase by the Majority Lenders who are Investors[6] (the "Preferred Majority Lenders"), resulting in an approximately 30.4% ownership stake (the "Exclusive Equity Allocation"). *See* Proposed Plan §§ I.A.51-52; Lall Decl. ¶ 7.

18.     The Proposed Plan provides, by default, that Holders of First Lien Claims participate in the Open Equity Allocation and receive Takeback Term Loans (the "Default Option") in a principal amount equal to 15% of their First Lien Claims. Proposed Plan § I.A.171. Holders of First Lien Claims may elect to receive the Takeback Term Loan Recovery Option instead of participating in the Open Equity Allocation. *See* Proposed Plan § III.C.3.(c). The Takeback Term Loan Recovery Option provides a Holder that makes the election recovery solely in the form of Takeback Term Loans in a principal amount equal to 20% of such Holder's First Lien Claim. *Id.* § I.A.189. The Proposed Plan provides an adjustment mechanism (the "Adjustment") pursuant to which participation in each recovery option is limited to 50% of the total. Proposed Plan § III.C.3.(c).

19.     The Majority Lenders committed in the RSA to buy their *pro rata* share of the Open Equity Allocation and the Exclusive Equity Allocation.[7] The RSA also provides that the Preferred Majority Lenders backstop the Equity Rights Offering by committing "to purchase from the [Debtors] in the Rights Offering the New Equity Interests that are not purchased by the Eligible Offerees in the Rights Offering . . . ." RSA, Exhibit 3 (Equity Rights Offering Term Sheet) to

---

[6]   The "Investors" are the Majority Lenders set forth on Schedule I to the Equity Rights Offering Term Sheet to the RSA that will backstop the Equity Rights Offering and are party to the Backstop Agreement.

[7]   *See* RSA § 4.02(a)(ii) (providing that each Consenting Stakeholder (which includes the each Holder of First Lien Claims party to the RSA) "elect the Rights Offering Rights and Takeback Loan Recovery Option (if applicable to such Party) . . . .").

6

Supp. App. 268

Exhibit B (Restructuring Term Sheet) at 3 (defining "Backstop Commitment") (emphasis added). The Eligible Offerees include only those Holders of First Lien Claims who elect the Default Option.[8]   Moreover, the Proposed Plan defines the "Backstop Commitment" to mean "commitments to purchase up to $159,250,000 of the New Equity Interests at the Plan Discount, pursuant to the terms of the Rights Offering and in accordance with the Backstop Agreement . . . ." Proposed Plan § I.A.16 (emphasis added).  Accordingly, the backstop commitment, according to both the RSA and Proposed Plan, relates solely to the $159.25 million Open Equity Allocation.

20.   Despite the Majority Lenders' backstop commitment is limited to buying unsubscribed discounted equity in the Open Equity Allocation, the Debtors are nevertheless required to pay a "backstop fee" (called the "Put Option Premium" and together with the Exclusive Equity Allocation, the "Exclusive Investment Opportunities"), payable in equity at the Plan Discount, calculated as 10% of the *entire* Equity Rights Offering amount ($245 million).  *See* Proposed Plan § I.A.145; RSA, Exhibit 3 (Equity Rights Offering Term Sheet) to Exhibit B (Restructuring Term Sheet) at 3.  Put plainly, in exchange for agreeing to backstop the purchase of no more than approximately $30.7 million of the $159.25 million Open Equity Allocation (*i.e.*, 19%), the Debtors are required under the RSA to give the Majority Lenders an approximately 8.7% stake in the reorganized company by paying them a 10% fee calculated on the total $245 million Equity Rights Offering, which is payable in discounted equity and has a value of $37.7 million ($24.5 million worth of shares issued at a 35% discounted to Plan Value equals approximately $37.7 million in Plan Value).  Lall Decl. ¶ 12.  In short, the Debtors are required to pay $37.7

---

[8]   "Eligible Offerees" is defined in the Equity Rights Offering Term Sheet to be Holders of First Lien Claims that elect the Rights Offering Rights and Takeback Term Loan Recovery Option (and satisfy certain requirements under securities laws).  RSA, Exhibit 3 (Equity Rights Offering Term Sheet) to Exhibit B (Restructuring Term Sheet) at 1-2.

Supp. App. 269

million in value to the Preferred Majority Lenders to backstop no more than $30.7 million of new equity. *Id.*

## C.   The Debtors' Restructuring-Related Governance

21.   As set forth in the Lombardi Declaration, the Debtors began implementing certain initiatives to address their financial and strategic challenges in early 2023. This included certain governance-related changes. In January 2023, the Debtors appointed Jeffrey S. Russell to serve as Chief Executive Officer. Lombardi Decl. ¶ 60. Although the Lombardi Declaration is not entirely clear on this point, it is reasonable to assume that Mr. Russell was selected and appointed by CVC, by nature of CVC's control of the Debtors through its indirect 100% ownership of Debtor PVKG Intermediate Holdings Inc. *Id.* ¶¶ 13, 26-27.[9] Moreover, at least two CVC executives— Lars Haegg and James Christopoulos—currently sit on the Debtors' boards of directors. *See Declaration of Michael T. Mervis in Connection with Ad Hoc Group of Excluded Lenders' Objection to Confirmation of Joint Prepackaged Chapter 11 Plan of Reorganization of CovergeOne Holdings, Inc. and Its Debtor Affiliates*, dated May 7, 2024 ("Mervis Decl."), Exhibit 1.

