United States District Court
Southern District of Texas
**ENTERED**
October 23, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CONVERGEONE HOLDINGS, INC., *et al.*, | § | Civil Case No. 4:24-cv-02001 |
| *Debtors/Appellees*, | § | |
| | § | Bankruptcy Case No. 24-90194 |
| | § | |
| Ad Hoc Group of Excluded Lenders, | § | |
| *Appellants.* | § | |

## ORDER DENYING APPELLEES' MOTION TO DISMISS

Before the Court is the Motion to Dismiss the Appeal as Equitably Moot filed by ConvergeOne Holdings, Inc., and Intervenor First Lien Ad Hoc Group (collectively, "Appellees"). (Doc. No. 34). The Ad Hoc Group of Excluded Lenders ("Appellants") responded, (Doc. No. 41), and Appellees replied. (Doc. No. 42).

**I.    Background**

This matter originates in the bankruptcy filed by ConvergeOne Holdings, Inc., and its affiliated companies (the "Debtors"). (Doc. No. 11 at 1). The Debtors are in the information technologies sector and provide services such as cybersecurity, software development, cloud computing, and application and software development. While headquartered in Minnesota, Debtors filed their Chapter 11 bankruptcy case in the Houston Division of the Southern District of Texas. Before filing, however, they reached an agreement with approximately 80% of their first and second lien holders. Certain parties entered a "restructuring support agreement" in expectation of a "prepackaged Chapter 11 Plan" (hereinafter, the "Plan").

This agreement was designed in principle to eliminate $1.6 billion of secured debt. The first lien holders agreed to take back debt, and they additionally received the right to purchase discounted equity in the reorganized company through an "equity rights offering." The agreement

would also give holders of second lien claims new equity interest in the reorganized Debtor. Importantly, it also would provide payment in full of certain unsecured claims.

This restructuring support agreement included commitments from the Majority Lenders to backstop the equity right offering, ensuring that the Debtors will raise sufficient capital to repay debt and support their business after emerging from bankruptcy. A portion of this new equity offering is allocated for purchase to those parties that agreed to backstop the Plan. These "backstoppers" were also to receive a 10% premium paid in equity. The backstopping parties also had to reserve capital to satisfy their commitments and were subject to certain milestones.

After the Plan had been filed for some time, the Minority Lenders objected because they were excluded from this aspect of the Plan. They offered two alternatives, both of which were rejected. The first was based upon the same valuation as the Plan transaction but was rejected primarily because it allegedly ignored the need to replace the Debtor in Possession ("DIP") financing facility. The second proposal tried to fix the DIP omission, but it lacked enough support from the stakeholders and, as proffered, was not able to be confirmed.

Eventually, the Plan was passed with the Minority Lenders filing the only objections. The factual basis of the objection was their exclusion from the opportunity to purchase the new equity. The legal objection was premised on the argument that their exclusion violated the equal treatment requirements of the Bankruptcy Code. *See* 11 U.S.C. § 1123(a)(4) ("Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."). The Debtors and proponents of the Plan argued that the Plan treated all prepetition claims the same, and that the extra value given to the Majority Lenders was for new financial commitments.

The Bankruptcy Court held a two-day hearing which included testimony and argument from all sides. The Bankruptcy Court found the backstop was necessary and reasonable, and that the Plan should be confirmed. The Plan was confirmed on May 23, 2024. Rather than immediately seeking a stay pending appeal from the Bankruptcy Court, the Appellants waited several days and filed for a stay in this Court. In addition to the stay, Appellants sought a certification of certain issues to the Fifth Circuit, including whether the Confirmation Plan violates 11 U.S.C. § 1123(a)(4) and is contrary to the Supreme Court's dictates in *Bank of America National Trust & Savings Association v. 203 N. LaSalle St. Partnership*, 526 U.S. 434 (1999). Appellees opposed both the stay and certification both on procedural and substantive grounds.

