**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| | § | Civil Action No. 4:24-cv-02001 |
| CONVERGEONE HOLDINGS, INC., et al.,[1] | § | |
| | § | Bankruptcy Case No. 24-90194 |
| | § | |
| Debtors. | § | |
| | § | |
| Ad Hoc Group of Excluded Lenders, | § | |
| | § | |
| Appellant. | § | |
| | § | |
| | § | |

**APPELLANT THE AD HOC GROUP OF EXCLUDED LENDERS'
NOTICE OF SUPPLEMENTAL AUTHORITY**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

Appellant the Ad Hoc Group of Excluded Lenders respectfully submits this Notice of Supplemental Authority to inform the Court of the Fifth Circuit's recent decision in *Excluded Lenders v. Serta Simmons Bedding, L.L.C.* (*In re Serta Simmons Bedding, L.L.C.*), No. 23-20181, --- F.4th ---, 2024 WL 5250365 (5th Cir. Dec. 31, 2024), a copy of which is attached hereto.[2]

In *Serta*, the Fifth Circuit analyzed 11 U.S.C. § 1123(a)(4) in the context of a plan that—like the one in this case—provided disparate value to different creditors within the same class. Specifically, the *Serta* plan provided members of Classes 3 and 4 with a settlement indemnity whose value "varied dramatically" among class members. 2024 WL 5250365, at *23–24. Although the indemnity was nominally offered to every class member, its worth depended on the recipient's exposure to liability from a prior transaction. *Id.* For creditors with such exposure—whose votes were needed to confirm the plan—the indemnity was "potentially worth millions or even tens of millions of dollars." *Id.* at *23. For class members without any exposure, the indemnity was "worth little or even nothing." *Id.*

The Fifth Circuit held that the plan violated § 1123(a)(4) by providing "differential" treatment to certain creditors within the same class. *Id.* at *23 &

---

[2] Capitalized terms have the meaning ascribed to them in the Excluded Lenders' opening brief. Dkt. No. 30.

4913-6324-8909

n.22.  The Fifth Circuit emphasized that § 1123(a)(4) demands an "objective approach to equal treatment" that requires a court to "look below the surface to determine whether the distributions were in fact equal in value."  *Id.*  Otherwise "any special gift could be recharacterized as equal treatment" through creative drafting.  *Id.* at *23 n.23.

Under *Serta*, the Plan in this case violates § 1123(a)(4) by favoring the Majority Lenders over the Excluded Lenders.  By offering the Majority Lenders a valuable and exclusive investment opportunity to secure their votes, the Plan caused the Majority Lenders to receive millions more for their claims than the Excluded Lenders received for identical claims.  As in *Serta*, this Court should see through the Debtors' and Majority Lenders' attempt to recharacterize the conferred value and hold that a plan cannot discriminate by offering a valuable investment opportunity to only certain class members but not others.

Dated:  January 7, 2025                    Respectfully submitted,

                                           **GRAY REED**
                                           By: */s/ Jason S. Brookner*
                                           Jason S. Brookner (Bar# 24033684)
                                           William N. Drabble (Bar# 24074154)
                                           1300 Post Oak Blvd., Suite 2000
                                           Houston, Texas 77056
                                           Telephone: (713) 986-7000
                                           Facsimile:  (713) 986-7100
                                           Email:  jbrookner@grayreed.com
                                                   wdrabble@grayreed.com

                                           -and-

3

**PROSKAUER ROSE LLP**
David M. Hillman (*pro hac vice*)
Michael T. Mervis (*pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone: (212) 969-3000
Facsimile:  (212) 969-2900
Email:  dhillman@proskauer.com
          mmervis@proskauer.com

-and-

**PROSKAUER ROSE LLP**
John E. Roberts (*pro hac vice*)
One International Place
Boston, MA 02110-2600
Telephone: (617) 526-9600
Facsimile:  (617) 526-9899
Email:  jroberts@proskauer.com

-and-

**PROSKAUER ROSE LLP**
Steve Y. Ma (*pro hac vice*)
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
Telephone: (310) 284-4542
Facsimile:  (310) 557-2193
Email:  sma@proskauer.com

*Counsel to Appellant the Ad Hoc Group
of Excluded Lenders*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 7th day of January, 2025, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF Electronic Notification System on all parties to this proceeding who have subscribed for notice, and on counsel to Appellees via electronic mail as reflected below.

*/s/ Jason S. Brookner*
Jason S. Brookner

Charles R. Koster
**WHITE & CASE LLP**
609 Main Street, Suite 2900
Houston, TX 77002
Telephone:  (713) 496-9700
Facsimile:   (713) 496-9701
Email:   charles.koster@whitecase.com

Bojan Guzina
Jason N. Zakia
Andrew F. O'Neill
Erin R. Rosenberg
Blair M. Warner
Adam T. Swingle
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone:  (312) 881-5400
Email:   bojan.guzina@whitecase.com
            jzakia@whitecase.com
            aoneill@whitecase.com
            erin.rosenberg@whitecase.com
            blair.warner@whitecase.com
            adam.swingle@whitecase.com

*Counsel to the Debtors*

John F. Higgins
Eric M. English
James A. Keefe
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, TX 77002
Telephone:  (713) 226-6000
Facsimile:   (713) 226-6248
E-mail:  jhiggins@porterhedges.com
            eenglish@porterhedges.com
            jkeefe@porterhedges.com

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg
Keith R. Martorana
C. Lee Wilson
200 Park Avenue
New York, New York 10166
Telephone:  (212) 351-4000
Facsimile:   (212) 351-4035
Email:   sgreenberg@gibsondunn.com
            kmartorana@gibsondunn.com
            clwilson@gibsondunn.com

**GIBSON, DUNN & CRUTCHER LLP**
Michelle Choi
333 South Grand Avenue
Los Angeles, California 90071
Telephone:  (213) 229-7000
Facsimile:   (213) 229-7520
Email:   mchoi@gibsondunn.com

*Counsel to the First Lien Ad Hoc Group*

5

## **ATTACHMENT**

*Excluded Lenders v. Serta Simmons Bedding, L.L.C.* (*In re Serta Simmons Bedding, L.L.C.*), No. 23-20181, --- F.4th ---, 2024 WL 5250365 (5th Cir. Dec. 31, 2024)

2024 WL 5250365
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

IN RE SERTA SIMMONS BEDDING, L.L.C., Debtor,
Excluded Lenders; LCM Lenders, Appellants,

v.

Serta Simmons Bedding, L.L.C.; Barings, L.L.C.;
Boston Management and Research; Credit Suisse Asset
Management, L.L.C.; Eaton Vance Management; Invesco
Senior Secured Management, Incorporated, Appellees,
In re Serta Simmons Bedding, L.L.C., Debtor,
Excluded Lenders; LCM Lenders, Appellants,

v.

Serta Simmons Bedding, L.L.C.; Barings, L.L.C.;
Boston Management and Research; Credit Suisse Asset
Management, L.L.C.; Eaton Vance Management; Invesco
Senior Secured Management, Incorporated, Appellees,
In the Matter of Serta Simmons Bedding, L.L.C., Debtor,
Citadel Equity Fund, Limited, Appellant,

v.

Serta Simmons Bedding, L.L.C.; SSB Manufacturing
Company; Dawn Intermediate, L.L.C.; Serta International
Holdco, L.L.C.; National Bedding Company, L.L.C.;
The Simmons Manufacturing Company, L.L.C.;
Dreamwell, Limited; SSB Hospitality, L.L.C.; SSB
Logistics, L.L.C.; Simmons Bedding Company, L.L.C.;
Tuft & Needle L.L.C.; Tomorrow Sleep, L.L.C.; SSB
Retail, L.L.C.; World of Sleep Outlets, Appellees,
Excluded Lenders, Appellant,

v.

Serta Simmons Bedding, L.L.C., Appellee.

No. 23-20181, No. 23-20450,
No. 23-20363, No. 23-20451
|
Filed December 31, 2024

Appeals from the Bankruptcy Court for the Southern District
of Texas, USDC Nos. 4:23-AP-9001, 4:23-BK-90020, 4:23-
CV-1342, 4:23-CV-1344, 4:23-CV-2173, David Ronald
Jones, U.S. Bankruptcy Judge

**Attorneys and Law Firms**

John Francis Higgins, IV, Heather K. Hatfield, Michael Shane
Johnson, Eric Drennan Wade, Porter Hedges, L.L.P., Houston,

TX, Kannon K. Shanmugam, William Thomas Marks, Paul,
Weiss, Rifkind, Wharton & Garrison, L.L.P., Washington,
DC, Blair R. Albom, Anne E. Beaumont, Elizabeth Bierut,
Lewis R. Clayton, Andrew James Ehrlich, Jamuna Kelley,
Lawrence Saul Robbins, Eric Seiler, Friedman Kaplan
Seiler Adelman & Robbins, L.L.P., New York, NY, Robert
O'Loughlin, Kenneth S. Ziman, Paul, Weiss, Rifkind,
Wharton & Garrison, L.L.P., New York, NY, for Appellant
Excluded Lenders.

Vincent Levy, Brian Taylor Goldman, Holwell Shuster &
Goldberg, L.L.P., New York, NY, John James Sparacino,
McKool Smith, P.C., Houston, TX, for Appellant LCM
Lenders.

Gregory Stuart Silbert, Luna Ngan Barrington, David Lender,
Daniel Lifton, Weil, Gotshal & Manges, L.L.P., New York,
NY, Richard Gage, Kelley Drye & Warren, L.L.P., New York,
NY, Gabriel Adam Morgan, Stephanie Nicole Morrison, Weil,
Gotshal & Manges, L.L.P., Houston, TX, Bruce Jay Ruzinsky,
Esq., Jackson Walker, L.L.P., Houston, TX, Alexander Welch,
Latham & Watkins, L.L.P., New York, NY, for Appellee Serta
Simmons Bedding, L.L.C.

Matthew D. McGill, Attorney, Christian Dibblee, Jessica
Wagner, Gibson, Dunn & Crutcher, L.L.P., Washington, DC,
Amanda Aycock, Jason Z. Goldstein, Scott J. Greenberg,
Akiva Shapiro, Ray C. Shrock, Christopher Lee Wilson,
Gibson, Dunn & Crutcher, L.L.P., New York, NY, Gabriel
Adam Morgan, Weil, Gotshal & Manges, L.L.P., Houston,
TX, Alexandra Perloff-Giles, Davis Wright Tremaine,
L.L.P., New York, NY, Bruce Jay Ruzinsky, Esq., Jackson
Walker, L.L.P., Houston, TX, for Appellees Barings, L.L.C.,
Boston Management and Research, Credit Suisse Asset
Management, L.L.C., Invesco Senior Secured Management,
Incorporated, Eaton Vance Management.

Richard Corbi, New York, NY, for Amicus Curiae Creditor
Rights Coalition.

Before Haynes, Willett, and Oldham, Circuit Judges.

**Opinion**

Andrew S. Oldham, Circuit Judge:

**\*1** Serta Simmons Bedding, LLC is an American company
that makes mattresses and other bedding products. In 2016
and 2020, Serta executed financing deals with various
lenders. Then Serta went bankrupt. The financing deals and
bankruptcy proceedings generated four appeals, which we

consolidated. Given the complexities, we will not even try to summarize our various holdings here. So read on.

I

We begin with three points by way of background. We first describe (A) relevant corporate-finance terms. Then we describe (B) the corporate-finance transactions that gave rise to these appeals. Finally, we explain (C) the litigation history.

A

Ratable treatment is an important background norm of corporate finance. Pursuant to this norm, a borrower must treat all of its similarly situated lenders, well, similarly. *See* Vincent S.J. Buccola, *Efficacious Answers to the Non-Pro Rata Workout*, 171 U. PA. L. REV. 1859, 1864–65 (2023); Diane Lourdes Dick, *Hostile Restructurings*, 96 WASH. L. REV. 1333, 1349 (2021); Jackson Skeen, Note, *Uptier Exchange Transactions: Lawful Innovation or Lender-on-Lender Violence?*, 40 YALE J. REG. 408, 413–14 (2023). Ratable treatment is such an important norm that it is often described as a lender's "sacred right" under syndicated[1] loan agreements. *See, e.g., LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 1:21-cv-03987, 2022 WL 953109, at *2 (S.D.N.Y. Mar. 29, 2022); Skeen, *supra*, at 413–14.

