United States District Court
Southern District of Texas
**ENTERED**
September 25, 2025
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CONVERGEONE HOLDINGS, INC., *et al.*, | § | Civil Case No. 4:24-cv-02001 |
| *Debtors/Appellees*, | § | |
| | § | Bankruptcy Case No. 24-90194 |
| | § | |
| Ad Hoc Group of Excluded Lenders, | § | |
| *Appellant.* | § | |

## ORDER

Certain lenders ask the Court to overrule the bankruptcy court's approval of the confirmed bankruptcy Plan to the extent it overruled Appellant's objection based upon the ground that the Plan violated 11 U.S.C. § 1123(a)(4) by giving a few preferred creditors exclusive investment opportunities that resulted in their receiving higher recoveries than others similarly situated. ConvergeOne Holdings, Inc., and several of its subsidiaries (collectively, "Debtors") and Intervenor First Lien Ad Hoc Group ("Majority Lenders") argue that the Plan should be upheld because, rather than treating certain class members differently, the Plan merely allowed additional recoveries in exchange for additional financial obligations. *See* (Doc. Nos. 33, 35). As explained below, the Court holds that the Plan authorizes unequal treatment of creditors for their claims and, thus, violates 11 U.S.C. § 1123(a)(4).

## I.    FACTUAL BACKGROUND

This matter arises from the bankruptcy filed by ConvergeOne Holdings, Inc., and its affiliated companies (the "Debtors"). (Doc. No. 31 at App. 003). The Debtors are in the information technologies sector and provide services such as cybersecurity, software development, cloud computing, and application and software development. (*Id.* at App. 037–038) (Declaration

of S. Lombardi). Though headquartered in Minnesota, Debtors filed their Chapter 11 bankruptcy case in the Houston Division of the Southern District of Texas.

Before filing, however, Debtors reached a restructuring agreement with approximately 81% of their first and second lien holders. (*Id.* at App. 039). Starting in mid to late December 2024, Debtors conducted extensive negotiations regarding the agreement with a number of creditor constituencies, including the Debtors' equity sponsor and senior secured lender, CVC Capital Partners ("Insider"). (Doc. No. 36 at Supp. App. 058–060) ("Combined Disclosure Statement and Confirmation Hearing"). This "restructuring support agreement" ("RSA"), was agreed to in expectation of the filing of the "prepackaged Chapter 11 Plan" (hereinafter, the "Plan"). (Doc. No. 31 at App. 213). In fact, the Plan was filed quickly after the RSA was finalized. *See* (Doc. No. 36 at Supp. App. 064) (Roopesh Shah, senior managing director at Evercore (the Debtors' lead investment banker), testified that the RSA was reached "about probably five minutes before we filed this case[]."); (Doc. No. 31 at App. 1015) (Sherman Edmiston, an independent director of the Debtor, testified that the RSA "wasn't agreed to until maybe the last week before we filed, maybe even later than that."); (*Id.* at App. 064–065) (Declaration of S. Lombardi) (stating the RSA was entered into on April 3, 2024 and the Plan was filed on April 4, 2024).

The RSA was designed in principle to eliminate $1.6 billion of secured debt. (*Id.* at App. 039) (Declaration of S. Lombardi). In summary, the majority of the first lien holders agreed to take back debt and, in turn, received the right to purchase discounted equity in the reorganized company through an "equity rights offering." (*Id.* at App. 039) (Declaration of S. Lombardi). These lenders are referred to as the Majority Lenders. Those lenders excluded from this opportunity are referred to as the Minority Lenders. The RSA, combined with the Plan, also gave holders of second lien

claims new equity interest in the reorganized Debtor. (*Id.* at App. 040). The RSA also provided payment in full of certain unsecured claims. (*Id.*).

This RSA also included commitments from the Majority Lenders to backstop the equity-rights offering, ensuring that the Debtors would raise sufficient capital to repay debt and support their business after emerging from bankruptcy. (*Id.* at App. 039–040). These "backstoppers" had to reserve capital to satisfy their commitments and were subjected to certain milestones. (Doc. No. 31 at App. 065). In return, they received a 10% premium on their claims through certain discounted equity purchases that were offered exclusively to the backstopping lenders. (*Id.* at App. 039). When analyzing the reasonableness of this consideration provided to the backstop parties, the special committee reviewed their lead investment banker, Evercore's, analysis comparing the consideration to approximately 25 similar transactions. (Doc. No. 36 at Supp. App. 072). Evercore did not, as part of its analysis, market test the backstop. (*Id.* at Supp. App. 074).

At the time the prepackaged Plan was filed, it had more than 80% support from Debtors' first and second lien lenders. (*Id.* at Supp. App. 074). Except for the two proposals mentioned below, Debtors had no other restructuring proposals from any other stakeholders. (*Id.* at Supp. App. 075). The Minority Lenders claim, and the Majority Lenders do not dispute, that they were not given any opportunity to participate in the negotiations or discussions leading to the RSA and the filing of the Plan, nor the chance to participate in the backstopping and/or equity purchasing opportunities.