22.   The Debtors also engaged three advisors—White & Case LLP ("White & Case") as counsel, AlixPartners, LLP ("AlixPartners") as financial advisor, and Evercore Group L.L.C. ("Evercore", and collectively with White & Case and AlixPartners, the "Advisors") as investment banker—in connection with its strategic initiatives. Lombardi Decl. ¶ 62. White & Case had served as counsel for the Debtors since 2019,[10] and Evercore and AlixPartners were retained in

---

9   Because discovery is ongoing, the Excluded Lenders anticipate providing additional evidence, at the confirmation hearing or otherwise, regarding the governance matters discussed herein.

10   *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of White & Case LLP as Attorneys to the Debtors Effective as of the Petition Date* [Docket No. 144].

8

Supp. App. 270

March and May 2023, respectively.[11]   Again, the retention of the Advisors was presumably approved by the Debtors' CVC-controlled board.

23.     Following the retention of the Advisors, the Debtors began exploring restructuring options.  Lombardi Decl. ¶ 67.  They began negotiations with the Holders of First Lien Claims, among others, in May 2023, and included CVC in these discussions the following month.  *Id.* According to the Debtors themselves, they "engaged in several rounds of negotiations with these parties on the terms of various proposals, and management and directors met regularly and extensively, including with the Company's advisors, to discuss the proposals and the Company's funding needs."  *Id.*[12]  During this entire period the Debtors' board was presumably controlled by CVC.

24.     In December 2023,[13] *over six months after these negotiations began*, the Debtors appointed two new purportedly independent directors (Larry J. Nyhan and Sherman K. Edmiston III) to the boards of directors of PVKG Intermediate and C1 Holdings.  *Id.* ¶ 71.  In January 2024, the Debtors formed a Special Committee.  *Id.*  The Special Committee was formed to "review, evaluate, and approve strategic and financial alternatives, including the possibility of seeking additional financing or undertaking a recapitalization transaction or other reorganization or restructuring."  *Id.*  Notably, not only were the two new directors appointed to the Special Committee, but so was the Debtors' CEO, Mr. Russell.  *Id.*  The Special Committee did not retain its own advisors, nor was it explicitly authorized to do so in the resolution by which it was formed.

---

[11] *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of AlixPartners, LLP as Financial Advisor Effective as of the Petition Date* [Docket No. 145]; *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Evercore Group L.L.C. as Investment Banker to the Debtors Effective as of the Petition Date* [Docket No. 146].

[12] The Lombardi Declaration defined "Company" as being comprised of the Debtors.  Lombardi Decl. ¶ 1.

[13] *See* Mervis Decl., Exhibit 2.

Mervis Decl., Ex. 1. Rather, as stated in their responses to the Excluded Lenders' document requests (Mervis Decl. Ex. 3, response to Request 16), "White & Case LLP, Evercore Group LLC, and AlixPartners LLP, have been retained by, performed services, or otherwise provided advice to the Special Committee."

## D.    Impact on Excluded Lenders

25.    Notionally, the Proposed Plan provides for Holders of First Lien Claims to share *pro rata* in the Takeback Term Loan Recovery Option, or the Open Equity Allocation, and receive an approximately 20.0% to ███% recovery, depending upon the option elected. *See* Proposed Plan § III.C.3.(c); Lall Decl. ¶ 10. However, the Exclusive Investment Opportunities position the Majority Lenders to receive additional reorganized equity with an aggregate Plan Value of approximately $169.6 million in exchange for only $85.75 million of new money, providing them as a group exclusive value of approximately $83.9 million—an approximately ███% recovery as outlined below:

| Rights Offering | Rights Offering Split (%) | New Capital Raise | Purchase Price ($ Mn) (A) | % Equity of Reorganized Debtors | Total Plan Value ($ Mn) | Share of Plan Value ($ Mn) (B) | Distributable Value ($ Mn) (B – A) |
|---|---|---|---|---|---|---|---|
| Open Equity Allocation | 65.0% | 245 | 159.25 | 56.5% | 434 | 245.0 | 85.8 |
| Exclusive Equity Allocation | 35.0% | 245 | 85.75 | 30.4% | 434 | 131.9 | 46.2 |
| Total: | | | 245.0 | 86.8% | | 376.9 | 131.9 |

| Backstop Fees | Fee | New Capital Raise | Fee Amount ($ Mn) (A) | Put Option Premium distributed as equity at 35% discount to Plan Value (B) | Distributable Value ($ Mn) (A / B) |
|---|---|---|---|---|---|
| Put Option Premium | 10% | 245 | 24.5 | 24.5 / (1-0.35) | 37.7 |

| | |
|---|---|
| Total Exclusive Value Allocated to Majority Lenders: | 83.9 |

10



Lall Decl. ¶¶ 10-11, Exhibit 1.