On June 25, 2024, this Court entered an order denying the motion for a stay. (Doc. No. 28). The Court found that Appellants had not prevailed on their burden to demonstrate a likelihood of success on the merits or an irreparable injury. However, the Court also denied the Stay on procedural grounds due to the Appellants' delay in seeking a stay and then seeking a stay in this Court instead of in the bankruptcy court. Finally, the Court denied the motion to certify an interlocutory appeal to the Fifth Circuit. (Doc. No. 28 at 13-14).

In their Motion to Dismiss, Appellees argue that all equitable mootness factors weigh in favor of dismissal. (Doc. No. 34 at 5). In essence, they argue that Appellants' failure to obtain a stay, and the substantial consummation of the plan that followed, mean that Appellant's requested relief would unwind the Plan and destroy third parties' rights.

**II.    Legal Standard**

As this Court has previously noted, equitable mootness as a concept in bankruptcy law has existed for approximately four decades.[1] Some trace its beginnings back to *In re Roberts Farm*,

---

[1]    For more discussion of this history, see *In re Walker Cnty. Hosp. Corp. d/b/a Huntsville Mem. Hosp.*, No. 4:20-CV-00911, 2020 WL 6482016 (S.D. Tex. Sept. 30, 2020), *aff'd sub nom. Matter of Walker*

3

*Inc.*, 652 F.2d 793 (9th Cir. 1981). It has "evolved in bankruptcy appeals to constrain appellate review, and potential reversal, of confirming reorganization plans." *In re Pacific Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009). Unlike the "traditional" or "constitutional" concept of mootness whereby a ruling of a court is withheld because it would have little or no effect, in equitable mootness the problem is just the opposite—a court ruling would have too much effect. It is perhaps more accurately described as a doctrine of judicial abstention. It has been implemented in situations where a successful bankruptcy appeal would "knock the props out from under the authorization for every transaction that has taken place [and] would do nothing other than create an unmanageable situation for the Bankruptcy Court." *In re Roberts*, 652 F.2d at 797. It has been described as pitting the concepts of finality against appellate rights or as one author describes it, "[p]ragmatism v. [p]rinciple."[2] The rationale behind the doctrine has been described as follows:

> That early history and subsequent interpreting case law helped establish its purpose as a prudential doctrine. Since *Robert Farms*, equitable mootness "has evolved in bankruptcy appeals to constrain appellate review, and potential reversal, of order confirming reorganization plans." It has evolved into a "kind of appellate abstention that favors the finality of reorganizations and protects the interrelated multi-party expectations on which they rest. It is constantly trying to "strik[e] the proper balance between the equitable considerations of finality and good faith reliance on a judgment and competing interests that underlie the right of a party to seek review of a bankruptcy order adversely affecting him." Case law suggests that the "paramount policy concern reflected by equitable mootness is the protection of third parties' interest who are not participating in the bankruptcy appeal." However, equitable mootness also furthers the "importance of finality to bankruptcy proceedings. Finality is vital to restoring third parties' confidence in a debtor and allowing it to successfully emerge from bankruptcy. The greater the chance the transaction will be undone, the less money parties may be willing to pay for the debtor's securities or assets—a knock-on effect with the potential to endanger the viability to the debtor's reorganization."[3]

---

*Cnty. Hosp. Corp.*, 3 F.4th 229 (5th Cir. 2021); *In re Serta Simmons Bedding, LLC*, No. AP 23-09001, 2023 WL 4275019 (S.D. Tex. June 29, 2023); *In re Nat'l CineMedia, LLC*, Nos. 4:23-CV-2414 and 4:23-CV-2485, 2023 WL 5030098 (S.D. Tex. Aug. 4, 2023).

[2] Christopher W. Frost, *Pragmatism vs. Principle: Bankruptcy Appeals and Equitable Mootness*, 15 N.Y.U. J.L. & Bus. 477 (2019).

[3] K. Lewis and S. Mattingly, *Recounting the History and Purpose of the Doctrine of Equitable Mootness and Exploring Its Evolving Persona*, 2020 Ann. Surv. of Bankr. Law 8.