How does ratable treatment work? To illustrate it, imagine a borrower with $150 million in debt distributed equally among five different lenders (each holding $30 million in loans). The borrower then decides to retire one-fifth or $30 million of this debt. The norm of ratable treatment provides that the borrower may not choose to repay only one of its lenders. Rather, it must proportionally allocate that $30 million among the relevant lenders according to their share of the outstanding debt. Thus lenders are treated equally, and individual lenders are protected from potential machinations by the majority.[2]

Uptiers are a relatively new and controversial exception to the ratable-treatment norm. They emerged during the COVID-19 pandemic, when distressed companies sought innovative ways to improve their financial positions. *See* Skeen, *supra*, at 410–17. They are controversial because, according to critics, uptiers create a zero-sum game of "lender-on-lender violence." *Id.* at 410 (quotation omitted).

**\*2** How does an uptier transaction work? The borrower amends the terms of a credit facility to allow the issuance of new super-priority debt. Because a majority of lenders in the existing facility must typically consent to such an amendment, the borrower purchases consent by allowing these lenders to exchange their existing debt for new super-priority debt, often at an above-market price. *See* Buccola, *Efficacious Answers, supra*, at 1865; Dick, *supra*, at 1352. Since not all of the lenders participate in the uptier, the uptier is a non-pro-rata transaction that violates the norm of ratable treatment.

The below figures ably depict two uptiers where a borrower issues super-priority debt on top of existing first-lien debt which was previously shared ratably (or *pari passu*):



Samir D. Parikh, *Creditors Strike Back: The Return of the Cooperation Agreement*, 73 DUKE L.J. ONLINE 1, 14 (2023).



Vincent S.J. Buccola & Greg Nini, *The Loan Market Response to Dropdown and Uptier Transactions*, 53 J. LEGAL STUD. 489, 501 (2024) (restyled).

Like everything in corporate finance, the uptier has benefits and costs. As to benefits, the borrower needs only majority (versus unanimous) consent to complete an uptier transaction. That means the borrower can play lender groups off of each other and avoid the expense of dealing with holdouts. *See* Dick, *supra*, at 1369–70; Buccola, *Efficacious Answers,*

*supra*, at 1875–76. And the borrower can secure additional financing through the issuance of new debt. *See* Vincent S.J. Buccola, *Sponsor Control: A New Paradigm for Corporate Reorganization*, 90 U. CHI. L. REV. 1, 35 (2023) (noting that uptiers "allow distressed companies to access liquidity that might otherwise be available only in and through bankruptcy"). In addition, the majority lenders often improve their net position by jumping the creditor line, which is advantageous in bankruptcy where debt claims are often resolved by seniority.

The costs of an uptier transaction are born entirely by the minority lenders, who end up with subordinated debt worth less than before. *See* Bek R. Sunuu, *A Closer Look at How Uptier Priming Loan Exchanges Leave Excluded Lenders Behind*, S&P GLOB. RATINGS ( June 15, 2021), https://perma.cc/ 6TBN-JMTT. Some have decried the uptier transaction as "a cannibalistic assault by one group of lenders ... against another." Skeen, *supra*, at 410 (quotation omitted). Others have called uptiers "super-aggressive," Stephen J. Lubben, *Holdout Panic*, 96 Am. Bankr. L.J. 1, 20 (2022), "hostile restructurings," Dick, *supra*, at 1351, "acts of financial war," Parikh, *supra*, at 6, and "unthinkable under [pre-pandemic] commercial norms," Buccola, *Sponsor Control, supra*, at 34.

B

We (1) describe SSB's[3] 2016 syndicated loan agreement and its ratable-sharing provision. Then we (2) describe SSB's 2020 uptier transaction.

1

In 2016, SSB decided to refinance its debt through a series of syndicated loans (the "2016 Refinancing"). Accordingly, SSB issued $1.95 billion in first-lien syndicated loans and $450 million in second-lien syndicated loans. SSB and its lenders made two credit agreements, one for each type of loan. The key agreement here is the First Lien Term Loan Agreement (the "2016 Agreement").

The 2016 Agreement protects the sacred right of pro-rata sharing. As relevant to this dispute, § 2.18 of the 2016 Agreement provides:

> **\*3** [E]ach Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest in respect of the Loans of a given Class and each conversion of any Borrowing ... shall be allocated pro rata among the Lenders in accordance with their respective Applicable Percentages of the applicable Class.

ROA.23-20181.214. Under § 2.18, SSB cannot choose to pay its obligations to one lender while offering nothing to the rest —the favored lender would have to share the payment with the other lenders.

To further protect the sacred right of pro-rata sharing, § 9.02(b)(A) generally requires unanimous consent of any affected lender to waive, amend, or modify § 2.18 in any way that would "alter the pro rata sharing of payments required thereby." ROA.23-20181.275–76. Thus, while most provisions of the 2016 Agreement can be changed with the approval of SSB and a simple majority of its lenders, the ratable sharing provision in § 2.18 is singled out for special protection. If the parties to the 2016 Agreement want to change or eliminate the ratable-sharing provision, they must do so unanimously—to prevent SSB from repaying one lender to the prejudice of the others, and to prevent a majority of the lenders from bargaining away the ratable-sharing provision that protects all lenders.

The 2016 Agreement contains exceptions to the ratable-sharing provisions, however. Only one is relevant to the present appeals, and it appears in § 9.05(g). That sub-section provides:

> [A]ny Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata

basis or (B) through open market purchases ....

ROA.23-20181.287. The 2016 Agreement defines "Affiliated Lender" to include SSB.[4] Thus, § 9.05(g) provides two ways by which SSB can repay its loans *without* ratable sharing between lenders.

The first is a Dutch auction open to all lenders, the procedures for which are comprehensively laid out in the 2016 Agreement. *See La. Stadium & Exposition Dist. v. Fin. Guar. Ins. Co.*, 701 F.3d 39, 42 (2d Cir. 2012) (explaining procedure for a Dutch auction); *see also Dutch Auction*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("An auction in which property is initially offered at an excessive price that is gradually lowered until the property is sold."). In a Dutch auction, the "Auction Party" (here, SSB) gives notice to its lenders that it wants to purchase a particular amount of its outstanding loans at a certain price relative to par. Lenders wishing to participate may reply with the amount of loans that they are willing to "sell" and at what price. If the amount and price in the notice match up with the amounts and prices in the replies, the Auction is conducted by sale at the lowest price to the Auction Party. If not, there is either a "Failed Auction" or the Auction Party can amend its notice offer and conduct the Auction at the lowest price necessary to complete a sale. Thus, the Dutch auction provides a mechanism by which SSB can leverage open competition among its lenders to retire its debt at the lowest possible price. And assuming that every lender did not offer all of their loans at the same exact price, the expected effect of a completed Dutch auction is non-pro-rata repayment, since only the lenders who offered the cheapest loans will be paid.

**\*4** The second exception is an "open market purchase[ ]." ROA.23-20181.287. The 2016 Agreement does not define or discuss the term "open market purchase." The 2016 Agreement's deafening silence on "open market purchase" stands in sharp contrast to the meticulous definition it provides for a Dutch auction. And it is the patent ambiguity in the undefined term that forms the foundation of this case.

## 2

In the years after the 2016 Refinancing, SSB struggled. When the COVID-19 pandemic threatened to drag SSB down even further, the company sought to bolster its financial position.

It chose an uptier. In 2020, SSB signed an uptier agreement (the "2020 Uptier") with some (but not all) of the lenders holding first-lien and second-lien debt issued in the 2016 Refinancing (the "Prevailing Lenders").[5] The Prevailing Lenders provided SSB with $200 million in new financing in exchange for $200 million in first-out, super-priority debt. The Prevailing Lenders also traded in $1.2 billion of their first-lien and second-lien loans for approximately $875 million in second-out, super-priority debt. The upshot of these moves was that SSB gained cash and lowered its overall debt load, while the Prevailing Lenders slashed the nominal value of their holdings (which were trading far below par) to jump the creditor line and get paid before their erstwhile first-and second-lien comrades.

The 2020 Uptier was controversial from its inception.[6] So to shore up the deal in anticipation of future litigation, SSB and the Prevailing Lenders took the following steps.

First, SSB and the Prevailing Lenders amended the 2016 Agreement to allow the 2020 Uptier. SSB and the Prevailing Lenders were able to do that because the Prevailing Lenders held a bare majority of the outstanding first-line debt.

Second, SSB and the Prevailing Lenders labeled the 2020 Uptier an "open market purchase," one of the two § 9.05(g) exceptions to pro-rata sharing. To wit, one of the contracts that formed the basis for the 2020 Uptier was termed the "Open Market Purchase and Cashless Exchange Agreement." SSB and the Prevailing Lenders did so apparently in recognition that the 2016 Agreement's ratable-sharing provision would otherwise bar the 2020 Uptier.

Finally, perhaps recognizing the risk of the 2020 Uptier, SSB agreed to indemnify the Prevailing Lenders for any and all losses, claims, damages and liabilities which they might incur in connection with their participation. *See* ROA.23-20451.764–65 (providing indemnification whether future litigation was based in "contract, tort or any other theory"). Such indemnification would be payable by SSB within 30 days of a written demand to fulfill its obligations.

## C

**\*5** In January 2023, SSB filed for bankruptcy under Chapter 11 in the Southern District of Texas. SSB also filed an adversary proceeding to the main Chapter 11 proceeding. We

discuss (1) the adversary proceeding and then (2) the main bankruptcy proceeding.

### 1

First, the adversary proceeding.

On January 24, 2023, SSB and some (but not all) of the Prevailing Lenders (the "Prevailing Lender plaintiffs") filed an action for declaratory relief against a number of lenders who held debt from the 2016 Refinancing but did not participate in the 2020 Uptier. The gist of this claim was that the Prevailing Lender plaintiffs wanted the bankruptcy judge's blessing of the 2020 Uptier and its assurance that the Prevailing Lenders did not violate the 2016 Agreement's ratable-sharing provision. As relevant here, the defendants in this declaratory-relief suit included two groups of first-lien lenders who did not get super-priority loans in the 2020 Uptier and who instead objected to the "lender-on-lender violence" perpetuated by the Prevailing Lenders. *See* Skeen, *supra*, at 410 (quotation omitted). Like the parties, *see supra* n.5, we refer to these objecting lenders as the "Excluded Lenders" and the "LCM Lenders."

In their adversary proceeding against the Excluded Lenders and the LCM Lenders, SSB and the Prevailing Lender plaintiffs sought a declaration that the 2020 Uptier (a) was permitted under the terms of the 2016 Agreement and (b) did not violate the implied covenant of good faith and fair dealing. The bankruptcy court granted partial summary judgment to SSB and the Prevailing Lender plaintiffs. As relevant here, the bankruptcy court held that the term "open market purchase" was "clear and unambiguous," and the 2020 Uptier was a valid "open market purchase" under the exception to pro-rata sharing provided for in § 9.05(g) of the 2016 Agreement. ROA.23-20181.6277–78. The bankruptcy court certified its decision for appeal to this court. 28 U.S.C. § 158(d)(2). A panel of our court also granted the Excluded Lenders and the LCM Lenders permission to appeal.

After the bankruptcy court's partial final judgment was appealed to our court, all that remained pending in the adversary proceeding were various counterclaims and third-party claims by the Excluded Lenders and the LCM Lenders. Again, the bankruptcy court sided with the Prevailing Lender plaintiffs. *See In re Serta Simmons Bedding, LLC*, No. 23-90020, 2023 WL 3855820, at *12–14 (Bankr. S.D. Tex. June 6, 2023). Having resolved all claims, the bankruptcy

court then entered final judgment in the adversary proceeding. The parties jointly agreed to certify the post-trial final judgment to this court, *see* 28 U.S.C. § 158(d)(2), and a panel granted a subsequent motion for permission to appeal.

### 2

Next, the main proceeding.

On January 23, 2023, SSB filed a proposed plan for Chapter 11 reorganization. Section 8.5 of that plan was titled "Survival of the Debtors' Indemnification Obligations" and provided for the survival of SSB's earlier promise to indemnify the Prevailing Lenders for their participation in the 2020 Uptier.[7] *See supra*, at 12. Section 8.5(b) characterized such obligations as "executory contracts" which were assumed under the proposed plan and would continue as obligations of the Reorganized Debtors.