After the Plan was filed, the Minority Lenders objected based on their exclusion from the backstopping and equity-purchasing opportunity. Ultimately, they offered two alternatives, both of which were rejected. (Doc. No. 31 at App. 754–755) (Amended Declaration of K. Lall). The first was based upon the same valuation as the Plan transaction but was allegedly rejected because

it did not address the need to replace the Debtor in Possession ("DIP") financing facility. The second proposal tried to fix the DIP omission, but it lacked enough support from the stakeholders and, as proffered, more than likely would not have been confirmed. (*Id.* at App. 754–755).

Eventually, the Plan as proposed by the Debtor and Majority Lenders passed with only the Minority Lenders objecting. The Minority Lenders' primary objection remained that their exclusion from the backstopping and equity-purchase opportunity violated the equal treatment requirements of the Bankruptcy Code.[1] *See* 11 U.S.C. § 1123(a)(4) ("Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."). The Debtors and Majority Lenders argue that the Plan treats all prepetition claims the same because the extra value recovered by the Majority Lenders was consideration for new additional commitments.

The Bankruptcy Court held a two-day hearing which included testimony and argument from all sides. The Bankruptcy Court found the backstop was necessary and reasonable and confirmed the Plan. The Bankruptcy Court made the factual finding that the special committee "negotiated with the overwhelming majority of holders of 1L debt extensively and reached consensus on a proposed Plan. The negotiations were extensive and at arm's-length." (Doc. No. 31 at App. 1184). Additionally, the Bankruptcy Court rejected the Minority Lenders' argument that the exclusive opportunity to backstop the equity-rights offering violated Section 1123(a)(4). The Bankruptcy Court did not apply a market-test requirement, holding that neither the United

---

[1] Minority Lenders also objected on the basis that the Plan was subject to review, and did not pass muster, under the heightened "entire fairness" standard, and that their alternative plan was a viable and confirmable path forward. Those objections have not been raised in this appeal and will therefore not be addressed by the Court.

States Supreme Court nor the Fifth Circuit require it for financing opportunities like the backstopping opportunity at issue here.[2]

Rather than immediately seeking a stay pending appeal from the Bankruptcy Court, the Minority Lenders waited several days and then filed for a stay in this Court. In addition to seeking the stay, Minority Lenders sought a certification of certain issues to the Fifth Circuit, including whether the Confirmation Plan violated 11 U.S.C. § 1123(a)(4) and was contrary to the Supreme Court's dictates in *Bank of America National Trust & Savings Association v. 203 N. LaSalle St. Partnership*, 526 U.S. 434 (1999). On appeal, this Court entered an order denying the motion for a stay. (Doc. No. 28). The Court found that Minority Lenders had not prevailed on their burden to demonstrate an irreparable injury. The Court also denied a stay on procedural grounds due to both the delay in seeking it, and the fact that Minority Lenders first sought the stay in this Court rather than in the Bankruptcy Court. Finally, the Court denied the motion to certify an interlocutory appeal to the Fifth Circuit. (Doc. No. 28 at 13–14).

After this appeal commenced, the Majority Lenders then filed a motion to dismiss the appeal as equitably moot. (Doc. No. 34). In the motion, Majority Lenders argued that Minority Lenders' failure to obtain a stay, and the substantial consummation of the Plan that followed, meant that Minority Lenders' requested relief would require "unwinding" the Plan and the destruction of third parties' rights. In response, Minority Lenders described the injury as the exclusion from the *opportunity* to backstop the Plan's equity-rights offering, which led to the higher recoveries. Thus, according to Minority Lenders, the Court could fashion complete relief by simply ordering the

---

[2]    A market test, in this context, is a tool debtors use to determine the fair value for those assets. Market tests have been required in various contexts. *See, e.g., LaSalle*, 526 U.S. at 458; *see also In re Eletson Holdings Inc.*, 664 B.R. 569, 621 (Bankr. S.D.N.Y. 2024). While the metes and bounds of what is precisely required to satisfy a market-test requirement has not been specified, it is undisputed that no such test occurred here.

Majority Lenders to sell to the Minority Lenders the shares of equity that would have been available had they not been excluded. (Doc. No. 41 at 1–2).

The Court denied the motion to dismiss the appeal as equitably moot. (Doc. No. 43). To establish equitable mootness, a debtor must show: 1) the plan of reorganization has not been stayed; 2) the plan has been substantially consummated; and 3) the relief requested by the appellant would either affect the rights of third parties or the success of the plan. *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 327 (5th Cir. 2013). While the first two prongs were certainly met, the Court found that relief *could* be granted without unwinding the Plan or unfairly damaging the rights of third parties and, thus, denied the motion to dismiss. (Doc. No. 43).

After the motion to dismiss on equitable mootness grounds was denied, the parties fully briefed the merits of the appeal at issue here. This appeal turns on whether the exclusion of the Minority Lenders from the backstopping opportunity constituted unequal treatment in violation of 11 U.S.C. § 1123(a)(4). *See* (Doc. No. 30 at 9).