26.     Thus, such favored lenders, *including the Insider*, stand to receive a more than 31.2% enhancement over the recovery provided to the Excluded Lenders electing the equity option even though all such lenders are in the same class (Class 3).

**E.     Excluded Lenders' Alternative Proposal**

27.     On April 26, 2024, the Excluded Lenders delivered to the Debtors an alternative restructuring proposal (the "Alternative Proposal") that does not illegally discriminate between members of the same class. Lall Decl. ¶ 13, Exhibit 2. The Alternative Proposal provides for the following modifications to the Proposed Plan:

(a)     Holders of First Lien Claims in Class 3 will receive identical treatment in the form of their *pro rata* share of $388.6 million of New Equity Interests at the Plan Value instead of the Takeback Term Loans.

(b)     Exit capital will be raised pursuant to an exit term loan facility (the "Exit Term Loan Facility") in the aggregate principal amount of $245 million on substantially the same terms as the proposed Takeback Term Loans.

(c)     All Holders of First Lien Claims in Class 3 will have the opportunity to participate in the Exit Term Loan Facility (both on a *pro rata* basis and to backstop the facility).

28.     On April 29, 2024, the Debtors rejected the Alternative Proposal. Lall Decl. ¶ 15, Exhibit 3.

---

[14] Assumes all First Lien Claims elect the Default Option, subject to 50% Adjustment pursuant to the Proposed Plan)

Supp. App. 273

**Objection**

A.    **The Proposed Plan, Including The Equity Rights Offering, Is Subject To Entire Fairness Scrutiny**

29.    As a threshold matter, the Proposed Plan, including the transactions and settlements proposed to be effectuated through it, is subject to the entire fairness standard because the Insiders are on both sides of the Equity Rights Offering.  Courts apply a "heightened scrutiny" or "entire fairness" standard when a transaction involves a debtor and its insiders.  *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (citing *In re MSR Hotels & Resorts, Inc.*, No. 13-11512, 2013 WL 5716897, at *1 (Bankr. S.D.N.Y. Oct. 1, 2013)).  A heightened standard is necessary given that transactions with insiders "are inherently suspect because 'they are rife with the possibility of abuse.'"  *Id.* (citation omitted).

30.    In *Pepper v. Litton*, the Supreme Court noted that dealings between an entity and its controlling shareholder "are subjected to rigorous scrutiny and where any of [the insider's] contracts or engagements with the [entity] is challenged the burden is on the [insider to] not only prove the good faith of the transaction but also to show its inherent fairness."  308 U.S. 295, 306 (1939).  The Fifth Circuit has adopted the Supreme Court's reasoning, holding that "a claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts," and that, when applying this heightened scrutiny to an insider transaction with the debtor, the burden of proof shifts to the insider, *Fabricators, Inc. v. Technical Fabricators, Inc., (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991), which then has the burden of proving the "inherent fairness and good faith of the challenged transaction," *Porretto v. Williams (In re Porretto)*, 761 F. App'x 437,  443 n.9, 444 (5th Cir. 2019) (quoting *In re Harford Sands Inc.*, 372 F.3d 637, 641 (4th Cir. 2004)) (affirming the District Court's decision).

12

31.    Additionally, section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Section 1129(a)(3) requires that the debtor's conduct in proposing a plan comply with state law—here, requiring a showing of "entire fairness" under Delaware corporate law in connection with the Debtors' approval of insider transactions underpinning the Proposed Plan.[15]  *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999) ("We agree that section 1129(a)(3) does incorporate Delaware law (as well as any other applicable nonbankruptcy law)."); *see Nat'l Convenience Stores Inc. v. Shields (In re Schepps Food Stores, Inc.)*, 160 B.R. 792, 799 (Bankr. S.D. Tex. 1993) (noting that shareholders may object to confirmation under section 1129(a)(3) on basis of violation of state law); *see also In re Food City, Inc.*, 110 B.R. 808, 814 n.13 (Bankr. W.D. Tex. 1990) ("[A] plan *proposed* by means which violate the securities laws would violate section 1129(a)(3)." (emphasis in original)); *In re Dernick*, 624 B.R. 799, 812-13 (Bankr. S.D. Tex. 2020) (looking at whether the debtor's conduct in proposing the plan was forbidden by law).[16]

32.    Under Delaware law, entire fairness is comprised of two components.  The first, fair dealing, "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."  *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 700 (Del. 2023) (citation omitted).  The second, fair price, "relates to the economic and financial

---

[15] Because the Debtors are incorporated in Delaware, the entire fairness test under Delaware law is applicable to this Court's review of the Proposed Plan and transactions contemplated therein. *Dunn v. Chappelle (In re Alta Mesa Resources, Inc.)*, No. 19-35133, 2022 WL 7750353, at *5 (Bankr. S.D. Tex. Oct. 13, 2022) (for Delaware-incorporated debtor, "matters of corporate governance, such as fiduciary duties, are governed by Delaware corporate law").