It has been accepted as a concept in virtually every circuit in the United States[4], yet all the while the very courts that have implemented this concept have cautioned against its widespread use. *See e.g., In re One2One Communications, LLC*, 805 F.3d 428, 438 (3rd Cir. 2015) ("[T]he time has come to reconsider whether [equitable mootness] should exist at all. . . .") (Krause, J., concurring). Somewhat like "he who shall not be named," the Seventh Circuit even strongly discourages the use of the term. *Matter of UNR Industries, Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) ("There is a big difference between the inability to alter the outcome (real mootness) and unwillingness to alter the outcome (equitable mootness) . . . Accordingly, we banish equitable mootness from the (local) lexicon.").

Regardless of the trend that seems critical of the doctrine, it has not been found to be inapplicable in the Fifth Circuit. It is, however, a concept that is looked at with great scrutiny, especially when it involves appeals concerning the rights of secured creditors. *In re Pacific Lumber Co.*, 584 F.3d at 243. In fact, the Fifth Circuit has written that courts in this area should wield it as a "scalpel rather than an axe." *In re Sneed Shipbuilding, Inc.*, 916 F.3d 405, 409 (5th Cir. 2019). "[E]quity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process." *In re Hilal*, 534 F.3d 498, 500 (5th Cir. 2008). Thus, while the Fifth Circuit (and other courts in this circuit) strongly suggests that the concept be used sparingly—especially in Chapter 11 cases dealing with the rights of secured creditors—the concept remains a possible bar for appellants in bankruptcy appeals.

### III.   Analysis

In this case, appellants argue that the Court can grant relief without disrupting the Plan or affecting any third parties, which eliminates any equitable mootness problem. (Doc. No. 41 at 4).

---

[4]   *Id.*

5

Essentially, Appellants describe the injury as the exclusion from an opportunity to invest in an equity backstop to receive a higher recovery on their claims. Thus, according to Appellants, the Court can fashion complete relief by simply ordering the Majority lenders to sell the Excluded lenders the share of the reorganized Debtors' equity that they would have been offered had they not been excluded. (Doc. No. 41 at 1–2).

In this Circuit, to establish equitable mootness, a debtor must show: 1) the plan of reorganization has not been stayed; 2) the plan has been substantially consummated; and 3) the relief requested by the Appellant would either affect the rights of third parties or the success of Plan. *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 327 (5th Cir. 2013). Here, while the first two prongs are certainly met, the Court finds that relief *can* be granted without unwinding the plan or damaging the rights of third parties.

### a. Appellants did not receive a stay.

Appellees first point to the fact that Appellants failed to receive a stay of the plan's implementation. Appellees' argument on this point is essentially that the lack of a stay *per se* weighs in favor of dismissal. While true, Appellants did not receive a stay, they certainly sought one to foreclose this very counteraction. Moreover, this Court's reasons for denying the stay weigh against Appellees' arguments in favor of dismissal.

The Court found that Appellants had no showing of irreparable harm, an essential element for a stay pending appeal, because their injury would be remedied by a monetary award of damages or by other court action. (Doc. No. 28 at 12). The injury Appellants claim is the lost value of an opportunity that was given to other lenders. The Court specifically noted that the reallocation of equity from Majority lenders to the Excluded lenders virtually precluded a finding of irreparable harm, and no party suggested any reason as to why this modification would be impossible post-

appeal. (*Id.* at 12 n.10). As was true in the Order denying the stay, Appellants' injury seems plainly remedial with either a monetary award or a redistribution of the equity allocation and would not require an unwinding of the plan that would affect the debtors. Thus, while no stay was granted, which typically weighs in favor of equitable mootness, the basis for denying the stay in this case weighs *against* Appellees' Motion to Dismiss.

### b. The plan has been substantially consummated.

Appellees next point to substantially consummation for support. The Court agrees and finds that the Plan certainly has been substantially consummated.