**\*6** On March 16, the Prevailing Lender plaintiffs filed proofs of claims against SSB, including claims for indemnification and contribution. The Excluded Lenders objected and argued that such claims were contingent claims for reimbursement disallowed by 11 U.S.C. § 502(e)(1)(B). Another creditor, Citadel Equity Fund Ltd. ("Citadel"), joined that objection.

On May 9, SSB filed a first amended plan for reorganization. The first amended plan contained indemnification obligations functionally identical to the initial plan. But five days later, on the eve of the confirmation hearing, SSB filed a modified first amended plan. That plan still contained a Section 8.5 titled "Survival of the Debtors' Indemnification Obligations." And it still provided indemnification "*on the same terms and limitations as afforded under the* [2020 Uptier contracts]." ROA.23-20363.17657 (emphasis added). But the nature of the indemnification obligation was slightly different because the obligations arose only after the effective date of the plan.

On May 23, the penultimate day of the confirmation hearing, SSB filed its final second amended plan. This time, SSB's indemnity did not cover all of the Prevailing Lenders involved with the 2020 Uptier. Rather, the plan's final indemnity applied to all creditors holding Class 3 and Class 4 claims in SSB's bankruptcy, as of the effective date of the plan ( June 29, 2023). ROA.23-20363.18748. The upshot? The indemnity covered the Prevailing Lenders that participated in the 2020 Uptier and that continued to hold super-priority debt from the

uptier transaction (i.e., Class 3 creditors). The indemnity did not cover any Prevailing Lender that participated in the 2020 Uptier and sold its super-priority debt before June 29, 2023. Instead, the indemnity covered other entities—like Citadel—which did *not* participate in the 2020 Uptier transaction but which later purchased the super-priority debt on secondary markets (i.e., Class 4 creditors).

The bankruptcy court then held a trial to consider confirmation of the Chapter 11 reorganization plan and resolve the adversary proceeding. *See Serta Simmons Bedding*, 2023 WL 3855820, at *7. During the trial, SSB and the Prevailing Lender plaintiffs agreed that the indemnity originally provided for in the 2020 Uptier and maintained by the first two reorganization plans (the "pre-petition indemnity") should be disallowed. *See id.* at *10. But they argued that the modified indemnity in the final plan (the "settlement indemnity") could be justified as a new indemnity and part of a settlement between SSB and some of its creditors to gain approval for plan confirmation. *See* 11 U.S.C. § 1123(b)(3). In support of this argument, multiple witnesses presented by the Prevailing Lender plaintiffs asserted that they would not have voted in favor of the plan without the settlement indemnity. *See, e.g.*, ROA.23-20363.3151 (one of SSB's directors asserting that the settlement indemnity was necessary to induce Prevailing Lenders to "participate and support the [Chapter 11] restructuring").

The bankruptcy court again agreed with SSB and the Prevailing Lender plaintiffs, finding that the settlement indemnity was a fair and equitable component of a § 1123(b)(3) settlement. *See Serta Simmons Bedding*, 2023 WL 3855820, at *10. Overruling related objections by the Excluded Lenders and Citadel, the bankruptcy court confirmed the second amended plan—indemnity and all (hereafter the "Plan"). The bankruptcy court also certified the confirmation order for direct appeal to this court. Motions panels granted subsequent motions for permission to appeal and to consolidate the Excluded Lenders and Citadel's related indemnity appeals (under case numbers 23-20451 and 23-20363, respectively). A panel also granted a motion to intervene by the Prevailing Lender plaintiffs.

\*

**\*7**  In sum, this consolidated appeal involves four cases: Numbers 23-20181, 23-20450, 23-20451, and 23-20363.[8] Our discussion proceeds as follows. In Part II, we discuss jurisdiction. In Part III, we discuss the two cases that arose

from the adversary proceeding and that relate to the validity of the 2020 Uptier as an open market purchase: the Excluded and LCM Lenders' appeal from the bankruptcy court's partial summary judgment (23-20181) and the Excluded and LCM Lenders' appeal from the post-trial final judgment (23-20450). Then in Part IV, we discuss the two cases that arose from the main Chapter 11 proceeding and that relate to the validity of the contested Plan indemnity: the Excluded Lenders' appeal from the confirmation order (23-20451) and Citadel's appeal from the confirmation order (23-20363).

II

"Jurisdiction is always first." *Carswell v. Camp*, 54 F.4th 307, 310 (5th Cir. 2022) (quotation omitted). We first (A) discuss the jurisdictional issues related to the two open market purchase cases, before (B) turning to the jurisdictional issues related to the two Plan indemnity cases. Then we dismiss the LCM Lenders from the appeal in No. 23-20450.

A

With respect to the open market purchase cases (Nos. 23-20181 & 23-20450), we first (1) discuss the bankruptcy court's jurisdiction. We then (2) discuss our appellate jurisdiction. Finally, we consider specific jurisdictional issues involving (3) the Excluded Lenders and (4) the LCM Lenders.

1

First, the bankruptcy court's jurisdiction in Nos. 23-20181 and 23-20450. The bankruptcy court entered final judgment in both appeals. In No. 23-20181, the bankruptcy court entered partial final judgment on the claim seeking a declaratory judgment that the 2020 Uptier was an open market purchase permitted by the 2016 Agreement. In No. 23-20450, the bankruptcy court entered final judgment on the Excluded and LCM Lenders' claims and counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing. The bankruptcy court had both (a) statutory and (b) constitutional authority to enter such judgments.

a

Under federal law, bankruptcy courts may enter final judgments in cases under title 11, or in core proceedings arising under title 11 or arising in a case under title 11. 28 U.S.C. § 157(b)(1). Core proceedings include, *inter alia*, "matters concerning the administration of the estate," the "allowance or disallowance of claims against the estate," "determinations as to the dischargeability of particular debts," and "determinations of the validity, extent, or priority of liens." 28 U.S.C. § 157(b)(2)(A), (B), (I), & (K).

As a matter of statutory authority, the bankruptcy court was on solid ground in both open market purchase cases. In No. 23-20181, the declaratory judgment claim was brought in anticipation of potential claims against SSB and the Prevailing Lender plaintiffs regarding a breach of the 2016 Agreement and the priority of liens relevant to SSB's Chapter 11 proceeding.[9] Such claims touch on the administration of the estate, the allowance of claims against the estate, the determination as to the discharge of particular debts, and the determination of the validity, extent, or priority of liens. *See* 28 U.S.C. § 157(b)(2)(A), (B), (I), & (K). Because the claims would thus constitute a core proceeding under 28 U.S.C. § 157(b)(2), the bankruptcy court had statutory authority to enter partial final judgment in No. 23-20181.

**\*8** In No. 23-20450, the Excluded and LCM Lenders brought counterclaims and third-party claims for breach of contract and breach of the implied covenant of good faith and fair dealing. For much the same reasons as stated above, such claims were part of a core proceeding under § 157(b)(2), so the bankruptcy court had statutory authority to enter final judgment in No. 23-20450.

b

Even where federal law allows a bankruptcy court to enter final judgment in a core proceeding, the Constitution may not. *See Stern v. Marshall*, 564 U.S. 462, 482, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). Generally, a non–Article III court may enter a final judgment only when the relevant claim falls within the "public rights" exception. *See id.* at 487–88, 131 S.Ct. 2594. That exception applies to, *inter alia*, claims that exist only by grace of Congress or the President, historically could have been determined exclusively by the Legislative or Executive branches, flow from a federal statutory or regulatory scheme, or depend completely on the adjudication of a claim created by federal law. *Id.* at 488–95, 131 S.Ct. 2594 (collecting cases).

The relevant claims in Nos. 23-20181 and 23-20450 do not fall within the public rights exception. The declaratory judgment claim in No. 23-20181 is based on potential claims for breach of contract—a prototypical state-law claim between "two private parties." *Cf. Stern*, 564 U.S. at 493, 131 S.Ct. 2594. The Excluded and LCM Lenders' counterclaims and third-party claims in No. 23-20450 are for breach of contract and breach of the implied covenant of good faith and fair dealing, which are again, ordinary state-law claims between private parties. *See ibid.* Since these claims have no connection with the federal branches or federal law, *Stern* would appear to bar their adjudication by the bankruptcy court.

But the Supreme Court recognizes a major exception to the public rights doctrine: consent. Claims otherwise barred by *Stern* may be adjudicated by bankruptcy courts where parties have expressly or impliedly consented to their jurisdiction. *Wellness International Network, Limited v. Sharif*, 575 U.S. 665, 683–85, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015); *see also CFTC v. Schor*, 478 U.S. 833, 848–49, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) ("[A]s a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried."). The *Wellness* Court articulated the key inquiry with respect to implied consent: "whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the non-Article III adjudicator." *Wellness*, 575 U.S. at 685, 135 S.Ct. 1932 (quotation omitted). The *Wellness* Court also stressed the importance of pragmatic values like "increasing judicial efficiency and checking gamesmanship." *Ibid.*

The *Wellness* exception for consent cures the *Stern* problems for the open market purchase cases. In No. 23-20181, the parties explicitly consented to the bankruptcy court's entry of partial final judgment. And in No. 23-20450, the bankruptcy court found that the Excluded Lenders' impliedly consented to its authority by requesting that it enter summary judgment. *See Serta Simmons Bedding*, 2023 WL 3855820, at \*8. Moreover, the Excluded Lenders failed to object at the summary judgment stage, before trial, and at trial. *Ibid.* Reviewing this finding for clear error, *see Saenz v. Gomez*, 899 F.3d 384, 391 (5th Cir. 2018), and in light of considerations like "judicial efficiency" and "checking gamesmanship," *see Wellness*, 575 U.S. at 685, 135 S.Ct.

1932, the bankruptcy court did not err when it found that the Excluded Lenders implicitly consented to non-Article III adjudication. *See also ibid.* (emphasizing the "deeply factbound" nature of the consent analysis). [10] The bankruptcy court did not specifically find that the LCM Lenders consented to its authority to enter final judgments. *See Serta Simmons Bedding*, 2023 WL 3855820, at *8. But given the LCM Lenders' consent for the bankruptcy court to enter partial final judgment on the declaratory judgment claim, the connection between that claim and the LCM Lenders' counterclaims, and *Wellness*'s discussion of efficiency and gamesmanship, *see* 575 U.S. at 685, 135 S.Ct. 1932, we hold that the LCM Lenders implicitly consented to non-Article III adjudication. Consequently, the bankruptcy court could constitutionally enter final judgment in No. 23-20450.


### 2

**\*9** Under 28 U.S.C. § 158(d), this court has jurisdiction over direct appeals from bankruptcy court final judgments, where either the bankruptcy court or all the relevant parties certify the direct appeal, and where this court authorizes it. In No. 23-20181, the bankruptcy court certified the judgment for direct appeal and a panel of this court granted authorization. In No. 23-20450, all the relevant parties jointly certified the judgment for direct appeal and a panel of this court granted authorization. Accordingly, this court has appellate jurisdiction over both open market purchase appeals.


### 3

In No. 23-20181, SSB and the Prevailing Lender plaintiffs argue that the Excluded Lenders did not file a valid notice of appeal from the partial final judgment. As the argument goes, Federal Rule of Bankruptcy Procedure 8006(a) provides that a certification for direct appellate review is effective when a timely appeal has been taken under Federal Rule of Bankruptcy Procedure 8003. FED. R. BANKR. P. 8006(a)(2). Rule 8003(a)(3)(B) in turn states in relevant part that a notice of appeal must "be accompanied by the judgment ... from which the appeal is taken ...." FED. R. BANKR. P. 8003(a)(3)(B). But the Excluded Lenders' notice of appeal from the partial final judgment order did not attach the judgment. Citing *In re Cleveland Imaging & Surgical Hospital, LLC*, 26 F.4th 285, 293 (5th Cir. 2022), SSB and the Prevailing Lender plaintiffs argue that we lack jurisdiction over the Excluded Lenders' summary judgment appeal.