Minority Lenders argue that the Plan's backstopping provision allowed the Majority Lenders to receive, on average, a 30% higher recovery for their claims through exclusive means unavailable to other class members. They argue that under *LaSalle*, this additional consideration constitutes unequal treatment because: (1) the investment opportunity itself was exclusive to certain stakeholders for their claims and interests; and (2) the investment opportunity was not market tested to establish that the investment had the best possible terms for the debtor. (Doc. No. 40 at 6) (citing *Bank Am. Nat. Tr. Sav. v. 203 N. Lasalle*, 526 U.S. 434 (1999)).

Majority Lenders do not dispute their higher recovery but argue that the Plan does not result in unequal treatment of similar situated creditors. Instead, Debtors simply provided them with more consideration in exchange for the additional financial obligation of backstopping the equity-

6

rights offering. (Doc. No. 35 at 13). In essence, Majority Lenders argue that the Plan treats every member of the First Lien Term class equally, and that the backstopping opportunity was merely a separate agreement that involved additional consideration for additional obligations. (Doc. No. 33 at 3).

## II.     LEGAL STANDARDS

District courts are given jurisdiction to review appeals from the bankruptcy courts under 28 U.S.C. § 158(a)(1). Generally, district courts apply the same standard of review for bankruptcy court decisions as appellate courts apply to district court decisions. *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1103–04 (5th Cir. 1992). Findings of fact are reviewed for clear error; issues of law and mixed questions of law and fact are reviewed *de novo. Szwak v. Earwood (In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.)*, 592 F.3d 664, 668 (5th Cir. 2009); *see also Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 542 F.3d 131, 134–35 (5th Cir. 2008).

This Court "may affirm for any reason supported by the record, even if not [explicitly] relied on by the [bankruptcy] court." *United States v. Gonzalez*, 592 F.3d 675, 681 (5th Cir. 2009); *In re Brown*, No. 4:18-CV-04416, 2020 WL 730878, at *1 (S.D. Tex. Feb. 13, 2020). Here, the Majority and Minority Lenders disagree on whether the issue presented is a pure question of law, or whether it involves mixed questions of fact and law. Regardless, the Court applies a *de novo* standard of review. *Szwak*, 592 F.3d at 668.

## III.     ANALYSIS

It is undisputed that Debtors entered Chapter 11 with a pre-packaged Plan. The Plan incorporated the salient terms of the pre-filing RSA, which funded the Debtors' emergence from bankruptcy by raising $245 million via an equity-rights offering at a 35% discount to the stipulated equity value of Debtors under the Plan. It is undisputed that the Majority Lenders and the Minority

Lenders are in the same class for bankruptcy purposes. Finally, it is undisputed that the Plan was backstopped by certain members of the First Lien Ad Hoc Group (Majority Lenders) for a return fee equal to 10% of the total equity raised. Minority Lenders argue that the Plan should have either offered the backstopping opportunity to all class members or, at least, subjected the opportunity to a market test. (Doc. No. 30 at 2). Therefore, the question on appeal is whether offering the backstopping opportunity to some creditors within a particular class, but not others, is "unequal treatment" under 11 U.S.C. § 1123(a)(4). In short, it is.

### A. Prevailing Legal Framework

The analysis begins with the relevant statutory text. Under 11 U.S.C. § 1123(a)(4), a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." This provision recognizes that equality of distribution among similarly situated creditors is "a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58 (1990). The Bankruptcy Code does not define "equal treatment," however, and the United States Supreme Court has not dealt with § 1123(a)(4) to any meaningful depth. *See In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986).

While different in substance, Minority Lenders rely heavily on the similarity in structure between § 1123(a)(4), and another provision of the Code—namely, 11 U.S.C. § 1129(b). *See* (Doc. No. 30) (citing *See Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 437 (1999); *Braun v. America-CV Station Group., Inc. (In re America-CV Station Group., Inc.)*, 56 F. 4th 1302 (11th Cir. 2023)). In summary, Section 1129(b) requires that a reorganization plan may not give "property" to the holders of junior claims or interests "on account of" those claims unless all classes of senior claims either receive the full value of their claims or give their consent.

8

*See* 11 U.S.C. § 1129(b)(2)(B); *see also In re DBSD N. Am., Inc.*, 634 F.3d 79, 88 (2d Cir. 2011). This requirement is referred to as the "absolute priority rule." *In re DBSD*, 634 F.3d at 88.

Both § 1123 and § 1129 set out certain parameters which parties need to follow in designing a plan to distribute assets from a debtor's estate. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 455 (2017). Like § 1123(a)(4)'s equal-treatment requirement, § 1129(b)'s absolute-priority rule was "developed in response to 'concern for the ability of a few insiders, whether representatives of management or major creditors, to use the reorganization process to gain an unfair advantage.'" *Id.* at 987 (citing *LaSalle*, 526 U.S. at 444).