[16] One court has held that section 1129(a)(3) does not require compliance with the entire fairness standard. *In re Charter Commc'ns*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009).  The court in *Charter* noted that section 1129(a)(3) "speaks only to the proposal of a plan." *Id.* (internal citations and quotations omitted).  That decision is not binding in this Court and, although discovery is ongoing, the Excluded Lenders believe the evidence presented at the confirmation hearing will distinguish *Charter* from the instant proceeding.

Supp. App. 275

considerations of the proposed [transaction], including all relevant factors:  assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of [the company]." *Id.*  Meeting the fair price component "requires the proponent of a self-dealing transaction to demonstrate that 'the price offered was the highest value reasonably available under the circumstances.'" *LaMonica v. Tilton (In re Transcare Corp.)*, 81 F.4th 37, 52 (2d Cir. 2023) (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995).  Notwithstanding these two components, "entire fairness is a unitary test, under which a reviewing court will scrutinize both the price and the process elements of the transaction as a whole." *In re Match Grp., Inc. Deriv. Litig.*, No. 368, 2024 WL 1449815, at *7 (Del. Apr. 4, 2024).

33.     Notably, "the entire fairness standard is 'Delaware's most onerous standard . . . .'" *Tilton*, 81 F.4th at 49 (quoting *Burtch v. Opus, LLC (In re Opus E., LLC)*, 528 B.R. 30, 66 (Bankr. D. Del. 2015).  As the Delaware Supreme Court stated in a landmark decision on the subject, "[t]he requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

34.     The entire fairness standard unquestionably applies here because the Proposed Plan provides for (a) distributions to a select group of Majority Lenders that includes the Insiders, which directly or indirectly hold substantially all of the equity interests of the Debtors and approximately $213 million in proposed allowed amount of the Debtors' first lien debt,[17] and (b) the settlement of the PVKG Note Claims held by the Insiders.[18]  The Proposed Plan provides the Insiders (who

---

[17] *Lombardi Decl.* ¶¶ 36-37.  CVC's claims constitute approximately 15.35% of the Allowed First Lien Claims.  *See* Proposed Plan § III.C.3.b. (providing for allowance of the PVKG Note Claims in the amount of $213,000,000 out of an aggregate amount of Allowed First Lien Claims totaling $1,387,538,807.33).

[18] *See* Proposed Plan § IV.B.

are Majority Lenders) the Exclusive Investment Opportunities. The value provided by the Exclusive Investment Opportunities would otherwise be available for distribution to *all* Holders of First Lien Claims in Class 3, including the Excluded Lenders.

35.     It does not matter that the Insiders purportedly wear different hats (*i.e.*, as equity owner and as lenders) on the different sides of the transactions. *See Weinberger*, 457 A.2d at 710-11 (holding entire fairness standard applies even when individuals "act in a dual capacity as directors of two corporations"). Under Delaware Law, CVC's uncontested ownership stake in the Debtors renders it a controller. *See In re Pattern Energy Grp. Inc. S'holders Litig.*, No. 2020-0357, 2021 WL 1812674, at *37 (Del. Ch. May 6, 2021) (citation omitted) ("A majority stockholder's control flows principally from its voting power, which translates into the power to 'alter materially the nature of the corporation and the public stockholders' interests.'"). Moreover, courts may consider even "softer sources of power" such as "relationships with particular directors" or the "exercise of contractual rights to channel the corporation into a particular outcome." *Id.* (citation omitted) (recognizing that even a minority stockholder could be considered a controller upon "[b]roader indicia of effective control"). Here, both Lars Haegg and James Christopolous of CVC are directors of both ConvergeOne Holdings, Inc. and PVKG Intermediate Holdings, Inc.[19] And CVC, as a party to the RSA through PVKG Lender, stands to reap the benefits of the Equity Rights Offering. Thus, regardless of what CVC calls itself—equity owner or lender—its stance on both sides of the transaction is sufficient to trigger the entire fairness standard. *See Emerald Partners*

---

[19] Lars Haegg is Chairman of the boards of these two companies, further underscoring CVC's control on both sides. *See In re Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674, at *37 (noting the "the ability to exercise outsized influence in the board room or on committees, as through roles like CEO, Chairman, or founder" as an indication of control.)

15

*v. Berlin*, 726 A.2d 1215, 1221 n.8 (Del. 1999) ("Hall's stance on both sides as a corporate fiduciary, alone, is sufficient to require the demonstration of entire fairness.").

36.    The Debtors will point to the fact that the Plan, RSA and Equity Rights Offering were approved by the Special Committee as evidence of entire fairness. As noted, discovery is just starting. But even the Debtors' first-day papers undermine the notion that the Special Committee's existence ensured entire fairness.

37.    To be sure, two members of the Special Committee are, at least nominally, independent directors. But the third member, the Debtors' CEO—who was presumably appointed by the Debtors' CVC-controlled board long before the board had any independent directors on it— is clearly an insider. *See* 11 U.S.C. § 101(31)(B)(ii); *see also Voigt v. Metcalf,* No. CV 2018-0828, 2020 WL 614999, at *16 (Del. Ch. Feb. 10, 2020) ("Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller").