A restructuring plan is "substantially consummated" after: (1) transfer of all or substantially all of the property proposed by the plan to be transferred; (2) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (3) commencement of distributions under the plan. *U.S. ex rel FCC v. GWI PCS 1, Inc.*, 230 F.3d 788, 801 (5th Cir. 2000) (citing 11 U.S.C. § 1101(2)). There is no doubt that a thorough analysis would determine that the plan has been substantially consummated. Such an analysis is not entirely necessary however, because Appellants do not challenge the consummation. As the Appellants concede that the plan is substantially consummated, there is no need for an in-depth analysis. This factor weighs in favor of equitable mootness.

### c. The requested relief does not threaten the success of the Plan or harm third parties.

Numerous courts have held that the availability of partial or fractional relief[5] allows a court "to minimize an appellate disturbance's effect on the rights of third parties." *Matter of Highland*

---

[5] The Fifth Circuit seems to use the terms "fractional relief" and "partial relief" interchangeably. *See In re Grand Prairie Hotel*, 710 F.3d at 328 ("This Court could grant partial relief to Wells Fargo without disturbing the reorganization by, for example . . . The Debtors present no credible evidence that granting

*Cap. Mgmt., L.P.*, 48 F.4th 419, 431 (5th Cir. 2022); *see also In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 328 (5th Cir. 2013) (denying dismissal on equitable mootness grounds because the court "could grant partial relief . . . without disturbing the reorganization"). Additionally, the Fifth Circuit in particular is "more hesitant to invoke equitable mootness than many circuits, treating it as a scalpel rather than an axe." *In re Sneed Shipping, Inc.*, 916 F.3d 405, 409 (5th Cir. 2019). In short, if the Court *can* fashion a remedy without upsetting the reorganization, then equitable mootness is improper.

Appellees argue that Appellants' requested relief would require unwinding the Plan and reversing the Bankruptcy Court's order. Further, Appellee suggests that this reversal and unwinding would be detrimental to the general unsecured creditors who obtained a full recovery under the Plan. Since the Plan was only possible with the first and second lien holders' approval, if reversed there would be no guarantee that any unsecured creditors get a recovery.

In response, Appellants argue that the Motion to Dismiss should not be denied because the Court can grant fractional relief without unwinding the Plan, harming third parties, or threatening the Debtors' reorganization. (Doc. No. 41 at 2). If the Court orders the Majority Lenders to sell the Excluded Lenders the share of the reorganized Debtors' equity that they would have been offered the opportunity to purchase originally, then there is no need to upset the Plan or the actions of third parties.

As the Court found in its analysis of the Order Denying the Stay, this factor weighs against equitable mootness. Notably, in their opposition to the Stay, Appellees argued that there would be no irreparable harm allowing the Plan to consummate. Thus, Appellees themselves made the very same arguments that they now accuse Appellants of using to mislead the Court. *Compare* (Doc.

---

such fractional relief would require unwinding . . . ."). As "fractional relief" is the language predominantly used in the parties' briefing, the Court uses "fractional relief" as well.

No. 42 at 6) ("The Minority AHG asks this Court not to burden itself with such details . . . but even the Minority AHG's modified request for relief would . . . require unwinding the plan and . . . directly harm third parties.") *with* (Doc. No. 17 at 3) ("[Appellants] filed the Motion solely . . . to ensure it preserved rights to pursue a discrete $ 22 million in value that it claims to have been owed"). As both the Appellants and Appellees agree that the remedy at issue is discrete payment and sale of certain equities, the Court finds that this factor weighs heavily against a finding of equitable mootness. *See Bank of N.Y. Tr. Co. NA v. Pac. Lumber Co.*, 624 F.3d 274, 282 (5th Cir. 2010) (denying a motion to dismiss on equitable mootness grounds because fractional relief was available even when the first two *Manges* factors were met).

### IV. Conclusion

Upon consideration of the law and the parties' briefing, the Court finds that the doctrine of equitable mootness does not require the dismissal of the appeal. Thus, the Court **DENIES** Appellees' Motion to Dismiss. (Doc. No. 34).

SIGNED this 22nd day of October 2024.

Andrew S. Hanen
United States District Judge