We disagree. As the Supreme Court has held time and time again, the Federal Rules "do not create or withdraw federal jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 453, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) (citing *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 370, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978)); *see also id.* at 453–54, 124 S.Ct. 906 (citing other authorities). To the contrary, Congress alone can enact procedural requirements with jurisdictional consequences. *See, e.g., Harrow v. Dep't of Def.*, 601 U.S. 480, 144 S. Ct. 1178, 1182–83, 218 L.Ed.2d 502 (2024); *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 143 S. Ct. 927, 935–36, 215 L.Ed.2d 262 (2023); *Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 142 S. Ct. 1493, 1497, 212 L.Ed.2d 524 (2022). Because the Federal Rules of Bankruptcy Procedure are promulgated by the Supreme Court, and because Rule 8003(a)(3)(B) does not follow from a clear federal statute, *cf. Bowles v. Russell*, 551 U.S. 205, 210–11, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007), a failure to attach the appealed-from judgment is not a jurisdictional defect. Properly understood, Rule 8003(a)(3)(B) is merely a claims-processing rule. *See Kontrick*, 540 U.S. at 454, 124 S.Ct. 906. And as a claims-processing rule, it can be forfeited. *See id.* at 456, 124 S.Ct. 906. Here, SSB and the Prevailing Lender plaintiffs did not oppose the Excluded Lenders' motion for permission to appeal the bankruptcy court's decision. Instead, they waited to raise their objection until five months after our motions panel granted authorization for the appeal. Having slept on their objection, they have forfeited it.

And in any event, a failure to attach the judgment is not a fatal defect under Rule 8003. Rule 8003(a)(3)(B) requires that the notice of appeal be accompanied by the appealed-from judgment. *See* FED. R. BANKR. P. 8003(a)(3)(B). But Rule 8003(a)(2) clarifies that the "failure to take any step other than the timely filing of a notice of appeal does not affect the appeal's validity, but is ground only for the [reviewing court] to act as it considers appropriate, including dismissing the appeal." FED. R. BANKR. P. 8003(a)(2). Since a failure to attach the appealed-from judgment is not a failure to timely file the notice of appeal, such a failure does not mandate dismissal. *See In re CPDC Inc.*, 221 F.3d 693, 698 (5th Cir. 2000) ("As the language of the rule makes clear, only the failure to file a notice of appeal, which deprives the reviewing court of jurisdiction, mandates dismissal."). For other filing defects, we must "exercise discretion and consider what sanctions are appropriate." *Id.* at 699. Here, the Excluded Lenders' notice of appeal designated the overall docket number, the specific docket entry, and the date of

the bankruptcy court's partial final judgment order—so there was no confusion about the scope of the appeal. Accordingly, the panel exercises its discretion to not dismiss the Excluded Lenders' appeal in No. 23-20181.

 **\*10**  *Cleveland Imaging* is not to the contrary. That case arose under § 158(a), not § 158(d)(2)(A). An appeal under § 158(a) "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts"—which requires the filing of a notice of appeal. 28 U.S.C. § 158(c)(2); *see* 28 U.S.C. § 2107(a); FED. R. APP. P. 3(a)(1). Likewise, Bankruptcy Rule 8003(a) (1) requires a notice of appeal for § 158(a) appeals. That explained the jurisdictional holding in *Cleveland Imaging.* But the same requirements do not apply to certified appeals under § 158(d)(2)(A).

### 4

The final jurisdictional issue in the open market purchase cases concerns the LCM Lenders' participation in No. 23-20450. In the adversary proceeding, the LCM Lenders filed counterclaims against SSB and the Prevailing Lender plaintiffs for breach of contract and breach of the implied covenant of good faith and fair dealing. After a trial, the bankruptcy court denied these claims, *see Serta Simmons Bedding*, 2023 WL 3855820, at *14, and the LCM Lenders noticed an appeal (No. 23-20450) from the post-trial final judgment. Then, on appeal and in a document supporting the Excluded Lenders' motion to adopt briefs from 23-20181, the LCM Lenders stated as follows:

> 6. In this instant appeal, the LCM Lenders *do not challenge the adverse ruling on the implied covenant claim ... or on the separate contract claims ....* The LCM Lenders noticed this appeal *solely as a protective matter*, given that the bankruptcy court entered final judgment following trial, *in order to preserve their rights on the open-market-purchase claim*, which (as noted) were earlier subject to a notice of appeal upon entry of a partial judgment.

No. 23-20450, ECF 62, at 3 (emphasis added).

This statement carries jurisdictional consequences. Because the bankruptcy court had already entered summary judgment on the open market purchase issue, the trial only concerned (1) plan confirmation, and (2) the counterclaims and third-party claims for breach of contract and breach of the implied covenant of good faith and fair dealing. *See In re Serta Simmons Bedding*, 2023 WL 3855820, at *8–14. Having explicitly abandoned their denied claims for breach of contract and breach of the implied covenant of good faith and fair dealing, the LCM Lenders have nothing left to appeal in No. 23-20450.

The proper response to such abandonment is dismissal. For the federal courts decide "Cases" and "Controversies," U.S. CONST. art III, § 2, cl. 1, and do not issue advisory opinions which cannot provide binding relief, *see, e.g., Letter from John Jay, C.J. & Assoc. JJ., U.S. Sup. Ct., to George Washington, President (Aug. 8, 1793)*, in 3 THE CORRESPONDENCE AND PUBLIC PAPERS OF JOHN JAY 488, 488–89 (Henry P. Johnston ed., 1891); *California v. Texas*, 593 U.S. 659, 673, 141 S.Ct. 2104, 210 L.Ed.2d 230 (2021); *see also* Samuel L. Bray & William Baude, *Proper Parties, Proper Relief*, 137 HARV. L. REV. 153, 155 (2023) ("Article III requires the proper parties, seeking proper relief..."). Having abandoned their claims on appeal in No. 23-20450, there is no longer any live dispute between the LCM Lenders and SSB and the Prevailing Lender plaintiffs. The LCM Lenders are not proper parties in No. 23-20450, so we dismiss them from that appeal.

### B

With respect to the Plan indemnity cases (Nos. 23-20451 & 23-20363), we first (1) discuss the bankruptcy court's jurisdiction. We then (2) discuss our appellate jurisdiction. Finally, we (3) reject SSB's and the Prevailing Lenders plaintiffs' arguments about the appellants' notices of appeal.

### 1

 **\*11**  First, the bankruptcy court's jurisdiction in Nos. 23-20451 and 23-20363. Both appeals arise from the bankruptcy court's final order confirming the Plan. We

therefore assess whether the bankruptcy court had statutory and constitutional authority to enter such an order.

The statutory analysis is straightforward. Bankruptcy courts may enter final orders in cases under title 11, or in core proceedings arising under title 11 or arising in a case under title 11. 28 U.S.C. § 157(b)(1). Core proceedings include the confirmation of plans. *Id.* at § 157(b)(2)(L); *In re Prescription Home Health Care, Inc.*, 316 F.3d 542, 547 (5th Cir. 2002). The final order confirmed the Plan, so the bankruptcy court had statutory authority to enter it.

And under *Stern*, the entry of a Chapter 11 confirmation order qualifies for the public rights exception to non-Article III adjudication. *See* 564 U.S. at 488–99, 131 S.Ct. 2594. *Stern* suggested that a bankruptcy court can decide matters that "stem[ ] from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* at 499, 131 S.Ct. 2594. Here, the confirmation order is directly related to the bankruptcy and was likely the main reason why SSB filed a Chapter 11 petition in the first place. Furthermore, the Chapter 11 route to confirmation of a reorganization plan is not one that "exists without regard to any bankruptcy proceeding," *see id.* at 499, 131 S.Ct. 2594; to the contrary, it is one "created by federal bankruptcy law," *id.* at 498, 131 S.Ct. 2594; *see also id.* at 499, 131 S.Ct. 2594 (asking whether a claim is "derived from or dependent upon bankruptcy law"). Therefore, the bankruptcy court had constitutional authority to enter the confirmation order. [11]

**2**

Under 28 U.S.C. § 158(d), this court has jurisdiction over direct appeals from bankruptcy court final orders, where either the bankruptcy court, district court, or all the relevant parties certify the direct appeal, and where this court authorizes it. The bankruptcy court certified its confirmation order for direct appeal and a panel of this court granted authorization. Accordingly, we have appellate jurisdiction over both of the Plan Indemnity appeals.

**3**

Before this court, SSB and the Prevailing Lender plaintiffs filed a motion to dismiss the appeal in both No. 23-20451 (the Excluded Lenders) and No. 23-20363 (Citadel). Following their argument in No. 23-20181, the appellees emphasize

that the Excluded Lenders and Citadel failed to attach the bankruptcy court's confirmation order to their notices of appeal. *See* FED. R. BANKR. P. 8003(a)(3)(B). As before, the appellees claim that this is a jurisdictional defect that requires dismissal. And as before, we reject this argument as meritless. *See supra* Part III.A.3.

**III**

Turning to the merits, we first take up the open market purchase cases (Nos. 23-20181 & 23-20450). This court reviews a grant of summary judgment *de novo. See Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). We review findings of fact for clear error and legal conclusions *de novo. Matter of Buffets, LLC*, 979 F.3d 366, 373 (5th Cir. 2020). The interpretation of a contract is question of law to be reviewed *de novo. See Wal-Mart Stores, Inc. v. Qore, Inc.*, 647 F.3d 237, 242 (5th Cir. 2011).

**\*12** We agree with the Excluded and LCM Lenders that the 2020 Uptier was not a permissible open market purchase within the meaning of the 2016 Agreement. We first (A) detail the applicable law of interpretation. We then (B) explain why the 2020 Uptier was not an "open market purchase" under the 2016 Agreement. Finally, we (C) reject various counterarguments and (D) explain the consequences of our holding for the Excluded Lenders' counterclaims.

**A**

The 2016 Agreement provides, and the parties all agree that New York law governs the interpretation of that contract. Under New York law, contracts "are construed in accord with the parties' intent and the best evidence of what parties to a written agreement intend is what they say in their writing." *Donohue v. Cuomo*, 38 N.Y.3d 1, 164 N.Y.S.3d 39, 184 N.E.3d 860, 866 (2022) (quotation omitted). "[A] written agreement that is complete, clear[,] and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002).

"A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.*, 750 N.Y.S.2d 565, 780 N.E.2d at 170–

71 (quotation omitted). In determining whether the terms of a contract are unambiguous, New York courts give a "practical interpretation to the language employed" and read "the contract as a whole." *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 997 N.Y.S.2d 339, 21 N.E.3d 1000, 1003 (2014); *see also In re Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 763 N.Y.S.2d 525, 794 N.E.2d 667, 670 (2003) ("A written contract will be read as a whole, and every part will be interpreted with reference to the whole.... The meaning of a writing may be distorted where undue force is given to single words or phrases" (quotation omitted)).

New York courts often look to dictionaries to understand the meaning of contractual terms. *See, e.g., R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 744 N.Y.S.2d 358, 771 N.E.2d 240, 242 (2002); *Ragins v. Hosps. Ins. Co.*, 22 N.Y.3d 1019, 981 N.Y.S.2d 640, 4 N.E.3d 941, 942 (2013). But when a contract is made in the context of a particular industry or trade, New York courts will also construe contractual language, especially technical terms, in light of the custom or usage in that industry or trade. *See, e.g., Beardslee v. Inflection Energy, LLC*, 25 N.Y.3d 150, 8 N.Y.S.3d 618, 31 N.E.3d 80, 84 (2015); *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 775 N.Y.S.2d 757, 807 N.E.2d 869, 873 (2004); *Fox Film Corp. v. Springer*, 273 N.Y. 434, 8 N.E.2d 23, 24 (1937); *see also Landmark Ventures, Inc. v. H5 Techs., Inc.*, 152 A.D.3d 657, 58 N.Y.S.3d 591, 593 (2017) ("Although words are generally afforded their ordinary meaning, technical words are to be given their generally accepted technical meaning and interpreted as usually understood by the persons in the profession or business to which they relate." (quotations omitted)).

B

As enumerated in § 9.05(g)'s exceptions to ratable treatment, an open market purchase is a purchase of corporate debt that occurs on the secondary market for syndicated loans. Thus, the 2020 Uptier was not a permissible open market purchase. Two reasons why.

1

As numerous sources confirm, an "open market" is a specific market that is generally open to participation by various buyers and sellers. An "open market purchase" therefore takes

place on such a market as is relevant to the purchased product —here, the secondary market for syndicated loans.