In *LaSalle*, the Supreme Court addressed the absolute-priority rule found in § 1129(b), not the equal treatment rule in § 1123(a)(4) at issue here, but its dictates are nonetheless instructive. *LaSalle*, 526 U.S. at 437 ("We hold that old equity holders are disqualified from participating in such a 'new value' transaction by the terms of 11 U.S.C. § 1129(b)(2)(B)(ii), which in such circumstances bars a junior interest holder's receipt of any property on account of his prior interest."). While they recognize the substantive distinctions, Minority Lenders argue that several of *LaSalle*'s holdings are nonetheless relevant here. The primary import of *LaSalle* seems to be that the Supreme Court rejected a reorganization plan that gave a debtor's pre-bankruptcy equity holders the exclusive opportunity to receive ownership interests in the reorganized debtor if they would invest new money in the reorganized debtor. *Id.* at 437.

The plan in *LaSalle* had been "crammed down" under 11 U.S.C. § 1129(b),[3] despite the objections of a senior class of the debtor's impaired creditors who claimed that the plan violated

---

[3]      In common bankruptcy parlance, a "cramdown" typically refers to a restructuring plan that is confirmed over dissenting votes of senior creditors and noteholders. *See In re Tribune Co.*, 972 F.3d 228, 232 (3rd Cir. 2020). While § 1129(b) does not deal exclusively with "cramdown" plans, it provides the requirements that the plan must meet before a court will "cram it down." *See id.*; *see generally* Bruce Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L.J. 227 (1998).

the absolute-priority rule by rewarding junior creditors before the interests of the senior creditors. *See id.* at 441–43; *see also* 11 U.S.C. § 1129(b)(2)(B)(ii) (stating that in a cramdown situation "the holder of any claim or interest that is junior to the claims of [a class of unsecured claims may] not receive or retain [property] under the [proposed] plan on account of such junior claim or interest any property"). The absolute-priority rule in § 1129(b)(2) provides that, in a cramdown plan, a junior stakeholder cannot receive property as treatment on account of its claim or interest unless all classes of senior claims either receive the full value of their claims or give their consent. § 1129(b)(2)(B)(ii) ("[T]he holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ."). The Supreme Court explained that the exclusive opportunity given to the equity holders was "a property interest extended 'on account of'" the equity holders' pre-bankruptcy equity interests in the reorganizing debtor. *LaSalle*, 526 U.S. at 456. The Supreme Court gave the phrase "on account of" a "common understanding" and interpreted it to mean "because of." *LaSalle*, 526 U.S. at 450. Thus, if the exclusive opportunity had a causal relationship to the interest or claim of the creditor, then the exclusivity was "on account of" the interest or claim. *Id.* at 453.

An additional issue troubling the *LaSalle* Court was the fact that the equity holders who were being prioritized paid nothing for the opportunity to invest new money for an ownership interest, and that the debtor neither considered alternative ways of raising capital nor attempted to market test the plan. *Id.* at 458. Specifically, the Court held that "a truly full value transaction . . . would pose no threat to the bankruptcy estate not posed by any reorganization . . . ." *Id.* at 453–54. While the Court declined to set out the specific parameters that constitute a determination of market valuation, it held that "plans providing junior interest holders with exclusive opportunities free from competition *and without benefit of market valuation* fall within the prohibition

of § 1129(b)(2)(B)(ii)." *Id.* at 458. Thus, to avoid the restrictions of the absolute priority rule, it was necessary to test the market valuation of the plan's proposals. Given these facts, the Supreme Court concluded that the "very purpose of the whole [LaSalle] transaction" must have been, "at least in part, to do old equity a favor . . . because of old equity's prior interest" in the debtor. *Id.*; *see also In re Peabody Energy Corp.*, 933 F.3d 918, 925–26 (8th Cir. 2019). Most relevant here, the Supreme Court held that an exclusive opportunity to obtain equity in a reorganized entity, without the benefit of market valuation, constituted a property interest received "on account of" a claim or interest. *LaSalle*, 526 U.S. at 455–56.

While the Supreme Court has not directly addressed § 1123(a)(4) in the same detail, several circuit courts have. In *In re Peabody*, the Eighth Circuit analyzed a plan that included "an exclusive sale of discounted preferred stock to qualifying creditors." *Peabody*, 933 F.3d at 922. In order to qualify for the preferred stock, however, creditors were required to execute certain agreements that obligated them to: "(1) buy a set amount of preferred stock; (2) agree to backstop (i.e., purchase shares of common and preferred stock that did not sell) both sales [of common and preferred stock]; and (3) support the plan in the confirmation process." *Id.* The amount of preferred stock qualifying creditors could buy depended on the portion of the pre-bankruptcy debt they owned and when they became qualifying creditors (*i.e.*, how quickly they sought to qualify). *Id.*

The Eighth Circuit, looking specifically at *LaSalle*, held that the plan did not provide unequal treatment due to several distinguishing factors. First, the opportunity to purchase preferred stock was not exclusive—any creditor could qualify. *Id.* at 926. Second, unlike the equity holders in *LaSalle* who were given the exclusive opportunity without exchanging value up front, the creditors in *Peabody* qualified to purchase the preferred stock by providing additional consideration. *Id.* Third, unlike in *LaSalle*, the debtor had considered several alternative ways to

raise capital, including the proposals submitted by the Ad Hoc Committees. *Id.* Based on these distinguishing factors, the Eighth Circuit found the plan did not violate § 1123(a)(4). *Id.*