38.    Also significant—and undercutting any claim of entire fairness based on the existence of a Special Committee—is the fact that the Special Committee was advised by *the Debtors' own Advisors* even though they too were also presumably retained by the Debtors' CVC-controlled board long before it had any independent directors. *See, e.g.*, *In re Match Grp., Inc. Derivative Litig.*, No. 2020-0505, 2022 WL 3970159, at *21 (Del. Ch. Sept. 1, 2022) ("The effectiveness of a Special Committee often lies in the quality of the advice its members receive from their legal and financial advisors. As has been repeatedly held, special committee members should have access to knowledgeable *and independent* advisors, including legal and financial advisors.") (emphasis added) (citations omitted), *aff'd in part, rev'd in part*, 2024 WL 1449815 (Del. Apr. 4, 2024). This lack of independence is compounded by the fact that for months before

Supp. App. 278

the nominally independent directors were appointed, the Debtors "engaged in several rounds of negotiations" with certain Holders of First Lien Claims "on the terms of various proposals, and management and directors met regularly and extensively, including with the [Debtors'] [A]dvisors, to discuss the proposals and the Company's funding needs." Lombardi Decl. ¶ 67. *See, e.g.*, *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1267-68 (Del. 1989) (criticizing special committee's reliance on company's advisor where company's management interviewed "and for four weeks thereafter maintained intensive contact with" advisor and advisor and management had meetings involving "extensive discussions" concerning potential transactions); *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1138-39 (Del. Ch. 2006) (In holding that merger was not the product of fair dealing, court noted that (i) the individual on single-person special committee "had no real authority to choose either his own lawyer or his own financial advisor"; (ii) the special committee's lawyer "had long been [one of the merger parties'] main outside counsel, and had already spent considerable time working on the proposed transaction.").

39.    In short, while the discovery record on entire fairness is only just being developed now, there is already ample reason to believe the Debtors will not be able to prove entire fairness. That should not come as surprise because, as discussed again below, the transaction at issue is grossly unfair..

B.    **The Proposed Plan Provides Unequal Treatment to Holders in Class 3 in Violation of Section 1123(a)(4) of the Bankruptcy Code**

40.    Even assuming the Debtors can meet their burden to prove entire fairness, the Exclusive Investment Opportunities nonetheless render the Proposed Plan unconfirmable by violating the equal treatment requirement set forth in Bankruptcy Code section 1123(a)(4). Equality of distribution among creditors is "a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58 (1990). Congress codified that policy into section 1123(a)(4) of the

Supp. App. 279

Bankruptcy Code, which requires that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Courts have interpreted the "same treatment" requirement to mean that all claimants in a class must have "'the same opportunity' for recovery." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (quoting *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008)). The unequal treatment here is undisputable.

41.     The Proposed Plan is predicated on the Exclusive Investment Opportunities, which result in unequal treatment in favor of the Majority Lenders in the following meaningful ways:

(a) The Direct Investment, available only to the Majority Lenders, positions the Majority Lenders to receive reorganized equity with an aggregate value of approximately $131.92 million (at the Plan Value), providing them with an approximately ██ % recovery while other Holders in Class 3 recover only between 20% and ██ % of their claims, assuming all Holders elect the equity option subject to the Adjustment.

(b) The Put Option Premium, again available only to the Majority Lenders, positions the Majority Lenders to own additional reorganized equity with an assumed value of $37.7 million, while none of that value is available for distribution to other Holders in Class 3.

42.     In the aggregate, the Exclusive Investment Opportunities position the Majority Lenders to own reorganized equity under the Proposed Plan with a Plan Value of approximately $169.6 million, while none of that value is available for distribution to the Excluded Lenders in Class 3.

43.     The Debtors will no doubt argue the Exclusive Investment Opportunities are on account of separate new money commitments and not as distribution on account of the Majority Lenders' preexisting claims. That claimed distinction is not credible; the RSA reveals the truth.

18

Supp. App. 280

The Exclusive Investment Opportunities are explicitly tied to plan voting.[20]  Voting is a right inexorably tied to a claim because the claim is what enables its holder to vote.  *See* 11 U.S.C. § 1126(a) ("The holder of a claim . . . may accept or reject a plan.").

44.     Moreover, any argument that the Exclusive Investment Opportunities are consideration for new money contributions must fail under the Supreme Court's holding in *LaSalle*.  In that case the reorganized debtor's new equity was to be distributed to existing shareholders ("old equity") in exchange for new capital in the reorganized debtor.  526 U.S. at 440.  A senior creditor who was denied a right to make the same investment objected, arguing the plan violated the absolute priority rule, which provides that when a senior class is not paid in full, "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."  11 U.S.C. § 1129(b)(2)(B)(ii).  The plan violated that rule, the senior creditor argued, because the right to purchase reorganized equity was granted exclusively to equity holders before the senior creditor was paid in full.  *LaSalle*, 526 U.S. at 442.  In response, the debtor argued that the exclusive investment right given to old equity was not granted "on account of" its old equity interest, but instead as consideration for old equity's new capital contribution.  *Id.* at 442-43.