Begin with dictionaries. *See R/S Assocs.*, 744 N.Y.S.2d 358, 771 N.E.2d at 242. Black's defines open market as "[a] market in which any buyer or seller may trade and in which prices and product availability are determined by free competition." *Open Market*, BLACK'S LAW DICTIONARY (10th ed. 2014). The OED similarly defines open market as "[a]n unrestricted market in which any buyer or seller may trade freely, and where prices are determined by supply and demand." *Open Market*, OXFORD ENGLISH DICTIONARY (3d revised ed. 2004). And WEBSTER's defines open market as "a freely competitive market in which any buyer or seller may trade and in which prices are determined by competition." *Open Market*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1580 (2002). [12] The dictionary definitions thus contemplate *a* specific market in which various parties may participate and the prices are set by competition.

**\*13** New York state precedents confirm this understanding of "open market" as referring to specific markets, especially in relation to "open market purchases." *See, e.g., Levine v. Chesapeake & Ohio R. R. Co.*, 60 A.D.2d 246, 400 N.Y.S.2d 76, 77 (1977) (referring to "open market purchases" on the public stock exchanges); *Schulwolf v. Cerro Corp.*, 86 Misc.2d 292, 380 N.Y.S.2d 957, 959 (N.Y. Sup. Ct. 1976) (describing "open market purchases" of stock from public stockholders). Looking beyond open market purchases to mere references to "open markets," the LCM Lenders compiled a vast number of precedents in which the term "open market" is used to refer to a specific market that is generally open. *See, e.g., United States v. Bilzerian*, 926 F.2d 1285, 1289–90 (2d Cir. 1991); *Cities Serv. Co. v. United States*, 522 F.2d 1281, 1289 (2d Cir. 1974); *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 858 (2d Cir. 1968); *see also* Blue Br. (LCM Lenders) in 23-20181 at 23–25. [13]

One significant example comes from the Federal Reserve. For many decades, the Federal Reserve, led by the Federal Reserve Bank of New York, has conducted "open market operations" through the "purchase and sale" of securities on a particular open market—the open securities market. *See Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 343–46, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979); *Merrill v. Fed. Open Mkt. Comm. of Fed. Rsrv. Sys.*, 565 F.2d 778, 781 (D.C. Cir. 1977) (discussing "open-market purchases"); *see also* U.S. FEDERAL RESERVE SYSTEM,

THE FED EXPLAINED: WHAT THE CENTRAL BANK DOES 13, 34, 37, 38 (11th ed., 2021) (explaining that the Federal Reserve makes "open market purchases" on the securities market at prices determined by competition). As the Federal Reserve has explained, federal law "requires" it to make these open market purchases in—where else?—"the open market." U.S. FEDERAL RESERVE SYSTEM, THE FED EXPLAINED: WHAT THE CENTRAL BANK DOES, *supra*, at 37. The New York Fed's widely known operations supply yet another data point that, as a matter of financial industry custom or usage, the term "open market" refers to a specific market. *Cf. Beardslee*, 8 N.Y.S.3d 618, 31 N.E.3d at 84.

These sources demonstrate a problem with the definitions proposed by SSB and the Prevailing Lender plaintiffs: they forget the word "market." SSB argues that "an open market purchase means to acquire something for value in competition among private parties." SSB Red Brief in 23-20181 at 38. But as discussed above, the words "open market" point to a specific "market," not merely a general context where private parties engage in non-coercive transactions with each other. Were that the case, the § 9.05(g) term could be "open purchase," not "open market purchase." For their part, the Prevailing Lender plaintiffs try to incorporate the word "market" into their definition. Prevailing Lenders Red Brief in 23-20181 at 37 (An open market purchase is "a transaction in which something is obtained for monetary value in a market where prices are set by competitive negotiations between private parties."). But their definition is equally flawed. The Prevailing Lender plaintiffs suggest that there is an open market wherever there is competition. But the relevant sources indicate that an open market is one tied to a specific market, like the stock market or the commodities market or the securities market. An open market is a designated market, not merely the background concept of free competition that characterizes much of modern American commerce.

**\*14** Thus, an open market purchase occurs on the specific market for the product that is being purchased. In this case, the relevant product is first-lien debt issued under the 2016 Agreement, and the market for that product is the "secondary market" for syndicated loans. *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 223 (D.C. Cir. 2018) (citation omitted); Excluded Lenders Blue Brief in 23-20181 at 30–31 (discussing this market). The market is generally open to buyers and sellers, and its prices are set by competition. So if SSB wished to make a § 9.05(g) open market purchase and thereby circumvent the sacred right of ratable treatment,

it should have purchased its loans on the secondary market. Having chosen to privately engage individual lenders outside of this market, SSB lost the protection of § 9.05(g).

### 2

The preceding definition of open market purchase also comports with the Dutch auction, § 9.05(g)'s other exception to ratable treatment. Whereas SSB and the Prevailing Lender plaintiffs' expansive definitions would swallow that exception and render it surplusage.

Recall the structure of § 9.05(g). SSB must respect the sacred right of pro-rata sharing and engage with its lenders on equal footing, except through a Dutch auction or by making open market purchases. Correctly understood, the open market purchase does not overlap with or intrude on the Dutch auction. SSB may go to the secondary market and submit bids to complete an open market purchase of any amount. Or SSB may conduct an off-market Dutch auction, wherein it must notify all relevant lenders of its intent, purchase at least $10 million of debt, and follow the procedures in the 2016 Agreement. The two § 9.05(g) exceptions may not be equally appealing, but one could not call a Dutch auction an open market purchase or vice versa.

Not so with the appellees' expansive definitions. If an open market purchase is merely an acquisition of "something for value in competition among private parties," SSB Red Brief in 23-20181 at 38, the Dutch auction exception does no work. Short of coercing one of its lenders, SSB could call any arms-length transaction—*including a Dutch auction*—an open market purchase. After all, the completion of a Dutch auction and accompanying buyback of loans would constitute an acquisition for value in competition among participants. The same would be true if SSB wanted to conduct a slightly less-regulated Dutch auction. The appellees' expansive definitions thus render the entire Dutch auction exception superfluous, contrary to standard rules of New York contract interpretation.[14] *See Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 648 N.Y.S.2d 422, 671 N.E.2d 534, 536 (1996) ("We have long and consistently ruled against any construction which would render a contractual provision meaningless or without force or effect.") (collecting cases). *See also Ellington*, 997 N.Y.S.2d 339, 21 N.E.3d at 1003 (requiring courts to read contracts "as a whole").

C

SSB and the Prevailing Lender plaintiffs offer a number of counter-arguments in favor of their definitions. None is persuasive.

1

First, they reference the *expressio unius* canon and its supposed application to § 9.05(g). *See, e.g., Quadrant Structured Prod. Co. v. Vertin*, 23 N.Y.3d 549, 992 N.Y.S.2d 687, 16 N.E.3d 1165, 1172 (2014) ("[I]f parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission.") (applying *expressio unius* canon to interpret a contract). In their telling, § 9.05(g) provides that a Dutch auction must be "open to all Lenders," but does not say that the open market purchase must be "open to all Lenders." *See* ROA.23-20181.287**.** Thus, SSB could conduct open market purchases that were not open to all, or even most, of their lenders. *See Serta Simmons Bedding*, 2023 WL 3855820, at *11 (making this same argument).

**\*15** This argument is very weak. Even if *expressio unius* was applicable, the word "open" appears in both exceptions: it's the first word of the term "open market purchase[ ]." ROA.23-20181.287. And as demonstrated above, the "open market" portion of "open market purchase" does significant work in shaping its meaning. There would be no reason to—and in fact, it would be surplusage—to say "open market purchases open to all Lenders" if the term "open market purchase" contemplated a transaction that was public and open to most, if not all lenders. *See supra* Part III.B. Therefore, the *expressio unius* argument carries no weight.

2

Next, SSB and the Prevailing Lender plaintiffs place great weight on what they term the Excluded Lenders' course of performance. At trial, SSB presented evidence that the Excluded Lenders had made an alternative re-capitalization proposal involving a similar kind of debt swap which also would have made use of the open market purchase exception. This past behavior, SSB argues, is course-of-performance evidence that parties to the 2016 Agreement understood the § 9.05(g) exception to allow uptiers.

There are multiple flaws with this argument. There is only one example of the Excluded Lenders performing in such a manner that would indicate the 2016 Agreement allowed uptiers. But SSB's single New York State authority requires the course of performance to encompass a "considerable period of time." *See Fed. Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44, 691 N.Y.S.2d 508 (N.Y. App. Div. 1999) (quotation omitted). And "action on a single occasion" does not constitute a course of performance. *See* RESTATEMENT (SECOND) OF CONTRACTS § 202, cmt. g. (Am. L. Inst. 1981). Moreover, the above authorities consistently reference "the parties" to an agreement, with the implication that all of the parties are involved in the course of performance. *See Fed. Ins. Co.*, 258 A.D.2d at 44, 691 N.Y.S.2d 508; RESTATEMENT (SECOND) OF CONTRACTS, *supra*, § 202, cmt. g. (Course of performance "does not apply ... to action of one party only."). But not all of the objecting lenders submitted a similar proposal—there is no evidence that the LCM Lenders ever thought an uptier was a permissible open market purchase. *Cf. Serta Simmons Bedding*, 2023 WL 3855820, at *11–12. If not all of the parties are involved in a course of performance, such evidence cannot be used to argue about an agreed-upon past intention. Thus, the course-of-performance argument fails.

3

Finally, SSB and the Prevailing Lender plaintiffs argue that industry usage supports their expansive definitions of open market purchase. Specifically, they point to a guide published by the Loan Syndications and Trading Association ("LSTA").

The LSTA is a trade group that covers the American syndicated loans market. Both sides cite their materials. *See, e.g.*, Excluded Lenders Blue Brief in 23-20181 at 31, 34–35; SSB Red Brief in 23-20181 at 39. In 2017, the LSTA published a "Complete Credit Agreement Guide," which discusses loan buybacks. [15] The relevant section reads as follows:

> Buyback methodologies can be grouped into two broad categories: pro rata offered buybacks available to all lenders and ***non-pro rata open market purchases that are made available on a narrower basis to individual***

*lenders*. In the former category, there are two principal methodologies that have developed to determine the price and total amount of the loans to be prepaid or acquired: a fixed-price tender offer and a reverse (or modified) Dutch auction. While there is no particular magic to using these methodologies, the market has come to regard them as fair and transparent—two considerations of utmost importance to lenders. Each lender (or at least each lender of a certain tranche for tranche-specific buybacks) is offered the opportunity to sell its loan and, even if it passes on the offer, at least the borrower cannot be accused of favoritism. ***In the category of open market purchases, a borrower is allowed to negotiate one-on-one with individual lenders to repurchase loans up to a pre-agreed dollar amount***. This approach is the most borrower-friendly, but may not pass the "fair and transparent" tests.

**\*16** ROA.23-20181.3675 (emphasis added). At first blush, the guide seems to endorse something close to the open market purchase definitions favored by the appellees: an off-market, one-on-one transaction conducted with individual lenders. But on a closer look, the LSTA guide cannot rescue SSB and the Prevailing Lender plaintiffs.

To begin, while the LSTA guide carries some weight, it is not binding authority. Insofar as it reflects industry custom and practice, the guide is relevant to our interpretation of the 2016 Agreement. [16] *See Beardslee*, 8 N.Y.S.3d 618, 31 N.E.3d at 84. But it is not dispositive in this case, especially when other interpretive aids—like the sources interpreting the words "open market" and the rule against surplusage—push strongly against the appellees' expansive definition.

Even if we viewed the guide as dispositive, its discussion of open market purchases does not support the 2020 Uptier. The guide endorses either a narrow definition of open market purchase confined to buybacks or a conception of open market purchase that does not fit the 2016 Agreement.

As to the narrow definition, open market purchases are described in a section on debt buybacks. The paragraph on open market purchases is surrounded by a larger discussion of buybacks and the concerns that lenders may have about buybacks depleting borrower liquidity—i.e., because the borrower has spent cash in buying back its own debt. Since the guide describes the open market purchase as a kind of "[b]uyback methodology," then an open market purchase is presumably used to retire outstanding debt and not to swap old debt for new debt (as the 2020 Uptier did). *See also* WACHTELL, LIPTON, ROSEN, & KATZ, DISTRESSED MERGERS AND ACQUISITIONS 21, 23 (2013) (contrasting debt buybacks—including open market purchases—with debt-for-debt exchanges). This understanding is confirmed by the discussion of the open market purchase alongside the Dutch auction and the fixed price tender offer. For these mechanisms are not used typically, if ever, to facilitate an old debt for new debt exchange like the 2020 Uptier.