In addition to the Eighth Circuit, the Fifth Circuit has also recently provided more guidance. After the parties completed the merits briefing in this case, the Fifth Circuit published an opinion interpreting § 1123(a)(4)'s equal-treatment requirement and laying out several applicable guidelines for the first time. *See In re Serta Simmons Bedding, LLC*, 125 F.4th 555 (5th Cir. 2024). In *Serta*, the Bankruptcy Court approved a plan where all members of the relevant classes received the same settlement indemnity; however, the expected value of the indemnity varied dramatically depending on whether members of the class had participated in an uptier exchange transaction ("the Uptier") that occurred before any bankruptcy petition was filed.[4] *Id.* at 591. The indemnity was worth potentially millions to those that participated in the Uptier, but was essentially worthless to those that had not. *Id.* at 591–92. Given the resulting differential in value, the Fifth Circuit held that the plan resulted in an impermissible unequal treatment. *Id.* at 592.

As the first case in the Fifth Circuit analyzing § 1123(a)(4) since *LaSalle*'s analysis of "treatment for a claim" under § 1129(b), the analysis in *Serta* is of the utmost importance here. First, the Fifth Circuit held that equal treatment "does not require 'precise equality, only approximate equality,' and that 'certain procedural differences' do not constitute unequal treatment." *Id.* (citing *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013)). Second, it held that "equal treatment prohibits disparate treatment with respect to value, thus prohibiting the

---

[4]       An "uptier exchange transaction" refers to "an aggressive tactic" through which some class members can access new capital by amending their existing credit agreements to permit new "superpriority" secured debt. Jackson Skeen, *Uptier Exchange Transactions: Lawful Innovation or Lender-on-Lender Violence?*, 40 YALE J. ON REG. 408, 413 (2023). Rather than removing collateral from the reach of existing creditors, the borrower in these transactions obtains consent from lenders holding a simple majority of outstanding loans and commitments (the "required lenders") to create new superpriority debt capacity under its existing credit agreement. *Id.*

payment of different settlements to co-class members or a requirement that some class members tender more valuable consideration for the same settlement." *Id.* (citing *AOV Indus., Inc.*, 792 F.2d at 1152). Third, it held that a plan must provide an equality of opportunity, even if equality of recovery does not necessarily result. *Id.* The second and third holdings are most important here.

### B. Application and Analysis

The Court finds that both *LaSalle* and *Serta* guide it to the same conclusion—the exclusive backstopping opportunity present in this case constituted treatment for a claim and allowed for some class members to receive higher recoveries than others in the same class. Therefore, the backstopping opportunity that was offered to some free from competition, but not all, class members violated 11 U.S.C. § 1123(a)(4).

#### *1. Unequal Treatment and the "Market Test" Requirement*

To be sure, this is neither a cramdown case nor does it concern the absolute priority rule, so the specific holding and application in *LaSalle* does not directly answer whether this Plan constitutes unequal treatment. Nevertheless, the similarity in text and structure of §§ 1123(a)(4) & 1129(b), as well as the Supreme Court's analysis certainly make the *LaSalle* opinion instructive. An exclusive opportunity resulting in a significant disparity in value, without consideration for the investment opportunity itself, qualifies as treatment for a claim under § 1123(a)(4).

To start, the backstopping opportunity was exclusive—it was offered to some, but not all, of the Class Three creditors before the bankruptcy petition was ever filed. The parties agree that the opportunity to participate in the backstopping was restricted to the Majority Lenders, despite the Minority Lenders actively seeking to participate in the opportunity. *See* (Doc. No. 52 at 6); (Doc. No. 51 at 5). The Majority Lenders argue that the Minority Lenders were not *really* excluded from the proposal because they were free to propose an alternative *after* the Plan had been filed.

(Doc. No. 51 at 6). The Court does not find this persuasive. The Majority Lenders, Debtors, and Insider negotiated the terms of the RSA for months before it was finalized, and the Minority Lenders were excluded from those negotiations from beginning to end. Then, as soon as the RSA was finalized, the Debtors filed the pre-packaged bankruptcy plan which was then confirmed by the Bankruptcy Court in a matter of weeks.

In the context of this pre-packaged plan, the fact that the Minority Lenders were expressly excluded—and were, in fact, intentionally restricted from participating in the deal—makes it undisputable that the backstopping agreement was an exclusive opportunity given to a subset of class members without giving the Minority Lenders the chance for inclusion. *See* (Doc. No. 31 at 749) (email from counsel for Debtors informing counsel for Minority Lenders that "[t]op 5 [creditors] in terms of size are restricting" what parties had access to the early discussions relating to the RSA).