45.     The *LaSalle* Court rejected that argument, holding that the exclusive opportunity to invest in the reorganized debtor was property "in its own right."  *Id.* at 455.  The Court noted that "given that the [exclusive investment] opportunity is of some value, the question arises why old equity alone should obtain it, not to mention at no cost whatsoever."  *Id.* at 456.  Distributing the

---

[20] *See* RSA §§ 4.02 (plan voting); 12.01(q) (termination if court grants relief inconsistent with Restructuring Term Sheet); RSA Exhibit B (Restructuring Term Sheet) at 2, 6 (incorporating Rights Offering Term Sheet).

19

right to buy discounted equity constituted impermissible favoritism of the shareholders and was not appropriate consideration for a new money contribution.  *Id*. at 457.

46.    The *LaSalle* Court further held that a stakeholder receives property "on account of" its claim or interest when a "causal relationship" exists between "holding the prior claim or interest and receiving or retaining property . . . ."  *Id.* at 451.    Payment at "full value," the Court emphasized, is *essential* to breaking the causal connection between the exclusive investment right and the preexisting claim or interest:  "if the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness (unless to trump an equal offer from someone else); if it is not the best, there is no apparent reason for giving old equity a bargain." *Id*. at 456.  That causal link may only be broken where the stakeholder pays "full value," because then such right is given solely for the new value being provided rather than the preexisting claim or interest.  *Id*. at 453-54.  A plan is "doomed" "by its provision for vesting equity in the reorganized business in [old equity] without extending an opportunity to anyone else to either compete for that equity or propose a competing reorganization plan." *Id*. at 454.  The "best way to determine value is exposure to the market." *Id*. at 457.

47.    The *LaSalle* Court's analysis applies with equal force here.  The legal tests are identical:  just as the absolute priority rule of section 1129(b) prohibits junior stakeholders from receiving property before senior stakeholders "on account of" their junior claims or interests, so does the equal treatment rule of section 1123(a)(4) prohibit a plan from providing unequal treatment for claims within the same class "on account of" those claims.  In other words, a plan is unconfirmable when (as here) it distributes property unequally within a class, except when property is conveyed for full value after a market test as part of a separate, legitimate new funding contribution.

20

48.     Exclusivity and the absence of full value are fatal to the Direct Investment Opportunities here.  As in *LaSalle*, a select group of stakeholders—here, those who can provide the Debtors with the votes to carry an impaired accepting class—are being offered an exclusive opportunity to invest in equity of the reorganized debtors at a significant discount.  If the Exclusive Investment Opportunities had been market tested and the price offered had been demonstrably "the best obtainable [value,]" there would be no reason to restrict the investment opportunity solely to the Majority Lenders, which would not need "the protection of exclusiveness (unless to trump an equal offer from someone else)."  *Id*. at 456.  The only "apparent reason" to give the Majority Lenders "a bargain" was, at least in part, to do the Majority Lenders a favor—in exchange for their agreement to vote in favor of the Proposed Plan—not to provide them legitimate consideration for the new funding they agreed to backstop.[21]

49.     Moreover, the Put Option Premium here is *per se* unreasonable and evidence the true purpose of the fee is to pay the Majority Lenders for their agreement to vote in favor of the Proposed Plan.  The amount of the Put Option Premium is disproportionate to the actual risk posed to the Majority Lenders.  The Majority Lenders, who committed under the RSA and the Backstop

---

[21] In response, the Debtors may highlight *In re Peabody Energy Corp.*, 933 F.3d 918 (8th Cir. 2019), where the Eighth Circuit affirmed a judgment confirming a plan containing a rights offering with a direct allocation and rejected an unfair discrimination objection, distinguishing *LaSalle*. *Peabody* is distinguishable because, unlike here, the investment opportunity there was not completely exclusive.  As a result, the *Peabody* court found that the objecting creditors had the same "opportunity for recovery" as other creditors in their class.  That is not the case here.

The Debtors may also cite to the approved rights offering in *In re LATAM Airlines Grp. S.A.*, 2022 WL 790414 (Bankr. S.D.N.Y. Mar. 15, 2022), where the court approved a 20% fee to backstop a rights offering.  *LATAM* is distinguishable because (1) the plan and rights offering were the product of mediation (not exclusive negotiation behind closed doors), (2) the debtors considered and explored multiple restructuring and exit financing proposals from numerous investment funds and other third parties before agreeing to the backstop agreement, and (3) the backstop parties were exposed to significant risk requiring them to reserve cash for at least eight months after confirmation while the reorganized debtors sought shareholder authority to issue securities in Chilean markets. *See LATAM*, 2022 WL 790414, at *14.  None of those factors are present here.  Moreover, the objecting parties in *LATAM* did not assert or otherwise address the argument presented here that the Exclusive Investment Opportunities are treatment on account of the Majority Lenders' claims under the precedent established in *LaSalle*.