As to the fit with the 2016 Agreement, the LSTA guide suggests that the use of open market purchases conforms to a pre-set price cap. *See* ROA.23-20181.3675 ("[A] borrower is allowed to negotiate one-on-one with individual lenders to repurchase loans *up to a pre-agreed dollar amount*." (emphasis added)); *see also* ROA.23-20181.3484 (noting that "borrowers would be permitted to spend *up to some fixed amount of dollars* making open market repurchases of their own loans...." (emphasis added)). But there is no such cap in the 2016 Agreement, so the LSTA definition may not apply to this open market purchase reference.

**\*17** In sum, the LSTA guide is not dispositive on the meaning of open market purchase. And even if it were, it still would not support the 2020 Uptier or apply to the open market purchase in the 2016 Agreement.

### D

We hold that the 2020 Uptier was not a permissible open market purchase within the meaning of the 2016 Agreement, cleanly resolving the appeal in 23-20181. We REVERSE the bankruptcy court's contrary ruling. We next turn to 23-20450 and the Excluded Lenders' appeal of their denied counterclaims for breach of contract.

The bankruptcy court's post-trial denial of those counterclaims was largely based on its analysis of the open market purchase issue. *See Serta Simmons Bedding*, 2023 WL 3855820, at *12–14. But if the 2020 Uptier was not permitted under the open market purchase exception in § 9.05(g), the Excluded Lenders have a strong case that SSB and the Prevailing Lender plaintiffs breached the 2016 Agreement. Because the parties to the post-trial final judgment appeal (23-20450) adopted their briefs from the summary judgment appeal (23-20181), however, there is little substantive discussion of the breach of contract issue before this court. Thus, in 23-20450, we VACATE in part and REMAND for reconsideration of the Excluded Lenders' breach of contract counterclaims.

## IV

Having decided that the 2020 Uptier was not an open market purchase within the meaning of the 2016 Agreement, we now consider the Plan indemnity cases (23-20451 & 23-20363).

We agree with the Excluded Lenders and Citadel that the Plan improperly included indemnities relating to the 2020 Uptier. We first (A) detail why equitable mootness does not bar our review of the Plan's confirmation order. We then (B) demonstrate why inclusion of the indemnity was an impermissible end-run around the Bankruptcy Code and (C) outline how the indemnity violated the Code's requirement of equal treatment. Finally, we (D) explain why the appropriate remedy is excision.

## A

The confirmed Plan provided an indemnity to all creditors holding first and second-out super-priority debt issued in the 2020 Uptier (the settlement indemnity), as of the effective date of the Plan (June 29, 2023). In 23-20451 and 23-20363, the Excluded Lenders and Citadel request that this court excise the settlement indemnity from the Plan. In response, SSB and the Prevailing Lender plaintiffs argue that such a request is equitably moot, requiring the dismissal of both appeals.

At the threshold, we note that equitable mootness is a bit of a misnomer—much like green pastel redness. *Cf.* JOHN HART ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 18 (1980). Following

Judge Easterbrook's lead, we differentiate between "*inability* to alter the outcome (real mootness)" and "*unwillingness* to alter the outcome ('equitable mootness')." *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994). Real mootness implicates our jurisdiction under Article III. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Whereas "equitable mootness" is a judicial anomaly," a judge-created doctrine of pseudo-abstention "that favors the finality of reorganizations" and thus constrains our appellate review of plan confirmation orders. *In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009); *see also In re Cont'l Airlines*, 91 F.3d 553, 569 (3d Cir. 1996) (en banc) (Alito, J., dissenting) ( "[T]he doctrine of 'equitable mootness' is not really about 'mootness' at all in either the Article III or non-Article III sense."); *cf. Chafin v. Chafin*, 568 U.S. 165, 178, 133 S.Ct. 1017, 185 L.Ed.2d 1 (2013) (rejecting a similar attempt to "manipulate constitutional doctrine" and rely on mootness to vindicate non-jurisdictional aims). As this court has previously done, we examine its application before turning to the merits. *See, e.g., In re Highland Cap. Mgmt., LP*, 48 F.4th 419, 429 (5th Cir. 2022); *Pac. Lumber*, 584 F.3d at 239.

**\*18** In assessing equitable mootness, we analyze three factors: "(i) whether a stay has been obtained, (ii) whether the plan has been 'substantially consummated,' and (iii) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *Highland Cap. Mgmt.*, 48 F.4th at 429 (citation omitted); *see also id.* at 430 ("[T]he inquiry turns on whether the court can craft relief for that claim that would not have significant adverse consequences to the reorganization."). In conducting this analysis, we are heedful that equitable mootness is a "scalpel, rather than an axe." *Pac. Lumber*, 584 F.3d at 240. We are aware of our " 'virtually unflagging obligation' to exercise the jurisdiction" that the Constitution and Congress have conferred on us. *Ibid.* (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). And we exercise "caution[ ]" when applying equitable mootness to direct appeals from a bankruptcy court. *Pac. Lumber*, 584 F.3d at 241.

Against this backdrop, we hold that the two Plan indemnity appeals are not equitably moot. There are three reasons why.

1

Begin with the three-factor test. Although the Excluded Lenders and Citadel failed to obtain a stay of confirmation, and the Plan has been substantially consummated, this court has still exercised appellate review when only the third factor weighed against equitable mootness. *See, e.g., Highland Cap. Mgmt.*, 48 F.4th at 430–32; *Pac. Lumber*, 584 F.3d at 242–43. We find that the third factor does so here, for the requested relief of excision would not "affect either the rights of parties not before the court or the success of the plan." *Highland Cap. Mgmt.*, 48 F.4th at 429 (quotation and citation omitted). Accordingly, equitable mootness does not apply.

First, the Excluded Lenders and Citadel sought a stay of the bankruptcy court's confirmation order, which was denied three times over. But we have never said that the failure to obtain a stay mandates finding an appeal equitably moot. *See Highland Cap. Mgmt.*, 48 F.4th at 430 ("No one factor is dispositive."); *In re Crystal Oil Co.*, 854 F.2d 79, 82 (5th Cir. 1988) (finding a stay is not a "per se requirement for relief on appeal"). And the parties obtained a direct appeal to this court under 28 U.S.C. § 158(d)(2), which is a "caution[ ]" against finding equitable mootness. *Pac. Lumber*, 584 F.3d at 241; *see also id.* at 242 ("Congress's purpose may be thwarted if equitable mootness is used to deprive the appellate court of jurisdiction over a properly certified appeal.").

Consider next the rights of third parties not before the court. Excision of the settlement indemnity would affect SSB, which would no longer be on the hook for liability related to the 2020 Uptier, [17] as well as those holders of super-priority debt who participated in the Uptier (i.e., the Prevailing Lender plaintiffs). The former would benefit from excision; the latter would not. But both are present here. Those holders of super-priority debt who received the indemnity but did not participate in the 2020 Uptier—like Citadel—might be technically affected by excision, in that they would no longer have the indemnity. But such entities never needed the indemnity in the first place, and our precedents suggest that the third equitable mootness factor cares for negative, not nominal, impact. *See, e.g., Highland Cap. Mgmt.*, 48 F.4th at 431–32. So it is unclear which third-parties would be harmed by excision. [18]

**\*19** A similar analysis applies to the success of the Plan. The Plan was intended to reorganize SSB and position it for long-term financial success. Plainly, SSB would face an easier future without a massive liability hanging over its head. So it is also unclear how excision would threaten the success of the Plan. *Cf. In re GWI PCS 1 Inc.*, 230 F.3d 788, 803 (5th Cir.

2000) (finding an appeal equitably moot when the requested relief would saddle subsidiary debtors with an additional $894 million obligation).

SSB and the Prevailing Lender plaintiffs disagree, contending that we cannot excise the indemnity without unwinding the entire Plan and triggering a whole new confirmation proceeding. They argue this would harm many third parties and undermine the success of the Plan. We agree that the unraveling of the Plan would have substantial consequences, but our precedents does not indicate that the remedy of excision requires thus. In fact, we have said just the opposite. *See, e.g., Highland Cap. Mgmt.*, 48 F.4th at 430–31 (explicitly rejecting the notion that the court cannot surgically excise certain provisions rather than unravel the entire plan); *see also Pac. Lumber*, 584 F.3d at 241 (noting that we may "fashion whatever relief is practicable"); *id.* at 240 (noting that we"generally apply equitable mootness with a scalpel rather than an axe").

And while the appellees rely on some of our precedents to support their "excision requires a new plan" argument, all are distinguishable. Unlike in *Crystal Oil*, the appellants here tried to obtain a stay, and excision of the indemnity would not destroy the confirmed Plan. *Cf. id.* at 81–82. Unlike *GWI PCS 1 Inc.*, excision would not place a massive financial burden on the relevant debtors—rather, it *helps* them. *Cf.* 230 F.3d at 803. And unlike *In re Manges*, 29 F.3d 1034 (5th Cir. 1994), excision would not harm many third parties which have substantially relied on the indemnity's presence in the Plan. *Cf. id.* at 1042–43. Accordingly, excision does not toll doom for the Plan, and the third factor properly weighs against equitable mootness.

2

In rejecting equitable mootness, we also are mindful of our precedent regarding direct appeals from bankruptcy courts. As we stated in 2009:

> The twin purposes of [28 U.S.C. § 158(d)(2)] were to expedite appeals in significant cases and to generate binding appellate precedent in bankruptcy, whose caselaw has been plagued by indeterminacy.... Congress's purpose may be thwarted if

equitable mootness is used to deprive the appellate court of jurisdiction over a properly certified appeal.

*Pac. Lumber*, 584 F.3d at 241–42.

Fifteen years later, these lines from *Pacific Lumber* speak with particular force. As to the first purpose, equitable mootness would here defeat the use of 28 U.S.C. § 158(d)(2) to expedite appeals in significant cases. The bankruptcy court quickly certified the confirmation order for direct appeal to this court. This court granted timely motions for permission to appeal. And no one can doubt that these appeals are significant—they involve a controversial indemnity potentially worth tens of millions of dollars. As to the second purpose, our discussion of the Bankruptcy Code generates binding appellate precedent. *See infra* Part IV.B–C. We would particularly note our discussion of the equal treatment rule in 11 U.S.C. § 1123(a)(4), *see infra* Part IV.C, which even the appellees admit has never been interpreted by the Supreme Court or this court. So the twin purposes of § 158(d)(2) only confirm our rejection of equitable mootness.

3

**\*20**   Finally, we address what we take to be the heart of SSB's and the Prevailing Lender plaintiffs' complaint about equitable mootness: unfairness. As the argument goes, the Prevailing Lender plaintiffs agreed to support the Plan only because of the settlement indemnity. If they had known it would be excised later, they would not have given their agreement; rather, they would have exacted some other consideration from SSB. They contend it is unfair for this court to excise the indemnity now without letting them go back to the drawing board, which we cannot do without upending the Plan. Thus, on their view, we must do nothing.

Such an aggressive position requires nothing less than a full-throated rebuttal. If endorsed, the appellees' argument would effectively abolish appellate review of even clearly unlawful provisions in bankruptcy plans. Parties supporting such provisions could always argue they would have done things differently if they had known the provisions would later be excised. And if we cannot excise specific provisions but must let the parties go back to square one—which we cannot do without destroying the underlying Plan—then the appellate courts are effectively stripped of their jurisdiction

over bankruptcy appeals, despite Congress's clear intent to the contrary. *See* 28 U.S.C. § 158(d) (providing for direct appellate jurisdiction over bankruptcy court final decisions, judgments, orders, and decrees). That, of course, cannot be so, and we do not accept the appellees' invitation to upset the norms of appellate review by complying with their implausible interpretations of a judge-made, atextual doctrine of pseudo-abstention.