This exclusivity created a distinction among class-members without any real opportunity for the excluded members to access the opportunity. For similar reasons, this Court finds this Plan distinguishable from *Peabody*. Most importantly, unlike in *Peabody* where every creditor had the opportunity to participate, the Majority Lenders here were given an *exclusive* opportunity to backstop the equity-rights offering without providing any up-front value in exchange for the opportunity. The most salient factor is whether the investment opportunity that led to higher recoveries was itself supported by adequate consideration. In *Peabody*, it was. Here, it was not. As such, the Court finds this Plan more analogous to *LaSalle* than to *Peabody*.

Further, there was no attempt by the Majority Lenders or Debtors to discern an accurate market valuation of the backstopping opportunity. The Supreme Court did not define a market test in *LaSalle*—much to the chagrin of many lower courts. *See In re Acis Capital Mgmt., L.P.*, 604

14

B.R. 484 (N.D. Tex. 2019), *aff'd sub nom.*, *Matter of Acis Capital Mgmt., L.P.*, 850 Fed. App'x 302 (5th Cir. 2021) (holding that the Supreme Court "suggested (but did not decide)" that the termination of exclusivity could constitute a sufficient market test); *In re NNN Parkway 400 26, LLC*, 505 B.R. 277, 283 (Bankr. C.D. Cal. 2014) ("Despite a lack of guidance in *LaSalle* other courts have provided some modest detail regarding the appropriate standard."); *In re Eletson Holdings Inc.*, 664 B.R. 569, 621 (S.D.N.Y. 2024) ("While this Court previously stated that one of the methods for potentially confirming a 'new value plan' is through the competing plan process, the Court notes that the United States Supreme Court in *203 N. LaSalle* did not definitively decide whether competing plans were sufficient to satisfy this requirement.").

The parties disagree in their conception of what constitutes a "market test," but they do not seem to disagree about what actually occurred in this case. Majority Lenders cite to analysis conducted by the Debtors and Majority Lenders to ensure that the Plan was "fair and reasonable," including "negotiat[ing] at arms' length" (with each other) to ensure that the terms were "within the range of precedent transactions." (Doc. No. 51 at 10). Further, Majority Lenders contend that Minority Lenders were given the opportunity to propose an alternative plan after Debtors filed. (*Id.*). Without contesting the truth of those assertions, the Minority Lenders simply argue that those allegations are insufficient to satisfy the requirement of "market testing" the Plan. (Doc. No. 50 at 8). Citing to various courts, Minority Lenders argue that no matter what definition of "market test" the Court eventually adopts, there was no such test here. *Id.* The Court agrees with Minority Lenders.

Looking at the testimony provided at the confirmation hearing, the Debtors' investment banker himself stated that a "[m]arket test is exposing an investment opportunity to some competitive tension," and that this was not done in this case. (Doc. No. 36 at 142, 147). In fact,

there seems to be no dispute that the only alternatives to the backstop agreement terms originally proposed were the two alternative plans proposed by the Minority Lenders after the RSA was already executed and the pre-packaged bankruptcy petition was filed. While Majority Lenders contend that a public marketing process is not required, they do not offer a definition of market test that would be satisfied here.

Even if the test merely required the consideration of alternative plans, there was no real opportunity for the Minority Lenders to propose an alternative that would receive genuine consideration. To put it bluntly, at the time the bankruptcy petition was filed, the train had already left the station, and the Minority Lenders were never permitted to board.[5] Majority Lenders concede that the Minority Lenders were excluded from participating in the backstop prior to the bankruptcy filings. (Doc. No. 51 at 6). They consistently sought to be included in the negotiations and "brought into the fold." (Doc. No. 31 at 736). Nevertheless, they were expressly told that the backstop negotiation was "restricted" by the largest creditors, and they were not permitted to participate. (*Id.* at 745). Interestingly, Debtors and Majority Lenders argue that there is no cause for concern because "Minority Lenders had time and opportunity to propose an alternative backstop *after* the bankruptcy filings." (Doc. No. 51 at 6). For all the reasons mentioned above and expounded on below, however, any such opportunity was illusory at best.

As a "pre-pack" case, there was a complete restructuring plan proposed at the moment the bankruptcy petition was filed. *See* Mark D. Plevin, Leslie A. Epley, Clifton S. Elgarten, *The Future Claims Representative in Prepackaged Asbestos Bankruptcies: Conflicts of Interest, Strange*

---

[5]    Testimony by Sherman K. Edmiston III, an independent director of the Debtor, described a "prepack" process such as the one used in this case as a process where "you file with a plan that's already voted on by the key constituency, so . . . it makes the bankruptcy process more efficient, and it limits, you know, cost." (Doc. No. 31 at App. 1024). This process also limited the participation of those who were excluded from the pre-filing opportunities.