21

Agreement to their *pro rata* share of the Open Equity Allocation and the Exclusive Equity Allocation, represent approximately 81% of First Lien Claims.  As noted above, the backstop commitment relates solely to the $159.25 million Open Equity Allocation according to the RSA and Proposed Plan.  *See supra* para. 19.

50.     The Majority Lenders would therefore only be at risk of backstopping no more than approximately $30.7 million of the $245 million in new equity capital (*i.e.*, 19%).  And the magnitude of even *that* "risk" is likely quite small given the deep discount at which the reorganized equity is being offered relative to Plan Value.

51.     Nonetheless, the RSA and Proposed Plan require the Debtors to pay the Majority Lenders a 10% fee calculated on the ***total $245 million Equity Rights Offering***, which is payable in discounted equity and has a value of $37.7 million.  Lall Decl. ¶ 9.  In short, the Debtors are required to pay $37.7 million in value to the Majority Lenders to backstop no more than $30.7 million of new equity (and in reality likely none or only a fraction of that already relatively small amount)—a 122.7% fee.  *Id.* ¶ 12.

52.     *Momentive Performance Materials Inc.*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 19, 2014), is instructive here.  In *Momentive*, former Bankruptcy Judge Robert Drain denied a request for the payment of backstop fees "as a matter of fairness" where the backstopping parties  (like the Preferred Majority Lenders here) had already committed to purchase large portions of the rights offerings they were backstopping.  In *Momentive*, certain creditors sought a purported 5% backstop fee on the entirety of a $600 million rights offering, which was offered at a 15% discount to plan value, and to which those creditors had already committed to subscribe to 85% of the rights offering.  Presented with this backstop request, Judge Drain surmised that "based on the state of the play today . . . where there is, at most, fifteen percent

22

uncommitted, although more likely ten percent uncommitted – a thirty-million-dollar fee is far outside the range that has been quoted to me, which is roughly three to six percent. It isn't really the five-percent fee, it's more like a thirty-five percent fee for that fifteen percent [theretofore uncommitted]. So standing alone as a fee, it doesn't make sense." *Momentive Performance Materials Inc.*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 19, 2014).[22]

53.     The Debtors may also argue that the Exclusive Investment Opportunities are intertwined with the overall bargain embodied under the RSA, and that no other exit financing option is "actionable" because it will not be attached to the votes needed to carry an impaired accepting class required for plan confirmation. Such justifications have no legal force, however. If the Exclusive Investment Opportunities are forbidden by law (and they are), then it does not matter that the Debtors say there is no other choice. This is especially so given the application of the entire fairness standard here.

**C.     The Alternative Proposal Provides the Debtors a Confirmable Path Forward**

54.     Denying confirmation of the Proposed Plan does not leave the Debtors without any options to restructure as a going concern. The Excluded Lenders have provided the Debtors an Alternative Proposal that, with relatively limited modifications to the Equity Rights Offering, remedy its legal infirmities. The Alternative Proposal is superior to the Proposed Plan and confirmable for the following reasons.

---

[22] Hr'g Tr. 195:10-19. A copy of the hearing transcript is attached hereto as **Exhibit B**. *See also Pacific Drilling*, 2018 Bankr. LEXIS 3024, at \*10 ("I cannot help but continue to be skeptical based on the evidence I have as to the proposed backstop fee and the alleged need for it in this case. That is particularly true as to the Ad Hoc Group's own commitments to exercise their rights in the rights offering. They have ample economic incentive to exercise those rights and, in fact, participated in structuring those rights to make them attractive to themselves. They have already committed to exercise their rights as part of a Plan Support Agreement with other parties. *I am concerned that nobody else was given a similar opportunity, which raises the possibility that the backstop fee is really just an extra payment and an extra recovery rather than a reasonable, stand-alone financing term.*" (emphasis added)).

23

55.    Unlike the Proposed Plan, the Alternative Proposal respects the equal treatment requirement set forth in section 1123(a)(4) by providing all Holders of First Lien Claims in Class 3 with the same treatment and opportunities.  All Holders in Class 3 will receive their *pro rata* share of $388.6 million of New Equity Interests and have the opportunity to participate in the Exit Term Loan Facility (both on a *pro rata* basis and to backstop the facility).  This does not materially impact the Reorganized Debtors' leverage, which remains at $245 million, just as proposed under the Proposed Plan.  Under the Alternative Proposal, members of Class 3 will recover between 28.0% and 29.8% (depending on whether a Holder participates in the Exit Term Loan Facility), whereas under the Proposed Plan the Majority Lenders will receive a ███ % recovery while other Holders in Class 3 will recover only between a 20% and ███ %.