In support of their fairness argument, SSB and the Prevailing Lender plaintiffs cite an isolated line from *Crystal Oil* about depriving a creditor of the benefits of its bargain. *See* Appellees' Opposed Motion to Dismiss Appeals at 17, No. 23-20363 (Feb. 20, 2024) (quoting *Crystal Oil*, 854 F.2d at 81). But to the extent it applies at all, that case is easily distinguished. In *Crystal Oil*, one creditor received concessions from another and then sought to deprive the second creditor of the benefits of its previous sacrifice. 854 F.2d at 81. In contrast, the objecting creditors here—the Excluded Lenders and Citadel—did not receive concessions from the Prevailing Lender plaintiffs. Actually, under the Plan, the Excluded Lenders barely received anything at all. Moreover, the *Crystal Oil* creditors made no efforts to obtain a stay or prevent the kind of "comprehensive change of circumstances" and reliance interests that raise equitable concerns. *Crystal Oil*, 854 F.2d at 82. The same kinds of fairness considerations are not present in this case.

Instead, to the extent equitable mootness exists at all, we affirm that it cannot be "a shield for sharp or unauthorized practices." *Pac. Lumber*, 584 F.3d at 244 n.19. Judge Jones put it well in *Pacific Lumber*: "That there might be adverse consequences to [the appellees] is not only a natural result of any ordinary appeal—one side goes away disappointed —but adverse appellate consequences were foreseeable to them as sophisticated investors who opted to press the limits of bankruptcy confirmation ... rules." *Id.* at 244. From the moment the Prevailing Lender plaintiffs agreed to a controversial indemnity arising out of a contentious transaction, they could foresee the adverse consequences of an unfavorable appellate ruling. We will not save such sophisticated parties from the consequences of their actions, and we decline to dismiss these appeals as equitably moot. [19]

B

**\*21**  Turning to the merits, we first hold that the Plan's inclusion of the indemnity was an impermissible end-run around the Bankruptcy Code.

Pursuant to 11 U.S.C. § 502(e)(1)(B), the bankruptcy court must disallow any contingent claim for reimbursement where the claiming entity is co-liable with the debtor. Section 502(e)(1)(B) thus "protects debtors from multiple liability on contingent debts," *In re Eagle Picher Indus., Inc.*, 131 F.3d 1185, 1187 (6th Cir. 1997), and prevents the estate from being "burdened by estimated claims contingent in nature," *In re Charter Co.*, 862 F.2d 1500, 1502 (11th Cir. 1989).

Here, the Prevailing Lender plaintiffs filed proofs of claims for indemnification and contribution related to their participation in the 2020 Uptier, seeking to make use of the indemnity which SSB agreed to back in 2020. Those claims are contingent claims for reimbursement where the claiming entity is co-liable with the debtor: the lenders wanted SSB to reimburse them for future losses they have not yet suffered and for which they were co-liable with SSB, their contractual partner in the Uptier. So as all parties and the bankruptcy court agreed, § 502(e)(1)(B) disallowed the above claims and invalidated the related pre-petition indemnity. *Serta Simmons Bedding*, 2023 WL 3855820, at \*10 (discussing the "pre-petition indemnity lost due to the bankruptcy filing"); *see also id.* ("Indeed, when asked by the Court, counsel for the PTL Lenders and the Debtors affirmed the disallowance of the prepetition indemnity."). This much is common ground.

However, the pre-petition indemnity did not stay dead for long. In the five days between the first amended plan and the modified first amended plan, SSB and the Prevailing Lender plaintiffs resurrected the pre-petition indemnity as a *settlement* indemnity. *See* 11 U.S.C. § 1123(b)(3)(A) ("[A] plan may ... provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."). So when the Excluded Lenders and Citadel objected to this new indemnity, the appellees argued that it was justified under § 1123(b)(3)(A) as the result of a settlement between SSB and the Prevailing Lender plaintiffs. *See Serta Simmons Bedding*, 2023 WL 3855820, at \*10. The bankruptcy court bought the appellees' arguments on this front and approved the settlement indemnity. *See id.*

That was a mistake. The settlement indemnity was an impermissible end-run around § 502(e)(1)(B)'s disallowance of contingent claims for reimbursement. And the appellees'

characterization of the indemnity as part of a § 1123(b)(3)(A) settlement does not change the analysis.

*Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 137 S.Ct. 973, 197 L.Ed.2d 398 (2017) is instructive. In *Czyzewski*, the bankruptcy court approved a settlement accomplishing the "structured dismissal" of a Chapter 11 petition, wherein certain assets of the estate would be distributed in a manner seemingly contrary to the Code's priority scheme. *See id.* at 459–61, 137 S.Ct. 973. Concluding that the structured dismissal did indeed clash with the priority system "long [ ] considered fundamental to the Bankruptcy Code[ ],"the Supreme Court searched for a textual hook sufficient to show that Congress intended such "a major departure." *Id.* at 465, 137 S.Ct. 973. But the only options were insufficient. *Compare* 11 U.S.C. § 1112(b) (providing that a bankruptcy court may "dismiss" a Chapter 11 petition), *with Czyzewski*, 580 U.S. at 465, 137 S.Ct. 973 ("[T]he word 'dismiss' itself says nothing about the power to make nonconsensual priority-violating distributions of estate value."); *compare* 11 U.S.C. § 349(b) (providing that, in the context of a dismissal, the bankruptcy court may "for cause, orde[r] otherwise"), *with Czyzewski*, 580 U.S. at 466, 137 S.Ct. 973 ("[T]he word 'cause' is too weak a reed upon which to rest so weighty a power."). Quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), the Court maintained that "Congress ... does not, one might say, hide elephants in mouseholes." *Czyzewski*, 580 U.S. at 465, 137 S.Ct. 973 (quotation omitted). And the Court reminded the litigants that "statutory construction ... is a holistic endeavor," by which courts must "look to the provisions of the whole law." *See id.* at 466–67, 137 S.Ct. 973 (quotation omitted). Without adequate textual support for its maneuver, the bankruptcy court was wrong to approve such an end-run around the Code. *See id.* at 471, 137 S.Ct. 973.

**\*22**  The analysis in *Czyzewski* is directly applicable to these appeals. The bankruptcy court approved a settlement wherein the Plan would contain an indemnity securing contingent claims for reimbursements. Such claims would otherwise be disallowed by § 502(e)(1)(B) of the Code,[20] so we search for a textual hook showing that Congress intended some kind of a work-around. But the only option— § 1123(b)(3) (A)—is insufficient. The language in § 1123(b)(3)(A) merely indicates that a plan may settle or adjust certain claims or interests. Since it does not affirmatively provide for the back-end resurrection of claims already disallowed on the front end, § 1123(b)(3)(A) is "too weak a reed" to support the settlement indemnity. *Cf. Czyzewski*, 580 U.S. at 466, 137 S.Ct. 973.

Mindful that Congress does not hide elephants in mouseholes and that statutory construction is a holistic endeavor, *see id.* at 466–67, 137 S.Ct. 973, we decline to read § 1123(b)(3)(A) as an escape hatch from the Code's explicit disallowance of certain claims. *See also In re Ultra Petroleum Corp.*, 51 F.4th 138, 146 (5th Cir. 2022), *cert. denied*, ‒‒‒ U.S. ‒‒‒‒, 143 S. Ct. 2495, 216 L.Ed.2d 454 (2023) (rejecting "easy end-runs by canny creditors" around the disallowance provisions of the Code). Accordingly, the Plan indemnity cannot be justified as part of a § 1123(b)(3)(A) settlement. [21]

Against this analysis, SSB and the Prevailing Lender plaintiffs stress the differences between the pre-petition and settlement indemnities. But this argument fails, for the settlement indemnity is sufficiently similar to the pre-petition indemnity so as to still view it as an end-run around § 502(e) (1)(B).

No party disputes that the settlement indemnity covers the same kind of losses as the pre-petition indemnity. Given that similarity, SSB and the Prevailing Lender plaintiffs must highlight two small differences: time and relevant parties. The pre-petition indemnity covered all of and only the Prevailing Lenders who participated in the 2020 Uptier, whereas the settlement indemnity covered only those holders of super-priority debt as of June 29, 2023. As the appellees tell it, such differences mean that the settlement indemnity was not an impermissible attempt to resurrect the pre-petition indemnity.

We reject this argument as unpersuasive. Taken to its logical conclusion, a § 1123(b)(3)(A) settlement could thus resurrect a clearly disallowed claim or related indemnity so long as it was modified slightly from its original form. Thus, an indemnity which applied to 19 creditors with disallowed contingent claims for reimbursement could be resurrected by adding in a twentieth creditor who has no need for the indemnity. But *Czyzewski* and *In re Ultra Petroleum* do not require such strict side-by-side comparisons, nor do they allow the Code's clear requirements to be evaded by such sophistry. *See In re Ultra Petroleum*, 51 F.4th at 147 (emphasizing "economic reality" over "dictionary definitions or formalistic labels"); *Czyzewski*, 580 U.S. at 467–71, 137 S.Ct. 973 (discussing functional considerations); *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) (rejecting an attempt to "short circuit the requirements of Chapter 11 for confirmation of a reorganization plan"). The proper test is functional—*i.e.*, whether the resurrected indemnity is, for all intents and purposes, the same as or similar to that which was disallowed before.

The settlement indemnity fails that test. The pre-petition indemnity mirrored the terms of the 2020 Uptier indemnity and was intended to satisfy the claims of the lenders that participated in the uptier. The settlement indemnity was on the exact same terms and was intended to protect the very same group of lenders, excluding those few of the Prevailing Lenders that sold their super-priority debt between 2020 and 2023. Moreover, the settlement indemnity was intended to cover the same contingent claims for reimbursement previously disallowed under § 502(e)(1)(B). That the settlement indemnity also applied to parties like Citadel who have no need of it does not disguise its true nature. For this reason and others, we hold that the Plan indemnity was an impermissible end-run around the Code.

## C

**\*23** Even if the settlement indemnity was justified under § 1123(b)(3)(A), its inclusion in the Plan violated the Code's requirement of equal treatment.

### 1

Under 11 U.S.C. § 1123(a)(4), a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The Code does not define this requirement of equal treatment, *see In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986), and neither the Supreme Court nor this court has substantially engaged with § 1123(a)(4). But some of our sister circuits have given more guidance. The Third Circuit has concluded that equal treatment does not require "precise equality, only approximate equality," and that "[c]ertain procedural differences" do not constitute unequal treatment. *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013). For its part, the D.C. Circuit has held that equal treatment prohibits disparate treatment with respect to value, thus prohibiting the payment of different settlements to co-class members or a requirement that some class members tender more valuable consideration for the same settlement. *See AOV Indus., Inc.*, 792 F.2d at 1152; *see also In re Quigley Co., Inc.*, 437 B.R. 102, 146 (Bankr. S.D.N.Y. 2010) ("Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution.").

Although we decline to delimit the exact scope of § 1123(a)(4) today, we hold that the inclusion of the Plan indemnity violated the Code's requirement of equal treatment. All members of Classes 3 and 4 received the settlement indemnity, but the expected value of the indemnity varied dramatically depending on whether members had participated in the 2020 Uptier. To class members like the Prevailing Lender plaintiffs, the indemnity was potentially worth millions or even tens of millions of dollars. But to other class members like Citadel that had no involvement with the uptier, the indemnity was worth little or even nothing. Thus, some class members received settlements with higher effective values than their co-class members. *Cf. AOV Indus.*, 792 F.2d at 1152; *Quigley*, 437 B.R. at 146. Given this differential, the Plan indemnity constituted impermissible unequal treatment.[22]

2

SSB and the Prevailing Lender plaintiffs challenge this conclusion, but their arguments are all meritless.

To begin with, it is of no concern that the Plan nominally awarded the indemnity to all members of Classes 3 and 4. Following the decisions of our sister circuits, we look below the surface to determine whether the distributions were in fact equal in value.[23] Here, differences in the expected value of the indemnity meant that distributions to the members of Classes 3 and 4 were not equal. Such variance likely ran to seven or eight figures, and therefore went far beyond "approximate equality." *Cf. W.R. Grace & Co.*, 729 F.3d at 327.

**\*24**  Second, the unequal treatment in this case implicates both opportunity and result. Citing *W.R. Grace & Co.*, the Prevailing Lender plaintiffs argue that § 1123(a)(4) requires "equal opportunity," not equal results, and that the distribution of the indemnity to all Class 3 and 4 members accomplishes such equality. *See* Green Brief at 59, No. 23-20363 (citing 729 F.3d at 327). But *W.R. Grace & Co.* discussed equal opportunity in the context of a Second Circuit case in which a class of asbestos plaintiffs were given equal opportunity to present their case to a jury (where their recoveries could differ). *See* 729 F.3d at 327 (citing *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992)). The difference between this case and the asbestos case is obvious. In *In re Joint Eastern & Southern Dist. Asbestos Litigation*,

everyone in the relevant class suffered injuries from asbestos, whereas not everyone in Classes 3 and 4 has liability from the 2020 Uptier. A better analogy would be a plan distribution by which all class members were given the opportunity to litigate their asbestos injuries, but only half had such injuries. We do not think that our sister circuits would find such an arrangement compliant with § 1123(a)(4).