*Alliances, and Unfamiliar Duties for Burdened Bankruptcy Courts*, 62 N.Y.U. ANN. SURV. AM. L. 271, 288 (2006) ("A pre-pack plan is one that is negotiated and voted on before the commencement of the bankruptcy case. In a pre-pack, the debtor has solicited and obtained the requisite votes in favor of its plan before commencing its bankruptcy case."). As such, the Debtor was in possession of a restructuring plan that had already been approved by the requisite number of creditors—in this case, the creditors holding over 81% of first-lien claims. (Doc. No. 30 at 12). Further, the Plan as it was proposed at that time resulted in a 31% higher recovery for the Majority Lenders permitted to participate in the backstopping agreement. (*Id.* at 15). As such, while Minority Lenders were given a few weeks to propose alternative plans, it was virtually certain that any alternative plan would never be approved. Since the proposed Plan already had the approval of enough creditors to be confirmed, Minority Lenders essentially had to convince a supermajority of creditors to take less money so that the Minority Lenders could recover slightly more and convince the Debtors to risk their otherwise confirmable Plan. For obvious economic and fiduciary reasons, none of the Majority Lenders found the alternative plans compelling. There was never any incentive for Debtors or Majority Lenders to consider any alternative plan, and they had no need to do so—the proposed pre-packaged Plan was basically finished, satisfied the needs of the Debtors, and permitted the in-group to recover more at the expense of the out-group. As such, any "opportunity" to propose an alternative plan was illusory at best.

Among the potential conceptions of a "market test" that have developed in the wake of *LaSalle*, the Court finds most persuasive the one utilized by the Seventh Circuit. *See In re Castleton Plaza LP*, 707 F.3d 821 (7th Cir. 2013) (Easterbrook, J.). In *Castleton*, a cramdown case, the Seventh Circuit announced its answer to the market test question as one that would focus on competition. *Id.* at 821 ("[C]ompetition is the way to tell whether a new investment makes the

senior creditor (and the estate as a whole) better off. A plan of reorganization that includes a new investment must allow potential investors to bid."); *see also* Paul T. Musser, *Castleton: 7th Circuit's Answer to 203 N. Lasalle's Market Test*, AM. BANKR. INST. J. 28, 106 (2015). In doing so, the Seventh Circuit rejected the idea that the mere opportunity to propose a competing plan was sufficient to "market test" the plan and instead required competitive bidding. *Id.* at 823.

The Court finds that no such market test occurred here.[6] As stated above, there is no dispute that the exclusion of the Minority Lenders from any backstopping opportunity was solidified before the RSA was finalized or the Plan was filed in the bankruptcy court. There is likewise no dispute that the Debtors made no attempt to put the investment opportunity into an open-market option, seek any third-party input, or otherwise test the fair-market valuation of the backstopping agreement.[7] The only "test" of the agreement was the discussions between the Debtors and Majority Lenders—from which the Minority Lenders were entirely excluded. While the Minority Lenders were permitted the opportunity to propose alternative plans, they were only given a few weeks to provide plans that would both satisfy the Debtors' need to raise capital and convince the Majority Lenders to walk away from the beneficial deal they already had and vote for confirmation. There was certainly no attempt to allow new potential investors to bid, as required in *In re Castleton*, 707 F.3d at 821, or submit the deal to an "open market" as described in *Serta*. 125 F.4th

---

[6]    In this area, there is a disagreement among the parties over the appropriate standard of review that this Court should apply to the Bankruptcy Court's determination that the Plan was "a market deal." (Doc. No. 29-47 at 427) (Oral Ruling Confirmation of Plan). As this Court does not question any of the Bankruptcy Court's factual findings and merely reviews whether those facts are sufficient to legally satisfy the market-test requirement as a matter of law, this Court reviews the question *de novo*. *See United Refin. Co. v. Dorrion*, 688 F. Supp. 3d 558, 562 (S.D. Tex. 2023) ("A district court functions as an appellate court when reviewing the decision of a bankruptcy court as to a core proceeding, and so . . . conclusions of law and mixed questions of fact and law are reviewed de novo.") (citing *In re Seven Seas Petroleum Inc*, 522 F.3d 575, 583 (5th Cir. 2008); FED. R. BANKR. P. 8013).

[7]    In fact, the RSA precluded an attempt to seek other alternatives to the proposed "deal" to the market as it had a "no-shop" provision. (Doc. No. 31 at App. 100).

at 579. Further, each of the Minority Lenders' plans were rejected by the Majority Lenders' overwhelming voting majority.

Without a genuine test of the market valuation of the backstopping opportunity, there is no definition of market test that would be satisfied here.[8] With *LaSalle* guiding the Court's reading of § 1123(a)(4), the Court holds that the exclusive backstopping opportunity provided to the Majority Lenders likely constitutes unequal treatment among creditors for their claim in violation of the Bankruptcy Code. This holding, as it turns out, is also independently supported by the Fifth Circuit's opinion in *Serta*.

### 2. **Serta's Function and Effect Analysis**

Guided by *Serta*, this Court must first look "below the surface to determine whether distributions were in fact equal in value." *Id.* (citing *W.R. Grace & Co.*, 729 F.3d at 327). As in *Serta*, the financial detriment cited by Minority Lenders here also involves the reallocation of an eight-figure sum and the availability of discounted equity to some class members but not those who were excluded from the backstopping opportunity. Thus, the disparate recovery here also extends "far beyond approximate equality." *Id.* (internal citations omitted).