56.    While the Majority Lenders are composed of approximately 81% of the Debtors' first lien debt and would presumably vote to reject the Alternative Proposal because it deprives them of the return on account of their illegal Exclusive Investment Opportunities, (a) the Excluded Lenders intend to seek entry of an order designating the Majority Lenders' rejecting votes pursuant to section 1126(e) of the Bankruptcy Code, for which the facts set forth in this Objection establish sufficient grounds, and (b) and CVC's vote (through PVKG Lender) on account of the $213 million PVKG Note Claims (approximately 15.35% of the Allowed First Lien Claims) would be disregarded pursuant to section 1129(a)(10) of the Bankruptcy Code.

57.    Section 1126(e) permits a court to designate (*i.e.*, disregard) the votes of "any entity whose acceptance or rejection of such plan was not in good faith."  11 U.S.C. 1126(e).[23]  This

---

[23] The Bankruptcy Code does not define "good faith" or "bad faith" and, as such, "determining which exists is a fact specific venture."  *In re Dernick*, 624 B.R. at 808*; see also In re Save Our Springs (S.O.S.) All., Inc.*, 388 B.R. 202, 230 (Bankr. W.D. Tex. 2008) ("Good faith – and its converse, bad faith – are not defined in the Bankruptcy Code.  Thus, the courts have developed the meaning of good (and bad) faith on the basis of the facts of each particular case.") (internal citations omitted), *aff'd*, 2009 WL 8637183 (W.D. Tex. Sept. 29, 2009), *aff'd*, 632 F.3d 168 (5th Cir. 2011).

Court has previously determined votes should be designated and disregarded pursuant to section 1126(e) where "the creditor's self-interest results in a vote for the 'purpose [of obstructing] a fair and feasible reorganization *in the hope that someone would pay [it] more than the ratable equivalent of [its] proportionate part of the bankrupt assets.*'" *In re Dernick*, 624 B.R. at 808-09 (quoting *Young v. Higbee Co.*, 324 U.S. 204, 210–11 (1945)) (emphasis added).

58.     Here, under the Proposed Plan, the Majority Lenders seek to impermissibly reallocate approximately $83.95 million of value from the Excluded Lenders to benefit themselves, in violation of section 1123(a)(4).  Any vote by the Majority Lenders' to reject the Alternative Proposal because it does not contain the Exclusive Investment Opportunities for the Majority Lenders would not be in good faith as it would be motivated by a desire to impermissibly receive value unavailable to the Excluded Lenders, despite being in the same class.[24]

59.     CVC's vote on account of its $213 million claim (through PVKG Lender) would also be disregarded pursuant to section 1129(a)(10).  Section 1129(a)(10) of the Bankruptcy Code provides that confirmation of a plan requires that "at least one class of claims that is impaired under the plan has accepted the plan, *determined without including any acceptance of the plan by any insider.*"   11 U.S.C. § 1129(a)(10) (emphasis added).  An "insider" pursuant to section 101(31)(B) includes a "person in control of the debtor" and any "affiliate, or insider of an affiliate as if such affiliate were the debtor."  *Id.* §§ 101(31)(B)(iii), 101(31)(E), 101(2) (defining "affiliate" to mean an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . .").

---

[24] Indeed, the RSA provides that the Majority Lenders agree not to vote for any alternative plan (*See* RSA § 4.01(b)(ii)), presumably for this very reason.

25

60.     Here, ConvergeOne Investment LP, controlled by CVC, is the Debtors' ultimate parent.  Lombardi Decl. ¶ 26.  PVKG Lender, an entity controlled by CVC, holds $213 million of PVKG Note Claims proposed to be settled pursuant to the RSA and Proposed Plan.  *Id.* ¶¶ 36-37.  Accordingly, CVC's vote on account of its First Lien Claims held by PVKG Lender would be disregarded pursuant to section 1129(a)(10).  *See In re Featherworks Corp.*, 25 B.R. 634, 639-40 (Bankr. E.D.N.Y. 1982) (disregarding votes of corporate parents holding largest claims against debtor), *aff'd*, 36 B.R. 460 (E.D.N.Y. 1984).

[*Remainder of Page Left Intentionally Blank*]

26

## Conclusion

WHEREFORE, the Excluded Lenders request the Court (a) deny confirmation of the Proposed Plan and (b) grant such other and further relief as the Court deems appropriate under the circumstances.

Respectfully submitted this 7th day of May, 2024.

**GRAY REED**

By: */s/ Jason S. Brookner*
    Jason S. Brookner
    Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:      jbrookner@grayreed.com

- and -

**PROSKAUER ROSE LLP**
    David M. Hillman (admitted *pro hac vice*)
    Michael T. Mervis (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
Email:      dhillman@proskauer.com
           mmervis@proskauer.com

- and -

**PROSKAUER ROSE LLP**
    Peter J. Young (admitted *pro hac vice*)
    Steve Y. Ma (admitted *pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
Telephone:  (310) 284-4542
Facsimile:  (310) 557-2193
Email:      pyoung@proskauer.com
           sma@proskauer.com

**COUNSEL TO THE AD HOC GROUP
OF EXCLUDED LENDERS**

27

Supp. App. 289

**Certificate of Service**

The undersigned hereby certifies that on the 7th day of May, 2024, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system.

*/s/ Jason S. Brookner*
Jason S. Brookner

1

Supp. App. 290