Finally, both SSB and the Prevailing Lender plaintiffs point to a 1995 decision from the Middle District of North Carolina, where the bankruptcy court held that a plan treated all class members equally, although the consequence of its distributions was to give only one creditor majority equity control. *See In re Piece Goods Shops Co.*, 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995). Accordingly, they argue that disparate value is sometimes permissible. However, the bankruptcy court in that case was clear that such "special control benefits" flowed not from the unequal treatment of claims, "but rather from the natural consequences of corporate law." *Ibid.*; *see also ibid.* ("Accordingly, non-economic attributes of equity ownership should not be germane to the analysis of equality of treatment under Section 1123(a)(4) of the Bankruptcy Code. Otherwise, it would be impossible to confirm any plan under which a creditor receives a controlling percentage of the stock of a reorganized corporate debtor."). Here, the disparate value flowed not from corporate law, but from the intentional actions of the Prevailing Lender plaintiffs through their participation in the 2020 Uptier. So *Piece Goods Shops* does not save the Plan indemnity.

D

The remedy for the aforementioned violations follows directly from our earlier discussion of equitable mootness. On review of a confirmed plan, we may " 'fashion whatever relief is practicable' for the benefit of appellants." *In re Scopac*, 649 F.3d 320, 322 (5th Cir. 2011) (quoting *Pac. Lumber*, 584 F.3d at 241); *see also Highland Cap. Mgmt.*, 48 F.4th at 431 ("[T]he court may fashion the remedy it sees fit without upsetting the reorganization."). Here, we choose to excise the offending indemnity in Section 8.5 of the Plan. So in 23-20451 and 23-20363, we REVERSE the bankruptcy court's final order confirming the Plan insofar as it approved the Plan's indemnity relating to the 2020 Uptier.

V

The 2020 Uptier was the first major uptier. *See* Buccola & Nini, *supra*, at 502. But it was far from the last. *See id.* at 503. And while the loan market has seen an increase in contracts blocking uptiers (so-called "uptier blockers") since 2020, *see id.* at 512–13, 521–22, there are doubtless still many contracts with open market purchase exceptions to ratable treatment, *see id.* at 502, 510. Though every contract should be taken on its own, today's decision suggests that such exceptions will often not justify an uptier.

In 23-20181, we REVERSE the judgment of the bankruptcy court. In 23-20450, we DISMISS the LCM Lenders from that appeal and VACATE the judgment of the bankruptcy court in part and REMAND for consideration of the Excluded Lenders' counterclaims. In 23-20451 and 23-20363, we REVERSE the confirmation order of the bankruptcy court in part insofar as it approved the Plan's indemnity related to the 2020 Uptier.

**All Citations**

--- F.4th ----, 2024 WL 5250365

---

# Footnotes

1   "Usually no single bank originates the entirety of a loan. Rather, multiple banks syndicate under a lead arranger, each holding only a portion of the loan. Syndicated loans are actively traded amongst financial institutions in a secondary market place, and purchased on these markets by a range of investors, including institutional investors [and] hedge fund managers ...." *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 223 (D.C. Cir. 2018) (quotation omitted).

2   Importantly, the norm of ratable treatment applies to lenders *within* their respective credit facilities. If a borrower has three different classes of lenders, the borrower need not treat a lender holding first-lien debt ratably with a lender holding third-lien debt.

3   Throughout this opinion, we use "SSB" to collectively refer to Serta Simmons Bedding, LLC and its various owners and affiliates involved with this litigation, unless articulated otherwise.

4   The Agreement defines "Affiliated Lender" as "any Non-Debt Fund Affiliate, Holdings, the Top Borrower and/or any subsidiary of the Top Borrower." ROA.23-20181.141. "Top Borrower" is SSB. *See* ROA.23-20181.134. "Holdings" is Dawn Intermediate, Inc., ROA.23-20181.134, which appears to be SSB's parent organization, *see* SSB Red Brief in 23-20181 at 13. And "Non-Debt Fund Affiliate" is "any Investor (which is an Affiliate of the Top Borrower) and any Affiliate of any such Investor." ROA.23-20181.180.

5   We refer to these lenders as the "Prevailing Lenders," because that is how they characterize themselves in the briefing before this court. *See* Prevailing Lenders Red Brief in 23-20181 at 1. *But see* Excluded Lenders Blue Brief in 23-20181 at 8 (referring to the "favored lenders"). We take the same approach to nomenclature with the other lender groups. In the record, however, the Prevailing Lenders are often referred to as the "PTL Lenders." *See, e.g.*, ROA.23-20451.1266.

6   *See, e.g.*, Buccola & Nini, *supra*, at 502 (asserting that the SSB transaction had "little precedent"); *see also* Buccola, *Sponsor Control, supra*, at 35 (observing that priming transactions like the Uptier "often hinge on dubious claims of legal right and almost always flout well-established norms").

7   *See* ROA.23-20451.1266 ("[A]ny Indemnification Obligation to indemnify the PTL Lenders with respect to all present and future actions, suits, and proceedings against the PTL Lenders or their respective Related Parties in connection with or related to the Adversary Proceeding, the Apollo Proceeding, the LCM Proceeding, and/or any other claims, proceedings, actions, or causes of action in connection with or related to the PTL Credit

Agreement, the Exchange Agreement, the Intercreditor Agreements, and/or the 2020 Transaction shall (a) remain in full force and effect, (b) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (c) not be limited, reduced or terminated after the Effective Date, and (d) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date ....").

8     The cases were originally consolidated in two pairs: the open market purchase cases (Nos. 23-20181 & 23-20450) and the plan indemnity cases (Nos. 23-20451 & 23-20363). We consolidated all four cases for oral argument and now consolidate them for resolution. FED. R. APP. P. 3(b)(2).

9     While the Declaratory Judgment Act did not create a new source of subject matter jurisdiction, *see Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), federal courts have regularly exercised jurisdiction over declaratory judgment suits in which the declaratory defendant could have brought a coercive federal action against the declaratory plaintiff. *See* RICHARD H. FALLON, JR., ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 842–43 (7th ed. 2015) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Calif.*, 463 U.S. 1, 19, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (asking whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment").

10    The gamesmanship consideration has particular weight in this case. The Excluded and LCM Lenders agreed that the bankruptcy court could enter final judgment on the declaratory judgment issue of whether the 2020 Uptier was permitted under the open market purchase exception in the 2016 Agreement. Those parties cannot now pivot to argue that the bankruptcy court lacks authority to adjudicate claims that almost entirely depend on whether the 2020 Uptier was permitted under the open market purchase exception in the 2016 Agreement. That is the sort of litigation gamesmanship plainly covered by *Wellness*.

11    True, the Supreme Court has repeatedly said it has never held that the "restructuring of debtor-creditor relations"—such as was accomplished in the bankruptcy court's confirmation order—"is in fact a public right." *Stern*, 564 U.S. at 492 n.7, 131 S.Ct. 2594 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 n.11, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)). But until the Court gives more direction in this area, we decline to hold that the confirmation of a Chapter 11 plan—a core element of federal bankruptcy law—is beyond the adjudicative authority of federal bankruptcy courts.

12    SSB argues that an "open market purchase" of the 2016 first-lien loans could not have been open to "any" buyer or seller because, under the terms of the open market purchase exception in § 9.05(g), only SSB and "certain SSB affiliates" could have bought and only an "existing lender" could have sold. *See* SSB Red Brief in 23-20181 at 48. But in an open market, while anyone can participate, not anyone can participate in *every* transaction. Sellers cannot sell when they have nothing to sell. Buyers cannot buy when they have no money to buy. Parties may also have additional restrictions placed on them by contracts or laws (e.g. insider trading). The point here is not whether the open market *purchase* contemplated by § 9.05(g) was open to anyone, but whether such a purchase took place on a *market* that was generally open to anyone.

13    SSB's attempt to distinguish these authorities as dealing with different kinds of financial transactions is unpersuasive. *See* SSB Red Brief in 23-20181 at 50 n. 16. The point is not that the term "open market" only refers to certain markets; rather, it is that the term "open market" is repeatedly used to refer to *a* specific market.

14    SSB protests against this argument from surplusage, but its response is unavailing. SSB states that the 2016 Agreement merely allows it to "select the procedure that it believes will yield the best results. For some transactions, that may be a Dutch auction. Here, it was an open market purchase." SSB Red Brief in 23-20181

at 58. Yet if an open market purchase necessarily encompasses a Dutch auction (even a Dutch auction with all of the requirements enumerated in the 2016 Agreement), then there is no real choice and no selection between differing options.

15   The LSTA is considered to be a reputable trade group, *see, e.g.*, Dick, *supra*, at 1338, and the guide has been repeatedly cited by corporate law scholars as authoritative. *See, e.g.*, Vincent S.J. Buccola, *Bankruptcy's Cathedral: Property Rules, Liability Rules, and Distress*, 114 NW. U. L. REV. 705, 718 n.53 (2019) (calling it "an excellent guide to modern credit agreements"); Dick, *supra*, at 1344 n.45 (calling it "a classic practice-oriented treatise on syndicated loan agreements").

16   The LSTA guide was not the only pre-2020 industry source discussing the open market purchase (with 2020 as the cut-off because publications began to be influenced by discussions of the 2020 Uptier and other such transactions). For example, a 2009 Weil Gotshal publication suggested a narrower understanding of open market purchase. *See* ROA.23-20181.4121–22 ("An open market purchase is accomplished through a broker or agent and requires the purchaser to pay a set market price. Normally, the parties involved in an open market purchase are not aware of one another's identity.").

17   Such liability is all the more apparent given our earlier resolution of the open market purchase cases. *See supra* Part III.D.

18   It is theoretically possible that one of the Prevailing Lenders involved with the 2020 Uptier could have (a) held onto its super-priority debt through the June 2023 and thus received a valuable indemnity but (b) chosen not to join the Prevailing Lender plaintiffs in this litigation, thus (c) becoming a third-party whose rights would be negatively affected by excision. But the parties do not identify such an entity and SSB and the Prevailing Lender plaintiffs do not argue against excision as such. Moreover, it seems like the Prevailing Lender plaintiffs held most of the super-priority debt as of June 2023, *see* Appellees' Opposed Motion to Dismiss Appeals at 3, 14, No. 23-20363, ECF 126 (Feb. 20, 2024) ("The [Prevailing] Lenders held at least 81% of SSB's first-lien, first out debt and at least 77% of the SSB's first-lien, second out debt."), with the remainder probably held by entities like Citadel that did not participate in the Uptier.

19   Because SSB and the Prevailing Lender plaintiffs filed a motion to dismiss that was carried with the case, we also DENY that motion.

20   And indeed, they were in this case.

21   Insofar as the *Czyzewski* Court also considered evidence of "contrary precedent ... from lower court decisions reflecting common bankruptcy practice," 580 U.S. at 467, 137 S.Ct. 973, SSB and the Prevailing Lender plaintiffs do not present such evidence.

22   Our analysis in this paragraph adopts an objective approach to equal treatment, wherein we consider the impact of the indemnity without regard to what one might label the subjective intent of the Plan's drafters. If we cared for intent, we would easily find unequal treatment. As this opinion has already laid out in exhaustive detail, the indemnity was awarded to Class 3 and Class 4 members to gain the voting approval of only some of those members (e.g., the Prevailing Lender plaintiffs). Because the Plan awarded an indemnity intended to benefit only some of those members, it did not provide equal treatment.

23   Taking this argument to its logical extent, any special gift could be recharacterized as equal treatment. For example, consider a plan that awarded an extra $5 million to every member of Class 3 who had its headquarters in Louisiana. That would obviously be unequal treatment. But what if the plan simply provided that every member of Class 3 gets a note promising payment of $5 million in one year if the member is

headquartered in Louisiana? Under the appellees' argument, this plainly improper provision would be fine. We decline to adopt such a restrictive view of equal treatment.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.