Second, the Court must examine the inequality both in opportunity and result. The *Serta* court addressed a similar argument that the plan provided "equal opportunity" if not an "equal result." *Id.* According to the appellees in *Serta*, the indemnity was akin to allowing all lenders to try their cases to a jury where some may recover more than others. *Id.* The Fifth Circuit rejected this theory of facial equality. *Id.* Instead, it held that the "better analogy would be a plan distribution by which all class members were given the opportunity to litigate their asbestos

---

[8]     There was testimony in the record that Debtors looked at comparable rights offerings. (Doc. No. 29–47, R. 010287). This testimony was conclusory and lacked any specific information that could in any way suggest that this "deal" was "market tested."

injuries, but only half had such injuries." *Id.* Based on the unequal effect that the indemnity would have on the different lenders, the Fifth Circuit held that the arrangement was not compliant with § 1123(a)(4). *Id.*

In this case, while the Plan here may be factually distinguishable from the plan in *Serta*, this Court is not persuaded that it is legally distinguishable. In fact, this case is perhaps more straightforward. In *Serta*, indemnity was offered to all creditors. The effect of the indemnity, however, only benefitted creditors who had previously chosen to participate in an Uptier before Serta ever filed bankruptcy—the different treatment resulted from the lender's pre-bankruptcy choice not to participate in the Uptier. Here, participation in the backstopping opportunity—which provided discounted stock purchases and significantly higher recoveries—was offered exclusively to some creditors without any consideration for the opportunity to participate. Similarly, Serta had, at least superficially, given all class members equal participation opportunities. *See Serta*, 125 F.4th at 590. Here, there was not even any pretense of equal participation. True, the Majority Lenders provided the backstopping funds (consideration) to the Debtor which qualified them to receive discounted equity (benefit) on the backend. The *opportunity* to participate in the backstop and provide this additional consideration, however, was made exclusive to certain creditors—in exchange for nothing—long before the pre-packaged bankruptcy was ever filed.

The fact that the unequal treatment happened before the bankruptcy petition was even filed does not insulate the Plan from the requirements of § 1123(a)(4). As a matter of law, courts have long held that pre-packaged plans must satisfy § 1123(a)(4). *See, e.g.*, *In re Combustion Eng. Inc.*, 391 F.3d 190, 239 (3rd Cir. 2004). In *Serta*, the qualifying factor that permitted some creditors to receive higher recoveries occurred several years before the bankruptcy was filed, and the Fifth Circuit nevertheless looked past the language of the plan to discern whether the *effect* of the plan

was unequal. While Debtors in this case can argue that the Plan itself treats all creditors the same,

*Serta* rejects a surface-level or overly formalistic (or simplistic) inquiry into equality:

> "Taking this argument to its logical extent, any special gift could be recharacterized as equal treatment. For example, consider a plan that awarded an extra $5 million to every member of Class 3 who had its headquarters in Louisiana. That would obviously be unequal treatment. But what if the plan simply provided that every member of Class 3 gets a note promising payment of $5 million in one year if the member is headquartered in Louisiana? Under the appellees' argument, this plainly improper provision would be fine. We decline to adopt such a restrictive view of equal treatment."

*Id.* at 592 n.24.

Finally, Debtors argue that essentially any exclusive financial opportunity can be given to a subset of lenders to dramatically increase their recovery so long as there is *some* sort of consideration in return. This argument, however, is already foreclosed by *LaSalle*. Rather than relying on the backstopping as consideration for the access to discounted equity, Debtors would have to show consideration for the *opportunity* to backstop the equity-rights offering to justify the exclusive opportunity. *See LaSalle*, 526 U.S. at 456; *In re Peabody*, 933 F.3d at 926. Unfortunately for the Debtors, no such consideration existed.

In sum, the Plan offered a valuable and exclusive opportunity to backstop an equity-rights offering for a portion of the class of creditors but not the remaining creditors. This opportunity was offered to the subclass of creditors without any exchange of value *for the opportunity* and, under the confirmed Plan, resulted in significantly higher recoveries to some class members for the same claims. Since this pre-planned arrangement constituted unequal treatment, the backstopping and equity-rights aspect of the Plan violated the equal-treatment requirement of § 1123(a)(4).

## IV.   CONCLUSION

The Plan relied heavily on a backstopping agreement to finance its equity-rights offering. The Majority Lenders were given the exclusive opportunity to purchase discounted stock in the

new entity in exchange for agreeing to backstop the Plan and Debtors' emergence from bankruptcy. This exclusive agreement resulted in significantly higher recoveries on the claims of the backstopping lenders. Participation in the backstopping opportunity, however, was not offered to all class members nor subjected to a market test. As such, this exclusive opportunity constituted unequal treatment of members of the same creditor class. The Court finds that the Plan violates 11 U.S.C. § 1123(a)(4) in the manner it treats the Minority (or Excluded) Lenders. The Court therefore **REVERSES** the Bankruptcy Court's Confirmation Order to the extent it overruled the Minority Lenders' objection based upon that section, and **REMANDS** for further proceedings consistent with the Court's decision.

SIGNED this 25th day of September, 2025.

Andrew S. Hanen
United States District Judge